## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————

|  |  |  |
|---|---|---|
| LOPER BRIGHT ENTERPRISES, INC. | ) | |
| c/o William Bright, President | ) | |
| 615 Goshen Road | ) | |
| Cape May Courthouse, NJ 08210; | ) | |
| | ) | |
| H&L AXELSSON, INC. | ) | |
| c/o Lars Axelsson, President | ) | |
| 738 Shunpike Road | ) | |
| Cape May, NJ 08204; | ) | |
| | ) | |
| CAPE TRAWLERS, INC.; | ) | |
| SCOMBRUS ONE LLC; | ) | |
| GOLDEN NUGGET LLC; | ) | |
| LUND MARR TRAWLERS LLC; | ) | |
| MOUNT VERNON LLC; and | ) | |
| NANCY ELIZABETH LLC | ) | |
| c/o Jeffrey Reichle, Chairman/Managing Member | ) | |
| 997 Ocean Drive | ) | |
| Cape May, NJ 08204, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-466 |
| | ) | |
| WILBUR L. ROSS, JR., in his official capacity | ) | |
| as Secretary of Commerce | ) | |
| U.S. Department of Commerce | ) | |
| Office of the Secretary | ) | |
| 1401 Constitution Avenue, NW, Room 5858 | ) | |
| Washington, DC 20230; | ) | |
| | ) | |
| U.S. DEPARTMENT OF COMMERCE | ) | |
| 1401 Constitution Avenue, NW | ) | |
| Washington, DC 20230; | ) | |
| | ) | |
| NEIL JACOBS, in his official capacity | ) | |
| as Acting NOAA Administrator | ) | |
| U.S. Department of Commerce | ) | |
| 1401 Constitution Avenue, NW, Room 5128 | ) | |
| Washington, DC 20230; | ) | |
| | ) | |
| (*continued on the next page*) | ) | |

NATIONAL OCEANIC AND                          )
ATMOSPHERIC ADMINISTRATION                    )
U.S. Department of Commerce                   )
1401 Constitution Avenue, NW, Room 5128       )
Washington, DC 20230;                         )
                                              )
CHRIS OLIVER, in his official capacity        )
as Assistant Administrator for NOAA Fisheries )
National Marine Fisheries Service             )
U.S. Department of Commerce                   )
1315 East-West Highway, Room 14636            )
Silver Spring, MD 20910; and                  )
                                              )
NATIONAL MARINE FISHERIES SERVICE             )
U.S. Department of Commerce                   )
1315 East-West Highway, Room 14636            )
Silver Spring, MD 20910,                      )
                                              )
            Defendants.                       )
_____ )

## **COMPLAINT**

### **NATURE OF THE ACTION**

1.      This case arises out of an unlawful mandate by the federal government that requires

herring fishermen along the eastern seaboard of the United States to carry National Oceanic and

Atmospheric Administration contractors—called "at-sea monitors"—on their vessels during

fishing trips and, moreover, to pay out-of-pocket for costs associated with allowing these

government contractors to monitor their fishing activity.  *See* Nat'l Oceanic & Atmospheric

Admin., Industry-Funded Monitoring, 85 Fed. Reg. 7,414 (Feb. 7, 2020) (to be codified at 50

C.F.R. pt. 648) ("February 7, 2020 Final Rule"); *see also* New Eng. Fishery Mgmt. Council,

Industry-Funded Monitoring Omnibus Amendment (Dec. 2018) [hereinafter "Omnibus

Amendment"], *available at* https://go.aws/39eKRTu (the "Omnibus Amendment").

2.      In addition to creating an industry-funded at-sea monitoring program for the

Atlantic herring fishery, the Omnibus Amendment introduces provisions into other New England

fishery management plans allowing for standardized and simplified implementation of statutorily unauthorized industry funding via future plan-specific amendments.

3.     Despite years of adverse feedback from fishermen and other stakeholders concerning the absence of statutory authority for industry-funded monitoring in the Atlantic herring fishery (and in other fisheries)—and in the face of the predicted negative economic impact—Defendants nevertheless pushed through the regulation at hand.

4.     Along the way, Defendants ignored well-established procedural safeguards.  For example, they refused to respond to public concerns about the economic feasibility of industry funding and kept secret important aspects of the rulemaking process—such as the timing and nature of the Secretary of Commerce's approval of the Omnibus Amendment and the proposal of implementing regulations.  Defendants also refused to revisit their economic and environmental analyses in light of drastic quota cuts introduced after approval of the Omnibus Amendment.

5.     Plaintiffs bring this action to protect their livelihoods and advocate for fellow fishermen in the face of regulations that may destroy their iconic way of life.

## JURISDICTION AND VENUE

6.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Magnuson-Stevens Fishery Conservation and Management Act, as amended by the Sustainable Fisheries Act, 16 U.S.C. § 1801 *et seq.* ("MSA"); the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370e ("NEPA"); the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* ("RFA"); the Anti-Deficiency Act, 31 U.S.C. § 1341 ("ADA"); the Independent Offices Appropriations Act, 31 U.S.C. § 9701 ("IOAA"); and the Miscellaneous Receipts Act, 31 U.S.C. § 3302 ("MRA").

7.     This Court has jurisdiction pursuant to the MSA, 16 U.S.C. §§ 1861(d), 1855(f), using the standards of the APA. *Id.* § 1855(f)(1); *cf.* 5 U.S.C. § 706(2)(A)–(D).  Plaintiffs' petition for review is timely filed within the statutorily mandated thirty-day window following the February 7, 2020 promulgation of the rule at issue.  16 U.S.C. § 1855(f)(1); *see infra* ¶ 97.

8.     The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 and the APA, 5 U.S.C. § 701 *et seq.*  The challenged rule is final and reviewable agency action; it marks the consummation of agency decision-making, mandates obligations on Plaintiffs, and carries legal consequences.  *See* 5 U.S.C. § 704.

9.     Venue is proper pursuant to 28 U.S.C. § 1391(e).

10.    The Court may issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 and grant permanent injunctive relief pursuant to the MSA, 16 U.S.C. §§ 1855(f), 1861(d); and the APA, 5 U.S.C. § 706.

## PARTIES

11.    Plaintiff LOPER BRIGHT ENTERPRISES, INC. ("Loper Bright") is a New Jersey corporation founded in 1977 and headquartered and operating at Cape May Courthouse, New Jersey.  Loper Bright co-owns and operates F/V *Retriever*, which targets and harvests Atlantic herring, among other fish species.  F/V *Retriever* utilizes mid-water trawl gear.  Loper Bright holds a Category A permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

12.    Plaintiff H&L AXELSSON, INC. ("H&L Axelsson") is a New Jersey corporation founded in 1978 and headquartered and operating at Cape May, New Jersey.  H&L Axelsson owns and operates F/V *Dyrsten*, which targets and harvests Atlantic herring, among other fish species.

F/V *Dyrsten* utilizes mid-water trawl gear.  H&L Axelsson holds 2 Category A permits for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

13.     Plaintiff CAPE TRAWLERS, INC. ("Cape Trawlers") is a New Jersey corporation founded in 1982 and headquartered and operating at Cape May, New Jersey.  Cape Trawlers owns and operates F/V *Jersey Cape*, which targets and harvests Atlantic herring, among other fish species.  F/V *Jersey Cape* utilizes bottom trawl gear.  Cape Trawlers holds a Category B permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

14.     Plaintiff SCOMBRUS ONE LLC ("Scombrus One") is a New Jersey corporation founded in 2004 and headquartered and operating at Cape May, New Jersey.  Scombrus One owns and operates F/V *Eva Marie*, which targets and harvests Atlantic herring, among other fish species.  F/V *Eva Marie* utilizes bottom trawl gear.  Scombrus One holds a Category A permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

15.     Plaintiff GOLDEN NUGGET LLC ("Golden Nugget") is a New Jersey corporation founded in 2012 and headquartered and operating at Cape May, New Jersey.  Golden Nugget owns and operates F/V *Golden Nugget*, which targets and harvests Atlantic herring, among other fish species.  F/V *Golden Nugget* utilizes bottom trawl gear.  Golden Nugget holds a Category B permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-

sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

16.     Plaintiff LUND MARR TRAWLERS LLC ("Lund Marr Trawlers") is a New Jersey corporation founded in 2003 and headquartered and operating at Cape May, New Jersey. Lund Marr Trawlers owns and operates F/V *Enterprise*, which targets and harvests Atlantic herring, among other fish species.  F/V *Enterprise* utilizes mid-water trawl gear.  Lund Marr Trawlers holds a Category A permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

17.     Plaintiff MOUNT VERNON LLC ("Mount Vernon") is a New Jersey corporation founded in 2007 and headquartered and operating at Cape May, New Jersey.  Mount Vernon owns and operates F/V *Anya Jo*, which targets and harvests Atlantic herring, among other fish species. F/V *Anya Jo* utilizes bottom trawl gear.  Mount Vernon holds a Category B permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

18.     Plaintiff NANCY ELIZABETH LLC ("Nancy Elizabeth") is a New Jersey corporation founded in 2010 and headquartered and operating at Cape May, New Jersey.  Nancy Elizabeth owns and operates F/V *Nancy Elizabeth*, which targets and harvests Atlantic herring, among other fish species.  F/V *Nancy Elizabeth* utilizes bottom trawl gear.  Nancy Elizabeth holds a Category A permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

19.     Collectively, the six (6) foregoing plaintiffs—*viz.*, Cape Trawlers, Scombrus One, Golden Nugget, Lund Marr Trawlers, Mount Vernon, and Nancy Elizabeth—form an important part of the Lund's Fisheries family of businesses.  LUND'S FISHERIES, INC. is a family-owned, vertically integrated company established in 1954, which purchases, produces, and distributes nearly 75 million pounds of fresh and frozen fish annually.  Atlantic herring landings make up approximately 10% of the company's production, although that percentage has declined in recent years due to burdensome regulation.  Lund's Fisheries, Inc. employs approximately 200 people in its processing plant and storage facility, including 100 full-time employees.  It distributes its high-quality fresh seafood, purchased from its own vessels and a number of independently owned vessels, across the country.  Lund's Fisheries, Inc. and its associated businesses are active stewards of fishery resources.  The company participates in regional fishery management council activities, assists in improving the data upon which fishery regulations are based, and is a founding member of the Science Center for Marine Fisheries, a National Science Foundation industry-government-academic partnership that funds applied science to minimize uncertainty in fish stock assessments.  Although Lund's Fisheries, Inc. is not party to the instant action, as the principal purchaser and processors of Plaintiffs' landings, the Omnibus Amendment and February 7, 2020 Final Rule will similarly adversely impact it.

20.     Defendant WILBUR L. ROSS, JR. is the Secretary of the United States Department of Commerce.  He is sued in his official capacity as the chief administrator of the federal agency charged with managing United States marine fisheries.  He also is sued in his capacity as the government official who gave final approval to both the fishery management plan amendments and implementing regulations at issue in this lawsuit.

21.     Defendant UNITED STATES DEPARTMENT OF COMMERCE ("DOC") is the federal agency charged with managing domestic marine fisheries.

22.     Defendant TIMOTHY C. GALLAUDET is the Assistant Secretary of Commerce for Oceans and Atmosphere.  He is sued in his official capacity as the Acting Administrator of the National Oceanic and Atmospheric Administration.

23.     Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION ("NOAA") is the component agency of DOC tasked with supervision of the National Marine Fisheries Service.  The Secretary of Commerce has delegated his management responsibilities for domestic marine fisheries to NOAA, which, in turn, has sub-delegated those responsibilities to the National Marine Fisheries Service.  NOAA promulgated the rule at issue.

24.     Defendant CHRIS OLIVER is the Assistant Administrator for Fisheries at NOAA. He is sued in his official capacity as chief administrator of the National Marine Fisheries Service.

25.     Defendant NATIONAL MARINE FISHERIES SERVICE ("NMFS") is a sub-component of DOC, which has sub-delegated responsibility from the NOAA Administrator to manage domestic fisheries and liaise with regional fishery management councils.

## STATUTORY AND REGULATORY CONTEXT

### The Magnuson-Stevens Act

26.     The MSA establishes the basis and authority for the federal management of domestic marine fisheries in the United States.  Recognizing the importance of fishery resources for the well-being of the American economy, Congress enacted the MSA to promote the conservation of fisheries in a way that also sustains the industry.  *See* 16 U.S.C. § 1801(a)–(c).

27.     Congress granted DOC the authority to regulate commercial fishing in a zone extending from each state's territorial waters to a line 200 nautical miles from the United States

coastline. *See id.* § 1801(b)(1).  This area is known as the "Exclusive Economic Zone" or "EEZ."
*See id.* § 1802(11).

28.     DOC has delegated its regulatory authority to NOAA, which exercises it through
NMFS in the various domestic marine fisheries located within the EEZ, including the Atlantic
herring and other New England fisheries at issue in this action.

29.     The government's regulatory authority must be exercised in a manner consistent
with the fishery management plans adopted and maintained by a system of regional fishery
management councils. *See infra* ¶¶ 31–44.  Congress created regional councils to "exercise sound
judgment in the stewardship of fishery resources," to enable stakeholder participation in the
regulatory process, and to protect "the social and economic needs" of each state.  16 U.S.C.
§ 1801(b)(5).

30.     The MSA requires that any fishery management plan adopted or revised by a
regional council—or any implementing regulation or secretarial action promulgated by the federal
government—be consistent with ten "National Standards."  *See id.* § 1851(a).  Among the ten
National Standards, the following are relevant to this case:

a.      *National Standard One* – "Conservation and management measures shall prevent
        overfishing while achieving, on a continuing basis, the optimum yield from each
        fishery for the . . . fishing industry."  *Id.* § 1851(a)(1); *cf.* 50 C.F.R. § 600.310.

b.      *National Standard Two* – "Conservation and management measures shall be based
        upon the best scientific information available."  16 U.S.C.  § 1851(a)(2);  *cf.*
        50 C.F.R. § 600.315.

c.    *National Standard Seven* – "Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication."   16 U.S.C. § 1851(a)(7); *cf.* 50 C.F.R. § 600.340.

d.    *National Standard Eight* – "Conservation and management measures shall, consistent with the conservation requirements of this Act . . . , take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of [National Standard Two], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8); *cf.* 50 C.F.R. § 600.345.

### Fishery Management Councils

31.    The MSA establishes eight regional fishery management councils that share responsibility with DOC and its component agencies for the conservation, management, and regulation of domestic marine fisheries.  16 U.S.C. § 1852(a)(A)–(H); *see id.* § 1852(h).

32.    Under the MSA, the regional councils prepare fishery management plans ("FMPs") and relevant amendments that regulate the harvesting of different species of fish within specified geographic areas.  *Id.* § 1852(h)(1).  FMPs and FMP amendments are approved by the Secretary of Commerce and implemented and enforced by NMFS.  *See id.* § 1854(a).

33.    Regional fishery management councils also have independent authority to propose implementing regulations for any FMP.  *See id.* § 1853(c); *see also id.* § 1854(b).

34.    FMPs are the formal mechanism by which the federal government manages domestic fisheries and seeks to achieve the MSA's conservation and resource management goals. *See id.* § 1853(a)–(b); *see also infra* ¶¶ 38–44.

35.     Regional fishery management councils have other functions too.  For example, the councils hold public hearings to facilitate stakeholder input on fisheries management, 16 U.S.C. § 1852(h)(3); set annual catch limits for regulated species of fish, *id.* § 1852(h)(6); and prioritize scientific and statistical research priorities.  *Id.* § 1852(h)(7).

36.     The voting members of any given regional fishery management council include (1) a set number of members appointed by the Secretary of Commerce, based on nominations from the governors of the states within the jurisdiction of each council; (2) the principal officer with marine fishery management responsibility and expertise, or his or her designee, from each of these same states; and (3) the regional director of NMFS for the area within the jurisdiction of the council.  *Id.* § 1852(b)(1); *id.* § 1852(b)(2) (describing appointment of governor-nominated members).  Non-voting members include representatives of the U.S. Fish and Wildlife Service, U.S. Coast Guard, Marine Fisheries Commission, and U.S. Department of State.  *Id.* § 1852(c).

37.     There are two regional councils relevant to this case.  The New England Fishery Management Council ("NEFMC") has jurisdiction over the Atlantic Ocean seaward of the coastal waters of Maine, New Hampshire, Massachusetts, Connecticut, and Rhode Island.  *Id.* § 1852(a)(1)(A).  The Mid-Atlantic Fishery Management Council ("MAFMC") has similar jurisdiction seaward of the coastal waters of New York, Pennsylvania, New Jersey, Maryland, Delaware, Virginia, and North Carolina.  *Id.* § 1852(a)(1)(B).

**Fishery Management Plans**

38.     The MSA sets forth the required and discretionary elements that a regional fishery management council may adopt for each FMP, and which the Secretary of Commerce, in conjunction with the council, must thereafter implement through regulation.

39.     Each FMP must contain, among other things, conservation and management measures for foreign and domestic fishing that (1) prevent overfishing and rebuild overfished stocks, or otherwise promote the long-term stability of the fishery, *id.* § 1853(a)(1); (2) describe and delimit the kinds of fishing vessels prosecuting regulated species, including gear type, and otherwise delimit the harvesting of fish based on the expected sustainable and optimum yield, *id.* § 1853(a)(2)–(4), (15); and (3) establish a standardized reporting methodology to minimize bycatch and bycatch mortality.  *Id.* § 1853(a)(11).

40.     FMPs may include—but need not contain—measures that (1) require permitting, *id.* § 1853(b)(1); (2) limit fishing in certain geographic areas based on type or quantity of fishing gear, *id.* § 1853(b)(2); (3) establish limited access privilege programs, *id.* § 1853(b)(6); *see also id.* § 1853a; or (4) require the placement of observers on domestic vessels "for the purpose of collecting data necessary for the conservation and management of the fishery," subject to conditions.  *Id.* § 1853(b)(8); *cf. id.* § 1802(31).

41.     When a council adopts an FMP or FMP amendment, the Secretary of Commerce must "immediately commence a review" to ensure the plan or amendment complies with the MSA, the National Standards, and other applicable law.  *Id.* § 1854(a)(1)(A).[1]  The Secretary "immediately" publishes a notice of availability in the *Federal Register* to solicit public feedback and provides a final approval decision within thirty days of the end of that required sixty-day comment period.  *Id.* § 1854(a)(1)(B), (a)(3).  The Secretary is obliged to consider the "information, views, and comments received from interested persons[.]"  *Id.* § 1854(a)(2).

---

[1] For purposes of Section 1854, the term "immediately" is defined to mean "on or before the 5th day on which a Council transmits to the Secretary a fishery management plan, plan amendment, or proposed regulation that the Council characterizes as final."  16 U.S.C. § 1854(a)(5).

42.     The Secretary conducts a similar compliance review for implementing regulations proposed by a regional council under 16 U.S.C. § 1853(c), except that the required preliminary evaluation must be completed within fifteen days and the public comment period on the proposed regulations may last between fifteen and sixty days.  *Id.* § 1854(b).

43.     In limited situations, the Secretary of Commerce may prepare an FMP, plan amendment, or implementing regulations *sua sponte* and without the involvement of a council. This only occurs when a council fails to fulfill its statutory obligations, *id.* § 1854(c)(1)(A)–(B), or when the MSA provides explicit authority for the Secretary to do.  *Id.* § 1854(c)(1)(C).  In any case, the Secretary is prohibited from enacting certain management measures, including the creation of a limited access privilege program, without council participation.  *Id.* § 1854(c)(3).

44.     The Secretary of Commerce may "promulgate emergency regulations or interim measures necessary to address [an] emergency or overfishing, without regard to whether a [FMP] exists for [any given] fishery."  *Id.* § 1855(c).

**The National Environmental Policy Act**

45.     Congress enacted the National Environmental Policy Act ("NEPA") to "promote efforts which will prevent or eliminate damages to the environment[.]"  42 U.S.C. § 4321.  To achieve this goal, the law requires an agency to consider and disclose the environmental consequences of a planned action before proceeding with it.  *See id.* § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.  An agency's evaluation of environmental consequences—including the interplay between the natural and human environments, *see* 40 C.F.R. § 1508.14—must be based on science that is both "[a]ccurate" and of "high quality."  *Id.* § 1500.1(b).  An agency must notify the public of proposed actions and afford it the opportunity to comment on the environmental impacts of the agency's planned project.  *See id.* § 1506.6.

46.     An Environmental Impact Statement ("EIS") is required for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  The EIS provides a "full and fair discussion of significant environmental impacts and . . . inform[s] decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.  As part of an EIS, an agency must identify direct, indirect, and cumulative impacts of its proposed action, *see id.* § 1508.8, as well as the impact of alternative actions.  *See* 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.14.

### The Regulatory Flexibility Act

47.     The Regulatory Flexibility Act ("RFA") fits regulatory requirements to the scale of the businesses that are subject to them.  It requires agencies to determine the economic impact of their planned actions on small entities and to explore alternatives that could reduce any significant economic impacts.  These determinations must be included in an "initial regulatory flexibility analysis" ("IFRA"), which is made available to the public for comment at the time of a notice of proposed rulemaking.  5 U.S.C. § 603(a); *see generally id.* § 603(b)–(d).

48.     When a final rule is promulgated, an agency is required to prepare a final regulatory flexibility analysis ("FRFA"), which must address, among other things, any "significant issues raised" during the public comment period, including responses to comments from the Small Business Administration, as well as steps the agency will take to minimize any "significant economic impact on small entities[.]"  *Id.* § 604(a).  The FRFA must be made publicly available and published in the *Federal Register.  Id.* § 604(b).

49.     The RFA affords a right to judicial review to any "small entity that is adversely affected or aggrieved by final agency action[.]"  *Id.* § 611(a).

14

### The Anti-Deficiency Act

50.     The Anti-Deficiency Act ("ADA") prohibits federal officers from either authorizing an "expenditure or obligation exceeding an amount available in an appropriation or fund for [an] expenditure or obligation" or involving the government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A)–(B).

### The Miscellaneous Receipts Act

51.      The Miscellaneous Receipts Act ("MRA") provides that any official "receiving money for the Government from any source shall deposit the money in the Treasury . . . without deduction for any charge or claim."  *Id.* § 3302(b).

52.     The MRA further requires than an official "having custody or possession of public money shall keep the money safe without lending . . . [or] using [it]," unless otherwise permitted by law.  *Id.* § 3302(a).

### The Independent Offices Appropriations Act

53.     The Independent Offices Appropriations Act ("IOAA") permits agencies to charge fees in the absence of specific statutory authority whenever a party—or "user"—is a special beneficiary of government services.  31 U.S.C. § 9701.

54.     The IOAA requires that fees be "fair" and "based on costs to the government, the value of the service or thing to the recipient, public policy or interested services, and other relevant facts."  *Id.* § 9701(b).  Fees must be deposited directly into the U.S. Treasury's general fund.

55.     Specific statutes that prohibit the collection of fees, or otherwise proscribe their use, displace any general authorization under the IOAA.  *See id.* § 9701(c).

## STATEMENT OF FACTS

### The Atlantic Herring FMP

56.     Atlantic herring is a pelagic fish species of the family *Clupeidae*.  It swims in large schools throughout the water column and feeds on various zooplankton.

57.     The Atlantic herring is found across the Northern Atlantic Ocean, but western populations are concentrated in coastal areas ranging from Canada to North Carolina.  In domestic waters, herring are principally located between New England and New Jersey.

58.     The herring population crosses the jurisdictional boundaries of two regional fishery management councils: the NEFMC and MAFMC.

59.     Atlantic herring is one of the most conservatively managed fisheries in the New England and Mid-Atlantic regions.  In its most recent stock assessment in 2015, NOAA did not find the Atlantic herring population to be overfished or subject to overfishing.  *See* Ne. Fisheries Sci. Ctr., Nat'l Oceanic & Atmospheric Admin., Atlantic Herring Operational Assessment Report 2015 (Aug. 2015), *available at* http://bit.ly/2SF4X2P.  In 2018, NOAA's Northeast Regional Stock Assessment Committee confirmed this estimation.  *See* Ne. Fisheries Sci. Ctr., Nat'l Oceanic & Atmospheric Admin., 65th Northeast Regional Stock Assessment Workshop Assessment Summary Report, *available at* http://bit.ly/2OBnn34.

60.     The Atlantic herring fishery is regulated by the NEFMC under the Atlantic Herring FMP.  *See* N. Eng. Fishery Mgmt. Council, Final Atl. Herring Fishery Mgmt. Plan (Mar. 8, 1999), *available at* http://bit.ly/2I2ilvL.  That plan was developed in consultation with the MAFMC, among others.  In coastal waters inward of the EEZ, Atlantic herring is regulated by the states and the Atlantic States Marine Fisheries Commission under the Interstate Fishery Management Plan for Atlantic Herring.

61.     The NEFMC adopted the Atlantic Herring FMP in March 1999, and it was implemented by NOAA the following year.  Since its initial adoption, the Atlantic herring FMP has been revised through seven separate plan amendments, including the Omnibus Amendment, and four abbreviated rulemakings, also known as "framework adjustments."[2]

62.     Every three years, the herring fishery is subject to revised quota and management specifications.  The NEFMC and NMFS last approved a three-year specification rule in 2016.  *See* Nat'l Oceanic & Atmospheric Admin., Specification of Management Measures for Atlantic Herring for the 2016-2018 Fishing Years, 81 Fed. Reg. 75,731 (Nov. 1, 2016) (to be codified at 50 C.F.R. pt. 648).  Defendants have not finalized specifications for the 2019–2021 period, although a rulemaking is pending.  *See* Nat'l Oceanic & Atmospheric Admin., Framework Adjustment 6 and the 2019–2021 Atlantic Herring Fishery Specifications, 85 Fed. Reg. 4,932 (proposed Jan. 28, 2020) (to be codified at 50 C.F.R. pt. 648).

63.     As a rule, the Atlantic Herring FMP achieves the NEFMC's management goals through a stock-wide annual catch limit ("ACL") that is allocated between four distinct geographic management areas ("sub-ACLs").  *See* 50 C.F.R. § 648.200(f).  These four areas include:

        a.      Area 1A – Inshore Gulf of Maine

        b.      Area 1B – Offshore Gulf of Maine

        c.      Area 2 – South Coastal Area

        d.      Area 3 – Georges Bank

---

[2] Another three framework adjustments and two amendments are under development.  Of note, Amendment 8, which would specify a long-term acceptable biological catch control rule for the fishery and address localized depletion and user group conflict, has attracted considerable attention and criticism from industry stakeholders.  *See* Nat'l Oceanic & Atmospheric Admin., Amendment 8, 84 Fed. Reg. 54,094 (proposed Oct. 9, 2019) (to be codified at 50 C.F.R. pt. 648).



**Figure 1: Atlantic Herring Management Areas,** *available at* **http://bit.ly/36A5FTB**

64.     Specifications and sub-ACLs for the Atlantic herring fishery's four management areas may be adjusted in-season—*i.e.*, during the fishing year—by NMFS, in order to "achieve conservation and management objectives," following consultation with the NEFMC.  50 C.F.R. § 648.200(e).   This last occurred in early 2019.   *See* Nat'l Oceanic & Atmospheric Admin., Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 84 Fed. Reg. 2,760 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648).

65.     The fishing year for the Atlantic herring fishery begins on January 1 and runs the length of the calendar year.  The bulk of prosecution and harvesting occurs in the late summer to early autumn for Areas 1A and 3, as well as other waters east of the Nantucket Shoals.  Fishery operations in Southern New England take place predominately during the winter and early spring.

66.     In addition to landings limits, the Atlantic herring FMP establishes additional management and accountability measures, including seasonal and (sub-)area closures, *see* 50 C.F.R. § 648.202; fishing gear restrictions, *id.* § 648.203; possession restrictions, *id.* § 648.204; and limited electronic vessel monitoring system ("VMS") requirements.  *Id.* § 648.205.

67.     Most vessels targeting, harvesting, and landing Atlantic herring are required to obtain a permit.  *Id.* § 648.4(a)(10)(i).  Permits are only granted to vessels of certain size and horsepower—*i.e.*, those of less than 165 feet in length, 750 gross registered tons, and 3,000 horsepower.  *Id.* § 648.4(a)(10)(iii).  Permits are divided into various categories that are subject to possession restrictions.  *See id.* § 648.204.  Additionally, there are four types of limited access permits that have different management area access rights and landing restrictions.  *See id.* § 648.4(a)(10)(iv)(A)(1)–(4).  Permits are available for vessels that incidentally catch herring, *see id.* § 648.4(a)(10)(iv)(C), or on an "open access" basis.  *See id.* § 648.4(a)(10)(v)–(vi).

68.     Relevant to this lawsuit, vessels holding Category A permits—including most, if not all, midwater trawlers, as well as some bottom trawlers—can fish in any of the Atlantic herring management areas.  Vessels with Category B permits are excluded from Area 1 (Gulf of Maine).  Category A and B permit holders are not restricted in the amount of herring they can catch per trip or land per calendar day.

69.     Many vessels that target herring concurrently prosecute mackerel, another pelagic fish that tends to mix with herring throughout Mid-Atlantic and Southern New England waters. Mackerel is managed under its own FMP, which is administered by the MAFMC.

### The Atlantic Herring Fleet

70.     The Atlantic herring fleet has been an integral part of the industry and culture of the New England and Mid-Atlantic regions for centuries.  Even today, the herring fishery and its participants are a major component of the domestic fishing industry.

71.     There are three types of fishing gear typically used in the Atlantic herring fishery. Purse seine vessels employ a purse-shaped net and encircle schools of fish.   Bottom trawlers fish both near the shore and offshore.  And midwater trawlers tow a net within the water column, either alone or paired with a second vessel.  The latter arrangement is known as a "pair trawl."

72.     Midwater trawlers make up the core of the herring fleet and land most of the annual catch.  As of 2016, there were fourteen midwater trawlers in the Atlantic herring fishery among a fleet of forty-three vessels possessing Category A or B permits.

73.     According to data available from Fishing Year 2016, Category A and B permit holders account for approximately 99% of total landings for the Atlantic herring fishery.

### The New England Industry-Funded Monitoring Omnibus Amendment

74.     The introduction of industry-funded at-sea monitoring in the Atlantic herring fishery and the creation of a standardized process for the introduction of similar industry-funding requirements in other fisheries has been a years-long process.  It started in 2013, when the NEFMC and the MAFMC initiated a joint process to design and implement an "omnibus" FMP amendment that would allow for the introduction of industry-funded monitoring in all the fisheries managed by the two councils.

75.     The Omnibus Amendment arose from the councils' desire to increase monitoring—ostensibly to better assess catch, monitor limits, and collect management information—but without expending as much money as would be required under existing observing programs, such as the Northeast Fisheries Observer Program ("NEFOP").

76.     Indeed, industry-funded monitoring goals were intended to supplement mandatory, federally funded monitoring already required under the Standardized Bycatch Reporting Methodology ("SBRM"), the Endangered Species Act ("ESA"), and the Marine Mammal Protection Act ("MMPA").  *See* Omnibus Amendment at 28.

77.     From the outset, Defendants recognized that industry-funded monitoring would be a "complex and highly sensitive issue."  *Id.*  In 2016, the NEFMC and the MAFMC solicited feedback from stakeholders about the prospects of industry funding.  *See, e.g.*, Nat'l Oceanic & Atmospheric Admin., Public Hearings, 81 Fed. Reg. 64,426 (Sept. 20, 2016).  The response to that solicitation, as well as multiple public hearings held across the Eastern seaboard, was overwhelmingly negative.

78.     Industry stakeholders expressed concern about the sustainability of industry-funded monitoring, given existing regulatory burdens.  Lund's Fisheries explained in a November 2016 public comment that the Omnibus Amendment's "projected costs are steep and . . . likely to be unsustainable[.]"  *See* Exhibit 1 (Nov. 8, 2016 Comment Letter).

79.     Lund's Fisheries also commented that the Omnibus Amendment marked "a turning point in regional fishery management policy . . . by requiring significant industry funding for monitoring programs that have been funded by the federal government since the passage of the MSA in 1977."  *Id.*  Although Lund's Fisheries recognized that some reasonable regulation was unavoidable, it pointed out that the estimated cost of industry-funded monitoring was not

"balanced with . . .  biological benefits accruing to the herring and mackerel resource," and instead was the result of "stakeholder campaigns," such as those pressed by environmental groups.

80.     Fishery stakeholders and interested members of the public continued to provide adverse feedback to Defendants about the legality and economic feasibility of industry-funded at-sea monitoring in subsequent years.  *See Withdraw Unlawful Plan Forcing Fishermen to Pay for At-Sea Monitors*, Cause of Action Inst., Apr. 12, 2017, https://coainst.org/2SGcDk5; *see also Fishermen in New England Face Another Costly Regulation*, Cause of Action Inst., Apr. 26, 2017, http://coainst.org/2owyD5H.

81.     Nevertheless, in April 2017, the NEFMC finalized its selection of preferred alternatives for the Omnibus Amendment.  *See* N.-Eng. Fishery Mgmt. Council, April 2017 Council Meeting Final Motions at 8–11 (April 18–20, 2017), *available at* https://go.aws/39lZODk.

82.     The MAFMC, for its part, decided to postpone action on preferred alternatives for the mackerel fishery.  *See* Mid-Atl. Fishery Mgmt. Council, April 2017 Motions at 3, *available at* https://coainst.org/39p22Si.

83.     Despite widespread opposition, and notwithstanding the MAFMC's failure to finalize requirements for industry funding in the mackerel fishery, Defendants published a "notice of availability" for the Omnibus Amendment.  *See* Exhibit 2 (Nat'l Oceanic & Atmospheric Admin., Industry-Funded Monitoring, 83 Fed. Reg. 47,326 (Sept. 19, 2018)).

84.     The September 19, 2018 Notice of Availability included a description of the planned industry-funded monitoring measures to be introduced in the Atlantic herring fishery, as well as a description of the "omnibus" measures that would be introduced into other FMPs managed by the NEFMC—*viz.*, the Atlantic Salmon FMP, Atlantic Sea Scallop FMP, Deep-Sea Red Crab FMP, Northeast Multispecies FMP, and the Northeast Skate Complex FMP.

85.     The Notice of Availability initiated a public comment period concerning the Secretary of Commerce's "approval/disapproval decision on the amendment." *Id.* at 47,327. That comment period was scheduled to close on November 19, 2018.

86.     The general response to the Notice of Availability was negative. Lund's Fisheries, for example, explained that the Omnibus Amendment would impose "an impossible financial burden" on the herring fleet, especially given substantial quota reductions that were then expected. *See* Exhibit 3 (Nov. 19, 2018 Comment Letter) (discussing potential "70% reduction in catch" over the "next 3 fishing years"); *cf. supra* ¶ 64 (finalizing 2019 in-season quota adjustment).

87.     Lund's Fisheries requested that the Omnibus Amendment be postponed while other accountability measures were explored, including electronic monitoring and shoreside monitoring. *Id.* Given the herring fishery's "very low bycatch rated and limited impact on bycatch species normally encountered," the monitoring rate outlined in the Omnibus Amendment would be both "excessive and statistically unnecessary[.]" *Id.*

88.     In October 2018, the MAFMC voted to withdraw from the Omnibus Amendment. The council tabled pending plans to approve industry-funded monitoring requirements for the mackerel fishery. *See* Mid-Atl. Fishery Mgmt. Council, October 2018 Council Meeting Summary at 1–2, (Oct. 1–4, 2018), *available at* http://bit.ly/2PYRMdA.

89.     On November 7, 2018—before the end of the public comment period on the approval decision for the Omnibus Amendment, and while secretarial approval of industry-funded monitoring was still pending—Defendants published proposed implementing regulations. *See* Exhibit 4 (Nat'l Oceanic & Atmospheric Admin., Industry-Funded Monitoring, 83 Fed. Reg. 55,665 (proposed Nov. 7, 2018) (to be codified at 50 C.F.R. pt. 648)).

90.     The November 7, 2018 Proposed Rule included a request for public comments and indicated that all such comments would need to be received by December 24, 2018.  *See id.*

91.     Once again, stakeholders and other interested parties expressed concern over the legality and economic feasibility of industry-funded monitoring.  *See, e.g.*, *CoA Institute Highlights Deficiencies in Proposed Rule to Shift Burdensome Costs of At-Sea Monitoring to Commercial Fishermen*, Cause of Action Inst., Dec. 11, 2018, http://bit.ly/3bucjhZ; *Cause of Action Institute Defends Fisheries from New Proposed Rule*, Cause of Action Inst., Dec. 13, 2018, http://bit.ly/2SD0AFc.

92.     By letter, dated December 18, 2018, the Regional Administrator for NOAA's Greater Atlantic Regional Office, Michael Pentony, informed the NEFMC that the Secretary of Commerce had approved the "New England Industry-Funded Monitoring Omnibus Amendment, including all the management measures recommended by the Council[.]"  *See* Exhibit 5.

93.     The December 18, 2018 letter notifying the NEFMC of secretarial approval of the Omnibus Amendment was transmitted by NOAA before the close of the comment period for implementing regulations, and it did not address the various public comments that had been filed in response to the September 19, 2018 Notice of Availability.

94.     The December 18, 2018 letter was not published or otherwise publicized by Defendants.  Plaintiffs and other stakeholders only became aware of the letter after an agency employee provided them with a copy.

95.     The irregularities surrounding the secret approval of the Omnibus Amendment raise serious concerns about Defendants' process for approving and implementing industry-funded monitoring.  *See Government Officials Ignore Public Comment, Create New Financial Burden on Fishermen*, Cause of Action Inst., Jan. 8, 2019, https://coainst.org/2SIAxeN; *see also CoA Institute*

*Sends Letter to Secretary Ross Requesting Public Confirmation of Controversial Fishery Regulation*, Cause of Action Inst., Feb. 14, 2019, https://coainst.org/2SLHfnu; Exhibit 6 (Feb. 12, 2019 Cause of Action Institute Letter).

96.     By letter, dated August 8, 2019, the Secretary of Commerce confirmed that he had approved the Omnibus Amendment sometime after the publication of the September 19, 2018 Notice of Availability and the November 7, 2018 Proposed Rule.  *See* Exhibit 7.  The Secretary neither clarified why the government had not responded to public comments on the legality of the Omnibus Amendment prior to the publication of proposed implementing regulations nor explained why any notice of secretarial approval had not been made publicly available.

97.     On February 7, 2020, Defendants published the final rule implementing the Omnibus Amendment with an effective date of March 9, 2020.  *See* Exhibit 8 (Nat'l Oceanic & Atmospheric Admin., Industry-Funded Monitoring, 85 Fed. Reg. 7,414 (Feb. 7, 2020) (to be codified at 50 C.F.R. pt. 648)).  Certain measures specific to the herring fishery are scheduled to become effective on April 1, 2020.  *Id.*

98.     The "omnibus measures" of the February 7, 2020 Final Rule create a standardized process to implement and revise industry-funded monitoring programs across the various New England FMPs, clarify cost responsibilities, establish requirements for monitoring service providers, and set a prioritization process for distributing available funds for NMFS's cost responsibilities associated with industry-funded monitoring.  *See* 85 Fed. Reg. at 7,414–17.  The Final Rule indirectly impacts existing at-sea monitoring programs in the Atlantic Sea Scallop FMP and Northeast Multispecies (Groundfish) FMP.  *Id.* at 7,414–15.

99.     With respect to the Atlantic herring fishery, the February 7, 2020 Final Rule establishes, among other things, a 50% industry-funded monitoring coverage target for all declared

herring trips undertaken by a vessel possessing a Category A or B permit.  *Id.* at 7,417.  This coverage target will be calculated together with federally funded SBRM observing coverage targets.  If, on any given trip, a vessel is notified that it will "need at-sea monitoring coverage," and it has not been assigned a NEFOP observer, then "[it] will be required to obtain and pay for an at-sea monitor to carry on that trip."  *Id.* at 7,418.

100.    The Final Rule acknowledges that "[i]ndustry-funded monitoring w[ill] have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery," including estimated costs of $710 per sea day for monitors, as well as an overall reduction to "returns-to-owner" or "RTO" (effectively, profits) of "approximately 20 percent."  *Id.* at 7,418.

101.    Midwater trawl vessels may choose to employ electronic monitoring and portside sampling through an exempted fishing permit ("EFP") scheme.  *Id.* at 7,419; *id.* at 7,420 ("The EFP would exempt midwater vessels from the requirement for industry-funded at-sea monitoring coverage and allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target.").  Defendants "estimate[] industry's cost for electronic monitoring and portside sampling at $515 per day," with an expected "reduction in annual TRO of up to 10 percent[.]"  *Id.* at 7,420.

102.    To gain access to Groundfish Closed Areas, midwater trawl vessels will need to "purchase observer coverage," when available.  *Id.* at 7,419.  The cost of purchasing a NEFOP observer is expected to be $818 per day.  *Id.*  These costs would result in roughly a "5 percent reduction in RTO . . . in addition to any reduction . . . due to other types of industry-funded monitoring coverage."  *Id.*

103.    Defendants "cautioned" that the estimated per day cost for either at-sea monitors or NEFOP observers was variable and would "largely depend on negotiated costs between vessels

26

and monitoring service providers."   *Id.* at 7,420.   In other words, Defendants may have *underestimated* the cost to industry of the new monitoring requirements.

104.   Defendants cost predictions, as described in the foregoing paragraphs, also do not reflect the effect of quota reductions introduced in 2019, *cf. supra* ¶ 64, and Defendants decided to forego revising their economic analysis of the expected impacts of the Omnibus Amendment and its various monitoring provisions.  *See* 85 Fed. Reg. at 7,421–22, 7,426.

## CLAIM ONE – INDUSTRY FUNDING IS UNLAWFUL

105.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

106.   The MSA provides for judicial review of fishery regulations, insofar as a petition for such review is filed within thirty days after the date on which regulations are promulgated or action to implement an FMP is published in the *Federal Register*.  16 U.S.C. § 1855(f)(1)–(2).

107.   The MSA, adopting the standards of the APA, authorizes this Court to hold unlawful and set aside any agency action, finding, or conclusion that is found to be arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law.  *Id.* § 1855(f)(1)(B); *cf.* 5 U.S.C. § 706(2)(A)–(D).

108.   On February 7, 2020, Defendants promulgated a rule to implement the Omnibus Amendment.  That act qualifies as final agency action under the APA, *see* 5 U.S.C. § 704, and constitutes the promulgation of a fishery regulation as contemplated by the MSA.  *See* 16 U.S.C. § 1855(f)(1).

109.   By finalizing the Omnibus Amendment and the February 7, 2020 Final Rule, Defendants violated the MSA and other applicable laws.

110.    Requiring Plaintiffs to fund novel at-sea monitoring programs in the Atlantic herring fishery is arbitrary, capricious, and an abuse of discretion, 5 U.S.C. § 706(2)(A); contrary to constitutional right, power, privilege, or immunity, *id.* § 706(2)(B); and in excess of statutory jurisdiction, authority, or limitations. *Id.* § 706(2)(C).

111.    Specifically, by requiring industry to fund an at-sea monitoring program in the Atlantic herring fishery, Defendants committed the following violations:

a.    Acting *ultra vires* in excess of any statutory authority granted by Congress in the MSA or otherwise;

b.    Improperly infringing on Congress's exclusive taxation authority and power to direct the use of public funds under the Tax and Spending and Appropriations Clauses of the U.S. Constitution;

c.    Violating the ADA and the MRA;

d.    Charging Plaintiffs improper fees in violation of the IOAA;

112.    Because Defendants have no authority to compel industry-funded at-sea monitoring in the Atlantic herring fishery, the Omnibus Amendment and the February 7, 2020 Final Rule are void and unenforceable to the extent they attempt to impose that requirement.

113.    Additionally, to the extent the Omnibus Amendment and the February 7, 2020 Final Rule revise other FMPs managed by the NEFMC in order to impose a standardized system for future introduction of industry-funded monitoring, those amendments are void and unenforceable.

**CLAIM TWO – THE FINAL RULE IS PROCEDURALLY INFIRM**

114.    Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

115.    The MSA, adopting the standards of the APA, authorizes this Court to hold unlawful and set aside any agency action, finding, or conclusions that was undertaken without observance of procedure required by law.  16 U.S.C. § 1855(f)(1)(B); *cf.* 5 U.S.C. 706(2)(D).

116.    The MSA requires that fishery regulations to be promulgated in accordance with NEPA, *see* 16 U.S.C. § 1854(i), and the RFA.  *See id.* § 1855(e).

117.    The Omnibus Amendment and the February 7, 2020 Final Rule are both procedurally infirm because they violate NEPA and the RFA.

118.    Defendants violated NEPA and relevant implementing regulations by:

a.      Failing to take a "hard look" at the environmental impact of the Omnibus Amendment, including the adverse impact of industry-funded monitoring on the human environment, both in the Atlantic herring fishery and other FMPs;

b.      Failing to adequately address potential mitigation measures or alternatives to Defendants' planned regulatory actions;

c.      Pre-judging the outcome of any and all environmental assessments and regulatory impact reviews in favor of the NEFMC's preferred alternatives;

d.      Refusing to revise or supplement any and all environmental assessments or regulatory impact reviews after significant herring catch reductions in early 2019.

119.    Defendants violated the RFA and relevant implementing regulations by failing to prepare adequate initial or final regulatory flexibility analyses that took into consideration the economic effects of industry-funded monitoring in the Atlantic herring fishery and other FMPs and, in particular, the adverse impact on small businesses.

120.    Defendants violated Plaintiffs' procedural due-process rights by (1) determining the legality of the Omnibus Amendment and approving it as consistent with the MSA and federal

law without public notice and without addressing public comments filed in response to NMFS's notice of availability; (2) proposing implementing regulations for the Atlantic herring fishery before obtaining secretarial approval of the Omnibus Amendment; and (3) obtaining secretarial approval for the Omnibus Amendment during ongoing public comment on the proposed implementing regulations.

121.    The foregoing procedural violations constitute final agency action that is arbitrary, capricious, and an abuse of discretion in violation of NEPA, the RFA, the MSA, and the APA.

122.    Given these procedural infirmities, the Omnibus Amendment and the February 7, 2020 Final Rule are void and unenforceable.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request and pray that this Court:

a.    Permanently enjoin each Defendant from requiring Plaintiffs to fund or contract for at-sea monitors pursuant to the Omnibus Amendment and the February 7, 2020 Final Rule;

b.    Declare that industry funding requirements for at-sea monitoring in the Omnibus Amendment and the February 7, 2020 Final Rule are unlawful and void because they are *ultra vires* and violate applicable statutes and constitutional provisions;

c.    Hold unlawful and set aside the industry funding requirements for at-sea monitoring in the Omnibus Amendment and the February 7, 2020 Final Rule;

d.    Award such attorneys' fees and costs as Plaintiffs may be entitled to under law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

e.    Grant such other relief that the Court may deem just and proper.

Dated: February 19, 2020

Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
D.C. Bar No. 1024362
Eric R. Bolinder
D.C. Bar No. 1028335

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Phone: (571) 444-2841
ryan.mulvey@causeofaction.org
eric.bolinder@causeofaction.org

*Counsel for Plaintiffs*