**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 20-cv-466 (EGS) |
| | ) | |
| WILBUR L. ROSS, JR., in his official capacity as | ) | HEARING SCHEDULED |
| Secretary of the U.S. Department of Commerce, *et al.*, | ) | FOR OCTOBER 9, 2020 |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEIR MOTION FOR SUMMARY JUDGMENT**

Ryan P. Mulvey
D.C. Bar No. 1024362
Eric R. Bolinder
D.C. Bar No. 1028335

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Phone: (571) 444-2841
ryan.mulvey@causeofaction.org
eric.bolinder@causeofaction.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

Glossary ...................................................................................................................... xiii

Introduction.................................................................................................................... 1

Statutory and Regulatory Background........................................................................... 2

   I.  The Magnuson-Stevens Fishery Conservation and Management Act .................... 2

   II.  The Atlantic Herring Fishery Management Plan ..................................................... 4

Statement of Facts.......................................................................................................... 5

   I.  The Development of the Omnibus Amendment at the Council Level..................... 5

   II.  Defendants' Finalization and Promulgation of the Omnibus Amendment............ 8

   III. Procedural History ............................................................................................... 10

Standard of Review....................................................................................................... 11

Argument ..................................................................................................................... 14

   I.  The Omnibus Amendment is unlawful, void, and unenforceable. ...................... 14

     A.  The MSA does not authorize industry-funded at-sea monitoring in the
         Atlantic herring FMP or other New England FMPs. ...................................... 14

        1.  The NEFMC and Defendants only have authority to require monitoring—
            not to require the industry to pay for it. ................................................... 15

        2.  The MSA only authorizes industry funding in three limited situations,
            none of which apply here. ........................................................................ 16

        3.  Defendants' reading of the MSA offends important canons of
            statutory interpretation. ........................................................................... 17

        4.  The legislative history supports Plaintiffs' reading of the MSA. ............. 18

     B.  *Goethel v. Pritzker* is dicta and wrongly decided. ......................................... 22

     C.  Industry-funded monitoring violates agency financing and expenditure statutes. ........... 25

        1.  Statutes explicitly bar this sort of revenue-raising.................................... 25

        2.  The Omnibus Amendment is a tax by another name. ............................... 27

     D.  The Omnibus Amendment violates National Standards 7 and 8. .................... 28

     E.  The February 7, 2020 Final Rule is substantively deficient. ........................... 30

   II.  The Omnibus Amendment is procedurally infirm. .............................................. 33

     A.  Defendants violated NEPA. ............................................................................ 33

     B.  Defendants violated the RFA. .......................................................................... 38

     C.  The approval and finalization of the Omnibus Amendment violated
         important aspects of procedural due process. ................................................... 40

Conclusion .................................................................................................................. 43

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Action Alliance of Senior Citizens of Greater Philadelphia v. Sullivan*,
930 F.2d 77 (D.C. Cir. 1991) ................................................................32

*Air Transportation Ass'n of America, Inc. v. National Mediation Board*,
663 F.3d 476 (D.C. Cir. 2011) .............................................................37

*Anglers Conservation Network v. Pritzker*,
139 F. Supp. 3d 102 (D.D.C. 2015) ...............................16, 17, 26, 27

*Associated Fisheries of Maine, Inc. v. Daley*,
127 F.3d 104 (1st Cir. 1997) ...............................................................39

*Boston Edison Co. v. Federal Energy Regulatory Commission*,
856 F.2d 361 (1st Cir. 1988) ...............................................................23

*C & W Fish Co. v. Fox*,
931 F.2d 1556 (D.C. Cir. 1991) ...........................................................12

*Catawba County v. Environmental Protection Agency*,
571 F.3d 20 (D.C. Cir. 2009) ...............................................................14

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
467 U.S. 837 (1984) .............................................................................13

*City of Arlington v. Federal Communications Commission*,
569 U.S. 290 (2013) .............................................................................15

*City of Olmstead Falls v. Federal Aviation Administration*,
292 F.3d 261 (D.C. Cir. 2002) .............................................................11

*Connecticut Light & Power Co. v. Nuclear Regulatory Commission*,
673 F.2d 525 (D.C. Cir. 1982) .............................................................42

*Consolidated Rail Corp. v. United States*,
896 F.2d 574 (D.C. Cir. 1990) .............................................................21

*Duncan v. Walker*,
533 U.S. 167 (2001) .............................................................................17

*EchoStar Satellite L.L.C. v. Federal Communications Commission*,
704 F.3d 992 (D.C. Cir. 2013) .............................................................17

*Environmental Defense Center v. Babbitt*,
73 F.3d 867 (9th Cir. 1995) .................................................................26

*Environmental Defense Fund v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981) ........................................................................12

*Federal Communications Commission v. Fox TV Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................................41

*Flaherty v. Bryson*,
    850 F. Supp. 2d 38 (D.D.C. 2012) ..................................................................34

*Food & Drug Administration v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ........................................................................................15

*Forest Guardians v. United States Fish & Wildlife Service*,
    611 F.3d 692 (10th Cir. 2010) ........................................................................36

*Fulbright v. McHugh*,
    67 F. Supp. 3d 81 (D.D.C. 2014) ....................................................................13

*Goethel v. Department of Commerce*,
    854 F.3d 106 (1st Cir. 2017) ..........................................................................23

*Goethel v. Pritzker*,
    No. 15-497, 2016 WL 4076831 (D.N.H. July 29, 2016) .........................22, 23, 24

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ........................................................................................15

*Grand Canyon Air Tour Coalition v. Federal Aviation Administration*,
    154 F.3d 455 (D.C. Cir. 1998) ........................................................................42

*Greater Boston Television Corp. v. Federal Communications Commission*,
    444 F.2d 841 (D.C. Cir. 1970) ........................................................................12

*Greenpeace v. National Marine Fisheries Service*,
    55 F. Supp. 2d 1248 (W.D. Wash. 1999) ........................................................35

*Gross v. FBL Financial Services, Inc.*,
    557 U.S. 167 (2009) ........................................................................................19

*Groundfish Forum v. Ross*,
    375 F. Supp. 3d 72 (D.D.C. 2019) ..............................................................11, 13

*Jackson County v. Federal Energy Regulatory Commission*,
    589 F.3d 1284 (D.C. Cir. 2009) ......................................................................35

*Louisiana Public Service Commission v. Federal Communications Commission*,
    476 U.S. 355 (1986) ........................................................................................14

*Mendoza v. Perez,*
   754 F.3d 1002 (D.C. Cir. 2014) ...................................................................42

*Motion Picture Ass'n of America, Inc. v. Federal Communications Commission,*
   309 F.3d 796 (D.C. Cir. 2002) ....................................................................14

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v.
   State Farm Mutual Automobile Insurance Co.,*
   463 U.S. 29 (1983) ........................................................................................12

*National Cable Television Ass'n, Inc. v. United States,*
   415 U.S. 336 (1974) .....................................................................................25

*National Credit Union Administration v. First National Bank & Trust Co.,*
   522 U.S. 479 (1998) .....................................................................................17

*National Federation of Independent Businsess v. Sebelius,*
   132 S. Ct. 2566 (2012) .................................................................................27

*Natural Resources Defense Council v. Daley,*
   209 F.3d 747 (D.C. Cir. 2000) ....................................................................13

*Natural Resources Defense Council v. National Marine Fisheries Service,*
   71 F. Supp. 3d 35 (D.D.C. 2014) ...............................................................11

*North Carolina Fisheries Ass'n, Inc. v. Gutierrez,*
   518 F. Supp. 2d 62 (D.D.C. 2007) .................................................12, 28, 39

*Oceana, Inc. v. Ross,*
   363 F. Supp. 3d 67 (D.D.C. 2019) ..............................................................11

*Passamaquoddy Tribe v. State of Maine,*
   75 F.3d 784 (1st Cir. 1996) .........................................................................27

*Perez v. Mortgage Bankers Ass'n,*
   575 U.S. 92 (2015) ........................................................................................41

*Public Employees for Environmental Responsibility v.
   Department of the Interior,*
   832 F. Supp. 2d 5 (D.D.C. 2011) ................................................................12

*Railway Labor Executives' Ass'n v. National Mediation Board,*
   29 F.3d 655 (D.C. Cir. 1994) ......................................................................17

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) .....................................................................................33

*Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*,
    87 F.3d 1356 (D.C. Cir. 1996) ...................................................................13, 25

*Sierra Club v. Van Antwerp*,
    661 F.3d 1147 (D.C. Cir. 2011) ...........................................................................34

*Southern Offshore Fishing Ass'n v. Daley*,
    995 F. Supp. 1411 (M.D. Fla. 1998) ....................................................................40

*Thomas v. Network Solutions, Inc.*,
    2 F. Supp. 2d 22 (D.D.C. 1998) ..........................................................................25

*United States Cellular Corp. v. Federal Communications Commission*,
    254 F.3d 78 (D.C. Cir. 2001) ...............................................................................39

*United States v. Butler*,
    297 U.S. 1 (1936) .................................................................................................17

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) .............................................................................................13

*Utility Air Regulatory Group v. Environmental Protection Agency*,
    134 S. Ct. 2427 (2014) .........................................................................................26

*Warger v. Shauers*,
    574 U.S. 40 (2014) ...............................................................................................18

*Whitman v. American Trucking Ass'ns*,
    531 U.S. 457 (2001) .............................................................................................15

*Young v. General Services Administration*,
    99 F. Supp. 2d 59 (D.D.C. 2000) ........................................................................33

*Zemeka v. Holder*,
    963 F. Supp. 2d 22 (D.D.C. 2013) ......................................................................12

**Statutes**

5 U.S.C. § 603(a) ......................................................................................................38

5 U.S.C. § 603(b) ......................................................................................................38

5 U.S.C. § 603(c) ......................................................................................................38

5 U.S.C. § 603(d) ......................................................................................................38

5 U.S.C. § 604(a) ......................................................................................................39

5 U.S.C. § 604(b) ......................................................................................................39

5 U.S.C. § 611(a)(1) ........................................................................................................39

5 U.S.C. § 706(2)(A) ........................................................................................................11

7 U.S.C. § 1622(h)(1) .......................................................................................................31

16 U.S.C. § 1801(a) ............................................................................................................2

16 U.S.C. § 1801(b) ............................................................................................................2

16 U.S.C. § 1801(b)(5) ........................................................................................................2

16 U.S.C. § 1801(c) ............................................................................................................2

16 U.S.C. § 1802(31) ..........................................................................................................3

16 U.S.C. § 1821(h)(4) ...............................................................................................16, 24

16 U.S.C. § 1851(a) ......................................................................................................3, 28

16 U.S.C. § 1851(a)(7) .................................................................................................3, 28

16 U.S.C. § 1851(a)(8) .................................................................................................3, 28

16 U.S.C. § 1852(a)(1)(A) ..................................................................................................2

16 U.S.C. § 1852(a)(1)(B) ..................................................................................................2

16 U.S.C. § 1852(a)(1)(C) ..................................................................................................2

16 U.S.C. § 1852(a)(1)(D) ..................................................................................................2

16 U.S.C. § 1852(a)(1)(E) ..................................................................................................2

16 U.S.C. § 1852(a)(1)(F) ..................................................................................................2

16 U.S.C. § 1852(a)(1)(G) ..................................................................................................2

16 U.S.C. § 1852(a)(1)(H) ..................................................................................................2

16 U.S.C. § 1852(h) ............................................................................................................2

16 U.S.C. § 1852(h)(1) ........................................................................................................2

16 U.S.C. § 1852(h)(3) ........................................................................................................2

16 U.S.C. § 1852(h)(6) ........................................................................................................2

16 U.S.C. § 1852(h)(7) ........................................................................................................2

16 U.S.C. § 1853(a) ................................................................................................................2

16 U.S.C. § 1853(a)(1) .....................................................................................................2, 18

16 U.S.C. § 1853(a)(2) ................................................................................................................3

16 U.S.C. § 1853(a)(3) ................................................................................................................3

16 U.S.C. § 1853(a)(4) ................................................................................................................3

16 U.S.C. § 1853(a)(11) ................................................................................................................3

16 U.S.C. § 1853(a)(15) ................................................................................................................3

16 U.S.C. § 1853(b) ................................................................................................................2

16 U.S.C. § 1853(b)(1) ................................................................................................................3

16 U.S.C. § 1853(b)(2) ................................................................................................................3

16 U.S.C. § 1853(b)(6) ................................................................................................................3

16 U.S.C. § 1853(b)(8) .................................................................................................3, 6, 15, 18

16 U.S.C. § 1853(b)(14) ................................................................................................................23

16 U.S.C. § 1853a ................................................................................................................3

16 U.S.C. § 1853a(e)(2) ................................................................................................................16, 24

16 U.S.C. § 1854(i) ................................................................................................................33

16 U.S.C. § 1854(a) ................................................................................................................2

16 U.S.C. § 1854(a)(1)(A) ................................................................................................................3, 40

16 U.S.C. § 1854(a)(1)(B) ................................................................................................................3

16 U.S.C. § 1854(a)(2) ................................................................................................................4, 40

16 U.S.C. § 1854(a)(3) ................................................................................................................3, 40

16 U.S.C. § 1854(b) ................................................................................................................4

16 U.S.C. § 1854(d)(1) ................................................................................................................16

16 U.S.C. § 1854(d)(2) ................................................................................................................16

16 U.S.C. § 1855(e) ................................................................................................................39

16 U.S.C. § 1855(f) .................................................................................23

16 U.S.C. § 1855(f)(1)(A) ........................................................................11

16 U.S.C. § 1855(f)(1)(B) ........................................................................11

16 U.S.C. § 1858(g)(1)(D) .......................................................................23

16 U.S.C. § 1862 .....................................................................................24

16 U.S.C. § 1862(a) ...........................................................................16, 19

29 U.S.C. § 655(b)(7) ..............................................................................31

31 U.S.C. § 1341(a)(1)(A) ..................................................................25, 27

31 U.S.C. § 1341(a)(1)(B) ..................................................................25, 27

31 U.S.C. § 3302(b) ..........................................................................25, 27

31 U.S.C. § 9701(b) .................................................................................25

33 U.S.C. § 1318(a) .................................................................................31

42 U.S.C. § 4321 .....................................................................................33

42 U.S.C. § 4332(C) ...........................................................................33, 34

42 U.S.C. § 7414(a)(1) .............................................................................31

I.R.C. § 6201 ..........................................................................................31

**Constitutional Provisions**

U.S. Const., art. I, § 8, cl. ......................................................................25

**Rules**

Federal Rule of Civil Procedure 56(a) .....................................................12

**Regulations and Regulatory Materials**

40 C.F.R. § 1501.2 ..................................................................................33

40 C.F.R. § 1501.4 ............................................................................33, 34

40 C.F.R. § 1501.4(e) ..............................................................................34

40 C.F.R. § 1502.1 ..................................................................................34

40 C.F.R. § 1502.5 ...................................................................................................33

40 C.F.R. § 1502.9(c) ..............................................................................................38

40 C.F.R. § 1502.14 .................................................................................................34

40 C.F.R. § 1506.6 ...................................................................................................33

40 C.F.R. § 1508.7 ...................................................................................................36

40 C.F.R. § 1508.8 ...................................................................................................34

40 C.F.R. § 1508.9 ...................................................................................................34

40 C.F.R. § 1508.13 .................................................................................................34

40 C.F.R. § 1508.25(a)(1) ........................................................................................35

50 C.F.R. § 600.340 .............................................................................................3, 28

50 C.F.R. § 600.345 .............................................................................................3, 28

50 C.F.R. § 648.2 .......................................................................................................6

50 C.F.R. § 648.4(a)(10)(i) ........................................................................................5

50 C.F.R. § 648.200(e) ...............................................................................................5

50 C.F.R. § 648.200(f) ...............................................................................................4

50 C.F.R. § 648.202 ...................................................................................................5

50 C.F.R. § 648.203 ...................................................................................................5

50 C.F.R. § 648.204 ...................................................................................................5

50 C.F.R. § 648.205 ...................................................................................................5

50 C.F.R. § 679.51 ...................................................................................................22

Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for
   2019, 84 Fed. Reg. 2,760 (Feb. 8, 2019) ...............................................................38

Executive Order 12866, 58 Fed. Reg. 51,735 (Oct. 4, 1993) .......................................31

Fisheries of the Northeastern United States; Atlantic Mackerel, Squid, and
   Butterfish Fisheries; Amendment 14, 79 Fed. Reg. 10,029 (Feb. 24, 2014) ...........26

Framework Adjustment 6 and the 2019–2021 Atlantic Herring Fishery
    Specifications, 85 Fed. Reg. 26,874 (May 6, 2020) ......................................4, 38

Groundfish of the Gulf of Alaska, Groundfish Fishery of the Bering Sea and
    Aleutian Islands Area, 55 Fed. Reg. 4,839 (Feb. 12, 1990)................................21

Habitat Clam Dredge Exemption Framework, 85 Fed. Reg. 29,870
    (May 19, 2020).....................................................................................................4

Northeast (NE) Multispecies Fishery; Framework Adjustment 48,
    78 Fed. Reg. 26,118 (May 3, 2013) ..............................................................26, 27

## Legislative Materials

136 Cong. Rec. H229 (daily ed. Feb. 6, 1990) ..............................................................20

136 Cong. Rec. S14953 (daily ed. Oct. 11, 1990) ........................................................20

Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, 104 Stat. 4436 ....................19

H.R. 39, 104th Cong. (1995) ........................................................................................18

H.R. 1554, 101st Cong. (1989) .....................................................................................18

H.R. 5018, 109th Cong. (2006)......................................................................................18

H.R. Rep. No. 101-393 (1989).......................................................................................19

*Reauthorization of the Magnuson Fishery Conservation and Management Act of
    1976: Hearing on H.R. 2061 Before the H. Comm. on Merch. Marine &
    Fisheries, Subcomm. on Fisheries & Wildlife Conservation & the Env't,*
    101st Cong. 250 (1989) ................................................................................19, 21

*Reauthorization of the Magnuson Fishery Conservation and Management Act of
    1976—Part II: Hearing on H.R. 2061 Before the H. Comm. on Merch. Marine
    & Fisheries, Subcomm. on Fisheries & Wildlife Conservation & the Env't,*
    101st Cong. 86 (1989)..................................................................................19, 20

## Books and Articles

Antonin Scalia & Bryan A. Garner, Reading Law (2012)............................................17

Frank H. Easterbrook, *Statutes' Domains*, 50 U. Chi. L. Rev. 533 (1983) ...................21

## Other Authorities

*Atlantic Herring Plan Overview*, N. Eng. Fishery Mgmt. Council,
    https://bit.ly/2Vc5Z8E .......................................................................................4

Envtl. Assessment of Amend. 13 to the Bering Sea and Aleutian Islands
   Groundfish FMP and Amend. 18 to the Gulf of Alaska Groundfish FMP
   (July 21, 1989) ...................................................................................................21

Gov't Accountability Office, 2 Principles of Federal Appropriations Law
   (3d ed. 2006) ................................................................................................27, 32

IRS Bull. 2014-18 (July 7, 2014) ................................................................................31

Mid-Atl. Fishery Mgmt. Council, October 2018 Council Meeting Summary
   (Oct. 2018) ........................................................................................................36

MRAG Americas, Inc., Independent Review of the North Pacific Groundfish
   Observer Program (May 2000) .........................................................................22

N. Eng. Fishery Mgmt. Council, Final Atl. Herring Fishery Mgmt. Plan
   (Mar. 8, 1999) .....................................................................................................4

Nat'l Marine Fisheries Serv. Alaska Fisheries Sci. Ctr., N. Pac. Groundfish &
   Halibut Observer Program: 2015 Annual Report (May 2016) .........................22

Nat'l Marine Fisheries Serv., Envtl. Assessment of Amend. 13 to the Bering Sea
   and Aleutian Islands Groundfish FMP and Amend. 18 to the Gulf of Alaska
   Groundfish FMP (July 21, 1989) ......................................................................20

OMB Circular A-4 (Sept. 17, 2003) ...........................................................................31

**GLOSSARY**

| | |
|---|---|
| ACL | Annual catch limit |
| ADA | Anti-Deficiency Act |
| APA | Administrative Procedure Act |
| ASM | At-sea monitoring |
| EM | Electronic monitoring |
| ESA | Endangered Species Act |
| FMP | Fishery management plan |
| GARFO | Greater Atlantic Regional Fisheries Office |
| IFM | Industry-funded monitoring |
| IOAA | Independent Offices Appropriations Act |
| LAPP | Limited access privilege program |
| MAFMC | Mid-Atlantic Fishery Management Council |
| MMPA | Marine Mammal Protection Act |
| MRA | Miscellaneous Receipts Act |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| NEFMC | New England Fishery Management Council |
| NEFOP | Northeast Fisheries Observer Program |
| NEFSC | Northeast Fisheries Science Center |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| PTNS | Pre-Trip Notification System |
| RFA | Regulatory Flexibility Act |
| SBRM | Standardized Bycatch Reporting Methodology |
| VMS | Vessel monitoring system |

## <u>INTRODUCTION</u>

The New England and Mid-Atlantic fishing industry is older than the Nation itself.  Today it creates thousands of jobs in countless fishing communities along the Eastern seaboard.  Yet the industry's regulators—in particular, the New England Fishery Management Council ("NEFMC") and Defendants—have embarked on a project that threatens to decimate commercial fishermen.  Specifically, they aim to impose industry-funded at-sea monitoring requirements across all the fisheries under the NEFMC's jurisdiction.  They seek to do this without statutory authority, defying the most elementary limits on their power.  Their first target is the Atlantic herring fishery.  To wit: Defendants recently finalized and promulgated implementing regulations for the NEFMC's New England Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment"), which contains destructive regulations that threaten our nation's fishermen.

Federal law does permit the NEFMC and Defendants to place "at-sea monitors" on fishermen's boats.  These monitors watch fishermen fish and collect scientific data.  Just like other government-contracted employees, at-sea monitors come with certain costs, including their own salary.  But unlike any other government-contracted employees, the NEFMC and Defendants have decided not to fund these costs themselves and instead plan to foist the burden on fishermen.  This is unlawful for numerous reasons, chief among which is that such a requirement is *ultra vires*.

In the past, when dealing with industry-funded monitoring, Congress has spoken clearly and authorized it—but not for the Atlantic herring fishery, or most other New England fisheries, and certainly not for the fishermen who bring this challenge.  And not only have the NEFMC and Defendants acted without any congressional authorization, but they have left myriad statutory and procedural violations in their wake.  For these reasons, this Court should declare industry-funded monitoring unlawful, enjoin Defendants from pursuing it, and vacate the Omnibus Amendment.

## STATUTORY AND REGULATORY BACKGROUND

I. **The Magnuson-Stevens Fishery Conservation and Management Act**

The Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, establishes the basis and authority for the federal management of domestic marine fisheries in the United States. Recognizing the importance of fishery resources for the well-being of the American economy, Congress enacted the MSA to promote the conservation of fisheries in a way that also sustains the industry. *See* 16 U.S.C. § 1801(a)–(c).

The Department of Commerce ("Commerce") exercises the MSA's regulatory authority by and through its various components, including the National Oceanic and Atmospheric Administration ("NOAA") and the National Marine Fisheries Service ("NMFS"). The government must use this authority in a manner consistent with fishery management plans ("FMPs") adopted and maintained by a system of eight regional fishery management councils, *id.* § 1852(a)(A)–(H); *id.* § 1852(h), which Congress designed to enable stakeholder participation in the regulatory process. *See id.* § 1801(b)(5).[1] FMPs are the formal mechanism by which the federal government manages domestic fisheries and seeks to achieve the MSA's conservation and resource management goals. *See id.* § 1853(a)–(b). FMPs regulate the harvesting of different fish species within specified geographic areas. *Id.* § 1852(h)(1). Defendants approve, implement, and enforce them. *See id.* § 1854(a).

Every FMP must contain, among other things, conservation and management measures that (1) prevent overfishing and seek to rebuild overfished stocks, or otherwise promote the long-term stability of the fishery, *id.* § 1853(a)(1); (2) describe and delimit the kinds of fishing vessels

---

[1] Regional fishery management councils have other functions, too. They hold public hearings to facilitate fisheries management, 16 U.S.C. § 1852(h)(3); set annual catch limits, *id.* § 1852(h)(6); and prioritize scientific and statistical research priorities. *Id.* § 1852(h)(7).

prosecuting regulated species, including gear type, and otherwise delimit the harvesting of fish based on the expected sustainable and optimum yield, *id.* § 1853(a)(2)–(4), (15); and (3) establish a standardized reporting methodology to minimize bycatch and bycatch mortality. *Id.* § 1853(a)(11). FMPs may also include, as a discretionary matter, provisions that (1) require permitting, *id.* § 1853(b)(1); (2) limit fishing in certain geographic areas based on type or quantity of gear, *id.* § 1853(b)(2); (3) establish limited access privilege programs, *id.* § 1853(b)(6); *see id.* § 1853a; and (4) require the placement of observers on domestic vessels "for the purpose of collecting data necessary for the conversation and management of the fishery," subject to various conditions. *Id.* § 1853(b)(8); *cf. id.* § 1802(31).

The MSA also requires that any FMP or FMP amendment adopted or revised by a regional council—or any implementing regulation or secretarial action promulgated by the Secretary of Commerce—be consistent with ten "National Standards." *See id.* § 1851(a). Two of those standards are relevant here:

- **National Standard Seven** directs that fishery regulations "shall, where practicable, minimize costs and avoid unnecessary duplication." *Id.* § 1851(a)(7); *cf.* 50 C.F.R. § 600.340.

- **National Standard Eight** requires regulators to consider "the importance of fishery resources to fishing communities," "provide for the sustained participation of such communities," and, "to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8); *cf.* 50 C.F.R. § 600.345.

When a regional council adopts an FMP or FMP amendment, the Secretary of Commerce must "immediately commence a review" to ensure that it complies with the MSA, the National Standards, and other applicable law. *Id.* § 1854(a)(1)(A). The Secretary "immediately" publishes a notice of availability in the *Federal Register* to solicit public feedback and provides a final approval decision within thirty days of the end of the required sixty-day comment period. *Id.* § 1854(a)(1)(B), (a)(3). The Secretary must consider the "information, views, and comments

received from interested persons[.]" *Id.* § 1854(a)(2).  A similar compliance review is required for implementing regulations proposed by a regional council under Section 1853(c), except that the Secretary must complete the preliminary evaluation within fifteen days and the subsequent public comment period may last between fifteen and sixty days.  *Id.* § 1854(b).

## II.  The Atlantic Herring Fishery Management Plan

The NEFMC and Defendants regulate the Atlantic herring fishery.  The NEFMC adopted the Atlantic herring FMP in March 1999, and NOAA implemented it the year after.  *See generally* N. Eng. Fishery Mgmt. Council, Final Atl. Herring Fishery Mgmt. Plan (Mar. 8, 1999), *available at* http://bit.ly/2I2ilvL.  Since its adoption, the Atlantic herring FMP has been revised through seven separate amendments—including the Omnibus Amendment—and six abbreviated rulemakings, known as "framework adjustments."  *See Atlantic Herring Plan Overview*, N. Eng. Fishery Mgmt. Council, https://bit.ly/2Vc5Z8E (last visited June 8, 2020).[2]

Every three years, the Atlantic herring fishery is subject to revised quota and management specifications.  The NEMC and Defendants approved the current three-year specification rule for 2019–2021 last month.  *See* 85 Fed. Reg. at 26,875–76.  Those specifications play an integral role in the management of the Atlantic herring FMP, which is defined by a stock-wide annual catch limit ("ACL") allocated between four geographic areas.  *See* 50 C.F.R. § 648.200(f); *see generally* Compl. ⁋ 63 & Figure 1, ECF No. 1.  NMFS can adjust specifications and sub-ACLs for the four

---

[2] Defendants have finalized two framework adjustments since the filing of this lawsuit: (1) Framework 5, *see* Habitat Clam Dredge Exemption Framework, 85 Fed. Reg. 29,870 (May 19, 2020) (to be codified at 50 C.F.R. pt. 648); and (2) Framework 6, which updates the overfishing/overfished definition for the Atlantic herring FMP, contains new quota specifications, and temporarily prohibits the carryover of unharvested herring catch.  *See* Framework Adjustment 6 and the 2019–2021 Atlantic Herring Fishery Specifications, 85 Fed. Reg. 26,874 (May 6, 2020) (to be codified at 50 C.F.R. pt. 648).

management areas in-season to "achieve conservation and management objectives," following consultation with the NEFMC.  50 C.F.R. § 648.200(e).

Besides landings limits, the Atlantic herring FMP establishes other management and accountability measures, including season and (sub-)area closures, *see id.* § 648.202; fishing gear restrictions, *id.* § 648.203; possession restrictions, *id.* § 648.204; and limited electronic vessel monitoring requirements.  *Id.* § 648.205.  Most vessels targeting, harvesting, and landing herring—including Plaintiffs—are required to obtain a permit.  *Id.* § 648.4(a)(10)(i); *see* Compl. ¶¶ 67–68.

## STATEMENT OF FACTS

### I.    The Development of the Omnibus Amendment at the Council Level

The introduction of industry-funded at-sea monitoring in the Atlantic herring fishery and the creation of a standardized process for introducing similar industry funding requirements in other New England fisheries has been a years-long process.[3]  It started as early as 2013, when the NEFMC, in consultation with the Mid-Atlantic Fishery Management Council ("MAFMC"), initiated a joint process to design and implement an "omnibus" amendment that would allow introduction of industry-funded monitoring in all the fisheries managed by the two councils.  *See* App. at 00010–00014, 00799.  From the outset, the NEFMC and MAFMC aimed to increase monitoring levels—ostensibly, to better assess catch, monitor limits, and collect other management information—but without expending as much money as would be required under existing observing programs, such as the Northeast Fisheries Observer Program ("NEFOP").  *See, e.g.*, App. at 00797; *see also* App. at 16992 ("We have limited funding for monitoring, so the Council would like the option to allow the fishing industry to pay its costs for additional monitoring, when

---

[3] In line with Local Civil Rule 7(n), Plaintiffs intend to confer with Defendants and file an appendix containing copies of those portions of the administrative record cited by or relied on by the parties in their briefs.  Appendix citations retain the original pagination from the record.

Federal funding is unavailable to cover industry's costs."). The councils intended these discretionary industry-funded monitoring goals to supplement mandatory, federally funded observing under the Standardized Bycatch Reporting Methodology ("SBRM"), the Endangered Species Act ("ESA"), and the Marine Mammal Protection Act ("MMPA").[4] App. at 00797, 17004.

The NEFMC, as well as Defendants, always recognized that industry funding would be a "complex and highly sensitive issue," App. at 17027, especially considering the legal issues related to cost sharing and recovery. *See generally* App. at 00002–00003, 00776–00787. Indeed, early in the regulatory process, regional NOAA officials hinted that the *only* way for the NEFMC and the MAFMC to achieve their discretionary monitoring goals would be to require "industry to be responsible for 100 percent of observing . . . costs, and for the Council to recommend coverage targets rather than mandating specific coverage levels." App. at 00028–000029.

Industry stakeholders—including observing service providers, who stood to benefit from increased monitoring levels—were engaged in the development of the Omnibus Amendment from the beginning and worried about the potentially disastrous economic impact of an industry funding requirement.[5] Even members of the NEFMC's Observer Policy Committee, who were tasked with developing the Omnibus Amendment, expressed frustration over the difficulty of estimating and resolving industry-cost issues. *See* App. at 00988–00989, 00993.

Throughout 2016, at public hearings and during a comment period, *see* App. at 16721–16722, commercial fishermen and their allies reiterated concerns about the feasibility of industry-funded monitoring, particularly given existing regulatory burdens and decreasing quota. Public

---

[4] The MSA authorizes the placement of "observers." 16 U.S.C. § 1853(b)(8). Presumably, this authorization encompasses the placement of "at-sea monitors," which serve a similar, though distinct, role in fisheries management. *See* 50 C.F.R. § 648.2; *see generally* App. at 06745–06746.
[5] *See* App. at 00039–00043, 00886–00887, 01306, 03405–03406, 03475–03476, 04969; *cf.* App. at 02840–02842.

feedback on the Omnibus Amendment was overwhelming negative.[6]  *See, e.g.*, App. at 13801–13804.  Lund's Fisheries, for its part, explained that "projected costs are steep and . . . likely to be unsustainable[.]"  App. at 16899.  It also commented that the Omnibus Amendment marked "a turning point in regional fishery management policy . . . by requiring significant industry funding for monitoring programs that have been funded by the federal government since the passage of the MSA in 1977."  App. at 16898.  Although Lund's Fisheries recognized that reasonable regulation was unavoidable, it pointed out that the projected costs of industry-funded monitoring—which far exceeded previous estimates, *see, e.g.*, App. at 00028 (discussing previous NEFMC proposal for herring and mackerel FMPs with $325 per day "cap on industry contribution"); *see also* App. at 16899 (public comment discussing $350/day proposal)—were not "balanced with . . . biological benefits accruing to the herring and mackerel resource," and were instead the result of "stakeholder campaigns," such as those pressed by environmental groups.  App. at 16899.  William Bright, the owner of Plaintiff Loper Bright Enterprises, Inc., put it more bluntly when describing the economic impact of industry-funded monitoring: "I'm very close to not surviving at all."  App. at 13493.

Fishery stakeholders and interested members of the public continued to provide adverse feedback to the NEFMC and Defendants about the legality and economic feasibility of industry-funded monitoring in late 2016 and early 2017.  *See* App. at 15938–15945, 15947–15956.[7]  Even so, the NEFMC finalized its selection of preferred alternatives in April 2017.  *See* Compl. ¶ 81.

---

[6] *See* App. at 13491, 13492–13494, 13495–13496, 13497–13498, 13504–13505, 13507–13544, 16728, 16730, 16733, 16735, 16738, 16740, 16743–16749, 16755, 16760, 16762, 16764, 16766, 16768, 16772, 16776, 16778, 16781, 16783, 16785, 16787, 16789, 16791, 16793, 16795, 16797, 16799, 16801, 16803, 16805, 16807, 16809, 16811, 16813, 16815, 16817, 16822, 16825, 16827, 16829, 16831, 16833, 16836, 16841, 16843, 16845, 16848, 16850, 16855, 16857, 16859, 16861, 16863, 16865, 16867, 16886, 16888, 16892, 16894, 16905–16906, 16908, 16910, 16937, 16939, 16941, 16944, 16946, 16949, 16952, 16956–16957, 16959, 16963–16965, 16966–16967, 16968.

[7] *See also* App. at 13450–13451, 13452, 13453, 13454, 13455, 13456, 13466, 13467, 13468.

The MAFMC, for its part, decided to postpone action for the mackerel fishery, effectively ending its involvement in the Omnibus Amendment.  *See* Compl. ¶ 82.[8]

## II.     Defendants' Finalization and Promulgation of the Omnibus Amendment

In September 2018, after the NEFMC had finalized the Omnibus Amendment, Defendants published a "notice of availability" in the *Federal Register*, which described the new industry-funded monitoring measures for the Atlantic herring fishery, as well as the "omnibus" measures that would govern industry-funded monitoring in other FMPs managed by the NEFMC—*viz.*, the Atlantic Salmon FMP, Atlantic Sea Scallop FMP, Deep-Sea Red Crab FMP, Northeast Multispecies FMP, and the Northeast Skate Complex FMP.  *See* App. at 17639–17640.  The notice also started a sixty-day comment period for the Secretary of Commerce's "approval/disapproval decision on the amendment."  App. at 17640.

The overall response from public comments to the notice of availability was negative.[9] Lund's Fisheries, for example, again explained that the Omnibus Amendment would impose "an impossible financial burden" on the herring fleet, especially given then-expected substantial quota reductions.  App. at 17683.  It requested that the Secretary pause the Omnibus Amendment while the NEFMC explored other accountability measures, including electronic monitoring and shoreside monitoring.  App. at 17683.  Given the herring fishery's "very low bycatch rates and limited impact on bycatch species normally encountered," the monitoring rates outlined in the Omnibus Amendment would be both "excessive and statistically unnecessary[.]"  App. at 17683.

The next month—before the end of the public comment period on the approval decision for the Omnibus Amendment, and while secretarial approval of industry-funded monitoring was

---

[8] In October 2018, the MAFMC voted to withdraw from the Omnibus Amendment.  Compl. ¶ 88.
[9] *See* App. at 17655–17662, 17675, 17699–17709, 17715.

still pending—Defendants published proposed implementing regulations in the *Federal Register*.
*See* App. 16969–16991.  Again, Defendants opened a public comment period, App. at 16969, and
stakeholders and other interested parties challenged the legality and economic feasibility of
industry-funded monitoring.[10]

By letter, dated December 18, 2018, the Regional Administrator for NOAA's Greater
Atlantic Regional Office, Michael Pentony, informed the NEFMC that the Secretary of Commerce
had approved the Omnibus Amendment.  *See* App. at 17760 –1772.  Mr. Pentony transmitted this
letter *before* the close of the comment period for implementing regulations, and he did not address
the public comments that had been submitted in response to the notice of availability.  Mr. Pentony
neither published the letter nor made it publicly available.[11]   Defendants only published their
responses to the public comments, which they memorialized internally in a decision memorandum,
as part of this lawsuit.  *See* App. at 17785–17798.

On February 7, 2020, Defendants published the final rule implementing the Omnibus
Amendment.  *See* App. at 17731–17759; *see also* App. at 17769–17784.  The omnibus measures
of the rule create a standardized process to devise and implement industry-funded monitoring
programs across the various New England FMPs, clarify cost responsibilities, establish
requirements for monitoring service providers, and set a prioritization process for distributing
available funds for NMFS's cost responsibilities.  *See* App. at 17731–17734.[12]  As for the Atlantic
herring fishery, the final rule establishes, among other things, a 50% industry-funded monitoring

---

[10] *See* App. at 17663–17667, 17689.

[11] As discussed below, the irregularities surrounding the secret approval of the Omnibus
Amendment raise serious concerns about Defendants' processes for approving and implementing
industry-funded monitoring.  *See infra* at pp. 40–42; *see also* Compl. ¶¶ 92–96.

[12] Defendants' final rule only indirectly impacts existing at-sea monitoring programs in the
Atlantic Sea Scallop FMP and Northeast Multispecies FMP.  *See* App. at 17731–17732.

coverage target for all declared herring trips undertaken by a vessel possessing a Category A or B permit. *See* App. at 17734. NMFS calculates this coverage target together with federally funded SBRM observing coverage targets. On any given trip, if a vessel is notified that it will "need at-sea monitoring coverage," and it has not already been assigned a NEFOP observer, "[it] will be required to obtain and pay for an at-sea monitor to carry on that trip." App. at 17735.

The final rule acknowledges that "[i]ndustry-funded monitoring w[ill] have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery," including estimated costs upwards of $710 per sea day, as well as an overall reduction to "returns-to-owner" ("RTO") of "approximately 20 percent." App. at 17735. The expected cost for midwater trawl vessels employing electronic monitoring and portside sampling with an exempted fishing permit is "$515 per day," with an expected "reduction in annual RTO of up to 10 percent[.]" App. at 17736–17737. And midwater trawl vessels that "purchase observer coverage" to gain access to Groundfish Closed Areas can expect to pay "$818 per day," leading to roughly a "5 percent reduction in TRO . . . in addition to any reduction . . . due to other types of industry-funded monitoring coverage." App. at 17736.

## III.    Procedural History

Plaintiffs are a collection of commercial fishing firms headquartered in southern New Jersey that participate regularly in the Atlantic herring fishery. They are subject to the industry-funded monitoring requirements of the Omnibus Amendment and Defendants' final rule. Plaintiffs filed this lawsuit in February 2020 within the MSA's thirty-day window for judicial review. *See generally* Compl.[13] Defendants filed an Answer, *see* ECF No. 12, and a certified list of the contents

---

[13] Neil Jacobs, the Acting NOAA Administrator, is one of the named Defendants. Plaintiffs listed him in the caption of the Complaint, identified him as such in the electronic docket, and served

of the administrative record, *see* ECF No. 13, in April 2020.  Soon after, Plaintiffs filed a consent motion to remove certain parties under Federal Rule of Civil Procedure Rule 21, *see* ECF No. 16, which the Court granted.[14]  Plaintiffs also filed an unopposed motion to expedite this case "in every possible way," as required by the MSA.  *See* ECF No. 15.  The Court granted that motion, too, and scheduled a hearing for October 9, 2020.  *See* Minute Order (May 4, 2020).[15]

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") "provides the exclusive vehicle for reviewing regulatory action . . . under the MSA," *Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 81 (D.D.C. 2019) (citing 16 U.S.C. § 1855(f)(1)),[16] as well as actions under the National Environmental Policy Act ("NEPA").  *See Oceana, Inc. v. Ross*, 363 F. Supp. 3d 67, 76 (D.D.C. 2019).  Under the APA, a court must "set aside agency action" that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) [made] without observance of procedure required by law[.]"  5 U.S.C. § 706(2)(A).  "The party challenging an agency's action . . . bears the burden of proof."  *City of Olmstead Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 261 (D.C. Cir. 2002) (cleaned up).  Review "is normally

---

him a copy of this lawsuit, as required by Federal Rule of Civil Procedure 4.  *See, e.g.*, Proof of Service at 7–9, ECF No. 11.  Government counsel entered an appearance on his behalf.  *See* Notice of Appearance, ECF No. 8.  In a paragraph of their Complaint, Plaintiffs mistakenly referred to the previous Acting Administrator, Timothy Gallaudet.  *See* Compl. ¶ 22.  Rear Admiral Gallaudet served as Acting Administrator from 2017 to 2019.  On information and belief, he now serves in a deputy position at NOAA.  Plaintiffs regret the inconvenience of their typographical error.

[14] The following four entities are no longer plaintiffs: Cape Trawlers, Inc., Golden Nugget LLC, Mount Vernon LLC, and Nancy Elizabeth LLC.

[15] The Court directed the parties to file a joint status report before September 25, 2020, to advise the Court whether a hearing would still be necessary following the completion of briefing.

[16] Although not relevant here, the MSA limits the grounds on which agency action may be set aside and prohibits preliminary relief.  *See* 16 U.S.C. § 1855(f)(1)(A)–(B); *see also Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 55 (D.D.C. 2014).

confined to the full administrative record before the agency at the time the decision was made." *Envtl. Def. Fund v. Castle*, 657 F.2d 275, 284 (D.C. Cir. 1981).[17]  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Zemeka v. Holder*, 963 F. Supp. 2d 22, 24 (D.D.C. 2013) (cleaned up); *see generally* Fed. R. Civ. P. 56(a).

Although "[j]udicial review of agency action under the MSA is especially deferential," *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007), courts must still consider whether a responsible agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) [hereinafter *State Farm*] (citation omitted).  When reviewing whether an FMP amendment tracks the MSA's National Standards, for example, the court's "task is . . . to determine whether the . . .  conclusion that the standards have been satisfied is rational and supported by the record." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1562 (D.C. Cir. 1991).  More generally, agency action should be set aside when an agency (1) "has relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) "is so implausible that is could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 42.

Agency actions are "not spared 'a thorough, probing, in-depth review.'" *Pub. Emps. for Envtl. Responsibility v. Dep't of the Interior*, 832 F. Supp. 2d 5, 15 (D.D.C. 2011) (citing *Citizens

---

[17] A court may correct fact-finding if it "becomes aware . . . that the agency has not really taken a 'hard look' at the salient problems . . . [and] genuinely engaged in reasoned decision-making." *Greater Boston Television Corp. v. Fed. Commc'ns Comm'n*, 444 F.2d 841, 851 (D.C. Cir. 1970).

*to Pres. Overton Park v. Volpe*, 401 U.S. 402, 145 (1971)).  Judicial review must entail careful examination of whether an agency acted outside the scope of its authority, failed to explain its decision, relied on facts outside the administrative record, or otherwise failed to consider relevant facts.  *See Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014).  In the MSA context, too, courts are not so deferential as "merely to rubber stamp agency action[]," which would be "tantamount to abdicating the judiciary's responsibility under the [APA],'" *Nat. Res. Def. Council v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000), especially when the challenged action has "little to do with . . . scientific judgment or technical expertise." *Groundfish Forum*, 375 F. Supp. 3d at 82.

When an agency's act does not carry the "force of law"—for example, when it has not followed required procedures—its interpretation of law receives deference commensurate only with the power to persuade.  *See United States v. Mead Corp.*, 533 U.S. 218, 233–34 (2001).  An agency also receives no deference for its interpretation of statutes that Congress did not entrust specifically to that agency's discretion.  *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996) (no deference to interpretation of the Miscellaneous Receipts Act).  When a party claims that a fishery regulation "exceeded or ran contrary to [a] grant of statutory authority in the MSA," a court "will only defer to the [government's] interpretations of the MSA to the extent that deference is warranted under the two-step framework" of *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984).  *Groundfish Forum*, 375 F. Supp. 3d at 82.  As the D.C. Circuit has explained:

> Under *Chevron* step one, [the court] ask[s] "whether Congress has directly spoken to the precise questions at issue."  If at that point [the court] determine[s] that "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  [The court] proceed[s] to *Chevron*'s second step only "if the statute is silent or ambiguous with respect to the specific issue."  At the second step, [it] determine[s] "whether the agency's answer is based on a permissible construction of the statute."

*Catawba Cty. v. Envtl. Prot. Agency*, 571 F.3d 20, 32 (D.C. Cir. 2009) (citations omitted). Regardless of whether Congress has spoken clearly, an "agency's interpretation of the statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue." *Motion Picture Ass'n of Am., Inc. v. Fed. Commc'ns Comm'n*, 309 F.3d 796, 801 (D.C. Cir. 2002). "An agency may not promulgate even reasonable regulations that claim a force of law without delegated authority from Congress." *Id.*

## ARGUMENT

### I.   The Omnibus Amendment is unlawful, void, and unenforceable.

This is a straightforward case. Defendants promulgated a rule requiring Plaintiffs and other herring fishermen to pay for the at-sea monitors that the NEFMC requires them to carry on their boats. Yet the MSA does not authorize such industry funding. Defendants must instead rely on allegedly implied powers. For the reasons set forth below, this Court should reject Defendants' invitation to find an implied power to impose economically devastating costs on commercial fishermen in the MSA. The Court should instead strike down the Omnibus Amendment and Defendants' *ultra vires* regulation.

### A.   The MSA does not authorize industry-funded at-sea monitoring in the Atlantic herring FMP or other New England FMPs.

Federal agencies do not enjoy unbridled power to choose which programs to pursue; they cannot impose new fees or taxes, nor can they simply demand that citizens pay for programs that the government ought to be financing. The basic presumption of the Omnibus Amendment—that the federal government can require industry by fiat to fund a discretionary monitoring program—violates a fundamental principle of administrative law: "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986). When agencies act "improperly, no less than when they act

beyond their jurisdiction, what they do is *ultra vires*."  *City of Arlington v. Fed. Commc'n Comm'n*, 569 U.S. 290, 297 (2013).  Here, the NEFMC and Defendants acknowledged as much, but failed to give the principle due credit: "Congress must decide how to finance any program, project, or activity . . . it establishes. . . .  A Federal agency cannot spend money . . . beyond the maximum authorized program level without authorization from Congress," and it "cannot get around the maximum authorized program level by adding to its appropriations from sources outside the government without permission from Congress."  App. at 17031.

### 1.   The NEFMC and Defendants only have authority to require monitoring—not to require the industry to pay for it.

The MSA *only* allows FMPs to "require that one or more observers be carried on board a vessel . . . for the purpose of collecting data[.]"  16 U.S.C. § 1853(b)(8).  That is where this case should end.  The MSA does not authorize industry-funded monitoring in the Atlantic herring fishery, or in most of the other fisheries under the jurisdiction of the NEFMC and the MAFMC.  Defendants, together with the NEFMC, have invented the statutory basis for the Omnibus Amendment's industry funding requirements out of whole cloth.

The expected economic impact of industry-funded monitoring, at a cost upwards of $710 *per day*, is possibly disastrous for the herring fleet.  *See supra* at pp. 6–10.  Congress would not "delegate a decision of such economic and political significance to an agency in so cryptic a fashion."  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).  Asking citizens to pay for their *own government minders* is significant and extraordinary.  Congress does not grant such "broad and unusual authority through an implicit delegation," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006), because it does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  When Congress has wanted to

15

delegate such extraordinary authority under the MSA—it has done so.  But not for this region. And not for this fishery.

### 2. The MSA only authorizes industry funding in three limited situations, none of which apply here.

The MSA contains three authorizations for industry funding of at-sea monitors or observers, but only in specific regions and circumstances—none of which apply here.  *First*, when an FMP establishes a special type of fishing permit program called a "limited access privilege program" ("LAPP"), the MSA authorizes collection of fees to "cover the costs of management, data collection and analysis, and enforcement activities."  16 U.S.C. § 1853a(e)(2).[18]  *Second*, the MSA requires foreign fishing vessels to carry and pay a special surcharge to fund observers, *id.* § 1821(h)(4), but that provision is separate from others governing the contents of FMPs and does not apply to domestic vessels.  *Third*, the most important MSA provision related to industry funding is Section 1862(a), which authorizes the North Pacific Council—*and only that Council*— to propose "fisheries research plans" that fund observers through mandatory fees, but *only* for certain fisheries in that region.  *Id.* § 1862(a).[19]

Congress's decision to permit industry-funded monitoring or observing in only these three situations manifests its intent not to authorize mandatory industry funding in other scenarios.  *Cf. Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.9 (D.D.C. 2015).  To read the MSA otherwise would render those provisions discussing industry funding mere surplusage.

---

[18] NOAA's Greater Atlantic Region, which encompasses the NEFMC and the MAFMC, contains two fisheries that permit industry funding through a fee system: the Atlantic sea scallop individual fishing quota and golden tilefish individual fishing quota LAPPs.

[19] As a general matter, the MSA also authorizes the collection of permitting fees, *see* 16 U.S.C. § 1854(d)(1) (cross-referencing Section 1853(b)(1)), or other fees in LAPPs and community development quota programs, so long as they do not exceed three percent of the ex-vessel value of harvested fish at landing.  *See id.* § 1854(d)(2).

*See, e.g.*, *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998).  That is, if Congress had intended the broad, implied authority that Defendants reach for here to allow industry-funding in all regions and for all fisheries, then why did it go through the trouble of specifically enumerating certain fisheries in which observer fees or cost recovery are permissible?  To apply the government's strained reading would render Congress's work surplusage.  But Congress's "words cannot be meaningless, else they would not have been used."  *United States v. Butler*, 297 U.S. 1, 65 (1936); *see* Antonin Scalia & Bryan A. Garner, Reading Law at 174–79 (2012) (discussing surplusage canon); *see also id*. at 107 (discussing *expressio unius* canon, which teaches the inclusion of some items in a set impliedly excludes others).

### 3. Defendants' reading of the MSA offends important canons of statutory interpretation.

Implied authority to impose industry-funded monitoring would reverse two common presumptions concerning congressional intent.  *First*, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Duncan v. Walker*, 533 U.S. 167, 173 (2001) (cleaned up).  *Second*, when Congress grants an agency enumerated regulatory powers, it denies the agency additional powers.  *EchoStar Satellite L.L.C. v. Fed. Commc'ns Comm'n*, 704 F.3d 992, 999 (D.C. Cir. 2013); *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670–71 (D.C. Cir. 1994).  Even the government has contended in other litigation that "'cost sharing' programs with industry participants in other fisheries in order to provide higher observer coverage levels . . . [are] *expressly authorized by statute for particular fisheries only*."  *Anglers Conservation Network*, 139 F. Supp. 3d at 116 n.9 (emphasis added) (citing 16 U.S.C. § 1862).

The express powers Congress did grant to the NEFMC and Defendants do not imply a general authority to impose industry funding. FMPs may only "require that one or more observers be carried on board a vessel . . . for the purpose of collecting data." 16 U.S.C. § 1853(b)(8). The MSA also requires that an FMP "contain the conservation and management measures . . . which are . . . necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1). But a power to raise money (or shift costs to regulated parties) does not follow from general powers related to data collection and conservation.

### 4. The legislative history supports Plaintiffs' reading of the MSA.

There is no evidence of congressional recognition of any sort of pre-existing, implied authority to impose monitoring costs on the regulated industry. "For those who consider legislative history relevant, here it confirms that this choice of language was no accident." *Warger v. Shauers*, 574 U.S. 40, 48 (2014). Congress has, in fact, repeatedly declined the opportunity to authorize industry-funded monitoring nationwide. Each time Congress reauthorized the MSA, it considered and rejected bills that would have created blanket authority for mandatory industry-funded monitoring programs. *See, e.g.*, H.R. 5018, 109th Cong. § 9(b) (2006); H.R. 39, 104th Cong. § 9(b)(4) (1995); H.R. 1554, 101st Cong. § 2(a)(3) (1989). The Omnibus Amendment, and the future industry-funded monitoring programs it envisions for the remaining New England FMPs, runs afoul of this clear legislative history, if such history is relevant.

The history of Section 1862, the North Pacific observer funding provision, is particularly helpful for understanding why the MSA contains no implicit authorization for industry-funded monitoring. Section 1862 originated as part of the Fishery Conservation Amendments of 1990 ("1990 Amendments"), which also added other sections to the MSA to provide for placement of

observers on vessels pursuant to FMPs.  *See* Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, § 109(b)(2), 104 Stat. 4436, 4448 (codified at 16 U.S.C. 1853(b)(8)); *id.* § 118(a), 104 Stat. 4457–59 (codified at 16 U.S.C. § 1862).  Congress authorized *placement* of observers nationwide but only established a method for industry *funding* of those observers for particular fisheries in a single region.[20]  By including those distinct enactments in one bill, Congress made clear that it sought to authorize industry funding for certain observers in the North Pacific but not elsewhere.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). Congress understood Section 1862's funding mechanism to be "specific to the North Pacific Fishery Management Council," and that this did not affect other councils or fisheries.  *See* H.R. Rep. No. 101-393, at 31 (1989).

Two other aspects of Section 1862's history demonstrate that Congress did not authorize industry funding as a general matter.  *First*, several witnesses in hearings for the 1990 Amendments told Congress that no mechanism for industry funding of observers was then available, sometimes in the context of asking Congress to create such a mechanism.  For example, Greenpeace wanted Congress to "[e]stablish a user fee requirement for funding of observer programs, and other management and enforcement purposes[.]"  *See Reauthorization of the Magnuson Fishery Conservation and Management Act of 1976: Hearing on H.R. 2061 Before the H. Comm. on Merch. Marine & Fisheries, Subcomm. on Fisheries & Wildlife Conservation & the Env't*, 101st Cong. 250 (1989) [hereinafter *Reauthorization Hearing*] (written statement of Greenpeace).  The Alaskan Longline Fisherman's Association urged "the Councils be given authority by region to assess cost recovery fees for the observer program[.]"  *Reauthorization of the Magnuson Fishery*

---

[20] The North Pacific Council's salmon fishery is specifically excluded from Section 1862's industry-funded observer provision.  16 U.S.C. § 1862(a).

*Conservation and Management Act of 1976—Part II: Hearing on H.R. 2061 Before the H. Comm. on Merch. Marine & Fisheries, Subcomm. on Fisheries & Wildlife Conservation & the Env't*, 101st Cong. 86 (1989) (statement of Ron Hegge, President, Alaskan Longline Fishermen's Ass'n).

Even the Governor of Alaska explained that "[f]ishing organizations in Washington and Alaska ha[d] developed a proposal that would establish a way to pay for observer programs. The State ha[d] reviewed this proposal, and [it] generally support[ed] it." *Id.* at 326 (written testimony of Gov. Steve Cowper, State of Alaska). And the United Fishermen of Alaska suggested "[r]equir[ing] each vessel to pay for the observer it carries as a cost of doing business." *Id.* at 365 (written testimony of Kate Graham, Exec. Dir., United Fishermen of Alaska). Congress was on notice from stakeholders that it must delegate this power.

*Second*, when the North Pacific Council considered an observer program in 1989, it stated in its Environmental Assessment—as part of its analysis of a "Mandatory Industry Funding" alternative—that it had "proposed an amendment to [the MSA] that would authorize the collection of funds from the users of the resource to help support fishery management programs," but acknowledged "[i]t is unclear whether Congress will take action[.]" Nat'l Marine Fisheries Serv., Envtl. Assessment of Amend. 13 to the Bering Sea and Aleutian Islands Groundfish FMP and Amend. 18 to the Gulf of Alaska Groundfish FMP at 171 (July 21, 1989) [hereinafter North Pacific EA], *available at* https://bit.ly/36ZNh8I. Some members of Congress echoed the point, describing the 1990 Amendments as creating a *new* funding power. *See* 136 Cong. Rec. H229, 237 (daily ed. Feb. 6, 1990) (statement of Rep. John Miller) ("Our amendment will allow the North Pacific Fisheries Management Council to collect a fee from the fishing industry to pay for observers on fishing boats and analyze the data they gather."); 136 Cong. Rec. S14953, 14968 (daily ed. Oct. 11, 1990) (statement of Sen. Robert Packwood) ("The bill also establishes a fee system to pay for

the observer program.").  All parties to the legislative process behind the 1990 Amendments, in other words, treated Section 1862 as granting the North Pacific Council an industry funding authority that would not have otherwise been available to any other regional council.  If regional fishery management councils, in general, had authority to require industry funding for observers or monitors whenever they wished, the importance attached to Section 1862 by members of Congress and outside stakeholders would make no sense.

Congressional choice of a fee-based industry funding mechanism for observers in the North Pacific under Section 1862 is significant.  Statutes reflect congressional selection of means as well as ends.  The role of a court (or agency) "is to interpret the methods that Congress chose to further its goals, not to devise methods of [its] own."  *Consol. Rail Corp. v. United States*, 896 F.2d 574, 579 (D.C. Cir. 1990); *see also* Frank H. Easterbrook, *Statutes' Domains*, 50 U. Chi. L. Rev. 533, 546–47 (1983) ("The judicial selection of means to pursue *X* displaces and directly overrides the legislative selection of ways to obtain *X*.  It denies to legislatures the choice of creating or withholding gapfilling authority.").  If charging fees required a grant of congressional authority, then surely requiring third-party contractors must.

In practice, it appears that the North Pacific Council and NOAA have not respected Congress's choice of methods.  In February 1990—when the 1990 Amendments and H.R. 1554 were pending, and after the Chairman of the North Pacific Council asked Congress to permit industry funding, *see Reauthorization Hearing* at 34, 171; North Pacific EA at 171—the Council and NOAA enacted an industry-funded observer program before receiving statutory authority.  That observer program was funded not by a fee, but by a requirement that vessel operators contract with observer providers and pay them directly.  *See* Groundfish of the Gulf of Alaska, Groundfish Fishery of the Bering Sea and Aleutian Islands Area, 55 Fed. Reg. 4,839, 4,840 (Feb. 12, 1990).

An independent review of the program prepared for the NMFS Alaska Fisheries Science Center commented that the third-party contract approach "was regarded as an interim solution, designed to meet the needs at that time" and that the North Pacific Council always intended to transition to a fee-based system.  MRAG Americas, Inc., Independent Review of the North Pacific Groundfish Observer Program 12–13 (May 2000), *available at* https://bit.ly/3gXi2zt.  Presently, the North Pacific observer program is still funded through a combination of fees and third-party contracts between observer providers and fishing industry members.  *See* Nat'l Marine Fisheries Serv. Alaska Fisheries Sci. Ctr., N. Pac. Groundfish & Halibut Observer Program: 2015 Annual Report at 10 (May 2016), *available at* http://bit.ly/1Yx7d9M; *see generally* 50 C.F.R. § 679.51.

The funding mechanism for the North Pacific observer program has not been challenged in court.  Because that program has its own lengthy history and derives from distinct statutory and regulatory language, a decision invalidating industry funding under the Omnibus Amendment would have limited application in the North Pacific.  Nonetheless, it evidences a pattern by Defendants of enacting and funding vessel monitoring programs without regard for congressional intent or statutory text.  This pattern of behavior must stop.

## B.  *Goethel v. Pritzker* **is dicta and wrongly decided.**

Defendants will likely rely on *Goethel v. Pritzker*, an unpublished district court case from New Hampshire.  No. 15-497, 2016 WL 4076831 (D.N.H. July 29, 2016).  Indeed, the administrative record reveals that the NEFMC and Defendants relied heavily on the *Goethel* decision to justify the legality of the Omnibus Amendment.  App. at 17788–17789.  The district court in *Goethel* dealt with a similar—though factually distinct—challenge to the industry funding provisions of Amendment 16 of the Northeast Multispecies FMP, which affected groundfishermen.  *Id*. at *1.  Although the lower court did a cursory analysis on the merits, it

ultimately decided the case on the statute of limitations and concluded that it had no jurisdiction to decide the case on the merits.[21]   *Id.* at \*4. ("The court finds that plaintiffs 30–day window to challenge the industry funding component of ASM closed . . . well before this suit was filed."). The First Circuit affirmed on that ground alone, taking no position on the substantive issues.  *See Goethel v. Dep't of Commerce*, 854 F.3d 106, 116 (1st Cir. 2017) ("Because we find that Goethel's suit was not filed within the MSA's thirty-day statute of limitations, we need go no further, and we take no position on the district court's statutory and constitutional rulings.").

Thus, in dicta, the district court wrongly ignored the rule against surplusage and gave no effect to the express grants of observer authority in the MSA.  The court instead relied on an augmented powers provision, 16 U.S.C. § 1853(b)(14), which reads that FMPs may contain "such measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery."  *See Goethel*, 2016 WL 4076831, at \*4.  In doing so, it misapplied the First Circuit's own precedent, which requires that a necessary and appropriate provision "merely augments whatever existing powers have been conferred on [an agency] by Congress, without itself comprising a source of independent authority to act."  *Boston Edison Co. v. Fed. Energy Regulatory Comm'n*, 856 F.2d 361, 369–70 (1st Cir. 1988).

The New Hampshire district court also cited 16 U.S.C. § 1858(g)(1)(D), which "allows the Secretary to issue sanctions against any vessel owner or operator who has not made 'any payment required for observer services provided to or contracted by an owner or operator.'"  *Goethel*, 2016 WL 4076831, at \*5.  It reasoned that the sanctions provision must mean the statute elsewhere permits direct industry funding.  *Id.*  Of course, as argued above, the statute *does* permit industry

---

[21] The MSA has a surprisingly short statute of limitations—only thirty days.  16 U.S.C. § 1855(f). The instant case was filed well within that time period and thus this is the first time any federal court has directly addressed the legal merits of industry-funded at-sea monitoring.

funding—in specific places, like the Pacific fishery.   It is sensible then to read Section 1858(g)(1)(D) to apply to those explicit grants of authority, and not implied grants inappropriately drawn out of a necessary and appropriate clause.   That the MSA contains a provision requiring payment for its other *explicit* requirements does not grant the agency extra *implied* authority—it simply allows the agency to enforce authority the agency already has.   Recognizing this, the *Goethel* court argued that Amendment 16 only required "industry contracts with ASM providers, with whom [fishermen] are free to negotiate contract terms."   2016 WL 4076831, at *5.   It contrasted this with the "fee schedule" required by Section 1862.   *Id*.   Thus, by artfully avoiding the word "fee" and instead requiring fishermen to pay the observers directly, the agency created an entirely new citizen-funding power.   This is a dangerous precedent.

There are other, less nefarious explanations.   By referring to "contracted" observer services in Section 1858(g)(1)(D), Congress may have believed that its explicit authorizations for industry funding allowed mandatory third-party contracting as an alternative in those fisheries where it already permitted assessed fees.   *See generally* 16 U.S.C. §§ 1862, 1821(h)(4), 1853a(e)(2).   Or Congress's distinction between observers "provided to" or "contracted by" fishermen may have referred to different methods of arranging placement of observers, and not to how the observers are paid for.   If the government were already permitted to authorize industry funding by requiring third-party contracts, why would Congress and other stakeholders have attached so much importance to allowing the North Pacific Council to fund observers through fees?   And why would Congress have repeatedly refused to make the implicit background authority explicit?   The district court's superficial analysis in *Goethel* missed the mark badly.   The First Circuit never blessed it, and neither should this court.

### C.     Industry-funded monitoring violates agency financing and expenditure statutes.

The principle that the NEFMC and Defendants cannot act without a grant of statutory authority is especially significant because industry funding is a tax in all but name.   The government seeks to extract money from regulated parties in order to fund its own operations and the programs it has established by regulation.   "[O]nly Congress," however, "has the power to levy taxes."   *Thomas v. Network Solutions, Inc.*, 2 F. Supp. 2d 22, 29 (D.D.C. 1998), *vacated on other grounds,* No. 97-2412, 1998 WL 1738180 (D.D.C. Aug. 28, 1998); *see* U.S. Const., art. I, § 8, cl. 1; *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes[.]").

### 1.     Statutes explicitly bar this sort of revenue-raising.

*First*, the industry funding requirements of the Omnibus Amendment would mean that the MSA—and potentially many other statutes—impliedly repeals statutes that limit the powers of agencies to raise additional money to fund their programs.   The Anti-Deficiency Act ("ADA"), for example, prohibits federal officers from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" and from "involv[ing] [the United States] in a contract or obligation for the payment of money before an appropriation is made unless authorized by law[.]"   31 U.S.C. § 1341(a)(1)(A)–(B).   Similarly, the Miscellaneous Receipts Act ("MRA") provides that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury[.]"   31 U.S.C. § 3302(b); *see Scheduled Airlines Traffic Offices, Inc.*, 87 F.3d at 1361.   And while the Independent Offices Appropriations Act allows agencies to recoup some "user fees" from regulated parties, 31 U.S.C. § 9701(b), the government has conceded that industry funding for monitors is not defensible as a user fee.   App. at 17739 ("These industry costs are not 'fees.'").

25

These statutes limit the ability of agencies to self-fund in the absence of an appropriation by Congress.  When congressional appropriations run out, even mandatory agency activities lapse. *Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir. 1995); *see Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 134 S. Ct. 2427, 2446 (2014).  Agencies may not perpetuate their operations by developing their own sources of revenue and undertaking their own financial commitments.

The government itself has contended that the ADA and MRA preclude it from creating observer programs and offloading costs onto the industry when they exceed appropriated funds. The agency successfully defended that position in litigation in recent years.  *See Anglers Conservation Network*, 139 F. Supp. 3d at 116 n.9; *see also, e.g.*, Fisheries of the Northeastern United States; Atlantic Mackerel, Squid, and Butterfish Fisheries; Amendment 14, 79 Fed. Reg. 10,029, 10,034, 10,036, 10,039 (Feb. 24, 2014).  NMFS also disapproved a fisheries-management measure proposed by the NEFMC in 2013 under the Northeast Multispecies FMP for at-sea monitoring cost sharing, explaining that "the Anti-Deficiency Act and other appropriations law prohibits Federal agencies from obligating the Federal government except through appropriations and from sharing the payment of government obligations with private entities."  Northeast (NE) Multispecies Fishery; Framework Adjustment 48, 78 Fed. Reg. 26,118, 26,119–20 (May 3, 2013) (to be codified at 50 C.F.R. pt. 648).

But that is exactly what the NEFMC and Defendants have done by requiring industry funding in the Atlantic herring FMP and setting the stage for its expansion to other New England fisheries.   Once the government realized that Congress's appropriated funding would be insufficient to fully fund a program that the NEFMC desired to create for the herring fishery and other New England FMPs, *see, e.g.*, App. at 00028–00029, it offloaded the costs of the program on the industry instead.  Assuming Congress could constitutionally permit the administrative state

that kind of fiscal independence, this Court should not assume Congress impliedly repealed pre-existing limits on agency finances without a more explicit statement than the MSA provides. *Passamaquoddy Tribe v. State of Me.*, 75 F.3d 784, 790 (1st Cir. 1996) ("[I]mplied repeals of federal statutes are disfavored.") (quotes omitted).

## 2. The Omnibus Amendment is a tax by another name.

If Defendants employed and paid at-sea monitors directly while compelling fishermen to provide the funds, there is no question that industry funding for monitoring would involve "revenue for the government" under Congress's taxation power, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2594 (2012); a government "expenditure or obligation" under the ADA, 31 U.S.C. § 1341(a)(1)(A)–(B); and "money for the Government" under the MRA, 31 U.S.C. § 3302(b).  The same would be true if Defendants received payments and then remitted the money to monitoring providers.  *See Anglers Conservation Network*, 139 F. Supp. 3d at 116 n.9; 78 Fed. Reg. at 26,119–20.

That the monies paid by impacted herring permit holders go to private monitoring companies, not directly to Defendants, is a distinction without a difference.  At-sea monitoring is a government program created by the NEFMC and Defendants, regulated by them in detail, and which they will continue to fund in-part themselves.  *See, e.g.*, App. at 17732–17733.  The Government Accountability Office has rejected the proposition that an agency can avoid the MRA "by authorizing a contractor to charge fees to outside parties and keep the payments in order to offset costs that would otherwise be borne by agency appropriations."  Gov't Accountability Office, 2 Principles of Federal Appropriations Law at 6-177 (3d ed. 2006) [hereinafter Principles of Federal Appropriations Law].

D.      **The Omnibus Amendment violates National Standards 7 and 8.**

The MSA requires any FMP adopted or revised by a regional council be consistent with

ten "National Standards."  *See* 16 U.S.C. § 1851(a).  Two standards are pertinent here.  National

Standard Seven requires that "[c]onservation and management measures shall, where practicable,

minimize costs and avoid unnecessary duplication."   16 U.S.C. § 1851(a)(7); *cf.* 50 C.F.R.

§ 600.340.  And National Standard Eight mandates that "[c]onservation and management measures

shall, consistent with the conservation requirements of this Act . . . , take into account the

importance of fishery resources to fishing communities by utilizing economic and social data that

meet the requirements of [National Standard Two], in order to (A) provide for the sustained

participation of such communities, and (B) to the extent practicable, minimize adverse economic

impacts on such communities."  16 U.S.C. § 1851(a)(8); *cf.* 50 C.F.R. § 600.345.  In evaluating

National Standards, unlike an *ultra vires* claim, the Court's role is "to determine whether the

Secretary's conclusion that the standards have been satisfied is rational and supported by the

record."  *Gutierrez*, 518 F. Supp. 2d at 79.

The economic impact of industry-funded monitoring is hard to deny.  *See supra* at pp. 6–

10.  At a cost upwards of $710 per day, many small business herring fishermen will suffer severe

economic consequence.  *Id*.  And the scientific need for monitors is dubious.  Michael Sissenwine,

a NOAA employee, conceded as much in a 2015 email to members of the NEFMC's Observer

Policy Committee: "I do not think that industry should be saddled with the cost of a program that

was primarily designed for application to a relatively small number of vessels for scientific

purposes using government standards for doing business.  The scope and quality of data needed

for scientific purposes makes at sea monitoring expensive."  App. at 01607.  Several commenters

to the rule concurred.  *See, e.g.*, App. at 16899 ("The projected costs from every option included

28

in [the Omnibus Amendment] are much, much higher [than anything previously proposed] . . . and we are questioning whether or not the additional biological information that may be gathered is worth that additional cost."). Based on the severe economic impact on the fishery, and the limited impact of the scientific data collected, Defendants should have rejected the Omnibus Amendment and advised the NEFMC to design a less-onerous alternative.

Instead, Defendants argue they have "concluded that the Council's measures minimize costs to the extent practicable and take into account the importance of fishery resources to fishing communities to provide for their sustained participation in the fishery and minimize the adverse economic impacts of these measures on those communities." App. at 17742. They concede that "the economic impact of industry-funding on participants in the herring industry may be substantial," but argue they "considered the nature and extent of those costs relative to the benefits of additional monitoring, such as reducing uncertainty around catch estimates to improve management, and measures to mitigate costs." App. at 17742. To combat this, the government claims it set the coverage target at "50 percent, instead of 75 or 100 percent" to balance "the benefit of additional monitoring with the costs[.]" App. at 17742. But the reasoning Defendants offer in support of the need for monitoring is specious and talks *primarily* of the benefits of *the method preferred by the NEFMC. See* App. at 17742. At no point did Defendants justify the Omnibus Amendment by describing less costly alternatives that the NEFMC seriously considered. By omitting such discussion from the final rule, Defendants implicitly admitted that the NEFMC's preferred alternatives—and the imposition of industry funding—were the sole solutions seriously considered. That is not good enough.

E.      **The February 7, 2020 Final Rule is substantively deficient.**

Many organizations filed regulatory comments opposing finalization of the Omnibus Amendment.  In the February 7, 2020 Final Rule, Defendants tried to address several legal and factual issues these commenters raised.  But Defendants' responses were substantively deficient.

Although Defendants correctly noted that "[t]he [MSA] expressly authorizes onboard human monitors[,]" and accordingly cited Section 1853(b)(8), they then argued that "[t]he requirement to carry observers . . . *includes compliance costs on industry participants*."  App. at 17739 (emphasis added).  But contrary to restatement of the authorization to require monitoring, the second claim was not followed by a statutory citation—because there is nothing to cite.  As described above, *supra* pp. at 14–22, there is *no* statutory authorization for industry-funded monitoring.  Defendants instead attempted to analogize monitoring costs to the requirement that vessels "install vessel monitoring systems" or "fish with certain gear types or mesh sizes" or "ensure a vessel is safe before an observer may be carried on a vessel."  App. at 17739.  Defendants continued that "[v]essels pay costs to third-parties for services or goods in order to comply with these regulatory requirements[.]"  App. at 17739.

There are several problems with Defendants' analogy.  *First*, the MSA *expressly* allows for industry funding of monitors in certain regions and fisheries elsewhere.  Defendants never addressed the argument that, were this power to be implied, then Congress's efforts to allow it elsewhere would be rendered surplusage, even though it was raised during rulemaking.  *See, e.g*, App. at 17657; *cf.* App. at 17699–17700, 17711.

*Second*, there is a key distinction between regulatory costs—often enumerated by statute— and effectively paying the salary of your direct, government minder.  There are, to be sure, many statutes that explicitly require regulated parties to self-monitor and report their own activities, and

many of those statutes may entail purchasing equipment. *E.g.*, 42 U.S.C. § 7414(a)(1) (Clean Air Act); 33 U.S.C § 1318(a) (Clean Water Act). In those fields, regulated parties bear the cost of compliance. In other circumstances, however, Congress or agencies do not consider self-monitoring to be sufficient, and instead require outside inspections. The costs of such law enforcement are, of course, borne by the government. When Congress wants regulated parties to pay for inspections, it issues specific statutory commands. *See, e.g.*, 7 U.S.C. § 1622(h)(1) (USDA inspections); 29 U.S.C. § 655(b)(7) (OSHA medical examinations). The Internal Revenue Code, for example, authorizes "inquiries, determinations, and assessments of all taxes[.]" I.R.C. § 6201. But individuals are not, and could not be, responsible for paying the cost of tax evaluations—even if the Internal Revenue Service ("IRS") contracted an outside third party for assistance. *See, e.g.*, IRS Bull. 2014-18 (July 7, 2014), *available at* https://www.irs.gov/irb/2014-28_IRB (discussing the IRS's use of third-party contractors).

The distinction between self- and government-funded monitoring regimes fits with how the government has customarily distinguished compliance costs from the government's cost of monitoring and enforcement. Executive Order 12886, which requires administrative agencies to undertake a cost-benefit analysis of proposed regulations, distinguishes between "the costs of enforcement and compliance," 58 Fed. Reg. 51,735, § 1(b)(5) (Oct. 4, 1993), as well as between "the direct cost . . . to the government in administering the regulation" and the cost "to businesses and others in complying with the regulation." *Id.* § 6(a)(3)(C)(ii); *see* OMB Circular A-4 at 7–8 (Sept. 17, 2003), *available at* https://bit.ly/372wgKS (directing agencies to control their own costs by identifying the most cost-effective "enforcement framework," including the options of "on-site inspections" and different types of "monitoring" activities). At-sea monitoring falls on what has always been considered the government's side of the ledger.

31

More fundamentally, Defendants' position has no limiting principle.  If an agency can arbitrarily shift expenses onto its regulated industry by defining those expenses as compliance costs, the limits created by congressional delegations and appropriations are meaningless. *Cf. Action All. of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 82 (D.C. Cir. 1991) (noting that agency power to require "data collections for compliance enhancement . . . would enable the agencies to shift enforcement costs from themselves to regulated parties").  Assuming the government can permissibly require regulated parties to carry monitors or monitoring equipment, it does not follow that the agency can compel them to assume the *cost* of monitoring.

Defendants also tried to dismiss arguments that industry funding is an unlawful tax, arguing that "[t]he inherent cost of a requirement, like industry-funding [sic] monitoring, is not the same as a 'tax.'  The hallmark of a tax is that the government receives some revenue.  The government receives no revenue from industry-funded monitoring."  App. at 17740.  The same arguments from above apply here—namely, industry-funded monitoring is different from a compliance cost—but also that the government *is* essentially receiving revenue; services the government is obligated to provide are instead paid by citizens.  *Cf.* Principles of Federal Appropriations Law at 6-177.  Consider a situation in which the government had money from taxpayers hit its bank accounts for a moment, and then the money was disbursed to pay the salaries of government monitors.  No one would dispute that this acted as a "tax."  Here, Defendants are trying to evade any construction of industry-funded monitoring as a tax by unlawfully requiring fishermen to pay the contractors directly.  Government officials cannot be allowed to use artful drafting to take money from Americans, at the risk that it could extend into other inherently governmental functions.  Could the IRS require you to contract directly with your third-party auditor?  Could the FBI require a defendant to pay the government's investigator?  Surely not—and the same holds true here.

32

## II.     The Omnibus Amendment is procedurally infirm.

Assuming Congress empowered the NEFMC and Defendants to impose industry funding for at-sea monitoring, they would still at a minimum need to follow the procedural requirements for imposing such a requirement.  They have not done so.  Defendants' design and implementation of the Omnibus Amendment is plagued by multiple procedural infirmities, including violations of NEPA, the Regulatory Flexibility Act ("RFA"), and general principles of procedural due process.

### A.     Defendants violated NEPA.

Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment[.]"  42 U.S.C. § 4321.  To achieve this goal, agencies must consider and disclose the environmental consequences of planned actions.  *See id.* § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.  Although NEPA does not impose outcome-determinative obligations, it does require an agency to "take a hard look at environmental consequences[.]"  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (cleaned up).  In this way, it ensures that an agency, "'will have available, and will carefully consider, detailed information concerning significant environmental impacts.'"  *Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 67 (D.D.C. 2000) (quoting *Robertson*).  The agency must notify the public of proposed actions and allow it to comment on the effects of the agency's project.  *See* 40 C.F.R. § 1506.6.  The MSA confirms the government must comply with NEPA when promulgating fishery regulations.  16 U.S.C. § 1854(i).

At the heart of NEPA is the Environmental Impact Statement ("EIS"), which is required for all "major Federal actions significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(C); 40 C.F.R. § 1501.4.  The EIS provides a "full and fair discussion of significant environmental impacts and . . . inform[s] decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of

the human environment." 40 C.F.R. § 1502.1. As part of an EIS, an agency must identify direct, indirect, and cumulative impacts of its proposed action, *see id.* § 1508.8, as well as the impact of alternative actions. *See* 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.14.

When an agency does not believe that a proposed action will significantly affect the environment, it must still prepare an Environmental Assessment ("EA") that "briefly provides sufficient evidence and analysis" for finding "no significant impact." *See* 40 C.F.R. §§ 1501.4, 1508.9. An agency must memorialize a decision to bypass an EIS in a Finding of No Significant Impact ("FONSI"). *See* 40 C.F.R. § 1501.4(e); *see also id.* § 1508.13.

"Courts review EAs and FONSIs," as well as the decision not to prepare an EIS, "under the familiar arbitrary or capricious standard of the APA." *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 69 (D.D.C. 2012). A reviewing court examines four factors, including whether the agency (1) accurately identified the relevant environmental concerns, (2) took a "hard look" at those problems, (3) made a convincing case for the "finding of no significant impact," and (4) showed that "even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011). Here, the NEFMC and Defendants conducted an EA and adopted a FONSI. *E.g.*, App. at 17332. But Defendants' decision to bypass an EIS must be set aside as arbitrary or capricious for at least four reasons.

*First*, Defendants failed to take a "hard look" at the *complete* environmental impact of the Omnibus Amendment. As for the "omnibus" measures that will standardize implementation of industry-funded monitoring across all FMPs, Defendants refused to undertake *any* analysis, arguing instead that these measures were mere "tools . . . to use when developing future IFM program" and thus do not "directly impose any costs." App. at 17179. But that is misleading.

34

The NEFMC itself recognized that the economic impact of future FMP-specific industry-funded monitoring programs developed under the Omnibus Amendment's "streamlined" provisions will be uniformly negative: "[T]here w[ill] be *direct negative economic impacts to fishing vessels*[.]" App. at 17179 (emphasis added).  The real costs associated with the omnibus alternatives cannot be dismissed as too "speculative" to "analyze" in detail. *See, e.g.*, App. at 17182 (The "preferred alternatives will likely have potential downstream impacts . . . but these impacts are too remote and speculative to be appropriate for consideration[.]").

If anything, Defendants' consideration of the omnibus measures, which purport to prescribe the design and operation of yet-to-be-created industry-funding requirements in other FMPs, suggests an improper attempt to "'artificially divid[e] a major federal action into smaller components, each without significant impact.'" *Jackson Cty. v. Fed. Energy Regulatory Comm'n*, 589 F.3d 1284, 1290 (D.C. Cir. 2009); *cf.* 40 C.F.R. § 1508.25(a)(1) (discussing "connected actions").  If the Omnibus Amendment has true "omnibus" effect, it was improper for the NEFMC and Defendants to narrow the scope of the EA to the herring alternatives. *Cf. Greenpeace v. Nat'l Marine Fisheries Serv.*, 55 F. Supp. 2d 1248, 1272–73 (W.D. Wash. 1999) (rejecting a supplemental EIS where NMFS improperly narrowed its analysis).

Relatedly, in a previous draft of the EA, the NEFMC suggested that monitoring costs could rise even higher than expected because of overlapping requirements for industry-funded monitoring in multiple fisheries.  The NEFMC revealed, for example, that "[m]any of the vessels that would be impacted by industry-funded monitoring costs in the herring fishery would also be impacted by . . . costs in the mackerel fishery."  App. at 14117.  When the MAFMC withdrew from the Omnibus Amendment, and concurrently tabled a monitoring regime for the mackerel fishery, it did so in large part because of its concern over overlapping industry-funded monitoring

requirements.[22]  Damningly, though, the final EA provides no detail about the potential economic impact of industry-funded monitoring in a hypothetical future where multiple fisheries impose similar industry funding requirements.  That failure violates NEPA's requirement that an agency consider the cumulative impacts of a planned action.  *See* 40 C.F.R. § 1508.7.  It is reasonable to assume that vessels declaring into multiple fisheries for any given trip could be continually subject to monitoring requirements.  And the EA offers only meager evidence of efforts to consider how the herring alternatives could impact the mackerel fleet and other vessels that incidentally declare herring yet still become subject to monitoring requirements.  *See* App. at 17249–17250.

*Second*, the NEFMC and Defendants failed to adequately address potential mitigation measures or alternatives to the Council's planned regulatory actions.  Although the EA reflects the direct negative effects on fishery-related businesses and communities associated with paying for industry-funded monitoring, it downplays that impact by referring to the waiver of coverage for vessels that land less than 50 metric tons of herring per trip—a mitigation measure that applies to an especially small portion of the herring fleet, *see, e.g.*, App. at 17250—and by vaguely referring to potential adjustments by the NEFMC in the next two years.  *See* App. at 17327.  If anything, the uncertainty of future management efforts by the Council, not to mention the uncertainty in estimating costs associated with monitoring, should be construed in favor of the regulated industry, rather than used as an effective exemption from serious economic analysis.

*Third*, Defendants pre-judged the outcome of the EA in favor of the NEFMC's preferred alternatives.  *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714–15 (10th Cir.

---

[22] Mid-Atl. Fishery Mgmt. Council, October 2018 Council Meeting Summary at 1–2 (Oct. 2018), *available at* http://bit.ly/2PYRMdA ("The Council had originally considered IFM due to observer coverage concerns in the mackerel fishery, but most mackerel catches will be subject to additional monitoring through a recent New England Council IFM action for the Atlantic herring fishery.").

2010) (violation of NEPA to predetermine the result of environmental analysis); *see also Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011) (discussing procedural due process implications of "unalterably closed minds").  Nothing in the administrative record suggests that the NEFMC and Defendants seriously considered preserving the status quo—*i.e.*, taking "No Action."  From the outset, the NEFMC and Defendants recognized there was only one acceptable result: "allow[ing] the Councils to use industry funding to increase observer coverage levels in their fisheries."  App. at 00028.  That much was clear several years into the development of the Omnibus Amendment, when a NOAA employee admitted cost benefit analysis would not be "completed" before the Council selected its preferred alternatives.  App. at 07484.

A reasonable regulator would think twice before implementing a rule that receives overwhelmingly negative feedback from stakeholders and regulated parties.  Not so here.  The reasons for widespread opposition to the Omnibus Amendment are straightforward enough.  Many small-scale fishermen cannot remain profitable if they must assume monitoring costs.  *See, e.g.*, App. at 16743–16749.  The Long Island Commercial Fishing Association, for example, explained that the Omnibus Amendment could force more than half of the entire New York-based fleet out of business.  *See* App. at 16963–16965.  Stakeholders also expressed skepticism that increased monitoring had any connection to conservation or maintaining the sustainability of the fisheries, and they questioned the quality of data that Defendants would collect.  Most importantly, however, commenters recognized that the MSA does not authorize industry-funded monitoring simply because the NEFMC or Defendants wish it so.  *See, e.g.*, App. at 16757–16758, 16949.

*Fourth*, the NEFMC and Defendants refused to revise or supplement the EA despite significant herring catch reductions in 2019 and 2020.[23]  *See* 40 C.F.R. § 1502.9(c) (supplemental EA/EIS required when there are "substantial changes" to a proposed action or "significant new circumstances or information . . . bearing on the proposed action or its impacts").  In the final rule, Defendants explained, in cursory fashion, that "increases in total revenue from other fisheries"— that is, "vessels . . . expanding their participation in other fisheries" due to historically low herring quota allowances—would "mitigate the negative impacts of reductions to the herring ACL and associated revenue."  App. at 17738.  But this is an inadequate and unpersuasive position, and the EA contains no data to support such a prediction.  It is more likely that Defendants believe a supplemental EA would delay the Omnibus Amendment and jeopardize the feasibility of imposing industry-funded monitoring—an unacceptable outcome given the NEFMC's monitoring goals.  That also seems more likely considering Defendant's explanation that its "RTO analysis" was "based on economic data collected with a special cost survey that could not be repeated in a timely way for this action[.]"  App. at 17738.

## B.    Defendants violated the RFA.

The RFA requires agencies to determine the economic impact of their planned actions on small entities and to explore alternatives that could reduce any significant economic impacts. Agencies must include these determinations in a "initial regulatory flexibility analysis" ("IFRA"), which they then make available to the public for comment at the time of a notice of proposed rulemaking.  5 U.S.C. § 603(a); *see generally id.* § 603(b)–(d).  When an agency promulgates a final rule, it prepares a final regulatory flexibility analysis ("FRFA"), which must address, among

---

[23] *See* 85 Fed. Reg. at 26,875–76; Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 84 Fed. Reg. 2,760 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648).

other things, any "significant issues raised" during the public comment period, including responses

to comments from the Small Business Administration, as well as steps the agency will take to

minimize "significant economic impact on small entities[.]" *Id.* § 604(a). The agency must make

the FRFA publicly available and publish it in the *Federal Register. Id.* § 604(b). The RFA affords

a right to judicial review to any "small entity that is adversely affected or aggrieved by final agency

action[.]" *Id.* § 611(a)(1). The RFA applies to actions governed by the MSA. 16 U.S.C. § 1855(e).

Reviewing courts adjudicate claims arising under the RFA in accordance with the APA's

arbitrary and capricious standard. *See Gutierrez*, 518 F. Supp. 2d at 79. Like NEPA, the RFA is

a "[p]urely procedural" statute. *U.S. Cellular Corp. v. Fed. Commc'ns Comm'n*, 254 F.3d 78, 88

(D.C. Cir. 2001). Authorities in this Circuit have recognized that a court should not examine

whether an agency "got the required analysis right," but whether it made "reasonable, good-faith

effort[s] to take [the required steps] and . . . satisfy the statute's mandate." *Gutierrez*, 518 F. Supp.

2d at 95 (citing *U.S. Cellular Corp.*). Yet even setting aside an inapt "standard of mathematical

exactitude," *Assoc. Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997), Defendants'

RFA analysis is still unreasonable.

The NEFMC and Defendants failed to prepare an adequate IFRA or FRFA that considered

the economic effects of industry-funded monitoring in the Atlantic herring fishery and other FMPs.

They addressed no economic impacts associated with the omnibus alternatives. App. at 17339.

As for the economic impact of the Atlantic herring alternatives, Defendants also did not adequately

consider the full set of costs they will impose on regulated entities. This includes the danger of

overlapping monitoring requirements, the effect of significant quota cuts (whether recent or

expected), and the actual feasibility of alternatives such as electronic monitoring or the use of an

exempted fishing permit. *See* App. at 17341–17346. Finally, Defendants offered no serious

explanation for their conclusion that certain businesses were "more likely to exit the fishery if the cost of monitoring [were] perceived as too expensive." App. at 17342. Conclusory findings such as these are facially unreasonable. *See S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1436 (M.D. Fla. 1998) ("[T]he Secretary's 'no significant impact' certification and the FRFA fail to satisfy APA standards and RFA requirements. The record strongly indicates that the [proposed action] . . . will significantly injure the prospects of . . . fishermen[.] . . . The record also severely discredits NMFS's argument that no fishermen are dependent on [the species at issue] and that the plaintiffs can effortlessly transfer their fishing efforts to other stocks.").[24]

### C.   The approval and finalization of the Omnibus Amendment violated important aspects of procedural due process.

Under the MSA, the Secretary of Commerce plays an important gatekeeping role by ensuring that FMPs and implementing regulations comply with federal law. When a regional council adopts an FMP amendment, as it did here, the Secretary "immediately commence[s] a review" to ensure that the amendment complies with the MSA, the National Standards, and other applicable laws. 16 U.S.C. § 1854(a)(1)(A). After the publication of a notice of availability and the end of a public comment period, the Secretary has thirty days to provide a final approval decision, which considers the "information, views, and comments received from interested persons[.]" *Id.* § 1854(a)(2); *see id.* § 1854(a)(1)(B), (a)(3). The MSA thus presumes a clear process: a council finalizes its preferred alternatives for an FMP amendment, NMFS solicits public comment, and the Secretary approves or disapproves the amendment. Proposed regulations

---

[24] The questionable quality of the data used in the IRFA is further highlighted by Defendants' inability to "ascertain whether or not the [Omnibus Amendment] can be certified as not having a significant adverse impact on a substantial number of small entities." App. at 17719.

implementing the amendment should be published in the *Federal Register* only after secretarial approval of the underlying FMP amendment.

Here, the NEFMC and Defendants failed to follow this common-sense process. After publishing the notice of availability in September 2018, *see* App. at 17639–17640, but before the Secretary had approved the Omnibus Amendment, Defendants published implementing regulations in November 2018. *See* App. at 16969–16991. The Secretary only cleared the Omnibus Amendment as consistent with the MSA and other federal law on December 17, 2018. *See* App. at 17785–17798.[25] The next day, NOAA informed the NEFMC of that approval in a non-public letter that it never officially disseminated. *See* App. at 17760–17762. NOAA addressed responses to the comments filed in response to the notice of availability in the final rule published earlier this year.

The irregularities surrounding the secret approval of the Omnibus Amendment raise important procedural due process concerns. Congress designed the APA and the MSA, including the requisite notice-and-comment process for approval of FMP amendments, to protect against the dangers of an unchecked, and democratically unaccountable, federal bureaucracy. It is a "fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fed. Comm'cns Comm'n v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). The APA and the MSA provide an important check on "administrators whose zeal might otherwise [carry] them to excesses not contemplated in legislation creating their offices." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)) (Scalia, J., concurring).

---

[25] In trying to defend the irregular approval process for the Omnibus Amendment, the Secretary claimed, in an August 2019 letter, that "approval of the [Omnibus] [A]mendment itself does not impose any regulatory requirement on the public[.]" Compl. Ex. 7, ECF No. 1-07.

Given the publication of a notice of availability and the solicitation of public comments, secretarial approval of the Omnibus Amendment should have been similarly published in the *Federal Register* along with responses to comments.  By deviating from this process, and proposing implementing regulations for an *unapproved* FMP amendment, the NEFMC and Defendants effectively prejudged the legality of the Omnibus Amendment and committed the government to proceeding with implementation of industry-funded monitoring requirements.

In doing so, NEFMC and Defendants denied the public the ability to meaningfully comment on the proposal.  "The process of notice and comment rule-making is not to be an empty charade. . . .  One particularly important component . . . is the opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules." *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982).  "An agency is generally required by the APA . . . to accept and *consider* public comments on its proposal." *Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir. 2014) (emphasis added); *see Grand Canyon Air Tour Coal. v. Fed. Aviation Admin.*, 154 F.3d 455, 468 (D.C. Cir. 1998) ("An agency is required to provide a meaningful opportunity for comments, which means that the *agency's mind must be open* to considering them.") (emphasis added).  Defendants' finalization of the rule before the comment process ended strongly suggests Defendants' intent to force the Omnibus Amendment onto fishermen regardless of the public outcry,[26] the clear (and unaddressed) legal infirmities, and the negative impact on the long-term viability of the commercial fishing fleet.

---

[26] *See, e.g.*, App. at 17692 ("It has come to my attention that the Secretary of Commerce has approved this amendment prior to the closing of the Public Comment period.  It is disappointing to see the process proceed in this manner.  How are public comments considered when the amendment has already been approved?"); *see also* Compl. Ex. 6.

## **CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment; permanently enjoin Defendants from implementing the Omnibus Amendment; and declare as unlawful and set aside industry funding requirements for at-sea monitoring in the Omnibus Amendment because they are *ultra vires* and violate applicable statutes and constitutional provisions.

Dated: June 8, 2020                              Respectfully submitted,

                                                 */s/ Ryan P. Mulvey*
                                                 Ryan P. Mulvey
                                                 D.C. Bar No. 1024362
                                                 Eric R. Bolinder
                                                 D.C. Bar No. 1028335

                                                 CAUSE OF ACTION INSTITUTE
                                                 1310 North Courthouse Road, Suite 700
                                                 Arlington, VA 22201
                                                 Phone: (571) 444-2841
                                                 ryan.mulvey@causeofaction.org
                                                 eric.bolinder@causeofaction.org

                                                 *Counsel for Plaintiffs*