## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LOPER BRIGHT ENTERPRISES, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No: 1:20-cv-00466-EGS |
| | ) |
| WILBUR L. ROSS, in his official capacity as | ) |
| Secretary of the Department of Commerce, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  STATUTORY BACKGROUND........................................................................... 1

    A.   The Magnuson-Stevens Fishery Conservation and Management Act ................................ 1

    B.   The National Environmental Policy Act (NEPA) ............................................................. 3

III. STATEMENT OF FACTS ................................................................................... 4

    A.   Approved Omnibus Measures............................................................................................ 5

    B.   Approved Atlantic Herring Measures ................................................................................ 6

    C.   Procedural Background....................................................................................................... 9

IV.  STANDARD OF REVIEW ................................................................................ 10

V.   ARGUMENT...................................................................................................... 12

    A.   The MSA Authorizes The IFM Coverage Requirement................................................... 12

       1.   The MSA authorizes the IFM requirement. ................................................................. 13

       2. NMFS reasonably interpreted the MSA to allow for imposition of monitoring requirements and their attendant compliance costs. ........................................................ 16

       3. The *Goethel* Case Is Notable For Its Complete Rejection Of Many Of The Arguments Made In This Case. .............................................................................................................. 21

    B.   The Omnibus Amendment Complies With National Standards 7 And 8. ........................ 22

    C.   The Omnibus Amendment And Its Implementing Regulations Were Approved Pursuant To The Procedures Established By The MSA. .................................................................... 27

    D.   NMFS Fully Responded To Comments Submitted On The Final Rule. .......................... 29

    E.   The IFM Coverage Requirement Complies With Other Federal Laws. ........................... 32

    F.   The IFM Requirement Is Not A Tax................................................................................. 35

    G.   NMFS Complied With NEPA By Taking The Requisite Hard Look At The Environmental Impacts Of The Industry-Funded Monitoring Amendment. .................... 36

       1. The Analysis of the Environmental Impacts of the Omnibus Amendment Fully Complies with NEPA ..................................................................................................................... 37

       2. The EA Adequately Considered a Reasonable Range of Alternatives and Addressed Mitigation Measures. .................................................................................................... 39

       3.   NMFS Did Not Predetermine The Outcome of the NEPA Analysis. ........................... 40

       4.   Recent Herring Catch Reductions Do Not Require Supplementation of the EA........... 41

i

H.     NMFS Complied With The Regulatory Flexibility Act.................................................. 43

VI.   CONCLUSION............................................................................................................. 45

# TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Alfa Int'l Seafood v. Ross*,
    264 F. Supp. 3d 23 (D.D.C. 2017) ........................................................... 44

*All for Nat. Health U.S. v. Sebelius*,
    775 F. Supp. 2d 114 (D.D.C. 2011) ......................................................... 32

*Am. Wild Horse Pres. Campaign v. Vilsack*,
    133 F. Supp. 3d 200 (D.D.C. 2015) ......................................................... 40

*Anglers Conservation Network v. Pritzker*
    139 F. Supp. 3d 102 (D.D.C. 2015) ..................................................... 34, 35

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983) ............................................................... 11, 12, 37

*Byers v. Intuit*,
    564 F. Supp. 2d 385 (E.D. Pa. 2008) ........................................................ 34

*C&W Fish Co. v. Fox*,
    931 F.2d 1556 (D.C. Cir. 1991) ........................................... 2, 10, 11

*Califano v. Sanders*,
    430 U.S. 99 (1977) .................................................................... 11

*Carlson v. Postal Regulatory Comm'n*,
    938 F.3d 337 (D.C. Cir. 2019) .......................................................... 29

*Chevron U.S.A. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984) ............................................................... 12, 13

*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) .............................................................. 39

*Citizens to Pres. Overton Park v. Volpe*,
    401 U.S. 402 (1971) .............................................................. 11, 12

*City of Olmstead Falls v. FAA*,
    292 F.3d 261 (D.C. Cir. 2002) .............................................................. 12

*Coastal Conservation Ass'n v. U.S. Dep't of Commerce*,
    2016 WL 54911 (E.D. La. Jan. 5, 2016) ................................................... 13

*Comm. of 100 on Fed. City v. Foxx*,
    87 F. Supp. 3d 191 (D.D.C. 2015) ......................................................... 40

*Conn. Light & Power Co. v. Nuclear Reg. Comm'n,*
  673 F.2d 525 (D.C. Cir. 1982) ........................................................... 29

*Conservation Law Found. v. Pritzker,*
  37 F. Supp. 3d 234 (D.D.C. 2014) ........................................................ 5

*Conservation Law Found. v. Ross,*
  374 F. Supp. 3d 77 (D.D.C. 2019) ...................................................... 10

*Ethyl Corp. v. EPA,*
  541 F.2d 1 (D.C. Cir. 1976) ............................................................... 11

*Goethel v. Pritzker,*
  2016 WL 4076831 (D.N.H. July 29, 2016) ................................ 17, 19, 21

*Goethel v. U.S. Dep't of Commerce,*
  854 F.3d 106 (1st Cir. 2017) .............................................................. 21

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,*
  559 U.S. 280 (2010) .......................................................................... 16

*Hammond v. Norton,*
  370 F.Supp.2d 226 (D.D.C. 2005) ........................................................ 4

*Hosp. of Univ. of Pa. v. Sebelius,*
  634 F. Supp. 2d 9 (D.D.C. 2009) ....................................................... 12

*In re NETtel Corp.,*
  2020 WL 2047965 (Bankr. D.C. Apr. 28, 2020) .................................... 17

*Karst Envtl. Educ. & Prot. v. EPA,*
  475 F.3d 1291 (D.C. Cir. 2007) ......................................................... 11

*Kleppe v. Sierra Club,*
  427 U.S. 390 (1976) ........................................................................ 3, 4

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ............................................................... 11, 41, 42

*Mayo v. Reynolds,*
  875 F.3d 11 (D.C. Cir. 2017) ............................................................. 41

*Michigan v. EPA,*
  135 S. Ct. 2699 (2015) ...................................................................... 20

*Midwater Trawlers Coop. v. Dep't of Commerce,*
  393 F.3d 994 (9th Cir. 2004) ............................................................. 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ................................................................................................ 11

*Myersville Citizens for a Rural Cmty. v. FERC*,
 783 F.3d 1301 (D.C. Cir. 2015) ................................................................................ 4

*N.C. Fisheries Ass'n v. Gutierrez*,
 518 F. Supp. 2d 62 (D.D.C. 2007) ................................................................... passim

*Nat. Health U.S. v. Sebelius*,
 775 F. Supp. 2d 114 (D.D.C. 2011) ......................................................................... 32

*Nat. Res. Def. Council v. Daley*,
 209 F.3d 747 (D.C. Cir. 2000) ........................................................................... 2, 10

*Nat. Res. Def. Council v. Morton*,
 458 F.2d 827 (D.C. Cir. 1972) .................................................................................. 4

*Nat. Res. Def. Council v. NMFS*,
 71 F. Supp. 3d 35 (D.D.C. 2014) ............................................................................ 22

*Nat'l Coal. for Marine Conservation v. Evans*,
 231 F. Supp. 2d 119 (D.D.C. 2002) ........................................................................ 26

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
 567 U.S. 519 (2012) .......................................................................................... 15, 35

*Nat'l Fisheries Inst., Inc. v. Mosbacher*,
 732 F. Supp. 210 (D.D.C. 1990) ........................................................................ 11, 20

*Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*,
 416 F. Supp. 2d 92 (D.D.C. 2006) .......................................................................... 44

*Nevada v. Dep't of Energy*,
 457 F.3d 78 (D.C. Cir. 2006) .................................................................................... 4

*Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*,
 509 F.3d 562 (D.C. Cir. 2007) ................................................................................ 37

*Ocean Conservancy v. Gutierrez*,
 394 F. Supp. 2d 147 (D.D.C. 2005) ........................................................................ 10

*Oceana, Inc. v. Pritzker*,
 24 F. Supp. 3d 49 (D.D.C. 2014) ............................................................................ 22

*Oregon Trollers Ass'n v. Gutierrez*,
 452 F.3d 1104 (9th Cir. 2006) ................................................................................ 22

*Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*,
  848 F.2d 256 (D.C. Cir. 1988) ............................................................................ 4

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ............................................................. 3, 39, 40, 41

*S. Offshore Fishing Ass'n v. Daley*,
  995 F. Supp. 1411 (M.D. Fla. 1998) ............................................................ 44

*Serono Labs. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998) ................................................................... 13

*Sierra Club v. EPA*,
  353 F.3d 976 (D.C. Cir. 2004) ...................................................................... 32

*Sierra Club v. U.S. Dep't of Transp.*,
  753 F.2d 120 (D.C. Cir. 1985) ........................................................................ 3

*Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*,
  940 F.2d 685 (D.C. Cir. 1991) ...................................................................... 17

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ...................................................................... 39

*Thomas v. Network,*
  *Sols.*, 2 F. Supp. 2d 22 (D.D.C. 1998) ........................................................ 35

*TOMAC v. Norton*,
  433 F.3d 852 (D.C. Cir. 2006) ........................................................................ 4

*Tongass Conservation Soc'y v. Cheney*,
  924 F.2d 1137 (D.C. Cir. 1991) .................................................................... 11

*U.S. Cellular Corp. v. FCC*,
  254 F.3d 78 (D.C. Cir. 2001) ....................................................................... 45

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ......................................................................................... 3

*WildEarth Guardians v. Bureau of Land Mgmt.*,
  8 F. Supp. 3d 17 (D.D.C. 2014) ................................................................... 43

*WildEarth Guardians v. Zinke*,
  368 F. Supp.3d 41 (D.D.C. 2019) ................................................................ 38

*Wilderness Society v. Salazar*
  603 F. Supp. 2d 52 (D.D.C. 2009) ............................................................... 38

vi

*Willie R. Etheridge Seafood Co. v. Pritzker,*
   2016 WL 1126014 (E.D.N.C. Mar. 21, 2016) ........................................................ 24

STATUTES

5 U.S.C. § 601 ................................................................................................................... 43

5 U.S.C. § 601(6) ........................................................................................................ 43, 44

5 U.S.C. § 603 ................................................................................................................... 44

5 U.S.C. § 603(a) ....................................................................................................... 44, 45

5 U.S.C. § 603(b) ..............................................................................................................44

5 U.S.C. § 603(c) .............................................................................................................. 45

5 U.S.C. § 604(a) ....................................................................................................... 44, 45

5 U.S.C. § 604(a)(6) ..........................................................................................................45

5 U.S.C. § 605(b) .............................................................................................................. 44

5 U.S.C. § 706 ............................................................................................................. 10, 12

5 U.S.C. § 706(1) .............................................................................................................. 42

5 U.S.C. § 706(2)(A) ........................................................................................................ 12

7 U.S.C. § 1622 ................................................................................................................. 31

7 U.S.C. § 1624(b) ............................................................................................................31

16 U.S.C. § 1801(a)(6) ....................................................................................................... 1

16 U.S.C. § 1801(b)(1) ....................................................................................................... 1

16 U.S.C. § 1801(b)(3) ....................................................................................................... 1

16 U.S.C. § 1802(31) .......................................................................................................... 6

16 U.S.C. § 1811(a) ............................................................................................................1

16 U.S.C. § 1851 ........................................................................................................... 2, 22

16 U.S.C. § 1851(a) .......................................................................................................... 11

16 U.S.C. § 1851(a)(7) ........................................................................................... 14, 15, 22

16 U.S.C. § 1851(a)(8) ..................................................................................... 14, 15, 22, 25

16 U.S.C. § 1852(a)(1)(A) .................................................................................................. 2

16 U.S.C. § 1852(b) ............................................................................................................ 2

16 U.S.C. § 1852(h)(1) ....................................................................................................... 2

16 U.S.C. § 1853(a) ............................................................................................................ 2

16 U.S.C. § 1853(a)(1) ...................................................................................................... 17

16 U.S.C. § 1853(a)(1)(A) ................................................................. 13, 20

16 U.S.C. § 1853(a)(5) .......................................................................... 14

16 U.S.C. § 1853(a)(9) .......................................................................... 15

16 U.S.C. § 1853(b) ................................................................................ 2

16 U.S.C. § 1853(b)(4) .......................................................................... 14

16 U.S.C. § 1853(b)(8) .................................................................... passim

16 U.S.C. § 1853(b)(14) ............................................................13, 17, 20

16 U.S.C. § 1853(c) ............................................................................ 2, 28

16 U.S.C. § 1854(a) ............................................................................ 2, 27

16 U.S.C. § 1854(a)(1) ............................................................................ 2

16 U.S.C. § 1854(a)(1)(A) ..................................................................... 27

16 U.S.C. § 1854(a)(1)(B) ..................................................................... 27

16 U.S.C. § 1854(a)(3) ................................................................. 2, 27, 28

16 U.S.C. § 1854(b) ................................................................................. 2

16 U.S.C. § 1854(b)(1) ............................................................................ 2

16 U.S.C. § 1855(f) ............................................................................... 10

16 U.S.C. § 1855(f)(1) ............................................................................. 3

16 U.S.C. § 1855(f)(2) ............................................................................. 3

16 U.S.C. § 1858(g)(1) .......................................................................... 19

16 U.S.C. § 1858(g)(1)(D) ................................................................ 15, 16

16 U.S.C. § 1862 ........................................................................ 17, 18, 19

29 U.S.C. § 653 .................................................................................... 31

29 U.S.C. § 655 .................................................................................... 31

29 U.S.C. § 657 .................................................................................... 31

31 U.S.C. § 1341 .................................................................................. 32

31 U.S.C. § 1341(a)(1)(A) .................................................................... 33

31 U.S.C. § 1341(a)(1)(B) .................................................................... 33

31 U.S.C. § 3302 .................................................................................. 32

31 U.S.C. § 3302(a) .............................................................................. 34

31 U.S.C. § 3302(b) ......................................................................... 33, 34

31 U.S.C. § 3302(d) .............................................................................. 34

31 U.S.C. § 9701 .................................................................................. 32

31 U.S.C. § 9701(b) .............................................................................. 34

33 U.S.C. § 1318(a)(A) .................................................................. 30

33 U.S.C. § 1342(a)(2) ...................................................................30

42 U.S.C. § 4321 et seq. ..................................................................3

42 U.S.C. § 4332(2)(C) .................................................................. 3

42 U.S.C. § 7414(a)(1) ................................................................... 30

42 U.S.C. § 7661c(b) ......................................................................30

46 U.S.C. § 4502 ........................................................................... 15


REGULATIONS

7 C.F.R. § 53.18 ............................................................................ 31

29 C.F.R. § 1910.1048 ................................................................... 31

40 C.F.R. § 1501.4(b) ................................................................... 3

40 C.F.R. § 1502.9(c)(1)(ii) ...........................................................41

40 C.F.R. § 1502.14(d) .................................................................. 40

40 C.F.R. § 1508.9 ........................................................................ 3

46 C.F.R. § pt. 28(B) .................................................................... 15

50 C.F.R. § 600.340 ...................................................................... 22

50 C.F.R. § 600.345 ...................................................................... 25

50 C.F.R. § 635.7 ......................................................................... 14

50 C.F.R. § 648.202(b) ................................................................. 8

50 C.F.R. § 648.11(g) ................................................................... 14

50 C.F.R. § 648.11(g)(5) ................................................................19

50 C.F.R. § 648.11(h) ................................................................... 6

50 C.F.R. § 648.9 ......................................................................... 14

50 C.F.R. § 648.10 ....................................................................... 14

50 C.F.R. § 648.11(i) .................................................................... 6

50 C.F.R. § 660.16 ................................................................. 14, 19

50 C.F.R. § 679.57 ........................................................................14

55 Fed. Reg. 4839-02 (Feb. 12, 1990) .......................................... 17

55 Fed. Reg. 50,386 (Dec. 6, 1989) .............................................. 17

57 Fed. Reg. 22290 (May 27, 1992) .............................................. 31

83 Fed. Reg. 47,236 (Sept. 19, 2018) ........................................... 9

83 Fed. Reg. 55665 (Nov. 7, 2018) ........................................................................ 9, 10, 28

85 Fed. Reg. 7414 (Feb. 7, 2020) ............................................................................. 5, 10


OTHER

Black's Law Dictionary (11th ed. 2019) ........................................................................ 35

GAO, 2 Principles of Federal Appropriations Law at 6-177 (3d ed. 2006) ............................ 34, 36

S. Rpt. No. 114-66 (June 26, 2015) ............................................................................. 19

S. Rpt. No. 114-239 (Apr. 21, 2016) ............................................................................ 20

H. Rpt. No. 114-605 (June 7, 2016) ............................................................................. 20

S. Rpt. No. 115-139 (July 27, 2017) ............................................................................ 20

S. Rpt. No. 115-275 (June 14, 2018) ............................................................................ 20

S. Rpt. No. 116-127 (Sept. 26, 2019) ........................................................................... 20

## ADMINISTRATIVE RECORD CITATIONS

Documents in the administrative record are assigned numbered pages, using consecutive Bates numbers.  In order to save space, citations to specific administrative record pages utilize only the direct Bates-numbered page with the prefix "AR".  Key administrative record documents can be found using the following Bates numbers and acronyms, and will be included in the parties' joint appendix as required by Local Civil Rule 7(n):

| Document | Bates Number | Acronym |
|---|---|---|
| Environmental Assessment | AR17000 to -17637 | EA |
| Final Rule, Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring, 85 Fed. Reg. 7414 (Feb. 7, 2020) | AR17731 to -17759 | Final Rule |

**GLOSSARY**

| | |
|---|---|
| ACL | annual catch limits (for the fishery or specified subcomponent) |
| ADA | Anti-Deficiency Act |
| ASM | at-sea monitor |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EFP | exempted fishing permit |
| FMP | fishery management plan |
| FRFA | final regulatory flexibility analysis |
| FY | Fishing year (May 1 – April 30) |
| IFM | industry-funded monitoring |
| IOAA | Independent Office Appropriations Act |
| IRFA | initial regulatory flexibility analysis |
| MRS | Miscellaneous Receipts Statute |
| MSA | Magnuson-Stevens Act |
| mt | metric ton |
| NEFMC or Council | New England Fishery Management Council |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| RFA | Regulatory Flexibility Act |
| RTO | returns to owner |
| SBRM | Standardized Bycatch Reporting Methodology |
| VMS | vessel monitoring system |

## I.    INTRODUCTION

In late 2018, the New England Fishery Management Council finalized an amendment establishing standards for developing and administering future industry-funded monitoring in its fishery management plans, and implementing industry-funded monitoring in the Atlantic herring fishery (the Omnibus Amendment). The Secretary of Commerce approved the amendment, and the National Marine Fisheries Service (NMFS) developed regulations to implement it. Plaintiffs question first, whether the industry-funding requirement in the Omnibus Amendment complies with the Magnuson-Stevens Fishery Conservation and Management Act (MSA) and other laws; and second, whether the Omnibus Amendment was enacted in compliance with the National Environmental Policy Act, the Regulatory Flexibility Act, and other procedural requirements. The answer to both questions is yes. The MSA authorizes industry-funded monitoring, NMFS acted within its statutory authority, and the Omnibus Amendment and implementing regulations comply with federal law. The Court should deny Plaintiffs' motion, and grant Defendants' cross-motion.

## II.    STATUTORY BACKGROUND

### A.    The Magnuson-Stevens Fishery Conservation and Management Act

The MSA establishes federal jurisdiction over fishery resources within the United States' exclusive economic zone. 16 U.S.C. §§ 1801(a)(6), 1811(a).[1] Congress passed the MSA "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States. . ." and "to promote domestic commercial and recreational fishing under sound conservation and management principles. . . ." *Id*. § 1801(b)(1), (3).

---

[1]   Congress first enacted the statute in 1976 as the Fishery Conservation and Management Act, Pub. L. No. 94-265, renamed it as the Magnuson-Stevens Act, made revisions in 1996 through the Sustainable Fisheries Act, Pub. L. No. 104-297, and amended it in 2007 with the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act, Pub. L. No. 109-479.

To carry out these duties, the MSA created eight regional Fishery Management Councils, each of which prepares and submits fishery management plans (FMPs) and plan amendments for each fishery under its authority that requires conservation and management. 16 U.S.C. § 1852(h)(1); *see Nat. Res. Def. Council v. Daley*, 209 F.3d 747, 749 (D.C. Cir. 2000); *C&W Fish Co. v. Fox*, 931 F.2d 1556, 1557-58 (D.C. Cir. 1991). Council voting members include federal, state, and territorial fishery management officials (including the NMFS Regional Administrator from the relevant geographic area) and individuals nominated by state governors and appointed by the Secretary who are knowledgeable about the conservation and management, or the commercial or recreational harvest, of fishery resources within the councils' geographic areas. 16 U.S.C. § 1852(b). The New England Fishery Management Council (Council or NEFMC) is responsible for developing and recommending FMPs for fisheries in the Atlantic Ocean seaward of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut, including the Atlantic herring fishery. *See id.* §§ 1852(a)(1)(A), 1852(h)(1). All FMPs must be consistent with National Standards established by Congress. *Id.* § 1851.

FMPs must include certain mandatory provisions, 16 U.S.C. § 1853(a), and may include additional discretionary provisions to conserve and manage fisheries. 16 U.S.C. § 1853(b). NMFS approves, partially approves, or disapproves FMPs and amendments developed and submitted by the councils, and implements them through regulations. *See id.* § 1854(a), (b). The relevant council submits an FMP or amendment to NMFS, and also proposed regulations that the council deems "necessary or appropriate" to implement the FMP or amendment. *Id.* § 1853(c). Both the FMP or amendment and proposed regulations are subject to public review and comment. *Id.* § 1854(a)(1), (b)(1). NMFS disapproves an FMP or amendment, in whole or in part, based on inconsistency with applicable law. *Id.* § 1854(a)(3). The MSA provides for judicial review of

"[r]egulations promulgated by the Secretary" and "actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing." *Id*. § 1855(f)(1)-(2). A petition for review must be filed "within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." *Id.* § 1855(f)(1).

> **B.     The National Environmental Policy Act**

The National Environmental Policy Act (NEPA) was enacted to establish a process for federal agencies to consider the environmental impacts of major federal actions.  42 U.S.C. §§ 4321-4370m-12; *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978).  NEPA does not dictate substantive results.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Instead, the mandate to agencies is "essentially procedural . . . It is to insure a fully informed and well-considered decision . . . ."  *Vt. Yankee*, 435 U.S. at 558.

An agency's obligation under NEPA is to take a "hard look" at environmental consequences of major federal action.  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). NEPA requires agencies to prepare an Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). To determine whether an EIS is required, the agency may prepare an Environmental Assessment (EA), 40 C.F.R. § 1501.4(b), which is a concise public document that should briefly describe the proposal, examine alternatives, consider environmental impacts, and provide a listing of individuals and agencies consulted.  40 C.F.R. § 1508.9.  "If a finding of no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary."  *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985) (citation omitted).

The reviewing court's role under NEPA is "limited" and "designed primarily to ensure 'that no arguably significant consequences have been ignored.'" *TOMAC v. Norton,* 433 F.3d 852, 860 (D.C. Cir. 2006) (quoting *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.,* 848 F.2d 256, 267 (D.C. Cir. 1988)). "The [c]ourt's role is to ensure that the agency takes a 'hard look' at the environmental consequences of an action, not to interject its own judgment as to the course of action to be taken." *Hammond v. Norton,* 370 F. Supp. 2d 226, 240 (D.D.C. 2005) (citing *Kleppe,* 427 U.S. at 410 n.21 (quoting *Nat. Res. Def. Council v. Morton,* 458 F.2d 827, 838 (D.C. Cir. 1972))). In undertaking this review, the D.C. Circuit "applies a 'rule of reason' to an agency's NEPA analysis and has repeatedly refused to 'flyspeck' the agency's findings in search of 'any deficiency no matter how minor.'" *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1322-23 (D.C. Cir. 2015) (quoting *Nevada v. Dep't of Energy,* 457 F.3d 78, 93 (D.C. Cir. 2006)).

## III.     STATEMENT OF FACTS

In 2018, the Council finalized the Council's Industry-Funded Monitoring Omnibus Amendment (Omnibus Amendment) to establish standards for the development of future industry-funded monitoring (IFM) in its FMPs,[2] and to establish industry-funded monitoring in the Atlantic herring fishery. AR17771. The Atlantic herring fishery measures are intended to assess the amount and type of catch, monitor annual catch limits more precisely, and/or provide other information for management, with the purpose of helping provide increased accuracy in catch estimates. AR17027. The details of the approved omnibus measures and the Atlantic herring measures are set forth below.

---

[2]   The amendment applies to the Council's FMPs except for those managed jointly with the Mid-Atlantic Fishery Management Council. AR17731.

### A.      Approved Omnibus Measures

The amendment standardizes the development and administration of future IFM programs in New England Council FMPs.  If the Council develops a future IFM program for a specific FMP, it would develop that program consistent with the specifications and requirements established by the omnibus measures.  AR17731 (85 Fed. Reg. 7,414 (Feb. 7, 2020)).  All of the amendment's omnibus measures are administrative:  they specify a process to develop and administer future IFM programs that do not directly affect fishing effort or amounts of fish harvested, but may have indirect effects on Council FMPs.  AR17732.  Specifically, standardizing the process for developing and administering future IFM programs may reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected.  *Id*.  Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources.  *Id*.

There are five core elements to the approved omnibus measures.  ***First***, the omnibus measures establish a process for FMP-specific industry-funded monitoring to be implemented through an FMP amendment and revised through a framework adjustment.[3]  AR17732.  This requirement will help ensure additional public notice and comment during the development of new programs.  *Id*.  Additional NEPA analysis would be required for any action implementing and/or modifying IFM programs, whether it is an amendment or framework adjustment.  *Id*.  ***Second***, the omnibus measures identify standard cost responsibilities for industry-funded monitoring for NMFS and the fishing industry, dividing those responsibilities by cost category.  AR17732.  NMFS is responsible for its administrative costs to support industry-funded programs, and industry is

---

[3]  A framework adjustment allows a council and NMFS to update an FMP through expedited changes that modify FMPs in more modest ways than an FMP amendment.  *See Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 234, 239 (D.D.C. 2014).

responsible for its costs associated with the sampling activities.  *Id*.  **Third**, the omnibus measures establish standard administrative requirements for monitoring service providers and industry-funded observers/monitors[4] as set forth in 50 C.F.R. § 648.11(h) and (i), respectively.  AR17733. These requirements serve as the default requirements for any future IFM programs in New England FMPs.  AR17733.  **Fourth**, the omnibus measures establish a Council-led process for prioritizing IFM programs for available federal funding across New England FMPs.  AR17733.  Prioritization allows the Council to recommend its IFM program priorities for available NMFS funding to pay NMFS's IFM cost responsibilities.  *Id*.  For example, if there are some available appropriations for funding NMFS's cost responsibilities, but not enough to support all IFM programs, the Council will determine its IFM coverage priorities for available funding across FMPs.  *Id*.  **Fifth**, the omnibus measures standardize the process to develop future monitoring set-aside programs, and allow monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP.  AR17734.  A monitoring set-aside program uses a portion of a fishery's annual catch limit (ACL) to help offset industry cost responsibilities associated with IFM coverage targets.  *Id*.

### B.   Approved Atlantic Herring Measures

Atlantic herring are found in the Atlantic Ocean between North Carolina and the Canadian Maritime Provinces.  AR17103.  Atlantic herring serve as a forage species for a number of other fish, marine mammals, and seabirds.  AR17070, AR17161, AR17511.  There is a directed fishery for Atlantic herring, composed primarily of vessels using midwater trawl gear, purse seines, and small-mesh bottom trawl vessels.  AR17104. Vessels using midwater trawl gear typically harvest the majority of herring catch.  *Id*.  The Atlantic herring fishery is managed through the Atlantic

---

[4]   An "observer" is "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this [Act]."  16 U.S.C. § 1802(31).

Herring FMP, which was developed by the Council and implemented in 2000.   AR17104.

Additional management measures have been implemented through FMP amendments and

framework adjustments, including the one at issue in this case.   AR17293 (listing amendments and

framework adjustments for Atlantic Herring FMP).

The Omnibus Amendment establishes an Atlantic herring IFM program that is expected to

provide increased accuracy in catch estimates. AR17734. Increased monitoring in the herring

fishery is expected to improve accuracy of catch estimates toward achieving the following goals:

(1) accurate estimates of catch (both retained and discarded), (2) accurate catch estimates for

incidental catch species with catch caps (such as haddock and river herring/shad), and (3)

affordable monitoring for the herring fishery. *Id*.; *see* AR17214 (increased information to help

track catch against catch caps may help allow the herring fishery to fully harvest ACLs); AR17215

(coverage targets have the potential to improve herring catch estimates and management). The

primary biological data that at-sea monitors in the Atlantic herring fishery will collect are length

data on retained and discarded catch, and whole specimens or photos to verify species

identification. AR17735. The herring measures establish a 50% coverage target for monitoring

coverage on vessels with Category A or Category B limited access herring permits.[5] AR17734.

The 50% coverage target includes a combination of Standardized Bycatch Reporting Methodology

(SBRM) coverage,[6] which is funded by NMFS, and IFM coverage.[7] *Id*. Vessel owners would pay

---

[5]   A Category A permit is an All Areas permit that allows vessels with such permits to fish in all
four areas.  *See* AR17135, AR17152.  A Category B permit is an Areas 2/3 Limited Access permit
that allows vessels to fish in areas 2 and 3. *Id*.

[6]   The SBRM amendment was implemented in 2007 and revised in 2015; it specifies methods and
processes to monitor bycatch in the Greater Atlantic fisheries.  AR17293.

[7]   For example, if there is an estimated 10% SBRM coverage in a given year, then 40% IFM
coverage will be needed to achieve the 50% coverage target.  AR17734.

for any additional monitoring coverage above SBRM coverage requirements to achieve the 50%

coverage target, which is calculated by combining SBRM and IFM coverage, thus a vessel will

not have SBRM and IFM coverage on the same trip. *Id*. Any additional coverage above SBRM is

contingent on NMFS having appropriated funds to pay for its administrative costs for IFM

coverage. AR17737. The Council considered other coverage targets, including 100%, 75% and

25%, but determined that the 50% coverage target best balanced the benefits associated with

reducing uncertainty against the costs of additional monitoring.  AR17734.

Coverage requirements may be waived on a trip-by-trip basis if monitoring coverage is

unavailable, if vessels intend to land less than 50 metric tons (mt) of herring, or if wing vessels

carry no fish on pair trawling trips.[8]  AR17735.  These waivers would help reduce the cost of IFM

coverage on those trips, but are not an option for vessels that choose to land more than 50 mt of

herring on a trip. *Id*. In addition, the Council recommended NMFS issue an exempted fishing

permit (EFP) to midwater trawl vessels that choose to use electronic monitoring together with

portside sampling.   AR17736-37.   The EFP exempts midwater trawl vessels from at-sea

monitoring coverage, and allows use of electronic monitoring and portside sampling to comply

with the 50% IFM coverage target. AR17737.  Midwater trawl vessels typically discard only a

small percentage of catch at sea, thus electronic monitoring and portside sampling have the

potential to be a cost-effective way to address monitoring goals for this large part of the herring

fishery. AR17736, AR17738.[9]

---

[8]  A wing vessel trip refers to the pairing of a trawl vessel with another midwater trawl vessel,
but that it would not pump or carry any fish onboard.  AR17735.

[9]  The herring measures also maintain the requirement that midwater trawl vessels that access
Groundfish Closed Areas must carry an observer as required by 50 C.F.R. § 648.202(b).
AR17735-36; AR17072, AR17093.  Previously, the only mechanism for midwater trawl vessels
to carry an observer in order to access the Groundfish Closed Areas was if the vessel was randomly

NMFS acknowledged that the IFM coverage requirement will have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery.  AR17735. The EA states that industry's estimated cost responsibility associated with carrying an at-sea monitor (ASM) is $710 per day. *Id*. According to the EA, the potential reduction in annual returns to owner for vessels with Category A or B herring permits associated with paying for monitoring coverage is up to approximately 20%, although the actual cost of IFM on a particular vessel would vary with effort level and the amount of SBRM coverage. AR17190, AR17290, AR17306; *see* AR17735. Finally, the Council will review IFM's effectiveness in the herring fishery two years after implementation and consider if adjustments to the coverage targets are warranted.  AR17734.

### C.      Procedural Background

The Council adopted the Omnibus Amendment on April 20, 2017, AR17731, and refined its recommendations for IFM in the Atlantic herring fishery on April 19, 2018.  *Id*.  A notice of availability (NOA) for the amendment was published in the Federal Register on September 19, 2018, 83 Fed. Reg. 47,236, with a comment period that ended on November 19, 2018.  AR17741. On December 18, 2018, NMFS approved the amendment on behalf of the Secretary of Commerce and informed the Council of its approval by letter.  AR17731; AR17760-62.

NMFS's proposed rule to implement the amendment was published in the Federal Register on November 7, 2018, with a comment period that ended on December 24, 2018.  83 Fed. Reg. 55,665 (Nov. 7, 2018); *see* AR17731.  The proposed rule stated that NMFS would consider any public comment received after the close of the NOA comment period but during the proposed rule's comment period in NMFS's decision-making regarding the proposed measures.  83 Fed.

---

selected to carry an SBRM observer.  AR17736.  The herring measures, however, allow midwater trawl vessels to purchase observer coverage to access those areas.  *Id*.

Reg. at 55,667.  While some expressed concerns over the economic impact of the IFM coverage requirement on participants in the herring industry, NMFS considered the nature and extent of the costs relative to the benefits of additional monitoring.  AR17742.  The final rule was published in the Federal Register on February 7, 2020.  AR17731 (85 Fed. Reg. 7,414).  The regulations associated with the omnibus measures became effective on March 9, 2020, and the regulations associated with IFM in the Atlantic herring fishery became effective on April 1, 2020.[10]

## IV.    STANDARD OF REVIEW

Courts resolve both MSA and NEPA claims under the deferential Administrative Procedure Act (APA) standard of review. *Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 88 (D.D.C. 2019).  "Under section 305(f) of the [MSA], 16 U.S.C. § 1855(f), which adopts the standard of review set forth in the APA at 5 U.S.C. § 706, regulations promulgated by the Commerce Secretary may be set aside only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Midwater Trawlers Coop. v. Dep't of Commerce*, 393 F.3d 994, 1002-03 (9th Cir. 2004); *see also C&W Fish Co.*, 931 F.2d at 1562 (citations omitted). Regulation of fisheries requires highly technical and scientific determinations that are within the agency's expertise, but are beyond the ken of most judges. *The Ocean Conservancy v. Gutierrez,* 394 F. Supp. 2d 147, 157 (D.D.C. 2005), *aff'd,* 488 F.3d 1020 (D.C. Cir. 2007). Thus, while judicial review is by no means a rubber stamp, *see Nat. Res. Defense Council,* 209 F.3d at 755, courts should "defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the [MSA] charges with making difficult policy judgments and choosing the appropriate conservation and management measures based on

---

[10]   Implementation of the industry-funded monitoring requirement in the Atlantic herring fishery later was delayed.  *See* https://www.fisheries.noaa.gov/species/atlantic-herring#industry-funded-monitoring (last visited July 24, 2020).

their evaluations of the relevant quantitative and qualitative factors." *Nat'l Fisheries Inst., Inc. v. Mosbacher,* 732 F. Supp. 210, 223 (D.D.C. 1990).  Under this standard, the Court must determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). Administrative actions are presumed valid; thus, the APA only requires the Court to decide whether the agency "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983) (citation omitted).

Further, when a party challenges an FMP, plan amendment, or regulation as inconsistent with one or more of the ten National Standards set forth in 16 U.S.C. § 1851(a), a court's "task is not to review *de novo* whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C&W Fish,* 931 F.2d at 1562.  Where, as here, an agency's technical expertise is involved, the reviewing court should be particularly zealous in guarding the agency's discretion. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376-77 (1989); *see Baltimore Gas*, 462 U.S. at 103 ("[w]hen examining . . . [a] scientific determination . . . a reviewing court must generally be at its most deferential"). The court "must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc).

NEPA claims are also reviewed under the APA's deferential "arbitrary and capricious" standard. *See Karst Envtl. Educ. & Prot. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007); *Tongass*

*Conservation Soc'y v. Cheney*, 924 F.2d 1137, 1140 (D.C. Cir. 1991). The Court's role is "'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *City of Olmstead Falls v. FAA*, 292 F.3d 261, 269 (D.C. Cir. 2002) (quoting *Baltimore Gas*, 462 U.S. at 97-98).

Because actions reviewed under the APA's standard of review are governed by the administrative record, *see* 5 U.S.C. § 706, there are no facts in dispute for the Court to resolve. *Hosp. of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 12-13 (D.D.C. 2009). Judicial review of Plaintiffs' claims is limited to the administrative record, and the Court should determine agency compliance with the law solely on the record on which the decision at issue was made. 5 U.S.C. § 706; *Overton Park*, 401 U.S. at 419. Summary judgment "thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sebelius*, 634 F. Supp. 2d at 13.

Although this case is brought before the Court on the parties' cross-motions for summary judgment, agency action is entitled to a presumption of regularity. *Overton Park*, 401 U.S. at 415. Plaintiffs must prove the particular manner in which the actions taken by Defendants are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also City of Olmsted Falls*, 292 F.3d at 271. If Plaintiffs fail to meet this burden, their motion for summary judgment must be denied, and judgment entered for Defendants.

## V.   ARGUMENT

### A.   The MSA Authorizes The IFM Coverage Requirement.

This case involves NMFS's construction of the MSA, thus the two-part analysis established by the Supreme Court in *Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), applies. Under the first step of the *Chevron* analysis, a court must give effect to congressional intent where

Congress has "directly spoken to the precise question at issue." *Id*. at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court [under step two] is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843; *Serono Labs. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998) (reviewing court must uphold agency's statutory interpretation as long as it is reasonable, even if the Court finds other interpretations reasonable or even more reasonable). Here, Congress has spoken directly to the precise question at issue by including multiple provisions in the MSA that presuppose that the industry will be responsible for the cost of utilizing human observers. The MSA provides the Council broad authorization for developing and implementing conservation and management measures. The MSA explicitly authorizes FMPs to include observer requirements, 16 U.S.C. § 1853(b)(8), and to implement measures that are deemed "necessary and appropriate" to conserve and manage the fishery, *id*. §§ 1853(a)(1)(A), (b)(14). If, however, the Court determines that Congress has not spoken directly on the issue, it should find NMFS's interpretation of the MSA to allow the IFM requirement is reasonable nonetheless.

### 1. The MSA authorizes the IFM requirement.

The MSA expressly authorizes at-sea monitors (i.e., observers) to be carried onboard fishing vessels "for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(8). The MSA also requires that FMPs contain measures "necessary and appropriate" for the conservation and management of a fishery, and authorizes FMPs to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id*. §§ 1853(a)(1)(A), 1853(b)(14); *see Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, 2016 WL 54911, at *4 (E.D. La. Jan. 5, 2016) (finding that "necessary and appropriate" in 16 U.S.C. § 1853(a)(1)(A) is "empowering language"). Further, the Council has a responsibility to

"specify the pertinent data which shall be submitted to the Secretary. . . , including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof. . . ."  16 U.S.C. § 1853(a)(5).  Even Plaintiffs admit that the MSA allows for observers.  Pl. Br. 15.  Their quarrel, instead, is with whether the MSA allows sampling costs to be imposed on the industry, rather than borne by the government.

The requirement that industry pay for sampling costs is neither novel nor a violation of law.  Observers are used in other fisheries, including in fisheries managed by the NEFMC, and widely accepted from scientific and management perspectives as an important tool for fisheries monitoring.  *See* 50 C.F.R. § 648.11(g) (listing fisheries under NEFMC jurisdiction that may require industry-funded monitoring);[11] *see also* 50 C.F.R. §§ 635.7, 679.51, 660.16 (requiring observers in Atlantic highly migratory species, Alaska Groundfish and Halibut, and West Coast groundfish fisheries).  The MSA authorizes various measures—in addition to observers—to monitor fisheries and, inherently, such measures result in costs to the regulated industry.  For example, in many fisheries, fishing vessels are required to install vessel monitoring system (VMS) units on board for purposes of monitoring the vessels' position.  *See*, *e.g.,* 50 C.F.R. §§ 648.9-648.10 (VMS requirements); 16 U.S.C. § 1853(b)(4) (authorizing FMPs to require, among other things, "devices which may be required to facilitate enforcement").  Requirements to install and use VMS can impose compliance costs.  The MSA recognizes that fact and requires, where practicable, minimization of costs and adverse economic impacts on communities.  *See* 16 U.S.C. § 1851(a)(7)-(8) (National Standards 7 and 8).  The MSA does not need to authorize *imposition* of

---

[11]   Plaintiffs also claim that the MSA does not authorize industry-funded monitoring "in most of the other fisheries" under the Council's jurisdiction.  Pl. Br. 15.  But, as Plaintiffs acknowledge, the New England groundfish fishery has had an IFM requirement in place since 2012, which was the topic of extensive litigation.  *See* Section V.A.3, *infra*.

the costs of regulatory requirements such as VMS or observers—the statute just needs to authorize the requirements themselves. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 652 (2012) ("Government regulation typically imposes costs on the regulated industry."); *see also* 46 U.S.C. § 4502 (directing Coast Guard to prescribe regulations for safety standards for vessels); 46 C.F.R. pt. 28(B) (onboard safety requirements for commercial vessels). To conclude otherwise would mean that Congress intended the government to subsidize the costs of all conservation measures, such as at-sea or electronic monitors, VMS, equipment necessary for vessels or dealers to submit reports to NMFS electronically, and appropriately configured fishing vessels and gear, which are necessary for harvesting fish from a public resource. The Omnibus Amendment does not impose the government's costs on the industry, or tax the industry, as Plaintiffs claim. Rather, it requires industry to comply with ASM coverage requirements. These requirements come with compliance costs, and the Omnibus Amendment identifies the industry's costs versus the government's costs, in part to ensure compliance with other Federal laws. *See* Section V.E, *infra*.

Section 1858(g) also demonstrates NMFS's statutory authority to require ASM coverage that imposes compliance costs on the industry with its statement that the Secretary may impose a permit sanction for an owner's or operator's failure to pay a contractor for observer services. *See* 16 U.S.C. § 1858(g)(1)(D). This section of the MSA is worded broadly and is not limited to any specific fishery or region. *See* Section V.A.2, *infra*. This enforcement provision presupposes that industry may be obligated to enter into contracts and pay for observer services, as do National Standards 7 and 8, which require NMFS to consider the costs and economic impact of regulation on the industry. 16 U.S.C. § 1851(a)(7)-(8); *see id*. § 1853(a)(9) (requiring assessment of economic impacts of conservation and management measures). The provision allowing imposition of permit sanctions on this basis would be needed only if the MSA authorizes industry payments for observer

services contracted for by vessel owners and operators. The explicit reference to payments for observer services demonstrates that the MSA authorizes observer coverage requirements that impose compliance costs on the industry. Plaintiffs' contention that the MSA gives NMFS authority to require observers, but not the authority to require industry to pay for them, Pl. Br. 18, lacks merit when Sections 1853(b)(8) and 1858(g)(1)(D) are read together, as a whole. *See Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 289 (2010) (a statute must be read as a whole). Indeed, Plaintiffs' argument that Section 1858(g)(1)(D) applies only to permit sanctions when a vessel has not paid for those observer services specifically enumerated in the MSA (such as in the North Pacific), Pl. Br. 24, lacks textual support.

All of these statutory provisions, taken as a whole and viewed in the context of the entire statutory scheme, indicate clear congressional intent to allow NMFS to cause industry to incur the costs of utilizing monitors. This Court must give effect to Congress's intent and reject Plaintiffs' contention that NMFS lacks authority under the MSA to cause vessels to incur the cost associated with monitoring in the Atlantic herring fishery.

## 2. NMFS reasonably interpreted the MSA to allow for imposition of monitoring requirements and their attendant compliance costs.

Should the Court determine that Congress has not spoken directly to the issue of NMFS's authority to require the industry to pay for IFM, NMFS's interpretation of the MSA is nonetheless reasonable under *Chevron* step two. Plaintiffs assert that the MSA's explicit references to industry-funding in other sections of the statute for other fisheries and programs act to preclude the IFM requirement in any other circumstance. Pl. Br. 16-17. This position has no merit, as a careful review of the amendment requiring observers in the North Pacific and other provisions of the MSA shows that NMFS is authorized to require monitoring coverage that comes with compliance costs for the industry.

Plaintiffs rely heavily on the principle of "*expressio unius est exclusio alterius*" for their claim that, because the MSA allows NMFS to impose coverage requirements on the industry in some fisheries, Congress must have meant to preclude NMFS from imposing that requirement elsewhere. Pl. Br. 17. "Whatever its usefulness in other circumstances, however, this canon has little force in the administrative setting." *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991); *see also In re NETtel Corp.*, 2020 WL 2047965, at *17 (Bankr. D.C. Apr. 28, 2020) (the *expressio unius* principle has its limits and exceptions and cannot apply when the legislative history and context are contrary to such a reading of the statute).  The D.C. Circuit has held that, under *Chevron*, it withholds deference from an agency's interpretation of a statute only when Congress has spoken directly to the precise question at issue, as "the *expressio* canon is simply too thin a reed to support the conclusion that Congress has clearly resolved [an] issue." *Tex. Rural*, 940 F.2d at 694; *see also Goethel v. Pritzker*, 2016 WL 4076831, at *5 (D.N.H. July 29, 2016) (the exclusionary principle is an "aid to construction. . .not an inflexible rule").

Observer programs where U.S. vessels paid for their costs of carrying observers on their vessels were implemented before Congress added observer provisions (now, 16 U.S.C. §§ 1853(b)(8) and 1862) to the MSA in late 1990.  The Secretary issued regulations requiring observers in two groundfish fisheries in the North Pacific, finding that it was "necessary and appropriate for the conservation and management of the fishery," citing what is now 16 U.S.C. §§ 1853(a)(1), 1853(b)(14).  *See* 55 Fed. Reg. 50,386, 50,391 (Dec. 6, 1989).  That observer program, approved by the North Pacific Council in 1989, provides that:

> Any vessel operator or manager of a shoreside processing facility who is required to accommodate an observer is responsible for obtaining a NMFS-certified observer . . . [and] will pay the cost of the observer directly to the contractor.

*Groundfish of the Gulf of Alaska, Groundfish Fishery of the Bering Sea & Aleutian Islands Area*, 55 Fed. Reg. 4,839-02, 4,840 (Feb. 12, 1990); *see also* N. Pacific Fishery Mgmt. Council, Envtl.

Assessment, Restructuring the Program for Observer Procurement & Deployment in the North Pacific (March 2011), at 3, *available at* https://repository.library.noaa.gov/view/noaa/4291 (last visited July 24, 2020) (later description of the observer program).

Congress was aware of the North Pacific Observer Program and its industry funding provisions when it developed the amendments to the MSA that were enacted in 1990 and resulted in the addition of Sections 1853(b)(8) (observer provision) and 1862 (North Pacific Fisheries Research Plan) to the statute. *See* Pub. L. No. 101-627 §§ 109, 118, 104 Stat. 4436 (respectively, observer provision and North Pacific Fisheries Research Plan). Thus, Plaintiffs' contention that witnesses for hearings on the 1990 amendments to the MSA told Congress that no industry-funding mechanism was available, Pl. Br. 19, fails to address that one was in place in the North Pacific region. *See* Hr'g 101-37, before the H. Subcomm. on Fisheries & Wildlife Conservation & the Env't at 33 (Stmt. of J. Peterson, Chairman of N. Pac. Fishery Mgmt. Council that vessels taking "observance [sic] will pay for it"); *see also* Oversight of Marine Fisheries Mgmt., Part 2, before the S. Comm. on Commerce, Sci., & Transp., S. Hr'g 101-465 at 464 (July 6, 1989) (Stmt. of C. Blackburn, Director, Alaska Groundfish Data Bank) (explaining the North Pacific Council's actions mandating observers on all vessels where "the processor pays the cost of the observer").[12]

When enacted, Section 1853(b)(8) confirmed the authority already implicit in the MSA, as it was being administered by NMFS at the time, to require observers on domestic fishing vessels at the vessel's expense of using the observer services. *See* Comm. on Merchant Marine & Fisheries,

---

[12] Congress received testimony that the cost of observers should be considered the appropriate cost of profiting from a public resource. *Id.* at 149 (Stmt. of A. Thomson, Executive Dir. of the Alaska Crab Coalition) ("[I]t is not the responsibility of the tax paying public to provide a subsidy to the factory trawlers in the form of federal funding for observers."). Others contended that federal funding should be available for the observer program, supplemented by funds collected from industry through a user fee. *Id.* at 183 (Stmt. of E. Evans, Alaska Factory Trawler Ass'n).

H.R. Rep. No. 101-393 at 28 ("[T]his subsection allows the Councils to require that observers be carried on board domestic fishing [vessels] for data collection purposes. The Committee notes that the Councils already have—*and have used*—such authority; the amendment makes the authority explicit.") (emphasis added); Comm. on Commerce, Sci., & Transp., Sen. Rep. No. 101-414 at 8, 20 (Aug. 2, 1990) (provision "clarif[ies] the existing authority"). Thus, the legislative history for the observer provision at Section 1853(b)(8) confirms that the MSA authorized fishery observer programs prior to the statutory amendment, like the program extant in the North Pacific. Other fisheries currently have observer programs where vessels pay for their direct costs. *E.g.*, 50 C.F.R. § 660.16 (West Coast groundfish fishery); *id.* § 648.11(g)(5) (fisheries under NEFMC jurisdiction). That costs (in the form of fees collected by the government, as opposed to industry paying its own costs such as those at issue in this case) are addressed in Section 1862 but not expressly in Section 1853 does not support a sensible inference that the MSA forbids an FMP that requires industry to bear the cost of certain regulations. *Goethel*, 2016 WL 4076831, at *6.

As this history shows, NMFS has consistently interpreted the MSA to authorize programs that require industry to absorb the cost of observers hired through third-party contractors, like the observers at issue in this case.  Plaintiffs impugn this approach as "evidenc[ing] a pattern" that shows no "regard for congressional intent or statutory text" that this Court "must stop."  Pl. Br. 22.  Yet, as Plaintiffs themselves note, Congress has amended the statute several times during this period; it has not overridden the agency's authority and, in fact, has explicitly acknowledged such authority in 16 U.S.C. § 1858(g)(1).  *See* Section V.A.1, *supra*.  In addition, Congressional committees are aware that industry is bearing the direct costs of monitoring in the Northeast groundfish fishery.  *See*, *e.g.*, S. Rep. No. 114-66 at 31-32 (June 16, 2015) (committee directing NMFS to work with the regional fishery councils to put in place more cost-affordable monitoring

plans); S. Rpt. No. 114-239 at 31-32 (Apr. 21, 2016) (directing NMFS to work with councils to identify cost-effective monitoring programs); H. Rpt. No. 114-605 at 17 (June 7, 2016) (same); S. Rpt. No. 115-139 at 34 (July 27, 2017) (recognizing Northeast groundfish fishery's struggles associated with monitoring costs); S. Rpt. No. 115-275 at 36 (June 14, 2018) (same); S. Rpt. No. 116-127 at 42 (Sept. 26, 2019) (same). Similarly, courts have rejected "cramped" interpretations of the MSA and held that the statute vests broad authority in the Secretary to promulgate such regulations as are necessary to carry out the conservation and management measures of an approved FMP. *Mosbacher*, 732 F. Supp. at 216 ("Merely because Congress chose to also specify certain actions as unlawful *per se* in [one part of the MSA] does not mean that it intended those prohibitions to be the boundaries of the Secretary's broad rulemaking authority.").

NMFS's interpretation of the MSA is reasonable for the reasons noted above. Furthermore, the MSA authorizes NMFS to implement measures that it deems "necessary and appropriate" to conserve and manage the fishery, 16 U.S.C. §§ 1853(a)(1)(A), (b)(14), in addition to authorizing the use of observers, *id*. at § 1853(b)(8). In *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015), the Supreme Court discussed the phrase "appropriate and necessary" as used in the Clean Air Act and stated that "[o]ne does not need to open up a dictionary in order to realize the capaciousness of [the phrase]. . . . 'appropriate' is 'the classic broad and all-encompassing term . . .'" (citation omitted).[13] This broad grant of discretion, coupled with the explicit authorization to use observers, supports the conclusion that Congress authorized the agency to require vessels to incur the compliance costs of an observer requirement (as well as any other conservation and management

---

[13] In *Michigan*, it was non-controversial that industry would bear the costs of complying with EPA's regulation, even though the pertinent statutory provision was silent on the issue of cost.

measure). NMFS's interpretation of the MSA on this issue is reasonable.  The legislative history cited by Plaintiffs and their patchwork arguments fail to contradict this conclusion.  Pl. Br. 19-20.

### 3.  The *Goethel* Case Is Notable For Its Complete Rejection Of Many Of The Arguments Made In This Case.

This is not the first time that NMFS has faced legal challenges to an industry-funding requirement established by the Council.  Fishermen participating in the Northeast multispecies fishery raised most of the same issues as Plaintiffs raise in this case.[14]  *Goethel v. Pritzker*, Civ. No. 15-cv-497-JL (D.N.H.).  The district court granted summary judgment for NMFS, holding that the statute of limitations barred the plaintiffs' claims and that, even if timely filed, NMFS was entitled to summary judgment nonetheless.  *Goethel*, 2016 WL 4076831, at *3-10.  In a methodical and well-reasoned opinion, the district court rejected all of the plaintiffs' claims, finding that the MSA authorized industry funding; industry funding was not a tax; industry funding did not violate the Anti-Deficiency Act, the Miscellaneous Receipts Statute, or the Commerce Clause of the United States Constitution; NMFS had complied with NEPA and the Regulatory Flexibility Act; and NMFS did not violate various other provisions of the Constitution.  *Id*.  The First Circuit affirmed the district court's statute of limitations holding and, thus, did not reach the remaining questions.  *Goethel v. U.S. Dep't of Commerce*, 854 F.3d 106, 108 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 221 (2017).  For Plaintiffs to say that the *Goethel* court's analysis was "cursory" or "superficial," and should be rejected as "dicta" or "dangerous precedent," Pl. Br. 22, 23, 24, is baseless criticism that ignores the multiple opportunities given to the plaintiffs in that case to show their claims had merit.  The *Goethel* decision is an unpublished decision from a sister district court that is not binding on this Court, but its wholesale rejection of the plaintiffs' claims in that case is

---

[14]  The *Goethel* plaintiffs were represented by Cause of Action, as are Plaintiffs in this case.

noteworthy and persuasive, as it reflects the district court's inability to find a scintilla of merit to many of the same arguments that are asserted here.

### B.      The Omnibus Amendment Complies With National Standards 7 And 8.

Contrary to Plaintiffs' assertions, the Omnibus Amendment also fully complies with National Standards 7 and 8.  Pl. Br. 28.[15]  National Standard 7 states that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication."  16 U.S.C. § 1851(a)(7); *see also* 50 C.F.R. § 600.340.  National Standard 8 states:

> [c]onservation and management measures shall, consistent with conservation requirements of this [Act] (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8).  Courts will "uphold a regulation against a claim of inconsistency with a 'national standard' under § 1851 if the Secretary had a 'rational basis' for it[,]" that is, as long as the Secretary acted reasonably in promulgating that regulation.  *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1119 (9th Cir. 2006).  Although the National Standards constitute statutory requirements upon which legal action can be based, they "do not require any particular outcome with respect to allocations; rather, they provide a framework for the Council's analysis" through "broadly worded statements of Congressional objectives for all fishery conservation and management measures."  *Nat. Res. Def. Council v. NMFS*, 71 F. Supp. 3d 35, 42 (D.D.C. 2014) (citation omitted).  Courts apply a rule of reason to challenges alleging failure to comply with the

---

[15]  Plaintiffs alleged in their Complaint that National Standards 1 and 2 also were "relevant to this case," ECF 1 ¶ 30, but did not present any argument regarding them in their brief.  Their failure to raise arguments or theories in their motion for summary judgment results in waiver of those arguments.  *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014).

National Standards, and will not invalidate a regulation or a plan amendment simply because the challenger's preferred alternative was not selected or the Secretary could have conducted a more thorough analysis. *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 92 (D.D.C. 2007).

First, the 50% coverage target for the IFM requirement is calculated by combining SBRM and IFM coverage. AR17734; AR17315. Thus, the vessels in the herring fishery will have either SBRM coverage or IFM coverage, but not both. The IFM requirement, therefore, expressly avoids any duplication and complies with National Standard 7. *Id*.

Further, analysis in the EA shows that the measures minimize the industry's monitoring costs, where practicable, while achieving the benefits of increasing monitoring coverage as demonstrated by the consideration of the value of additional monitoring against the costs to be borne by industry. AR17315. The 50% coverage target selected by the Council for vessels with Category A or B herring permits provides the benefits of collecting additional information on biological resources while minimizing industry cost responsibilities, particularly when compared to the higher coverage targets of 100% and 75% considered by the Council, which would have carried higher costs for such vessels. AR17315; AR17346. The EA analysis expressly includes a consideration of less costly alternatives, including no additional coverage (which would have no additional cost to the herring industry) and a 25% coverage target (which would have a lower cost to the herring industry than the 50% coverage target that ultimately was selected). AR17075, AR17082, AR17083. In fact, the Council considered higher coverage targets of 75% and 100%, but chose the 50% coverage target because it best balanced the benefits and costs of additional monitoring while establishing costs that "are substantially less than those associated with higher coverage targets." AR17734; *see* AR17257. The herring measures also allow an exemption for trips that land less than 50 mt of herring from the IFM requirement, which has the potential to

greatly reduce IFM costs for vessels on such trips.  AR17315.  The herring measures also include

provisions for the EFP, which would exempt midwater trawl vessels from the at-sea monitoring

coverage requirement in lieu of electronic monitoring and portside sampling.  AR17737.  Both

measures may be a more cost-effective way for vessels to meet the 50% coverage target

requirement than at-sea monitoring coverage.  AR17738, 17742.  While the Omnibus Amendment

carries costs for the industry, the simple fact that a regulation will impose cost does not mean that

it violates National Standard 7.  *Willie R. Etheridge Seafood Co. v. Pritzker*, 2016 WL 1126014,

at *8 (E.D.N.C. Mar. 21, 2016).   Indeed, National Standard 7's language anticipates that

conservation and management measures will carry at least some costs, which need to be minimized

to the extent practicable when attempting to achieve the amendment's conservation and

management objectives.   These considerations show that the Omnibus Amendment measures

minimize costs and avoid duplication, to the extent practicable, and satisfy National Standard 7.

Second, for similar reasons, the Omnibus Amendment satisfies National Standard 8.  As

set forth in the EA, the value of additional monitoring was weighed against the associated costs.

AR17316.  The EA included economic and social data that the Council had before choosing

monitoring provisions that attempt to provide for the sustained participation by fishing

communities, and minimize costs against monitoring's benefits to the extent practicable. NMFS

explained that additional monitoring is expected to reduce uncertainty around catch estimates in

the herring fishery to help improve the tracking of catch against catch limits and, ultimately, to

help improve management.  *Id*.  While Plaintiffs contend that the "scientific need for monitors is

dubious," Pl. Br. 28, such statements represent their disagreement with policy, which "is not a

basis for a reviewing court to declare agency action unlawful" when evaluating compliance with

the National Standards.  *N.C. Fisheries*, 518 F. Supp. 2d at 95.[16]

NMFS specifically acknowledged that IFM may have a substantial impact on participants in the herring fishery, but outlined in the final rule all of the measures that minimize adverse economic impacts, including the 50% coverage target, the exemption for trips that land less than 50 mt of herring, and the combined coverage target.  AR17742.  These measures are all consistent with National Standard 8 and its guidelines (50 C.F.R. § 600.345), which require that any analysis should assess the likely positive and negative social and economic impacts of the alternative management measures considered, over both the short and long term.  By improving the ability to track catch against catch limits, the 50% coverage target is expected to support the herring fishery as it seeks to achieve optimum yield, minimize bycatch and incidental catch to the extent practicable, and support the sustained participation of fishing communities.  AR17742.  Tracking catch against catch limits has the potential to lead to the development of improved management measures, which in turn has the potential to provide for the sustained participation of fishing communities in the herring fishery.  Thus, the Omnibus Amendment specifically "take[s] into account the importance of fishery resources to fishing communities."  16 U.S.C. § 1851(a)(8).

The Omnibus Amendment also includes measures to ensure that the Council considers the costs of additional monitoring relative to its effectiveness, and provides flexibility to adjust

---

[16]   Plaintiffs cite one document from the administrative record written in 2015 by former NOAA employee Michael Sissenwine.  Pl. Br. 28.  From this five-page attachment to a meeting summary, AR01600-08, Plaintiffs excerpt two sentences to attempt to support their contention that there is no scientific need for monitors.  Pl. Br. 28.  Yet Mr. Sissenwine also wrote that higher percentages of observer coverage in recent years "has been great in terms of the amount of scientific data produced," AR01605-06, and that his "inclination is that industry should pay the cost of quota monitoring and maybe it should pay for part of the cost of monitoring for science and enforcement," as the industry is comprised of "private individuals . . . benefiting from a public resource." AR01608.  Plaintiffs flyspeck this document, even though, when read in context, it does not support their argument.

measures if IFM requirements become too onerous.  AR17742.  The herring measures require the Council to review the IFM requirement two years after implementation, and the omnibus measures allow the Council to modify the weighting approach to recommend how to prioritize federal funding across IFM programs.  *Id*.  This process would allow the Council to recommend against prioritizing federal funding to administer IFM in the herring fishery (i.e., recommending no additional monitoring for the herring fishery) or, if NMFS finds that coverage waivers undermine the benefits of additional monitoring, the Council could restrict waivers when it reviews the IFM requirements two years after implementation.  AR17742-43.

The MSA's sometimes conflicting goals of conservation on the one hand and minimizing harm to fishing communities on the other require striking an appropriate balance.  *N.C. Fisheries*, 518 F. Supp. 2d at 92.  In striking that balance, the law does not require an official or numerical cost/benefit analysis.  *Id*.  Rather, NMFS has substantial discretion when determining whether an FMP's implementing regulations are consistent with National Standard 8.  NMFS considers the analysis of various alternatives to ensure that an FMP's implemented measures take into account all of the factors required by National Standard 8.  This includes a determination that the potential for sustained participation of fishing communities does not compromise achievement of the FMP's conservation goals, and the adverse economic impacts on those communities are minimized to the extent practicable consistent with achieving the conservation goals, as it did here.  *Nat'l Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 133 (D.D.C. 2002).  NMFS's analysis complied with the National Standards.  Because Plaintiffs' arguments boil down to dissatisfaction with the IFM coverage selected for the Omnibus Amendment, the Court should apply the rule of reason and reject Plaintiffs' National Standards claims.

**C.      The Omnibus Amendment And Its Implementing Regulations Were Approved Pursuant To The Procedures Established By The MSA.**

Section 1854(a) of the MSA prescribes the review process for FMPs and FMP amendments.  Contrary to Plaintiffs' claims, Pl. Br. 40, those steps were followed and there were no procedural irregularities for the Omnibus Amendment or its final rule.

When a council transmits an FMP or FMP amendment, the Secretary is required to "immediately commence a review of the plan or amendment to determine whether it is consistent" with the MSA, the National Standards, and any other applicable law.  16 U.S.C. § 1854(a)(1)(A).  The Secretary also must immediately publish a notice in the Federal Register stating that the FMP or FMP amendment is available, and provide a 60-day comment period (the NOA comment period).  *Id*. § 1854(a)(1)(B).  The Secretary then shall approve, disapprove, or partially approve the FMP or FMP amendment within 30 days of the end of the comment period by written notice to the council.  *Id*. § 1854(a)(3).  If the Secretary fails to notify a council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of an FMP or FMP amendment, then such plan or amendment shall take effect as if approved.  *Id*.

Here, the notice of availability for the Omnibus Amendment was published on September 19, 2018, the 60-day NOA comment period ended on November 19, 2018, and NMFS approved the amendment and notified the Council on December 18, 2018.  AR17731, AR17741; AR17760-62.  While Plaintiffs contend that NMFS's approval was conveyed to the Council in a "non-public letter that it never officially disseminated," Pl. Br. 41, that notice of approval was sent directly to the Council as required by the MSA.  16 U.S.C. § 1854(a)(3).  There is no statutory requirement to publish the letter in the Federal Register.  Further, while Plaintiffs appear to suggest some misfeasance with their statement that the Secretary "only cleared the Omnibus Amendment as consistent with the MSA and other federal law on December 17, 2018," Pl. Br. 41, the MSA plainly

establishes a compressed timeframe of just 30 days from the end of the NOA comment period to the Secretary's final decision.  16 U.S.C. § 1854(a)(3).  The fact that the Omnibus Amendment was cleared by the Secretary and written notice was sent to the Council the same day is completely consistent with the timing requirements of the MSA.

With regard to rulemaking, the MSA provides that a council shall submit proposed regulations that it deems "necessary or appropriate" to implement an FMP or amendment.  16 U.S.C. § 1853(c).  It is NMFS's practice to publish a notice of availability regarding an FMP or amendment concurrently with a proposed rule.  AR17741.  Accordingly, the proposed rule for the Omnibus Amendment was published on November 7, 2018, with a comment period ending December 24, 2018.  *Id*.  As a result, the comment periods for the Omnibus Amendment and proposed rule overlapped for 13 days.  *Id*.  As NMFS stated in its response to comments, both the NOA and the proposed rule explained that any public comments received on the Omnibus Amendment or proposed rule during the NOA comment period would be considered in the agency's decision to approve or disapprove the amendment.  *Id*.

According to Plaintiffs, proposed regulations implementing an amendment should be published in the Federal Register only after secretarial approval of the underlying FMP amendment.  Pl. Br. 40-41.  There is no MSA provision to support this proposition.  Contrary to Plaintiffs' assertion, NMFS's publication of the proposed rule did not "prejudge[] the legality" of the Omnibus Amendment.  The proposed rule explained that the amendment had not yet been finalized and that its comment period remained open.   83 Fed. Reg. at 55,665, 55,667.  Furthermore, the NOA and the proposed rule had separate public comment periods of 60-days and 45-days respectively.   The public was given the opportunity to meaningfully and usefully

participate in the process, in full compliance with the cases on which Plaintiffs rely. *E.g.*, *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982).

NMFS received seven comment letters during the NOA comment period and carefully considered all comments, especially those urging the agency to disapprove or delay the amendment, before it was approved on December 18.  AR17731; AR17773.  NMFS reviewed and considered all additional comments received during the proposed rule comment period prior to preparing the final rule, but no new or additional information was provided that would have prevented NMFS from approving the amendment.  *Id.*  Indeed, Plaintiffs fail to identify a single comment that NMFS did not consider, or for which the agency failed to make a response.  To the contrary, NMFS reviewed and considered all comments received during both comment periods, and interested members of the public had ample opportunity to communicate information, concerns, and criticisms to the agency during the process.  *See Conn. Light & Power*, 673 F.2d at 530.  There was no procedural infirmity and, in the absence of any pertinent legal authority to support Plaintiffs' claim, the Court should enter judgment for Defendants.

### D.     NMFS Fully Responded To Comments Submitted On The Final Rule.

Nor is there any merit to Plaintiffs' contention that NMFS "tried to address several legal and factual issues" raised in comments submitted in connection with the February 7, 2020 final rule, but that NMFS's responses were "substantively deficient."  Pl. Br. 30.  Notably, Plaintiffs fail to identify any statutory or regulatory authority that was purportedly violated in connection with this alleged shortcoming. In any event, NMFS fully responded to the issues raised during the public comment process, and its responses to comments were "sufficient to enable the courts 'to see what major issues of policy were ventilated. . .and why the agency reacted to them as it did.'" *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (citation omitted).

First, Plaintiffs argue that NMFS failed to cite any statutory authority in support of its position that the requirement to carry observers includes compliance costs for industry participants. Pl. Br. 30. As set forth above, however, the MSA authorizes the IFM coverage requirement, and NMFS reasonably interpreted the MSA to provide such authorization. *See* Section V.A, *supra*. NMFS explained this position in its responses to comments and analogized IFM costs to other costs that vessels typically bear in order to participate in the fishery. AR17739-40. Any suggestion that NMFS had to address the finer points of their comments regarding "surplusage" has no merit because NMFS squarely explained that the IFM requirement is well within its legal authority. *Id*.

Plaintiffs also contend, without any authority, that there is some distinction between regulatory costs and "effectively paying the salary of your direct, government minder," suggesting that the IFM requirement is analogous to an outside inspection or a "law enforcement" cost that should be borne by the government. Pl. Br. 31. But NMFS addressed these comments, explaining that at-sea monitors are placed on vessels for the purposes of collecting data, not for conducting searches or discovering criminal violations. AR17740.

Plaintiffs' claim that there are "problems" with Defendants' responses to comments is further belied by their cited examples, which undermine their basic premise that government should be responsible for IFM costs. For example, the section of the Clean Air Act cited by Plaintiffs requires monitoring and reporting <u>without</u> specifying a funding scheme. *E.g*., 42 U.S.C. § 7414(a)(1); *see also id*. § 7661c(b) (monitoring requirements for permits). Similarly, the section of the Clean Water Act cited by Plaintiffs authorizes EPA to require owners and operators of point sources to perform multiple reporting and monitoring activities. 33 U.S.C. § 1318(a)(A); *see id*. § 1342(a)(2) (data and information collection for permits). Industry bears the costs of complying with such monitoring and reporting requirements, even though the statutes are silent on costs.

Plaintiffs also refer in passing to the food industry. Pl. Br. 31. This example also falls flat: the inspection and grading of meat and poultry are two separate programs within the U.S. Department of Agriculture.   *See*   https://www.fsis.usda.gov/wps/portal/fsis/topics/food-safety-education/get-answers/food-safety-fact-sheets/production-and-inspection/inspection-and-grading-of-meat-and-poultry-what-are-the-differences_/inspection-and-grading-differences   (last visited July 24, 2020). Inspection for wholesomeness is mandatory and is paid for with public funds.  *Id*.  Grading for quality is voluntary, and the service is requested and paid for by meat and poultry producers/processors.  *Id*.; *see* 7 C.F.R. § 53.18 (setting forth charges to be assessed for grading of meat). This regulation was promulgated under the broad powers granted to the Secretary of Agriculture to determine the costs of marketing agricultural products. *See* 7 U.S.C. § 1622; *see also id*. § 1624(b) (directing the Secretary to promulgate such orders, rules, and regulations as he deems necessary to carry out the provisions of this title).  As with the other examples, industry bears the costs of certain associated programs.[17]  These examples across multiple regulated industries show that the costs of complying with regulations are routinely imposed without explicit statutory authorization for a wide array of health, safety, and environmental protections.  In short, there is no "problem" with Defendants' responses to comments that is illuminated by Plaintiffs' examples.

Finally, Plaintiffs contend that at-sea monitoring falls on what has always been considered "the government's side of the ledger" and this Court must intervene to prevent Defendants from

---

[17]   As Plaintiffs acknowledge, workplace safety is another area in which costs of compliance are borne by the industry. *E.g*., 57 Fed. Reg. 22,290, 22,292, 22,294 (May 27, 1992) (codified at 29 C.F.R. § 1910.1048) (requiring employer to pay medical examination costs).  This regulation relies on the Secretary of Labor's general authority to promulgate workplace safety regulations and standards, where only one of the statutory provisions specifically empowers the Secretary to require industry to pay the costs of such regulation. *See* 57 Fed. Reg. at 22,307 (citing, among other statutory authority, 29 U.S.C. §§ 653, 655, 657).

"arbitrarily shift[ing] expenses" onto the industry.  Pl. Br. 31, 32.[18]  But there is nothing arbitrary about the IFM requirement.  As Plaintiffs themselves acknowledge with the lengthy recitation of the procedural history leading to the Omnibus Amendment, the IFM requirement was put in place after years of study, consideration, and evaluation of the costs and benefits associated with conservation.  Pl. Br. 5-11.  As set out in Section V.A, *supra*, the fishing industry has carried the cost of monitoring in multiple fisheries for years.  Further, participation in the fishery is voluntary.  If a vessel determines the costs of compliance are too high, it may choose to land less than the 50 mt of herring per trip threshold for requiring IFM, or not participate at all.  *See* AR17740.

NMFS fully and substantively responded to the comments challenging the agency's authority for the IFM requirement.  *See* AR17739-40.  The agency considered the relevant factors and explained its position.  *E.g.*, *Sierra Club v. EPA*, 353 F.3d 976, 986 (D.C. Cir. 2004) (noting that the failure to respond to comments is significant only insofar as it demonstrates the agency's decision was not based on a consideration of relevant factors).  Nothing more was required.

### E.   The IFM Coverage Requirement Complies With Other Federal Laws.

In abbreviated fashion, Plaintiffs allege that the IFM requirement violates the Anti-Deficiency Act (ADA), 31 U.S.C. § 1341, the Miscellaneous Receipts Statute (MRS), 31 U.S.C. § 3302, and the Independent Office Appropriations Act (IOAA), 31 U.S.C. § 9701.  Pl. Br. 25-26.  Plaintiffs' entire argument rests on the faulty premise that the IFM requirement constitutes "revenue raising" and is a measure used by the government "to fund its own operations."  Pl. Br. 25.  None of this is accurate: the Omnibus Amendment specifically identifies the government's

---

[18]   Plaintiffs also suggest that the IFM requirement runs afoul of Executive Order (E.O.) 12866. Pl. Br. 31.  But E.O. 12866 provides no basis to challenge agency action under the MSA.  It is designed to improve internal management of the Federal government; it creates no right, substantive or procedural, that is enforceable at law.  *See* E.O. 12866 § 10; *All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 135 n.10 (D.D.C. 2011).

costs and industry's costs to avoid a situation where the industry is paying the government's costs, thus funding the government's operations and constructively augmenting NMFS's appropriations.

The ADA prohibits federal officers from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" and from "involv[ing the United States] in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A)-(B). Here, NMFS is neither making nor authorizing an expenditure or obligation, nor is it entering into a contract or obligation.  Indeed, NMFS promulgated regulations to implement the Omnibus Amendment to avoid the imposition of a measure that would require funds that Congress may not have appropriated to NMFS.  On these facts, there is no violation of the ADA.

For similar reasons, the MRS offers no relief to Plaintiffs.  Under this law, "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b).  The MRS prevents an agency from augmenting its appropriations by either directly accepting funds from another entity or causing another entity to bear a cost that should otherwise be borne by the agency.  Here, the vessel pays a third-party monitoring service provider for the ASM services it provides to the vessel pursuant to contractual arrangements between the vessel and the service provider.  AR17740.  Defendants will not receive any payment from the vessel related to industry-funded monitoring, nor do Defendants maintain control over the contractual relationship between the vessel and the service provider—such that payment by the vessel for such services could be considered constructive augmentation—beyond exercising their statutorily authorized regulatory function in ensuring vessel owners comply with the requirement to have a third-party observer on board.  AR17740, AR17741 (categorizing cost responsibilities allows

industry to negotiate better contracts); AR17481 (vessels negotiate and contract directly with providers).  Even the Government Accountability Office (GAO) treatise cited by Plaintiffs, Pl. Br. 27, makes plain that money "for the Government" means money received "for the use of the United States" or "for the use of a particular agency."  GAO, 2 Principles of Federal Appropriations Law at 6-177 (3d ed. 2006).  Payments to monitoring providers are not remitted to NMFS, NMFS does not exercise control over the contractual relationship, and therefore payments to monitoring providers are not "for the use" of NMFS or any other federal agency.

Nor does the IFM requirement violate the IOAA, which specifically applies only to fees collected by government agencies for "a service or thing of value provided by the agency."  31 U.S.C. § 9701(b).  The IOAA is part of a statutory scheme that requires "official[s] or agent[s] of the United States Government having custody or possession of public money" to "keep the money safe" and "deposit [it] in the Treasury as soon as practicable," with the penalty for noncompliance being removal from office.  31 U.S.C. § 3302(a), (b), (d).  Here, no government agency is collecting a fee, nor is any government agency providing a service or thing of value.  Rather, a private entity (a monitoring provider) collects a vessel's payment for the service provider's at-sea monitoring, an arrangement under which no government agent or official ever has custody or possession of any public money.  The IOAA plainly does not apply (and provides no private right of action in any event).  *Byers v. Intuit*, 564 F. Supp. 2d 385, 415-19 (E.D. Pa. 2008).

Plaintiffs' argument that NMFS's position in other litigation that the ADA and MRS preclude the agency from creating observer programs with IFM requirements, Pl. Br. 16-17, 26, mischaracterizes *Anglers Conservation Network v. Pritzker*, which presented facts significantly different than this case. 139 F. Supp. 3d 102 (D.D.C. 2015).  In *Anglers*, the challenged FMP amendment included no accommodation for whether NMFS had appropriated funds available for

its costs. The amendment mandated placement of an observer on 100% coverage on certain herring fishing vessel trips. *Id*. at 115-16. Further, a fixed portion of the observer costs (a maximum of $325 per day of coverage) would be paid by the industry, with no differentiation between the industry's and government's costs. *Id*. NMFS disapproved of that mandate because it may have obligated NMFS to bear a cost for which it had no appropriated funds (in violation of the ADA), and to potentially augment its budget by accepting fees directly from the fishing industry to fund observer monitoring costs (in violation of the MRS). *Id*. No such facts are present here: the IFM coverage requirement does not require NMFS to administer a program for which it has no appropriated funds, nor does it implicate cost-sharing between NMFS and the industry (as each has its own cost responsibilities), nor will it require the direct acceptance of contributions from industry participants (i.e., direct payment from vessels to NMFS). For the same reasons, Plaintiffs are simply wrong in their contention that NMFS's position on at-sea monitors under the Northeast Multispecies FMP represents a concession that industry-funding is precluded by the ADA. Pl. Br. 26. NMFS's position on cost-sharing with respect to that monitoring program is consistent with its position in *Anglers*, which is inapplicable for the reasons stated above. Thus, the IFM requirement violates none of these statutes and the Court should enter judgment for Defendants on these claims.

### F.     The IFM Requirement Is Not A Tax.

Similarly, Plaintiffs' contention that the IFM imposes a tax is without merit. Pl. Br. 32. The "essential feature of any tax: [is that] [i]t produces at least some revenue for the [g]overnment." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 564 (citation omitted); *see* Black's Law Dictionary (11th ed. 2019) ("tax" is "a charge, usu[ally] monetary, imposed by the government on persons, entities, transactions, or property *to yield public revenue*") (emphasis added); *Thomas v. Network Sols.*, 2 F. Supp. 2d 22, 30 (D.D.C. 1998) (fee collected by government contractor was a

tax because it "exist[ed] to generate revenue for public projects and goals"). Even the GAO treatise cited by Plaintiffs states that money "for the Government" means money received "for the use of" the United States or a particular agency. 2 Principles of Federal Appropriations Law at 6-177.

The IFM requirement bears none of the hallmarks of a tax. As NMFS explained in its responses to comments, the IFM requirement generates no revenue for NMFS. AR17740; AR17772. Rather, monitors are employed by private companies who apply to NMFS to participate as monitoring service providers and are approved after demonstrating that they meet the standard requirements. AR17733. Vessels pay monitoring service providers directly for industry cost responsibilities associated with IFM. AR17740; AR17772. NMFS receives no payment from the vessels related to IFM, therefore, these payments are not "for the use" of NMFS or any other federal agency, nor are Defendants trying to "evade" a requirement to pay contractors. *Id*. Thus, there is no resemblance between taxes levied and collected by Congress in its legislative authority, and industry payments to monitoring service providers.

### G. NMFS Complied With NEPA By Taking The Requisite Hard Look At The Environmental Impacts Of The Industry-Funded Monitoring Amendment.

NMFS complied with NEPA by taking a hard look at the environmental effects of a reasonable range of alternatives for both the omnibus measures and the industry-specific IFM measures for the Atlantic herring fishery, including the economic impact of both on the fishing industry. Plaintiffs' challenge to the adequacy of the economic impact analysis lacks merit and Plaintiffs have not met their burden of showing that NMFS's action was arbitrary and capricious.

The determination that the omnibus measures, which merely standardize the development and administration of future IFM programs in the New England Council FMPs, do not directly affect fishing effort, the amount of fish harvested, or otherwise impose direct costs on the fishing industry, has a rational basis supported by the administrative record. As to the herring measures,

NMFS recognized and adequately considered the economic impacts of the IFM measures on the herring industry, and further considered and addressed comments about recent herring catch limits in the final rule.  No more was required by NEPA.  Under the applicable standard of review, the Court should grant summary judgment in favor of Defendants because "the agency 'has adequately considered and disclosed the environmental impact of its actions and . . . its decision is not arbitrary or capricious.'" *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 509 F.3d 562, 568 (D.C. Cir. 2007) (quoting *Baltimore Gas*, 462 U.S. at 97-98).

### 1. The Analysis of the Environmental Impacts of the Omnibus Amendment Fully Complies with NEPA.

NMFS determined that the omnibus measures do not have any direct impacts on fishery-related businesses because those measures "do not require the development of IFM programs nor do they directly impose any costs."  AR17179; *see also* AR17183-87; AR17741.  The EA acknowledges that there would be direct negative economic impacts to fishing vessels if an IFM program were developed for a particular FMP in the future, but explains that such impacts would be evaluated in any such future amendment. AR17179, AR17183, AR17741. As further explained,

> Future [IFM] programs would be developed to achieve specific goals.  Without knowing the goals or the details of the measures to achieve those goals, attempting to quantify in this amendment the impact or the specific benefits of a future [IFM] program is too speculative.  The economic impacts to fishing vessels and benefits resulting from a future [IFM] program would be evaluated in the amendment to establish that [IFM] program and cannot [be] considered in this amendment.

AR17741.  In response to comments presented about the possibility of overlapping requirements for IFM in other fisheries that may be harvested with herring, NMFS likewise explained that "the impacts of those programs relative to existing [IFM] programs will be considered at that time." AR17742.  Applying the rule of reason, the Court should reject Plaintiffs' contention (Pl. Br. 36) that this analysis of the environmental impacts of the Omnibus Amendment is inadequate.

The Omnibus Amendment does not require the development of IFM programs in all New England Council FMPs. Instead, the Omnibus Measures are simply standards that will be applied if IFM programs are developed in the future. NEPA does not require NMFS to speculate as to the economic impacts of future IFM programs for other FMPs that have not yet been proposed. This conclusion is supported by this court's rulings in a different but comparable context. In *Wilderness Society v. Salazar*, the court reviewed the Bureau of Land Management's (BLM) decision not to consider site-specific environmental impacts as part of its decision to make land available for oil and gas leasing. 603 F. Supp. 2d 52, 59 (D.D.C. 2009). In finding that BLM had not acted contrary to NEPA, the court noted that BLM had been limited in what it could analyze because it did not yet know information on the exact location of wells or development. *Id.* at 62. The court based its determination on the "rule of reason," which "requires that consideration be given to practical limitations on the agency's analysis, such as information available at the time." *Id.* at 61 (citation omitted). The court also observed that the agency "[made] clear. . .that further site-specific analysis will be conducted prior to exploration in the planning area." *Id.* at 62. *Accord WildEarth Guardians v. Zinke*, 368 F. Supp.3d 41, 66-67 (D.D.C. 2019).

As applied here, NEPA does not require NMFS to speculate as to the potential economic impacts of any future FMP-specific IFM amendments that are not required by the Omnibus Amendment. In addition, the determination that such impacts will be analyzed as part of any future IFM amendment is fully explained in the record and consistent with the requirements of NEPA. Applying the rule of reason, the Court should find that the assessment of the environmental consequences of the Omnibus Amendment satisfies the requirements of NEPA.

###### 2.     The EA Adequately Considered a Reasonable Range of Alternatives and Addressed Mitigation Measures.

Plaintiffs' cursory assertion that Defendants failed to adequately consider alternatives is unsupported by the robust administrative record that considers the environmental consequences of a reasonable range of alternatives.   *See* AR17046-68 (omnibus alternatives); AR17069-101 (Atlantic herring monitoring alternatives).  Pl. Br. 36.  With respect to mitigation measures, NEPA requires "a reasonably complete discussion of possible mitigation measures" as part of an agency's "hard look" at the environmental consequences of a proposed action.  *Robertson*, 490 U.S. at 352. "However, NEPA 'does not require agencies to discuss any particular mitigation plans that they might put in place,' nor does it 'require agencies—or third parties—to effect any.'"  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (quoting *Citizens Against Burlington v. Busey,* 938 F.2d 190, 206 (D.C. Cir. 1991)).

Here, the EA describes the economic impact of the IFM on the Atlantic herring industry as negative.  As detailed above in Section III, *supra*, the EA and Final Rule also address mitigation measures that are expected to lessen economic impacts, including a provision allowing monitoring coverage to be waived on a trip-by-trip basis if a vessel intends to land less than 50 mt of herring. AR17735, AR17742; AR17250, AR17264.  Plaintiffs acknowledge this waiver as mitigation, but contend that it "applies to an especially small portion of the herring fleet."  Pl. Br. 36 (citing AR17250).  Plaintiffs' critique, which focuses on the number of vessels eligible to request a waiver, fails to recognize that effect of the waiver is to focus monitoring coverage on the vessels with the largest herring catch.  AR17742.  In addition, the administrative record addresses the impact of this waiver by considering the percentage of trips by vessel and gear type with trips under 50 mt of herring, AR17250, and discussing the impact of that mitigation measure based on that information.  AR17264.  That discussion is complete and adequate for purposes of NEPA.

The amendment also includes a provision that "requires the Council to examine the results of any increased coverage in the herring fishery two years after implementation of this amendment, and consider if adjustments to the coverage targets are warranted." AR17734. Plaintiffs' assertion that the "uncertainty of future management efforts by the Council" pursuant to this provision somehow renders the discussion of mitigation measures inadequate is without merit given that NEPA does not require agencies to put any particular mitigation plan in place, and the results of a future re-examination are not known at this time.

### 3.    NMFS Did Not Predetermine The Outcome of the NEPA Analysis.

Plaintiffs' contention (Pl. Br. 36-37) that Defendants pre-judged the outcome of the EA in favor of the Council's preferred alternatives is not supported by the administrative record.

To begin with, because NEPA is a procedural statute, it does not mandate a particular result. *See Robertson*, 490 U.S. at 351 ("Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed-rather than unwise-agency action."). In addition, "[b]ias towards a preferred outcome does not violate NEPA so long as it does not prevent full and frank consideration of environmental concerns." *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 206 (D.D.C. 2015) (citation omitted). Against this procedural background, a plaintiff must meet a high standard to prove that a federal agency has predetermined the outcome of the environmental analysis required by NEPA. *Am. Wild Horse Pres. Campaign v. Vilsack*, 133 F. Supp. 3d 200, 222 (D.D.C. 2015).

Plaintiffs make no such showing here. NMFS fully and adequately considered a reasonable range of alternative actions in the EA, including a "no action" alternative as required by 40 C.F.R. § 1502.14(d). *See* AR17287 (Impacts Summary for Herring Alternatives). The mere fact that some of those alternatives were designated as preferred alternatives does not establish that NMFS predetermined the outcome. NMFS took the required hard look at each alternative, and Plaintiffs

have not pointed to any irreversible or irretrievable commitment to a plan of action dependent on a particular outcome.  All Plaintiffs have shown is that the Council did not select their preferred no action alternative, but NEPA does not require choosing the Plaintiffs' preferred alternative.  *See Robertson*, 490 U.S. at 350 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.").

In addition, the submission of negative comments regarding the industry-funded monitoring targets does not establish that the outcome was predetermined.  NMFS and the Council received a range of comments, including some advocating for *greater* monitoring coverage than the alternative that was selected.  *See*, *e.g.*, AR17668-71; AR17742.  In determining that the 50% target coverage provided the best balance between the benefits and costs of additional monitoring, NMFS considered and addressed these comments in the Final Rule.  AR17739-44.  Those circumstances do not establish that the outcome of this process was predetermined, and Plaintiffs' contrary contention should be rejected as unsupported by the record.

### 4.  Recent Herring Catch Reductions Do Not Require Supplementation of the EA.

Plaintiffs' contention (Pl. Br. 38) that the EA should have been supplemented because of herring catch reductions in 2019 and 2020 is without merit.

An agency is required to prepare a supplement to an EIS or an EA where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact."  40 C.F.R. § 1502.9(c)(1)(ii).  This duty to supplement is guided by a "rule of reason" under which "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized."  *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017) (quoting *Marsh*, 490 U.S. at 373).  The agency's decision not to prepare a supplement

41

must be upheld unless a plaintiff shows that decision is "arbitrary and capricious." *Marsh*, 490 U.S. at 377 n.23; 5 U.S.C. § 706(1).

Here, NMFS took a hard look at whether the EA supporting the herring IFM measures required supplementation because of the recent catch reductions. AR17737-39. NMFS reviewed the EA, which analyzed the economic impacts of the IFM coverage on the herring fishery by estimating the industry-funded cost of carrying an at-sea monitor (per sea day), calculating the annual return-to-owner (RTO) (expressed as a percentage of annual gross revenue), and then estimating the potential reduction in the annual RTO associated with paying the monitoring costs under the different coverage alternatives considered. AR17442-74. Based on this analysis, the EA estimated that the reduction in annual RTO associated with the coverage target alternative ranges from 45% to less than 1%. AR17261. For the selected 50% coverage target for IFM on Category A and B vessels the reduction in annual RTO was estimated to be approximately 20%, although the actual cost of IFM on a particular vessel would vary with effort level and the amount of SBRM coverage. AR17190, AR17290, AR17306, AR17326; AR17735.

NMFS then compared herring revenue generated by Category A and B vessels from 2014 to 2018 and found that, even though the 2018 catch limit was reduced by 52% from the 2014 catch limit, the industry did not experience a proportional decrease in revenue. AR17737-38. NMFS observed that changes in revenue may have been affected by several factors, including the availability of herring relative to demand, vessel participation in other fisheries, and an almost 70% increase in the price of herring between 2014 and 2018. AR17738. NMFS also took into account other factors that affect the economic impact of IFM, including the level of fishing effort and SBRM coverage, and available mitigation. AR17738-39. Based on this additional analysis, NMFS determined that, despite reductions in expected revenue in 2020 and 2021, the reduction in

annual RTO associated with implementing a 50% coverage target for ASM on Category A and B vessels fell within the range of economic impacts analyzed in the EA.  AR17739.  The EA and the FONSI were thus determined to remain valid to support this amendment.

Plaintiffs have not shown that this decision was arbitrary or capricious.  Plaintiffs complain that the analysis of factors that might mitigate the impact of IFM, including participation in other fisheries, is inadequate.  Pl. Br. 38.  But participation in other fisheries is just one of several variables that NMFS took into account in assessing the economic impact of the IFM on the herring industry.[19]  The essence of Plaintiffs' complaint is that NMFS "did not analyze certain issues in the manner or level of detail [P]laintiffs would have preferred," but the law makes clear that "the applicable standard of review neither contemplates nor countenances that type of judicial second-guessing of agency decisionmaking . . . ."  *WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 31 (D.D.C. 2014).  Here, NMFS reasonably determined that the economic impact of IFM, even with recent catch reductions taken into account, still fell within the range analyzed by the EA.  No more is required under NEPA.  Thus, the Court should reject Plaintiffs' arguments, find that Defendants' complied with NEPA in connection with the Omnibus Amendment and grant summary judgment in favor of Defendants on Plaintiffs' NEPA claim.

### H.  NMFS Complied With The Regulatory Flexibility Act.

Defendants fully complied with the procedural requirements imposed by the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 et seq., in evaluating the Omnibus Amendment.  The RFA requires an agency to conduct a "regulatory flexibility analysis" whenever it proposes a rule that will have "a significant economic impact on a substantial number of small entities."  5 U.S.C. §§

---

[19]   When the economic impacts of IFM were analyzed in the EA, NMFS observed that the impact is difficult to estimate because it varies with sampling costs, fishing effort, SBRM coverage, price of herring, and participation in other fisheries.  AR17737.

601(6), 603, 605(b). The agency must prepare an "initial regulatory flexibility analysis" (IRFA) when it publishes the proposed rule and a "final regulatory flexibility analysis" (FRFA) when it publishes the final rule. *Id.* §§ 603(a), 604(a). Sections 603 and 604 of the statute establish the explanations and considerations that IRFAs and FRFAs, respectively, "shall contain." *Id.* §§ 603(b), 604(a). Both forms of analysis generally "describe[ ] the effect of the proposed rule on small businesses and discuss[ ] alternatives that might minimize adverse economic consequences." *Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 108 (D.D.C. 2006). Completion of these analyses is a "purely procedural" obligation. *N.C. Fisheries*, 518 F. Supp. 2d at 95. The RFA does not prohibit regulations from having adverse economic effects on small entities or even require agencies to minimize those effects. *Id.*

NMFS complied with the obligations imposed by the RFA when it prepared an IRFA and FRFA for the Omnibus Amendment. *See* AR17339-46 (IRFA, contained in EA); AR17744-47 (FRFA, contained in final rule).[20] The case cited by Plaintiffs as their primary authority does not apply because the defendants in that case did not fulfill this basic statutory requirement. Pl. Br. 40 (citing *S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1436 (M.D. Fla. 1998)).

Further, the IRFA and FRFA both satisfied Defendants' statutory obligations. While Plaintiffs allege that Defendants failed to address economic impacts associated with the omnibus measures, Pl. Br. 39, both the IRFA and the FRFA explain that the omnibus measures are administrative and have no direct economic impacts, thus they did not need to be addressed further. Plaintiffs offer no rebuttal to this assertion. AR17339; AR17744. Plaintiffs' attacks on the

---

[20]   Plaintiffs neither refer to nor cite NMFS's FRFA; they identify only alleged inadequacies in the IRFA. Pl. Br. 39-40. Courts lack jurisdiction to consider challenges to an agency's IRFA. *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 67 (D.D.C. 2017). In light of Plaintiffs' failure to cite to any alleged failures to comply with the RFA in the FRFA itself, Defendants request that the Court summarily dismiss Plaintiffs' RFA claim for this reason alone.

analyses of the herring measures fare no better.  Both the IRFA and the FRFA track, subsection by subsection, what Congress by statute required an agency to provide in each.  *See* 5 U.S.C. §§ 603(a), 604(a).  Such an approach has been endorsed by courts within this District.  *See N.C. Fisheries*, 518 F. Supp. 2d at 95-96.  More specifically, contrary to Plaintiffs' claims, the analyses also considered the economic impacts on small entities that could result from the herring measures, and described the steps NMFS took to minimize the economic impact on small entities as required by the RFA.[21]  AR17341-46; AR17744.  The FRFA analysis addressed the potential impacts associated with other considered alternatives.  AR17746-47.  There is no serious dispute that Defendants put forth a "reasonable, good-faith effort to carry out [the RFA's] mandate," *N.C. Fisheries*, 518 F. Supp. 2d at 73 (quoting *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001)), thus Plaintiffs' claim should be dismissed.

## VI.    CONCLUSION

For these reasons, the Court should enter judgment for Defendants.

Dated:  July 24, 2020.                              Respectfully submitted,

JEAN E. WILLIAMS,
Deputy Assistant Attorney General
SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Chief

/s/ Alison C. Finnegan
Alison C. Finnegan, Senior Trial Attorney
(Pennsylvania Bar No. 88519)
U.S. Department of Justice
Environment and Natural Resources
Division
Wildlife and Marine Resources Section

---

[21]  Plaintiffs contend that Defendants failed to "adequately consider the full set of costs they will impose on regulated entities."  Pl. Br. 39.  The RFA, however, requires only that the IRFA analyze the "economic impacts on small entities resulting from the action," and the FRFA describe the steps taken to minimize the significant impact on small entities consistent with the stated objectives of applicable statutes, 5 U.S.C. §§ 603(c), 604(a)(6).  The analyses complied with this requirement.

Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0500;  Fax: (202) 305-0275
alison.c.finnegan@usdoj.gov

/s/ Kristine S. Tardiff
Kristine S. Tardiff
(New Hampshire Bar No. 10058)
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583; Fax (603) 225-1577
kristine.tardiff@usdoj.gov

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2020, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Alison C. Finnegan