**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 20-cv-466 (EGS) |
| | ) | |
| WILBUR L. ROSS, JR., in his official capacity as | ) | HEARING SCHEDULED |
| Secretary of the U.S. Department of Commerce, *et al.*, | ) | FOR OCTOBER 9, 2020 |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION**
**FOR SUMMARY JUDGMENT AND IN OPPOSITION TO**
<u>**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

Ryan P. Mulvey
D.C. Bar No. 1024262
Eric R. Bolinder
D.C. Bar No. 1028335

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Phone: (571) 444-2841
ryan.mulvey@causeofaction.org
eric.bolinder@causeofaction.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of Contents..............................................................................................................ii

Table of Authorities.........................................................................................................iii

Introduction.......................................................................................................................1

Argument ...........................................................................................................................2

I.    Defendants tempt the Court into error by urging deference where it does not apply.........2

II.    The Omnibus Amendment is unlawful, void, and unenforceable. ....................................4

    A.    The MSA does not unambiguously grant Defendants and the NEFMC broad authority to impose industry funding in any fishery.........................................4

    B.    Plaintiffs correctly rely on the *expressio unius* canon. ...........................................6

    C.    To the extent it is relevant, the legislative history supports Plaintiffs. .....................8

    D.    The MSA's "necessary and appropriate" clauses do not apply here. ......................10

    E.    The MSA's penalty provision must be read in context............................................12

    F.    At-sea monitoring is unlike other compliance measures. ........................................13

    G.    Even under *Chevron* Step Two, Defendants' action must fail.................................17

        1.    Defendants' construction of the MSA is unreasonable....................................17

        2.    Defendants' regulation is arbitrary and capricious because they did not seriously consider the cost of industry-funded monitoring. .....................18

    H.    The Omnibus Amendment violates agency financing and expenditure statutes. ....20

    I.    The Omnibus Amendment violates the MSA's National Standards. ......................22

        1.    National Standard Seven..................................................................................22

        2.    National Standard Eight..................................................................................25

III.    The Omnibus Amendment is procedurally infirm. .........................................................27

    A.    Defendants violated NEPA. ....................................................................................27

        1.    Defendants and the NEFMC failed to take a "hard look" at the complete environmental impact of the Omnibus Amendment. ......................28

        2.    Defendants and the NEFMC did not adequately consider regulatory alternatives or potential mitigation measures. ..................................................30

        3.    Defendants and the NEFMC never seriously considered any alternative to industry-funded monitoring. .........................................................................30

        4.    Defendants and the NEFMC should have revised their environmental impact analysis following significant herring catch reductions.......................31

    B.    Defendants violated the RFA....................................................................................34

    C.    Defendants' irregular proposal of implementing regulations for an unapproved FMP amendment violated due process, the rulemaking process contemplated by the MSA, and common sense..............................................................................36

Conclusion .......................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adirondack Medical Center v. Sebelius,*
    740 F.3d 692 (D.C. Cir. 2014) .................................................................6

*Agape Church, Inc. v. Federal Communications Commission,*
    738 F.3d 397 (D.C. Cir. 2013) ...............................................................18

*Alfa International Seafood v. Ross,*
    264 F. Supp. 3d 23 (D.D.C. 2017) .........................................................34

*Associated Fisheries of Maine, Inc. v. Daley,*
    127 F.3d 104 (1st Cir. 1997) ..................................................................35

*Blue Water Fisherman's Ass'n v. Mineta,*
    122 F. Supp. 2d 150 (D.D.C. 2000). ...............................................24, 26

*Bunker Hill Co. Lead & Zinc Smelter v. Environmental Protection Agency,*
    658 F.2d 1280 (9th Cir. 1981) ...............................................................14

*Center for Biological Diversity v. Department of the Interior,*
    563 F.3d 466 (D.C. Cir. 2009) ...............................................................17

*Center for Biological Diversity v. Everson,*
    435 F. Supp. 3d 69 (D.D.C. 2020) ...............................................4, 17, 39

*Chevron U.S.A. v. Natural Resources Defense Council,*
    67 U.S. 837 (1984) ...................................................................................5

*Connecticut Light & Power Co. v. Nuclear Regulatory Commission,*
    673 F.2d 525 (D.C. Cir. 1982) ...............................................................39

*Consumer Product Safety Commission v. GTE Sylvania, Inc.,*
    447 U.S. 102 (1980) .................................................................................8

*County of Maui v. Hawaii Wildlife Fund,*
    140 S. Ct. 1462 (2020) ...........................................................................38

*Davis v. Latschar,*
    202 F.3d 359 (D.C. Cir. 2000) ...............................................................31

*Detroit International Bridge Co. v. Government of Canada,*
    192 F. Supp. 3d 54 (D.C. Cir. 2016) .......................................................3

*EchoStar Satellite LLC v. Federal Communications Commission*,
  704 F.3d 992 (D.C. Cir. 2013 .........................................................................11, 12

*Ethyl Corp. v. Environmental Protection Agency*,
  51 F.3d 1053 (D.C. Cir. 1995)...................................................................................6

*Global Tel*Link v. Federal Communications Commission*,
  866 F.3d 397 (D.C. Cir. 2017)................................................................................17

*Goethel v. Pritzker*,
  No. 15-497, 2016 WL 4076831 (D.N.H. July 29, 2016) ..........................................3

*Grand Canyon Air Tour Coalition v. Federal Aviation Administration*,
  154 F.3d 455 (D.C. Cir. 1998)................................................................................37

*Greenpeace v. National Marine Fisheries Service*,
  55 F. Supp. 2d 1248 (W.D. Wash. 1999).................................................................28

*Groundfish Forum v. Ross*,
  375 F. Supp. 3d 72 (D.D.C. 2019) .....................................................................26, 30

*Gulf Fishermen's Ass'n v. National Marine Fisheries Service*,
  No. 19-30006, 2020 WL 4433100 (5th Cir. Aug. 3, 2020) ......................................5

*Helomics Corp. v. Burwell*,
  No. 16-546, 2016 WL 3525885 (D.D.C. Apr. 8, 2016)............................................7

*Hutchins v. District of Columbia*,
  188 F.3d 531 (D.C. Cir. 1999)................................................................................34

*Jackson County v. Federal Energy Regulatory Commission*,
  589 F.3d 1284 (D.C. Cir. 2009)..............................................................................28

*K Mart Corp. v Cartier, Inc.*,
  486 U.S. 281 (1988)................................................................................................38

*King v. Burwell*,
  576 U.S. 473 (2015).................................................................................................7

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019).........................................................................................4, 7

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803)..................................................................................2

*Marx v. General Revenue Corp*,
  568 U.S. 371 (2013).................................................................................................7

*Mayo v. Reynolds*,
   875 F.3d 11 (D.C. Cir. 2017) .......................................................................31, 32

*McLouth Steel Products Corp. v. Thomas*,
   838 F.2d 1317 (D.C. Cir. 1988) ..........................................................................37

*Merck & Co. v. Department of Health & Human Services*,
   962 F.3d 531 (D.C. Cir. 2020) ............................................................................17

*Michigan v. Environmental Protection Agency*,
   576 U.S. 743 (2015) ......................................................................................19, 20

*National Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) ..............................................................................................7

*National Labor Relations Board v. SW General, Inc.*,
   137 S. Ct. 929 (2017) ............................................................................................7

*New York Stock Exchange LLC. v. Securities & Exchange Commission*,
   962 F.3d 541 (D.C. Cir. 2020) ................................................................... *passim*

*North Carolina Fisheries Ass'n, Inc. v. Daley*,
   27 F. Supp. 2d 650 (E.D. Va. 1998) ...................................................................26

*Oceana Inc. v. Ross*,
   No. 17-829, 2020 WL 1905148 (D.D.C. Apr. 17, 2020) .....................................15

*Oceana v. Bureau of Ocean Energy Management*,
   37 F. Supp. 3d 147 (D.D.C. 2014) ......................................................................29

*Oceana, Inc. v. Ross*,
   290 F. Supp. 3d 73 (D.D.C. 2018) ......................................................................15

*Peter Pan Bus Lines v. Federal Motor Carrier Safety Administration*,
   471 F.3d 1350 (D.C. Cir. 2006) ............................................................................5

*Southern Offshore Fishing Ass'n v. Daley*,
   995 F. Supp. 1411 (M.D. Fla. 1998) ..............................................................26, 35

*Texas Rural Legal Aid, Inc. v. Legal Services Corp.*,
   940 F.2d 685 (D.C. Cir. 1991) ..............................................................................6

*Tingzi Wang v. U.S. Citizen & Immigration Services*,
   375 F. Supp. 3d 22 (D.C. Cir. 2019) .....................................................................3

*United States v. Stauffer Chemical Co.*,
   464 U.S. 165 (1984) .............................................................................................14

*Warger v. Shauers,*
   574 U.S. 40 (2014)................................................................................................10

*WildEarth Guardians v. Zinke,*
   368 F. Supp. 3d 41 (D.D.C. 2019) ...................................................................29

*Wilderness Society v. Salazar,*
   603 F. Supp. 2d 52 (D.D.C. 2009) ........................................................28, 29, 30

**Statutes**

5 U.S.C. § 611(a)(1)..................................................................................................35

5 U.S.C. § 706...........................................................................................................15

16 U.S.C. § 1821(h)(4) ..............................................................................................12

16 U.S.C. § 1851(a)(7)...............................................................................................22

16 U.S.C. § 1851(a)(8)...............................................................................................25

16 U.S.C. § 1853(a) ...................................................................................................11

16 U.S.C. § 1853(a)(1)(A)..........................................................................................10

16 U.S.C. § 1853(b) ...................................................................................................11

16 U.S.C. § 1853(b)(14) .............................................................................................11

16 U.S.C. § 1853(c)(1)...........................................................................................11, 39

16 U.S.C. § 1853(c)(2)................................................................................................39

16 U.S.C. § 1853a(e)(2) .............................................................................................12

16 U.S.C. § 1854(a)(3)................................................................................................36

16 U.S.C. § 1854(a)(4)................................................................................................38

16 U.S.C. § 1854(b)(1) ...........................................................................................36, 38

16 U.S.C. § 1858(g)(1)(D)..........................................................................................13

16 U.S.C. § 1862.......................................................................................................12

16 U.S.C. § 1862(a) .....................................................................................................8

33 U.S.C. § 1318(a)(A)...............................................................................................13

33 U.S.C. § 1318(a)(B) ................................................................................13, 14

42 U.S.C. § 7414(a)(1) .....................................................................................13

42 U.S.C. § 7414(a)(2) .....................................................................................13

Fishery Conservation Amendments of 1990, Pub. L. 101-627, 104 Stat. 4436 ............................9

**Regulations and Regulatory Materials**

40 C.F.R. § 1500.1(b) ......................................................................................30

40 C.F.R. § 1508.25(a)(1) ...............................................................................28

50 C.F.R. § 600.140(a) ....................................................................................38

50 C.F.R. § 600.140(b) ....................................................................................38

50 C.F.R. § 600.340(b) ....................................................................................22

50 C.F.R. § 600.340(c) .....................................................................................22

50 C.F.R. § 648.11 ...........................................................................................20

50 C.F.R. § 648.11(i) ........................................................................................21

50 C.F.R. § 648.11(g) .......................................................................................29

50 C.F.R. § 648.11(h)(1) ..................................................................................21

50 C.F.R. § 648.11(h)(5) ..................................................................................21

[Proposed] Adjustment to Atlantic Herring Specifications and Sub-Annual Catch
    Limits for 2019, 83 Fed. Reg. 61,593 (Nov. 30, 2018)
    (to be codified at 50 C.F.R. pt. 648) ...........................................................32

[Proposed] Framework Adjustment 6 and the 2019–2021 Atlantic Herring Fishery
    Specifications, 85 Fed. Reg. 4,932 (Jan. 28, 2020)
    (to be codified at 50 C.F.R. pt. 648) ...........................................................32

Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for
    2019, 84 Fed. Reg. 2,760 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648) .....................32

Atlantic Herring Amendment 5, 79 Fed. Reg. 8,786 (Feb. 13, 2014)
    (to be codified at 50 C.F.R. pt. 648) ...........................................................25

Framework Adjustment 6 and the 2019–2021 Atlantic Herring Fishery
    Specifications, 85 Fed. Reg. 26,874 (May 6, 2020)
    (to be codified at 50 C.F.R. pt. 648) ...........................................................32

Notice of Approved Industry-Funded Monitoring Service Providers,
85 Fed. Reg. 22,720 (Apr. 23, 2020) ......................................................................21

**Legislative Materials**

H.R. Rep. No. 101-393 (Dec. 15, 1989) .................................................................9, 10

S. Rep. No. 101-414 (Aug. 2, 1990) ......................................................................9

**Other Authorities**

Black's Law Dictionary (9th ed. 2009).................................................................5, 28

Government Accountability Office, 2 Principles of Federal Appropriations Law
(3d ed. 2006) .........................................................................................................21

New England Fishery Management Council,
Operations Handbook: Practice & Policies (2020)................................................38

New England Fishery Management Council,
Statement of Organization, Practices, and Procedures (SOPP) (2015) ..................38

Northeast Fisheries Observer Program Sea Day Schedule,
April 2019–March 2020..........................................................................................23

## INTRODUCTION

Despite the complexity of domestic fisheries regulation, and the gritty details of the devastating economic impact and procedural irregularities of the New England Fishery Management Council's ("NEFMC") Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment"), this case presents a straightforward legal question: Did Congress authorize Defendants to require the industry to pay for discretionary at-sea monitoring?

As Plaintiffs demonstrated in their opening brief, Congress could not have been clearer. Although the Magnuson-Stevens Act ("MSA") authorizes the *placement* of monitors as part of a fishery management plan ("FMP"), it strictly limits the ability of regional councils and Defendants to shift *the cost* of those monitors from the government to regulated parties.  Industry-funded monitoring is permissible in only a few instances, none of which apply here.

Defendants struggle to cite any authority from the MSA granting them the power to impose industry funding, instead choosing a tortured reading of "necessary and appropriate" clauses. Defendants' arguments violate the statutory text, well-established principles of statutory interpretation, and the relevant legislative history.  In stating their case, Defendants also confuse the relevant standards of review and incorrectly plead for deference from the Court when it evaluates Plaintiffs' *ultra vires* claims.  On several other issues, such as the procedural infirmities of the Omnibus Amendment, Defendants' arguments are no more compelling.  From the outset of designing the Omnibus Amendment, Defendants and the NEFMC had a single goal in mind: imposing an industry funding requirement regardless of their legal authority to do so.

This Court should declare industry-funded monitoring unlawful, permanently enjoin Defendants from pursuing it, and vacate the Omnibus Amendment.

## ARGUMENT

**I.    Defendants tempt the Court into error by urging deference where it does not apply.**

The Court need answer only one question: were Defendants' actions *ultra vires* because they exceeded their statutory authority?  When answering that question, this Court must examine and construe statutory language.  Defendants urge the Court to defer to their reading of the statute under the familiar *Chevron* rubric.

Defendants argue that the analysis required here is "beyond the ken of most judges" and that the Omnibus Amendment and its implementing regulations should be "presumed valid." Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. at 10–12 [hereinafter Defs.' Br.], ECF No. 20-1.  Yet there is no analysis more in the ken of a federal judge than statutory analysis—determining what and how much power Congress has granted an agency. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

As Plaintiffs argued in their opening brief, "an 'agency's interpretation of [a] statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue.'"  Pls.' Mem. of P. & A. in Supp. of Mot. for Summ. J. at 14 [hereinafter Pls.' Mot.], ECF No. 18-1 (quoting *Motion Picture Ass'n of Am., Inc. v. Fed. Commc'ns Comm'n*, 309 F.3d 796, 801 (D.C. Cir. 2002)).  Defendants failed to address the import of *Motion Picture Ass'n of America, Inc.*  This is critical, as "'[a] precondition to deference under *Chevron* is a congressional delegation of administrative authority.'"  *N.Y. Stock Exch. LLC. v. Sec. & Exch. Comm'n*, 962 F.3d 541, 552 (D.C. Cir. 2020) (citation omitted).  "An agency is owed no deference if it has no delegated authority from Congress to act."  *Id.* at 553.

Defendants ignore this critical step and instead ask the Court to jump straight to deferential review. For some of the issues at hand, such as whether the Omnibus Amendment complies with National Standards Seven and Eight, deference may be appropriate. *See* Defs.' Br. at 11. But to apply Defendants' proposed deferential standard—a presumption of validity—would require this Court to presume that *any* action by *any* government agency is valid, until proven otherwise. "'Mere ambiguity in a statute," however, "is *not evidence of congressional delegation of authority*.'" *N.Y. Stock Exch. LLC*, 962 F.3d at 553 (emphasis added) (citing *Michigan v. Envtl. Prot. Agency*, 268 F.3d 1075, 1082 (D.C. Cir. 2001)).

The D.C. Circuit has historically approached *ultra vires* and arbitrary and capricious review distinctly. *See, e.g.*, *Tingzi Wang v. U.S. Citizen & Immigration Servs.*, 375 F. Supp. 3d 22 (D.C. Cir. 2019). *Ultra vires* claims hinge on "three basic tenets of administrative law." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 65 (D.C. Cir. 2016) (calling an arbitrary and capricious argument an "alternative claim" to an *ultra vires* allegation.). *First*, "'an agency's power is no greater than that delegated to it by Congress.'" *Id*. (citation omitted). *Second*, "actions beyond delegated authority are *ultra vires* and should be invalidated." *Id*. *Third*, "courts look to an agency's enabling statute and subsequent legislation to determine whether the agency has acted within the bounds of its authority." *Id*. Thus, this Court need not afford any presumption of validity to Defendants' actions. Instead, Plaintiffs' *ultra vires* claims present "a pure legal question subject to *de novo* review." *Id.* at 64. Did Congress grant Defendants the power to require industry-funded monitoring or not?[1]

---

[1] A similar challenge to industry funding in the groundfish fishery was filed several years ago but escaped substantive review because of the MSA's statute of limitations. *See Goethel v. Pritzker*, No. 15-497, 2016 WL 4076831 (D.N.H. July 29, 2016). Defendants try to construe the *Goethel*

II.    **The Omnibus Amendment is unlawful, void, and unenforceable.**

A.    **The MSA does not unambiguously grant Defendants and the NEFMC broad authority to impose industry funding in any fishery.**

When "determining whether the statute unambiguously expresses the intent of Congress, [a] court should use all the 'traditional tools of statutory construction,' including looking to the text and structure of the statute, as well as its legislative history." *Ctr. for Biological Diversity v. Everson*, 435 F. Supp. 3d 69, 78 (D.D.C. 2020) (citation omitted), *appeal dismissed*, No. 20-5078 (D.C. Cir. May 13, 2020); *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (insisting courts "exhaust all the 'traditional tools' of construction" before affording *Auer* deference).

Vital to any *Chevron* Step One analysis is determining the "precise question at issue." *Ctr. for Biological Diversity*, 435 F. Supp. 3d at 79. Here, the "precise question" is whether Congress delegated to Defendants and the regional councils authority to implement industry funding *nationwide*—that is, beyond fisheries explicitly mentioned in the MSA. *See* Pls.' Mot. at 16. Defendants ask this Court to stop at *Chevron* Step One—disregarding many tools of statutory construction, including legislative history—to find that Congress unambiguously granted them broad-reaching power by implication. Defs.' Br. at 12–13. For example, Defendants argue that "Congress has spoken directly to the precise question at issue by including multiple provisions in the MSA that *presuppose* that the industry will be responsible for the cost of utilizing human observers." *Id.* at 13 (emphasis added); *see id.* at 15 ("This enforcement provision[, Section 1858(g) of the MSA,] *presupposes* . . .") (emphasis added). But that is an oxymoron. Congress cannot unambiguously do something by presupposition. *Chevron* is direct: "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect

court's opinion as a substantive look at the merits. *See* Defs.' Br. at 21–22. For reasons already stated in Plaintiffs' opening brief, it is not. *See* Pls.' Mot. at 22–24.

to the unambiguously *expressed* intent of Congress." *Chevron U.S.A. v. Nat. Res. Def. Council*, 67 U.S. 837, 842–43 (1984) (emphasis added).  To "express" something entails "[c]learly and unmistakably communicating" or "directly stat[ing]" it. *Express*, Black's Law Dictionary (9th ed. 2009).  As Defendants concede, Congress never "clearly and unmistakably communicated," let alone "directly stated," that they enjoy the power to shift monitoring costs onto the regulated industry.  That incorrect conclusion requires a "presupposition," an implication—and bluntly, it is the wrong inference to draw from congressional silence and is contrary to legislative history.

"[D]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly "believes that interpretation is compelled by Congress." *Peter Pan Bus Lines v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (cleaned up) (quoting *PDK Labs., Inc. v. Drug Enf't Agency*, 362 F.3d 786, 798 (D.C. Cir. 2004)).  Defendants cannot inject ambiguity into the statute, garnering deferential review, with their own interpretation that contradicts the expressed intent of Congress.  If anything, the Court's analysis at *Chevron* Step One should favor Plaintiffs.  As the Fifth Circuit recently held, Congress can unambiguously withhold a power in the MSA by simply never granting it.  *See Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, No. 19-30006, 2020 WL 4433100, *4–8 (5th Cir. Aug. 3, 2020).  Indeed, the *Gulf Fishermen's Ass'n* court explicitly rejected the National Marine Fisheries Service's ("NMFS") attempt to advance a "nothing-equals-something argument" that presumed congressional silence left the agency a "mere 'gap' . . . to fill." *Id.* at *4 ("[T]he agency argues it has the power to regulate 'aquaculture' because the [MSA] 'do[es] not unambiguously express Congress's intent to prohibit the regulation of aquaculture.  This nothing-equals-something argument is barred[.]").

Defendants take a similar tact here, arguing that through presupposition, Congress has somehow spoken clearly.  Not so.  Courts should not "presume a delegation of power absent an express withholding of such power" as such thinking means agencies "would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well."  *Ethyl Corp. v. Env't'l Prot. Agency*, 51 F.3d 1053, 1060 (D.C. Cir. 1995).

Thus, this Court should hold that Congress has spoken unambiguously—by not speaking at all.  "For an agency 'to suggest that *Chevron* deference is due any time a statute does not expressly *negate* the existence of a claimed administrative power is both flatly unfaithful to the principles of administrative law and refuted by precedent."  *N.Y. Stock Exch. LLC*, 962 F.3d at 553 (cleaned up) (citing *Am. Bar Ass'n v. Fed. Trade Comm'n*, 430 F.3d 457, 468 (D.C. Cir. 2005)).

**B.**    **Plaintiffs correctly rely on the *expressio unius* canon.**

Defendants caution this Court against applying the familiar *expressio unius* canon and, in doing so, rely on *Texas Rural Legal Aid, Inc. v. Legal Services Corporation*, 940 F.2d 685 (D.C. Cir. 1991).  Defs.' Br. at 17.  But Defendants mischaracterize that case.  In full context, it reads:

> Under *Chevron*, we normally withhold deference from an agency's interpretation of a statute only when Congress has "directly spoken to the precise question at issue," and the *expressio* canon is simply too thin a reed to support the conclusion that Congress has clearly resolved this issue.

*Texas Rural Legal Aid, Inc.*, 940 F.2d at 694.  Thus, *Texas Rural*'s limitation on the *expressio unius* canon should only apply when Congress has expressly *granted* an agency a power, rather than when it has *not* spoken.  Only in the former case is the canon a "'feeble helper.'"  *See Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014) (citation omitted).

But that is not the scenario here.  Plaintiffs ask this Court to determine whether Congress has granted any power at all, rather than whether Congress spoke clearly on the breadth of that power.  Further analysis, such as whether the agency acted beyond the power granted to it by

Congress, is not limited by *Texas Rural*. To hold otherwise would mean that courts could never use statutory context—an important tool—to divine congressional intent.[2] The Supreme Court has rejected that position. In *King v. Burwell*, for example, the Supreme Court cautioned that "we must read the words [of a statute] in their context and with a view to their place in the overall statutory scheme . . . [A court's] duty, after all, is to construe statutes, not isolated provisions." 576 U.S. 473, 486 (2015) (cleaned up). And when "making the threshold determination under *Chevron*, 'a reviewing court should not confine itself to examining a particular provision in isolation.'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (citation omitted).[3]

The Supreme Court recently reiterated this approach in an analogous setting in *Kisor v. Wilke*: "[w]hen we interpret a regulation, we . . . proceed in the same way we would *when interpreting any other written law*[.]" 139 S. Ct. at 2446 (emphasis added). A court begins with text "and, if the text is unclear, [it] 'turn[s] to other canons of interpretation' and tie-breaking rules to resolve the ambiguity." *Id*. (referring to *expressio unius* in a footnote). Thus, the *expressio* canon avails itself "when circumstances support a sensible inference that the term left out must have been meant to be excluded." *Nat'l Labor Relations Bd. v. SW Gen., Inc.*, 137 S. Ct. 929, 941 (2017) (cleaned up and citation omitted); *see Marx v. Gen. Revenue Corp*, 568 U.S. 371, 381 (2013) ("The force of any negative implication . . . depends on context."). Even Defendants concede as much, stating in a parenthetical that *expressio unius* is inappropriate only "when the

---

[2] *See Helomics Corp. v. Burwell*, No. 16-546, 2016 WL 3525885, at *5 (D.D.C. Apr. 8, 2016) ("It is a well-known canon of statutory construction that 'the mention of one thing means the exclusion of another.'").

[3] Defendants themselves ask this Court to consider the full context of the statute. *See, e.g.*, Defs.' Br. at 16 (encouraging the Court to read two sections of the MSA "together, as a whole").

legislative history and context are contrary to such a reading of the statute." Defs.' Br. at 17 (citation omitted). But the legislative history and statutory context here weigh heavily in favor of Plaintiffs and, as such, the *expressio* canon is appropriately applied first to *ultra vires* analysis and, if necessary, to any *Chevron* Step One and Two determinations.

    **C.**    **To the extent it is relevant, the legislative history supports Plaintiffs.**

    Defendants argue that the North Pacific Council already had industry-funded observers when "Congress added observer provisions . . . to the MSA in late 1990." Defs. Br. at 17. As far as their logic goes, Congress knew that regional councils were imposing at-sea monitoring requirements *and* associated costs onto regulated entities. But this was not the case. Any broad language employed by Congress spoke only to the authority to require vessels to *carry* observers—it did not entail nationwide authority to shift costs onto the industry.

    *First*, as Defendants concede, in its 1990 MSA amendments, Congress only explicitly granted cost-recovery or fee-shifting authority to the North Pacific Council for certain of its FMPs. *See* Defs.' Br. at 17; *see also* 16 U.S.C. § 1862(a). Although Congress simultaneously added a general observer provision—Section 1853(b)(8)—the provision contained no authority to impose or shift costs. If Congress had intended broad authority for industry-funded monitoring (or observing) to apply to *all* fisheries, as Defendants contend, then why, knowing that the North Pacific Council was using this authority, did Congress only explicitly allow for it in most of the fisheries under *that* Council's jurisdiction?

    Citing a Senate Report, Defendants allege that Congress's 1990 provision "clarif[ied] the existing authority." Defs.' Br. at 19 (citing S. Rep. No. 101-414). However, "[a] mere statement in a conference report of such legislation as to what the Committee believes *an earlier statute meant* is obviously less weighty." *Cons. Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S.

102, 118 n.13 (1980) (emphasis added). A congressional committee's ability—through legislative history—to confirm what an earlier statute may have said is limited and unpersuasive. That said, Defendants also omit key context. In full, the Senate Report reads that Section 1853(b)(8) "would clarify the existing authority in the [MSA] for fishery management plans to require that *observers be carried on board domestic* fishing vessels for conversation and management purposes." S. Rep. No. 101-414, 1990 WL 201665, at *6296 (Aug. 2, 1990) (emphasis added). Such "clarifying" language says nothing about costs or funding.

Defendants also cite the companion House Report, which speaks only to existing authority for "the Councils to require that observers *be carried on board* domestic fishing [vessels] for data collection purposes." H.R. Rep. No. 101-393 at 28 (Dec. 15, 1989) (emphasis added); *see* Defs.' Br. at 19. This quote is from the "Section 110" heading of the House Report. And, again, Section 110 of Public Law 101-627 says nothing about fees—it only codifies authority to require observers, which Plaintiffs do not contest in this case. Fishery Conservation Amendments of 1990, Pub. L. 101-627, 104 Stat. 4436, § 110. There was no "clarification of existing authority" for funding. Only for observer placement.

Yet Section 118 of Public Law 101-627 does speak to fees and it supports Plaintiffs' position. Under the heading "Section 118" of the House Report, the Committee notes that "[t]his section adds *a new provision* to the [MSA] which is *specific to the North Pacific Management Council*. Nothing in this section should be construed *as affecting the rights and responsibilities of other Regional Fishery Management Councils* or as affecting fisheries other than those within the jurisdiction of the North Pacific Fishery Management Council." H.R. Rep. 101-393 at 31 (emphasis added). And what Section 118 allowed was a "fisheries research plan" and "a system of fees to pay the cost of implementing the plan." *Id*. at 32. The report even goes to great lengths

9

to specify how the fees should be used: "it is the intent of the Committee that any fees collected under a plan shall be used for the purpose of implementing that fishery research plan." *Id.* If this power was "existing," as Defendants want this Court to believe, then why did the same Committee Report Defendants rely on call it a "new provision" and note that it is "specific to the North Pacific Management Council"—even going so far as to say that it should not affect the rights or responsibilities of any other council? This legislative history only buttresses what is clear from the plain text of the MSA: Congress gave the North Pacific Council power to impose industry-funded monitoring. It withheld it from other councils and for most other fisheries. *See* Pls.' Mot. at 16–17 (discussing authorization for industry funding at 16 U.S.C. § 1853a(e)(2) (LAPPs) and 16 U.S.C. § 1821(h)(4) (foreign fishing vessels)); *see generally Warger v. Shauers*, 574 U.S. 40, 48 (2014) ("For those who consider legislative history relevant, here it confirms that [Congress's] choice of language as no accident.").

> **D.    The MSA's "necessary and appropriate" clauses do not apply here.**

Defendants continually fail to cite any explicit statutory authority for industry funding because there is none. They instead grasp at straws by reaching for an ancillary power found in "necessary or appropriate" clauses throughout Section 1853, which describes the contents of FMPs. *See* Defs.' Br. at 13, 17, 20. Specifically, the MSA requires a council to design an FMP to contain "necessary and appropriate" conservation and management measures, 16 U.S.C. § 1853(a)(1)(A), and it permits councils to introduce other discretionary "measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the

conservation and management of the fishery." *Id.* § 1853(b)(14).[4]  But Defendants stretch any "necessary and appropriate" power they enjoy too far, contrary to well-established precedent.

In *New York Stock Exchange, LLC v. Securities & Exchange Commission*, the D.C. Circuit grappled with a similar statute that allowed the Securities and Exchange Commission ("SEC") to issue "regulations as may be necessary or appropriate."  962 F.3d at 553.  The SEC claimed this language "gave it authority to act, as it saw fit, without any other statutory authority[.]"  *Id.* at 554.  The Circuit rejected this argument, writing that "[t]he Supreme Court's decision in *Michigan v. EPA* debunks the Commission's position."  *Id.* (citing *Michigan v. Envtl. Prot. Agency*, 576 U.S. 743 (2015)).  In *Michigan*, "the Court ma[de] it plain that the mere reference to 'necessary' or 'appropriate' in a statutory provision authorizing an agency to engage in rulemaking does not afford the agency authority to adopt regulations as it sees fit with respect to all matters covered by the agency's authorizing statute."  *Id.*  "The larger point," however, "is that an agency cannot purport to act with the force of law without delegated authority from Congress."  *Id.*

The *expressio* canon can assist here too.  As the D.C. Circuit held in *EchoStar Satellite LLC v. Federal Communications Commission*—a case Plaintiffs cited in their opening brief, but which Defendants failed to address—the *expressio* canon is appropriate "when 'one can be confident that a normal draftsman when he expressed "the one thing" would have likely considered the alternatives that are arguably precluded.'"  704 F.3d 992, 999 (D.C. Cir. 2013) (citation omitted).  In *EchoStar*, the Court held that "there is every reason to believe [the statutory section

---

[4] Defendants also appear to suggest that industry-funded monitoring may be authorized by Section 1853(c), which gives councils authority to propose "necessary and appropriate" regulations.  *See* Defs.' Br. at 2, 28.  Assuming Defendants intended to make that argument, it must be wrong. Section 1853(c) applies to *implementing regulations*.  16 U.S.C. § 1853(c)(1).  It is not a source of authority to require industry funding as a measure in an FMP.  *See id.* § 1853(a)–(b).

at issue] was directed at cable systems alone." *Id.* The court reasoned that Congress could fully grant an agency authority when it wanted to—and it did not do so there. *See id.* The *EchoStar* court thus concluded that it was improper for the FCC to invoke "its ancillary jurisdiction to override Congress's clearly expressed will." *Id.* at 1000.

Both cases apply here. Looking at the plain text and context of the MSA, Congress demonstrated its capability of providing fee authority to the North Pacific Council. It was aware of the need to grant the power, knew the language to use, and did so. *See EchoStar*, 704 F.3d at 999 ("Clearly, Congress was adept at using the terms . . . when it so chose.") (cleaned up). Add in the legislative history, and it is apparent that Congress intended for industry funding authority to be limited to specific fisheries—none of which are relevant in this case. Thus, just like *EchoStar*, this Court is left with a provision that does not authorize the "rules at issue." *Id.* at 1000. And as in *New York Stock Exchange*, the agency has construed its "necessary and appropriate" power in an unlawfully broad manner, improperly expanding limited delegations of authority in one part of the statute to cover the whole. Defendants' abuse of its ancillary powers to impose industry-funded monitoring is "therefore *ultra vires.*" *Echo Star*, 704 F.3d at 1000.

**E.    The MSA's penalty provision must be read in context.**

Defendants urge this Court to read the MSA's penalty provision, Section 1858(g), in tandem with Section 1853(b)(8) alone—and not the rest of the statute. Defs.' Br. at 16. They claim Plaintiffs' position "lacks textual support" but they make no argument about why. *Id.* As Plaintiffs have argued, the MSA authorizes industry-funded monitoring in three situations. *See* 16 U.S.C. §§ 1821(h)(4), 1853a(e)(2), 1862.[5] Section 1853(b)(8) merely provides for the *placement*

---

[5] Notably, Defendants do not cite, let alone discuss, Sections 1821(h)(4) and 1853(e)(2).

of monitors as part of an FMP; it does not speak to any particular funding mechanism. All these sections, not just Section 1853(b)(8), must be read together with the MSA's penalty provision.

It requires no stretch to see that Congress permitted some form of industry funding for specific geographic regions and fisheries, and then included elsewhere in the MSA penalties for failing to pay those fees. *See* 16 U.S.C. § 1858(g)(1)(D). But it is a stretch to say that the existence of such a penalty provision implicitly means that the government can assess fees—or shift costs to the regulated industry—for whatever the agency wants, contrary to congressional intent and the legislative history. If Defendants demand a reading in context, they cannot simply stop at one provision of the statute and then dismiss the rest as lacking textual support. Defendants assert that "a statute must be read as a whole." Defs.' Br. at 16 (citation omitted). Plaintiffs agree.

### F.    At-sea monitoring is unlike other compliance measures.

Defendants seek to favorably compare industry-funding here to provisions of the Clean Air Act ("CAA"), 42 U.S.C. § 7414(a)(1), and the Clean Water Act ("CWA"), 33 U.S.C. § 1318(a)(A). But this is a faulty analogy because those statutory provisions deal with internal recordkeeping, internal monitoring equipment, and other clear compliance requirements. As Plaintiffs previously argued, the costs associated with these sorts of requirements are similar to fishery management measures like the Vessel Monitoring System ("VMS") that fishermen must carry. *See* Pls.' Mot. at 14–15.[6] An industry-funded monitoring requirement, however, is more aptly analogized to the inspection provisions of the CWA and CAA, which Defendants do not cite. Those sections— 42 U.S.C. § 7414(a)(2) and 33 U.S.C. § 1318(a)(B)—require industry to permit the "Administrator

---

[6] Defendants also refer to the food industry, differentiating programs between the inspection and grading of poultry. As Defendants state, mandatory inspections are "paid for with public funds." Defs.' Br. at 31. But the industry pays for "voluntary" inspections themselves. *Id.* Industry-funded at-sea monitors are, of course, mandatory.

or his authorized representative" access to inspect premises, equipment, or records.  Moreover, the CWA contemplates "an authorized contractor acting as representative of the Administrator." 33 U.S.C. § 1318(a)(B).  And, with respect to the CAA, "[s]ince [the EPA's] creation in late 1970, [it] . . . *has sought and received appropriations from Congress for the use of private contractors* to provide technical support for stationary source inspections."  *Bunker Hill Co. Lead & Zinc Smelter v. Envtl. Prot. Agency*, 658 F.2d 1280, 1284 (9th Cir. 1981) (emphasis added) (referring to the contractors contemplated by 42 U.S.C. § 7414).[7]

Again, Defendants want this Court to read into the MSA a power to shift costs for monitoring to the regulated industry as a sort of compliance cost similar to VMS.  Beyond all the differences enumerated in Plaintiffs' opening brief and above, there is another relevant distinction in how the MSA speaks about funding mechanisms.  For VMS and other basic compliance measures—ones that do not require an in-person inspector—the statute is silent about cost-shifting. Yet for observers and monitors, Congress explicitly authorized industry funding for specific fisheries and certain councils, but not for the Atlantic herring FMP.  Congress did not intend to shift at-sea monitoring costs to fishermen in all fisheries, let alone as a cost of "doing business."

The difference between VMS, other reasonable compliance requirements, and industry funding is further highlighted by the marked difference in *cost* to the regulated industry. Monitoring under the Omnibus Amendment for limited access herring permits is expected to be upwards of $710 per sea day, with an overall reduction in "returns-to-owner" ("RTO") of "approximately 20 percent."  App. at 17735.  The expected cost for midwater trawl vessels

---

[7] The use of private contractors to conduct government searches was later questioned.  *See, e.g.*, *United States v. Stauffer Chem. Co.*, 464 U.S. 165 (1984).  Plaintiffs do not challenge the legality of at-sea monitors in this lawsuit, only industry funding.

employing electronic monitoring and portside sampling with an exempted fishing permit is "$515 per day," with an expected "reduction in annual RTO of up to 10 percent[.]"  App. at 17736–17737.  And midwater trawl vessels that "purchase observer coverage" to gain access to Groundfish Closed Areas can expect to pay "$818 per day," leading to roughly a "5 percent reduction in RTO . . . in addition to any reduction . . . due to other types of industry-funded monitoring coverage."  App. at 17736.  The costs associated with VMS compliance pales in comparison.

Lund's Fisheries, Inc., for example, recently outfitted fourteen boats—including three of the boats operated by Plaintiffs—with new VMS units for a total cost of $33,557.72, or $2,396.98 per vessel.  Decl. of Jeffrey Howard Kaelin ¶¶ 10–11.[8]  The annual service fee associated with VMS is only around $979.  Kaelin Decl. ¶ 12.  Vessels owners are thus able to comply with the government's rather extensive VMS program, *see* Kaelin Decl. ¶¶ 7–10, for less money than would be required to carry an at-sea monitor for only *two* sea days.

Data employed as part of the Environmental Assessment ("EA") for the Omnibus Amendment reflect that the midwater trawl fleet—which includes several of Plaintiffs' boats— reported approximately 1,300 sea days in Standardized Bycatching Reporting Methodology ("SBRM") Year 2014 alone.  *See* App. at 17076; *see also* App. at 17447 (reflecting similar 2015

---

[8] Plaintiffs acknowledge that, at least for the Court's arbitrary-and-capricious review, the parties are limited to the administrative record.  *See* 5 U.S.C. § 706.  Of course, courts still admit extra-record evidence in some situations, *see Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018), such as when "background information is needed 'to determine whether the agency considered all the relevant factors'" before taking action.  *Oceana Inc. v. Ross*, No. 17-829, 2020 WL 1905148, at *3 (D.D.C. Apr. 17, 2020) (cleaned up) (citing *City of Dania Beach v. Fed. Aviation Admin.*, 628 F.3d 581, 590 (D.C. Cir. 2010)).  Here, Mr. Kaelin's declaration is offered principally for illustrative purposes and to give the Court the full context behind costs associated with vessel monitoring and the nature of several of the boats owned and operated by Plaintiffs.

data used to assess economic impact of herring alternatives).  Although some of these days were not spent prosecuting herring, as Atlantic mackerel is often taken when fishing for herring, the EA nevertheless acknowledged that "a majority of the sea days [for the midwater trawl fleet] . . . will be used to observe trips targeting herring."  App. at 17076.  Of course, with reduced quotas, it is possible that the fleet will see a reduction in effort, regardless of whether industry-funded monitoring stands.  But the point remains, the midwater trawl fleet fishes frequently, and the cost of complying with the industry-funding requirement on even a fraction of those trips will far outweigh the relatively tiny cost of complying with VMS requirements.  *Cf. infra* at pp. 23–24.  The difference is not one of degree, but of kind.  Being forced to pay for a government minder to ride your boat is *not* a reasonable cost of doing business.  It is *not* a "compliance cost."

As a final point, Defendants argue that participation in the herring fishery is "voluntary" because a boat may "choose to land less than 50 mt of herring per trip" to evade the industry funding requirement, "or not participate at all."  Defs.' Br. at 32.  This betrays a complete detachment between regulators and the fishing industry.  Few herring captains could survive with tiny 50-metric-ton landings, let alone simply switch to a different fishery.  For example, the Atlantic herring boats owned and operated by Plaintiffs are purpose-built for high-capacity pelagic fishing.  *See* Kaelin Decl. ⁋ 13.  To qualify for the 50-metric ton exemption, these boats would need to return to shore at only 15–35% capacity.  *See* Kaelin Decl. ⁋⁋ 14–16.  That is not economically feasible.  Kaelin Decl. ⁋ 17.  And because the boats were designed for catching herring, mackerel, and squid, it would not be realistic to refit them for other fisheries.  Kaelin Decl. ⁋ 18.  Other herring fishery participants are in a similar position with respect to the uniqueness of their vessels and their ability to qualify for the mitigation measures set out in the Omnibus

Amendment.  *See* App. at 17713–17715.  That Defendants would deign to make this argument is evidence of the arbitrariness of industry funding.

      **G.**     **Even under *Chevron* Step Two, Defendants' action must fail.**

          **1.**     **Defendants' construction of the MSA is unreasonable.**

Even if this Court grants *Chevron* deference to Defendants and moves to Step Two, Defendants' construction of the MSA still falls short.  At *Chevron* Step Two, the Court must defer to an agency interpretation so long as it is "not arbitrary, capricious, or manifestly contrary to the statute."  *Everson*, 435 F. Supp. 3d at 79 (cleaned up and citation omitted).  To garner deference, an agency's interpretation of a statute must be "a permissible construction."  *Ctr. for Biological Diversity v. Dep't of the Interior*, 563 F.3d 466, 484 (D.C. Cir. 2009).  And a statutory interpretation that "does not effectuate Congress' intent" must fall.  *Everson*, 435 F. Supp. 3d at 93 (cleaned up and citation omitted).  In sum, "deference under *Chevron* step two is premised on either an express delegation of authority or an implicit legislative delegation to an agency."  *N.Y. Stock Exch. LLC*, 962 F.3d at 554.  "[A]gency action cannot be 'permissible' under *Chevron* step two if the agency acts in excess of the authority under the applicable statute . . . or if the agency's interpretation of the statute is unreasonable[.]"  *Id.* at 557 (citations omitted); *see Glob. Tel\*Link v. Fed. Commc'ns Comm'n*, 866 F.3d 397, 418 (D.C. Cir. 2017) (Silberman, J., concurring) (*Chevron* Step Two is "a meaningful limitation on the ability of administrative agencies to exploit statutory ambiguities, assert farfetched interpretations, and usurp undelegated policymaking discretion").

Plaintiffs incorporate all the above arguments—a plain reading of the statute, a lack of delegated authority, statutory context, and legislative history.  Defendants' construction of the MSA to authorize industry-funded monitoring in all fisheries is impermissible, in excess of

statutory authority, and contrary to congressional intent.  *See Merck & Co. v. Dep't of Health & Human Servs.*, 962 F.3d 531, 536 n.2 (D.C. Cir. 2020) (noting plaintiffs' arguments on Step One carried the day on Step Two when incorporated).  Even if this Court gives deference under Step Two, Defendants' position is so unreasonable and contrary to the statute that it must fail.

> ### 2. Defendants' regulation is arbitrary and capricious because they did not seriously consider the cost of industry-funded monitoring.

If this Court adopts Defendants' request and moves to *Chevron* Step Two, arbitrary and capricious review also comes into play.  "The analysis of disputed agency action under *Chevron* Step Two and arbitrary and capricious review is often 'the same, because under *Chevron* step two, the court asks whether an agency interpretation is arbitrary and capricious in substance.'"  *Agape Church, Inc. v. Fed. Commc'n Comm'n*, 738 F.3d 397, 421 (D.C. Cir. 2013) (cleaned up) (citing *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011)).  As above, Plaintiffs incorporate all their arguments against this rubric, including their arguments about compliance with the MSA's National Standards, *see infra* at pp. 22–27, and the procedural infirmity of the Omnibus Amendment and implementing regulations.  *See infra* at pp. 27–36.

But one issue bears special focus: cost.  As discussed above, in *New York Stock Exchange* the D.C. Circuit relied heavily on the Supreme Court's decision in *Michigan v. Environmental Protection Agency* when limiting a similar "necessary or appropriate" clause in the SEC's enabling statute.  The principle that governed the disposition of that case was: "'Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'"  *N.Y. Stock Exch. LLC*, 962 F.3d at 554 (citation omitted).

The primary issue in *Michigan* was that the agency failed to consider cost.[9]  "Read naturally in the present context, the phrase 'appropriate and necessary' requires at least some attention to cost. One would not say it even rational, never mind 'appropriate' to impose billions of dollars in economic costs in return for a few dollars in . . . benefits." *Michigan v. Envtl. Prot. Agency*, 576 U.S. 743, 752 (2015).  The context here, regulatory, also encompasses cost: "Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate." *Id.* at 752–53. Importantly, "[n]o regulation is 'appropriate' if it does significant more harm than good." *Id.* at 752.  And "[s]tatutory context reinforces the relevance of cost." *Id.* at 753.  Ultimately, in *Michigan*, the Supreme Court held that the agency "strayed far beyond th[e] bounds [of reasonable interpretation] when it read ['appropriate and necessary'] to mean that it could ignore cost when deciding" to implement a regulatory burden on an agency.  *N.Y. Stock Exch. LLC*, 962 F.3d at 554 (citing *Michigan*, 576 U.S. at 751).[10]

If this Court decides Congress granted Defendants authority to impose industry funding, then Defendants must still show that they gave serious consideration to cost, benefit, and overall impact.  *Cf. infra* at pp. 22–27, 27–36.  Damningly, Defendants did not analyze cost adequately and thus acted arbitrarily in setting herring monitoring coverage targets.  Defendants argue they "considered other coverage targets, including 100%, 75% and 25%, but determined that the 50%

---

[9] The principle underlying *Michigan* is not limited to considerations of cost and speaks to agency abuse of "necessary and appropriate" clauses as a whole.  *See N.Y. Stock Exch. LLC*, 962 F.3d at 554.  But here, the cost discussion is also useful.

[10] Defendants cited this very same page from *Michigan*, claiming in a footnote that it was "non-controversial that industry would bear the costs of complying with EPA's regulation, even though the pertinent statutory provision was silent on the issue of cost."  Defs.' Br. at 20 n.13.  But the statute was not silent on cost.  As the *Michigan* court held, the compliance provision there required the EPA to conduct three studies, and "one of those three studies reflects concerns about costs." 576 U.S. at 757.  And the "directive to EPA to study cost is a further indication of the relevance of cost to the decision to regulate."  *Id.* at 753.

coverage target best balanced the benefits associated with reducing uncertainty against the costs of additional monitoring." Defs.' Br. at 8. But the agency never attempted to explain why it picked 50%, what went into the cost analysis, and why this was best to "reduce uncertainty." And, as discussed below, the costs Defendants arrived at are manifestly unreasonable, arbitrarily favor certain fishermen, and are substantially harmful to the industry. *See infra* at pp. 22–36. Although necessary-and-appropriate clauses may leave "agencies with flexibility, an agency may not entirely fail to consider an important aspect of the problem when deciding whether regulation is appropriate." *Michigan*, 576 U.S. at 752 (cleaned up and citation omitted).[11] Based on Defendants' failure to show their analysis, the Omnibus Amendment is arbitrary and capricious.

### H. The Omnibus Amendment violates agency financing and expenditure statutes.

In their opening brief, Plaintiffs explained that imposition of an industry-funding requirement without statutory authorization effectively constitutes the raising of a "tax," *see* Pls.' Mot. at 27, and violates various agency finance laws, including the Anti-Deficiency Act, the Miscellaneous Receipts Act, and the Independent Offices Appropriations Act. *See id.* at 25–27. Defendants' response, at its core, is that industry funding is not "revenue raising" because payments are "not remitted to NMFS, [and] NMFS does not exercise control over the contractual relationship" compelled by the Omnibus Amendment. Defs.' Br. at 34; *see id.* at 36. But these arguments fail on two grounds.

*First*, Defendants' position relies on a formalism that ignores the reality of how the industry funding requirement will operate. The NEFMC created the herring monitoring program to satisfy its own desire for increased, discretionary data collection. The program is regulated by the

---

[11] Plaintiffs continue to maintain that industry funding provisions apply to specific fisheries and geographic areas, none of which are not relevant here.

government in detail.  *See generally* 50 C.F.R. § 648.11.  And federal monies will continue to be used to fund certain shore-side administrative costs.  *See, e.g.*, App. at 17732–17733.  That Defendants and the Council seek to require the industry to contract directly with monitoring service providers, in lieu of the government paying those companies, is a distinction without a difference.  Agencies cannot avoid the limits on their ability to fund programs by simply ordering a private "contractor to charge fees to outside parties and keep the payments in order to offset costs that would otherwise be borne by agency appropriations."  Gov't Accountability Office, 2 Principles of Federal Appropriations Law at 6-177 (3d ed. 2006).  Such an arrangement may not be "revenue raising" at first blush, but the law looks past superficial structures to the heart of what an agency is trying to accomplish.  And here Defendants intentionally designed the industry funding requirement to support an agency program that could not otherwise operate with appropriated funds.  Defendants nearly concede as much: "NMFS promulgated regulations to implement the Omnibus Amendment to avoid the imposition of a measure that would require funds that Congress may not have appropriated to NMFS."  Defs.' Br. at 33.

*Second*, and relatedly, it is incorrect for Defendants to assert that NMFS does not closely "control" monitoring service providers or the contractual relationships they enter with vessel owners.  To the contrary, the market for monitoring service providers is highly regulated and controlled by NMFS.  *See* 50 C.F.R. § 648.11(h)(5).  NMFS must certify the companies permitted to provide monitors.  *See id.* § 648.11(h)(1), (i).  Only four providers are currently certified to offer monitoring services for the herring fishery.  *See* Notice of Approved Industry-Funded Monitoring Service Providers, 85 Fed. Reg. 22,720 (Apr. 23, 2020).  Not all these companies operate in the same geographic regions.  Vessel owners are therefore extremely limited in their ability to negotiate a favorable rate, and monitors have little incentive to cater to a captured clientele.

## I.     The Omnibus Amendment violates the MSA's National Standards.

### 1.     National Standard Seven

National Standard Seven requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication."  16 U.S.C. § 1851(a)(7). "Management measures should not impose unnecessary burdens," including increased "fuel costs, enforcement costs, or the *burdens of collecting data*," without showing an advantage or gain to conservation goals. 50 C.F.R. § 600.340(b)–(c) (emphasis added).  The crippling costs of industry-funded monitoring far outweigh any purported advantage arising from increased discretionary data collection, especially considering the dubious scientific need for additional coverage.  *See, e.g.*, Pls.' Mot. at 28–28.  Defendants' response is two-fold.

*First*, Defendants argue that "[t]he IFM requirement . . . expressly avoids any duplication" because "the 50% coverage target for the IFM requirement is calculated by combining SBRM and IFM coverage."  Defs.' Br. at 23.  Although that may be true for the herring measures, *see* App. at 17315, the Omnibus Amendment sets the stage for development of industry-funded monitoring programs in other NEFMC-administered fisheries.  Those new programs may lead to the sort of "duplication" that National Standard Seven aims to avoid.  The Council itself acknowledged that vessels in non-herring fisheries could become subject to concurrent monitoring requirements.  *See* App. at 14117.  And the Mid-Atlantic Fishery Management Council ("MAFMC") withdrew from the Omnibus Amendment precisely because of the potential impact of overlapping industry-funded monitoring requirements in the herring and mackerel fisheries.  *See* Pls.' Mot. at 35–36 & n.22. The NEFMC's final amendment document—and Defendants' final agency action—fails to address this sort of "duplication," just as it avoids discussion of the environmental impact of overlapping monitoring requirements under the National Environmental Policy Act ("NEPA").  *See infra* at pp.

27–34.  Indeed, the Council explicitly refused to address the consistency of its preferred omnibus alternatives with *any* of the MSA's National Standards.  *See* App. at 17311.

It also bears noting that Defendants' discussion of the herring measures is somewhat misleading.  Although the NEFMC's 50% coverage target for vessels with limited access herring permits will be calculated by adding SBRM coverage together with industry-funded monitoring coverage, not all vessels within the herring fishery receive federally funded observing coverage under the SBRM at the same rate.  Whereas monitoring in the herring fishery will based on *permit* category, *see, e.g.*, App. at 17734, SBRM coverage is determined by discard rates at the fleet and geographic levels.  *See, e.g.*, Ne. Fisheries Observer Program Sea Day Schedule, April 2019– March 2020, *available at* https://bit.ly/3kETWvl.  For example, as Defendant concede, *see* Defs.' Br. at 8, midwater trawl vessels, such as the ones owned and operated by several Plaintiffs here, have one of the lowest discard rates of all fisheries in the region, as does the herring fishery as a whole.  *See, e.g.*, App. at 17683.  Defendants acknowledged that there has been significant variability in SBRM coverage for the midwater trawl fleet from year-to-year.  *See* App. at 17736.  And data from SBRM Years 2014 and 2015, which formed the bases for the Omnibus Amendment EA, also suggest rather low observer coverage rates.  *See, e.g.* App. at 17076; App. 17442–17474.

Effectively, this means that midwater trawl vessels will end up bearing a greater share of the costs associated with achieving a 50% industry-funded monitoring coverage target, as compared to herring participants utilizing different gear types, if only because midwater trawlers have a *lower* level of federally funded coverage under the SBRM.  *See* App. at 17262 ("[M]idwater trawl vessels have more sea days that would be subject to monitoring costs than vessels that use other gear types."); *see also* App. at 17264 ("Because midwater trawl vessels average more sea days than other gear types, midwater trawl vessels have a greater negative economic impact

associated with paying for monitoring coverage, followed by purse seine vessels, and small mesh

bottom trawl vessels.").  It is unclear whether Defendants even considered this disparate treatment.

*Cf.* App. at 17738 ("In an effort to estimate the maximum number of coverage days, [the Omnibus

Amendment EA] *did not account for SBRM coverage* or coverage waivers for trips landing less

than 50 mt of herring.") (emphasis added).

*Second*, Defendants argue the NEFMC adequately demonstrated that its preferred

alternatives would "minimize the industry's monitoring costs, where practicable, while achieving

the value of additional monitoring against the costs to be borne by industry." Defs.' Br. at 23.  But

the record shows that the Council's analysis was more conclusory than anything.  *See* App. at

17315.  "NMFS's bare statement that it 'feels the benefits obtained from [its proposed alternatives]

justify the costs' is insufficient." *Blue Water Fisherman's Ass'n v. Mineta*, 122 F. Supp. 2d 150,

171 (D.D.C. 2000).  More detailed analysis is required, particularly when the proposed regulation

will harm most of the herring fleet.

Consider the government's limited discussion of cost-minimization, which focused mainly

on the savings derived from an exemption for vessels landing less than 50 metric tons of herring.

*See* App. at 17315.  While the Council noted "[o]nly 13% of paired midwater trawl trips" would

qualify for such an exemption, it failed to note that those same vessels—midwater trawlers—land

nearly all herring.  Compl. ¶¶ 71–73; App. at 17104, 17138, 17144, 17157, 17318.  The 50-metric-

ton exemption does little to minimize costs across the entire Atlantic herring fleet.

Also telling is the lack of any meaningful discussion about the impact—beneficial or

otherwise—of maintaining the *status quo*, that is, government-funded monitoring at the coverage

levels set by the SBRM.  *See, e.g.*, App. at 17206.  In the final Omnibus Amendment, the NEFMC

merely noted without elaboration that its preferred alternatives were ideal "for the benefits of

collecting additional information on biological resources while minimizing industry cost responsibilities, especially when compared to non-preferred coverage targets of 100% and 75%." App. at 17315.

It is unlikely, however, that the Council ever seriously considered a 100% monitoring coverage rate for the herring fishery, which NMFS rejected in similar form when proposed in Atlantic Herring Amendment 5. 79 Fed. Reg. 8,786, 8,792–93 (Feb. 13, 2014) (to be codified at 50 C.F.R. pt. 648). The record shows that, from the outset, the Council was intent on requiring *some* form of discretionary industry-funded monitoring. Former Regional Administrator John Bullard even sent the NEFMC and MAFMC a letter in late September 2013, advising the councils how "to use industry funding to increase observer coverage levels in their fisheries." *See* App. at 00028–00029. Industry funding was the predetermined outcome of the Omnibus Amendment. Post-hoc rationalization by the government cannot satisfy the MSA's National Standards.[12]

### 2. National Standard Eight

National Standard Eight mandates that "[c]onservation and management measures shall, consistent with the [MSA's] conservation requirements . . . take into account the importance of fishery resources to fishing communities by utilizing economic and social data . . . in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts[.]" 16 U.S.C. § 1851(a)(8). Defendants argue that the decision to impose industry-funded monitoring—despite the acknowledged decimating effect it

---

[12] Defendants argue that "[w]hile the Omnibus Amendment carries costs for the industry, the simple fact that a regulation will impose cost does not mean that it violated National Standard 7." Defs.' Br. at 24. Whether industry-funded monitoring constitutes a permissible compliance cost, however, is at the heart of the parties' dispute. This Court should avoid uncritically applying a "rule of reason" and reject Defendants' presumptions about the legality of industry funding.

will have on the herring fleet—is a "policy decision" that the Court cannot declare inconsistent with the MSA.[13]  But Defendants mischaracterize both Plaintiffs' arguments and the relevant caselaw, which shows that courts both routinely examine whether fishery management measures serve an actual "conservation" goal, or whether they are justified given the expected economic effect on fishing communities.  *See Blue Water Fishermen's Ass'n*, 122 F. Supp. 2d at 169–71; *see also N. Carolina Fisheries Ass'n, Inc. v. Daley*, 27 F. Supp. 2d 650, 662–66 (E.D. Va. 1998); *cf. S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1433–37 & n.35 (M.D. Fla. 1998).

Defendants spill much ink over the NEFMC's cost-minimization efforts—such as the exemption for vessels landing under 50 metric tons of herring.  But given the demographics of the fishery, those efforts will invariably favor a small portion of the fleet.  This will therefore impermissibly benefit a select number of fishing communities where that sliver of the fleet berths and does business.  *See Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 87–88 (D.D.C. 2019); *see also* App. at 17160–17168; App. at 17316.  Similarly, as discussed above, differences in SBRM coverage among different gear types will lead to the midwater trawl fleet carrying more of the financial burden in meeting the herring monitoring coverage target.  *See supra* at pp. 23–24.

More importantly, the NEFMC and Defendants have failed to establish the underlying scientific need for increased monitoring beyond the Council's professed "interest[] . . . in increasing monitoring and/or other types of data collection[.]"  App. at 17030.  Unlike the observing required under the SBRM, at-sea monitoring under the Omnibus Amendment in the herring fishery is *discretionary* and unnecessary to advance conservation goals.  In this sense, the Observer Policy Committee statement from Michael Sissenwine is apt because Dr. Sissenwine

---

[13] As with National Standard Seven, Defendants and the NEFMC refused to justify the consistency of the omnibus measures with National Standard Eight.  *See* App. at 17311.

distinguished the *scientific* use of at-sea data collection from other purposes, including enforcement and quota monitoring.  *See* App. at 01604.

Among other things, Dr. Sissenwine explained how increased monitoring coverage by itself would not guarantee a more precise picture of the fishery and could even work *against* data accuracy.  App. at 01605–01606.  As for quota monitoring, Dr. Sissenwine indicated that at-sea efforts could be *less* efficient than shoreside alternatives.  App. at 01606.  And he provided the Observer Policy Committee with his professional view that, at least when it comes to industry-funded monitoring, he "would leave it to the industry to design, implement and pay for programs so long as the monitoring adheres to all . . . data access and delivery requirements."  App. at 01607.  The Omnibus Amendment, of course, is neither industry-driven nor truly voluntary.  Thus, coupled with the public comments that echoed such sentiment, *see, e.g.*, App. at 16899, Dr. Sissenwine's opinion should give the Court pause before it defers to Defendants' "conservation" claims.

## III.  The Omnibus Amendment is procedurally infirm.

### A.  Defendants violated NEPA.

The Omnibus Amendment and its implementing regulations must be set aside as arbitrary and capricious because Defendants and the NEFMC bypassed an Environmental Impact Statement ("EIS") and failed to adequately address the impacts of the Omnibus Amendment.  *See* Pls.' Mot. at 33–38.  Not only did Defendants neglect to take a "hard look" at the complete environmental impact of industry-funded monitoring, they also did not adequately address potential mitigation measures and regulatory alternatives.  Most damningly, Defendants and the NEFMC prejudged the legality of industry-funded monitoring, despite the environmental and economic effects of the Council's preferred alternatives.  Finally, Defendants incorrectly refused to supplement the EA

supporting the Omnibus Amendment after notable herring catch reductions in 2019 and 2020, which will transform the economics of the fishery.

> **1.    Defendants and the NEFMC failed to take a "hard look" at the complete environmental impact of the Omnibus Amendment.**

Defendants failed to take a "hard look" at the complete environment impact of the Omnibus Amendment because they refused to undertake any serious analysis of the NEFMC's omnibus alternatives, *see, e.g.*, App. at 17182, even though the Council recognized the uniformly negative expected economic impact of future FMP-specific industry-funded monitoring programs. App. at 17179. This failure suggests that Defendants, together with the Council, tried to "'artificially divid[e] a major federal action into smaller components, each without significant impact.'" *Jackson Cty. v. Fed. Energy Regulatory Comm'n*, 589 F.3d 1284, 1290 (D.C. Cir. 2009); *see* Pls.' Mot. at 34–36; *cf.* 40 C.F.R. § 1508.25(a)(1). If the Omnibus Amendment has true "omnibus" effect,[14] it was improper to narrow the scope of the EA to only the herring alternatives. *Cf. Greenpeace v. Nat'l Marine Fisheries Serv.*, 55 F. Supp. 2d 1248, 1272–73 (W.D. Wash. 1999).

Defendants do little to rebut these arguments and rely instead on the "rule of reason," asking this Court to defer to their decision to forgo any sort of comprehensive analysis of the Omnibus Amendment, including the omnibus alternatives. *See, e.g.*, App. at 17741–42. The only case that Defendants discuss—*Wilderness Society v. Salazar*—does little to distinguish the authorities cited by Plaintiffs. To be sure, the *Salazar* court explained that "limited information" could "necessarily limit[] the scope of [an] environmental analysis" under NEPA. 603 F. Supp. 2d 52, 60 (D.D.C. 2009). But it also explained that "'an environmental impact statement which is

---

[14] "Relating to or dealing with numerous objects or items at once; including many things or having various purposes." *Omnibus*, Black's Law Dictionary (9th ed. 2009).

incomplete due to the omission of *ascertainable facts*, or the inclusion of erroneous information, violates [NEPA's] disclosure requirement[.]'" *Id.* at 60–61 (citation omitted and emphasis added). Thus, while an agency need not undertake impractical efforts to obtain information, or to provide especially rigorous analysis, *see id. at* 61–62 (discussing "tiering" under 40 C.F.R. § 1508.28), it cannot rely on the "rule of reason" to ignore its NEPA obligations.

Related cases reflect the same idea. The sort of detailed analysis that Plaintiffs seek here is only excusable when information about future regulatory efforts would be unattainable. *See, e.g.*, *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 166–67 (D.D.C. 2014). But Defendants have cited nothing in the record to suggest that analysis of the environmental impacts of the omnibus measures would lead to a "gross misallocation of resources," "trivialize NEPA," or be "unduly expensive." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 66–67 (D.D.C. 2019) (cleaned up and citations omitted).

Moreover, unlike the defendant agency in *Salazar*, which was "limited in what it could analyze because it did not yet know information on the exact location of wells or development," Defs.' Br. at 38, Defendants know precisely which FMPs "may include industry-funded monitoring programs." *See, e.g.*, 50 C.F.R. § 648.11(g).[15] Defendants and the NEFMC have access to extensive information about the demographics and operation of New England fisheries— information that fishery participants routinely submit as a part of the Council's regulatory scheme and that the government uses for management purposes. As with the refusal to supplement their analysis in the wake of herring catch reductions, it is likely Defendants merely hoped to avoid the delay that adequate analysis of the omnibus measures would entail. *See* App. at 17738.

---

[15] Of course, Plaintiffs dispute whether the NEFMC may required industry-funded monitoring in all the FMPs that it administers. *See, e.g.*, Pls.' Mot. at 16 & 16 n.18.

### 2.    Defendants and the NEFMC did not adequately consider regulatory alternatives or potential mitigation measures.

As for potential mitigation measures and regulatory alternatives, Plaintiffs have described why the inadequacies of the Omnibus Amendment EA appear to violate National Standard Eight. *See supra* at pp. 25–27. That argument is relevant to NEPA too. Mitigation measures such as the exemption for vessels landing under 50 metric tons of herring will favor a sliver of the fleet and therefore impermissibly benefit a select number of fishing communities. *See Groundfish Forum*, 375 F. Supp. 3d at 87–88; *see also* App. at 17160–68; App. at 17316. The MSA does not countenance this sort of disparity.

Defendants also misunderstand Plaintiffs' arguments about the "uncertainty" of future management efforts. *See* Pls.' Mot. at 36. It is not that "uncertainty" rendered Defendants' "discussion of mitigation measures inadequate." Defs.' Br. at 40. Rather, the government cannot use purported uncertainty, together with a promise of possible future remedial action, as a shield to avoid fuller environmental impact analysis. *Cf.* 40 C.F.R. § 1500.1(b) (agency must take a hard look at environmental impacts *before* taking an action). When relevant facts are discoverable, and the record fails to prove the impracticality of expending the time and resources necessary to obtain and analyze those facts, an agency does not satisfy its NEPA obligations. *See, e.g.*, *Salazar*, 603 F. Supp. 2d at 60–61.

### 3.    Defendants and the NEFMC never seriously considered any alternative to industry-funded monitoring.

Defendants acknowledge that an agency violates NEPA if it predetermines the outcome of an EA or EIS in favor of a preferred regulatory action. Defs.' Br. at 40. Plaintiffs have explained why the administrative record evidences such prejudgment, and Defendants did not address the matter in any convincing way. For example, Defendants failed to explain why, early in developing

the Omnibus Amendment, it was clear that the NEFMC was intent on instituting *some* form of industry-funded monitoring, no matter if the Council had yet to settle on a specific coverage rate. *See, e.g.*, App. at 00028.    Indeed, at the start of the Omnibus Amendment, Defendants memorialized how NMFS staff "recapped [the amendment's] purpose": "establish[ing] a clear delineation of costs for monitoring between the industry and NMFS for all FMPs."  App. at 00010. Defendants also did not explain why the NEFMC forged ahead with the Omnibus Amendment, despite an agency employee admitting that cost benefit analysis could not be "completed" before the Council selected its preferred alternatives.  App. at 07484.

> ### 4.    Defendants and the NEFMC should have revised their environmental impact analysis following significant herring catch reductions.

The NEFMC and Defendants refused to revise or supplement their environmental impact analysis despite notable herring catch reductions in 2019 and 2020, which will significantly impact the economics of the fishery and the viability of the fleet under an industry-funded monitoring regime.  *See* Pls.' Mot. at 38.  Defendants response is two-fold.  *First*, they suggest that NEPA does not require an agency to "supplement an EIS every time new information comes to light[.]"  Defs.' Br. at 41 (citing *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017)).  *Second*, they argue that, regardless, they took a "hard look" at whether the Council's EA needed to be revised, but determined supplementation was unnecessary.  *Id.* at 42–43.  These arguments are unavailing.

Defendants abuse *Mayo v. Reynolds* and contort its holding.  Although Defendants are correct that supplemental NEPA analysis is not required "every time new information comes to light," an agency *must* revisit past analysis when "'new information provides a *seriously* different picture of the environmental landscape.'"  *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017) (citations omitted); *see Davis v. Latschar*, 202 F.3d 359, 369 (D.C. Cir. 2000) (supplemental

impact statement required for "changes that cause effects which are significantly different from those already studied").

In *Mayo*, the plaintiff unsuccessfully argued that an annual NEPA (re-)assessment was required for implementation of a fifteen-year elk-management plan because hunting of the elk was authorized every year by the defendant-agency, which had never sought to consider whether those annual "hunting authorizations deviated from the [original environmental] assessment" prepared at the start of the fifteen-year plan. *Mayo*, 875 F.3d at 21. Rejecting the plaintiff's NEPA claim, the court explained that "[a]ll the environmental effects seen during the years after the promulgation of the" plan "had been anticipated and analyzed in the original environmental assessments," and later actions—the annual hunting authorizations—were not significant enough to trigger the need for supplemental analysis. *Id.*

This case is distinguishable. Not only do the 2019 and 2020 herring catch reductions have little direct relation to the NEFMC's preferred alternatives and the industry-funding requirement— at least in the way that annual hunting authorizations were expected to be part of the regular implementation of the elk-management plan in *Mayo*—but Defendants proposed and finalized those catch reductions in early 2020,[16] and between November 2018 and February 2019.[17] In other words, the drastic catch reductions took effect in the midst of ongoing development and finalization of the Omnibus Amendment. These were not subsequent regulatory actions.

---

[16] *See generally* Framework Adjustment 6 and the 2019–2021 Atlantic Herring Fishery Specifications, 85 Fed. Reg. 26,874 (May 6, 2020) (to be codified at 50 C.F.R. pt. 648); [Proposed] Framework Adjustment 6 and the 2019–2021 Atlantic Herring Fishery Specifications, 85 Fed. Reg. 4,932 (Jan. 28, 2020) (to be codified at 50 C.F.R. pt. 648).

[17] *See generally* Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 84 Fed. Reg. 2,760 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648); [Proposed] Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 83 Fed. Reg. 61,593 (Nov. 30, 2018) (to be codified at 50 C.F.R. pt. 648).

Multiple public comments addressed the significance of the herring catch reductions and the need for more analysis. App. at 17683, 17689, 17713. As Cause of Action Institute explained in its comment:

> [T]he Omnibus EA fails to address the interplay between IFM and recent in-season adjustments in the herring fishery. This past summer, NMFS and the NEFMC reduced the annual catch limit for herring by over 50%. The Council and NMFS now seek again to lower the annual quota for calendar 2019, with an eye to further reductions in 2020 and 2021. Although there is some uncertainty to the precise level of reduction, all the possible specification adjustments will be economically devastating. According to a report provided to the NEFMC at its December 2018 meeting, these alternatives will reduce herring revenue by between 80–87%. That, in turn, will result in a 20–22% reduction in total revenue for all vessels declaring into the fishery. Such a loss in profitability on top of the costs associated with IFM will cripple the fleet.

App. at 17666 (footnotes omitted).

Defendants concede that the original EA estimated industry costs for monitoring at $710 per sea day. App. at 17737; Defs.' Br. at 42.[18] They also concede that the NEFMC's preferred herring alternatives will "reduce annual RTO for vessels with Category A or B herring permits up to 20 percent and up to an additional 5 percent for midwater trawl access to Groundfish Closed Areas." App. at 17737; Defs.' Br. at 42.[19] Nevertheless, Defendants argue that the Council's 52% reduction in herring quota over the current three-year specification period—a reduction likely to hurt herring revenue between 80–87% by the Council's own calculation, *see* App. at 17666 (citing Presentation: In-Season Adjustment to Atlantic Herring Specifications for 2019, N. Eng. Fishery Mgmt. Council (Dec. 5, 2018), *available at* http://bit.ly/2V3w4Vk))—is *insignificant* for NEPA

---

[18] In the February 7, 2020 Final Rule, Defendants suggested that the daily cost of monitoring would "largely depend on negotiated costs between vessels and monitoring service providers." App. at 17737. But there is little in the record to support this assertion. *See supra* at p. 21.

[19] Annual RTO for vessels electing to participate in electronic monitoring and portside sampling coverage is expected to be 10%. App. at 17737.

purposes and does not warrant revisiting initial analysis based on different catch restrictions, older revenue data, and statistics derived from studies conducted as long ago as 2014.  *See* App. at 17737.

Nor is there any serious basis for Defendants' speculations about a possible increase in the price of herring, let alone their prediction that herring permit holders will decide to prosecute other species in other fisheries in order to make up for lost herring revenue.  *See* App. at 17738–17739; *cf.* Kaelin Decl. ¶¶ 17–18.  As Plaintiffs have explained, it is more likely that Defendants and the Council believed supplemental analysis would delay the Omnibus Amendment and jeopardize industry-funded monitoring.  *See* Pls.' Mot. at 38 (citing App. at 17738).

### B.    Defendants violated the RFA.

In defense of their Regulatory Flexibility Act ("RFA") analysis, Defendants offer several arguments.  *First*, in a footnote, Defendants request the Court to "summarily dismiss Plaintiffs' RFA claim" because Plaintiffs supposedly failed "to cite to any alleged failures to comply with the RFA in the FRFA itself[.]"  Defs.' Br. at 44 n.20.  Assuming the Court were to find that Defendants properly raised this argument, *see Hutchins v. Dist. of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (a court "need not consider cursory arguments made only in a footnote"), it should reject it.  Defendants' single authority—*Alfa International Seafood v. Ross*—is inapt as it involved a challenge to an agency's failure to publish an IRFA in the *Federal Register*. 264 F. Supp. 3d 23, 67 (D.D.C. 2017).  Plaintiffs here, by contrast, attack the overall adequacy of Defendants' economic impact analysis.  In that respect, Plaintiffs' reference to the EA/RIR/IFRA is appropriate because Defendants incorporated the earlier analysis of their IFRA into the FRFA. App. at 17744 ("The FRFA incorporates the initial RFA, a summary of the significant issues raised by the public comments in response to the initial RFA, NMFS responses to those comments, and

a summary of the analyses completed in support of this action."). Indeed, Defendants never

published a stand-alone FRFA apart from the February 7, 2020 Final Rule. *See* App. at 17744.[20]

     *Second*, Defendants try to dismiss the import of *Southern Offshore Fishing Ass'n v. Daley*

"because the defendants in that case did not fulfill th[e] basic statutory requirement" of preparing

an IRFA. Defs.' Br. at 44. But Defendants misstate that case. Admittedly, in *Daley*, NMFS made

the "tactical mistake of not preparing an IRFA." 995 F. Supp. 1411, 1436 (M.D. Fla. 1998). But

the agency still prepared a FRFA to bolster its "prior 'no significant impact certifications.'" *Id.*

After "stud[ying] the *entire record*," the court "conclude[d] that the Secretary's . . . FRFA [still]

fail[ed] to satisfy APA standards and RFA requirements," and not just because the agency failed

to summarize significant issues raised by public comments in response to a never-prepared and

never-published IRFA. *Id.* (emphasis added). More to the point, the *Daley* court's decision had

to implicate the substance of NMFS's RFA compliance because the RFA does not provide for

judicial review of Section 603, which governs the preparation and disclosure of IRFAs. *See* 5

U.S.C. § 611(a)(1).

     *Third*, with respect to other deficiencies raised by Plaintiffs, Defendants provide no

substantive response. As for the failure to analyze the economic impacts associated with the

omnibus alternatives, Defendants merely repeat that those measures are "administrative and have

no direct economic impacts." Defs.' Br. at 44. That is flatly disproven by the administrative

record, which shows that Defendants and the NEFMC conceded its omnibus measures will have

"direct negative economic impacts to fishing vessels[.]" App. at 17179. Defendants also failed

(again) to address the related issue of overlapping requirements for industry-funded monitoring in

---

[20] This appears to follow past practice in the fishery management context. *See, e.g.*, *Assoc. Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997).

multiple fisheries—a concern that the Council *deleted* from an earlier draft of the Omnibus Amendment EA.  App. at 14117.  Such conclusory statements that fail to address economic realities are inadequate under the RFA.

### C.   Defendants' irregular proposal of implementing regulations for an unapproved FMP amendment violated due process, the rulemaking process contemplated by the MSA, and common sense.

Defendants' publication of proposed implementing regulations *before* the Secretary of Commerce even approved the Omnibus Amendment reflects how Defendants and the NEFMC prejudged the legality of industry-funded monitoring and otherwise violated common sense norms of procedural due process and administrative law.  *See generally* Pls.' Mot. at 40–42.  "The MSA . . . presumes a clear process: a council finalizes its preferred alternatives for an FMP amendment, NMFS solicits public comment, and the Secretary approves or disapproves the amendment.  Proposed regulations implementing the amendment should be published in the *Federal Register* only after secretarial approval of the underlying FMP amendment."  *Id.* at 40–41.

Defendants protest that they followed the statutorily prescribed timelines for approval of an FMP amendment and implementing regulations.  *See* Defs.' Br. at 27–29.  That much is undisputed.  Defendants approved the Omnibus Amendment within thirty days of the end of the comment period following the September 2018 notice of availability.  *See* App. at 17760–17762; App. at 17785–17798; *see also* 16 U.S.C. § 1854(a)(3).  And they finalized implementing regulations after the required public comment period.  *See id.* § 1854(b)(1).  But Plaintiffs never suggested that either of these actions or processes, *when considered in isolation*, violated the MSA. The irregularities and due process concerns arise from Defendants presuming the legality of the Omnibus Amendment and proposing implementing regulations *before* any final approval decision

for the underlying FMP amendment.  In other words, Defendants' decision to *overlap* the distinct timelines and processes set out in Section 1854 is legally fatal.

"An agency is required to provide a meaningful opportunity for comments, which means that the *agency's mind must be open* to considering them."  *Grand Canyon Air Tour Coal. v. Fed. Aviation Admin.*, 154 F.3d 455, 468 (D.C. Cir. 1998) (emphasis added).  "Consideration of comments as a matter of grace is not enough."  *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988).  The preambular language of the September 2018 notice of availability and the November 2018 proposed rule, when read together, casts doubt on the government's willingness to have entertained serious arguments about the legality of the Omnibus Amendment and industry-funded monitoring.  *See* App. at 16969–16971; App. at 17639.  The public comment instructions for the notice of availability, for example, confusingly advised that Defendants would accept the submission of comments on the *yet-to-be published* proposed implementing regulations.  App. at 17640.  And the introduction of the November 2018 proposed rule failed to mention the *still-pending approval decision* for the Omnibus Amendment except for a single, vague paragraph several pages into the *Federal Register* publication.  App. at 16971.  If anything, Defendants' language suggested that approval of the Omnibus Amendment was a foregone conclusion: "This action proposes regulations to implement the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment."  App. at 16969.  Even sophisticated members of the regulated industry, including a former Council member, were confused by Defendants' actions.  *See* App. at 17691–17692.

Defendants nevertheless argue there is "no MSA provision to support" Plaintiffs' claim that "proposed regulations implementing an amendment should be published . . . only after secretarial approval[.]"  Defs.' Br. at 28.  Only an exceedingly narrow interpretation of the statute

could justify that position.  The separate processes for approval of FMP amendments and regulations work together as part of the overall "design" of the MSA.  *K Mart Corp. v Cartier, Inc.*, 486 U.S. 281, 291 (1988).  It would make little sense to permit Defendants to publish both proposed implementing regulations and an FMP amendment concurrently when the MSA foresees the possibility of secretarial *disapproval* of the latter.  *See* 16 U.S.C. § 1854(a)(4).  Similarly, the Secretary's obligation to review council-proposed regulations as "consistent with [a] fishery management plan, [or] plan amendment," would make little sense if the underlying FMP or amendment had yet to be approved.  *Id.* § 1854(b)(1).  What, exactly, would the proposed regulations be implementing?  To read the MSA to permit these different approval processes to overlap would defeat rather than further the aims of efficient fishery management.  *Cf. Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1473 (2020) (citing *The Emily & the Caroline*, 22 U.S. (9 Wheat.) 381, 390 (1824)).

Defendants also insist that "[i]t is NMFS's practice to publish a notice of availability regarding an FMP or amendment concurrently with a proposed rule."  Defs.' Br. at 28 (citing App. at 17741).  Even if this is the agency's actual "practice," Defendants have not identified any statute, regulation, or authoritative statement of policy or practice that justifies it.  The MSA does not provide for it and neither do the Department of Commerce's MSA regulations.  The NEFMC's organizational documents and procedures similarly fail to shed light of the legality of the "practice," even though regional councils must maintain a "written procedure for proposed regulations" that "describe[s] how the Council deems proposed regulations necessary or appropriate for the purposes of implementing a [FMP] or a plan amendment."  50 C.F.R. § 600.140(a)–(b); *see* N. Eng. Fishery Mgmt. Council, Statement of Organization, Practices, and Procedures (SOPP) § 3.2.5 (2015), *available at* https://bit.ly/3gyLr2H; *see also* N. Eng. Fishery

Mgmt. Council, Operations Handbook: Practice & Policies at 68 (2020), *available at* https://bit.ly/30zjLVu.[21]

"The process of notice and comment rule-making is not to be an empty charade." *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982). Although Defendants may have superficially "considered" the comments received in response to the notice of availability, the publication of proposed implementing regulations in the midst of the process of secretarial approval for the underlying FMP amendment is procedurally irregular and suggests prejudgment of the legality of the Omnibus Amendment. *Cf. Everson*, 435 F. Supp. 3d at 86–89. The overall context of Section 1854, as described above, shows that Defendants erred by overlapping these distinct processes.

## <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motion. Plaintiffs further request that the Court permanently enjoin Defendants from implementing the Omnibus Amendment and declare as unlawful and set aside industry funding requirements in the Omnibus Amendment because they are *ultra vires* and violate applicable statutory and constitutional provisions.

//

//

---

[21] When a council "deems" regulations "necessary or appropriate" for implementation of an FMP or plan amendment, it must submit those draft regulations to NMFS "simultaneously with the plan or amendment." 16 U.S.C. § 1853(c)(1). Submitting draft regulations—or modifying them, *see id.* § 1853(c)(2)—is distinct from the *Federal Register* process contested by the parties.

Dated: August 14, 2020

Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
D.C. Bar No. 1024362
Eric R. Bolinder
D.C. Bar No. 1028335

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Phone: (571) 444-2841
ryan.mulvey@causeofaction.org
eric.bolinder@causeofaction.org

*Counsel for Plaintiffs*