**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LOPER BRIGHT ENTERPRISES, INC., *et al.*,

Plaintiffs,

v.

WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce, *et al.*,

Defendants.

No. 20-cv-0466 (EGS)

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION OF JEFFREY HOWARD KAELIN**

Ryan P. Mulvey
D.C. Bar No. 1024362
Eric R. Bolinder
D.C. Bar No. 1028335

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Phone: (571) 444-2841
ryan.mulvey@causeofaction.org
eric.bolinder@causeofaction.org

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

Table of Authorities ........ iii
Introduction ........ 1
Legal Standard ........ 2
Argument ........ 5
I. The Court may consider the Kaelin Declaration as extra-record evidence. ........ 5
II. VMS cost data are already part of the "whole record." ........ 10
III. Plaintiffs' arguments do not depend on the Kaelin Declaration. ........ 11
IV. Mr. Kaelin is not an expert witness and does not seek to offer expert testimony. ........ 13
Conclusion ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asarco, Inc. v. Environmental Protection Agency*,
616 F.2d 1153 (9th Cir. 1980) ....................3

*Camp v. Pitts*,
411 U.S. 138 (1973)....................3

*Carlton v. Babbitt*,
26 F. Supp. 2d 102 (D.D.C. 1998)....................8

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971)....................2

*City of Dania Beach v. Federal Aviation Administration*,
628 F.3d 581 (D.C. Cir. 2010)....................3, 4, 7, 14

*County of San Miguel v. Kempthorne*,
587 F. Supp. 2d 64 (D.D.C. 2008)....................11

*Department of Commerce v. New York*,
139 S. Ct. 2551 (2019)....................3

*Environmental Defense Fund v. Costle*,
657 F.2d 275 (D.C. Cir. 1981)....................2

*Esch v. Yeutter*,
876 F.2d 976 (D.C. Cir. 1989)....................3, 7, 9

*Franks v. Salazar*,
751 F. Supp. 2d 62 (D.D.C. 2010)....................4

*Groundfish Forum v. Ross*,
375 F. Supp. 3d 72 (D.D.C. 2019)....................2

*Hill Dermaceuticals, Inc. v. Food & Drug Administration*,
709 F.3d 44 (D.C. Cir. 2013)....................4

*Hutchins v. District of Columbia*,
188 F.3d 531 (D.C. Cir. 1999)....................13

*IMC, P.C. v. Alvarez*,
129 F.3d 618 (D.C. Cir. 1997)....................4

*J.D.B. v. North Carolina*,
564 U.S. 261 (2011) ........ 15

*Marcum v. Salazar*,
751 F. Supp. 2d 74 (D.D.C. 2010) ........ 7

*Maritel, Inc. v. Collins*,
422 F. Supp. 2d 188 (D.D.C. 2006) ........ 10

*National Labor Relations Board v. Jackson Hospital Corp.*,
257 F.R.D. 302 (D.D.C. 2009) ........ 15

*National Mining Association v. Jackson*,
856 F. Supp. 2d 150 (D.D.C. 2012) ........ 7

*Oceana, Inc. v. Evans*,
384 F. Supp. 2d 203 ........ 7, 8, 10

*Oceana, Inc. v. Locke*,
674 F. Supp. 2d 39 (D.D.C. 2009) ........ 7

*Oceana, Inc. v. Pritzker*,
126 F. Supp. 3d 110 (D.D.C. 2015) ........ 4, 8, 14

*Oceana, Inc. v. Ross*,
290 F. Supp. 3d 73 (D.D.C. 2018) ........ 4

*Oceana, Inc. v. Ross*,
363 F. Supp. 3d 67 (D.D.C. 2019) ........ 2

*Pacific Shores Subdivision California Water District v. Army Corps of Engineers*,
448 F. Supp. 2d 1 (D.D.C. 2006) ........ 9

*Palmer v. Rice*,
No. 76-1439, 2005 WL 1278262 (D.D.C. May 27, 2005) ........ 15

*Styrene Information & Research Center, Inc. v. Sebelius*,
851 F. Supp. 2d 57 (D.D.C. 2012) ........ 4

*The Cape Hatteras Access Preservation Alliance v. Department of the Interior*,
667 F. Supp. 2d 111 (D.D.C. 2009) ........ 4, 11

*Theodore Roosevelt Conservation Partnership v. Salazar*,
616 F.3d 497 (D.C. Cir. 2010) ........ 4

*United States v. Cardoza*,
713 F.3d 656 (D.C. Cir. 2013) ........ 15

*United Student Aid Funds, Inc. v. Devos*,
237 F. Supp. 3d 1 (D.D.C. 2017) ....4

*University of Colorado Health at Memorial Hospital v. Burwell*,
151 F. Supp. 3d. 1 (D.D.C. 2015) ....11

**Statutes**

5 U.S.C. § 706 ....2, 6

**Rules**

Federal Rule of Civil Procedure 26(a)(2)(A) ....14

Federal Rule of Evidence 602 ....14

Federal Rule of Evidence 701 Advisory Committee Note (2000 Amendments) ....14, 15

Federal Rule of Evidence 701(c) ....14

**Other Authorities**

Fed. Defs.' Mem. in Supp. of Mot. to Strike the Decl. of George Weaver,
*Oceana, Inc. v. Pritzker*, No. 08-1881 (D.D.C. filed July 20, 2015) ....8

Fed. Defs.' Opp'n to Pl.'s Mot. for Summ. J. & Permanent Injunctive Relief,
*Oceana, Inc. v. Evans*, No. 04-810 (D.D.C. filed Apr. 25, 2005) ....9

Mot. for Summ. J. & Permanent Injunctive Relief,
*Oceana, Inc. v. Evans*, No. 04-810 (D.D.C. filed Mar. 22, 2005) ....9

Mot. to Supplement the Admin. Record,
*Pac. Shores Subdiv. Calif. Water Dist. v. Army Corp of Engr's*,
No. 04-2091 (D.D.C. filed Feb. 9, 2006) ....9

Pl. Oceana, Inc.'s Resp. to Not. of Completion of Remand,
*Oceana, Inc. v. Pritzker*, No. 08-1881 (D.D.C. filed July 10, 2015) ....9

## INTRODUCTION

This case arises out of a mandate by the federal government requiring herring fishermen to pay for third-party monitors to ride their boats during certain fishing trips and monitor their fishing activity. *See* Compl., ECF No. 1; *see also* Pls.' Mem. of P. & A. in Supp. of Mot. for Summ. J. at 5–11 [hereinafter "Pls.' Mot."], ECF No. 18-1. Plaintiffs filed their final summary judgment brief last month. *See* Pls.' Reply in Supp. of Mot. for Summ. J. & in Opp'n to Defs.' Cross-Mot. for Summ. J. [hereinafter "Pls.' Reply"], ECF No. 22. As part of that filing, Plaintiffs included a declaration signed by Jeffrey Howard Kaelin, a senior employee at Lund's Fisheries, Inc. *See* Decl. of Jeffrey Howard Kaelin, ECF No. 22-1. Several plaintiffs—Scombrus One LLC and Lund Marr Trawlers LLC—have the same owners and managers as Lund's Fisheries. Kaelin Decl. ⁋ 3 (citing Compl. ⁋ 19). The companies are operated together as a single family of businesses. Plaintiff Loper Bright Enterprises, Inc. co-owns and operates F/V *Retriever* with the owners of Lund's Fisheries. Kaelin Decl. ⁋ 4 (citing Compl. ⁋ 11). Thus, Mr. Kaelin has regular access to and knowledge of the business records and operations of these parties and their participation in the Atlantic herring fishery. Kaelin Decl. ⁋ 2. His declaration provides the Court with useful background information on costs associated with operating a Vessel Monitoring System ("VMS"), *see* Kaelin Decl. ⁋⁋ 7–12, as well as the design and function of several of Plaintiffs' vessels. *See* Kaelin Decl. ⁋⁋ 13–17.

Defendants contest the submission of Mr. Kaelin's declaration and ask the Court to exclude it, along with the portions of Plaintiffs' reply brief that purportedly rely on the declaration. *See* Mem. in Supp. of Defs.' Mot. to Exclude Pls.' Extra-Record Decl. ["Mot. to Exclude"], ECF No. 24-1. They argue that the Court's scope of review should be limited to the administrative record, *see id.* at 2; that introduction of the Mr. Kaelin's declaration was "procedurally improper," *id.* 5;

and that "Plaintiffs' effort . . . lacks any substantive merit" because none of the relevant exceptions to "the record review rules that govern this case" apply. *See id.* at 6–7. And, in a lone footnote, Defendants suggest that Mr. Kaelin improperly offers expert testimony. *See id.* at 7 n.1.

Each of these arguments lacks merit. Mr. Kaelin's declaration is "offered principally for illustrative purposes" unrelated to the Court's arbitrary and capricious review. Pls.' Reply at 15 n.8. If the Court were to reject the use of the declaration for that purpose, or if it considers Mr. Kaelin's declaration as part of its substantive review of the Omnibus Amendment, the declaration is still proper under recognized exceptions to the relevant record review rules. Finally, Plaintiffs properly submitted the declaration, and Mr. Kaelin is not offering expert-witness testimony.

## LEGAL STANDARD

The Administrative Procedure Act ("APA") "provides the exclusive vehicle for reviewing regulatory action . . . under the [Magnuson-Stevens Act ("MSA")]," *Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 81 (D.D.C. 2019) (citing 16 U.S.C. § 1855(f)(1)), as well as actions under the National Environmental Policy Act ("NEPA"). *See Oceana, Inc. v. Ross*, 363 F. Supp. 3d 67, 76 (D.D.C. 2019). Judicial review of agency action under the APA is "normally confined to the full administrative record before the agency at the time the decision was made." *Envtl. Def. Fund v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981); *see* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party[.]").

But, as with most general rules, there are exceptions. For example, extra-record evidence is permitted upon "a strong showing of bad faith or improper behavior[.]" *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). A court may also admit extra-record evidence when a proffered "explanation for agency action . . . is incongruent with what the record reveals about [an] agency's

priorities and decisionmaking process." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019); *cf. Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (extra-record "explanation" for agency action appropriate when the government "fail[s] to explain administrative action so as to frustrate effective judicial review"). These exceptions, and others discussed below, are important as it is "often . . . impossible, especially when highly technical matters are involved, for [a] court to determine whether [an] agency took into consideration all relevant factors *unless it looks outside the record* to determine what matters the agency should have considered but did not." *Asarco, Inc. v. Envtl. Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980) (emphasis added).

The D.C. Circuit has recognized various situations where a court may consider extra-record evidence in an APA suit. "[W]hen the substantive soundness of [an] agency's decision is under scrutiny," it "may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective," including:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under . . . [NEPA]; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (citation omitted).

More recently, the D.C. Circuit has identified a narrower set of instances when courts may consult extra-record materials: "(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information [is] needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so as to frustrate judicial review[.]'" *City of Dania Beach v. Fed. Aviation Admin.*, 628 F.3d 581, 590 (D.C. Cir. 2010) (citation omitted). Some district courts in this Circuit

have suggested that these exceptions displace the eight identified in *Esch*. *See, e.g.*, *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 4 (D.D.C. 2017). And the Circuit itself has opined that *Esch* may now be limited to cases of "gross procedural deficiencies." *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013). But the principal cases cited for this proposition either fail to mention *Esch*, let alone discuss or limit its application, *see City of Dania Beach*, 628 F.3d at 581; *IMC, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997) (articulating four exceptions), or they do not explicitly limit its use to procedural disputes. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). In any event, courts continue to rely on *Esch* to admit extra-record evidence post-*Dania Beach*, including in MSA cases. *E.g.*, *Oceana, Inc. v. Pritzker*, 126 F. Supp. 3d 110, 113 (D.D.C. 2015).

Aside from extra-record evidence, courts may rely on materials that an agency failed to include in the official administrative record. This evidence is not technically "extra-record," and courts therefore apply a less-stringent standard of admissibility. *See Styrene Info. & Research Ctr., Inc. v. Sebelius*, 851 F. Supp. 2d 57, 64 (D.D.C. 2012); *see also Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77–78 (D.D.C. 2018). The party seeking to supplement—or, more precisely, complete—the record must "overcome the strong presumption of regularity to which an agency is entitled" and "put forth concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers." *Franks v. Salazar*, 751 F. Supp. 2d 62, 67 (D.D.C. 2010). "If for some reason, materials that were actually a part of the agency's record were not properly included, whether by design or accident, they should be included in the record for the Court's review." *The Cape Hatteras Access Pres. All. v. Dep't of the Interior*, 667 F. Supp. 2d 111, 114 (D.D.C. 2009).

## ARGUMENT

### I. The Court may consider the Kaelin Declaration as extra-record evidence.

Mr. Kaelin's declaration provides the Court with objective information on the cost of complying with Defendants' extensive VMS requirements. *See* Kaelin Decl. ¶¶ 7–12. It also describes the capacity and design of several of Plaintiffs' vessels. *See* Kaelin Decl. ¶¶13–16. By itself, this information does not speak to the legality of the Omnibus Amendment as such, and Defendants' attempts to mischaracterize Mr. Kaelin's testimony as buttressing "Plaintiffs' claims . . . that the costs associated with the industry-funded [*sic*] requirement are too high" are transparent. Mot. to Exclude at 5. The Court should reject them.

As made clear in their reply brief, Plaintiffs do not rely on Mr. Kaelin's declaration in their discussion of Defendants' failure to properly consider the costs of industry-funded monitoring in light of environmental and economic impacts, benefits to the fishery, and regulatory alternatives. *See* Pls.' Reply at 18–20; *id.* at 27–34.[1] Plaintiffs rather use Mr. Kaelin's description of VMS costs to show the *difference in kind* between complying with VMS requirements, on the one hand, and being forced to pay upwards of $710 per sea day for a monitor, on the other. *See id.* at 14–16. In other words, Mr. Kaelin's VMS costs provide the Court with concrete context that it may use when distinguishing reasonable compliance costs, as a legal category, from Defendants' unlawful attempts to unload the cost of a discretionary monitoring program onto commercial fishermen.

That distinction should play a key role in the Court's analysis of the parties' arguments. Defendants' final rule refers to the MSA's supposed implicit authorization for imposing

[1] Consequently, even if the Court excludes Mr. Kaelin's declaration, Plaintiffs' arguments concerning Defendants' failure to seriously consider the cost of industry-funded monitoring in light of *New York Stock Exchange LLC v. Securities & Exchange Commission* and *Michigan v. Environmental Protection Agency* still stands. *See* Pls.' Reply at 18–20.

"compliance costs on industry participants." App. at 17739. The VMS costs detailed in Mr. Kaelin's declaration—which Defendants do not suggest are unauthenticated or false—are *precisely* the sort of information that Plaintiffs' counsel would appropriately offer during the hearing scheduled for October 9, 2020, if the Court were to ask about Plaintiffs' obligation to bear the costs of regulatory compliance, rather than their responsibility to fund an agency's program.[2]

As for the second half of Mr. Kaelin's declaration, that testimony provides nonargumentative facts about the capacity of Plaintiffs' vessels and their overall design. Plaintiffs use these facts to highlight the limited impact of the 50-metric-ton exemption from industry-funded monitoring on portions of the herring fleet. *See* Pls.' Reply at 16. Defendants have already acknowledged that this exemption would provide limited relief for the midwater trawl fleet. *See, e.g.*, App. at 17742. And stakeholders repeatedly mentioned gear type or vessel structure vis-à-vis the economic utility of the 50-metric-ton exemption during public hearings and public comment periods. *See, e.g.*, App. at 17713–17715; *see also infra* at pp. 11–13. Mr. Kaelin does not raise new issues that Defendants never had a chance to consider before finalization of the Omnibus Amendment. Although the specific details of Plaintiffs' vessels may not have been shared, the overarching concerns were before the agency.

If the Court rejects the use of Mr. Kaelin's declaration for "illustrative" purposes, it may still admit the declaration under well-established exceptions that allow extra-record evidence. *See* Pls.' Reply at 15 n.8. Consideration of extra-record evidence is particularly appropriate when an agency has behaved improperly or when supplementation will "facilitate examination of the

[2] Defendants and the NEFMC had access to historical VMS costs during the design of the Omnibus Amendment. *See infra* at pp. 10–11. The Environmental Assessment ("EA") does not report those data and Defendants did not certify them as part of the administrative record. They still form a part of the "whole record" contemplated by the APA. *See* 5 U.S.C. § 706.

procedural soundness of an agency decision" and "assist a court's review." *Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156 (D.D.C. 2012) (citations omitted). Here, Plaintiffs have highlighted serious procedural irregularities in Defendants' approval of the Omnibus Amendment, which suggest prejudgment of the legality of industry-funded monitoring. *See* Pls.' Mot. at 40–42; Pls.' Reply at 36–39. Plaintiffs also raise claims under NEPA and the Regulatory Flexibility Act. *See* Pls. Mot. at 33–40; Pls.' Reply at 27–36; *id.* at 34 (citing Kaelin Decl. ⁋⁋ 17–18).

Mr. Kaelin's declaration provides information that is absent from the administrative record and would otherwise "enable the court to understand the issues [at hand more] clearly." *Esch*, 876 F.2d at 991. Mr. Kaelin was indirectly involved in the development of the Omnibus Amendment as part of the NEFMC's Observer Policy Committee. *See, e.g.*, App. at 00986–00993. He serves as an Advisor to the Council's Herring Oversight Committee. Kaelin Decl. ⁋ 6. And he has unique familiarity with the issues at bar and, more importantly, he offers *purely factual information* that does not directly attack the legality of the Omnibus Amendment. *See Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 217–17 & n.17; *cf. Oceana, Inc. v. Locke*, 674 F. Supp. 2d 39, 46–47 (D.D.C. 2009) (rejecting "background information" as "argumentative" instead of "explanatory"). This is exactly the sort of "background information" contemplated by *Dania Beach*. *See* 628 F.3d at 590. The Court should therefore admit Mr. Kaelin's declaration "to enable [its] judicial review to become effective." *Marcum v. Salazar*, 751 F. Supp. 2d 74, 79 (D.D.C. 2010).

Two MSA cases are instructive. *First*, in *Oceana, Inc. v. Evans*, the court considered a letter written by a "sea turtle expert" who had designed a scientific model employed by the National Marine Fisheries Service ("NFMS"). 384 F. Supp. 2d at 217. The plaintiff argued that the letter demonstrated why NMFS's use the expert's model was "too speculative to support a no-jeopardy conclusion" as part of the biological opinion under review. *See id.*; *see also id.* at 217–

18 ("The letter . . . claimed the agency had misused the SEFSC 2001 model and urged the agency to reevaluate its no-jeopardy decision."). Citing *Esch*, the *Evans* court denied the government's "request to strike" the scientist's letter, and explained that the extra-record evidence was "particularly" relevant: "[The] letter bears directly on whether the agency 'considered factors which are relevant to its final decision,' and 'purports to undermine key evidence supporting' NMFS's decision." *See id.* at 217 n.17 (internal citations omitted).[3] Here, Defendants and the NEFMC considered VMS and other operating costs. *See infra* at pp. 10–11. Industry stakeholders presented them with concerns about the limited impact of the proposed 50-metric-ton exemption and the viability of fishmen simply moving to a different fishery. *See infra* at pp. 11–13. Mr. Kaelin's testimony merely provides more concrete detail that shows Defendants failed to adequately consider these issues.

*Second*, in *Oceana, Inc. v. Pritzker*, the court denied NMFS's motion to strike an "expert declaration submitted by Oceana as an exhibit to its response memorandum[.]" 126 F. Supp. 3d at 111–12. The Court rejected many of the same arguments Defendants raise here,[4] and it admitted the declaration because NMFS "failed to adequately explain the grounds for its conclusion that a strong positive linear relationship exists between dredge hours and loggerhead takes[.]" *Id.* at 113. "[The extra-record] declaration only endeavors to point out gaps in the agency's explanation and analysis; it does not purport to fill those gaps." *Id.* at 114. Mr. Kaelin's declaration provides similarly useful data that "does not purport to fill . . . gaps" in Defendants' consideration of the Omnibus Amendment, but only offers data of the sort already before the agency—or implicated in

[3] The *Evans* court relied, in part, on an earlier case in which a plaintiff successful introduced a declaration from a scientist—who was, notably, not classified as an expert—to show NMFS's faulty understanding of the scientific data available during administrative proceedings. *See Carlton v. Babbitt*, 26 F. Supp. 2d 102, 108 (D.D.C. 1998).

[4] *See generally* Fed. Defs.' Mem. in Supp. of Mot. to Strike the Decl. of George Weaver, *Oceana, Inc. v. Pritzker*, No. 08-1881 (D.D.C. filed July 20, 2015).

the issues raised during public hearings and comment. The Court can use this data as a benchmark for evaluating the adequacy of Defendants' decisionmaking.

Finally, Defendants claim that "[i]n order for a court to review extra-record evidence, case law within the District of Columbia Circuit clearly anticipates that the proponent will file a motion." Mot. to Exclude at 6. But Defendants identify no federal or local rule that requires a party to submit a declaration upon motion. And the sole case they cite, *Pacific Shores Subdivision California Water District v. Army Corps of Engineers*, is inapt.[5] In *Pacific Shores*, the party seeking to supplement the record only filed a motion because past disagreement between the parties about the contents of the administrative record had prompted the Court to "order[] that any motions regarding [its] adequacy . . . be filed by" a date determinate. Mot. to Supplement the Admin. Record, *Pac. Shores Subdiv. Calif. Water Dist. v. Army Corp of Engr's*, No. 04-2091 (D.D.C. filed Feb. 9, 2006). This Court has not issued a similar order.

Parties regularly file declarations as part of briefing and without special leave of the court. In both *Evans* and *Pritzker*—the cases discussed above—the plaintiff simply attached extra-record evidence to its briefs. *See, e.g.*, Pl. Oceana, Inc.'s Resp. to Not. of Completion of Remand, *Oceana, Inc. v. Pritzker*, No. 08-1881 (D.D.C. filed July 10, 2015). In one of those cases, the plaintiff noted in a footnote—as here—why the court should consider that evidence. *See* Mot. for Summ. J. & Permanent Injunctive Relief at 8 & n.5, *Oceana, Inc. v. Evans*, No. 04-810 (D.D.C. filed Mar. 22, 2005). Further, in *Evans*, the government objected to the plaintiff's introduction of the extra-record letter in its opposition brief, rather than file a stand-alone motion to strike or exclude the letter. *See* Fed. Defs.' Opp'n to Pl.'s Mot. for Summ. J. & Permanent Injunctive Relief

[5] This case also justifies consideration of additional information "to evaluate an agency's analysis of potential environmental impacts" under NEPA. *Pac. Shores Subdivision Calif. Water Dist. v. Army Corps of Engr's*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006); *accord Esch*, 876 F.2d at 991.

at 19–20, *Oceana, Inc. v. Evans*, No. 04-810 (D.D.C. filed Apr. 25, 2005). The court then resolved the matter as part of its disposition of the pending summary judgment motion. 384 F. Supp. 2d at 217 n.17. The same sequence of events could have unfolded here. That Defendants decided to file a separate motion to strike, rather than incorporate their objections to Mr. Kaelin's declaration in their final reply brief, does nothing to discredit Plaintiffs' manner of introducing the declaration.

## II. VMS cost data are already part of the "whole record."

The APA's reference to the "whole record" in Section 706 includes "all documents and materials that the agency 'directly or *indirectly* considered.'" *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) (citation omitted and emphasis added). Defendants and the regional councils gathered VMS cost data, as well as various other types of financial information, during the development of the Omnibus Amendment. Although the government's EA did not report all aspects of this data, the record reflects that the government did, in fact, collect and consider it. *See, e.g.*, App. at 17312 (reference to cost survey in discussion of National Standard Two).

Defendants and the regional councils tasked "Jason Didden, staff of the Mid-Atlantic Fishery Management Council ["MAFMC"] . . . [with] coordinat[ing] a survey of herring and mackerel vessels to collect more detailed cost information[.]" App. at 17247.

> The survey requested information from vessel owners on total trip costs in 2014. The cost survey collected information on variable costs; payments to crew; the cost of repairs, maintenance, upgrades; and fixed costs. These data were used to update the impact analyses. . . . Surveys were sent to approximately 18 vessel owners (representing about 26 vessels) in the herring and/or mackerel fisheries. Surveys were sent in May 2015 and information was submitted for 16 of the 26 vessels.

App. at 17247.

Mr. Didden analyzed operating costs, including the annual and average daily costs for on-board communications equipment such as "cell phones, radio, VMS etc." App. at 17631; *see* Exhibit 1 (2014 Cost Survey – App. 17625–17637). Although the survey category implicating

VMS is slightly broader than the cost totals reported in Mr. Kaelin's declaration—given that the latter do not reflect expenses associated with radios and cellphones—the record still shows that roughly the same information "was known to the agency when it made its decision, . . . directly relates to [its] decision, and . . . [is] adverse to the agency's decision" to characterize industry-funded monitoring as a sort of compliance cost. *Cty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 72 (D.D.C. 2008). The cost of compliance with VMS regulations pales in comparison to the estimated costs of industry-funded monitoring. "The difference is not one of degree, but of kind. Being forced to pay for a government minder to ride your boat is *not* a reasonable cost of doing business. It is *not* a 'compliance cost.'" Pls.' Reply at 16.

The MAFMC's 2014 survey is "concrete, non-speculative evidence" that VMS and other communication costs, at the annual and daily level, were "actually consider[ed] 'either directly or indirectly'" yet are "absent from the record" currently before the Court. *Univ. of Colo. Health at Mem. Hosp. v. Burwell*, 151 F. Supp. 3d. 1, 14 (D.D.C. 2015). If the Court excludes Mr. Kaelin's declaration, it may still consider the cost survey and order Defendants to complete the record with the data compiled by Mr. Didden. *The Cape Hatteras Access Pres. All.*, 667 F. Supp. 2d at 114.[6]

**III. Plaintiffs' arguments do not depend on the Kaelin Declaration.**

Defendants ask the Court to exclude "any portion of Plaintiffs' Reply that relies on [the Kaelin Declaration], including the text at pages 15 (paragraph 2), 16 (paragraph 2), and 34 (paragraph 2)." Mot. to Exclude at 2; *see id.* at 7. Even if the Court were to reject Mr. Kaelin's declaration, it should not grant this further relief. Plaintiffs do not base their arguments solely on

[6] On August 26, 2020, Mr. Kaelin contacted Mr. Didden to request copies of any survey responses that Plaintiffs may have submitted on behalf of their boats. Mr. Didden responded two days later that, upon recommendation of counsel at the National Oceanic and Atmospheric Administration, the MAFMC would only release records in response to a Freedom of Information Act request.

the Kaelin Declaration and repeatedly cite the administrative record. All of Plaintiffs' arguments stand, with or without the declaration. It is simply an additional piece of helpful evidence. The Court should reject Defendants' attempt to use their motion to carve-up Plaintiffs' brief.

As for the 50-metric-ton exemption, Plaintiffs explained that "[o]ther herring fishery participants are in a similar position [to Plaintiffs' vessels] with respect to the uniqueness of their vessels and their ability to qualify for the mitigation measures set out in the Omnibus Amendment." Pls.' Reply at 16–17 (citing App. at 17713–17715). As one stakeholder explained: "We do not have the same profit margins per day [as the "typical 'herring' vessel"] and therefore cannot afford [industry-funded monitoring]. But neither do we have the same impact on the resource per day; our footprint is much smaller." App. at 03405. Thus, "[t]o lump vessels with very different characteristics together isn't equitable or reasonable." App. at 03406.[7] Cause of Action Institute, Plaintiffs' counsel, raised the same point in its own regulatory comment:

> [T]here are vessels in the fishery that have unique fishing behavior and daily capacity, including those that process at sea and return to port after extended multi-day trips. Because the 50 mt exemption is provided *per trip*, rather than *per day*, the IFM program will favor small capacity vessels that make short, daily trips and land fresh fish. Other vessels, which do not otherwise harvest at a higher daily rate, will be disproportionately impacted and likely subject to a higher monitoring coverage rate. The inequity of this outcome is only heightened by the fact that these same vessels may declare into herring only incidentally, or without any real intention of primarily targeting herring.

App. at 17666–17667.

Similarly, in terms of Defendants' speculation about the ability of "herring permit holders . . . to prosecute other species in other fisheries in order to make up for lost herring revenue," the

[7] The potential problem of inequitable treatment based on vessel design was mentioned by a former NEFMC member, Mary Beth Tooley, on behalf of the O'Hara Corporation: "[I]t is important to set equivalent coverage targets for all gear types and sectors in the fishery. The fishery operates in a competitive market and it is imperative to not impose costs on one sector of the fishery that creates imbalanced market access." App. at 16924.

administrative record is teeming with examples of stakeholders suggesting, directly or indirectly, that they cannot simply transition from one fishery or vessel configuration to another. One fisherman, Mr. Grachek, described how his vessel, the "80 foot [F/V] *Anne Kathryn*," was the main source of income for his family and the families of his crew. App. at 13450. Because of the decimation of the groundfish fishery in the wake of the introduction of catch shares and industry-funded monitoring, he is dependent "almost entirely on [s]quid fishing." App. at 13450. As he explained: "My *single licensed*, single vessel fishing business cannot tolerate another financial insult." App. at 13451 (emphasis added). If the NEFMC were to propose a new squid monitoring program, in line with the omnibus measures, Mr. Grachek would be out of luck. Thus, as Mr. Kaelin's declaration implies vis-à-vis Plaintiffs' vessels, it is improper for the government to assume that fishermen can supplement lost income from herring with landings in other fisheries. Some, like Mr. Grachek, lack the necessary permits; others operate boats that cannot be refit for other species of fish. *See* Kaelin Decl. ⁋ 18.

## IV. Mr. Kaelin is not an expert witness and does not seek to offer expert testimony.

In a footnote, Defendants contend that Mr. Kaelin improperly offers expert testimony based on his "opinion" in violation of Federal Rule of Civil Procedure Rule 26(a)(2), as well as Federal Rules of Evidence 702, 703, and 705. *See* Mot. to Exclude at 7 n.1. As a threshold matter, the Court should treat this argument as not properly raised. A court "need not consider cursory arguments made only in a footnote[.]" *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999). If the Court does consider the argument, it should reject it for three reasons.

*First*, district courts admit alleged "expert declarations" as extra-record evidence without observance of the procedural niceties cited by Defendants. For example, as discussed above, *see supra* at pp. 9–10, the plaintiff in *Pritzker*, attached an extra-record declaration to its brief and the

Court agreed to admit it in the face of the government's motion to exclude. *See* 126 F. Supp. 3d at 113–14. That is unsurprising. Under Rule 26, the disclosure of an expert witness is only required in cases set for trial: "[A] part must disclose . . . the identify of any witness it may use *at trial*[.]" Fed. R. Civ. P. 26(a)(2)(A) (emphasis added). But this case is not (and never would be) scheduled for "trial." Pretrial discovery requirements under Rule 26 do not apply. Further, the distinctions between lay and expert testimony, or opinion and factual testimony, have less force in an APA case precisely because the proffered testimony will not implicate a "fact in issue" that the court (or a jury) will need to resolve. In other words, the "whole record" contemplated by Section 706 of the APA contains the "facts" this Court will need. Any extra-record evidence this Court admits will serve as "background information . . . needed 'to determine whether [Defendants] considered all the relevant factors'" in approving the Omnibus Amendment. *Dania Beach*, 628 F.3d at 590 (citation omitted).

*Second*, Mr. Kaelin is not an "expert." His testimony about the economic viability of operating Plaintiffs' vessels at limited capacity, *see* Kaelin Decl. ¶¶ 13–17, or the impossibility of retrofitting those boats for the prosecution of other fish, *see* Kaelin Decl. ¶¶ 13 & 18, is based on personal knowledge acquired as part of his normal employment duties at Lund's Fisheries. *See* Kaelin Decl. ¶¶ 1–4; *see generally* Fed. R. Evid. 602. He is a classic fact witness. Even if any portion of Mr. Kaelin's declaration qualifies as "opinion" testimony, it is still permissible because it is limited to common-sense conclusions informed by Mr. Kaelin's day-to-day experiences in the commercial fishing world. These are conclusions that "result[] from a process of reasoning familiar in everyday life." *See* Fed. R. Evid. 701 Advisory Comm. Note (2000 Amendments). Mr. Kaelin's conclusions do not depend on "scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702." Fed. R. Evid. 701(c). Moreover, "most

courts . . . permit[] the owner or officer of a business to testify to the value or projected profits of [a] business, without the necessity of qualifying . . . as an accountant, appraiser, or similar expert." *See* Fed. R. Evid. 701 Advisory Comm. Note (2000 Amendments) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)).[8]

*Finally*, in terms of the economic feasibility of Plaintiffs continuing to fish at only "15–35% capacity," Pls.' Reply 16 (citing Kaelin Decl. ¶¶ 14–16 & 17), the Court hardly requires expert testimony to draw its own conclusions based on the independently verified capacities of F/V *Eva Marie*, F/V *Enterprise*, and F/V *Retriever*. In a wide array of situations, judges are expected to rely on common sense. *See United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013) (evaluation of probable cause); *Nat'l Labor Relations Bd. v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 307 (D.D.C. 2009) ("[T]he Court does not leave its common sense at the door when it examines a privilege log and the legitimate inferences that it draws[.]"); *see also J.D.B. v. N. Carolina*, 564 U.S. 261, 279–80 (2011) (in custody cases, "judges need no imaginative powers, knowledge of development psychology, training in cognitive science, or expertise in social and cultural anthropology to account for a child's age . . . [but] simply need . . . common sense"). So too here. The Court can conclude for itself that it is unlikely to be economically feasible to operate a large herring boat with fixed operating costs while only filling 15% of the hold with fish.

## CONCLUSION

For these reasons, the Court should deny Defendants' motion and take Mr. Kaelin's declaration under advisement along with the parties' cross-motions for summary judgment.

[8] *See generally Palmer v. Rice*, No. 76-1439, 2005 WL 1278262, at *3–4 (D.D.C. May 27, 2005) (accepting holding of *Lightning Lube, Inc.* but declining to admit purported lay opinion testimony as based on the witness's perception because witness lacked personal knowledge, *e.g.*, did not review relevant business records).

Dated: September 3, 2020

Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
D.C. Bar No. 1024362
Eric R. Bolinder
D.C. Bar No. 1028335

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Phone: (571) 444-2841
ryan.mulvey@causeofaction.org
eric.bolinder@causeofaction.org

*Counsel for Plaintiffs*