# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| LOPER BRIGHT ENTERPRISES, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No: 1:20-cv-00466-EGS |
| ) | |
| WILBUR L. ROSS, in his official capacity as ) | |
| Secretary of the Department of Commerce, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

# REPLY MEMORANDUM
# IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.   ARGUMENT ............................................................................................................. 1

A.   The MSA Authorizes The Omnibus Amendment's IFM Requirement. ............................. 2

B.   NMFS Reasonably Interpreted The MSA ........................................................................ 7

   1.   The legislative history supports the legality of the IFM requirement. ........................... 7

   2.   NMFS reasonably considered the costs associated with the Omnibus Amendment's IFM requirement ................................................................................................................. 9

C.   The Omnibus Amendment Is Consistent With National Standards 7 and 8. ..................... 12

   1.   National Standard 7 .................................................................................................... 12

   2.   National Standard 8 .................................................................................................... 15

D.   The IFM Requirement Is Not A Tax, Nor Does It Violate The Expenditure Statutes Identified By Plaintiffs ..................................................................................................... 16

E.   Defendants Complied With The Regulatory Flexibility Act. ............................................ 18

F.   Defendants' Approval Of The Omnibus Amendment And Implementing Regulations Was Procedurally Proper. ........................................................................................................ 19

G.   Plaintiffs' Complaints About the Economic Impacts of the Omnibus Amendment Do Not Present a Cognizable Claim Under NEPA ........................................................................ 21

III.   CONCLUSION ........................................................................................................... 25

i

## TABLE OF AUTHORITIES

CASES                                                                              PAGE

*ANR Pipeline Co. v. FERC*,
    205 F.3d 403 (D.C. Cir. 2000) ................................................. 22

*Associated Fisheries of Maine v. Daley*,
    127 F.3d 104 (1st Cir. 1997) ................................................. 18, 19

*Auer v. Robbins*,
    519 U.S. 452 (1997) ................................................. 6

*C & W Fish Co. v. Fox*,
    931 F.2d 1556 (D.C. Cir. 1991) ................................................. 12

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*,
    889 F.3d 584 (9th Cir. 2018) ................................................. 22

*Carver v. United States*,
    16 Ct. Cl. 361 (1880) ................................................. 17

*Chevron U.S.A. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984) ................................................. passim

*Coastal Conservation Ass'n v. U.S. Dep't of Commerce*,
    Civil Action No. 15-1300, 2016 WL 54911 (E.D. La. Jan. 4, 2016) ................................................. 3, 5

*Coastal Conservation Ass'n v. U.S. Dep't of Commerce*,
    846 F.3d 99 (5th Cir. 2017) ................................................. 3, 6

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
    192 F. Supp. 3d 54 (D.D.C. 2016) ................................................. 2

*EchoStar Satellite LLC v. FCC*,
    704 F.3d 992 (D.C. Cir. 2013) ................................................. 5

*Ecosystem Inv. Partners v. Crosby Dredging, LLC*,
    729 Fed. App'x 287 (5th Cir. 2018) ................................................. 22

*Found. on Econ. Trends v. Lyng*,
    817 F.2d 882 (D.C. Cir. 1987) ................................................. 22

*Goethel v. Pritzker*,
    854 F.3d 106 (1st Cir. 2017) ................................................. 6, 23

*Goethel v. Pritzker*, Civil No. 15–cv–497–JL,
    2016 WL 4076831 (D.N.H. July 29, 2016) ................................................................. passim

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    559 U.S. 280 (2010) .................................................................................................... 6

*Groundfish Forum v. Ross*,
    375 F. Supp. 3d 72 (D.D.C. 2019) .............................................................................. 5

*Grunewald v. Jarvis*,
    776 F.3d 893 (D.C. Cir. 2015) .................................................................................... 22

*Gulf Fishermen's Ass'n v. NMFS*,
    No. 19-30006, 2020 WL 4433100 (5th Cir. Aug. 4, 2020) .......................................... 3

*Gunpowder Riverkeeper v. FERC*,
    807 F.3d 267 (D.C. Cir. 2015) .............................................................................. 22, 23

*Hercules v. United States*,
    516 U.S. 417 (1996) .................................................................................................... 17

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ................................................................................................ 6

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) .................................................................................................... 22

*Lexmark Int'l v. Static Control Components*,
    572 U.S. 118 (2014) .................................................................................................... 22

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) .................................................................................................... 24

*Marx v. Gen. Revenue Corp.*,
    568 U.S. 371 (2013) .................................................................................................... 6

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983) .................................................................................................... 22

*Michigan v. EPA*,
    576 U.S. 743 (2015) .................................................................................................... 5

*N.C. Fisheries Ass'n v. Gutierrez*,
    518 F. Supp. 2d 62 (D.D.C. 2007) ........................................................................ 16, 18

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ........................................................................................ 10

*Nat'l Women, Infants, & Children Growers Ass'n v. Food & Nutrition Serv.*,
    416 F. Supp. 2d 92 (D.D.C. 2006) .................................................................. 18

*New York Stock Exchange v. SEC*,
    962 F.3d 541 (D.C. Cir. 2020) .......................................................................... 5

*Oceana v. Locke*,
    831 F. Supp. 2d 95 (D.D.C. 2011) .................................................................... 4

*S. Offshore Fishing Ass'n v. Daley*,
    995 F. Supp. 1411 (M.D. Fla. 1998) ............................................................... 19

*Silver Buckle Mines v. U.S.*,
    117 Fed. Cl. 786 (Fed. Cl. 2014)..................................................................... 17

*Tingzi Wang v. U.S. Citizen & Immigration Servs.*,
    375 F. Supp. 3d 22 (D.D.C. 2019) .................................................................... 2

*Tx. Rural Legal Aid v. Legal Services Corp.*,
    940 F.2d 685 (D.C. Cir. 1991) .......................................................................... 6

STATUTES

5 U.S.C. § 603(a) ................................................................................................ 18

5 U.S.C. § 603(b) ................................................................................................ 18

5 U.S.C. § 604(a) ................................................................................................ 18

5 U.S.C. § 604(b) ................................................................................................ 18

5 U.S.C. § 706(2)(C) ............................................................................................. 2

16 U.S.C. § 1851(a)(7)................................................................................. passim

16 U.S.C. § 1851(a)(8)........................................................................................... 4

16 U.S.C. § 1853(a)(1)(A) ................................................................................. 3,7

16 U.S.C. § 1853(a)(1)(B) .................................................................................. 20

16 U.S.C. § 1853(a)(5)........................................................................................... 7

16 U.S.C. § 1853(b)(1)(A) ................................................................................. 20

16 U.S.C. § 1853(b)(8) ................................................................................. 3, 7, 8

16 U.S.C. § 1853(b)(14) ................................................................................... 3, 7

16 U.S.C. § 1853(c) ............................................................................................ 19

16 U.S.C. § 1854(a)(5) ............................................................................................ 20

16 U.S.C. § 1854(b) ................................................................................................. 20

16 U.S.C. § 1858(g) ............................................................................................... 4, 7

16 U.S.C. § 1858(g)(1)(D) ........................................................................................ 4

16 U.S.C. § 1858(g)(1)(D)(i)-(iv) ............................................................................. 4

16 U.S.C. § 1862(a) ............................................................................................... 8, 9

16 U.S.C. § 1862(b)(2)(B) ......................................................................................... 8

16 U.S.C. § 1862(b)(2)(E) ......................................................................................... 8

## FEDERAL REGULATIONS

40 C.F.R. § 1502.9(c) .............................................................................................. 24

40 C.F.R. § 1508.14 ................................................................................................. 24

50 C.F.R. § 600.340(c) .............................................................................................. 4

## OTHER AUTHORITIES

S. Rep. No. 101-414, reprinted in 1990 U.S.C.C.A.N. 6276 ....................................... 9

H. R. Rep. No. 101-393 .............................................................................................. 8

## I.     INTRODUCTION

In their Reply in support of their Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment (ECF 22 & 23) ("Pl. Opp."), Plaintiffs continue to assail Defendants' approval of the New England Fishery Management Council's Omnibus Amendment and the regulations that the National Marine Fisheries Service ("NMFS") developed to implement the Omnibus Amendment.  Plaintiffs repackage their earlier arguments, misrepresent Defendants' positions, and either fail to address the points raised in Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (ECF 20-1), or offer any support for their flawed positions.  Plaintiffs also urge the Court to reject the standard of review established in *Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), and decline to grant deference to Defendants in their interpretation of the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), even though many of the cases on which they rely engaged in the *Chevron* analysis that Defendants contend is appropriate here.  It is plain that Plaintiffs disagree, and are dissatisfied, with the Omnibus Amendment. But the question before the Court is whether the omnibus measures and herring measures in the Omnibus Amendment comply with the MSA and other laws.  The answer is clearly yes.  Defendants considered the available information and viewpoints, and explained themselves. That information supports Defendants' conclusions. Plaintiffs' desire for a different outcome is irrelevant.  The Court should deny Plaintiffs' motion, and grant Defendants' cross-motion.

## II.     ARGUMENT

Plaintiffs argue that this Court should not decide the question of Defendants' authority to implement the industry-funded monitoring ("IFM") requirement under the two-step test articulated in *Chevron*.  Pl. Opp. 2-3.  Instead, Plaintiffs contend that the Court should ask only whether

Congress granted Defendants the power to implement the IFM requirement as set forth in the Omnibus Amendment, looking first at the statutory text of the MSA and then the legislative history.[1]  *Id*.  Notably, Plaintiffs rely on cases in which the plaintiffs explicitly relied on 5 U.S.C. § 706(2)(C), although Plaintiffs do not cite that statutory provision in their briefs in this case.  *E.g*., *Tingzi Wang v. U.S. Citizen & Immigration Servs*., 375 F. Supp. 3d 22, 38 (D.D.C. 2019) (plaintiff alleged that agency "exceeded its statutory authority and engaged in *ultra vires* agency action under 5 U.S.C. § 706(2)(C)" by denying his petition").  Plaintiffs also urge this Court to apply "three basic tenets of administrative law," Pl. Opp. 3, but then fail to actually apply those tenets to the facts in this case.  Instead, they argue within the *Chevron* framework that they say is inapplicable here.  *E.g.*, Pl. Opp. 4, 7 (engaging in *Chevron* step one analysis); *id*. at 17 (discussing *Chevron* step two analysis).[2]

Whether the IFM requirement is viewed through the test for determining whether an agency action is *ultra vires* (which, according to Plaintiffs, asks whether Defendants exceeded their statutory authority) or whether an agency action is arbitrary and capricious under *Chevron* (in which the inquiry at step one is whether Congress has directly spoken to the precise question at issue), the result is the same.  The Omnibus Amendment is lawful.

### A.    The MSA Authorizes The Omnibus Amendment's IFM Requirement.

The MSA authorizes the IFM requirement.  Although Plaintiffs argue that Defendants "ask the Court to jump straight to deferential review" and have tried to "inject ambiguity into the

---

[1]  Plaintiffs now state that the Court should evaluate the legislative history only "[t]o the extent it is relevant."  Pl. Opp. 8.  Notably, Plaintiffs themselves put the legislative history of the MSA at issue when they discussed portions of it in their opening brief.  ECF 18-1 at 20-22.

[2]  Plaintiffs' argument is even more confusing when one considers that the case on which they rely for these "three tenets," *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 65 (D.D.C. 2016), states that "[w]hen reviewing an agency's interpretation of its enabling statute and the laws it administers, courts are generally guided by 'the principles of [*Chevron*].'"

statute," Pl. Opp. 3, 5, Defendants plainly argued in their opening brief that this Court can resolve the question of their authority at *Chevron* step one, which does not require deference to the agency's interpretation of the statute.  ECF 20-1 at 13-16.  To be clear, Congress has spoken directly to this issue by including multiple provisions in the MSA that demonstrate that it confers authority to require the industry to be responsible for the cost of utilizing human observers.  Among these provisions are the broad authorization for developing and implementing conservation and management measures.  Specifically, the MSA authorizes fishery management plans ("FMPs") to include observer requirements as set forth in 16 U.S.C. § 1853(b)(8).  The MSA also requires that FMPs contain measures "necessary and appropriate" for the conservation and management of the fishery, and authorizes FMPs to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery."  16 U.S.C. §§ 1853(a)(1)(A), 1853(b)(14).  Congress's intent is clear: by using the words "necessary and appropriate" throughout the MSA, it granted the agency broad authority to take actions for the conservation and management of the fishery through "empowering language."  *Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, Civil Action No. 15-1300, 2016 WL 54911, at *4 (E.D. La. Jan. 4, 2016) , *aff'd*, 846 F.3d 99 (5th Cir. 2017).[3]  As Defendants explained previously, measures requiring vessel monitoring system unit installation and use, electronic reporting, gear identification and configuration, and vessel and crew restrictions, come with compliance costs.  ECF 20-1 at 14.  The MSA recognizes that fact in numerous sections of

---

[3]   The issues before the Court in this case are different from those in *Gulf Fishermen's Ass'n v. NMFS*, No. 19-30006, 2020 WL4433100, at *5 (5th Cir. Aug. 4, 2020), which the Fifth Circuit described as the agency's claim that it was empowered to act because the MSA failed "to express Congress's unambiguous intent to foreclose the regulation of aquaculture."  Here, Defendants are arguing that the text of the MSA authorizes the imposition of conservation and management measures; requiring vessels to carry observers; and measures that have compliance costs that are appropriate for industry to bear when harvesting fish from a public resource.

the statute and requires, where practicable, minimization of costs and adverse economic impacts

on communities. 16 U.S.C. § 1851(a)(7)-(8) (National Standards 7 and 8). Indeed, the guidelines

associated with National Standard 7 discuss compliance costs, 50 C.F.R. § 600.340(c), and the

agency's interpretation of the National Standards have been held to have persuasive authority.

*Oceana v. Locke*, 831 F. Supp. 2d 95, 117 (D.D.C. 2011). This explicit recognition of compliance

costs, without any enumeration of the kind of costs that are included or excluded, shows the fatal

flaw in Plaintiffs' argument that Congress did not grant NMFS the authority to require IFM.

Section 1858(g), which authorizes permit sanctions when an owner or operator fails to pay

a contractor for observer services, also supports NMFS's position that industry may be obligated

to enter into contracts and pay for observer services. *See* 16 U.S.C. § 1858(g)(1)(D). Plaintiffs do

not dispute that Section 1858(g)(1)(D) is not limited to any specific fishery or region, Pl. Opp. 12-

13, nor to any of the three sections of the MSA that Plaintiffs claim are the sole authority for

assessing costs to the industry. *Compare* ECF 18-1 at 15 *with* Pl. Opp. at 12-13. Thus, there is no

textual support for Plaintiffs' suggestion that Section 1858(g) applies only to specific geographic

regions and fisheries. If the authority to require IFM was as narrow as Plaintiffs allege, surely

Congress would have tailored it here, with specific reference to the provisions on which Plaintiffs

rely. But Congress did not, nor did it use the word "fee" in the text of Section 1858(g). Instead,

the MSA states that if the owner or operator of a vessel fails to make "<u>any payment</u> required for

observer services provided to <u>or contracted by an owner or operator</u>," NMFS can suspend, revoke,

deny, or impose conditions on, the vessel's permit. 16 U.S.C. § 1858(g)(1)(D)(i)-(iv) (emphasis

added). In other words, a vessel must pay for the observer services it has contracted for as a

condition for participating in the fishery. Reading the statute as a whole as argued by Plaintiffs,

Section 1858(g)(1)(D)'s language is evidence that Congress allowed NMFS to approve FMPs and

implementing regulations that require IFM.

Citing "precedent," Plaintiffs dispute that the MSA's "necessary and appropriate" clause serves as statutory authority for the IFM requirement.  Pl. Opp. 10-12.  But there actually is precedent for Defendants' position that the MSA's "necessary and appropriate" language confers a broad grant of authority.  *See Coastal Conservation Ass'n*, 2016 WL 54911, at *4, *see also Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 83-84 (D.D.C. 2019) (the words "necessary and appropriate" are part of a "broad definition" of "conservation and management measures"). Instead of addressing relevant case law interpreting the MSA, Plaintiffs instead try to draw parallels with cases construing other statutes with mismatched facts that have no relevance here. Pl. Opp. 10-11.[4]  For example, in *New York Stock Exchange v. SEC*, 962 F.3d 541 (D.C. Cir. 2020), the D.C. Circuit held that the SEC improperly relied on "necessary and appropriate" language in the Securities and Exchange Act in adopting a rule to establish a pilot program, while failing to consider costs. Plaintiffs argue that *Michigan v. EPA*, 576 U.S. 743 (2015), applies as well, where the Court rejected EPA's reliance on "necessary and appropriate" language in the Clean Air Act as the basis for declining to consider costs.[5]  As a legal matter, neither case vitiates the fundamental proposition that the term "necessary and appropriate" is broad authority.  In fact, *Michigan v. EPA* recognizes "the capaciousness of this phrase." 576 U.S. at 752.  Nor does either case interpret that phrase as it is used in the MSA, or displace other court decisions which have.  *See supra*.  As a factual matter, Plaintiffs' statement that costs to industry were not considered in the course of the decisionmaking on the Omnibus Amendment is baseless.  *See* Section II.B.2, *infra*.

---

[4]  For the same reason, Plaintiffs' reliance on *EchoStar Satellite LLC v. FCC*, 704 F.3d 992, 999 (D.C. Cir. 2013), is misplaced.  *See* Pl. Opp. 11.

[5]  Both *Michigan v. EPA*, 576 U.S. at 751, and *N.Y. Stock Exchange*, 962 F.3d at 552, were decided under the *Chevron* standard of review that Plaintiffs contend is inappropriate here.

Plaintiffs continue to assert that the Court should apply the *expressio unius* canon to their claim that the MSA does not authorize the IFM requirement because the MSA allows NMFS to impose coverage requirements on the industry in some fisheries, but not in the Atlantic herring fishery. Pl. Opp. 6-8.[6]  As stated in Defendants' opening brief, the Court should decline to apply this canon.[7]  ECF 20-1 at 17.  In a challenge to a different FMP that established quotas and other management measures, the Fifth Circuit held that "the canon does not apply 'unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.'" *Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, 846 F.3d 99, 106 (5th Cir. 2017) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013)).  When one reads the statutory text together, as a whole, as the law requires, it is clear that no such assumption can be made here.  *See Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 289 (2010) (a statute must be read as a whole). Another court construing the exact same argument that Plaintiffs make here with respect to an IFM requirement in another fishery unambiguously rejected the *expressio* canon.  *See Goethel v. Pritzker*, Civil No. 15–cv–497–JL, 2016 WL 4076831, at *5 (D.N.H. July 29, 2016), *aff'd*, 854 F.3d 106 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 221 (2017).

As a factual matter, moreover, the Court should not apply the *expressio* canon because there are differences between the fees that are allowed in the North Pacific Fishery as set out in

---

[6]  Plaintiffs' citation to and extended discussion of *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) has no relevance here.  *See* Pl. Opp. 4, 7. That case concerned deference to an agency's interpretation of an ambiguous regulation pursuant to *Auer v. Robbins*, 519 U.S. 452 (1997).  Here, the question before the Court is one of statutory interpretation.

[7]  Without any authority, Plaintiffs contend that the court's rejection of the *expressio unius* canon in *Tx. Rural Legal Aid v. Legal Services Corp.*, 940 F.2d 685 (D.C. Cir. 1991), does not apply because Congress has not granted Defendants the authority to impose the IFM requirement. Pl. Opp. 6. Defendants have already refuted Plaintiffs' assertion regarding Congress's grant of authority, their assertion that Defendants mischaracterized the holding of *Tx. Rural Legal Aid*, and their contention that the case does not apply. The distinction they attempt to make does not exist.

Section 1862 and the costs of complying with the Omnibus Amendment's IFM requirement that is authorized by Sections 1853(a)(1)(A), 1853(a)(5), 1853(b)(8), 1853(b)(14), and 1858(g). *See* Section B.1, *infra*. Although Section 1853(b)(8) and Section 1862 were added to the statute at the same time, the statutory provisions providing the North Pacific Counsel with the authority to require all fishery participants to pay fees to the government for the administrative costs of monitoring do not explicitly or impliedly foreclose other Councils from requiring industry participants to carry observers on their vessels and pay service providers for the costs of that service. *See id*. In light of the MSA's expansive authorization to take action for the conservation and management of the fishery and the ample statutory support for the IFM requirement, the Court should decline to apply the *expressio* canon.

Congress expressly provided the Council broad authorization for developing and implementing conservation and management measures, including FMPs that have observer requirements. The MSA further includes provisions that make clear that industry may be required to bear the costs of those conservation and management measures, including specific reference to payment for observers. The Court plainly can find that the MSA has spoken directly to this issue.

### B.    NMFS Reasonably Interpreted The MSA.

If the Court determines that Congress has not spoken directly on the issue of NMFS's authority, it should find NMFS's interpretation of the MSA to allow the Omnibus Amendment's IFM requirement is reasonable nonetheless.

### 1.    The legislative history supports the legality of the IFM requirement.

Plaintiffs waver on whether the MSA's legislative history is relevant to the inquiry before the Court, but argue nonetheless that certain portions of the MSA's legislative history support their position. Pl. Opp. 8-10. Relying on Section 1862, which added the North Pacific Fisheries

Research Plan to the MSA in 1990, Plaintiffs argue that Congress only granted the North Pacific Council the authority to require fees for certain FMPs. *Id*. at 8. But, as the court stated in *Goethel*, the fact that fees are addressed in Section 1862, but costs are not addressed specifically in Section 1853 "does not 'support [] a sensible inference' that the MSA forbids an FMP amendment under which industry must bear the cost of certain regulations." *See Goethel*, 2016 WL 4076831, at *6.[8] In enacting Section 1853(b)(8), NMFS confirmed the authority already implicit in the MSA to require observers on domestic fishing vessels at the vessel's expense of using the observer services. *See* Comm. on Merchant Marine & Fisheries, H.R. Rep. No. 101-393 at 28 ("[T]his subsection allows the Councils to require that observers be carried on board domestic fishing [vessels] for data collection purposes. The Committee notes that the Councils already have—*and have used*— such authority; the amendment makes the authority explicit.") (emphasis added). While Plaintiffs contend that this language relates only to the authority to carry observers, Pl. Opp. 11-12, the reality is that the authority also was being administered so as to require industry members to pay for their respective vessel's expenses, and the language of the committee report supports the idea that it would continue to be used in that manner.

Indeed, Plaintiffs' insistence that Section 1862 operates to exclude NMFS from exercising its authority to require vessels to bear their costs of observer services stretches too far, as the fees permitted by that section are a different mechanism than the one at issue in this case. Section 1862(a) allowed the Council to establish user fees that include administrative and other specified costs that may be distributed fairly and equitably to all fishery participants. *See also* 16 U.S.C. § 1862(b)(2)(B), (E). This was a change from prior law, rather than placing the direct cost of carrying

---

[8] Plaintiffs acknowledge that Section 1862 established a system of fees, Pl. Opp. 9, but do not acknowledge the inherent difference between a fee and a cost. *See infra*.

observers only on the vessels that carried them.  S. Rep. No. 101-414, at 8, reprinted in 1990 U.S.C.C.A.N. 6276, 6283 (prior to the amendments, the North Pacific Council did not have "authority to implement an equitable funding mechanism").  The 1990 amendments provided the North Pacific Council an alternative to its existing observer program where industry paid for the costs of carrying observers on their vessels. In enacting Section 1862(a), Congress allowed fisheries in the North Pacific to employ a specific funding mechanism (a fee) for specific industry-wide costs that would be paid to the government, and usage of the fees for those costs, while leaving NMFS discretion to require vessels to pay for costs that they incur for use of observer services in the North Pacific and other fisheries.

Finally, as noted in Defendants' opening brief, Congress has amended the MSA several times since the 1990 amendments. ECF 20-1 at 19-20. Congressional committees have expressly acknowledged that vessels in the Northeast groundfish fishery are bearing the direct costs of monitoring through a requirement much like the one at issue here.  *Id*. (listing House and Senate reports from 2015-2019, in which Congress discussed the costs borne by industry).  But Congress has taken no action to override the agency's authority, nor to correct the agency's understanding of its authority.  *Id*.  Accordingly, Plaintiffs' interpretation of the legislative history cannot stand.

### 2.  NMFS reasonably considered the costs associated with the Omnibus Amendment's IFM requirement.

Plaintiffs complain that IFM is unlike the compliance measures imposed by other statutes, and that IFM is more like an inspection measure required under other statutes for which government bears the cost.  Pl. Opp. 13-14.  This argument is based on nothing more than Plaintiffs' characterization of at-sea monitors as "government minders." Pl. Opp. 16.  At-sea monitors, however, simply gather data on fishing gear, tow-specific information, and biological information on retained and discarded catch, functioning solely as the sort of reporting requirement

that Plaintiffs attempt to distinguish.  AR17735.  In making these distinctions, Plaintiffs fail to identify any examples of a court invalidating a payment regime such as the one at issue.  Indeed, as the *Goethel* court observed, their characterization of these costs as somehow different is semantics.  *Goethel*, 2016 WL 4076831, at *6.

Moreover, Plaintiffs miss the fundamental point:  participation in the fishery (which allows the harvesting of a public resource) carries all kinds of costs.  NMFS regulations require fishing vessels to fish with certain gear types or mesh sizes, ensure the safety of the vessel before an observer may be carried on the vessel, install vessel monitoring system ("VMS") units for monitoring vessel positions and fishing, and report catch electronically.  AR17739.  Plaintiffs apparently do not take issue with any of these requirements, even though the funding mechanisms for them are not directly authorized by the MSA.  Vessels pay third-parties for the costs of goods or services needed to comply with these regulatory requirements, which are authorized by the MSA. AR17739.  The IFM requirement is no different:  NMFS has determined that monitoring is necessary in the herring fishery, and industry should bear the cost of that requirement, just as industry bears the costs of these other requirements.  This is consistent with the maxim that "[g]overnment regulation typically imposes costs on the regulated industry."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 652 (2012) (Scalia, J., Kennedy, J., Thomas, J., Alito, J., dissenting).[9]  Plaintiffs state that the Omnibus Amendment imposes costs that are "unlike other compliance measures" imposed by regulation, Pl. Opp. 13-14, and draw an arbitrary line between compliance costs associated with the IFM requirement and those subsumed by other regulatory

---

[9]  Plaintiffs repeatedly characterize the IFM requirement as a cost-shifting requirement.  Pl. Opp. 1, 5, 8, 13, 14.  The herring measures in the Omnibus Amendment, however, delineate between industry costs and government costs to avoid any cost shifting.  AR17732-33.  Thus, their statement that the IFM requirement "shifts" costs demonstrates a fundamental misunderstanding of the Omnibus Amendment.

regimes.    These are artificial distinctions, however, that are based solely on Plaintiffs'
characterization of at-sea monitors as intrusive passengers on vessels participating in the fishery.

The simple difference, Plaintiffs assert, is that the cost associated with the IFM requirement
is too high to bear.  Pl. Opp. 15.  They go to great lengths to argue that the costs associated with
installing VMS units and paying the annual service fee are much lower to vessel owners than the
costs associated with the IFM requirement,[10] and attack the costs associated with purchasing
observer coverage to gain access to the Groundfish Closed Areas.  *Id.*[11]  Indeed, Plaintiffs assert
that the costs to midwater trawl vessels will be higher than for other vessels and that the waiver
available to vessels that intend to land less than 50 metric tons of herring is not a feasible option
for them.  *Id.* at 16.  This position was expressed during the development of the IFM requirement.
*Id.* at 16-17 (citing AR17713-15). After considering those comments, the Council chose not to
carve out an exception for such vessels or afford them special treatment.  AR17742-43.

Here, NMFS considered costs throughout its decisionmaking, from its analysis of costs in
the EA, to its evaluation of public comments regarding the IFM requirement.  *E.g.*, AR17241-50
(providing background on economic impacts and estimating industry's cost responsibility at
$710/day); AR17734 ("industry's cost responsibilities associated with a 50-percent coverage

---

[10]    Plaintiffs' Opposition/Reply brief attached an extra-record declaration from Jeffrey Howard
Kaelin of Lund's Fisheries, Inc.  *See* n.11, *infra.* This case is governed by the Administrative
Procedure Act's scope and standard of review and, therefore, this Court should not consider Mr.
Kaelin's declaration.  Defendants have filed a separate motion to exclude the declaration and any
portion of Plaintiffs' Opposition/Reply brief on which it relies.  ECF 24.

[11]    Plaintiffs now suggest that the costs associated with purchasing observer coverage to access
Groundfish Closed Areas are too high.  Yet, one commenter affiliated with Plaintiffs made no such
argument during the comment period on the Omnibus Amendment.  Lund's Fisheries, which is
alleged in the Complaint to be associated with Plaintiffs Lund Marr Trawlers and Scombrus One,
Compl. ¶ 19, stated that it "appreciate[d] the amendment allowing midwater trawl vessels to
purchase fishery monitors, rather than have no NEFOP observer available, if a vessel intends to
access a Groundfish Closed Area during a trip."  AR17683.  Obviously, accessing the Groundfish
Closed Area is a vessel's voluntary decision.

target are substantially less than those associated with higher coverage targets"); *id*. ("[c]ombined coverage targets are intended to help reduce the cost of industry-funded coverage"); AR17741 (responding to comment asserting that the IFM requirement would impose an economic burden); AR17742 (concluding that the Council's measures minimize costs to maximum extent practicable). NMFS also considered costs in the context of assessing whether the IFM requirement complied with National Standards 7 and 8. AR17315-16; AR17346; *see* Section II.C, *infra*. The administrative record plainly refutes any suggestion that NMFS failed to consider cost or otherwise acted in an unreasonable manner.

###    C.    The Omnibus Amendment Is Consistent With National Standards 7 and 8.

In reviewing an FMP or an amendment to an FMP, the Court's task "is not to review *de novo* whether the amendment complies with [the ten National Standards] but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1562 (D.C. Cir. 1991) (citations omitted). The Omnibus Amendment satisfies National Standards 7 and 8.

###    1.    National Standard 7

In their opening brief, Plaintiffs focused their National Standard 7 argument only on the measures concerning the Atlantic herring fishery. ECF 18-1 at 28-29 (claiming that costs associated with the IFM requirement would have severe economic consequences for the herring fishery). While conceding that it "may be true" that the IFM requirement itself avoids the sort of duplication discouraged by National Standard 7, Pl. Opp. 22, Plaintiffs now dispute that the omnibus measures violate National Standard 7's requirement to "avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7); *see* Pl. Opp. 22 (contending that future IFM programs established pursuant to the procedures set by the Omnibus Amendment may violate National Standard 7). But any

assertion that an IFM requirement established in another fishery in the future could lead to duplication in violation of National Standard 7 is blatantly speculative, and cannot form the basis of a challenge in this case.  Pl. Opp. 22.  No such requirement has yet been proposed, much less established.  To clarify, the omnibus measures only establish a process for FMP-specific industry-funded monitoring to be implemented through an FMP amendment.  AR17732.  And the document that Plaintiffs cite for the proposition that the Council "explicitly refused" to address the omnibus alternatives' consistency with the National Standards says no such thing.  Pl. Opp. 23.  Rather, as the environmental assessment ("EA") explains, the Council recognized that the omnibus measures are administrative and "facilitate the establishment of future monitoring programs in a manner that is consistent with the National Standards." AR17311. This ensures that future IFM requirements will be consistent with the National Standards.  *Id*.  Thus, there is no basis for Plaintiffs' claim.

Second, Plaintiffs complain that the herring measures violate National Standard 7 because midwater trawl vessels will have a higher level of IFM coverage than herring vessels using other gear that have higher levels of federally funded Standardized Bycatch Reporting Methodology ("SBRM") coverage that mitigates their IFM costs.  Pl. Opp. 23.  But this is exactly the point:  the herring measures focus monitoring coverage on the vessels with the largest herring catch, AR17736, AR17742, which, according to Plaintiffs, also happened to have lower levels of SBRM coverage and thus, lower monitoring.  The vessels in the herring fishery will have either SBRM coverage or IFM coverage on a fishing trip, but not both on the same trip, thus avoiding duplication in compliance with National Standard 7.  AR17734; AR17315.  That the IFM requirement may have a financial impact on midwater trawl vessels cannot save Plaintiffs' claim under National Standard 7 because National Standard 7 specifically recognizes that regulation of the fishery carries inherent costs for the industry.  16 U.S.C. § 1851(a)(7).  All that is required is that

"[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). The herring measures offer multiple ways for minimizing costs in order for midwater trawl vessels to continue their voluntary participation in the herring fishery, including but not limited to an exempted fishing permit ("EFP") for midwater trawl vessels that choose to use electronic monitoring together with portside sampling. AR17736-37, AR17742. These measures are consistent with this National Standard.

Plaintiffs vaguely argue that the Council should have engaged in a "[m]ore detailed analysis" regarding the coverage alternative selected, and suggest that there was both inadequate discussion of maintaining the status quo (i.e., continuing only SBRM coverage in the Atlantic herring fishery so that there is no IFM requirement) or a 100% coverage alternative. Pl. Opp. 22-25. But, as outlined in NMFS's opening brief, a full explanation was given for the 50% coverage target for vessels with Category A and B herring permits. This coverage target was selected because it provides the benefits of collecting necessary additional catch information while practicably minimizing industry costs. AR17005-06, AR17030, AR17070-71, AR17315, AR17346. The EA demonstrates that less costly alternatives were considered, including no additional coverage (the status quo option preferred by Plaintiffs) and a 25% coverage target. *E.g.*, AR17075, AR17082, AR17083. The administrative record also shows that the Council considered both lower and higher coverage targets (of 75% and 100%), but chose the 50% coverage target as a balance of the costs and benefits of additional monitoring. AR17734; *see* AR17257. Measures that minimize the costs to the extent practicable are included. *E.g.*, AR17315 (waiver for trips that land less than 50 metric tons ("mt")); AR17736-37 (exempted fishing permit for midwater trawls); *see also* AR17738, 17742. Plaintiffs ignore this discussion, choosing instead to cite a single page

from the administrative record, as if to suggest that this is all that was done.  Pl. Opp. 25 (citing AR17315).  As outlined above, the administrative record plainly refutes their argument.

Finally, Plaintiffs state that the Court should not apply the rule of reason when analyzing their National Standard 7 claim.  Pl. Opp. 25 n.12.  There is no legitimate reason against applying the rule of reason in this case:  Plaintiffs' claim is nothing more than a demand that they be absolved of bearing the costs of participating in the Atlantic herring fishery.  National Standard 7 specifically recognizes that costs to vessels are an inherent part of conservation and management measures, 16 U.S.C. § 1851(a)(7), demonstrating that Plaintiffs' claim has no merit.  Moreover, as demonstrated above, Defendants considered costs and made a reasonable decision.

### 2.    National Standard 8

Plaintiffs argue that the IFM requirement does not comply with National Standard 8 because it serves no underlying conservation need and it will have a decimating effect on the herring fleet.  Pl. Opp. 25-26.  Neither argument has merit.

First, NMFS fully explained the conservation value associated with additional monitoring, which is expected to reduce uncertainty around catch estimates in the herring fishery, and help improve the tracking of catch against catch limits.  AR17316.  This, in turn, will help improve management of the fishery.  *Id.*  If increased monitoring reduces uncertainty of catch tracked against catch caps, herring vessels may be more constrained by catch caps, thereby increasing accountability, or they may be less constrained by catch caps and better able to fully harvest herring sub-annual catch limits.  AR17789.  Improving the ability to track catch against catch limits is expected to support the herring fishery achieve optimum yield and minimize bycatch and incidental catch to the extent practicable.  *Id.*; *see also* AR17742.  In short, it will benefit future stock assessments and overall management with the potential of helping the fishery achieve

optimum yield and reduce bycatch and incidental catch to the extent practicable.  AR17790. The conservation benefits associated with monitoring cannot be denied.

Second, Plaintiffs quarrel about the costs imposed by the IFM requirement.  Consistent with National Standard 8, however, the IFM requirement includes measures that are aimed expressly at minimizing adverse economic impacts to participants in the herring fishery, to the extent practicable.  Such measures include the 50% coverage target, the exemption for trips that land less than 50 mt of herring, the combined SBRM and IFM coverage target, and the potential to use EFP for electronic monitoring/portside sampling, which may be a more cost-effective alternative.  AR17742.  While Plaintiffs dismiss these measures as "favor[ing] a small portion of the fleet," Pl. Br. 26, the Council considered this issue when it was raised during the comment period and determined that the measures are appropriate nonetheless.  AR17742-43.  In part, NMFS noted that the potential for high herring catches onboard other vessels (including those in the midwater trawl fleet, as Plaintiffs note) "warranted additional monitoring."  AR17743.

The statutory text and implementing regulations of National Standard 8 make clear that Congress intended "conservation efforts [to] remain the Secretary's priority, and that a focus on the economic consequences of regulations not subordinate this principal goal of the MSA." *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 91-92 (D.D.C. 2007). The IFM requirement is consistent with this principal goal and, therefore, National Standard 8.

**D.    The IFM Requirement Is Not A Tax, Nor Does It Violate The Expenditure Statutes Identified By Plaintiffs.**

Defendants' opening brief demonstrated that the IFM requirement is not a tax; Plaintiffs fail to make a direct response to those arguments.  *Compare* ECF 20-1 at 35-36 *with* Pl. Opp. 20-21.  Plaintiffs similarly ignore the detailed and specific arguments Defendants made to show that the IFM requirement does not violate the Anti-Deficiency Act ("ADA"), the Miscellaneous

Receipts Statute ("MRS"), and the Independent Offices Appropriations Act ("IOAA").  *Id.*  These

failures are fatal to their claims.

First, Plaintiffs assert that it does not matter that NMFS does not collect money from the

industry or its contracted IFM providers because "the law looks past superficial structures to the

heart of what an agency is trying to accomplish."  Pl. Opp. 21.  Putting aside the fact that Plaintiffs

fail to identify exactly <u>which</u> of the three laws they are talking about, the plain language of these

statutes refutes this baseless assertion.  *See, e.g., Hercules v. United States*, 516 U.S. 417, 427

(1996) (the ADA "bars [an] agency from entering into a contract for future payment of money in

advance of, or in excess of, an existing appropriation"); *Carver v. United States*, 16 Ct. Cl. 361,

381 (1880) (under the MRS, "[t]he Treasurer is the official custodian [of public money] for

Congress, and unless money is in his custody, or in the hands of the persons authorized by law to

receive it on behalf of the United States, it is not in the possession of the United States"), *aff'd*,

111 U.S. 609 (1884); *Silver Buckle Mines v. U.S.*, 117 Fed. Cl. 786, 794 (Fed. Cl. 2014) (IOAA

applies when agencies "recoup the direct and indirect costs of providing goods and services").

Second, Plaintiffs suggest that NMFS controls monitoring service providers and the

relationships between monitoring service providers and vessels.  Pl. Opp. 21.  This is the first time

that Plaintiffs have made such an allegation in support of their MRS claim, but it has no merit in

any event.  Defendants exercise their statutorily authorized regulatory function in ensuring vessel

service providers meet certain required standards set by the Council and that vessel owners comply

with the requirement to have a third-party monitor/observer on board.  Defendants do not receive

any payment from vessels related to the IFM requirement, nor do Defendants maintain control

over the contractual relationship between the vessel and the service provider that the vessel itself

selects.  AR17481 (vessels negotiate and contract directly with providers); AR17741 (categorizing

cost responsibilities allows industry to negotiate better contracts).  Absent facts to the contrary, Plaintiffs have not demonstrated any violation of the MRS, and have similarly failed to show a violation of the ADA or the IOAA, or that the IFM requirement constitutes a tax.  The Court should enter judgment for Defendants on these claims.

> ### E.    Defendants Complied With The Regulatory Flexibility Act.

The RFA requires an agency to make a "reasonable, good-faith effort," prior to the issuance of a final rule, to inform the public about potential adverse effects of an agency's proposals and about less harmful alternatives.  *Associated Fisheries of Maine v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997); *see also Nat'l Women, Infants, & Children Growers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 108 (D.D.C. 2006).  Sections 603 and 604 of the statute establish the explanations and considerations that an initial regulatory flexibility analysis ("IRFA") and a final regulatory flexibility analysis ("FRFA") "shall contain."   5 U.S.C. §§ 603(b), 604(a).  Here, NMFS's analyses addressed the economic impact from the omnibus measures and the herring measures, leaving no doubt that Defendants complied with these requirements and satisfied their statutory obligations.  AR17339, AR17341-46; AR17744.  As to the herring measures, the IRFA and FRFA track, subsection by subsection, what Congress by statute required an agency to provide in each, 5 U.S.C. §§ 603(a), 604(a), a fact that Plaintiffs do not (and cannot) dispute.  Pl. Opp. 34-36.  This is fatal to Plaintiffs' RFA claim.  *N.C. Fisheries*, 518 F. Supp. 2d at 96.

Instead, Plaintiffs contend (without any support) that they should prevail on their claim because Defendants' analyses were "conclusory." Pl. Opp. 35-36.  This assertion cannot be squared with the administrative record.  Defendants' RFA analyses considered the economic impacts on small entities that could result from the herring measures and described the steps taken to minimize those impacts on small entities as required by the statute.  AR17341-46; AR17744.

The FRFA also addressed the potential impacts associated with other considered alternatives. AR17746-47.  Defendants gave attention to the impacts the proposed actions would have on small entities; disclosed the alternatives that were considered to lessen those impacts; considered public comments; and stated the reasons that support the final decision.  *Associated Fisheries of Maine*, 127 F.3d at 116.  The case cited by Plaintiffs in support of their claim does not apply.  Pl. Opp. 35 (citing *S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1436 (M.D. Fla. 1998)).  There, the agency never prepared an IRFA, which had consequences beyond just the failure to follow a necessary procedural step.  995 F. Supp. at 1436.  As the court stated, the agency might have avoided compounding its error if it had "engage[d] in a careful and meaningful study of the problem from the beginning."  *Id*. In contrast, Defendants' RFA analysis reflects the careful and meaningful study required by the RFA.  Plaintiffs' claim should be dismissed.

### F.    Defendants' Approval Of The Omnibus Amendment And Implementing Regulations Was Procedurally Proper.

Plaintiffs rely heavily on "common sense norms" and purported irregularities for their claim that Defendants should have followed some other unspecified process when approving the Omnibus Amendment and implementing regulations.  Pl. Opp. 36-39. [12]  Their claim is with the statute itself, however, and must be rejected because it lacks a legal basis.  Specifically, Section 1853(c) requires the Council to submit proposed regulations that implement an FMP or FMP amendment to the Secretary "simultaneously with the plan or amendment under [Section 1854]." 16 U.S.C. § 1853(c).  Upon receipt of proposed regulations prepared under Section 1853(c), the Secretary shall "immediately initiate an evaluation of the proposed regulations to determine

---

[12]    Plaintiffs now concede that it is "undisputed" that Defendants "followed the statutorily prescribed timelines for approval of an FMP amendment and implementing regulations."  Pl. Opp. 36.  That admission should be the end of the inquiry.

whether they are consistent with the [FMP or amendment]," the MSA, or other applicable law. *Id*.
§ 1854(b). The MSA defines "immediately" as requiring Secretarial action within five days. *Id*.
§ 1854(a)(5). The sequential "common sense" process that Plaintiffs argue should have been
followed does not appear in the MSA.

Further, consistent with the MSA, the notice of availability for the FMP amendment ("the
NOA comment period") and the proposed rule had separate comment periods of 60 days and 45
days, respectively. *See* 16 U.S.C. § 1853(a)(1)(B), 1853(b)(1)(A).[13] The public had the
opportunity to meaningfully and usefully participate in the process, consistent with the cases on
which Plaintiffs rely. Pl. Opp. 38. And NMFS acted in a manner consistent with the MSA and its
past practice of publishing a notice of availability regarding an FMP or amendment concurrently
with a proposed rule. AR17741. While Plaintiffs suggest that there is no support in the MSA or
its regulations for this practice,[14] the fact that NMFS proceeded as it has done in the past refutes
Plaintiffs' claim that the agency acted in an "irregular" manner.

As Plaintiffs acknowledge, Defendants set out the process they intended to follow for the
notice of availability of the FMP amendment and the notice of proposed rulemaking upfront in the
instructions for public comment on the notice of availability. Pl. Opp. 37. That initial disclosure

---

[13]   A full year passed between NMFS's approval of the Omnibus Amendment on December 18,
2018, and the agency's decision to finalize the implementing regulations. AR17760-62;
AR17769-84 (Decision Memo regarding Final Rule); AR17731-59 (Final Rule as published in the
Federal Register on February 7, 2020). As explained in the administrative record, the partial
government shutdown that began in December 2018 required a re-evaluation of workload priorities
and a delay in completion of the final rule. AR17799-17800. Work on implementation activities
associated with the IFM requirement was ongoing during that year, including development of the
exempted fishing permit, thus refuting any suggestion that the outcome was pre-determined.

[14]   Plaintiffs also suggest that the Council has not addressed this issue as part of a regulatory
requirement to maintain a written procedure for proposed regulations. Pl. Opp. 38. The Council
is not a party to this lawsuit. Any allegations regarding the propriety of the Council's
"organizational documents," *id*., are not properly before the Court, nor are they relevant in light of
the process that Defendants followed, which is consistent with the text of the MSA.

was followed by a statement in the notice of proposed rulemaking regarding the regulations that its decision to approve the Omnibus Amendment was still pending. AR16971. These facts demonstrate that there is no merit to the argument in Plaintiffs' opening brief that NMFS was working outside of the public eye. *See* ECF 18-1 at 41.

Plaintiffs persist nonetheless, claiming that "overlap[ping] the distinct timelines and processes" is "legally fatal" because it shows that Defendants "presum[ed] the legality" of the Omnibus Amendment. Pl. Opp. 36-37. There is no legal support for this argument and the facts show there was no prejudice to Plaintiffs, or any other person or entity who wanted to participate in the notice and comment process. As NMFS explained, the comment periods for the Omnibus Amendment and proposed rule overlapped for 13 days. AR17741. Both the NOA and the proposed rule explained that any public comments received on the Omnibus Amendment or proposed rule during the NOA comment period would be considered in the agency's decision to approve or disapprove the amendment. *Id*. Two organizations took the opportunity to submit comments during both comment periods, showing that NMFS's process was, in fact, clear. AR17655-62 (Cause of Action's comment on Omnibus Amendment); AR17663-67 (Cause of Action's comment on proposed rule); AR17699-709 (Seafreeze Ltd.'s comment on Omnibus Amendment); AR17710-15 (Seafreeze Ltd.'s comment on proposed rule). Importantly, Plaintiffs do not identify any comment for which Defendants failed to provide an adequate response.

### G. Plaintiffs' Complaints About the Economic Impacts of the Omnibus Amendment Do Not Present a Cognizable Claim Under NEPA.

Plaintiffs contend that NMFS violated the National Environmental Policy Act ("NEPA") by failing to take a hard look at the "complete environmental impact" of the Omnibus Amendment. Pl. Opp. 28. But this argument is not based on any failure to consider environmental impacts; it is based solely on the claim that NMFS failed to adequately consider the economic impacts of IFM

on the fishing industry.  This crystallization of Plaintiffs' position in their response brief reveals a

fatal flaw in their claim because economic interests are not cognizable under NEPA.

"NEPA was designed to promote human welfare by alerting governmental actors to the

effect of their proposed actions on the physical environment." *Metro. Edison Co. v. People Against*

*Nuclear Energy*, 460 U.S. 766, 772 (1983).[15]  Numerous courts have explained that the zone of

interests protected by NEPA includes environmental interests, not economic ones.  *See Gunpowder*

*Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) ("[t]he zone of interest protected by

NEPA is, as its name implies, environmental; economic interests simply do not fall within that

zone" (citing *ANR Pipeline Co. v. FERC*, 205 F.3d 403, 307-08 (D.C. Cir. 2000)); *Ecosystem Inv.*

*Partners v. Crosby Dredging, LLC*, 729 Fed. App'x 287, 294 (5th Cir. 2018) (per curiam) (NEPA's

zone of interest covers "environmental injuries and not purely economic ones"); *Cachil Dehe Band*

*of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 606 (9th Cir. 2018) ("purely

economic interests do not fall within NEPA's zone of interests.") (citation omitted).  *See also*

*Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 129 (2014) ("[W]e presume that a

statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests

protected by the law invoked.") (internal quotations marks and citation omitted).

The application of these legal principles in *Goethel v. Pritzker*, 2016 WL 4076831, which

also involved claims related to an IFM requirement in a different fishery, is particularly relevant

---

[15]    As explained in the government's opening brief, NEPA is a procedural statute.  Rather than
dictating substantive results, NEPA requires agencies to take a "hard look" at the environmental
consequences of major federal action.  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).
NEPA is "'not a suitable vehicle' for airing grievances about the substantive policies adopted by
an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald v.*
*Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (quoting *Found. on Econ. Trends v. Lyng*, 817 F.2d
882, 886 (D.C. Cir. 1987)).  Plaintiffs' complaints about the economic impact of the IFM
requirement on their fishing vessels highlights the improper invocation of NEPA here.

here.  With respect to the claim that NMFS violated NEPA by failing to "to adequately assess the economic impact of industry funding," the district court noted that the plaintiffs' briefing "makes no mention of environmental concerns."  *Goethel*, 2016 WL 4076831, at *8.  The *Goethel* court found that "[t]his posture is fatal to [the plaintiffs' NEPA argument] as a party 'must assert an environmental harm in order to come within [NEPA's] zone of interest.'"  *Id.* (quoting *Gunpowder Riverkeeper*, 807 F.3d at 273) (alteration in original)).[16]  Plaintiffs' response brief in this case reveals that the same fatal flaw exists here.  As in *Goethel*, the only impacts Plaintiffs complain of are the economic impacts of the IFM requirement on the Atlantic herring fishing industry.  *See* Pl. Opp. 28 (stating that recent herring catch reductions "will transform the economics of the fishery"); *id.* at 28 (referencing "the uniformly negative expected economic impact of future FMP-specific industry-funded monitoring programs"); *id.* at 31 (asserting that herring catch reductions "will significantly impact the economics of the fishery and the viability of the fleet under an industry-funded monitoring regime"); *id.* at 33 (quoting comment letter addressing the economic impact of recent herring catch limits in addition to the costs of the herring IFM measure).  Plaintiffs' response brief makes no mention of environmental concerns that NMFS failed to consider.[17]  Having rested their NEPA claim solely on economic impacts, Plaintiffs have not brought a cognizable claim under NEPA and the Court should dismiss that claim.[18]

---

[16]  The First Circuit's affirmance of the district court's decision in *Goethel* does not address that court's rejection of the plaintiffs' NEPA claim because the plaintiffs did not raise and preserve the NEPA claim in their opening appellate brief.  *Goethel*, 854 F.3d at 112.

[17]  Plaintiffs use the term "environmental impacts" in their response brief, but the only impacts actually identified are economic impacts.  *See* Pl. Opp. 27-34.

[18]  Social and economic factors remain a consideration under the MSA and National Standard 8, and are addressed in detail in the EA for that reason.  *See* AR17151-177.

Plaintiffs' argument that NEPA was violated because NMFS did not supplement its EA based on herring catch reductions in 2019 and 2020 fails for the same reason.  Pl. Opp. 31-34. First, the omnibus measure was determined to have "no direct impacts" on biological resources or the physical environment, although NMFS recognized that, if the Council developed an IFM program for a particular FMP in the future, there would be negative economic impacts to affected fishing vessels.  AR 17179.  The impacts of the preferred herring alternatives on biological resources were determined to be "not significant," and the impacts of those alternatives on the physical environment were determined to be "negligible."  AR 17189-190.  This is because the herring measures affect monitoring levels rather than harvest specification.  AR 17290.  The EA recognized that the economic impacts of preferred herring alternatives on fishery-related businesses are negative.  *Id*.  But, just as economic impact alone does not require analysis under NEPA in the first instance, new information that relates only to economic impact does not require supplementation of the EA or an environmental impact statement ("EIS") under NEPA.  *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372-73 (1989) (supplementation of an EIS is only necessary if there "are significant new circumstances or information relevant to *environmental concerns* and bearing on the proposed action or its impacts" (emphasis added) (quoting 40 C.F.R. § 1502.9(c) (1987)); *see also* 40 C.F.R. § 1508.14 ("economic or social effects are not intended by themselves to require preparation of an [EIS]").  Here, Plaintiffs have not identified any significant new circumstances or information relevant to environmental concerns and bearing on the omnibus measures or the herring IFM measures.  Indeed, Plaintiffs appear to acknowledge that the herring catch reductions in 2019 and 2020 "have little direct relation to the [Council's] preferred alternatives and the industry-funding requirement . . . ."  Pl. Opp. 32. Instead, Plaintiffs seek supplementation of the environmental analysis solely to address their anticipated changes in the

24

*economic impact* of the IFM regulation due to reductions in herring catch limits, reductions which are not caused or affected in any way by the IFM regulation. As with the rest of their NEPA arguments, Plaintiffs' focus on economic impacts is fatal to this argument, and the Court should reject Plaintiffs' claim that NEPA was violated here because NMFS did not prepare an EIS or supplement the existing EA to address new information related only to economic impacts.

In addition, as detailed in Defendants' opening brief, NMFS did take a hard look at whether the EA supporting the herring IFM measures required supplementation because of the recent catch reductions. ECF 20-1 at 41-43; AR17737-39. The determination that no supplement to the EA was required was well supported. NEPA requires no more in this situation, particularly where there is no indication that those catch reductions have any impact on NMFS's determination regarding the environmental impacts of the administrative omnibus measures or the herring IFM measures.

Plaintiffs' remaining NEPA arguments consist of conclusory or speculative statements that are untethered to the facts of this case as derived from the Administrative Record, or restatements of their arguments regarding the legality of the challenged IFM regulations under the MSA (Pl. Opp. 27) and whether the IFM requirement violates National Standard 8 (Pl. Opp. 30). These arguments are addressed above in Section II.A. and Section II.C.2. NMFS fully complied with NEPA in analyzing the environmental impacts of both the omnibus measures and the herring IFM measures. Plaintiffs' motion fails to establish otherwise and should be denied, and Defendants' cross-motion should be granted as to Plaintiffs' NEPA claim.

## III.   CONCLUSION

Plaintiffs have failed to carry their burden in challenging the Omnibus Amendment. The Court should deny their motion for summary judgment and enter judgment for Defendants.

Dated:  September 4, 2020.               Respectfully submitted,

                                         JEAN E. WILLIAMS,
                                         Deputy Assistant Attorney General
                                         SETH M. BARSKY, Chief
                                         MEREDITH L. FLAX, Assistant Chief

                                         /s/ Alison C. Finnegan
                                         Alison C. Finnegan, Senior Trial Attorney
                                         (Pennsylvania Bar No. 88519)
                                         U.S. Department of Justice
                                         Environment and Natural Resources Division
                                         Wildlife and Marine Resources Section
                                         Ben Franklin Station, P.O. Box 7611
                                         Washington, D.C. 20044-7611
                                         Tel: (202) 305-0500; Fax: (202) 305-0275
                                         alison.c.finnegan@usdoj.gov

                                         /s/ Kristine S. Tardiff
                                         Kristine S. Tardiff
                                         (New Hampshire Bar No. 10058)
                                         United States Department of Justice
                                         Environment & Natural Resources Division
                                         Natural Resources Section
                                         53 Pleasant Street, 4th Floor
                                         Concord, NH 03301
                                         Tel: (603) 230-2583; Fax (603) 225-1577
                                         kristine.tardiff@usdoj.gov

                                         Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2020, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Alison C. Finnegan