# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 20-cv-0466 (EGS) |
| ) | |
| WILBUR L. ROSS, JR., in his official capacity as ) | |
| Secretary of the U.S. Department of Commerce, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## <u>JOINT APPENDIX</u>

As required by Local Civil Rule 7(n), the parties hereby respectfully submit an appendix

containing copies of those portions of the administrative record cited by or relied on by the parties.

Excerpts from the administrative record retain their original pagination.


//



//



//



//

Dated: September 16, 2020

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
D.C. Bar No. 1024362
Eric R. Bolinder
D.C. Bar No. 1028335

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Phone: (571) 444-2841
ryan.mulvey@causeofaction.org
eric.bolinder@causeofaction.org

*Counsel for Plaintiffs*

Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
SETH M. BARKSY, Chief
MEREDITH L. FLAX, Assistant Chief

/s/ Alison C. Finnegan
Alison C. Finnegan, Senior Trial Attorney
(Pennsylvania Bar No. 88519)
U.S. Department of Justice
Environmental and Natural Resources
Division
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0500; Fax (202) 305-0275
alison.c.finnegan@usdoj.gov

/s/ Kristine S. Tardiff
Kristine S. Tardiff
(New Hampshire Bar No. 10058)
United States Department of Justice
Environmental & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583; Fax: (603) 225-1577
kristen.tardiff@usdoj.gov

Attorneys for Defendants

## TABLE OF CONTENTS

February 7, 2013 Observer Funding Meeting Minutes.........................................AR00002–00003

December 31, 2013 Observer Funding Omnibus Development Memo ...............AR00010–00014

September 20, 2013 Letter from John Bullard, GARFO Administrator................AR00028–00029

December 27, 2013 AIS, Inc. Recommendation for Observer Funding................AR00039–00047

August 19, 2014 Omnibus Staff Presentation......................................................AR00776–00787

August 19, 2014 IFM Omnibus Amendment Draft Discussion Document...........AR00796–00818

August 15, 2014 IFM Omnibus Amendment Development Memo .....................AR00878–00896

August 19, 2014 Observer Policy Committee Final Meeting Summary ..............AR00986–00993

December 11, 2014 Letter from Donald Fox, F/V *Lightning Bay*...................................AR001306

January 22, 2015 Observer Policy Committee Final Meeting Summary .............AR01600–01608

June 2012 MRAG Report on ASM Programs in the Herring Fishery.................AR02810–02850

Seafreeze Ltd. Letter to NEFMC ........................................................................AR03405–03406

April 16, 2015 Letter from Ad Hoc Pelagics Coalition to NEFMC .....................AR03475–03476

2014 MAFMC Herring and Mackerel Cost Survey...............................................AR03594–03606

2014 MAFMC Herring and Mackerel Cost Survey with Cover Letter ................AR04936–04952

August 31, 2015 Letter from The Town Dock to NEFMC.............................................AR04969

Monitoring Program Comparison Charts............................................................AR06745–06747

September 28, 2015 Observer Policy Committee Meeting Summary.................AR07481–07488

2014 MAFMC Herring and Mackerel Cost Survey...............................................AR09572–09586

April 2016 IFM Omnibus Amendment Discussion Document ...........................AR10728–10921

January 2017 Public Comments (1 of 2).............................................................AR13449–13464

January 2017 Public Comments (2 of 2).............................................................AR13465–13468

Public Hearing Summaries (October – November 2016) .....................................AR13473–13544

Summary Charts of Public Hearing Comments (1 of 3)................................................AR13801

Summary Charts of Public Hearing Comments (2 of 3)................................................AR13802

Summary Charts of Public Hearing Comments (3 of 3)................................................AR13804

September 2016 IFM Omnibus Amendment (excerpted).....................................AR13817 *et seq.*

April 12, 2017 CoA Institute Letter to NEFMC ..................................................AR15937–15945

April 2017 Correspondence to NEFMC ..............................................................AR15946–15956

September 20, 2016 Notice of Public Hearings...................................................AR16721–16722

2016 Public Hearing Comment Submissions .......................................................AR16725–16968

November 7, 2018 Proposed Implementing Regulations ...................................... AR16969–16991

September 11, 2018 NOAA Decision Memo ............................................................ AR16992–16998

November 6, 2018 NOAA Memo to SBA re RFA ................................................................ AR16999

December 2018 IFM Omnibus Amendment (excerpted) ...................................... AR17000 *et seq.*

December 17, 2018 Environmental Assessment Clearance Memo ................................. AR17638

September 19, 2018 Notice of Availability ............................................................... AR17639–17640

September 11, 2018 Notice of Availability Clearance Memo ......................................... AR17641

2018 Public Comments ............................................................................................ AR17647–17718

October 26, 2017 RFR Clearance Memo ............................................................................ AR17719

February 7, 2020 Final Rule ................................................................................... AR17731–17759

December 18, 2018 Letter from Michael Pentony, GARFO Administrator .......... AR17760–17762

December 18, 2019 Final Rule Decision Memo .................................................... AR17769–17784

December 17, 2018 Omnibus Amendment Decision Memo ................................ AR17785–17798

April 19, 2019 Letter from Michael Pentony, GARFO Administrator ................. AR17799–17800

**Observer Funding AMD 5 PDT and AMD 14 FMAT**
Meeting Minutes

*February 7, 2013*
*Present:*                  Carrie Nordeen (NERO Herring), Mitch MacDonald (NERO GC), Peter
                            Christopher (NERO Herring/Mackerel), Katherine Richardson (NERO
                            NEPA/Mackerel), Melissa Hooper (NERO NE multispecies), Denise
                            Desautels (NERO GC), Jason Didden (MAFMC staff), Lori Steele
                            (NEFMC staff), Drew Kitts(NEFSC), Amy Van Atten (NEFSC Observer
                            Program) and various members of the public

---

**I.    Review of motions, goal and potential vehicle for decisions**

Carrie reviewed the Herring AMD 5 motions regarding observer coverage percentages and
industry funding amounts.  Katherine did the same for Mackerel, Squid, Butterfish AMD 14.
Major points:

- Both 100% observer coverage (reduced coverage for the lower mackerel limited access
  tiers) and a target industry contribution of $325 per sea day are goals.
- Frameworks were discussed as a vehicle  to implement observer coverage cost sharing,
  although AMD 14 includes some latitude to use specifications to adjust industry funding
  amount

**II.   Elimination**

Mitch discussed the basic legal guidance received so far:

- The Anti-deficiency act prevents the Federal government from augmenting its budget with
  outside monies and the Miscellaneous Receipts Act requires any money paid to the
  Federal government to go into the general Treasury, and not toward certain programs.

- Generally, industry funding of all costs above those statutorily required of the Federal
  government is easiest and most common.

- Exceptions exist with the Northwest which has been reimbursing at-sea costs  in
  declining amounts to observer providers through a grant program, slowly moving towards
  100% industry-funding of at-sea costs..

- The reimbursement money goes from NMFS to Pacific States Marine Fisheries
  Association through a grant and then to the observer providers. The NW has an action
  under way to implement a cost recovery fee for agency costs regarding storage and
  analysis of data.  Because neither the Herring nor MSB FMP contain ITQs/catch shares,
  these FMPs have no authority for cost recovery fee programs.

Melissa described some findings from the groundfish cost sharing work:

- Subsidies that have been covering the At Sea Monitors are drying up, industry is required
  by regulations to pay monitoring costs, even without subsidies.
- Preliminary word from DOC-GC is that delineating costs between NMFS and the industry
  does not violate Anti-deficiency or Miscellaneous Receipts Act.

- Some disagreement where the line is between costs incurred from "at-sea activities" vs "overhead" – a detailed list would have to be compiled and reviewed.

**III. Next Steps**

NERO staff will continue work on:
- Documenting the existing continuum of existing programs and authorities to create boundaries for a full range of funding alternatives.
- Delineating which costs may legally be paid by industry vs. NMFS in a shared program.
- Determine actual at-sea and management costs.
- When the above information has been gathered, the development of a full range of alternatives can proceed.
- Council staffers will meanwhile manage information and comments on their respective websites

**MEMORANDUM**

**DATE:**      December 31, 2013

**TO:**        New England Fishery Management Council
              Mid-Atlantic Fishery Management Council

**FROM:**      Industry-funded Monitoring Plan Development Team/Fishery Management
              Action Team

**SUBJECT:**   Observer Funding Omnibus Development


1.  The PDT/FMAT met via conference call on December 5, 2013 to begin work on the omnibus amendment to address observer funding issues.  The PDT/FMAT discussion focused on planning for the omnibus and the scope of draft alternatives.  PDT/FMAT participants included Melissa Hooper, Aja Szumylo, Carrie Nordeen, Mitch MacDonald, Kevin Collins, Katherine Richardson (NMFS NERO), Susan Gardner, Amy Martins, Wendy Gabriel, Andrew Kitts (NMFS NEFSC), Jason Didden, Lee Anderson (MAFMC), and Lori Steele (NEFMC).   Geoffrey Smith, Greg Wells, Joseph Gordon, Mary-Beth Tooley, Shana Moore, Tom Rudolph, James Reinhart, Claire Fitzgerald, Lucy Van Hook, Michael Lake,  Bonnie Brady, Jerry Cygler, Melissa Yuen, JP Bilodeau, Patrick Paquette, Shannon Davis, Shawn Gehan, Eoin Rochford.

2.  NMFS staff recapped the purpose of the omnibus amendment and the charge of the PDT/FMAT.  Northeast Multispecies Framework Adjustment 48, Atlantic Herring Amendment 5, and Mackerel, Squid, and Butterfish Amendment 14, considered sharing the costs for additional monitoring coverage between the industry and NMFS.  These measures did not meet legal requirements, which prevent NMFS and the industry from sharing costs, and thus were disapproved.  NMFS staff presented a proposal to the New England and Mid-Atlantic Councils in September/October to take the lead on an omnibus amendment that would establish a clear delineation of costs for monitoring between the industry and NMFS for all FMPs.  It would also address the issue of limited federal funding to support NMFS infrastructure for industry-funded monitoring programs, and consider industry-funded monitoring requirements for the herring and mackerel fisheries.  The Councils concurred with NMFS' proposal and the PDT/FMAT is charged with developing an initial range of alternatives to present to the Councils in January/February.

Melissa Hooper will chair the PDT/FMAT with assistance from Aja Szumylo and Carrie Nordeen as the NERO leads for Atlantic mackerel and herring.  The PDT/FMAT took some public comment from attendees after each topic.  Council and NMFS staff will discuss a policy for public comment for future meetings.  The meeting was not recorded.  Jason Didden volunteered to set up the webinar for future meetings to enable audio recording. The chair will coordinate communication of future meetings with Council staff.

3.  The PDT/FMAT briefly discussed the interaction of the SBRM Omnibus Amendment and this Observer Funding/Coverage Omnibus Amendment.  The SBRM amendment contains some measures that were originally contemplated for the Observer Funding amendment.  The SBRM amendment contains standards and requirements for observer service providers, which would be standardized across all FMPs.  It also includes an alternative that would make industry-funded observer coverage a frameworkable item in all FMPs.  If these alternatives go forward in the SBRM amendment, they may not need to be included in the Observer Funding omnibus.  But if these alternatives do not go forward in the SBRM amendment, it may be necessary to include them in the Observer Funding amendment in order have operational monitoring programs in the Atlantic herring and mackerel fisheries with this action.  Additionally, the Observer Funding amendment may include alternatives beyond those considered in the SBRM amendment.  For example, the Observer Funding amendment may consider standards for dockside monitoring/port samplers.

4.  The PDT/FMAT reviewed the preliminary timeline for the amendment (Table 1).  Since the range of alternatives is not yet known, the level of necessary NEPA analysis has not been determined.  If the action requires an EIS, the timeline in Table 1 would need to be revised.  The PDT/FMAT discussed publishing a general NOI as soon as possible in case an EIS is needed.  NMFS staff will draft an NOI to begin circulating.

The PDT/FMAT was concerned about the limited amount of time to develop and analyze alternatives.  The timeline was drafted to meet the Councils' target of having operational monitoring programs in the herring and mackerel fisheries with the start of the 2015 fishing year.  The timeline may have to be extended depending on how progress is made, but the timeline in Table 1 is what would be necessary to achieve a Jan. 1, 2015 implementation.

**Table 1 – Preliminary timeline for completing an amendment and EA.  This timeline does not allow for any delays or complications.**

| Timeline | Meeting Schedule | Task |
|---|---|---|
| January/February 2014 | Council Meetings | Councils consider and adopt a range of draft alternatives |
| March-May 2014 | | Develop alternatives and NEPA analysis |
| April 2014 | Council Meetings | Councils receive update |
| June 2014 | Council Meetings | Councils take final action |
| September 2014 | | Proposed rule publishes |
| November 2014 | | Final rule publishes |
| January 2015 | | Implementation of herring and mackerel coverage |

**Monitoring Cost Definitions**

5.  NMFS staff prepared and presented an initial outline of alternatives for the amendment (Attachment 1).  The PDT/FMAT first discussed Alternative Set 1, which lays out the types of costs NMFS and the industry would each be responsible for in future monitoring programs.

Council staff suggested developing an estimate of the costs to industry of Option 1 to illustrate the measure for the Councils. This would difficult to estimate, because the costs differ depending on the fishery and program requirements, but may be possible to do for the NEPA analysis.

The PDT/FMAT considered whether it would be possible to consider additional options for this alternative set, but concluded that it would not be feasible because few options meet the legal requirements. NEPA staff advised that the range of cost definition options would still meet NEPA requirements because of the other legal constraints.

The PDT/FMAT recommended clarifying that "no shows" refers to instances where the vessel operator changed plans or cancelled the trip they previously notified for without updating NEFOP. NEFOP staff reported that this can be a significant problem in some fisheries (70% for some), though not in the herring fishery. NEFOP provides some compensation to observers to make up for the lost opportunity, but not as much as a seaday salary.

The PDT/FMAT also recommended clarifying the terminology used in Option 1 to make clear whether it refers to observers or at-sea monitors. Option 1 is intended to apply to all types of monitoring moving forward, so a general term will need to be identified. The need to clearly and reasonably specify if/when/why/how compensation for "no shows" would be made by vessel operators was discussed as critical if included as an alternative.

**Coverage Prioritization Process**

6. The PDT/FMAT reviewed Alternative Set 2, an outline of a prioritization process for industry-funded monitoring coverage (Attachment 1). The purpose of these alternatives is to establish a process by which the Councils and NMFS can prioritize NMFS' funding for monitoring (above SBRM) when it is not enough to achieve the desired coverage levels in every FMP. The omnibus amendment would establish the prioritization process, and defer to individual FMP actions to establish coverage targets to guide the process. This process would have to defer to specific instructions in the appropriations for certain line items (e.g., X amount must be spent on groundfish monitoring), but would facilitate evaluation of trade-offs given resource limitations and legal constraints.

The PDT/FMAT discussed that this means that coverage levels can no longer be required, but only targeted. If the Council desired 100% coverage of a fleet, it would need to consider requiring vessels not to leave the dock without an observer, as is done in other regions (e.g. give example FMPs).

The PDT/FMAT was concerned that the process outlined would be too cumbersome to be completed annually. One possible solution would be to specify the priorities for multiple years, like a specifications cycle, or to be effective until revised. The Councils and NMFS could then revisit it every few years or as circumstances change.

The PDT/FMAT also discussed how to address the fact that the following year's budget may not be known in order to be taken into account during the prioritization. The seaday or dollar

amount allocation agreed to by the Councils and NMFS could be meaningless if NMFS revised it after the fact when the budget was finally known.  One possible solution would be for the process to set priorities for coverage (e.g., rank fisheries) or percentages for each fishery (e.g., 20% funding to mackerel, 20% funding to herring, etc.), rather than to allocate sea days.  If final funding was less than anticipated, it could still be applied according to the priorities.  This option would divorce the process from the budget timeline and ease timing constraints.  NEFSC staff also recommended developing flexibility guidelines to allow funding to be shifted between fisheries, if, for example, a fishing season closed early before the money for monitoring was used up.  Other regions use these "deployment plans" that include both required and discretionary coverage.  NMFS staff also shared preliminary advice from GCNE, which is that rulemaking may be necessary to solicit public comment on the priorities if they may change drastically from year to year or there is a substantial amount of discretion in setting them.

Since the alternative sets are inter-dependent, the PDT/FMAT recommended modifying the structure of the alternatives to give the Councils a clearer understanding of the impacts from a suite of alternatives.  NMFS staff clarified that the no-action alternative in this set means that there would be no additional above-SBRM coverage for FMPs that do not have industry-funded monitoring programs.

7.  One member of the public asked whether industry could pay for infrastructure costs to meet the desired coverage level, if federal funding is short.  NMFS staff responded that this would not meet legal requirements, because it would necessitate fee collection which the NE Region does not have the authority to do.  Another member of the public asked if this process could be merged with the SBRM process and amendment.  NMFS staff responded that the actions deal with separate needs and constraints which necessitate keeping them separate – SBRM is a statutory requirement whereas industry-funded monitoring is a discretionary requirement.  However, the PDT/FMAT is trying to align the timeline and measures of the two actions, so as not to conflict or duplicate effort.  A public comment expressed concern at the idea of requiring herring and mackerel vessels to not leave the dock without an observer when other fleets are not subject to the same requirement.

7.  The PDT/FMAT discussed the scope of alternatives for the coverage targets for the herring and mackerel fisheries in this action (Alternative Set 3).  Specific measures to consider:
- Coverage target
- Criteria – area and gear-based versus permit type
- Consequences if coverage falls short – a target only? Or must something happen if coverage falls short (e.g., can't fish without an observer).
- Types of monitoring (at sea monitors, observers, dockside monitors, electronic monitoring).

The omnibus amendment would make setting these coverage targets frameworkeable in other FMPs.  To address the disapproved elements of Amendments 5 and 14, the omnibus would implement monitoring coverage targets for the herring and mackerel fisheries, so no subsequent action would be required.

These alternatives will require further development at the next meeting.  The PDT/FMAT felt that the range of coverage levels considered in Amendments 5 and 14 would be a good place to

start.  Council and NMFS staff will discuss these options offline and prepare a more complete draft of these alternatives for the next meeting.

**Other Items**

8. Council staff wanted to include an option in the document for states to serve as dockside monitoring providers for the herring and mackerel fisheries, which was contemplated in Amendments 5 and 14.

9. Council staff asked that the PDT/FMAT provide an update to the Herring Committee at their January 14th meeting.  Council staff will need any documents by January 7th to be distributed in the mailing.

10. Council staff asked how this action would interact with the third party mechanism that was outlined at the presentation to the Councils in September and October.  NMFS staff explained that the third party mechanism is administrative and does not need to be put in regulation. NMFS has been working on that internally since the September/October Council meetings.  It would allow NMFS to offset the costs of the items laid out as industry costs in Option 1 of Alt. Set 1, when funding is available.  On the West Coast this is an offset paid to the provider at a fixed rate per sea day or trip, so the provider takes that off the top of the industry's bill.  To be eligible for this, the fishery has to have the options laid out in the omnibus amendment.  NMFS staff will check if a mechanism for external entities (non-governmental organizations) to contribute funds for reimbursement could be established.

11. One member of the public asked whether charging data users for the use of observer data to offset the costs of monitoring.  NMFS staff commented that this idea was not considered by the internal working group, but would seem to have some legal issues on its face.  NMFS does not currently have the authority to collect fees for data or to withhold any fees collected from the general treasury.  Both of these authorities the North Pacific has, which allows fee collection from industry in that region, but we don't have in the Northeast.



**UNITED STATES  DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
NORTHEAST REGION
55 Great Republic Drive
Gloucester, MA 01930-2276

Tom A. Nies, Executive Director
New England Fishery Management Council
50 Water Street
Newburyport, MA 01950

SEP  2 0  2013

Dr. Christopher M. Moore, Executive Director
Mid-Atlantic Fishery Management Council
800 North State Street
Dover, DE 19901

Dear Tom and Chris:

Since our July 30, 2013, letter to Tom, the agency working group on observer funding has been working to resolve the legal issues related to proposed observer cost sharing measures. We concluded that these issues required further discussion among NMFS, NOAA General Counsel, and Department of Commerce staff and that our lack of internal resolution of these issues prevented the joint observer funding plan development team and fishery management action team (Joint PDT/FMAT) from advancing their efforts. We now have a plan as to how to incorporate industry-funded observer coverage into fishery management plans (FMPs), which we will present at your upcoming September and October meetings; the plan is summarized below. Our plan would not specify fishery-by-fishery provisions for industry coverage programs, but would allow the Councils to use industry funding to increase observer coverage levels in their fisheries.

There are two components to the costs of observer coverage, and funding must be available for both components in order to achieve desired observer coverage levels. These components are:
1) Observer monitoring costs, which include the costs that would be incurred by an observer service provider, such as observer salary and travel; and
2) NMFS support and infrastructure costs, which include observer training, data processing, and infrastructure.

Under existing law, NMFS and industry cannot share responsibility for observer monitoring costs in the regulations. For example, we cannot cap the industry contribution and require NMFS to be responsible for the remainder of observer monitoring costs, such as the $325 per day cap on industry contribution that was proposed in the recent Atlantic herring and Atlantic mackerel amendments. Also, any increases to observer coverage, even when industry is paying the full costs for the observers, will result in NMFS incurring additional support and infrastructure costs. Because NMFS's appropriations to cover support and infrastructure costs are limited and variable, the Councils cannot mandate specific levels of observer coverage that could impose financial obligations beyond what is appropriated.

The only way to increase observer coverage levels above levels set to cover legal mandates or the standardized bycatch reporting methodology (SBRM) is for industry to be responsible for 100 percent of observer monitoring costs, and for the Council to recommend coverage targets

rather than mandating specific coverage levels. We believe the best way to provide the Councils the tools to use industry funding of increased observer coverage is through an omnibus amendment for all New England and Mid-Atlantic fishery management plans (FMPs). As we have done with SBRM, we have asked our staffs to take the technical lead on developing this amendment if the Councils choose to proceed. The omnibus amendment would:

1) Define both NMFS and industry cost responsibilities for observer coverage consistent with the allocations noted above;
2) Create industry-funding requirements, similar to those currently in place in the Northeast multispecies and the Atlantic sea scallop FMPs, that can be referenced by any FMP that needs to implement industry funding requirements; and
3) Establish an annual process in which NMFS and both Councils would prioritize observer coverage levels above SBRM that will inform NMFS's decisions on the allocation of available NMFS support and infrastructure funds to achieve regional coverage goals, consistent with considering efficiency in the utilization of resources and minimizing costs as required by National Standards 5 and 7.

We intend to keep this action focused exclusively on the observer issue to avoid lengthy development that could result from the addition of other issues and management measures. Council input and meetings remain critical to ensure the public is involved, so we recommend leaving the Joint PDT/FMAT intact, with expanded membership to include experts from other FMPs.

We acknowledge that the observer monitoring costs can be a significant burden for industry. That is why we have identified a potential mechanism that may enable NMFS, when funding is available, to help offset some of industry's costs. This model was used to fund NE multispecies Sector dockside monitoring coverage in 2010 and 2011.

In order for these concepts to work, we need support from both Councils. This proposed approach would require both Councils to be willing to work together to prioritize regional monitoring goals. The Councils must remember that available funds limit the amount of observer coverage for all of our fisheries, regardless of the source of funding. The Councils must not prescribe specific observer coverage levels or specific industry contribution levels in future Council actions.

There are many details of this plan that still need to be resolved, but if both Councils agree with this approach, our staff will begin to develop alternatives for the omnibus amendment. Our goal is to present both Councils with an initial range of alternatives at their January and February 2014 meetings.

Sincerely,

John K. Bullard
Regional Administrator

William A. Karp, Ph.D.
Science and Research Director

2

**December 27, 2013**

**A.I.S., Inc. Recommendation for Observer Funding Omnibus Amendment**

<u>Introduction</u>

A.I.S. Inc. has been a provider of fishery observers, endangered species observers, dredging observers and inspectors for federal and state programs, and private industry since 1988 on the Atlantic, Gulf of Mexico and Pacific coasts.  We have current contracts with NOAA for the At-Sea Monitoring Program (ASM), Industry Funded Scallop Program ( IFS), and the North Pacific Groundfish Observer Program (NPGOP). We are also a certified Dockside Monitoring provider. A.I.S. Inc. held the Northeast Fishery Observer Program (NEFOP) contract from 2002 through 2012 and has been an IFS observer provider since the program began in 1999.

<u>Funding Source Arguments</u>
From our experience over many years in contracting directly with both the government and the fishing industry for observer and monitor services, we are very familiar with the many issues which may arise.  We feel that the best method to fund the monitoring requirements for the Northeast fishing fleet is through direct federal government funding as is done in the Northeast, Southeast and Pacific Islands observer programs.  Currently, the Northeast fisheries industry is experiencing significant financial difficulties.  Having the federal government pay for observer, monitor and sea sampling needs will help to alleviate the fishing industry's cost of doing business.  Many other natural resource based industries receive federal monetary support to assist their regular business operations and, more importantly, during natural and economic disasters similar to what the Northeast groundfish fleet is experiencing.

If the Northeast fishing industry is required to fund observer coverage by paying observer providers who will bill either individual vessels or individual sectors rather than the federal government, the following describes possible ramifications of this action.

- The cost of the observer is not equitable. Vessels that land similar quantities of fish but of lower values due to the species being sought, will have a higher percentage of observer costs on a per trip basis.  This may impact fishing behavior when an observer is assigned (i.e. the "observer effect") and will increase bias.
- Due to the burden of the costs of an observer, the resentment from fishing vessel crews will increase when the cost of the observer is being paid by the vessel's revenue, but are not actually assisting with the crew's workload.

- There will be increased pressure from the captain and crew for observers to perform fishing related work (other than their observer duties) while on the vessel since captain/crew are incurring direct loss of income while the observer is onboard.
- The education standards under the current Framework for the Industry Funded At Sea Monitor Program have been lowered from a Bachelors of Science degree (which is required of most observers in all other U.S. observer programs) to a High School diploma. Based on our experience, this will lead to fewer observer candidates passing training, greater attrition, and a decrease in data quality.. This will also cause higher costs to train additional observers if they fail to pass training or do not stay with the program for an extended period of time. Additionally, since data quality is the key component to observer programs, lowering the education standards will yield lower data quality and will only hurt the program's already fragile reputation with the fishing industry.
- Lower education requirements and increased pressure from the financially depressed industry to decrease observer sea day rates will ultimately reduce observer pay and further contribute to less job satisfaction as well as lower data quality. This will also increase the probability that observers may try to recoup lost income by accepting offers of pay from vessel crews to assist in fishing work aboard the vessel which is a conflict of interest. Once they accept money from a vessel, the observers become more vulnerable to data falsification as pressure from the crew may influence them.

The Atlantic sea scallop fishery has been industry funded since 1999 (except 2004 – 2006 when NEFOP provided funding). This requirement was instituted when NMFS allowed the fishery to access the Closed Areas (Access Areas). However the vessel which takes an observer receives compensation of either scallop meats (currently 150 lbs. per day) or additional Days at Sea (.08 DAS per 24 hours with observer onboard) depending on whether it is an Access Area or Open Area trip. This helps to offset the cost of an observer and it also relieves some of the resentment from the vessel's captain/crew of having to absorb the observer cost. The NE groundfish fishery does not have large enough quota to support the current participants in addition to setting aside quota for observer compensation. There are six regional fisheries observer programs in the U.S.A. which receive funding to operate from multiple sources. Below are the programs and source of funding.

| | Percent NOAA FISHERIES Funded | Percent Industry Funded | Comments |
|---|---|---|---|
| **Northeast Fisheries Observer Program(NEFOP)** | 100% | 0% | Observer contractor fully funded by government |
| **NEFOP Industry Funded Scallop Program** | 0% | 100% | Industry is compensated as follows: Access Area = 150 lbs./ day of scallop meats. Open Area = .08 DAS reimbursement for each 24 hour period observer is onboard |
| **NEFOP  At-Sea Monitoring (ASM)** | 100% (2010-2013) | 0% | Currently being proposed as partially industry funded |
| **Southeast Fisheries Science Center Observer Program (Pelagic Longline, Shark Gillnet & Longline, Shrimp Trawl and Reef Fish)** | 100% | 0% | Observer contractor fully funded by government |
| **Pacific  Island Region Observer Program (PIROP)** | 100% | 0% | Observer contractor fully funded by government |
| **NPGOP Alaska Partial Coverage Fleet Gulf of AK and Aleutian Islands    (40' - 125- vessels)** | 0% | 100% | Program funded by 1.25% ex-vessel price fee on landed catch.  Program administered by NMFS NWFSC |
| **NPGOP 100% Coverage (vessels >125')** | 0% | 100% | Observer contractor fully funded by industry |
| **Southwest Fisheries Science Center Observer Program (Longline and Drift Gillnet)** | 100% | 0% | Observer contractor fully funded by government |
| **Northwest Fisheries Science Center West Coast Observer Program Catch Shares Program** | Cost Share with NMFS | Cost Share with NMFS | Program funding is administered through Pacific States Marine Fisheries Commission as both industry and NMFS share costs |

Recommended Observer Funding Approach

Most observer programs are government funded while fewer are either partially or fully funded by the fishing industry. The observer programs that are currently industry funded are high volume or high value species fisheries.   If full government funding is not possible then an equitable industry wide fee based system is the best alternative.  Under the current Magnuson-Stevens Act (MSA) the mechanism (see addendum) to create an ex-vessel landing fee for vessels in an entire fishery is not authorized except in the Gulf of Alaska FMP and the Bering Sea and Aleutian Island FMP which will support the North Pacific Groundfish and Halibut Observer Program (NPGOP).  A.I.S. Inc. is currently contracted by NMFS to help manage the NPGOP. From our experience with this observer program, some of the issues that are normally inherent with Industry Funded Observer Programs are not evident since the cost is shared by the Alaska groundfish fishery as a whole. The Magnuson Stevens Act authorizes the federal government to assess an ex-vessel fee of up to 2% to covers costs of this program.  The North Pacific Fishery Management Council (NPFMC) has decided to use this mechanism to fund the new NPGOP partial coverage program.  In this new program NMFS will deploy the observers according to coverage needs to assure all fisheries are being monitored.  With the Magnuson- Stevens Act in the process of being reauthorized, now would be the time for NOAA Fisheries, the NEFMC and its stakeholders to seize the opportunity to include this as a funding mechanism for the At Sea Monitor Program in the upcoming reauthorization.

Concluding Remarks

Observers collect data at sea which is essential to meeting the standards set by the MSA under the same difficult and at times dangerous conditions faced by the fishing industry.  They also have to contend with the pressure from both the industry and NOAA Fisheries to ensure the data they collect is accurate and representative of the vessel they are observing on.  A.I.S. Inc. has always promoted the fisheries observer position as a professional occupation as observers are required to collect accurate data, have high integrity, act professionally, and be diplomatic as a NOAA Fisheries representative while working under harsh conditions as an often  unwelcome individual on the vessel.  Observers should be compensated accordingly, and receive benefits that are similar to other professional occupations.  The costs associated with deploying an observer by a provider are extensive and include the following:

- Training, debriefing, and briefing costs
- Observer salary which includes substantial overtime hours worked
- Benefits including health, dental, federal taxes, life insurance, disability insurance, holiday pay, sick and vacation pay, unemployment insurance, and retirement contributions
- Travel expenses to and from deployments (mileage reimbursement, other transportation costs such as parking fees and public transportation)

- Sampling equipment
- Insurance: Maritime Employers Liability Insurance (MEL), Longshoreman's and Harbor Workers Insurance, Workman's Compensation Insurance)
- Administrative costs
- Overhead costs (program management, office, etc.

Fisheries observer data is an essential part of the fisheries management process and government funding or an equitable industry wide fee based system will assist the Northeast groundfish industry to survive through the current rebuilding process and also remove any additional resentment toward the observers thereby enhancing data quality which is the goal of observer programs.

## ADDENDUM- Relevant Sections of the Magnuson-Stevens Act

**SEC. 313. NORTH PACIFIC FISHERIES CONSERVATION 16 U.S.C. 1862**

**104-297**

**(a) IN GENERAL.**--The North Pacific Council may prepare, in consultation with the Secretary, a fisheries research plan for all fisheries under the Council's jurisdiction except salmon fisheries which--

(1) requires that observers be stationed on fishing vessels engaged in the catching, taking, or harvesting of fish and on United States fish processors fishing for or processing species under the jurisdiction of the Council, including the Northern Pacific halibut fishery, for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction; and

(2) establishes a system of fees to pay for the costs of implementing the plan.

**102-582**

**(b) STANDARDS.--**

(1) Any plan or plan amendment prepared under this section shall be reasonably calculated to--

(A) gather reliable data, by stationing observers on all or a statistically reliable sample of the fishing vessels and United States fish processors included in the plan, necessary for the conservation, management, and scientific understanding of the fisheries covered by the plan;

(B) be fair and equitable to all vessels and processors;

(C) be consistent with applicable provisions of law; and

(D) take into consideration the operating requirements of the fisheries and the safety of observers and fishermen.

(2) Any system of fees established under this section shall--

(A) provide that the total amount of fees collected under this section not exceed the combined cost of (i) stationing observers on board fishing vessels and United States fish processors, (ii) the actual cost of inputting collected data, and (iii) assessments necessary for a risk-sharing pool implemented under subsection (e) of this section, less any amount received for such purpose from another source or from an existing surplus in the North Pacific Fishery Observer Fund established in subsection (d) of this section;

(B) be fair and equitable to all participants in the fisheries under the jurisdiction of the Council, including the Northern Pacific halibut fishery;

(C) provide that fees collected not be used to pay any costs of administrative overhead or other costs not directly incurred in carrying out the plan;

(D) not be used to offset amounts authorized under other provisions of law;

(E) be expressed as a percentage, not to exceed 2 percent, of the unprocessed ex-vessel value of the fish and shellfish harvested under the jurisdiction of the Council, including the Northern Pacific halibut fishery;

(F) be assessed against all fishing vessels and United States fish processors, including those not required to carry an observer under the plan, participating in fisheries under the jurisdiction of the Council, including the Northern Pacific halibut fishery;

(G) provide that fees collected will be deposited in the North Pacific Fishery Observer Fund established under subsection (d) of this section;

(H) provide that fees collected will only be used for implementing the plan established under this section; and

(I) meet the requirements of section 9701(b) of title 31, United States Code.

**(c) ACTION BY SECRETARY.--**

(1) Within 60 days after receiving a plan or plan amendment from the North Pacific Council under this section, the Secretary shall review such plan or plan amendment and either (A) remand such plan or plan amendment to the Council with comments if it does not meet the requirements of this section, or (B) publish in the Federal Register proposed regulations for implementing such plan or plan amendment.

(2) During the 60-day public comment period, the Secretary shall conduct a public hearing in each State represented on the Council for the purpose of receiving public comments on the proposed regulations.

(3) Within 45 days of the close of the public comment period, the Secretary, in consultation with the Council, shall analyze the public comment received and publish final regulations for implementing such plan.

(4) If the Secretary remands a plan or plan amendment to the Council for failure to meet the requirements of this section, the Council may resubmit such plan or plan amendment at any time after taking action the Council believes will address the defects identified by the Secretary. Any plan or plan amendment resubmitted to the Secretary will be treated as an original plan submitted to the Secretary under paragraph (1) of this subsection.

**(d) FISHERY OBSERVER FUND.**--There is established in the Treasury a North Pacific Fishery Observer Fund. The Fund shall be available, without appropriation or fiscal year limitation, only to the Secretary for the purpose of carrying out the provisions of this section, subject to the restrictions in subsection (b)(2) of this section. The Fund shall consist of all monies deposited into it in accordance with this section. Sums in the Fund that are not currently needed for the purposes of this section shall be kept on deposit or invested in obligations of, or guaranteed by, the United States.

**(e) SPECIAL PROVISIONS REGARDING OBSERVERS.**--

(1) The Secretary shall review--

(A) the feasibility of establishing a risk sharing pool through a reasonable fee, subject to the limitations of subsection (b)(2)(E) of his section, to provide coverage for vessels and owners against liability from civil suits by observers, and

(B) the availability of comprehensive commercial insurance for vessel and owner liability against civil suits by observers.

(2) If the Secretary determines that a risk sharing pool is feasible, the Secretary shall establish such a pool, subject to the provisions of subsection (b)(2) of this section, unless the Secretary determines that--

(A) comprehensive commercial insurance is available for all fishing vessels and United States fish processors required to have observers under the provisions of this section, and

(B) such comprehensive commercial insurance will provide a greater measure of coverage at a lower cost to each participant.

**104-297**

**(f) BYCATCH REDUCTION.--**In implementing section 303(a)(11) and this section, the North Pacific Council shall submit conservation and management measures to lower, on an annual basis for a period of not less than four years, the total amount of economic discards occurring in the fisheries under its jurisdiction.

**104-297**

**(g) BYCATCH REDUCTION INCENTIVES.--**

(1) Notwithstanding section 304(d), the North Pacific Council may submit, and the Secretary may approve, consistent with the provisions of this Act, a system of fines in a fishery to provide incentives to reduce bycatch and bycatch rates; except that such fines shall not exceed $25,000 per vessel per season. Any fines collected shall be deposited in the North Pacific Fishery Observer Fund, and may be made available by the Secretary to offset costs related to the reduction of bycatch in the fishery from which such fines were derived, including conservation and management measures and research, and to the State of Alaska to offset costs incurred by the State in the fishery from which such penalties were derived or in fisheries in which the State is directly involved in management or enforcement and which are directly affected by the fishery from which such penalties were derived.

(2) (A) Notwithstanding section 303(d), and in addition to the authority provided in section 303(b)(10), the North Pacific Council may submit, and the Secretary may approve, conservation and management measures which provide allocations of regulatory discards to individual fishing vessels as an incentive to reduce per vessel bycatch and bycatch rates in a fishery, *Provided*, That--

(i) such allocations may not be transferred for monetary consideration and are made only on an annual basis; and

(ii) any such conservation and management measures will meet the requirements of subsection (h) and will result in an actual reduction in regulatory discards in the fishery.

(B) The North Pacific Council may submit restrictions in addition to the restriction imposed by clause (i) of subparagraph (A) on the transferability of any such allocations, and the Secretary may approve such recommendation.

**104-297**

**(h) CATCH MEASUREMENT.--**

(1) By June 1, 1997 the North Pacific Council shall submit, and the Secretary may approve, consistent with the other provisions of this Act, conservation and management measures to ensure total catch measurement in each fishery under the jurisdiction of such Council. Such measures shall ensure the accurate enumeration, at a minimum, of target species, economic discards, and regulatory discards.

(2) To the extent the measures submitted under paragraph (1) do not require United States fish processors and fish processing vessels (as defined in chapter 21 of title 46, United States Code) to weigh fish, the North Pacific Council and the Secretary shall submit a plan to the Congress by January 1, 1998, to allow for weighing, including recommendations to assist such processors and processing vessels in acquiring necessary equipment, unless the Council determines that such weighing is not necessary to meet the requirements of this subsection.

**104-297**

**(i) FULL RETENTION AND UTILIZATION.--**

(1) The North Pacific Council shall submit to the Secretary by October 1, 1998 a report on the advisability of requiring the full retention by fishing vessels and full utilization by United States fish processors of economic discards in fisheries under its jurisdiction if such economic discards, or the mortality of such economic discards, cannot be avoided. The report shall address the projected impacts of such requirements on participants in the fishery and describe any full retention and full utilization requirements that have been implemented.

(2) The report shall address the advisability of measures to minimize processing waste, including standards setting minimum percentages which must be processed for human consumption. For the purpose of the report, 'processing waste' means that portion of any fish which is processed and which could be used for human consumption or other commercial use, but which is not so used.

# Omnibus Industry-Funded Monitoring Amendment

## Background and Context

**Lori Steele, NEFMC Staff**

**Observer Policy Committee Meeting**
**August 19, 2014**



New England
Fishery Management Council

# Background/Context

**NMFS-Led Omnibus Industry-Funded Monitoring (IFM) Amendment**

- Initiated after partial approval of Amendment 5 (Herring) and Amendment 14 (Mackerel)

- Addresses observer coverage in the Atlantic herring and mackerel fisheries, but the omnibus elements of the amendment establish provisions to allow the development of industry-funded monitoring programs in ***all fisheries*** managed by the NEFMC and MAFMC



2

# IFM Amendment – Problem Statement

1. Legal constraints prevent NMFS from sharing monitoring costs with the fishing industry.

2. Limited Federal funding for NMFS's costs prevents NMFS from approving proposals for industry-funded monitoring programs it cannot guarantee funding to support.

3. Need to remedy partial approval of Herring Am. 5 and Mackerel Am. 14.

    · Observer coverage requirements to enhance catch monitoring



3

_0000000778

# NEFSC Monitoring Programs

1. **Northeast Fisheries Observer Program (NEFOP)**

   - Marine mammal bycatch

   - Standardized Bycatch Reporting Methodology (SBRM)

   - Observers required by FMPs (ex., herring, loligo)

2. **At-Sea Monitoring (ASM)**

   - Northeast Multispecies FMP

3. **Industry-Funded Scallop Observers**

   - Atlantic Sea Scallop FMP



4

# General Costs of Monitoring Programs

1. **Infrastructure (Federal Government)**
   - Operations
   - Training
   - Data processing, quality assurance

2. **At-sea costs (Industry/Government)**
   - Paid to service providers under contract agreements

*There are still Federal costs associated with IFM*



5

# Allocation of Federal Funds for Monitoring

SBRM Amendment *(April 2015)*:

- Establishes provisions for allocating Federal funds to address needs for observer coverage in all fisheries in the Northeast Region

- Includes prioritization process to address Federal funding shortfalls

- Mandates the allocation of specific line items for SBRM observer coverage

- ***Any additional Federal funds to support IFM will have to be allocated from non-SBRM line items***

6

_0000000781

# SBRM Amendment Changes the Allocation of Federal Funds

| Budget Funding Line | Currently Funds….. | SBRM Amendment Requires…. |
|---|---|---|
| **Atlantic Coast Observers** | SBRM | SBRM |
| **Northeast Observers** | SBRM, Atlantic Herring Closed Area | SBRM |
| **Reducing Bycatch** | Atlantic Herring Closed Area | SBRM |
| **National Observer Program** | At-sea Monitoring (ASM), Special Projects | SBRM |
| **National Catch Shares** | ASM | ASM |
| **MMPA** | Marine Mammal Bycatch | Marine Mammal Bycatch |
| **ASMFC** | Inshore Fisheries | Inshore Fisheries |



7

# SBRM Amendment Alternatives

| SBRM Element | Alternatives Under Consideration | | | |
|---|---|---|---|---|
| 1. Bycatch Reporting and Monitoring Mechanisms | Status quo | | Implement electronic video monitoring | |
| 2. Analytical Techniques and Allocation of Observers | Pre-2007 SBRM Amendment | Integrated allocation approach | Integrated allocation approach w/ importance filter (Option C) | Minimum percent observer coverage |
| 3. SBRM Performance Standard | No performance standard | | Establish a CV standard | |
| 4. SBRM Review/ Reporting Process | Status quo | | Specify a SBRM review process (Option D – 3 yrs) | Require periodic discard reports (Option B – Annual) |
| 5. Framework Adjustment Provisions | Status quo | Framework adjustment | Frameworks and annual adjustments | Frameworks and annual adjustments, exclusive of fishing modes |
| 6. Prioritization Process | | | | |
| 6.1 Funding trigger | Status quo | | Identify specific SBRM funding sources | |
| 6.2 Reallocation | Council consultation | | Proportional adjustment | Penultimate Cell Approach |
| 6.3 Less than Minimum Pilot Coverage | Ad hoc prioritization | | Remove fleets with high MPC | Remove fleets with high MPC to days absent ratio |
| 7. Industry-Funded Observer Programs | Status quo | | Observer provider approval | Framework provisions |

*Shaded cells indicate the alternatives selected by the NEFMC Ad Hoc SBRM Committee on 1/16/14.*

8

# SBRM/IFM Amendments

*\*There are still Federal costs associated with IFM\**

- Federal funds not likely to be sufficient to meet all SBRM requirements every year (shortfalls will be subject to SBRM prioritization)

- Cannot shift funds from SBRM line items to support IFM

- Unclear if/when additional Federal funds will be available to support IFM

- No mechanism available to allow industry to cover Federal costs (i.e., pay 100%)



9

# *Omnibus Elements* of **IFM Amendment**

1. Division of Costs/Responsibilities (Industry/Government)

2. Standards for Service Providers (Observer, portside, ASM(?), EM

3. *Process for Prioritizing Available Federal Funds to Support IFM*

4. Provisions to allow new IFM programs to be established through framework adjustment



10

# Omnibus Amendment Timeline

| Action | Current Timeline | Proposed (Revised) Timeline |
|---|---|---|
| Councils approve range of alts | Jan/Feb 2014 | Jan/Feb 2014 |
| PDT/FMAT/Councils develop alts, draft EA | Feb-Aug 2014 | Feb-Oct 2014 |
| Councils review draft EA, select Preferred Alts | Aug/Sept 2014 | Nov/Dec 2014 |
| 30-day comment period on draft amendment | Oct 2014 | Dec 2014-Jan 2015 |
| Councils select final measures | Nov/Dec 2014 | Jan/Feb 2015 |
| EA finalized, Proposed Rule drafted | Jan 2015 | Mar 2015 |
| Proposed Rule publishes, 30-day comment period | Mar 2015 | Apr 2015 |
| Comment period ends, Final Rule drafted | Apr 2015 | May 2015 |
| Final Rule publishes | May 2015 | June 2015 |
| Final Rule effective | June 2015 | July 2015 |



11

_0000000786

# Observer Committee (8/19/14)

- Focus on the *omnibus* alternatives

- Gain a clear understanding of prioritization alternatives and clarify outstanding questions

- Discuss process/timing challenges under the prioritization alternatives

- Develop recommendations (if any) for refining omnibus alternatives

- Discuss expectations and potential challenges under Year 1



12

# Draft Discussion Document

# Industry-Funded Monitoring Omnibus Amendment

## New England Fishery Management Council
## Observer Oversight Committee Meeting
## August 19, 2014

**Prepared by NOAA's National Marine Fisheries Service**

1.0 INTRODUCTION AND BACKGROUND

The New England and Mid-Atlantic Councils are interested in increasing monitoring and/or other types of data collection in some fishery management plans (FMPs) to assess the amount and type of catch, to monitor annual catch limits, and/or provide other information for management.  This increased monitoring would be above and beyond coverage required through the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA) or Marine Mammal Protection Act (MMPA).  The amount of available Federal funding to support additional monitoring and legal constraints on the sharing of costs between the National Marine Fisheries Service (NMFS) and the fishing industry have recently prevented NMFS from approving proposals for industry-funded monitoring in some fisheries, specifically Atlantic Herring Amendment 5, Atlantic Mackerel Amendment 14, and Northeast (NE) Multispecies Framework Adjustment 48.  The Councils have initiated this omnibus amendment to remedy the disapprovals of these actions and to reconsider new monitoring requirements for the Atlantic herring and mackerel fisheries.  This amendment considers mechanisms that could facilitate the use of industry funding to increase monitoring, but it cannot resolve the underlying issue of limited Federal funding.

The Anti-Deficiency Act (ADA) prohibits augmenting or improperly shifting congressional appropriations, and a criminal prohibition restricts supplementing government employee salaries.  These provisions tightly control government funding and services.  The basic funding principle is that congressional appropriations establish a maximum authorized program level that cannot be exceeded without specific statutory authorization, and any monitoring or observer funding must comply with these restrictions.  When Congress appropriates money for observer coverage, NMFS cannot obligate funding for a monitoring program if the total costs to fund that program and existing monitoring programs exceeds its appropriations for that purpose.

Consequently, NMFS cannot approve monitoring levels for which there is potentially insufficient funding because NMFS cannot spend funds on contracts that are not provided for in its appropriations.  Also, insufficiently funded monitoring coverage would result in coverage levels that would not meet the FMP's goals and objectives.  NMFS also cannot commit to pay for costs that do not fall under its legal obligations to pay for government services.   NMFS has interpreted this to mean that it can only be obligated to pay for its infrastructure costs to support industry-funded programs and cannot commit to pay for any costs generated from sampling activities for these programs.  This standard was applied to the monitoring cost provisions recently proposed in the Herring, Mackerel, and NE Multispecies FMPs and resulted in the disapproval of those measures.

NMFS Greater Atlantic Regional Fisheries Office (GARFO) and Northeast Fisheries Science Center (NEFSC) receive certain line items and set amount of funds in those line items to fund its infrastructure costs for monitoring programs.  NMFS cannot shift funds appropriated for another purpose to pay for new monitoring programs, without congressional authorization.  Additionally, monitoring coverage levels for the NE Multispecies and Atlantic Sea Scallop FMPs

2

_0000000797

are specified through existing processes that do not allow for coverage levels to fluctuate based upon NMFS funding, so NMFS must fully fund its infrastructure costs for monitoring in those fisheries.  Monitoring in the groundfish fishery is required to meet a 30% coefficient of variation.  While NMFS has paid for both infrastructure and sampling costs in past years, the groundfish fleet is required to cover the sampling costs if NMFS does not cover those costs.  Observer coverage in the scallop fishery is based on SBRM and ESA requirements and sampling costs are funded by a 1% harvest set-aside.   NMFS cannot reduce coverage in NE multispecies or scallop fisheries in order to increase coverage in another FMP.   Thus, "available Federal funding" refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements.  However, this amendment could apply to the NE multispecies and scallop fisheries to the extent that the Council desires coverage above levels currently set by those FMPs.

The Miscellaneous Receipts Statute requires Federal employees to deposit any money received on behalf of the government into the general Treasury, unless otherwise directed by law.  This means that if NMFS could accept funds from the industry, NMFS would be required to direct those funds to the Treasury and would not be able to reserve them to pay for monitoring in the Northeast.  The Alaska Region has special authorization in the Magnuson-Stevens Act (MSA) to collect fees from the industry and to put these fees into a fund to be used to defray the costs of monitoring in that region (Section 313).  The NMFS Northeast Region does not have any such authority, except for cost recovery for Limited Access Privilege Programs (LAPPs).

Given these constraints, a joint New England and Mid-Atlantic Fishery Management Council Industry-Funded Monitoring Plan Development Team/Fishery Management Action Team (PDT/FMAT) has been tasked with developing alternatives for the omnibus amendment that would allow NMFS to approve the Councils' future proposals for new monitoring programs while meeting the legal requirements outlined above.

The PDT/FMAT used the following criteria in developing the alternatives outlined in this document.  The alternatives must allow NMFS to approve new monitoring programs **without**:
- Obligating itself to pay for any costs beyond its appropriations;
- Obligating itself to redirect appropriations designated for another purpose;
- Obligating itself to pay for costs it is not required to by law; and/or
- Requiring itself to accept funds from the fishing industry or other entity in order to meet its obligations.

Additionally, the PDT/FMAT developed the concept of monitoring *coverage targets*, rather than *mandatory coverage levels*, for industry-funded monitoring to achieve on an annual basis to meet certain FMP objectives.  The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities a given year.  The realized coverage level for the fishery in a given year (above and beyond SBRM) would fall somewhere between no additional coverage above SBRM and the specified coverage target.  Establishing monitoring coverage targets would allow NMFS to approve and implement new

3

_0000000798

industry-funded monitoring programs, without committing to support coverage levels above appropriated funding or before funding is determined to be available.

However, this industry-funded omnibus amendment WOULD NOT automatically allow for higher coverage levels in NE fisheries.  This amendment establishes tools that NMFS and the Councils could use to provide additional monitoring in NE fisheries when Federal funding is available.  Therefore, during years when there is no additional funding to cover NMFS cost responsibilities above funding for SBRM, the tools developed in this amendment would not be used and there would be no additional monitoring coverage, even if industry is able to fully fund their cost responsibilities.

1.1 PURPOSE AND NEED FOR ACTION

The purpose of this action is to consider measures that would allow the Councils to implement industry-funded monitoring coverage in New England and Mid-Atlantic FMPs.  This amendment would allow industry funding to be used in conjunction with available Federal funding to pay for additional monitoring to meet FMP-specific coverage targets.  This amendment also considers (1) standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry, (2) process for FMP-specific industry-funded monitoring to be implemented via a future framework adjustment action, (3) standard administrative requirements for industry-funded monitoring service providers, and (4) process to prioritize available Federal funding for industry-funded monitoring across FMPs.  Additionally, this amendment considers monitoring coverage targets for the Atlantic Herring FMP and the Atlantic Mackerel, Squid, Butterfish (MSB) FMP, which are anticipated to enhance the monitoring of at-sea catch of herring, mackerel, river herring, shad, haddock, and other species harvested in the herring and mackerel fisheries.  This amendment is being done as an omnibus to ensure consistency for industry-funded monitoring programs across New England and Mid-Atlantic FMPs.

2.0 MANAGEMENT ALTERNATIVES

The PDT/FMAT for this amendment has developed a range of management alternatives for the Councils to consider.  These alternatives include the following:

- Standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry;
- A process by which NMFS and/or the Councils would prioritize available Federal funding for industry-funded monitoring across FMPs, when Federal funding is not sufficient to meet all coverage targets;

- A process by which industry-funded monitoring programs (e.g., at-sea monitoring, dockside monitoring, electronic monitoring) can be implemented via framework adjustment in each FMP;

4

_0000000799

- Standards for industry-funded monitoring service providers (e.g., for dockside monitoring, at-sea monitoring, electronic monitoring); and
- Monitoring coverage targets or requirements for certain permit categories and/or gear types for the herring and mackerel fisheries.

## 2.1 OMNIBUS ALTERNATIVES

The following alternatives consider provisions that would apply to all New England and Mid-Atlantic FMPs, including (1) standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry, (2) process for FMP-specific industry-funded monitoring to be implemented via a future framework adjustment action, (3) standard administrative requirements for industry-funded monitoring service providers, and (4) process to prioritize available Federal funding for industry-funded monitoring across FMPs.

### 2.1.1 Omnibus Alternative 1:  No Industry-funded Monitoring Programs (No Action)

Under Omnibus Alternative 1 (No Action), there would be no standard definition of costs and cost responsibility for industry-funded monitoring in the New England and Mid-Atlantic fisheries.  Cost definitions and the determination of who pays for them would be considered individually by each FMP as industry-funded monitoring programs are developed.  Under Omnibus Alternative 1, there would be no process to prioritize available Federal funding to meet Council desired monitoring coverage target above and beyond the SBRM and no standard administrative requirements for industry-funded monitoring service providers.  The allocation of available Federal funding to increase monitoring to meet Council desired coverage levels and observer service provider requirements for industry-funded monitoring would be evaluated on an FMP-by-FMP basis.  Additionally, under Omnibus Alternative 1, there would be no framework adjustment process to implement FMP-specific industry-funded monitoring.  Rather, industry-funded monitoring programs would be developed and established in FMP-specific amendments.

### 2.1.2 Omnibus Alternative 2:  Industry-funded Monitoring Programs

Under Omnibus Alternative 2, there would be an industry-funded monitoring program that would apply to all New England and Mid-Atlantic FMPs.  This industry-funded monitoring program would include the following components:  (1) standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry, (2) process for FMP-specific industry-funded monitoring to be implemented via a future framework adjustment action, and (3) standard administrative requirements for industry-funded monitoring service providers.  Additionally, Omnibus Alternative 2 would include a range of option for the process to prioritize available Federal funding for industry-funded monitoring across FMPs.

5

_0000000800

**Standard Cost Responsibilities**

Omnibus Alternative 2 would include standard cost responsibilities between NMFS and the industry for supporting monitoring programs targeting coverage above and beyond SBRM. Because there are legal requirements that dictate cost responsibilities, as described in the Introduction, certain costs must be borne by NMFS. These cost responsibilities would be codified into regulation for industry-funded monitoring in New England and Mid-Atlantic FMPs. If Omnibus Alternative 2 was not selected by the Councils, cost responsibilities for industry-funded monitoring would be codified on an FMP-by-FMP basis.

The cost responsibilities described below would be considered by the Councils when developing any industry-funded monitoring program for New England and Mid-Atlantic FMP in future actions. The cost responsibilities described below are already in operation in the Atlantic Sea Scallop and NE Multispecies FMPs, although the cost responsibilities are not explicitly defined in those FMPs. Selection of the Omnibus Alternative 2 would codify the industry-funded monitoring cost responsibilities in regulation for all New England and Mid-Atlantic FMPs, but it would not change industry-funded monitoring in the scallop or multispecies fisheries.

NMFS Cost Responsibilities
NMFS would be responsible for funding the costs to set standards for, monitor performance of, and support industry-funded monitoring programs. These program elements would include:
- The labor and facilities costs associated training and debriefing of monitors
- Certification of monitoring providers and individual monitors
- Developing and executing vessel selection
- Data processing
- Costs associated with liaison activities between service providers and NMFS

Industry Cost Responsibilities
The industry would be responsible for funding all other costs of the monitoring program. These program elements and activities would include, but are not limited to:
- Costs to the provider for deployments and sampling (e.g., travel and salary for observer deployments and debriefing)
- Equipment, as specified by NMFS, to the extent not provided by NMFS
- Costs to the provider for observer time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time.
- Provider overhead and project management costs (e.g., facility costs, training)
- Other costs of the provider to meet performance standards laid out by a fishery management plan

NMFS costs to support industry-funded monitoring must be fully funded. The industry would be responsible for its cost responsibilities, unless it was determined that Federal funds were also available to offset industry cost responsibilities. The administrative mechanism by which

_0000000801

industry cost responsibilities could be offset using available Federal funding is being developed by NMFS separately and can be used in conjunction with Omnibus Alternative 2.

**Framework Adjustment Process**

Omnibus Alternative 2 would include the ability for Councils to implement industry-funded monitoring programs, including at-sea monitoring, dockside monitoring, or electronic monitoring, through framework adjustments to the relevant FMP.  If Omnibus Alternative 2 was not selected by the Councils, a full FMP amendment would be required to implement industry-funded monitoring programs for all New England and Mid-Atlantic fisheries, excluding existing industry funded monitoring programs in the Scallop and Multispecies FMP and any program developed in this action for the Herring or MSB FMPs.

Under Omnibus Alternative 2, the details of any industry-funded monitoring program, including at-sea, dockside, or electronic monitoring, would be specified and/or modified in a subsequent framework adjustment to the relevant FMP.  These details may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) process for vessel notification and selection, (4) fee collection and administration, (5) standards for monitoring service providers, and (6) any other measures necessary to implement the industry-funded monitoring program.  Additional National Environmental Policy Act (NEPA) analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying industry-funded monitoring programs.

Omnibus Alternative 2 contains a framework adjustment component for the known types of monitoring that are available for NE fisheries.  At-sea monitoring focuses data collection at sea, recording the type and quantity of retained and/or discarded catch.  Dockside monitoring focuses data collection at the dock, accounting for landings of target species and incidental catch.  If all fish caught are retained and landed, dockside monitoring can also record type and quantity of total catch.  Electronic monitoring uses video cameras and other sensors to monitor discards at sea or to monitor compliance with full retention requirements or other at-sea requirements.  Depending on the information needs for a given fishery, a dockside and/or electronic monitoring program could be used in addition to at-sea monitoring to provide more complete catch monitoring, or to reduce the overall monitoring costs for a given fishery (if dockside or electronic monitoring can be administered at a lower cost).

**Monitoring Service Providers**

Omnibus Alternative 2 would include standard administrative requirements for industry-funded monitoring service providers.  If Omnibus Alternative 2 was not selected by the Councils, service provider requirements for industry-funded monitoring programs would be developed and implemented in individual FMPs.

_0000000802

The SBRM Omnibus Amendment, if approved, would modify the scallop industry-funded observer service provider requirements (at 50 CFR 648.11(h) and (i)) to apply to all New England and Mid-Atlantic FMPs as of April 2015. Specifically, the SBRM Amendment would authorize at-sea observer service provider approval and certification for all applicable fisheries, should a Council develop and implement a requirement or option for an industry-funded observer program in other fisheries beside scallops. However, the SBRM Amendment does not address service provider requirements for other types of industry-funded monitoring programs.

The Omnibus Alternative 2 would include an approval and certification process for dockside and electronic monitoring service providers for all New England and Mid-Atlantic FMPs. The monitoring service provider approval and certification process would be based on the current process in place for the scallop fishery and would be developed in the coming months. The selection of Omnibus Alternative 2 would not implement any dockside or electronic monitoring programs, but would only implement a process to approve and certify dockside and electronic monitoring service providers. In the future, if the Councils implement any industry-funded dockside or electronic monitoring programs through a future action, the process to develop those monitoring programs would be streamlined.

**Prioritization Process**

The Omnibus Alternative 2 also includes prioritization options to allocate available Federal funding towards industry-funded monitoring. When Federal funding is not sufficient to cover NMFS cost responsibilities to achieve target coverage levels (above and beyond SBRM) across FMPs, Omnibus Alternative 2 includes different prioritization processes to allocate available Federal funding towards industry-funded monitoring. Alternatives 2.1 and 2.2 provide the Councils and NMFS with more discretion to make trade-offs between FMPs, but also require more analysis and resources. The primary difference between these two alternatives is who (NMFS or Councils) would lead the prioritization process and analysis. Alternatives 2.3 – 2.5 use formulaic approaches, eliminating much of the discretion and analytical burden of Alternatives 2.1 and 2.2. However, these formulaic approaches in Alternatives 2.3 - 2.5 may reduce the effectiveness of the resulting outcome. If Omnibus Alternative 2 was not selected by the Councils, available Federal funding would be allocated toward industry-funded monitoring on an FMP-by-FMP basis.

Due to legal and budgetary constraints described in the Introduction, NMFS cannot approve and implement monitoring requirements for which it does not have the Federal funding to cover NMFS cost responsibilities. Omnibus Alternative 2 includes a prioritization process to allocate available Federal funding across FMPs to cover NMFS cost responsibilities for coverage targets above and beyond SBRM and independent from ESA and MMPA requirements.

When target monitoring coverage levels exist for multiple FMPs, the Councils and NMFS must decide how to allocate available Federal funding available across FMPs. Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing

8

_0000000803

monitoring requirements.  The allocation of available Federal funding to cover NMFS cost responsibilities would determine which FMPs had additional monitoring for a given year and which would not.  Under all of the options described below, the industry would be responsible for covering its cost responsibilities, unless it was determined that Federal funds were also available to be used to offset industry cost responsibilities.

2.1.2.1 Omnibus Alternative 2.1:  NMFS-led Prioritization Process for Industry-funded Monitoring Programs

Under Omnibus Alternative 2.1, the Regional Administrator and Science and Research Director would determine, in consultation with the Councils, how to allocate NMFS available resources to support NMFS cost responsibilities required to achieve coverage targets for industry-funded monitoring coverage.  After those costs are funded, NMFS would also determine, in consultation with the Councils, the allocation of any remaining funding available to offset industry costs established in this amendment for the Herring and MSB FMPs and other FMP actions.  The costs would be defined as described by Omnibus Alternative 2.  Funding for SBRM, ESA, and MMPA observer coverage would not be changed by this measure.  Any funding for industry-funded monitoring programs would be allocated separate from any funding for SBRM or other statutory requirements and any coverage would be above and beyond coverage for SBRM or other statutory requirements.

The prioritization process would have the following steps:

1) NMFS would develop a proposed allocation of Federal resources across FMPs with industry-funded monitoring programs.  If available funding in a given year is sufficient, this distribution would be based on the allocation necessary to fully implement the industry-funded monitoring coverage targets specified in each FMP.  If available funding is not sufficient to fully fund all industry-funded monitoring programs, then NMFS would recommend an allocation of resources across FMPs that would include:
   - The total amount of funding and seadays necessary to meet the coverage targets specified by each FMP if each FMP were fully funded, including each FMP's share of the total;
   - The coverage level for each FMP if each FMP maintains its percentage share of the total funding (e.g., a fishery with a bigger proportion of the total funding would absorb a bigger proportion of the shortfall);
   - The coverage levels that incorporate the recommended prioritization; and
   - The rationale for the recommended prioritization.

   NMFS' recommendation would be based upon a consideration of:
   - Any restrictions on the appropriations;
   - Funding necessary to meet mandatory coverage levels or standards in any FMPs or other legal mandates (i.e., required sector at-sea monitoring coverage in the NE multispecies fishery);

9

_0000000804

- Objectives of the individual industry-funded monitoring programs established by FMPs;
- The statistical basis for the FMP coverage target, including an evaluation of the basis for the coverage target (i.e., why the specified coverage level is necessary);
- Coverage already available in a fishery from other sources (e.g., if SBRM coverage in a given year provides sufficient information, additional industry-funded monitoring coverage may not be necessary);
- The extent to which proposed coverage or combinations of coverage would benefit management of fisheries or fleet types operating under multiple FMPs;
- The cost of coverage in each fishery, including the marginal cost and benefit of different coverage levels;
- Available funding to offset industry costs;
- Data needs of upcoming fishery management actions;
- Status of the stock of interest (i.e., coverage of a stock in poor condition would be prioritized over coverage of a stock in better condition);
- Risk to management based on fishery performance (e.g., a stock for which the quota is consistently under harvested is unlikely to face the same management risk as one with a constraining quota);
- The minimum level of coverage defined in the FMP that would provide sufficient information to meet the FMP's objectives for additional monitoring; and
- Any other criteria identified by NMFS and/or the Councils.

Some of the information above would be defined or analyzed in the original FMP action that created the industry-funded monitoring program. NMFS would first look to the original FMP action for information and update or supplement this information as necessary.

2) At the Spring Northeast Region Coordinating Council (NRCC) meeting, NMFS and the Councils would review NMFS's proposed allocation of funding and recommend any modifications to the prioritization.

3) Following this discussion, NMFS would provide the Councils, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels that incorporate the recommended prioritization, based on available funding; and (2) the rationale for the recommended prioritization, including the reason for any deviation from the NRCC's recommendations. The Councils may recommend revisions and additional considerations to be made by the Regional Administrator and Science and Research Director.

The process is outlined above as an annual process. However, an annual process could be time intensive and strain Council and NMFS resources. The prioritization process could be in effect for longer than one year by remaining as specified until revised.

Draft Discussion Document                                                        August 19, 2014

_0000000805

The Councils may choose to form a joint committee or hold a joint Council meeting instead of using the NRCC as the forum for the prioritization process.

Step 3 allows the Councils and NMFS to discuss any final revisions to the distribution, which might be necessary if the final budget is not known at the time of initial prioritization and is less than expected.

2.1.2.2 Omnibus Alternative 2.2:  Council-led Prioritization Process for Industry-funded Monitoring Programs

Under Omnibus Alternative 2.2, the Regional Administrator and Science and Research Director would inform the Councils of NMFS's available funding to achieve coverage targets for industry-funded monitoring coverage, including supporting NMFS's infrastructure costs and/or any offset of industry costs established in this amendment for the Herring and MSB FMPs and other FMP actions.  If available funding in a given year is sufficient, this distribution would be based on the allocation necessary to fully implement the industry-funded monitoring coverage targets specified in each FMP.  If available funding is not sufficient, the Councils would determine the best allocation of available funding across FMPs with industry-funded monitoring programs to meet regional priorities and make recommendations to NMFS.  NMFS and industry's costs would be defined as described by Omnibus Alternative 2.  Funding for SBRM, ESA, and MMPA observer coverage would not be changed by this measure.

The prioritization process would have the following steps:

1)  If available funding is not sufficient to fully fund all industry-funded monitoring programs, the Councils would form a PDT/FMAT to help develop a proposed allocation of resources across FMPs with industry-funded monitoring programs that would include:
    - The total amount of funding and seadays necessary to meet the coverage targets specified by each FMP if each FMP were fully funded, including each FMP's share of the total;
    - The coverage level for each FMP if each FMP maintains its percentage share of the total funding (e.g., e.g., a fishery with a bigger proportion of the total funding would absorb a bigger proportion of the shortfall);
    - The coverage levels that incorporate the recommended prioritization; and
    - The rationale for the recommended prioritization.

    The PDT/FMAT's recommendation would be based upon a consideration of:
    - Any restrictions on the appropriations;
    - Funding necessary to meet mandatory coverage levels or standards in any FMPs or other legal mandates (i.e., required sector at-sea monitoring coverage in the NE multispecies fishery);

11

_0000000806

- Objectives of the individual industry-funded monitoring programs established by FMPs;
- The statistical basis for the FMP coverage target, including an evaluation of the basis for the coverage target (i.e., why the specified coverage level is necessary);
- Coverage already available in a fishery from other sources (e.g., if SBRM coverage in a given year provides sufficient information, additional industry-funded monitoring coverage may not be necessary);
- The extent to which proposed coverage or combinations of coverage would benefit management of fisheries or fleet types operating under multiple FMPs;
- The cost of coverage in each fishery, including the marginal cost and benefit of different coverage levels;
- Available funding to offset industry costs;
- Data needs of upcoming fishery management actions;
- Status of the stock of interest (i.e., coverage of a stock in poor condition would be prioritized over coverage of a stock in better condition);
- Risk to management based on fishery performance (e.g., a stock for which the quota is consistently under harvested is unlikely to face the same management risk as one with a constraining quota);
- The minimum level of coverage defined in the FMP that would provide sufficient information to meet the FMP's objectives for additional monitoring; and
- Any other criteria identified by NMFS and/or the Councils.

Some of the information above would be defined or analyzed in the original FMP action that created the industry-funded monitoring program. The PDT/FMAT would first look to the original FMP action for information and update or supplement this information as necessary.

2) At the Spring NRCC meeting, NMFS and the Councils would review the PDT/FMAT's proposed allocation of funding for NMFS's infrastructure costs and offsets for industry costs. The NRCC would make any modifications and recommend a prioritization to NMFS.

3) NMFS would provide the Councils, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels that incorporate the recommended prioritization, based on available funding; and (2) the rationale for the recommended prioritization, including the reason for any deviation from the NRCC's recommendations. The Councils may recommend revisions and additional considerations to be made by the Regional Administrator and Science and Research Director.

Again, the process outlined above could be annual or the allocation of resources could remain as specified unless revised.

2.1.2.3 Omnibus Alternative 2.3:  Proportional Prioritization Process for Industry-funded Monitoring Programs

Under Omnibus Alternative 2.3, the amount of Federal funding available to support industry-funded monitoring in each FMP would be reduced by the same percentage as the funding shortfall.  If the available Federal funding falls short, the amount of the shortfall would be deducted from the total amount of funding to be allocated to each FMP, proportional to that FMP's share of the total funding need.  For example, an FMP that represents 20% of the total funding need would absorb 20% of the total funding shortfall.

There could be a scenario where the available Federal funding for a given FMP would produce a coverage level below the coverage target defined by the FMP as providing sufficient information to meet an FMP's objectives for monitoring.  For example, an additional 10 observed trips may provide additional data, but not sufficient data to provide a robust estimate of bycatch of the species of interest.  In this case, that FMP would not receive additional coverage and the funding for that FMP would be re-allocated proportionally to other FMPs.

NMFS would determine and provide the Councils with:  (1) The estimated industry-funded monitoring coverage levels that incorporates the proportional adjustments, based on available funding; and (2) the rationale for the recommended prioritization, including how it deviates from the fully funded coverage levels across all FMPs.  This could be done on an annual basis or the allocation of resources could remain as specified unless revised.

Example       FMP 1 needs $3 million, FMP 2 needs $5 million, and FMP 3 needs $2 million to fully implement their coverage targets.  The total funding need is $10 million, with FMP 1 needing 30%, FMP 2 50%, and FMP 3 20% of the total.  If there is only $8 million in Federal funds for the coming year, then there is a $2 million shortfall.  Using the proportional prioritization process, NMFS would allocate the $8 million such that each FMP maintains its share of the total.  FMP 1 would get 30% of $8 million, or $2.4 million, FMP 2 would get 50% of $8 million, or $4 million, and FMP 3 would get 20% of $8 million, or $1.6 million.  These would be the total funds available to the FMPs to fund NMFS's costs for coverage days above SBRM.

2.1.2.4 Omnibus Alternative 2.4:  Cost-based Prioritization Process for Industry-funded Monitoring Programs

Under Omnibus Alternative 2.4, the Federal funding would be assigned to each FMP by sequentially eliminating coverage in FMPs that have the highest funding need until the available funding is sufficient to meet the funding needs of the FMPs remaining.  This process would prioritize fisheries with the least expensive programs first.  NMFS would determine and provide the Councils with:  (1) The estimated industry-funded monitoring coverage levels that incorporates the prioritization, based on available funding; and (2) the rationale for the

13

_0000000808

recommended prioritization, including how it deviates from the fully-funded coverage target across all FMPs.  This could be done on an annual basis or the allocation of resources could remain as specified unless revised.

Example       FMP 1 needs $3 million, FMP 2 needs $5 million, and FMP 3 needs $2 million to fully implement their coverage targets.  The total funding need is $10 million, with FMP 1 needing 30%, FMP 2 50%, and FMP 3 20% of the total.  If there is only $8 million in Federal funds for the coming year, then there is a $2 million shortfall.  Under the cost-based prioritization approach, NMFS would eliminate the FMP with the highest cost first, FMP 2.  Because total funding need of the remaining programs, $5 million, is less than the available Federal funds, $8 million, coverage for FMP 1 and FMP 3 would be fully funded.  FMP 2 would receive no additional coverage.  This leaves $3 million in unused Federal funds, or this amount could be put toward achieving some coverage for FMP 2.

## 2.1.2.5 Omnibus Alternative 2.5:  Coverage Ratio-based Prioritization Process for Industry-funded Monitoring Programs

Under Omnibus Alternative 2.5, the amount of funding would be allocated to each FMP by prioritizing coverage in fisheries that have the lowest coverage needs (based on projections for the coming year) relative to effort (based on vessel trip reports from the previous year).  In practice, this would mean that fisheries with the highest ratio of coverage to effort would be sequentially eliminated until the available Federal funding is sufficient to meet the coverage targets of the remaining FMPs.  NMFS would determine and provide the Councils with:  (1) the estimated industry-funded monitoring coverage levels that incorporate the prioritization, based on available funding; and (2) the rationale for the recommended prioritization, including how it deviates from the fully funded coverage levels across all FMPs.  This could be done on an annual basis or the allocation of resources could remain as specified unless revised.

Example       FMP 1 needs $3 million, FMP 2 needs $5 million, and FMP 3 needs $2 million to fully implement their coverage targets.  The total funding needed is $10 million, but there is only $8 million in Federal funds for the coming year, so there is a $2 million shortfall.  Under the coverage ratio-based prioritization approach, NMFS would calculate the following ratio for each FMP:

$$\text{Coverage Ratio} = \frac{\text{Projected coverage days needed in the coming year}}{\text{Level of effort in the previous year}}$$

If FMP 1 had a ratio of 0.1, FMP 2 a ratio of 0.08, and FMP 3 a ratio of 0.2, FMP 3 would be eliminated from coverage first.  Because the total funding need of the remaining programs, $8 million, can be met by the available Federal funding, $8 million, coverage for FMP 1 and FMP 2 would be fully funded.  FMP 3 would receive no additional coverage in the coming year.

14

_0000000809

## 2.1.3 Considered But Rejected Omnibus Alternatives

The January 2014 version of the Discussion Document contained a Vessel Cancellation Charge Option. That option included discussion of a fee to be paid by the vessel to the at-sea observer service provider when vessels are a "no show" or when they cancel trips less than 12 hours before the scheduled departure time. That option also discussed that payment of fees would be a vessel permit requirement and that outstanding fees would result in non-renewal of vessel permits.

As the PDT/FMAT further developed this option, the Department of Commerce Office of General Counsel advised that the government may not dictate the terms of a private transaction such as this fee. As a result, the Vessel Cancellation Charge Option is likely not legal because it involves the terms of a private business contract between a vessel and an observer service provider. While an observer service provider or a vessel could specify a cancellation fee as part of a contract, thereby eliminating the necessity of increasing the base rate that all vessels pay, it is unlikely that NMFS could legally require or specify the amount of such a fee.

## 2.2 ATLANTIC HERRING MONITORING ALTERNATIVES

As described in the Introduction, the New England Council is interested in increasing monitoring in the Herring FMP to assess the amount and type of catch, to monitor annual catch limits, and/or provide other information for management. This increased monitoring is above and beyond coverage required through the SBRM, the ESA, or MMPA. The amount of available Federal funding to support additional monitoring and legal constraints on the sharing of costs between NMFS and the fishing industry have recently prevented NMFS from approving proposals for industry-funded monitoring in some fisheries, specifically Atlantic Herring Amendment 5. This amendment is intended to remedy the industry-funded monitoring disapproval in Herring Amendment 5 by establishing (1) a process by which available Federal funding could be allocated to the Herring FMP and (2) a monitoring coverage target for the industry-funded monitoring to achieve on an annual basis to meet Herring FMP objectives.

Using the process established in this amendment, the realized coverage level for the Herring FMP in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities a given year. The realized coverage level for the Herring FMP in a given year (above and beyond SBRM) would fall anywhere between no additional coverage above SBRM and the specified coverage target. Establishing monitoring coverage targets would allow NMFS to approve and implement new industry-funded monitoring programs, without committing to support coverage levels above appropriated funding or before funding is determined to be available.

However, this amendment WOULD NOT automatically allow for higher coverage levels in the herring fishery. This amendment establishes tools that NMFS and the Councils could use to provide additional monitoring in the herring fishery when Federal funding is available.

Draft Discussion Document                                                    August 19, 2014

_0000000810

Therefore, during years when there is no additional funding to cover NMFS cost responsibilities above funding for SBRM, the tools developed in this amendment would not be used and there would be no additional monitoring coverage in the herring fishery, even if industry is able to fully fund their cost responsibilities.

Under Omnibus Alternative 2, the details of any industry-funded monitoring program, including at-sea, dockside, or electronic monitoring, may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) process for vessel notification and selection, (4) fee collection and administration, (5) standards for monitoring service providers, and (6) any other measures necessary to implement the industry-funded monitoring program.  Additional NEPA analysis may be required for any subsequent Herring FMP framework adjustment action modifying the industry-funded monitoring program.

Additionally, after the specified target coverage levels are effective for 2 years, this amendment gives the New England  Council the choice to either (1) require that target coverage levels expire or (2) examine the results of any higher coverage in herring fishery, and consider if adjustments to the coverage targets are warranted.  Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via specifications, a framework adjustment, or an amendment to the Herring FMP, as appropriate.

Draft Discussion Document                                                          August 19, 2014

_0000000811

2.2.1 – 2.2.2.4 RANGE OF HERRING MONITORING ALTERNATIVES

| Atlantic Herring Monitoring Alternatives | Target Coverage Level | Coverage Category | Effects on Fishing Effort | Comments |
|---|---|---|---|---|
| **Herring Alternative 1: No Coverage Target** | No additional coverage above SBRM, ESA, and MMPA | SBRM allocates observer coverage based on gear and area | No effect | No target level specified |
| **Herring Alternative 2: Coverage Target Specified** | Target coverage level specified for industry-funded monitoring above SBRM, ESA, and MMPA | Coverage target specified by permit and/or gear | Effects vary by alternative | Ability to target coverage level is variable |
| **Herring Alternative 2.1: Up to 100% Coverage** | *Up to* 100% coverage on Category A and B vessels | Category A and B vessels | Vessels fish under waivers when Federal funding limits observer coverage | Target coverage level is likely not met |
| **Herring Alternative 2.2: 100% Coverage** | 100% coverage on Category A and B vessels | Category A and B vessels | Vessels cannot fish without an observer when Federal funding limits observer coverage; effort is reduced to match observer coverage | Target coverage level is met |
| **Herring Alternative 2.3: Up to Specified Confidence Interval Coverage** | *Up to* specified confidence interval around RH/S catch | Category A, B, C, and E vessels are subject to RH/S catch caps | Vessels fish under waivers when Federal funding limits observer coverage | Target coverage level is likely not met; aligns with Mackerel Alternative 2.3 |
| **Herring Alternative 2.4: Confidence Interval Coverage** | Specified confidence interval around RH/S catch | Category A, B, C, and E vessels are subject to RH/S catch caps | Vessels cannot fish without an observer when Federal funding limits observer coverage; effort is reduced to match observer coverage | Target coverage level is met; aligns with Mackerel Alternative 2.4 |

Discussion Document                                         August 19, 2014

_0000000812

2.3 ATLANTIC MACKEREL MONITORING ALTERNATIVES

As described in the Introduction, the Mid-Atlantic Council is interested in increasing monitoring for the mackerel fishery in the MSB FMP to assess the amount and type of catch, to monitor annual catch limits, and/or provide other information for management.  This increased monitoring is above and beyond coverage required through the SBRM, the ESA, or MMPA.  The amount of available Federal funding to support additional monitoring and legal constraints on the sharing of costs between NMFS and the fishing industry have recently prevented NMFS from approving proposals for industry-funded monitoring in some fisheries, specifically MSB Amendment 14.  This amendment is intended to remedy the industry-funded monitoring disapproval in MSB Amendment 14 by establishing (1) a process by which available Federal funding could be allocated to the MSB FMP and (2) a monitoring coverage target for the industry-funded monitoring to achieve on an annual basis to meet MSB FMP objectives.

Using the process established in this amendment, the realized coverage level for the MSB FMP in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities a given year.  The realized coverage level for the MSB FMP in a given year (above and beyond SBRM) would fall somewhere between no additional coverage above SBRM and the specified coverage target.  Establishing monitoring coverage targets would allow NMFS to approve and implement new industry-funded monitoring programs, without committing to support coverage levels above appropriated funding or before funding is determined to be available.

However, this amendment WOULD NOT automatically allow for higher coverage levels in the mackerel fishery.  This amendment establishes tools that NMFS and the Councils could use to provide additional monitoring in the mackerel fishery when Federal funding is available.  Therefore, during years when there is no additional funding to cover NMFS cost responsibilities above funding for SBRM, the tools developed in this amendment would not be used and there would be no additional monitoring coverage in the mackerel fishery, even if industry is able to fully fund their cost responsibilities.

Under Omnibus Alternative 2, the details of any industry-funded monitoring program, including at-sea, dockside, or electronic monitoring, may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) process for vessel notification and selection, (4) fee collection and administration, (5) standards for monitoring service providers, and (6) any other measures necessary to implement the industry-funded monitoring program.  Additional NEPA analysis may be required for any subsequent MSB FMP framework adjustment action modifying the industry-funded monitoring program.

Additionally, after the specified target coverage levels are effective for 2 years, this amendment gives the Mid-Atlantic  Council the choice to either (1) require that target coverage levels expire or (2) examine the results of any higher coverage in mackerel fishery, and consider if adjustments to the coverage targets are warranted.  Depending on the results and desired

18

_0000000813

actions, subsequent action to adjust the coverage targets could be accomplished via specifications, a framework adjustment, or an amendment to the MSB FMP, as appropriate.

19

_0000000814

2.3.1 – 2.3.2.4 RANGE OF MACKEREL MONITORING ALTERNATIVES

| Atlantic Mackerel Monitoring Alternatives | Target Coverage Level | Coverage Category | Effects on Fishing Effort | Comments |
|---|---|---|---|---|
| **Mackerel Alternative 1: No Coverage Target** | No additional coverage above SBRM, ESA, and MMPA | SBRM allocates observer coverage based on gear and area | No effect | No target level specified |
| **Mackerel Alternative 2: Coverage Target Specified** | Target coverage level specified for industry-funded monitoring above SBRM, ESA,  and MMPA | Coverage target specified by permit and/or gear | Effects vary by alternative | Ability to target coverage level is variable |
| **Mackerel Alternative 2.1: Up to Target Coverage Levels** | *Up to* 100% coverage on limited access MWT & Tier 1 SMBT; 50% coverage on Tier 2 SMBT; 25% on Tier 3 SMBT | Limited access MWT and SMBT | Vessels fish under waivers when Federal funding limits observer coverage | Target coverage level is likely not met |
| **Mackerel Alternative 2.2: Target Coverage Level** | 100% coverage on limited access MWT & Tier 1 SMBT; 50% coverage on Tier 2 SMBT; 25% on Tier 3 SMBT | Limited access MWT and SMBT | Vessels cannot fish without an observer when Federal funding limits observer coverage; effort is reduced to match observer coverage | Target coverage level is met |
| **Mackerel Alternative 2.3: Up to Specified Confidence Interval Coverage** | *Up to* specified confidence interval around RH/S catch | Limited access MWT and SMBT | Vessels fish under waivers when Federal funding limits observer coverage | Target coverage level is likely not met; aligns with Herring Alternative 2.3 |
| **Mackerel Alternative 2.4: Confidence Interval Coverage** | Specified confidence interval around RH/S catch | Limited access MWT and SMBT | Vessels cannot fish without an observer when Federal funding limits observer coverage; effort is reduced to match observer coverage | Target coverage level is met; aligns with Herring Alternative 2.4 |

August 19, 2014

_0000000815

3.0 DESCRIPTION OF THE AFFECTED ENVIRONMENT

3.1 INTRODUCTION

3.1.1 TARGET SPECIES

3.1.2 NON-TARGET AND BYCATCH SPECIES

3.1.3 PHYSICAL ENVIRONMENT AND ESSENTIAL FISH HABITAT

3.1.3.1 PHYSICAL ENVIRONMENT

3.1.3.2 ESSENTIAL FISH HABITAT

3.1.4 ENDANGERED AND OTHER PROTECTED SPECIES

3.1.4.1 SPECIES PRESENT IN THE AREA

3.1.4.2 SPECIES POTENTIALLY AFFECTED

3.1.5 HUMAN COMMUNITIES

3.1.5.1 ATLANTIC HERRING AND MACKEREL VESSELS AND PERMIT CATEGORIES

3.1.5.2 ATLANTIC HERRING AND MACKEREL FISHERY SPECIFICATIONS AND LANDINGS

3.1.5.3 ATLANTIC HERRING AND MACKEREL FISHERY REVENUES

3.5.1.4 ATLANTIC HERRING AND MACKEREL FISHERY COMMUNITIES

4.0 ENVIRONMENTAL CONSEQUENCES OF THE ALTERNATIVES

4.1 IMPACTS TO TARGET SPECIES

4.2 IMPACTS TO NON-TARGET SPECIES AND BYCATCH SPECIES,

4.3 IMPACTS TO THE PHYSICAL ENVIRONMENT AND EFH

4.4 IMPACTS TO ENDANGERED AND OTHER PROTECTED SPECIES

4.5 IMPACTS TO HUMAN COMMUNITIES

4.6 IMPACTS SUMMARY

5.0 CUMULATIVE EFFECTS ANALYSIS

5.1 TARGET SPECIES

Discussion Document                                                                 August 19, 2014

_0000000816

5.2 NON-TARGET AND BYCATCH SPECIES

5.3 PHYSICAL ENVIRONMENT AND EFH

5.4 ENDANGERED AND PROTECTED SPECIES

5.5 HUMAN COMMUNITIES

5.6 NON-FISHING ACTIVITIES

6.0 OTHER APPLICABLE LAWS

6.1 MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT

6.2 NATIONAL ENVIRONMENTAL POLICY ACT

6.2.1 FINDING OF NO SIGNIFICANT IMPACT

6.3 MARINE MAMMAL PROTECTION ACT

6.4 ENDANGERED SPECIES ACT

6.5 PAPERWORK REDUCTION ACT

6.6 INFORMATION QUALITY ACT

6.7 IMPACTS OF FEDERALISM/EXECTIVE ORDER 13132

6.8 ADMINISTRATIVE PROCEDURES ACT

6.9 COASTAL ZONE MANAGEMENT ACT

6.10 REGULATORY FLEXIBILITY ACT/EXECUTIVE ORDER 12866

6.10.1 Regulatory Impact Review and Initial Regulatory Flexibility Analysis

6.10.2 Description of Management Objectives

6.10.3 Description of the Fishery

6.10.4 Statement of the Problem

6.10.5 Description of the Alternatives

6.10.6 Economic Analysis

6.10.7 Determination of Significance Under E.O. 12866

Draft Discussion Document                                                August 19, 2014

_0000000817

6.10.8 Initial Regulatory Flexibility Analysis

6.10.8.1 Reasons for Considering the Action

6.10.8.2 Objectives and Legal Basis for the Action

6.10.8.3 Description and Number of Small Entities to Which the Rule Applies

6.10.8.4 Recordkeeping and Reporting Requirements

6.10.8.5 Duplication, Overlap, or Conflict with Other Federal Rules

6.10.8.6 Economic Impacts on Small Entities Resulting from the Proposed Action

7.0 LITERATURE CITED

8.0 LIST OF PREPARERS

9.0 AGENCIES CONSULTED

Draft Discussion Document                                                                                     August 19, 2014

_0000000818

**MEMORANDUM**

**DATE:**     August 15, 2014

**TO:**       New England Fishery Management Council
            Mid-Atlantic Fishery Management Council

**FROM:**     Industry-funded Monitoring Plan Development Team/Fishery Management
            Action Team

**SUBJECT:**  Industry-funded Monitoring Omnibus Amendment Development

1.   The PDT/FMAT met via in person on March 7 and August 5, 2014 to continue development of the omnibus amendment to address observer funding issues.  The March 7th PDT/FMAT meeting focused on planning the analysis and the  PDT reviewed the preliminary results of the analysis at the August 5th meeting, so the meeting reports of these meetings are combined. PDT/FMAT participants at the March 7th meeting included Melissa Hooper, Aja Szumylo, Carrie Nordeen, Katherine Richardson, J. Michael Lanning, (NMFS GARFO), Susan Gardner, Kelly Neville, Andrew Kitts, Kiersten Curti, Susan Wigley, Paul Rago (NMFS NEFSC), Jason Didden(MAFMC), and Lori Steele (NEFMC), and several members of the public.  Participants at the August 5th meeting included Carrie Nordeen, Katherine Richardson, J. Michael Lanning, (NMFS GARFO), Andrew Kitts, Kiersten Curti, Susan Wigley, Amy Martins, (NMFS NEFSC), Jason Didden(MAFMC), and Lori Steele (NEFMC), and several members of the public.

**2.   Prioritization Process and Timeline**

At the August 5th meeting, the PDT reviewed several potential schedules for the prioritization process alternatives (Table 1).  The IFM Omnibus would create the framework for industry-funded monitoring (IFM) programs for all fisheries for coverage above and beyond SBRM. Under this amendment, the Councils could flesh out those monitoring programs in future actions, but these programs would be contingent upon funding which would be allocated through a prioritization process, on an annual or other time scale, to determine actual seaday allocations for any given year.  The sub-options in the document consider different processes for this prioritization, which would follow different schedules.  The major components affecting the schedules are:
   1. How much discretion does NMFS have?  Advice from NE General Counsel is that the more discretion NMFS has, the more likely rulemaking and additional NEPA would be required before the seaday allocation could be put into effect.  The formulaic alternatives (2.3-2.5) are not likely to require rulemaking.
   2. How much Council and public input is desired?  In what forum would the prioritization take place?  Hosting public meetings or syncing with Council meetings, as opposed to a formula computed by NMFS, requires a longer process.  But more public input reduces need for rulemaking.
   3. Does the amount of industry-funded coverage depend on the amount of SBRM coverage in the same fishery?  If an IFM program counts SBRM coverage toward the IFM

coverage in a given fishery (e.g., as in sector ASM), then it will be necessary to conduct the IFM prioritization after the SBRM prioritization is complete.

4. When is NMFS's budget to support IFM known? The IFM funding prioritization can't be completed without a budget. The draft timelines are based on a January/February timeline for final budget approval, as that has been the case recently. However, that may differ year to year.

5. How much or what type of information is needed to calculate the IFM coverage? The availability of different types of data would affect when the analysis could begin, and the complexity of the analysis would also affect the timeline. At this time, it is difficult to predict what type of analysis would be needed and how long it would take.

6. What is the "coverage year"? Is the IFM coverage allocated on the fishing year, calendar year, or SBRM year? This would affect when the process needs to be completed by. Because the prioritization process would have to address all fisheries that have an IFM program, it may be necessary for all IFM programs to be on a consistent timeline with each other and with SBRM (April-May).

Alternatives 2.1/2.2 – These alternatives have the advantage of allowing the Councils and NMFS the most discretion over the funding priorities. However, they call for substantial analysis to be prepared by someone (a PDT or NMFS), and for that analysis to be presented at a joint meeting between the Councils, such as an NRCC meeting. These alternatives would also likely require rulemaking because of the potential for very different priorities year to year. After reviewing potential timelines for this alternative, the PDT concluded that the process laid out in these alternatives would be difficult, maybe impossible, to complete within a year and thus could not be done annually. The PDT recommends that this alternative include a schedule based on a 2-3 year cycle, similar to how the Councils set specifications. This would allow the Councils/NRCC and NMFS to go through the prioritization process before NMFS conducts rulemaking, and the rulemaking to be complete before the annual budget/SBRM process begins. This could work if NMFS and the NRCC/Councils agree on a set of priorities that would remain static for 3 years, and that NMFS would use to run a formulaic prioritization on an annual basis to determine final coverage rates based on available funding, without additional rulemaking (similar to SBRM). This would also provide some stability for industry, because they would know if their fishery was first priority and, therefore, more likely to get funding and have IFM in those 2-3 years. However, this would mean that the Councils would be conducting the prioritization well in advance of the specs cycle and would not modify the criteria during a cycle, although the Councils could always do so anyway if new information became available.

Alternatives 2.3/2.4/2.5 – Under these alternatives, the Councils would select a formula in this omnibus amendment that NMFS would use to determine the funding allocation to each IFM program. The formula would be agreed upon and analyzed in this omnibus amendment, so additional rulemaking would not be required. This results in a more streamlined timeline that could be completed on an annual basis and adjust to changes in budget from year to year. However, these alternatives are blunt tools that do not provide NMFS or the Councils any discretion over the funding priorities in a given year.

In order for a monitoring program to be implemented with completion of this action, the Councils/NMFS would have to run the Council's preferred prioritization process as part of the

omnibus rulemaking (AND assuming there is funding).  Depending upon which alternative the Councils select and how long it would take, the Councils may want to specify a separate one-time priority list through this amendment that would stand for the first 1-2 years (contingent upon funding), until the prioritization process could be set up and run.

The PDT had some questions for the Observer Committee related to the timing and process for these alternatives:

1. Is the timing and process laid out for the alternatives clear? Are there any modifications or other alternatives that the Committee recommends for consideration?
2. For Alternatives 2.1/2.2, what joint meeting forum does the Committee recommend to consider for the prioritization discussion?
3. Does the Committee inclusion of a separate one-time priorities list in this action for the early years of implementation?

**Table 1:  Current and potential process schedules**

|  |  | Status Quo (SBRM, etc.) | Alternatives 2.1.-2.2 (discretionary) | Alternatives 2.3-2.5 (formulaic) |
|---|---|---|---|---|
| Year 1 | January-April |  | Prepare and analyze draft IFM prioritization for Years 2-4 **(4 mos)** |  |
|  | April |  | NRCC and/or Councils review draft IFM prioritization for Years 2-4 |  |
|  | May-October |  | NMFS conducts proposed and final rulemaking **(6 mos)** |  |
|  | October – December | Observer data July Year 0 - June Year 1 is available; work on analysis for SBRM; work on analysis for sector ASM **(3 mos?)** | Observer data July Year 0 - June Year 1 is available;work on analysis for IFM including coverage and  funding needs **(3 mos)** | Observer data July Year 0 - June Year 1 is available; work on analysis for IFM including coverage and  funding needs **(3 mos)** |
| **Year 2** | January-February | Receive Year 2 budget; publish sector ASM coverage rates in proposed rule; determine scallop seaday schedule and compensation rate **(1-2 mos?)** | Receive Year 2 budget; determine whether funding sufficient; determine final Year 2 coverage rates **(2 mos)** | Receive Year 2 budget; determine whether funding sufficient; run IFM prioritization **(2 mos)** |
|  | March | Run SBRM | Announce Year 2 | Announce Year 2 |

| | | prioritization; publish sector ASM rates in final rule; begin scallop Year 2; roll-out SBRM seadays to providers ASAP **(1-2 mos)** | coverage rates and roll-out to providers **(min 30 days before year start)** | coverage rates and roll-out to providers **(min 30 days before year start)** |
|---|---|---|---|---|
| | April | Begin Year 2 seaday schedule for SBRM | Begin Year 2 for IFM; NMFS briefs Councils on final rates | Begin Year 2 for IFM; NMFS briefs Councils on final rates |
| | May | Begin sector ASM Year 2 | | |

### 3. Prioritization Criteria

Alternatives 2.1/2.2 include criteria to be used by the PDT/FMAT or NMFS in developing the initial recommendations for funding priorities.  These criteria are meant to guide the PDT/NMFS and ensure they examine all the factors that the Councils wish to weigh on the decision.  The PDT discussed how the PDT/NMFS would use the criteria in any given year to generate a recommendation.  The criteria are quite diverse and it is not clear how the PDT/NMFS is intended to weight fisheries within a criterion or across criteria.  For example, if one fishery's objective is to monitor bycatch of an overfished stock, while another fishery's objective is to monitor a recently listed species, which should take priority?  In absence of further guidance, this would require the PDT/NMFS to project what value judgments the Councils are likely to make and to reconcile the different concerns of the two Councils in order to generate the initial recommendation.  The PDT was concerned that this would be too much to expect of the PDT/NMFS and would require a significant amount of analysis that would extend the process timeline.  This wide open process could also result in vastly different recommendations from cycle to cycle, which would be unstable for the industry and may require more public input and be more likely to be litigated.  The PDT considered developing a weighting scheme in this omnibus amendment that could provide the PDT/NMFS more guidance in developing their initial recommendation.  The PDT found an example of a similar process that the Mid-Atlantic SSC developed to prioritize RSA projects (Attachment 1).  Developing a similar weighting scheme in this omnibus would require the Councils to make value judgments now about the different criteria and FMPs, but would save time in the specs cycle process.  The Councils could make modifications to the weighting scheme frameworkable.

The PDT was concerned that if the Councils have difficulty agreeing on the weighting scheme, it could delay the omnibus.  The PDT considered whether a separate omnibus framework adjustment could be the vehicle for the weighting scheme to be implemented after the omnibus amendment.  However, the actual prioritization of funding could not take place until the framework is implemented, so the PDT concluded this would not save time.  If the Council specified a one-time priorities list in this omnibus amendment to be effective until the framework

is implemented, this may be more feasible.  The PDT plans to investigate this option further and try to develop a weighting scheme to present at the Committee's next meeting.

Specific questions the PDT has for the Committee on this topic:
1. Does the Committee support the list of criteria in Alternatives 2.1 and 2.2?  Are there any modifications the Committee recommends?
2. Does the Committee support the idea to try to develop a weighting scheme for prioritizing fisheries?

## 4.  Monitoring Provider Standards

The Omnibus Alternative 2 will lay out a framework for IFM programs moving forward, including general standards for monitoring providers and individual monitors.  The SBRM amendment already includes general standards for observers and observer providers.  This omnibus amendment would add standards for other types of monitoring programs, such as at-sea monitoring, dockside monitoring, portside sampling, and electronic monitoring (EM).  The PDT plans to develop these standards for the Committee's next meeting.  The PDT discussed what types of programs and standards to include in the amendment.  The observer provider standards are based on national policy and national policies may be developed in the future for EM providers and other types of providers.  The PDT discussed that any provider standards developed in this amendment should be consistent with national policy and existing observer service provider standards.  Although these types of monitoring programs differ in terms of the types of data they collect, the PDT thought it would be possible to develop some overarching standards for all monitoring programs in this amendment (e.g., conflict of interest, insurance requirements).  Later Council frameworks that implement IFM programs for individual fisheries could then add on any specific standards applicable to their individual situation.  The PDT thought that EM may be too fluid at this point to develop specific standards, but it may be possible to include EM in some of the general standards.

The PDT noted that there are different educational requirements for groundfish ASMs (high school diploma) and observers (college degree), and that the Councils need to clarify whether the general ASM standards developed in this omnibus would include the college degree requirement or the high school diploma requirement, and if the former, if they would supersede the groundfish ASM standards.  Because ASMs collect a simpler dataset than NEFOP observers and only have to have a high school diploma, it was thought they would require less training and could be paid less, which would reduce the costs of the program.  However, the National Observer Program conducted a review of ASM and observer performance and found that ASMs have not been a cost savings.  In addition, wages are established by the Department of Labor based on the duties and environment of the position, which is not substantially different for ASMs and observers, so observers and ASMs receive the same wages.  Providers also take experience into account in setting wages.  ASMs are less likely to complete the training program and have a higher attrition rate, requiring them to be more frequently replaced, which increases costs.  They also found that ASMs struggle more with the subsampling methods under intense conditions (e.g., high volume catches), resulting in lower data quality.  Therefore, NEFSC staff recommends not extending the exemption from the college degree requirement.

The PDT has the following questions for the Committee on this topic:
1. Does the Committee support using the observer service provider requirements from the SBRM amendment to establish consistent requirements for all third party monitoring services (at-sea, dockside, EM)?
2. Does the Committee recommend that the omnibus standards supersede the groundfish ASM standards?

## 5.  Monitoring Costs/Economic Analysis

At the March 5th meeting, the PDT discussed how to approach the economic analysis for the omnibus and individual FMP alternatives.  At the August 5th meeting, the PDT received an initial report from the NEFSC and discussed how to proceed.  The omnibus alternatives (1 and 2) are all administrative. Since there would be no impacts on the fishing industry until a framework implements a regulation using these administrative requirements, an analysis of impacts can be general at this time.  A detailed analysis of impacts will be needed when a framework adjustment is made on a fishery FMP.  For Alternative 2.1 and 2.2, it would be helpful to provide information about the level of costs to be borne by NMFS and by the industry so the public and decision makers have a sense of the relative magnitudes of the separate cost responsibilities. While this would not be a formal economic evaluation, it would provide useful information for when a framework proposes a level of observer coverage so there is a clear understanding of how that translates to costs for industry, and for NMFS.

For all of the mackerel and herring coverage options (Herring Alternatives 1-2.4, Mackerel Alternatives 1-2.4) an estimate on the impacts on fishing vessels from paying for increased observer coverage is required.  These are the general steps for doing this analysis:
Under each coverage option:
1. Identify the directly regulated vessels
2. Identify trips from the previous year's landings records that would have been eligible for selection under the new proposed coverage.
3. Describe the regulated vessels and eligible trips and, if appropriate, divide them into categories for analyses (large/small vessels, long/short trips, etc)
4. Estimate the number of trips, by category (could do a random selection of trips), that would get observer coverage
5. Calculate the average revenue and average operating costs by vessel category
6. Show to what degree the increased industry-funded observer cost (and so would need a breakdown of observer costs) increases the average operating costs.  Report this impact on a per trip basis and on an annual basis.
7. Calculate the cost to both industry and to NMFS of the increased observer coverage, including the average vs. marginal costs.

However, the NEFSC's research into monitoring costs revealed a clarification that needs to be made to the definition of cost responsibility.  Specifically, training and debriefing costs need to be separated between the cost of labor and facilities to provide the training/debriefing (NMFS responsibility) and the salary and per diem of the monitors for attending the training/debriefing (not NMFS responsibility). The NEFSC also has costs for maintaining a liaison between the NEFSC, enforcement, the USCG, and the observer providers to address safety and compliance

issues for IFM programs. The PDT has made this clarification to Omnibus Alternative 2. The PDT plans to provide annual totals for each of these items, as well as in terms of cost per seaday. The PDT is still compiling this information, and does not have actual number values to share with the Committee at this time. However, the PDT wanted to prepare the Committee for the eventual results - that the cost per seaday based on Alternative 2, assuming a total seaday cost is ~$1200, is likely to be ~$300-500/day for NMFS and $700-900/day for industry. This is substantially different than the $325/day industry cost called for in the original herring and mackerel amendments.

Another consideration for this analysis is that infrastructure costs do not increase in seaday increments. At a given certain level of infrastructure, the NEFSC may be able to absorb some additional seadays, up to a point. After that tipping point, another substantial investment of infrastructure would be needed (e.g., a new lease on additional office space, hiring a new staff member, modification to a contract or creation of a new contract). How much additional coverage could be absorbed depends on how close to the tipping point the Observer Program is at any given time. NEFSC staff are looking at the amount of additional seadays they may be able to absorb at current levels, and preliminarily estimated it to be an additional 10% of total seadays. An additional 20% seadays would require additional infrastructure investment.

The NEFSC does not track costs by individual FMP or by the items listed in Alternative #, but the NEFSC is trying to develop annual and seaday cost estimates for each of the items. This may be necessary for the NEFSC to do on a regular basis as part of the analysis for the eventual prioritization process, in order for the prioritization to be scalable. For example, if the NEFSC has $2M, they need to be able to translate that into seadays in order to determine how much coverage that would provide a given FMP. Estimates would have to be generated for different types of monitoring programs in order to see how far the funding would go in a fishery with observer coverage vs. a fishery with dockside monitoring, which have different per day costs.

## 6. Observer Coverage Alternatives Analysis

At the March 7th meeting, the PDT developed an approach to the analysis in support of the alternatives for observer coverage in the herring and mackerel fisheries (Herring Alternatives and Mackerel Alternatives 1-2.4). On August 5th, the PDT received a progress report on the analysis.

The PDT has been working on updating the analysis of incidental catch of river herring and shad by different gear types, similar to the analysis conducted for mackerel Amendment 14. Preliminary results are consistent with previous analysis. For river herring species, midwater trawl gear and small mesh bottom trawl gear continue to account for the large majority of incidental catch. For shad species, large mesh gillnets account for the greatest percentage, followed by small mesh bottom trawl gear, and then midwater trawl gear. NEFSC staff are continuing to refine these results and plan to present them at a later date. NEFSC staff are also planning to calculate CVs/confidence intervals for the estimates, and develop curves of the relationship of a given CV/CI to coverage level. The NEFSC is also looking further into which fisheries in the small mesh bottom trawl strata are responsible for the river herring catch. This should assist the PDT in identifying what CV/CI and coverage levels to recommend to the Councils and for which gear types or permit categories in the alternatives.

The PDT has also discussed several other ideas to pursue in the analysis:

- Look at the CV/CI at the catch cap vs. fleet vs. stock level, which can require different sample sizes and lead to vastly different coverage rates.
- Look at what level of precision would provide assurance for monitoring catch caps. The PDT could use the methodology developed in FW 3 for the catch caps to simulate the performance of the estimates under different scenarios.
- Examine changes to CV/CI as a result of coverage on gear types/permit categories under the catch caps vs. gears responsible for the most incidental catch. This would illustrate the value of coverage on different trip types in terms of precision. Modes with high variance, but not necessarily high volume, of discards will tend to be magnet for observer coverage, so it is important to determine what modes to focus coverage on.
- Look at the relationship of precision to cost, and the tradeoffs. What is the marginal value of incremental increases in coverage?
- Determine timeliness of data needed for making determinations if analysis had to be conducted as part of prioritization process.
- Consider whether a single coverage target or complimentary coverage targets for both herring and mackerel fisheries would meet objectives, given the amount of overlap in these fisheries.
- Look at what kind of SBRM coverage herring and mackerel fleets would be likely to get under the SBRM amendment to see if would satisfy some objectives. If so, additional IFM coverage might not be needed, or additional coverage could focus on making up for specific short-falls (e.g., if compliance objective, then maybe EM).
- Consider alternatives that might take advantage of the overlap in the herring and mackerel fisheries for efficiency.

SBRM Coverage

The NEFSC ran the Councils' preferred SBRM amendment prioritization process for the first time to determine 2014 seaday allocations, so the PDT was able to get an idea of the coverage levels herring and mackerel modes might get under the SBRM amendment. Currently, midwater trawl vessels are required to have 100-percent coverage of trips into the groundfish closed areas. The NEFSC typically sets aside a pool of sea days for this coverage based on the anticipated number of closed area trips, prior to conducting the seaday allocation for SBRM. So this coverage is in addition to any seadays the midwater trawl fleets are allocated through the SBRM prioritization process. This has resulted in fairly high overall coverage levels for the herring fishery in recent years. However, this separate closed area seaday allocation is not expected to continue after implementation of the SBRM amendment because the amendment requires that the funding currently used for this purpose be directed exclusively to SBRM. Beginning April 2015, the midwater trawl fleets would only receive coverage allocated through SBRM. This amounted to 45 seadays in 2014 for NE midwater trawl (pilot coverage), and none for MA midwater trawl. The MA midwater trawl mode is filtered out by the "trip filter, " because it accounted for less than 1% of total VTR trips and any pilot coverage would have resulted in 100% coverage or more. The NE midwater trawl mode was given only pilot coverage through the prioritization process because it accounts for a small proportion of discards to total catch of herring. Seaday allocations may increase or decrease in future years, depending on discard behavior on these trips, and the results of the prioritization process. However, it appears the Councils cannot rely on increased SBRM coverage to achieve this amendment's objectives.

The PDT wants to highlight to the Committee that the discontinuation of the additional seaday allocation for herring closed area trips under SBRM next year could limit closed area trips by herring midwater trawl vessels. Under Amendment 5, herring midwater trawl vessels are prohibited from fishing in the closed areas without an observer. When the new SBRM goes into effect, this means that herring vessels would only be able to fish in a closed area if they are randomly assigned an observer for SBRM. This also has the potential to bias discard estimates for SBRM, if a large majority of midwater trawl SBRM trips are fished in the closed areas. The PDT intends to address this issue in the document by including this requirement in industry-funded monitoring program described in the Herring Alternatives.

The PDT has struggled with how to approach the analysis for the coverage alternatives – by gear type or permit category or fishery (e.g., "mackerel trip"). The current alternatives adapted from the original amendments are developed around permit categories or a trip definition (e.g., "mackerel trip"), rather than gear type. However, the PDT is using NEFOP observer data from SBRM deployments, so stratifying incidental catch estimates by permit category or an FMP trip definition would violate the randomness of the SBRM sampling scheme and potentially bias estimates. Council staff indicated that the original alternatives were developed around the river herring/shad catch cap definition – because the catch caps apply to the limited access fisheries, the IFM coverage would be targeted at the limited access fisheries. Yet the objectives and performance standard for the coverage is to achieve a certain CV/CI on the estimate of river herring and shad catch. This suggests targeting the coverage at the fleets responsible for the most incidental catch, which may not be the same as the permit category or FMP definitions under the catch cap. The analysis the PDT is developing will help to illustrate the impacts of defining the performance standard in these different ways. It may be possible to develop an alternative that addresses both the cap definition and the objectives for coverage. The PDT is also considering how to specify the coverage target in these alternatives – as a desired CV? A confidence interval? A coverage level? The definition of a desired CV or CI allows for the coverage level to be calculated through the prioritization process, but these concepts can be difficult to understand. The Councils could also specify a target coverage level based on the desired CV or CI that would be maintained in the regulations until modified. However, this would not be robust to changes in incidental catch patterns. The PDT will continue work on the analysis for these alternatives and bring the refined alternatives to the Committee/Councils at a later meeting.

**7. Public Comments**

- One member of the public commented that the amendment should consider accuracy and observer bias as well as precision. Another member of the public suggested looking at whether certain gear types might have greater impact on accuracy than others, such as high volume gears. The PDT responded that it intends to consider the issue of accuracy in the document, but that it is difficult to quantify. The PDT may be able to use data from the 100% coverage on herring closed area trips to model potential observer effects in fleets with less than 100% coverage.
- Some members of the public emphasized the urgency of completing the action and expressed disappointment that development is not progressing more quickly.

- One member of the public was concerned about fairness, that some vessels may receive "free" coverage from SBRM, while others have to pay for coverage.  He emphasized the need to understand these types of interactions between the amendments.
- One commenter suggested that only the alternative for 100% coverage without waivers would meet the Councils' objectives, because all other alternatives would result in coverage levels that fluctuate based on funding which would not ensure objectives are met.
- One commenter suggested the PDT economic analysis of the alternatives should include potential cost savings that could accrue if the fishery has 100% coverage in terms of efficiencies in notifications and deployments.
- One commenter asked that the analysis of infrastructure costs for NMFS in the document consider whether it would be cheaper to outsource some tasks.
- One commenter emphasized the need for information about the costs for industry as soon as possible so that the industry could better weigh in on the alternatives under consideration.  One commenter asked to see analysis of the industry's ability to pay and believed that industry would not be able to accommodate $300-800/day for industry. Another commenter suggested that the PDT flag cost drivers for the industry, NMFS, providers so that they can change practices to reduce costs (e.g., lack of notice of trip cancellations).
- One comment suggested that data collection tasks for herring observers could be prioritized to require less training and reduce costs.  The Observer Program responded that herring observers are paid the same as other NEFOP observers, even though they have additional high volume sampling training.  Another commenter expressed concern that requiring a college degree of at-sea monitors would result in a shortage of qualified applicants.  The Observer Program clarified that this has not been an issue.

PDT Report Attachment 1                                    August 15, 2014

**Draft MAFMC Research Prioritization Process**

Under the Magnuson-Stevens Act, each Council is to develop a 5-year Research Plan for submission to and consideration by the National Marine Fisheries Service.  A draft 2012-2016 Research plan has been prepared by Council staff and includes dozens of important projects that range from relatively simple short-term single species activities to long-term ecosystem modeling and assessment programs. The Mid Atlantic Council requested the assistance of its Scientific and Statistical Committee to suggest a process to help the Council identify its priorities within the list of proposed research and information needs.

 A work group of the SCC met by teleconference on February 8th to discuss the task and suggest preliminary criteria to use in evaluating projects.  Those results have been incorporated into a draft prioritization process described below for further consideration by the SSC.  Basic assumptions going into the process included that there are more proposed projects than there is funding available, and that not all projects have equal priority for funding.  Therefore a process was needed to prioritize the MAFMC research proposals in a way that maximizes net benefits from the available funds.

The process includes six steps outlined in more detail in the following pages:

**Step 1: Compare species criteria to species criteria**
**Step 2: Compare species (vertical) to species criteria (horizontal) in an L-shaped matrix**
**Step 3: Identify additional criteria against which to evaluate research proposals**
**Step 4:  Assign weights to the importance of criteria by comparing them in an L-shaped matrix**
**Step 5: Construct the final L-shaped matrix**
**Step 6: Cost-benefit analysis**


**Step 1: Compare species criteria to species criteria**

**(See Step 1 Spreadsheet.xls)**
All species are not created equal, and we may want to give deference to research on some species in lieu of others. What criteria would make us prefer one species over another?   We identified five species criteria.

Species criteria

1.  High commercial value (annual dollar value of fishery)
    The higher the dollar value (in the case of a commercial fishery), the more important the species.
2.  Recreational value (landings, weight)
    The higher number of annual landings or gross weight (in the case of a recreational fishery), the more important the species.
3.  The stock is overfished
    The more overfished the stock, the more important the species (as it is important for research to be conducted on this stock).

4. Overfishing is occurring on the species
   The more overfishing of the stock, the more important the species (as it is important for research to be conducted on this stock).
5. Impact on other species (Ex. Forage fish and choke species)
   The more impact a species has on other species (whether positive or negative), the more important the species.

\*\*Remember that each of these species criteria is being judged in reference to which species are the most important from the standpoint of funding research proposals. That means that while overfishing is generally not considered a good thing, the criteria is being applied in the context of giving more deference to funding a fishery where overfishing is occurring.

We do not want to assume that each of the five criteria have equal weights, so we assign weights to the relative importance of these criteria by comparing them pair-wise in an L-shaped matrix. (Step 1 Spreadsheet.xls)

- Reading across the vertical axis, compare each species criteria to those on the horizontal axis (place an "x" in the boxes where the same two criteria are being compared).
- Each time a weight (e.g. 1, 5, 10) is recorded in a row cell, its reciprocal value (e.g. 0.1, 0.2) must be recorded in the corresponding cell.
  - 1 = species criteria equally important
  - 5 = species criterion is more important
  - 10 = species criterion is much more important
  - .2 = species criterion is less important
  - .1 = species criterion is much less important
- Total each horizontal row and convert to a relative decimal value known as the "species criterion weighting."

- If individual judgments are sought (versus taking a group consensus) these judgments will be compiled group-wide by taking a geometric mean to come up with a final rating which will be used in step 2.

**Step 2: Compare species (vertical) to species criteria (horizontal) in an L-shaped matrix**

**(See Step 2 Spreadsheet.xls)**

Each species criterion now has a weighted value. In the context of funding research proposals for MAFMC, how do we determine species importance relative to the species criteria?

- Reading across the vertical axis, compare each species to the species criteria on the horizontal axis. Assign a rating by how much each species is in alignment with the criterion. The maximum number that can be assigned is equal to the species criterion weighting for

that criterion found in step 1 after adding up the group totals. The species will be assigned the full weight if the species perfectly meets the species criterion. The lowest number is 0 (the species does not meet that criterion at all). A table was developed based on facts from the NMFS databases. Recommendations on what percentage of the species criterion weight should be attributed to each species are below:

| Species | Commercial value $ (2010) | Recreational value (# fish 2010) | Overfished (Stock size relative to biological reference points) | Overfishing (F current/Fmsy) | Spillover? |
|---|---|---|---|---|---|
| Bluefish | 1,075,604 | 2,559,736 | 95% | ~0.75 | neither |
| Tilefish | 5,106,306 | ~0 | 104% | ~0.35 | neither |
| Surfclams | 17,718,858 | ~0 | 162% | ~0.20 | neither |
| Ocean quahog | 7,878,102 | ~0 | 162% | ~0.25 | neither |
| Summer flounder | 8,125,838 | 1,225,669 | 100% | ~0.75 | neither |
| Black sea bass | 1,613,590 | 1,317,458 | 111% | ~1.00 | neither |
| Scup | 2,935,522 | 2,735,543 | 202% | ~0.25 | neither |
| Atlantic mackerel | 912,426 | 3,914,000 | midpoint* | 0.50* | forage |
| Butterfish | 329,021 | ~0 | Yes; exact data not available but <50% | 0.50* | choke |
| Illex | 5,676,703 | ~0 | Midpoint* | 0.50* | forage |
| Loligo | 6,088,431 | ~0 | 128% | 0.50* | forage |
| Spiny dogfish | 228,607 | ~0 | 106% | ~0.35 | neither |
| * no data- use midpoint 50% error rate each way | | | | | |

**For commercial value:**

    Surfclams (100% of species criterion weighting)

    Ocean quahog, Tilefish, Summer flounder, Illex, Loligo (75% of species criterion weighting)

    Scup (50% of species criterion weighting)

    Bluefish, Black sea bass, Atlantic mackerel (25% of species criterion weighting)

    Butterfish, Spiny dogfish (0% of species criterion weighting)

**For recreational value:**

    Atlantic mackerel (100% of species criterion weighting)

    Bluefish, Scup (66.67% of species criterion weighting)

    Black sea bass, summer flounder (33.33% of species criterion weighting)

    Tilefish, Surfclams, Ocean quahog, Butterfish, Illex, Loligo, Spiny dogfish (0% of species criterion weighting)

    Note the use of "number of fish" for a proxy of recreational importance is imperfect and undervalues species such as summer flounder where low bag limits affect landings.  Better proxies such as MRIP data on directed trips were not yet available nor were willingness to pay values for recreational species.  We can check sensitivity of this value on the outcome and/or adjust accordingly.

**For Overfished:**

    Normalized cumulative data for overfished (numbers in second column (red) are 1 minus the normalized cumulative data because those species that are overfished should get a greater percentage of the criterion weighting): *=no data so they were assigned the median 50%

| | | | |
|---|---|---|---|
| Bluefish | 0.265605 | 0.734395 | 73% of species criterion |
| Tilefish | 0.338178 | 0.661822 | 66% of species criterion |
| Surfclams | 0.823204 | 0.176796 | 18% of species criterion |
| Ocean Quahog | 0.823204 | 0.176796 | 18% of species criterion |
| Summer flounder | 0.304954 | 0.695046 | 70% of species criterion |
| Black sea bass | 0.399322 | 0.600678 | 60% of species criterion |
| Scup | 0.968222 | 0.031778 | 3% of species criterion |
| Atlantic mackerel | .5* | 0.5 | 50% of species criterion |
| Butterfish | 0.047484 | 0.952516 | 95% of species criterion |
| Illex | .5* | 0.5 | 50% of species criterion |
| Loligo | 0.555333 | 0.444667 | 44% of species criterion |
| Spiny dogfish | 0.355297 | 0.644703 | 64% of species criterion |

Numbers in the second column are the percentages each species will get of the overfished criterion

**For Overfishing:**

Use the same proportions in above table (Fcurrent/Fmsy) as the proportions of the species criterion

| | | |
|---|---|---|
| Bluefish | ~0.75 | 75% of species criterion |
| Tilefish | ~0.35 | 35% of species criterion |

| | | |
|---|---|---|
| Surfclams | ~0.20 | 20% of species criterion |
| Ocean Quahog | ~0.25 | 25% of species criterion |
| Summer flounder | ~0.75 | 75% of species criterion |
| Black sea bass | ~1.00 | 100% of species criterion |
| Scup | ~0.25 | 25% of species criterion |
| Atlantic mackerel | 0.50* | 50% of species criterion |
| Butterfish | 0.50* | 50% of species criterion |
| Illex | 0.50* | 50% of species criterion |
| Loligo | 0.50* | 50% of species criterion |
| Spiny dogfish | ~0.35 | 35% of speceis criterion |

**For Spillover:**
Species that are both choke and forage (100% of species criterion weighting)
Species that are one or the other (50% of species criterion weighting)
Species that are neither (0% of species criterion weighting)

THEN…

- Total each horizontal row and convert to a relative decimal value known as the "species weighting."

- Now we know the relative importance of each species (in reference to needing research conducted) and can start on the main part of the process for comparing research proposals to criteria.

**Step 3: Identify other criteria besides species against which to evaluate research proposals**

In the previous steps we've already determined why research on one species might be more important to fund than research on another species.  In step 3 we need to identify other criteria besides species importance to use in rating research proposals.  Based on SSC conference call results and further reflection, we've identified a total of eight criteria, including species importance.  We can easily add or subtract criteria if these are not to everyone's liking.  We define the meaning of the different criteria below.

1) Species is important

   We need to simply evaluate the need to pick research projects benefiting important species compared to the other criteria.

2) Decreases scientific and/or management uncertainty and risk

   Species are put into various tiers based on how much information is available. In this way, tier 3 species have a lot of uncertainty, while tier 1 species have the least uncertainty related to their

stock assessments. When addressing this criterion, the ability of a particular project to decrease uncertainty and move the species from a higher tier to a more desirable lower tier should be taken into account. The same process can be used to evaluate the importance of a project to reducing management uncertainty, i.e., it lowers risk to Councils associated with achieving the chosen ACL. If a research project lowers the risk of not achieving the chosen ACL (and the repercussions to the Council and fish stocks that go along with that) by increasing the accuracy of scientific data or creating a new management mechanism that has a higher likelihood of success, then the project is more desirable.

3)  Positive social impacts

Social considerations must be taken into account when evaluating any research proposal, as coastal and fishing communities are major stakeholders. These include the research's benefit to these communities, whether it is through increased access to jobs, recreational fishing, artisanal fishing, etc., with a particular emphasis on sustainability.

4)  Positive economic impacts

Economic considerations also must be taken into account when evaluating research proposals. This includes the potential the research has for increasing net economic values over time with a particular emphasis on sustainability.

5)  Is widely applicable

If a research project contributes results that are widely applicable to the greater understanding of multiple species or attributes it is to be rated highly as "applicable." For instance, if developing a new method for assessing the length at age of a mackerel can be applied to other species, this research will be considered highly applicable. Data collection on a single species may not be considered highly applicable, while analytical and assessment tasks may be more so.

6)  Contributes to a better understanding of the big-picture ecosystem

It should be considered whether research projects may be beneficial to the larger ecosystem—not only to a specific species. For example research that helps sustain forage fish would help sustain other fish that eat these fish. Important ecosystem attributes to consider when evaluating research proposals include: bottleneck species, bycatch, and ecosystem indicators. This is similar in concept to criteria 6 but is not identical.  Given the special interest in ecosystem based fishery management of the Council we kept this separate.

7)  Quick achievement of an outcome

Research projects require different amounts of time before the achievement of an outcome is expected. Some projects may be implemented and expected to achieve an outcome within the year (a one-shot deal), while others may need to be conducted over a much longer period of time with

several trials before results can be conclusive.  Projects that are valuable to fisheries management and achieve an outcome quickly should have priority over slower projects.

8)  Has elements of applied research (as opposed to basic)

Projects may either be basic or applied. The goal of basic research is to improve scientific understanding, while applied research builds off of basic research and is used to solve practical problems. Applied research is often much easier to implement because it already has tools and technologies available to tackle an issue.  Much of the Council's focus is on decisions hinging on applied research so we give deference to applied research.

**Step 4:  Assign weights to the importance of criteria by comparing them in an L-shaped matrix**

**(See Step 4 Spreadsheet.xls)**

Now that we have our final criteria, through a pair-wise comparison we determine weights for the eight criteria since we do not want assume they are all equally important.  The process is similar to Step 1.  We can either use a mean of individual judgments or simply accept a group consensus response for the relative importance of different criteria. Our goal in this step is to ask "In the context of funding research proposals for MAFMC, how important each of the eight criteria compared to each other?"

- Reading across the vertical axis, compare each criteria to those on the horizontal axis (place an "x" in the boxes where the same two criteria are being compared).
- Each time a weight (e.g. 1, 5, 10) is recorded in a row cell, its reciprocal value (e.g. .1, .2) must be recorded in the corresponding cell.
    - 1 = species equally important
    - 5 = species is more important
    - 10 = species is much more important
    - .2 = species is less important
    - .1 = species is much less important
- Total each horizontal row and convert to a relative decimal value known as the "criteria weighting."

**Step 5: Construct the final L-shaped matrix**

**(See Step 5 Spreadsheet.xls)**

 Now the fun part.

Compare, i.e., rate each research proposal (vertical) against the criteria (horizontal) in an L-shaped matrix.

- First we must explain how to evaluate the species criterion. This criterion in the matrix is subdivided into each species. The proportion assigned to each species in step 2 (after group consensus) must be re-proportioned based on the weighted value of species importance from step 4. So if the proportional value for bluefish from step 2 was 0.2 and the value of species importance from step 4 was 0.3 then the final value of importance for bluefish is the product of these two numbers, 0.06. For the purpose of the species columns in this matrix, the research proposal will be rated based on how closely it targets/supports/aligns with one or more species.

- Now for the other criteria. Each criterion has a weighted value. Reading across the vertical axis, compare each research proposal to the criteria on the horizontal axis. Assign a number by how much each research proposal is in alignment with the criterion. The maximum number that can be assigned is equal to the criterion weighted value (that is if the research proposal perfectly meets the criterion). The lowest number is 0 (the research proposal does not meet that criterion at all). Use the scale below:

    - 0% of criterion weighting= doesn't meet criterion at all
    - 25% of criterion weighting = slightly meets criterion
    - 50% of criterion weighting = somewhat meets criterion
    - 75% of criterion weighting = mostly meets criterion
    - 100% of criterion weighting = fully meets criterion

- Total each horizontal row and convert to a relative decimal and then compare. Those research proposals with the highest numbers have the highest amount of benefits to pursuing them.

These relative decimals will be used as the value for benefits for each research proposal, and can be used in step 6.

**Step 6: Cost-benefit analysis**

- We left out cost as a criterion for a reason. We don't have a total budget constraint and don't have specific costs for each proposal.  If we did we could simply convert the cost into a rating score, compute the benefit cost ratio for each proposal, sort them from highest to lowest score and apply the budget constraint. We could also get into optimization and program the frontier of projects that give us the greatest return for our budget.

- For now we can only compare the benefits of a research proposal to some proxy for the cost of the proposal to see which research projects maximize benefits and minimize cost. Each project could be assigned a cost ratings value (e.g., score of 1 = under $250K, 2 = $250-500K, etc) by guesstimate/expert knowledge. We know the benefit value from step 5. Create a chart with the research proposals on the vertical axis and "benefit," "cost," "benefit/cost," "cumulative cost" and "cumulative benefit" on the horizontal axis. After dividing benefit by cost, re-rank the options with the highest number at the top of the list and the lowest at the bottom. Then

calculate the cumulative cost and cumulative benefit. This easily shows you where you must cut off the projects based on how much money you have available and the cumulative benefits associated with this set of projects. Thus, you will be able to maximize the benefits for the amount of money you have with which to pursue research projects.

Note: All factors that go into cost must be considered including the cost of labor and equipment. Whether the research would be funded through appropriations or industry (through grant set-aside programs) could be considered either as a criteria in ranking the benefits or as a discounted cost. For example, a project funded by industry would be considered low cost for this purpose (as it wouldn't cost the government money), and thus more desirable if our accounting stance was government dollars.



**New England Fishery Management Council**
50 WATER STREET  |  NEWBURYPORT, MASSACHUSETTS 01950  |  PHONE 978 465 0492  |  FAX 978 465 3116
E.F. "Terry" Stockwell III, *Chairman*  |  Thomas A. Nies, *Executive Director*

# FINAL MEETING SUMMARY

## Observer Policy Committee

Sheraton Colonial Hotel, Wakefield, MA

August 19, 2014

The Observer Policy Committee held its first meeting on August 19, 2014 in Wakefield, MA to: discuss Terms of Reference (TOR) and the general charge to the Observer Committee; review progress regarding development of NMFS-led Omnibus Industry-Funded Monitoring (IFM) Amendment, which will establish provisions for industry-funded monitoring across all Council-managed fisheries; and to discuss the details of the Omnibus IFM Amendment alternatives and develop related Committee recommendations.

*MEETING ATTENDANCE:*  Terry Stockwell (Chairman), Pete Kendall, Mary Beth Tooley, Jeff Kaelin, Peter Christopher, Wendy Gabriel, Paul Parker, Gerry O'Neill, Peter Hughes, Rick Usher, Bruce Lambert, Doug Brander (12 of 13 Committee members present, Terry Alexander absent); Lori Steele (NEFMC staff); Melissa Hooper, Carrie Nordeen (NMFS GARFO staff); Mitch MacDonald (NOAA General Counsel); Michael Lake (Alaskan Observers, Inc.), Jenna Rockwell (Fathom Research), Amy Martins (NEFOP), Don Frei (NMFS OLE), Greg Wells (Pew Charitable Trusts), Shaun Gehan, JP Bilodeau (F/V Providian), Ryan Raber (F/V Providian), Erica Fuller (EarthJustice).
*In addition, several individuals listened to the Committee meeting online via GoToMeeting.*

### KEY OUTCOMES

The Observer Committee reviewed the details of the Omnibus IFM Amendment alternatives and addressed specific questions raised in the August 5, 2014 Report from the Industry-Funded Monitoring Fishery Management Action Team/Plan Development Team (FMAT/PDT).

- The Committee recommended that Alternative 2.1.2.4, Cost-Based Prioritization, be eliminated (considered but rejected) from the Omnibus IFM Amendment.

- Through several motions and consensus items, the Committee developed recommendations for modifying the other prioritization options under consideration in the Omnibus IFM Amendment.

- The Committee was not comfortable providing specific recommendations about standards for service providers at this time but agreed to revisit this issue at a future meeting. There was agreement that the Omnibus IFM Amendment should establish standards for all service providers.

_0000000986

- The Committee unanimously recommended that an alternative be developed in the Omnibus IFM Amendment that would allow for the direct contracting between a vessel/fishing business and a NMFS approved at-sea monitoring and/or electronic monitoring provider to meet the coverage levels identified by the Council and help achieve the catch monitoring goals of the FMP.
- The Committee recommends that the Council ask the Agency to develop a mechanism to accept funding for monitoring from outside sources, and to review the proposed division of cost responsibilities with the goal being a 50-50 IFM cost-sharing outcome.

Detailed minutes of the August 19, 2014 Observer Committee meeting are provided below.


### INTRODUCTIONS, GROUND RULES, REVIEW OF AGENDA AND TERMS OF REFERENCE (TOR)

As the meeting began, each member of the Observer Committee introduced themselves and provided a brief background regarding their involvement in fisheries and monitoring programs as well as their interest in participating on the Committee. Mr. Stockwell then reviewed the Terms of Reference with the Committee:

1.  Provide input regarding the continued development of the NMFS-led omnibus Industry-Funded Monitoring (IFM) Amendment and recommend *Preferred Alternatives* for the Council to consider during the selection of final measures for this amendment;
2.  Upon completion of the omnibus Industry-Funded Monitoring (IFM) Amendment, provide input regarding issues related to observer coverage and catch monitoring, at the request and discretion of the Council.

Mr. Stockwell encouraged members of the Observer Committee to focus on the omnibus elements of the IFM Amendment, i.e., the alternatives in the document that will apply to all fisheries managed by the New England and Mid-Atlantic Councils.

### PRESENTATION: OMNIBUS INDUSTRY-FUNDED MONITORING AMENDMENT – BACKGROUND AND CONTEXT (STEELE)

Ms. Steele provided the Committee with a presentation summarizing the background regarding the development of the Omnibus IFM Amendment. Following the presentation, there was some brief discussion regarding the notion that monitoring costs must be split in only one way (infrastructure/at-sea) and always shared by the government and industry. Mr. Parker questioned the need for government-supported infrastructure (and related costs) for IFM programs. He suggested that this may be a primary reason why costs continue to be high, and he asked why a IFM program cannot be developed that would allow the industry to pay for 100% of the cost. Mr. Macdonald stated that the cost delineation comes from the Department of Commerce General Counsel and relates to what is determined to be an inherent governmental function. The government receives data from observers and uses that data for management purposes. Mr. Macdonald noted that data that are collected by fisheries monitors are similar to vessel trip reports and dealer reports in that the infrastructure must exist to process these data and utilize it for fisheries management purposes. Mr. Parker encouraged the Committee members to continue to test the boundaries established by this legal interpretation of cost delineation in order to ultimately build a more cost-efficient system.

_0000000987

*PRESENTATION: OMNIBUS INDUSTRY-FUNDED MONITORING AMENDMENT– MANAGEMENT ALTERNATIVES UNDER CONSIDERATION (HOOPER)*

Melissa Hooper (GARFO staff) provided a detailed presentation to the Observer Committee about the omnibus alternatives under consideration in the Omnibus IFM Amendment. Following the presentation, Committee and audience members asked clarifying questions and discussed several issues:

- Mr. Parker asked how the prioritization options respond to new fisheries/new programs. Dr. Gabriel explained that the formulaic options simply add another fishery to the equation; the discretionary options may include scoring/ranking criteria that would be evaluated for each fishery requiring IFM. Mr. Parker then expressed concern that the alternatives in the amendment appear to be reactive in that they respond to limited funding by reducing observer coverage because it's expensive. He said that the industry supports monitoring to create better data and wants to move in a direction that does not appear to be supported by the alternatives in this amendment.

- Mr. Kendall asked for more information regarding the infrastructure costs. Dr. Gabriel cited some data from a presentation she recently made to the Council, which was distributed to the Committee. She noted that most of the costs are related to infrastructure and labor; labor costs are in data processing.

- Mr. Kaelin questioned the equity of the cost-sharing breakdown proposed in the IFM amendment and also wondered if/how the language requiring consideration of waivers could be incorporated into the omnibus elements of the amendment. He also suggested that there be more focus in the document on other types of monitoring programs like dockside and electronic monitoring.

- Mr. Brander asked for more information regarding the $1,200 estimate of the cost of an observer per day at sea. This estimate includes both infrastructure and at-sea costs.

  Dr. Gabriel provided some details regarding the infrastructure costs, which total about $5 million annually; these costs are distributed over the total sea days per year, which fluctuate from year to year. This is how the average infrastructure costs are estimated.

  The at-sea costs are paid to service providers; providers are invoiced for at-sea time, travel, salary, land days, and meals. In aggregate, the Northeast Fisheries Observer Program (NEFOP) paid $2.6 million for about 5,000 sea days in 2013, which equates to about **$542 per sea day** for at-sea costs. In 2011, the NEFOP spent $4.8 million for about 6,500 sea days, so the at-sea cost in 2011 was **$746 per sea day**. This variability is why it is difficult to estimate the costs per sea day of IFM programs. She also noted that the timing of the allocation of Federal funds varies from year to year, further complicating the process.

- Mr. O'Neill asked how the requirement for 100% observer coverage on Atlantic herring vessels fishing in the groundfish year-round closed areas would be funded given the projected 45 sea days that will be covered under the standardized bycatch reporting methodology (SRBM) amendment allocations next year. Ms. Hooper responded that any additional observer days beyond the 45 SBRM days would have to be industry-funded through the program that will be established in the IFM amendment, if any additional government funds are available to support IFM programs. Otherwise, herring vessels will be prohibited from fishing in the groundfish closed areas unless they are on one of the SBRM

_0000000988

trips with an observer on board.  Mr. Macdonald added that a statutory change would be needed to allow the industry to pay for 100% of the costs of these additional closed area trips. Ms. Hooper agreed to follow-up with GARFO staff regarding efforts to develop a mechanism to allow for the industry to pay for 100% of the monitoring costs.  Ms. Fuller expressed concern that the amendment does not appear to be making any progress to address this issue.

- Mr. Parker emphasized the need to consider another structure that allows the government and industry to work together to reduce the overall cost of monitoring programs.  He stated that the industry should be able to seek competitive pricing and reduce costs, and the government should oversee the product that comes out of this competitive service.  He feels that the government does not need to own a fraction of the costs in order for the programs to support fisheries management.

- Several Committee members further discussed issues associated with at-sea costs.  Mr. Hughes estimated that the industry is averaging about $750 per DAS for a scallop observer. Mr. Usher stated that his company's costs are significantly lower but noted that it is all very relative.  Ms. Tooley expressed frustration that obtaining specific and clear cost information about IFM seems to be very challenging.  She asked whether long-term contracts with observers are limited in the Northeast, and she suggested that any limitations on observer contracts be evaluated to determine how costs can be reduced.


### DISCUSSION OF OMNIBUS INDUSTRY-FUNDED MONITORING ALTERNATIVES

Following the morning discussion, the Observer Committee walked through the details of the Omnibus IFM Amendment alternatives and addressed the questions raised in the August 5, 2014 FMAT/PDT Report.

- The Committee discussed the timing/process associated with each prioritization alternative and felt that the concepts are generally clear, but the timing of budget allocations and funding is so variable and unclear that it is not possible to really understand how the processes would work in a given year, or how the IFM prioritization process would coincide with the SBRM process.  Mr. Kaelin suggested that the document more clearly address the relationship between the SRBM and IFM amendments.

- Mr. Kaelin and other Committee members expressed general support for the matrix concept proposed by the FMAT/PDT under the discretionary prioritization options.  Ms. Steele noted that the matrix needs more development/discussion.

_0000000989

1.   **MOTION: TOOLEY/PARKER**

To recommend that Alternative 2.1.2.4, Cost-Based Prioritization, be eliminated (considered but rejected)

**Discussion on the Motion:**  Observer Committee members acknowledged that this motion is consistent with comments made by the FMAT/PDT (August 5, 2014) regarding this option, although the FMAT/PDT did not formally recommend that it be eliminated from consideration at this time.  The Committee felt that the cost-based prioritization proposed in this option lacks rationale and would likely not support the goals/objectives of IFM monitoring programs established by the Council.

**MOTION #1 carried unanimously.**

*OBSERVER COMMITTEE CONSENSUS*

*The Observer Committee agreed by consensus to support further development of the prioritization matrix discussed by the FMAT under Alternatives 2.1 and 2.2 (NMFS-led and Council-led prioritization process).*

*The Observer Committee agreed by consensus to recommend further development of the catch-ratio alternative (Alternative 2.5) to allow for the ratio to be calculated/applied in both directions.*

The Committee members briefly discussed what may be an appropriate forum for prioritizing fisheries under the two discretionary options.  Ms. Tooley stated that she does not support the Northeast Region Coordinating Committee (NRCC) as the appropriate forum for making prioritization decisions and suggested a joint Committee between the New England and Mid-Atlantic Councils.  Mr. Kaelin suggested that prioritization decisions should come before both Councils for formal decision-making.  Dr. Gabriel noted that the scoring/ranking matrix suggested by the FMAT/PDT may be a good way to reconcile differing priorities between the two Councils.

Mr. Parker asked how industry initiatives can be accommodated under the proposed prioritization options and asked for clarification regarding consideration of future experimental fisheries that may need observer coverage.  Ms. Steele and Ms. Hooper agreed to flag this issue for the FMAT/PDT.

The Committee identified the fisheries that would be subject to a prioritization process for IFM during Year 1 under the omnibus amendment: groundfish (sector monitoring), Atlantic herring, and Atlantic mackerel.  It was noted that because of requirements within the Northeast Multispecies Fishery Management Plan (FMP), groundfish monitoring would be prioritized first.

2.    **MOTION: KAELIN/HUGHES**

> To Amend Section 2.1.2, Prioritization sub-options, to add a waiver/no waiver alternative to each sub-option

**Discussion on the Motion:**  Ms. Nordeen asked for clarification as to how the provisions to require consideration of waivers fit into the prioritization options in the omnibus amendment. Ms. Hooper responded that this language could be added under the discussion of general requirements for monitoring programs under Alternative 2.

**MOTION #2 PERFECTED:**

> To Amend Section 2.1.2, Omnibus Alternative 2, to include language to require consideration of waivers with coverage targets in industry-funded monitoring programs

**PERFECTED MOTION #2 CARRIED UNANIMOUSLY.**

The Observer Committee discussed issues related to establishing universal standards for service providers.  Ms. Steele noted that the SBRM amendment already proposes to apply the scallop observer service provider requirements to observer service providers in all fisheries and clarified that the IFM amendment proposes to extend those requirements to providers of other monitoring services, including at-sea monitoring (ASM, different from observer coverage), dockside monitoring, and electronic monitoring.  She also pointed out that the Multispecies (Groundfish) FMP includes requirements/standards for at-sea monitors, which differ from observer service provider standards in that the at-sea monitors are not required to have a college degree.  She suggested that the Observer Committee consider the differences between the two sets of requirements and provide a recommendation regarding the proposed standards for all service providers in the IFM Amendment.

- Mr. Usher expressed support for requiring a college degree for observers.  He stated that in his experience, there is a significant difference in terms of retention and data quality.  Mr. O'Neill agreed.  Mr. Hughes noted that there are highliners in the industry who have not even graduated high school and he questioned the need to restrict people who do not have a college degree from observing catch, counting and measuring fish, and filling out reports.

- Ms. Tooley pointed out that there does not appear to be a cost savings from eliminating the requirement for a college degree in the groundfish ASM program.

3.    **MOTION: PARKER/WITHDRAWN**

> To support standard requirements for service providers across fisheries

**Discussion on the Motion:**  Ms. Tooley said that she is unclear about which standards to support because she cannot tell how costs are impacted by the requirements.  Mr. Parker stated that he supports standard requirements across fisheries but was not ready to move this motion forward given the ongoing discussion at the meeting.  He further emphasized that the business aspect of providing observers should be decoupled from the government to allow for a more competitive marketplace and lower costs.

**MOTION #3 was withdrawn.**

_0000000991

Through further discussion, Ms. Martins (Northeast Fisheries Observer Program, NEFOP) highlighted several points for the Committee:

- In recent program evaluations, the retention rate was a lot higher with at-sea monitors that have a college degree (about a 40% difference).
- The minimum wage in the Commonwealth of Massachusetts is about $8/hour.  The requirement for contractors to meet this wage is a minimum requirement, and many service providers go above and beyond this wage.  This is determined individually by the providers.
- Portside samplers probably don't need as much training as observers.
- Deployment issues can affect cost, i.e., how fast you have to turn around an observer and what kinds of options the providers have to get observers to the vessels.

Ms. Tooley and several other Committee members indicated that they are not comfortable providing specific recommendations about standards for service providers at this time.  However, there was agreement that the omnibus IFM amendment should establish standards for all service providers.  The Committee agreed to revisit this issue at a future meeting (October 2014).  Ms. Hooper agreed to distribute the requirements for ASM for comparison purposes.

Mr. Parker urged the Committee to continue to emphasize the importance of developing a mechanism to allow the industry to pay 100% of monitoring costs in some circumstances.  He offered a motion for consideration.

4.      **MOTION: PARKER/KAELIN**

   To include for analysis in the omnibus amendment an alternative that would allow for the direct contracting between a vessel/fishing business and a NMFS approved at-sea monitoring and/or electronic monitoring provider to meet the coverage levels identified by the Council and help achieve the catch monitoring goals of the FMP

**Discussion on the Motion:**  Mr. Parker stated that his rationale is to craft an alternative that improves the opportunity for the industry to seek pricing efficiency for monitoring services.  He suggested that NMFS reassess its current assumptions regarding which cost responsibilities may be covered by the government and by the industry to determine of a more efficient structure exists than the one currently proposed in the IFM Amendment.  Mr. Kaelin expressed support for the motion and emphasized the importance of this issue.  Mr. Kendall also expressed support for further consideration of this issue.  Mr. Parker suggested that at the very least, a more specific rationale should be provided regarding the legal constraints that are preventing this approach. He encouraged further debate of the legal interpretation of the applicable laws.

**MOTION #4 CARRIED 10/0/1.**

5.    **MOTION: KENDALL/HUGHES**

   To request that the Council ask the Agency to develop a mechanism to accept outside funding for monitoring purposes

**Discussion on the Motion:**  The Committee acknowledged that this motion directly relates to the previous motion and that outside funding sources may extend beyond the fishing industry.

**MOTION #5 CARRIED 9-0-2.**


6.    **MOTION: KAELIN/HUGHES**

   To request the Council ask the Agency and the FMAT/PDT to review the proposed division of cost responsibilities (p. 6 of Discussion Document) with the goal being a 50-50 IFM cost-sharing outcome

**Discussion on the Motion:**  Mr. Kaelin expressed support for achieving a 50-50 split between costs for which the government and industry are responsible.  Mr. Parker expressed support for the intent of the motion and concern about restricting the outcome to a 50-50 split.  Mr. Kendall agreed and expressed similar concern.  Ms. Fuller expressed support for a substantive examination of costs but opposed the 50-50 restriction and encouraged the Committee to prioritize the other issues/motions discussed at the meeting.

**MOTION #6 CARRIED 8-0-3.**


*OTHER ISSUES*

The Observer Committee briefly discussed issues related to the economic analyses to be developed for the Omnibus IFM Amendment.  Ms. Hooper stated that the analyses will provide information about the range of costs to each of the affected fisheries under different coverage levels since the available funding and coverage levels in Year 1 cannot be determined at this time.  Mr. Kaelin suggested that the document provide information about what percentage of profits the industry may lose to support IFM and what the limitations on fishing businesses may be.  Ms. Tooley emphasized the importance of understanding the economic impacts before making final decisions regarding the alternatives in the IFM Amendment.

The Observer Committee agreed to meet again on Thursday, October 23, 2014, to review further work on the Omnibus IFM Amendment.

_0000000993

December 11th, 2014

Terry Stockwell

Chairman

New England Fishery Management Council

50 Water Street, Mill 2

Newburyport, MA 01950

Re: Proposed Industry Funded Monitoring Amendment

Dear Mr. Stockwell,

I'm writing on behalf of *F/V Lightning Bay* to comment on the proposed Industry Funded Monitoring Amendment. I'm writing to oppose this Amendment as the Industry cannot absorb the added expense of this monitoring program. Between the leasing of fish and quota cut backs, this Industry cannot absorb any additional expenses especially the rumored expense of the $700-$900 a day cost of having an Observer on board.

I urge you to please not add any financial burden to an Industry that is already in dire straits.

I greatly appreciate the opportunity to provide a comment regarding this proposed Amendment.

Sincerely,

Donald Fox, Owner *F/V Lightning Bay*



New England Fishery Management Council
50 WATER STREET  |  NEWBURYPORT, MASSACHUSETTS 01950  |  PHONE 978 465 0492  |  FAX 978 465 3116
E.F. "Terry" Stockwell III, *Chairman*  |  Thomas A. Nies, *Executive Director*

# FINAL MEETING SUMMARY

## Observer Policy Committee

Doubletree Hotel, Danvers, MA

January 22, 2015

The Observer Policy Committee met on January 22, 2015 in Danvers, MA to: review the draft Environmental Assessment for NMFS-led Omnibus Industry-Funded Monitoring (IFM) Amendment, which will establish provisions for industry-funded monitoring across all Council-managed fisheries and specify coverage targets for the herring and mackerel fisheries; and to discuss the details of the Omnibus IFM Amendment alternatives and develop related recommendations for the Council to consider at its January 2015 meeting.

***MEETING ATTENDANCE:*** Terry Stockwell (Chairman), Pete Kendall, Mary Beth Tooley, Terry Alexander, Mike Sissenwine, Jeff Kaelin, Peter Christopher, Wendy Gabriel, Gerry O'Neill, Peter Hughes, Paul Parker, Rick Usher, Bruce Lambert, Doug Brander (14 of 14 Committee members present); Lori Steele (NEFMC staff); Carrie Nordeen, Aja Szumylo (NMFS GARFO staff); Mitch MacDonald (NOAA General Counsel); several members of the public in the audience.
*In addition, several individuals listened to the meeting online via GoToMeeting.*

### KEY OUTCOMES

The Observer Committee passed two motions (both 11-0-2) related to the Draft Environmental Assessment (EA) for the Omnibus IFM Amendment. Overall, the Observer Committee agreed that the Draft EA needs to be further developed and reviewed again by the Committee and both the New England and Mid-Atlantic Councils prior to moving forward for public comment. The Observer Committee also identified specific issues related to the Draft EA that should be addressed prior to public comment and final decision-making.

Detailed minutes of the January 22, 2015 Observer Committee meeting are provided below.

### *PRESENTATION: OMNIBUS INDUSTRY-FUNDED MONITORING AMENDMENT– MANAGEMENT ALTERNATIVES UNDER CONSIDERATION (GARFO STAFF)*

Carrie Nordeen and Aja Szumylo (NMFS GARFO/SFD staff) presented the Observer Committee with an overview of the Draft Environmental Assessment for the Omnibus Industry-Funded Monitoring Amendment. This amendment proposes to establish provisions for industry-funded monitoring (IFM) across all FMPs; it also includes options to address targets for observer coverage on Atlantic herring and mackerel vessels. The Committee members asked some

_0000001600

clarifying questions and agreed to develop more specific comments and recommendations following more detailed discussion of three issues (below).

- Mr. Parker asked some clarifying questions regarding the alternatives in the document and expressed serious concern that the issues raised at the August 2014 Committee meeting are not addressed by the current range of alternatives.  He emphasized the need to include an alternative in the document that would allow for the industry to pay for all of the IFM monitoring costs, essentially delivering a package of data to the Council/NMFS that could inform management.

- Mr. Kaelin, Mr. O'Neill, and Ms. Tooley expressed concerns about the impact analyses provided in the draft Environmental Assessment.  Mr. O'Neill and Mr. Kaelin agreed that better information could be obtained by contacting a few herring industry participants and at least clarifying/ground-truthing estimates of fixed/operating costs.

The Observer Committee discussed three issues identified by GARFO staff in more detail.

1. *Proposed Division of Cost Responsibilities:* GARFO staff summarized the response provided in the November 2014 letter.

2. *Discretionary Prioritization Alternatives:* Ms. Szumylo provided the Committee with an overview of streamlined approaches for prioritizing IFM programs under the two discretionary alternatives proposed in the document.  She summarized the results of working examples using a survey that several Committee members completed.  Dr. Sissenwine noted that although the weighing process proposed in the alternatives is clearly-articulated, the process (i.e., formula for combining factors) is arbitrary such that it does not necessarily lead to meaningful results.

3. *Service Provider Requirements:* GARFO staff summarized the current alternative in the omnibus amendment that addresses service provider requirements for IFM.  Currently, the omnibus alternative in the IFM amendment proposes to establish service provider requirements for IFM programs (including dockside and EM) that are consistent with the observer service provider requirements in the SBRM amendment.  However, the IFM amendment proposes that service provider requirements can be adjusted for specific FMPs/fisheries in the trailing actions (framework adjustment) that establish new IFM programs.  Ms. Steele reminded the Committee that there may be a need to address this issue more specifically when selecting the options to address coverage for the herring and mackerel fisheries in this amendment.

### Herring Committee Recommendations (January 16, 2015)

The Observer Committee reviewed/discussed the Herring Committee recommendations regarding the options for herring observer coverage targets in the IFM amendment.  It was noted that although a motion to support portside sampling/EM failed at January 16 Herring Committee meeting, a very similar motion carried unanimously at the November 2014 Herring Committee meeting.  It was apparent to the Observer Committee that there is a need for the Councils to clarify recommendations regarding the development of options for portside sampling/EM for the herring/mackerel fisheries in the IFM amendment.

*Observer Committee Recommendations Re. Draft IFM Amendment*

The Committee members provided more specific comments about the Draft EA for the Omnibus IFM Amendment and discussed possible modifications to the range of alternatives and the document prior to moving forward with the document for public comment.  The Committee members agreed that more explicit consideration and additional development of options for portside sampling and EM under the herring/mackerel options is necessary.

1.      **MOTION: TOOLEY/HUGHES**

        To include in the omnibus amendment alternatives available for all FMPs for portside monitoring and electronic monitoring, and that the analysis in the document would support future framework adjustments, and to also include a portside sampling/EM program in the options for herring and mackerel coverage

**Discussion on the Motion:**  GARFO staff advised the Committee that these options would require coverage targets similar to the observer coverage options in the Draft IFM document. Ms. Steele suggested some possible approaches to developing coverage options and agreed that the options would need to be more specific; she noted that the document may require revisions anyway and hoped that options for herring/mackerel could be better developed to allow for this approach to be further developed.

**MOTION #1 carried 11-0-2.**

2.      **MOTION: TOOLEY/ALEXANDER**

        That the draft omnibus IFM amendment needs more development and additional analysis, and should be reviewed by the Observer Committee and both Councils at a future meeting prior to going out for public comment

**MOTION #2 carried 11-0-2.**

**The Observer Committee identified the following issues related to the Draft Environmental Assessment for the Omnibus IFM Amendment that should be addressed prior to public comment and final decision-making by the New England and Mid-Atlantic Councils:**

- Expansion of the discussion of economic impacts – address/groundtruth fixed and operating costs for herring/mackerel vessels

- Expansion of the discussion of impacts on the Atlantic herring and mackerel fleets

- Information and analysis to support the implementation of a portside sampling program and/or EM program to be implemented through a framework adjustment (relative government costs/industry costs, comparison to at-sea costs)

- Costs differences between at-sea monitors versus observers

- Expansion of impacts of herring and mackerel options on other fisheries (groundfish stocks)

- Impacts of current observer coverage requirements for midwater trawl vessels in the groundfish closed areas

The Observer Committee also discussed an email message sent by one of the Committee members prior to the meeting (see attachment).  The message reviewed the evolution of observer program from a Woods Hole Laboratory scientific program to the current government-led multipurpose program that provides information for stock assessment, enforcement, quota monitoring, and other purposes.   The message raises the possibility of a system of purpose-specific program elements including an element that is industry-funded and designed according to standards and quality control procedures established by the Council.  The Observer Committee expressed interest in further discussing this approach at a future meeting.

_0000001603

# ATTACHMENT

## Observer Policy Committee (Email)
January 22, 2015

Dear Observer Committee,

Yesterday's meeting was interesting and a learning experience for me since it was my first Observer Committee meeting and it has been years since I have been responsible for observer programs.  We seem to have made progress and I complement the Regional Office for taking the initiative to move an option for industry funded observers forward, and to the staff for a lot of good work.  However, I am concerned that "repurposing" the existing observer program approach to meet new needs may be less effective and efficient than starting over with an alternative approach.   With respect to the purpose of observer programs (or more broadly, at sea data collection), I think it is useful to consider the following purpose categories:

1.   Science-  Most importantly, at sea data collection is needed to estimate discards for input to stock assessments.  A lot of other scientific data is collected.
2.   Enforcement-  At sea data can be used as evidence that a violation has occurred.  For example, it might be used as evidence that a vessel fished in a closed area, but VMS is probably a more effective enforcement tool.   It might also be used as evidence that a vessel retained more fish than is documented in logbooks and dealer reports (evidence of black landings) or that illegal gear (e.g., undersize mesh) is used.
3.   Quota monitoring-  This purpose is similar to the purpose of enforcement since at sea data collection is used as a deterrent to mis-reporting landings and/or discards.  However, I think it is useful to distinguish it from broader enforcement needs and to use this category for at sea data collection to address compliance with sector or individual allocations of quota.   Quota monitoring needs to be more systematic and comprehensive than at sea data collection for broader enforcement purposes.
4.   Other-  Some of the other reasons for at sea data collection are:
     o   monitoring exempted fishing programs.
     o   research in addition to Science purpose in number 1, such as gear testing.
     o   as a condition for treating a fishing operation (individual or sector) different from other fishing operations.  For example, an overall average discard rate might be applied to all fishing activity that catches a particular species/stock.  However, a more favorable rate might be applied to fishing operations that provided reliable evidence their rate is lower.
     o   to address miscellaneous concerns about the fishery.  More data may be useful to respond to stakeholders concerns (e.g., herring fishery).

The premise of this message is that a "one size fits all" solution may be inefficient and so expensive that opportunities to obtain additional valuable at sea data are missed.   I discuss the purposes for at sea data collection below.

**Science and Enforcement**

Observer programs were initiated by the Woods Hole Fishery Laboratory in the first half of the 20th century. Scientists went to sea on fishing vessels to get to know fishermen and collect data. The data was only used for scientific purposes. Bigelow and Schroeder's will known book on Fishes of the Gulf of Maine was based on a lot of this data.

In the 1980s, the program was more formally organized and funding increased tremendously mostly to monitor takes of marine mammals. The data continued to be used solely for scientific purposes. Fishermen were assured it would not be used for enforcement because scientists wanted unbias samples of what went on at sea.

The situation changed dramatically when Enforcement demanded the data to make a case. The NEFSC was sympathetic to the enforcement need, but it argued vigorously that the quality of the data for scientific purposes, including discard estimates, would be degraded because it could no longer be confident future data would be representative of the fishery when observers are not present. The change in fishing behavior that might occur when observers are present, potentially biasing observer data, is referred to as the "observer effect." The Center lost the argument when the Director was threatened with disciplinary action and it was told that observer data would be subpoenaed. The representativeness of the data has been a potential issue ever since (unless there is 100% observer coverage). Most of us involved at the time accepted that use of observer data for both scientific and enforcement purposes was the only realistic option because separate programs were unaffordable. This continues to be the prevailing view. There is also a widely held view that data collected for scientific purposes cannot be protected such that fishers can be confident that it will not be used for enforcement.

LET ME BE CLEAR, NO ONE SHOULD WANT TO INHIBIT ENFORCEMENT OF FISHERY REGULATIONS OR MAKE IT EASIER FOR A FEW BAD ACTORS TO VIOLATE THE LAW! The issue is, how best (in terms of cost and effectiveness) to collect at sea data to fulfill different purposes.

To examine this issue, it is worth continuing with my review of the evolution of observer programs. In the 1980s when the potential for scientific observer program data for enforcement purposes became a reality, there was virtually no additional cost. Enforcement continued as usual with observer data occasionally used on an ad hoc basis. The scientific program did not change much under the continuing assumption that there was no change in behavior (fishing method, fishing location, discarding) when observers were onboard. This may have been a reasonable assumption at the time (an perhaps still is) since there had been little use of observer data for enforcement. However, the assumption was attacked in the early 2000s as part of continuing litigation over groundfish management. The sue asserted that the percentage observer coverage was not adequate. I recall preparing an affidavit stating that it was sample size, not percentage coverage, that mattered, and that precision of estimates was adequate. The litigant's response was that accuracy, not precision, was the issue because observer data was not representative of the fishery when observers were not on board, and that a much higher percent observer coverage was necessary. I do not recall the exact legal outcome, but my recollection is the argument that observer data might not be representative gained traction. Ever since, environmental NGOs have strongly advocated a higher percentage of observer coverage and expenditure on observers has skyrocketed. This has been great in terms of the amount of

**ATTACHMENT**                                    **1/22/2015 Observer Committee**

scientific data produced, but there are still challenges to the accuracy of the data, and calls for 100% coverage in many situations. Even some scientists that have benefited from more at sea data collection believe that scientific uncertainty might be reduced more by using some of the money spent on observers for other scientific purposes.

Given the background above, I think it is important to ask and answer the question: Is the potential increase in cost and/or decrease in value of at sea data collection for scientific purposes justified by the benefits gained for enforcement purposes? The potential increase in cost comes from the need for higher percentage coverage and the potential decrease in value comes from loss of representativeness of the data. In terms of enforcement benefits, it would be worthwhile to examine how many cases have been made because of observer data (I have no idea) and how important the cases were. One should also consider how valuable the presents of an observer is as a deterrent. However, deterrent value is probably inversely proportional to loss of scientific value since being a deterrent means fishers change behavior when observers are onboard.

I suspect one reason the question I ask above has not been examined (if it has, its news to me) is because it is generally believed that observer data cannot be protected from enforcement use. I presume this is the case under current policies and law, but this should not prevent an objective consideration of the issues. If the conclusion is that there are better approaches in terms of both fiscal responsibility and conservation, why not advocate changing policies and/or the law. There are examples where information is protected (AID virus test results) because it is deemed to be in the best public interest.

## Quota Monitoring

At sea quota monitoring requires less detailed, lower quality data, than at sea data collection for science, but the coverage percentage may need to be much higher (perhaps 100%). Depending on the nature of the fishery, it may be possible and monetarily rewarding to mis-report on any fishing trip when at sea monitoring does not occur. Since high levels of at sea monitoring by humans is probably only affordable by large high value fisheries (e.g., Bering Sea groundfish), it will be necessary to design quota management such that shore side monitoring is adequate or technology for cost effective electronic (camera or video) monitoring is perfected (meaning, good enough, not perfect). In most cases, shore side monitoring can be adequate to monitoring retained catch and this is the approach that is used for most fisheries.

Discards are the problem. In most cases, discards can be estimated for stock assessments and taken into account in ACL at the stock level using at sea monitoring data designed for scientific purposes. Even when at sea monitoring for scientific purposes is protected from enforcement uses, there may be situation where it is bias as a result of an observer effect. This potential will need to be examined on a case by case basis. I'd argue that accounting for discards at the individual vessel level (including enforcement of no-discard rules) is not feasible for most fisheries without perfected electronic monitoring. The recent Highly Migratory Species FMP Amendment that accounts for pelagic longline Bluefin tuna catch (including discards) at the individual vessel level is based on the expectation that electronic monitoring will be adequate. Accounting for discarding at the NE groundfish sector level falls between the level of a stock and individual vessel, but I am skeptical about the quality of sector level discard mortality accounting. I understand why there is a desire to account for discards at the individual vessel and sector level. Doing so creates a strong incentive to minimize discards. However well-

_0000001606

intentioned vessel level or sector level discard accounting is, it should not be pursued unless affordable monitoring is adequate.

**Other**

I think that at sea monitoring for other purposes should be industry funded in most cases. However, I do not think that industry should be saddled with the cost of a program that was primarily designed for application to a relatively small number of vessels for scientific purposes using government standards for doing business. The scope and quality of data needed for scientific purposes makes at sea monitoring expensive. Also, we have all heard about the Department of Defense buy hammers or toilet seats or whatever for a hundred times more than they are worth. I don't know if these stories are true, and I know that NOAA is conscientious about getting its money's worth, but it is true that government rules and procurement procedures add costs.

For industry funded monitoring, I would leave it to industry to design, implement and pay for programs so long as the monitoring adheres to standards established by the fishery management process. Some standards should apply to all monitoring, such as data access and delivery requirements. Other standards might be fishery or situation specific to assure the data fulfills its intended purpose.

I use the term fishery management process generically. It could mean standards established in a fishery specific FMP (for example, standards for industry funded 100% at sea monitoring of herring pair trawling), an omnibus FMP, policy established by the Council, or guidelines issued by NOAA Fisheries.

I'd envision a formal review process for industry funded monitoring plans to assure that they will adhere to the standards, and that the integrity of data is protected. Integrity will probably require a standard that creates "arm's length" separation between the fishing operation and the observers (individuals and companies). Integrity might require some type of certification of observers or companies conducting at sea monitoring, but the certification should be about integrity and narrowly defined qualifications for purpose driven data collection, not about company management or business practices that drive up costs. This would be analogous to having certified public accountants sign off on various financial records with minimal interference with the management and business practices of accounting firms.

I would envision a standard that accepted the integrity of data produced by a non-profit scientific or educational institution. This doesn't mean that at sea monitoring program conducted by such an institution is always right or useful. It means that it is presumed that data is honestly recorded and the data collection methods are accurately described. I would not extent this presumption of integrity to spinoff companies of scientific or education institutions that are primarily fishing industry consultants. However, they might qualify for certification.

If a process along the lines I describe above was available now, it may not have been necessary for NOAA Fisheries to have rejected provisions of the sea herring FMP that called for 100% observer coverage because the Agency could not pay for the observers. My understanding is that the omnibus Amendment for Industry Funded Observers is an effort to address this dilemma. The problem is that the Amendment may be too late, it does not seem likely NOAA fisheries will

**ATTACHMENT**                                                    **1/22/2015 Observer Committee**

be able to fund its share of the cost of observers in excess of SBRM requirements, and the cost of the industry share is high (maybe unaffordable). It might have been better for the FMP to have required the industry (as a license condition or perhaps as a condition of an exempted fishing permit or whatever legal mechanism makes sense) to design, implement and pay for at sea monitoring to satisfy whatever concerns lead to the desire for 100% observer coverage. The industry might have contracted a university or scientific institution to design and implement a research project to address the concerns. The Council might have review the plan (perhaps using its SSC) and approved it if it was satisfied that it would be successful. At the conclusion of the study, a decision would have to be made if 100% at sea monitoring was necessary, and if so, how to achieve it. I would not envision a university or scientific institution carrying out such a monitoring program indefinitely.

One of the issues with the approach to at sea monitoring described above is adequacy of data for scientific uses such as stock assessment. In the design of the program, the only consideration should the adequacy of the data for its intended purpose, usually not stock assessment since SBRM data is intended for that purpose. However, the data might be useful for broader purposes, and this should be decided on a case by case basis by the scientists that are considering using the data.

## Funding

In the discussion above, I specifically advocated that as sea monitoring for other purposes should be funded by industry. I did not comment on funding for at sea monitoring for science, enforcement or quota monitoring. Philosophically my inclination is that industry should pay the cost of quota monitoring, and maybe it should pay for part of the cost of monitoring for science and enforcement. My philosophy reflects the fact that private individuals are benefiting from a public resource. Paying such costs should be considered in the context of government cost recovery or a resource rental fees. However, philosophy must be balance by economic realities (fisheries need to be profitable to pay fees) and government accounting rules (i.e., user fees should be used to improve fishery management, not deposited in a general account of the Department of Treasury).

I have not commented on funding when the cost of monitoring is shared by NOAA Fisheries and the fishing industry. This topic seems to be covered by the Omnibus IFM Amendment. However, I do not think this amendment is adequate to address the diverse needs for at sea monitoring.

Happy holidays,

Mike
Michael Sissenwine

# Comparison of At-Sea Catch Monitoring Programs with Full Observer Coverage to the Directed Atlantic Herring Fishery – New England

**June 2012**

**A report prepared**

**by**



**MRAG Americas, Inc.**

**www.mragamericas.com**

_0000002810

# Contents

1  Executive Summary.................................................................................................... 1

2  Introduction ............................................................................................................... 2

3  Characteristics of the Atlantic Herring Fishery ......................................................... 3

4  Characteristics of US Fisheries that employ 100% At-Sea monitoring ..................... 6

   4.1    The West Coast Groundfish Trawl Individual Fishing Quota (IFQ)................. 8

       4.1.1    West Coast Trawl IFQ Observer Program ........................................ 10

   4.2    West Coast At-Sea Hake Fishery ................................................................ 11

       4.2.1    West Coast At-Sea Hake Fishery Observer Program........................ 12

   4.3    Alaska Pollock Trawl Fleet.......................................................................... 13

       4.3.1    Alaska Pollock Trawl Fleet Observer Program ............................... 14

   4.4    Hawaii Longline Swordfish Fishery ............................................................ 16

       4.4.1    Hawaii Longline Swordfish Fishery Observer Program .................. 17

5  Observer Program Requirements, Costs and Fishery Revenues.............................. 18

   5.1    WC Trawl Fishery Observer Program Costs ............................................... 22

   5.2    WC At-Sea Hake Fishery Observer Program Costs...................................... 23

   5.3    AK Pollock Fishery Observer Program Costs ............................................. 24

   5.4    Hawaii Swordfish Longline Fishery Observer Program Costs ..................... 25

6  Prospects for 100% monitoring in the New England Atlantic herring fishery ................ 26

   6.1    Current At-sea monitoring on herring vessels ............................................ 26

   6.2    Design considerations ................................................................................ 29

   6.3    Cost and Revenue Considerations ............................................................. 30

   6.4    Contributing Factors .................................................................................. 33

7  Summary .................................................................................................................. 38

8  Acknowledgements.................................................................................................. 39

# 1  Executive Summary

The Atlantic herring fishery is currently undergoing scrutiny concerning bycatch of haddock, bycatch of alewife and blueback herring (collectively referred to as 'river herring') and dumping complete or partial hauls (slippage) without having these discards accounted for. River herring are depleted and candidates for listing under the Endangered Species Act (ESA). Observer coverage is currently in the range of 30% on midwater trawls, sufficiently low to question the robustness of river herring bycatch and of slippage estimates. The possibility of introducing higher observer coverage levels to the herring fishery suggests that information for observer programs that require 100% or higher observer coverage in other regions could provide valuable information for discussions on increasing the herring coverage. This report summarizes fishery characteristics, observer program characteristics, and observer cost components for four fisheries that require 100% or higher observer coverage for comparison with characteristics of the Atlantic herring fishery to inform discussions on potential coverage levels of the Atlantic herring fishery. The four 100% fisheries are the Hawaii (HI) longline swordfish, the Alaska (AK) pollock midwater trawl, the west coast (WC) at-sea whiting (hake) midwater trawl, and the west coast (WC) non-whiting trawl Individual Fishing Quota (IFQ). Both the at-sea hake and AK pollock fisheries are certified as sustainable according to the principles and criteria of the Marine Stewardship Council (MSC). The MSC certification criteria require sufficient data to account for impacts of the fishery on the target stock and on the components of the ecosystem. MSC certified fisheries tend to have more robust monitoring systems than uncertified fisheries, but the at-sea monitoring for certified fisheries can range from quite modest to 100% or higher coverage levels, depending on the needs.

In the Atlantic herring fishery, midwater trawl vessels possess either category A (access to fish in all management areas) or B permits (access to fish in two of four management areas), and take over 60% of the landings. Presently there are less than 20 active vessels with A/B permits, 12 of which are paired midwater trawls that catch the majority of the quota; the remaining are single midwater trawls, purse seines and bottom trawls. In 2010, paired midwater trawls landed 70.54% of the total herring landings from all areas, single midwater trawls landed 12.97%, purse seine gear landed 11.47% and bottom trawls landed 5.02%.

The four fisheries with 100% observers span a range of gears, catch volume, revenue, and vessel characteristics that bracket the NE herring fishery. The herring fishery is comparable in weight and revenue to the WC hake fishery; far exceeds the weight of the HI longline fishery but only doubles its revenue; substantially exceeds the weight of the WC trawl IQF fishery but moderately exceeds the revenue; and falls far below the weight and value of the AK pollock fishery as do all the other fisheries. NE herring and WC trawl IFQ both run short trips compared to HI longline and the mothership operations of AK pollock and WC hake, resulting in higher logistics requirements to deploy the observers.

The Atlantic herring fishery shares some important characteristics with the four 100% observer coverage fisheries discussed here (Table 2 and Table 3). All four 100% fisheries and the Atlantic herring fishery have some sort of limited access. All four 100% fisheries and the Atlantic herring fishery have interactions with endangered, threatened and protected (ETP) species and/or depleted species that can limit the target fishery. Like the pollock and whiting fisheries, the Atlantic herring fishery is high volume, which can make detection of the limiting species difficult. Like the whiting at-sea fishery, midwater trawl gear makes up the total (whiting) or a very high

_0000002812

proportion of the total (herring) catch, although the herring fishery has three other legal gears, similar to the IFQ whiting fishery.

Bycatch and discards drive the observer programs as primary objectives for the 100% fisheries and for the Atlantic herring fishery (Table 3), reflecting the need to obtain observer information for activities that occur at sea and cannot be effectively monitored from ports. Prohibited species monitoring uniformly rises to the top one or two priorities. Discard weights (herring, WC Trawl IQ) and species composition sampling (pollock, at-sea hake) appear as high priorities for some but not other fisheries. Biological samples and length frequencies tend to occur as mid priorities for most programs, but HI swordfish shows biological samples as a high priority. The 100% coverage required of the comparison fisheries represent a variable proportion of the revenues for these fisheries, ranging from around 2% for AK pollock and the at-sea whiting to 7-8% for Hawaii swordfish longline and WC trawl IFQ. Applying the characteristics of the Atlantic herring fishery, we estimate that the cost of 100% observer coverage would run in the 10-11% range. The substantially higher cost for herring results from a sea day rate that is about twice as expensive as for the other fisheries. Where the sea day rates for the 100% comparison fisheries runs on the order of $350, the estimated sea day rate for herring is about $740. The $740 rate incorporates observer salary, travel, provider fees and logistics, federal Service Contract Act (SCA) and Fair Labor Standards Act (FLSA) requirements and an observer pay bonus structure required under NEFOP. This rate does not include NMFS expenses (estimated at an additional $400 approximately), which includes training and debriefing, NMFS salaries, and database development and maintenance; these additional costs assumed by NMFS would remain in place as long as the program is operated as a federal observer program. The higher rate for herring, which is comparable to the current rates for the Northeast Fishery Observer Program (NEFOP) and the Northeast At-sea Monitoring (ASM) Program, results from a combination of short trips and a substantial infrastructure needed for efficient deployment of observers; the NEFOP bonus; and SCA and FLSA requirements.

## 2   Introduction

Four fisheries in the U.S. employ 100% or more at-sea monitoring. Currently, and in large part due to concerns over significant and unreported river herring bycatch, Draft Amendment 5 to the Atlantic Herring Fishery Management Plan is considering alternatives to increase observer coverage to 100% on all herring vessels. MRAG Americas developed information concerning the fishery characteristics, reasons for choosing 100% coverage, the observer program structure, and requirements and costs of these 100% (comparison) fisheries to provide background for the discussions of potential changes to the herring observer program. This report compares and contrasts the comparison fisheries with the current directed Atlantic herring fishery (permit category A/B). The report further speculates on the potential costs of 100% at-sea coverage for the A/B herring fishery, by applying a number of relevant factors known to affect observer program costs.

_0000002813

# 3   Characteristics of the Atlantic Herring Fishery

The Atlantic herring fishery operates year round in the Gulf of Maine. In 2010, the fleet landed 144 million lbs of herring worth over $18.7M.[1] Four gears types are employed in fishing operations (weir, purse seine, single midwater trawl and paired midwater trawl. The Atlantic Herring fishery is managed by the New England Fishery Management Council's (NEFMC) Atlantic Herring Fishery Management Plan as a limited access permit fishery. Permits regulate possession limits and grant access to four management areas: Area 1A (Gulf of Maine), Area 1B (Gulf of Maine), Area 2 (Southern New England), and Area 3 (Georges Bank) (        ).  Category A permitted vessels are authorized to fish in all limited access managed areas and have unlimited possession limits in all areas; Category B permits have access to Areas 2 and 3 only and unlimited possession limits within Areas 2/3; Category C are incidental catch permits limiting vessels to 55,000 lb per trip/day in all areas; and Category D permits are open access permits with a more restricted possession limit of 6,600 lb per trip/day in all areas.[2]

The majority of commercially-caught Atlantic Herring is harvested by midwater trawl boats ranging up to 165' in length with Category A and B permits; over 80% of Atlantic herring landings[3] in all management areas resulted from midwater trawls in 2010 (paired midwater trawls landed 70.54% of the landings, single midwater trawls landed 12.97%, purse seine gear landed 11.47% and bottom trawls landed 5.02%).[4] Within each herring management area, in 2010, over 70% of herring landings by Category A permitted vessels were caught by paired midwater trawls whereas single midwater trawls caught only about 10% of the total for Category A permits (Figure 2). In 2010, 101 vessels were granted limited access permits in the Atlantic Herring fishery, 46 had Category A and B permits, and 55 were Category C permits. An additional 2,258 boats held Category D open access herring permits; a number of these were herring/multispecies combination permits (Table 1). Presently there are less than 20 active vessels with A/B permits, 12 of which are paired midwater trawls that catch the majority of the quota; the remaining are single midwater trawls and bottom trawls.[5] Additional vessels are permitted to possess herring without a federal herring permit if herring is only used for bait and commercial fishing gear (purse seine, midwater trawl, pelagic gillnet, sink gillnet, or bottom trawl gear) is not on board the vessel, and herring is not transferred, sold, traded, or bartered; or the vessel is a skiff or other similar vessel that is used exclusively to set the net in a purse seine operation with a vessel that has a herring permit. The fishery is assigned an annual catch limit (ACL) that is allocated among the four management areas.

[1] NEFMC. 2012. Draft Amendment 5 to the Atlantic Herring FMP. Public comments. February 16, 2012. Available at: http://nefmc.org/herring/planamen/draft_a5/public%20hearings/Draft%20AM%205%20FOR%20PUBLIC%20HEARINGS%20OFFICIAL%20FEB%2016%202012%20NO%20INDEX.pdf
[2] Northeast Regional Office (NERO). 2012. Atlantic Herring Information Sheet. January 1, 2012. http://www.nero.noaa.gov/nero/regs/infodocs/AtlHerringInfoSheet.pdf
[3] These values breakdown gear composition by catch for categories A and B permit types only; this is slightly different than the values provided in Table 1, which considers gear composition of catch by all permit types.
[4] NEFMC. 2012. NMFS VTR data.
[5] NEFSC staff, personal communications. February 2012.

_0000002814



**Figure 1: Herring Management Areas: Area 1A – Inshore Gulf of Maine, Area 1B – Offshore Gulf of Maine, Area 2 – South Coastal Area, Area 3 – Georges Bank (NERO 2012).**



**Figure 2: Atlantic herring landings by federally permitted single and paired midwater trawl vessels (Category A) as a percentage of the total for this category, by management area fished in 2010 (NEFMC 2012).**

_0000002815

**Table 1: 2010 Herring permits by category and herring/multispecies combination permits (NEFMC 2011).**

| Herring Permit Category | Herring Only | Herring with Multispecies Limited Access | | Herring with Multispecies Open Access** | Total | Percentage of Total Landings in 2010 |
|---|---|---|---|---|---|---|
| | | A, D, E, F | C, HA | HB, I, J, K | | |
| A | 8 | 14 | 1 | 19 | 42 | 97.12%*** |
| B* | 0 | 4 | 0 | 0 | 4 | 1.11% |
| C** | 0 | 39 | 0 | 12 | 51 | 1.13% |
| D | 144 | 887 | 71 | 1144 | 2246 | 0.63% |
| **Total** | **152** | **944** | **72** | **1175** | **2343** | **100.00%** |
| * All B permitted vessels also have a C permit. | | | | | | |
| ** Does not include C permits that are associated with B permits. | | | | | | |
| *** Break down by gear for 97% of total herring landings: 67% paired midwater trawls, 14 % midwater otter trawls, 12% purse seine, and 4% bottom trawl. | | | | | | |

The range of the herring fleet overlaps with that of river herring, designated species of concern range (i.e. alewife and blueback herring).[6] Both species of river herring are presently depleted and proposed for listing under the Endangered Species Act.[7] River herring populations have drastically declined over the last twenty years due to overfishing, bycatch, dam construction, habitat degradation and striped bass predation. Due to these continual declines, the bycatch of river herring in the Atlantic herring fishery is a significant concern. Public comments in response to the scoping for draft Amendment 5 included many interested parties that believe present levels of observer coverage on midwater trawl vessels do not adequately identify the amount of river herring bycatch.[8] Higher observer coverage on these vessels would provide the data necessary to understand the magnitude of the problem and allow management to appropriately address it. In addition, other fish (e.g. haddock, mackerel), birds, marine mammals and tuna that feed on herring schools are also vulnerable to midwater trawlers in the herring fishery.[9] According to observer data for 2009-2010, where it is estimated that over 30% of the midwater trawl A/B vessel trips were observed (387 observed of 1005 total trips), six species (alewife, blueback herring, dogfish, haddock, Atlantic herring, Atlantic mackerel) made up 22% of the discarded species between January and June 2009: these same species comprised over 97% of the landed catch. The majority of discarded fish was categorized as fish NK and totaled 945,922 lb. Fish NK and herring NK, where the observer can see and confirm herring-bodied fish, are categories used by observers to represent the component of the catch for which observers could not verify identification. This includes partial and fully released tows (net

---

[6] NOAA Fisheries. 2009. Species of Concern: River Herring. Available at:
http://www.nmfs.noaa.gov/pr/pdfs/species/riverherring_detailed.pdf
[7] Alewife: http://www.nmfs.noaa.gov/pr/species/fish/alewife.htm; Blueback herring:
http://www.nmfs.noaa.gov/pr/species/fish/bluebackherring.htm
[8] NEFMC. 2012. Draft Amendment 5 to the Atlantic Herring FMP. Public comments. February 16, 2012. Available at:
http://nefmc.org/herring/planamen/draft_a5/public%20hearings/Draft%20AM%205%20FOR%20PUBLIC%20HEARINGS%20
OFFICIAL%20FEB%2016%202012%20NO%20INDEX.pdf
[9] NEFMC. 2012.

_0000002816

slippage[10]) and operational discards ("not enough fish to pump"). [11] These data reflect information available for only a portion of the midwater trawl fleet (paired and single trawls), where the highest portion of observed trips occurred on Category A/B vessels fishing in Groundfish Closed Area 1.[12]

# 4    Characteristics of US Fisheries that employ 100% At-Sea monitoring

The impetus for mandating 100% at sea monitoring in U.S. fisheries varies by example and in some cases the requirement pertains only to a sector of vessels within the fishery.  High levels of monitoring are typically used when needed information on activities that occur at sea cannot be obtained in port, e.g., discards and monitoring of rare events (endangered, threatened, and protected (ETP) and limiting species).  Below we provide a general summary outlining the characteristics of four US fisheries with 100% monitoring (west coast limited entry groundfish trawl IFQ, west coast (WC) at-sea hake processors, Alaska (AK, subdivided into Gulf of Alaska and Bering Sea/Aleutian Islands) pollock midwater trawl, and Hawaii (HI) swordfish longliners (LL)) for comparison with the herring fishery (Table 2). The four fisheries with 100% observers span a range of gears, catch volume, revenue, and vessel characteristics that bracket the NE herring fishery. The herring fishery is comparable in weight and revenue to the WC hake fishery; far exceeds the weight of the HI longline fishery but only doubles its revenue; substantially exceeds the weight of the WC trawl IQF fishery but moderately exceeds the revenue; and falls far below the weight and value of the AK pollock fishery – as do all the other fisheries. NE herring and WC trawl IFQ both run short trips compared to HI longline and the mothership operations of AK pollock and WC hake, resulting in higher logistics requirements to deploy the observers.

---

[10] Draft Amendment 5 (NEFMC 2012) defines slippage as "Unobserved catch, i.e., catch that is discarded prior to being observed, sorted, sampled, and/or brought on board the fishing vessel. Slippage can include the release of fish from a codend or seine prior to completion of pumping or the release of an entire catch or bag while the catch is still in the water".
[11] NEFMC. 2012.
[12] NEFMC. 2010.

_0000002817

**Table 2: Comparison of fishery characteristics.**

| | NE Herring | HI Swordfish Longline | AK Pollock | WC At-Sea Hake | WC Trawl IFQ |
|---|---|---|---|---|---|
| Current level of observer coverage | 30%+ | 100% | 100-200% | 100% | 100% |
| **Fishery Characteristics (data through 2010)** | | | | | |
| Target Species | Atlantic Herring | Swordfish, Marlin | Pollock | Hake | Various species |
| Primary gear | Midwater trawl | Shallow LL | Midwater trawl | Midwater trawl | shallow/deep Trawl/pots/LL |
| Catch Volume range | 63,000 - 95,000 mt | 1,800 - 2,300 mt | 813,000 - 1,390,000 mt | 114,784 - 240,985 mt | 19,400 - 27,700 mt |
| Fishery Revenue range (2007 - 2010) | $19.3M - $18.77M | $10.8M - $9.5M | $297.4M - $323.2M | $32.6M - $27.3M | $26.7M - $27.0M |
| Season | all year | Jan-Dec slower in Summer | late Jan to Oct | May-Dec | Jan-Dec |
| Number of Permits | 46 | 32 active in shallow set fishery (124 active LL vessels) | 82 | 15 | 114 |
| Landing Ports | 4+ | 2 | 3 | 7+ | 13+ |
| Trip length range | 1-5 days | 21-50 days | 2-90 days | 2-90 days | 2-5 days |

Bycatch and discards drive the observer programs as primary objectives for the 100% fisheries and for the Atlantic herring fishery (Table 3), reflecting the need to obtain observer information for activities that occur at sea and cannot be effectively monitored from ports. Prohibited species monitoring uniformly rises to the top one or two priorities. Discard weights (herring, WC trawl IFQ) and species composition sampling (pollock, at-sea hake) appear as high priorities for some but not other fisheries. Biological samples and length frequencies tend to occur as mid priorities for most programs, but HI swordfish longline shows biological samples as a high priority. Monitoring compliance, marine mammal and seabird collections, fishing effort data, gear measurements, and processor recovery rates fall to low priorities, and observers collect data for these categories on an opportunity basis.

**Table 3: Summary of observer program priorities.**

| | NE Herring | HI Swordfish Longline | AK Pollock | WC At-Sea Hake | WC Trawl IFQ |
|---|---|---|---|---|---|
| **Issues and Priority of Data collection (if applicable)** *Data collection priority ranked in order or importance (1 is top priority); where lesser priority data would not be collected if time and conditions would not permit.* | | | | | |
| Federal Obs | No | No | No | No | No |
| Obs Primary Concern | Bycatch - River Herring, Tuna, MMs, seabirds | Bycatch - Turtles, MM, sharks | Bycatch - salmon | Bycatch - rebuilding stocks | Discard analysis |
| Obs Secondary Concern | Discard Analysis | Biological Sampling | Species Composition | Species Composition | Bycatch - critical stocks |
| Compliance Monitoring | 4 | 4 | 6 | 6 | 5 |
| MM Collection | 5 | 4 | 4 | 5 | 6 |
| Seabird Collection | 5 | 4 | 4 | 5 | 6 |
| Biological Samples | 5 | **2** | 3 | 3 | 4 |
| Length Frequencies | 5 | 3 | 3 | 3 | 4 |
| Observer Training Center Determination | 6 | 3 | 5 | 4 | 3 |
| Discard Weights | **2** | No | 5 | 4 | **1** |
| Species Composition Sampling | 3 | 5 | **2** | **2** | 3 |
| Prohibited Species Monitoring | **1** | **1** | **1** | **1** | **2** |
| Fishing Effort Data | 4 | 5 | 6 | 6 | 5 |
| Gear Measurements | 4 | No | No | 6 | No |
| Processor Recovery Rates | 7 | No | No | No | No |
| Shore Side Sampling | No | No | 100% | 100% | 100% |

## 4.1   The West Coast Groundfish Trawl Individual Fishing Quota (IFQ)

The west coast groundfish fishery is a multispecies fishery managed by the Pacific Fishery Management Council's (PFMC) Groundfish Fishery Management Plan (FMP), which manages over ninety species, eight of which are presently under rebuilding plans. In January 2011, The PFMC implemented the West Coast Groundfish Trawl Rationalization Program , a limited access privilege program under the Magnuson-Stevens Act. The program consists of the individual fishing quota (IFQ) program for the shoreside limited entry bottom trawl fleet and two

_0000002819

distinct cooperative programs for the at-sea hake mothership and catcher/processor trawl fleets (described in more detail below). A quota share permit authorizes a person or group to own quota share (expressed as a percentage); quota share (QS) accounts allocate individual fishing quota (IFQ) and individual bycatch quota (IBQ) species[13]. Only vessels with quota shares are allowed to fish in the trawl IFQ fishery; however, quota can be bought, sold, leased or traded. In the first year of the program (2011) numerous fixed gear vessels, using pot and longline gear entered the fishery. These vessels were able to target specific species with lower bycatch of limiting stocks. The bottom trawl fleets traditionally operates from the U.S./Canadian border to Morro Bay, California. The fishing season operates year round.

In 2011, there were 138[14] permitted shore-based trawl vessels in the groundfish IFQ fishery. The fishery landed 242,386,298 pounds of a 375,004,872 quota[15] (64.6%) worth $26,066,500. While the landed weight did not change substantially from previous years, the 2011 value per non-whiting vessel increased by 34% from the previous 5-yr average, from an average of $216,000 to slightly more than $289,000[16]. The value of the whiting fleet increased even more, from about $273,000 per vessel on average over the last few years to $775,000 in 2011.

Within the IFQ program, vessels will be allowed to use a variety of directed groundfish commercial gear (including non-trawl gear) to take the shoreside trawl sector allocation, which will thus allow for "gear switching." IFQs were created for most species of groundfish under the Groundfish FMP. Allocation of annual harvest is shared between sectors. In the non-whiting sector, 90% of the quota share is granted to limited entry permit holders, 0% to processors, and 10% for adaptive management.[17] In 2010, catch of groundfish by the limited entry bottom trawl sector was approximately 24,250 mt, and with 114 active permits. In 2011, the limited entry bottom trawl sector catch was approximately 19,400 mt with ~80 active permits.[18] Shoreside vessels receive an individual bycatch quota (IBQ) for Pacific halibut.

Groundfish bottom trawl vessels range in from 35 - 95 feet, with an average length of 65 feet. Vessels fish a wide range of depths throughout the year and deliver catch to shoreside processors. Bottom trawlers often target species assemblages, resulting in a mixed catch. A single groundfish tow often includes 15-20 species. Groundfish trawl vessels retain the portion of their catch that is marketable and permitted to be landed. The portion of the catch which is prohibited by regulations or not marketable is discarded at-sea.[19]

---

[13] http://www.nwr.noaa.gov/Groundfish-Halibut/Groundfish-Fishery-Management/Trawl-Program/upload/2012-interim.pdf

[14] http://www.nwr.noaa.gov/Groundfish-Halibut/Groundfish-Fishery-Management/Trawl-Program/quota-shares.cfm

[15] https://www.webapps.nwfsc.noaa.gov/ifq/

[16] http://www.nwr.noaa.gov/Newsroom/Current/loader.cfm?csModule=security/getfile&pageid=53063

[17] PFMC. 2011. Groundfish FMP Appendix E: Trawl Rationalization. http://www.pcouncil.org/wp-content/uploads/GF_FMP_ApdxE_TRat.pdf

[18] Pacific Fisheries Information Network: http://pacfin.psmfc.org/

[19] NWFSC. 2012. Limited Entry Bottom Trawl Webpage. Accessed February 2012. Available at: http://www.nwfsc.noaa.gov/research/divisions/fram/observer/bottom_trawl.cfm

_0000002820

### 4.1.1    West Coast Trawl IFQ Observer Program

One hundred percent observer coverage is provided by the West Coast Groundfish Observer Program (WCGOP) in both the west coast (WC) groundfish shore-based trawl fleets managed under IFQ (for whiting and non-whiting groundfish) and the offshore fisheries (motherships and catcher/processors) targeting Pacific whiting. Observers collect information on fishing activity, catch, individual fish, bycatch, and species interactions. The program is designed to enhance accountability by fishermen through the use of 100% at-sea observer coverage and 100% monitoring of shoreside landings. All vessels are required to carry at-sea observers for full total catch verification (100 percent of the groundfish IFQ species in each haul); observers are required to monitor the sorting, weighing, and discarding of catch.[20,21] The data collected are used to account for any IFQ discarded catch, including the mandatory discarding of and the tracking of individual bycatch quota (IBQ)[22] for Pacific halibut. Fishery observers monitor all offloads and confirm the accuracy of reported landings; these data enable fishermen to track their IFQs and managers to monitor progress of the fishery. The observer coverage is a core element of the accountability of the program.[23]

The catch shares program led to development of the Catch Shares Observer Program (CSOP) under the WCGOP, which provides 100% observer coverage on all catch shares program fishing trips. All vessels participating in the shorebased IFQ program must carry a NMFS-certified observer on each trip until all fish from that trip have been offloaded; vessels greater than 125' participating in the Mothership Coop Program or Catcher/Processor Coop Program must carry two NMFS-certified observers.

Prior to the 2011 implementation of the catch shares program, observer coverage monitored less than 25% of non-whiting trawl trips; there was considerable delay in data delivery resulting in catch by species information not being available for more than a year after the fishing ended.[24] Additionally, observers were employed by observer providers, though the Pacific States Marine Fisheries Commission (PSMFC) selects and funds the provider for observer services through a federal contract and the WCGOP was completely funded by the federal government. This program differs from other federally-funded programs in that a separate entity, the PSMFC, rather than NMFS administered the funds.

---

[20] PFMC. 2011. Pacific Groundfish Fishery Management Plan. http://www.pcouncil.org/groundfish/fishery-management-plan/fmp-amendment-20/

[21] PFMC. 2010. Rationalization of the Pacific Coast Groundfish Limited Entry Trawl Fishery; Final Environmental Impact Statement Including Regulatory Impact Review and Initial Regulatory Flexibility Analysis.

[22] Individual bycatch quota (IBQ) means the amount of bycatch quota for an individual species/species group and area expressed as a percentage of the annual allocation of allowable bycatch mortality to the Shorebased IFQ Program. (50CFR660.111; http://edocket.access.gpo.gov/cfr_2010/octqtr/50cfr660.111.htm)

[23] NOAA Fisheries. 2010. West Cast Groundfish Trawl Catch Share Program - New Catch Share Regulations. Final: August 16, 2010.

[24] PFMC. 2010. Rationalization of the Pacific Coast Groundfish Limited Entry Trawl Fishery; Final Environmental Impact Statement Including Regulatory Impact Review and Initial Regulatory Flexibility Analysis.

_0000002821

## 4.2   West Coast At-Sea Hake Fishery

The Pacific whiting (or 'hake', *Merluccius productus)* fishery is one of the largest by volume in the US with an annual catch in 2010 of 161,000 mt (106,000 mt caught by the at-sea fishery and 55,000 mt by the shoreside fishery).[25] Pacific hake is managed by the PFMC under the Pacific Coast Groundfish FMP.[26] Of the 90+ species managed under the Groundfish FMP, whiting landings are the largest single-species landings by volume. Presently, the entire U.S. west coast groundfish trawl fishery is managed under a catch share program (Trawl Rationalization Program, implemented January 2011).[27] Since the 1990s, the US share is divided among distinct sectors: Catcher/Processors (CP) are large vessels that harvest and process their own catch at-sea; Motherships (MS) that take deliveries from catcher vessels and process at-sea; Shoreside (SS) where shore-based processing plants take deliveries from catcher vessel; and Coastal treaty Tribes in Washington State (namely the Makah and Quileute tribes) that receive a reserved fraction of the coast-wide hake harvest set aside for native tribes. Motherships and catcher/processers belong to fishery cooperatives that help optimize use of allowable harvest and aid in management and research of the resource.[28,29] In 2006, a Pacific whiting retention maximization program went into place for the shoreside fishery[30] with objectives of accounting for Chinook salmon catch; meeting standardized bycatch reporting requirements specified by the Magnuson-Stevens Fishery Conservation and Management Act; and collecting biological data on catch that would otherwise not be available; these objectives require a high level of at-sea monitoring. Chinook salmon is a protected species listed as endangered or threatened for nine of 17 recognized evolutionary significant units (ESU), where each ESU is treated as a separate species under the ESA.[31] Chinook salmon are anadromous species, similar to river herring that are susceptible to fishing during their adult lives at sea.

Each sector's catch is also restricted by limits on bycatch of Chinook salmon and depleted rockfish species. The management system uses observer data to determine if the whiting fishery reaches or exceeds an aggregate limit of 11,000 Chinook salmon, which automatically triggers a salmon conservation area closure for the entire whiting fleet. The at-sea mothership and catcher-processor co-ops and vessels in the shorebased IFQ programs receive limits on the amount of depleted rockfish available for catch. Attaining the co-op or individual vessel

---

[25] Stewart, I.J., R.E. Forrest, C. Grandin, O.S. Hamel, A.C. Hicks, S.J.D. Martell, and I.G. Taylor. 2011.  Status of the Pacific Hake (Whiting) stock  in U.S. and Canadian Waters in 2011. Joint U.S. and Canadian Hake Technical Working Group. Final SAFE document. March 17, 2011. http://www.pcouncil.org/wp-content/uploads/Pacific_Whiting_2011_Assessment.pdf

[26] PFMC. 2011. Pacific Coast Groundfish Fishery Management Plan for the California, Oregon, and Washington Groundfish Fishery. Through Amendment 19. December 2011. http://www.pcouncil.org/wp-content/uploads/GF_FMP_FINAL_Dec2011.pdf

[27] DOC 2010. 50CFR Part 660. Fisheries Off West Coast States; Pacific Coast Groundfish Fishery Management Plan; Amendments 20 and 21; Trawl Rationalization Program. http://www.nwr.noaa.gov/Publications/FR-Notices/2010/upload/75FR78344.pdf

[28] Stewart et al. 2011.

[29] Pacific Whiting Conservation Cooperative (PWCC). 2012. Website. http://www.pacificwhiting.org/

[30] Northwest Regional Office. 2007. A maximized Retention and Monitoring Program for the Pacific Whiting Shoreside Fishery, Implementing Amendment 10. http://www.nwr.noaa.gov/Groundfish-Halibut/Groundfish-Fishery-Management/NEPA-Documents/upload/Amend-10-EA.pdf

[31] NMFS Office of Protected Resources Chinook Salmon designation, Accessed March 2012: http://www.nmfs.noaa.gov/pr/species/fish/chinooksalmon.htm; Northwest Regional Office Chinook Salmon Populations, Accessed March 2012: http://www.nwr.noaa.gov/ESA-Salmon-Listings/Salmon-Populations/Chinook/

_0000002822

limits leads to restrictions in fishing activities for the co-op or vessel; attaining the aggregate limit for the depleted species could close an entire sector.

These vessels target Pacific hake using midwater trawl nets and fish mid-May through November. Hake is targeted and is the predominant catch, though catch can include rockfish (*Sebastes spp.*) and salmon bycatch. Whiting form huge schools and midwater trawls target the schools; bycatch can be upwards of 2% of the catch (by weight).  Fishermen may discard unwanted catch, but all catch is accounted for and applied to individual or co-op quotas. Midwater trawls must have a codend mesh of at least 3 inches to prevent bycatch of small fish. Regulations restrict where fishermen may harvest Pacific whiting to reduce the bycatch of Chinook salmon. Bycatch allocations are used to limit the catch of depleted rockfish species in the catcher/processor and mothership sectors. Quota shares are used in the shore-based fishery. The at-sea hake processing sector (motherships and catcher/processor vessels) is subject to mandatory 100% observer coverage and catch monitors monitor landings. This was precipitated by the need to account for bycatch of rockfish (*Sebastes spp.*) and salmon. Full accounting of the catch leads to reduced bycatch. In 2010, fleet size was comprised of 15 processing vessels (9 catcher/processors and 5 motherships with 14 catcher vessels), processing vessels range in size from 250-600'. In 2009, the Pacific hake midwater trawl fishery received certification as a sustainable and well managed fishery under the Marine Stewardship Council (MSC) standards.[32]

### 4.2.1   West Coast At-Sea Hake Fishery Observer Program

The At-Sea Hake Observer Program (A-SHOP) monitors the at-sea hake processing vessels and all vessels carry two observers at all times. A-SHOP dates back to 1975 when observers were deployed to monitor foreign and joint venture fishing; there has been 100% coverage on the domestic fleet since 1991. Observer data collection focuses primarily on total catch and bycatch (especially salmon and rockfish) and protected species interactions data.[33]  Observer coverage in the directed hake (Pacific whiting fishery) is required for all offshore fisheries (motherships and catcher/processors). Processing vessels less than 125' are required to carry one observer on all fishing trips; vessels 125' or over must carry two observers on all trips directed at hake. Since 2002, all catcher-processors and motherships have carried two observers due to declines in populations of certain rockfish species along the west coast; this has resulted in the hake fishery being held to lower bycatch quotas. In 2004, the at-sea hake fishery came close to catching the entire canary rockfish allocation in one haul; therefore, some rockfish species have specific bycatch limits (or "hard caps").[34] The west coast at-sea limiting species situation has similarities to haddock in the herring fishery, in which a haddock incidental catch cap in place in the Atlantic herring fishery allocates 1% of the haddock acceptable biological catch for each the Gulf of Maine and Georges Bank stocks in each multispecies fishing year. The Chinook conservation zone has additional similarities with a management option proposed in Atlantic herring draft Amendment 5 that includes monitoring and

---

[32] MSC Certification of Hake: http://www.msc.org/newsroom/news/pacific-hake-mid-water-trawl-fishery-is-msc/
[33] Northwest Fisheries Science Center. 201.1 At-Sea Hake Observer Program, Observer Sampling Manual. Fishery Resource Analysis and Monitoring, At-Sea Hake Observer Program. NWFSC, 2725 Montlake Blvd. East, Seattle, Washington 98112. Available at: http://www.nwfsc.noaa.gov/research/divisions/fram/observer/pdf/hake_manual_2011.pdf
[34] NWFSC. 2011.

_0000002823

avoidance measures in certain geographic regions that would be implemented in the event that river herring catch caps in the directed herring fishery (in specified geographic regions) were triggered.

Data collection occurs 24 hours/day in order to sample nearly all tows for species composition, though due the large volume (>60mt/tow) observers sample about 50% of each haul. [35] The primary concerns that require observer coverage are catch of rebuilding stocks and interaction with marine mammals and seabirds. Any bycatch of marine mammals and seabirds found in a species composition sample requires expanded sampling. These sampling protocols differ from those used by the West Coast Groundfish Observer Program (for the WC IFQ fishery), since the shore-based non-hake groundfish fisheries do not process at sea and deliver retained catch to shoreside processors. Observers on the at-sea hake vessels subsample total catch (both retained and discarded fish); this is similar to the protocols employed in the Northeast Observer Program aboard midwater trawl herring vessels. [36]

Observers are trained and certified by NMFS and employed by independent observer providers. Observers are primarily responsible for collecting bycatch data, on rebuilding stocks in particular. Observer providers hire, deploy, and support the observers in the field. Deployments are typically for a month or more and motherships and C/Vs and are often limited by the 90 day limit for a given individual observer on a vessel in a calendar year. Catcher vessels typically fish everyday as weather allows. Offloads are usually short, less than 3 hours, allowing rapid catcher vessels redeployment. Considerably less logistical time is required in the at-sea hake program, versus in the CSOP.

## 4.3   Alaska Pollock Trawl Fleet

Alaska, or walleye, pollock (*Theragra chalcogramma*) is a key species in the Alaska groundfish complex and a target species for the largest fishery in the U.S. and one of the world's largest fisheries. Pollock is a semipelagic schooling fish widely distributed in the North Pacific Ocean with largest concentrations found in the eastern Bering Sea. Pollock is a member of the cod family, managed within the multi-species groundfish complex by the North Pacific Fishery Management Council (NPFMC) under the Groundfish FMPs for the Gulf of Alaska (GoA) and Bering Sea and Aleutian Islands (BSAI). The BSAI and GoA stocks are considered to be two separate stocks. In 2010, there were 82 permitted catcher vessels in the Alaska pollock fishery, and pollock catch was 888,520 mt worth over $320 million, which comprised 55.8% of the total groundfish catch off Alaska. The fishing season operates between January 20 to mid-April and June 10 to November 1 annually.

The BSAI and GoA pollock fishery is currently a midwater trawl fishery. Originally, the vessels used both demersal and midwater trawls, but the bycatch of various crab species, Pacific halibut, and other species led to a prohibition on the use of non-pelagic trawl gear in the directed fishery for pollock. Catcher vessels range in size from 90' to 150' in length making short trips and then offloading catches at shoreside plants. Some catcher vessels deliver to floating processors. Catcher-processor vessels comprise the balance of the fleet, ranging from 125 to 320 feet in length; these vessels remain on the grounds for extended periods. In the Gulf of Alaska, the

---

[35] NOAA Fisheries. 2008. Report on the Bycatch of Marine Mammals and Seabirds by the US West Coast Groundfish Fleet. Northwest Fisheries Science Center, At-sea Hake Observer Program, West Coast Groundfish Observer Program. Available at: 36 http://www.nwfsc.noaa.gov/research/divisions/fram/observer/datareport/otherreports/full_mmsb_report072308.pdf

_0000002824

pollock fishery uses predominantly pelagic trawls, and is entirely shore-based. In 1998, the American Fisheries Act (AFA) implemented a cooperative program for the pollock fishery to limit access, including a buyout of 9 catcher-processor vessels. Vessels that meet the statutory requirements established under the AFA that specify minimum landings of pollock and U.S. vessel ownership requirements, and shore-based processors eligible to receive pollock from catcher vessels. The mothership and catcher-processor sectors have formed voluntary cooperatives to manage their allocations and do not receive an exclusive harvest privilege from NMFS. The pollock TAC is adjusted for the community development quota and incidental catch of pollock in other fisheries; the remaining TAC is allocated 50% to catcher vessels using shoreside processing, 40% to catcher/processer vessels and 10% to motherships. Seventeen catcher-processor vessels greater than 125'and eleven motherships require two observers at all times, the catcher vessels and processing plants require 100% coverage for full catch accounting including incidental catch of Pacific salmon, crab, Pacific halibut, and Pacific herring. In 2005, the Gulf of Alaska and Bering Sea pollock fisheries became MSC certified.[37]

American Fisheries Act (AFA) cooperatives in the Gulf of Alaska are managed through catch shares, requiring full catch accounting. The catch accounting system in the fishery includes real-time electronic reporting and observer reporting components to monitor allocations. The North Pacific Groundfish Observer Program (NPGOP) has deployed observers on domestic groundfish vessels since 1990. Observer coverage for vessels is based on length overall (LOA), gear type and the amount of groundfish delivered each month for fish processing plants.

### 4.3.1   Alaska Pollock Trawl Fleet Observer Program

The current Alaska observer program evolved from a need to understand and control foreign fishing in Alaskan waters. Foreign fishing began in the 1930s and over time led to depletion of fish stocks, such as Pacific Ocean perch and yellowfin sole. Foreign vessels directed high levels of harvest on snow and king crab. The foreign vessels caused high levels of mortality on Pacific halibut, one of the few domestic Alaskan fisheries at the time. In 1973, NMFS began placing observers on foreign vessels on a voluntary basis to determine the amount of discarded and retained Pacific halibut and to monitor the catch of various crab species by the Japanese.[38, 39] The observer program subsequently started monitoring bycatch of snow and king crab and the salmon species, and began to collect biological data on the retained and discarded catch. In 1976, as a result of the Magnuson Fishery Conservation and Management Act (now the Magnuson-Stevens Fishery Management and Conservation Act), NMFS placed observers on all foreign vessels. As fishing transitioned from foreign to joint venture (American catcher vessels delivering to foreign processing vessels) to fully domestic, the observer coverage declined as domestic vessels did not carry observers. In 1986, the domestic observer program began on a small scale with industry funded coverage for a fishery with bycatch of red king crab, followed by other small scale observer programs. In 1989, amendments to the groundfish management plans for the Gulf of Alaska and the

---

[37]MSC Certification of BSAI and GoA Pollock: http://www.msc.org/track-a-fishery/certified/pacific/bsai-pollock; http://www.msc.org/track-a-fishery/certified/pacific/gulf-of-alaska-pollock

[38] http://www.afsc.noaa.gov/FMA/history.htm

[39] NPFMC. 2010. Restructuring the Program for Observer Procurement and Deployment in the North Pacific – Public Review Draft. October 2010. Available at: http://www.fakr.noaa.gov/npfmc/PDFdocuments/conservation_issues/Observer/Observer_restructuring910.pdf

_0000002825

Bering Sea-Aleutian Islands required vessels 125 feet or longer to carry a NMFS-certified observer 100 percent of the time while fishing for groundfish; vessels 60-124 feet long to carry a NMFS-certified observer during 30 percent of their fishing days in each calendar quarter of the year in which they fish more than 10 days; plants processing 1,000 or more metric tons in a month to have an observer in the plant each day they process groundfish; and those processing 500-1,000 metric tons to have observers 30 percent of the days. The catcher processor vessels (greater than 125') that are required to carry observers 100% of their time at sea are allocated 40% of the directed fishing allowance (after 10% of the total is allocated to the community development quota program) in the Bering Sea/Aleutian Islands; motherships receive 10% and catcher vessels the remaining 50%.[40] These requirements were put into place in 1990 with the implementation of the North Pacific Groundfish Observer Program (NPGOP). Fishing vessels paid for observers and NMFS paid for the costs of managing the program. The management system understood the value of data collected by observers for obtaining data available only at sea. The loss of observer data as foreign fishing phased out of Alaska before the beginning of the NPGOP threatened the data-intensive assessment and management system in Alaska.

The AFA recognized the value of observer data by requiring two observers on catcher-processor and mothership vessels participating in the pollock fishery to monitor and better understand actual harvest.[41] Vessels in the AK pollock fishery are subject to 100 to 200% observer coverage, depending on vessel size. More recently, salmon bycatch taken incidentally in the GOA and BSAI pollock fisheries is a major concern, similar to the concerns of river herring catch in the directed Atlantic herring fishery where catch caps are under consideration, leading to improvements in the efforts to minimize this bycatch.[42, 43] Because the pollock fisheries tend to have low bycatch rates, the amounts of salmon bycatch could have passed with little notice in the absence of observers; the fairly rare events of salmon on a haul by haul basis lead to substantial total salmon mortality because of the magnitude of the total pollock catch. The North Pacific Council and NMFS noted that "coverage requirements have increased for vessels and processors participating in (rationalized) limited access privilege programs and individual quota based fisheries. In fisheries where individual entities or cooperatives receive an allocation of the TAC, observer coverage has been increased to ensure harvesters maintain catches within the annual allocations and do not exceed prohibited species catch or other harvest limits. The amount of observer coverage in these fisheries is typically higher than in the open access groundfish fisheries and observers may be required to have additional training and experience beyond an entry level groundfish observer."[44]

In 2010, Amendment 86 to the FMP for Groundfish in the Bering Sea / Aleutian Islands and Amendment 76 for the FMP for Gulf of Alaska Groundfish restructured the observer program by expanding coverage to include smaller groundfish vessels (< 60'), extended coverage to 100% for all catcher/processor (CP) vessels from 60'-125', changed the way observers are funded and deployed on catcher vessels observer at less than 100%, and extended the reach of the NPGOP into the directed Pacific Halibut fishery (previously vessels in the halibut IFQ were not regularly observed). These changes apply to vessels not previously required to carry observers on

---

40 Final 2011 and 2012 Allocations of Pollock TACS.
http://www.alaskafisheries.noaa.gov/sustainablefisheries/specs11_12/bsaitable3.pdf
41 http://www.fakr.noaa.gov/sustainablefisheries/afa/congress202.pdf
42 http://www.alaskafisheries.noaa.gov/sustainablefisheries/bycatch/salmon/non_chinook/default.htm
43 http://www.alaskafisheries.noaa.gov/sustainablefisheries/bycatch/default.htm
44 http://www.fakr.noaa.gov/npfmc/PDFdocuments/conservation_issues/Observer/Observer_restructuring910.pdf

_0000002826

100% of their trips. Vessels that remain unaffected along with the smaller CPs that gained extended coverage will pay for observers through contracted observer providers. For other vessels, the added costs due to the expansion of the program will be covered by a fixed percentage (currently set at 1.25%, split by harvesters and processor) of their total fishery revenues from landings of groundfish and halibut.[45]  Restructuring of the program will significantly increase the number of vessels and plants that are observed, and change the funding structure.

## 4.4   Hawaii Longline Swordfish Fishery

Longline fishing began in Hawaii in 1917 targeting large yellowfin tuna, *Thunnus albacares*, and bigeye tuna, *T. obesus*. The Hawaii-based longline fishery is the largest domestic commercial fishery in Hawaii. Many current Hawaii-based longliners continue to target tunas in addition to broadbill swordfish, *Xiphius gladius*. The fishery is managed under the Western Pacific Fishery Management Council's (WPFMC) Pelagic FMP. In April 1991, a moratorium prohibiting new entrants into the fishery went in effect, and was later replaced in 1994 by a limited entry program. Federal limited entry permits are capped at 164 Hawaii-based longline vessels. Also beginning in 1994, a satellite vessel monitoring system (VMS) program was implemented to track longline vessels fishing within and beyond the EEZ off Hawaii. Currently, all Hawaii-based longline vessels carry VMS on board. The longline fishery is one sector of the Pacific pelagic fishery, along with the purse seine and troll fisheries. The Hawaii-based longline fishery accounts for the majority of Hawaii's commercial pelagic landings. Commercial longline vessels are small, generally 40 to 100 feet in length and are typically operated by the captain and four or five deck hands. Fishing activity occurs throughout the year, although fishing effort is concentrated between October 1 and June 30. In 2010, the shallow set longline fishery landed over 1,400 mt of swordfish worth over $7.3 million[46]; inter-annually catch typically ranges from 1,800 to 2,300 with a total fishery revenue ranging $9 to 11 million. The combined tuna and swordfish fleet consists of about 100 vessels, though only 32 vessels target swordfish with shallow sets landing their catch at two ports, Honolulu and San Francisco. Approximately 1/3 of the tuna/swordfish fleet is owned and operated by Korean interests and 1/3 is operated by Vietnamese interests. A large percentage of the shallow set trips are conducted by the Vietnamese vessels.

Since 1990, a federal logbook system for domestic longline vessels in the Western Pacific region has been used to record interactions with endangered and threatened species. These data coupled with data from voluntary observer trips before 1994 indicated that estimated sea turtle interactions or "take" had exceeded the level allowed by a Biological Opinion[47]; additionally, NMFS suspected under-reporting by fishermen of interactions with protected species. This need for accurate data on interactions led the NMFS Southwest Region (SWR) to institute an observer program in February 1994, and operators of Hawaii-based longline fleet vessels were required to carry a federal observer if requested by NMFS. The priority of the program was to document

---

[45] NPFMC. 2010. Restructuring the Program for Observer Procurement and Deployment in the North Pacific – Public Review Draft. October 2010. Available at:
http://www.fakr.noaa.gov/npfmc/PDFdocuments/conservation_issues/Observer/Observer_restructuring910.pdf
[46] NMFS Commercial Landings database (2012): http://www.st.nmfs.noaa.gov/pls/webpls/MF_GEAR_LANDINGS.RESULTS
[47] NMFS and Pacific Islands Region. 2011. Endangered Species Act – Section 7 Consultation Biological opinion. January 30, 2012. http://www.fpir.noaa.gov/Library/PUBDOCs/biological_opinions/SSLL%202012%20BiOp%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-final%20FOR%20POSTING%20ON%20WEBSITE.pdf

_0000002827

interactions of longline gear with five species of protected sea turtles; among these leatherback, loggerhead and hawksbill sea turtles are ESA-listed as endangered where green and olive ridley are ESA-listed as threatened.[48]

In 2002, regulations were imposed that severely limited the allowable catch of swordfish, with closed seasons and strict possession limits, closed certain sectors (the longline "shallow set" fishery for swordfish) of the fishery, and required mandatory observer coverage on longline vessels. In 2004, management measures allowed for reopening of the longline "shallow set" swordfish fishery with new management measures and a requirement for 100% observer coverage on vessels engaged in the shallow set fishery.

### 4.4.1   Hawaii Longline Swordfish Fishery Observer Program

The Hawaiian Longline Swordfish fishery (or shallow-set longline fishery) operates out of Honolulu, Hawaii, but some trips occasionally originate or terminate in San Francisco, CA. Trip lengths average around 33 days, but may extend up to 50 days. Longline vessels fish in deep ocean waters, more than 50 miles beyond the Northwestern Hawaiian Islands. These fisheries encounter sharks, sea turtles, sea birds, marine mammals, and other fish species. Because of the incidental take of sea turtles, including leatherback, loggerhead, green, olive ridley, and hawksbill, and other protected species, NMFS has the obligation to monitor the fishery and obtain estimates of take. The NMFS Office of Protected Resources List of Fisheries places the Hawaii longline/setline fishery for swordfish, tuna, billfish, mahi mahi, wahoo, and oceanic sharks in Category I, a serious level of concern that requires observers. Observers collect the required information to assess the involvement of sea turtles, sea birds, and marine mammals, other protected species, and other by-catch species in the pelagic longline fisheries along with acquired biological information for population and life history studies.

There is 100% observer coverage on vessels engaged in the shallow set fishery and the program is managed by the Pacific Islands Regional Office (PIRO). While at sea, observers may work an average of 77 hours per week aboard commercial fishing vessels, with a daily range between 8 and 16 hours. The mandatory observer program is operated under the authority of the Pelagic Fishery FMP established under the Magnuson Fishery Conservation and Management Act (MSFCMA) in response to concerns regarding interactions with listed threatened and endangered sea turtle species.

Observers aboard Hawaii longliners collect data specific to interactions with protected species and fishing effort data. They sample marine mammal, sea turtle, and sea bird specimen parts as well as the entire animal carcass of species that haven taken. Data are required to assess the potential impact of the fisheries on sea turtles and other protected species, specifically: loggerhead, olive ridley, leatherback, and green turtles, seabirds, and marine mammals. The collected data are analyzed by PIRO scientists in conjunction with logbook data to estimate total sea turtle and seabird interactions. Data are used to prepare for the annual reports of biological opinions (as required by the current biological opinion) for the Western Pacific Fishery Management Council, and estimates of bird mortality to the U.S. Fish and Wildlife Service. The current biological opinion for the pelagic fisheries has concluded that the shallow set longline fishery adversely affects sea turtles, but that they are not likely to jeopardize the continued existence of the species.

---

[48] NMFS OPR. 2012. Sea Turtles ESA status. Accessed March 2012. http://www.nmfs.noaa.gov/pr/species/turtles/

_0000002828

Observers collect required information to assess the involvement of sea turtles, sea birds, and marine mammals, other protected species, and other by-catch species in the pelagic longline fisheries along with acquired biological information for population and life history studies.

The federal government is responsible for training, debriefings, and data management. NMFS contracts with certified independent contractors that recruit and deploy observers, handle logistics provide insurance and deliver data to NMFS. Vessel owners and operators are responsible for contacting the program manager to make arrangements for placement of observers.

## 5   Observer Program Requirements, Costs and Fishery Revenues

The four 100% fisheries and the Atlantic herring observer programs have similar requirements for individuals to qualify as observers (Table 4). In general, the programs require observers to have a Bachelors degree with classes in biology, math, and sometimes a statistics course (AK pollock, WC at-sea hake, and WC trawl IQ). The HI swordfish longline allows individuals without a degree to qualify as an observer by passing a unique course (Alu Like[49]) designed to recruit and train candidates; those who pass the Alu Like program may enter NMFS training and may become observers upon passing the NMFS course. The programs all require information on prior criminal history, through a criminal background check (Atlantic herring and HI longline) or through self-reporting.

**Table 4: Summary of observer program position requirements.**

|  | NE Herring | HI Swordfish Longline | AK Pollock | WC At-Sea Hake | WC Trawl IFQ |
|---|---|---|---|---|---|
| **Observer Position Requirements** | | | | | |
| **Primary Data Users** | NMFS | NMFS | NMFS/COOP - bycatch | NMFS | NMFS/COOP - bycatch |
| **Bachelors Required** | Yes | No | Yes | Yes | Yes |
| **30+ Hours Collegiate Biology** | Yes | No | Yes | Yes | NMFS/COOP - bycatch |
| **Statistics Course** | No | No | Yes | Yes | Yes |
| **Math Course** | Yes | Yes | Yes | Yes | Yes |
| **CPR/1st Aid** | Yes | Yes | No | No | Yes |
| **Criminal Background Check** | Yes | Yes | No-Self Report | No-Self Report | No-Self Report |

---

[49] http://www.alulike.org/services/kaipu_maritime.html

_0000002829

In no cases do the 100% or Atlantic herring observer programs use federal observers, but the federal government assumes the indirect costs of training and debriefing, managing the program, and providing data processing and quality control (Table 5). Independent third-party observer providers hire and deploy observers, but variability occurs in the use of single (Atlantic herring and HI longline) and multiple (AK pollock, WC at-sea hake, and WC trawl IQ) observer providers. In two cases (Atlantic herring and HI longline), the federal government contracts and pays for observers, in two cases (AK pollock and WC at-sea hake) industry contracts and pays for observers; and the WC trawl splits the costs between industry and the government. The federally funded programs require compliance with the Service Contract Act (SCA)[50] and the Fair Labor Standards Act (FLSA)[51], which increases costs relative to programs not required to minimum wage and overtime. Northern Economics (2011) estimated that these requires are likely to add approximately $100 to the sea day cost. Specific components of observer daily costs vary among programs. All programs have observer salary and benefits, debriefing pay, and observer support costs included in daily costs for observers. Briefing/training, room and board while deployed or on land, dockside monitoring, and travel may appear within the observer daily cost or as a separate cost item.

The sea day rate for the Northeast consists of observer salary, travel, provider fees and logistics, federal Service Contract Act (SCA) and Fair Labor Standards Act (FLSA) requirements and an observer pay bonus structure required under NEFOP. This rate does not include NMFS expenses (estimated at an additional $400 approximately), which includes training and debriefing, NMFS salaries, and database development and maintenance; these additional costs assumed by NMFS would remain in place as long as the program is operated as a federal observer program. The higher rate for herring, which is comparable to the current rates for the Northeast Fishery Observer Program and the Northeast At-sea Monitoring Program, results from a combination of short trips and a substantial infrastructure needed for efficient deployment of observers; the NEFOP bonus; and SCA and FLSA requirements.

---

[50] The McNamara-O'Hara Service Contract Act (SCA) applies to every contract entered into by the U.S., requires contractors and subcontractors performing services to pay service employees in various classes no less than the monetary wage rates and to furnish fringe benefits: http://www.dol.gov/compliance/laws/comp-sca.htm.

[51] The Fair Labor Standards Act (FLSA) prescribes standards for the basic minimum wage and overtime pay: http://www.dol.gov/compliance/laws/comp-flsa.htm.

_0000002830

**Table 5: Summary of observer program cost components.**

| | NE Herring | HI Swordfish Longline | AK Pollock | WC At-Sea Hake | WC Trawl IFQ |
|---|---|---|---|---|---|
| **Observer Costs** | | | | | |
| **Direct Observer Costs** | Federal Gov currently | Federal Gov | Industry | Industry | Industry/Gov split 10%/90% |
| **Indirect Observer Costs** | Federal Gov | Federal Gov | Federal Gov | Federal Gov | Federal Gov |
| **Provider** | Federal Contracted Independent Provider (currently) | Federal Contracted Independent Provider | Multiple Independent Providers | Multiple Independent Providers | Multiple Independent Providers |
| **Federal Observer** | No | No | No | No | No |
| **Federal Cost Requirements** *estimated to add $100/sea-day - removed when industry funded* | | | | | |
| **Service Contract Act requirement** | Yes | Yes | No | No | No |
| **Fair Labor and Standards Act Requirement** | Yes | Yes | No | No | No |
| **Sea -Day Cost** *'Yes/No' indicates whether the expense is/is not included in the sea day rate, and who pays (whether included in the sea day rate or not)* | | | | | |
| **Observer Salary & Benefits, Insurance, Taxes** | Yes - NMFS | Yes – NMFS | Yes - Industry | Yes - Industry | Yes - Industry/NMFS |
| **Brief/Training Pay** | No - separate line item | No - separate line item | Yes - Industry | Yes - Industry | Yes - Industry/NMFS |
| **Debrief Pay** | Yes - NMFS | Contractor Line Item after Oct 2008 | Yes - Industry | Yes - Industry | Yes - Industry/NMFS |
| **Room/Board Deployed** | Yes - NMFS | Yes – NMFS | No - Industry | No - Industry | No - Industry |
| **Room/Board Land** | No - N/A | No - N/A | Yes - Industry | Yes - Industry | Partial - Industry/NMFS |
| **Logistical and Support Costs** | Yes - NMFS | Yes – NMFS | Yes - Industry | Yes - Industry | Yes - Industry/NMFS |
| **Dockside Monitoring** | No - N/A | No - N/A | Yes - Industry | Yes - Industry | Yes - Industry/NMFS |
| **Travel & Lodging** | No - separate line item | No - separate line item | No - Industry | Yes - Industry | Yes - Industry/NMFS |
| **Briefing & Training Indirect Costs** | NMFS budget | NMFS budget | NMFS budget | NMFS budget | NMFS budget |

_0000002831

|  | NE Herring | HI Swordfish Longline | AK Pollock | WC At-Sea Hake | WC Trawl IFQ |
|---|---|---|---|---|---|
| Debriefing & Data Management | NMFS budget | NMFS budget | NMFS budget | NMFS budget | NMFS budget |

Over the past four years, revenue within each of the comparison fisheries has remained relatively stable (Figure 3), though by comparison the AK pollock fisheries is worth considerably more than the other fisheries. Sea day costs in each of the observer programs compared with fishery revenue in 2010, and 2011 for the WC at-sea hake and trawl IFQ are provided in Figure 4. The following sections provide overview of the costs associated with the various 100% fishery observer programs. Section 5.3 further compares the costs associated with the various programs.



**Figure 3: Recent revenues compared across 100% fisheries and Atlantic herring; pollock revenue is plotted separately (B), note scales on x-axes in figures A and B.[52]**

---

[52] Revenue data for pollock, swordfish, hake and pacific groundfish limited entry from NOAA Fisheries Annual Commercial Landings by Gear Type Database (accessed February 2012, available at: http://www.st.nmfs.noaa.gov/st1/commercial/landings/gear_landings.html), herring landings from Draft Amendment 5 (NEFMC 2012).

_0000002832



**Figure 4: 2010 sea day costs and revenue for Herring, Hawaii longline, pollock and at-sea hake and 2011 for at-sea hake and west coast trawl.[53]**

## 5.1   WC Trawl Fishery Observer Program Costs

The Northwest Fisheries Science Center provides observer training, handles logistical assignments, develops sampling design, contacts vessels, debriefs observers, conducts data editing, analysis and storage, quality assurance and control, database maintenance and security. Observer services (including employment and travel arrangements) are provided through contracted third party providers. Observer providers contract directly with vessels and processors and the PSMFC currently reimburses these providers for observer services with funds provided by NMFS.

The third-party funding approach used by the CSOP is federally regulated, but fishery participants are responsible for making arrangements with a NMFS permitted observer provider to have an observer onboard their vessel. Participants pay the providers directly for the observer costs that are not reimbursed under the government subsidy plan. The providers collect the fees from the vessels and PSMFC to cover the sea day and

---

[53] Revenue data for pollock, swordfish, hake and pacific groundfish limited entry from NOAA Fisheries Annual Commercial Landings by Gear Type Database (accessed February 2012, available at: http://www.st.nmfs.noaa.gov/st1/commercial/landings/gear_landings.html), herring landings from Draft Amendment 5 (NEFMC 2012). Sea day costs from NEI 2011, National Observer Program Report for 2010 (http://www.st.nmfs.noaa.gov/st4/nop/Outreach/FY_2010_NOP_Annual_Report_FINAL.pdf) and personal communications B. Belay (MRAG Americas Observer Programs Manager).

_0000002833

dockside observer costs. These costs fund the recruitment and training of observers, provide salary, insurance and benefits for deployed and shore days, cover the logistical costs to deploy observers and dockside monitors, and ensure debriefed data are delivered to NMFS in a timely manner. Vessels may be charged additional travel and lodging costs by providers. The industry provides room and board for the observers while deployed and does not get reimbursed by the government. Federal funds are used for the training and debriefing of observers, data management and maintaining observer equipment. NMFS uses the data to account for catches against participant's individual quotas and to develop stock assessments for the annual allocation of catch.

In 2011, NMFS reimbursed observer providers for approximately 90% of the cost of observers. The industry portion of the costs of observers will increase each year. The original plan called for 50% reimbursement in 2012, 25% reimbursement in 2013 and in 2014 industry will be responsible for all of the cost of hiring and deploying observers. The 2011 cost per sea day for observers in the CSOP as provided by NMFS is $365/day. Rates for the 2012 season range from $380 to $420 per day.[54] There is an additional hourly cost for a catch monitor to monitor offloads that is incurred by the processing plant.

## 5.2   WC At-Sea Hake Fishery Observer Program Costs

In this program NMFS is responsible for funding and overall administration of the program including providing observer trainings, in-season data support, and sampling gear. NMFS is responsible for debriefing observers and maintaining information systems for scientific and operational data, and administrative support. Observer contractors are certified by NMFS against the North Pacific Observer Program NMFS-certification requirements and are responsible for observer recruiting, deployment, logistics, and salary, insurance, and benefits. The fishing industry must make arrangements with observer providers for placement of NMFS-trained observers aboard their vessels. Motherships and C/Ps are responsible for paying for their costs directly to the contractors. In 2011, catcher vessels were required to carry 100% observers and were subject to the subsidies provided under the catch shares program, thus 90% of their observer costs were covered in 2011. The observer costs on catcher vessels will continue to be subsidized at the 75% to 90% level in 2012.

The at-sea hake fishery has been using the industry-funded third-party provider approach for 10 years. The program is federally regulated, but fishery participants are responsible for making arrangements with a NMFS permitted observer provider to have an observer(s) onboard their vessel. Participants pay the providers directly for the observer costs on motherships and C/Vs. The government began to require 100% observer coverage on catcher vessels in 2011. In 2011, 90% of the observer cost for catcher vessels was covered by the government. The providers collect the fees from the vessels and PSMFC to cover the sea day and dockside observer costs. These costs fund the recruitment and training of observers, provide salary, insurance and benefits for deployed and shore days, cover the logistical costs to deploy observers and dockside monitors, and ensure debriefed data is delivered to NMFS in a timely manner. Vessels may be charged additional travel and lodging costs by providers. The industry provides room and board for the observers while deployed and does not get reimbursed by the government. Federal funds are used for the training and debriefing of observers, data management and

---

[54] NEI, Inc. 2011.

_0000002834

maintaining observer equipment. NMFS uses the data to account for catches against participant's individual quotas and to develop stock assessments for the annual allocation of catch.

Several factors reduce the overall cost of the Hake observer program. Motherships and catcher processors carry one or two observers for an extended time, up to 90 days. Catcher vessels typically deliver daily and carry observers for multiple trips. The logistics for the catcher vessels required more effort by the contractors in 2011 under the catch shares program. However, the logistics are still far simpler than those in the multi-species trawl fishery. Observer duties are not extensive in comparison to many other fisheries. The primary costs for the observer providers are in the training and initial deployment of observers. Once observers are deployed, observer provider responsibilities are minimal. Debriefing costs may also become a factor as seasons extend later into the year. Some observer providers offer housing or other support for observers during non-deployed time.[55]

## 5.3   AK Pollock Fishery Observer Program Costs

When the North Pacific Observer Program was designed in 1989, there was no authority by the MSFCMA to charge domestic industry fees to pay for the cost of observers, and Congress provided no funds to cover the cost of observers. This provided limited options for the NMFS and NPFMC. The need for observers was deemed urgent enough that the Council and NMFS established observer program requirements under Amendments 13 and 18 to the groundfish FMPs for the BSAI and GOA, respectively. These "interim" regulations established observer coverage requirements for vessels and processors participating in the BSAI and GOA groundfish fisheries, and required those vessels and processors to arrange for observer services from an observer provider certified by NMFS. Under this program, NMFS provides operational oversight, certification training, definition of observer sampling duties and methods, debriefing of observers, and management of the data. Although the costs associated with managing the program are paid for by the Federal government, vessels and processing plant owners pay for the direct cost of the observers.[56]

NMFS, the Observer Training Center of the University of Alaska Anchorage (OTC), industry and independent observer providers share the responsibilities for the observer program. NMFS and OTC train and debrief observers. NMFS also provides support services, including observer gear, training documents, enforcement support, maintains field offices in Kodiak and Dutch Harbor, and is responsible for storage and analysis of data collected by the observers.

The Federal Government covers the costs associated with the administration of the program, observer certification training and briefing, observer debriefing, and management of the observer data. The fishing industry must make arrangements with NMFS-permitted observer providers for placement of NMFS-certified observers aboard their vessels or at their processing facilities. Industry pays observer providers for direct observer costs. The observer providers are responsible for recruiting, deployment, logistics, insurance/benefits for observers and delivery of observer data to NMFS.

---

[55] B. Belay, personal communications, MRAG Americas Observer Program Manager. February 2012.
[56] NPFMC. 2010.

_0000002835

The daily sea day rate for deploying observers in 2010 averaged $366 ($323 per sea day with an additional $43 per day for travel expenses); estimates varied slightly by provider (NEI 2011). The sea day rate covers the observer salary, benefits, insurance, and taxes for the deployed day. The SCA and the FLSA do not apply in the Pollock fishery due to direct contracts between the vessel and the provider. In addition the sea day rate includes the training and debriefing costs as well as any standby or travel time for each observer. The sea day rate includes communication and logistical costs observer support costs while on land and observer provider field office costs. The primary costs to the observer provider are the training and debriefing costs as well as housing observers while not deployed. Despite these additional training and debriefing expenses, the volume of deployed days created by two observers per catcher processor allows the providers to maintain a low sea day rates. The travel costs in the Pollock fishery are much higher than other fisheries. Observers are flown from Seattle through Anchorage to Dutch Harbor. In 2011 the round-trip airfare averaged $2,300.00 per observer. The industry provides room and board for the observers while deployed and does not get reimbursed by the government.

In 2008, the groundfish industry-funded costs of the NPGOP were estimated at $14.4million, about 1.4% of the fishery revenue generated in the groundfish fishery. Though this does not take into account that the majority of observer days occur on CPs and at onshore plants; by comparing cost of the program to the estimated first wholesale value of groundfish products, the cost of observers is 0.6% of total product value generated in the fishery (NEI 2011).

## 5.4   Hawaii Swordfish Longline Fishery Observer Program Costs

The National Marine Fisheries Service contracts directly with an independent observer provider via an indefinite-delivery indefinite-quantity (IDIQ) contract. The current contract held by Saltwater, Inc., was awarded in October of 2008 for five years. The contractor invoices the government for line items which include sea days, vessel meal reimbursements, travel and gear reimbursements, and debriefing costs. The contractor's sea day rate includes the recruitment of observers, the observers salary, benefits, insurance and taxes, daily effort estimation, gear management, and logistical and support costs. Vessels are reimbursed $20 for each deployed day for observer room and board while deployed. Contractors pay vessels directly and are reimbursed by the government. Costs in addition to the sea day rate include; debriefing pay which is based on a trip basis, three days are allocated for each trip. The government reimburses direct travel costs for observers embarking or disembarking outside of Honolulu. Reimbursed travel is typically flights to/from San Francisco or Hilo, HI. The government reimburses the contractor for up to five pre-deployment status days (PDS); these are paid at a lower rate while the observer is waiting for the vessel to deploy. The government provides reimbursement for training salary and per diem. NMFS is responsible for training, debriefing and data management at the PIRO offices in Honolulu.

Since providers are under a federal contract, the SCA and FLSA apply to the observer salary. The swordfish fishery revenue also does not compare to the highly profitable AK pollock and EC hake fisheries.  Observers are paid based on hourly wage determination issued by the Department of Labor. All hours worked over 40/week must be paid overtime (time and a half). The observer workforce is also unionized which affects the hourly rate. Due to the long trips and limited number of ports, the logistical and support costs are relatively low per sea day. The primary costs to the contractor are gear maintenance and observer placement. Contractor staff conducts a placement meeting for every trip. The observers sampling responsibilities during fishing activity are extensive.

_0000002836

Observers may work more than the average of 11 hours per day. If observers work additional overtime during their deployment that cost is covered under the sea day rate. The additional overtime costs can be a significant factor during slow fishing periods. The observer contractor does not support observers during land days in Hawaii.

## 6   Prospects for 100% monitoring in the New England Atlantic herring fishery

### 6.1   Current At-sea monitoring on herring vessels

The Northeast Fisheries Observer Program (NEFOP) collects data on catch and protected species interactions for fisheries in the Northeast region of the U.S. In New England, scientists calculated the level of coverage needed to achieve estimates of bycatch with a 30% coefficient of variation (CV) for fishing gears and species groups in the Northeast region.[57] The attainment of no more than 30%CV is for individual fleet/species combinations. Thus, for each fleet, a CV of 30% or less is to be attained for target species within that fleet. The cost of observer coverage needs to be considered in the context of setting, and attaining a performance standard. This is often expressed in terms of a target level of precision (usually the Coefficient of Variation – CV) of one or more quantities to be estimated from the observer data. An increase in the number of samples (i.e. from higher observer coverage) will reduce the CV, indicating higher precision in the estimate. But there are diminishing returns in terms of CV reduction for each additional sample. NMFS (2004) identified the relative tradeoff between increased sample size, reduction in uncertainty, and cost assuming the relationship between sample size and cost can be considered fixed and linear (Figure 3). Observer coverage rates that would result in a CV within the prescribed range for primary species may result in CVs far larger than desired for rare species – such as river herring.

---

[57] NEFSC. 2011. Standardized Bycatch Reporting Methodology Sea Day Analysis and Prioritization. January 25, 2011.

_0000002837



**Figure 5: Example of the tradeoffs between precision (CV) and cost.[58]**

NEFOP does currently deploy a small portion of at-sea observers on permitted herring vessels. Herring days are presently based on the SBRM (30% CV on overall bycatch rate).  Recently, the prioritization part of the methodology was challenged and the courts declared that it was flawed; however, it is presently unclear how the ruling will change the methodology in time for the start of the fishing season (April 1st).[59] NMFS began placing observers on herring vessel in 1994, though there was only 1 observed trip that year. There was no established protocol for data collection in place until 2003.[60] Prior to 2005, NMFS placed observers on herring vessels in response to concerns around interactions with marine mammals. Subsequently, with the allowance of herring fishing in groundfish closed areas, the focus of the observer program shifted over concerns of substantial amounts of haddock bycatch being caught by herring vessels; it has been estimated that in 2006 herring midwater trawl vessels caught 277 mt of haddock on Georges Bank, five times that of the previous year.[61] Initially, the focus was on accounting for haddock bycatch in the midwater trawl herring fishery. Haddock bycatch had remained the top priority of observers, followed by concerns over river herring and tuna bycatch. More recently substantial bycatch of river herring has resulted in area closures. Priorities for placing observers on herring vessels has and continues to evolve around the growing concerns of bycatch of haddock and depleted

---

[58] NMFS 2004. Evaluating bycatch: a national approach to standardized bycatch monitoring programs. U.S. Dep. Commer., NOAA Tech. Memo. NMFSF/ SPO-66, 108 p. http://www.nmfs.noaa.gov/by_catch/SPO_final_rev_12204.pdf

[59] Federal Register Volume 76, Number 250 (Thursday, December 29, 2011). Fisheries of the Northeastern United States; Removal of Standardized Bycatch Reporting Methodology Regulations. Available at: http://www.gpo.gov/fdsys/pkg/FR-2011-12-29/html/2011-33302.htm

[60] NEFOP personal communications.
[61] NEFMC. 2011. Framework Adjustment 46 to the Northeast Multispecies FMP. June 17, 2011.

_0000002838

river herring stocks.[62] Data suggests that the majority of the haddock bycatch is taken in Herring Management Area 3 by midwater trawlers.[63]

The current herring sea day rate under NEFOP is estimated at about $740. The $740 rate incorporates observer salary, travel, provider fees and logistics, federal Service Contract Act (SCA) and Fair Labor Standards Act (FLSA) requirements and an observer pay bonus structure required under NEFOP. This rate does not include NMFS expenses (estimated at an additional $400 approximately), which includes training and debriefing, NMFS salaries, and database development and maintenance; these additional costs assumed by NMFS would remain in place as long as the program is operated as a federal observer program. The higher rate for herring, which is comparable to the current rates for the Northeast Fishery Observer Program (NEFOP) and the Northeast At-sea Monitoring (ASM) Program, results from a combination of short trips and a substantial infrastructure needed for efficient deployment of observers, the NEFOP bonus, and SCA and FLSA requirements.

Funding for the NEFOP program is used primarily to ensure that program-specific and negotiated TACs are not exceeded, and to monitor bycatch of groundfish in the Atlantic herring fishery. This later objective allowed for the allocation of 547 sea days to cover midwater trawl and purse seine components of the fishery, with statistical performance standards for that specific objective (420 sea days and 127 sea days associated with Herring Closed Area I) in 2011.[64]

Present estimates of observer coverage on the herring fleet have been around 40% on all paired midwater trawls.  NEFOP deploys 100% coverage to herring vessels that fish in Groundfish Closed Area 1 within Herring Management Area 3 (Figure 4); Herring Management Area 3 represents about 55.9% of the area fished by the Atlantic herring fleet and have averaged 17.6% of the Atlantic herring taken each year. In 2001, Area 3 reached its maximum percentage of the overall catch at 30.5%. In 2006 only 4.5% of the overall catch came from Area 3.  In 2010, herring catch from Area 3 accounted for 22.9% of the overall catch from all areas and permits types; and 25.8% of the catch from 'A' vessels. NEFOP aims for, but has rarely achieved, 20% coverage to all other areas.[65] In 2009 – 2010, coverage rates on directed herring vessels were substantially increased, ranging between 7-44%, with 37% coverage of trips on Category A midwater pair trawl vessels.[66]

---

[62] NEFOP personal communications. February 2012.
[63] Groundfish Oversight Committee. 2011. Framework Adjustment 46 Haddock Catch Cap Issues. January 19, 2011. Available at:
http://www.nefmc.org/nemulti/council_mtg_docs/Jan%202011/Haddock%20Catch%20Cap%20Issues_C0uncil.pdf
[64] NEFSC. 2011.
[65] NEFSC Sampling Branch, personal communications, January 2012
[66] NEFMC 2012.

_0000002839



**Figure 6: Northeast Multispecies closed areas and herring management areas.[67]**

Midwater trawl herring vessels fishing in Closed Area 1 are subject to a specific set of observer sampling protocols for high volume fisheries, in addition to general sampling protocols. These additional requirements are designed to improve sampling in fisheries that pump fish on board and ensure that only experienced observers who have proven high data quality will be assigned to these fisheries. The program focuses on improved fishery-specific training and focuses on defining gear, understanding bycatch issues, knowing and identifying species of concern, subsampling methodology, common scenarios, safety, and the process of pumping fish on board.[68] Training observers for high volume fisheries adds an additional day to a 15 day NEFOP training.[69] In 2010, the NEFOP conducted three fishery training classes to recertify 70 observers for work in high-volume fisheries. In 2010, NEFOP also implemented a discard log to obtain more detailed information regarding discards in high-volume fisheries.[70]

## 6.2   Design considerations

The Atlantic herring fishery shares some important characteristics with the four comparison fisheries discussed earlier (Table 2 and Table 3). All four 100% fisheries and the Atlantic herring fishery have some sort of limited access. All four 100% fisheries and the Atlantic herring fishery have interactions with endangered, threatened and protected (ETP) species and/or depleted species that can limit the target fishery. Like the pollock and whiting fisheries, the Atlantic herring fishery is high volume, which can make detection of the limiting species difficult. Like the whiting at-sea fishery, midwater trawl gear makes up the total (whiting) or a very high

---

[67] NERO. 2009. Changes for Midwater Trawl Vessels Fishing in Groundfish Closed Area I: Small Entity Compliance Guide. October 28, 2009. http://www.nero.noaa.gov/nero/nr/nrdoc/09/09MultiCAIHerringMidwaterTrawl.pdf

[68] NEFMC. 2012.
[69] NEFOP personal communications. February 2012.
[70] NEFMC. 2012.

_0000002840

proportion of the total (herring) catch. Although the herring fishery has three other legal gears, the majority of the fish is caught with midwater trawls. However, one major feature of the herring fishery contrasts with the four 100% fisheries: the herring fishery can slip the catch (discard the entire or a portion of the catch without bringing it on board); in the cases of slippage, the species composition, amount of limiting species, and biological data are not available for the slipped or pumped fish. The 100% fisheries meet the primary observer objectives by fully accounting for the entire catch and making the fishery (in some cases the vessels) responsible for catches, discards, or takes of ETP of depleted species: reaching specified limits results in closure to fishing of vessels, co-ops, or sectors. By having 100% coverage, the fisheries nearly eliminate the issue of rare events since even infrequent occurrences will be observed. The current herring fishery observer coverage cannot fully meet the top priorities (prohibited species monitoring, discard weight, and sampling catch composition) because a substantial portion of the catch is not accessible to the observers and because coverage levels limit the ability to detect rare events even if the observers had full access.

Accountability for catch is particularly important in the Atlantic herring fishery; annual catch limits and accountability measures require accurate reporting of herring catch and strict limits on haddock bycatch (1% of the herring ABC for each of the Gulf of Maine and Georges Bank stocks), which when met will prohibit midwater trawlers from fishing for, possessing or landing more than 2,000 lb of herring in either the Gulf of Maine or Georges Bank.[71]

In comparing aspects of the 100% observer programs and considering the feasibility of employing a similar program in the Atlantic herring fishery, there are a number of factors that would require further analysis for understanding the impact these factors would have on data collection, observer sampling protocols, cost and other aspects of the observer program, some of which has been undertaken by the Herring Plan Development Team (PDT) and are discussed in Amendment 5. These include the issues of net slippage and maximized retention and test tows[72]; these impacts are not discussed further in the present analysis.

## 6.3   Cost and Revenue Considerations

There are some similarities that can be drawn in comparing the revenues of the four comparison fisheries with each other and the Atlantic herring fishery. In Table 6, all values are for 2010, with the exception of the WC trawl IFQ fishery, which wasn't in operation as a catch share until 2011. The 2011 WC hake fishery numbers are also included for comparison on the new IFQ regulations. The total cost estimates for the Atlantic herring fishery assumes 100% observer coverage in all areas for the fleet (either Category A, B, C or Category A, B only). The observer sea day cost can be compared as a percentage of fishery revenue or using the observer cost index. When comparing observer sea day costs as a percentage of fishery revenue it becomes obvious that high-volume fisheries such as the AK pollock and WC hake fisheries have significantly lower ratios to the fishery

---

[71] NOAA Fisheries. 2012. Atlantic Herring Information Sheet. Last updated January 1, 2012. http://www.nero.noaa.gov/nero/regs/infodocs/AtlHerringInfoSheet.pdf

[72] Fishermen may make a short tow to determine the composition and/or quality of fish they are catching before fully loading the bag. If the fish in the test tow are not desirable, the vessel can release the bag and move elsewhere. This is addressed in the Closed Area I provisions by requiring that the fish from the test tow remain in the net until the subsequent pump-out (p.404, Draft Amendment 5, NEFMC 2011).

_0000002841

revenue. Lower volume fisheries, such as the Hawaiian swordfish longline and west coast trawl IFQ fisheries, have a higher ratio of observer costs to fishery revenue, but still less than that for Atlantic herring. The Atlantic herring fishery is a high volume fishery; however, the percentage of total fishery revenue that a 100% coverage observer program would require is higher than any of the other comparison fisheries - by a significant margin. This is due, in large part, to the relatively high sea day costs for this fishery compared to others, with a NEFOP sea day costing nearly twice as much. The government pays for all monitoring for the Hawaiian swordfish longline fishery and, at present, 90% of the WC trawl IFQ fishery. The Atlantic herring observer days are currently provided by the Northeast Fisheries Observer Program (NEFOP) which is a government funded program.

The observer cost index provides a comparison between programs based on the daily sea day rate as opposed to the total program cost. The observer cost index is determined by adding the observer sea day rate plus any travel and additional costs on a daily basis together and dividing this total 'daily observer cost' by the total fishery revenue. The quotient is then multiplied by $1,000 to provide an index that can be compared between programs. This number serves as a conversion factor to derive a cost index that represents the cost of a day of observer coverage for every $1000 of revenue. The four fisheries with 100% coverage have observer cost indexes ranging from 0.13 to 2.39, where lower indices correspond to higher economic feasibility. The upper limit of industry funded programs may actually be closer to 1.4, since the Hawaiian swordfish longline fishery observer program is fully federally funded and has a higher rate as results of SCA and FLSA requirements. The Atlantic herring fishery is substantially higher in comparison to the 100% comparison fisheries. This is primarily due to the large daily rate currently being charged under NEFOP, as described in Section 6.1.

_0000002842

**Table 6: Comparison of 2010 observer program rates and fishery revenues.**

| | 2010 Rates and Revenues | | | | | 2011 | |
| | NE Herring A, B, C[A] | NE Herring A/B | HI Swordfish Longline[B] | AK Pollock[C] | WC At-Sea Hake[D] | WC At-Sea Hake[E] | WC Trawl IFQ in 2011[E] |
|---|---|---|---|---|---|---|---|
| **Total Fishery Revenue** | $18,771,000 | $18,449,000 | $16,807,991 | $282,398,860 | $27,315,866 | $52,368,500 | $26,066,500 |
| **Observer Cost/Sea day** | $741.88[F] | $741.88 | $364.70 | $323.00 | $346.50 | $365.00 | $365.00 |
| **Observer Travel Cost/Sea day** | $59.38 | $59.38 | $15.71 | $43.00 | $3.39 | $4.50 | $4.05 |
| **Other Reimbursable Cost (e.g. debriefing)** | $55.18 | $55.18 | $20.68 | n/a | n/a | n/a | n/a |
| **Total Sea days** | 2,479 | 2,122 | 3,446 | 11,742 | 1,772 | 2,666 | 5,236 |
| **Total Observer Sea day Cost** | $1,839,121 | $1,574,269 | $1,256,756 | $3,792,666 | $613,998 | $973,090 | $1,911,140 |
| **Total Travel Cost** | $147,203 | $126,004 | $54,138 | $504,906 | $6,000 | $12,000 | $21,205 |
| **Additional Total Reimbursable Costs** | $136,791 | $117,092 | $71,263 | n/a | n/a | n/a | n/a |
| **Obs Cost % of Fishery Revenue** | 11.31% | 9.85% | 8.22% | 1.52% | 2.27% | 1.88% | 7.33% |
| **Observer cost index** | 4.56 | 4.64 | 2.39 | 0.13 | 1.28 | 0.71 | 1.40 |

[A] Herring revenue data and Sea days (VTR data) from Draft Amendment 5 (NEFMC 2012), sea day, travel and debriefing costs from NEI (2011)

[B] Hawaii Swordfish LL revenue data from NMFS Annual Landings database for Hawaii and Pacific, sea days from National Observer Program Annual Report for 2010 (NMFS 2011), travel and other costs estimated based on total cost from 2007 (B. Belay, MRAG Americas) and 2010 sea days, sea day cost in Hawaii varies, with one rate ($342.01) applying 3/4 of the year and another rate ($355.01) applying to the remaining quarter, plus $20/sea day vessel reimbursement. This factors to an average sea day cost of $364.70.

[C] AK Pollock revenue data from NMFS Annual Landings database, number of sea days, sea day and travel costs from NEI 2011. Note that the restructured program will adjust these costs some.

[D] WC at-sea hake for 2010, revenue from NMFS Annual Landings database, travel cost estimate averaged from total cost of travel and number of sea days (B.Belay MRAG Americas), number of sea days from National Observer Program Report for 2010 (NMFS 2011).

[E] WC at-sea hake and WC trawl IFQ for 2011, revenue, sea day cost, estimated travel cost per sea day based on total travel costs and number of sea days observed, and total number of sea days provided from NWFSC (J. Majewski, personal communications).

[F] This estimated rate of approximately $740 are the provider's costs for a sea day, including observer salary, travel, provider fees and logistics, federal contract requirements (Service Contract Act and Fair Labor Standards Act) and an observer pay bonus structure. This rate is independent of NMFS expenses (estimated at an additional $400 approximately), which includes training and debriefing, NMFS salaries, and database development and maintenance; these additional costs assumed by NMFS would remain in place as long as the program is operated as a federal observer program.

_0000002843

## 6.4   Contributing Factors

There are a number of factors that affect the complexity and cost of observer programs. These factors: observer wage (including insurance, benefits, bonuses), federal requirements, deployment logistics (e.g. trip length, number of ports, number of vessels, travel), NMFS certification requirements (contractor responsibilities, training length, debriefing requirements), and sampling strategy/data collection, storage and analysis vary among the comparison fisheries. Evaluation of these factors and their affect on the Atlantic herring fishery and observer program cost structure could be considered to mitigate the cost and increase the feasibility of implementing 100% observer coverage in the directed herring fishery (Category A, B, C).

**Sea Day Costs**

- The AK pollock fishery is significantly higher volume and revenue compared with the other fisheries (Figure 3, above). The sea day rate for deploying observers includes training costs, debriefing time, and deployment costs and is less than  (in 2010) that in all other fisheries (Figure 4, above). This low daily rate in the AK pollock fishery is a direct result of competition between observer providers in the North Pacific. Competition between providers lowers the costs to the vessels and constricts observer wages.
- In the North Pacific Groundfish Observer Program, observer wages start at $140/day and maximize at $210/day; observers receive little to no benefits or bonus. In the Northeast, observer wages begin around $240/day and exceed $300/day; there are significant bonus pay and benefits available.
- Other costs that factor into payroll, such as insurance and federal and state tax requirements are directly proportional to salary. Structuring observer benefits and performance bonuses in an equitable manner can provide additional savings. Observer providers with efficient payroll systems, direct deposit and automated billing can reduce overhead costs and minimize days paid to the observers that are not billed to vessels, where industry assumes the cost.

**Logistics**

- The deployment logistics of placing an observer on a vessel vary between fisheries and affect the sea day rate considerably. Longer deployments reduce the administrative burden of scheduling, coordinating and placing observers on vessels, along with reduced post-trip debriefing. The number of field offices, coordinators, bunk houses, and other observer support costs required to coordinate the observer program is determined by size, seasonality, and fishing strategy of the subject fishery.
- In Hawaii trips range from 3 to 5 weeks, in the North Pacific deployments typically are 10 to 12 weeks for the at-sea fleet, and in the WC at-sea hake trips range from day trips for shoreside catcher vessels and 6 to 12 week for the catcher processors and mother ships. In these cases, logistical overhead and training/debriefing costs can be spread over a larger number of sea days.
- Trip length in the Atlantic herring fishery is similar to the WC trawl IFQ fishery, where trip lengths generally last from 1 to 5 days. Due to these shorter trip lengths, observer program coordinators spend considerably more time arranging the same numbers of sea days compared to fisheries with long trips. On the west coast, observer program offices are located near the primary landing ports used in the hake and trawl IFQ fisheries; this keeps travel costs low, even where trip lengths are shorter.

_0000002844

- In addition to trip length, the number of vessels and primary landing ports reduce logistics involved and travel costs. The cost for observer travel to/from departure/landing port for trip deployment is lower with fewer trips (of greater trip length). Further, when the travel costs can be spread over a greater number of days per trip, the contribution of travel expense to sea day rate is lower.
- For example, in the AK pollock fishery, trips are long and the high cost of deployment airfare (of approximately $2,300 on average) spread over a large number of days adds a small travel expense to the sea day rate.
- In the Atlantic herring fishery, the fishery is authorized to fish a relatively small area (approximately 63,750 mi²) in comparison with the regions fished by the west coast fisheries. Given this smaller area, observers could be based in a number of northeast states and reach the majority of deployment ports with little travel (several hours drive, and low cost).
- While short trip lengths increase logistics, in the Atlantic herring fishery there is estimated to be less than 20 active vessels in permit Category A/B. This lower number of vessels using relative few ports (4 primary ports are responsible for > 90% of the landings) could further simplify the required logistics. In addition, the current requirement for vessels to provide a pre-trip notification to determine if they have been assigned for observer coverage requires a substantial effort on the part of observer coordinators to arrange for a vessel to take an observer. In 100% coverage, the vessel could not leave without an observer, simplifying the duties of the observer coordinators.
- A limited number of ports, small number of permitted vessels, and relatively steady fishing will lend itself to a more efficient logistical structure.

**Federal Requirements**

- The Hawaii longline and Atlantic herring observer providers are both under federal contracts, which requires compliance with SCA and FLSA; these requirements are removed from third-part funding approaches, as seen in the AK pollock, at-sea hake and WC trawl IFQ. The third-party funding structure maintains federal regulation of the program, but fishery participants coordinate with and directly pay the providers.
- The requirements on observer salary due to the SCA and the FLSA can increase observer rates 50 to 100% due to overtime and wage determinations, NEI (2011) estimated this to add on average $100/sea day.

**Fishery Characteristics**

- Undoubtedly the value of a fishery's landed catch factors considerably into whether they can support the cost of an observer program at a given rate. The Hawaii swordfish longline fishery, the WC at-sea hake and groundfish trawl IFQ and the Atlantic herring fishery are relatively similar in the volume of landings over the last four years (2007-2010) (Figure 7). The WC at-sea hake, WC trawl IFQ and Atlantic herring have also been relatively similar in annual revenue from landed catch (Figure 3). In comparing price per pound, the swordfish fishery is worth considerably more than the others (Figure 8).
- Seasonality of a fishery affects observer costs. The WC hake program begins in May annually and slows down in October and the fishery typically closes by December. With the limited season, the fishery requires a large number of observers to be trained and prepared to deploy for a limited period of time.

_0000002845

The AK pollock fishery season is longer than the at-sea hake season, but observer providers must accommodate remote deployments in the Bering Sea. In contrast, the Hawaiian swordfish longline fishery operates year round, though slows during summer months, reducing the number of deployments.

- Seasonality is one of the factors in the difference in (2010) sea day rate for observers in the WC at-sea hake ($346.50) and AK Pollock ($323), with additional costs required in ramping up for a shorter season.
- The Atlantic herring fishery operates year round, though exhibits seasonality in which fish are caught as herring populations migrate from inshore to offshore and from north to south in winter months.[73] Given that this fishery does operate year round, there is unlikely to be significant additional costs, as seen in the hake fishery; additionally, with some months requiring additional sea days compared to others, but no months having significantly fewer or greater days, the observer program would maintain a steady workforce, increase employment opportunities and reduce days paid in between deployments.

**NMFS-Regulated Requirements**

- NMFS decisions on what components of an observer program to pay for directly affect the sea day rate for observer programs. Length of observer training, NMFS certification requirements, trip debriefing requirements, and other reporting criteria can add substantial costs. In some fisheries - AK pollock, WC at-sea hake and trawl IFQ[74] – these costs are paid by the observer provider, whereas in the Hawaii longline and Atlantic herring fisheries the government reimburses these costs directly. In the case of a hypothetical 100% coverage for herring, these government costs are included in the additional $400/day that adds to the estimated $740/sea day rate in the northeast to bring the total sea day rate to around $1200 in the Northeast Fishery Observer Program.
- In most industry funded programs (e.g., AK pollock, WC at-sea hake and trawl IFQ) the training and debriefing costs are incorporated in the sea day rate. Currently the Atlantic herring fishery trains its observers under the NEFOP protocols. Observers in the herring fishery require additional training for high-volume fisheries, which adds an additional day to an already 15-day training program. Under an industry funded program the training costs would most likely be incorporated into the sea day rate; however, there could be flexibility in the training protocols dependant on the desired sampling strategy and data collection.
- In some programs (e.g., Hawaii swordfish longline), NMFS reimburses observer providers for debriefing pay. In other programs (AK pollock) vessels are responsible for debriefing costs through the sea day rate.
- Developing an efficient and reliable debriefing system decreases observer costs. Allowing quicker observer turn-around onto subsequent trips results in fewer observers needed for a program.

**Sampling Strategy, Data Collection, Storage and Analysis**

- The amount of work and time spent collecting data required of the observer in a given sea day relates to the priority data collection needs and the required training for that program. The actual sampling

---

[73] Gulf of Maine Research Institute: Atlantic Herring Life Cycle. http://www.gma.org/herring/biology/life_cycle/default.asp
[74] Note that this program will not phase into being completely industry-funded until 2014.

_0000002846

strategy/data collection and data storage and analysis can often be streamlined to improve inefficiencies and reduce costs.

- Observer programs must have clear primary and secondary goals for data collection and these goals should be fishery specific. It is important to consider a program that allows observers to accomplish these goals and collect additional information in a reasonable and realistic manner. The present sampling strategy of NEFOP requires the collection of important data, although the strategy may not sufficiently address the issues bycatch, slippage, and discarding in the Atlantic herring fishery.

- In the West Coast Catch Share Observer Program, the program is designed to account for small numbers of critical rebuilding stocks. A specific sampling strategy was designed for that purpose; this includes observers recording all at-sea discards and complete monitoring of retained catch at processing plants or other offload points to ensure recording of every fish.

- The requirements and protocols of the program will change with increased observer coverage, e.g. from 30%+ to 100%. The level of confidence in the numbers and the ability to identify unusual tows will increase, and the margin for error will decrease, with the enhanced at-sea monitoring.

- Presently in the Atlantic herring fishery, a vessel may spend a large portion of sea time searching for fish and conducting test tows, during which time an observer is idle waiting for a haul in order to conduct sampling. In this fishery, actual work load conducted by an observer is disproportionately low relative to the amount of time deployed. A modified program design could consider other uses for time spent at sea, or ways to pay reduced rates for sea-time that does not produce collected data.

- A well-designed program will increase observer morale. This point should not be underestimated; employee well-being has significant impacts on performance and job retention. Low retention affects data quality, increases training costs, and recruitment costs. The observer's quality of life is an important aspect that should always be considered when making decisions about program design.

- The feasibility of a sampling protocol is an important design consideration. Programs in which observers are unable to complete tasks or collect quality data because of an overly complicated or physically taxing sampling protocol would likely experience lower retention than in more efficient programs. In recent years, the North Pacific Groundfish Observer Program has added additional duties and specific sampling protocols to an already complex program. The resulting 600+ page manual combined with a lengthy debriefing process are contributing factors to the reduced retention rates experienced by that program.

- In U.S. observer programs, observers collect and provide the data to NMFS, who typically conducts the data debriefing[75], and handles data storage, maintenance and analysis. However, most observer providers do have experience with observer debriefing and storage, including database development. The role (and cost) of data debriefing and storage may be assumed by the provider in single provider systems, or by a third party in multiple provider systems; this is another factor for consideration that could reduce costs compared to the costs for the government to conduct these activities.

---

[75] In order to ensure that data are consistently collected according to program guidelines observers are required to go through a debriefing process that consists of data review, submission, correction and evaluation. (WCGOP Manual, Chapter 11: http://www.nwfsc.noaa.gov/research/divisions/fram/observer/observermanual/wcgop_manual_chapter_11.pdf.sav)

_0000002847



**Figure 7: Recent landings compared across the four 100% observer fisheries and Atlantic herring; note the scale for landings in figures A and B.[76]**

[76] Landings data for pollock, swordfish, hake and pacific groundfish limited entry from NOAA Fisheries Annual Commercial Landings by Gear Type Database (accessed February 2012, available at:
http://www.st.nmfs.noaa.gov/st1/commercial/landings/gear_landings.html), herring landings from Draft Amendment 5 (NEFMC 2012).

_0000002848



**Figure 8: Recent changes in price per pound for landed catch compared across the four 100% fisheries and Atlantic herring.[77]**

# 7   Summary

Implementing industry-funded 100% observer coverage in the Atlantic herring fishery, given the current program structure, would put a higher economic burden on the industry compared with other 100% observer coverage fisheries. There are a number of factors that affect observer costs, some of which could be evaluated for their potential in reducing program costs. The Atlantic herring fishery shares many characteristics with the comparison fisheries, most importantly in the context of where 100% observer coverage has been adopted to solve catch monitoring and protected species problems that enhanced the need for at-sea monitoring. Total fishery revenue in the Atlantic herring fishery falls in line with both the at-sea hake and WC trawl IFQ fisheries; however, characteristics of the NEFOP program results in a sea day cost nearly double that of the other four comparison fisheries.

In the Atlantic herring fishery in 2010, NMFS estimated 139 vessels in herring Categories A, B, C and D (though likely an overestimate according to NEFSC); Categories A/B accounted for approximately 30 active vessels (also likely overestimated according to NEFSC), and paired midwater trawls accounted for 12 of these 30 active

---

[77] Price per pound calculated from revenue and andings data for pollock, swordfish, hake and pacific groundfish limited entry from NOAA Fisheries Annual Commercial Landings by Gear Type Database (accessed February 2012, available at: http://www.st.nmfs.noaa.gov/st1/commercial/landings/gear_landings.html), herring landings from Draft Amendment 5 (NEFMC 2012).

vessels. Category A/B vessels landed just over 70% of the herring landings worth $18.4M; whereas Category C vessel landings were worth $322,000.[78] Therefore, a small subset of the Atlantic herring fleet lands the great majority of the catch and the revenue. Options for herring observer coverage could include all vessels or a subset of vessels, and options for payment could include government funding, industry funding on a sea day rate, and industry funding based on payment proportional to landings (value or pounds). Funding could include shared government and industry contributions.

Separating herring observers from NEFOP could lead to some savings by specifying requirements that minimize the current high costs of NEFOP. For example, shifting the structure of the program to a third-party funding structure would remove the SCA and FLSA requirements and the requirement for overtime. NMFS could evaluate whether elements of a herring observer program, such as training, are more economically run by the government or shifted to third party providers. Regardless, NMFS should retain control over the data once delivered.

Logistics required to operate NEFOP remain complex. Vessels currently have an incentive to avoid carrying observers so they may not maintain good communication with observer providers, which requires observer providers to expend time seeking out vessels selected for coverage; a 100% requirement would require the vessel to arrange for an observer before departure, reducing observer provider administrative time. Short trips, diverse landing sites, NEFOP observer performance bonuses, and SCA/FLSA requirements all lead to a complex infrastructure that increases cost.  Shifting to a small number of authorized landing ports, coordination of vessels to maximize observer efficiency, privatizing the workforce to remove SCA/FLSA requirements, and structuring pay to be commensurate with observer work effort could simplify the logistics and result in lower costs. The NEFOP program, in consultation with observer providers and stakeholders, could evaluate a new design specifically for herring that achieves coverage requirements with increased efficiency that reduces costs.

# 8   Acknowledgements

The research presented here was supported by funds from the Pew Charitable Trusts, Environment Group.

---

[78] NEFMC. 2012.

_0000002850

# Seafreeze Ltd.



100 Davisville Pier
North Kingstown, R.I. 02852 U.S.A.
Tel: (401) 295-2585 Telex: 325114
FAX: (401) 295-5825

Dear Council Members,

At Seafreeze, we are completely opposed to 100% observer coverage and electronic monitoring in the herring/mackerel fisheries, and have some very real economic concerns with what is being discussed in the IFM Amendment with regards to these fisheries.  Seafreeze boats typically do not just fish for herring/mackerel on one trip. Typically our boats go fishing for 7-14 days (unlike a "herring" boat that fishes only/mostly for herring and is at sea for a much shorter amount of time, maybe 2-3 days). Usually we are declared into a squid fishery, but with the option to retain herring or mackerel in case we come across some on the way. We are concerned about the economic impact that herring/mackerel (if mackerel is incorporated) IFM may have on our squid trips. For this reason, we are very opposed to increased monitoring, whether by observer or EM. We cannot afford to pay for herring observers or EM coverage on squid trips, and it does not seem equitable that this would be the case. I am writing to raise these issues and inquire whether there will be any separate analysis of the estimated costs to boats who are fishing in multiple/mixed fisheries with the option to retain herring, as opposed to boats targeting primarily herring.

Also, I am writing to inquire if there will be a separate economic analysis for  boats catching large amounts of herring as opposed to small amounts of herring. For example, many of the "herring" boats, which fish primarily for herring, can catch a million lbs a day. Seafreeze boats, because we are freezing onboard and therefore have limited capacity (i.e. we can only catch as much as we can freeze at a time), are limited to up to 100,000 lbs a day. We are actually more comparable, in capacity, to much smaller vessels. Much smaller vessels can actually out-catch us in a day. If a typical "herring" vessel can catch in one day what it takes ten days for us to catch (poundage wise), it would seem inequitable for us to have to pay the same amount per day or have the same amount of coverage. We do not have the same profit margins per day, and therefore cannot afford it. But neither do we have the same impact on the resource per day; our footprint is much smaller. This is a very real concern for us, as well as for a lot of the small boat fleet. It would be appropriate for a separate analysis or exemptions to be made for smaller production vessels.

We are requesting if some kind of separation/exemption can be made for these types of issues. There definitely needs to be some delineation between herring focused and mixed species

focused boats, and between higher production and lower production boats. To lump vessels with very different characteristics together isn't equitable or reasonable. Let me know if anything can be done along these lines, and let me know if there is any information that can help with possibly developing these as options.

Best,

Meghan

Meghan Lapp

Fisheries Liaison, Seafreeze Ltd.

Tel: (401) 295-2585, Ext. 15

Cell: (401) 218-8658

Meghan@seafreezeltd.com

#6a



**The Law Office of Shaun M. Gehan**

R E C E I V E D

APR 16 2015

NEW ENGLAND FISHERY
MANAGEMENT COUNCIL

April 16, 2015

*Via Electronic Mail*
Terry Stockwell, Chairman
New England Fishery Management Council
50 Water Street, Mill 2
Newburyport, MA 01950

RE:    Observer Committee Report

Dear Chairman Stockwell:

These comments are submitted on behalf of the Ad Hoc Pelagics Coalition, comprised of Gloucester-based participants in the Atlantic sea herring fishery. At its upcoming meeting in Mystic, Connecticut, the New England Fishery Management Council will receive the Observer Committee's report on the Industry-funded Monitoring ("IFM") Omnibus Amendment. Among other things, the Council will consider actions on alternatives for the herring fishery to be considered in the IFM Amendment.

In terms of potential additions to the current set of alternatives, the Council will be considering provisions that would allow for electronic vessel monitoring systems, dockside monitoring, and less expensive at-sea monitors (in lieu of observers). The Coalition strongly supports the addition of these alternatives for further development in the Omnibus IFM Amendment. The Council deserves credit for focusing on the costs of the monitoring programs to be developed and for directing the IFM Fishery Management Action Team ("FMAT") to work with the industry to develop more realistic cost information and explore ways to reduce costs. These alternatives can help meet those objectives.

That said, consistent with the position it and, indeed, all full-time directed herring industry members have long taken, the Coalition opposes heightened monitoring requirements for this fishery beyond what is required to garner precise and accurate bycatch data and meet reasonable management objectives. Those are not the objectives of some, if not many, public supporters of the most extreme measures in the Amendment, including 100% observer coverage and no exemptions when observer coverage is unavailable. To some, these are just means toward the end of eliminating the mid-water trawl sector of the herring fishery.

Any monitoring program that is implemented must be practicable. That is to say, the measures must be cost-effective and reasonably calculated to obtain necessary information without unduly burdening the fishery's ability to obtain optimal yield from the herring resource on an ongoing basis. In the Coalition's view, there is no possibility that a 100% coverage requirement

3050 K Street, NW | Suite 400 | Washington, D.C. 20007 | (202) 342-8469 | sgehan@gehanlaw.com

*15 ~ 4/16/15*

or any alternative that disallows a vessel from making a trip when coverage is unavailable can meet this test. If not patently unlawful, these alternatives represent poor policy and a diversion of monitoring resources that could be used to improve management of other fisheries. These costly measures also drain resources from already strapped fishing communities such as Gloucester that are reeling from the most recent groundfish reductions. Therefore, the Coalition respectfully requests that these alternatives be dropped from further consideration.

As mentioned, we very appreciative of the Council's focus on cost-minimization. Further, the herring industry as a whole fully appreciates the Council's and public's legitimate concerns regarding the potential for bycatch in this fishery. We look forward to working with you, the Observer Committee, and the Council as a whole in developing a reasonable monitoring program that we believe will prove the industry's long-standing contention that the herring fishery is one of the "cleanest" and most responsible fisheries not just in New England, but in the nation.

Thank you very much for your kind attention to these comments.

Sincerely,

*/s/ Shaun M. Gehan*

*Counsel for the Ad Hoc Pelagics Coalition.*



# Herring and Mackerel Vessel Annual Cost Survey for 2014



**Thank you very much for participating in this important survey!**

**The questions in this survey relate to the following vessel only**:
[**Vessel name**]
Coast Guard Documentation or State Registration Number: **[12345678]**

Your responses and participation in this survey are
**CONFIDENTIAL**

*Photo credit: Lisa Colburn, NOAA Fisheries*

Completed surveys should be mailed to:
Jason Didden
Mid-Atlantic Fishery Management Council
800 North State Street, Suite 201
Dover, DE 19901-3910

**General Instructions:**

- **This survey is about your costs in 2014 for the vessel identified in this survey.** In your answers, include combined costs for all state and/or federal fisheries for this vessel in 2014, including costs incurred while the vessel was inactive.

**Please note that all responses are completely confidential.**

---

## <u>Section A: Vessel Information</u>

This section is only about the vessel identified in this survey. **<u>All costs requested are for 2014.</u>**

1.  **Ownership type for this vessel (*check one*):**
    - ☐ Sole proprietorship
    - ☐ General partnership
    - ☐ Limited partnership
    - ☐ C Corporation
    - ☐ S Corporation
    - ☐ Limited Liability Company (LLC)
    - ☐ Other  _____

2.  **Number of owners, including yourself:**  _____

3.  **Was this vessel acquired from a previous owner or was it bought new (*check one*)?**
    - ☐ Acquired from a previous owner
    - ☐ Purchased New

4.  **In what calendar year did you become the owner of the vessel?**  _____

5.  **What port did this vessel operate from most of the time during 2014?**

    _____

_0000003595

## Section B: Repair/Maintenance/Upgrade/Improvements Costs

**6a. Was this vessel hauled out in 2014 for any reason?** (Possible reasons include regular repair and maintenance, emergency haul-out, long term storage, etc.)

☐ Yes
☐ No [please go to 6c]

**6b. What were the haul-out costs in 2014, including taking the vessel out of the water and any transportation?** *(Do not include any repair/maintenance costs – we'll ask you for them in question 7.)*

Haul out cost in 2014:  $ _____

**6c. How often do you usually haul-out this vessel?**

☐ Every year
☐ Every other year
☐ Every _____ years
☐ Every _____ months
☐ Other (please describe) _____

**7.  What were your repair/maintenance and upgrade/improvement costs for this vessel in 2014? Include the cost of any tools and equipment you may have purchased. If you did not have any expenses in 2014, then check $0.**

*We know that these kinds of costs may vary significantly year to year. However, **this survey is about 2014 expenses only.***

$ _____          ☐ $0

**If you are able to provide a breakdown of these total repair/maintenance and upgrade/improvement costs, please do so in the following table. Otherwise, skip to question #8.**

_0000003596

**7.**

| | *Do not include vessel haul-out costs reported above in question 6b.* |
|---|---|
| **Expense Category** | **Repair/Maintenance/Upgrades/Improvements, 2014** |
| **Propulsion Engine** (such as engine, drive train, exhaust/cooling systems) | $_____ <br> ☐ $0 <br> **Description:** |
| **Deck Equipment/ Other Machinery** (such as winches, haulers, generators, hydraulics, compressors, reels, pumps) | $_____ <br> ☐ $0 <br> **Description:** |
| **Hull** (such as frame, deck, wheelhouse, keel, steering, rigging, fish holds, fuel tanks) | $_____ <br> ☐ $0 <br> **Description:** |
| **Fishing Gear** (such as codends, nets/panels, dredges, buoys, highfliers, doors, pots/traps, cables) | $_____ <br> ☐ $0 <br> **Describe Upgrade/Improvement:** |

_0000003597

| 7. | *Do not include vessel haul-out costs reported above in question 6b.* |
|---|---|
| **Expense Category** | **Repair/Maintenance/Upgrades/Improvements, 2014** |
| **Wheelhouse and Electronics** (such as Radar, GPS, VMS, sounder, radio, depth/temperature/net sensors) | $_____ ☐ $0 **Describe Upgrade/Improvement:** |
| **Processing/ Refrigeration** (such as RSW, packaging equipment, icemaker) | $_____ ☐ $0 **Describe Upgrade/Improvement:** |
| **Safety Equipment** (such as EPIRB, rafts, fire extinguishers, flares, survival suits) | $_____ ☐ $0 **Describe Upgrade/Improvement:** |
| **Other Repair/maintenance or upgrade/improvement:** | $_____ ☐ $0 **Describe Upgrade/Improvement:** |

_0000003598

## **Section C: Vessel Related Costs**

8. **For each expense category listed in the table below,** *please enter the total amount spent in 2014 for this vessel (and average per day cost for crew and hired captain)*. If you did not have an expense in 2014, then check $0.

| | |
|---|---|
| **Mooring/Dockage Fees** for this vessel in 2014 (including upkeep expenses):<br><br>$_____<br><br>☐  $0 | **Permit and/or License fees** for this vessel in 2014:<br><br>$_____<br><br>☐  $0 |
| **Vessel insurance premium** in 2014 for this vessel (premium paid for either hull or P & I insurance):<br><br>$_____<br><br>*Number of months insured:* _____<br><br>☐  $0 | **Quota or DAS lease payments** in 2014 for this vessel (if non-monetary payments were used to obtain quota or DAS, please estimate the value of those non-monetary payments):<br><br><br>$_____<br><br>☐  $0 |
| **Total payments to crew and hired captain** in 2014 for this vessel only:<br><br>Crew:  Annual $_____   Avg per day $_____<br><br><br><br>Hired Cpt: Annual $_____   Avg per day $_____<br>(**Do not include** what you earn when you are the captain)<br><br>☐  $0 | **Crew benefits** for this vessel in 2014 (the cost to you, as the vessel owner, for providing retirement benefits; health, life, or disability insurance premiums; and unemployment insurance for your crew and hired captain):<br><br><br><br>$_____<br><br>☐  $0 |
| **Vessel Activity/Quota Monitoring Cost** for this vessel in 2014 (such as observer or dockside monitoring cost): | **Other costs** for this vessel in 2014:<br><br>*Describe*:<br>_____ |

_0000003599

$_____

☐  $0

$_____

☐  $0

## **Section D: Operating Costs**

9. **For each expense category listed in the table below,** *please enter the total amount spent in 2014 for this vessel, including all payments made by you and/or the crew. Also please enter the average cost per day.*
   - If nothing was spent in a category, please check $0.
   - *We are aware that these kinds of costs may vary significantly from year to year.* **Please bear in mind that this survey is about 2014 expenses only.**

---

| | |
|---|---|
| **Fuel/oil/filter** for this vessel in 2014:<br><br>Annual $_____    Avg per day $_____<br><br>☐ $0    ☐ I Don't Know | **Food and Drinking Water** for this vessel in 2014:<br><br>Annual $_____    Avg per day $_____<br><br>☐ $0    ☐ I Don't Know |
| **Ice** for this vessel in 2014:<br><br>Annual $_____    Avg per day $_____<br><br>☐ $0    ☐ I Don't Know | **Carrier vessel fees** for this vessel in 2014:<br><br>Annual $_____    Avg per day $_____<br><br>☐ $0    ☐ I Don't Know |
| **Fresh Water** for use in this vessel in 2014:<br><br>Annual $_____    Avg per day $_____<br><br>☐ $0    ☐ I Don't Know | **Communication Costs** for this vessel in 2014 (such as cell phones, radio, VMS etc.): *Do not include office phone use.*<br><br>Annual $_____    Avg per day $_____<br><br>☐ $0    ☐ I Don't Know |
| **General Fishing Supplies** for this vessel in 2014 (such as knives, picks, hooks, boxes, bags, ties, lobster bands, rags, tape, links/rings, lines/twine, etc.):<br><br>Annual $_____    Avg per day $_____<br><br>☐ $0    ☐ I Don't Know | **General Crew Supplies** for this vessel in 2014 (such as gloves, boot liners and foul-weather gear):<br><br>Annual $_____    Avg per day $_____<br><br>☐ $0    ☐ I Don't Know |
| **Catch Handling Costs** for this vessel in 2014 (such as auction, lumping, pumping, | **Other Costs** for this vessel in 2014:<br>*Describe*:_____ |

_0000003601

| grading, shipping and sales rep): | |
|---|---|
| Annual $_____        Avg per day $_____ | Annual $_____        Avg per day $_____ |
| ☐ $0        ☐ I Don't Know | ☐ $0        ☐ I Don't Know |

## <u>Section E: Typical Crew Payment System</u>

**10a.  Did you hire a captain for the majority of this vessel's trips in 2014, or were you the captain for most trips?**

      ☐ Mostly Owner-operated
      ☐ Mostly Hired Captain
      ☐ Other  _____

**10b.  On average, how many crew were on this vessel when it went out in 2014?
DO NOT COUNT YOURSELF OR THE CAPTAIN.**

      _____ Average number of crew members, not including you or the captain, in 2014

- **If you answered 0 (you had no crew in 2014), SKIP TO QUESTION 11**

- **If your answer was > 0 (you had crew in 2014), please CONTINUE WITH QUESTION 10c**

**10c.  Please use the diagram on the next page to list the types of expenses that were normally taken out of gross revenue, crew's share, and captain's share in 2014.**

      **You do not need to list the dollar amounts. Just list the *types* of expenses deducted (for example: "fuel" "ice" "food").**



*Your responses to the survey are completely confidential*        9

**NOTE: If the diagram below is not appropriate for your settlement system, please describe your system on the next page.**

_0000003603

**GROSS REVENUE**

EXPENSES YOU DEDUCT BEFORE ANY
DISTRIBUTION (list the types of expenses
only, not the amount):

_____

_____

_____

_____

_____

_____

Boat's percentage + Crew's percentage +
Captain's percentage = 100%

**BOAT'S PERCENTAGE:** \_\_ \_\_ %

**CREW'S PERCENTAGE :** \_\_ \_\_ %

EXPENSES YOU DEDUCT FROM
CREW'S PERCENTAGE (list the
types of expenses only, not the
amount):

_____

_____

_____

_____

_____

_____

_____

**CAPTAIN'S PERCENTAGE:** \_\_ \_\_ %

EXPENSES YOU DEDUCT FROM
CAPTAIN'S PERCENTAGE (list the
types of expenses only, not the
amount):

_____

_____

_____

_____

_____

_____

**If the diagram displayed on the previous page is not appropriate for your crew payment,
then please describe your crew payment system in the space below:**

*Your responses to the survey are completely confidential*          11

**10d.  Please list the *types* (not the cost) of items crew members purchase for themselves.**

Examples include: "food on day boats", "foul weather gear", "gloves", etc.
(These expenses would NOT be included in the diagram above.)

_____    _____

_____    _____

_____    _____

_0000003605

## Section F: Overall Business Cost

**11a.  Including the vessel listed in this survey, how many vessels did your fishing business operate or maintain in 2014?**

_____vessel(s) operated or maintained in 2014

**11b. For each expense category listed below, please enter the amount spent for either <u>all your vessels</u> or <u>just this vessel</u> in 2014. Indicate by checking the appropriate box.**
If you did not spend anything on that expense category in 2014, please check $0.

| | |
|---|---|
| **Workshop/Storage Expenses** for 2014 (such as gear shed rental and workshop expense):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Office Expenses** for 2014 (such as office supplies, office rental, home office, office utilities (such as electric, heat, etc.), postage, photocopying, computer and office phone use, excluding **communication costs**):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Business Vehicle Usage Costs** for 2014 (for fishing business related purposes only; such as number of miles the vehicle was used for business multiplied by a standard mileage rate):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Business Travel Costs** for 2014 (such as cost of lodging, travel, and transportation for business associated travel **excluding business vehicle costs**):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Association Fees Paid** in 2014 (such as co-operative, fishing organization, sector fees and union dues):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Professional Fees Paid** in 2014 (such as settlement, accounting, and legal fees):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Principal Paid on Business Loans** for 2014 (enter only payments made, *not* amount owed):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Interest Paid on Business Loans** for 2014:<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Taxes paid (income, property, etc.)** for 2014:<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Non-Crew Labor Services** for 2014 (such as night watchman, shore engineer, and office secretary):<br><br>$_____<br><br>*Describe:* _____ |

_0000003606

_____   ☐  $0        ☐  for all vessels    ☐  for this vessel only

## Section G: Other Costs and Earnings

**12.  Did you have any other costs in 2014 that we have not asked about in this survey? If so, please list them below. (Please do not report your personal costs).**

**Other costs for the <u>identified vessel</u> only:**

| Cost | Description of other annual costs incurred in 2014 |
|---|---|
| $ _____ | _____ |
| $ _____ | _____ |

**Other costs for your <u>entire business:</u>**

| Cost | Description of other annual costs incurred in 2014 |
|---|---|
| $ _____ | _____ |
| $ _____ | _____ |

**13. Please record the total gross revenue from all activities generated by this vessel in 2014.**
*(Note: Although we collect revenue information from the dealer reporting system, this question is for cross-checking our record in order to improve our overall data quality.)* **:**

Gross revenue from commercial trips:  $_____

Gross revenue from non-commercial trips (e.g. charter trips):  $_____

☐  $0  (this vessel was inactive during 2014)

**15. In the following table, Please record the number of days this vessel spent in each fishery in 2014. Be as specific as possible in the fishery description noting things such as gear type, target species, fishing region, etc.**

*Your responses to the survey are completely confidential*                    14

| Fishery Description (gear/species/region) | Number of Days in 2014 |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Thank you for your response! Please use the space below for comments.

_0000003608

**Mid-Atlantic Fishery Management Council**
800 North State Street, Suite 201, Dover, DE 19901-3910
Phone: 320-674-2331 | FAX: 320-674-5399 | www.mafmc.org
Richard B. Robins, Jr., Chairman | Lee G. Anderson, Vice
Chairman | Christopher M. Moore, Ph.D., Executive
Director



March 24, 2015

Dear _____,

As you are most likely aware, the National Marine Fisheries Service in conjunction with both the New England and Mid-Atlantic Fisheries Management Councils is developing an omnibus action that would allow the Councils to implement industry-funded monitoring within their respective jurisdictions. The Amendment will also consider specific coverage levels for the Atlantic mackerel and Atlantic herring fisheries. Please see http://www.mafmc.org/actions/observer-funding-omnibus for further information.

Preliminary analyses of economic factors related to the alternatives currently being considered for the herring and mackerel fisheries have highlighted the need for more detailed information about the cost of fishing in these two fisheries. It is important that the degree to which the cost of industry-funded coverage reduces the profitability of fishing for different types of vessels be understood and described in the Environmental Assessment. The current analyses use fishing cost information collected by the Northeast Fisheries Observer Program but the type of costs collected and the coverage on herring and mackerel vessels are limited.

Thank you for agreeing to fill this information gap by completing the attached survey. This survey is being administered by the MAFMC. The survey will ask you a number of questions about your annual fishing costs.  Responses to the survey are completely confidential, as required by law. Once you complete the survey please return it using the enclosed stamped envelope. The survey should take no longer than one hour to complete. Responses to the survey are voluntary, but by completing it, you will be helping the Councils understand how the policies currently being considered affect you.

If you have any questions about how to complete the survey please contact Jason Didden (302-526-5254 or jdidden@mafmc.org). Thank you in advance for your participation!

Sincerely,

Christopher M. Moore, Ph.D., *Executive Director MAFMC*

**Completed surveys should be mailed to:**

Jason Didden
Mid-Atlantic Fishery Management Council
800 North State Street, Suite 201
Dover, DE 19901-3910

_0000004937



# Herring and Mackerel Vessel Annual Cost Survey for 2014



**Thank you very much for participating in this important survey!**

**The questions in this survey relate to the following vessel only**:
[**Vessel name**]
Coast Guard Documentation or State Registration Number: **[12345678]**

Your responses and participation in this survey are
**CONFIDENTIAL**

Completed surveys should be mailed to:
Jason Didden
Mid-Atlantic Fishery Management Council
800 North State Street, Suite 201
Dover, DE 19901-3910

**General Instructions:**

- **This survey is about your costs in 2014 for the vessel identified in this survey.** In your answers, include combined costs for all state and/or federal fisheries for this vessel in 2014, including costs incurred while the vessel was inactive.

**Please note that all responses are completely confidential.**

---

## Section A: Vessel Information

This section is only about the vessel identified in this survey. **All costs requested are for 2014.**

1. **Ownership type for this vessel (*check one*):**
   ☐ Sole proprietorship
   ☐ General partnership
   ☐ Limited partnership
   ☐ C Corporation
   ☐ S Corporation
   ☐ Limited Liability Company (LLC)
   ☐ Other _____

2. **Number of owners, including yourself:** _____

3. **Was this vessel acquired from a previous owner or was it bought new (*check one*)?**
   ☐ Acquired from a previous owner
   ☐ Purchased New

4. **In what calendar year did you become the owner of the vessel?** _____

5. **What port did this vessel operate from most of the time during 2014?**

   _____

_0000004939

## **Section B: Repair/Maintenance/Upgrade/Improvements Costs**

**6a. Was this vessel hauled out in 2014 for any reason?** (Possible reasons include regular repair and maintenance, emergency haul-out, long term storage, etc.)

☐ Yes
☐ No [please go to 6c]

**6b. What were the haul-out costs in 2014, including taking the vessel out of the water and any transportation?** *(Do not include any repair/maintenance costs – we'll ask you for them in question 7.)*

Haul out cost in 2014:  $ _____

**6c. How often do you usually haul-out this vessel?**

☐ Every year
☐ Every other year
☐ Every _____ years
☐ Every _____ months
☐ Other (please describe) _____

**7.  What were your repair/maintenance and upgrade/improvement costs for this vessel in 2014? Include the cost of any tools and equipment you may have purchased. If you did not have any expenses in 2014, then check $0.**

*We know that these kinds of costs may vary significantly year to year. However, **this survey is about 2014 expenses only.***

$ _____          ☐ $0

**If you are able to provide a breakdown of these total repair/maintenance and upgrade/improvement costs, please do so in the following table. Otherwise, skip to question #8.**

_0000004940

| 7. | *Do not include vessel haul-out costs reported above in question 6b.* |
|---|---|
| **Expense Category** | **Repair/Maintenance/Upgrades/Improvements, 2014** |
| **Propulsion Engine** (such as engine, drive train, exhaust/cooling systems) | $_____<br><br>☐ $0<br>**Description:** |
| **Deck Equipment/ Other Machinery** (such as winches, haulers, generators, hydraulics, compressors, reels, pumps) | $_____<br><br>☐ $0<br>**Description:** |
| **Hull** (such as frame, deck, wheelhouse, keel, steering, rigging, fish holds, fuel tanks) | $_____<br><br>☐ $0<br>**Description:** |
| **Fishing Gear** (such as codends, nets/panels, dredges, buoys, highfliers, doors, pots/traps, cables) | $_____<br><br>☐ $0<br>**Describe Upgrade/Improvement:** |

_0000004941

**7.**

| | *Do not include vessel haul-out costs reported above in question 6b.* |
|---|---|
| **Expense Category** | **Repair/Maintenance/Upgrades/Improvements, 2014** |
| **Wheelhouse and Electronics** (such as Radar, GPS, VMS, sounder, radio, depth/temperature/net sensors) | $_____  ☐ $0  **Describe Upgrade/Improvement:** |
| **Processing/ Refrigeration** (such as RSW, packaging equipment, icemaker) | $_____  ☐ $0  **Describe Upgrade/Improvement:** |
| **Safety Equipment** (such as EPIRB, rafts, fire extinguishers, flares, survival suits) | $_____  ☐ $0  **Describe Upgrade/Improvement:** |
| **Other Repair/maintenance or upgrade/improvement:** | $_____  ☐ $0  **Describe Upgrade/Improvement:** |

_0000004942

## **Section C: Vessel Related Costs**

8.  **For each expense category listed in the table below,** *please enter the total amount spent in 2014 for this vessel (and average per day cost for crew and hired captain)*. If you did not have an expense in 2014, then check $0.

| | |
|---|---|
| **Mooring/Dockage Fees** for this vessel in 2014 (including upkeep expenses):<br><br>$_____<br><br>☐  $0 | **Permit and/or License fees** for this vessel in 2014:<br><br>$_____<br><br>☐  $0 |
| **Vessel insurance premium** in 2014 for this vessel (premium paid for either hull or P & I insurance):<br><br>$_____<br><br>*Number of months insured:* _____<br><br>☐  $0 | **Quota or DAS lease payments** in 2014 for this vessel (if non-monetary payments were used to obtain quota or DAS, please estimate the value of those non-monetary payments):<br><br><br>$_____<br><br>☐  $0 |
| **Total payments to crew and hired captain** in 2014 for this vessel only:<br><br>Crew:  Annual $_____    Avg per day $_____<br><br><br><br>Hired Cpt: Annual $_____    Avg per day $_____<br>(**Do not include** what you earn when you are the captain)<br><br>☐  $0 | **Crew benefits** for this vessel in 2014 (the cost to you, as the vessel owner, for providing retirement benefits; health, life, or disability insurance premiums; and unemployment insurance for your <u>crew and hired captain</u>):<br><br><br><br>$_____<br><br>☐  $0 |
| **Vessel Activity/Quota Monitoring Cost** for this vessel in 2014 (such as observer or dockside monitoring cost): | **Other costs** for this vessel in 2014:<br><br>*Describe*:<br>_____ |

_0000004943

$\underline{\hspace{4cm}}$

☐  $0

$\underline{\hspace{4cm}}$

☐  $0

_0000004944

## **Section D: Operating Costs**

9. **For each expense category listed in the table below,** *please enter the total amount spent in 2014 for this vessel, including all payments made by you and/or the crew. Also please enter the average cost per day.*
   - If nothing was spent in a category, please check $0.
   - *We are aware that these kinds of costs may vary significantly from year to year.* **Please bear in mind that this survey is about 2014 expenses only.**

| | |
|---|---|
| **Fuel/oil/filter** for this vessel in 2014: <br><br> Annual $_____  Avg per day $_____ <br><br> ☐  $0    ☐  I Don't Know | **Food and Drinking Water** for this vessel in 2014: <br><br> Annual $_____  Avg per day $_____ <br><br> ☐  $0    ☐  I Don't Know |
| **Ice** for this vessel in 2014: <br><br> Annual $_____  Avg per day $_____ <br><br> ☐  $0    ☐  I Don't Know | **Carrier vessel fees** for this vessel in 2014: <br><br> Annual $_____  Avg per day $_____ <br><br> ☐  $0    ☐  I Don't Know |
| **Fresh Water** for use in this vessel in 2014: <br><br> Annual $_____  Avg per day $_____ <br><br> ☐  $0    ☐  I Don't Know | **Communication Costs** for this vessel in 2014 (such as cell phones, radio, VMS etc.): <br> *Do not include office phone use.* <br><br> Annual $_____  Avg per day $_____ <br><br> ☐  $0    ☐  I Don't Know |
| **General Fishing Supplies** for this vessel in 2014 (such as knives, picks, hooks, boxes, bags, ties, lobster bands, rags, tape, links/rings, lines/twine, etc.): <br><br> Annual $_____  Avg per day $_____ <br><br> ☐  $0    ☐  I Don't Know | **General Crew Supplies** for this vessel in 2014 (such as gloves, boot liners and foul-weather gear): <br><br> Annual $_____  Avg per day $_____ <br><br> ☐  $0    ☐  I Don't Know |
| **Catch Handling Costs** for this vessel in 2014 (such as auction, lumping, pumping, | **Other Costs** for this vessel in 2014: <br> *Describe*:_____ |

_0000004945

| grading, shipping and sales rep):<br><br>Annual $_____    Avg per day<br>$_____<br><br>☐ $0        ☐ I Don't Know | Annual $_____    Avg per day $_____<br><br>☐ $0        ☐ I Don't Know |
|---|---|

## Section E: Typical Crew Payment System

**10a. Did you hire a captain for the majority of this vessel's trips in 2014, or were you the captain for most trips?**

☐ Mostly Owner-operated
☐ Mostly Hired Captain
☐ Other _____

**10b. On average, how many crew were on this vessel when it went out in 2014?**
**DO NOT COUNT YOURSELF OR THE CAPTAIN.**

_____ Average number of crew members, not including you or the captain, in 2014

- **If you answered 0 (you had no crew in 2014), SKIP TO QUESTION 11**

- **If your answer was > 0 (you had crew in 2014), please CONTINUE WITH QUESTION 10c**

**10c. Please use the diagram on the next page to list the types of expenses that were normally taken out of gross revenue, crew's share, and captain's share in 2014.**

**You do not need to list the dollar amounts. Just list the *types* of expenses deducted (for example: "fuel" "ice" "food").**



_0000004946

**NOTE: If the diagram below is not appropriate for your settlement system, please describe your system on the next page.**

_0000004947

GROSS REVENUE

EXPENSES YOU DEDUCT BEFORE ANY
DISTRIBUTION (list the types of expenses
only, not the amount):

_____

_____

_____

_____

_____

_____

Boat's percentage + Crew's percentage +
Captain's percentage = 100%

BOAT'S PERCENTAGE:   __ __ %

CREW'S PERCENTAGE :  __ __ %

EXPENSES YOU DEDUCT FROM
CREW'S PERCENTAGE (list the
types of expenses only, not the
amount):

_____

_____

_____

_____

_____

_____

_____

CAPTAIN'S PERCENTAGE:   __ __ %

EXPENSES YOU DEDUCT FROM
CAPTAIN'S PERCENTAGE (list the
types of expenses only, not the
amount):

_____

_____

_____

_____

_____

_____

**If the diagram displayed on the previous page is not appropriate for your crew payment,
then please describe your crew payment system in the space below:**

*Your responses to the survey are completely confidential*                    11

_0000004948

**10d.  Please list the *types* (not the cost) of items crew members purchase for themselves.**

Examples include: "food on day boats", "foul weather gear", "gloves", etc.
(These expenses would NOT be included in the diagram above.)

_____    _____

_____    _____

_____    _____

_0000004949

## **Section F: Overall Business Cost**

**11a.  Including the vessel listed in this survey, how many vessels did your fishing business operate or maintain in 2014?**

_____vessel(s) operated or maintained in 2014

**11b**. **For each expense category listed below, please enter the amount spent for either** **all your vessels** **or** **just this vessel** **in 2014. Indicate by checking the appropriate box.**
If you did not spend anything on that expense category in 2014, please check $0.

| | |
|---|---|
| **Workshop/Storage Expenses** for 2014 (such as gear shed rental and workshop expense):<br><br>$_____<br><br>☐ $0    ☐ for all vessels    ☐ for this vessel only | **Office Expenses** for 2014 (such as office supplies, office rental, home office, office utilities (such as electric, heat, etc.), postage photocopying, computer and office phone use, excluding **communication costs**):<br><br>$_____<br><br>☐ $0    ☐ for all vessels    ☐ for this vessel only |
| **Business Vehicle Usage Costs** for 2014 (for fishing business related purposes only; such as number of miles the vehicle was used for business multiplied by a standard mileage rate):<br><br>$_____<br><br>☐ $0    ☐ for all vessels    ☐ for this vessel only | **Business Travel Costs** for 2014 (such as cost of lodging, travel, and transportation for business associated travel **excluding business vehicle costs**):<br><br>$_____<br><br>☐ $0    ☐ for all vessels    ☐ for this vessel only |
| **Association Fees Paid** in 2014 (such as co-operative, fishing organization, sector fees and union dues):<br><br>$_____<br><br>☐ $0    ☐ for all vessels    ☐ for this vessel only | **Professional Fees Paid** in 2014 (such as settlement, accounting, and legal fees):<br><br>$_____<br><br>☐ $0    ☐ for all vessels    ☐ for this vessel only |
| **Principal Paid on Business Loans** for 2014 (enter only payments made, *not* amount owed):<br><br>$_____<br><br>☐ $0    ☐ for all vessels    ☐ for this vessel only | **Interest Paid on Business Loans** for 2014:<br><br>$_____<br><br>☐ $0    ☐ for all vessels    ☐ for this vessel only |
| **Taxes paid (income, property, etc.)** for 2014:<br><br>$_____<br><br>☐ $0    ☐ for all vessels    ☐ for this vessel only | **Non-Crew Labor Services** for 2014 (such as night watchman, shore engineer, and office secretary):<br><br>$_____<br><br>*Describe:* _____ |

_0000004950

| | | $0 | | for all vessels | | for this vessel only |

## <u>Section G: Other Costs and Earnings</u>

**12.  Did you have any other costs in 2014 that we have not asked about in this survey? If so, please list them below. (Please do not report your personal costs).**

**Other costs for the <u>identified vessel</u> only:**

| Cost | Description of other annual costs incurred in 2014 |
|---|---|
| $ _____ | _____ |
| $ _____ | _____ |

**Other costs for your <u>entire business:</u>**

| Cost | Description of other annual costs incurred in 2014 |
|---|---|
| $ _____ | _____ |
| $ _____ | _____ |

**13. Please record the total gross revenue from all activities generated by this vessel in 2014.**
*(Note: Although we collect revenue information from the dealer reporting system, this question is for cross-checking our record in order to improve our overall data quality.)* **:**

Gross revenue from commercial trips:  $_____

Gross revenue from non-commercial trips (e.g. charter trips):  $_____

[ ]  $0  (this vessel was inactive during 2014)

**15. In the following table, Please record the number of days this vessel spent in each fishery in 2014. Be as specific as possible in the fishery description noting things such as gear type, target species, fishing region, etc.**

*Your responses to the survey are completely confidential*                14

| Fishery Description (gear/species/region) | Number of Days in 2014 |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

<u>Thank you for your response! Please use the space below for comments.</u>

_0000004952

*15. Observer Policy Committee (Sept. 29 - Oct. 1, 2015) )*







Chairman Terry Stockwell                                    August 31ˢᵗ, 2015
New England Fishery Management Council
50 Water Street
Mill 2
Newburyport, MA 01950


Dear Chairman Stockwell,

I am writing in regards to the Omnibus Industry-Funded Monitoring Amendment.

I have looked over some settlement sheets from one of our vessels to see just how difficult it would be for a small mesh bottom trawl vessel to absorb the estimated daily cost of $700 for observer coverage.

As an example, for the week of January 7ᵗʰ through the 12ᵗʰ one of our vessels took four day-trips and stocked a total of $10,500.00. If we were to take on 100% observer coverage it's roughly 25% of the gross stock. That expense would be taken right off the top cutting into whatever profit the boat and crew were able to make. One particular day-trip in January had a gross stock of only $800.00. Having to pay for coverage for a trip like that would have been impossible.

Please keep in mind that there are other trip expenses that also need to be covered, for instance, fuel, insurance, food, and oil.

These smaller vessels do not generate large profits and would be severely impacted by this Amendment.  We ask that you please take these smaller vessels into account when considering the different monitoring programs you might implement.

Thank you for the opportunity to comment on this proposed Amendment.


Sincerely,


Katie Almeida
Fishery Policy Analyst

The Town Dock:  P.O. Box 608; 45 State St  Narragansett, RI 02882
PH: 401-789-2200  FAX: 401-782-4421
Website: www.towndock.com

_0000004969

Table 1.  Comparison of Different Types of Monitoring

| Table 1. | NEFOP Observer | At-Sea Monitor | Electronic Monitoring | Portside Sampling |
|---|---|---|---|---|
| **Minimum Education Requirements** | Bachelor's Degree* | High School Diploma or Equivalency | None | High School Diploma or Equivalency |
| **Data Collected on Retained Catch** | Fishing effort and species composition | Fishing effort and species composition | Verify retention of catch | Species Composition |
| **Data Collected on Discarded Catch** | Fishing effort, species composition, and slippage | Fishing effort, species composition, and slippage | Frequency of discard events | None |
| **Biological Sampling** | Age and length data | Age and length data | None | Age and length data |
| **Supplemental Research Projects** | Collects additional data as requested | Collects additional data as requested | None | Collects additional data as requested |
| * *Subject to national policy on minimum education requirements, but exceptions may be made for individuals with appropriate work experience.* | | | | |

Table 2.  Comparison of Self-Reported Data.

| Are these data collected? | Self-Reported Data | | |
|---|---|---|---|
| | **Vessel** | **Dealer** | **Affidavits** |
| **Retained Catch** | yes | yes | yes |
| **Discarded Catch** | yes | no | yes |
| **Area** | yes | no | no |
| **Gear** | yes | no | no |
| **Trip Type** | yes | no | no |
| **Economic Information** | yes | no | no |

Table 3.  Comparison of Data Collected Via Independent Monitoring.

| Can these data be collected? | Independent Monitoring | | | | |
|---|---|---|---|---|---|
| | **VMS** | **NEFOP Observer** | **At-Sea Monitors** | **Electronic Monitoring** | **Portside Sampling** |
| **Retained Catch** | no | yes | yes | no | yes |
| **Discarded Catch** | no | yes | yes | yes | no |
| **Area** | yes | yes | yes | no | no |
| **Gear** | no | yes | yes | no | no |
| **Trip Type** | no | yes | yes | no | no |
| **Economic Information** | no | yes | yes | no | no |

Table 4.  Comparison of Different Types of Monitoring for Herring and Mackerel Coverage Target Alternatives.

| Table 4. | NEFOP Observer | At-Sea Monitor | Electronic Monitoring | Portside Sampling |
|---|---|---|---|---|
| **Minimum Education Requirements** | Bachelor's Degree* | High School Diploma or Equivalency | None | High School Diploma or Equivalency |
| **Data Collected on Retained Catch** | Specialized High Volume Fisheries Sampling, including fishing effort and species composition | Fishing effort | Verify retention of catch | Species Composition |
| **Data Collected on Discarded Catch** | Specialized High Volume Fisheries Sampling, including fishing effort, species composition, and slippage | Fishing effort, species composition, and slippage | Frequency of discard events | None |
| **Biological Sampling** | Age and length data | Age and length data on discarded catch | None | None |
| **Supplemental Research Projects** | Collects additional data as requested | None | None | None |
| *\* Subject to national policy on minimum education requirements, but exceptions may be made for individuals with appropriate work experience.* | | | | |



**New England Fishery Management Council**
50 WATER STREET  |  NEWBURYPORT, MASSACHUSETTS 01950  |  PHONE 978 465 0492  |  FAX 978 465 3116
E.F. "Terry" Stockwell III, *Chairman*  |  Thomas A. Nies, *Executive Director*

# MEETING SUMMARY

## Observer Policy Committee
Radisson, Plymouth, MA
September 28, 2015

The Observer Policy Committee met on September 28, 2015 in Plymouth, MA to discuss the Industry Funded Monitoring Amendment.

***MEETING ATTENDANCE:*** Terry Stockwell (Chairman), Terry Alexander, Peter Kendell, Dr. Michael Sissenwine, Mary Beth Tooley, Dr. Wendy Gabriel, Peter Hughes, Gerry O'Neil, Rick Usher, Danielle Kane, Jeff Kaelin, Pete Christopher (Bullard designee), and Doug Brander (13 of 14 Committee members present; Paul Parker absent); Lori Steele, Maria Jacob, Dr. Jamie Cournane, Tom Nies (NEFMC Staff), Aja Szumylo, Carrie Nordeen (NMFS GARFO Staff), and Mitch MacDonald (NOAA General Counsel). In addition, five members of the public attended the meeting.

***KEY OUTCOMES:***

- **Outcome 1:** The Committee made the following motion: That the Councils split the omnibus elements of the IFM amendment from the herring/mackerel coverage target options, and further refine the omnibus elements for another review in December, at which time the omnibus elements would be reviewed/approved for public comment. Motion carried on a show of hands 11/0/1.
- **Outcome 2:** Include/develop the monitoring set-aside options in the omnibus amendment. Motion carried on a show of hands 11/0/1.
- **Outcome 3:** That the Council remand the herring coverage target options (now as a separate management action) back to the Herring Committee for a clear purpose/need and additional discussion regarding data usage.  Also, that the Council direct the Herring PDT to work with the NEFSC and other technical bodies to provide a thorough technical review of an industry-funded monitoring program for the herring fishery including observer/at-sea monitoring, portside sampling, and EM, in order to determine appropriate coverage levels based on the purpose/need identified by the Committee. Motion carried on a show of hands 11/0/1.
- **Outcome 4:** Committee members expressed interest in a pilot program to collect baseline information to better inform the utility of portside sampling as a monitoring tool in the herring fishery. In addition, Committee members expressed interest in a workshop involving the fishing industry to explore the operational aspects of the monitoring programs.

_0000007481

*AGENDA ITEM #1: GARFO PRESENTATION, DRAFT OMNIBUS INDUSTRY-FUNDED MONITORING AMENDMENT AND ENVIRONMENTAL ASSESSMENT (SZUMYLO)*

Ms. Szumylo presented information on the updated economic analysis for the omnibus and herring fishery management plan (FMP) target alternatives in the Industry-Funded Monitoring (IFM) Amendment. Ms. Szumylo clarified that National Marine Fisheries Service (NMFS) would provide funding when available to cover the coverage targets for additional monitoring costs separate from the Federal mandates under the Magnuson-Stevens Act, Marine Mammal Protection Act, and Endangered Species Act. NMFS does not have discretion to use funds to cover program costs not specified under a particular budget line item. The Omnibus alternatives in the amendment would apply to any FMP that adopts additional monitoring targets. Monitoring programs would be prioritized annually based on available funds for NMFS to cover their share of the cost responsibility. The Omnibus alternatives include several options for the prioritization process, which differ based on the amount of discretion that the Council and NMFS would have to alter the priorities. As approved by the Department of Commerce, the cost sharing analysis for NMFS and the industry in the IFM Amendment is divided by category, including administrative costs covered by NMFS and sampling costs covered by the industry (i.e. the cost analysis is not separated by dollar amount between NMFS and the industry). There is an option within the amendment to make these additional monitoring programs adoptable through an FMP's framework adjustment process.

**Committee Discussion:**

Mr. Alexander asked whether it is possible to contract directly with the observer/monitor without a service provider, in order to save costs. Ms. Szumylo explained that NMFS currently uses contracts with the service provider to administer trips based on the established coverage targets. Dr. Sissenwine stated that Mr. Alexander may be discussing a model similar to the monitoring program in Alaska, where a variety of providers contracted by the industry allowed for the ability to negotiate costs, and the samplers are trained by the agency.

Ms. Nordeen clarified that IFM Amendment would set up service provider standards and monitor standards. The industry would be able to choose from a list of NMFS-approved service providers that meet the service provider requirements for a particular fishery. Competition among service providers for contracts should allow for reduced costs.

Mr. Usher stated that the industry could negotiate directly with observers/monitor, but those monitors/observers would either need to develop as a company or consider themselves independent contractors, and they would need to meet the same observer provider requirements, which includes insurance requirements.

*AGENDA ITEM #2: GARFO PRESENTATION, HERRING MONITORING COVERAGE TARGET ALTERNATIVES (NORDEEN)*

The IFM Amendment also establishes coverage targets for the Herring and Mackerel FMP (Squid/Mackerel/Butterfish FMP).

_0000007482

Ms. Nordeen discussed the range of monitoring alternatives to improve estimates of kept and discarded catch in the herring fishery, and instances of haddock and river herring incidental catch. If a vessel is selected for monitoring coverage, there are options to allow for a waiver of coverage when funding or logistics does not allow for an observer/monitor on a particular trip (sub-option #1 would need to be selected). There is also an option in the amendment that would not require vessels landing 25 metric tons or less to be subjected to additional monitoring requirements (sub-option #5). Alternative 2 would require high volume certification for observers/monitors to work on herring fishery monitoring. Monitors/observers would only be required to hold a high school diploma compared to the Bachelor's degree requirement, which is expected to reduce monitoring cost (this is consistent with the groundfish ASM standards currently in place). Herring alternatives also allow for an observer/monitor to redeploy on the same vessel more than twice, consecutively, for multi-day trips.

Ms. Nordeen also presented information on the types of data collected in the existing monitoring programs and how the data is used. Standardized Bycatch Reporting Methodology (SBRM) data is used to estimate herring fishery bycatch, and incidental catch of river herring/shad, and haddock. Herring permit holders are currently required to carry an observer when fishing in groundfish closed areas, which include the Western Gulf of Maine, Cashes Ledge, Nantucket Lightship, and Closed Areas I and II.

Ms. Nordeen presented information on the costs to the industry, by percentage, relative to the return-to-owner revenue (gross revenue after vessel and crew costs). Return to owner costs vary based on data editing costs, observer/monitor turnover rates, and travel costs. Initial start-up costs for electronic monitoring is higher in Year 1 compared to Year 2 due to equipment costs. Monitoring costs based on the alternatives varies based on percentage of monitoring coverage target (25%-100%), number of sea days fished, and gear type used.

There are two major factors to consider when evaluating these additional monitoring programs:
  (1) Determine the type of information collected (type and quality of data should meet the Council's information collection goals for the appropriate fishery); and
  (2) Program Costs to implement additional monitoring targets.

Decision makers should weigh the benefits of increased monitoring coverage against the costs to implement these programs. The benefits of additional monitoring should equal or outweigh the costs to implement these programs. In addition, requirements for achieving optimum yield on a continuing basis under Magnuson-Stevens Act National Standard 1 should be weighed against the benefits of the program, because the program should not restrict the ability of the fishery to achieve optimum yield.

**Committee Discussion:**

Mr. Alexander asked whether a vessel would have to dump its catch if there are mechanical issues that do not allow for pumping of fish aboard the vessel.  Ms. Nordeen clarified that the sub-option for a waiver, if selected, would need further development to address the particular stipulations that describes the types of permissible waivers. Mr. Kaelin suggested that Alternative 2.5 (NEFOP level coverage on mid-water trawl vessels operating within groundfish

closed areas) include a waiver to accommodate circumstances that prevent pumping aboard the vessel (i.e. operational discards due to mechanical issues).

Ms. Tooley raised concerns regarding the economic analysis for return to owner costs that uses 83 sea days as an average for the mid-water trawl herring fleet. Some vessels fish twice as many sea days, and the costs are doubled for these vessels that operate year round.

**Public Comments:**

Meghan Lapp (Seafreeze, Ltd) asked if the cost benefit analysis of the At-Sea Monitoring (ASM) Program would be completed before the options within the IFM amendment would be deliberated. Ms. Szumylo clarified that the cost benefit analysis of the ASM Program would likely not be complete before this action is deliberated. The groundfish ASM costs are used to analyze the costs for the herring ASM program, but the costs would differ. The costs would likely be slightly lower for the herring fleet's ASM program.

Dr. Cournane stated that the review rate of 100 percent for electronic monitoring would substantially increase the industry costs for the monitoring program. Dr. Cournane suggested that the appropriate level of electronic monitoring coverage should be clarified within the document. Ms. Nordeen explained that 100 percent electronic monitoring coverage is likely not necessary. The analysis is based on the whiting fishery program in Pacific Northwest, which has similar program goals. Without a pilot program, there is no actual data to show how these costs could be reduced. However, the IFM amendment would allow the flexibility to reduce the coverage for electronic monitoring and portside sampling.

Dr. Cournane stated that the amendment addresses options to allow for changes to retention practices, where NMFS would consider maximized retention practices on an individual FMP basis. Ms. Szumylo clarified that the intent is not to change retention requirements currently in place. The individual monitoring programs could explore modifications to retention requirements, which would be deliberated by the Council.

Dr. Cournane raised concerns that sampling directed to a specific area invites bias that makes it difficult for the data to be used be the Northeast Fisheries Science Center, and suggested that this issue be addressed within the impacts analysis. Ms. Nordeen stated that the alternatives for herring monitoring in the groundfish closed areas are similar to SBRM requirements for the herring fleet, which would allow for the data to be used because it would supplement existing data collections under SBRM requirements. The benefits for additional monitoring in closed areas are low-positive because the additional coverage would apply to a small area (closed area).

Dr. Cournane stated that the catch caps for river herring/shad and haddock were developed based on observer data and vessel trip reports. Electronic monitoring and portside sampling are different types of monitoring currently under consideration for the herring fleet, which may alter the information that is used to set catch caps. Ms. Nordeen stated that the utility of the data from electronic monitoring and portside sampling would be considered within the amendment.

_0000007484

**Committee Discussion:**

Mr. Kaelin raised concern that the amendment includes the squid fishery, although the squid fishery does not catch river herring. Ms. Nordeen stated that the vessels covered under the small mesh bottom trawl category are based on the designations for small mesh as they exist under the SBRM Amendment. However, this is one instance where the monitoring requirements for small mesh bottom trawl vessels such as squid vessels likely cannot offset monitoring costs through herring revenue generated on these small mesh bottom trawl vessels.

Mr. O'Neil raised concerns that the mid-water trawl vessels that operate year round are not accurately represented in these cost estimates. The cost estimates for the mid-water trawl fleet are based on an average sea day across the fleet. However, approximately ten vessels harvest 90 percent of the herring catch, and these vessels fish significantly more sea days compared to the average of 83 sea days. Ten vessels would negate confidentiality issues to allow more realistic numbers to be collected and used for the cost estimate to the mid-water trawl fleet. Ms. Szumylo stated they would try to reconfigure the analysis based on the known information for the top harvesters (by landings). Mr. O'Neil also raised concerns regarding the accuracy of the survey data used to collect vessel cost estimates.

*AGENDA ITEM #3: GARFO PRESENTATION, SUPPLEMENT DISCUSSION DOCUMENT (SZUMYLO)*

Ms. Szumylo highlighted changes to the environmental assessment based on recent Committee recommendations. Regarding the use of electronic monitoring, the Council may choose to review a certain percentage of the hauls on video footage, or a percentage of the video footage by length of time. The analysis will be updated to reflect options for less than 100 percent video recording and review. NMFS is able to accept and utilize external funds to cover its administrative costs for the industry-funded monitoring programs, under the Magnuson-Stevens Act's Fisheries Conservation and Management fund. Under the Magnuson-Stevens Act, NMFS may also accept resources for observer training (including facilities) from states, universities, and non-profit organizations. Ms. Szumylo also presented information on the monitoring set aside alternative. Ms. Szumylo explained that for fisheries that do not have possession limits that allow for additional pounds to be set aside to offset monitoring costs, the operation for setting harvest restrictions in that fishery may need to be altered in order to utilize the set aside program. One option would be to allow access to harvest of fish for the set-aside program during seasonal closures timeframes.

**Public Comment:**

Patrick Paquette (MA recreational fishing advocate) confirmed that for Closed Area I, the 100 percent observer requirement was implemented in 2010. Mr. Paquette urged the Committee to reconsider any waiver options based on information showing that over 100 observed slippage events have occurred in the past, and that these slippage events were done in violation of the regulations currently in place for Closed Area I.

_0000007485

Erica Fuller (Earth Justice) also raised similar concerns regarding seven prohibited slippage events that include operational discards in 2014, with a higher number of slippage events in 2012 and 2013.

Meghan Lapp (Seafreeze, Ltd.) raised concerns that the total number of sea days reflected in the cost analysis for the small mesh bottom trawl fleet is likely inaccurate because the freezer vessels alone fish over 200 sea days (declared into the fishery, though they may not land herring on those trips). Therefore, the cost analysis should be changed to accurately reflect the fleet's effort by sea days.

**Committee Discussion:**

Ms. Steele clarified that the referenced slippage events are operational discard events, which are not allowed in the groundfish closed areas. Operational discards are defined as instances where fish remain in the net after pumping activity. Safety, mechanical, and dogfish events are permitted slippage events for herring vessels operating in the groundfish closed areas. In addition, if slippage for one of these reasons occur, the vessel is required to leave the area and continue fishing outside the closed area. Framework 4 to the Herring FMP does not prohibit operational discards, but that change is not reflected in the regulations for herring fishing in the groundfish closed areas.

Several Committee members expressed concerns with the prohibited slippage events for operational discards in the closed areas based on the nature of herring fishing operations. Ms. Tooley stated that the industry is confused on the issue, and these regulations should be clearer.

Mr. Brandor stated that a key part of this monitoring program is regulatory compliance, which is one of the major reasons that led to the development of the IFM amendment. For electronic monitoring recording, a bias similar to the observer effect is likely to occur if the cameras do not record 100 percent of the fishing activity. Decision makers may elect to only review a percentage of the video footage.

Ms. Tooley stated that monitoring set aside functions well in the scallop fishery because the price of scallops is high; in the herring fishery, it would be difficult to implement this type of program based on the challenges to harvest set aside fish under the herring research set aside program.

Dr. Sissenwine stated that a monitoring set aside program would only be efficient if the costs for the government to administer a set aside program is cheaper than the cost for the industry to directly contract with observers/monitors without supplemental funds from a set aside program.

Ms. Tooley stated that the herring Committee does not think that the document is ready for public comment. The herring alternatives in the IFM amendment needs additional work. Ms. Tooley stated that a pilot program is needed to collect more information to help make an informed decision (other committee members agreed). In addition, there should also be an industry workshop to help develop the details of a monitoring program for a particular FMP. Some of the overarching issues are more appropriate for the Observer Policy Committee, and the

_0000007486

more detailed considerations for the herring monitoring program should be discussed by the herring Committee.

Many Committee members expressed concern that the IFM amendment will set a precedence where industry pays for monitoring going forward, citing impacts that may affect the viability of the industry after they begin to absorb these costs.

Mr. MacDonald stated that this amendment would not alter coverage for the groundfish industry because Amendment 16 to the Northeast Multispecies FMP addressed that issue. The issue that led to the development of this amendment is that there currently is not a mechanism to allow for additional monitoring coverage to be utilized (and prioritized) to remedy competing priorities for monitoring coverage.

Peter Hughes stated that the cost of the program to the fishermen based on the days at sea has increased substantially from its inception, where we have assumed a cost of $600 per sea day for monitoring.

**Committee Discussion:**

Dr. Sissenwine stated that the Committee needs to outline the reasons for collecting additional monitoring data. If the purpose of the additional monitoring is compliance monitoring, then these programs would work. If the additional monitoring is expected to increase scientific information, it is not sufficient as currently framed. Ms. Tooley stated that a combination of portside sampling and electronic monitoring could achieve the amendment goals for catch monitoring. Mr. Stockwell stated that the alternatives developed for the herring and mackerel fishery are expected to address the *considered but rejected* alternatives for monitoring in those fisheries. The omnibus amendment is broader in scope, compared to the herring and mackerel alternatives. Dr. Sissenwine suggested investigating the Atlantic Highly Migratory Species Fishery Management Plan's electronic monitoring program (used to monitor Bluefin tuna catch in the pelagic longline fishery) for useful monitoring cost estimates.

Ms. Steele stated that there should be some technical work completed to figure out what coverage level is needed based on what is determined to be necessary for a particular fishery. The document needs to clarify what percentage of coverage is needed. Mr. Brandor stated that the Committee cannot set the coverage targets up front, because these targets would vary by fishery. Ms. Tooley suggested that the amendment include problem statements in the introductory sections of the document. Dr. Sissenwine expressed concern that it is unclear what party would be responsible for choosing an appropriate coefficient of variation (CV) level for monitoring. In addition, the Committee must determine the level of coverage at which the observer effect is realized.

Based on the Committee's discussions, the following motions were made:

1. **MOTION #1 (Tooley/Alexander): That the Councils split the omnibus elements of the IFM amendment from the herring/mackerel coverage target options, and further refine**

_0000007487

the omnibus elements for another review in December, at which time the omnibus elements would be reviewed/approved for public comment.

**Motion carried on a show of hands 11/0/1**

2. **MOTION #2 (Kaelin/Kendell): Move to include/develop the monitoring set-aside options in the omnibus amendment**

   **Motion 2 carried on a show of hands 11/0/1**

3. **Motion #3 (Kendell/Tooley): That the Council remand the herring coverage target options (now as a separate management action) back to the Herring Committee for a clear purpose/need and additional discussion regarding data usage.  Also, that the Council direct the Herring PDT to work with the NEFSC and other technical bodies to provide a thorough technical review of an industry-funded monitoring program for the herring fishery including observer/at-sea monitoring, portside sampling, and EM, in order to determine appropriate coverage levels based on the purpose/need identified by the Committee.**

   **Motion 3 carried on a show of hands 11/0/1**

**Public Comment:**

Mr. Nies stated that NMFS is responsible for the majority of the workload to develop the IFM amendment. By splitting the amendment, the Council staff would be responsible for the majority of the workload for one aspect of the amendment (herring alternatives). The Committee should keep in mind that the Herring FMP priorities includes the issue of localized depletion within the Herring control rule amendment, which will require a considerable amount of Plan Development Team effort.

**The Observer Policy Committee meeting adjourned at approximately 6:10 pm.**

_0000007488



**MID-ATLANTIC** | FISHERY MANAGEMENT COUNCIL

# Herring and Mackerel Vessel Annual Cost Survey for 2014



**Thank you very much for participating in this important survey!**

**The questions in this survey relate to the following vessel only**:
[**Vessel name**]
Coast Guard Documentation or State Registration Number: **[12345678]**

Your responses and participation in this survey are
**CONFIDENTIAL**

*Photo credit: Lisa Colburn, NOAA Fisheries*

Completed surveys should be mailed to:
Jason Didden
Mid-Atlantic Fishery Management Council
800 North State Street, Suite 201
Dover, DE 19901-3910

**General Instructions:**

- **This survey is about your costs in 2014 for the vessel identified in this survey.** In your answers, include combined costs for all state and/or federal fisheries for this vessel in 2014, including costs incurred while the vessel was inactive.

**Please note that all responses are completely confidential.**

---

## <u>Section A: Vessel Information</u>

This section is only about the vessel identified in this survey. **<u>All costs requested are for 2014.</u>**

1. **Ownership type for this vessel (*check one*):**
   - ☐ Sole proprietorship
   - ☐ General partnership
   - ☐ Limited partnership
   - ☐ C Corporation
   - ☐ S Corporation
   - ☐ Limited Liability Company (LLC)
   - ☐ Other _____

2. **Number of owners, including yourself:** _____

3. **Was this vessel acquired from a previous owner or was it bought new (*check one*)?**
   - ☐ Acquired from a previous owner
   - ☐ Purchased New

4. **In what calendar year did you become the owner of the vessel?** _____

5. **What port did this vessel operate from most of the time during 2014?**

   _____

_0000009573

## **Section B: Repair/Maintenance/Upgrade/Improvements Costs**

**6a. Was this vessel hauled out in 2014 for any reason?** (Possible reasons include regular repair and maintenance, emergency haul-out, long term storage, etc.)

☐ Yes
☐ No [please go to 6c]

**6b. What were the haul-out costs in 2014, including taking the vessel out of the water and any transportation?** *(Do not include any repair/maintenance costs – we'll ask you for them in question 7.)*

Haul out cost in 2014:  $ _____

**6c. How often do you usually haul-out this vessel?**

☐ Every year
☐ Every other year
☐ Every ____ years
☐ Every ____ months
☐ Other (please describe) _____

**7.  What were your repair/maintenance and upgrade/improvement costs for this vessel in 2014? Include the cost of any tools and equipment you may have purchased. If you did not have any expenses in 2014, then check $0.**

*We know that these kinds of costs may vary significantly year to year. However, **this survey is about 2014 expenses only.***

$ _____      ☐  $0

**If you are able to provide a breakdown of these total repair/maintenance and upgrade/improvement costs, please do so in the following table. Otherwise, skip to question #8.**

_0000009574

| 7. | *Do not include vessel haul-out costs reported above in question 6b.* |
|---|---|
| **Expense Category** | **Repair/Maintenance/Upgrades/Improvements, 2014** |
| **Propulsion Engine** (such as engine, drive train, exhaust/cooling systems) | $_____ <br> ☐ $0 <br> **Description:** |
| **Deck Equipment/ Other Machinery** (such as winches, haulers, generators, hydraulics, compressors, reels, pumps) | $_____ <br> ☐ $0 <br> **Description:** |
| **Hull** (such as frame, deck, wheelhouse, keel, steering, rigging, fish holds, fuel tanks) | $_____ <br> ☐ $0 <br> **Description:** |
| **Fishing Gear** (such as codends, nets/panels, dredges, buoys, highfliers, doors, pots/traps, cables) | $_____ <br> ☐ $0 <br> **Describe Upgrade/Improvement:** |

_0000009575

| 7. | *Do not include vessel haul-out costs reported above in question 6b.* |
|---|---|
| **Expense Category** | **Repair/Maintenance/Upgrades/Improvements, 2014** |
| **Wheelhouse and Electronics** (such as Radar, GPS, VMS, sounder, radio, depth/temperature/net sensors) | $_____<br><br>☐ $0<br>**Describe Upgrade/Improvement:** |
| **Processing/ Refrigeration** (such as RSW, packaging equipment, icemaker) | $_____<br><br>☐ $0<br>**Describe Upgrade/Improvement:** |
| **Safety Equipment** (such as EPIRB, rafts, fire extinguishers, flares, survival suits) | $_____<br><br>☐ $0<br>**Describe Upgrade/Improvement:** |
| **Other Repair/maintenance or upgrade/improvement:** | $_____<br><br>☐ $0<br>**Describe Upgrade/Improvement:** |

_0000009576

## Section C: Vessel Related Costs

**8. For each expense category listed in the table below,** *please enter the total amount spent in 2014 for this vessel (and average per day cost for crew and hired captain)*. If you did not have an expense in 2014, then check $0.

| | |
|---|---|
| **Mooring/Dockage Fees** for this vessel in 2014 (including upkeep expenses):<br><br>$_____<br><br>☐  $0 | **Permit and/or License fees** for this vessel in 2014:<br><br>$_____<br><br>☐  $0 |
| **Vessel insurance premium** in 2014 for this vessel (premium paid for either hull or P & I insurance):<br><br>$_____<br><br>*Number of months insured:* _____<br><br>☐  $0 | **Quota or DAS lease payments** in 2014 for this vessel (if non-monetary payments were used to obtain quota or DAS, please estimate the value of those non-monetary payments):<br><br>$_____<br><br>☐  $0 |
| **Total payments to crew and hired captain** in 2014 for this vessel only:<br><br>Crew:  Annual $_____    Avg per day $_____<br><br><br>Hired Cpt: Annual $_____    Avg per day $_____<br>(**Do not include** what you earn when you are the captain)<br><br>☐  $0 | **Crew benefits** for this vessel in 2014 (the cost to you, as the vessel owner, for providing retirement benefits; health, life, or disability insurance premiums; and unemployment insurance for your <u>crew and hired captain</u>):<br><br><br><br><br>$_____<br><br>☐  $0 |
| **Vessel Activity/Quota Monitoring Cost** for this vessel in 2014 (such as observer or dockside monitoring cost): | **Other costs** for this vessel in 2014:<br><br>*Describe*:<br>_____ |

_0000009577

$_____

☐   $0

$_____

☐   $0

*Your responses to the survey are completely confidential*                    7

_0000009578

## **Section D: Operating Costs**

9.  **For each expense category listed in the table below, *please enter the total amount spent in 2014 for this vessel, including all payments made by you and/or the crew. Also please enter the average cost per day.***
    - If nothing was spent in a category, please check $0.
    - *We are aware that these kinds of costs may vary significantly from year to year. **Please bear in mind that this survey is about 2014 expenses only.***

| **Fuel/oil/filter** for this vessel in 2014: | **Food and Drinking Water** for this vessel in 2014: |
|---|---|
| Annual $_____  Avg per day $_____ | Annual $_____  Avg per day $_____ |
| ☐ $0  ☐ I Don't Know | ☐ $0  ☐ I Don't Know |
| **Ice** for this vessel in 2014: | **Carrier vessel fees** for this vessel in 2014: |
| Annual $_____  Avg per day $_____ | Annual $_____  Avg per day $_____ |
| ☐ $0  ☐ I Don't Know | ☐ $0  ☐ I Don't Know |
| **Fresh Water** for use in this vessel in 2014: | **Communication Costs** for this vessel in 2014 (such as cell phones, radio, VMS etc.): *Do not include office phone use.* |
| Annual $_____  Avg per day $_____ | Annual $_____  Avg per day $_____ |
| ☐ $0  ☐ I Don't Know | ☐ $0  ☐ I Don't Know |
| **General Fishing Supplies** for this vessel in 2014 (such as knives, picks, hooks, boxes, bags, ties, lobster bands, rags, tape, links/rings, lines/twine, etc.): | **General Crew Supplies** for this vessel in 2014 (such as gloves, boot liners and foul-weather gear): |
| Annual $_____  Avg per day $_____ | Annual $_____  Avg per day $_____ |
| ☐ $0  ☐ I Don't Know | ☐ $0  ☐ I Don't Know |
| **Catch Handling Costs** for this vessel in 2014 (such as auction, lumping, pumping, | **Other Costs** for this vessel in 2014: *Describe*:_____ |

*Your responses to the survey are completely confidential*                    8

_0000009579

| grading, shipping and sales rep): | | |
|---|---|---|
| Annual $_____         Avg per day $_____ | Annual $_____         Avg per day $_____ | |
| ☐ $0                ☐ I Don't Know | ☐ $0                ☐ I Don't Know | |

### <u>Section E: Typical Crew Payment System</u>

**10a.  Did you hire a captain for the majority of this vessel's trips in 2014, or were you the captain for most trips?**

    ☐ Mostly Owner-operated
    ☐ Mostly Hired Captain
    ☐ Other  _____

**10b.  On average, how many crew were on this vessel when it went out in 2014?
DO NOT COUNT YOURSELF OR THE CAPTAIN.**

    _____ Average number of crew members, not including you or the captain, in 2014

- **If you answered 0 (you had no crew in 2014), SKIP TO QUESTION 11**

- **If your answer was > 0 (you had crew in 2014), please CONTINUE WITH QUESTION 10c**

**10c.  Please use the diagram on the next page to list the types of expenses that were normally taken out of gross revenue, crew's share, and captain's share in 2014.**

    **You do not need to list the dollar amounts. Just list the *types* of expenses deducted (for example: "fuel" "ice" "food").**



*Your responses to the survey are completely confidential*          9

*NOTE: If the diagram below is not appropriate for your settlement system, please describe your system on the next page.*

_0000009581

**GROSS REVENUE**

EXPENSES YOU DEDUCT BEFORE ANY
DISTRIBUTION (list the types of expenses
only, not the amount):

_____

_____

_____

_____

_____

_____

Boat's percentage + Crew's percentage +
Captain's percentage = 100%

BOAT'S PERCENTAGE:  __ __ %

CREW'S PERCENTAGE : __ __ %

EXPENSES YOU DEDUCT FROM
CREW'S PERCENTAGE (list the
types of expenses only, not the
amount):

_____

_____

_____

_____

_____

_____

_____

CAPTAIN'S PERCENTAGE:  __ __ %

EXPENSES YOU DEDUCT FROM
CAPTAIN'S PERCENTAGE (list the
types of expenses only, not the
amount):

_____

_____

_____

_____

_____

_____

**If the diagram displayed on the previous page is not appropriate for your crew payment,
then please describe your crew payment system in the space below:**

*Your responses to the survey are completely confidential*              11

_0000009582

**10d.  Please list the *types* (not the cost) of items crew members purchase for themselves.**



Examples include: "food on day boats", "foul weather gear", "gloves", etc.
(These expenses would NOT be included in the diagram above.)

_____     _____

_____     _____

_____     _____

_0000009583

## Section F: Overall Business Cost

**11a.  Including the vessel listed in this survey, how many vessels did your fishing business operate or maintain in 2014?**

_____vessel(s) operated or maintained in 2014

**11b**. **For each expense category listed below, please enter the amount spent for either** **all your vessels** **or** **just this vessel** **in 2014. Indicate by checking the appropriate box.**
If you did not spend anything on that expense category in 2014, please check $0.

| | |
|---|---|
| **Workshop/Storage Expenses** for 2014 (such as gear shed rental and workshop expense):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Office Expenses** for 2014 (such as office supplies, office rental, home office, office utilities (such as electric, heat, etc.), postage, photocopying, computer and office phone use, excluding **communication costs**):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Business Vehicle Usage Costs** for 2014 (for fishing business related purposes only; such as number of miles the vehicle was used for business multiplied by a standard mileage rate):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Business Travel Costs** for 2014 (such as cost of lodging, travel, and transportation for business associated travel **excluding business vehicle costs**):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Association Fees Paid** in 2014 (such as co-operative, fishing organization, sector fees and union dues):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Professional Fees Paid** in 2014 (such as settlement, accounting, and legal fees):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Principal Paid on Business Loans** for 2014 (enter only payments made, *not* amount owed):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Interest Paid on Business Loans** for 2014:<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Taxes paid (income, property, etc.)** for 2014:<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Non-Crew Labor Services** for 2014 (such as night watchman, shore engineer, and office secretary):<br><br>$_____<br><br>*Describe:* _____ |

_0000009584

| | ☐ $0 | ☐ for all vessels | ☐ for this vessel only |

## Section G: Other Costs and Earnings

**12. Did you have any other costs in 2014 that we have not asked about in this survey? If so, please list them below. (Please do not report your personal costs).**

**Other costs for the <u>identified vessel</u> only:**

| Cost | Description of other annual costs incurred in 2014 |
|------|---------------------------------------------------|
| $ _____ | _____ |
| $ _____ | _____ |

**Other costs for your <u>entire business</u>:**

| Cost | Description of other annual costs incurred in 2014 |
|------|---------------------------------------------------|
| $ _____ | _____ |
| $ _____ | _____ |

**13. Please record the total gross revenue from all activities generated by this vessel in 2014.**
*(Note: Although we collect revenue information from the dealer reporting system, this question is for cross-checking our record in order to improve our overall data quality.)* **:**

Gross revenue from commercial trips:  $_____
Gross revenue from non-commercial trips (e.g. charter trips):  $_____
☐  $0  (this vessel was inactive during 2014)

**15. In the following table, Please record the number of days this vessel spent in each fishery in 2014. Be as specific as possible in the fishery description noting things such as gear type, target species, fishing region, etc.**

*Your responses to the survey are completely confidential*          14

| Fishery Description (gear/species/region) | Number of Days in 2014 |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

Thank you for your response! Please use the space below for comments.

_0000009586

# Industry-Funded Monitoring
# Omnibus Amendment
# Discussion Document

# *Herring Alternatives*

## New England Fishery Management Council
## April 19-21, 2016

## Prepared by NOAA's National Marine Fisheries Service

# 1.0   Table of Contents

1.1    INTRODUCTION ...........................................................................................................3

1.2    PURPOSE AND NEED.................................................................................................4

1.3    UPDATE ON OMNIBUS ALTERNATIVES ............................................................5

1.4    DESCRIPTION OF HERRING COVERAGE TARGET ALTERNATIVES.....................5

    1.4.1    Herring Alternative 1:  No Coverage Target for Industry-Funded Monitoring Program ...........................................................................................................................7

    1.4.2    Herring Alternative 2:   Coverage Target Specified for Industry-Funded Monitoring Program.......................................................................................................9

    1.4.3    Considered But Rejected Herring Coverage Target Alternatives........................... 25

1.5    IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES ........................... 25

    1.5.1    IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES ON BIOLOGICAL RESOURCES ................................................................................................................ 26

    1.5.2    IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES ON THE PHYSICAL ENVIRONMENT................................................................................................................ 41

    1.5.3    IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES ON HUMAN COMMUNITIES ................................................................................................................ 43

_0000010729

## 1.1   INTRODUCTION

The New England Fishery Management Council (NEFMC) is interested in increasing catch monitoring in the Atlantic Herring Fishery Management Plan (Herring FMP).  This increased monitoring would be above and beyond coverage required through the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), or Marine Mammal Protection Act (MMPA).  Limited Federal funding and legal constraints on the sharing of costs between NOAA's National Marine Fisheries Service (NMFS) and the fishing industry have recently prevented NMFS from approving new industry-funded monitoring programs. Examples of new industry-funded monitoring programs that were not approved include Amendment 5 to the Herring FMP, Amendment 14 to the Atlantic Mackerel, Squid, and Butterfish (MSB) FMP, and Framework Adjustment 48 to the Northeast Multispecies FMP.  This amendment is intended to remedy the industry-funded monitoring program disapproval in Herring Amendment 5 by establishing (1) a process by which available Federal funding could be allocated to the Herring FMP to support industry-funded monitoring and (2) an industry-funded monitoring coverage target to meet Herring FMP objectives.

Establishing monitoring coverage targets would allow NMFS to approve and implement new industry-funded monitoring programs, without committing to support industry-funded monitoring coverage targets above appropriated funding or before funding is determined to be available.

Although this action may select desired coverage targets beyond SBRM requirements, the availability of Federal funds to support industry-funded monitoring may impact the realized coverage level in any given year.  The realized coverage level for the Herring FMP in a given year may be constrained if available Federal funding falls short of NMFS cost responsibilities for administering new industry-funded monitoring programs.  During years when there is no additional funding to cover NMFS cost responsibilities above SBRM requirements, there would be no additional monitoring coverage in the herring fishery, even if industry is able to fully fund their cost responsibilities.  However, if Federal funding is available to allow NMFS to meet its administrative responsibilities for new industry-funded monitoring programs, the specified coverage target levels would likely be met.  Therefore, over time, the realized coverage level for the Herring FMP would fall between SBRM requirements and the industry-funded monitoring coverage target.

The omnibus alternatives in this amendment would apply to both NEFMC and Mid-Atlantic Fishery Management Council (MAFMC) FMPs and consider a standardized process to develop

new industry-funded monitoring programs to target coverage levels above SBRM requirements and prioritize available Federal funding across new industry-funded monitoring programs funding falls short of NMFS cost responsibilities for administering new industry-funded monitoring programs.

The omnibus alternatives include (1) standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry, (2) a process for FMP-specific industry-funded monitoring to be implemented via a future framework adjustment action, (3) standard administrative requirements for industry-funded monitoring service providers, (4) a process to prioritize available Federal funding for industry-funded monitoring across FMPs, and (5) a process for monitoring set-aside programs to be implemented via a future framework adjustment action.  Both Councils reviewed and selected preliminary preferred omnibus alternatives in early 2016.

The coverage target alternatives in this amendment would apply to the Herring and MSB FMPs and consider coverage targets to increase monitoring in these FMPs, but this document only discusses the herring coverage target alternatives.  The NEFMC recommended increased monitoring in the herring fishery to address the following goals:  1)  Accurate estimates of catch (retained and discarded), 2) accurate catch estimates for incidental species for which catch caps apply, and 3) affordable monitoring for the herring fishery.

In 2016, NMFS was awarded NMFS National Observer Program/Fishery Information System money to test electronic monitoring aboard midwater trawl vessels and build an interface to receive state portside sampling data.  NMFS will be evaluating how to use electronic monitoring to verify catch retention aboard midwater trawl vessels and how to use portside sampling data to monitor catch in the herring fishery.

## 1.2    PURPOSE AND NEED

The purpose of this action is to consider measures that would allow the NEFMC and MAFMC to develop new industry-funded monitoring programs using a standardized approach.  These programs would allow industry funding to be used in conjunction with available Federal funding to pay for additional monitoring to meet FMP-specific coverage targets.   This action is needed to allow the Councils to recommend increased monitoring above SBRM coverage levels in specific fisheries and prioritize Federal funding across new industry-funded monitoring programs when funding falls short of Federal cost responsibilities for administering new industry-funded monitoring programs.

_0000010731

**1.3   UPDATE ON OMNIBUS ALTERNATIVES**

Both the NEFMC and the MAFMC have identified a Council-led prioritization process (Omnibus Alternative 2.2) as their preliminary preferred alternative to prioritize Federal funding across new industry-funded monitoring programs when funding falls short of Federal cost responsibilities for administering new industry-funded monitoring programs.

This action may establish industry-funded monitoring coverage targets for the herring and/or mackerel fisheries.  The Council-led prioritization process would apply to those industry-funded monitoring programs, if there is a funding shortfall to support NMFS administrative cost responsibilities.  The Councils could identify a weighting approach to prioritize funding under the Council-led prioritization process alternative in this action.  Industry-funded monitoring programs for the herring and mackerel fisheries would both aim to address the following goals: 1) Accurate estimates of catch (retained and discarded), 2) accurate catch estimates for incidental species for which catch caps apply, and 3) affordable monitoring.  The Councils may want to consider specifying an equal weighting approach in this action, acknowledging that a more complex weighing approach could be developed in the future.  An example of an equal weighting approach would be funding both industry-funded monitoring programs at 70%, if only 70% of the Federal funding needed to administer both programs was available.

Revising the prioritization process (e.g., change from Council-led to NMFS-led) would be done in a future framework action.  But the Councils could change the weighting approach for the Council-led prioritization process by considering a new weighting approach at a public meeting, where public comment is taken, and asking NMFS to publish a notice or rulemaking modifying the weighting approach.  Both Councils would have to agree to any weighting approach, and an equal weighting approach specified in this action would ensure that the management objectives of both Councils are initially given equal weight.

**1.4   DESCRIPTION OF HERRING COVERAGE TARGET ALTERNATIVES**

The industry-funded monitoring coverage target alternatives for the herring fishery provide a range of data collections and monitoring costs.  This document evaluates how different coverage target alternatives meet specific monitoring goals identified by the NEFMC while comparing the costs of the monitoring programs, particularly costs that would be borne by the fishing industry.

Under any of the herring coverage target action alternatives, existing industry reporting requirements and observer coverage to meet MSA, ESA, and MMPA requirements under the no action alternative would continue.  Any information collected under the herring coverage target action alternatives would be in addition to existing reporting and monitoring.

**TABLE 1.  RANGE OF INDUSTRY-FUNDED MONITORING HERRING COVERAGE TARGET ALTERNATIVES**

| Gear Type | Purse Seine | MWT | Bottom Trawl |
|---|---|---|---|
| **Herring Alternative 1:**  No Coverage Target for IFM Program (No Action) | SBRM | SBRM | SBRM |
| **Herring Alternative 2:**  Coverage Target for IFM Program | Includes Sub-Options:   Waiver Allowed, Wing Vessel Exemption, 2 Year Sunset, 2 Year Re-evaluation, and 25 mt Threshold | | |
| **Herring Alternative 2.1:**  100% NEFOP-Level Coverage on Category A and B Vessels | 100% NEFOP-Level Observer | 100% NEFOP-Level Observer | 100% NEFOP-Level Observer |
| **Herring Alternative 2.2:**  ASM Coverage on Category A and B Vessels | [25,50,75,100%] ASM | [25,50,75,100%] ASM | [25,50,75,100%] ASM |
| **Herring Alternative 2.3:**  Combination Coverage on Category A and B Vessels and MWT Fleet | [25,50,75,100%] ASM | [50,100%] EM/Portside | [25,50,75,100%] ASM |
| **Herring Alternative 2.4:**  EM and Portside Coverage on MWT Fleet | SBRM | [50,100%] EM/Portside | SBRM |
| **Herring Alternative 2.5:**  100% NEFOP-Level Coverage on MWT Fleet in Groundfish Closed Areas[*] | SBRM | 100% NEFOP-Level Observer | SBRM |
| **Herring Alternative 2.6:**  Combination Coverage on MWT Fleet in Groundfish Closed Areas | SBRM | Coverage would match selected alternatives 2.1-2.4 | SBRM |
| * Sub-Options do not apply to Herring Alternative 2.5. | | | |

### 1.4.1   Herring Alternative 1:  No Coverage Target for Industry-Funded Monitoring Program

Under Herring Alternative 1 (No Action), there would be no coverage target specified for an industry-funded monitoring program in the Herring FMP.  Observer coverage for herring vessels would be allocated according to SBRM, and there would be no additional cost to the herring industry for monitoring coverage.   If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis.

Under SBRM, the Atlantic herring fishery receives Northeast Fisheries Observer Program (NEFOP) at-sea observer coverage under the following six fleets:  New England and Mid-Atlantic small mesh otter trawl; New England and Mid-Atlantic purse seine; and New England and Mid-Atlantic paired and single midwater trawl.  The table below describes the sea days allocated for April 2015 through March 2016.  The sea days listed below for small mesh otter trawl cover all FMPs that use this gear type, so only a portion would cover trips targeting herring.  The purse seine and midwater trawl fleets are largely comprised of vessels targeting herring, so a majority of these sea days in these categories will be used to observe trips targeting herring.

**TABLE 2.  PROPOSED AND OBSERVED SEA DAYS FOR FLEETS THAT TARGET HERRING**

| Fleet | Region | Sea Days allocated for April 2015 to March 2016 | Observed sea days, July 2013 to June 2014 | VTR sea days, July 2013 to June 2014 | Observed trips, July 2013 to June 2014 | VTR trips, July 2013 to June 2014 |
|---|---|---|---|---|---|---|
| Small Mesh Bottom Trawl | MA | 1,340 | 993 | 8,824 | 357 | 3,839 |
| Small Mesh Bottom Trawl | NE | 1,312 | 735 | 9,318 | 279 | 3,588 |
| Purse seine | MA | 6 | 0 | 231 | 0 | 229 |
| Purse seine | NE | 31 | 73 | 618 | 34 | 296 |
| Midwater Trawl (Pair and Single) | MA | 0 | 9 | 51 | 2 | 13 |
| Midwater Trawl (Pair and Single) | NE | 39 | 455 | 1,426 | 105 | 439 |

*Sources: 2015 SBRM Annual Discard Report with Observer Sea day Allocation; Wigley et al., 2015.*

Under SBRM, NEFOP observers collect the following information on declared herring trips:

- Fishing gear information (i.e., size of nets and dredges, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Retained catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Whole specimens, photos, and biological samples (i.e., scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);
- Information on interactions with protected species, such as sea turtles, marine mammals, and birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

Currently, NEFOP observers are required to possess a High Volume Fisheries (HVF) certification in order to observe the herring fishery. The HVF certification was developed in order to more effectively train certified NEFOP observers in high volume catch sampling and documentation. HVF certification allows observers to cover any of the fisheries that pump catch, typically the mid-water trawl and purse seine fleets. This certification was developed to prepare observers for changes in the regulations and new requirements that were under consideration in Herring Amendment 5.

NEFOP determined that data quality was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers. Having additional training to identify these practices allowed for improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

In order to qualify for HVF training, NEFOP observers need to be certified and in a positive data quality standing with all trip data. Prior data and data quality history are critically examined in order to determine if an observer would be a good candidate for certification.

Currently, the HVF training is conducted at the NEFOP training center in Falmouth, MA and is one day in duration. Training consists of species identification, sampling and subsampling methodologies, practice and documentation, gear identification and a review of the regulations. Regulations are discussed in order to educate observers in regard to Groundfish

Closed Area coverage, haddock and river herring/shad catch accounting, slippage and operational discarding.  Sampling and subsampling high volume catch is the main focus of training to ensure that observers understand the challenges that exist in trying to account for and accurately extrapolate catch on a haul-by-haul basis.  Training on the use of a Marel scale is also conducted as most of the high volume vessels have volunteered to keep Marel scales onboard for the observers to utilize.  An exam is administered at the end of training and if successfully completed an observer is certified to observe the high volume fisheries.

### 1.4.2   Herring Alternative 2:   Coverage Target Specified for Industry-Funded Monitoring Program

Under Herring Alternative 2, the NEFMC would specify the details of an industry-funded monitoring program for the Herring FMP.  These details may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) minimum level of coverage necessary to meet coverage goals, (4) consideration of coverage waivers if coverage target cannot be met, (5) process for vessel notification and selection, (6) process for payment of industry cost responsibilities, (7) standards for monitoring service providers, and (8) any other measures necessary to implement the industry-funded monitoring program. Additional NEPA analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying the specified industry-funded monitoring programs.

The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in a given year.  The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM and the specified coverage target.

Herring Alternative 2 would allow several sub-options to apply to the herring coverage target alternatives.  Sub-options could apply to any of the alternatives except Herring Alternative 2.5.
- Sub-Option 1 would allow vessels to be issued waivers to exempt them from industry-funded monitoring requirements, for either a trip or the fishing year, if coverage was unavailable due to funding or logistics.  Selection of this sub-option preserves the NEFMC's intent for additional monitoring in the herring fishery, but would not prevent vessels from participating in the herring fishery if monitoring coverage was not available.  Should the NEFMC not select Sub-Option 1, then fishing effort would be reduced to match the available level of monitoring (i.e., the fleet would not fish if NMFS does not have funding for the program).
- Sub-Option 2 would exempt a wing vessel pair trawling with another vessel from industry-funded monitoring requirements, provided the vessel does not carry any fish.

- Sub-Option 3 would require that industry-funded monitoring requirements expire two years after implementation.
- Sub-Option 4 would require the NEFMC to examine the results of any increased coverage in the herring fishery two years after implementation, and consider if adjustments to the coverage targets are warranted.  Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate.
- Sub-Option 5 would exempt trips that land less than 25 mt of herring from industry-funded monitoring requirements.

Omnibus Alternative 2 would include standard monitoring and service provider requirements for industry-funded monitoring, including NEFOP-level observers, at-sea monitors, electronic monitoring, and portside samplers.  (*See Appendix 1 – Monitoring and Service Provider Requirements for the details of the standard requirements.*)  If Omnibus Alternative 2 is not selected by the Councils, service provider requirements for industry-funded monitoring programs would be developed and implemented in individual FMPs.

A monitoring and service provider provision previously only considered under Herring Alternative 2 was recommended by the NEFMC in January 2016 to be included in the standard monitoring and service provider requirements in Omnibus Alternative 2.  That provision would allow NEFOP-level observers and at-sea monitors to be deployed on the same vessel for more than two consecutive multi-day trips or more than twice in a given month.

In addition to the standard monitoring and service provider requirements specified in Omnibus Alternative 2, Herring Alternative 2 would specify that industry-funded observer requirements include a HVF certification for the herring fishery

Under Herring Alternative 2, the process for vessel notification and selection and payment of industry cost responsibilities would be developed during the rulemaking and amendment approval process.

### 1.4.2.1   *Herring Alternative 2.1:  100% NEFOP-Level Observer Coverage on Category A and B Vessels*

Herring Alternative 2.1 would require vessels with All Areas (Category A) and Areas 2/3 (Category B) Limited Access Herring Permits to carry a NEFOP-level observer on every declared herring trip.

NEFOP-level observers would be required to possess a NEFOP certification, including a HVF certification, and they would collect comprehensive catch data consistent with NEFOP protocols for observer data collected under the SBRM.

Prior to any trip declared into the herring fishery, representatives for vessels with Category A and B herring permits would be required to provide notice to NMFS and request a NEFOP-level observer through the pre-trip notification system.  If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that NEFOP-level observer coverage must be procured through an industry-funded monitoring service provider.  The vessel representative would then be required to contact an industry-funded monitoring service provider to obtain and pay for a NEFOP-level observer to carry on its next fishing trip.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying a NEFOP-level observer on its next trip.

NEFOP-level observers would collect the following information on herring trips:

- Fishing gear information (i.e., size of nets and dredges, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Retained catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Whole specimens, photos, and biological samples (i.e., scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);
- Information on interactions with protected species, such as sea turtles, marine mammals, and birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

The realized observer coverage level for this alternative in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities. The realized observer coverage level would fall anywhere between SBRM coverage and 100% NEFOP-level coverage on vessels with Category A and B herring permits.

Herring Alternative 2.1 would require all vessels with Category A and B permits to carry a NEFOP-level observer on every declared herring trip.  If a NEFOP-level observer was not

available to cover a specific herring trip (either due to logistics or a lack of funding), that vessel would be prohibited from participating in the herring fishery on that trip. Acknowledging that available Federal funding to cover NMFS cost responsibilities may be limited, this alternative would likely reduce the ability of vessels with Category A and B herring permits to participate in the herring fishery, unless Sub-Option 1 was selected.

**Rationale**: Amendment 5 recommended 100% NEFOP-level observer coverage on vessels with Category A and B herring permits. The increased observer coverage recommended in Amendment 5 was intended to help determine the true nature and extent of bycatch in the fishery and better address and manage bycatch issues in the future. The requirement for 100% NEFOP-level observer coverage was recommended to apply to the most active vessels in the herring fishery. Vessels with Category A and B herring permits harvest greater than 98% of herring catch while vessels with Limited Access Herring Incidental Catch Permits (Category C) harvest only a small percentage of the overall herring catch (0.6%). Because of the costs associated with industry-funded monitoring, Herring Amendment 5 recommended limiting industry-funded observer coverage to vessels with Category A and B permits. The recommendation to increase coverage just on vessels with Category A and B permits was intended to improve catch monitoring in the herring fishery, while minimizing the negative economic impacts associated with industry-funded observer coverage on fishery-related businesses and communities.

Support for 100% NEFOP-level observer coverage on Category A and B herring vessels in Amendment 5 was driven by a majority of fishing industry stakeholders (e.g., groundfish fishing industry, recreational fishery participants, environmental advocates). Those stakeholders, as well as some members of the herring industry, believed that 100% NEFOP-level observer coverage on the most active vessels was important to either confirm or disprove the claims that have been made by many regarding bycatch in the herring fishery.

### 1.4.2.2   Herring Alternative 2.2: At-Sea Monitor Coverage on Category A and B Vessels

Herring Alternative 2.2 would require vessels with Category A and B herring permits to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS. Vessels would be selected to carry an at-sea monitor by NMFS to meet the at-sea monitor coverage target (25%, 50%, 75%, or 100%) specified in this action.

Prior to any trip declared into the herring fishery, representatives for vessels with Category A and B herring permits would be required to provide notice to NMFS and request an at-sea monitor through the pre-trip notification system. If an SBRM observer was not selected to

cover that trip, NMFS would notify the vessel representative whether or not an at-sea monitor must be procured through an industry-funded monitoring service provider.  If NMFS informs the vessel representative at-sea monitoring coverage is necessary, they would then be required to contact an industry-funded monitoring service provider to obtain and pay for an at-sea monitor to carry on its next fishing trip.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on its next trip.  If NMFS informs the vessel representative that at-sea monitoring coverage is not necessary on its next trip, NMFS would issue the vessel an at-sea monitoring coverage waiver.

At-sea monitors would collect the following information on herring trips:

- Fishing gear information (i.e., size of nets and dredges, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Biological samples (i.e., scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes) on discarded catch; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

Currently, there are slippage restrictions and reporting requirements when is an observer is aboard vessels with limited access herring permits.  Slippage restrictions and reporting requirements could be extended to vessels with at-sea monitors aboard.

The realized observer coverage level for this alternative in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities. The realized observer coverage level would fall anywhere between SBRM coverage and the specified at-sea monitoring coverage level on vessels with Category A and B herring permits.

Herring Alternative 2.2 would require all vessels with Category A and B permits to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS.  If an at-sea monitor was not available to cover a specific herring trip (either due to logistics or a lack of funding), that vessel would be prohibited from participating in the herring fishery on that trip. Acknowledging that available Federal funding to cover NMFS cost responsibilities may be limited, this alternative would likely reduce the ability of vessels with Category A and B herring permits to participate in the herring fishery, unless Sub-Option 1 was selected.

**Rationale**:  In contrast to NEFOP-level observers, at-sea monitors would only collect species composition on discarded catch, or catch that is not retained on board the vessel for any reason, including slippage events, operational discards, and catch that is sorted on board the vessel and then discarded.  The NEFMC recommended that at-sea monitors collect only a limited data set compared to NEFOP-level observers to allow for any possible cost saving associated with reducing training time, gear requirements, and internal support resources necessary to administer an at-sea monitoring program for the herring fishery.  (*See Appendix 5 – Analysis of ASM Costs for additional details.*)

### 1.4.2.3   *Herring Alternative 2.3: Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet*

**Category A and B Vessels**

Herring Alternative 2.3 would require vessels with Category A and B herring permits using purse seine and small mesh bottom trawl gear to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS.  Vessels would be selected to carry an at-sea monitor by NMFS to meet the at-sea monitor coverage target (25%, 50%, 75%, or 100%) specified in this action.

Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits using purse seine or small mesh bottom trawl gear would be required to provide notice to NMFS and request an at-sea monitor through the pre-trip notification system.  If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether or not an at-sea monitor must be procured through an industry-funded monitoring service provider.  If NMFS informs the vessel representative that they needed at-sea monitoring coverage, they would then be required to contact an industry-funded monitoring service provider to obtain and pay for an at-sea monitor to carry on its next fishing trip.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on its next trip.  If NMFS informs the vessel representative that at-sea monitoring coverage is not needed on its next trip, NMFS would issue the vessel an at-sea monitoring coverage waiver.

At-sea monitors would collect the following information on herring trips:
- Fishing gear information (i.e., size of nets and dredges, mesh sizes, and gear configurations);

- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Biological samples (i.e., scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes) on discarded catch; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

Currently, there are slippage restrictions and reporting requirements when is an observer is aboard vessels with limited access herring permits.  Slippage restrictions and reporting requirements could be extended to vessels with at-sea monitors aboard.

Herring Alternative 2.3 would require all vessels with Category A and B permits using purse seine or small mesh bottom trawl gear to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS.  If an at-sea monitor was not available to cover a specific herring trip (either due to logistics or a lack of funding), that vessel would be prohibited from participating in the herring fishery on that trip.  Acknowledging that available Federal funding to cover NMFS cost responsibilities may be limited, this alternative would likely reduce the ability of vessels to participate in the herring fishery, unless Sub-Option 1 was selected.

**Rationale**:  In contrast to NEFOP-level observers, at-sea monitors would only collect species composition on discarded catch, or catch that is not retained on board the vessel for any reason, including slippage events, operational discards, and catch that is sorted on board the vessel and then discarded.  The NEFMC recommended that at-sea monitors collect only a limited data set compared to NEFOP-level observers to allow for any possible cost saving associated with reducing training time, gear requirements, and internal support resources necessary to administer an at-sea monitoring program for the herring fishery.  (*See Appendix 5 – Analysis of ASM Costs for additional details.*)

**Midwater Trawl Fleet**

Herring Alternative 2.3 would also require midwater trawl vessels to carry an operating electronic monitoring (EM) system on every trip declared into the herring fishery and portside sampling of catch on declared herring trips selected for coverage by NMFS.   The intention of the NEFMC would be that some percentage of all declared herring trips by midwater trawl vessels would be sampled portside (50% or 100%).  However, factors such as where catch is

landed, ability to access the offload, and infrastructure limitations at certain landing ports, may prevent the program from achieving 100% coverage, even if funding is not an issue.

Prior to any trip declared into the herring fishery, representatives for vessels using midwater trawl gear would be required to have an operational EM system installed aboard their vessel and provide notice to NMFS and request a portside sampler through the pre-trip notification system.  NMFS would notify the vessel representative whether or not portside sampling coverage must be procured through an industry-funded monitoring service provider.  If NMFS informs the vessel representative that they needed portside sampling coverage, they would then be required to contact an industry-funded monitoring service provider to obtain and pay for a portside sampler for its next fishing trip.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without portside sampling of its offload on its next trip.  If NMFS informs the vessel representative that portside sampling coverage is not needed on its next trip, NMFS would issue the vessel a portside sampling coverage waiver.

*Electronic Monitoring*

Under Herring Alternative 2.3, owners or operators of vessels issued a herring permit and using midwater trawl gear would be required to install EM equipment and maintain the equipment on board for the duration of the fishing year.  Though the system would have to be installed for the duration of the fishing year, it would only need to be turned on during declared herring trips using midwater trawl gear.

Video footage would be used to confirm retention on midwater trawl trips to ensure that all catch is available to be sampled portside for a given trip.  Video footage would be recorded either throughout the duration of the trip or just around haulback.  For analysis purposes, haulback would be defined as the time gear sensors document the start of gear deployment to some set amount of time after the time gear sensors sense the end of deployment, in order to ensure that all catch has been transferred into the hold.  In addition, one wide angle camera may remain on for the duration of the trip to monitor for discard compliance.

While video footage would initially only be used to verify retention of catch for portside sampling, EM would also be evaluated for its ability to verify compliance with slippage restrictions and reporting requirements, as well as slippage consequence measures (i.e., requirements to move 15 nautical miles or terminate a fishing trip following a slippage event).  Footage would not initially be used to identify species, nor estimate the amount of catch released if a haul were slipped.  The Councils or NMFS may expand the uses of video footage to include species identification or quantification of released catch in the future if video footage

_0000010743

proves useful for these purposes. Such an expansion would be done via a framework adjustment or amendment, as appropriate.

Equipment

The EM system, installed by a NMFS-approved contractor, would be comprised of video camera(s), recording equipment, and other related equipment with the following components and capabilities:

- Video cameras. Video cameras would need to be mounted so to provide a clear, unobstructed, and well illuminated views of the area(s) where the midwater trawl gear is retrieved prior to catch being placed in the hold. There would need to be a sufficient number of cameras with sufficient resolution for NMFS, the US Coast Guard, and other authorized officers/designees to determine that all catch was brought aboard the vessel during haulback. The EM system must be capable of initiating video recording at the time gear retrieval starts, and record all periods of time when the gear is being retrieved and until catch is placed in the hold or discarded.
- Global Positioning System (GPS) receiver. A GPS receiver would be required to document coordinates, velocity, and heading data.
- Hydraulic and drum rotation sensors. Hydraulic sensors would be required to continuously monitor the hydraulic pressure. Drum rotation sensor would be required to continuously monitor drum rotations.
- EM control box. The system would need to include a control box that receives and stores the raw data provided by the sensors and cameras. The control box would need to contain removable hard drives and sufficient storage system capability to record data for the full duration of a trip (i.e., the longest expected trip length for the vessel).
- EM systems monitor. A wheelhouse monitor would be necessary to provide a graphical user interface for the vessel operator to monitor: 1) The state and performance of the control box, 2) information on the current date and time synchronized via GPS, 3) GPS coordinates, 4) current hydraulic pressure reading, 5) presence of a data disk, 6) percentage used of the data disk, 7) and video recording status.

NMFS would announce specifics about this equipment list, as well as any additional design requirements for the EM system, during the rulemaking and implementation process. Industry will be responsible for contracting with a NMFS-approved provider for technical and maintenance services.

_0000010744

Data Transfer

After completing a fishing trip, a vessel representative would be required to mail or transmit the removable EM system hard drive(s) containing all data to NMFS or a NMFS-approved contractor, according to instructions provided by NMFS.  The method of transfer that would be allowed under the EM program would be developed during implementation.  Prior to departing on a subsequent trip, a vessel representative would be required to install a replacement EM system hard drive(s) to enable data collection and video recording.  A vessel representative would be responsible for contacting NMFS or a NMFS-approved contractor if they have requested but not received a replacement hard drive(s) and for informing NMFS or NMFS-approved contractor of any lapse in the hard drive management procedures described in the vessel monitoring plan.

Retention Requirements

Initially, Herring Alternative 2.3 would maintain the existing retention requirements for the midwater trawl fleet.  Vessels would continue to operate under the regulations and possession limits for any fisheries for which they possess permits.  Currently, there are slippage restrictions and reporting requirements when is an observer is aboard vessels with limited access herring permits.  Slippage restrictions and reporting requirements could be extended to vessels with EM on trips that are selected for portside sampling.  There are also some statutory measures under the ESA and MMPA that may dictate retention of protected species.

Review of EM Video Footage

Video footage would be subsampled at a predetermined percent of review (50% or 100%) and then compared to released catch affidavits, VMS reports describing slippage events, and/or observer data on slippage.  Relatively high rates of review may be required to confirm discarding is not happening because discard events are relatively rare.  The rate of review may be adjusted by NMFS during implementation, in cooperation with Council staff, to use the optimum and most cost effective rate to achieve management goals.

Compliance Measures

Rates of video collection and/or subsampling could be increased is there is evidence of non-compliance.  For example, if a vessel is found to have undocumented discarding events on more than a specified number of trips during a fishing year, then the vessel could be subject to increased rates of video collection and/or review for all subsequent fishing trips at the vessel

_0000010745

owner's expense for the remainder of the season and the next season, or until NMFS has determined that review levels can return to the original specified level.

<u>Vessel Monitoring Plans (VMPs)</u>

Individual Vessel Monitoring Plans (VMPs) would serve as a clear plan for discard documentation, installation and maintenance, protocols for data storage and transfer, and other important information regarding a vessel's EM system.  Each vessel operator or owner would be responsible for working with NMFS or a NMFS-approved contractor to develop a VMP, and would be required to keep the VMP aboard the vessel at all times.  NMFS would specify VMP requirements in the regulations.  VMPs may include, but are not limited to, information on the locations of EM system components, contact information for technical support, instructions on how to conduct a pre-trip system test, instructions on how to verify proper system functions, location(s) on deck where fish retrieval should occur to remain in view of the cameras, procedures for how to manage EM system hard drives, catch handling procedures, periodic checks of the monitor during the retrieval of gear to verify proper functioning, and reporting procedures.  The VMP should minimize, as much as possible, any impact on the current operating procedures of the vessel, and should help ensure the safety of the crew.  NMFS or a NMFS-approved contractor would review VMPs biennially prior to the start of the upcoming fishing year.

*Portside Sampling*

Under Herring Alternative 2.3, vessels with herring permits using midwater trawl gear would be subject to portside sampling requirements for declared herring trips selected for coverage by NMFS.  Portside sampling would be used to verify the amount and species composition of catch in the herring fishery and help track catch against catch caps for haddock and river herring and shad.  Portside samplers would also collect biological information (i.e., age and length data).

<u>Sampling Design</u>

The sampling design for portside sampling alternatives would be based on the existing portside sampling programs for the herring fishery, administered by the states of Massachusetts Division of Marine Fisheries and Maine Department of Marine Resources, and consistent with NEFOP sampling methodology.  Midwater trawl vessels returning from a declared herring trip would be sampled portside during the offload.  Initially, the level of sampling for midwater trawl trips would be approximately 50% or 100%.  However, the sampling rate may be adjusted by NMFS during implementation, in cooperation with Council staff, to use the optimum and most cost

effective rate to achieve management goals.  Such factors such as where catch is landed, ability to access the offload, and infrastructure limitations at certain landing ports, may prevent the program from achieving 100% coverage, even if funding is not limiting.

Basket samples would be collected from the vessel's dewatering box at specified intervals throughout the duration of the offload.  Basket samples would be sorted and weighed by species and extrapolated based on vessel hail weight to represent the total trip.  Actual weights could be verified using the vessel trip report and/or dealer data.  Age and length data would be collected consistent with NEFOP sampling methodology.

Landing Ports

Midwater trawl vessels returning from declared herring trips would be required to land catch in specific ports.  In past years, the midwater trawl fleet has landed catch in Maine (Portland, Rockland, Vinalhaven, Prospect Harbor, Jonesport, Milbridge), New Hampshire (Newington), Massachusetts (Boston, Gloucester, New Bedford), Rhode Island (Point Judith, North Kingston), and New Jersey (Cape May).  The list of specific landing ports and the details of offloading requirements in those ports would be developed as part of this amendment.  Alternatives that include portside sampling are not intended to restrict the landing and offloading behavior of midwater trawl vessels.  However, if certain ports are not suitable for portside sampling, then vessels may not be able to land in those ports on trips that are selected for portside sampling. If portside sampling is selected as a preliminary preferred alternative for the herring fishery, then NMFS would further evaluate how to enable portside sampling in all midwater trawl landing ports.

Vessel Responsibilities

Midwater trawl vessels would be responsible for offloading catch consistent with offloading requirements and contacting a service provider to arrange a portside sampler to sample catch from declared herring trips.

Herring Alternative 2.3 would require midwater trawl vessels to carry an operating EM system on every trip declared into the herring fishery and portside sampling of catch on every declared herring trip selected for coverage by NMFS.  If an operating EM system or portside sampler was not available to cover a specific herring trip (either due to logistics or a lack of funding), that vessel would be prohibited from participating in the herring fishery on that trip.  Acknowledging that available Federal funding to cover NMFS cost responsibilities may be limited, this

_0000010747

alternative would likely reduce the ability of vessels to participate in the herring fishery, unless Sub-Option 1 was selected.

As recommended by the NEFMC, Herring Alternative 2.3 would have a pre-implementation plan to help the industry understand any new EM and portside monitoring requirements and become compliant with sampling equipment, notification, sampling, and reporting requirements.

**Rationale**:  Because the midwater trawl fleet discards only a small percentage of its catch at sea, EM and portside sampling have the potential to be a cost effective way to address monitoring goals for the midwater trawl fleet harvesting herring.  EM would be used to verify retention of catch on the midwater trawl fleet and portside sampling would be used to verify amount and species composition of landed catch.

The implementation of EM in the herring fishery would be based on the ongoing EM exempted fishing permit program for the West Coast whiting fishery that is expected to be transitioned into regulation by 2017.  The implementation of portside sampling in the herring fishery would be based on the existing portside sampling program for the midwater trawl fleet operated by the Massachusetts Division of Marine Fisheries and Maine Department of Marine Resources.

### 1.4.2.4    *Herring Alternative 2.4: Electronic Monitoring and Portside Sampling on the Midwater Trawl Fleet*

Herring Alternative 2.4 would require midwater trawl vessels to carry an operating EM system on every trip declared into the herring fishery and portside sampling of their catch on declared herring trips selected for coverage by NMFS.   The intention of the NEFMC would be that some percentage of all declared herring trips by midwater trawl vessels would be sampled portside (approximately 50% or 100%).  However, the sampling rate may be adjusted by NMFS during implementation, in cooperation with Council staff, to use the optimum and most cost effective rate to achieve management goals.  Such factors as where catch is landed, ability to access the offload, and infrastructure limitations at certain landing ports, may prevent the program from achieving 100% coverage, even if funding is not an issue.  For complete details of EM and portside sampling, see the description of Herring Alternative 2.3.

Herring Alternative 2.4, similar to Herring Alternative 2.3, would require midwater trawl vessels to carry an operating EM system on every trip declared into the herring fishery and portside sampling of their catch on every declared herring trip selected for coverage by NMFS.  If an operating EM system or portside sampler was not available to cover a specific herring trip (either due to logistics or a lack of funding), that vessel would be prohibited from participating

_0000010748

in the herring fishery on that trip.  Acknowledging that available Federal funding to cover NMFS cost responsibilities may be limited, this alternative would likely reduce the ability of vessels to participate in the herring fishery, unless Sub-Option 1 was selected.

As recommended by the NEFMC, Herring Alternative 2.4 would have a pre-implementation plan to help the industry understand any new EM and portside monitoring requirements and become compliant with sampling equipment, notification, sampling, and reporting requirements.

**Rationale**:  Because the midwater trawl fleet discards only a small percentage of its catch at sea, EM and portside sampling have the potential to be a cost effective way to address monitoring goals for the midwater trawl fleet harvesting herring.  EM would be used to verify retention of catch on the midwater trawl fleet and portside sampling would be used to verify amount and species composition of landed catch.

The implementation of EM in the herring fishery would be based on the ongoing EM exempted fishing permit program for the West Coast whiting fishery that is expected to be transitioned into regulation by 2017.  The implementation of portside sampling in the herring fishery would be based on the existing portside sampling program for the midwater trawl fleet operated by the Massachusetts Division of Marine Fisheries and Maine Department of Marine Resources.

### 1.4.2.5   *Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas*

Herring Alternative 2.5 would require vessels fishing with midwater trawl gear in the Groundfish Closed Areas to carry a NEFOP-level observer.  The sub-options (i.e., waiver allowed, wing vessel exemption, 2 year sunset, 2 year evaluation, and 25 mt threshold) described under Herring Alternative 2 would not apply to Herring Alternative 2.5.

The Groundfish Closed Areas include:  Closed Area I, Closed Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and Western Gulf of Maine Closure Area.

Prior to any Groundfish Closed Area trip declared into the herring fishery, representatives for vessels with midwater trawl gear would be required to provide notice to NMFS and request a NEFOP-level observer through the pre-trip notification system.  If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that NEFOP-level observer coverage must be procured through an industry-funded at-sea monitoring service provider.  The vessel representative would then be required to contact an industry-funded monitoring service provider to obtain and pay for a NEFOP-level observer to carry on its next

_0000010749

fishing trip within a Groundfish Closed Area.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring on any trip within a Groundfish Closed Area without carrying a NEFOP-level observer for that trip.

NEFOP-level observers would collect the following information on herring trips in Groundfish Closed Areas:

- Fishing gear information (i.e., size of nets and dredges, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Retained catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Whole specimens, photos, and biological samples (i.e., scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);
- Information on interactions with protected species, such as sea turtles, marine mammals, and birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

Herring Alternative 2.5 would require vessels fishing with midwater trawl gear in the Groundfish Closed Areas to carry a NEFOP-level observer.  If a NEFOP-level observer was not available to cover a specific herring trip inside a Groundfish Closed Area (either due to logistics or a lack of funding), that vessel would be prohibited from fishing inside a Groundfish Closed Area on that trip.  Acknowledging that available Federal funding to cover NMFS cost responsibilities may be limited, this alternative would likely reduce the ability of the midwater trawl fleet to participate in the herring fishery inside the Groundfish Closed Areas.

**Rationale**:  The requirement that midwater trawl vessels fishing in the Groundfish Closed Areas carry a NEFOP-level observer was established in Herring Amendment 5.  Analyses in Amendment 5 suggest that midwater trawl vessels are not catching significant amounts of groundfish either inside or outside the Groundfish Closed Areas.  Additionally, the majority of groundfish catch by midwater trawl vessels is haddock, and the catch of haddock by midwater trawl vessels is already managed through a haddock catch cap for the herring fishery.  However, the rationale in Amendment 5 described the importance of determining the extent and nature of bycatch in the herring fishery.  This alternative would still allow the herring midwater trawl

fishery to operate in the Groundfish Closed Areas, but it would ensure that opportunities for sampling are maximized.

Revisions to the SBRM in April 2015 affected how funding is used to allocate observer coverage, such that SBRM funding must first be used to provide SBRM coverage.  SBRM coverage is used to estimate amount of fish discarded at sea.  Since midwater trawl vessels generally discard only a small percentage of catch at sea, SBRM coverage allocated to midwater trawl vessels is relatively low compared to coverage allocated to other gear types that have higher discard rates.  Thus, the realized coverage level of midwater trawl vessel fishing in Groundfish Closed Areas will only be equivalent to SBRM coverage aboard midwater trawl vessels and much less than 100% observer coverage.  This alternative was added to this amendment as a way to increase observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.

### 1.4.2.6   Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas

Herring Alternative 2.6 would require vessels fishing with midwater trawl gear in the Groundfish Closed Areas to comply with any at-sea monitoring or EM and portside monitoring requirements specified for the herring fishery in this amendment.

Prior to any Groundfish Closed Area trip declared into the herring fishery, representatives for vessels with midwater trawl gear would be required to provide notice to NMFS and request the appropriate type of industry-funded monitoring coverage through the pre-trip notification system.  If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that industry-funded monitoring coverage must be procured through an industry-funded at-sea monitoring service provider.  The vessel representative would then be required to contact an industry-funded monitoring service provider to obtain and pay the appropriate type of industry-funded monitoring coverage to carry on its next fishing trip within a Groundfish Closed Area.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring on any trip within a Groundfish Closed Area without the appropriate type of monitoring coverage for that trip.

Herring Alternative 2.6 would require vessels fishing with midwater trawl gear in the Groundfish Closed Areas to comply with any as-sea monitoring or EM and portside monitoring requirements specified for the herring fishery in this amendment.  If the appropriate type of monitoring coverage was not available to cover a specific herring trip inside a Groundfish Closed Area (either due to logistics or a lack of funding), that vessel would be prohibited from fishing inside a Groundfish Closed Area on that trip.  Acknowledging that available Federal funding to cover NMFS cost responsibilities may be limited, this alternative would likely reduce

_0000010751

the ability of the midwater trawl fleet to participate in the herring fishery inside the Groundfish Closed Areas, unless Sub-Option 1 was selected.

**Rationale**:  This alternative was recommended by the NEFMC to balance stakeholder interest in additional catch monitoring on midwater trawl vessels with the ability of the herring fishery to operate within the Groundfish Closed Areas and the economic impacts of paying for monitoring on trips within the Groundfish Closed Areas.

### 1.4.3   Considered But Rejected Herring Coverage Target Alternatives

The alternative specifying NEFOP-level observer coverage on the midwater trawl fleet to obtain a 30% coefficient of variation (CV) on river herring and shad catch was considered but rejected by the NEFMC.

The monitoring of river herring and shad catch in the herring fishery was identified as a Herring FMP need in Amendment 5.  This alternative was developed from an analysis that evaluated catch of river herring and shad in the herring and mackerel fisheries and was designed to complement SBRM coverage.

This alternative would have focused observer coverage on the midwater trawl fleet because that fleet catches the majority of river herring and shad (57%).  Additionally, consistent with the need identified in Amendment 5 to monitor all catch in the herring fishery, this alternative would have focused coverage on the fleet that catches the majority of the herring harvest (73%) and on the vessels with Category A and B permits that harvest the majority of the herring harvest (83%).  Based on 2013 data, the percent coverage to achieve a 30% CV on river herring and shad catch by the midwater trawl fleet would have been up to 61%.

The NEFMC recommended this alternative be considered but rejected because it was not considered consistent with the goals of Herring Amendment 5 and it could not be revised to apply only to vessels with Category A and B herring permits.

## 1.5   IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES

This section considers the potential impacts of alternatives considered by the NEFMC to specify industry-funded monitoring coverage targets for the herring fishery on valued ecosystem components (VEC), including target species, non-target species, protected species, physical environment, and human communities.

For each VEC, the impacts associated with Herring Alternatives 1 and 2 will be discussed, followed by a discussion of impacts associated with Herring Alternatives 2.1-2.6.

## 1.5.1   IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES ON BIOLOGICAL RESOURCES

When evaluating industry-funded monitoring for the herring fishery, one major consideration is whether a monitoring alternative provides the type and quality of data necessary to meet the Council's information collection goals for the herring fishery.

**Allocation of Monitoring Coverage**

The allocation of monitoring, or the basis of selecting a vessel for monitoring coverage, affects how the resulting data can be used for management.

Under SBRM, vessels are selected for observer coverage by fishing fleet (based on gear, mesh and area), not based on FMP or permit category.  Valid estimates of catch or bycatch (and their variances) rely on formulas that are consistent with the underlying sampling design.  Estimates that are inconsistent with the sampling design may be biased, which may impact the utility of the data.

Observed trips that were selected for coverage based on permit category, and not fleet, may be treated separately by the Northeast Fisheries Science Center in catch and bycatch analyses. These data may not be used in stock assessments or total catch estimation because the vessel selection for observer coverage is no longer done in a randomized way and is inconsistent with SBRM's sampling design.  Data collected by permit category could be used to track catch against annual catch limits (ACLs) or fishery catch caps that are specific to the permits that are being targeted for coverage because the data collection and catch estimation method would match.  However, the utility of data collected by permit category would likely be limited as compared to data that were collected by fishing fleet because the catch estimate method does not match SBRM's sampling design.

To summarize, the decision to allocate observer coverage by FMP (i.e., permits) or fishing fleet depends on the objectives of the additional coverage and how the data will subsequently be used.  If one of the objectives of additional coverage is to improve catch estimates for use in stock assessments, and not just solely for monitoring harvest, then monitoring coverage should be allocated by fishing fleet and not FMP, fishery, or permit category.

**Table 3.  PROS AND CONS OF ALLOCATING MONITORING COVERAGE BY PERMIT VERSUS FLEET**

| | Pros | Cons |
|---|---|---|
| **Permit-Based Coverage Target Alternatives** | Councils manage fisheries by FMP and vessel permit | Not consistent with how SBRM allocates observers |
| | Can be used to monitor FMP-specific quotas and catch caps | Resulting data may be biased and not used for stock assessment and/or total removals |
| | Can be used to monitor FMP-specific quotas and catch caps | Difficult to design, deploy and analyze results because vessels typically don't structure trips by permit category |
| **Fleet-Based Coverage Target Alternatives** | Consistent with how SBRM allocates observer coverage | Typically extends across FMPs |
| | Resulting data may be combined with SBRM data for stock assessments and/or total removals | Not consistent with how Councils manage fisheries by FMP and vessel permit |

**Type of Information Collected**

Different types of monitoring can provide different kinds of information with varying levels of verification (Table 4.)

Currently, vessel trip reports (VTRs) provide information on fishing effort, retained catch, and discarded catch.  Dealer reports provide information on retained catch and vessel monitoring systems (VMS) provided information on fishing location and behavior.  Affidavits of slippage events and discard reports can provide details of why slippage and/or discard events occur.

Under the industry-funded herring coverage target alternatives, NEFOP-level observers and at-sea monitors would both provide information on fishing effort.  NEFOP-level observers and portside samplers would be collecting species composition and biological information on retained catch, while at-sea monitors would be collecting species and biological information on discarded catch.   EM would be used to confirm retention of catch.

**TABLE 4.  COMPARISON OF INFORMATION COLLECTED ACROSS HERRING COVERAGE TARGET ALTERNATIVES**

| Herring Data Interests | Current Information Collections That Would Continue Under Any Alternative | HER Alt 1 | HER Alt 2.1 | HER Alt 2.2 | HER Alt 2.3 | HER Alt 2.4 | HER Alt 2.5 |
|---|---|---|---|---|---|---|---|
| | | | Ability to meet data interest: ☐ High  ☐ Medium  ☐ Low  ■ N/A | | | | |
| | | No Action (NEFOP coverage for SBRM only) | 100% NEFOP on Category A and B Vessels | ASM (25, 50, 75, or 100%) on Category A and B Vessels | EM/Portside on MWT Vessels<br><br>ASM (25, 50, 75, or 100%) on other Category A and B vessels | EM/Portside on MWT vessels | 100% NEFOP On MWT Vessels Fishing in Groundfish Closed Areas |
| Retained Catch | • Vessel trip reports<br>• Dealer reports<br>• VMS catch reports | Information on effort, area, gear, and economics<br><br>Species composition data | Information on effort, area, gear, and economics<br><br>Species composition data | Information on effort, area, gear, and economics<br><br>Confirm retention | ASM - Information on effort, area, gear, economics; confirms retention<br><br>EM/Portside - Confirms retention; species composition data | Confirms retention<br><br>Species composition data | Information on effort, area, gear, and economics<br><br>Species composition data |
| Discarded Catch | • Vessel trip reports<br>• VMS catch reports | Discard estimate<br><br>Species composition of discarded catch | Discard estimate<br><br>Species composition of discarded catch | Discard estimate<br><br>Species composition of discarded catch | ASM - Discard estimate; species composition data on discarded catch<br><br>EM - Flags discarding | Flags discarding | Discard estimate<br><br>Species composition of discarded catch |
| Haddock Catch Cap Monitoring | • Vessel trip reports<br>• Dealer reports<br>• VMS catch reports<br>• Affidavits | Species composition of retained catch | Species composition of retained catch | Discard estimate<br><br>Species composition of discarded catch | ASM - Discard estimate; species composition data on discarded catch<br><br>EM/Portside - Confirms retention; species composition data on retained catch | Confirms retention<br><br>Species composition of retained catch | Species composition of retained catch |
| River Herring and Shad Catch Cap Monitoring | • Vessel trip reports<br>• Dealer reports<br>• VMS catch reports<br>• Affidavits | Species composition of discarded catch | Species composition of discarded catch | | | | Species composition of discarded catch |
| Stock Assessments | • Vessel trip reports | Age and length data on catch | Age and length data on catch | Age and length data on discarded catch | ASM - Age and length data on discarded catch<br><br>EM/Portside - Age and length data on retained catch | Age and length data on retained catch | Age and length data on catch |

Data collected under HER Alt 2.6 would be consistent with the data collected by ASM (25, 50, 75, 100%) or EM/PRT on MWT vessels fishing in Groundfish Closed Areas.

**Tracking Catch Against Herring Fishery Catch Caps**

Herring Alternatives 2.1-2.4 were evaluated with regard to their impact on monitoring catch caps (haddock and river herring and shad) in the herring fishery. The intent of this analysis is to provide a general characterization of how different alternatives would affect the precision of catch estimates tracked against catch caps. Fishing year (FY) 2015 data were used because haddock and river herring/shad catch caps were in effect for the herring fishery in 2015 and 2015 is the most recent available data. River herring/ shad catch data were from January 1 to December 31, 2015, while haddock data were from May 1, 2015 to March 2, 2016. Due to restrictions placed on the Georges Bank Haddock Accountability Measure Area in October 2015 and the low probability of midwater trawl fishing in the Gulf of Maine, catch tracked against the catch caps is unlikely to change between March 2, 2016, and April 30, 2016. The FY2015 catch data are not finalized and should be considered preliminary.

Estimates of catch tracked against herring fishery catch caps are comprised of both retained and discarded components. In FY2015, incidental retained catch accounted for greater than 99% of the total catch tracked against all catch caps, except for river herring/shad small mesh bottom trawl cap in Southern New England where retained catch accounted for 87% of total catch (Table 1).

**TABLE 5. SUMMARY OF PRELIMINARY FY2015 CATCH TRACKED AGAINST CATCH CAPS**

| Catch Cap Fishery | Catch Cap (mt) | Discard (mt) | Incidental Kept (mt) | Catch (mt) |
|---|---|---|---|---|
| Haddock:  Gulf of Maine Midwater Trawl | 14 | 0.0 | 0.0 | 0.0 |
| Haddock:  Georges Bank Midwater Trawl | 227 | 0.6 | 235.0 | 235.5 |
| Herring-River Herring/Shad: Gulf of Maine Midwater Trawl | 86 | 0.0 | 11.1 | 11.1 |
| Herring-River Herring/Shad: Cape Cod Midwater Trawl | 13 | 0.0 | 0.7 | 0.7 |
| Herring-River Herring/Shad: Southern New England Bottom Trawl | 89 | 13.1 | 87.6 | 100.7 |
| Herring-River Herring/Shad: Southern New England Midwater Trawl | 124 | 0.1 | 63.9 | 64.0 |

Source: GARFO Quota Monitoring Database Archives

Because of the relatively minor influence discards have on total catch tracked against catch caps, catch estimate precision will be sensitive to the type of coverage (NEFOP-level observer, at-sea monitor, or EM and portside) specified in each alternative. Alternatives that increase at-sea monitoring coverage are likely to produce minimal precision improvements, compared to those focusing on NEFOP-level observer coverage or EM/portside sampling coverage. This is because at-sea monitors will only quantify discard catch composition, not retained catch composition, which would be collected by NEFOP-level observers and portside samplers.

The coefficient of variation (CV) is defined for this analysis as the ratio of the standard error of total catch (incidental retained and discards) to estimated total catch is commonly used to quantify the precision of the estimated catch.  The CV is sensitive to sample size.  In a finite population the CV will converge to zero as the sample size approaches the population size.  The total fishing trips within a stratum is considered finite, therefore as sampling coverage approaches 100%, the CV will converge to zero for that stratum.  However, it is important to understand that this dynamic only holds for sampling regimes that capture both retained and discarded catch composition.  Sampling regimes that only capture one of these components (retained or discarded) will only improve that component's precision, while leaving the precision of the other component unchanged.

For the purpose of this discussion, it was assumed that at-sea monitors would collect data on discarded catch similar to NEFOP-level observers and the vessel estimate would be used for retained catch information for each haul.  An EM and portside sampling program does not currently exist for the herring fishery, therefore, its performance is unknown.  For the purpose of this discussion, it was assumed that EM and portside sampling would collect data on retained and discarded catch similar to NEFOP-level observers.  Thus, for Alternatives 2.3 and 2.4, 100% NEFOP-level observer coverage is used as a proxy for 100% EM and portside sampling coverage.

*Herring Alternative 2.1:  100% NEFOP-Level Coverage on Category A and B Vessels*

Herring Alternative 2.1 would likely produce CVs of zero for FY2015 haddock and midwater trawl river herring/shad catch caps.  All of the FY2015 trips subject to these catch caps were by Category A and B vessels, therefore, under 100% NEFOP-level observer coverage, the CV will converge to zero.  The river herring/shad bottom trawl cap for Southern New England was the only catch cap with catch by vessels other than Category A and B vessels, therefore, not all trips that would count against catch caps would be covered by Herring Alternative 2.1.  This causes the CV for bottom trawl catch cap estimates to decline, but not converge to zero.

Catch caps apply to trips landing more than 6,600 lb of herring or, in general, to trips by vessels with limited access herring permits (Category A- C).  One hundred percent sampling of Category A and B vessels may bias the catch estimate tracked against catch caps by over sampling Category A and Be vessels (100% coverage) relative to Category C vessels (SBRM coverage).

*Herring Alternative 2.2:  25%-100% ASM Coverage on Category A and B Vessels*

Herring Alternative 2.2 will likely have a negligible impact on CVs for catch estimates tracked against catch caps for all proposed coverage targets (25%-100) because FY2015 discards

_0000010757

comprise less than 1% of total catch for most catch caps.  The river herring/shad bottom trawl cap in Southern New England is the only catch cap with a substantial discard component; therefore, the impact on the CV for the catch estimate tracked against this cap may be low positive.  Furthermore, the sampling bias (described above) towards Category A and B vessels may have more impact on catch estimation than any improvement in CV from increased sampling of the discarded portion of the catch.

*Herring Alternative 2.3:  Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet*

Assuming EM and portside sampling is analogous to NEFOP-level observer coverage, Herring Alternative 2.3 would likely produce CVs of zero for haddock and midwater trawl river herring/shad catch caps covered by 100% EM and portside sampling.  The river herring/shad bottom trawl cap in Southern New England is the only catch cap that would not be covered by 100% EM and portside sampling.  The impact on the CV for the catch estimate tracked against the river herring/shad bottom trawl cap in Southern New England will be similar to Herring Alternative 2.2 at low positive.

*Herring Alternative 2.4:  EM and Portside Coverage on Midwater Trawl Fleet*

Assuming EM and portside sampling is analogous to NEFOP-level observer coverage, Herring Alternative 2.4 would likely produce CVs of zero for haddock and midwater trawl river herring/shad catch caps covered by 100% EM and portside sampling.  The CV for catch estimates tracked against the river herring/shad bottom trawl cap in Southern New England would not be affected by this alternative because EM and portside sampling would not apply to bottom trawl gear.

**TABLE 6.  SUMMARY OF BIOLOGICAL IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES**

| Alternatives | Impacts on Herring Resource, Non-Target Species, and Protected Species |
|---|---|
| Herring Alternative 1:  No Coverage Target Specified For IFM Programs  (No Action) | • Low positive impact associated with observer coverage allocated by SBRM<br>• Low negative impact associated with no additional monitoring to reduce uncertainty around catch estimates |
| Herring Alternative 2:  Coverage Target Specified For IFM Programs | • Positive impact associated with additional monitoring to reduce uncertainty around catch estimates<br>• Low negative impact associated with no additional monitoring unless available Federal funding can cover NMFS cost responsibilities<br>• Magnitude of impacts associated with additional monitoring would be primarily dependent on the type of information collected, amount of coverage, and amount of available Federal funding<br>• Positive impact associated with Sub-Option 1 not being selected if fishing effort is limited and reproductive potential of herring, non-target species, and protected species is increased<br>• Negative impact associated with Sub-Option 5 if it biases data used to track catch against catch caps |
| Herring Alternative 2.1:  100% NEFOP-Level Coverage on Category A and B Vessels | • Low positive impact associated with additional information to reduce uncertainty of catch estimates for Category A and B vessels and to track catch against catch caps<br>• Positive impact if fishing effort is limited and reproductive potential of herring, non-target, and protected species is increased |
| Herring Alternative 2.2:  ASM Coverage on Category A and B Vessels | • Negligible impact associated with additional information to reduce uncertainty of discard estimates associated with Category A and B vessels and to track discards against catch caps<br>• Positive impact if fishing effort is limited and reproductive potential of herring, non-target, and protected species is increased |
| Herring Alternative 2.3:  Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | • Positive impact associated with additional information to reduce uncertainty around catch estimates associated with the midwater trawl fleet  and to track catch against catch caps<br>• Negligible impact associated with additional information to reduce uncertainty of discard estimates associated with Category A and B vessels and to track discards against catch caps<br>• Positive impact if fishing effort is limited and reproductive potential of herring, non-target, and protected species is increased |
| Herring Alternative 2.4:  EM and Portside Sampling on Midwater Trawl Fleet | • Positive impact associated with additional information to reduce uncertainty around catch estimates associated with the midwater trawl fleet and to track catch against catch caps<br>• Positive impact if fishing effort is limited and reproductive potential of herring, non-target, and protected species is increased |
| Herring Alternative 2.5:  100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | • Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with the midwater trawl fleet and to track catch against catch caps<br>• Negligible impact associated with changes in fishing effort |
| Herring Alternative 2.6:  Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | • Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with the midwater trawl fleet and to track catch against catch caps<br>• Negligible impact associated with changes in fishing effort |

### 1.5.1.1  Impacts of Herring Alternatives 1 and 2 on Biological Resources

For the purposes of this discussion, biological resources include the herring resource, non-target species, and protected species.  The non-target species of interest that are harvested by the herring fishery are haddock, river herring and shad, and mackerel.  Protected species include fish, turtles, and marine mammals listed under the ESA and marine mammals protected under the MMPA.

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP.  Monitoring for herring vessels would be allocated according to SBRM.  If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM.  The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries.  The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species.  Although management measures are typically developed and implemented on an FMP-specific basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

For example, New England vessels using extra-large mesh gillnets catch monkfish, skates, and Northeast multispecies, often on the same fishing trip, and, therefore, most participants in this fishery must operate according to the regulations implemented under three different FMPs.  To distinguish between the management units identified in individual FMPs and the fisheries that operate under one or more FMPs, the SBRM is designed around "fishing modes" defined by the type of fishing gear used and the area from which the vessels depart.

There are 56 fishing modes defined in the SBRM, some of which further subdivide a fishery by the mesh size of the gear used (for gillnets and otter trawls), or by the type of permit and access area program (for sea scallop dredges).  Although there are differences among the modes, the participants in these fishing modes fish throughout the Gulf of Maine, Georges Bank, and the Mid-Atlantic Bight, and land their catch across a large number of fishing ports from the Outer Banks of North Carolina to Downeast Maine.  The SBRM is limited to those fisheries that are prosecuted in the Federal waters of the Greater Atlantic Region and managed

through a FMP developed by either the MAFMC or NEFMC. Current observer coverage allocated to the herring fishery through SBRM is described in Table 2.

The herring fishery is managed through a stock-wide ACL (reduced from the overfishing limit and acceptable biological catch to address scientific uncertainty and management uncertainty) and sub-ACLs (allocated by herring management area) that are designed to prevent overfishing on individual stock components. Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 will not likely affect the setting of herring harvest specifications, but it may affect the ability of the herring fishery to fully harvest the ACLs if less monitoring (when compared to Herring Alternative 2) results in catch caps for haddock and river herring/shad limiting effort in the herring fishery.

The catch of mackerel in the herring fishery is managed by the MAFMC in the mackerel fishery specifications and the catch of haddock in the herring fishery is managed by the NEFMC in the Northeast multispecies specifications. The catch of haddock, river herring, and shad in the herring fishery is managed by fishery specific catch caps established by the NEFMC. Selection of Herring Alternative 1 will not likely affect the setting of harvest specifications for mackerel or haddock, but less monitoring (when compared to Herring Alternative 2) may affect the ability to track catch against fishery specific catch caps.

Under Herring Alternative 2, the NEFMC would specify the details of an industry-funded monitoring program for the Herring FMP. These details may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) minimum level of coverage necessary to meet coverage goals, (4) consideration of coverage waivers if coverage target cannot be met, (5) process for vessel notification and selection, (6) process for payment of industry cost responsibilities, (7) standards for monitoring service providers, and (8) any other measures necessary to implement the industry-funded monitoring program. Additional NEPA analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying the specified industry-funded monitoring programs.

Herring Alternative 2 is intended to allow for additional monitoring in the herring fishery by specifying coverage targets, above SBRM (Herring Alternative 1), for industry-funded monitoring. The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year. The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM and the specified coverage target. If Federal funding is available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, Herring Alternative 2 may

have a positive impact on biological resources by increasing monitoring in the herring fishery. While the benefits to the biological resources may be difficult to quantify under Herring Alternative 2, they may not be realized under Herring Alternative 1.

Under Herring Alternative 2, long-term benefits to the biological resources would vary with the type and amount of monitoring coverage target specified for the herring fishery but could result from increased monitoring to verify catch and bycatch. As catch information increases, the uncertainty around catch and bycatch in the herring fishery may be reduced, potentially improving the tracking of harvest against ACLs and catch caps and allowing for discard estimates to be incorporated into future stock assessments. The magnitude of positive impacts to the biological resources associated with additional catch information is expected to vary with the type of coverage target specified and the realized coverage level in a given year. The realized coverage level in a given year would be largely driven by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM (Herring Alternative 1) and the specified coverage target (Herring Alternatives 2.1-2.6).

Similar to Herring Alternative 1, the selection of Herring Alternative 2 will not likely affect the setting of herring harvest specifications. However, similar to Herring Alternative 1, the selection of Herring Alternative 2 may affect the ability of the herring fishery to fully harvest ACLs. Under Herring Alternative 2, if fishing effort is limited by the availability of monitoring coverage or increased monitoring results in catch caps for haddock and river herring/shad limiting effort in the herring fishery, then the herring fishery may not be able to fully harvest the ACLs.

Herring Alternative 2 would allow several sub-options to apply to the industry-funded monitoring alternatives. Sub-Option 1 would allow vessels to be issued waivers to exempt them from industry-funded monitoring requirements, for either a trip or the fishing year, if coverage was unavailable due to funding or logistics. Selection of this sub-option preserves the NEFMC's intent to increase monitoring in the herring fishery, but would not prevent vessels from participating in the herring fishery if monitoring coverage was not available. Should the NEFMC not select Sub-Option 1, then any industry-funded monitoring requirements established in this amendment would have the potential to reduce effort in the herring fishery. Sub-Option 2 would exempt a wing vessel pair trawling with another vessel from industry-funded monitoring requirements, provided the vessel does not carry any fish. Sub-Option 3 would require that industry-funded monitoring requirements expire two years after implementation. Sub-Option 4 would require the NEFMC to examine the results of any increased coverage in the herring fishery two years after implementation, and consider if adjustments to the coverage

_0000010762

targets are warranted.  Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via specifications, a framework adjustment, or an amendment to the Herring FMP, as appropriate.  Lastly, Sub-Option 5 would exempt trips that land less than 25 mt of herring from industry-funded monitoring requirements.

If the increased monitoring associated with Herring Alternative 2 is reduced or minimized by selection of any of the sub-options, the benefits of additional monitoring to the herring resource may be reduced and/or be similar to impacts under Herring Alternative 1. Additionally, under Herring Alternative 2, because the 25 mt threshold differs from the triggers used to determine which trips count against catch caps for haddock (1 lb of herring) and river herring and shad (6,600 lb of herring) the data generated by selecting Sub-Option 5 may bias (either higher or lower) the catch tracked against catch caps when compared to not selecting Sub-Option 5.  Therefore, the selection of Sub-Option 5 may reduce any benefits associated with Herring Alternative 2.

**Coverage Target Alternatives**

Herring Alternative 2 would specify a level and type of industry-funded monitoring for the herring fishery.  The types of industry-funded monitoring considered by the NEFMC for the herring fishery include:  NEFOP-level observers, at-sea monitors, and electronic monitoring and portside sampling.  Monitoring alternatives allocate coverage by fleet or permit category. Monitoring requirements could apply across all herring management areas or to just midwater trawl vessels fishing in the Groundfish Closed Areas.

Under Herring Alternative 2, the amount and quality of information collected as part of an industry-funded monitoring would vary with the type of coverage target alternative specified for the herring fishery.  Impacts on the herring resource associated with specific coverage target alternatives (Herring Alternatives 2.1-2.6) are discussed in the following section.

**Monitoring and Service Provider Requirements**

Herring Alternative 2 would specify that industry-funded observer requirements include a HVF certification for the herring fishery.   The HVF certification was developed in order to more effectively train certified NEFOP observers in high volume catch sampling and documentation. HVF certification allows observer to cover any of the fisheries that pump catch, typically the midwater trawl and purse seine fleets.  This certification was developed to prepare observers for changes in the regulations and new requirements that were under consideration in Herring Amendment 5.

_0000010763

NEFOP determined that data quality was sub-optimal when collected by observers without specialized training, potentially resulting in data loss.  In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers.  Having an additional training to identify these practices allowed for improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Observers in the herring fishery are currently required to possess a HVF certification under Herring Alternative 1 and would be required to possess a HVF certification under Herring Alternative 2.  Therefore, the impacts of a HVF certification requirement under Herring Alternative 2 on the herring resource would be similar to the impacts under Herring Alternative 1.

Under Herring Alternative 2, the process for vessel notification and selection and payment of industry cost responsibilities would be developed during the rulemaking and amendment approval process.

To the extent that increased information on herring catch benefits the biological resources under Herring Alternative 2, those benefits may not be realized under Herring Alternative 1.

### 1.5.1.2   *Impacts of Herring Coverage Target Alternatives 2.1- 2.6 on the Biological Resources*

Herring Alternatives 2.1-2.6 are intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above and beyond SBRM, for industry-funded monitoring.  If Federal funding is available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, Herring Alternatives 2.1-2.6 may have a positive impact on the biological resources by increasing monitoring in the herring fishery.  While the benefits to the biological resources may be difficult to quantify under Herring Alternatives 2.1-2.6, they may not be realized under Herring Alternative 1.

The magnitude of positive impacts to the biological resources associated with additional catch information is expected to vary with the monitoring coverage target specified and the realized coverage level in that year.  The realized coverage level in a given year would be largely driven by the amount of funding available to cover NMFS cost responsibilities in a given year.  The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM (Herring Alternative 1) and the specified monitoring coverage target (Herring Alternatives 2.1-2.6).

_0000010764

Herring Alternatives 2.1-2.6 differ by (1) the type of information collected, (2) the specified amount of coverage, and (3) how coverage is allocated.

Currently, vessel and dealer data are used to track retained herring catch and SBRM observer data are used to track discarded herring catch. Vessel and dealer data are used to track retained catch of mackerel and SBRM observer data are used to track retained and discarded catch of haddock, river herring, and shad, as well as the discarded catch of mackerel. SBRM observer data are used to track catch of protected species. Additionally, vessel and SBRM observer data are used for stock assessments and to estimate total removals.

Herring Alternatives 2.1 would specify NEFOP-level observer coverage, Herring Alternatives 2.2 would specify at-sea monitor coverage, Herring Alternative 2.3 would specify at-sea monitor coverage as well as EM and portside sampling coverage, and Herring Alternative 2.4 would specify EM and portside sampling coverage. NEFOP-level observer coverage provides species composition data on both retained and discarded catch, while at-sea monitor coverage would provide species composition data on discarded catch and portside sampling coverage would provide species composition data on retained catch. NEFOP-level observer coverage and at-sea monitors can estimate amounts of discarded catch while EM cannot estimate the amount of discarded catch, but it can verify retention of catch. In the herring fishery, discards are a small percentage of total catch. Because alternatives with NEFOP-level observer coverage and EM and portside sampling coverage have the potential to collect information on a greater percentage of catch than at-sea monitoring coverage, Herring Alternatives 2.1, 2.3, and 2.4 have the potential to benefit the biological resources more than Herring Alternative 2.2.

Herring Alternatives 2.1, 2.3, 2.4, and 2.5 specify some aspect of monitoring coverage at 100% while Herring Alternatives 2.2, 2.3, and 2.4 allow some aspect of monitoring coverage to range between 25% and 100%. The monitoring objectives for the herring coverage targets are accurate estimates of herring catch and the catch of haddock and river herring/shad to track against catch caps. While high levels of monitoring are not always necessary to address a monitoring goal, more monitoring could be more effective to meet monitoring goals than less monitoring. Therefore, Herring Alternatives 2.1, 2.3, 2.4, and 2.5 have the potential to benefit the biological resources more than Herring Alternative 2.2.

Herring Alternatives primarily 2.1 and 2.2 would allocate monitoring coverage by vessel permit category (i.e., Category A and B herring permits), Herring Alternative 2.4 would allocate monitoring coverage by fishing fleet (i.e., midwater trawl fleet), and Herring Alternative 2.3 would allocate monitoring coverage by permit category and fishing fleet. The extent to which

coverage is allocated consistent with SBRM fishing fleet will determine how the resulting data can be used.  Unless vessel permit category is equivalent to fishing fleet, the resulting information from Herring Alternatives 2.1 and 2.2 will have limited utility when compared to Herring Alternatives 2.3 and 2.4.  The additional information on catch and bycatch estimates in the herring fishery obtained via Herring Alternatives 2.1, 2.2, and 2.3 (at-sea monitoring data) can be used for tracking catch against ACLs and catch caps but it is unlikely that those data will be used for stock assessments and estimating total removals.  Additional data on catch and bycatch estimates in herring fishery obtained via Herring Alternatives 2.3 (EM and portside sampling data) and 2.4 could be used for catch monitoring as well as stock assessments and estimating total removals.  Because the midwater trawl fleet harvests the majority of herring catch (over 70%), alternatives that focus coverage on the midwater trawl fleet (Herring Alternatives 2.3 and 2.4) would increase monitoring on vessels that harvest the majority of catch in the herring fishery.

Current management of the herring fishery specifies gear and area specific catch caps for non-target species of interest harvested in the herring fishery.  River herring and shad catch caps for vessels using midwater trawl gear exist for the Gulf of Maine, Cape Cod, and Southern New England.  River herring and shad catch caps for vessels using small mesh bottom trawl gear exist for Southern New England.  The haddock catch cap in the herring fishery applies to vessels using midwater trawl gear in the Gulf of Maine and Georges Bank.  The midwater trawl fleet harvests the majority of haddock and river herring and shad, so alternatives that increase coverage on the midwater trawl fleet (Herring Alternatives 2.3 and 2.4) have the potential to benefit non-target species more than alternatives that increase coverage on Category A and B vessels (Herring Alternatives 2.1 and 2.2).

The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year.  If coverage is not available (either due to logistics or a lack of funding) for a specific trip, Herring Alternatives 2.1-2.4 specify that the vessel would be prohibited from participating in the herring fishery on that trip.  The selection of Herring Alternative 2 - Sub-Option 1 would enable coverage requirements to be waived on a specific trip to allow vessels to continue participating in the herring fishery, even if monitoring coverage is not available.  Should fishing effort be limited by the availability of monitoring coverage, such that herring ACLs in a given year are not harvested, there is the potential for a positive impact on biological resources associated with Herring Alternatives 2.1-2.4.  The positive impact would result from the increased reproductive potential of the individuals that are unharvested.  However, larger numbers of spawning fish do not guarantee increased recruitment and high densities of fish may result in slow growth and poor condition.  The selection of Herring Alternative 2 - Sub-Option 1 would enable monitoring coverage

requirements to be waived on a specific trip, allowing a vessel to continue participating in the herring fishery, even if monitoring coverage is not available.  For this reason, any benefits to the biological resources under Herring Alternatives 2.1-2.4 may not be realized under Herring Alternative 2 – Sub-Option 1.

Alternatives that increase the amount of information on retained catch (Herring Alternatives 2.1, 2.3, and 2.4) may have an increased likelihood of affecting the data tracked against catch caps than alternatives that increase the amount of information on just discarded catch (Herring Alternative 2.2).  Increased monitoring of haddock and river herring and shad catch may help reduce variability in estimates of catch that is tracked against catch caps, when that variability may have otherwise led to effort restrictions in the herring fishery.  Conversely, additional monitoring may illustrate higher than expected catch of haddock and river herring and shad, resulting in catch caps that are fully harvested earlier than expected and reduced opportunities to harvest herring.  Increased information to help track catch against catch caps may help allow the herring fishery to fully harvest the ACLs or it may curtail the harvest of herring by the herring fishery.

Herring Alternative 2.5 specifies that midwater trawl vessels fishing in the Groundfish Closed Areas must carry a NEFOP-level observer while Herring Alternative 2.6 would specify that coverage for midwater trawl vessels fishing in Groundfish Closed Areas would match the coverage targets recommended by the NEFMC for the rest of the fishery.  The Herring Alternative 2 Sub-Options would apply to Herring Alternative 2.6 but not to Herring Alternative 2.5.  Even though Herring Alternative 2.5 would not allow coverage requirements to be waived for a trip inside the Groundfish Closed Areas, it is unlikely that monitoring availability would reduce fishing effort such that the herring ACLs are not able to be harvested.  During 2005-2010, prior to any observer coverage requirements for midwater trawl vessels fishing in Groundfish Closed Areas, less than 12% of total catch by the midwater trawl fleet came from inside the Groundfish Closed Areas.  Because a relatively small percentage of the midwater trawl fishery's herring harvest comes from inside Groundfish Closed Areas, any positive impact to the biological resources associated with additional catch and bycatch information under Herring Alternatives 2.5 and 2.6 would be similar, but likely reduced, to impacts under Herring Alternatives 2.1-2.4.

In general, the benefits of these herring alternatives to the biological resources are indirect because they affect levels of monitoring rather than harvest specifications.  Indirect benefits to the herring resource are possible if increased monitoring can reduce uncertainty of catch and bycatch tracked against ACLs and generate more information to estimate total removals and for stock assessments. Indirect benefits to non-target species are possible if increased monitoring

can reduce uncertainty of catch and bycatch tracked against catch caps and, possibly, better inform the setting of fishery catch caps.   Indirect benefits to protected species are possible if increased monitoring of the herring fishery generates additional information on protected species to estimate total removals and for stock assessments.  However, these alternatives may lead to direct positive impacts on the biological resources if fishing effort is limited, either through monitoring availability or catch caps, leading to increased reproductive potential of the biological resources.  The impacts of these herring alternatives on the herring resource or non-target species are not significant because they would not cause the herring resource or non-target species to become overfished and would not result in overfishing.  The impacts of these herring alternatives on protected species are not significant because they would not cause a change in population status.

### 1.5.2   IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES ON THE PHYSICAL ENVIRONMENT

**TABLE 7.  SUMMARY OF PHYSICAL ENVIOROMENT IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES**

| Alternatives | Impacts on Physical Environment |
|---|---|
| Herring Alternative 1: No Coverage Target Specified For IFM Programs (No Action) | • Negligible impact associated with minimal and temporary effects on the environment from herring fishery |
| Herring Alternative 2: Coverage Target Specified For IFM Programs | • Negligible impact associated with minimal and temporary effects on the environment from herring fishery<br>• Low positive impact if fishing effort is limited by monitoring availability<br>• Negligible impact associated with switching gear modes |

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP.  Monitoring for herring vessels would be allocated according to SBRM.  If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis.

Under Herring Alternative 2, the NEFMC would specify the details of an industry-funded monitoring program for the Herring FMP.  These details may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) minimum level of coverage necessary to meet coverage goals, (4) consideration of coverage waivers if coverage target cannot be met, (5) process for vessel notification and selection, (6) process for payment of industry cost responsibilities, (7) standards for monitoring service providers, and (8) any other measures necessary to implement the industry-funded monitoring program.

Additional NEPA analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying the specified industry-funded monitoring programs.

Herring Alternative 2 is intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above and beyond SBRM (Herring Alternative 1), for industry-funded monitoring.  The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year.  The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM requirements (Herring Alternative 1) and the specified coverage target (Herring Alternatives 2.1-2.6).

The impact of the herring fishery on the physical environment is thought to be minimal and temporary.  Therefore, the expected impact on the physical environment of increased monitoring in the herring fishery is expected to be negligible under both Herring Alternatives 1 and 2.

Herring Alternative 2 would specify a level and type of industry-funded monitoring for the herring fishery.  The monitoring levels under consideration by the NEFMC range from 25% to 100%.  The types of monitoring under consideration include:  NEFOP-level observers, at-sea monitors, and electronic monitoring and portside sampling.  Monitoring alternatives allocate coverage by fleet or permit category.  Monitoring requirements could apply across all herring management areas or to just midwater trawl vessels fishing in the Groundfish Closed Areas.  The amount and quality of information collected as part of an industry-funded monitoring would vary with the type of coverage target alternative (Herring Alternatives 2.1-2.6) specified for the herring fishery.

The realized coverage level would be determined by the amount of funding available to cover NMFS cost responsibilities in a given year.  If coverage is not available (either due to logistics or a lack of funding) for a specific trip, Herring Alternatives 2.1-2.6 specify that the vessel would be prohibited from participating in the herring fishery on that trip.  The selection of Herring Alternative 2 - Sub-Option 1 would enable coverage requirements to be waived on a specific trip to allow vessels to continue participating in the herring fishery, even if monitoring coverage is not available.  Additionally, the amount and quality of information collected under Herring Alternatives 2.1-2.4 has the potential to affect the amount of effort in the herring fishery.

Should fishing effort be limited by the availability of monitoring coverage or additional data collected, there is the potential for a positive impact on the physical environment.  However, the magnitude of any potential positive impact is low because the herring fishery has only

minimal and temporary impacts on the environment. Additionally, vessels may switch gear modes to minimize economic impacts associated with gear-specific requirements. However changes to gear modes associated with Herring Alternatives 2.1-2.6 are not expected to affect the overall impact of the herring fishery on the physical environment. Therefore, impacts on the physical environment are expected to be similar under Herring Alternatives 1 and 2.

### 1.5.3    IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES ON HUMAN COMMUNITIES

Another major consideration when evaluating an industry-funded monitoring program is the cost of the monitoring program. The requirement to pay for monitoring coverage increases operating costs for fishing vessels, which in turn reduces vessel revenues.

There are two primary approaches for minimizing the cost of monitoring paid by industry. The first approach is to select the most cost effective type of coverage to meet program goals. For example, it may be more cost effective to use electronic monitoring rather than at-sea observers to confirm retention of catch on herring vessels.

The second approach to limit costs to industry is to set coverage levels at the lowest level necessary to gather information to meet program goals. For example, it may be possible to increase data precision around discard estimates for a certain species by setting a coverage target of 50%, rather than a coverage target of 100%.

Table 8 shows the range of costs associated with the different types of monitoring being considered for the herring fishery. A detailed description of industry cost responsibilities associated with each of these types of monitoring can be found in Appendix 2 – Monitoring Cost Estimates.

**TABLE 8.  MONITORING COST ESTIMATES FOR THE HERRING FISHERY**

| Types of Monitoring | NMFS Cost | Vessel Cost |
|---|---|---|
| NEFOP-Level Observer | $479 per sea day | $818 per sea day |
| At-Sea Monitor | $530 per sea day | $710 per sea day |
| Electronic Monitoring | Year 1:  $36,000 startup plus $97 per sea day<br><br>Year 2:  $97 per sea day | Year 1:  $15,000 startup plus $325[1] or $187[2] per sea day<br><br>Year 2:  $325[1] or $187[2] per sea day |
| Portside Sampling | $479-$530 per sea day | $5.12[1] or $3.84[2] per mt |

1 – Initial cost assumptions:  EM on every vessel, video collected throughout the duration of a trip, 100% video review, and targeting 100% of all trip sampled portside.  Additionally, this portside cost estimate includes portside administration costs.

2 – Revised cost assumptions:  EM on every vessel, video collected only around haulback, 50% video review, and targeting 50% of all trips sampled portside.  Additionally, this portside cost estimate no longer include portside administration costs.

**Assumptions used to generate estimates of industry cost responsibilities**

While the cost of a sea day can vary between service providers, the individual components of a sea day cost are necessary to successfully execute a monitoring program.  Because each of these components is essential, in most cases, it is not appropriate to reduce industry's cost responsibilities by removing or adjusting components of the sea day cost.

NEFOP-Level Observer Cost Estimate

The $818 per sea day industry cost responsibility related to NEFOP-level observer coverage is based on sampling costs from October 2012 through May 2014 averaged across 3 service providers.  The program elements and activities covered in this cost would include, but are not limited to, costs to the provider for deployments and sampling (e.g., travel and salary for observer deployments and debriefing), equipment, costs to the provider for observer time and travel to a scheduled deployment that does not sail and was not canceled by the vessel prior to the sail time, and provider overhead.

At-Sea Monitor Cost Estimate

The $710 per sea day industry cost responsibility related to a herring at-sea monitoring program is based on the current sea day rate for the groundfish at-sea monitoring program.

IFM Amendment Herring Coverage Target Alternatives Discussion Document          April 19-21, 2016

_0000010771

However, herring at-sea monitors would be collecting data on discards only.  This may reduce training time, gear requirements, and internal support resources necessary to administer an at-sea monitoring program for the herring fishery resulting in a lower sea day rate than the groundfish at-sea monitoring program rate.  (*See Appendix 5 – Analysis of ASM Costs for additional information.*)  In the absence of an estimate specific to the herring at-sea monitoring program, the PDT/FMAT determined that using the groundfish at-sea monitoring sea day rate was appropriate, but the actual cost of a herring at-sea monitor may be less.

**TABLE 9. INDUSTRY COST RESPONSIBILITES FOR NEFOP-LEVEL OBSERVERS AND AT-SEA MONITORS**

| Industry Cost Responsibilities | NEFOP-level observer cost per sea day | At-sea monitoring  cost per sea day |
|---|---|---|
| Provider costs for deployments and sampling (e.g., travel and salary for observer deployments and debriefing) | Sea day charges paid to providers: $640<br>Travel: $71<br>Meals: $22<br>Other non-sea day charges:  $12 | Sea day charge paid to providers: $561<br>Travel: $67<br>Meals: $18<br>Other non-sea day charges: $14 |
| Equipment, as specified by NMFS, to the extent not provided by NMFS | $11 | |
| Provider costs for observer time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time. | $1 | |
| Provider overhead and project management costs not included in sea day charges above (e.g., per diem costs for trainees) | Training: $61 | Training: $50 |
| Provider costs to meet performance standards laid out by a fishery management plan | TBD – won't know these costs until an industry funded observer coverage program is implemented in a fishery | TBD – won't know these costs until an industry funded observer coverage program is implemented in a fishery |
| Total (not including other costs) | $818 | $710 |

Midwater Trawl Electronic Monitoring Cost Estimate

Because no Federal electronic monitoring program exists for the midwater trawl fleet, industry cost responsibilities associated with an electronic monitoring program for the midwater trawl fleet were difficult to estimate.  Electronic monitoring cost estimates include a one-time implementation cost, as well as ongoing annual operational program costs.  Cost components include equipment, field services, data services, and program management.  The implementation costs associated with EM are summarized in Table 10 and the ongoing costs associated with EM are summarized in Table 11.  Additional details on monitoring costs are available in Appendix 2 – Monitoring Cost Estimates.

**TABLE 10. INDUSTRY COST RESPONSIBILITES FOR ELECTRONIC MONITORING IMPLEMENTATION**

| Industry Cost Responsibilities | Electronic Monitoring Implementation Costs Per Vessel |
|---|---|
| Equipment, including initial purchase and installation of the cameras, associated sensors, integrated GPS, control box, and hard drives | $9,018 |
| Field Services, including  technician's labor and travel associated with the installation of equipment | $2,952 |
| Program Management, including one-time labor, equipment, facilities, and administrative costs associated with getting the new EM program operational | $3,493 |
| Total | $15,463 |

Initially, the sea day cost for EM was estimated at $325.  In September 2015, the NEFMC requested the PDT/FMAT revise the $325 per sea day industry cost estimate associated with electronic monitoring.  The $325 cost estimate was likely high because it assumed video was collected for the duration of a trip and 100% of the video was reviewed.  The revised cost estimate of $187 per sea day assumes video collected around haulback only and 50% video review.  This revised estimate may be closer to the actual industry cost responsibilities associated with electronic monitoring of midwater trawl trips.  The breakdown of these costs is shown in Table 11.

_0000010773

**TABLE 11. INDUSTRY COST RESPONSIBILITES FOR ONGOING ELECTRONIC MONITORING COSTS**

| Industry Cost Responsibilities | Initial Ongoing Electronic Monitoring Costs Per Vessel Per Sea Day [1] | Revised Ongoing Electronic Monitoring Costs Per Vessel Per Sea Day [2] |
|---|---|---|
| Equipment, including annual equipment costs estimated here include spare parts to replace broken or aging equipment, as well as licenses for the use of proprietary software | $11 | $11 |
| Field Services, including labor, travel, and other costs associated with repairs, technical support, and retrieving hard drives from the vessels and shipping them to the service provider for analysis | $78 | $47 |
| Data Services, including the costs associated with review and analysis of the video, reporting to NMFS, and archiving of the data | $160 | $52 |
| Program Management, including costs of the day-to-day operations of the service provider for running the EM program | $77 | $77 |
| Total | $325 | $187 |
| 1 - Initial cost assumptions based on video collected for the duration of a trip and 100% video review. | | |
| 2 - Revised cost assumptions based on video collected only around haulback and 50% video review. | | |

Midwater Trawl Portside Sampling Cost Estimate

The analysis assumes the cost per amount of fish landed is the most accurate way to represent the potential industry costs for monitoring.  Because no Federal portside sampling program exists for the midwater trawl fleet, industry cost responsibilities associated with a portside sampling program for the midwater trawl fleet were difficult to estimate.

The average cost per pound of groundfish landed for the Northeast Multispecies dockside monitoring program ranged from $0.01 - $0.12 per pound for all sectors.  The average cost per pound landed per trip is inversely related to the average pounds landed – that is, trips that land larger amounts are less expensive to monitor than trips that land smaller amounts.  Larger trips are less expensive to monitor because they typically land in principle ports with a dedicated monitor, therefore, there are no additional costs for monitors to travel to offload locations.

Using cost estimates from the Massachusetts Division of Marine Fisheries portside sampling program for the herring fishery, the industry cost responsibility associated with portside sampling may be as much as $5.12 per mt.  This cost estimate is likely high as it includes program administration costs as well as sampling costs and was intended to apply to all midwater trawl trips for a target sampling rate of 100%.

In September 2015, the NEFMC requested the PDT/FMAT revise the estimate of the industry cost responsibility associated with portside sampling.  The revised cost estimate eliminates portside administration costs and is estimated at $3.84 per mt.  This cost estimate may be closer to the actual industry cost responsibilities associated with portside sampling and is intended to apply to 50% of all midwater trawl trips for target sampling rate of 50%.

**TABLE 12.  SUMMARY OF ECONOMIC IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES**

| Alternatives | Impacts on Fishery Related-Businesses |
|---|---|
| Herring Alternative 1: No Coverage Target Specified For IFM Programs  (No Action) | • Low positive impact associated with observer coverage allocated by SBRM<br>• Low negative impact associated with no additional monitoring to reduce uncertainty around catch estimates |
| Herring Alternative 2: Coverage Target Specified For IFM Programs | • Negative impact associated with potential reduction in return to owner (RTO)<br>• Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested<br>• Low positive impact associated with additional monitoring to reduce uncertainty around catch estimates in the herring fishery<br>• Low negative impact associated with no additional monitoring unless available Federal funding can cover NMFS cost responsibilities<br>• Magnitude of impacts associated with additional monitoring would be dependent on the type of information collected, amount of coverage, how coverage is allocated, and amount of available Federal funding<br>• Magnitude of impacts associated with selection of Sub-Options |
| Herring Alternative 2.1: 100% NEFOP-Level Coverage on Category A and B Vessels | • Negative impact associated with potential  44.7%-11.5% reduction in RTO<br>• Negative impact associated with potential 42.2%-5.8% reduction in RTO with 25 mt threshold<br>• Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested<br>• Low positive impact associated with additional information to reduce uncertainty of catch estimates in the herring fishery |

| | |
|---|---|
| Herring Alternative 2.2: ASM Coverage on Category A and B Vessels | <ul><li>Negative impact associated with potential 38.9%-3.0% reduction in RTO</li><li>Negative impact associated with potential 36.7%-1.4% reduction in RTO with 25 mt threshold</li><li>Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested</li><li>Negligible impact associated with additional information to reduce uncertainty of discard estimates in the herring fishery</li></ul> |
| Herring Alternative 2.3: Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | <ul><li>Negative impact associated with potential 38.5%-3.0% reduction in RTO</li><li>Negative impact associated with potential 36.7%-1.4% reduction in RTO with 25 mt threshold</li><li>Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested</li><li>Low positive impact associated with additional information to reduce uncertainty of catch estimates in the herring fishery</li></ul> |
| Herring Alternative 2.4: EM and Portside Sampling on Midwater Trawl Fleet | <ul><li>Negative impact associated with potential 29.1%*-6.9% reduction in RTO</li><li>Negative impact associated with potential 27.5%*-2.4% reduction in RTO with 25 mt threshold</li><li>Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested</li><li>Low positive impact associated with additional information to reduce uncertainty around catch estimates in the herring fishery</li></ul> |
| Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | <ul><li>Negative impact associated with potential 5.4%-1.0% reduction in RTO</li><li>Low positive impact associated with additional information to reduce uncertainty around catch estimates in the herring fishery</li><li>Negligible impact associated with changes in fishing effort</li></ul> |
| Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | <ul><li>Negative impact associated with potential reduction in RTO</li><li>Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with the midwater trawl fleet</li><li>Negligible impact associated with changes in fishing effort</li></ul> |
| * Reflects RTO from Year 2 of Herring Alternative 2.4 | |

Analysis of the economic impact of industry-funded monitoring herring coverage target alternatives on fishery-related businesses compared industry cost responsibilities to 2014 herring vessel returns-to owner (RTO).  RTO is calculated by subtracting fixed and operational costs from gross revenue and was used rather than net revenues to more accurately reflect income from fishing trips.

The previous analysis of economic impacts of herring coverage target alternatives on the herring industry was based on trip cost data collected by NEFOP and showed the economic impact of the alternatives on partial vessel net revenues (gross revenues less certain trip costs). Because NEFOP only collects a limited amount of cost data, industry participants expressed concern that an analysis of net revenues underestimated vessel costs.  In response, Jason

Didden, staff of the MAFMC, offered to coordinate a survey of herring and mackerel vessels to collect more detailed cost information.

The survey requested information from vessel owners on total trip costs in 2014.  The cost survey collected information on variable costs; payments to crew; the cost of repairs, maintenance, upgrades; and fixed costs.  These data were used to update the impact analyses. To profile vessels, data were averaged across vessel types, by vessel characteristics, and by primary species caught.  The cost profiles of vessels, as adjusted by the estimated industry cost responsibilities of each herring coverage target alternative, were used to describe the economic impact on herring vessels.  Economic impacts are described at an annual level.  Surveys were sent to approximately 18 vessel owners (representing about 26 vessels) in the herring and/or mackerel fisheries.  Surveys were sent in May 2015 and information was submitted for 16 of the 26 vessels.  A copy of the survey is included in Appendix 3.

_0000010777

**TABLE 13.  SUMMARY OF TOTAL TRIP COSTS FOR HERRING AND MACKEREL VESSELS IN 2014.**

| Cost Category | Description | Average Percent of 2014 Gross Revenue for Herring and Mackerel Vessels | Average Percent of 2014 Gross Revenue for Squid Vessels |
|---|---|---|---|
| Variable Costs | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| Crew Share | Total annual payments to crew | 28% | 26% |
| Repair, Maintenance, Upgrades, Haulout (RMUH) | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, safety equipment, upgrades and haulout.  Because these costs vary considerably from year to year and are typically spread out over several years, only a portion of these costs were applied to 2014 revenue | 13% | 11% |
| Fixed Costs | Annual mooring, dockage, permits and licenses, insurance, quota and DAS lease, crew benefits, vessel monitoring, workshop and storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs<br>Note: principal payments on business loans are not included in fixed costs. | 19% | 21% |
| Return to Owner | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

Prior to any trip declared into the herring fishery, vessel representatives would be required contact NMFS and request monitoring coverage.  If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether monitoring coverage must be procured through an industry-funded monitoring service provider.  For the purposes of this analysis, however, it is assumed that there would be no SBRM coverage of trips.  Therefore, the economic impacts of industry-funded monitoring cost alternatives described in this section may be an overestimate of actual costs.

The NEFMC is considering four types of industry-funded monitoring for the herring fishery, including NEFOP-level observers, at-sea monitors, EM, and portside sampling coverage.  NEFOP-

level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

**Summary of Economic Analyses**

In general, the paired midwater trawl vessels have the highest monitoring costs as a percentage of RTO.  This is because these vessels have, on average, more sea days declared into the herring fishery than other gear types.  Therefore, midwater trawl vessels have more sea days that would be subject to monitoring costs than vessels that use other gear types.

There are differences across gear types regarding the sources of revenue that would be used to pay for monitoring costs.  For example, for small mesh bottom trawl vessels, roughly half of their revenue is generated by participating in the herring fishery and the other half is generated by participating in other fisheries.  This means that small mesh bottom trawl vessels may need to use revenue from other fisheries to pay the industry-funded monitoring costs associated with the herring fishery.  A metric for considering different revenue sources across gear types is evaluating monitoring costs as a percent of herring revenue.  For small mesh bottom trawl vessels, industry-funded monitoring costs as a percent of herring revenue are higher than for other gear types.

Exempting trips that land less than 25 mt of herring (Herring Alternative 2 Sub-Option 5) from industry-funded monitoring costs reduces the monitoring cost substantially in many cases.  The degree of saving varies by gear type.  Using Alternative 2.1 as an example, aggregate NEFOP-level observer costs decline by 48% for purse seine vessels ($320k to $166k).  For paired midwater trawl vessels, the percentage difference (20%; $673k to $541k) is not as great.

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811,000 to $75,000 – a 91% reduction.  However, Herring Alternative 2.5 only provides increased monitoring in the Groundfish Closed Areas.

Initial industry cost assumptions for Herring Alternative 2.4 estimated $325 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected for the duration of the trip, 100% vide review) and $5.12 per mt for portside sampling (administration and sampling cost) on close to 100% of trips.  Revised industry cost assumptions for Herring Alternative 2.4 estimated $187 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected around haulback, 50% video review) and $3.84 per mt for portside sampling (only sampling costs) on close to 50% of trips.  Using the revised cost assumptions rather than the initial cost assumption for Herring Alternative 2.4 reduces total

industry monitoring costs by 51% ($457,595 to $222,958) in Year 2 for paired midwater trawl vessels and reduces costs by 54% ($134,165 to $61,067) in Year 2 for single midwater trawl vessels.

The tables and box plots on the following pages provide summarized economic data for each of the herring coverage target alternatives.  The economic impact on vessels associated with paying for monitoring coverage is described as a percentage of RTO for each herring coverage target alternative in the following figures.  The tables provide the mean and median number of sea days per vessel that would result from each of the alternatives, as well as the mean and median RTO that would ultimately be reduced by the industry-funded monitoring costs. Additionally, fleet level effort, revenue, and monitoring cost information for each herring coverage target alternative are also provided.  Additional economic analysis is available in Appendix 4.

### 1.5.3.1   Impacts of Herring Alternatives 1 and 2 on Fishery-Related Businesses

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP.  Monitoring for herring vessels would be allocated according to SBRM.  If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis. Under Herring Alternative 1, additional costs to vessels participating in the herring fishery associated with monitoring coverage, if there were any, would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM.  The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries.  The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species.   Although management measures are typically developed and implemented on an FMP-by-FMP basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

Currently, the herring resource is not overfished, and overfishing is not occurring.  Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs.  Selection of Herring Alternative 1 will not likely affect the setting of herring harvest specifications, but it may affect the ability of the herring fishery to fully harvest the ACLs if less

monitoring (when compared to Herring Alternative 2) results in catch caps for haddock and river herring/shad limiting effort in the herring fishery.

Under Herring Alternative 2, the NEFMC would specify the details of an industry-funded monitoring program for the Herring FMP. These details may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) minimum level of coverage necessary to meet coverage goals, (4) consideration of coverage waivers if coverage target cannot be met, (5) process for vessel notification and selection, (6) process for payment of industry cost responsibilities, (7) standards for monitoring service providers, and (8) any other measures necessary to implement the industry-funded monitoring program. Additional NEPA analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying the specified industry-funded monitoring programs.

Herring Alternative 2 is intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above and beyond SBRM (Herring Alternative 1), for industry-funded monitoring. The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year and would fall somewhere between no additional coverage above SBRM (Herring Alternative 1) and the specified coverage target (Herring Alternatives 2.1-2.6).

If Federal funding is available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, Herring Alternative 2 may have both positive and negative economic impacts on vessels participating in the herring fishery.

Indirect positive impacts on herring vessels associated with Herring Alternative 2 may result from increased monitoring helping reduce variability around catch and bycatch estimates in the herring fishery leading to additional harvesting opportunities. If increased monitoring reduces the variability in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be less likely to be constrained by catch caps and more likely to be able to fully harvest herring sub-ACLs.

Direct negative impacts on herring vessels associated with Herring Alternative 2 would likely result from reduced RTO after paying for monitoring coverage. The magnitude of the economic impact associated with paying for monitoring coverage would vary with herring coverage target alternative (Herring Alternatives 2.1-2.6). If increased monitoring results in fishery catch caps being harvested more often than expected, an indirect negative impact on herring vessels may be that vessels are not able to fully harvest herring sub-ACLs. While the full extent of positive

_0000010781

and negative impacts to herring vessels may be difficult to quantify under Herring Alternative 2, the impacts may not be realized under Herring Alternative 1.

If Federal funding is not available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, fishing effort may be reduced under Herring Alternative 2 to match available levels of monitoring coverage.  If fishing effort is reduced to match available monitoring levels, herring vessels may not be able to fully harvest herring sub-ACLs.  This direct negative economic impact associated with Herring Alternative 2 would be less likely to be realized under Herring Alternative 1.

Herring Alternative 2 would allow several sub-options to apply to the industry-funded monitoring alternatives.  Sub-Option 1 would allow vessels to be issued waivers to exempt them from industry-funded monitoring requirements, for either a trip or the fishing year, if coverage was unavailable due to funding or logistics.  Selection of this sub-option preserves the NEFMC's intent to increase monitoring in the herring fishery, but would not prevent vessels from participating in the herring fishery if monitoring coverage was not available.  Should the NEFMC not select Sub-Option 1, then any industry-funded monitoring requirements established in this amendment would have the potential to reduce effort in the herring fishery.  Sub-Option 2 would exempt a wing vessel pair trawling with another vessel from industry-funded monitoring requirements, provided the vessel does not carry any fish.  Sub-Option 3 would require that industry-funded monitoring requirements expire two years after implementation. Sub-Option 4 would require the NEFMC to examine the results of any increased coverage in the herring fishery two years after implementation, and consider if adjustments to the coverage targets are warranted.  Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via specifications, a framework adjustment, or an amendment to the Herring FMP, as appropriate.  Lastly, Sub-Option 5 would exempt trips that land less than 25 mt of herring from industry-funded monitoring requirements.

If selection of the sub-options under Herring Alternative 2 minimizes the likelihood of positive or negative economic impacts on herring vessels, then the economic impacts associated with the sub-options may be reduced and/or similar to impacts under Herring Alternative 1. Additionally, under Herring Alternative 2, because the 25 mt threshold differs from the triggers used to determine which trips count against catch caps for haddock (1 lb of herring) and river herring and shad (6,600 lb of herring), the data generated by selecting Sub-Option 5 may bias (either higher or lower) the catch tracked against catch caps when compared to not selecting Sub-Option 5.

Impacts under Herring Alternative 2 assume that the future behavior of fishery participants will be similar to that in past years, when in reality fishery participants are likely to engage in a range of mitigation behaviors to reduce the economic impact associated with industry-funded monitoring. For example, vessels that have historically participated in many fisheries may stop fishing for herring and only participate in fisheries that do not have industry-funded monitoring requirements. However, if a vessel does not have the ability to participate in other fisheries, it may not be able to mitigate the impacts of industry-funded monitoring in that way. At this time, it is not possible to predict what, if any, mitigation behaviors may be used by herring fishery participants.

**Coverage Target Alternatives**

Herring Alternative 2 would specify a level and type of industry-funded monitoring for the herring fishery. The types of industry-funded monitoring considered by the NEFMC for the herring fishery include: NEFOP-level observers, at-sea monitors, and electronic monitoring and portside sampling. Monitoring alternatives allocate coverage by fleet or permit category. Monitoring requirements could apply across all herring management areas or to just midwater trawl vessels fishing in the Groundfish Closed Areas.

Under Herring Alternative 2, the amount, quality, and cost of information collected as part of an industry-funded monitoring would vary with the type of coverage target alternative specified for the herring fishery. Economic impacts on vessels participating in the herring fishery associated with specific coverage target alternatives (Herring Alternatives 2.1-2.6) are discussed in the following section.

**Monitoring and Service Provider Requirements**

Herring Alternative 2 would specify that industry-funded observer requirements include a HVF certification for the herring fishery. The HVF certification was developed in order to more effectively train certified NEFOP observers in high volume catch sampling and documentation. HVF certification allows observers to cover any of the fisheries that pump catch, typically the mid-water trawl and purse seine fleets. This certification was developed to prepare observers for changes in the regulations and new requirements that were under consideration in Herring Amendment 5.

Observers in the herring fishery are currently required to possess a HVF certification under Herring Alternative 1 and would be required to possess a HVF certification under Herring Alternative 2. Herring vessels do not pay for observer training under Herring Alternative 1, but

vessels would be responsible for additional observer training costs under Herring Alternative 2. Therefore, the economic impact on herring vessels of a HVF certification requirement under Herring Alternative 2 would be more negative than under Herring Alternative 1.

Under Herring Alternative 2, the process for vessel notification and selection and payment of industry cost responsibilities would be developed during the rulemaking and amendment approval process.

### 1.5.3.2   Impacts of Herring Coverage Target Alternatives 2.1- 2.6 on Fishery-Related Businesses

Herring Alternatives 2.1-2.6 are intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above and beyond SBRM, for industry-funded monitoring.  If Federal funding is available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, Herring Alternative 2 may have both positive and negative economic impacts on vessels participating in the herring fishery.

While the positive and negative economic impacts on herring vessels may be difficult to quantify under Herring Alternatives 2.1-2.6, the impacts would be less likely to be realized under Herring Alternative 1.

The magnitude of positive and negative economic impacts on herring vessels is expected to vary with the monitoring coverage target specified and the realized coverage level in a given year.  The realized coverage level in a given year would be largely driven by the amount of funding available to cover NMFS cost responsibilities in that year and would fall somewhere between no additional coverage above SBRM (Herring Alternative 1) and the specified monitoring coverage target (Herring Alternatives 2.1-2.6).

Herring Alternatives 2.1-2.6 differ by (1) the type of information collected, (2) the specified amount of coverage, and (3) how coverage is allocated.  Both the type of information collected and the amount of monitoring coverage will have a direct economic impact on vessels paying for monitoring coverage in the herring fishery.

Currently, vessel and dealer data are used to track retained catch of haddock and mackerel, and SBRM observer data are used to track catch of river herring and shad as well as the discarded catch of haddock and mackerel.  Additionally, vessel and SBRM observer data are used for stock assessments and to estimate total removals.

The herring fishery is managed with gear and area specific catch caps for haddock and river herring and shad.  If a catch cap is harvested, effort in the fishery using that gear in that area is restricted.  River herring and shad catch caps are in place for vessels using midwater trawl gear (Gulf of Maine, Cape Cod, and Southern New England catch caps) and small mesh bottom trawl gear (Southern New England catch cap), while the haddock catch cap is only specified for vessels using midwater trawl gear (Gulf of Maine and Georges Bank catch cap).

Herring Alternatives 2.1 would specify NEFOP-level observer coverage, Herring Alternatives 2.2 would specify at-sea monitor coverage, Herring Alternative 2.3 would specify at-sea monitor coverage as well as EM and portside sampling coverage, and Herring Alternative 2.4 would specify EM and portside sampling coverage.

The industry cost responsibility associated with NEFOP-level observer coverage is the most expensive ($818 per sea day), followed by at-sea monitor coverage ($717 per sea day), and EM ($187-$325 per sea day) and portside sampling ($3.84-$5.12 per mt).

The following table describes the potential reduction to RTO associated with paying for monitoring coverage across herring coverage target alternatives.  Shaded cells in the following table indicate when the potential reduction to RTO associated with paying for monitoring coverage exceeds 10%.  Additional background and summary information can be found in the tables and box plots displayed starting on page 62.

**TABLE 14. POTENTIAL REDUCTION TO RETURN-TO-OWNER FOR HERRING COVERAGE TARGET ALTERANTIVES 2.1 – 2.5**

| Herring Coverage Target Alternatives 2.1 - 2.5 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Alternative | Gear Type | Paired MWT | | Single MWT | | Purse Seine | | SMBT | |
| | Median potential reduction to RTO from coverage | ≥1 lb | > 25 MT | ≥1 lb | > 25 MT | ≥1 lb | > 25 MT | ≥1 lb | > 25 MT |
| 2.1 | 100% NEFOP-level | 44.7% | 42.2% | 24.4% | 5.8% | 13.9% | 10.4% | 11.5% | 14.2% |
| 2.2 and 2.3 | 100% ASM | 38.9% | 36.7% | 21.3% | 5.1% | 12.1% | 9.1% | 10.0% | 12.3% |
| | 75% ASM | 29.5% | 28.2% | 15.9% | 3.8% | 9.1% | 6.8% | 7.5% | 9.4% |
| | 50% ASM | 20.4% | 18.9% | 10.5% | 2.5% | 6.0% | 4.5% | 5.4% | 6.4% |
| | 25% ASM | 10.1% | 9.6% | 5.6% | 1.4% | 3.0% | 2.2% | 3.5% | 3.8% |
| 2.3 and 2.4 | EM/Portside Year 1[1] | 42.2% | 40.1% | 37.3% | 19.5% | N/A | | N/A | |
| | EM/Portside Year 2[1] | 29.1% | 27.5% | 12.8% | 4.9% | | | | |
| | EM/Portside Year 1[2] | 25.1% | 24.2% | 26.7% | 16.9% | | | | |
| | EM/Portside Year 2[2] | 14.4% | 13.3% | 6.9% | 2.4% | | | | |
| 2.5 | 100% NEFOP-level | 5.4% | 5.4% | 1.0% | 1.0% | 1.0% | 1.0% | | |

1 – Initial cost assumptions based on video collected for the duration of a trip, 100% video review, and including portside administration costs.  This cost would apply to 100% of trips.
2 – Revised cost assumptions based on video collected only around haulback, 50% video review, and not including portside administration costs.   This cost would apply to 50% of trips.

In general, the negative economic impact on herring vessels of paying for monitoring coverage (as measures by the potential reduction in the RTO) is greatest with Herring Alternative 2.1, followed by Herring Alternatives 2.2, 2.3, and 2.4. These impacts are influenced by the type of information collected and amount of coverage specified. Because paired midwater trawl vessels average more sea days than other gear types, paired midwater trawl vessels have a greater negative economic impact associated with paying for observer coverage, followed by purse seine, single midwater trawl, and small mesh bottom trawl vessels.

NEFOP-level observer coverage provides species composition data on both retained and discarded catch, while at-sea monitor coverage provides species composition data on discarded catch and portside sampling coverage provides species composition information on retained catch. NEFOP-level observers and at-sea monitors can estimate amounts of discards. EM cannot estimate the amount of discards, but EM can verify retention of catch.

Alternatives with NEFOP-level observer coverage and EM and portside sampling coverage have an increased likelihood to collect information on the catch of haddock, river herring, and shad than alternatives with only at-sea monitoring coverage. Herring Alternatives 2.1, 2.3, and 2.4 have a greater potential to reduce the variability in haddock, river herring, and shad catch and increase the likelihood that vessels can fully harvest the herring sub-ACLs than Herring Alternative 2.2.

Herring Alternative 2.1 specifies monitoring coverage at 100% while Herring Alternatives 2.2-2.4 allow monitoring coverage to range between 25% and 100%. The economic impact on herring vessels of paying for higher levels of monitoring coverage would be more negative than paying for lower levels of monitoring. Therefore, alternatives that specify higher coverage rates may have a more negative direct impact on herring vessels paying for monitoring coverage than alternatives with lower coverage rates.

While high levels of monitoring are not always necessary to address a monitoring goal, because the NEFMC is interested in increasing monitoring to improve the accuracy of catch estimates, in particular the ability to track catch against catch caps, more monitoring could be more effective than less monitoring. Additionally, because the catch of river herring and shad is highly variable, both spatially and temporally, increased monitoring for those species would be more effective than less monitoring. To the extent that increased monitoring helps reduce the variability of data tracked against catch caps and helps increase the likelihood that vessels can fully harvest herring sub-ACLs, Herring Alternatives 2.1, 2.3, and 2.4 may have more indirect positive economic impacts on herring vessels than Herring Alternative 2.2.

_0000010787

Herring Alternatives 2.1 and 2.2 would primarily allocate monitoring coverage by vessel permit category (i.e., Category A and B herring permits), Herring Alternative 2.4 would allocate monitoring coverage by fishing fleet (i.e., midwater trawl fleet), and Herring Alternative 2.3 would allocate monitoring coverage by permit category and fishing fleet.  The extent to which coverage is allocated consistent with SBRM fishing fleet will determine how the resulting data can be used.  Unless vessel permit category is equivalent to fishing fleet, the resulting information from Herring Alternatives 2.1 and 2.2 will have limited utility, when compared to Herring Alternatives 2.3 and 2.4.  The additional information on catch and discard estimates in the herring fishery obtained via Herring Alternatives 2.1, 2.2, and 2.3 (at-sea monitoring data) can be used for tracking catch against catch caps but it is unlikely that those data will be used for stock assessments and estimating total removals.  Additional data on catch and bycatch estimates in herring fishery obtained via Herring Alternatives 2.3 (EM and portside sampling data) and 2.4 could be used for catch cap monitoring as well as stock assessments and estimating total removals.  Any indirect economic benefits for herring vessels related to data utility would be more likely to be realized under Herring Alternatives 2.3 and 2.4 than under Herring Alternatives 2.1 and 2.2.

The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year.  If coverage is not available (either due to logistics or a lack of funding) for a specific trip, Herring Alternatives 2.1-2.4 specify that the vessels would be prohibited from participating in the herring fishery on that trip.  The selection of Herring Alternative 2 - Sub-Option 1 would enable coverage requirements to be waived on a specific trip to allow vessels to continue participating in the herring fishery, even if monitoring coverage is not available.  Should fishing effort be limited by the availability of monitoring coverage, such that the herring sub-ACLs in a given year are not harvested, there is the potential for additional negative economic impacts on herring vessels.  The selection of Herring Alternative 2 - Sub-Option 1 would enable monitoring coverage requirements to be waived on a specific trip, allowing a vessel to continue participating in the herring fishery, even if monitoring coverage is not available.

Herring Alternative 2.5 specifies that midwater trawl vessels fishing in the Groundfish Closed Areas must carry a NEFOP-level observer while Herring Alternative 2.6 would specify that coverage for midwater trawl vessels fishing in Groundfish Closed Areas matches the coverage target recommend by the NEFMC for the rest of the fishery.  The Herring Alternative 2 Sub-Options would apply to Herring Alternative 2.6 but not to Herring Alternative 2.5.  If the benefits associated with increased monitoring and/or the negative economic impacts of paying for monitoring coverage associated with Herring Alternative 2.6 are reduced or minimized by the selection of any of the sub-options, then the benefits of increased monitoring and/or

_0000010788

negative economic impacts associated with paying for monitoring coverage may be less under Herring Alternative 2.6 than under Herring Alternative 2.5.

During 2005-2010, less than 10% of the herring effort, less than 12% of the herring harvest, and less than 13% of the herring revenue for the midwater trawl fleet came from inside the Groundfish Closed Areas.  Additionally, herring catch accounted for almost 100% of the revenue generated by the midwater trawl fleet.  Haddock is the only non-target species of interest that is typically harvested by midwater vessels inside the Groundfish Closed Areas.  The haddock catch by midwater trawl vessels inside Groundfish Closed Areas is tracked against the haddock catch caps and haddock ACL.  The magnitude of potential reduction to RTO associated with Herring Alternative 2.5 is much less than under Herring Alternatives 2.1-2.4 because of the limited amount of time the midwater trawl fleet spends inside the Groundfish Closed Areas. The benefits of increased monitoring to herring vessels associated with Herring Alternative 2.5 would be similar to other alternatives that specify NEFOP-level observer coverage (Herring 2.1) and allocate monitoring coverage by midwater trawl fleet (Herring Alternatives 2.3-2.4), and would be greater than at-sea monitoring alternatives that allocate coverage by permit category (Herring Alternative 2.2).  However, the magnitude of those benefits would be less than Herring Alternatives 2.1-2.4 because increased monitoring would be focused on effort in the Groundfish Closed Areas and not across all herring management areas.

Herring Alternative 2.6 specifies that industry-funded monitoring requirements inside Groundfish Closed Areas would match monitoring requirements for the general herring fishery. Therefore, the economic impacts, both positive and negative, associated with Herring Alternative 2.6 have already been accounted for in Herring Alternatives 2.1-2.4.  The magnitude of economic impacts associated with Herring Alternative 2.6 is expected to be similar to the magnitude of impacts associated with Herring Alternative 2.5.

Herring Alternative 2.5 specifies that midwater trawl vessels fishing in the Groundfish Closed Areas must carry a NEFOP-level observer while Herring Alternative 2.6 would specify that coverage for midwater trawl vessels fishing in Groundfish Closed Areas would match the coverage targets recommended by the NEFMC for the rest of the fishery.  The Herring Alternative 2 Sub-Options would apply to Herring Alternative 2.6 but not to Herring Alternative 2.5.  Even though Herring Alternative 2.5 would not allow coverage requirements to be waived for a trip inside the Groundfish Closed Areas, it is unlikely that monitoring availability would reduce fishing effort such that the herring ACLs are not able to be harvested.

In general, the direct economic impacts on herring vessels associated with Herring Alternatives 2.1-2.6 are negative.  Impacts result from reductions in RTO related to paying for monitoring coverage and possible reductions in fishing effort to match monitoring availability and would vary in magnitude by alternative.  Indirect positive economic impacts on herring vessels result from increased monitoring and relate to the potential for vessels to be able to fully harvest the herring ACLs without being constrained by catch caps.

The following box plots show of the distribution of monitoring costs and the distribution of monitoring costs as a percent of a vessel's RTO.  Box plots are a useful tool to show how data are distributed. The following schematic shows what the various pieces of a box plot show regarding the distribution of data.



When examining the box plots, it is important to note the differences between mean and median values by gear type and by alternatives, as well as the differences in the variability of values by these criteria.  For example, in the first figure (Herring Alternative 2.1) there is a much wider range of costs for purse seine vessels than small mesh bottom trawl vessels, as represented by the length of the rectangle.  Further, the difference between alternatives for purse seine vessels shows that the mean and median values are lower under the 25 mt threshold (Sub-Option 5) but also that the likely range of NEFOP costs are much narrower.

**TABLE 15.  HERRING ALTERNATIVES 2.1, 2.2, 2.3 (PURSE SEINE AND SMBT) – ANNUAL AVERAGE PER VESSEL SUMMARY**

| | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | > 1 lb | > 25 mt | > 1 lb | > 25 mt | > 1 lb | > 25 mt | > 1 lb | > 25 mt |
| Mean RTO | $163,080 | | $241,180 | | $141,169 | | $144,125 | $163,329 |
| Median RTO | $159,529 | | $253,048 | | $60,156 | | $121,026 | $135,782 |
| Mean Sea Days (100%) | 103 | 83 | 56 | 29 | 28 | 19 | 21 | 20 |
| Median Sea Days (100%) | 104 | 84 | 57 | 26 | 23 | 16 | 17 | 15 |
| Mean Sea Days (75%) | 77 | 62 | 42 | 22 | 21 | 15 | 17 | 15 |
| Median Sea Days (75%) | 77 | 63 | 43 | 20 | 18 | 12 | 13 | 11 |
| Mean Sea Days (50%) | 52 | 42 | 28 | 15 | 14 | 10 | 12 | 10 |
| Median Sea Days (50%) | 51 | 42 | 29 | 13 | 12 | 8 | 9 | 8 |
| Mean Sea Days (25%) | 26 | 21 | 14 | 8 | 8 | 6 | 8 | 7 |
| Median Sea Days (25%) | 26 | 21 | 14 | 7 | 7 | 5 | 6 | 6 |



**FIGURE 1.  HERRING ALTERNATIVE 2.1 100% NEFOP COST AND PERCENT OF RTO**

_0000010792



**FIGURE 2.  HERRING ALTERNATIVE 2.2 100% ASM COST AND PERCENT OF RTO**

_0000010793



**FIGURE 3.  HERRING ALTERNATIVE 2.2 75% ASM COST AND PERCENT OF RTO**



**FIGURE 4.  HERRING ALTERNATIVE 2.2 50% ASM COST AND PERCENT OF RTO**



**FIGURE 5.  HERRING ALTERNATIVE 2.2 25% ASM COST AND PERCENT OF RTO**

Note: The box plots for purse seine and SMBT vessels shown in Figures 2-5 under Herring Alternative 2.2 also describe the distribution of values for Herring Alternative 2.3.

**TABLE 16.  HERRING ALTERNATIVES 2.1, 2.2, 2.3 (PURSE SEINE AND SMBT) – ANNUAL FLEET SUMMARY**

| Fleet Level | Paired MWT ≥ 1 LB | Paired MWT > 25 MT | Single MWT ≥ 1 LB | Single MWT > 25 MT | Purse Seine ≥ 1 LB | Purse Seine > 25 MT | SMBT ≥ 1 LB | SMBT > 25 MT |
|---|---|---|---|---|---|---|---|---|
| Number of Vessels | 8 | 8 | 6 | 6 | 7 | 7 | 9 | 6 |
| Days at Sea | 825 | 663 | 170 | 116 | 392 | 204 | 192 | 117 |
| Total NEFOP Cost (2.1) | $673k | $541k | $138k | $95k | $320k | $166k | $156k | $96k |
| Total ASM Cost (2.2) | $586k | $471k | $120k | $82k | $278k | $145k | $136k | $83k |
| Total Revenue | $10.6M | $9.8M | $4.5M | $4.2M | $11.0M | $10.3M | $2.6M | $1.8M |
| % Revenue Herring | 89% | 93% | 86% | | 100% | | 58% | 78% |
| % Revenue Mackerel | 11% | 7% | 13% | | - | | 3% | 2% |
| % Revenue Squid | - | | - | | - | | 20% | 10% |
| *Data shown by trips harvesting ≥ 1 lb of herring and > 25 mt of herring* | | | | | | | | |

**TABLE 17.  HERRING ALTERNATIVES 2.3 AND 2.4 – ANNUAL AVERAGE PER MIDWATER TRAWL VESSEL SUMMARY**

| | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | > 1 lb | > 25 mt | > 1 lb | > 25 mt |
| Mean RTO | $163,080 | | $134,205 | $149,714 |
| Median RTO | $159,529 | | $60,156 | $80,070 |
| Mean EM Days (100%) | 103 | 83 | 22 | 17 |
| Median EM Days (100%) | 104 | 84 | 18 | 13 |

IFM Amendment Herring Coverage Target Alternatives Discussion Document          April 19-21, 2016

_0000010797



**FIGURE 6.  HERRING ALTERNATIVE 2.4 100% EM AND PORTSIDE COST AND PERCENT OF RTO**



**FIGURE 7.  HERRING ALTERNATIVE 2.4 50% EM AND PORTSIDE COST AND PERCENT OF RTO**

**TABLE 18.  HERRING ALTERNATIVES 2.3 AND 2.4 – ANNUAL MIDWATER TRAWL FLEET SUMMARY**

| Fleet Level | Paired MWT ≥ 1 LB | Paired MWT > 25 MT | Single MWT ≥ 1 LB | Single MWT > 25 MT |
|---|---|---|---|---|
| Number of Vessels | 8 | 8 | 8 | 7 |
| Days at Sea | 825 | 663 | 180 | 117 |
| Total Monitoring Cost (100% EM at $325/day, 100% PS at $5.12/mt, year 2) | $457,595 | $393,117 | $134,165 | $107,580 |
| Total Monitoring Cost (100% EM at $187/day, 50% PS at $3.84/mt, year 2) | $222,958 | $188,376 | $61,067 | $47,083 |
| Total Revenue | $10.6M | $9.8M | $4.5M | $4.2M |
| % Revenue Herring | 89% | 93% | 86% | 86% |
| % Revenue Mackerel | 11% | 7% | 13% | 14% |
| % Revenue Squid | - | | - | |
| *Data shown by trips harvesting ≥ 1 lb of herring and > 25 mt of herring* | | | | |

IFM Amendment Herring Coverage Target Alternatives Discussion Document          April 19-21, 2016

**TABLE 19.  HERRING ALTERNATIVE 2.5 – ANNUAL AVERAGE PER MIDWATER TRAWL VESSEL SUMMARY**

|  | Paired MWT | | Single MWT | |
|---|---|---|---|---|
|  | > 1 lb | > 25 mt | > 1 lb | > 25 mt |
| Mean RTO | $172,922 | | $545,609 | |
| Median RTO | $159,529 | | $545,609 | |
| Mean Sea Days | 14 | 9 | 4 | 4 |
| Median Sea Days | 11 | 9 | 4 | 4 |



**FIGURE 8.  HERRING ALTERNATIVE 2.5 100% NEFOP FOR MIDWATER TRAWL VESSELS IN GROUNDFISH CLOSED AREAS COST AND PERCENT OF RTO**

**TABLE 20.  HERRING ALTERNATIVE 2.5 – ANNUAL MIDWATER TRAWL FLEET SUMMARY**

| Fleet Level | Single and Paired MWT $\geq$ 1 LB | Single and Paired MWT > 25 MT |
|---|---|---|
| Number of Vessels | 8 | 8 |
| Days at Sea | 92 | 62 |
| Total NEFOP Cost | $74,827 | $50,347 |
| Total Revenue | $1.4M | $1.4M |
| % Revenue Herring | 99.9% | 100% |
| % Revenue Mackerel | - | - |
| % Revenue Squid | - | - |
| % Other Species | 0.1% | 0% |
| *Data shown by trips harvesting $\geq$ 1 lb of herring and > 25 mt of herring* | | |

Economic and effort data for Herring Alternative 2.6 is included in tables for Herring Alternatives 2.1-2.4.

## Appendix 1 – Monitoring and Service Provider Requirements

The following sections are the existing regulations for monitoring service providers. Omnibus Alternative 2 would revise these requirements to apply to all industry-funded monitoring programs in the New England and Mid-Atlantic FMPs.

### § 648.11 -- At-sea sea sampler/observer coverage.

(g)((5)(3) ) Owners of scallop vessels shall pay observer service providers for observer services within 45 days of the end of a fishing trip on which an observer deployed.

(h) Observer service provider approval and responsibilities—(1) General. An entity seeking to provide observer services must apply for and obtain approval from NMFS following submission of a complete application. A list of approved observer service providers shall be distributed to vessel owners and shall be posted on the NMFS/NEFOP website at: www.nefsc.noaa.gov/femad/fsb/.

(2) [Reserved]

(3) Contents of application. An application to become an approved observer service provider shall contain the following:

(i) Identification of the management, organizational structure, and ownership structure of the applicant's business, including identification by name and general function of all controlling management interests in the company, including but not limited to owners, board members, officers, authorized agents, and staff. If the applicant is a corporation, the articles of incorporation must be provided. If the applicant is a partnership, the partnership agreement must be provided.

(ii) The permanent mailing address, phone and fax numbers where the owner(s) can be contacted for official correspondence, and the current physical location, business mailing address, business telephone and fax numbers, and business email address for each office.

(iii) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, that they are free from a conflict of interest as described under paragraph (h)(6) of this section.

(iv) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, describing any criminal conviction(s), Federal contract(s) they have had and the performance rating they received on the contracts, and previous decertification action(s) while working as an observer or observer service provider.

(v) A description of any prior experience the applicant may have in placing individuals in remote field and/or marine work environments. This includes, but is not limited to, recruiting, hiring, deployment, and personnel administration.

_0000010803

(vi) A description of the applicant's ability to carry out the responsibilities and duties of a fishery observer services provider as set out under paragraph (h)(5) of this section, and the arrangements to be used.

(vii) Evidence of holding adequate insurance to cover injury, liability, and accidental death for observers during their period of employment (including during training). Workers' Compensation and Maritime Employer's Liability insurance must be provided to cover the observer, vessel owner, and observer provider. The minimum coverage required is $5 million. Observer service providers shall provide copies of the insurance policies to observers to display to the vessel owner, operator, or vessel manager, when requested.

(viii) Proof that its observers, whether contracted or employed by the service provider, are compensated with salaries that meet or exceed the U.S. Department of Labor (DOL) guidelines for observers. Observers shall be compensated as Fair Labor Standards Act (FLSA) non-exempt employees. Observer providers shall provide any other benefits and personnel services in accordance with the terms of each observer's contract or employment status.

(ix) The names of its fully equipped, NMFS/NEFOP certified, observers on staff or a list of its training candidates (with resumes) and a request for an appropriate NMFS/NEFOP Observer Training class. The NEFOP training has a minimum class size of eight individuals, which may be split among multiple vendors requesting training. Requests for training classes with fewer than eight individuals will be delayed until further requests make up the full training class size.

(x) An Emergency Action Plan (EAP) describing its response to an "at sea" emergency with an observer, including, but not limited to, personal injury, death, harassment, or intimidation.

(4) Application evaluation. (i) NMFS shall review and evaluate each application submitted under paragraph (h)(3) of this section. Issuance of approval as an observer provider shall be based on completeness of the application, and a determination by NMFS of the applicant's ability to perform the duties and responsibilities of a fishery observer service provider, as demonstrated in the application information. A decision to approve or deny an application shall be made by NMFS within 15 business days of receipt of the application by NMFS.

(ii) If NMFS approves the application, the observer service provider's name will be added to the list of approved observer service providers found on the NMFS/NEFOP Website specified in paragraph (h)(1) of this section, and in any outreach information to the industry. Approved observer service providers shall be notified in writing and provided with any information pertinent to its participation in the fishery observer program.

(iii) An application shall be denied if NMFS determines that the information provided in the application is not complete or the evaluation criteria are not met. NMFS shall notify the applicant in writing of any deficiencies in the application or information submitted in support of the application. An applicant who receives a denial of his or her application may present additional information to rectify the deficiencies specified in the written denial, provided such information is submitted to NMFS within 30 days of the

_0000010804

applicant's receipt of the denial notification from NMFS. In the absence of additional information, and after 30 days from an applicant's receipt of a denial, an observer provider is required to resubmit an application containing all of the information required under the application process specified in paragraph (h)(3) of this section to be re-considered for being added to the list of approved observer service providers.

(5) Responsibilities of observer service providers. (i) An observer service provider must provide observers certified by NMFS/NEFOP pursuant to paragraph (i) of this section for deployment in a fishery when contacted and contracted by the owner, operator, or vessel manager of a fishing vessel, unless the observer service provider refuses to deploy an observer on a requesting vessel for any of the reasons specified at paragraph (h)(5)(viii) of this section.

(ii) An observer service provider must provide to each of its observers:

(A) All necessary transportation, including arrangements and logistics, of observers to the initial location of deployment, to all subsequent vessel assignments, and to any debriefing locations, if necessary;

(B) Lodging, per diem, and any other services necessary for observers assigned to a fishing vessel or to attend an appropriate NMFS/NEFOP observer training class;

(C) The required observer equipment, in accordance with equipment requirements listed on the NMFS/NEFOP Website specified in paragraph (h)(1) of this section, prior to any deployment and/or prior to NMFS observer certification training; and

(D) Individually assigned communication equipment, in working order, such as a mobile phone, for all necessary communication. An observer service provider may alternatively compensate observers for the use of the observer's personal mobile phone, or other device, for communications made in support of, or necessary for, the observer's duties.

(iii) Observer deployment logistics. Each approved observer service provider must assign an available certified observer to a vessel upon request. Each approved observer service provider must be accessible 24 hours per day, 7 days per week, to enable an owner, operator, or manager of a vessel to secure observer coverage when requested. The telephone system must be monitored a minimum of four times daily to ensure rapid response to industry requests. Observer service providers approved under paragraph (h) of this section are required to report observer deployments to NMFS daily for the purpose of determining whether the predetermined coverage levels are being achieved in the appropriate fishery.

(iv) Observer deployment limitations. (A) A candidate observer's first four deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/NEFOP prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified.

(B) Unless alternative arrangements are approved by NMFS, an observer provider must not deploy any observer on the same vessel for more than two consecutive multi-day trips, and not more than twice in any given month for multi-day deployments.

Appendix 1 – Monitoring and Service Provider Requirements                    April 19-21, 2016

_0000010805

(v) Communications with observers. An observer service provider must have an employee responsible for observer activities on call 24 hours a day to handle emergencies involving observers or problems concerning observer logistics, whenever observers are at sea, stationed shoreside, in transit, or in port awaiting vessel assignment.

(vi) Observer training requirements. The following information must be submitted to NMFS/NEFOP at least 7 days prior to the beginning of the proposed training class: A list of observer candidates; observer candidate resumes; and a statement signed by the candidate, under penalty of perjury, that discloses the candidate's criminal convictions, if any. All observer trainees must complete a basic cardiopulmonary resuscitation/first aid course prior to the end of a NMFS/NEFOP Observer Training class. NMFS may reject a candidate for training if the candidate does not meet the minimum qualification requirements as outlined by NMFS/NEFOP minimum eligibility standards for observers as described on the NMFS/NEFOP Website.

(vii) Reports—(A) Observer deployment reports. The observer service provider must report to NMFS/NEFOP when, where, to whom, and to what fishery (including Open Area or Access Area for sea scallop trips) an observer has been deployed, within 24 hours of the observer's departure. The observer service provider must ensure that the observer reports back to NMFS its Observer Contract (OBSCON) data, as described in the certified observer training, within 24 hours of landing. OBSCON data are to be submitted electronically or by other means specified by NMFS. The observer service provider shall provide the raw (unedited) data collected by the observer to NMFS within 4 business days of the trip landing.

(B) Safety refusals. The observer service provider must report to NMFS any trip that has been refused due to safety issues, e.g., failure to hold a valid USCG Commercial Fishing Vessel Safety Examination Decal or to meet the safety requirements of the observer's pre-trip vessel safety checklist, within 24 hours of the refusal.

(C) Biological samples. The observer service provider must ensure that biological samples, including whole marine mammals, sea turtles, and sea birds, are stored/handled properly and transported to NMFS within 7 days of landing.

(D) Observer debriefing. The observer service provider must ensure that the observer remains available to NMFS, either in-person or via phone, at NMFS' discretion, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any observed trip. If requested by NMFS, an observer that is at sea during the 2-week period must contact NMFS upon his or her return.

(E) Observer availability report. The observer service provider must report to NMFS any occurrence of inability to respond to an industry request for observer coverage due to the lack of available observers by 5 p.m., Eastern Time, of any day on which the provider is unable to respond to an industry request for observer coverage.

(F) Other reports. The observer service provider must report possible observer harassment, discrimination, concerns about vessel safety or marine casualty, or observer illness or injury; and any

_0000010806

information, allegations, or reports regarding observer conflict of interest or breach of the standards of behavior, to NMFS/NEFOP within 24 hours of the event or within 24 hours of learning of the event.

(G) Observer status report. The observer service provider must provide NMFS/NEFOP with an updated list of contact information for all observers that includes the observer identification number, observer's name, mailing address, email address, phone numbers, homeports or fisheries/trip types assigned, and must include whether or not the observer is "in service," indicating when the observer has requested leave and/or is not currently working for an industry funded program.

(H) Vessel contract. The observer service provider must submit to NMFS/NEFOP, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the observer provider and those entities requiring observer services.

(I) Observer contract. The observer service provider must submit to NMFS/NEFOP, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the observer provider and specific observers.

(J) Additional information. The observer service provider must submit to NMFS/NEFOP, if requested, copies of any information developed and/or used by the observer provider and distributed to vessels, such as informational pamphlets, payment notification, description of observer duties, etc.

(viii) Refusal to deploy an observer. (A) An observer service provider may refuse to deploy an observer on a requesting scallop vessel if the observer service provider does not have an available observer within 48 hours of receiving a request for an observer from a vessel.

(B) An observer service provider may refuse to deploy an observer on a requesting fishing vessel if the observer service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described at §600.746.

(C) The observer service provider may refuse to deploy an observer on a fishing vessel that is otherwise eligible to carry an observer for any other reason, including failure to pay for previous observer deployments, provided the observer service provider has received prior written confirmation from NMFS authorizing such refusal.

(6) Limitations on conflict of interest. An observer service provider:

(i) Must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, a fishing vessel, fish dealer, fishery advocacy group, and/or fishery research;

(ii) Must assign observers without regard to any preference by representatives of vessels other than when an observer will be deployed; and

(iii) Must not solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing related activities that are

_0000010807

regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of observer providers.

(7) Removal of observer service provider from the list of approved observer service providers. An observer service provider that fails to meet the requirements, conditions, and responsibilities specified in paragraphs (h)(5) and (6) of this section shall be notified by NMFS, in writing, that it is subject to removal from the list of approved observer service providers. Such notification shall specify the reasons for the pending removal. An observer service provider that has received notification that it is subject to removal from the list of approved observer service providers may submit written information to rebut the reasons for removal from the list. Such rebuttal must be submitted within 30 days of notification received by the observer service provider that the observer service provider is subject to removal and must be accompanied by written evidence rebutting the basis for removal. NMFS shall review information rebutting the pending removal and shall notify the observer service provider within 15 days of receipt of the rebuttal whether or not the removal is warranted. If no response to a pending removal is received by NMFS, the observer service provider shall be automatically removed from the list of approved observer service providers. The decision to remove the observer service provider from the list, either after reviewing a rebuttal, or if no rebuttal is submitted, shall be the final decision of NMFS and the Department of Commerce. Removal from the list of approved observer service providers does not necessarily prevent such observer service provider from obtaining an approval in the future if a new application is submitted that demonstrates that the reasons for removal are remedied. Certified observers under contract with an observer service provider that has been removed from the list of approved service providers must complete their assigned duties for any fishing trips on which the observers are deployed at the time the observer service provider is removed from the list of approved observer service providers. An observer service provider removed from the list of approved observer service providers is responsible for providing NMFS with the information required in paragraph (h)(5)(vii) of this section following completion of the trip. NMFS may consider, but is not limited to, the following in determining if an observer service provider may remain on the list of approved observer service providers:

(i) Failure to meet the requirements, conditions, and responsibilities of observer service providers specified in paragraphs (h)(5) and (h)(6) of this section;

(ii) Evidence of conflict of interest as defined under paragraph (h)(6) of this section;

(iii) Evidence of criminal convictions related to:

(A) Embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; or

(B) The commission of any other crimes of dishonesty, as defined by state law or Federal law, that would seriously and directly affect the fitness of an applicant in providing observer services under this section;

(iv) Unsatisfactory performance ratings on any Federal contracts held by the applicant; and

_0000010808

(v) Evidence of any history of decertification as either an observer or observer provider.

(i) Observer certification. (1) To be certified, employees or sub-contractors operating as observers for observer service providers approved under paragraph (h) of this section must meet NMFS National Minimum Eligibility Standards for observers. NMFS National Minimum Eligibility Standards are available at the National Observer Program Website:www.nmfs.noaa.gov/op/pds/categories/science_and_technology.html.

(2) Observer training. In order to be deployed on any fishing vessel, a candidate observer must have passed an appropriate NMFS/NEFOP Observer Training course. If a candidate fails training, the candidate shall be notified in writing on or before the last day of training. The notification will indicate the reasons the candidate failed the training. Observer training shall include an observer training trip, as part of the observer's training, aboard a fishing vessel with a trainer. A candidate observer's first four deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/NEFOP, prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified.

(3) Observer requirements. All observers must:

(i) Have a valid NMFS/NEFOP fisheries observer certification pursuant to paragraph (i)(1) of this section;

(ii) Be physically and mentally capable of carrying out the responsibilities of an observer on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/NEFOP Website specified in paragraph (h)(1) of this section and shall be provided to each approved observer service provider;

(iii) Have successfully completed all NMFS-required training and briefings for observers before deployment, pursuant to paragraph (i)(2) of this section; and

(iv) Hold a current Red Cross (or equivalence) CPR/First Aid certification.

(v) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment.

(4) Probation and decertification. NMFS may review observer certifications and issue observer certification probation and/or decertification as described in NMFS policy found on the NMFS/NEFOP Website specified in paragraph (h)(1) of this section.

(5) Issuance of decertification. Upon determination that decertification is warranted under paragraph (i)(4) of this section, NMFS shall issue a written decision to decertify the observer to the observer and approved observer service providers via certified mail at the observer's most current address provided to NMFS. The decision shall identify whether a certification is revoked and shall identify the specific reasons for the action taken. Decertification is effective immediately as of the date of issuance, unless the decertification official notes a compelling reason for maintaining certification for a specified period

_0000010809

and under specified conditions. Decertification is the final decision of NMFS and the Department of Commerce and may not be appealed.

(j) In the event that a vessel is requested by the Regional Administrator to carry a NMFS-certified fisheries observer pursuant to paragraph (a) of this section and is also selected to carry an at-sea monitor as part of an approved sector at-sea monitoring program specified in §648.87(b)(1)(v) for the same trip, only the NMFS-certified fisheries observer is required to go on that particular trip.

## § 648.87(b) -- Groundfish Sector At-Sea and Electronic Monitoring Requirements

(4) Independent third-party monitoring provider standards. Any service provider intending to provide at-sea/electronic monitoring services described in paragraph (b)(1)(v) of this section must apply to and be approved/certified by NMFS in a manner consistent with the Administrative Procedure Act. NMFS shall approve/certify service providers and/or at-sea monitors as eligible to provide sector monitoring services specified in this part and can disapprove/decertify service providers and/or individual monitors through notice in writing to individual service providers/monitors if the following criteria are no longer being met:

(i) Service provider information. As part of the application for service provider approval/certification, potential service providers must include at least the following information:

(A) Identification of corporate structure, including the names and duties of controlling interests in the company such as owners, board members, authorized agents, and staff; and articles of incorporation, or a partnership agreement, as appropriate;

(B) Contact information for official correspondence and communication with any other office;

(C) A statement, signed under penalty of perjury, from each owner, board member, and officer that they are free from a conflict of interest with fishing-related parties including, but not limited to, vessels, dealers, shipping companies, sectors, sector managers, advocacy groups, or research institutions and will not accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from such parties;

(D) A statement, signed under penalty of perjury, from each owner, board member, and officer describing any criminal convictions, Federal contracts they have had, and the performance rating they received on the contract, and previous decertification action while working as an observer or observer service provider;

(E) A description of any prior experience the applicant may have in placing individuals in remote field and/or marine work environments including, but not limited to, recruiting, hiring, deployment, and personnel administration;

(F) A description of the applicant's ability to carry out the responsibilities and duties of a sector monitoring/reporting service provider and the arrangements to be used, including whether the service provider is able to offer at-sea monitoring services;

(G) Evidence of adequate insurance (copies of which shall be provided to the vessel owner, operator, or vessel manager, when requested) to cover injury, liability, and accidental death to cover at-sea monitors (including during training); vessel owner; and service provider;

(H) Proof of benefits and personnel services provided in accordance with the terms of each monitor's contract or employment status;

(I) Proof that the service provider's at-sea monitors have passed an adequate training course sponsored by the service providers to the extent not funded by NMFS that is consistent with the curriculum used in the current yearly NEFOP training course, unless otherwise specified by NMFS;

(J) An Emergency Action Plan describing the provider's response to an emergency with an at-sea monitor, including, but not limited to, personal injury, death, harassment, or intimidation; and

(K) Evidence that the company is in good financial standing;

(ii) Service provider performance requirements. At-sea monitoring service providers must be able to document compliance with the following criteria and requirements:

(A) A service provider must establish and carry out a comprehensive plan to deploy NMFS-certified at-sea monitors, or other at-sea monitoring mechanism, such as electronic monitoring equipment that is approved by NMFS, according to a prescribed coverage level (or level of precision for catch estimation), as specified by NMFS, including all of the necessary vessel reporting/notice requirements to facilitate such deployment, as follows:

(1) A service provider must be available to industry 24 hr per day, 7 days per week, with the telephone system monitored a minimum of four times daily to ensure rapid response to industry requests;

(2) A service provider must be able to deploy at-sea monitors, or other approved at-sea monitoring mechanism to all ports in which service is required by sectors, or a subset of ports as part of a contract with a particular sector;

(3) A service provider must report at-sea monitors and other approved at-sea monitoring mechanism deployments to NMFS and the sector manager in a timely manner to determine whether the predetermined coverage levels are being achieved for the appropriate sector;

(4) A service provider must assign at-sea monitors and other approved at-sea monitoring mechanisms without regard to any preference by the sector manager or representatives of vessels other than when the service is needed and the availability of approved/certified monitors and other at-sea monitoring mechanisms;

_0000010811

(5) A service provider's at-sea monitor assignment must be fair, equitable, representative of fishing activities within each sector, and able to monitor fishing activity throughout the fishing year;

(6) For service providers offering catch estimation or at-sea monitoring services, a service provider must be able to determine an estimate of discards for each trip and provide such information to the sector manager and NMFS, as appropriate and as required by this section;

(B) The service provider must ensure that at-sea monitors remain available to NMFS, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any monitored trip/offload;

(C) The service provider must report possible at-sea monitor harassment; discrimination; concerns about vessel safety or marine casualty; injury; and any information, allegations, or reports regarding at-sea monitor conflict of interest or breach of the standards of behavior to NMFS and/or the sector manager, as specified by NMFS;

(D) The service provider must submit to NMFS, if requested, a copy of each signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the service provider and those entities requiring services (i.e., sectors and participating vessels) and between the service provider and specific dockside, roving, or at-sea monitors;

(E) The service provider must submit to NMFS, if requested, copies of any information developed and used by the service providers distributed to vessels, such as informational pamphlets, payment notification, description of duties, etc.;

(F) A service provider may refuse to deploy an at-sea monitor or other approved at-sea monitoring mechanism on a requesting fishing vessel for any reason including, but not limited to, the following:

(1) If the service provider does not have an available at-sea monitor or other at-sea monitoring mechanism approved by NMFS within the advanced notice requirements established by the service provider;

(2) If the service provider is not given adequate notice of vessel departure or landing from the sector manager or participating vessels, as specified by the service provider;

(3) For the purposes of at-sea monitoring, if the service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described in §600.746; and

(4) Failure to pay for previous deployments of at-sea monitors, or other approved at-sea monitoring mechanism.

(G) With the exception of a service provider offering reporting, dockside, and/or at-sea monitoring services to participants of another fishery managed under Federal regulations, a service provider must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, fishing vessels, dealers, shipping companies, sectors, sector managers, advocacy groups, or research institutions and may not solicit or accept, directly or indirectly, any gratuity, gift, favor,

entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing-related activities that are regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of service providers;

(H) A system to record, retain, and distribute the following information to NMFS, as requested, for a period specified by NMFS, including:

(1) At-sea monitor and other approved monitoring equipment deployment levels, including the number of refusals and reasons for such refusals;

(2) Incident/non-compliance reports (e.g., failure to offload catch); and

(3) Hail reports, landings records, and other associated interactions with vessels and dealers.

(I) A means to protect the confidentiality and privacy of data submitted by vessels, as required by the Magnuson-Stevens Act; and

(J) A service provider must be able to supply at-sea monitors with sufficient safety and data-gathering equipment, as specified by NMFS.

(iii) Standards for individual at-sea monitors. For an individual to be approved/certified as an at-sea monitor, the service provider must demonstrate that each potential monitor meets the following criteria:

(A) A high school diploma or legal equivalent;

(B) Successful completion of all NMFS-required training and briefings before deployment;

(C) Physical and mental capacity for carrying out the responsibilities of an at-sea monitor on board fishing vessels, pursuant to standards established by NMFS such as being certified by a physician to be physically fit to work as an at-sea monitor after consideration of at least the following work-related issues:

(1) Susceptibility to chronic motion sickness;

(2) Ability to live in confined quarters;

(3) Ability to tolerate stress;

(4) Ability to lift and carry heavy objects up to 50 lb (22.7 kg);

(5) Ability to drag heavy objects up to 200 lb (90.7 kg); and

(6) Ability to climb a ladder.

(D) A current Red Cross (or equivalent) CPR/first aid certification;

(E) Absence of fisheries-related convictions, based upon a thorough background check; and

(F) Independence from fishing-related parties including, but not limited to, vessels, dealers, shipping companies, sectors, sector managers, advocacy groups, or research institutions to prevent conflicts of interest.

(5) At-sea/electronic monitoring operational standards. In addition to the independent third-party monitoring provider standards specified in paragraph (b)(4) of this section, any at-sea/electronic monitoring program developed as part of a sector's yearly operations plan pursuant to paragraph (b)(1)(v)(B) of this section must meet the following operational standards to be approved by NMFS:

(i) Gear. Each at-sea monitor must be provided with all of the equipment specified by the Northeast Fisheries At-sea Monitoring Program. A list of such equipment is available from the Northeast Fisheries Science Center upon request. At-sea/electronic monitoring service providers are responsible for the cost of providing such gear to at-sea monitors to the extent not funded by NMFS. This gear shall be inspected by NMFS upon the completion of training required pursuant to paragraph (b)(4)(i)(I) of this section.

(ii) Vessel selection protocol. An at-sea/electronic monitoring program service provider must develop a formal vessel-selection protocol to deploy at-sea monitors and electronic monitoring equipment in a statistically random manner consistent with the coverage levels required pursuant to paragraph (b)(1)(v)(B)(1) of this section. This protocol must include a method to allow for waivers in specific circumstances, including how waivers would be requested, assessed, and recorded.

(iii) Reporting/recordkeeping requirements—(A) Vessel requirements. In addition to all other reporting/recordkeeping requirements specified in this part, to facilitate the deployment of at-sea monitors and electronic monitoring equipment pursuant to paragraph (b)(1)(v)(B)(1) of this section, the operator of a vessel fishing on a sector trip must provide at-sea/electronic monitoring service providers with at least the following information: The vessel name, permit number, trip ID number in the form of the VTR serial number of the first VTR page for that trip or another trip identifier specified by NMFS, whether a monkfish DAS will be used, and an estimate of the date/time of departure in advance of each trip. The timing of such notice shall be sufficient to allow ample time for the service provider to determine whether an at-sea monitor or electronic monitoring equipment will be deployed on each trip and allow the at-sea monitor or electronic monitoring equipment to prepare for the trip and get to port, or to be installed on the vessel, respectively. The details of the timing, method (e.g., phone, email, etc.), and information needed for such pre-trip notifications shall be included as part of a sector's yearly operations plan. If a vessel has been informed by a service provider that an at-sea monitor or electronic monitoring equipment has been assigned to a particular trip pursuant to paragraph (b)(5)(iii)(B)(1) of this section, the vessel may not leave port to begin that trip until the at-sea monitor has arrived and boarded the vessel, or the electronic monitoring equipment has been properly installed.

(B) At-sea/electronic monitoring service provider requirements—(1) Confirmation of pre-trip notification. Upon receipt of a pre-trip notification pursuant to paragraph (b)(5)(iii)(A) of this section, the service provider shall inform the vessel operator whether the vessel will be monitored by an at-sea observer or electronic monitoring equipment for that trip, or will be issued an at-sea/electronic

_0000010814

monitoring waiver for that trip based upon the vessel selection protocol specified in paragraph (b)(5)(ii) of this section.

(2) At-sea/electronic monitoring report. A report detailing area fished and the amount of each species kept and discarded shall be submitted electronically in a standard acceptable form to the appropriate sector and NMFS within 48 hr of the completion of the trip, as instructed by the Regional Administrator. The data elements to be collected and the format for submission shall be specified by NMFS and distributed to all approved at-sea/electronic monitoring service providers and sectors. At-sea/electronic monitoring data shall not be accepted until such data pass automated NMFS data quality checks.

(iv) Safety hazards—(A) Vessel requirements. The operator of a sector vessel must detail and identify any safety hazards to any at-sea monitor assigned pursuant to paragraph (b)(5)(iii)(B)(1) of this section prior to leaving port. A vessel cannot begin a trip if it has failed a review of safety issues pursuant to paragraph (b)(5)(iv)(B) of this section, until the identified safety deficiency has been resolved, pursuant to §600.746(i).

(B) At-sea/electronic monitoring service provider requirements. An at-sea monitor must complete a pre-trip vessel safety checklist provided by NMFS before an at-sea monitor can leave port onboard a vessel on a sector trip. If the vessel fails a review of safety issues pursuant to this paragraph (b)(5)(iv)(B), an at-sea monitor cannot be deployed on that vessel for that trip.

(v) Adjustment to operational standards. The at-sea/electronic monitoring operational standards specified in paragraph (b)(5) of this section may be revised by the Regional Administrator in a manner consistent with the Administrative Procedure Act.

_0000010815

**Appendix 2 – Monitoring Cost Estimates for the Industry-Funded Monitoring Omnibus Amendment**

*NMFS Costs for NEFOP-level observers, at-sea monitors and dockside monitors.* Based on fiscal year 2013 expenses, Table 1 shows the level of costs required to support the deployment of all Northeast Region at-sea monitoring programs, including NEFOP observers, and groundfish at-sea monitors, and the scallop industry-funded monitoring program. These are presented as annual costs because while some components can be scaled up proportional to an increase in the total number of sea days, many cannot be scaled proportionally. For example, an increase in observer days would increase the number of hours needed to process data and that need could be met by hiring additional data processing personnel (proportional to the increased need). However, the facilities (particularly office space) needed to accommodate the additional data processing personnel is not proportionally scalable. <u>The approximately $5 million of NMFS costs, detailed below, supported 10,666 sea days in FY 2013, but could support about a maximum of 15,000 sea days per year.</u> The currently leased facilities could accommodate additional personnel to support an additional 2,000 sea days. However, beyond that, new facilities cost would have to be incurred. Facility costs cannot be obtained in small increments, so if sea days beyond 17,000 are considered, new facilities would have to be obtained so that there is sufficient capacity to cover the upper end of any anticipated increase. NMFS costs for dockside monitoring programs are likely similar to the costs described in this annual estimate.

The operational costs are presented as a single figure and are not broken out by each of the three components because there is some overlap, particularly when allocating employees' time over these activities.

**TABLE 1. NMFS COST RESPONSIBILITIES FOR MONITORING**

| NMFS Cost Responsibilities | | Annual Cost (FY2013) for all Programs (NEFOP, ASM, and industry funded scallops) |
|---|---|---|
| **Training and Data Processing Costs** | The labor and facilities costs associated with training and debriefing of monitors | $805,700 |
| | Data processing | $2,057,100 |
| **Operational Costs** | Certification of monitoring providers and individual monitors; performance monitoring to maintain certifications | $2,244,700 |
| | Developing and executing vessel selection | |
| | Costs associated with liaison activities between service providers, NMFS, Councils, sectors and other partners | |
| **Total** | | $5,107,500 |

The groundfish electronic monitoring cost comparison report estimates NMFS costs for the groundfish at-sea monitoring program for fiscal year 2014 costs. In fiscal year 2014, NMFS spent an estimated

_0000010816

$531,953 on training, $626,043 on data processing, and $719,548 on program management for the groundfish at-sea monitoring program for a total cost of $1,877,544 (Table 2).  This total cost is divided by the number of at-sea monitor sea days accomplished in 2014 (3,541 days) to get a per sea day administrative costs of $530 (Table 2).

**TABLE 1:  ANNUAL AT-SEA MONITORING COSTS FOR NOAA FISHERIES**

| Program Component | Estimated Cost | |
|---|---|---|
| | **Total** | **Per Sea Day** |
| **Training** | $531,953 | $150 |
| **Data Processing** | $626,043 | $177 |
| **Program Management** | $719,548 | $203 |
| **Total** | $1,877,544 | $530 |

*NMFS cost responsibilities for electronic monitoring.*  In this section, we estimate NMFS costs for administering the example EM programs for groundfish sectors (audit approach) and the midwater trawl fleet (optimized/full retention approach) based on the roles and responsibilities described above.  The reader should note that generalized descriptions for industry costs for electronic monitoring programs presented in this section were derived separately and differently than the NMFS costs presented here.

Many of the costs to NMFS for administering the example EM program would be driven by the scale of the program and the level of participation, although these costs do not necessarily increase linearly with the amount of sea days.  Thus, we present a range of potential NMFS costs from overseeing an audit approach EM program for a single hypothetical sector (20 vessels) to a program for the entire active groundfish fleet (400 vessels), and for an optimized/full retention approach EM program for an example midwater trawl fleet (9 vessels).  We based NMFS costs for the EM program on costs the Northeast Fishery Observer Program incurred for administering programs with similar roles and responsibilities and from the New England EM Project (Archipelago, 2014).  These are rough estimates of NMFS potential costs and, unlike the NEFOP-level observer/at-sea monitoring program costs presented in the section above, may not reflect efficiencies or economies of scale that are possible in a mature program.  NMFS would also have other incremental costs for enforcement and use of the data for management, which were not estimated here in order to be consistent with the estimates of the NEFOP-level observer/at-sea monitoring program.

In Table 3, training costs include labor and costs of licenses for any proprietary EM review software.  The number of annual trainings that would need to be held and, hence, the number of trainers, would depend on the number of EM reviewers employed by the service providers, which would depend on the number and activity levels of vessels using EM in the fishery.  For the audit model, training costs do not increase linearly.  Although the number of participants increases by a factor of 20 when scaling up from 20 vessels to a fleet-wide program, the training costs increase by a factor of 8.  This type of relationship makes it difficult to estimate costs at a unit that is easily multiplied (e.g., sea day cost).  For the optimized/full retention model, although the example fleet includes only 9 midwater trawlers, there is a

_0000010817

large amount of video footage to be reviewed, due to a high number of assumed trips (500) and the assumed rate of video review (100 percent) used in the analysis.  This much video footage may require a larger cadre of EM reviewers than the number of vessels might indicate, also increasing demand for training and certifications and NMFS's training costs.

NMFS may also have some costs for reviewing and approving individual Vessel Monitoring Plans (VMPs), which are each vessels individualized plans for equipment specifications, installation, and catch handling, and inspecting equipment installation on the vessel.  Annual labor and travel associated with this activity is estimated at $15,500 for 9 vessels, $31,000 for 20 vessels and $232,500-$310,000 for 400 vessels.

For the audit model, NMFS costs for auditing the service provider's review of logbooks were estimated to be $46,795 for 20 vessels and $432,405-$525,905 for 400 vessels (Table 3), assuming NOAA Fisheries audits 5 percent of trips.  These costs include staff time and licenses for proprietary EM review software. Use of open source software would negate the cost of software licenses in this category.   For the optimized full retention model, the staff time and equipment costs to conduct periodic video reviews to audit the service providers are estimated at $26,295, assuming 5 percent of trips are audited.

Program management cost is labor for a program manager, which is necessary to administer the new program, liaise with the service providers, vessel, and enforcement, and coordinate staff.   Program management cost is estimated at $86,000 annually, irrespective of the number of vessels participating in the program.

Not included in these cost estimates is the cost of storing any EM data submitted by the service providers or sectors.  NMFS data storage costs would be driven by record-keeping and security requirements for EM data, which NMFS is still working to determine.   Alternately, NMFS may be able to get remote access to EM data and video stored by the provider, and reduce or eliminate its data storage costs (Van Oyen, pers. comm., 2014).

**TABLE 3:  NMFS COST RESPONSIBILITIES FOR ELECTRONIC MONITORING PROGRAMS**

| | Estimated NMFS Cost Responsibilities for Audit and Optimized/Full Retention EM program models | | |
|---|---|---|---|
| | **Audit Model** | | **Optimized/Full Retention Model** |
| **Program Component** | **20 vessels** | **400 vessels** | **9 vessels** |
| **EM Reviewer Training** | $25,000 | $187,500 - $250,000 | $12,500 |
| **VMP Approval, Inspections** | $31,000 | $232,500 - $310,000 | $15,500 |

Appendix 2 – Monitoring Cost Estimates                                                April 19-21, 2016

_0000010818

| EM Review Audit | $46,795 | $423,405 - $525,905 | $26,295 |
|---|---|---|---|
| Program Management | $86,000 | $86,000 | $86,000 |
| **Total** | $188,795 | $929,405 - $1,171,905 | $140,295 |

*Industry Costs for NEFOP-level observers and FMP-specific at-sea monitors.* The industry cost responsibilities are presented as costs per sea day because these costs are, for the most part, proportionally scalable to the number of sea days. These per day costs by cost component are shown in the tables below. This per day cost estimate does not include "Other costs of the provider to meet performance standards laid out by a fishery management plan" because those costs will not be known until the details are made explicit in subsequent management plans. These costs are based on the period from October 2012 through May 2014 and are averaged across the three service providers.

TABLE 4. INDUSTRY COST RESPONSIBILITIES FOR NEFOP AND AT-SEA MONITORING

| Industry Cost Responsibilities | NEFOP-level observer cost per observed sea day (FY2013) | Fishery Specific At-sea monitoring  cost per sea day |
|---|---|---|
| Costs to the provider for deployments and sampling (e.g., travel and salary for observer deployments and debriefing) | Sea day charges paid to providers: $640/day<br>Travel: $71/day<br>Meals: $22/day<br>Other non-sea day charges: $12/day | Sea day charge paid to providers: $561/day<br>Travel: $67/day<br>Meals: $18/day<br>Other non-sea day charges: $14/day |
| Equipment, as specified by NMFS, to the extent not provided by NMFS | $11/day | |
| Costs to the provider for observer time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time. | $1/day | |
| Provider overhead and project management costs not included in sea day charges above (e.g., per diem costs for trainees) | Training: $61/day | Training: $50/day |
| Other costs of the provider to meet performance standards laid out by a fishery management plan | TBD – won't know these costs until an industry funded observer coverage program is implemented in a fishery | TBD – won't know these costs until an industry funded observer coverage program is implemented in a fishery |
| Total (not including other costs) | $818/day | $710/day |

Additional estimates for industry contributions for NEFOP-level observer coverage and the groundfish at-sea monitoring program were provided in the Fisheries Monitoring Roadmap (Lowman et al., 2013).

Appendix 2 – Monitoring Cost Estimates                                      April 19-21, 2016

This report based the estimated costs on the 2011 fiscal year.  For 2011, the industry cost for NEFOP-level coverage was estimated at $917 per sea day, and the industry cost groundfish at-sea monitoring was estimated at $847 per sea day.  These additional estimates are provided to highlight the inter-annual variability in the sea day estimate for NMFS and industry costs, as outlined in the introduction (Section 1.0).

*Industry cost responsibilities for dockside monitoring*.  The industry costs of a dockside monitoring program are generally broken into several components:  Program management and overhead costs of the provider company; travel costs for the monitor to travel from home or office to offload port, for non-principle ports; and hourly salary for the monitor, including, in some instances, waiting time at the dock.

A number of example industry costs for dockside monitoring are presented below.  Dockside monitoring costs can be represented in three ways: 1) as a cost per sea day; 2) as a cost per landing event; and 3) as a cost per pound landed.  The paragraphs below will discuss the different available estimates of dockside monitoring costs using each of these representations, and the pros and cons of each representation.

- Cost per sea day – This document uses a cost estimate of $106 per sea day based on publicized estimates for other dockside monitoring programs.   In particular, the estimate is influenced by the industry costs for the NE Multispecies dockside monitoring program.  The Fisheries Monitoring Roadmap (Lowman et al., 2013) provides per sea day rates of $51 and $82 for dockside monitoring for the British Columbia Hook and Line Groundfish fishery and the Pacific Groundfish (non-whiting) IFQ fishery, respectively.  The "cost per sea day" representation makes the cost of dockside monitoring easy to compare against industry costs for at-sea and electronic monitoring.  However, this representation of dockside monitoring costs implies that costs scale linearly with trip length, which does not accurately represent dockside monitoring costs.  For example, if we assume the cost for monitoring is $106 per sea day, then a 3 day trip would cost $318 and 10 day trip would cost $1,060 to monitor.  However, a 10-day trip could come back with its hold only half full with fish, or a 3-day trip could come back with a full hold.  In this example, the 3-day trip with the full hold would actually cost more to monitor than the 10-day trip.
- Cost per landing event - The average cost per landing event for the NE Multispecies groundfish dockside monitoring program ranged from $36.87-$212.32 for all sectors.  Though this range is a more accurate representation of costs than the cost per sea day representations, it is not easy to compare against industry costs for at-sea and electronic monitoring.
- Cost per pound of fish landed – The analysis assumes the cost per pound landed for each specific FMP is the most accurate way to represent the potential industry costs for monitoring.  The average cost per pound of groundfish landed for the NE Multispecies groundfish dockside monitoring program range ranged from $0.006-$0.12 per pound for all sectors.  The average cost per pound landed and per trip is inversely related to the average pounds landed – that is, larger trips are less expensive to monitor, by pound, than smaller trips.  This was due to several

_0000010820

factors, including that larger trips typically landed in a principle port (no roving monitor required and, depending on the location, no travel costs) and much of the cost of providing a monitor is fixed, due to the logistics of having monitors present while vessels land their catch (e.g., insurance, administrative costs). The analysis uses estimated a cost of $0.002 per pound of herring landed, based on state dockside monitoring programs for herring, to analyze the economic impacts of Herring Alternative 2.3 and 2.4 and Mackerel Alternative 2.3 and 2.4.

*Industry cost responsibilities for electronic monitoring.* Portions of the discussion that follows were originally included in the March 2015 version of the Environmental Assessment for the Omnibus Standardized Bycatch Reporting Methodology Amendment. The description of costs and costs responsibilities below is generalized to encompass a range of potential program designs.

The economic impacts associated with the alternative to implement an electronic video monitoring program for one or more fisheries in the Greater Atlantic Region are derived directly from the expected costs to purchase, install, and maintain the electronic monitoring systems. Industry would be required to purchase, install, and maintain the electronic monitoring equipment aboard their vessels.

Based on cost estimates as of May 2006, it is likely that the cost to purchase a complete electronic video monitoring system would be approximately $7,200 per vessel (Archipelago Marine Research, Ltd. 2006).[1, 2] Installation costs are highly variable and depend upon the size of the vessel, the number of cameras to be installed, and other complicating factors such as the need to retrofit the vessel to support the installation of the equipment. Kinsolving (2006) estimates installation costs as ranging from $650 to $4,225 per vessel, based on a service rate of $65 per hour and the installation time ranging from 10 hours to as many as 65 hours per vessel, depending on the aforementioned complexity. In addition to the cost to purchase and install a system, it is expected that an annual registration fee would be required by the contractor providing the equipment and this is estimated to be approximately $600 per year. Maintenance costs would be expected to vary, but for the purposes of analysis, Kinsolving's (2006) estimate of $975 per year is used. The total first year costs would be approximately $10,200 per vessel, with continuing costs of approximately $1,600 per vessel per year for the second year and beyond (see **Error! Reference source not found.**).

---

[1] Archipelago Marine Research, Ltd. (2006), identifies the costs to purchase, install, and maintain a complete electronic monitoring system. While this fee schedule is focused on the British Columbia groundfish longline fisheries, the costs identified are presumed to be transferable to other fisheries. Published costs in Canadian dollars were converted to U.S. dollars based on the published exchange rate for September 7, 2006.

[2] Kinsolving (2006) also provides estimates of the cost to purchase a complete electronic monitoring system, ranging from $4,250, if off-the-shelf components are used, to $8,000 if a package system is purchased from an approved contractor. For the purposes of this analysis, the costs published by Archipelago Marine Research, Ltd. (2006), were used to simplify the analysis and to clearly identify the source of the costs used.

_0000010821

**TABLE 5. ESTIMATED COSTS PER FISHING VESSEL TO PURCHASE, INSTALL, AND MAINTAIN AN ELECTRONIC VIDEO MONITORING SYSTEM (ARCHIPELAGO MARINE RESEARCH, LTD. 2006; KINSOLVING 2006).**

|  | Year 1 (per vessel) | Year 2+ (per vessel) |
|---|---|---|
| Equipment purchase | $7,194 | N/A |
| Installation costs (average) | $2,438 | N/A |
| Annual program registration fee | $608 | $608 |
| Annual maintenance | N/A | $975 |
| **Total** | **$10,240** | **$1,583** |

The information presented above and in **Error! Reference source not found.** provide an estimate of the per vessel costs of implementing an industry-funded electronic monitoring requirement. The next step is to estimate the number of affected vessels within the fisheries for which this alternative would be considered.

The costs discussed above address only the purchase, installation, and annual maintenance of the electronic video monitoring systems, but do not address the costs associated with extracting the data from the video recording systems, or storing, maintaining, editing, and reviewing the data.

Agency or contractor personnel would be required to obtain the video data from fishing vessels (either through dockside extraction or a mail-in hard drive exchange program), to review the video footage in order to document discard events, to oversee and perform quality control on the extracted data, and to archive and maintain the data. Video reviewing and data archiving equipment would also be required. Kinsolving (2006) estimates that data storage systems would be required to support approximately 20 terabytes of data per year, but this was an estimate solely for the Pacific rockfish pilot program, which has a fleet of approximately 25 vessels (consolidating to 18 active vessels) that make an average of seven fishing trips per year, with trips averaging 3 days each. Therefore, extrapolating to determine the data storage needs were this program implemented in the Greater Atlantic Region would most likely be orders of magnitude greater.

*Potential Industry Cost Saving with Electronic Monitoring and Portside Monitoring.* For both electronic monitoring and portside monitoring it is difficult to predict whether and/or how costs may change if industry is contracting directly with providers (versus the federal government contracting with providers). General program overhead/management is a substantial part of the costs and it is difficult to know whether these costs will be reduced when industry is contracting with providers, and if so how much. Based on the amount of coverage/monitoring several potential cost savings have been identified however, as described below. It is also important to remember that all of these cost figures (including the original values) are estimates, and may be higher or lower than actual costs once implemented.

Electronic Monitoring

Based on "A Cost Comparison of At-Sea Observers and Electronic Monitoring for a Hypothetical Midwater Trawl Herring/Mackerel Fishery."
https://www.greateratlantic.fisheries.noaa.gov/stories/2015/september/em_cost_assessment_for_gar_herring_150904_v6.pdf

_0000010822

100% recording, 100% Review: **_$325_**

Haulback Recording Only, 100% Review: $**_248_** - Reduction: $78 of the $160 data services cost (49%). [(325 – (.49*160)) = (325 – 78) = $248].  $82 of data services costs remaining.

Haulback Recording Only, 50% Review: **_$218_** - $61 is the cost for haulback review, so if only half of the trips are reviewed, this would save about another $30.  [(248 – (61/2)) = (248 – 30.5) = $218]

Field Services are $78/day, and "Field services costs are largely driven by the frequency of hard drive retrievals from the vessel, and the associated travel and labor costs."  "Repair and technical support needs also drive field services costs."  However, the document also states that repair and technical support costs were low because it was believed that minor problems could be addressed during data retrieval.  If 25% of costs were repair and technical support but this amount doubled due to additional single purpose technical support trips, an overall 40% savings from mailing hard drives appears reasonable.  40% of $78 = $31.  Saving $31 would reduce the overall cost to around **_$187_** per seaday. [(218 – 31) = $187]

Portside Monitoring

The Portside Monitoring cost estimate is $5.12/mt, but this includes administration costs that have been borne by the State of Massachusetts, and could be paid for by NMFS (subject to funds being available to run such a program).  For NEFOP observers, the administrative cost for NMFS is approximately 37% ($479 NMFS cost $818 at-sea industry cost - http://s3.amazonaws.com/nefmc.org/150929-NEFMC-Meeting-Presentation-without-notes.pdf, slide 32).  If one assumes that 25% or 33% of these costs would not be directed at vessels (conservatively less than 37%), the cost for vessels per mt would be $3.84/mt and $3.41/mt respectively.

If only 50% of trips were sampled, while any particular trip might still have to pay $3.84/mt or $3.41/mt, over the course of a year it should reduce average costs to $1.92/mt or $1.71/mt.  The table below describes the total costs for trips landing different amounts of fish, and daily costs assuming a 3-day trip.

|                 | 25% Admin |              | 33% Admin |              |
|-----------------|-----------|--------------|-----------|--------------|
| Full Cost       | $5.12     | Per day cost | $5.12     | Per day cost |
| Cost less Admin | $3.84     | with 3/day   | $3.41     | with 3/day   |
| 50% Coverage    | $1.92     | trip         | $1.71     | trip         |
| 100 mt trip cost| $192      | $64          | $171      | $57          |
| 200 mt trip cost| $384      | $128         | $341      | $114         |
| 300 mt trip cost| $576      | $192         | $512      | $171         |
| 400 mt trip cost| $768      | $256         | $683      | $228         |

Table 6 summarizes the ways that sea day costs can be minimized reduced in an industry-funded monitoring program.  The discussion provided in Table 6 was generated from information provided by NEFOP personnel, observers, and representatives from service providers in the northeast and west coast.  To the extent that the issues identified in Table 6 can be addressed through the management

_0000010823

measures that establish/implement the IFM program, sea day costs borne by the fishing industry can be reduced.

TABLE 6  SUMMARY DISCUSSION – HOW TO REDUCE SEA DAY COSTS

| How to Reduce Sea Day Costs | Discussion/Rationale |
|---|---|
| **Build from existing observer sampling protocols; do not require new/different data to be collected** | • Collecting data in a new/different way will require modifications to existing observer sampling protocols and training procedures, new/revised manuals/logs, possibly new/additional sampling equipment, and database design or restructure; this could increase administrative and training costs |
| **Eliminate SCA and related regulatory requirements for Federal contracts** | • Federal requirements for wage structure/overtime/paid holidays/vacation are not necessary for contracts between vessels/providers; without specifically implementing these requirements as part of the IFM regulations, wage structure and benefits for employees would be determined by individual service provider companies; MRAG report (June 2012) estimates that eliminating these requirements may reduce costs by $50-$100 per sea day;<br><br>• FLSA and other Federal labor laws would still apply to service provider companies; however, eliminating the SCA requirements from IFM regulations is likely to result in some reduction in sea day cost;<br><br>• Not likely to result in $100 per sea day cost savings in this region due to existing pay structure/benefits for observers required by Federal contracts |
| **"Grandfather in" current service providers approved for NEFOP observer coverage and GF ASM programs – approve these providers immediately for any new, fishery-specific ASM program** | • Reduces expense of applying/re-approving service provider companies already approved for other programs in the region; observers/monitors for approved service providers would still need to be certified for existing monitoring programs to participate as fishery-specific at-sea monitors;<br><br>• Allows vessels to select from multiple service providers when program is established; increases negotiating opportunities for vessels at onset of program by creating competition between companies;<br><br>• Provides opportunity for existing service providers to offer more work days to their observers (could reduce staff/overhead expenses for both programs) |
| **Allow cross-certification of NEFOP and GF ASM observers for new, fishery-specific ASM programs; combine/overlap training and recertification whenever possible** | • Cross-training and applying training courses to multiple certifications reduces training costs (travel, hotel, per diem for service providers);<br><br>• Reduces equipment costs for service providers – no need to purchase duplicative equipment<br><br>• As previously noted, this may reduce overhead costs for service providers by providing their observers with a greater number of days to work (improving ability for service providers to retain full-time employees) |

_0000010825

**Table 6 continued.  Summary Discussion – How to Reduce Sea Day Costs**

| How to Reduce Sea Day Costs | Discussion/Rationale |
|---|---|
| **Provide detailed information about fishing patterns for vessels participating in the industry-funded monitoring program** | <ul><li>Allows providers to more accurately estimate manpower/resources needed, logistics, overhead, and travel costs - reduces need for providers to over-estimate these costs to cover expenses that cannot be predicted prior to the start of the year;</li><li>Increases predictability of fishery for observer/monitor deployment;</li><li>Increases efficiency for service providers</li></ul> |
| **Minimize observer deployment logistics** | <ul><li>Simplifying the selection process for vessels/trips that require industry-funded observers/monitors reduces costs for service providers because vessel selection/notification would not require additional staff or resources</li></ul> |
| **Allow industry to negotiate less significant costs with providers** | <ul><li>Structure the provisions in the industry-funded monitoring program to allow the industry to negotiate as many minor costs as possible with service providers, to better meet their individual vessel needs circumstances;</li><li>These may include costs for trip cancellations and no-shows, meal reimbursements, partial day/hourly billing (see below), land-hour rates (if necessary), or other costs</li></ul> |
| **Encourage service providers/industry to negotiate billing by partial days (versus 24 hour days)** | <ul><li>Sea scallop regulations 648.11(g)(5)(i)(A)(2) state that "For the purposes of determining a daily rate…a service provider may charge a vessel owner for not more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where a day is defined as a 24-hour period, and portions of other days would be pro-rated at an hourly charge."</li><li>Industry participants should be aware that this can be negotiated in contracts with providers; may be an opportunity to reduce sea day costs for some vessels depending on fishing operations;</li><li>Consideration should be given to the possibility of land hour time for observers/monitors, which may be necessary if days are billed partially or by the hour</li></ul> |
| **Allow observers to be deployed on the same vessel for more than two consecutive multi-day trips, and more than twice in any given month for multi-day deployments** | <ul><li>Prohibited in current regulations for industry-funded observer coverage, implemented in SBRM amendment</li><li>Increases flexibility and reduces travel costs for service providers; appears to be consistent with regulations for Groundfish ASM</li></ul> |

**Table 6 continued.  Summary Discussion – How to Reduce Sea Day Costs**

| How to Reduce Sea Day Costs | Discussion/Rationale |
|---|---|
| **Encourage vessels in close proximity to negotiate contracts together so that they can utilize the same observers and minimize travel expenses** | • Industry can reduce costs by collaborating with vessels that fish from same ports and/or during same seasons to reduce travel and related costs for observers/monitors |
| **Streamline debriefing and re-certification requirements** | • Reduces costs to service providers (travel/per diem) |
| **Insurance** | • There may be ways to reduce/streamline insurance requirements to reduce costs for providers.  To the extent that duplicative or redundant insurance requirements can be eliminated, costs can be reduced.  This issue requires further investigation. |
| **Combine the IFM programs for multiple fisheries, when appropriate** | • Would reduce complexity (PTNS, deployment, travel) and increase efficiency for service providers; increases number of sea days for amortizing travel/training expenses over the year;<br><br>• Could increase the total number of work days available for ASM-certified observers/monitors and may reduce staff/overhead costs for service providers |

*Cost drivers for electronic monitoring.*  There are a number of variables in the design of an electronic monitoring program.  The text below briefly summarizes some of the program specifications related to data submission, video review, video audit, and data storage that can reduce the industry contribution for electronic monitoring programs.

Data Submission

- Allow the hard drives that store EM footage to be submitted by mail, rather than requiring them to be retrieved by a technician.
- For fisheries that have dockside monitoring programs in addition to EM, consider having dockside monitor retrieve/transmit hard drives.

Video Review

- Design a random sampling program to select trips or portions of trips (i.e., around haulback on herring and mackerel trips) from which video would be reviewed.
- For audit approaches, specify an assumed discard rate in lieu of additional video review in the instances where the EM validation fails.
- Documentation of discards at the species level, including identifying and counting the fish and measuring the length of the fish, for only a few species of interest (e.g., only species in the NE multispecies complex on groundfish trips).
- Software solutions may be able to automate review of portions of video footage.

_0000010827

Data storage

- Allow video data to be stored in the "cloud" (as permitted within security and data confidentiality regulations).
- Determine the lowest possible frame rate and image resolution necessary to document the activity of interest for the EM program.  Slow activities such as identifying large objects in a pile of fish being sorted, requires more frames per second.  The higher the frame rate, the more likely it is that the camera will capture detailed information. Similarly, identifying fish to species requires higher resolution than verifying when fishing gear is deployed.  Higher frame rate and resolution results in larger video files and requires additional storage requirements.

_0000010828



# Herring and Mackerel Vessel Annual Cost Survey for 2014



**Thank you very much for participating in this important survey!**

**The questions in this survey relate to the following vessel only**:
[**Vessel name**]
Coast Guard Documentation or State Registration Number: **[12345678]**

Your responses and participation in this survey are
**CONFIDENTIAL**

Completed surveys should be mailed to:
Jason Didden
Mid-Atlantic Fishery Management Council
800 North State Street, Suite 201
Dover, DE 19901-3910

## General Instructions:

- **This survey is about your costs in 2014 for the vessel identified in this survey.** In your answers, include combined costs for all state and/or federal fisheries for this vessel in 2014, including costs incurred while the vessel was inactive.

## Please note that all responses are completely confidential.

---

## <u>Section A: Vessel Information</u>

This section is only about the vessel identified in this survey. <u>**All costs requested are for 2014.**</u>

1. **Ownership type for this vessel (*check one*):**
   - ☐ Sole proprietorship
   - ☐ General partnership
   - ☐ Limited partnership
   - ☐ C Corporation
   - ☐ S Corporation
   - ☐ Limited Liability Company (LLC)
   - ☐ Other  _____

2. **Number of owners, including yourself:**  _____

3. **Was this vessel acquired from a previous owner or was it bought new (*check one*)?**
   - ☐ Acquired from a previous owner
   - ☐ Purchased New

4. **In what calendar year did you become the owner of the vessel?**  _____

5. **What port did this vessel operate from most of the time during 2014?**

   **_____**

_0000010830

## **Section B: Repair/Maintenance/Upgrade/Improvements Costs**

**6a. Was this vessel hauled out in 2014 for any reason?** (Possible reasons include regular repair and maintenance, emergency haul-out, long term storage, etc.)

☐ Yes
☐ No [please go to 6c]

**6b. What were the haul-out costs in 2014, including taking the vessel out of the water and any transportation?** *(Do not include any repair/maintenance costs – we'll ask you for them in question 7.)*

Haul out cost in 2014:  $ _____

**6c. How often do you usually haul-out this vessel?**

☐ Every year
☐ Every other year
☐ Every _____ years
☐ Every _____ months
☐ Other (please describe) _____

**7. What were your repair/maintenance and upgrade/improvement costs for this vessel in 2014? Include the cost of any tools and equipment you may have purchased. If you did not have any expenses in 2014, then check $0.**

*We know that these kinds of costs may vary significantly year to year. However, **this survey is about 2014 expenses only.***

$ _____    ☐ $0

**If you are able to provide a breakdown of these total repair/maintenance and upgrade/improvement costs, please do so in the following table. Otherwise, skip to question #8.**

_0000010831

| 7. | *Do not include vessel haul-out costs reported above in question 6b.* |
|---|---|
| **Expense Category** | **Repair/Maintenance/Upgrades/Improvements, 2014** |
| **Propulsion Engine** (such as engine, drive train, exhaust/cooling systems) | $_____  ☐ $0  **Description:** |
| **Deck Equipment/ Other Machinery** (such as winches, haulers, generators, hydraulics, compressors, reels, pumps) | $_____  ☐ $0  **Description:** |
| **Hull** (such as frame, deck, wheelhouse, keel, steering, rigging, fish holds, fuel tanks) | $_____  ☐ $0  **Description:** |
| **Fishing Gear** (such as codends, nets/panels, dredges, buoys, highfliers, doors, pots/traps, cables) | $_____  ☐ $0  **Describe Upgrade/Improvement:** |

_0000010832

| 7. | *Do not include vessel haul-out costs reported above in question 6b.* |
|---|---|
| **Expense Category** | **Repair/Maintenance/Upgrades/Improvements, 2014** |
| **Wheelhouse and Electronics** (such as Radar, GPS, VMS, sounder, radio, depth/temperature/net sensors) | $_____   ☐ $0<br>**Describe Upgrade/Improvement:** |
| **Processing/ Refrigeration** (such as RSW, packaging equipment, icemaker) | $_____   ☐ $0<br>**Describe Upgrade/Improvement:** |
| **Safety Equipment** (such as EPIRB, rafts, fire extinguishers, flares, survival suits) | $_____   ☐ $0<br>**Describe Upgrade/Improvement:** |
| **Other Repair/maintenance or upgrade/improvement:** | $_____   ☐ $0<br>**Describe Upgrade/Improvement:** |

_0000010833

## Section C: Vessel Related Costs

**8.  For each expense category listed in the table below,** *please enter the total amount spent in 2014 for this vessel (and average per day cost for crew and hired captain)*. If you did not have an expense in 2014, then check $0.

| | |
|---|---|
| **Mooring/Dockage Fees** for this vessel in 2014 (including upkeep expenses):<br><br>$_____<br><br>☐  $0 | **Permit and/or License fees** for this vessel in 2014:<br><br>$_____<br><br>☐  $0 |
| **Vessel insurance premium** in 2014 for this vessel (premium paid for either hull or P & I insurance):<br><br>$_____<br><br>*Number of months insured:* _____<br><br>☐  $0 | **Quota or DAS lease payments** in 2014 for this vessel (if non-monetary payments were used to obtain quota or DAS, please estimate the value of those non-monetary payments):<br><br><br>$_____<br><br>☐  $0 |
| **Total payments to crew and hired captain** in 2014 for this vessel only:<br><br>Crew:  Annual $_____    Avg per day $_____<br><br><br><br>Hired Cpt: Annual $_____    Avg per day $\_\_\_\_\_<br>(**Do not include** what you earn when you are the captain)<br><br>☐  $0 | **Crew benefits** for this vessel in 2014 (the cost to you, as the vessel owner, for providing retirement benefits; health, life, or disability insurance premiums; and unemployment insurance for your <u>crew and hired captain</u>):<br><br><br><br>$_____<br><br>☐  $0 |
| **Vessel Activity/Quota Monitoring Cost** for this vessel in 2014 (such as observer or dockside monitoring cost): | **Other costs** for this vessel in 2014:<br><br>*Describe*:<br>_____ |

_0000010834

$_____

☐  $0

$_____

☐  $0

_0000010835

## Section D: Operating Costs

9. **For each expense category listed in the table below, *please enter the total amount spent in 2014 for this vessel, including all payments made by you and/or the crew. Also please enter the average cost per day.***
    - If nothing was spent in a category, please check $0.
    - *We are aware that these kinds of costs may vary significantly from year to year. **Please bear in mind that this survey is about 2014 expenses only.***

---

| **Fuel/oil/filter** for this vessel in 2014: | **Food and Drinking Water** for this vessel in 2014: |
|---|---|
| Annual $_____     Avg per day $_____ | Annual $_____     Avg per day $_____ |
| ☐ $0     ☐ I Don't Know | ☐ $0     ☐ I Don't Know |
| **Ice** for this vessel in 2014: | **Carrier vessel fees** for this vessel in 2014: |
| Annual $_____     Avg per day $_____ | Annual $_____     Avg per day $_____ |
| ☐ $0     ☐ I Don't Know | ☐ $0     ☐ I Don't Know |
| **Fresh Water** for use in this vessel in 2014: | **Communication Costs** for this vessel in 2014 (such as cell phones, radio, VMS etc.): *Do not include office phone use.* |
| Annual $_____     Avg per day $_____ | Annual $_____     Avg per day $_____ |
| ☐ $0     ☐ I Don't Know | ☐ $0     ☐ I Don't Know |
| **General Fishing Supplies** for this vessel in 2014 (such as knives, picks, hooks, boxes, bags, ties, lobster bands, rags, tape, links/rings, lines/twine, etc.): | **General Crew Supplies** for this vessel in 2014 (such as gloves, boot liners and foul-weather gear): |
| Annual $_____     Avg per day $_____ | Annual $_____     Avg per day $_____ |
| ☐ $0     ☐ I Don't Know | ☐ $0     ☐ I Don't Know |
| **Catch Handling Costs** for this vessel in 2014 (such as auction, lumping, pumping, | **Other Costs** for this vessel in 2014: *Describe:*_____ |

*Your responses to the survey are completely confidential*          8

_0000010836

grading, shipping and sales rep):

| | |
|---|---|
| Annual $_____        Avg per day $_____ | Annual $_____        Avg per day $_____ |
| ☐ $0        ☐ I Don't Know | ☐ $0        ☐ I Don't Know |

## Section E: Typical Crew Payment System

**10a.  Did you hire a captain for the majority of this vessel's trips in 2014, or were you the captain for most trips?**

☐ Mostly Owner-operated
☐ Mostly Hired Captain
☐ Other  _____

**10b.  On average, how many crew were on this vessel when it went out in 2014?
DO NOT COUNT YOURSELF OR THE CAPTAIN.**

_____ Average number of crew members, not including you or the captain, in 2014

- **If you answered 0 (you had no crew in 2014), SKIP TO QUESTION 11**

- **If your answer was > 0 (you had crew in 2014), please CONTINUE WITH QUESTION 10c**

**10c.  Please use the diagram on the next page to list the types of expenses that were normally taken out of gross revenue, crew's share, and captain's share in 2014.**

**You do not need to list the dollar amounts. Just list the *types* of expenses deducted (for example: "fuel" "ice" "food").**



_0000010837

**NOTE: If the diagram below is not appropriate for your settlement system, please describe your system on the next page.**

_0000010838

**GROSS REVENUE**

EXPENSES YOU DEDUCT BEFORE ANY DISTRIBUTION (list the types of expenses only, not the amount):

_____

_____

_____

_____

_____

_____

Boat's percentage + Crew's percentage + Captain's percentage = 100%

BOAT'S PERCENTAGE:  __ __ %

CREW'S PERCENTAGE :  __ __ %

EXPENSES YOU DEDUCT FROM CREW'S PERCENTAGE (list the types of expenses only, not the amount):

_____

_____

_____

_____

_____

_____

_____

CAPTAIN'S PERCENTAGE:  __ __ %

EXPENSES YOU DEDUCT FROM CAPTAIN'S PERCENTAGE (list the types of expenses only, not the amount):

_____

_____

_____

_____

_____

_____

_____

**If the diagram displayed on the previous page is not appropriate for your crew payment, then please describe your crew payment system in the space below:**

*Your responses to the survey are completely confidential*          11

**10d.  Please list the *types* (not the cost) of items crew members purchase for themselves.**

Examples include: "food on day boats", "foul weather gear", "gloves", etc.
(These expenses would NOT be included in the diagram above.)

_____     _____

_____     _____

_____     _____

*Your responses to the survey are completely confidential*                12

# Section F: Overall Business Cost

**11a.  Including the vessel listed in this survey, how many vessels did your fishing business operate or maintain in 2014?**

_____vessel(s) operated or maintained in 2014

**11b**. **For each expense category listed below, please enter the amount spent for either _all your vessels_ or _just this vessel_ in 2014. Indicate by checking the appropriate box.**
If you did not spend anything on that expense category in 2014, please check $0.

| | |
|---|---|
| **Workshop/Storage Expenses** for 2014 (such as gear shed rental and workshop expense):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Office Expenses** for 2014 (such as office supplies, office rental, home office, office utilities (such as electric, heat, etc.), postage, photocopying, computer and office phone use, excluding **communication costs**):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Business Vehicle Usage Costs** for 2014 (for fishing business related purposes only; such as number of miles the vehicle was used for business multiplied by a standard mileage rate):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Business Travel Costs** for 2014 (such as cost of lodging, travel, and transportation for business associated travel **excluding business vehicle costs**):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Association Fees Paid** in 2014 (such as co-operative, fishing organization, sector fees and union dues):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Professional Fees Paid** in 2014 (such as settlement, accounting, and legal fees):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Principal Paid on Business Loans** for 2014 (enter only payments made, _not_ amount owed):<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Interest Paid on Business Loans** for 2014:<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only |
| **Taxes paid (income, property, etc.)** for 2014:<br><br>$_____<br><br>☐ $0   ☐ for all vessels   ☐ for this vessel only | **Non-Crew Labor Services** for 2014 (such as night watchman, shore engineer, and office secretary):<br><br>$_____<br><br>_Describe:_ _____ |

_0000010841

| | $0 | | for all vessels | | for this vessel only |

## Section G: Other Costs and Earnings

**12.  Did you have any other costs in 2014 that we have not asked about in this survey? If so, please list them below. (Please do not report your personal costs).**

**Other costs for the <u>identified vessel</u> only:**

| Cost | Description of other annual costs incurred in 2014 |
|---|---|
| $ _____ | _____ |
| $ _____ | _____ |

**Other costs for your <u>entire business</u>:**

| Cost | Description of other annual costs incurred in 2014 |
|---|---|
| $ _____ | _____ |
| $ _____ | _____ |

**13. Please record the total gross revenue from all activities generated by this vessel in 2014.**
*(Note: Although we collect revenue information from the dealer reporting system, this question is for cross-checking our record in order to improve our overall data quality.)* **:**

Gross revenue from commercial trips:  $_____
Gross revenue from non-commercial trips (e.g. charter trips):  $_____
☐  $0  (this vessel was inactive during 2014)

**15. In the following table, Please record the number of days this vessel spent in each fishery in 2014. Be as specific as possible in the fishery description noting things such as gear type, target species, fishing region, etc.**

*Your responses to the survey are completely confidential*          14

| Fishery Description (gear/species/region) | Number of Days in 2014 |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

Thank you for your response! Please use the space below for comments.

_0000010843

**APPENDIX 4 -- ATLANTIC HERRING ALTERNATIVE ECONOMIC
IMPACTS ON HERRING FISHING BUSINESSES**

Impact Analysis Methods

Four types of industry-funded monitoring for the herring fishery are being considered: Northeast Fisheries Observer Program (NEFOP) level observer, at-sea monitor (ASM), Electronic Monitoring (EM), and portside sampling (PS) coverage.  NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

**MONITORING COSTS TO INDUSTRY**

| Types of Monitoring | NEFOP-Level Observer | At-Sea Monitor | Electronic Monitoring | Portside Sampling |
|---|---|---|---|---|
| **Industry Cost Responsibility** | $818 per seaday | $710 per seaday | Year 1: $15,000 one-time set up cost then $325 (also $187) per seaday Year 2:  $325 (also $187) per seaday | $0.0023 per lb ($5.12 per mt) and at $0.00174 per lb ($3.84 per mt) |

Trips that occurred in 2014 were used to estimate the likely future impacts of the herring alternatives. This is the most recent year for which data is available and 2014 activity should represent what is likely to occur in future years in terms of the vessels participating in the fishery, the condition of the stock, the regulatory environment, and fishing methods. Each alternative has different criteria for defining which types of trips would be monitored (based on permit type, gear used, etc.). Trips from 2014 that met these criteria were evaluated in terms of how the monitoring costs impacted annual returns to owner (see below for description of how return-to-owner (RTO) was calculated). If an alternative specified 100% coverage, then the monitoring costs that would have been paid for all trips occurring in 2014 were calculated and assessed in terms of impacts to RTO. For alternatives that have options with less than 100% coverage, trips from the pool of 2014 trips were randomly selected until the coverage target was met. This was repeated 1,000 times for each trip selection simulation. Mean annual ASM/NEFOP costs per vessel are then calculated from the simulated trip selections.

 Vessels were assigned a major gear type based on the gear that earned the greatest revenue (from all species landed) among the trips selected for evaluation (according to the criteria in the alternative). It is not necessarily the major gear for the year for a particular vessel.

In the tables, any information that pertains to amounts of revenue from various species and numbers of days at sea and trips are for the trips that met the criteria under each of the alternatives only, not for the year.

_0000010844

<u>Return-to-Owner</u>

A previous analysis of economic impacts of herring and mackerel coverage target alternatives was based on trip cost data collected by the NEFOP and showed the economic impact of the alternatives on vessel net revenues (gross revenues less trip costs). Because NEFOP only collects a limited amount of cost data, industry participants expressed concern that net revenue estimates used in the previous economic analysis underestimated vessel costs. In response, Jason Didden, staff of the Mid-Atlantic Council, offered to survey herring and mackerel vessels to collect more detailed cost information.

The survey requested information from vessel owners on total trip costs in 2014. The cost survey collected information on variable trip costs, the cost of repairs/maintenance/upgrades/haulout, fixed costs, and payments to crew. These data were used to update the impact analyses. If the vessel owner completed a survey then that vessel's actual costs were used in the analysis. Otherwise, respondent data were used to project costs on other vessels that did not provide a survey response. To do this, responses from the surveys were categorized by the annual primary species caught based on value. Two categories were used: herring/mackerel vessels and squid vessels. For each of these vessel types, costs were assigned into one of four categories: variable costs, crew share, repair/maint/upgrades/haulout, and fixed costs. Average percentages of annual gross revenue by cost category and vessel type were used to estimate costs for vessels that did not have survey data. See table below for cost category descriptions and average percentages of gross revenue.

Surveys were sent to approximately 18 vessel owners (representing about 26 vessels) in the herring and/or mackerel fisheries. Surveys were sent in May 2015 and information was submitted for 16 of the 26 vessels.

Appendix 4 – Economic Impacts on Fishing Businesses                                        April 19-21, 2016

| Cost category | Description | Average percent of gross revenue | |
|---|---|---|---|
| | | Herring/ mackerel vessels | Squid vessels |
| **Variable costs** | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| **Crew share** | Total annual payments to crew | 28% | 26% |
| **Repair/ maintenance/ upgrades/ haulout (RMUH)** | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, and safety equipment. Includes haulout costs.<br><br>Because these costs vary considerably from year to year and upgrade costs were combined with repair/maintenance costs, half of these costs were amortized over 7 years. | 13% | 11% |
| **Fixed costs** | Annual mooring/dockage, permits/licenses, insurance, quota/DAS lease, crew benefits, vessel monitoring, workshop/storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs.<br><br>Note: principal payments on business loans are not included in fixed costs. | 19% | 21% |
| **Return to Owner (RTO)** | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

Major Findings

Across the vessel types examined, the paired MWT vessels have the highest monitoring costs as a percentage of RTO. This is due to the fact that these vessels have, on average, more sea days that would have monitoring costs than the other vessel types.

There are differences among vessel types in terms of the sources of revenue that would be used to pay for monitoring costs. For example, for SMBT vessels, half of their revenue comes from herring and the other half from other species. What this means is that for monitoring that is required for the herring fishery, other non-herring sources of revenue must be used to cover the herring related costs. A metric for evaluating these differences is monitoring cost as a percent of herring revenue. For SMBT monitoring costs as a percent of herring revenue are higher than for other vessel types.

Exempting trips less than 25 mt of herring (Herring Alternative 2 Sub-Option 5) from industry-funded monitoring costs reduces the monitoring cost substantially in many cases. The degree of saving varies by gear type. Using Alternative 2.1

_0000010846

as an example, aggregate NEFOP costs decline by 48% for purse seine vessels ($320k to $166k). For paired midwater trawl vessels, the percentage difference (20%; $673k to $541k) is not as great.

For midwater trawl vessels, selecting Herring Alternatives 2.3 or 2.4 rather than Herring Alternative 2.2 results in about a 60% cost saving for paired midwater vessels in Year 2 and beyond and about a 45% cost saving for single midwater trawl vessels.

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811k to $75k – a 91% reduction.

Reducing EM costs from $325 to $187 per day and only monitoring half of the portside sampling trips at a rate of $3.84 per mt, as opposed to all trips at $5.12 per mt, reduces total monitoring costs by 51% for paired MWT vessels ($457,595 to $222,958) in year 2. For single MWT vessels, costs are reduced by 54% ($134,165 to $61,067).

Herring Alternative 2.1

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $1,364,372 | $920,296 | $1,026,390 | $1,179,521 | $1,875,233 | $1,505,034 |
| Annual Variable Costs | $318,252 | $167,769 | $330,865 | $233,767 | $284,996 | $267,061 | $594,112 | $412,374 |
| Annual Crew Share | $410,406 | $213,633 | $358,167 | $270,086 | $292,093 | $332,733 | $519,728 | $451,846 |
| Annual Repair/Maint/Upgrade/Haulout | $177,888 | $98,231 | $182,172 | $119,312 | $120,240 | $101,172 | $149,714 | $94,073 |
| Annual Fixed Costs | $268,728 | $172,799 | $251,988 | $177,397 | $187,892 | $200,926 | $467,553 | $476,899 |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $144,125 | $113,903 |
| Annual Cost of NEFOP | $84,150 | $37,945 | $45,700 | $28,075 | $23,077 | $13,108 | $17,380 | $14,134 |
| NEFOP as pct of RTO (median) | 44.7% | | 13.9% | | 24.4% | | 11.5% | |
| post-NEFOP RTO | $78,930 | $77,928 | $195,480 | $159,212 | $118,091 | $352,542 | $126,745 | $110,764 |
| Percent of Revenue from Herring | 91.2% | 9.5% | 100.0% | 0.0% | 81.9% | 17.0% | 52.4% | 42.0% |
| Percent of Revenue from Mackerel | 13.9% | 8.2% | | | 19.4% | 17.0% | 2.6% | 4.1% |
| Percent of Revenue from Squids | | | | | | | 44.3% | 39.7% |
| Percent of Revenue from Other Species | 0.1% | 0.1% | | | 7.7% | 17.0% | 21.5% | 17.9% |
| Average Number of Days at Sea | 103 | 47 | 56 | 34 | 28 | 16 | 21 | 17 |
| Average Number of Trips | 34 | 16 | 64 | 37 | 22 | 20 | 11 | 16 |

_0000010848

Herring Alternative 2.1

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| **Number of Vessels** | 8 | 7 | 6 | 9 |
| **Total Days at Sea** | 825 | 392 | 170 | 192 |
| **Total Number of Trips** | 275 | 451 | 129 | 103 |
| **Total Herring Revenue** | $9,409,389 | $11,042,232 | $3,842,873 | $1,483,242 |
| **Total Mackerel Revenue** | $1,155,588 | $225 | $570,246 | $97,806 |
| **Total Squid Revenue** | | | | $529,723 |
| **Total Other Species Revenue** | $5,906 | | $50,399 | $485,180 |
| **Total Revenue** | $10,570,883 | $11,042,457 | $4,463,518 | $2,595,951 |
| **Total NEFOP Cost** | $673,200 | $319,902 | $138,463 | $156,420 |
| **NEFOP as pct of Total Revenue** | 6.4% | 2.9% | 3.1% | 6.0% |
| **NEFOP as pct of Herring Revenue** | 7.2% | 2.9% | 3.6% | 10.5% |

Herring Alternative 2.1 – Sub Option 5

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $1,364,372 | $920,296 | $1,026,390 | $1,179,521 | $2,057,720 | $1,835,879 |
| Annual Variable Costs | $318,252 | $167,769 | $330,865 | $233,767 | $284,996 | $267,061 | $626,872 | $501,818 |
| Annual Crew Share | $410,406 | $213,633 | $358,167 | $270,086 | $292,093 | $332,733 | $583,258 | $550,531 |
| Annual Repair/Maint/Upgrade/Haulout | $177,888 | $98,231 | $182,172 | $119,312 | $120,240 | $101,172 | $141,508 | $110,893 |
| Annual Fixed Costs | $268,728 | $172,799 | $251,988 | $177,397 | $187,892 | $200,926 | $542,753 | $581,061 |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of NEFOP | $67,626 | $36,730 | $23,759 | $13,141 | $15,756 | $13,934 | $15,975 | $12,682 |
| NEFOP as pct of RTO (median) | 42.2% | | 10.4% | | 5.8% | | 14.2% | |
| post-NEFOP RTO | $95,454 | $72,095 | $217,421 | $153,564 | $125,412 | $351,076 | $147,354 | $135,976 |
| Percent of Revenue from Herring | 94.9% | 6.3% | 100.0% | 0.0% | 88.0% | 15.0% | 88.5% | 17.9% |
| Percent of Revenue from Mackerel | 8.1% | 6.1% | | | 19.5% | 17.1% | 2.1% | 1.3% |
| Percent of Revenue from Squids | | | | | | | 12.2% | 8.5% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 0.4% | 0.5% | 20.3% | 12.5% |
| Average Number of Days at Sea | 83 | 45 | 29 | 16 | 19 | 17 | 20 | 16 |
| Average Number of Trips | 28 | 15 | 46 | 29 | 12 | 15 | 10 | 12 |

Herring Alternative 2.1 – Sub Option 5

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 663 | 204 | 116 | 117 |
| Total Number of Trips | 221 | 320 | 73 | 59 |
| Total Herring Revenue | $9,152,836 | $10,263,855 | $3,606,269 | $1,352,045 |
| Total Mackerel Revenue | $657,345 | $225 | $570,246 | $28,633 |
| Total Squid Revenue | | | | $171,323 |
| Total Other Species Revenue | $4,109 | | $2,721 | $237,472 |

Appendix 4 – Economic Impacts on Fishing Businesses                                      April 19-21, 2016

| | | | | |
|---|---|---|---|---|
| **Total Revenue** | $9,814,290 | $10,264,080 | $4,179,236 | $1,789,473 |
| **Total NEFOP Cost** | $541,008 | $166,313 | $94,538 | $95,852 |
| **NEFOP as pct of Total Revenue** | 5.5% | 1.6% | 2.3% | 5.4% |
| **NEFOP as pct of Herring Revenue** | 5.9% | 1.6% | 2.6% | 7.1% |

Herring Alternative 2.2 & 2.3 (100%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| **Annual Gross Revenue** | $1,338,354 | $704,254 | $1,364,372 | $920,296 | $1,026,390 | $1,179,521 | $1,875,233 | $1,505,034 |
| **Annual Variable Costs** | $318,252 | $167,769 | $330,865 | $233,767 | $284,996 | $267,061 | $594,112 | $412,374 |
| **Annual Crew Share** | $410,406 | $213,633 | $358,167 | $270,086 | $292,093 | $332,733 | $519,728 | $451,846 |
| **Annual Repair/Maint/Upgrade/Haulout** | $177,888 | $98,231 | $182,172 | $119,312 | $120,240 | $101,172 | $149,714 | $94,073 |
| **Annual Fixed Costs** | $268,728 | $172,799 | $251,988 | $177,397 | $187,892 | $200,926 | $467,553 | $476,899 |
| **Annual Return-to-owner** | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $144,125 | $113,903 |
| **Annual Cost of ASM** | $73,219 | $33,016 | $39,764 | $24,428 | $20,079 | $11,405 | $15,122 | $12,298 |
| **ASM as pct of RTO (median)** | 38.9% | | 12.1% | | 21.3% | | 10.0% | |
| **post-ASM RTO** | $89,862 | $78,545 | $201,417 | $159,318 | $121,089 | $353,817 | $129,003 | $111,075 |
| **Percent of Revenue from Herring** | 91.2% | 9.5% | 100.0% | 0.0% | 81.9% | 17.0% | 52.4% | 42.0% |
| **Percent of Revenue from Mackerel** | 13.9% | 8.2% | 0.0% | | 19.4% | 17.0% | 2.6% | 4.1% |
| **Percent of Revenue from Squids** | | | | | | | 44.3% | 39.7% |
| **Percent of Revenue from Other Species** | 0.1% | 0.1% | | | 7.7% | 17.0% | 21.5% | 17.9% |
| **Average Number of Days at Sea** | 103 | 47 | 56 | 34 | 28 | 16 | 21 | 17 |
| **Average Number of Trips** | 34 | 16 | 64 | 37 | 22 | 20 | 11 | 16 |

Herring Alternative 2.2 & 2.3 (100%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|

Appendix 4 – Economic Impacts on Fishing Businesses

April 19-21, 2016

| Number of Vessels | 8 | 7 | 6 | 9 |
|---|---|---|---|---|
| Total Days at Sea | 825 | 392 | 170 | 192 |
| Total Number of Trips | 275 | 451 | 129 | 103 |
| Total Herring Revenue | $9,409,389 | $11,042,232 | $3,842,873 | $1,483,242 |
| Total Mackerel Revenue | $1,155,588 | $225 | $570,246 | $97,806 |
| Total Squid Revenue | | | | $529,723 |
| Total Other Species Revenue | $5,906 | | $50,399 | $485,180 |
| Total Revenue | $10,570,883 | $11,042,457 | $4,463,518 | $2,595,951 |
| Total ASM Cost | $585,750 | $278,346 | $120,477 | $136,100 |
| ASM as pct of Total Revenue | 5.5% | 2.5% | 2.7% | 5.2% |
| ASM as pct of Herring Revenue | 6.2% | 2.5% | 3.1% | 9.2% |

_0000010852

Herring Alternative 2.2 & 2.3 – Sub Option 5 (100%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $1,364,372 | $920,296 | $1,026,390 | $1,179,521 | $2,057,720 | $1,835,879 |
| Annual Variable Costs | $318,252 | $167,769 | $330,865 | $233,767 | $284,996 | $267,061 | $626,872 | $501,818 |
| Annual Crew Share | $410,406 | $213,633 | $358,167 | $270,086 | $292,093 | $332,733 | $583,258 | $550,531 |
| Annual Repair/Maint/Upgrade/Haulout | $177,888 | $98,231 | $182,172 | $119,312 | $120,240 | $101,172 | $141,508 | $110,893 |
| Annual Fixed Costs | $268,728 | $172,799 | $251,988 | $177,397 | $187,892 | $200,926 | $542,753 | $581,061 |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of ASM | $58,841 | $31,959 | $20,673 | $11,434 | $13,710 | $12,124 | $13,900 | $11,034 |
| ASM as pct of RTO (median) | 36.7% | | 9.1% | | 5.1% | | 12.3% | |
| post-ASM RTO | $104,239 | $73,608 | $220,508 | $154,643 | $127,459 | $352,543 | $149,429 | $136,046 |
| Percent of Revenue from Herring | 94.9% | 6.3% | 100.0% | 0.0% | 88.0% | 15.0% | 88.5% | 17.9% |
| Percent of Revenue from Mackerel | 8.1% | 6.1% | 0.0% | | 19.5% | 17.1% | 2.1% | 1.3% |
| Percent of Revenue from Squids | | | | | | | 12.2% | 8.5% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 0.4% | 0.5% | 20.3% | 12.5% |
| Average Number of Days at Sea | 83 | 45 | 29 | 16 | 19 | 17 | 20 | 16 |
| Average Number of Trips | 28 | 15 | 46 | 29 | 12 | 15 | 10 | 12 |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (100%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 663 | 204 | 116 | 117 |
| Total Number of Trips | 221 | 320 | 73 | 59 |
| Total Herring Revenue | $9,152,836 | $10,263,855 | $3,606,269 | $1,352,045 |
| Total Mackerel Revenue | $657,345 | $225 | $570,246 | $28,633 |
| Total Squid Revenue | | | | $171,323 |
| Total Other Species Revenue | $4,109 | | $2,721 | $237,472 |

Appendix 4 – Economic Impacts on Fishing Businesses                    April 19-21, 2016

_0000010853

| | | | | |
|---|---|---|---|---|
| **Total Revenue** | $9,814,290 | $10,264,080 | $4,179,236 | $1,789,473 |
| **Total ASM Cost** | $470,730 | $144,709 | $82,257 | $83,400 |
| **ASM as pct of Total Revenue** | 4.8% | 1.4% | 2.0% | 4.7% |
| **ASM as pct of Herring Revenue** | 5.1% | 1.4% | 2.3% | 6.2% |

Herring Alternative 2.2 & 2.3 (75%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| **Annual Return-to-owner** | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $144,125 | $113,903 |
| **Annual Cost of ASM** | $54,936 | $24,736 | $29,898 | $18,339 | $15,021 | $8,472 | $11,709 | $9,100 |
| **ASM as pct of RTO (median)** | 29.7% | | 9.1% | | 15.9% | | 7.5% | |
| **post-ASM RTO** | $108,144 | $80,253 | $211,282 | $159,725 | $126,148 | $356,073 | $132,416 | $111,831 |
| **Percent of Revenue from Herring** | 91.3% | 9.4% | 100.0% | 0.0% | 82.5% | 16.2% | 52.7% | 42.0% |
| **Percent of Revenue from Mackerel** | 13.8% | 8.0% | 0.0% | 0.0% | 19.3% | 16.7% | 2.6% | 4.0% |
| **Percent of Revenue from Squids** | | | | | | | 44.3% | 39.8% |
| **Percent of Revenue from Other Species** | 0.1% | 0.1% | | | 7.5% | 16.5% | 22.6% | 19.1% |
| **Average Number of Days at Sea** | 77 | 35 | 42 | 26 | 21 | 12 | 16 | 13 |

Herring Alternative 2.2 & 2.3 (75%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| **Number of Vessels** | 8 | 7 | 6 | 9 |
| **Total Days at Sea** | 619 | 295 | 127 | 148 |
| **Total Herring Revenue** | $7,069,090 | $8,301,401 | $2,870,099 | $1,106,513 |
| **Total Mackerel Revenue** | $865,766 | $225 | $436,137 | $73,907 |
| **Total Squid Revenue** | | | | $440,897 |
| **Total Other Species Revenue** | $4,749 | | $39,714 | $385,635 |
| **Total Revenue** | $7,939,606 | $8,301,626 | $3,345,950 | $2,006,952 |
| **Total ASM Cost** | $439,489 | $209,288 | $90,126 | $105,382 |
| **ASM as pct of Total Revenue** | 5.5% | 2.5% | 2.7% | 5.3% |
| **ASM as pct of Herring Revenue** | 6.2% | 2.5% | 3.1% | 9.5% |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (75%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of ASM | $44,198 | $23,997 | $15,571 | $8,472 | $10,298 | $9,099 | $10,474 | $8,230 |
| ASM as pct of RTO (median) | 28.2% | | 6.8% | | 3.8% | | 9.4% | |
| post-ASM RTO | $118,882 | $76,712 | $225,610 | $156,562 | $130,870 | $354,992 | $152,855 | $136,065 |
| Percent of Revenue from Herring | 94.9% | 6.2% | 100.0% | 0.0% | 88.1% | 14.8% | 89.2% | 16.8% |
| Percent of Revenue from Mackerel | 8.7% | 6.0% | 0.0% | | 19.4% | 17.0% | 2.2% | 1.1% |
| Percent of Revenue from Squids | | | | | | | 11.8% | 8.4% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 0.5% | 0.8% | 19.6% | 11.3% |
| Average Number of Days at Sea | 62 | 34 | 22 | 12 | 15 | 13 | 15 | 12 |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (75%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 498 | 154 | 87 | 89 |
| Total Herring Revenue | $6,874,690 | $7,702,188 | $2,712,401 | $1,024,121 |
| Total Mackerel Revenue | $526,863 | $225 | $433,487 | $21,556 |
| Total Squid Revenue | | | | $130,869 |
| Total Other Species Revenue | $3,148 | | $2,345 | $190,706 |
| Total Revenue | $7,404,700 | $7,702,413 | $3,148,233 | $1,367,252 |
| Total ASM Cost | $353,586 | $108,996 | $61,791 | $62,845 |
| ASM as pct of Total Revenue | 4.8% | 1.4% | 2.0% | 4.6% |
| ASM as pct of Herring Revenue | 5.1% | 1.4% | 2.3% | 6.1% |

_0000010856

Herring Alternative 2.2 & 2.3 (50%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $163,080 | $241,180 | $241,180 | $141,169 | $141,169 | $144,125 | $144,125 |
| Annual Cost of ASM | $36,875 | $16,417 | $19,846 | $12,053 | $10,145 | $5,662 | $8,483 | $6,375 |
| ASM as pct of RTO (median) | 20.4% | | 6.0% | | 10.5% | | 5.4% | |
| post-ASM RTO | $126,205 | $82,980 | $221,334 | $160,394 | $131,024 | $358,152 | $135,643 | $112,417 |
| Percent of Revenue from Herring | 91.4% | 9.3% | 100.0% | 0.0% | 83.3% | 15.4% | 53.6% | 42.2% |
| Percent of Revenue from Mackerel | 14.1% | 8.0% | 0.0% | | 19.1% | 16.2% | 2.9% | 4.4% |
| Percent of Revenue from Squids | | | | | | | 44.5% | 39.8% |
| Percent of Revenue from Other Species | 0.1% | 0.2% | | | 8.2% | 17.9% | 24.7% | 21.7% |
| Average Number of Days at Sea | 52 | 23 | 28 | 17 | 14 | 8 | 12 | 9 |

Herring Alternative 2.2 & 2.3 (50%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 9 |
| Total Days at Sea | 415 | 196 | 86 | 108 |
| Total Herring Revenue | 4,732,456 | 5,510,474 | 1,943,001 | 748,019 |
| Total Mackerel Revenue | 591,520 | 225 | 310,908 | 56,804 |
| Total Squid Revenue | | | | 369,787 |
| Total Other Species Revenue | 3,503 | | 33,722 | 312,508 |
| Total Revenue | 5,327,480 | 5,510,699 | 2,287,630 | 1,487,117 |
| Total ASM Cost | $294,999 | $138,922 | $60,867 | $76,346 |
| ASM as pct of Total Revenue | 5.5% | 2.5% | 2.7% | 5.1% |
| ASM as pct of Herring Revenue | 6.2% | 2.5% | 3.1% | 10.2% |

Appendix 4 – Economic Impacts on Fishing Businesses                                    April 19-21, 2016

_0000010857

Herring Alternative 2.2 & 2.3 – Sub Option 5 (50%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of ASM | $29,489 | $15,844 | $10,464 | $5,525 | $6,999 | $6,001 | $7,247 | $5,562 |
| ASM as pct of RTO (median) | 18.9% | | 4.5% | | 2.5% | | 6.4% | |
| post-ASM RTO | $133,591 | $80,718 | $230,716 | $158,500 | $134,170 | $357,624 | $156,082 | $136,133 |
| Percent of Revenue from Herring | 95.0% | 6.2% | 100.0% | 0.0% | 88.5% | 14.0% | 90.2% | 15.2% |
| Percent of Revenue from Mackerel | 10.3% | 6.6% | 0.0% | | 19.3% | 16.4% | 2.7% | 0.6% |
| Percent of Revenue from Squids | | | | | | | 11.2% | 7.8% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 0.8% | 1.3% | 20.1% | 9.6% |
| Average Number of Days at Sea | 42 | 22 | 15 | 8 | 10 | 8 | 10 | 8 |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (50%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 332 | 103 | 59 | 61 |
| Total Herring Revenue | $4,580,747 | $5,158,742 | $1,820,329 | $708,574 |
| Total Mackerel Revenue | $417,898 | $225 | $310,536 | $15,657 |
| Total Squid Revenue | | | | $95,931 |
| Total Other Species Revenue | $2,109 | | $2,117 | $159,514 |
| Total Revenue | $5,000,754 | $5,158,967 | $2,132,982 | $979,676 |
| Total ASM Cost | $235,915 | $73,250 | $41,994 | $43,482 |
| ASM as pct of Total Revenue | 4.7% | 1.4% | 2.0% | 4.4% |
| ASM as pct of Herring Revenue | 5.2% | 1.4% | 2.3% | 6.1% |

Appendix 4 – Economic Impacts on Fishing Businesses                                        April 19-21, 2016

_0000010859

Herring Alternative 2.2 & 2.3 (25%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $144,125 | $113,903 |
| Annual Cost of ASM | $18,578 | $7,854 | $10,041 | $5,914 | $5,498 | $2,600 | $5,642 | $4,539 |
| ASM as pct of RTO (median) | 10.1% | | 3.0% | | 5.6% | | 3.5% | |
| post-ASM RTO | $144,503 | $86,107 | $231,139 | $161,277 | $135,671 | $360,600 | $138,483 | $112,951 |
| Percent of Revenue from Herring | 91.8% | 9.0% | 100.0% | 0.0% | 85.0% | 13.7% | 55.0% | 42.1% |
| Percent of Revenue from Mackerel | 16.3% | 8.9% | 0.1% | | 20.0% | 15.2% | 3.1% | 4.4% |
| Percent of Revenue from Squids | | | | | | | 44.6% | 39.8% |
| Percent of Revenue from Other Species | 0.2% | 0.4% | | | 9.0% | 19.4% | 27.6% | 26.7% |
| Average Number of Days at Sea | 26 | 11 | 14 | 8 | 8 | 4 | 8 | 6 |

Herring Alternative 2.2 & 2.3 (25%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 9 |
| Total Days at Sea | 209 | 99 | 46 | 72 |
| Total Herring Revenue | $2,394,688 | $2,774,156 | $981,948 | $448,402 |
| Total Mackerel Revenue | $357,710 | $225 | $213,945 | $39,547 |
| Total Squid Revenue | | | | $305,034 |
| Total Other Species Revenue | $2,470 | | $28,154 | $249,797 |
| Total Revenue | $2,754,868 | $2,774,381 | $1,224,046 | $1,042,780 |
| Total ASM Cost | $148,622 | $70,288 | $32,987 | $50,782 |
| ASM as pct of Total Revenue | 5.4% | 2.5% | 2.7% | 4.9% |
| ASM as pct of Herring Revenue | 6.2% | 2.5% | 3.4% | 11.3% |

Appendix 4 – Economic Impacts on Fishing Businesses                              April 19-21, 2016

Herring Alternative 2.2 & 2.3 – Sub Option 5 (25%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of ASM | $14,949 | $7,649 | $5,370 | $2,578 | $3,994 | $2,978 | $4,560 | $3,380 |
| ASM as pct of RTO (median) | 9.6% | | 2.2% | | 1.4% | | 3.8% | |
| post-ASM RTO | $148,131 | $85,224 | $235,811 | $160,535 | $137,175 | $360,395 | $158,769 | $136,042 |
| Percent of Revenue from Herring | 95.4% | 5.8% | 100.0% | 0.0% | 89.3% | 12.8% | 90.9% | 14.1% |
| Percent of Revenue from Mackerel | 15.5% | 9.9% | 0.1% | | 20.1% | 15.6% | 3.1% | 0.1% |
| Percent of Revenue from Squids | | | | | | | 11.0% | 7.2% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 1.3% | 2.0% | 21.7% | 8.6% |
| Average Number of Days at Sea | 21 | 11 | 8 | 4 | 6 | 4 | 6 | 5 |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (25%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 168 | 53 | 34 | 39 |
| Total Herring Revenue | $2,317,299 | $2,591,280 | $940,773 | $452,532 |
| Total Mackerel Revenue | $336,069 | $225 | $205,825 | $10,562 |
| Total Squid Revenue | | | | $68,202 |
| Total Other Species Revenue | $1,128 | | $1,920 | $135,106 |
| Total Revenue | $2,654,496 | $2,591,505 | $1,148,518 | $666,402 |
| Total ASM Cost | $119,591 | $37,587 | $23,964 | $27,358 |
| ASM as pct of Total Revenue | 4.5% | 1.5% | 2.1% | 4.1% |
| ASM as pct of Herring Revenue | 5.2% | 1.5% | 2.5% | 6.0% |

Appendix 4 – Economic Impacts on Fishing Businesses                                April 19-21, 2016

_0000010862

Herring Alternative 2.3 and 2.4 (100% EM at $325 per day, 100% PS at $5.12 per mt)

| Per Vessel | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $912,105 | $1,024,851 |
| Annual Variable Costs | $318,252 | $167,769 | $264,620 | $232,352 |
| Annual Crew Share | $410,406 | $213,633 | $239,242 | $297,854 |
| Annual Repair/Maint/Haulout | $177,888 | $98,231 | $110,742 | $90,131 |
| Annual Fixed Costs | $268,728 | $172,799 | $163,296 | $175,943 |
| Annual Return-to-owner | $163,080 | $89,827 | $134,205 | $310,157 |
| Annual Cost of EM - year 1 | $48,516 | $15,113 | $22,300 | $5,316 |
| Annual Cost of EM - year 2 | $33,516 | $15,113 | $7,300 | $5,316 |
| Annual Cost of PS | $23,684 | $15,503 | $9,471 | $16,229 |
| Total Monitoring Costs as pct of RTO - year 1 (median) | 42.2% | | 37.3% | |
| Total Monitoring Costs as pct of RTO - year 2 (median) | 29.1% | | 12.8% | |
| Post-monitoring RTO -- year 1 | $90,881 | $74,211 | $102,434 | $292,275 |
| Post-monitoring RTO -- year 2 | $105,881 | $74,211 | $117,434 | $292,275 |
| Percent of Revenue from Herring | 91.2% | 9.5% | 86.0% | 16.3% |
| Percent of Revenue from Mackerel | 13.9% | 8.2% | 15.5% | 17.1% |
| Percent of Revenue from Squids | | | 2.9% | |
| Percent of Revenue from Other Species | 0.1% | 0.1% | 6.4% | 15.5% |
| Average Number of Days at Sea | 103 | 47 | 23 | 17 |
| Average Number of Trips | 34 | 16 | 18 | 18 |

_0000010863

Herring Alternative 2.3 and 2.4 (100% EM at $187 per day, 50% PS at $3.84 per mt)

| Per Vessel | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $134,205 | $310,157 |
| Annual Cost of EM - year 1 | $34,284 | $8,696 | $19,200 | $3,059 |
| Annual Cost of EM - year 2 | $19,284 | $8,696 | $4,200 | $3,059 |
| Annual Cost of PS | $8,585 | $5,620 | $3,433 | $5,883 |
| Total Monitoring Costs as pct of RTO - year 1 (median) | 25.1% | | 26.7% | |
| Total Monitoring Costs as pct of RTO - year 2 (median) | 14.4% | | 6.9% | |
| Post-monitoring RTO -- year 1 | $120,211 | $82,109 | $111,572 | $302,913 |
| Post-monitoring RTO -- year 2 | $135,211 | $82,109 | $126,572 | $302,913 |


Herring Alternative 2.3 and 2.4(100% EM at $325 per day, 100% PS at $5.12 per mt)

| Fleet Level | Paired MWT | Single MWT |
|---|---|---|
| Number of Vessels | 8 | 8 |
| Total Days at Sea | 825 | 180 |
| Total Number of Trips | 275 | 140 |
| Total Herring Revenue | $9,409,389 | $3,873,778 |
| Total Mackerel Revenue | $1,155,588 | $570,248 |
| Total Squid Revenue | | $441 |
| Total Other Species Revenue | $5,906 | $50,421 |
| Total Revenue | $10,570,883 | $4,494,888 |
| Total EM Cost - year 1 | $388,125 | $178,398 |
| Total EM Cost - year 2 | $268,125 | $58,398 |
| Total PS Cost | $189,470 | $75,767 |
| Total Monitoring Costs - year 1 | $577,595 | $254,165 |
| Total Monitoring Costs - year 2 | $457,595 | $134,165 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 5.5% | 5.7% |

Appendix 4 – Economic Impacts on Fishing Businesses                    April 19-21, 2016

| | | |
|---|---|---|
| **Monitoring Costs as pct of Total Revenue -- year 2** | 4.3% | 3.0% |
| **Monitoring Costs as pct of Herring Revenue -- year 1** | 6.1% | 6.6% |
| **Monitoring Costs as pct of Herring Revenue -- year 2** | 4.9% | 3.5% |

Herring Alternative 2.3 and 2.4 (100% EM at $187 per day, 50% PS at $3.84 per mt)

| Fleet Level | Paired MWT | Single MWT |
|---|---|---|
| **Number of Vessels** | 8 | 8 |
| **Total Days at Sea** | 825 | 180 |
| **Total Number of Trips** | 275 | 140 |
| **Total Herring Revenue** | $9,409,389 | $3,873,778 |
| **Total Mackerel Revenue** | $1,155,588 | $570,248 |
| **Total Squid Revenue** | | $441 |
| **Total Other Species Revenue** | $5,906 | $50,421 |
| **Total Revenue** | $10,570,883 | $4,494,888 |
| **Total EM Cost - year 1** | $274,275 | $153,601 |
| **Total EM Cost - year 2** | $154,275 | $33,601 |
| **Total PS Cost** | $68,683 | $27,465 |
| **Total Monitoring Costs - year 1** | $342,958 | $181,067 |
| **Total Monitoring Costs - year 2** | $222,958 | $61,067 |
| **Monitoring Costs as pct of Total Revenue -- year 1** | 3.2% | 4.0% |
| **Monitoring Costs as pct of Total Revenue -- year 2** | 2.1% | 1.4% |
| **Monitoring Costs as pct of Herring Revenue -- year 1** | 3.6% | 4.7% |
| **Monitoring Costs as pct of Herring Revenue -- year 2** | 2.4% | 1.6% |

_0000010865

Herring Alternative 2.3 and 2.4 – Sub Option 5 (100% EM at $325 per day, 100% PS at $5.12 per mt)

| Per Vessel | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $990,082 | $1,081,027 |
| Annual Variable Costs | $318,252 | $167,769 | $284,110 | $243,803 |
| Annual Crew Share | $410,406 | $213,633 | $259,816 | $315,519 |
| Annual Repair/Maint/Haulout | $177,888 | $98,231 | $120,806 | $92,369 |
| Annual Fixed Costs | $268,728 | $172,799 | $175,636 | $186,264 |
| Annual Return-to-owner | $163,080 | $89,827 | $149,714 | $331,640 |
| Annual Cost of EM - year 1 | $41,934 | $14,629 | $20,425 | $5,543 |
| Annual Cost of EM - year 2 | $26,934 | $14,629 | $5,425 | $5,543 |
| Annual Cost of PS | $22,205 | $15,461 | $9,943 | $17,483 |
| Total Monitoring Costs as pct of RTO - year 1 (median) | 40.1% | | 19.5% | |
| Total Monitoring Costs as pct of RTO - year 2 (median) | 27.5% | | 4.9% | |
| Post-monitoring RTO -- year 1 | $98,941 | $73,425 | $119,346 | $312,177 |
| Post-monitoring RTO -- year 2 | $113,941 | $73,425 | $134,346 | $312,177 |
| Percent of Revenue from Herring | 94.9% | 6.3% | 89.7% | 14.4% |
| Percent of Revenue from Mackerel | 8.1% | 6.1% | 19.5% | 17.1% |
| Percent of Revenue from Squids | | | | |
| Percent of Revenue from Other Species | 0.0% | 0.1% | 0.4% | 0.5% |
| Average Number of Days at Sea | 83 | 45 | 17 | 17 |
| Average Number of Trips | 28 | 15 | 11 | 15 |

_0000010866

Herring Alternative 2.3 and 2.4 – Sub Option 5 (100% EM at $187 per day, 50% PS at $3.84 per mt)

| Per Vessel | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev |
| **Annual Return-to-owner** | $163,080 | $89,827 | $149,714 | $331,640 |
| **Annual Cost of EM - year 1** | $30,498 | $8,417 | $18,122 | $3,189 |
| **Annual Cost of EM - year 2** | $15,498 | $8,417 | $3,122 | $3,189 |
| **Annual Cost of PS** | $8,049 | $5,605 | $3,604 | $6,338 |
| **Total Monitoring Costs as pct of RTO - year 1 (median)** | 24.2% | | 16.9% | |
| **Total Monitoring Costs as pct of RTO - year 2 (median)** | 13.3% | | 2.4% | |
| **Post-monitoring RTO -- year 1** | $124,533 | $81,356 | $127,988 | $323,695 |
| **Post-monitoring RTO -- year 2** | $139,533 | $81,356 | $142,988 | $323,695 |

Herring Alternative 2.3 and 2.4 – Sub Option 5 (100% EM at $325 per day, 100% PS at $5.12 per mt)

| Fleet Level | Paired MWT | Single MWT |
|---|---|---|
| **Number of Vessels** | 8 | 7 |
| **Total Days at Sea** | 663 | 117 |
| **Total Number of Trips** | 221 | 75 |
| **Total Herring Revenue** | $9,152,836 | $3,618,705 |
| **Total Mackerel Revenue** | $657,345 | $570,246 |
| **Total Squid Revenue** | | |
| **Total Other Species Revenue** | $4,109 | $2,721 |
| **Total Revenue** | $9,814,290 | $4,191,672 |
| **Total EM Cost - year 1** | $335,475 | $142,978 |
| **Total EM Cost - year 2** | $215,475 | $37,978 |
| **Total PS Cost** | $177,642 | $69,602 |
| **Total Monitoring Costs - year 1** | $513,117 | $212,580 |
| **Total Monitoring Costs - year 2** | $393,117 | $107,580 |
| **Monitoring Costs as pct of Total Revenue -- year 1** | 5.2% | 5.1% |

Appendix 4 – Economic Impacts on Fishing Businesses                    April 19-21, 2016

| | | |
|---|---|---|
| **Monitoring Costs as pct of Total Revenue -- year 2** | 4.0% | 2.6% |
| **Monitoring Costs as pct of Herring Revenue -- year 1** | 5.6% | 5.9% |
| **Monitoring Costs as pct of Herring Revenue -- year 2** | 4.3% | 3.0% |

Herring Alternative 2.3 and 2.4 – Sub Option 5 (100% EM at $187 per day, 50% PS at $3.84 per mt)

| Fleet Level | Paired MWT | Single MWT |
|---|---|---|
| **Number of Vessels** | 8 | 7 |
| **Total Days at Sea** | 663 | 117 |
| **Total Number of Trips** | 221 | 75 |
| **Total Herring Revenue** | $9,152,836 | $3,618,705 |
| **Total Mackerel Revenue** | $657,345 | $570,246 |
| **Total Squid Revenue** | | |
| **Total Other Species Revenue** | $4,109 | $2,721 |
| **Total Revenue** | $9,814,290 | $4,191,672 |
| **Total EM Cost - year 1** | $243,981 | $126,852 |
| **Total EM Cost - year 2** | $123,981 | $21,852 |
| **Total PS Cost** | $64,395 | $25,231 |
| **Total Monitoring Costs - year 1** | $308,376 | $152,083 |
| **Total Monitoring Costs - year 2** | $188,376 | $47,083 |
| **Monitoring Costs as pct of Total Revenue -- year 1** | 3.1% | 3.6% |
| **Monitoring Costs as pct of Total Revenue -- year 2** | 1.9% | 1.1% |
| **Monitoring Costs as pct of Herring Revenue -- year 1** | 3.4% | 4.2% |
| **Monitoring Costs as pct of Herring Revenue -- year 2** | 2.1% | 1.3% |

Herring Alternative 2.5

| Per Vessel | Average | Stnd Dev |
|---|---|---|
| Annual Gross Revenue | $1,752,994 | $822,480 |
| Annual Variable Costs | $409,945 | $181,028 |
| Annual Crew Share | $527,920 | $227,404 |
| Annual Repair/Maint/Upgrade/Haulout | $208,650 | $73,627 |
| Annual Fixed Costs | $340,386 | $171,281 |
| Annual Return-to-owner | $266,094 | $239,382 |
| Annual Cost of NEFOP | $9,353 | $7,604 |
| NEFOP as pct of RTO (median) | 4.0% | |
| post-NEFOP RTO | $256,740 | $244,116 |
| Percent of Revenue from Herring | 99.9% | 0.4% |
| Percent of Revenue from Mackerel | | |
| Percent of Revenue from Squids | | |
| Percent of Revenue from Other Species | 0.2% | 0.4% |
| Average Number of Days at Sea | 11 | 9 |
| Average Number of Trips | 4 | 3 |

_0000010869

| Fleet Level | |
|---|---:|
| **Number of Vessels** | 8 |
| **Total Days at Sea** | 93 |
| **Total Number of Trips** | 33 |
| **Total Herring Revenue** | $1,437,094 |
| **Total Mackerel Revenue** | |
| **Total Squid Revenue** | |
| **Total Other Species Revenue** | $1,170 |
| **Total Revenue** | $1,438,264 |
| **Total NEFOP Cost** | $74,827 |
| **NEFOP as pct of Total Revenue** | 5.2% |
| **NEFOP as pct of Herring Revenue** | 5.2% |

_0000010870

Herring Alternative 2.5 – Sub Option 5

| Per Vessel | Average | Stnd Dev |
|---|---|---|
| Annual Gross Revenue | $1,752,994 | $822,480 |
| Annual Variable Costs | $409,945 | $181,028 |
| Annual Crew Share | $527,920 | $227,404 |
| Annual Repair/Maint/Upgrade/Haulout | $208,650 | $73,627 |
| Annual Fixed Costs | $340,386 | $171,281 |
| Annual Return-to-owner | $266,094 | $239,382 |
| Annual Cost of NEFOP | $6,293 | $3,131 |
| NEFOP as pct of RTO (median) | 3.7% | |
| post-NEFOP RTO | $259,800 | $241,604 |
| Percent of Revenue from Herring | 100.0% | 0.0% |
| Percent of Revenue from Mackerel | | |
| Percent of Revenue from Squids | | |
| Percent of Revenue from Other Species | 0.0% | 0.0% |
| Average Number of Days at Sea | 8 | 4 |
| Average Number of Trips | 3 | 1 |

| Fleet Level | |
|---|---|
| Number of Vessels | 8 |
| Total Days at Sea | 62 |
| Total Number of Trips | 23 |
| Total Herring Revenue | $1,379,191 |
| Total Mackerel Revenue | |
| Total Squid Revenue | |
| Total Other Species Revenue | |
| Total Revenue | $1,379,191 |
| Total NEFOP Cost | $50,347 |
| NEFOP as pct of Total Revenue | 3.7% |
| NEFOP as pct of Herring Revenue | 3.7% |

Appendix 4 – Economic Impacts on Fishing Businesses                                    April 19-21, 2016

_0000010871

Herring Alternative 2.6

Analyses are not yet complete for this alternative. Alternative 2.6 applies the same criteria as found in Alternatives 2.2, 2.3, and 2.4 but only for vessels that fish in groundfish closed areas. However, in order to provide a means for obtaining a reasonably reliable estimate of the impacts of Alternative 2.6, the following two tables are provided. The first table shows the major differences between Alternatives 2.1 and 2.5 at 100% coverage for trips with > 1 lb of herring landed (the second table shows the differences for trips > 25 mt – Sub-Option 5). These two alternatives are identical except that Alternative 2.5 applies only to vessels that fish in groundfish closed areas and applies to MWT vessels with category A through E herring permits whereas Alternative 2.1 applies to vessel with category A and B permits only. Therefore, these differences can be used to estimate the impacts of Alternative 2.6.

Trips with Herring Landings > 1 lb (includes all gear types)

| | Herring Alternative 2.1 | Herring Alternative 2.5 | Herring Alternative 2.5 as a Percent of Alternative 2.1 | |
|---|---|---|---|---|
| **Number of Vessels** | 30 | 8 | 26.7% | |
| **Total Days at Sea** | 1,579 | 92 | 5.8% | |
| **Number of Trips** | 958 | 33 | 3.4% | |
| **Total Revenue** | $28,672,809 | $1,438,264 | 5.0% | Use this for estimating portside sampling costs for Alternative 2.6 |
| **Total NEFOP Cost** | $1,287,985 | $74,827 | 5.8% | Use this for estimating EM and ASM costs for Alternative 2.6 |

Trips with Herring Landings > 25 mt (Sub-Option 5) (includes all gear types)

| | Herring Alternative 2.1 | Herring Alternative 2.5 | Herring Alternative 2.5 as a Percent of Alternative 2.1 | |
|---|---|---|---|---|
| **Number of Vessels** | 27 | 8 | 29.6% | |
| **Total Days at Sea** | 1,100 | 62 | 5.6% | |
| **Number of Trips** | 673 | 23 | 3.4% | |
| **Total Revenue** | $246,047,079 | $1,379,191 | 5.6% | Use this for estimating portside sampling costs for Alternative 2.6 |
| **Total NEFOP Cost** | $897,711 | $50,347 | 5.6% | Use this for estimating EM and ASM costs for Alternative 2.6 |

_0000010873

# Omnibus Industry-Funded Monitoring (IFM) Amendment
## *Amendment 7 to the Atlantic Herring FMP*

**DRAFT**

## Options Under Consideration

## to Establish IFM in the Atlantic Herring Fishery

### *(Coverage Targets, Program Requirements, Sea Day Costs)*

*Lori Steele, NEFMC Staff, Herring Plan Development Team (PDT) Chairman*
*Industry-Funded Monitoring FMAT*

**DATE: 8/7/15 for Draft Omnibus IFM Amendment/EA**

_0000010874

*Intentionally Blank*

_0000010875

# TABLE OF CONTENTS

**1.0    SUMMARY OF HERRING IFM OPTIONS UNDER CONSIDERATION**..................................... 1

**2.0    WHAT IS A SEA DAY COST?**.............................................................................................. 2

   **2.1    What Drives Sea Day Costs Up?** ............................................................................... 3

   **2.2    How Can Sea Day Costs be Reduced?**....................................................................... 5

**3.0    ELEMENTS OF HERRING OPTIONS UNDER CONSIDERATION** ........................................ 10

   **3.1    Sampling Objectives, Sampling Design, Data Collected** ............................................ 10

   **3.2    Service Provider Requirements**................................................................................. 18

   **3.3    Observer Training, Certification, and Sampling Equipment** ....................................... 21

   **3.4    Pre-Trip Notification, Debriefing, and Data Management** ......................................... 25

   **3.5    Summary: Comparison of Herring OBS and ASM Options** ......................................... 28

**4.0    ESTIMATED SEA DAY COSTS FOR THE HERRING ASM OPTIONS**.................................... 29

# LIST OF TABLES

Table 1  Summary Discussion – How to Reduce Sea Day Costs .................................................... 6

Table 2  Types of Information/Data That Can Improve Predictability of the Fishery ................... 9

Table 3  NEFOP Generic Haul Log (Example).......................................................................... 12

Table 4  NEFOP Discard Log (Example) .................................................................................. 13

Table 5  Monitoring Approaches for the Atlantic Herring Fishery Based on Data Needs ........... 15

Table 6  Monitoring Approaches for the Atlantic Mackerel Fishery Based on Data Needs ........ 16

Table 7  Herring IFM Options: Sampling Objectives, Sampling Design, Data Collected .......... 17

Table 8  Herring IFM Options: Service Provider Requirements .................................................. 20

Table 9  Herring IFM Options: Observer Training and Certification........................................... 24

Table 10  Herring IFM Options: Observer Equipment ............................................................... 24

Table 11  Herring IFM Options: Logistics (Notification), Debriefing, and Data Management ... 27

Table 12  Qualitative Comparison of Options for Industry-Funded Monitoring in the Atlantic
        Herring Fishery (Herring OBS Options vs. Herring ASM Options) ................................ 28

_0000010877

## 1.0    SUMMARY OF HERRING IFM OPTIONS UNDER CONSIDERATION

The options under consideration to establish industry-funded monitoring (IFM) in the Atlantic herring fishery are described in detail in the Draft omnibus IFM amendment.  The options under consideration are grouped into two categories: (1) options for industry-funded observer coverage (herring OBS options, HER OBS); and (2) options for industry-funded at-sea monitoring (herring ASM options, HER ASM).  The primary difference between these options is that the herring OBS options require comprehensive sampling (catch and bycatch) to provide data that is consistent with NEFOP observer data collected to meet the requirements of the standardized bycatch reporting methodology (SBRM).  The herring ASM options require comprehensive sampling of bycatch only, i.e., any catch that is not retained on board the vessel for any reason, including full and partial slippage events, operational discards, and catch that is sorted on board the vessel and then discarded.  The industry (vessels/vessel owners) would pay for at-sea monitors to collect bycatch data, while NEFOP observers would continue to be deployed to collect observer data on herring vessels to meet SBRM requirements.  The details of the industry-funded herring OBS and ASM options under consideration are discussed in the following subsections of this document.

The intent of considering two different kinds of industry-funded monitoring programs for the Atlantic herring fishery is to address specific monitoring needs identified by the Council while providing a basis for understanding and comparing the costs of the monitoring program, particularly those which will be borne by the fishing industry.  This approach also provides a mechanism to consider options that may reduce costs for the industry.  For comparison purposes, information about the current multispecies (groundfish) at-sea monitoring program (GF ASM) for sector vessels is provided throughout this document as well.  Since the sea day costs of the GF ASM program are better understood and current estimates of these costs are available, the sea day costs of a herring ASM program can be estimated based on a comparison to the groundfish ASM program, with particular consideration of the factors that can drive sea day costs up (see Section 2.1, p. 3).

Under the herring OBS options, vessels would be required to hire/pay sea day costs for NMFS-approved observers on some number of trips (based on coverage targets) above those on which vessels are required to carry an observer deployed through the standardized bycatch reporting methodology (SBRM).  The industry-funded observers would require NEFOP certification to collect observer data, including a high-volume certification, and they would collect comprehensive catch/bycatch data consistent with NEFOP protocols for observer data collected under the SBRM.  Under the herring ASM options, vessels would be required to hire/pay sea day costs for NMFS-approved at-sea monitors on trips (based on coverage targets) other than those on which vessels are required to carry an observer deployed through the SBRM.  The industry-funded at-sea monitors would require NEFOP certification for the herring ASM program (HER ASM), and they would collect bycatch (discard) data consistent with NEFOP protocols.

Each set of options for IFM in the Atlantic herring fishery includes sub-options to consider allowances for waivers in the event that an observer or at-sea monitor cannot be provided for a fishing trip (to allow the vessel to fish).  Additional sub-options are under consideration to exempt wing vessels (in a pair trawl operation) that do not take on fish from requirements to carry observers/monitors under the industry-funded monitoring program.  These vessels would be required to notify NMFS ahead of time (through the pre-trip call-in and/or VMS) and would be prohibited from fishing for or possessing herring on exempted trips.

Some of the herring IFM options under consideration in the IFM amendment would apply to all Category A/B Atlantic herring vessels (single and paired midwater trawl, purse seine, small mesh bottom trawl) on trips declared into the herring fishery, while other options would apply only to midwater trawl vessels (single and paired, all permit categories).  The options that apply only to midwater trawl vessels are based on SBRM fleet divisions (gear type and area).

## 2.0     WHAT IS A SEA DAY COST?

For the purposes of this discussion document, the *sea day cost* is amount that the participants in the fishery (vessels/vessel owners) pay to service provider companies for deploying an observer/at-sea monitor for a fishing trip to meet the requirements of an industry-funded monitoring program.  As described in the Draft omnibus IFM amendment, the *sea day cost* incurred by the industry generally includes travel and salary for observer training, deployment and debriefing; service provider overhead and project management costs; special equipment costs; and other expenses determined by the service provider to meet the monitoring program requirements.  Sea day costs are usually estimated based on a 24-hour day but can be billed based on full days, partial days, or hours.  In many cases, vessel owners will enter into contracts with service providers to negotiate and secure a specific sea day cost for an agreed-upon number of sea days.  Vessels may enter into contracts with multiple service providers to meet the monitoring requirements for a fishery.  There are several elements of a sea day cost that can be negotiated through these contracts.

In an industry-funded monitoring program, a primary component of a *sea day cost* (sometimes upwards of 50% of the sea day cost) is **labor**, i.e., wages/salary for observers, which can be estimated by the service provider based on the anticipated number of days per month that each observer will work in the monitoring program.  **Insurance** is another significant component of the sea day cost, the annual cost of which (per observer) is spread across the estimated number of sea days.  Additional costs related to observer **training** (daily stipend, travel, and lodging), employee **benefits** (health insurance, vacation), and project management and **overhead** (staff, offices) are estimated for the year and then distributed across the estimated number of sea days for the monitoring program.*

*Insurance and workers compensation expenses are higher in the Northeast Region than in west coast fisheries.*

There are currently no industry-funded monitoring programs in the Greater Atlantic Region that include contracts between service provider companies and fishing industry participants.  Until now, all contracts for observer coverage and at-sea monitoring have been entered into by the Federal government and service providers, administered by NMFS/NEFOP.  The contract for NEFOP observer coverage under the SBRM requirements is signed for five years with one provider (currently MRAG Americas).  Until recently, the Federal government has been covering industry sea day costs in the groundfish at-sea monitoring program through contracts with three service providers.  Later in 2015, when groundfish sectors will become responsible for paying their at-sea monitoring sea day costs, there will be an opportunity for sector vessels to enter into contracts with provider companies to negotiate sea day costs.  There is likely to be some reduction in sea day costs that will result from "privatizing" contracts and eliminating the Federal government as a party entering into the contract (see following discussion).  Several industry-funded monitoring programs in U.S. west coast fisheries use vessel/provider contracts; reviewing these programs is helpful to understand the factors that drive sea day costs up and the ways that the monitoring program can be structured to reduce these costs (see Section **Error! Reference**

_0000010879

**source not found.** of this document for more information about industry-funded monitoring programs in other U.S. fisheries).

Sea day costs are determined by individual service providers based on their overhead and the estimated costs associated with deploying their employees as observers in the monitoring program.  There are many elements of the sea day cost that will be unique to individual service provider companies and cannot be predicted or estimated with any certainty.  In addition, sea day costs can be variable, and service providers can bid different sea day costs to different vessels under the same monitoring program, depending on the details of the individual contracts.  Ultimately, it will be up to the participants in the fishing industry to negotiate sea day costs with service providers in contracts designed to better meet their individual needs.  To the extent that vessels that fish out of the same ports can work together to negotiate costs with service provider companies, there may be savings by reducing observer travel costs and offering more days in total for the providers to distribute overhead costs.  In addition, there may be opportunities for the industry to reduce their sea day costs by allowing some costs (travel, meals, cancellations) to be negotiated in the contracts with service providers.

A large part of the sea day cost is determined by service providers based on predictions/assumptions of how vessels participating in the monitoring program will operate over the course of a fishing year and how the fishery will respond.  If service providers have adequate information to accurately predict their overhead and related costs, then they can increase their efficiency and transfer these cost savings to the industry.

## 2.1    WHAT DRIVES SEA DAY COSTS UP?

There are several factors that can significantly affect sea day costs in any industry-funded monitoring program.  During the development of this discussion document, representatives from the NEFOP, service provider companies in the northeast U.S., and representatives from U.S. west coast service provider companies identified the following factors that most commonly increase sea day costs.  In an effort to reduce sea day costs, the elements of the herring ASM options under consideration (described in Section 3.0 of this document) specifically address the following factors, to the extent possible. *Discussion of each of these factors with respect to the herring ASM options is provided below in italics.*

- **Requirements for New Data Collection/New Equipment.**  New or different sampling protocols require modifications to observer training, which could increase training costs for both the government and service providers.  If new or different sampling equipment is required to meet the monitoring program needs, the expense of the additional equipment will be incurred by the service provider.  In addition, re-designing existing observer databases to incorporate new data introduces a significant administrative expense.

  *The herring ASM options build on existing observer data collection protocols and do not require the collection of new/different data and/or new/additional sampling equipment.  The protocols for the herring ASM options focus on the sampling of bycatch and is based on existing protocols for sampling bycatch and completing a NEFOP discard log for observed herring trips (see Section 3.1 for more information).*

- **SCA and FLSA Requirements.**  Requirements associated with the Service Contract Act (SCA) and Fair Labor Standards Act (FLSA) apply to any contracts in which the Federal government is involved. There is likely to a reduction in sea day cost associated with eliminating any legal requirements that

apply specifically to contracts involving the Federal government.  However, service provider companies would still be subject to FLSA requirements and other applicable labor laws.

The SCA applies to every contract entered into by the United States (government) or the District of Columbia.  Contractors and subcontractors performing on these Federal contracts must observe minimum wage standards (based on the prevailing wage for a locality, as determined by the Department of Labor) as well as safety and health standards, and they must maintain certain records.  The SCA requires that every employee working under the contract must be paid not less than the monetary wages, and must be furnished fringe benefits, which are determined based on locality.  Fringe benefits include paid holiday leave, vacation time, and minimum requirements for health and welfare (80/20 compensation for health insurance).  Because contracts in the Atlantic herring industry-funded monitoring program will be between service providers and participants in the fishing industry, it will not be necessary for these contracts to meet the requirements of the SCA.

However, even without the SCA requirements, service provider companies will still be required to pay employees not less than the federal minimum wage provided in the Fair Labor Standards Act (FLSA).  The FLSA establishes minimum wage, overtime pay, recordkeeping, and youth employment standards affecting employees *in the private sector as well as in Federal, State, and local governments.*  Covered non-exempt workers are entitled to a minimum wage of not less than $7.25 per hour effective July 24, 2009.  Overtime pay at a rate not less than one and one-half times the regular rate of pay is required after 40 hours of work in a workweek.

According to a report published by MRAG Americas (June 2012), Northern Economics (2011) estimated that the SCA and FLSA requirements are likely to add $50-$100 to the sea day cost for an industry-funded monitoring program.  However, eliminating SCA requirements by privatizing contracts in this region is not likely to decrease sea day costs by as much as $100 for two reasons: (1) FLSA requirements for minimum wage and overtime would still apply to vessel/provider contracts; and (2) employees working for companies currently providing observer coverage and at-sea monitoring services in this region have been working (some for many years) under government contracts, which are consistent with SCA requirements for wages and fringe benefits.  It may be very difficult for service providers in this region to change the wage and benefit structure they offer to their employees, many of whom have been working in observer and ASM programs in this region for several years.  Therefore, the reduction in sea day cost that can be expected from the privatization of contracts cannot be estimated with certainty but is likely to be on the lower end of the range predicted in the MRAG Report.

*This savings is not reflected in the current estimate of sea day costs for the groundfish ASM program.*

- **Ability to Predict the Fishery.**  Sea day costs will likely be higher if service providers cannot predict how the fishery will operate (numbers of vessels/trips, length of trips, seasonality and spatial distribution of trips) in order to accurately estimate costs (administrative, overhead, communications, logistics) associated with deploying observers to meet the needs of the monitoring program.  Predictability increases efficiency and therefore reduces costs.  With limited information to predict the fishery, service providers are more likely to over-estimate costs associated with travel and observer deployment to ensure that they cover their costs.

*The Atlantic herring fishery is a small group of vessels that fish in a relatively predictable manner. Ultimately, in order to reduce costs, it will be up to industry participants to provide as much detail as*

_0000010881

*possible about their fishing patterns to the service providers when they negotiate contracts for sea days.*

- **Complicated Logistics (Vessel Selection and Observer Deployment).** The more infrastructure necessary to efficiently deploy observers to meet the needs of the monitoring program (field offices, coordinators, communications networks), then the higher the sea day costs will be. If pre-trip notification systems need to be expanded to determine observer/monitor deployment, this will likely increase costs.

  *The existing pre-trip notification system (PTNS) can be utilized for vessel selection under the herring ASM options. The coverage targets are relatively simple and should not create overhead/staff costs associated with vessel selection/notification and observer deployment. In addition, travel costs associated with deploying observers on Category A/B herring vessels may be less than those for other IFM programs. The Atlantic herring fishery operates with a relatively small number of boats in a limited geographical area (versus the area covered by west coast fisheries), so observers can reach a number of deployment ports across several states more easily (ex., driving vs. flying).*

## 2.2    HOW CAN SEA DAY COSTS BE REDUCED?

Table 1 summarizes the ways that sea day costs can be in an industry-funded monitoring program. The discussion provided in Table 1 was generated from information provided by NEFOP personnel, observers, and representatives from service providers in the northeast and U.S. west coast. To the extent that the issues identified in Table 1 can be addressed through the management measures that establish/implement the IFM program, sea day costs borne by the fishing industry can be reduced.

_0000010882

**Table 1  Summary Discussion – How to Reduce Sea Day Costs**

| How to Reduce Sea Day Costs | Discussion/Rationale |
|---|---|
| **Build from existing observer sampling protocols; do not require new/different data to be collected** | • Collecting data in a new/different way will require modifications to existing observer sampling protocols and training procedures, new/revised manuals/logs, possibly new/additional sampling equipment, and database design or restructure; this could increase administrative and training costs |
| **Eliminate SCA and related regulatory requirements for Federal contracts** | • Federal requirements for wage structure/overtime/paid holidays/vacation are not necessary for contracts between vessels/providers; without specifically implementing these requirements as part of the IFM regulations, wage structure and benefits for employees would be determined by individual service provider companies; MRAG report (June 2012) estimates that eliminating these requirements may reduce costs by $50-$100 per sea day; <br><br> • FLSA and other Federal labor laws would still apply to service provider companies; however, eliminating the SCA requirements from IFM regulations is likely to result in some reduction in sea day cost; <br><br> • Not likely to result in $100 per sea day cost savings in this region due to existing pay structure/benefits for observers required by Federal contracts; <br><br> • *Needs NOAA GC Input\** |
| **"Grandfather in" current service providers approved for NEFOP observer coverage and GF ASM programs – approve these providers immediately for Herring ASM program** | • Reduces expense of applying/re-approving service provider companies already approved for other programs in the region; observers/monitors for approved service providers would still need NEFOP certification for Herring ASM program; <br><br> • Allows herring vessels to select from multiple service providers when program is established; increases negotiating opportunities for vessels at onset of program by creating competition between companies; <br><br> • Provides opportunity for existing service providers in GF ASM program to offer more work days to their observers (could reduce staff/overhead expenses for both programs) |
| **Allow cross-certification of NEFOP and GF ASM observers for HER ASM program; combine/overlap training and recertification whenever possible** | • Cross-training and applying training courses to multiple certification reduces training costs (travel, hotel, per diem for service providers); <br><br> • Reduces equipment costs for service providers – no need to purchase duplicative equipment <br><br> • As previously noted, this may reduce overhead costs for GF ASM service providers by providing their observers with a greater number of days to work (improving ability for service providers to retain full-time employees) |

**Table 1 continued.  Summary Discussion – How to Reduce Sea Day Costs**

| How to Reduce Sea Day Costs | Discussion/Rationale |
|---|---|
| **Provide detailed information about fishing patterns for vessels participating in the industry-funded monitoring program** | • Allows providers to more accurately estimate manpower/resources needed, logistics, overhead, and travel costs - reduces need for providers to over-estimate these costs to cover expenses that cannot be predicted prior to the start of the year;<br><br>• Increases predictability of fishery for observer/monitor deployment;<br><br>• Increases efficiency for service providers |
| **Minimize observer deployment logistics** | • Simplifying the selection process for vessels/trips that require industry-funded observers/monitors reduces costs for service providers because vessel selection/notification would not require additional staff or resources;<br><br>• Pre-trip notification and selection for Herring ASM options could be built into existing herring PTNS; 100% coverage target options (and 50% coverage target options) eliminate need for service provider to develop a plan to meet specified coverage targets for the monitoring program; |
| **Allow industry to negotiate less significant costs with providers** | • Structure the provisions in the industry-funded monitoring program to allow the industry to negotiate as many minor costs as possible with service providers, to better meet their individual vessel needs circumstances;<br><br>• These may include costs for trip cancellations and no-shows, meal reimbursements, partial day/hourly billing (see below), land-hour rates (if necessary), or other costs |
| **Encourage service providers/industry to negotiate billing by partial days (versus 24 hour days)** | • Sea scallop regulations 648.11(g)(5)(i)(A)(2) state that "For the purposes of determining a daily rate…a service provider may charge a vessel owner for not more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where a day is defined as a 24-hour period, and portions of other days would be pro-rated at an hourly charge."<br><br>• Industry participants should be aware that this can be negotiated in contracts with providers; may be opportunity to reduce sea day costs for some vessels depending on fishing operations;<br><br>• Consideration should be given to the possibility of land hour time for observers/monitors, which may be necessary if days are billed partially or by the hour |
| **Allow observers to be deployed on the same vessel for more than two consecutive multi-day trips, and more than twice in any given month for multi-day deployments** | • Prohibited in current regulations for industry-funded observer coverage (Herring OBS options), implemented in SBRM amendment<br><br>• Increases flexibility and reduces travel costs for service providers; appears to be consistent with regulations for Groundfish ASM |

**Table 1 continued. Summary Discussion – How to Reduce Sea Day Costs**

| How to Reduce Sea Day Costs | Discussion/Rationale |
|---|---|
| **Encourage vessels in close proximity to negotiate contracts together so that they can utilize the same observers and minimize travel expenses** | • Industry can reduce costs by collaborating with vessels that fish from same ports and/or during same seasons to reduce travel and related costs for observers/monitors |
| **Streamline debriefing and re-certification requirements** | • Reduces costs to service providers (travel/per diem) |
| **Insurance** | • There may be ways to reduce/streamline insurance requirements to reduce costs for providers. To the extent that duplicative or redundant insurance requirements can be eliminated, costs can be reduced. This issue requires further investigation. |
| **Combine the IFM programs for herring and mackerel fisheries** | • Would reduce complexity (PTNS, deployment, travel) and increase efficiency for service providers; increases number of sea days for amortizing travel/training expenses over the year;<br><br>• Could increase the total number of work days available for ASM-certified observers/monitors and may reduce staff/overhead costs for service providers<br><br>• The New England and Mid-Atlantic Councils should consider this further when the goals/objectives for IFM programs in the Atlantic herring and mackerel fisheries are more clearly articulated. |

As noted in Table 1, one way to reduce sea day costs is to provide service provider companies with accurate, detailed information about the fishery characteristics to better predict how vessels participating in the industry-funded monitoring program will operate over the course of the upcoming year.  This allows providers to more accurately estimate the staff, resources, and overhead that will be needed to meet their contractual requirements.  This information also helps service providers predict any travel expenses they may incur, therefore reducing the need to over-estimate these costs to cover expenses that cannot be anticipated ahead of time.  Table 2 describes the types of fishery data that can help to better predict how vessels in the fishery will operate over the upcoming fishing year.  Ultimately, in order to reduce sea day costs, it will be up to industry participants to provide as much detail as possible about their fishing patterns to the service providers when they negotiate contracts for sea days.

**Table 2  Types of Information/Data That Can Improve Predictability of the Fishery**

| | |
|---|---|
| **Number of vessels and trips by gear type, area, and month** | *This information helps service providers estimate:* <br><br> • No. of observers are needed for the monitoring program <br><br> • Number of days per month observers may work <br><br> • Staff/overhead to deploy observers and maintain communications <br><br> • Travel expenses and other logistics |
| **Length of vessels, other vessel characteristics** | |
| **Length of fishing trips** | |
| **Percentage/proportion of back-to-back trips** | |
| **Port sailed/port landed; geographical extent of fishing** <br> **Proportion of trips with different port sail/land** | |
| **Total ports sailed from (by month or season)** | |
| **How many boats will be out fishing at any given time?** | |
| **Number of hauls per trip (per day)** | *This helps to determine minimum number of hours of work per sea day; some service providers may pay their observers differently, depending on the work schedule at sea.* |

## 3.0     ELEMENTS OF HERRING OPTIONS UNDER CONSIDERATION

The following subsections describe the elements of the options under consideration in the IFM amendment to establish industry-funded monitoring (IFM) in the Atlantic herring fishery, including the options for industry-funded observer coverage (Herring OBS) and the options for industry-funded at-sea monitoring (Herring ASM).  The primary focus of the discussion in this document is regarding the details of the herring ASM options, which were added to the IFM amendment by the New England Council in January 2015.  (The Mid-Atlantic Council added similar options for industry-funded monitoring in the Atlantic mackerel fishery.)

To the extent possible, the herring ASM options were developed based on the current multispecies (groundfish) at-sea monitoring (GF ASM) program for sectors.  However, the elements of the herring ASM options have been designed with a more explicit intent of reducing sea day costs (borne by the fishing industry) to the extent possible.  For comparison purposes, and for a better understanding of the factors that can increase sea day costs, the elements of the Groundfish ASM program are discussed throughout the following subsections.  Since the sea day costs of the GF ASM program are currently better understood and recent estimates of these costs are available, the sea day costs of a herring ASM program can be estimated based on a comparison to the Groundfish ASM program.

In addition to the coverage targets specified within each option (see Draft IFM Amendment), the elements of the options for industry-funded monitoring in the Atlantic herring fishery include the sampling objectives, sampling design, data to be collected, service provider requirements, training and certification requirements, sampling equipment, logistics (trip notification) and related provisions, debriefing, and data management.

Under all of the herring at-sea monitoring options (HER ASM), to reduce sea day costs for vessels that are subject to the industry-funded monitoring requirements, the following provisions would apply:

- Existing service providers approved for observer coverage (NEFOP) and groundfish at-sea monitoring (GF ASM) would be "grandfathered in" as approved service providers for Herring ASM (observers working for these companies would still require certification for Herring ASM – see Section 3.2 for more information).  Re-approval of the Herring ASM service providers after Year 1 would be consistent with the process for re-approving Groundfish ASM service providers.

- Cross-certification of observers from NEFOP and GF ASM programs would be allowed to certify observers for Herring ASM (see Section 3.2 for more information).  Any training that is completed for a NEFOP and/or GF ASM certification could be applied to a Herring ASM certification during the same year.  Training, certification, debriefing, and re-certification would be streamlined and combined with the NEFOP and GF ASM programs to the extent possible.

## 3.1     SAMPLING OBJECTIVES, SAMPLING DESIGN, DATA COLLECTED

The herring OBS options under consideration in the IFM amendment focus on the collection of comprehensive catch and bycatch data, along with other environmental and economic information, consistent with the NEFOP sampling protocols for high-volume fisheries.  The herring ASM options focus on the collection of bycatch data, including documentation of full and partial slippage events,

_0000010887

operational discards, and catch that is discarded after being brought on board the vessel, i.e., any catch that is not kept/landed by the vessel. The intent of focusing the herring ASM options on the collection of bycatch (discard) data only is to reduce some of the training and equipment expenses associated with the monitoring program, thereby reducing sea day costs for the industry. The herring ASM options also represent one component of a comprehensive long-term catch monitoring program for the Atlantic herring fishery, which will also incorporate portside sampling and electronic monitoring (EM).

There would be no new or different data collection requirements under the herring ASM options; rather, the ASM options would require that a subset of the catch data that is currently collected by NEFOP observers on a limited number of herring trips (determined by the SBRM) be collected on more trips,. i.e., trips with an industry-funded at-sea monitor. The sampling protocols for the ASM options would be developed by NEFOP based on information needed to document catch that is not kept/landed by the vessels, including slippage events and operational discards. In order to streamline training and equipment costs, the bycatch data (data elements and sampling protocols) collected by herring at-sea monitors would be consistent with bycatch data collected by groundfish at-sea monitors.

In general, data elements collected under the Herring ASM options would be identified based on existing NEFOP haul logs and the NEFOP discard log that was developed in 2010 specifically for vessels that pump fish. Table 3 represents a generic NEFOP haul log, and Table 4 represents a NEFOP discard log, which was developed by the NEFOP in 2010 specifically to meet the monitoring needs of the herring fishery. The discard log is currently required to be completed by observers on all hauls in which fish are pumped, as well as any significant discard events on vessels that do not pump fish. Under the herring ASM options, the discard log would be required to be completed by at-sea monitors on all observer hauls, regardless of gear type or fishing method. Basing the Herring ASM sampling design on the NEFOP discard log allows data collected by herring at-sea monitors to be compared to observer data since the discard log was created in 2010.

**Table 3  NEFOP Generic Haul Log (Example)**

**Table 4  NEFOP Discard Log (Example)**

_0000010890

Different kinds of reporting and/or monitoring can provide different kinds of information with varying levels of verification, as illustrated for the Atlantic herring and mackerel fisheries in Table 5 and Table 6. These tables were developed by the IFM FMAT based on similar tables provided in the 2013 Fisheries Monitoring Roadmap Report (Lowman et al, 2013).

For landings, vessel trip reporting and dealer landings reporting provide dual records of reported landings with the general location coming from the vessel trip report. If specific location of catch is important, VMS, observers, and monitors can provide independent verification of location. Portside sampling can provide independent verification of total landings amounts but no information on location of catch. If small amounts of incidentally-caught species are typically mixed in and retained with the target species, portside sampling may be the best way to estimate/document those landings.

For discards (of targeted or incidental species), vessel trip reporting provides reported discards, but independent verification of discards is often desired. Observers and monitors can provide detailed location-specific discard information, though monitors may or may not collect species composition and may limit their data collection to confirming retention and generally documenting discarding frequency. Cameras (electronic monitoring) can also confirm retention. If retention is confirmed (by whatever means), then portside monitoring can provide full catch verification. Affidavits of discard/slippage events can provide details of why discard/slippage events occur. If retention is not confirmed, then portside sampling can provide independent verification of landings composition but uncertainty regarding discards will persist (assuming observer coverage is not complete).

Biological information (age/length data) must generally be collected by observers/monitors at sea or dockside samplers/port agents on land.

Depending on the level of detail desired for tracking landings and/or discards, some combination of the above monitoring and reporting requirements should address Council needs (the costs of the various requirements are described in Section 4.0 of this document). If independent verifications of both landings and discards are desired, then having either a high level of observer/monitor coverage that subsamples catch or verification of retention (by monitors or cameras) coupled with portside sampling should address that objective.

_0000010891

**Table 5  Monitoring Approaches for the Atlantic Herring Fishery Based on Data Needs**

| Data Need | | Self-Reporting | | | Independent monitoring | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Vessel | Dealer | Affidavits | VMS | NEFOP Observers | Cameras | Portside | At-sea monitors With sampling for species comp | At-sea monitors w/o sampling for species comp |
| Total herring catch accounting [ACL monitoring] | Verifying retained | Vessels report by species | Dealer reports by species | | Can verify location fishing activity | Verifying location of fishing activity | Not quantifying, but confirming retention | Not useful for vessels fishing in more than one area | Verifying location of fishing activity | Not quantifying, but confirming retention |
| | Quantifying discards | Vessels report by species | | | Can verify location fishing activity | Species composition data Estimates amount of discards | Not quantifying, but confirming retention | | Species composition data | Not quantifying, but confirming retention |
| Non-target catch accounting | Haddock catch cap monitoring [ACL monitoring] | Used for total retained | | Can help with details of why slippage occurs | Can verify location fishing activity | Species composition data Estimates amount of discards | Not quantifying, but confirming retention | Not useful for vessels fishing in more than one area | Species comp and estimates of discarded catch | Not quantifying, but confirming retention |
| | River herring and shad catch cap monitoring | Used for total retained | | Can help with details of why slippage occurs | Can verify location fishing activity | Species composition data Estimates amount of discards | Not quantifying, but confirming retention | Not useful for vessels fishing in more than one area | Species comp and estimates of discarded catch | Not quantifying, but confirming retention |
| Scientific information | Stock assessments for herring | VTR only | | | | Collect age, length data | | Collect age, length data | Collect age, length data for discards only | |
| | Stock assessments for non-target species | VTR only | | | | Collect age, length data | | Collect age, length data | Collect age, length data for discards only | |
| | Spawning information | | | | | Collect age, length data | | Collect age, length data | Collect age, length data for discards only | |

Appendix 5 – Analysis of ASM Costs                    April 19-21, 2016

**Table 6  Monitoring Approaches for the Atlantic Mackerel Fishery Based on Data Needs**

| Data Need | | Self-Reporting | | | Independent monitoring | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Vessel | Dealer | Affidavits | VMS | NEFOP Observers | Cameras | Portside | At-sea monitors With sampling for species comp | At-sea monitors Without sampling for species comp |
| Total mackerel catch accounting [ACL monitoring] | Verifying retained | Vessels report by species | Dealer reports by species | | Can verify location fishing activity | Verifying location of fishing activity | Not quantifying, but confirming retention | Not useful for vessels fishing in more than one area | Verifying location of fishing activity | Not quantifying, but confirming retention |
| | Quantifying discards | Vessels report by species | | | Can verify location fishing activity | Species comp data Estimates amount of discards | Not quantifying, but confirming retention | | Species comp data | Not quantifying, but confirming retention |
| Non-target catch accounting | River herring and shad catch cap monitoring | Used for total retained | | Can help with details of why slippage occurs | Can verify location fishing activity | Species comp data Estimates amount of discards | Not quantifying, but confirming retention | Not useful for vessels fishing in more than one area | Species comp and estimates of discarded catch | Not quantifying, but confirming retention |
| Scientific information | Stock assessments for mackerel | VTR only | | | | Collect age, length data | | Collect age, length data | Collect age, length data for discards only | |
| | Stock assessments for non-target species | VTR only | | | | Collect age, length data | | Collect age, length data | Collect age, length data for discards only | |

Appendix 5 – Analysis of ASM Costs                              April 19-21, 2016

_0000010893

Table 7 summarizes the sampling objectives, the primary elements of the sampling design, and the data to be collected under the options for industry-funded monitoring in the Atlantic herring fishery (herring OBS and herring ASM options – see description of options in the Draft IFM Amendment); the elements of the current groundfish ASM program are also provided in the table for comparison purposes.  Under all of the options, the details of the sampling protocols and logs to be completed would be determined by NEFOP upon implementation of the IFM amendment.

**Table 7  Herring IFM Options: Sampling Objectives, Sampling Design, Data Collected**

|  | Industry-Funded Observer Coverage Options (OBS) | *NE GROUNDFISH ASM PROGRAM* | Industry-Funded Herring ASM Options (Herring ASM) |
|---|---|---|---|
| **Sampling Objectives** | SBRM, MMPA, MSA, ESA Stock Assessment, Discard Estimation | MSA Catch monitoring; discard estimation | *Bycatch documentation* - catch that is not kept/landed on Herring Category A/B herring vessels, including full and partial slippage events and operational discards; also including catch that may be brought aboard, sorted, and then discarded *Elements of data collection based on GF ASM; Herring ASM program is intended to complement portside sampling/EM for comprehensive catch monitoring program (landings + discards)* |
| **Sampling Design** | Comprehensive catch and bycatch data collection program; protected species documentation; biological sampling; environmental parameters; economic information | Catch monitoring to ensure that ACLs are not exceeded; data on catch composition to estimate total discards by sectors and common pool vessels, by gear type and stock area | Sampling protocols based on NEFOP Haul Log ("modified" - discards); Discard Log; Documentation of bycatch (discards); Protected species interactions; *(in addition to pre-trip safety checklist and other logs/reports as determined by NEFOP)* |
| **Data Collected** | Comprehensive catch/bycatch catch/bycatch; biological samples; protected species; fishery information; environmental parameters | Catch/Bycatch | Catch not brought on board the vessel for any reason; Slippage events; Operational discards; Discards brought on board *No subsampling for kept catch estimation* |

*The elements of the Groundfish ASM program are provided in the table above for comparison purposes.

## 3.2    SERVICE PROVIDER REQUIREMENTS

Under the herring OBS options, the requirements for approving service providers and certifying observers for observer coverage (HER OBS) are proposed to be consistent with those implemented recently through the SBRM amendment (CFR 648.11(h)).  Under the herring ASM options, the requirements for approving service providers and certifying observers for the herring at-sea monitoring program (HER ASM) are proposed to be consistent with those for the groundfish sector ASM program, implemented through Amendment 16 to the Multispecies FMP (CFR 648.47(b)(4) and (b)(5)).  This approach is consistent with the January 2015 Council motion regarding the addition of the Herring ASM options.

Appendix I of this document provides a detailed comparison of the service provider regulatory requirements for approval/certification under the herring observer coverage options (HER OBS) and the herring at-sea monitoring options (HER ASM).  As previously noted, the HER ASM service provider requirements are based on the current requirements for the groundfish ASM program.  The major elements of the options as well as the differences between the herring OBS options and herring ASM options are discussed below.

***Under the Herring OBS Options:***

- Service provider requirements for industry-funded observer coverage would be consistent with those recently implemented through the SBRM amendment (CFR 648.11(h), Table 8, see details in Appendix I).

- Certified observers would be required to qualify/receive and additional NEFOP high-volume certification to work on herring OBS trips.  MRAG Americas is currently the only service provider with high-volume certified observers because this is the company that has the existing (five-year) contract with NMFS for observer coverage under the SBRM amendment.  Under the herring OBS options, additional service provider companies would need to apply and be approved by NMFS for observer coverage and train/certify their observers through NEFOP for observer coverage in high-volume fisheries.

***Under the Herring ASM Options:***

- Service provider requirements for industry-funded herring at-sea monitoring would be consistent with those for the multispecies (groundfish) sector at-sea monitoring program, implemented in Amendment 16 to the Northeast Multispecies FMP (CFR 648.47(b)(4) and (b)(5), Table 8, see details in Appendix I).

- Existing service providers approved for observer coverage and the groundfish ASM program would be "grandfathered in," i.e., automatically approved for the herring ASM program, when the omnibus IFM amendment becomes effective.  This increases negotiating opportunities for participants in the fishery by providing competition between companies at the onset of the industry-funded monitoring program (versus having only one service provider available at the program onset).

_0000010895

- Observers working for HER ASM-approved service providers would be required to obtain a Herring ASM certification before being deployed for at-sea monitoring trips on herring vessels.  Re-approval of the herring ASM service providers after Year 1 would be consistent with the process for re-approving groundfish ASM service providers.

- Cross-certification for existing providers/observers across multiple monitoring programs would be allowed and encouraged to minimize additional training for a HER ASM certification.  Observers employed by the service provider companies that are approved for NEFOP observer coverage and/or groundfish ASM could apply their training for these certifications to a herring ASM certification during the same year.  An abbreviated herring ASM training program would be developed to certify new (HER ASM only) observers who are not already certified/certifying for observer coverage or groundfish ASM.  This is discussed more in Section 3.3 of this document.

- Provisions for re-certification of herring ASM observers would be consistent with those for Groundfish ASM, but the time needed for re-certification would likely be shorter (see Section 3.3).

The primary differences between the service provider requirements proposed under the HER OBS options and the HER ASM options is that there is no requirement for observers to have a college degree for HER ASM, and there is no prohibition on deploying observers on back-to-back multi-day trips or multiple multi-day trips on the same vessel in the same month (Table 8).  Eliminating the college degree requirement and prohibition on multiple trips should reduce sea day costs by increasing the potential pool of observers for-hire and reducing logistics and travel expenses associated with deploying observers on multiple fishing trips.  However, concerns about observer retention and data quality have been expressed regarding the elimination of the college degree requirement; these concerns should be considered carefully under the HER ASM options.

Another difference between the options is that the regulations regarding service provider approval and responsibilities under the herring ASM options do not include requirements for service providers to meet SCA/FLSA and Department of Labor (DOL) wage/overtime standards.  While it is expected that service provider companies will continue to adhere to DOL and other applicable Federal labor laws, the proposed regulations for the HER ASM options would not further address these requirements, which is also consistent with the current service provider requirements for the Groundfish ASM program.  As previously discussed (see Sections 2.1 and 2.2), there is likely to be a sea day cost savings by eliminating these requirements.

_0000010896

**Table 8  Herring IFM Options: Service Provider Requirements**

| | Industry-Funded Observer Coverage Options (HER OBS) | NE GROUNDFISH ASM PROGRAM | Industry-Funded Herring ASM Options (HER ASM) |
|---|---|---|---|
| **Service Provider Requirements** | *Implemented through SBRM Amendment* | *Implemented through Am 16 Multispecies FMP* | *Same as Groundfish ASM Program* |
| | CFR 648.11( h)  Observer Service Provider Approval/Responsibilities | CFR 648.47(b)(4) and (b)(5) | *No requirement for providers to meet SCA/FLSA/DOL wage/overtime standards* |
| | Bachelor's Degree required | High School Diploma or equivalency | *High School Diploma or equivalency* |
| | | *No prohibition on observer deployment on back-to-back trips or multiple multi-day trips* | *No prohibition on observer deployment on back-to-back trips or multiple multi-day trips* |
| **Current NMFS-Approved Providers** | MRAG Americas | MRAG Americas East West Technical Services AIS, Inc. ACD USA Ltd.* Fathom Research, LLC* | MRAG Americas East West Technical Services AIS, Inc. ACD USA Ltd.* Fathom Research, LLC* |

*Service provider companies with an asterisk by their names have been approved for Groundfish ASM but are not currently providing sea day coverage.*

*The elements of the Groundfish ASM program are provided in the table above for comparison purposes.*

### 3.3     OBSERVER TRAINING, CERTIFICATION, AND SAMPLING EQUIPMENT

General provisions related to observer training, certification, and sampling equipment under the herring OBS and ASM options are summarized in Table 9 and Table 10.  Training and certification of industry-funded observers under the HER OBS and HER ASM options would be administered/managed through NEFOP, consistent with training and certification for the groundfish ASM program (GF ASM).  Approved service providers for would be responsible for covering the costs associated with providing their employees with a daily stipend, meals, hotel/lodging, and covering other related expenses associated with attending training/certification courses at NEFOP (Falmouth, MA).  This can include lodging, meals, and a daily stipend over weekends if training courses more than one week.

Cross-certification of observers and carryover of overlapping training/equipment from NEFOP and GF ASM programs would be allowed to certify observers under the herring ASM options.  Any training courses that are completed for a NEFOP observer coverage certification and/or GF ASM certification could be applied to a herring ASM certification during the same year.  Training, certification, debriefing, and re-certification would be streamlined (ex., provided remotely) and combined with the NEFOP and GF ASM programs to the extent possible.  Because the herring ASM program focuses only on the collection of discard data on Category A/B herring vessels, training requirements and equipment needs for a HER ASM only certification (observers not certified for other programs) would be less than those for the industry-funded observer coverage (OBS options) or the GF ASM program.  Therefore, the costs paid by service providers to certify observers for the HER ASM program are expected to be less than those for observer coverage (OBS options) and the GF ASM program, which is likely to reduce the sea day costs for the HER ASM options.  Any newly-approved service providers that do not have observers currently certified for either NEFOP observer coverage or GF ASM would incur the largest training/certification/equipment costs under the HER ASM options.

***Under the Herring OBS Options:***

- Observers (employed by approved service providers) would need to attend 15 training days to obtain a NEFOP certification for observer coverage (Table 9).  Newly certified observers would be required to work four training trips, including one trip with a veteran observer.  Additional experience (sea days) is necessary prior to qualifying for a high-volume certification, which would then require one additional training day.

- Current GF ASM-certified observers could obtain a NEFOP certification for observer coverage under the Herring OBS options with additional training days and a high-volume certification.

Appendix 5 – Analysis of ASM Costs                                           April 19-21, 2016

***Under the Herring ASM Options:***

- Any training that is completed for a NEFOP observer coverage and/or GF ASM certification by observers working for approved service providers could be applied to a HER ASM certification during the same year. Observers already certified for NEFOP and/or GF ASM would not require training trips with a veteran observer to certify for HER ASM. This should significantly reduce costs for existing service providers that may want to "dual certify" their observers for multiple monitoring programs, including herring ASM. Many costs associated with training/certifying observers under the herring ASM options would be incurred only by service provider companies that are certifying their observers for HER ASM only.

- Current NEFOP-certified observers with high-volume certification would not require additional training days to certify for HER ASM, but would likely require some overview/instruction regarding the protocols for HER ASM trips (possibly conducted remotely/online).

- Current groundfish ASM-certified observer would likely require 1-2 additional training days to learn more about herring fishing operations (midwater trawl, purse seine, and small mesh bottom trawl gear) and sampling protocols in high-volume fisheries. Based on cost information provided by service provider companies (*see below), the cost of certifying GF ASM observers for HER ASM would be about $320-$640 (1-2 training days), or about 10-20% of the cost of certifying observers for the GF ASM program (11 training days).

- New observers certifying for HER ASM-only (employed by approved service providers) would likely require 4-5 training days, which includes two days of safety training plus 2-3 days or training for the HER ASM program (herring fishing operations, sampling protocols, data entry, species identification). To obtain a HER ASM certification, new observers would be required to work four training trips, including one trip with a veteran observer. Based on the cost information provided by service provider companies (*see below), the cost of certifying new observers for HER ASM only would be about $1,500-$2,000 per observer (4-5 training days), or about 50% of the cost of certifying observers for the GF ASM program (11 training days).

- Annual recertification would be required for the HER ASM program, but the recertification process could likely be reduced to one day. The GF ASM program recertification currently lasts three days. The costs to service providers for recertifying observers under the herring ASM options, therefore, is expected to be 1/3 of the cost for recertifying observers for Groundfish ASM. To the extent possible, the recertification courses for these programs would be combined and/or provided remotely.

*The cost for training/certifying one observer for the Groundfish ASM program is estimated by service providers to be $3,000-$4,000 (personal communication). This includes travel, meals, lodging, and a daily stipend for 11 training days at the NEFOP training center in Falmouth, MA. This results in an average estimate of about $320 per training day per observer.*

Appendix 5 – Analysis of ASM Costs                                                                         April 19-21, 2016

Under the herring ASM options, expenses for sampling equipment would be shared between the Federal government and the service providers in a manner that is similar to the current groundfish ASM program.  Because of the focus on bycatch/discards only, less sampling equipment would likely be needed for the herring ASM options versus the herring OBS options (Table 10).  Personal safety equipment (immersion suit, inflatable vest, etc.) would continue to be paid for by the service providers; existing observers certified observer coverage and the GF ASM program already possess personal safety equipment and would not need to purchase it again to certify for HER ASM.  Other personal issue and off-the-shelf gear such as small scales, gloves, bags, measuring tapes, knives, clipboards, etc. would be covered by the service provider.  Additional costs for this equipment would be incurred primarily by newly-approved service providers that do not have observers currently certified for either NEFOP observer coverage or GF ASM.  Special prints, special electronics, and not-off-the-shelf gear would continue to be funded by the Federal government, although the availability of future funding is unknown.  This includes manuals, field guides, tablets, logs, laptops, and other electronics.  The costs of any sampling equipment not provided by the Federal government must be covered by the service providers and is therefore transferred to the industry in the sea day cost.

Overall, because of the need for less sampling equipment and the ability for current NEFOP and GF ASM observers to utilize existing equipment for a herring ASM program, the equipment costs associated with the herring ASM options are expected to be less than those for the herring OBS options.  The equipment costs for the herring ASM options will also be lower for service providers with observers who are already certified for groundfish ASM.*

*Information provided by NMFS indicates that the estimated sea day cost incurred by the service provider for equipment in the Groundfish ASM program is $17.50 per observer (based on the observer working 150 sea days in a year).*

**Table 9  Herring IFM Options: Observer Training and Certification**

| | Industry-Funded Observer Coverage Options (OBS) | NE GROUNDFISH ASM PROGRAM | Industry-Funded Herring ASM Options (Herring ASM) |
|---|---|---|---|
| **Training and Certification** | | | **NEFOP-Certified Observers with Current High-Volume Certification** - no extra training days, but possibly some instruction on protocols for ASM trips; **GF ASM-Certified Observers** - 1-2 training days for herring/high-volume; |
| *Training Courses* | 15 days (3 working weeks) comprehensive training, plus high-volume certification for qualified observers (one extra day); **Current Groundfish ASM-certified Observers** - can certify for OBS with additional training days and high-volume certificaiton | 11 days (covers multiple gear types - gillnet, longline, otter trawl, handline - catch estimation procedures, protected species) | **New HER ASM Observers** - 4-5 training days for HER ASM only certification (2 days safety, plus herring/high-volume training); *Providers pay for travel/lodging, and daily pay to observers for attending training; Est. provider cost for Gfish ASM training (11 days) - $3000-$4000 per observer ($325/day)* |
| *Certification/Shadow Trips* | Yes, 4 trips incl. 1 with trainer | Yes, 4 trips incl. 1 with trainer | Not required for existing NEFOP and GF ASM-certified observers (already certified); New HER ASM only observers - one shadow trip with trainer; first four trips would be training trips |
| *Re-certification* | No | Yes, Annual | Yes, annual - one day (Gfish ASM - 3 days; cost reduced by 2/3) |
| *Safety Refresher (two days)* | Yes, every 18 months | Yes, every 18 months | Yes; cross-certify; additional cost only for HER ASM-only observers |
| *CPR/First Aid Certification* | Annual | Annual | Annual; cross-certify; additional cost only for HER ASM-only observers |

**Table 10  Herring IFM Options: Observer Equipment**

| | Industry-Funded Observer Coverage Options (Herring OBS) | NE GROUNDFISH ASM PROGRAM | Industry-Funded Herring ASM Options (Herring ASM) |
|---|---|---|---|
| **Equipment** | Comprehensive - 83 items | Limited - 44 items | Limited - Similar to Groundfish ASM; any equipment necessary for discard sampling/documentation |
| *Personal Safety Equipment- Immersion suit, PLB, Inflattable Vest* | Yes | Yes, covered by provider | Yes, covered by provider; Equipment for NEFOP and GFASM can be used; Additional cost only for HER ASM-only observers |
| *Personal Issue and Off-the-Shelf Gear* | (baskets, small scales, gloves, bags, measuring tapes, disposable cameras, knives, clipboards) | Yes, covered by provider | Yes, covered by provider; Est. total cost for new observer ($2,600 amortized for life of equipment); Est. sea day cost (service provider) per observer (150 days) - $17.50 |
| *Special Prints, Electronics, Not Off-the-Shelf Gear* | (manuals, guides, Marel scales, tablets, logs, electronics) | Yes, covered by NMFS | Yes, covered by NMFS; *future funding unknown* |

*The elements of the Groundfish ASM program are provided in the tables above for comparison purposes.*

Appendix 5 – Analysis of ASM Costs                                    April 19-21, 2016

## 3.4     PRE-TRIP NOTIFICATION, DEBRIEFING, AND DATA MANAGEMENT

Provisions related to vessel selection (through pre-trip call-in/notification), debriefing, and data management for the herring OBS and ASM options are summarized in Table 11.  Under all of the herring OBS and ASM options, vessel selection/notification for industry-funded coverage would occur through the existing pre-trip call-in system for Atlantic herring vessels (Amendment 5).  The Atlantic herring notification process differs from the Groundfish Pre-Trip Notification System.

The existing notification system for observer deployment on Atlantic herring vessels requires all limited access herring vessels (as well as Category D vessels fishing with midwater trawl gear in Areas 1A, 1B, and/or 3) and all Atlantic herring carrier vessels to notify NMFS/NEFOP at least 48 or 72 hours (depending on permit category) prior to the beginning of any trip where the vessel may harvest, possess, or land Atlantic herring.  Vessels/representatives must provide information including the vessel name, permit number/permit category, contact person name and contact phone number, date sail, time sail, port of departure, gear type, and area intending to fish (i.e., herring management area, closed area, etc., consistent with regulatory requirements), as well as target species (target species is helpful to identify directed herring versus directed mackerel trips).  Notification is through a telephone number.  Vessels can provide pre-trip notification for multiple trips at one time.  If a trip is cancelled, a vessel representative must notify NMFS of the cancelled trip, even if the vessel is not selected to carry an observer.  All waivers or observer selection notices for observer coverage are issued to the vessel by VMS so as to have on-board verification of the waiver or selection.

The existing pre-trip notification system (PTNS) for observer deployment on groundfish and longfin vessels requires all vessels fishing on PTNS-eligible groundfish trips or PTNS-eligible longfin trips to notify NMFS/NEFOP at least 48 hours prior to the beginning of any trip.  Groundfish sector vessels with category A, C, D, E, F, and HA multispecies permits must notify for all multispecies trips.  Common pool vessels with categories A, D, E, and F permits, as well as those fishing monkfish or multispecies using A DAS must notify for their groundfish trips.  Vessels with a longfin/butterfish moratorium (SMB 1) permit must notify for all trips on which they plan on landing greater than 2500 pounds of longfin squid.  Vessels/representatives must provide information including the vessel name, permit number, contact person name and contact phone number, date sail, time sail, port of departure, estimated length of trip, gear type, and area intending to fish.  There are several methods available for the pre-trip notification: internet, email, and telephone.  Vessels can provide pre-trip notification for multiple trips at one time and may enter their own trips directly into the PTNS without contacting FSB staff.  Trips are entered into the PTNS and go through a programmed algorithm to determine which trips get selected for observer coverage.  Trips are cancelled by FSB staff based on automated sail reports.  All waivers or observer selection notices for observer coverage are issued to the vessel via VMS so as to have on-board verification of the waiver or selection.  The PTNS system in all its complexity requires a full time contractor to oversee the system on a daily basis.  The NEFOP also contracts with an afterhours phone service to provide access 24 hours a day, 7 days a week to allow for notifications or troubleshooting.

Under the Herring OBS and ASM Options, vessels would be notified via VMS if they are selected for industry-funded coverage.  The 100% coverage target options simplify vessel selection, as all vessels that are not selected for observer coverage under the SBRM provisions would be required to obtain an industry-funded observer employed by one of the service providers approved for the monitoring program.

**Debriefing** is an important component of any monitoring program, as it helps to resolve data issues expeditiously and ultimately enhances data quality. It also provides an opportunity to review observer performance and address any problems with data collection and data entry. Provisions for debriefing under the Herring ASM options would be consistent with those for the Groundfish ASM program. To the extent possible, debriefing will be streamlined (for example, conducted remotely) to reduce travel and other related costs. The most successful debriefings are conducted soon after the vessel lands and after the preliminary data are uploaded to the NEFOP program. Preliminary data can be reviewed by staff and follow-up questions answered in a timely manner. Information is then edited near real-time and is therefore more accurate. Sampling in the high volume fisheries can be challenging and direct communication with observers after trips land is key to understanding the data, especially slippage information.

Responsibilities and provisions for **data management** under the Herring ASM options would be the same as those for observer data and data collected for Groundfish ASM. The NEFOP would manage the data. A summary of preliminary data would be uploaded electronically, by observers and reviewed by the NEFOP staff. Once verified the data are available for use by GARFO and other end users. Data are stored in master tables in the Observer database, and fully audited data are available 90 days after date landed.

**Table 11  Herring IFM Options: Logistics (Notification), Debriefing, and Data Management**

| | Industry-Funded Observer Coverage Options (HER OBS) | *NE GROUNDFISH ASM PROGRAM* | Industry-Funded Herring ASM Options (HER ASM) |
|---|---|---|---|
| **Logistics and Related Provisions** | PTNS | Gfish PTNS | Build into existing pre-trip notification system for Herring A/B vessels (different from GFish)<br><br>*No need to develop strategy for vessel selection under 100% coverage options (or possibly 50%)* |
| **Debriefing** | Yes | Yes | Yes; Pre-trip and post-trip briefing important for discard logs; *Streamline/combine debriefing to the extent possible* |
| **Data Management** | NEFSC/NEFOP | NEFSC/NEFOP | Data submitted to NEFOP for use by all users (NEFSC, GARFO, NEFMC) under a separate program code |
| | Upload OB PRELIM record 48 hours from landing | Upload OB PRELIM record 48 hours from landing | OBPRELIM upload - a) Delivery of paper log data shall be received within 5 calendar days (120 hours) of the vessel landing<br>(b) Delivery of electronic data shall be received within 2 calendar days (48 hours) of the vessel landing |
| | Paper logs due 5-7 business days | Paper logs due 5-7 business days | Paper logs due 5-7 business days |

*The elements of the Groundfish ASM program are provided in the table above for comparison purposes.*

## 3.5    SUMMARY: COMPARISON OF HERRING OBS AND ASM OPTIONS

Table 12 provides a qualitative comparison of some of the pros/cons associated with the options under consideration in the IFM amendment to establish industry-funded monitoring in the Atlantic herring fishery.

**Table 12  Qualitative Comparison of Options for Industry-Funded Monitoring in the Atlantic Herring Fishery (Herring OBS Options vs. Herring ASM Options)**

|  | Pros | Cons |
|---|---|---|
| **Observer Coverage Options (HER OBS)** | Comprehensive catch sampling (kept and discarded) | Higher sea day cost |
|  | Biological samples collected | Limited ability to reduce industry/sea day costs |
|  | More applications/uses for data (stock assessment, catch monitoring, etc.) | Industry-funded observer data not collected consistently with SBRM strata (gear type, area) not utilized for bycatch estimation and stock assessment |
|  |  | Limited to only one service provider at onset of industry-fund program; higher costs for other providers to certify observers |
|  |  |  |
|  | **Pros** | **Cons** |
| **At-Sea Monitoring Options (HER ASM)** | Reduces sea day costs for industry | Discard data only; more limited applications of data |
|  | Builds on existing discard data collected by observers (provides basis for comparison to observer data) | Loss of opportunity to collect other important data while paying for an observer |
|  | Focuses on at-sea component of comprehensive long-term catch monitoring program that will likely include portside sampling and EM |  |
|  | Multiple service providers available at onset of industry-funded program; increases flexibility and negotiating ability for industry; competition reduces costs |  |
|  | Discard data collected by at-sea monitors can help to inform decisions about maximized retention provisions for the portside sampling/EM components of the IFM program |  |
|  |  |  |

## 4.0     ESTIMATED SEA DAY COSTS FOR THE HERRING ASM OPTIONS

For the purposes of the omnibus IFM Amendment, an estimate of the sea day cost that may be expected under the Herring ASM options will be developed by the IFM FMAT based on estimates of sea day costs for NEFOP observer coverage (currently estimated at $806 in the Draft IFM Amendment) and the Groundfish ASM program.  This sea day cost can be used in the economic analysis for a comparison of the impacts of the Herring ASM options to the Herring OBS options.

*Intentionally Blank*

**Omnibus Industry-Funded Monitoring (IFM) Amendment**

*Amendment 7 to the Atlantic Herring FMP*

| DRAFT APPENDIX I: |
| :---: |
| SERVICE PROVIDER REQUIREMENTS |

*Proposed Regulations for Herring Industry-Funded Observer Coverage (OBS) and Herring Industry-Funded At-Sea Monitoring (ASM)*

### Regulations for Service Provider Approval

| | Industry-Funded Observer Coverage (OBS) Options Service Provider Requirements *Consistent with SBRM Amendment* | Proposed Atlantic Herring At-Sea Monitoring (ASM) Service Provider Requirements *Consistent with NE Groundfish ASM Requirements* |
| --- | --- | --- |
| **At-Sea Sampler/Observer Coverage  (CFR 648.11)** CFR 648.11( h)  Observer Service Provider Approval/Responsibilities | | **Independent Third-Party Monitoring Provider Standards** CFR 648.47(b)(4) and (b)(5) |
| ***3. Contents of Application*** | *Corporate structure, contact information, confict-of-interest and other statements* | *Same requirements (b)(4)* |
| | *Summary of prior experience, monitoring services provided* | *Same requirements (b)(4)* |
| | *Proof of Insurance - Workers Compensation and Maritime Employer's Liability Insurance $5M min)* | *Addressed in i(G) Evidence of adequate insurance to cover in jury, liability, and accidental death* |
| | *Proof that salaries meet/exceed DOL Guidelines, compensation for FLSA non-exempt employees, information about benefits and personnel services provided* | *Addressed in (b)(4)(i)(H) Proof of benefits and personnel services, but no reference to DOL Guidelines or FLSA requirements* |
| | *Names of NMFS-certified observers and trainees* | *Addressed in (b)(4)(i)(I) Proof that monitors have passed adequate training course to the extent not funded by NMFS, consistent with NEFOP* |
| | *Emergency Action Plan* | *(b)(4)(i)(J) Same* |
| | | *(b)(4)(i)(K) Evidence that the company is in good financial standing* |

**_Regulations for Service Provider Responsibilities_**

| | Industry-Funded Observer Coverage (OBS) Options<br>Service Provider Requirements<br>*Consistent with SBRM Amendment* | Proposed Atlantic Herring At-Sea Monitoring (ASM)<br>Service Provider Requirements<br>*Consistent with NE Groundfish ASM Requirements* |
|---|---|---|
| **At-Sea Sampler/Observer Coverage  (CFR 648.11)**<br><br>CFR 648.11( h)  Observer Service Provider Approval/Responsibilities | | **Independent Third-Party Monitoring Provider Standards**<br><br>CFR 648.47(b)(4) and (b)(5) |
| ***5.  Responsibilities of Observer Service Providers*** | Provide observers with transportation to initial location of deployment, subsequent vessel assignments, and debriefing locations | *(b)(4)(ii)(A) Must establish and carry out a comprehensive plan to deploy NMFS-certified at-sea monitors, or other at-sea monitoring mechanism (ex., NMFS-approved EM equipment) to meet specified coverage levels;*<br><br>*(b)(4)(ii)(A)(1)-(A)(6) include specific requirements for groundfish sector monitoring* |
| | Lodging, per diem, and any other services for observers to attend training classes | |
| | Required observer equipment prior to training or deployment | *Addressed in (b)(4)(ii)(J); and*<br>*(b)(5)(i) - providers are responsible for cost of gear to the extent not funded by NMFS* |
| | Individually-assigned communication equipment (cell phones, other devices) | |
| *iii. Logistics* | Must be able to deploy observers based on comprehensive plan (24/7) with phone system to secure coverage, must access all ports, report deployments to NMFS, fair/equitable assignment of observers | *Addressed in (b)(4)(ii)(A)* |
| *iv. Limitations* | Review/edit/approve data from first four deployments by candidate observer before certifying | |
| | *Observers cannot be deployed on the same vessel for more than two consecutive multi-day trips; observers cannot be deployed on the same vessel more than twice in any given month for multi-day deployments* | *Not addressed in Groundfish ASM Provider Requirements* |
| *v. Communications with Observers* | Must have employee on call 24/7 to handle issues | |
| *vi. Observer Training Requirements* | Must submit information about trainees at least 7 days prior to training | |
| *vii. Reports* | Observer deployment reports w/in 24 hours; reports back in OBSCON data w/in 24 hours of landing; raw data w/in four days of landing | |
| | *Safety refusals within 24 hours; Return biological samples within 7 days; Debriefing availability for up to 2 weeks following trip; Observer availbaility report to NMFS by 5 p.m.; other reports (harassment, discrimination, injury, etc.) within 24 hours of event* | *(b)(4)(ii)(B) Monitors must remain available to NMFS for debriefing at least two weeks following trip; (b)(4)(ii)(C) similar requirements for other reports in this section* |
| | *Requirements for observer status reports, vessel contracts, observer contracts and additional information that may be distributed to vessels* | *(b)(4)(ii)(D) contracts and (b)(4)(ii)(E) other paperwork distributed to vessels* |
| *viii. Refusal to Deploy Observer* | *If provider does not have observer available within 48 hours of request; if the vessel is determined unsafe; other reasons including failure to pay for previous deployments (if authorized in writing by NMFS)* | *(b)(4)(ii)(F); also includes refusal for inadequate notice for departure or landing* |
| ***6.  Limitations on Conflict of Interest*** | *No direct/indirect interest in fishery/vessels/dealers/research/advocacy; must assign observers without preference; must not soliciy or accept gifts, favors, loans, etc.* | *Addressed in (b)(4)(ii)(G)* |
| ***7.  Removal of Service Provider*** | *Process for removal if provider does  not meet requirements/conditions of service, conflict of interest, criminal convictions, embezzlement, theft, etc., crimes of dishonesty, unsatisfactory performance ratings on Federal contracts, evidence of de-certification* | *(b)(4)(ii)(I) A means to protect the confidentiality and privacy of data submitted by vessels, as required under the MSA* |

Appendix 5 – Analysis of ASM Costs                                                    April 19-21, 2016

## *Regulations for Observer Certification*

| | Industry-Funded Observer Coverage (OBS) Options Service Provider Requirements *Consistent with SBRM Amendment* | Proposed Atlantic Herring At-Sea Monitoring (ASM) Service Provider Requirements *Consistent with NE Groundfish ASM Requirements* |
|---|---|---|
| **648.11( i)  Observer Certification** | | **Independent Third-Party Monitoring Provider Standards** |
| *(1) Eligibility Standards* | Observers must meet NMFS National Minimum Eligibility Standards (National Observer Program), Provided Below | **CFR 648.47(b)(4) and (b)(5)** |
| *Education/Experience* | *Unless waived by the RA, must possess Bachelor's Degree with a major in one of the sciences; must have had at least one undergad course on math/stats; must have experience with data entry on computers; these requirements can be waived by RA or NEFSC Directors if skills have been acquired through alternative training program (observing fishing activities, research cruises, marine mammal data recording, collecting biological samples, entering data, completing NMFS biological training program* | *(b)(4)(iii)(A) High school diploma or legal equivalent* |
| *Training Requirement* | Must pass tests 80% or greater for program; must complete acknowledgement of risk | (b)(4)(iii)(B) Successful completion of NMFS-required training and briefings before deployment |
| *Conflict of Interest* | No direct financial interest, ownership, etc. in catching, taking, harvesting, processing fish; may not solicit or accept gifts; may not observe on vessels previously employed in another capacity; must not work for other vessels/processors while hired as observer | Addressed in (b)(4)(ii)(G) |
| *Physical/Mental Confition* | Documentation of physician certification within 12 months of completing training | Addressed in (b)(4)(iii)(C) |
| *Communication Skills* | Must be able to communicate verbally and written in English | |
| *Citizenship/Ability to Work Legally in US* | Must be a U.S. citizen, non-citizen with green card, TN authorization, H1 visa, or valid work visa, and social security card | |
| *(2) Observer Training* | Must pass NMFS/NEFOP course(s); one training trip with another observer; data from first four trips reviewed/approved for certification | Addresssed in (b)(4)(iii)(B) |
| *(3) Observer Requirements* | Must be NMFS/NEFOP certified; completed all required training and briefings for observers | |
| | Physically and mentally capable fo carrying out responsibilities | Addressed in (b)(4)(iii)(D) |
| | Red Cross/CPR certification | |
| | Must accurately record sampling data, write complete reports, report observations accurately | |
| *(4) and (5) Probation/Decertification* | Process for NMFS to review certifications and written issuance of de-certification | |
| | *Automatic background check when observers are issued a "CAC" card* | *(b)(4)(iii)(E) Absence of fisheries-related convictions, based upon a thorough background check* |
| | | (b)(4)(iii)(F) Independence from fishing-related parties |
| | | *(b)(5)(ii) includes requirements for groundfish vessel selection protocols* |

**Appendix 6 -- Summary Information about Midwater trawl Trips in Groundfish Year-Round Closed Areas**

Establishing criteria and provisions for midwater trawl access to groundfish year-round closed areas – including requirements for industry-funded observer coverage in these areas –  is largely a policy decision to be made by the Council.

### *Current Requirements for Midwater trawl Vessels in Year-Round Groundfish Closed Areas*

Additional sampling and monitoring requirements became effective for midwater trawl vessels fishing in Closed Area 1 in late 2010; Amendment 5 to the Atlantic Herring FMP (March 2014) extended those requirements to all of the year-round groundfish closed areas.  The following management measures apply to midwater trawl vessels fishing in the year-round groundfish closed areas:

- Midwater trawl vessels are **required to carry an observer on 100%** of trips in the groundfish year-round closed areas.  If an observer cannot be provided, the midwater trawl vessel is prohibited from fishing in the year-round groundfish closed areas on that fishing trip.

- Vessels are required to **pump aboard all fish** from the net for inspection and sampling by the observer.  Vessels that do not pump fish are required to bring all fish aboard the vessel for inspection and sampling by the observer.  Unless specific conditions are met (see below), vessels are prohibited from releasing fish from the net, transferring fish to another vessel that is not carrying a NMFS-approved observer, or otherwise discarding fish at sea, unless the fish have first been brought aboard the vessel and made available for sampling and inspection by the observer.

- Vessels may make short **test tows** in the area to check the abundance of target and non-target species without pumping or bringing the fish on board if the net is reset without releasing the contents of the test tow.  In this circumstance, catch from the test tow will remain in the net and would be available to the observer to sample when the subsequent tow is pumped out or all fish are brought aboard.

- Fish that have not been pumped or brought aboard may be released (**slippage**) if the vessel operator finds that:

  (1.)  Pumping the catch or bringing all fish aboard could compromise the **Safety** of the vessel;

  (2.)  **Mechanical Failure** precludes bringing some or all of the catch aboard the vessel; or

  (3.)  **Spiny Dogfish** have clogged the pump and consequently prevent pumping of the rest of the catch.

- If the net is released for any of the reasons stated above, the vessel operator is required to complete and sign a **Released Catch Affidavit Form** (available from NMFS) providing information about where, when, and why the net was released, as well as a good-faith estimate of the total weight of fish caught on the tow and weight of fish released.  Released Catch Affidavit Forms are required for all slippage events and must be submitted within 48 hours of completion of the fishing trip.

- Midwater trawl vessels are required to **leave the closed area for the remainder of the fishing trip** if a slippage event occurs in the closed area for any of the three reasons (1) safety; (2) mechanical failure; or (3) spiny dogfish.

_0000010912

- **Operational discards are prohibited** on observed midwater trawl trips in the year-round groundfish closed areas.  If fish remain in the net at the conclusion of pumping operations, those fish must be brought on board the vessel and made available for sampling and inspection by the observer, unless one of the other three slippage exemptions applies.

*\*Upon implementation of the omnibus habitat amendment, the above provisions would apply to the remaining year-round groundfish closed areas.*

### Amendment 5 Analysis

The analysis in the FEIS for Amendment 5 to the Atlantic Herring FMP evaluated the proportion of Atlantic herring fishing effort that may occur in the year-round groundfish closed areas based on 2005-2010 fishery data.  While somewhat dated, this information is still useful to generally characterize the proportion of the Atlantic herring fishery that may occur in the year-round groundfish closed areas, recognizing that fish availability, observer coverage requirements, and other regulations have likely affected fishing patterns in recent years to some extent.

Table 1 characterizes the spatial distribution of the midwater trawl directed Atlantic herring fishery relative to the five year-round groundfish closed areas from 2005-2010.  The data in Table 1 were pulled based on midwater trawl trips landing 2,000 pounds or more Atlantic herring from 2005-2010.  At that time, approximately 9-12% of Atlantic herring fishing (as measured by revenues, catch, and fishing effort) occurred in the five multispecies year-round closed areas.  Vessels fished for Atlantic herring in Closed Area I the most during these years.

**Table 1  Herring Fishing Effort and Revenues in the Groundfish Closed Areas 2005-2010**

|  | Cashes Ledge | Closed Area I | Closed Area II | NLSCA | Western GOM | Subtotal Closed Areas | Open Areas | Grand Total |
|---|---|---|---|---|---|---|---|---|
| **Fishing Time (hours)** | 1.5% | 3.8% | 1.2% | 0.5% | 2.2% | 9.2% | 90.8% | 100% |
| **Atlantic Herring Catch** | 1.7% | 3.8% | 1.4% | 1.8% | 2.8% | 11.5% | 88.5% | 100% |
| **Atlantic Herring Revenue** | 2.1% | 4.6% | 1.8% | 0.8% | 3.1% | 12.4% | 87.6% | 100% |

### Updated Observer Data from Groundfish Closed Areas

Increased monitoring requirements for midwater trawl vessels in groundfish closed areas have been effective in Closed Area 1 since 2010 and in all other year-round groundfish closed areas since the implementation of Amendment 5 in March 2014.  To evaluate the need for additional monitoring

_0000010913

(industry-funded) in the year-round groundfish closed areas, observer data from Atlantic herring trips in these areas from 2010-2014 were queried and are summarized below.

Figure 1 summarizes observed Atlantic herring catch on midwater trawl trips targeting Atlantic herring from 2010-2014 for any trips with a begin or end haul location within a groundfish closed area (any haul starting or ending in a groundfish closed area during the trip). From 2010-2014, there were 149 observed midwater trawl trips with at least one haul starting or ending in a groundfish closed area. With the exception of 2012, the Atlantic herring catch observed on these trips represented less than 10% of the total Atlantic herring catch for the year (19% of the total Atlantic herring catch in 2012 was observed on these trips).

**Figure 1  Observed Atlantic Herring Catch on Midwater Trawl Trips in Groundfish Closed Areas (2010-2014)**



Figure 2 summarizes the groundfish catch observed on the 149 midwater trawl trips with at least one haul starting or ending in a groundfish closed area from 2010-2014. The vast majority of observed groundfish catch by midwater trawl vessels in the groundfish closed areas is haddock. Aside from haddock, pollock, redfish, and small amounts of other multispecies were caught by midwater trawl vessels in the groundfish closed areas.

**Figure 2  Observed Groundfish Catch on Midwater Trawl Trips in Groundfish Closed Areas (2010-2014)**



Haddock comprises the largest component of groundfish bycatch by midwater trawl vessels, and the catch of haddock by these vessels is managed by the Council through a catch cap (Framework 46 to the Multispecies FMP) and increased sampling/monitoring (Amendment 5 to the Atlantic Herring FMP). Vessels issued a Category A/B Atlantic herring permit and on a declared herring trip, regardless of gear or area fished, and or a vessel issued a Category C permit and/or an Category D permit (open access) that fishes with midwater trawl gear in Areas 1A, 1B, and 3 are **prohibited from discarding haddock at-sea**. These vessels are limited to possessing/landing up to 100 lb. of other NE multispecies. Atlantic herring **processors and dealers are required to separate out, and retain** such haddock for at least 12 hours for inspection by authorized NMFS officers. However, haddock or other NE multispecies separated from the herring catch may not be sold, purchased, received, traded, bartered, or transferred, or attempted to be sold, purchased, received, traded, bartered, or transferred for, or intended for, human consumption.

Further investigation of the 18 observed midwater trawl trips (single and paired) that entered the year-round groundfish closed areas during 2014 (all trips in the groundfish closed areas occurred June – September 2014) showed that these vessels are generating almost 100% of their revenues on these trips from the catch of Atlantic herring. Single midwater trawl vessels generated a small fraction (less than 2%) of revenues on these trips from whiting, redfish, and illex squid; pair trawl vessels generated 100% of their revenues on these trips from Atlantic herring.

***Haddock Catch Cap in the Atlantic Herring Fishery***

Table 2 summarizes haddock catch in the Atlantic herring fishery by herring vessels subject to the haddock catch caps during the 2006 – 2010 groundfish fishing years (May 1 – April 30).  The catch cap was not applied by gear type and haddock stock area during this time period, and data from observed tows only were counted against the cap for those years.  The catch in the GOM and GB areas was combined for the report/data for these years (2006-2010).  With the implementation of Framework 46 to the Multispecies FMP in the 2011 fishing year, the haddock catch cap was split into two areas (GOM and GB) and applied to herring midwater trawl vessels.

**Table 2  Haddock Catch by Midwater Trawl Vessels Subject to Haddock Catch Cap (2006-2010)**

| FY | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Areas | Gulf of Maine and Georges Bank Combined | | | | |
| Haddock Cap in Lbs. | 161,377 (73 mt) | 404,991 (184 mt) | 541,925 (246 mt) | 316,218 (143 mt) | 189,597 (86 mt) |
| Haddock Catch in Lbs. | 18,067 (8 mt) | 13,496 (6 mt) | 37,126 (17 mt) | 52,382 (24 mt) | 153,382 (70 mt) |
| % of Cap | 11.2 | 3.3 | 6.8 | 16.5 | 81 |

*Catch Caps are based on groundfish fishing year (May 1 – April 30).*
*Source:  NOAA/NMFS (http://www.nero.noaa.gov/ro/fso/reports/reports_frame.htm)*

Under Framework 46, the midwater trawl fleet (which includes both single and paired midwater trawl vessels) is subject to a stock-specific cap on haddock catch that is equal to 1% of the GB haddock ABC and 1% of the GOM haddock ABC.  Haddock catch estimates are calculated by expanding NEFOP sea sampling observations to the entire fleet by haddock stock area.  The method for estimating haddock catch by midwater trawl herring vessels matches the method used for estimating catch and discards in the multispecies fisheries.  This method replaces estimated pounds with observed pounds where available.  The cumulative method uses catch from the entire year to estimate a haddock catch ratio for each herring stock area. The haddock bycatch ratio is calculated for a stock area by dividing observed haddock catch for the year by the observed kept-all (total amount of all species) for the year.  Haddock catch on unobserved trips is then estimated by multiplying the catch ratio by the kept all from all unobserved herring midwater trawl vessels fishing within that haddock stock area.

Table 3 summarizes haddock catch by the herring midwater trawl vessels from 2011-2014.  Starting in 2011, data used to estimate/monitor the cap include observer data, vessel trip reports (VTR), and dealer reports.  During the 2012 groundfish fishing year, the haddock catch cap was fully utilized in the GB area. The 2013 Georges Bank cap was slightly exceeded.  As a result, the 2014 catch cap was adjusted downward from 179 mt to 162 mt to account for the overage.  There remains very little catch of Gulf of Maine haddock by midwater trawl vessels in the Atlantic herring fishery.

**Table 3  Haddock Catch by Midwater Trawl Vessels Subject to Haddock Catch Cap (2011-2014)**

| FY | 2011 | | 2012 | | 2013 | | 2014 | |
|---|---|---|---|---|---|---|---|---|
| Areas | GB | GOM | GB | GOM | GB | GOM | GB | GOM |
| Haddock Cap in Lbs. | 701,063 (318 mt) | 24,251 (11mt) | 630,516 (286 mt) | 19,841 (9 mt) | 601,862 (273 mt) | 6,613 (3 mt) | 394,627 (162 mt) | 6,613 (3 mt) |
| Haddock Catch in Lbs. | 223,546 (101 mt) | 5,544 (3 mt) | 628,317 (285 mt) | 0 (0 mt) | 628,317 (285 mt) | 220 (0.1 mt) | 251,503 (114 mt) | 0 (0 mt) |
| **% of Cap** | **32%** | **23%** | **100%** | **0%** | **105%** | **2%** | **70%** | **0%** |

*Catch Caps are based on groundfish fishing year (May 1 – April 30).*
*Source:  NOAA/NMFS (http://www.nero.noaa.gov/ro/fso/reports/reports_frame.htm)*

The haddock catch caps for FY2015 (May 1, 2015 – April 30, 2016) are 227 mt for the Georges Bank stock and 14 mt for the Gulf of Maine stock.  Based on data reported through August 12, 2015, almost 8% of the GB catch cap and none of the GOM catch cap has been utilized by the midwater trawl fleet.

### Slippage by Midwater Trawl Vessels

An important consideration related to observer coverage and industry-funded monitoring requirements in the year-round groundfish closed areas relates to the need to document slippage events in the Atlantic herring fishery.  Observer data for 2012, 2013, and 2014 were queried for additional information about slippage that may have been observed in the year-round groundfish closed areas.  Most of the observer data is for Closed Area 1, as the requirement for 100% observer coverage in the other groundfish closed areas was not implemented until 2014.  Information from 2012 and 2013 is summarized in a combined manner below; preliminary observer data for slippage events in the closed areas during 2014 is summarized separately.

Across the entire Atlantic herring fishery, 64 slippage events and 231 operational discard events were observed on 348 midwater trawl trips during 2012 and 2013.  Twenty seven (27) of these events were observed to have occurred on tows that either started or ended in Closed Area I.  One very large released catch event was observed in Area 3 and recorded to be due to gear damage (380,000 pounds); in this instance, the net tore and released a large catch before it could be brought on board.  This event actually occurred in Closed Area I (see Table 4 and Figure 3).  The amount of fish estimated to be released during this event (380,000 pounds) totaled almost as much as the estimated slipped catch on all 64 observed slippage events on midwater trawl vessels over the two year time period (473,982 pounds).  Of the 473,982 pounds estimated by observers to be slipped by midwater trawl vessels during 2012 and 2013, 29% of these fish was slipped on events that were due to spiny dogfish clogging the pump.  Of the 112,852 pounds estimated by observers to be released in Closed Area I during 2012 and 2013, 48% was slipped on events that were due to spiny dogfish clogging the pump.

**Table 4  Summary of NEFOP Observer Data for Catch Not Brought on Board, 2012-2013 Observed Midwater Trawl Trips (Single and Paired)** *in Closed Area I*

| CLOSED AREA 1: Midwater trawl, paired & single | | | |
|---|---|---|---|
| | NOT BROUGHT ONBOARD | | |
| **AREA 3: CLOSED AREA 1** | **SLIPPAGE EVENTS** | | **NON-SLIPPAGE EVENTS** |
| | | | Other |
| Closed Area 1 | 27 | | 94:  Operational Discards<br><br>1: Gear damage<br><br>6:  Fell from gear |
| **Total  Trips 91** | **Total Kept Atl. Herring 34,939,236 lbs** | **Total Slipped Catch 112,852 lbs** | **Total Non-slipped Catch 412,562 lbs** |
| Total Slippage (or non-slippage)/Total Kept | **N/A** | **0.3%** | **1%** |
| | | | |
| | | | |
| **TOTAL SLIPPED CATCH** | | **112,852 lbs** | |
| **% dogfish** | | 48% | |
| **% safety** | | 0% | |
| **% mechanical failure** | | 0% | |

**Figure 3  Number of Events and Estimated Weight of Catch Not Brought on Board by Disposition Code, 2012-2013 Observed Midwater Trawl Trips *in Closed Area I***



| | |
|---|---|
| ■040 (not brought onboard, operational discards, non-slippage) | 32072 |
| ■ 042 (not brought onboard, gear damage prevented capture, non-slippage) | 380000 |
| ■043 (not brought onboard, fell out/off of gear, non-slippage) | 490 |
| ■041 (not brought onboard, other, slippage) | 6222 |
| ■044 (not brought onboard, no market value, slippage) | 1000 |
| ■047 (not brought onboard, spiny dogfish clogging pump, slippage) | 54000 |
| ■ 048 (not brought onboard, vessel capacity filled, slippage) | 48300 |
| ■049 (not brought onboard, not enough fish to pump, slippage) | 1000 |
| ■071 (not brought onboard, clogged, other, slippage) | 2330 |

_0000010919

In 2014, seven slippage events were observed to have occurred on midwater trawl tows that either started or ended in Closed Area I (see Table 5 and Figure 4).  There were also two observed operational discard events by midwater trawl vessels on trips that fished in the western Gulf of Maine closed area during 2014, totaling an estimated 60 pounds.

**Table 5  Summary of NEFOP Observer Data for Catch Not Brought on Board, 2014 Observed Midwater Trawl Trips (Single and Paired) *in Closed Area I***

| CLOSED AREA 1: Midwater trawl, paired & single | | | |
|---|---|---|---|
| | NOT BROUGHT ONBOARD | | |
| AREA 3: CLOSED AREA 1 | SLIPPAGE EVENTS | | NON-SLIPPAGE EVENTS |
| | | | Other |
| Closed Area 1 | 7 | | 20: Operational Discards<br><br>1: Not brought onboard, fell out/off of gear |
| **Total  Trips 23** | **Total Kept Atl. Herring 10,469,157 lbs** | **Total Slipped Catch 3,950 lbs** | **Total Non-slipped Catch 1,016 lbs** |
| Total Slippage (or non-slippage)/Total Kept | **N/A** | **0.3%** | **1%** |
| | | | |
| | | | |
| TOTAL SLIPPED CATCH | | 3,950 lbs | |
| % dogfish | | 0% | |
| % safety | | 0% | |
| % mechanical failure | | 0% | |

_0000010920

**Figure 4  Number of Events and Estimated Weight of Catch Not Brought on Board by Disposition Code, 2014 Observed Midwater Trawl Trips *in Closed Area I***



| Fish disposition | Hailweight |
|---|---|
| 043 (not brought onboard, fell out/off of gear, non-slippage) | 200 lbs |
| 040 (not brought onboard, operational discards, non-slippage) | 816  lbs |
| 049 (not brought onboard, not enough fish to pump, slippage) | 1,000 lbs |
| 071 (not brought onboard, clogged other, slippage) | 2,950 lbs |

*15. Observer Policy Committee (January 24-26, 2017) M*

#9a.

# ADDITIONAL
# CORRESPONDENCE

_0000013449

**Joan O'Leary**

| | |
|---|---|
| **From:** | Dick Grachek <dickgrachek@gmail.com> |
| **Sent:** | Saturday, January 14, 2017 11:03 AM |
| **To:** | Tom Nies |
| **Subject:** | Comment on IFM Omnibus amendment |



NEW ENGLAND FISHERY
MANAGEMENT COUNCIL

Dear Tom,

I'm writing this in response to the Council taking final action on the Omnibus Industry Funded Monitor amendment at the Portsmouth, New Hampshire meeting on Tuesday, January 24, 2017.

**I don't support the omnibus amendment going forward, and I don't support Industry Funded Monitoring in any fishery, because in my situation it's simply not financially possible for my fishing business to pay. A full amendment should be required, and is certainly a more democratic procedure, if an IFM program is considered. An omnibus "Fast track" on something so important is not acceptable, and is not in keeping with the requisite representation of timely public input.**

**In the name of integrity and decency and in the name of my family and the four other families dependent on the survival of this fishing business, this omnibus amendment must not be passed. This amendment would expedite or "fast track" the implementation of fishermen having to pay---to a private company---for a government mandated observer program, without due process and representation.**

My fishing vessel, the 80 foot Anne Kathryn, provides income for four families plus income for my wife and me. Our fishing year has been whittled down and relegated to essentially two species: Squid and Fluke---and the Mid-Atlantic Council is working diligently on removing Fluke from the realm of feasibility with upwards of 70% allocation decreases by 2018. This leaves us with Squid fishing for the major part of our yearly income.

Being almost entirely reliant on Squid fishing renders us barely profitable over the year. Our groundfish landings (which was formerly 50% of our income) have literally been taken away through the "fast-tracked" catch shares program. So, when Squid are not abundant or when they have been shut down through the trimester allocation process, my vessel literally has no cash flow whatsoever, but the bills for this vessel come every month. I can barely keep the business going by relying on the receipts from the few months of good fishing. Any additional costs would render this business not viable.

1



If I have to pay $3,000 to $4,000 a trip for an observer to a "for-profit" company when we *are* allowed to fish, that would eat up enough money to classify *my* business as a "Non-Profit". I simply wouldn't be able to pay bills. And I certainly wouldn't have anything left over to get through the dry periods---we would soon be out of business. My single licensed, single vessel fishing business cannot tolerate another financial insult. This added burden of observer payments will destroy my fishing operation and the income of 4 families dependent on its revenues.

No other industry has to pay for its own policing---whether it's labeled "monitoring" or "observers". I am sure that you are aware that this has been accomplished exclusively for fishing through a lawsuit brought by Oceana which manipulated NOAA funding allocation within its own observer programs.

And I often wonder about the entire matter of having someone looking over our shoulder. When did risking life, limb, and a great deal of family-invested money, in order to provide healthy, un-chemicalized, and beneficial abundant fresh fish to a hamburger poisoned public...when did that become "possible criminal activity"? And when did fishermen become "persons of interest" warranting this kind of scrutiny---or, more accurately, surveillance?

And as far as by-catch and its "prevention" is concerned, if the regulations were even close to being in proportion to the amount of fish that are actually out there, fish that we encounter on a daily basis up and down the coast, there wouldn't be a "by-catch problem."

Dick Grachek, Mystic CT
F/V Anne Kathryn

2

_0000013451

**Joan O'Leary**

| | |
|---|---|
| **From:** | Edward Everich <ejeverich@gmail.com> |
| **Sent:** | Sunday, January 15, 2017 5:01 PM |
| **To:** | Tom Nies |
| **Subject:** | Observer ruling by "Omnibus Amendment" |

NEW ENGLAND FISHERY
MANAGEMENT COUNCIL

Tom,

As a retired fisherman from Pt. Judith, Rhode Island and as a person who has spent the last 50 + years on the water, 4 years in the USCG, the balance either fishing commercially as owner / Captain of 2 small day Trawler's and a Gillnetter .

The time not fishing has been in fishing related support industries or as a licensed Tug Operator.

My son left the New England Fishery for Alaska primarily due to the regulatory turmoil and problems with reduced quota. He is one of the youngest Trawler Captain's in the Pollack fishery out of Kodiak.

Myself, my son and many of my closest friend's have been severely impacted by the lack of a sound management scheme in New England both at the State and Federal level.

I am totally opposed to any additional financial burden being placed on the Commercial fleet of New England especially by "fast tracking" through the use of the "Omnibus Amendment" or any other method that does not allow Fishermen the right to be treated with the utmost of due process.

Adding these Observer costs to the boat is pure insanity and one can only assume that the regulatory goal is to force these people out of business.

Shame on us all if this is allowed to happen !!

Sincerely,

Ed Everich

1

**Joan O'Leary**

| | |
|---|---|
| **From:** | Don DeBerardino II <dondnanuk@gmail.com> |
| **Sent:** | Sunday, January 15, 2017 7:40 PM |
| **To:** | Tom Nies |
| **Subject:** | observers |



Please you all cannot be serious on charging me $700-$800 per day for an observer on my boat.I DO NOT make that much money in a day to pay my self etc.With due respect this is nuts! Can you explain this to me.Also this bum rush to get this passed SO quickly!
Thank you Don DeBerardino II

1



_0000013453

**Joan O'Leary**

| | |
|---|---|
| **From:** | Joel Hovanesian <jhovanesian1@gmail.com> |
| **Sent:** | Sunday, January 15, 2017 3:00 PM |
| **To:** | Tom Nies |
| **Subject:** | Omnibus amendment for the "IFM" or Industry Funded Monitoring of the At Sea Monitor (ASM) program. |

RECEIVED

NEW ENGLAND FISHERY
MANAGEMENT COUNCIL

Mr. Nies,

My name is Joel Hovanesian and I am a lifelong commercial fisherman from Pt. Judith RI. I am writing you to voice my total opposition to this industry destroying program. I will not bore you with the details as to the reasons but rest assured there are many. This seems like yet another attempt by the federal government to continue to drive stakes through the heart of an industry that they have slowly but surely been killing by the way of death by a thousand cuts. Enough with this waste of time and money that is destroying our way of life. This whole program is by its very definition nothing but crony capitalism which is filling the bank account of a former regional administrator who came up with this scam years ago then built a company to profit from his ill advised idea. Enough is enough!

Sincerely,
Joel Hovanesian
F/V Defiant, Pt. Judith RI



1

_0000013454



**From:** Sam Parisi [mailto:samparisi42@gmail.com]
**Sent:** Sunday, January 15, 2017 6:35 PM
**To:** Tom Nies
**Subject:**

As a retired fisherman in Gloucester and still has family in the business I am opposed for our vessels to pay for monitoring, the government impose this they should pay for it not our fisherman they are having a hard time of paying their bills.
To continue I will be contacting other fisherman and, other organizations for their support also to voice their opposition to the monitoring. If there is anything else I can do to help let me know and thank you.
 Sam Parisi
 Gloucester ,Mass

35 Congdon Hill Road
Saunderstown, RI 02874
January 16th, 2017



Thomas A. Nies
Executive Director
New England Fishery Management Council
50 Water Street, Mill 2
Newburyport, MA 01950

Mr. Nies,

This is to formally register my concern over the action NEFMC contemplates for its scheduled meeting of January 24th, 2017, in Portsmouth, New Hampshire.

Specifically I oppose the proposed forced increases of daily operating overhead costs that would result from adoption of Industry Funded Monitoring of the At Sea Monitor (ASM) program. You have to realize that the business model of the traditional fishing trawler has been made more and more tenuous in the last decade as it has been caught in the vise of increasing costs and severely limited catches with which to cover those costs. IFM is projected to increase the daily overhead costs for a trawler by nearly $900. Worse yet, the Council's choice to initiate this program through the passage of an Omnibus Amendment dramatically compresses the time during which this move can be debated. Given that working fishermen do their work at sea, the more options for public comment ashore before locking-in new regulations like this one the greater the chance those most affected by them will be heard.

Please count this as a comment against the proposed move on the 24th.

As a working politician here in Rhode Island I have become more acquainted with the regulatory environment under which Ocean State's oldest profession labors than I might have if I were just a consumer of their catch. I have seen the toll that has been taken on the working fleet by such problems as fuel prices, catch shares, and the existing cost of monitoring at sea. I believe this background gives me standing to make an informed comment on the IFM Proposal. I hope you will give my thoughts your full consideration in light of that standing.

If you have any questions or comments on my position with regard to this measure, please do not hesitate to call or write.

Very Truly Yours,

Mark Zaccaria

Mark Zaccaria
Cell:     401.225.5051



# CHOIR
# COALITION

*Coalition for the Atlantic Herring Fishery's Orderly, Informed and Responsible Long Term Development*



November 7th, 2016

Mr. John K. Bullard
Regional Administrator, NMFS
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930

Re: Comment on the Industry Funded Monitoring Omnibus Amendment

Dear John,

I am writing on behalf of CHOIR to comment on the Industry Funded Monitoring Omnibus Amendment ("Amendment"). CHOIR is an industry coalition made up of over 650 commercial and recreational fishing organizations, fishing and shore-side businesses, researchers and eco-tourism companies that all rely on healthy herring and mackerel resources. Before going into specific comments on the Amendment, we will first make a couple general comments.

This action is the culmination of a great deal of effort on behalf of fishery managers and stakeholders that began in 2008 in response to serious and widespread concern over the lack of accountability in the herring and mackerel midwater trawl fisheries. It must be noted that this is the second final action that has occurred in relation to this important matter. After four years of work, the public came out in force in 2012 during the comment period for final action on Amendment 5 in support of 100% observer coverage and a prohibition on slippage. Few fishery actions in recent times have garnered the level of public response that was seen during that comment period. In turn, the Council voted overwhelmingly in support of 100% coverage and strong slippage measures. But, as we all know, the agency then declined to approve the amendment—leading us to where we stand today.

Despite the strong support for 100% coverage and slippage accountability four years ago, we have somehow seen a decline in coverage rates in the herring midwater trawl fishery ever since. In fact, coverage over the past year was the lowest in a decade. The result: the largest and most powerful fleet in the region—a fleet that targets keystone forage species and is proven to have serious problems with bycatch—has been allowed to operate with essentially zero observer coverage. When you combine all the relevant factors—small mesh size, vessel speed and power, volume landed per tow, and the ability to fish anywhere in the water column—the potential for impacts by this fleet on the ecosystem

1

and those that rely on it are very high, and the excuses for allowing such a lack of accountability are non-existent.

As such, there is arguably more concern over what is happening on the water today than there was four years ago. But the public has lost faith in both the Council and NMFS after watching their massive level of effort and support lead to a disapproved action and an actual decline in accountability since 2012. The time has come for both the Council and NMFS to do what is necessary by choosing and implementing measures that finally address the lack of accountability in this fishery. As we have said all along, that will require two things: 100% monitoring and full slippage accountability. And both parts are equally important—it is a total waste of time if you put a system in place that addresses one without the other.

We will now offer our recommendations on how to get there.

**Specific Recommendations**

*Herring*

First and foremost, we want to make it very clear that our focus in this action is the midwater trawl fleet. While some in the herring industry have tried to lump both seiners and small-mesh bottom trawl (SMBT) vessels into the program in order to create delay and inaction, we believe the only priority moving forward should be to address the lack of accountability in the midwater trawl segment of the fishery. These boats are responsible for the majority of landings and have the most potential for bycatch due to the nature of their gear. While the Council and NMFS may choose to address the rest of the herring and mackerel fisheries at a later date, we strongly urge you to focus on the large midwater trawlers at this point in time.

Second, when we first began work on this action back in 2008, CHOIR's initial stance was that the best long-term solution in this fishery was to use Electronic Monitoring (EM). Our initial proposal laid out a maximized retention system that would couple the use of cameras on the vessels with a shoreside-monitoring program to allow for managers to gather adequate data on what was being caught in the fishery. After facing stiff opposition from the industry, we eventually shifted to supporting 100% observer coverage, but all along we believed that EM was the future. We have now come back to that position and feel that EM holds the most promise moving forward.

But there are a number of questions that arise when we start to envision an EM program in the herring and mackerel midwater trawl fisheries. First, is it possible that developing the EM system will take time? If so, we do not want to see a total lack of coverage in the interim. This fleet needs coverage now—not in a year or two—and so something needs to be in place while we develop the EM program. Second, is it also possible that after spending time developing an EM program, the Council and NMFS may determine it is not a feasible option? If so, we need a backup plan.

As such, we support moving forward with a *modified* **Herring Alternative 2.7**. We support a modified version because we only want it to cover the midwater trawl fleet, while the purse seine and SMBT vessels would remain under SBRM coverage. We recommend choosing 100% ASM coverage under this alternative. And under an EM

2

program, we would recommend running the cameras from when the gear first goes into the water until the vessel hits the dock, while having a minimum of 50% shore-side monitoring. Levels of video review will be less important than the level of video coverage, but we would recommend 30% video review at a minimum.

Such a modified Alternative 2.7 will ensure that many of our concerns are covered. First, it will give the Council and NMFS time to develop the EM program without a period of time with little or no coverage. Under this alternative, while the pilot project is ongoing there will be a high level of ASM coverage in place to ensure accountability. Second, it will ensure that there is a strong monitoring program in place if the Council and NMFS find that EM will not work. And third—because ASMs are less expensive than NEFOP observers—it will do all of the above in a more affordable fashion than if NEFOP-level observers were chosen.

Now, it should be noted that this alternative technically allows for the industry to choose to use ASMs even if EM is shown to work, and therefore it could appear to go against our call for using an EM program in the future. But we are confident that a well-designed and effectively implemented EM program will be the obvious choice for those in the industry, and so this mixed alternative will ultimately turn into an EM alternative. But, in the unlikely scenario that ASMs are seen as the cheaper and better alternative, we are confident that they will allow for full monitoring and slippage accountability moving forward.

In regards to the **sub-options** listed in the document, we only support sub-options 2 and 4, and do not support the other sub-options. We *strongly* oppose sub-options 1 and 4. Sub-option 1, in allowing waivers, would potentially undercut the entire system since a waiver could theoretically be used on every trip in a fishing year. If the Council and NMFS foresee specific, genuine examples of when a waiver would be needed that does not create a massive loophole, it should try and limit the scope of the waiver sub-option in the document rather than simply allowing waivers across the board. And sub-option 3 makes absolutely no sense whatsoever—we have spent almost a decade on this action, it would be ridiculous to only put in a system for two years after implementation. This fleet needs strong monitoring forever if it wants to operate off our coasts.

Lastly, we will reiterate that any monitoring system that does not address slippage is a waste of time. So we hope that no matter what choices are made in the future, that the Council and NMFS ensure that slippage is fully considered. That means that, whether we use EM or ASMs, that slippage is accounted for and, if we do move forward with EM, that the slippage consequence measures in place now be carried forward.

*Mackerel*

We support choosing **Mackerel Alternative 2.5.** We would again recommend 100% ASM coverage. And under an EM program we would again recommend running the cameras from the moment the gear is first set into the water until the vessel is back at the dock along with a minimum of 50% shore-side monitoring. This would be partnered with a minimum of 30% video review. And as mentioned in the Herring section above, we only support sub-options 2 and 4, and strongly oppose sub-options 1 and 3.

## Designing an EM Program

3

_0000013459

### EM Pilot Project

First, we strongly support the effort by NMFS to conduct an EM pilot project in the midwater trawl fishery. But we believe that it is critically important for the agency to ensure that all relevant stakeholders are allowed to oversee the ongoing work being done under the project. There are two reasons for this. First, many of the non-herring stakeholders involved in management of the herring fishery have expertise on the ocean that may help inform the pilot project. If non-herring stakeholders are excluded from the process, it may hinder the project's success. And second, transparency is an important matter moving forward. If the public is kept in the dark as the project moves forward, it will only make matters worse. As such, we again strongly urge NMFS to find a way to keep interested stakeholders involved as the project is undertaken.

Also, we will attach at the bottom of this letter another letter we submitted to the agency in June of this year. This second letter outlines many of our concerns with how the PIP was structured at that time. While some of these concerns may have been addressed, we want to include the letter in full to have it on the record for this action.

Lastly, we would strongly urge the agency to bring in people involved in the day-to-day operation of the project that understand the gear and are able to troubleshoot in order to truly figure out if a certain problem can be addressed or not. These boats are not the most complex boats on the ocean, but it is vital to have people involved that can answer questions on their own instead of relying on a captain or crew to tell them if something can be done. The captain and crew may have something to gain by the project failing, and so the agency needs to remain vigilant.

In short, we strongly believe that a pilot project is absolutely essential to the efficacy of an EM program in the herring and mackerel midwater trawl fisheries. We commend agency staff for taking the initiative to find the necessary funding and time to get this rolling. But if the project is not done correctly than it may lead to a lot of lost time and money, and so we hope NMFS will do all it can to make sure the project is effective.

### Specific EM Program Recommendations

First, as mentioned above, we believe that it is important for the EM program to be part of a larger system of maximized retention. Make the boats bring everything to port so that the shore-side monitors can sample and account for what was caught. This is the key to an EM program. And you must keep the slippage consequences in place to deter slippage—otherwise there is zero incentive for the captains to follow the rules. And to be clear, an affidavit is NOT adequate.

Second, it is critical that the cameras run from the moment the gear first goes into the water until the vessel hits the dock. If you stop running the cameras at any point after the first tow, then you will provide the vessel with a loophole. The level of video review is less important to the efficacy of an EM system than the video coverage level itself, but we would still recommend no less than 30% review. As long as the level is high enough, you can provide a deterrent without wasting money.

4

_0000013460

Third, as with any monitoring system in the herring and mackerel midwater trawl fisheries—it is critical for a full and accurate accounting of slippage to be central to the system. No amount of observer or camera coverage will be useful if slippage is not accounted for fully. We strongly recommend that the Council and NMFS keep the goal of slippage accountability front and center at all times.

While there are a number of steps that can be taken to ensure that an EM program accounts for slippage, we believe that using net sensors is of critical importance. These vessels all have net sensors that give the captains an accurate idea of what is in the net while it is being towed. By looping this data into the EM system, NMFS will have an easy method for knowing if slippage is occurring. For example, if the net sensors show that the net has 200,000 pounds in it, and then that net comes aboard empty, you will know catch was slipped. Perhaps the Study Fleet data can be brought into the system to help you in this regard. This and other steps are critical to an effective EM system.

Lastly, we urge the agency to work with HMS staff and other parts of the agency that have dealt with the implementation of EM programs in the past. There is a lot of expertise that can be brought into this process by talking with those that have already been down a similar road.

## Conclusion

The herring and mackerel midwater trawl fleets are the most powerful fleets on the east coast. There is simply no excuse for these boats to have such a weak and inadequate monitoring system. While we understand that this has not been an easy process and that some delay was needed to get things right, the time has now come for action. We urge both the Council and NMFS to do what is right and put a strong monitoring system in place when it meets to make decisions on this Amendment.

Thanks for your time,

Steve Weiner, Chair

5



*Coalition for the Atlantic Herring Fishery's Orderly, Informed and Responsible Long Term Development*

June 13th, 2016

Mr. John Bullard, Regional Administrator
National Marine Fisheries Service
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930

Re: Mackerel and Herring Electronic Monitoring Pre-Implementation Plan

Dear John,

I am writing on behalf of CHOIR to provide comments on the Pre-Implementation Plan (PIP or pilot program) for electronic monitoring in the Atlantic mackerel and herring fisheries. CHOIR is an industry coalition made up of over 650 commercial and recreational fishing organizations, fishing and shore side businesses, researchers and eco-tourism companies.

We appreciate that GARFO has sought the money to develop this pilot program and that your staff has taken time to meet with us and provide some of the details we've been seeking for the last few months. However, the PIP, which is scheduled to begin in less than a month, will be unable to inform the future monitoring program unless serious changes are made to its design. We have identified the following problems and practical solutions that should be addressed prior to the start of this pilot program:

Problem No. 1: There is insufficient accountability in this fishery. Solution: We support the "key data analysis and reporting tasks" outlined in NMFS project summary document. In particular, we support efforts to: review 100% of all fishing activity, identify all discards, identify contents of the net at the end of pumping (i.e., operational discards), and identify interactions with protected species. However, the pilot goals are currently administrative in nature and should reflect the collection of this information. We recommend an additional goal to evaluate the efficacy of EM to detect all discarding activity and compliance with slippage requirements.

Problem No. 2: The slippage reporting and consequence measures will not apply to a PIP trip without an observer. Solution: Slippage restrictions and reporting requirements must apply on every "observed" trip (PIP or NEFOP). Testing EM's ability to monitor compliance with

1

slippage measures on only a portion of observed trips is not acceptable. The PIP must provide a complete examination of this issue, which is of tremendous concern to CHOIR and many other stakeholders.

Problem No. 3: The importance of operational discards is underestimated. Large amounts of slippage can occur at the end of a trip. Solution: Operational discards should be documented on all trips. This should be an explicit goal for this PIP. Pumping in the water is a problem to the degree that it is an obstacle to monitoring this fishery. Operators need to find a way to bring the net onboard—and we believe this is possible. But if they are unable to make their catch available for viewing, then maybe this gear is not fit for use in these fisheries.

Problem No. 4: The PIP standards are not well understood. Solution: NMFS should provide a list of specific standards that will guide the proposed EM/PS program through the PIP.

Problem No. 5: There is continued reliance on self-reporting in this fishery and there is trust that slippage is accurately documented. Solution: NMFS should ensure redundancy during the PIP and compare video review of the EM/PS PIP trips with the reports filed by the NEFOP observers on those same trips (37% of the time) for discrepancies. This analysis should be made public.

Problem No. 6: The PIP will not document the weight of slipped catch. Solution: NMFS should coordinate with the study fleet to ensure that participating vessels with net sensors document the weight of slipped catch.

Problem No. 7: The PIP should meet the goals of the IFM Amendment. NMFS project summary indicates that "identification of discarded fish is not necessary for the purpose of this project" but obtaining accurate estimates of catch (retained and discarded) is a specific goal for the IFM amendment. Solution: Revise the goals of the PIP.

Problem No. 8: The PIP will not improve the documentation of all catch (species composition) in this fishery. NMFS, NEFMC and MAFMC should view the PIP as an opportunity to collect necessary information to inform the development of a comprehensive EM/PS program, including design and implementation of a maximized retention (which should be a necessary component of this program). Solution: (1) NMFS should signal a move towards maximized retention – require all catch in this PIP to come to port (with limited exceptions) and audited discard logbook similar to the one used on the West Coast; (2) all vessels in the PIP should land in a port capable of portside sampling.

Problem No. 10: There's a mismatch between PIP and final decisions on the IFM Amendment – the PIP concludes in fall 2017, final action in fall 2016, effective date is March 2017. Solution: Perhaps a Letter of Authorization to fish?

Problem No. 11: The funding limitation of $400,000 will not allow all of these solutions. Solution: Run a pilot program with fewer vessels (2 or 3) in order to gather all of the information necessary to inform a future EM/PS program. Find incentives to reward these few participating boats. Maybe give them the cameras at the end of the PIP.

_0000013463

We have fought for many years to bring about better monitoring in this fishery. While we believe an EM pilot program has a lot of worth, it must be done right of else there will be a lot of wasted time and money. And we believe that unless the steps above are taken, this project will not have the ability to inform an effective monitoring program down the road.

Thanks for your time,

Steve Weiner, Chair

3

*15. Observer Policy Committee (January 24-26, 2017) M)*

#9

# CORRESPONDENCE

**Sherie Goutier**

| | |
|---|---|
| **From:** | John Haran (Sector 13) <sector13@comcast.net> |
| **Sent:** | Tuesday, January 10, 2017 10:34 AM |
| **To:** | comments |
| **Subject:** | omnibus comments |

You all know the groundfish industry is struggling.
The cost of At Sea Monitoring is just starting to take affect.
This Omnibus should be postponed until the middle of FY 2017 so everybody can see the full effect of ASM costs.
ASM will be the 100% responsibility of the industry as of May 1st.
I project less than 15% of the fleet will continue to groundfish after May 1st.

John Haran
Sector 10 & 13

RECEIVED
JAN 10 2017
NEW ENGLAND FISHERY
MANAGEMENT COUNCIL

_0000013466



From: BRENT LOFTES [mailto:bloftes@hotmail.com]
Sent: Tuesday, January 10, 2017 11:56 AM
To: Tom Nies; John Haran
Subject: Brent Loftes F/V Asher & Ariana

Hi Tom Niles my name is Brent Loftes I own a 60 foot stern trawler out of Point Judith RI. I can't possibly fathom the idea of the Omnibus Amendment going through. We've all but lost the ground fishery due to bogus trawl surveys leaving us almost no quota to work with and having to pay for observers on top of all this. Now you want us to pay for all observers in all fisheries?? This is nothing short of pure extortion and we know observer information isn't even being used. This industry is all but over due to overregulation and pure lies about what's in the ocean. I, and almost everyone within the industry knows what bunch of crap this whole idea is. America the only country on the planet surrounded by 3 oceans and we import 90% of the seafood consumed. I am strongly opposed to the fishing industry being strong armed into paying for observers. Do the right thing and get rid of this extortion and let the government pay for the observer program. Does this make any sense to you??? Thank you for your time.

Brent Loftes

FN 1/11/17

_0000013467

**Sherie Goutier**

| | |
|---|---|
| **From:** | Ron Borjeson <borjesonron@yahoo.com> |
| **Sent:** | Tuesday, January 10, 2017 7:21 PM |
| **To:** | comments |
| **Subject:** | Industry cannot afford observers it would be the final nail in the coffin especially for small boats!!! Consul system is a runaway train. If anybody needs observation it's the council and N M F S !!! Sincerely Ronald Borjeson |

Sent from my iPhone



1

_0000013468

**Industry-Funded Monitoring (IFM) Omnibus Amendment**
**Public Hearing Summaries**
**October – November 2016**

| | | Schedule of Public Hearings | |
|---|---|---|---|
| **Date** | **Time** | **Location** | **City/State** |
| Tuesday, October 4, 2016 | 6:00 – 8:00 p.m. | Greater Atlantic Regional Fisheries Office 55 Great Republic Drive | Gloucester, MA |
| Monday, October 17, 2016 | 5:00 – 7:00 p.m. | Internet webinar, connection information is available at (http://mafmc.adobeconnect.com/ifm-hearing/) | |
| Thursday, October 20, 2016 | 6:00 – 8:00 p.m. | Double Tree by Hilton Hotels 363 Maine Mall Road | Portland, ME |
| Thursday, October 27, 2016 | 5:00 – 7:00 p.m. | Congress Hall 200 Congress Place | Cape May, NJ |
| Tuesday, November 1, 2016 | 6:00 – 8:00 p.m. | Corless Auditorium - Watkins Building University of Rhode Island Graduate School of Oceanography 218 Ferry Road | Narragansett, RI |

**October 4, 2016 – Gloucester, MA**

**Attendance:**
Peter Kendall - Hearing Officer and NEFMC Member
Deirdre Boelke - NEFMC Staff
Carrie Nordeen - NMFS Staff
Dan Luers - NMFS Staff
Nichole Rossi
Doug Cristel
Laura Warch
Kristen Gustafson
Morgan Wealti
Michelle Klein
Shaun Gehan
Thomas Balf
Glenn Chamberlain

_0000013473

Greg Wells – PEW Charitable Trusts
Peter Nugen

**Carrie Nordeen:** *(General Info and Omnibus Presentation)*

**Shaun Gehan**

Just a quick question about prioritization.  If a herring and mackerel alternative are selected now, the omnibus portion of the prioritization would apply as between those two programs, correct?

**Carrie Nordeen:**

That is correct, they would be the first programs into the prioritization process, as other new IFM programs were added, they would also go into the same mix, the same prioritization process.

**Shaun:**

And that process would have to be developed in a separate rulemaking, or would the details of that be developed as part of this process?

**Carrie:**

The details would be developed as part of this amendment, so with the 2 deliberative processes, 2.1 and 2.2, there are 2 weighting schemes that are discussed in the document.  One was taken from the Mid-Atlantic Council, how they sort of look at their research project, that's a fairly length weighting scheme that's described in there.  We did have (I think it was the) Observer Committee go through the process and fill it out to see how it would work, and that selects sort of big categories of monitoring programs, maybe stock status, economic value, things like that, and those criteria are then weighed against each other.  That's one option that is considered in the document, the other one is just an equal weighting scheme.  The Councils have already selected 2.2 as their preliminary preferred omnibus alternative, that's the Council led process. The Mid-Atlantic Council did select an equal weighting scheme, meaning that all programs would be allocated the same amount of money initially.  New England has not weighed in yet on what their recommendation for the weighting scheme is. So those are the details of the 2 deliberative, and then the other 3 are formulaic, so they would just go in as a formula, but the process would definitely be developed as part of this action.

**Shaun:**

Ok, but it would either be one of the two, equal weighting or Council led.  Just I'm not clear, is there an answer between the two fisheries of which will get funded first or second under the Council led, because I thought there was a lot of discretionary stuff that had to go into that, so it would take another action, that's kind of what my confusion was…

2

**Carrie:**

Oh, sorry, I misunderstood what you were asking, so yes, if it is a deliberative, there would likely be a rulemaking, not so much another action, because it is discretionary, you are correct, there would likely be a rulemaking, unlike the formulaic, which probably would not require a rulemaking.

**Carrie** *(Herring Alternatives):*

**Shaun Gehan:**

I guess one of the things I really haven't been clear, I didn't finish the 600 pg. EA yet, if one of the alts that require EM was selected, would the amendment require purchase of necessary equipment upon some transition date, or ahead of the funding year in which funding was available for NMFS to actually accept the data, so in other words would you have to buy the cameras etc., right away, or would you say "next year we are going to have funding, so you've got to gear up"?

**Carrie:**

That is a good question.  In the omnibus section, there is a discussion about what is the time line for doing the prioritization process. That sort of would be dictating- at some point NMFS would need to be making a determination of whether or not it had funding, and if it did, how would that prioritization process work?  So it's a two year process that's laid out in the document, our fiscal year starts in October, as you well know we get a lot of information as the SBRM year also is starting, so especially with this past year, I think that timeline for when SBRM coverage was allocated for the coming year might probably be the time when we were determining whether NMFS had any additional funding. Again, sbrm funding would need to fund sbrm first, but if there was any left over, it could be used for IFM programs.  Also, we are hoping that because these alternatives are diverse- EM, portside- we can also access other funding lines, not just sbrm, but we would need to make a determination in the previous year for the following year whether or not there was money available to start the prioritization process and give the industry the heads up on whether or not there would be monitoring that year. So my guess is it would be probably the March/April time period that NMFS would be determining whether or not it had money, so I think at the point the decision would be made, and let the industry know whether or not- what requirement it would be subject to for the following year starting in January.

**Shaun:**

So that requirement would be triggered sometime early in the year before the next year's money was available?

**Carrie:**

Yes and there are sort of two tiers to that money.  First off nmfs would have to determine whether they had any available money, and then if the answer is yes, then it may not have enough to cover all of the programs, then there would be a prioritization process.  But the decision as to whether there was

3

money to meet the IFM requirements would need to be made in time to give the industry the heads up of what the requirements were.

**Shaun:**

Ok, I think I get that.  The other thing, just to make sure I am clear on it, Alt. 2.6 is coverage for the groundfish closed areas the same as everywhere else, is this really a standalone alternative, or more of a subobtion? Because you're looking at 2.5-100% NEFOP coverage in GCAs- you could just do that, sbrm 100% everywhere else, but you can't really do-so am I conceptualizing that right, is it more of a sub-option to- do we treat the GCAs like the whole fishery, or do we take the sub-option that is 100% NEFOP and, which could actually be done in conjunction with anything else too, so there is sort of options, they are kind of outliers right?

**Carrie:**

We had thought that 2.6 would be selected along with another alternative. Again, that was a fairly recent alternative that was added, it was trying to give options to not just have the 100% coverage in groundfish closed areas.  But you are correct, it would likely be chosen with another alternative.

**Greg Wells (Pew):**

I am assuming the presentation that is next is about the Mackerel Alts, so anything that is related to herring specifically?

**Carrie:**

Yes

**Greg:**

We have heard in previous meetings that running 2 monitoring programs might be more costly for the agency? I don't know if that is still an issue, because we have alternatives that are for NEFOP observers, for sbrm, and the GCAs, and then we also have the asm, so I don't know if there is any of that discussed in the document, so is that still a consideration?

**Carrie:**

I think that is still an issue, the ASM alternatives were sort of an… (end of tape*)


*Note:  This tape stopped recording at this point.  This occurred near the end of the question/answer period for the herring alternatives section.  Greg was the last to comment during this section, although the scope of his comments were not captured completely.  Things missing from this transcript include the Mackerel alternatives section, the Mackerel question/answer period (there were no clarifying questions during this period), and the open public comment period (no public comments were made).

_0000013476

**October 17, 2016 – Webinar**

**Attendance:**
Libby Etrie – Hearing Officer and NEFMC Member
Jason Didden – MAFMC Staff
Carrie Nordeen – NMFS Staff
Dan Luers – NMFS Staff
Fiona Hogan – NEFMC Staff
Greg Wells – PEW Charitable Trusts
Katie Almeida – The Town Dock
Pam Lyons Gromen – Wild Oceans
Pete Benoit
Joyce R

**Carrie Nordeen** *(Introduction and Background)***:** (No comments/questions)

**Carrie** (*Omnibus Amendment Presentation*) **:**

**Katie Almeida:**

I have a question, this is Katie Almeida from the Town Dock.  So if the option to have the monitoring set-aside program, if that goes through, if a vessel is selected for monitoring, they automatically are able to bring in "X" amount of fish to offset the price? Or do they have to sign up for that?

**Carrie**:

So the selection of alternative 2.6 in this amendment just means that in the future, an FMP could establish a monitoring set-aside for IFM programs. The next step would be that that individual FMP would have to go through a framework adjustment process to set up the monitoring set-aside, and then in that framework adjustment would be the details of how the set-aside would work.

**Katie**:

Ok, thank you.

**Carrie**: (*Herring Alts Presentation*)

**Katie**:

For herring alt. 2.2- or for any of them really. When you have the coverage targets for 25, 50, 75, or 100% for ASMs, who determines what level of coverage is picked, the 25,50, or 75%?

5

**Carrie**:

That's a good question, and I'll go back to the slide that shows the range of alternatives. So for 2.1 it's set, it's 100%. For alternatives 2.2, 2.3, 2.4, so these specify a coverage target that would be selected, the Councils would be selecting-in this case the New England Council would be selecting one coverage target, and that would apply to the different gear types. So for example, one coverage type would be selected for 2.2, for 2.3 the Council would select one coverage target for EM and PS for the MWT vessels, and would select another coverage target for ASM on purse seine and on bottom trawl. And that holds true for 2.4, again the Council would select 50 or 100% for MWT- 2.5 is set, that's 100% coverage. 2.6 is a little different, this is one of the more recently added alternatives. What that means is that whatever coverage target and monitoring type was selected for this fishery would apply to the MWT vessels fishing in the groundfish closed areas. And lastly 2.7,  this was just added in June by the New England Council, and this operates a little differently from the other alternatives. What this means is that if they select this, ASM coverage would initially be on Cat. A&B vessels. The Councils would be selecting what coverage target it was, 25, 50, 75, or 100%. Then, once the Council determines that EM/PS is a sufficient substitute for ASM, vessels would be able to choose whether they did ASM or EM/PS. And the other wrinkle that makes this slightly different is that the Councils would be able to specify a different coverage target amount- meaning 25, 50, 75, or 100% coverage for MWT vessels, purse seine vessels, or SMBT vessels. Did that answer your questions, or maybe you have a follow up?

**Katie**:

Quick follow-up. So once the coverage level is selected- say it is 25%        for alternative 2.2- is that it, and that is it for years to come? Or could it possibly change from year to year?

**Carrie**:

It would be selected for a period of time, perhaps indefinitely. There are 2 sub-options that could affect this. One of them is that IFM coverages would expire after 2 years. Another sub-option is that they will be re-evaluated after 2 years. So if the Council does select either of those, that would affect what those would be.

**Katie**:

Okay, thank you.

**Carrie** (*Mackerel Alts Presentation)*:

**Libby Etrie**:

Carrie, this is Libby. I see one question on the chat, it's from Greg Wells. It says  "Does HVF certification factor into the cost estimates associated with training ASMs?" I'm not sure if this was written during the mackerel portion, I am just seeing it now.

6

**Carrie**:

That's a good question, Thank you Greg. During the development of the range of alternatives, the Councils- both Councils- did recommend that ASMs have the High Volume Fishery certification. This certification is similar to what NEFOP observers are required to have if they are going to be observing in any of the high volume fisheries, including mackerel and herring. It may have some impact on the cost for ASMs, it was difficult to tease that out from the cost estimate that we used, which was the $710, so we didn't factor that into our economic analysis, because it was too difficult to tease out what that cost might be as compared to the overall training costs. So it did not change our economic analysis. Overall, the cost estimates that we use for the economic analysis are estimates, so it is likely that what the industry will ultimately be paying as the programs are first implemented and when they evolve will be different from the economic costs in the analysis- they could be higher, they could be lower. But we were not able to adjust the number we used for the economic analysis to factor in the HVF certification.

**Libby**:

I have hopefully the last question. For the sub-option of a 2 year sunset, if that is selected, what happens?

**Carrie**:

So after the IFM requirements would be in place for 2 years, they would sunset after that. If the Councils wanted to change something or do something different, it would be in a subsequent action.

**Libby**:

Ok, thanks

**Jason Didden**:

Carrie, Pam has a question.

**Pam Lyons Gromen**:

Hi. Carrie can you hear me ok? (Yes). Okay, so my question is about mackerel alternative 2.1 and 2.2. So 2.1 most closely mirrors what the Council chose, when they did Amendment 14 to the SMB plan, so I'm curious why there wasn't a coverage level alternative for the at-sea-monitors that would be less expensive that would have the same percent of coverage for Tier 2 and Tier 3? Is it a qualification issue for the ASMs, that that alternative wasn't developed- it just seems like that would be a more cost effective way in this amendment for the Councils to do what they tried to do in Amendment 14.

**Carrie**:

I think that is a good question. I'll take a shot at answering and then pass it off to Jason, who might do a better job. I think 2.2 was sort of intended to mirror the herring alternative 2.2- that alternative was focusing coverage on Cat. A&B vessels. I think the mid-atlantic Council was targeting MWT vessels and

7

Tier 1 SMBT vessels with this coverage, because they harvest the greatest amount of mackerel. That is my recollection, Jason, can you correct me, or do you have something to add?

**Jason**:

So the question is, why is there not a similar ASM on 2.2 and 2.3 like there is for NEFOP?

**Pam**:

 That's correct, it would just seem like a more cost effective way to get at what the Council was trying to do, you know there is a lot of uncertainty with the SMBT, because of  the historically low coverage on that gear in the Mid-Atlantic, so I believe the Council if they did that tiered structure in their final selection of alternatives, that they could actually get some information about the bycatch retained and discarded- gear types, and that is one of the only alternatives- and more costly ones- that would give you information about the Tier 2 and Tier 3 vessels, and there is actually some pretty large vessels in Tier 2. At least back in Amendment 14, I remember there were, things could have changed by then, but I remember that there were. It make sense to change it Jason.

**Jason**:

Yeah, these alternatives have kind of been developed over the past several years, I think the general idea was to kind of create- to structure some of the alternatives, the ASM alternatives, around something that will be as cost effective as possible. I think the focus was on the the MWT and SMBT vessels Tier 1, even though there are some large SMBT Tier 2 and Tier 3 vessels, I think when you get the MWT and the SMBT Tier 1, you are accounting for most of the mackerel landings. So I think as Carrie said it was kind of mirroring some of the herring alternatives, and trying to focus on which groups of vessels accounted for most of the catch.

**Pam**: OK, I think I understand how things evolved, thank you.

Jason: I'll just note, since that is going to be less expensive than mackerel alternative 2.1, I'm not sure that that is something that the Council could come back with as a final option, I think you could argue that it was in the range, and thus not have to go back out for public hearings again- that would be a NEPA question that NEPA folks would have to answer. You know it might be- that could potentially be something that the Council could do at final action, I'm not quite positive.

**Carrie**: Any more questions or comments? (*None- Meeting Adjourned by Libby Etrie*).

_0000013480

**October 20, 2016 – Portland, ME**

**Attendance:**
Peter Kendall - Hearing Officer and NEFMC Member
Fiona Hogan - NEFMC Staff
Carrie Nordeen - NMFS Staff
Jeff Kaelin - Lund's Fisheries
John Haran - Groundfish Sectors 10 and 13
Cate O'Keefe - MA Division of Marine Fisheries
Mary Beth Tooley - O'Hara Corporation
Emily Tucker - Maine Coast Fishermen's Association
Pam Thames - NMFS Staff

**Carrie Nordeen:** *(General Presentation and Omnibus Alternatives)*

**Cate O'Keefe:**

Carrie, this is just a clarifying question. If no action was taken on Omnibus Alt. 1, would that mean that the herring/mackerel alts would not go forward at all?

**Carrie:**

I think they would go forward on a case by case basis.  I think they could still continue, but the decisions on the standardized pieces of those would have to be made- I think we would just have to make decisions based on that. But I think we could proceed.

**Cate:**

So just as a follow up, would that be a different action potentially, in the herring plan?

**Carrie:**

I'm not sure about that, I can look into that and get an answer for you.

**Jeff Kaelin:**

I'll just say this.  Philosophically, I am totally opposed to this amendment. I worked on the Hill back in the 80's, and for decades, it has always been a government responsibility to monitor the fisheries. Congress of course allowed the West Coast to do something different, and the East Coast- Congress- decided not to do that.  So I kind of come from that perspective philosophically, but I realize that having been in the herring fishery since the mid-80's, that that's not going to be enough to satisfy members of the public, so we are going to have to go ahead with some kind of additional monitoring that probably is going to cost our company some money.  2 or 3 years ago in Amendment 4, we agreed to the 100% coverage at 325$ per day.  And I think what we've learned over the last few years in this committee is that the Agency just cannot provide the services that members of the public want, whether it's 100% observer coverage, or whatever some of the other options are. So I think the preferred alternative is the

9

way to go, I know both Councils have talked about that in terms of standardized structure for IFM, so I think we would support that generally.  And similarly, Alt 2.2 the Council led prioritization process is extremely important for both Councils, because it give the Councils the ability to work with the Agency to determine just what kind of costs are going to be asked of the different sectors or different fisheries on a case by case basis.  So I think we would speak in favor of those alternatives when we finally write up our comments.  And similarly, I like the idea of keeping the monitoring set-aside option in there although, right now, we are closing at 92%, so we are leaving 8%, we are leaving 3% for shoreside monitoring, so that is 11%.  So maybe the 3% is allowing us to pay for the shoreside monitoring program today, I don't know what those costs will be in the future so I would like to keep the (set-aside monitoring?) option on the list.  Thanks.

**Carrie**: (*Presentation on herring alternatives*):

**Peter Kendall**:

On herring alt. 2.5, right now, herring vessels need a nefop observer to go into the GCAs and as Ryan was saying earlier, that is kind of few and far between. So if the industry was paying for the observer, does that give you greater access to the closed areas?

**Carrie:**

That was the thinking under that, with including this alt. in the amendment. If NeFOP coverage that is funded by nmfs is limited, it would be an opportunity for vessels to obtain an observer to go into those areas.  Or in comparison to 2.6, any other type of monitoring, what 2.6 says is that any type of monitoring that was selected in the other alternatives would also apply in the GCAs.

**Peter:**

Another question, on the EM pilot project, that is going to be 100% video footage, is it not?

**Carrie:**

Correct, and what that means is that EM will be on all of the vessels involved, and that video footage will be collected.  The vessels will go out, and the first time they deploy the gear, the video will begin recording and will record until the vessel gets to port. And then in terms of video review, 100% of that video will be reviewed.

**Peter:**

So I assume that we would have better cost estimates for EM monitoring when that project is complete, because this says EM 172-325$ per day. Will there be costs estimates for that when that project is done?

10

_0000013482

**Carrie:**

We are hopeful that the project will help clarify some of the costs associated with EM.  The range that you see in there is actually driven by the coverage target.  For example, the $325 is for 100% coverage, we estimate something less-$202 is actually what we used in the economic analysis for 75%, we used $187 for 50% coverage, and we use $172 for 25% coverage. That's covered in the Public Hearing Document, but that is because EM review is one of the main cost drivers for the EM cost estimate.

**Mary Beth Tooley:**

 Just a question, I forget, I should know the answer to this, but the cost estimates for the portside sampling, and cost would be the $5 and whatever for a ton of fish, and the $3, you're still going to have the same amount of fish come across the dock. How is that calculated? I mean if someone shows up, they are going to portside sample, it's going to be one cost for that day, so how do you get the difference there?

**Carrie:**

It's a good question; part of this is just how this action evolved.  If you think back, when we first proposed portside, it was 100% coverage, and we were basing some of our cost estimates on the existing programs. Because the existing programs with the states have contracts, we couldn't provide all of the details of those existing programs and what the actual cost was. The $5.12 was based on the MA program and included costs for administration; it was sort of the package deal. We didn't have a way to parse that out without providing too much information on existing contracts. And then the Council asked us to think about something less expensive for portside sampling, so we went back and generated initially a 50% coverage option, and when we were thinking of that, the $3.84 came up because we subtracted the administrative costs, so that is the difference between $5.12 and $3.84. The $5.12 number has administrative costs wrapped into it; the $3.84 number does not, so the $3.84 would apply whether it was 75% coverage, 50%, or 25% coverage.

**Mary-Beth:**

So I think that was my question, it's not tied to the range of coverage; it's tied to the administration…?

**Carrie:**

Correct, and so your comment- once an alternative is selected, it would be one amount tied to the metric ton and that would be applied to whether it was 25%, 50%, 75%, so it was rather a convoluted process to get at those estimates, but that is where we landed after the evolution.

**Mary-Beth:**

Yeah, I've been driving around with the copy of the amendment in the back seat but I haven't hauled it into the house yet.  And one other thing that I noticed on one of the tables on what you get under each alternative, and it did say for the portside sampling for the biological data it was just age and length; for

_0000013483

at-sea monitoring it was just length, and for NEFOP I think it was age and length, that must be based on the current protocol, because it doesn't seem like it would be necessary for someone to be taking otoliths at the dock, which would be really time consuming, so we could perhaps amend that part.

**Carrie:**

That is true, the only one that the Council specifically weighed in on was ASM, and that they collect length data, however, at the recent meeting, there was the provision that ASMs may collect additional information as needed or requested, but you are correct that the age/length came from existing programs.

**Mary-Beth:**

Okay, good to note. I don't have any other questions.

**John Haran:**

Do you have a breakdown for EM costs for the groundfishing industry? I noticed you gave quite a breakdown for this industry.

**Carrie:**

Are you asking for cost estimates for the sort of EFP that is being done in the groundfish fishery, or…? The costs I showed are for herring fishery. You're asking about groundfish fishery?

**John:**

Yes

**Carrie:**

We don't have those costs in this amendment, right now we don't have any electronic monitoring alternatives proposed for the groundfish fishery.  In the background information, we did use some of that to derive some of these costs, but in general, we don't have specifics on groundfish costs associated with EM, I do believe that the groundfish team has recently produced a report that does look at costs for the groundfish fishery, it's not part of this action, but it is available.

**John:**

OK, I think the initial first year, the $15k dollars, you are attributing most of that to the cost of installing the cameras; I think that is a little misleading.  We have been told that the first year is going to be  a learning year for the monitoring companies, and that industry was going to pick up that learning experience so that anyone that is going to be using EM is going to pay more for monitoring as the people on shore learn… how to monitor electronically.

12

**Carrie:**

I think it could be, there is variability around our cost estimates, we've heard that it might be something higher than 15k, we have also heard that is could be something lower, so there is some variability around the cost estimates.  And the situation you describe could be likely. For herring and mackerel, we are doing an EM pilot project over the next year, so hopefully we will get some of that learning out of the way, and NMFS is funding that pilot project for herring and mackerel.

**Cate O'Keefe:**

Thanks, Carrie another question for you, so if any of the alternatives that include EM and PS are chosen and moved forward as preferred, what would happen if the pilot project suggested that this is potentially not a viable tool to monitor the fishery. Where would that leave the fishery in terms of coming up with the tool that they need to monitor the fishery for the omnibus?

**Carrie:**

If the Council does choose to take final action before the completion of the pilot project, I think we could put a clause in there about what are the criteria if this doesn't prove fruitful or appropriate, I think that consideration would be with alternatives 2.3 and 2.4.  Alt. 2.7 kind of has that consideration built into it, ASM would be on the vessels initially, then once the Councils determine that EM/PS are a suitable substitute for ASM, then the vessels would be able to choose.  I suspect that the Councils would wait until the pilot project had concluded to make that determination.  So I think 2.7 kind of builds that determination into it.

**Cate:**

And just a follow up if I can quickly. For 2.7, If, and I'm not suggesting that I think it will fail or want it to fail, but if the pilot project suggests that EM is not a viable tool, then would the ASM level that was chosen for 2.7 be, by default, the kind of level that the fleet would be stuck with?

**Carrie:**

I think that would continue. One of the sub-options-well we have two sub-options that would affect whether IFM options were continued or re-evaluated.  We have one sub-option that says they would sunset in two years, we have another sub-option that says they would be re-evaluated in two years. I suspect there may be some support for the re-evaluating in two years. That was also part of A5- that once coverage was in place, we would re-evaluate in two years- so that is also a tool to revisit once we've had coverage in place for a little while.

**Jeff Kaelin:**

Carrie, first of all I want to say thank you for all of the hard work you have put into this amendment, it has been difficult to be clear about what these options mean and how they all fit together. I think your PowerPoint would be helpful after the fact; it would be nice for the public to have the PowerPoint to

13

kind of work their way through the amendment. In fact, I'm thinking of asking you to send it to me before I write mine up.  Then I would be unfair to everyone else, but this is really because there are so many sections to this thing, you have to flip through the 500 page document, so I thought your PowerPoint did a great job of laying out all of these competing options.

**Carrie:**

So we have the audio files for each of the hearings. What about posting the audio files with the PowerPoints, the PowerPoints have been slightly different for each of the hearings, but we could make those available on our webpage.

**Jeff:**

I think that would be great, because we've got until November 7th to finalize comments. But I wanted to thank you for the work you have done.  Like I said before, as a company, and having been through this process since the beginning having been a member of the committee, because from the beginning, from our perspective, the cheapest way out of this likely will be the EM- the cameras- and the shoreside monitoring combination, and if you look at the return on investment, the lowest cost seems to be with those options. So again, like I said earlier, I think it is very premature to launch this until we can analyze this pilot project- whether it is going to work- I think both Council members asked me very good questions about how this is all going to fit together. So that is sort of a general comment, I hope that we can slow the train down until we have a little better idea of what we are getting into, not only as the companies are going to pay the bills, but as managers to make sure that the CVs and the estimates of accuracy and precision are reasonable, and really equate to some of the standards that we are using in some of the other fisheries too.  You know, I guess in a perfect world, the sbrm would be enough, but I think we are well beyond that, so I'm not going to speak in favor of the no action alternative, I don't think that is logical, but I wanted to go through the alternatives and make a couple of comments based upon my understanding of how this is going to work.  Reserving the right to write up and submit some comments down the road after I have talked to some other people.  I think number one, the allowance of a waiver, is incredibly important here, and I think actually not granting waivers may be contrary to NS1, it would allow us to realize OY; NS2 because the best scientific information available shows that we already collect timely and accurate information; NS8 because it doesn't give the chance to minimize detrimental impacts on fishing communities; and NS9 because it is not practicable to leave sustainable herring yield in the ocean when adequate bycatch information is already being collected. So we got some real concern with the "no waiver" option, in the end we don't think that it is a legal option.  The wing vessel option makes a lot of sense, and realistically I think a two year re-evaluation is better than a sunset, because I really think we are trying to get to a place where the industry is providing the information that the public and the managers need to fish and so we have a duty to go beyond the status quo and for that reason, I think we would support the two year re-evaluation, in addition to maybe halting the whole train until we can get through the pilot program.  On the 25 mt threshold, I think that makes sense, I believe the reason that is in here is to give a little bit of a break to the SMBT fleet that has a bit of a different cost structure than we do as larger boats, even though the little boats and the big boats aren't making any money.  But I think that is fair. The 100% NEFOP coverage, we did

14

agree to that some time ago at a lower cost than is being projected today, but I think Wendy Gabriel is doing an excellent job as a member of the committee in explaining that the Agency just cannot commit to providing funding for levels of coverage that high, and I am not convinced that we need 100% observer coverage to have good accurate and precise estimates of catch and bycatch. Maybe ASM coverage in the neighborhood of 25% could be a reasonable target, and again, I'm thinking about what are the estimates of precision and CVs that we use right now in the scallop fishery, which we are in, thank God, or we would probably not be able to afford to be in the herring fishery, honestly. Scallops is subsidizing everything on the East Coast- we have four full time scallop permits and a couple of part time scallop permits, some limited access general category quota, and if we didn't have that, I think we would be in serious trouble. So the 25% target seems to be in the neighborhood of fairness, something that is fair and equitable, my question is how would that level of coverage compare to the accuracy and precision that are coming out of the estimates made for the scallop fleet and the groundfish fleet. The level of coverage in both of those fleets is 25% or less. So if we ever go down the asm road, I don't see how the Council can justify a level of coverage and the costs higher than that. On alts 2.3, a combination of coverage on A&B vessels and the MWT fleet, a 50% target on the EM and on PS seems to be a good place to start, because that is what it is in the voluntary program, but as we discussed earlier today, the agency hasn't been able to explain to us or the Council how precise those estimates are for the 50% coverage rate, so I don't know why we would go to 100% before we know whether we are getting good, accurate and precise data from the 50% target that exists right now in the voluntary program, so 50% seems like a reasonable target to start with, and 25% maybe for the at-sea. Our preferred alternative as a company, I think right now, given the information we have, would be 2.4- EM and PS coverage for the MWT fleet, with sbrm being adequate for the other group, but I am going to jump down to alt. 2.7, which provides an option for A&B vessels to use either shoreside or at-sea. I think that is probably the fairest option because it would not give the seiners a pass, so you have to be aware of the cost structures in the two fisheries in the way that we compete, and I think I'm leaning towards 2.7 as the best approach, because it basically spreads the pain around, and creates an option for people that want to go to asm-whatever the target is- or shoreside monitoring. It doesn't allow a particular fleet that we compete with in the MWT fleet to get away with no additional costs, if that's what the public wants. So I guess right now, 2.7 is probably our preferred option at the moment, but I think it is premature to go ahead at all before the pilot project has been completed. I'll leave it at that, thank you very much.

**Mary-Beth Tooley:**

I don't know how coherent comments are going to be at this hour, but I will give it a shot. Under the sub-options, we would support 1,2,4, and 5. And as just stated, the waivers are particularly important. The prospect of reducing the fishery because of a lack of observers or funds is definitely not acceptable, I don't know how we could achieve OY. I'm not going to go through each one, other than to say, that the one I excluded from that list was the one where the program would expire after two years, I think the review is a better alternative in that case. In looking at the various alternatives in the document, we would not support alt. 2.1 because of the additional cost associated with nefop observers. It does seem like alts 2.2 and 2.3 are not currently viable options in the document because of the EM requirements and the lack of a current program. Umm, 2.3 and 2.4, that would be correct. Alternative 2.5 relative to

15

the GCAs we would not support. We would support alt. 2.6 which would take whatever comes out of this amendment across the fleet and require it in GCAs. We talked about this a little bit earlier today at the committee meeting, and for some reason, probably wishful thinking, I just thought that if the GCAs go away, and if you have a req for fishing in a GCA that no longer exists, that that would be the end of that, but it sounds like we need to take a little bit of a more proactive action here, and this would do that, so that certainly seems wise. I'm not sure, alt. 2.6- it's a little bit redundant of alt. 2.7? So I think 2.7 is preferred over 2.6, which allows the combination and choice. The only problem I see with 2.7 is that there is not that option there for purse seining. It seems like clearly for a purse seiner to choose EM, there would need to be some sort of pilot project that goes on, and we have a project that is going on now that seems mostly to be MWTing, and there may possibly be some information that comes out of that on purse seining, but not to the same extent, but I think we should at least have in the amendment that option so we don't have to repeat this in the future. It really could move the council looking at purse seine in a much quicker fashion regardless of whether the pilot work is done under the current program. In general, the O'hara corporation as a whole has been very supportive of increasing coverage in the fishery with the caveat that it be affordable, and we have been since A5 and continue with that position. I do have some concerns about the economic data given the current circumstances in the fishery and other interaction that are going on, certainly with haddock this year our fishing activity was much reduced, significantly reduced, in area 3 and then now we have A8 which looks to possibly reduce the overall catch of the fishery, and exclude the fishery from many of their historic fishing grounds, so I am not sure that the economic data in the amendment, although looking back it's probably as accurate as it could be, but looking forward it could be totally inaccurate and make the entire program no longer affordable, no matter what you choose. That's a significant concern, and as for how all of the parts and pieces fit together, the estimates for the shoreside monitoring program-well, you have to look at what you have and what you have done, and we don't have a program like that in maine, and certainly if the council would choose one method of monitoring the fishery for one gear type, and another for another gear type, we could end up in Rockland, ME as the only facility required to have a portside monitoring program. My understanding is that it will make it much more expensive to implement that program in that port. Everyone else is landing with purse seine gear, and additionally, we have vessels that will move back and forth between the two gear types, and it's not clear to me how if we invest in the equipment under the EM program how two of our vessels landing to an offshore island that is not feasible for shoreside monitoring, what happens to that vessel? It is not acceptable for us to say "Oh, you'll have to find other business arrangements," there are no other business arrangements that could be made to get the vessels catch to that port, and 50% of that vessel is not owned by the O'hara corporation, it is owned by a resident of that island community. So I probably could say more, but I think that will have to do it for today. Thank you.

**Jeff:**

Can I add one thing? (yes). I talked about 2.4, then I jumped up to 2.7 and our interest in having additional monitoring and monitoring costs added to herring seiners and the MWT fleet, but relative to the GCAs, I think 2.6, if I remember correctly when the committee created that alternative, the idea was that- let's say EM and portside were applied across the board for the MWT fleet, that that would suffice

_0000013488

and that the groundfish closed area 100% observer requirement would go away. And I wanted to speak in support of that, because as you looked at it today in the committee Mister Chairman, there's an awful lot of activity that takes place outside of those groundfish closed areas, and 100% observer coverage does eliminate- if we can't get an observer right away, we lose access to 15-20% of the fish, which doesn't seem to make any sense, so hopefully we can evolve a set of alternatives across the board that can eliminate that 100% observer requirement, because I don't think the agency is in a position to have the resources available after sbrm to give us the resources that might be needed, so I hope that will go away, and that was the added comment that I wanted to make, was about 2.6 which I think accomplishes what I just described, and is certainly a better option than 2.5. Thank you.

**Peter Kendall:**

I have another one, Carrie on page 10 of your report there, it says the NEFOP observer costs will be $818 per day and asm is $710 per day. So when you go back and do a comparison of costs on page 8, it looks like the only reason the NEFOP is more expensive is because they take the otoliths and do age data. Is that correct?  If you look at the columns, that is the only thing that is different. Is that what is associated with an extra $108 per day?

**Carrie:**

Right now the qualifications to be an observer and to be an asm are different, there is a college requirement to be a NEFOP observer, and if you are a NEFOP observer and if you are an observer observing in the high volume fisheries, you need an HVF certification. Initially the difference between NEFOP and ASMs was that ASMs would be collecting info on discarded catch only, not retained. That sort of has changed over time, so the ASM option has sort of morphed to look more and more like a NEFOP option.  What we used for the cost estimates were the existing NEFOP costs over a few years. We also looked at the existing groundfish ASM program to get a cost estimate.  Those two estimates vary from between year to year, so we're trying to average from $818 and $710, so currently there is different criteria to become the different types of monitors and then maybe what you can do as that type of monitor.  There's also- NEFOP observers collect whole fish samples, other biological samples, they collect sighting data on marine mammals- that is slightly different than the ASMs. Although recently the Councils added the option that ASMs could collect biological information if requested. So you're right, those two options are starting to look more and more like each other. When the Council recommended changes to the ASMs most recently, we had a look at that $710 value to see if we could change it. We just didn't have a basis for parsing out things like additional training for just a small piece, so we ended up leaving the $710 in the economic analysis, but there is variability around each of those cost estimates, and the Council may want to consider that those two options are starting to look very much like each other. And is there any difference in having two types of similar data collection in the herring and mackerel fisheries.

**Carrie:** *(Mackerel Alts. Presentation)*

_0000013489

**Jeff:**

I do have a question because I remember that the committee decided to use the incidental catch allowance of 20k lb of mackerel as the threshold for these alternatives so that if you landed less than 20k lb, the alternatives would not apply to that trip.  But at the same time, because the 25 mt threshold came up on the herring side, we've also got language in here that says the 25 mt threshold will be the threshold for not being required to live with any of these alternatives, so there's a conflict there I think. At one point it says that the exemption limit is 25 mt, like it is in herring, but at the same time the matrix also says that the exemption is 20k lb which is the incidental catch allowance. So I think it is unclear what the threshold would be.

**Carrie:**

 Just as a point of clarification, for the herring alternatives, we have two options as well. IFM alts would apply to trips that land more than 1 lb of herring, that is the first option, and the sub-option is that they wouldn't apply on trips that land more than 25mt.  So we do have two threshold amounts for herring. We have the same two threshold amounts for mackerel. IFM reqs would apply on any trips that land more than 20k lb of mackerel, unless that Council selected sub-option 5, the 25 mt threshold.

**Jeff:**

Okay, well that helps explain that discrepancy to me. And I won't go down the full list, I think our comments at Lunds fishing will be very similar to what I provided on herring. We are in both fisheries, but I do think it would be interesting to have Jason tell us how many mackerel trips were over 25 mt in the last 5 years, I bet there's not that many of them, it would be interesting to know that- I didn't know whether Jason would be here or not- just because I'm not sure this is a big priority for the mackerel fishery, because we don't really have a mackerel fishery.  So the rubber really meets the road in the herring fishery, and we are spending a lot more time in the herring fishery than in the mackerel fishery, the mackerel just seem to have disappeared, but they might come back.  So I won't go down the full list, the comments will be similar to those I provided for the other fishery. Okay, thank you very much.

**Carrie:**

And to answer your questions about the trips landing more than 25 mt, we do, its not in the public hearing document, we have additional economic analyses in the appendices to the EA, we look at fleet level data and that does have trip- so I'll look at that and then get back to you.

**Jeff:**

I have the whole document- from when I used to sit up there with you guys- that is probably pretty accurate, so I'll look at that, I didn't check it out but I've got it with me.

_0000013490

**Carrie:**

It's only 600 pages, I'll have a look at it and email you, because it should have the trip level data in those tables.

**Jeff:**

I'm parked here to start writing this, and our coral amendment comments too, so thanks very much.

**Peter K**: Any other questions for the Mackerel alternatives? (*None*) .  Any other questions or comments on any of the other draft amendment?

**John Haran:**

As a point of reference, sector 13 forecasted last year that we would have only one boat fish if IFM was implemented. Sector 13 last year had 50 permits in the sector, and the forecast has come true. The "Buzzard's Bay" is the only boat fishing for groundfish. This year I was fortunate to have 10 more permits join sector 13, out of permits, only 2 are fishing for groundfish. So that is 3 permits out of 60 that are fishing for groundfish. Is the cost driving it? Yes. Will they be able to continue to fish in the future? No. It's very expensive for them. Sector 10 has 20-some permits, only 1 boat is fishing for groundfish. We're having problems with the allocation of trips for groundfish- it's all done randomly. Yet some of the boats are being picked on over 60% of the time. Economically, it's not feasible. One of the biggest problems that we're going to have, and that they will have with EM, is that we do not have a board that we can go to for disputes. This year, the "Illusion" went out for a fishing trip- the ASM misrepresented the species, came in with the wrong weights, it was a total disaster trip, such that Amy met the boat at the dock.  They threw out several tows, however, as a sector we lost. The "Illusion" is one of the cleanest boats on the coast for fishing, such that we lost one valuable trip that would have lowered our discard rate. Once again, we had no board to go to for disputes, no arbitration board- we need an arbitration board going forward. EM may be even more of a reason to have an arbitration board. Someone will be sitting at a desk that has never been to sea, doesn't know species, and they will be making determinations that will cost fishermen severely. With the amount of quota that we have today- which is 90% for some species of what we started with in 2010- we cannot afford mistakes. This year with the "Illusion", the biggest issue was cod, and the gentleman on that boat misrepresented species, and it was going to cost us dearly on discards. Once again, as Jeff said, I ask you to go slowly. This is a very touchy situation that will cost fishermen a lot of money in the future.  Thank you.

**Peter:**

Any other comments? (*None*).

**Carrie:**

Thank you all for your questions and comments, please sign the signup sheet before you leave.

_0000013491

**October 27, 2016 – Cape May, NJ**

**Attendance:**
Howard King – Hearing Officer and MAFMC Member
Jason Didden – MAFMC Staff
Carrie Nordeen – NMFS Staff
Chad Power
Josh O'Connor – NMFS Staff
Greg DiDomenico - Garden State Seafood Association
Bill Bright – F/V Retriever
Wayne Reichle – Lunds's Fisheries

**Carrie Nordeen**:  *Introduction and Background Information Presentation.*

**Greg DiDomenico**:

Carrie, could you explain again the issue of costs and funding from the agencies perspective on how this will work?

**Carrie**:

We talk a little bit about that in the omnibus alternatives section. Do you want to wait for that, I'll go through that and see if that answers your question? We can talk about it at that point, does that make sense?

**Bill Bright**:

Can I ask a question? Because I have a vested interest in this and this is really hard for me to swallow. The New England Council is interested in more data. Has anyone ever looked at the tax returns on these vessels? There is a lot of money, not scallop money or anything, I invested heavily in the mackerel industry and herring, but this is a hard pill to swallow. It's very easy when you're sitting on that side, but when you're sitting here and you are already working- we're working with the study fleet, we're working with Dartmouth, counting our catch. I can just see this, this is coming, and I certainly don't have to like it. But now, if this the a precedent for here, I'm just going to say that if you are going to take somebody with you, and you're not only going to pay that with your house, you're also going to watch you and force you- this is really hard to swallow. Not just financially, when you're looking at it from here, because now you are going to have the squid fishery, we say this is ok, the govt. is broke just like everywhere else… But now because of perception,  because of everywhere else- I'm sure what the problem is is that people that think this is a good idea, people that are pushing the council- all the environmental groups- let's use up some of their money, let's use up some of their funding. I'm not against the observer, I'm not against the camera, but when I'm looking at the thing here, I'm barely holding on by a thread. We've dropped mackerel down from 300k tons, and they said it's a good idea to invest $4 million, (inaudible), even the herring, we're getting shoved in all directions. I mean, where do

_0000013492

you think this money is going to come from, that is my biggest question, I'm not against observers. I'm actually- I believe we've got to be responsible for what we catch. But if we don't catch enough to survive, It's all in vain. Everybody here loses, I lose- if we do not figure out a way. In my personal opinion, this is pretty close to put this (inaudible)… when we say 350, that's no different than when we go back to NJ and that would take a little more. Sooner or later, I'm very close to not surviving at all. It's a little hard to swallow. If there was many people in here, they would be- this is sick- I mean, I'm just telling you the way that I feel. It's a hard pill to swallow- no wait a minute- because of the environmental- we're raising all this money to save the ocean- now we want those guys to pay. Well if you're that worried about the ocean, let them fork out some of the money, but anyway, that is just my opinion, that's what I have to say to the…

**Carrie**:

I appreciate your comments. We are- a lot of this- in New England, we've had discussions, and a lot of this has been brought up. It's very much the dialogue of what information, what is the value of the information, versus what is the cost. So all of the points that you are raising have definitely been part of the (conversation?), I haven't been at Mid-Atlantic meetings, by I'm assuming it is much of the same. The Councils have been taking a very long time to do this amendment, I think in part because of the concerns about the costs. Ultimately, it's the costs- the industry isn't opposed to monitoring- but they want something that is affordable. That is what we have heard the whole time. And also what is the need for (this?). So all of the points you are raising have definitely been part of the dialogue, and I think that's why this has been a very difficult amendment for the councils to grapple with.

**Bill Bright**:

Well okay, I can see this is something (inaud.), so this is okay for now, but now we move into the next (inaud.), which would be, off here, when we've had a lot of observer coverage on small mesh on the edge in the summertime. I just think, you know, it's a (bad?) feeling on our side to be honest with you. Because then the only people are the scallop industry are really good and it's really easy for them to say we have (inaud.) or whatever, because if we're $16 a pound it's on the bottom you can go catch. So now even if you said, ok, I'll give you 100k lb of mackerel or 5k tons, that's still not an easy thing to go out there and catch. It's a totally different scenario, so my personal opinion is that as an industry we have to tread lightly going in this direction because once we take that step, we are never going back, because you know how the rules are- it will never go back. You will never change that train of thought once we go there, that is my concern. I'm in it for the long term, I've already been in it for 35 years, I mean we invested in mackerel and we're still- we can make a profit. But I don't see how that is going to help us to (keep our long term goal?) of staying in business, feeding our family… All of the people that are you know, the cowboys at the industry, they're all gone. You know the people that are in it now with vested interest that have far more money in it- and I know you cannot harvest anything- there is only so much you can take out of (anything?), so we understand the situation, but it's a tough precedent to set, because now you are setting that for everything. That's my point.

21

**Greg** :

Carrie, there's really, there's two issues here. One is scale, so what Billy's saying is that whatever the cost is, you have to just consider that scallops are worth $16 a pound, what he catches is worth 16 cents a pound.

**Bill Bright**:

In the areas where I'm allowed to catch it, when I can catch it- its not so much the population but the availability to catch that product at any given time. When you start drawing all of the boxes we contend with, you know if we can't go- it's pretty tough, you know our season is so short to start with.

**Greg**:

So there's the other part, how this is no one's fault. The herring issues, RH issues, mackerel issues, have been going on since I got here 11 years ago. It has been very hot and contentious for the last 9 years. Looking back on it, this is probably the first thing we should have done. Because we have already suffered, in some cases needlessly, from restrictions by (inaud.). We know we have bycatch issues, we know there is haddock, we know all this stuff, we know. But this problem we should have done 1st to understand what the scale of the problem really is. So the only thing I can say at this point, and I hope Billy agrees and maybe I'm trying to make the point he's trying to make, is that if this goes through, or when this goes through, at whatever rate we are talking about- If it's proven that some of the regulations on RH, on herring, on mackerel, were unnecessary. Whether it's spatially, temporally, whatever it is, then it's really going to have to be up to the council to use the information that's taken from this observer coverage, and reverse what has been done in the past. Because there have been things that have been done wrong. Now don't put that in our comments, I know that can't be part of the amendment, I know amendments don't make promises, but that really has to happen here. You know it has gone on, (Jason?) knows what is going on, between the restrictions- the ability to catch, whether they are even there at this point is irrelevant, but the ability to catch the fish- it's too restrictive. So if we could reverse that, after we get more information, that would be the best of both worlds.

**Carrie**:

There are options in the herring and mackerel alternatives. One sub-option is that the herring/mackerel alternatives would sunset in two years, another is that they would re-evaluate in two years. That re-evaluation was part of amendment 5 for herring, I think it was part of amendment 14 possibly (for mackerel?). I suspect there is a lot of interest in selecting that sub-option and having a re-evaluation.

**Greg**:

Well then as part of that motion, you should say the previous motions done by the Council- both Councils- need to be revised as well. They've likely done 3 or 4- just for river herring, and if this information proves that this is not a problem, whether it is haddock, or river herring, whatever it may be. Then it is incumbent upon the agency to say "okay, now we (put to rest?) some of that because we

_0000013494

had observer coverage. Whether or not it sunset at this point, whatever, the important part is that some of the other rules need to sunset.

**Audience 3**:

So when you are going to revisit this, basically what you are saying is that if there wasn't a bycatch issue, we would do away with the amount of coverage for the IFM? You know that is not realistic. We've never seen a turn of direction- Are you saying bycatch revisit or bycatch issues, or…

**Jason Didden**:

I think we have two options. One is that it automatically goes away after 2 years, unless the Council takes positive action to keep it. The other, the flip side, is that the council will take a look at it, but it stays in unless they do some action… so both of those option are in the document, and may be useful- again I think Carrie was just trying to go through the timeline and the process, but she will walk through the other alternatives and maybe (inaud) through one of these discussions after she goes through it.

**Carrie**:

We have been hearing a lot that people want this information used in some sort of a re-evaluation on whether- are current management measures necessary? Is anything recommended in this amendment- does it need those IFM coverage targets to continue, so that's where part of the re-evaluation comes in.

**Carrie**:

Anything else on background… (*Omnibus section presentation*)

**Greg**:

Well I think you have a range of what possible costs would be, right?

**Carrie**:

Oh, you mean actual costs related to herring and mackerel? We do have those coming up in the next section.

**Greg**:

Okay.

**Audience  4**:

Just looking at this- must be pretty clueless. How is the economic impact a low positive economic impact to us in alternative 2? Because we are going to get more fish in the long term, is that why it would be?

_0000013495

**Carrie**:

Well that is part of it, the thought is, so right now there is a perception of uncertainty around catch estimates. If somehow additional monitoring helped to address that uncertainty we could (inaud.) that limit, or management measures, that sort of thing. If overly cautious management because of uncertainty continues to restrict and overly restrict, If that is what happens, than this could have a low positive effect.

**A4**:

Somebody actually calculated this out that we are going to end up with more money paying out of our pocket, that is a positive. I'm just asking?

**Carrie**: These are more sort of indirect or qualitative, we don't have any numbers attached to this…

**Jason Didden**:

And these are just on the process side of things, when we get to the alternatives…

**A4**:

Ok, ok , it was just a question.

**Jason**:

When we consider the costs of some of the actual coverages, those are all negative for economic impacts. So we are not trying to say that the program overall has some rosy positive economic impact. It that this processing, compared to the other process alternatives- but when we get to actually what happens when you put 50% coverage or some kind of monitoring on some fishery, all of those are negative impacts to the fishery.

**Carrie**:

And part of this low positive, again this is sort of setting up a process, so we think there is probably some value having standardized observer provider requirements, that will maybe help the industry make economically feasible relationships with service providers. It does have (inaud.) options, that may work for some fisheries, and may not work for other fisheries. It is also prioritizing how to use federal funding, so our funding- you know we have federal funding sort of on an annual basis. If we don't have something in place in order to use it, often we can't use it for monitoring. So this sets up the process that whenever we have available money, that we use it to try to address monitoring issues. So that is kind of what is all part of the low positive. That if you have a standardized process for IFM programs in the future, it should be easier to run, implement… so that is part of it.

**Carrie**:

Any other questions on omnibus… (*Mackerel Alts Presentation*)

24

_0000013496

**Audience 5**:

Ok, just a question, with the mackerel fishing how would you know if you are going to catch more than 25 mt? If there is any mackerel, you are going to catch more than that, so what you are saying is that in that situation, you would not be able to bring in any more than 25 tons?

**Carrie**:

Well I think there is a discussion that some vessels only do less than 25 mt as a matter of course, so this is really only a discussion for those boats. However, you would have to make a determination before you left on your trip. If you are likely to land more than 25, than it would be a good idea to be compliant with whatever IFM requirements are for that trip. It seems like there were a handful of vessels that never really make 25 mt, these have the same alternatives in the herring alternatives.

**Audience 6**:

If you go with the intention of catching mackerel…

**Audience 7**:

Yeah, because anybody who is going with less than 25 ton, unless it's a small jigger vessel is not going to make any, that's not the way the fishery is set up.

**Carrie**:

Yeah so it is really for the vessels that as a matter of course typically don't harvest that much.

**Carrie**:

(*Mackerel Alts Presentation Continued*)

**Audience 8**:

I just had a question, is that gross or is that net? Would you calculate that- you're calculating net? I don't know how you can call that net, we've been operating 20 years and have never even had a profit, so I'm just curious how you come out with that when we haven't even seen a profit. If it wasn't for our ability to steal from everywhere else to keep the boat going- I'm very questionable how you can take that as a net when there isn't a net. If you look at most of these guys- if you look at the herring at the purse seine- if you disguise it, or go on midwater trawling, that margin is very small- that's what I'm saying, the margin is small so if you are looking at taking, even with us, 10% but with 10%, the net is so small- it mathematically doesn't add up in my head, that is all I am saying.

**Jason**:

This is based on the information that was submitted by the participants, we didn't have all of the participants, but a pretty good chunk of them participated. And comparing that to whatever their

_0000013497

revenues were through dealer data, but we can flag that as a concern that it is not matching your experience.

**Carrie**:

And that last bit of comment we have heard, we tried to do the economic analysis a different way, because we heard that a lot of people feel that it doesn't reflect their situation- that is something we heard.

**Audience 9**:

See the problem is when you are operating a vessel like this, everyone is like, oh your only gonna lose 10%, but one line, when you drop below this line, you can't operate much longer. I'm not crying- we survived this long but only out of, I don't know, persistence and stupidity- but if you do start actually dropping that line at one point, it all goes away. In my other boats- I'm going to take the Bluefin, I'm going to lose 15%, all of that comes out of the bottom line- it comes out of the gross but all of that other has already been taken up by all of these other costs, so when you take that small bit- it takes a bigger bite than everyone that is sitting here- it's hard for you to imagine, but it would be like me coming to you after you get done feeding the kids and everything else, and say give me the leftovers- that's not there anymore. That's what I'm saying it's hard to- It's easy to sit there and put up them numbers but-it's still a big thing, somewhere between 35% and 1%. That's still a lot, that's a big margin. Even 12% of a company's profit and 4%, that's still a big margin, I mean when you look at our's- 1/3rd to 1%, that's a wild ass guess. And you wonder why I am skeptical, if you had most of the other guys, I don't even though that they could bear to come, a lot of the others. But that's a big difference.

**Jason**:

And I think that those numbers are associated with specific coverage levels. So it's not saying for one particular coverage level that the range is that. So on page 25- 11.9- of the different coverage levels, NEFOP there are- so some of the ranges, whether you are talking about paired MW, single MW, some of it is whether you have that exemption for the 25mt so some trips don't have to do it, but its more...

**A9**:

But you are going to tie this and the herring together so if we're going, we're going for one or the other, it's across the board, so it doesn't matter, it's not going to matter, not for my situation. It's not going to matter for most of the guys in the same way, mackerel and herring, that's tied together so for most of us in that situation, it's not going to matter.

**Greg D**:

Jason, how many Tier 1 mackerel vessels are there?

**Jason**:

I think it is about 25, but I'd have to double check.

26

_0000013498

**Audience 10**:

And active it is about half that right? Well active meaning fishing or they could fish for the herring or mackerel…

**Greg**:

If all the mackerel showed up tomorrow, what would we have for it?

**A10**:

(Inaud.) Half those people are gone, so (Inaud.)

**Jason**:

It's just a handful of vessels that account for most of the mackerel revenues in recent years…(inaud)… and even in the late 2000s, there were only 10 or 20 vessels that were accounting for all most all of the landings.

**Carrie**:

And I think some of the big cost drivers are what kind of coverage is it and what is the coverage target. I think there has been a lot of dialogue about having the least expensive type of monitoring, which right now, is sort of between ASM and EM/Portside, and also, what can be the lowest coverage target to get the information and still be (inaud) so those are some of the discussions that we have been having in New England (…inaud…).

**Carrie**: (*Resume Mackerel Alts Presentation*)

**Audience 11**:

Who decides how many days we're gonna have coverage, and right now we're part of the… And if we already EM and have cameras which I have already had for a few years in the longline industry- who decides how many days and what coverage we get?

**Jason**:

That is what the Council will be picking in this amendment is that level of coverage.

**A11**:

So there is a lot to this amendment. They would still pick whichever one, they wouldn't have to pick how many days or what percent coverage they want? Even with the EM?

_0000013499

**Jason**:

So with the EM, the monitoring is 100% but then there is a range of review. And whether or not there is 100% review of the tapes, or 50% review of the tapes that obviously impacts the costs. That's part of some of the alternatives, right Carrie, about what percentage of the trips get reviewed.

**Audience 12**:

That is where the $172 to $325 dollars per day comes in?

**Carrie**:

yes

**A12**:

And the industry would fund that?

**Carrie**:

Yes, there is a couple (inaud) of the costs of EM, like Jason said EM would be on every vessel. If it is 100%, if that is what is selected by the Council, that means video would be collected throughout the duration of the trip. If the Council selects 75%, 50%, or 25%, then video would be collected only around haulback. That is the big difference in the amount of video collected. And then as Jason said, there is different review. There is 25%, 50%, 75%, and 100%, again, review is a big cost driver for EM. So the idea is how can you collect the least amount of footage to target what you are interested in, and what coverage target for review is adequate, but can help to minimize costs. So the Councils will be selecting how much footage will be collected and what the video review rate is.

**Audience 13**:

Well shouldn't that be an hourly thing or something, because we ride for a week sometimes without ever setting the net out, it could be tied to the hydraulics. I mean, to pay for the day for someone for the camera when it's not even running, that seems ridiculous. Because most, I mean, that camera's only going to be on for a small amount of time when the hydraulics are on. When we're looking for mackerel, we will sit there for a week, and look- I mean that just seems ridiculous.

**Jason**:

And that's why this- 2.5, so like 2.4 and 2.5- we used some of the EM, that's one of the reasons the low ends of those are low, if it's only on at haulback, if it is only 25% or 50% of what is recorded, even if it is just haulback, gets reviewed- that kind of drives the price down. And that's part of why the Council put in those alternatives, say, if you are only recording the haulback; if you are only recording- if you are only looking at 25-50% of the time the camera was on during haulback, that drives the price down. There is still a certain amount of startup cost, and sending in the tapes, and maintaining the equipment- those costs are there no matter how much the equipment is running, so it doesn't totally make the cost

_0000013500

get tiny, but it does drive the cost down to some degree. As, if you only record during haulback, or you only review a certain chunk of what you do record.

**Carrie**:

Similarly with PS, the higher coverage target you have, the more expensive. So what is the lowest coverage target you could have to minimize costs while still getting the information that you want.

**Audience 14**:

So if you are looking at the camera across (the board?) they got an observer, obviously they got an observer on the boat and it's like, (…inaud…), but it doesn't matter if you have a 25% camera- if it's random- you're still putting that tape out there, you know what I am saying? I can understand your point about having an observer, of course I am not going to break the rules, my kids aren't going to break the rules when I'm home, same way. But with a camera even if it's 25%, your still getting a (random sample?) of the whole thing, it's a total difference, I just think we have to look at all of the options here.That's the reality of the situation.

**Jason**:

So what are you suggesting exactly?

**A14**:

No, no, I'm saying with a camera, versus an observer, everyone would like to see 100% observer coverage because people act differently whether they are monitored or not monitored, no different than when you are driving down in a car and (inaud)… or anything else. But with a camera, if you are looking at 25% but it is random and you don't know which 25% you're looking at, you're still going to act different with a camera on than without.  Whether you are monitoring 25% of it or 100% of it, it is a totally different thing, like an observer on the boat- obviously everybody is going to be towing the line.

**Carrie**:

And that is an important point and that has been talked about a lot in the New England meetings. That it's not for an observer effect, and even if it is a low review rate, you still don't know when it is so you get a better bang for your buck.

**A14**:

For the EM, yes.

**Audience 15**:

A lot of the boats have electronic logbooks on them too, so that should be able to help reduce the costs of monitoring, by just knowing when the vessels are starting their tows and stopping their tows, rather than reviewing the whole video, I would think that would drop costs down considerably.

_0000013501

**Carrie**:

I would definitely affect when video was collected.

**Audience 16**:

The video is going to be turned on by the hydraulics.

**A15**:

Yeah I know that, but it's not like someone has to sit there and watch the whole video of when these guys fish- when they have your electronic logbook, you are starting your tow, you're stopping your tow. Start your haulback at 1 o'clock, end at 2 o'clock, that is all they have to look at.

**A16**:

But there won't be any footage until you start the hydraulics and the (spool string?), but it actually only goes one way, when we are hauling not setting. I would think it would be the same thing, so you are not wasting all of that tape. So that would be, that's what I'm saying is that you would cut that down a lot. So it should be by the hour and not the day, figure that in there, that we spent very little time on a trip, even to GB, four or five tows would be a lot. So the time you are actually bringing the fish on the boat- 5 hours?

**Jason**:

And I think some of our EM costs may be high, because of that. When we were trying to ballpark the EM, we obviously didn't want to underestimate it, so some of the EM costs may be high. And I think the main idea of the EM, the real monitoring of the bycatch would be occurring with portside sampling. The EM is really just to figure out- is the fish coming back to be observed portside. That is really what the EM will be used for, isn't that right Carrie?

**Audience 17**:

You see in the longline fishery, we'd be hauling back sometimes for 8 or 10 hours. That's not the scenario, and you're not like doing a tow every hour, that's not what we do. You spend most of your time riding and looking.

**Carrie**:

And EM is definitely a new technology for these fisheries. We are doing a pilot project right now, most of you if you have MWTers, you are involved. So we are putting cameras on MWT vessels for the next year, to see if EM can be an effective tool to monitor. This is really just trying to get the bugs out, trying to set up the most effective system. It is also to get more accurate cost estimates, if possible, see if our cost estimates are too high or too low. So I believe we have data coming back from one or two vessels already. We anticipate time lines running through October of next year, and then we finish up the project in November or December. So hopefully that would be informative for the Councils to select EM,

_0000013502

we'll have that trial period to get the kinks out. And the states already have, ME an MA already have PS programs. So a lot of lessons were learned there already for PS programs.

**Carrie**:  (*Herring Alternative Presentation)*

**Greg D**:

Did you mention something about Purse seine? The purse seine fishery? How will coverage be handled in the purse seine fishery?

**Carrie**:

There are a few alternatives that do have coverage options for the purse seine. There is NEFOP, there is ASM coverage. This last alternative that the Council proposed, they did include EM and Portside, but there is some recognition that there would need to be some evaluation of how EM/PS would be suitable for both purse seine and SMBT. Right now, I mentioned that we do have that pilot program for the MWTers. Because this is a relatively new alternative, we haven't been back in front of the Council since they recommended it. But there would likely need to be something similar, a pilot program, to look at EM/PS for those gear types to see if it is (feasible).

**Greg**:

And that's what you mean by fleets, right?

**Carrie**:

So fleet is only the MWT fleet. So if you look at alternatives 2.3 and 2.4, we have alternatives that look at basing coverage on Cat. A&B vessels, and the MWT fleet. A little different in how to allocate coverage. And for example, 2.4- that is just the MWT fleet. There is no specification within any permit category. That is slightly different from the mackerel alternatives, those are always one of the tiered permits.

31

_0000013503

**November 1, 2016 – Narragansett, RI**

**Attendance:**
Terry Alexander - Hearing Officer and NEFMC Member
Fiona Hogan - NEFMC Staff
Carrie Nordeen - NMFS Staff
Donald E Fox – The Town Dock
Glenn Goodwin – Seafreeze LTD
Meghan Lapp – Seafreeze LTD
Phil Ruhle Jr – F/V Sea Breeze Too
Jeff Jordan – F/V Prevail
Joel Hovanesian –F/V Defiant
Mark S Phillips – F/V Illusion
John Curzake – F/V Emilia Rose
Glenn Westcott – F/V Ocean State
Jerry Cawalhs – RI Fishermen's Alliance
John Haran- Sector 13
Jeff Taylor – Mayforth Group
Tina Jackson - F/V Skipper
William Briggs
Eric Lundvall
Karen Bradbury – Senator Whitehouse Staff
Bonnie Brady – Long Island Commercial Fishing Association

**Carrie Nordeen**: (*Section 1: General presentation*)

**Audience 1**:

I'm curious as to why there wasn't any public notice about these meetings. I found out about this 2 hours ago, I talked to a gazillion people who can't make it- they didn't know anything about it either. My fear is that, as NMFS has a tendency to do, they look around the room and not see any people and think no one cares. Trust me, people care.

**Carrie**:

The public comment period opened in September, so we did send out our typical emails. The Mid-Atlantic council also sent out an email blast announcing when the public comment period was and when the public hearings were.

**A1**:

Did that include the portion that included having industry funded people on all fishing trips, or was that for the herring/mackerel plan?

_0000013504

**Carrie**:

Well we tried to send it out for everyone, because while there are things in here for herring and mackerel, it also has the ability to affect other FMPs. So we tried to disseminate widely to all fmps, not just herring and mackerel.

**A1**:

Because what I took from it is that it affected fisheries that I wasn't really concerned about, although I was concerned about the people that were involved in them, but this is so broad based now, this is out of control, but anyways…

**Carrie**:

I appreciate your comment, I do think we have had fairly good turnout for the public hearings, but clearly this is an issue that people are very interested in and concerned about.

**Carrie**: (*Section 2: Omnibus Alts. Presentation*)

**Audience 2**: (Mid-Presentation):

So this is starting with herring right?

**Carrie**:

This option is in the omnibus alts, so it has the potential to apply to any NE or Mid-Atlantic FMP.

**A2**:

Alright, well let me get to my point then. So if a vessel is selected for monitoring, the vessel may harvest a certain amount above the possession limit. If there's no possession limit- and there isn't on herring; there isn't on squid- how does that help you?

**Carrie**:

A monitoring set-aside is going to be a good option for certain fisheries, like it is for scallops.  It's not going to be for other fisheries. Any fishery that doesn't have a possession limit; it does make it a more difficult fit. So for herring and mackerel, it is not as good of a fit as for scallops or something that does have a possession limit.

**A2**:

Exactly, every fish that I fish for- I don't think it would help me with any of them. It wouldn't help with whiting, I mean, there's a 40k lb possession limit. It's not like scallops where you basically know what you are going to get for them before you leave. I don't see that helping at all in the fisheries- the seven boats I manage, the fisheries that they do do, I don't see that helping at all.

_0000013505

**Carrie**:

And I think a lot of individuals share that concern, again this is just a tool available to the Council, it might work for some fisheries and it won't work for others.

**A2**:

But for all the fisheries that we are talking about here, I can't think of one that it will work for. So it's basically the rusty tool in the bottom of the tool box that you never use. You know I don't see that helping at all... At all.

**Carrie**:

And right now the Councils have selected it as a preferred option, they ultimately wouldn't need to select this. Then it does take away that option for if there is some fishery that it would work for.  But I understand your point.

**Audience 3**:

In the event that it does work for a particular species for cost offsets, my assumption is that the extra fish allowed by the boat being monitored would be taken from the overall quota, therefor, putting everyone at a disadvantage, because we are going to let the government allow us to harvest more fish, yet at the end of the day, we're going to be able to harvest less fish.

**Carrie**:

Those are choices that would need to be discussed if and when this tool is used or if a monitoring set-aside is...

**A3**:

This is out-of-con-trol. This has got to stop. This stuff has to stop.

**Audience 4**:

How do they plan to allocate how a boat gets selected and everything? I mean, I'm a groundfish boat, and multi- other boats, but when went seven trips in a row carrying an observer. And I call up Amy, and she says "Oh, it's completely random." It's not random. There's virtually no randomness in it. They say "Nobody will get an observer if they are going to catch yellowtail on Georges Bank. We know you catch yellowtails, so we hope you'll make a yellowtail trip" when we're chasing haddock. There's no way we're going to go chase yellowtails when I got a TAC of, I don't know what it was at the time- 10, 20 thousand pounds for the whole year, and I go catch 40-50 thousand pounds of haddock. Who in their right mind is going to go and catch something that they are going to lose money on, and they said "well we got to put an observer on you anyway, because you might just go for that." Seven trips in a row, and it didn't stop until I complained.

34

**Carrie**:

Well for herring and mackerel, we will be talking about coverage targets.

**A4**:

But I'm talking about for all fisheries, and I know how it works. Certain boats are selected, certain boats are not selected. If the captain has a hard time with the observers, they get a low priority. If MRAG likes a boat, or AIS likes a boat, he is going to get selected more. They have the option, every one of the providers has the option to say "we don't want to put an observer on that boat." And there's a lot of reasons why a boat doesn't get selected, so the burden usually falls on a handful of boats. And you know I can count the groundfish boats in New Bedford that get observers, more than others- "well, you know the cooking's better on these boats, so we like these boats. We don't like to eat fish every trip, so we're not going to put an observer on that. He might get sick of eating fish, or some other reason. We don't like listening to Portuguese that whole time. So we're not going to put an observer on there."  And this is going to happen to every single fishery, and that's going to put an onus on boats that get selected to pay a much higher cost.

**Carrie**:

Well, we will definitely note your concerns, it sounds like you have concerns with the existing program.

**A4**:

I have a lot of concerns with the existing program, I'm currently carrying close to 500 observers in my lifetime, I've carried the first or second most amount of observers. That's a long time though. I carried an observer every single trip when I was tuna pair trawling. Every trip. Six days, every trip was. Yeah, and I got put out of business on tuna pair trawling. But 3 years, or four years- I don't remember how long I did it- I carried an observer on every single trip. And it got me nowhere, it just came up and they throw more regulations at them. And then they just took "oh wait, let's see.  Let's just throw this at them next year and maybe that will put them out of business." And that's how they put us out of business, the cleanest fishery I have ever been in. And we were put out of business because politics wants us out of business. And that is really all this is. They're going to keep looking for something to put us out of business. Maybe we're going to catch a "blue snue" or something, some fish that has never been seen before and we're going to have to put a management program in on it.

**Audience 5**:

I just wish the government would say "you know what guys, you are all done." I wish they would just say it and be done with it.  Just think of all of the money the country could save. You wouldn't have a job, we wouldn't have a job, we could all go on welfare, the people who had a job could support us. And all everything would be wonderful.

_0000013507

**Carrie**:

Well this is a decision that is in front of the Councils, the Councils do not have to select…

**A5**:

Well who put it in front of the Councils?

**Carrie**:

The Councils requested additional monitoring for the fisheries…

**A5**:

NMFS!

**A4**:

We've got less and less boats in the industry every year. And yet we want more and more monitoring. New Bedford has over 200, probably close to 250 boats in groundfish. There's less than 30 full and part time groundfish boats in New Bedford. That's an 80-some percent reduction in the fleet.

**Carrie**:

I understand that you have some concerns about IFM. I think you need to make sure that the Councils are aware of this. NMFS is not putting this in front of the Councils saying "Councils, we need more monitoring." This is something the Councils have come up with on their own. Entirely their decision.

**A5**:

At whose behest?

**Carrie**:

So all of these concerns about existing programs and the ability to afford future IFM programs; definitely make these concerns known to the Councils.

**Audience 6**:

So the government, all they do is make up rules and regulations, they've created a whole cottage industry now to employ more government people. Every time there is a new regulation now, the expand on it, and expand on it, and they have created a whole cottage industry now to hire more people. And you talk about crony capitalism, how about the former regional administrator owning one of the observer companies? And while he was the regional administrator, he was the one that put the act into place.

36

**Carrie**:

Definitely, if you have concerns about IFM, it's good to submit them to the Councils and we'll just continue on to the omnibus alternatives.

**A6**:

This is Bullshit!

**Terry Alexander:**

I understand all of you concerns with this stuff, because I am a fisherman too and I'm paying for my observers right now, but that isn't what this (action) is doing, so direct your comments to what is on the board.

**Audience** (previous but unidentified):

It's gonna make everybody (..unheard). If I were you I would be looking at it and saying "if I have to pay, then why shouldn't they?"

**Terry A**:

Well I don't say that, I'm the last one to say that. Just direct it towards there please.

**Audience 7**:

Well how big is NOAA's budget now, just off the top of your head? In 2009, it was about 7.5, 7.8 billion. I think it is something like 9 billion, 9.5 billion now is NOAA's budget. They can't find the money to pay for observers?

**Carrie**:

Well right now what's being funded is what's required by existing regulation. The Councils expressed interest in monitoring above existing requirements, that is what this amendment is doing. It is above anything that is required Federally or through NMFS. In NMFS's budget there are certain things, certain budget lines, so there is only so much money for monitoring, you can't take from other budget lines for monitoring.

**Audience 8**:

Excuse me, that is completely untrue, because in the Saltenstall Kennedy Act, NOAA stole 540-some-odd million dollars out of the (Saltenstall) Kennedy money, and they never repaid it. And they were supposed to – under Jane Lubchenco, so why doesn't NOAA, NMFS get there little butts together and find out where they stashed all of that cash outside of buying a luxury yacht that they were all partying on down in Virginia all these years, all the nice little trips they took over to Dubai and, God, and taking all the judges and everywhere else it went, from 2007-2013. Tell them to find the money, put it back, and spend that on observers, because quite frankly, it ended. I know everybody in this room is

37

_0000013509

frustrated, if you are a fisherman and own a boat, you're frustrated. And I haven't been around for a long time, but this is ridiculous. Nobody has the money to pay for observers. They don't have it. You bankrupted us under Catch Shares. You bankrupted us. NMF bankrupted everybody on the basis of a few people owning all of it, and then they got screwed on it the year after. So what does NMF- what does the Council want us to do?

**Carrie**:

Well back to your first point there, recently the SBRM amendment, there are very strict guidelines for how funding is to be used for monitoring. That was implemented I think in 2015. So I understand that you have concerns about how money has been handled in the past, it is different now...

**A8**:

No, No, No; No! Quite frankly, I'd beg to differ with you, it is not different now. NOAA took the money, they were legally bound to put that money back, and they never did. They never did. They put a portion of it back- I think 60 or 70 million dollars- took that off the top of my head because it was a long time ago but, so were short 400 and some-odd million dollars of that. Quite frankly, NOAA owes the fishing industry all over the country. So put that in the public opinion, use that- for John Bullard and tell him to stop screwing everybody in the fishing industry.

**Carrie**:

Well it also sounds like you have general concerns about affordability, those are comments for the Council, this is a Council amendment, the Councils are deciding whether or not to have IFM.

**A8**:

So basically what I'm telling you is that we need to tell the Council no. It's about time we told them no. No, no,no; no.

**Terry A**:

Exactly, nobody comes, nobody comes when we have the IFM, nobody comes...

**Audience 9**:

Speaking of the comments, I just walked in. Written comments must be submitted by November 7th? Today is the first, what kind of joke is that? And I didn't even know about this meeting, I just heard about this last minute.

**Terry A**:

So I just want to say, I'm a Councilman, and I'm a fisherman, so I definitely feel your pain. But when we have these discussions with the Council, nobody comes.

38

**A8**:

But we're tired of it.

**Audience 10**:

It comes at great cost to us personally with no regard, complete ignorance.  Let me give you an example. The monitoring program, a day boat registered in the state of RI had monitors come down and demand to get on that boat or they were going to get fined for $50k. Went out on a day boat that never left Narragansett Bay, and they go on at 4 o'clock, and at 12 o'clock, they'd get the next day too. So they'd get two day's pay, abusing these people with threats and innuendos, on a fishery that's not even supposed to be monitored- day boating in Narragansett Bay. I mean, when you get this kind of abuse, and then your presentation says they'll be able to harvest more fish- if it comes out of the port- but in effect, what you are saying is that we could take the quota and use the quota to fund the monitoring program. That's what you're saying. Because still, the fishermen are going to pay for it any way you look at it or present it. I remember when we started the RSA program, and what a debacle that turned into. When they realized corruption, both government-wise and private-wise, that got implemented through that program- they had to do away with that entire program. Nobody is here to express their anger at you personally, both of you. But it's because of these programs and the government imposing itself on the people- People say we don't want this and the government says you are going to do it anyway. An when they go up there to object to it, and take their time/money/effort- I went down to Atlantic States Marine Fisheries Commission, and two meetings in one year cost me a loss of $15k in stock, because I captained my vessel. And what did I get out of it? They did it anyway. Now this is what you're up against in this room, and all of these men and women feel the same way. You've got the government dictating their lives to them, and then telling them "you have to pay for this dictation." You're not going to get a positive response out of it.

**Audience 11**:

We'd welcome them with open arms if they could ever show us something beneficial. I mean we'll throw in seabass, we'll throw in fluke, we'll throw in everything we're wide open, wide open! Wide Open! And they've observed it, why aren't we allowed to harvest these things?

**Audience 12**:

That's a mid-atlantic thing, that's not a New England thing...

**A11**:

It's the Federal government! They're the ones that need to be monitored, not us. If anyone needs to be monitored, it's them. The corruption that takes place- I mean they destroyed emails while under subpoena- does that sound familiar? The OLE is corrupt, the whole system is corrupt. You talk about draining the swamp, they ought to start right up there in Gloucester.

_0000013511

**Terry**:

Okay, lets move on (Gerry?)

**Audience 13**:

We apologize for the hostility, but you have to understand what these men have been through.

**Carrie**:

I do understand, I think these comments are very important for the Council to hear, these questions are in front of the Council right now. Do they move ahead with IFM programs- new ones- or not? I think your comments are critical in shaping how they move forward, or choose not to.

**Audience 14**:

Is the Regional Administrator hanging the Sword of Damocles over their neck?

**Carrie**:

This is a Council amendment, there are no requirements NMFS has not said that additional monitoring is required, this is a Council decision, the Councils are wanting additional monitoring.

**Audience 15**:

I don't understand why they would want additional monitoring. Last week, three trips in the same area doing the same thing for 3 days. I took monitors on the first 2 days and on the 3rd day they called and they said we could take another (observer?). I was doing the same thing, I wasn't getting any better information than on the first day, any better information on the second day, and on the 3rd day I was, I told the kid I mean basically, you're a beggar. You're not doing anything, you're just doing the same data day after day after day. If they called and asked "are you going to the same place, are you going to catch the same thing?" I would have said yes. If you want to send one on one day, that's fine but three days in a row? He called and said he got approval for three days in a row on your boat. But why? There was nothing different on day 3 than there was on day one. It's 9300 lb of skates, I mean, with what we have, we're lucky if we get $1400 a day with a deckhand and fuel. And now you're telling me that if NMFS has enough money to cover their portion, I'm gonna have enough to cover my $500? Take that out of the stock, and then take the fuel, and then tell the deckhand what he's gonna come home with after he picks up 9000 lb of bait, while this other kid is scraping scales off of fish. It's not, I mean, he's going to make more than my deckhand, who is working very hard. Now that's what I don't understand, why do you have to monitor- even for the herring- if we are all fishing in the same area, why do you need a monitor if you are all catching the same thing? And we all are, we are all catching the same thing. Why not put a monitor on one boat to see what everybody's catching instead of every boat. You can see why this is a waste of my time and money. Not to mention that I don't have a very big boat, and I am falling over these guys no matter what I do.

_0000013512

**Audience 16**:

And he needs the money.

**Carrie**:

Sir you had a question?

**Audience 17**:

Unfortunately, I think, you kind of get the sense that the monitoring companies are the tail that wag the dog, and if I sat in an office and if every time I put an observer on a boat it pays 250$ or whatever it is towards our expenses, then guess what? The more I do, the more I make. And unfortunately I hope we're close to the herring/mackerel, because I would really like to see what the whole idea is, the whole dockside monitoring, what the impetus is for herring and mackerel.

**Carrie**:

Well we are just going to wrap up the omnibus, then move into herring next.

**Audience 18**:

Could I just ask, are all of these comments being looked at as comments specifically to the omnibus amendment, or after we get through this, do you want us to go "point 1: xyz; point 2: abc," what is the preferred method to do so? Also, two weeks from now, Newport, which day Terry? Are they going to be discussing this?

**Terry**:

For groundfish? I'm not sure what the agenda is.

**Audience 18**:

Ok but if you go to the public comment period… I don't know which day it is… It is in Newport when? Do you know Meghan?

**Meghan Lapp**:

I'm not sure.

**A18**:

I can check it out, but the Council is going to be right in Newport. So as long as somebody goes with (Joel?)

**Audience 19**:

_0000013513

Well the only other thing that I was going to say is that history shows us that even when we have monitors, all the information that monitors collect- whether we're paying for it or they're paying for it- sits in a box. They never even use it. So that is another waste of money as far as a lot of us are concerned. Over the last 10 years that I have been dealing with it myself, I don't understand why bother? And what Joel was referring to with one of the monitoring programs, they even announced they had the contract before the federal govt. announced that they had the contract so being the prior regional administrator and knowing you had the contract and that you outbid everyone else, obviously that was a big inside deal. That was a bad taste in everyone's mouth and you can understand why people get very frustrated over things like this, you know what I mean, so please understand we're not taking it out on you, but the Council needs to understand. And maybe this is a good thing for everybody. We're all going to go to the meetings. We all have to start going again and saying no, and mean it- No, no more.

**Audience 20 (John?):**

But I fish, I can't go to meetings every day, if I wasn't in the boatyard today, getting ready to launch, I wouldn't be here tonight.

**A19:**

I know, I hate to say it, believe me, I understand, but…

**Audience 20:**

I can't go to all these meetings, I run my own vessel too. How do I get to these meetings and keep my vessel running and keep my deckhand. What do I tell him- "we're not going tomorrow, I have another meeting"? He's got 3 kids, I have 3 kids, I can't go to meetings, I don't have that kind of a schedule.

**A19:**

That brings up my other point… The other point I was going to make is that history has shown us that we could attend every meeting under the sun, and give the Council every bit of our side of the story, and they still would just do whatever they want anyway, 'cause it has already been settled. This is already a done deal. We're already going to pay for it. You can sit down there and tell me to my face that this is a public comment and that the Council is going to consider our comments. But that's not reality. And that comes from basically some of the school classes, education classes that I have taken, that many of us have taken. So when it comes to Council and fishermen getting together, they have already told us. This is a done deal. That is what is sad about this, and that is why John doesn't go to meetings. That's why so and so doesn't go to meetings. And you want us to go, but it doesn't do us any good. So that is the other thing the Council needs to understand.

_0000013514

**Terry**:

Send us an email. Send us an email and let us know how you feel about that. Send the Council an email. We'll make sure you get the address in you get me your number. I make sure you get the address so you can send us an email. We pay attention to that stuff.

**Audience 21**:

You know, what he was saying about getting covered by monitors, I run a clean family boat. I was getting 80 to 90%, and when I called I got the same thing. It's not you, it's a lot of (things?). I had to get a lawyer. A lawyer! He fixed it for a week. The next week after I got 100% coverage, I called the lawyer back, and then all of a sudden my name did not appear more than any other name. I like these kids, they're good kids, and we have a good time when we are out there. But it's my boat, you know what I mean, and to be told I got to take- I told them before- you know guys, let me see their resume. Let me see who they are before I let them on my boat, because you wouldn't want me in your house. You wouldn't want me standing in your house. I had a kid on my boat with my sons on there when they were young who was such a freak. I had to call the monitoring company and say "you just can't send this guy" and the guy said "we'll send who we want to send." "You take them out on the boat with your kids"- my boys were young then. And you know what he said? "You're right, he shouldn't go out," he was weird, this was back when they were giving us guys who were on alcoholics anonymous, this was quite a few years back, and I can't say anything about that in the last few years, seems like they are all good kids now. But it's my boat. Don't tell me what to do and what I can't do on stuff like that. I paid for it, it's mine. And again, I have a good time with these kids usually, but lately, I've been the other way, I've had enough. And that's what happens, if you're a good guy, and you're good to these guys, you're going to get a lot of coverage. Because even when I'm trying to be a jerk, I only make it a half a day and you know what the kid said? You started out with... (?) but you failed me and...

**Carrie**:

To answer your question about comments, comments discussed in the hearing or in the discussion under the different sections, we were just compiling them under the different sections. So a lot of this discussion is overall concerns about IFM, that's sort of what the omnibus alternatives are.

**Audience 22**:

So would you prefer we wait until...

**Audience 23**:

It's November 17th and 19th (Bonnie?). The date is Wednesday, the public comment period is noon for the Council meeting, I believe it is the 16th. If anyone wants to talk about this, I'm trying to find out if there is an opportunity for this at the mid-atlantic.

_0000013515

**A22**:

Do you want to hear our comments now? Wait for them at the end?

**Carrie**:

Do you plan to submit written comments?

**A22**:

I will submit written in addition to this, but I have some comments in general. We had no meeting in Long Island, and Montauk is the state's largest fishing port, but luckily I'm here for the groundfish advisory panel meeting.

**Carrie**:

So if you have mackerel specific or herring specific comments, those sections are coming up.

**A22**:

No, I have other regarding the overall fisheries and how it pertains to the future fisheries issues.

**Carrie**:

So we are in the omnibus section now…

**A22**:

So I'm on? Great. So New York, recently, for you guys that aren't always in Montauk, apparently New York has gotten it out of the mailing that Sara Weeks sent me, who is from NEFOP, there are a total of 9,945 sea days that were given for SBRM for 13 states from NC to ME, and NY for some unknown reason, lucky us, has been given 2,961 of those sea days for 2016, which according to the handout that I didn't bring a copy of, but I can send it to anyone- Mark, I know you got a copy- of those 2961 sea days under SBRM, 1968 are trawl trips of small, medium, large, or XL mesh, and a couple of twin trawls, although it's minute by comparison. That's out of a total- it's a third. I did a little math, and under the concept that eventually under IFM that industry would be required to pay, and I used the average as $800 per day- is that right Carrie, that was the number they floated originally? Do you know?

**(Crowd)**:

$710, $720.

**A22**:

We'll add inflation in. That would mean for New York alone, for the trawl fleet, that would mean a cost of $1.5 million to pay for observers, and that's according to- I've spoken to Wendy Gabriel who does pop dy, I've spoken to John Hare who is looking more into it, I've spoken to Sara Weeks, I've spoken to Amy Martins. Apparently, part of the reason New York has the preponderance of sea days is because of the

_0000013516

variability of the bycatch that is caught in the fishery, and that apparently if you got out and catch the same one fish, two fish, red fish, blue fish, they give you the same sea days, but when you have variability in the type of species, they need more coverage in order to flesh out whatever the answers are. I'm having a look into is it regulatory bycatch, are we looking at two different states. Obviously like New Jersey you can catch 5000 lb of fluke, RI catches 5000, NY catches 70. Is it because we in southern New England have a mixed trawl fishery- it's referred to sometimes as a shopping cart.

**Carrie**:

It sounds like you have questions about SBRM coverage, is that correct?

**A22**:

Well no I don't actually. The point is that…

**Carrie**:

The numbers you are giving though are related to SBRM coverage.

**A22**:

I know we're going past that, we're going beyond and above…

**Carrie**:

But if I could just explain for one second, when we are looking at IF, it is not IF for SBRM. It's for selecting a different coverage target. So those are the questions in front of the Council whenever they develop an IFM program, or a new fishery, so I think you have a good point, but the question of a coverage target is not…

**A22**:

I understand that, but I'm getting to my point. The point being that anything above it, whether they determine they want the small mesh fishery, the level of bycatch of windowpane flounder for example or something like that. The fleet in NY, in RI, in southern New England has been traditionally for years a mixed bag, a mixed fishery. And the majority are owner/operators. They are not large conglomerates. They do not have the ability to fund above what is already being required through SBRM and NEFOP. If there were to be any omnibus alternative, you could scratch 1 and scratch 2 and go straight to 2.6 which would require a standardized structure for funding has to be approved prior to any further implementation. Doesn't matter if you're talking about cameras, that's 50 grand as soon as they hit the deck, or the extra fees that are associated with it, whether it's $800 a day or anything like that. The mechanism must be in place for it to not affect industry, which means whether it is Senator Whitehouse or Senator Schumer's office has decided to pass a bill that puts a tax on imports so that fisher observer coverage is paid for that way, and that way it doesn't have to affect industry. And whether anything gets done past that, a funding mechanism that is not an industry tariff or tax… You know we did the RSA, and there were problems with it, there were also non-problems with it. It was the only way to -actually in

_0000013517

New York, there were a couple of egregious errors with it- it was the only way to buy into a fishery, that we were basically sold down the road with the fluke amendment. And that was the way for New York to make regulatory discards into landings, was through buying RSA. Now we know scenarios happened with (Tony Josephs?) and with (Charlie?). But in spite of that, it is the only way to fund it, but everyone can't afford some of the prices when they've done the auction. You know it's one thing if you're a charter or a rec guy and you're buying quota, you can pass that on to the consumer. You can't through industry, and especially not where you would have to have- so there would have to be a regulated system where there is a base price that is determined, and it would have to come either through (shoreside?) or through some bill that creates tariffs from imports to be able to pay for what we do domestically. There is just no other way it can be done.

**Carrie**: (*Finishes omnibus presentation*)

**Audience 23**:

I was involved in a fishery with 100% observer coverage, and the observer coverage proved that we were clean. Cleanest fishery I have ever been in, and we were still put out of business. Not because of what we caught, but because the government, and they even wrote a report, it said they didn't believe the observers. And I walked away from the Council process because of this fishery, because when they wrote the report up about us- this was pair trawling for tuna fish, and it was pretty lucrative for us, and it was super clean. We had 400-1 bycatch, we had less bycatch, less sharks, less turtles- compared to the longline industry. But we were put out of business for all of the rumors that the observer program did not dispel. They put down in their report that we must have been catching birds, because other fisheries caught birds, even though there was never a bird caught. They took that from the west coast fishery. They put down things that were, even though we didn't catch them, they put them down anyway in their report. So the observer stuff, it doesn't mean a hill of beans. When we were (work?) fishing, because we only fished for tuna at nights, the observers were required to do mammal counts, but when we were steaming in the daytime. We steamed all day, 8 knots, 6 pairs of us, every direction you could see, as far as you could see, were common dolphins. We went through millions. I go to the bycatch meetings and say "well there is only 600k of them in the whole Atlantic ocean from the US to Africa. We saw probably 10 or 20 times that amount in one day. "Oh but we can't use that, because the people on the *Albatross* or the *Bigelow*, they didn't see them." So if the two guys in the crow's nest, they don't see them, and the guy on deck, they see them, they're not counted, because the two guys in the crow's nest were seasick. So they don't exist. We steamed through millions, and the gillnetters, the swordfish gillnetters, they had the same thing, where they couldn't get out of the mammals.  They'd steam and steam and steam. And we're supposed to believe all this stuff that comes out from these observer programs. Now I got a thing going- Terry, you got a copy of my letter- about an observer that falsified data, literally falsified data. And I'm waiting for the council to say something about it. I do write letters to the Council, I do write letters to NMFS, me and John Bullard go round and round and round quite a bit. And I got a letter from- John's letter- saying that I was satisfied with the result from Amy's office. I'm not satisfied- he should have been kicked out of the observer program for falsifying data. If I falsify data, I get a notice from OLE, maybe I get a fine from OLE, or I get a permit sanction. This guy knowingly falsified data, and he gets a pat on the back "don't do it again."  I'm sorry if I don't trust what you are

trying to tell me comes out of the observer program, because it is total bs. I just carried a NEFOP observer, her first NEFOP trip. She didn't even know what some of the fish were we caught. She'd been doing this for 2 years. I'm squid fishing right now, we had a total of about 1200-1300 pounds of everything. She put down that I caught 1000 lb of haddock, baby haddock. There might have been a couple of baskets. I haven't renewed the information yet because it just came in the mail yesterday and I haven't been home to get it. And I want to see what it is. But again, she falsified the data. You know, she got out there with her little stick, there's plenty of water sloshing around there in the squid bag, she sits on deck, goes out there with her stick. "Oh, well, that's what the calculations say." There's 1200 lb in the whole tow for everything, and I got a 1000 lb of haddock discards? I don't think so. But her word will be gospel, and mine won't. The one day I sent you a letter about- or the Council a letter about- I got 51 years of experience fishing. That kid didn't have 51 days. And he knows so much more than I do. He put down so many codfish discards- I was out of business- that we didn't catch. He put down one tow I caught 77 lb of ocean pout with his extrapolation. There was one ocean pout caught for the whole trip, it was pulled out of the chafing matt. They don't stay in a 6.5 inch square bag. He should have been hung by OLE for what he did. He falsified data, and he tried to put me out of business. Yet nothing will happen to him. If I do the same thing- I was in Cape May, NJ, last year, I was sick as a dog. I came in, NMF came on the boat, I said yeah, I don't have much. They went down in my fish hold, they looked at my VTR, they said "you got one John Dory." It's not on your VTR, I can write you a ticket for that. Yet this guy can falsify data, and nothing happens to him.

**Audience 24**:

We've asked for an arbitration board for 5 years now for situations like this. And every time that sector 13 has had a problem, it has always been with the cleanest boats in the fleet. The 3 boats we've had problems with, the cleanest boats. Mark volunteers for scientific research. He's taken observers, he'll take them, no questions. And he gets hammered. The other two boats are similar, the *Heritage* and the *(James and Matthew?)*. Three boats that everyone in this room knows fishes cleanly. We need an arbitration board, we need somewhere we can go. It's Amy's laws, Amy's students, Amy's rules, and we have no recourse. Going back to the omnibus, Sector 10 has one boat fishing right now. They have 25 permits in the sector. One boat fishing. He lands maybe 5-6-700 lb per day. He's been charged travel fees when the observer came to his boat. He cannot afford it. He's been hit over 60% of the time for monitoring, because he is the only one fishing. He cannot afford this, the small dayboat fleet cannot afford this. NOAA knows this, they just sit on it. Sector 13, when we started years ago, we had 77% participation in the groundfish fleet. Not every day, every 2 or 3 trips, but now it's down to 31%, by the end of the year it will probably be 25%. Since 2010, it's been a losing transaction for these boats. Something has to change, as Joel says, we have to clean the swamp.

**Carrie**:

Meghan do you have comments about this?

_0000013519

**Meghan Lapp:**

I just have a few comments about the omnibus part. Really the only alternative that is viable for the fishing fleet is no action. And I do want to make the point that there has not really been a lot of outreach to the fleet on the omnibus portion of this amendment. Most people that are in the industry thought that this had only to do with herring and mackerel because it has been discussed at herring and mackerel committee meetings, AP meetings- I'm on the AP. The only input through APs for the Council have been through herring and mackerel APs, there has not been any input from anyone else for the omnibus part of this. And for that reason, I think most people were under the impression that this only applied to herring and mackerel. So I don't think that people are aware that this could apply to every fishery, and I don't think there has been enough outreach on that. I don't think it has gone out through all of the appropriate venues, I understand there have been emails sent out through Council list serves or NOAA list serves. But a lot of this has been under- even if you go on the Council webpage- it's under herring and mackerel, you know. It's all connected to herring and mackerel, and the omnibus part of this, that's not the case, so I do think that does need to be corrected. I would also like to point out that in the amendment, the purpose- under the heading of "what is the purpose of the amendment"- it says the omnibus alternatives would allow the Councils to develop industry funded monitoring programs for the collection of information in addition to SBRM. One thing that the amendment does not address at all is that the Magnuson Act has a specific section called "Information Collection Programs." And it specifically mentions observer coverage and extra monitoring. It discusses when the council wants to have an additional monitoring for a fishery for more information or whatever, whatever issue they may be wanting more information on, there is a legislative way that they are directed to do so. And none of that is in this amendment. It's very clear, it talks about how these programs can be funded. It specifically talks about how these can be funded- observer coverage, monitoring coverage, what can be done with that… In fact this amendment doesn't even mention any of the legal provisions that are in the law – to be a vehicle for what this amendment is designed to do is pretty disturbing. The other thing that I would like to point out, that is an inherent problem with this going forward, the way that it is going forward through IFM, because the way the Act discusses it is not IFM. You know it could be done through a Senators office, it could be done through a legislators office. It's actually through the secretary's office, but if there was a need, there could be grants and money given to certain issues if that was a concern of the Councils'. It is directed that when the Councils have a concern about a particular fishery, that this is what they are supposed to do for additional information collection, including additional observer coverage. The problem with the way that this amendment is going and the way that it is designed, is that this amendment was initiated because of a public perception problem in the herring fishery- in the herring MWT fishery. There were certain groups that were telling the Council that you need to look at certain aspects of this fishery because of low observer coverage. And quite often, we sit at Council meetings- I sit at council meetings- and say well, we are going to initiate this action because we have received public input, and the public said we want to see a certain outcome or whatever. That allows- that is how the Councils operate- the Councils do operate in response to what the public says. You've heard from a lot of people here tonight that the fishing industry, at large, is unable to participate in this process to a large degree because of their jobs. But what you will see at the Council meetings is a lot of special interest groups, with a lot of money backing them, pressuring the Council for certain things at

48

certain times, and this amendment allows them to pressure- to force private vessels to pay for monitoring. And that's not right- even when they can. At this point, the thing you have heard about tonight is the asm program in groundfish fishery, and that is not being addressed by this amendment, but it has a lot of lessons that we can learn from it. Recently, the Councils voted to suspend the ASM program because the vessels could not pay. They absolutely could not pay, and it showed that it would bankrupt the vessels that were left. And that Council vote was disallowed by the Agency, because they said this is already in place, and this is what is going to happen. So that is unsettling to know that if there is an omnibus part of this amendment that goes or if it's an Act in a specific FMP in the future, it doesn't matter if the industry can't pay, it only matters if the Agency can't pay. And that's a problem so as far as the omnibus alternatives, the only thing we can support is no action.

**Carrie**:

Ok thank you for your comments. (*Start of Herring Alt. Presentation*)

**Carrie**:

You had a question?

**Audience 25**:

Yes, for the administrative costs, do they have an idea, and maybe you already answered this, do they have an estimate of what industry costs would be, on top of sampling and the financial (?) to the industry?

**Carrie**:

We do, I don't have it in any of the slides, it is in the EM- Portside/EM sections of the EA. Typically the administration costs are NMFS costs. It was a little difficult for us to get PS costs. We were looking at existing programs, but existing programs have contracts, and as a way to not divulge private contract information, that's the way we came up with the $5.12 cost to the program. To get the lower cost estimate of $3.84, rather than use any existing programs, we just made some assumptions, and we subtracted out 25% for administration.

**A25**:

You know what they say about assumptions don't you… That actually leads me to another point about contracts, specifically speaking, administratively, with the 3 observer programs that we are contracted with to provide the observers for boats to go out.

**Carrie**:

You mean the ones that currently have contracts with NMFS?

**A25**:

Yes.

_0000013521

**Carrie**:

We did look at those, we also looked at other contracts that the states have for their sampling.

**A25**:

Is that included for state… observer…

**Carrie**:

Yes, Maine and MA have portside sampling programs for herring, and we did use their existing program information to help generate cost estimates.

**A25**:

Maybe I'm missing something, but I guess my question was- these costs are not inclusive, they don't include administrative costs for programs that are already contracted out for the herring industry. But you said that was NMFS responsibility, it didn't really fall on industry, correct?

**Carrie**:

I guess it depends on what you are talking about when you refer to administrative costs. I can go back to what are industry responsibilities, and what are NMFS responsibilities, we talked about that earlier in the omnibus.

**A25**:

Well you mentioned that administrative costs were not included in this, that's what piqued my interest. So I'm asking is it something that is going to be transferred over to the industry? Because everything else is being pushed off on us, so again, maybe it's a stupid question, but…

**Carrie**:

No, those are generally NMFS costs.

**A25**:

Generally, but is it going to NMFS responsibility or is it going to be ours?

**Carrie**:

Again, depending on what particulars you are talking about, it goes back to the slide on what was in the industry column and what was in the NMFS column. As far as the 25% that I am talking about here with the cost estimates, those are NMFS costs. We included them in the $5.12 because we couldn't strip those out for privacy and confidentiality arrangements, but what is a better cost estimate for PS, if you look at the $3.84…

_0000013522

**A25**:

Why is it private? Those contracts should be public knowledge, that is taxpayer dollars, there shouldn't be any privacy issues regarding taxpayer dollars being spent regardless. That information should be full available, whatever administrative costs are. Whether it is the president of the company getting a salary, whether it is the person under him- his secretary- is getting paid. All of that should be public knowledge, that's tax dollars.

**Carrie**:

Well there are requirements for what is private under Magnuson, so we were just trying to be consistent with what is required under the act. But for a better cost estimate, as we were revamping this, the $3.84 per mt do not have the administration, and that would apply to if the Council selected 25%, 50%, or 75% coverage.

**Audience 26**:

Are those observer rates carved in stone, or is that just a…

**Carrie**:

These- good question- these are just estimates that we did, there is variability from year to year- what is paid for observer coverage, what is paid for ASMs, for this program under the standardized service providers, we would put out the contract requirements if you wanted to be a service provider for any of these fisheries. Any company that applied and met those reqs could be a provider and the industry could select from approved providers. So I think what happened with groundfish- you can correct me- is that some groups were able to negotiate better rates by working together, so the idea was to allow the industry to do the same thing, to negotiate with the companies themselves. For rate.

**Audience 27**:

And we did in the groundfish fishery, in our sector.

**A25**:

So since your sector negotiated with a provider, and another sector didn't, how this is being thrown at us now, we may be out of luck?

**Audience 28**:

Every sector has negotiated.

**A25**:

Okay.

**Audience 29**:

_0000013523

So how would it work in this industry? Who would negotiate that price?

**Carrie**:

So again, if you were a vessel, you would have a list of service providers that were approved, you could contact them. There aren't really sectors or anything equivalent in the herring fishery, but there are groups that work together, so it may be an advantage to work as a group to negotiate a price.

**A29**:

That would all be on us though? NMFS isn't going to negotiate?

**Carrie**:

Correct, the idea was to allow the vessels as much flexibility as possible to select companies and the rates.

**Audience 30**:

There's only 13 boat, MWT, right?

**Audience**:

Correct

**Audience 31**:

I have a question on the EM.  Why so much cheaper as compared to the EM on groundfish?

**Carrie**:

I think that EM in the herring fishery is being used for a different purpose. We are using it in herring to verify catch. I believe in groundfish it is being used as an audit model, I think it is being used to identify fish, so it is a very different model. EM here is really just being used to verify catch retention, the catch is brought back and sampled portside, those 2 are paired together. A bulk of what drives EM costs is how you use it, and also the video review you have- those are the two…

**A31**:

Well, you were just saying it could be 100% video review. If we went to 100%, it could be- I don't have the figures with me- but it could be well over $100k for a groundfish boat with EM in the groundfish fleet for 1 year. If you base it on 200 days per year, it's astronomical how much EM will cost us, it's not even feasible.

**Carrie**:

Well, we had started out looking at 50% and 100% coverage options, in an effort to make it more affordable, the Council had asked us to look at that again. Which is why we have 25,50, 75, and 100%.

_0000013524

**Mark S Phillips**:

I understand that, but what I'm looking at, just the $15k startup costs for year 1 for the groundfish fleet, I might be wrong, but I think we were looking at $40-50k just for startup costs, and then I think it was another $30-40-50k for training captains on how to use it in the first year.

**Audience 32**:

So I put one on my boat Mark, and the initial cost was less than $5k, that's a gillnet boat though, one of my boats.

**A31**:

Well I think it works best actually on the gillnet boats. Hopefully it works terrible…

**A32**:

They've been trying to get me to put one of them on my trawler, but how they going to do it? What are they going to tell the guys they got to shoot everything…

**A31**:

Like a what's his name… a… (Bryant?) said, well you just hold every fish up to the camera. I'm getting 20 thousand pound tows of skates every 45 mins and picking 1000 lb of flounder out of it, I'm going to hold up every single skate? I'd have to put 10 more men on the boat.

**Carrie**:

We are not proposing that you hold every herring up to the camera. Again, how EM is being used is just to verify retention. It is to identify discard events. And I think your points are good ones. The first year of an EM project there is a big learning curve with EM, so NMFS is actually testing EM on the MWT fleet this year. I think there are 12 vessels involved, I think most of the vessels have EM equipment installed on them and we're just starting to get data. So for this year, until this time next year, NMFS will be testing- again it will be paid for by NMFS- to get the testing, get the learning curve, get everyone familiar with it, get a better idea of what things cost. And hopefully- NMFS is leasing all of the equipment- at the end of this year- the idea is the vessels could resume those lease relationships with the providers if they so chose. So there has been some effort to try to get some of the learning done that the groundfish industry has with EM, and have NMFS pay for it.

**Audience 33**:

I would like to say that sector 13 and sector 10 are against EM monitoring. Once again, we're having a 3rd party view the data, view the catch, and once again we can't dispute that, we have no process for an appeal. And going forward with EM, there is no program set up for an appeal. We have to go back to the same program that reviewed the tape the first time. Again, it is not workable for us. And also, the cost for the appeal, who pays for that, it will be very expensive.

_0000013525

**Audience 34**:

I agree, I agree with that.

**Audience 35**:

Well they already said that any extra monitoring, any extra review if you question the data, fishermen pay for it. And so I assume that is going to happen in every other fishery.

**Audience 36**:

Also, portside sampling doesn't work. We experienced that in the groundfish fishery, It was a waste of taxpayer dollars.

**Audience 37**:

Lawyers don't even want to get involved with this, it is such a nightmare. The number of fishermen appealing different cases in the state of RI, and they can't even get a lawyer. They say I don't want nothing to do with this. DEM, this problem, this is the same thing. They'll have a hard time getting a lawyer to represent them.

**Terry**:

With this, all this is going to be looking at is the amount of river herring in the catch, and the amount of bycatch in the catch- the portside part of it. It's not like our groundfish catch.

**Audience 38**:

But it's not just one boat, there is a trickle down effect, and we have to stop it.

**Terry**:

But this particular program is set up just to look at river herring and shad bycatch, and for haddock bycatch, am I right Carrie?

**Carrie**:

Primarily. I mean because herring and mackerel is high volume, basket sampling at sea for those species is not always the best platform, and that's why there has been support, and I think industry support too for portside sampling. And those are the data that are used to track haddock against the catch cap, as well as river herring and shad, because you have the opportunity for a larger sample rather than basket sampling.

**Audience 39**:

At the meeting, Jeff (Kaelin) asked the Council to please slow down, do not go forward with this, slow down. I think you should listen to what he said.

54

_0000013526

**Audience 40**:

Ok, quick question, so how would the portside sampling work, so you are taking out your- so you got 100k lb of herring, you're taking out 1000 lb here or there?

**Carrie**:

Yes, so currently ME and MA do sample these fisheries. And so when the vessels come into port, the catch is pumped out through a dewatering box, samples are taken at the dewatering box, usually basket samples.

**A40**:

That's the same as dockside monitoring that we have had.

**Audience 41**:

We have it in RI too. You can't participate in the herring unless you participate in the dockside monitoring, is that right?

**Audience 42**:

No, you can.

**A40**:

But the problem is if that is what you are looking for is RH/S, these prices seem ridiculous. Way to high.

**Terry**:

So the initial electronic monitoring is looking for slippage events, these guys dumping big bags of haddock or whatever, so that is the initial thought about it, looking for slippage events in the MWT fishery.

**Carrie**:

Then similar to NEFOP sampling there would be some looking at, whether it be mackerel or herring, but it is right now largely because NEFOP data is used to track the catch against the catch caps, and it would be portside data used for that.

**A41**:

I, I am just totally… There is a name for this, for all of this. It is called tyranny. This is what this is, this is tyranny. What's next? Putting policemen in our vehicles to make sure we don't speed? This is government tyranny at its finest. It is out of control. I think this is something that ought to be brought up to the ACLU, let them play with it. This is insanity! Where does it end? Where does it end? Where does the nanny state stop getting into our lives? This isn't what I signed up for.

_0000013527

**Audience 42**:

Next Tuesday (Laughter)

**Carrie**: (*Resumes Presentation of Herring Alts*)

**Glenn Goodwin**:

I'm Glenn Goodwin, I represent about 30 guys on the water, 30 in a freezer storage building, 30 more in a wet operation we have in Point Judith, and I can just say that we don't want any part of (IFM?) observers. We're not in the business of padding some college kid's resume. We don't need anyone standing around and watching us work we got plenty of that going on already. This is all about the erosion of profitability, we've got closed areas coming at us, we've got new marine monuments, we've got people on Nantucket screaming at us because they can see boats on the horizon, we've got aquariums and universities picking off new places to close next, already, after we just closed down 34,000 square miles of ocean to deepwater corals in the Mid-Atlantic. This is just more of the same coming at us, we've got 92% imports right now, in an industry, sitting in this room, that it looks like the agency is steamrolling and hoping to make it 100% as fast as possible. And you don't have too far to go before you won't have an industry to monitor, like you said, how many pair trawlers are working now? And there is probably 10 boats in Point Judith or on this side of the Cape that actually go do that. We have Tier 1 permits in mackerel and herring. I'm not interested in paying an observer for the 12 days I'm going to spend out squid fishing because I stopped right outside this window and caught 50 or 80k lb of herring on the way out so the boat could be a little more stable while we bounced around 100 miles offshore for the next two weeks. We're just not interested in paying that fee. I can sit in this room and see 2 NOAA buildings, and plus there's another one that just got rolling on the other side of the bay, that just got rolling with dozens of people. We have one, a facility, in North Kingston, and I can't figure out what they are doing in there. The parking lot is full of cars, I never see anyone, all we get now is complaints because we have trucks now that are loading product coming and going from all over the place, complaining about noise and exhaust fumes that they might be exposed to, so I just wanted to get that out there and get my comment in.

**Audience 43**:

That's their job is to put you out of business, that is what they do. And they are good at it.

**Donald Fox**:

Donald Fox from the Town Dock. I have one boat that does this, and he is just getting into it, he's not great at it yet. I support everything that Glen said, the most important thing to realize is that they can't afford any of this. We punched all the numbers from his trip, he basically did it for about 4 or 5 weeks last year. That's all it is for most of the guys at Point Judith, some of the guys go out at the most for 2 months, most of them are 4-6 weeks. In that 4 weeks that he did it, he got into it a little late, it was 1200 dollars per man less, they were made to pay for that at $700, if it's $800, do the math. We don't need any more observer, we can't afford it, we just can't afford it.

56

_0000013528

**Meghan Lapp:**

One thing I would like to point out is this amendment, like I said prior, was designed to address a public perception problem in the MWT fishery. This was never addressed at the SMBT fishery. The boats that fish out of RI, the SMBT boats, including our boats, we have the daily capacity that is like 1/10th of a MWTer. Pair trawler, or even a purse seiner. Our daily capacity is a lot less, which means we get a lot less profit per day. Which means that the impact to us is a lot greater, and I have asked for this amendment to look at daily capacity- it has not. One thing that I will say is that in a PDT memo, a herring PDT memo from January 2016, said that SMBT boats on herring catch cap trips for river herring had 26% observer coverage, and for 2015 preliminary estimates between January and June showed 31% coverage. We have very high coverage. That is a higher coverage rate than is in the groundfish fishery, which is monitoring 19 species at one time. And the RH catch cap CVs in the SMBT fishery is above 30%- we don't need increased coverage on the SMBT fishery, and the SMBT fishery cannot afford it. As you have heard. Another thing that I hear quite frequently at Council meetings is the idea that for small mesh bottom trawl fisheries, we should put ASMs on them, and that seems to be the prevailing talk at the table, and when I look at the costs of the ASMs, they are extremely high. And at the same Council meeting where the Council voted to discontinue the ASM program, they also voted to conduct a cost/benefit analysis of the ASM program because the costs were so high for the information they were getting out of it. Which doesn't seem right, we'd like to investigate this further, I haven't seen this cost/benefit analysis, and I'm uncomfortable moving forward with any amendment that talks about ASM in other fisheries, when that analysis has not been conducted. Um, another thing that was put up on the slide about the RTO estimates- the RTO estimates done for this amendment were only for trips landing herring. And I have also raised it for SeaFreeze vessels, for our two freezer vessels, our concerns have not been addressed. We fish for multiple species at one time, so some species- sometimes we declare into herring because we want the option to retain it, and we don't catch it, so all of those trips went unanalyzed in the economic analysis. The economic impact to our vessels are extremely high. Because we declare into herring and mackerel fisheries all winter long, November through April, we're declared in, because we might see some, and we might need to catch it, because we are steaming around and we are doing a different type of fishery that is typical in the herring fishery.

**Carrie**:

So we did add a table in the EA that looked at the economic impacts of trips that did not land herring, so in that table- you're saying that table does not assess economic impacts?

**Meghan**:

Did it look at the VMS declarations?

**Carrie**:

I'm not sure what it used to assess trips, but it used trips that did not land herring. It might have been vms, I'm not sure what else they would have used. But there is economic analysis in there.

_0000013529

**Meghan**:

I was told that they couldn't look at it, that they wouldn't look at it.

**Carrie**:

Well we do have, we did recently add information in there on trips that didn't land any herring, I can check with the PDT about what was used, whether it was the VMS declarations but there is an economic analysis of trips that didn't land herring.

**Audience 44**:

I think I read somewhere that more river herring were just killed in the shallow rivers than the whole trawl fleet catches? And I think that the cranberry bogs have a small problem with river herring compared to… yet, the only ones being targeted, are the fishermen. Because technically, it could become an overfishing problem. We've gone down this road before on other species, where multiple other industries, but because they're not towing a net, don't technically meet the definition of overfishing, or causing overfishing, they're not addressed, because they don't use the net.

**Phil Ruhle:**

I own the Sea Breeze out of Newport. And I operate a 90 foot vessel, the *Prevail*, not 90- 105- out of… The Sea Breeze is 55 ft, we have a Cat. A (herring) permit. I mean, obviously I don't support this. The difference between a Cat. A permit, that's the Western Venture, which is no longer here, but the challenge for any of those type of boat and what we have, for earning in a day, is completely two total ends of the spectrum, we do not catch enough fish in a day. Just because we have a permit that I paid a lot of money for- I can't catch what they catch, I can't warrant paying for that. And even on the 90 ft boat, we have an A permit on that, it's not even close, not even close to being able to do that. And I've been herring fishing down in SNE for about 12 years. Last year I did the numbers it was about 1.34% river herring. What's the problem? There is no problem. The problem is the environmentalists and I know the MW boats want more coverage so that when they have an event that is massive, it doesn't look so massive if it was observed. Let them pay for it, you know, there is just no way.

**Audience 45**:

Can I ask you a question Phil, do you have a midwater trawl?

**Phil**:

 Yes. That's why a pair trawl- don't lump me in with them. Don't lump me in with them. I've been saying that for 10 years.

**Carrie**:

Do you normally run a single MWTer? Or is it…

_0000013530

**Phil**:

Yeah always single. For the most part.

**Audience 46**:

The biggest problem is- I fish Georges a lot, I fish haddock a lot- two of the worst actors are out of business right now, and that was the lobster guy –shaftmaster- and Peter Mullin. But that is an issue, they make 4-5-6 hour tows, and none of the boats around here make… if they tow an hour, that's a long time, most of them are making 25 min tows.

**Audience 47**:

You know you just can't make these laws with a roller, or with a straight (?), I'm not them. We work hard not to be them and it's not easy. But we are very, very proud of that. Now you get penalized for that? Steamed away from fish I don't know how many times and came home with nothing, just because I can't fish here. Everybody else is but I can't do it. We can't do it, not going to. And we get penalized. Again, we just can't do it, it's absurd.

**Tina Jackson-**

Commercial fishing: I think one of the things that the Council needs to be aware of is the safety issue that will be (encountered) when forcing smaller boats with $1400 a day (income), just making that small, minimal amount of money, you're going to force everybody to forego maintenance, to forego safety issues. That's a really big problem, you need to be aware of that, and that needs to be an issue that maybe we can use to stop all of this. It is something for them to seriously think about. You know, it's already happened in a lot of the other fisheries that were forced to pay for observer coverage, and I think our lives are far more valuable at any point and time, then the federal govt. or some environmentalist telling us that we need to have increased observer coverage in any of the fisheries. And their dollar bill, why don't they pay for it? Pew is worth billions of dollars. EDF is worth billions of dollars. They want it so bad, let them do it. You know it just becomes very frustrating after a while, especially when you attend meeting after meeting…… and everything everyone says in here may be on a piece of paper, and it may be recorded, but it goes unheard. Because it's not cared about. And I think that is a real, a valid point. You know, you force the hand. When catch shares were put into place in 2010, all these boats- the Northeast lost in one fell swoop. The costs that were incurred upon small guys, and the fact that you have to go through daily limits and more stricter limits- they cut back on this, they don't do the science for that- it would be different if all of this observer coverage and all of this information was utilized in some way, shape, or form. But I'm going to repeat myself from before, it never is. So what is the point? You know if they can, and another point you brought up, if everybody is fishing in the same area, and they are going back day after day after…… doing the same thing over and over again, what is the point of increasing observer coverage if you are coming back with the same information? At least utilize it, you know? And again safety, I think it is one of the biggest points and maybe somebody has said it before but I know it was always an issue with me. You know when you consolidate, and you have corporate people overseeing a portion of any fishery, and it becomes a

59

_0000013531

monopoly, and say three people own a particular resource, the loss of life triples. And it's already been proven in the surfclam industry, you know you're forcing guys to go out and fish, and they don't want to go out and fish, and what ends up happening? You know, is it going to force everybody's hand, ask these guys to put out $15k right off of the top of the bat for a portside system, that first of all is not going to show how many pounds of fish they had in their net. You're going to guess- you're going to assume, and then, you're not even going to be able to look at bycatch because it is not even going to be accounted for. So what is the sense of even asking these guys to incur $15k for portside and EM monitoring, when you're not even going to get a valid picture of what you are looking to get. You know, that's another issue as far as I am concerned. I think all of it stinks, I think everyone in this room is going to agree with me, maybe I haven't been around for a while but I got to tell you, this is sad.

**Meghan**:

I can just make one more comment, I know that as far as the SMBT fleet is concerned, there has been a lot of discussion about the 25% coverage level because coverage rates are already very high, but they thought that might not impact the fishery. It might not impact the fishery this year, it may not next year, but if for some reason SBRM coverage gets cut and we are still held to that, it would impact the fishery. It would be very devastating, and we may end up in the situation that groundfish was in, where "oh, it's already in, and even though you can't afford to pay, it's legal now, and you will pay." The only thing that we can afford is SBRM. For this, that is the only thing that we can support.

**Carrie** (*Mackerel Alt. Presentation*):

**Meghan**:

Again, similar to for herring, the only thing that we can support for the SMBT fleet is SBRM. One thing that I would like to make is a comment specific to mackerel. Right now, there is very little directed mackerel fishing that is occurring. It is not a very big fishery at this point and time, and forcing the vessels to pay for monitoring for that fishery, will just shut it down completely. Nobody is going to look at it. You will shut down the directed mackerel fishery, and it will become a bycatch fishery only, and that is not going to (inaudible). So in this fishery, this should definitely be left at SBRM. And I would like to address a statement that is made in the document. And it's actually, it's in the herring section as well, it says "a positive impact is associated with sub-option 1, a waiver allowed for IFM requirements not being selected, if fishing effort is limited either due to funding or logistics, and the reproductive potential of mackerel, non-target species, and protected species is (inaudible)." I find that very offensive. Because this document is saying if the fishing industry can't go because NMFS can't fund It's side of this and fishing doesn't happen, that is a positive impact. And that is not correct, and if that is the theory underpinning some of this, that needs to be (removed?), because it is not a positive impact  not having a fishery. And not having people be able to go, because they can't afford to pay for it, or because NMFS doesn't have their side of the cost responsibilities. We're supposed to be achieving optimum yield in these fisheries, and to say that "Well, they can't go, because we can't afford it" is not a positive impact, that is a very negative impact.

_0000013532

**Phil Ruhle:**

What she said is correct, with the mackerel fishery you won't go. Basically the same as with the groundfish fishery, both the boats that I am on, have I been? Nope. I'm not paying for an observer. The other boat, not paying for an observer, it's not happening. Obviously we're going to run out of things to catch but the flexibility of the fleet- we all leave from down here in the winter, and we go, you know, now that you have to clock in for stuff, which is absurd- I'll clock in for everything, I'm going fishing! Whatever gets in the way I'm getting it, then coming home. As fast as I can do it. You know, I'll never clock in for mackerel, you can forget it. Never going to clock in for squid with the option to catch herring, because now I got to carry an observer for that. But you know, we got to pay for it, forget it. Before if you wanted to put an observer on me, that's fine, go ahead. But not if I'm going to have to pay for it, so now we're all going to go catch squid and then once it goes to squid, then forget it, right? But I mean all of this stuff takes all of the flexibility out of the fleet, where it forces people to do the same thing at the same time. Reap little rewards, so. I don't support any of it, it's stupid.

**Audience 48:**

I have a question about the process here, this is a public hearing? Is this being monitored, do you have a recording going on?

**Carrie &Terry**:

Yes

**A48**:

So all of this testimony will be reviewed?

**Carrie**:

We do compile comments from the public hearing.

**A48**:

So someone reviews it and compiles comments? A third party?

**Carrie**:

Probably me and other staff…

**A48**:

Do you like us? It's going to have an effect on which comments you take.

**Carrie**:

_0000013533

I think you are all making very good comments, I think all of these comments need to be in front of the Council when they make their decision, so I appreciate you coming here tonight, taking your valuable time, and making a comment. And I will do my best to accurately reflect what you have said tonight.

**A48**:

Well this process is a little bit different than the administrative process that we use in RI, at least for a public hearing. This more resembles a work session. But I'm on a RI level, I suppose this is your federal level public hearing process.

**Carrie**:

So the Councils do the public hearing process, we're trying to closely follow what the Councils use for their public hearing process. I think this is maybe a little different than the usual public hearings, I think there is a little bit more discussion at these public hearings than in the past, and I think that's good, it's public comment.

**A48**:

Well it allows for flexibility, if you like us you're going to record the comments that really express the views of the group here. But I've seen this type of… where, a summary was given where it didn't naturally reflect the sentiments of the public that attended. Hopefully, you…

**Carrie**:

Well I will do my best, Fiona is here, we'll work together, and Terry has been here, he has heard everything, he will look at it. We will try to accurately reflect the comments.

**Terry**:

I will be at the Council meeting

**Audience 49**:

One of the things that would be nice, if you know, Terry you mentioned it, you know we need to go to more Council meetings. A bunch of us in this room have to go to Council meetings, so have gone to Council meetings. But one of the big complaints, and you're a fisherman so you fully know it- is the one you are going to hold in Newport- if I'm not in Point Judith or New Bedford- and I got to travel there, that motel is $350 a night, where you guys are going to hold that meeting. If you gotta fly there, you are looking at close to $3000 for an industry member to go to one of these meetings. When I went to a lot of these meetings, it was $1500 to $2000 per trip, for every single meeting. When you are from NY or RI, you're dealing with 2 Councils. You look at what Meghan does, or Town Dock's Katie. They are on the road 50% of the month going to meetings, and no fishermen can afford that, and that's why you don't see the fishermen at the meetings. You know it's pure economics, I can't afford $3000 a month to go to basically 12 meetings a year. That's without going to any committee meetings or anything. And also, for

_0000013534

the owner/operators, you are losing that trip too. You're losing, if you go to just the Council meetings, you are losing 12 trips a year roughly.

**Audience 50**:

I told you before, it cost me $15,000 to go to 2 meetings, and lost stock, as an owner operator. I mean, you can only do that for so long, and eventually, your good-heartedness gets dried up.

**Terry**:

 Before I was on the Council, I used to struggle with that, so I know exactly where you are coming from. I was just, I knew it affected a lot of guys in this area, and we're in Newport- it's the closest shot that you're going to have to get there. If you're in, please come and show up. I understand, trust me. Out of my own back pocket, I wasn't being paid by anyone. I would go, and I always was there.

**Audience 51**:

Terry, I used to participate in a lot of NEFMC meetings, and I haven't been gone, well one, because I sold my boat- the bigger one, have a small boat now- but the reason I stopped going was that I felt that it was a foregone conclusion and that it was an exercise in futility for myself and for other fishermen. And the decisions had already come down. My question was, and I'm not even sure who was on the Council anymore- what is the makeup of the Council today? Fishermen versus NGOs?

**Terry**:

There's some fishing boats, real fishing boats, there's me, (Vincent Malzano?), Peter Kendall, Eric Reed. Then we have two recreational boats (inaudible) out of RI, (Mark Godfrey?) out of New Hampshire. Then we have five state directors. Then we have Matt McKenzie from CT. I mean, the fishing folks are there, and nothings dead until we- nothing is cast in stone. This Council can make the decision not to go ahead with this.

**Audience 52**:

Well if the Council came up with this…

**Audience 53**:

NMFS came up with it, according to the document that they have on the Mid-Atlantic site…

**Terry**:

No, it was a Council decision to explore additional monitoring to take away some of the uncertainty surrounding some fisheries, and catch efforts. It was a Council decision.

_0000013535

**Audience 54**:

Right, but it says this amendment is being done jointly to insure consistency for IFM across NE and Mid-Atlantic FMPs. NMFS has taken the lead in developing this action, so we know who is driving the bus, and everyone is coming along for the ride. I have a question though. 4 meetings, one webinar, 3 meetings, and 6 days later, boom, it's over? I mean, as far as the comment period. It started October 4th with the meeting in Gloucester, there's a webinar, there's a meeting in Cape May, there is a meeting here, and then boom, 6 days from now it is over and comments are done. That is really not effective, especially when there is an omnibus. Let's face it, there are a lot of people out there that don't know what omnibus means, and that's the reality. And this is kind of hurry up and let's get it done, and since it is going to be industry wide there should really be a response from NMFS to make sure, you know, I'm looking at documents from 2014 from the PDT where, if we go with 2.1 vs. 2.5, well the ability to NEPA it out might work better so then we don't have to look at this and we don't have to look at that. It's fast tracked, and it shouldn't be. There should be a more open process, even if you guys have to drag this show along down to Montauk, and…

**Terry**:

So what, on the fast track, is the herring and mackerel alternatives…

**A54**:

Right

**Terry**:

Nothing else, so each FMP will do its own IFM under the omnibus. So that's…

**A54**:

Right but the bottom line is it's still an omnibus, here is our template but we're going to let it go to all of the other fisheries with the concept "you buy, you pay, you go". That's not really acceptable.

**Terry**:

Each one of these FMPs are going to come up with a different…

**Audience 55**:

We all know where this leads, I was told 3-4 months ago, I was talking to Meghan, about the Monuments, said "Aww that's not going to happen, it can't happen, it's not going to happen." It's going to happen because they want it to happen, and right and wrong doesn't mean anything anymore. They wanted it to happen, it'll happen, and it happened. Well we can sit here and say we're going to fast track the herring and the mackerel but the other stuff isn't on… it's gonna happen.

64

**Terry**:

I didn't say it wasn't, I said we are going to go through another process for each individual FMP.

**A54**:

But why go to the meeting and say something when you are already telling us that it is going to happen? It's basically why vote? It's like the whole thing, why vote? She's ahead by 15 points, so why go out and vote because the other guy ain't going to win. This is almost an oppression issue, do you know what I mean? But that is so disheartening. That's not what you are meant to do. Not you personally but the council as a whole. It's tyranny.

**Audience 56**:

What are the chances that the Council says no? They have to do herring and mackerel, why? I mean, what would happen if the Council said "no, no, no. We're not going to go any further. We are done"?

**Terry**:

They could say that.

**A56**:

And then what would happen?

**Terry**:

It would go away.

**A56**:

So completely over and done, like community based… size of the fleet one?

**Terry**:

Right.

**Audience 57**:

Is this it?

**Carrie**:

So typically when the council goes out for public comment, they have already selected a preferred alternative. You saw they did for the omnibus, there is nothing selected for either herring or mackerel. I think that is because the difficulty of the decision, the committee members and the council weighing the value of the information collected vs. the cost. I think that decision is weighing heavily on everyone that is involved, for all of the reasons that you have raised. So they haven't selected a preferred alternative.

65

_0000013537

**A54**:

Will the secretary through an action if the Council doesn't choose to do this, who is looming, who is the lawsuit chute? There's got to be somebody, who Oceana? What has been… those on high, is this going to come through secretarial action if it's not done through the council process, or is it just going to go off and away until the next round. Do we know?

**Carrie**:

So there is no NMFS req, I know you were saying that NMFS is driving the bus on this. NMFS is taking the technical lead because a lot of the issues have to do with the legality of cost sharing. That is really why NMFS agreed to do the technical piece of this amendment. Also, there has been a series of disapprovals related to industry funded, so nmfs was trying to help – number one, legality on how to sort out sharing costs with the industry, and also to help the workload. But again, this really is the Council's amendment. It is the Council's choice, it's the council's desire to have more monitoring. So there is no nmfs requirement. If the councils decide not to do it, there likely would be litigation, and maybe a court would decide.

**A54**:

Is that going to be discussed in Baltimore in December by the Mid-Atlantic council? Is that when this is coming up?

**Carrie**:

Yes, final action by Mid in December.

**A54**:

That is December 4-7 in Baltimore. I got the mini-van Mark, you don't have to spend 3 grand!

**Audience 58**:

The other thing that boggles my mind is why didn't the council consider more observership when they were paying for it. When it was coming out of the government's pocket, you know what I mean? Why now? And again, they never used it. So this is just a fight to the death anyway, I am probably just sitting here talking until I am blue in the face so it doesn't matter, but it's a point.

**Terry**:

The Council has (inaudible).

**A58**:

Yeah but then they ran out of money, and then they stopped it, but they stopped it because you ran out of money, not because I ran out of money.

_0000013538

**Terry**:

I don't have any of that money.

**A58**:

Well how are you going to vote when the time comes, are you going to vote for…

**Terry**:

I'm a very big advocate for the fishery…

**A58**:

No Action…?

**Terry**:

I'm a very big advocate for the fishery, and I try to make things as best I can. As bad as some of our stuff sucks for fisheries- excuse my French if you are offended-

**A58**:

Well if you are really for the fishery right now, you're not going to care what anyone else in that room is voting, you are going to vote "No Action", and you're going to talk to…

**Terry**:

You want me to (inaudible), you think I'm stupid? (laughter) I didn't get to where I am being stupid, they're not going to nail me for that. Absolutely not, I will do the best I can for the fishing industry, because you read the votes around the table, and see where votes are going. Your strategy is to read the people around the table and see what is going to happen, but you try to make it the best that you can make it for the fishing industry. I mean, that's what I think I do, I think that is what a lot of people do.

**A58**:

I don't know where you were back in 2010, but that wasn't happening when we were sitting at the table.

**Audience 59**:

If this is a joint effort, then what if one Council approves and the other does not? What happens then, just it becomes moot, or what? What happens, like when the ASMFC approves something and the Council doesn't, what's the conciliatory process?

67

**Carrie**:

I guess it depends on what is approved, if there are no omnibus alternatives, if there is no agreement-there could be a disagreement on herring and mackerel, they are different fisheries.

**A59**:

So they could disapprove all parts of the omnibus amendment, they could just approve whatever components of the mackerel and herring fishery.

**Carrie**:

I think we would have to talk about what that would look like…

**A59**:

Could you split it, in other words?

**Carrie**:

Yeah, possibly. Yes. We haven't played out all of the scenarios for how it would go, but we do need to do that before the Mid meeting, because there is likely going to be many questions like that.

**Terry**:

Well like monkfish, if we don't both approve it, then it dies, right?

**Audience 60**:

But that's in the regs, because we have to agree between the two, but we don't necessarily have the same requirement here in this case.

**Carrie**:

In herring and mackerel, the FMPs are made individually, nothing is joined about those, even though a lot of people have said that they think they should be.

**Eric Lundvall**:

I have a question, it's jointly managed- this list of public hearings here, is there public hearings that the mid-Atlantic is going to do in front of the Council, or is this for both the Mid-Atlantic and New England Council?

**Carrie**:

So there was a Mid-Atlantic meeting last week in Cape May, NJ…

68

**Eric**:

I see that, but that is the furthest port south that there was any type of public hearing?

**Carrie**:

Yes.

**Eric Lundvall**:

What about NC, VA? Delaware? MD?

**Carrie**:

No.

**Eric**:

Ok, that was my question. Eric Lundvall by the way.

**Audience 62**:

I just have a comment for people in the room. A lawyer, for cause of action, he said we made a mistake over the years by not writing in our comments, and he begged us to please write in any comment that we can, it would help in any case going forward. He said we were at a loss because we didn't have as many comments as we should have in the public record, so please, put a comment in.

**Audience 63**:

What are you talking about, all that should have been…

**A62**:

No, no, no, we don't put enough in. He wants more.

**Audience 64**:

That applies if it's a legal challenge, you want the data backing you. The problem is, most of us don't have the money- the combined resources- to come up with legal challenges.

**Terry**:

I'll give it to you that we are going to get 10k letters on this. I'll guarantee it.

**Audience 65**:

Terry, can I ask one groundfish question? We've taken basically an 80-85% cut on GB cod. Given rec cod boats, they can do whatever they want, they haven't taken a single cut since sectors went into effect.

69

_0000013541

**Terry**:

Where, on Georges?

**A65**:

For GB cod, GB cod basically goes all the way to NC. Which about is- it's stupid. But leaving that alone, (Penobsca?) probably has the largest amount of GB cod of any boat. It might not be exactly the highest, but he's one of the top boats, he's got 20k for the year. One of these head boats does that in 2 days. Yet there has been zero cuts, right in the regulations it says "10 fish, per person, for recreational, no limit on the charter boat/headboats." Right in the regulations, I brought this up to John a few times, and I get zero answer. So is anything being done to address- we get an 80% cut, or an 85% cut, I think he actually said we got a 90-some% cut in one of his things that he wrote. But why is one group get all the cuts, and another group gets zero cuts, and to me it appears that it's reallocation, that they're going to take what they caught in the last 10 years, and say "Oh they've been taking so much more than you guys, so we have to reallocate so the recreational charter/party industry gets a much larger share."

**Audience 66**:

They just discussed that today Mark, the AP discussed it today to bring it up tomorrow.

**Terry**:

So we talked a little bit about this at the council, but we took it off of our priority for groundfish this year…

**A65**:

It's not important?

**Terry**:

It is important for most of us groundfish- we all fish Georges. It's an important issue, but, with our ASM problems, with our halibut problem, trying to move the AM area, which by the way is going to screw up on Georges too, it's all (inaudible) in closed area 1, you're going to be required to (inaudible) that. When we use that area to fish for monkfish, or hake, or cod, or haddock, or anything- it's not like eastern Georges where you can, kind of, work on a trip of haddock. So it is important, and I'll be interested to see what happens tomorrow, in the groundfish.

**Audience 67**:

Yes, they brought up today in the AP, Peter, "the Hooker guy", not Baker, the other guy, whose the guy who used to work for the Hookers?

**A65**: Paul Parker?

70

_0000013542

**A67**:

Yes, Paul Parker brought it up at the meeting as a recommendation to address and put a sub-ACL on the GB recreational sector 2 match regarding overages of their fishery, and…

**Audience 68**:

Well they would have to go to a 2 fish limit to get the same percentage cuts that we've taken.

**Terry**:

Right, so we actually don't know how many fish they catch, absolutely don't because there is no record of it anywhere, there's no…

**A67**:

105 mt according to records of today.

**Terry**:

Okay, when we were talking about priorities, we didn't have any idea what they thought, I hadn't seen that number yet, so… We'll be talking about it tomorrow, and then it will be in priorities discussion I'm assuming if it got through to the AP…

**A67**:

Groundfish Committee is tomorrow and I think Wednesday, right behind the southern windowpane.

**Audience 69**:

You know it's funny, I said something in Providence a few months ago about this, and my son has a facebook page, and he got attacked on facebook for what I said about the recreational charter/party boat, and one of the guys put his name- he put enough information so I went online, and I found who he was, and I called him up.

**A67**:

You are being taped here Mark, just remember that.

**A69**:

It's okay. So I called him up and I asked him, he says "Why are you attacking us?" I says "I'm not, I'm just putting out the facts, I read right from NOAA's document what the regulations were." I says "I'm not allowed to do that? I put the facts out. The facts are that I've taken an 80% cut. One headboat goes out and catches more than all of sector 13 has in 1 or 2 days. So I don't consider that equitable." It's, I don't know, maybe there is something wrong with me.

_0000013543

**Terry**:

Alright so we're in a… one more? Okay, last one.

**Donald Fox:**

One the Mackerel- Donald Fox from the Town Dock- I also would like to support "No Action" on this. We just can't afford it, we can't afford it, and again what Phil said, it's like taking one more option away from us, and putting us into a smaller and smaller and smaller little box. RI has lost groundfish, there is nobody, I have 7 boats that I manage, there enough if I add up all of the fish from the 7 boats, there is enough for maybe one boat to make two trips. We can't afford for the same thing to happen in herring or mackerel.

**Terry**:

We've got time for one more, if it hasn't been said. No… Ok, thank you guys for coming.

**Carrie**:

Thank you very much.

_0000013544

15. Observer Policy (January 24-26, 2017) M #4d

| | General Comments on the IFM Amendment | Against the Amendment | Omnibus Comments | Support Alt. 1 (No Action) | Support Alt. 2 (Standardized Structure) | Against Alt. 2 | Against Alt. 2 | For Alt. 2.1 (NMFS led) | For Alt. 2.2 (Council led) | For Alt 2.3 (Proportional) | For Alt 2.4 (Lowest Coverage Ratio) | For Alt 2.5 (Highest Coverage Ratio) | For Alt 2.6 (Monitoring Set-Aside) | Against Alt 2.1 | Against Alt 2.2 | Against Alt 2.3 | Against Alt 2.4 | Against Alt 2.5 | Against Alt 2.6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Submitted Comments | | 63 | | 63 | 3 | | | | | 4 | | | 3 | | | 1 | 1 | | |
| Public Hearings Comments | | | | 7 | | | | | | 2 | | | | 1 | 1 | | | | |
| Total | | 63 | | 70 | 3 | 0 | 0 | 0 | 6 | 0 | 0 | 5 | 1 | 2 | 0 | 0 | 0 | | |

| | Mackerel Comments | Support Alt. 1 (No Action) | Support Alt. 2 (IFM Coverage Targets) | Against Alt. 1 | Against Alt. | For Alt. 2.1 (100% NEFOP) | For Alt. 2.2 (ASM) | For Alt 2.3 (Combined Coverage) | For Alt 2.4 (ASM or EM/PS) | For Alt 2.5 (EM/PS) | Against Alt 2.1 | Against Alt 2.2 | Against Alt 2.3 | Against Alt 2.4 | Against Alt 2.5 | For Sub-Option 1 (Waiver Exemption) | For Sub-Option 2 (Wing-Vessel Exemption) | For Sub-Option 3 (2-year sunset) | For Sub-Option 4 (2 year re-evaluation) | For Sub-Option 5 (Only trips >25 mt) | Against Sub-Option 1 | Against Sub-Option 2 | Against Sub-Option 3 | Against Sub-Option 4 | Against Sub-Option 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Submitted Comments | | 35 | | 1 | | | | 3 | 2 | 1 | | | 4 | 5 | 4 | 5 | 3 | 3 | 1 | 4 | 1 | 2 | | | |
| Public Hearings Comments | | 5 | | | | | | | | | | 1 | 1 | | | | | | | | | | | | |
| Total | 0 | 40 | 0 | 2 | 0 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 4 | 5 | 4 | 5 | 3 | 3 | 1 | 4 | 1 | 2 | | | |

| Additional Popular/Important Comments | Number of Comments |
|---|---|
| General | |
| Inadequate notice/locations for public hearings/comment | 14 |
| Weren't aware that amendment involved FMPs other than herring and mackerel (hidden in omnibus, etc.) | 11 |
| NOAA should fund any additional coverage | 25 |
| Observer info is repetitive/isn't used, so why collect it? | 12 |
| Concerns that this amendment doesn't address (or violates) legal provisions of the MSA | 8 |

| Additional Popular/Important Comments | Number of Comments |
|---|---|
| Cost of increased coverage will result in unsafe conditions due to lack of funds for maintenance, increased tension with observers etc. | 5 |
| IFM should account for affordability to industry in the future- no safeguard that this won't bankrupt them | 6 |
| Mackerel | |
| Complete the EM Pilot before moving ahead | 3 |
| Can't afford any additional coverage on SMBT/smaller boats | 15 |

15. Observer Policy (January 24-26, 2017) M #4c

| | General | Against the Amendment | Omnibus | Support Alt. 1 (No Action) | Alt. 2 (Standardized Structure) | Against Alt. 1 | Against Alt. 2 | For Alt. 2.1 (NMFS led) | For Alt. 2.2 (Council led) | For Alt. 2.3 (Proportional Ratio) | For Alt. 2.4 (Lowest Coverage) | For Alt. 2.3 (Highest Coverage) | For Alt. 2.3 (Monitoring Set-Aside) | Against Alt. 2.1 | Against Alt. 2.2 | Against Alt. 2.3 | Against Alt. 2.4 | Against Alt. 2.5 | Against Alt. 2.6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Submitted Comments | 63 | | 63 | 3 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Public Hearings Comments | | | 7 | | | | | 2 | | | | | | 1 | 1 | | | | |
| Total | 63 | | 70 | 3 | 0 | 0 | 6 | 0 | 0 | 0 | 5 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |

| | Herring | Support Alt. 1 (No Action) | Support Alt. 2 (IFM Coverage Targets) | Against Alt. 1 | Against Alt. 2 | For Alt. 2.1 (100% NEFOP) | For Alt. 2.2 (ASM) | For Alt. 2.4 Coverage (EM/PS) | For Alt. 2.5 NEFOP in GCAs) | For Alt. 2.4 (Combined 100% Coverage in GCAs) | For Alt. 2.5 (Combined ASM or EM/PS) | Against Alt. 2.1 | Against Alt. 2.2 | Against Alt. 2.3 | Against Alt. 2.4 | Against Alt. 2.5 | Against Alt. 2.6 | Against Alt. 2.7 | For Sub-Option 1 (Waiver Exemption) | Option 2 (Wing Vessel Exemption) | For Sub-Option 3 (2 year sunset) | For Sub-Option 4 (2 year evaluation) | For Sub-Option 5 (Only trips >25 mt) | Against Sub-Option 1 | Against Sub-Option 2 | Against Sub-Option 3 | Against Sub-Option 4 | Against Sub-Option 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Submitted Comments | 37 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 3 | 4 | 1 | 0 | 0 | 1 | 3 | 1 | 0 | 3 | 6 | 6 | 6 | 4 | 3 | 1 | 4 | 1 | 2 | |
| Public Hearings Comments | | | | | | | | | | | | | | | 2 | | | 2 | | | | 2 | 2 | | 1 | | | |
| Total | 0 | 37 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 3 | 5 | 2 | 0 | 0 | 1 | 3 | 1 | 0 | 6 | 6 | 6 | 6 | 4 | 3 | 1 | 5 | 1 | 2 |

| Additional Popular/Important Comments | Number of Comments |
|---|---|
| **General** | |
| Inadequate notice/locations for public hearings/comment | 14 |
| Weren't aware that amendment involved FMPs other than herring and mackerel (hidden in omnibus, etc.) | 11 |
| NOAA should fund any additional coverage | 25 |
| Observer info is repetitive/isn't used, so why collect it? | 12 |
| Concerns that this amendment doesn't address (or violates) legal provisions of the MSA | 8 |
| Cost of increased coverage will result in unsafe conditions due to lack of funds for maintenance, increased tension with observers etc. | 5 |

| | |
|---|---|
| IFM should account for affordability to industry in the future- no safeguard that this won't bankrupt them | 6 |
| Herring | |
| Complete the EM Pilot before moving ahead | 3 |
| Can't afford any additional coverage on SMBT/smaller boats | 15 |

15. Observer Policy (January 24-26, 2017) M #4b

| Comment: | Gloucester Hearing - NL Comments | Webinar- No Comments | Portland Public Hearing | Jeff Kaelin- Lunds Fisheries | Mary-Beth Tooley- O'hara Corp. | John Haran- Sector 13 | Cape May Public Hearing | Greg DiDomenico- Garden State Seafood | Bill Bright - F/V Retriever | Audience Member 8 | Audience Member 9 | Audience Member 13 | Audience Member 14 | Narragansett Public Hearing | Audience Member 1 | Audience Member 2 | Audience Member 3 | Audience 4 | Audience 8 | Audience 9 | Audience 15 | Audience 19 | Audience 21 | Audience 22 | Audience 23 | Audience 24 | Meghan Lapp- Sea Freeze | Audience 33 (For Sectors 10&13) | Audience 39 | Audience 41 | Glenn Goodwin- SeaFreeze Ltd. | Donald Fox- The Town Dock | Phil Ruhle-Comm. Fisherman | Tina Jackson- Commercial Fishing | Audience 51 | Audience 54 | Eric Lundvall | Audience 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **General** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | |
| Slow down this alternative, it is being rushed | | x | | | | x | | | | | | | | | x | | | | | | | | | | | | | | | | | | | | | | | |
| Inadequate notice/locations for public hearings/comment | | | | | | | | | | | | | | | x | | | | | x | | | | x | | x | | | | | | | | | | x | x | |
| Weren't aware that amendment involved FMPs other than herring and mackerel | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Concerned about how selection process for current and future observer coverage will work | | | | | | | | | | | | | | | | | | x | | | | x | | x | | | | | | | | | | | | | | |
| NOAA should fund any additional coverage | | | | | | | | | | | | | | | | | | | | x | | x | | | | | | | | | | | | | | | | |
| Observer info is repetitive/isn't used, so why collect it? | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | | x | | | | |
| Concern that Council/NMFS never actually consider public comments | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | | | | x | x | |
| Concerns with exacerbation of current observer problems with increased coverage | | | | | | | | | | | | | | | | | | | | | | | | | x | x | x | | | | | | | | | | | |
| Concerns that this amendment doesn't address (or violates) legal provisions of the MSA | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | |
| Against EM | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | | |
| Portside Sampling doesn't work | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | | |
| This amendment is tyranny, drain the swamp, nanny state | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | x | | | | | | x | | x |
| Let environmentalist fund additional coverage | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | x | | | | |
| Cost of increased coverage will result in unsafe conditions due to lack of funds for maintenance, etc. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | |
| **Omnibus:** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| For Alt. 1 (No Action)- Fishermen Can't afford it | | | | | | x | | | x | | | | | | | | | x | | x | | | | | | x | | | | | x | x | | | | | | |
| In favor of Preferred Alt 2.2 (Council-led Process) | | | | x | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | |
| In favor of Alt 2.6 (Monitoring Set-Aside) | | | | x | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | | | | |
| If EM/increased observer coverage is chosen, need to have an arbitration board for disputes | | | | | x | | | | | | | | | | | | | | | | | | | | | x | | x | | | | | | | | | | |
| Monitoring Set-aside won't work in most FMPs | | | | | | | | | | | x | x | | | | | | | | | | | | | | | x | | | | | | | | | | | |
| Against Alt 2.1 (NMFS led process) | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | |
| Against Alt 2.2(Council led process) | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | |
| Any action must be fully govt. funded before approval (through tax, tariff, etc.) | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | |
| **Herring Alternatives** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Slow down this alternative, it is being rushed | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EM/PS is the best return on investment- is preferred | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support Sub-option 1 (Waivers) as imperative | | | | x | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Legal issues (National Standards) with not selecting Sub-option 1 | | | | x | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support Sub-option 2 (Wing vessel exemption) | | | | x | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Against sub-option 3 (2 year sunset) | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support sub-option 4 (2 year re-evaluation) | | | | x | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support sub-option 5 (25 mt threshold) | | | | x | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

_0000013804

| Comment: | Gloucester Hearing-NL Comments | Webinar- No Comments | Portland Public Hearing | Jeff Kaelin- Lunds Fisheries | Mary-Beth Tooley- O'hara Corp. | John Haran- Sector 13 | Cape May Public Hearing | Greg DiDomenico- Garden State Seafood | Bill Bright- F/V Retriever | Audience Member 8 | Audience Member 9 | Audience Member 13 | Audience Member 14 | Narragansett Public Hearing | Audience Member 1 | Audience Member 2 | Audience Member 3 | Audience 4 | Audience 8 | Audience 9 | Audience 15 | Audience 19 | Audience 21 | Audience 22 | Audience 23 | Audience 24 | Meghan Lapp- Sea Freeze | Audience 33 (For Sectors 10&13) | Audience 39 | Audience 41 | Glenn Goodwin- SeaFreeze Ltd | Donald Fox- The Town Dock | Phil Ruhle-Comm. Fisherman | Tina Jackson- Commercial Fishing | Audience 51 | Audience 54 | Eric Lundval | Audience 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Maximum of 25% target coverage for ASM options | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| For Alt. 2.3, 50% target for EM/OS | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support Alt. 2.7 as preferred measure | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Complete the EM Pilot before moving ahead | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Against Alternative 2.1 (100% NEFOP) | | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Against Alternative 2.5 (100% NEFOP in GCAs) | | | | x | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support Alt. 2.6 (Coverage in GCAs to match elsewhere) | | | | x | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Need Pilot Project to look at EM feasibility on purse seine | | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Supportive of increasing coverage provided it is affordable | | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Concern about the accuracy of economic data, Concern about the future of the fishery if it is wrong | | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Concern about EM/PS due to inaccessability of some ports | | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Can't afford additional coverage on SMBT/smaller boats | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | x | | | | | |
| Concern about economic impacts of zero catch herring trips | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Mackerel Alternatives** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Slow down this alternative, it is being rushed | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EM/PS is the best return on investment- is preferred | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support Sub-option 1 (Waivers) as imperative | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Legal issues (National Standards) with not selecting Sub-option 1 | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support Sub-option 2 (Wing vessel exemption) | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Against sub-option 3 (2 year sunset) | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support sub-option 4 (2 year re-evaluation) | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support sub-option 5 (25 mt threshold) | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Maximum of 25% target coverage for ASM options | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| For Alt. 2.3, 50% target for EM/OS | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Against Alternative 2.1 (100% NEFOP) | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Complete the EM Pilot before moving ahead | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support Alt. 1 (No Action)- Mack. Fishery can't afford | | | | | | | | | | x | x | | | | | | | | | | | | | | | | x | | | | | | x | x | | | | |
| Economic Analyses have too wide of a range | | | | | | | | | | x | x | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| If EM chosen, cameras should only record around haulback | | | | | | | | | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | | |
| If EM chosen, 25% will keep vessels following regs | | | | | | | | | | | | | x | | | | | | | | | | | | | | | | | | | | | | | | | |
| Concern about economic impacts of zero catch mackerel trips | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | |
| Impacts Section of EA- Offensive that Sub-option 1 would be a positive impact because of reduced fishing effort | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | | | | | | | | | |

Comment:

| Gloucester Hearing-NL Comments |
| Webinar- No Comments |
| Portland Public Hearing |
| Jeff Kaelin- Lunds Fisheries |
| Mary-Beth Tooley- O'hara Corp. |
| John Haran- Sector 13 |
| Cape May Public Hearing |
| Greg DiDomenico- Garden State Seafood |
| Bill Bright- F/V Retriever |
| Audience Member 8 |
| Audience Member 9 |
| Audience Member 13 |
| Audience Member 14 |
| Narragansett Public Hearing |
| Audience Member 1 |
| Audience Member 2 |
| Audience Member 3 |
| Audience 4 |
| Audience 8 |
| Audience 9 |
| Audience 15 |
| Audience 19 |
| Audience 21 |
| Audience 22 |
| Audience 23 |
| Audience 24 |
| Meghan Lapp- Sea Freeze |
| Audience 33 (For Sectors 10&13) |
| Audience 39 |
| Audience 41 |
| Glenn Goodwin- SeaFreeze Ltd. |
| Donald Fox- The Town Dock |
| Phil Ruhle-Comm. Fisherman |
| Tina Jackson– Commercial Fishing |
| Audience 51 |
| Audience 54 |
| Eric Lundtail |
| Audience 11 |

_0000013806

# Industry-Funded Monitoring

An Omnibus Amendment to the
Fishery Management Plans
of the Mid-Atlantic and New England
Fishery Management Councils

## September 2016





**This page intentionally left blank.**

**Amendment X to the Atlantic Bluefish Fishery Management Plan (FMP);**

**Amendment 7 to the Atlantic Herring FMP;**

**Amendment X to the Atlantic Salmon FMP;**

**Amendment 17 to the Atlantic Sea Scallop FMP;**

**Amendment 5 to the Deep-Sea Red Crab FMP;**

**Amendment XX to the Mackerel, Squid, and Butterfish FMP;**

**Amendment 8 to the Monkfish FMP;**

**Amendment 22 to the Northeast Multispecies FMP;**

**Amendment 5 to the Northeast Skate Complex FMP;**

**Amendment X to the Spiny Dogfish FMP;**

**Amendment XX to the Summer Flounder, Scup, and Black Sea Bass FMP;**

**Amendment XX to the Surfclam and Ocean Quahog FMP; and**

**Amendment X to the Tilefish FMP**

**Including a**
**Draft Environmental Assessment**

**September 2016**

Prepared by the

New England Fishery Management Council
50 Water Street, Mill 2
Newburyport, MA  01950
National Marine Fisheries Service
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA  01930

Mid-Atlantic Fishery Management Council
800 N. State Street, Suite 201
Dover, DE  19901
National Marine Fisheries Service
Northeast Fisheries Science Center
166 Water Street
Woods Hole, MA  02543

Draft EA Adopted by MAFMC:  June 15, 2016
Draft EA Adopted by NEFMC:  June 23, 2016
Draft EA Available for Public Comment:  September 23, 2016
Final EA Submitted to NMFS:

_0000013819

The realized coverage level would be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. If coverage is not available (either due to logistics or a lack of funding) for a specific trip, Herring Alternatives 2.1-2.7 specify that the vessel would be prohibited from participating in the herring fishery on that trip. The selection of Herring Alternative 2 - Sub-Option 1 would enable coverage requirements to be waived on a specific trip to allow vessels to continue participating in the herring fishery, even if monitoring coverage is not available. Additionally, the amount and quality of information collected under Herring Alternatives 2.1-2.4 and 2.7 has the potential to affect the amount of effort in the herring fishery.

Should fishing effort be limited by the availability of monitoring coverage or additional data collected, there is the potential for a positive impact on the physical environment. However, the magnitude of any potential positive impact is low because the herring fishery has only minimal and temporary impacts on the environment. Additionally, vessels may switch gear modes to minimize economic impacts associated with gear-specific requirements. However changes to gear modes associated with Herring Alternatives 2.1-2.7 are not expected to affect the overall impact of the herring fishery on the physical environment. Therefore, impacts on the physical environment are expected to be similar under Herring Alternatives 1 and 2.

**TABLE 88. SUMMARY OF PHYSICAL ENVIRONMENT IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES**

| Alternatives | Impacts on Physical Environment |
|---|---|
| **Herring Alternative 1:** No Coverage Target Specified For IFM Programs (No Action) | • Negligible impact associated with minimal and temporary effects on the environment from herring fishery |
| **Herring Alternative 2:** Coverage Target Specified For IFM Programs | • Negligible impact associated with minimal and temporary effects on the environment from herring fishery<br>• Low positive impact if fishing effort is limited by monitoring availability<br>• Negligible impact associated with switching gear modes |

## 4.2.5 IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES ON HUMAN COMMUNITIES

Another major consideration when evaluating an industry-funded monitoring program is the cost of the monitoring program. The requirement to pay for monitoring coverage increases operating costs for fishing vessels, which in turn reduces vessel revenues.

There are two primary approaches for minimizing the cost of monitoring paid by industry.

The first approach is to select the most cost effective type of coverage to meet program goals.  For example, it may be more cost effective to use electronic monitoring rather than observers to confirm retention of catch on herring vessels.

The second approach to limit costs to industry is to set coverage levels at the lowest level necessary to gather information to meet program goals.  For example, it may be possible to increase precision around catch estimates for a certain species by setting a coverage target of 50%, rather than a coverage target of 100%.

Table 89 shows the range of costs associated with the different types of monitoring being considered for the herring fishery.  A detailed description of industry cost responsibilities associated with each of these types of monitoring can be found in Appendix 6 – Monitoring Cost Estimates.

**TABLE 89.  MONITORING COST ESTIMATES FOR THE HERRING FISHERY**

| Types of Monitoring | NMFS Cost | Vessel Cost |
|---|---|---|
| NEFOP-Level Observer | $479 per sea day | $818 per sea day |
| At-Sea Monitor | $530 per sea day | $710 per sea day |
| Electronic Monitoring[1] | Year 1:  $36,000 startup plus $97 per sea day<br><br>Year 2:  $97 per sea day | Year 1:  $15,000 startup plus $325-$172 per sea day (depending on coverage target)<br><br>Year 2:  $325-$172 per sea day (depending on coverage target) |
| Portside Sampling[2] | $479-$530 per sea day | $5.12[1] or $3.84[2] per mt |
| 1 – EM cost assumptions:  EM on every vessel, video collected throughout the duration of a trip (100%) or only around haulback (25%, 50%, or 75%), and 25%, 50%, 75% or 100% video review.  Costs for coverage targets are:  $325 for 100%, $202 for 75%, $187 for 50%, and $172 for 25%. |||
| 2 – Portside cost assumptions:  $5.12 includes portside administration costs. $3.84 does not include portside administration.  $5.12 mt would apply to 100% of trips, while $3.84 would apply to 25%, 50%, or 75% of trips. |||

**Assumptions used to generate estimates of industry cost responsibilities**

While the cost of a sea day can vary between service providers, the individual components of a sea day cost are necessary to successfully execute a monitoring program.  Because each of these components is essential, in most cases, it is not appropriate to reduce industry's cost responsibilities by removing or adjusting components of the sea day cost.

NEFOP-Level Observer Cost Estimate

The $818 per sea day industry cost responsibility related to NEFOP-level observer coverage is based on sampling costs from October 2012 through May 2014 averaged across 3 service providers.  The program elements and activities covered in this cost would include, but are not limited to, costs to the provider for deployments and sampling (e.g.,

_0000014107

travel and salary for observer deployments and debriefing), equipment, costs to the provider for observer time and travel to a scheduled deployment that does not sail and was not canceled by the vessel prior to the sail time, and provider overhead.

At-Sea Monitor Cost Estimate

The $710 per sea day industry cost responsibility related to a herring at-sea monitoring program is based on the current sea day rate for the groundfish at-sea monitoring program. However, herring at-sea monitors would be collecting data on discards only. This may reduce training time, gear requirements, and internal support resources necessary to administer an at-sea monitoring program for the herring fishery resulting in a lower sea day rate than the groundfish at-sea monitoring program rate. (*See Appendix 5 – Analysis of ASM Costs for additional information.*) In the absence of an estimate specific to the herring at-sea monitoring program, the PDT/FMAT determined that using the groundfish at-sea monitoring sea day rate was appropriate, but the actual cost of a herring at-sea monitor may be more or less.

**TABLE 90. INDUSTRY COST RESPONSIBILITIES FOR NEFOP-LEVEL OBSERVER AND AT-SEA MONITORS**

| Industry Cost Responsibilities | NEFOP-level observer cost per sea day | At-sea monitoring cost per sea day |
|---|---|---|
| Provider costs for deployments and sampling (e.g., travel and salary for observer deployments and debriefing) | Sea day charges paid to providers: $640<br>Travel: $71<br>Meals: $22<br>Other non-sea day charges: $12 | Sea day charge paid to providers: $561<br>Travel: $67<br>Meals: $18<br>Other non-sea day charges: $14 |
| Equipment, as specified by NMFS, to the extent not provided by NMFS | $11 | |
| Provider costs for observer time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time. | $1 | |
| Provider overhead and project management costs not included in sea day charges above (e.g., per diem costs for trainees) | Training: $61 | Training: $50 |
| Provider costs to meet performance standards laid out by a fishery management plan | TBD – won't know these costs until an industry funded observer coverage program is implemented in a | TBD – won't know these costs until an industry funded observer coverage program is implemented in |

_0000014108

|  | fishery | a fishery |
|---|---|---|
| Total (not including other costs) | $818 | $710 |

## Electronic Monitoring Cost Estimate

Because no Federal electronic monitoring program exists for the herring fishery, industry cost responsibilities associated with an electronic monitoring program were difficult to estimate. Electronic monitoring cost estimates include a one-time implementation cost, as well as ongoing annual operational program costs. Cost components include equipment, field services, data services, and program management. The implementation costs associated with EM are summarized in Table 91 and the ongoing costs associated with EM are summarized in Table 92. Additional details on monitoring costs are available in Appendix 6 – Monitoring Cost Estimates.

**TABLE 91. INDUSTRY COST RESPONSIBILITIES FOR ELECTRONIC MONITORING IMPLEMENTATION**

| Industry Cost Responsibilities | Electronic Monitoring Implementation Costs Per Vessel |
|---|---|
| Equipment, including initial purchase and installation of the cameras, associated sensors, integrated GPS, control box, and hard drives | $9,018 |
| Field Services, including technician's labor and travel associated with the installation of equipment | $2,952 |
| Program Management, including one-time labor, equipment, facilities, and administrative costs associated with getting the new EM program operational | $3,493 |
| Total | $15,463 |

Initially, the sea day cost for EM was estimated at $325. The $325 cost estimate is likely high because it assumes video footage is collected for the duration of a trip and 100% of the video footage is reviewed. Subsequently, the PDT/FMAT generated cost estimates for other coverage targets (25%, 50%, and 75%) with the assumption that video footage is just collected around haulback and that the level of video footage review matches the coverage target. The breakdown of these costs is shown in Table 92.

**TABLE 92. INDUSTRY COST RESPONSIBILITIES FOR ONGOING ELECTRONIC MONITORING COSTS PER SEA DAY**

| Industry Cost Responsibilities | 100% Coverage | 75% Coverage | 50% Coverage | 25% Coverage |
|---|---|---|---|---|
| Equipment, including annual equipment costs | $11 | $11 | $11 | $11 |

_0000014109

| | | | | |
|---|---|---|---|---|
| estimated here include spare parts to replace broken or aging equipment, as well as licenses for the use of proprietary software | | | | |
| Field Services, including labor, travel, and other costs associated with repairs, technical support, and retrieving hard drives from the vessels and shipping them to the service provider for analysis | $78 | $47 | $47 | $47 |
| Data Services, including the costs associated with review and analysis of the video, reporting to NMFS, and archiving of the data | $160 | $67 | $52 | $37 |
| Program Management, including costs of the day-to-day operations of the service provider for running the EM program | $77 | $77 | $77 | $77 |
| Total | $325 | $202 | $187 | $172 |

<u>Portside Sampling Cost Estimate</u>

The analysis assumes the cost per amount of fish landed is the most accurate way to represent the potential industry costs for monitoring. Because no Federal portside sampling program exists for the midwater trawl fleet, industry cost responsibilities associated with a portside sampling program for the midwater trawl fleet were difficult to estimate.

The average cost per pound of groundfish landed for the Northeast Multispecies dockside monitoring program ranged from $0.01 - $0.12 per pound for all sectors. The average cost per pound landed per trip is inversely related to the average pounds landed – that is, trips that land larger amounts are less expensive to monitor than trips that land smaller amounts. Larger trips are less expensive to monitor because they typically land in principle ports with a dedicated monitor, therefore, there are no additional costs for monitors to travel to offload locations.

Initially, the industry cost responsibility associated with portside sampling was estimated to be as much as $5.12 per mt. This cost estimate was generated using information from the Massachusetts Division of Marine Fisheries portside sampling program for the herring

_0000014110

fishery.  The $5.12 per mt cost estimate is likely high as it includes program administration costs as well as sampling costs and was intended to apply to all trips for a target sampling rate of 100%.

Subsequently, the PDT/FMAT generated a revised cost estimate ($3.84 per mt) that does not include portside administration costs.  This cost estimate may be closer to the actual industry cost responsibilities associated with portside sampling and would apply to 25%, 50%, or 75% of trips, consistent with the coverage target selected by the NEFMC.

Midwater trawl vessels returning from declared herring trips would be required to land catch in specific ports for sampling.  Table 93 describes the ports where midwater trawl vessel currently land catch and whether those ports are currently sampled by existing portside sampling program for the midwater trawl fleet operated by the Massachusetts Division of Marine Fisheries and Maine Department of Marine Resources.

**TABLE 93. LANDING PORTS FOR MWT VESSELS AND PORTSIDE SAMPLING ISSUES**

| Ports | Currently Sampled (Y/N) | Issues Affecting Sampling |
|---|---|---|
| **Maine** | | |
| Portland | Y | None |
| Rockland | Y | None |
| Vinalhaven | N | Not cost effective; fish sold over the side of vessels |
| Prospect Harbor | Y | None |
| Jonesport | Y | None |
| **Massachusetts** | | |
| Boston | N | Costly to sample; logistically challenging; unsafe area |
| Gloucester | Y | Only a few landings during the year |
| New Bedford | Y | Logistically challenging; safety issues |
| **Rhode Island** | | |
| Point Judith | Y | None |
| North Kingstown | N | Only frozen product is landed |
| Newport | N | Safety issues |
| **New Jersey** | | |
| Cape May | Y | None |

Approximately 95% of midwater trawl landings are made in ports currently sampled by the state programs.  However, if certain ports are not suitable for portside sampling, then vessels may not be able to land in those ports on trips that are selected for portside

_0000014111

sampling. Some vessels only land in a single port and that port is not currently sampled. Some vessels land in both sampled and unsampled ports, but changing past practices to land only in sampled ports may not be easy.

Travel time and seller/buyer arrangements are likely to be most affected by requiring midwater trawl vessels to land in specified ports. Seasonal fishing conditions may make travel time to specified ports an issue of concern. But seller/buyer arrangements are likely the larger concern. A vessel may need to substantially revise its business plan if it must land in a port not previously used.

Without a predictive model, the analysis of requiring vessels to land in specified ports will be qualitative. Additionally, data confidentiality will limit a quantitative analysis. However, if certain ports are not suitable for portside sampling, then vessels may not be able to land in those ports on trips that are selected for portside sampling.

TABLE 94. SUMMARY OF ECONOMIC IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES

| Alternatives | Impacts on Fishery Related-Businesses |
|---|---|
| Herring Alternative 1: No Coverage Target Specified For IFM Programs (No Action) | • Low positive impact associated with observer coverage allocated by SBRM<br>• Low negative impact associated with no additional monitoring to reduce uncertainty around catch estimates |
| Herring Alternative 2: Coverage Target Specified For IFM Programs | • Negative impact associated with potential reduction in return to owner (RTO)<br>• Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested<br>• Low positive impact associated with additional monitoring to reduce uncertainty around catch estimates in the herring fishery<br>• Low negative impact associated with no additional monitoring unless available Federal funding can cover NMFS cost responsibilities<br>• Magnitude of impacts associated with additional monitoring would be dependent on the type of information collected, amount of coverage, how coverage is allocated, and amount of available Federal funding<br>• Magnitude of impacts associated with selection of Sub-Options |
| Herring Alternative 2.1: 100% NEFOP-Level Coverage on Category A and B Vessels | • Negative impact associated with potential 44.7%-11.5% reduction in RTO<br>• Negative impact associated with potential 42.2%-5.8% reduction in RTO with 25 mt threshold<br>• Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested<br>• Low positive impact associated with additional information to reduce uncertainty of catch estimates in the herring fishery |

_0000014112

| | |
|---|---|
| Herring Alternative 2.2:  ASM Coverage on Category A and B Vessels | • Negative impact associated with potential 38.9%-3.0% reduction in RTO<br>• Negative impact associated with potential 36.7%-1.4% reduction in RTO with 25 mt threshold<br>• Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested<br>• Low positive impact associated with additional information to reduce uncertainty of catch estimates in the herring fishery |
| Herring Alternative 2.3:  Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | • Negative impact associated with potential 38.5%-3.0% reduction in RTO<br>• Negative impact associated with potential 36.7%-1.4% reduction in RTO with 25 mt threshold<br>• Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested<br>• Low positive impact associated with additional information to reduce uncertainty of catch estimates in the herring fishery |
| Herring Alternative 2.4:  EM and Portside Sampling on Midwater Trawl Fleet | • Negative impact associated with potential 29.1%*-6.9% reduction in RTO<br>• Negative impact associated with potential 27.5%*-2.4% reduction in RTO with 25 mt threshold<br>• Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested<br>• Low positive impact associated with additional information to reduce uncertainty around catch estimates in the herring fishery |
| Herring Alternative 2.5:  100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | • Negative impact associated with potential 5.4%-1.0% reduction in RTO<br>• Low positive impact associated with additional information to reduce uncertainty around catch estimates in the Groundfish Closed Areas<br>• Negligible impact associated with changes in fishing effort |
| Herring Alternative 2.6:  Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | • Negative impact associated with potential reduction in RTO<br>• Low positive impact associated with additional information to reduce uncertainty around catch estimates in the Groundfish Closed Areas<br>• Negligible impact associated with changes in fishing effort |
| Herring Alternative 2.7:  ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage | • Negative impact associated with potential 29.2%*-0.8%* reduction in RTO<br>• Negative impact associated with potential 27.1%*-1.0%* reduction in RTO with 25 mt threshold<br>• Negative impact if fishing effort is limited by monitoring availability and herring ACLs are not harvested<br>• Low positive impact associated with additional information to reduce uncertainty of catch estimates in the herring fishery |
| * Reflects RTO from Year 2 | |

_0000014113

The previous analysis of economic impacts of herring coverage target alternatives on the herring industry was based on trip cost data collected by NEFOP and showed the economic impact of the alternatives on partial vessel net revenues (gross revenues less certain trip costs).  Because NEFOP only collects a limited amount of cost data, industry participants expressed concern that an analysis of net revenues underestimated vessel costs.  In response, Jason Didden, staff of the MAFMC, offered to coordinate a survey of herring and mackerel vessels to collect more detailed cost information.

The survey requested information from vessel owners on total trip costs in 2014.  The cost survey collected information on variable costs; payments to crew; the cost of repairs, maintenance, upgrades; and fixed costs.  These data were used to update the impact analyses.  To profile vessels, data were averaged across vessel types, by vessel characteristics, and by primary species caught.  The cost profiles of vessels, as adjusted by the estimated industry cost responsibilities of each herring coverage target alternative, were used to describe the economic impact on herring vessels.  Economic impacts are described at an annual level.  Surveys were sent to approximately 18 vessel owners (representing about 26 vessels) in the herring and/or mackerel fisheries.  Surveys were sent in May 2015 and information was submitted for 16 of the 26 vessels.  A copy of the survey is included in Appendix 7.

Analysis of the economic impact of industry-funded monitoring herring coverage target alternatives on fishery-related businesses compared industry cost responsibilities to 2014 herring vessel returns-to owner (RTO).  RTO is calculated by subtracting fixed and operational costs from gross revenue (Table 95) and was used rather than net revenues to more accurately reflect income from fishing trips.  RTO is similar to net income from a financial income statement.  Other financial statement approaches, such as a balance sheet or a cash flow statement, are not used.  These approaches consider other financial aspects of a business, such as total assets and liabilities and the ability to cover expenses within a particular time frame.  Principal payments on loans, which matter from a balance sheet and cash flow perspective, are not typically sued in the calculation of RTO/net income.  Depreciation of capital assets is typically part of a RTO/net income calculation.  In this analysis, depreciation of vessel improvements is included but the depreciation of the vessel is not included because that information was not collected in the survey.

TABLE 95. SUMMARY OF TOTAL TRIP COSTS FOR HERRING AND MACKEREL VESSELS IN 2014

| Cost Category | Description | Average Percent of 2014 Gross Revenue for Herring and Mackerel Vessels | Average Percent of 2014 Gross Revenue for Squid Vessels |
|---|---|---|---|
| Variable Costs | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| Crew Share | Total annual payments to crew | 28% | 26% |
| Repair, Maintenance, Upgrades, Haulout (RMUH) | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, safety equipment, upgrades and haulout. Because these costs vary considerably from year to year and are typically spread out over several years, only a portion of these costs were applied to 2014 revenue | 13% | 11% |
| Fixed Costs | Annual mooring, dockage, permits and licenses, insurance, quota and DAS lease, crew benefits, vessel monitoring, workshop and storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs Note: depreciation expense of the vessel is not included in fixed costs. | 19% | 21% |
| Return to Owner | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

The NEFMC is considering four types of industry-funded monitoring for the herring fishery, including NEFOP-level observers, at-sea monitors, EM, and portside sampling coverage. NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

Prior to any trip declared into the herring fishery, vessel representatives would be required contact NMFS and request monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether monitoring coverage must be procured through an industry-funded monitoring service provider. For the purposes of this analysis, however, it is assumed that there would be no SBRM coverage of trips. Therefore, the economic impacts of industry-funded monitoring cost alternatives described in this section may be an overestimate of actual costs.

**Summary of Economic Analyses**

In general, the paired midwater trawl vessels have the highest monitoring costs as a percentage of RTO. This is because these vessels have, on average, more sea days declared into the herring fishery than other gear types. Therefore, midwater trawl vessels have more sea days that would be subject to monitoring costs than vessels that use other gear types.

There are differences across gear types regarding the sources of revenue that would be used to pay for monitoring costs. For example, for small mesh bottom trawl vessels, roughly half of their revenue is generated by participating in the herring fishery and the other half is generated by participating in other fisheries. This means that if small mesh bottom trawl vessels want to continue to declare herring trips, they may need to use revenue from other fisheries to pay the industry-funded monitoring costs associated with the herring fishery. A metric for considering different revenue sources across gear types is evaluating monitoring costs as a percent of herring revenue. For small mesh bottom trawl vessels, industry-funded monitoring costs as a percent of herring revenue are higher than for other gear types.

Another method for accounting for these differential impacts on small mesh bottom trawl vessels is to apportion the overall RTO to the different fisheries and then reduce the herring RTO by the monitoring cost. However, to properly apportion RTO to fisheries, much more detailed cost data is required. If data were available on a trip basis, costs that are specific to the fishery pursued on that trip could be assigned. Fuel is a good example of this type of cost. However, the trip related cost data used in the RTO analysis is at an annual level. Even with highly detailed cost information there are still costs that do not vary by trip, such as insurance costs. It is unclear in this instance what method should be used to apportion these costs. For these reasons, herring as a percentage of revenue, rather than herring RTO, is shown in the following tables to evaluate impacts on small mesh bottom trawl vessels.

Exempting trips that land less than 25 mt of herring (Herring Alternative 2 Sub-Option 5) from industry-funded monitoring costs reduces the monitoring cost substantially in many cases. The degree of saving varies by gear type. Using Alternative 2.1 as an example, aggregate NEFOP-level observer costs decline by 48% for purse seine vessels ($320k to $166k). For paired midwater trawl vessels, the percentage difference (20%; $673k to $541k) is not as great.

_0000014116

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811,000 to $75,000 – a 91% reduction.  However, Herring Alternative 2.5 only provides increased monitoring in the Groundfish Closed Areas.

Initial industry cost assumptions for Herring Alternative 2.4 estimated $325 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected for the duration of the trip, 100% vide review) and $5.12 per mt for portside sampling (administration and sampling cost) on close to 100% of trips.  Revised industry cost assumptions for Herring Alternative 2.4 estimated $187 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected around haulback, 50% video review) and $3.84 per mt for portside sampling (only sampling costs) on close to 50% of trips.  Using the revised cost assumptions rather than the initial cost assumption for Herring Alternative 2.4 reduces total industry monitoring costs by 51% ($457,595 to $222,958) in Year 2 for paired midwater trawl vessels and reduces costs by 54% ($134,165 to $61,067) in Year 2 for single midwater trawl vessels.

Many of the vessels that would be impacted by industry-funded monitoring costs in the herring fishery would also be impacted by industry-funded monitoring costs in the mackerel fishery.  For example, all the vessels impacted by Herring Alternative 2.1 would also be impacted by Mackerel Alternative 2.1.

A trip must be a declared herring trip in order to land 1 lb or more of herring.  The economic analysis focused on trips that landed 1 lb or more of herring because those are the trips that would be subject to industry-funded monitoring.  However, industry participants also requested consideration of the economic impacts associated with declared herring trips that did not land any herring.

In 2014, there were 121 sea days for 22 trips that had no herring landings.  If 100% NEFOP-level observer coverage was required on those trips, then $98,978 would have been spent monitoring those trips.   If 100% at-sea monitoring coverage was required on those trips, then $85,910 would have been spent monitoring those trips.  The breakdowns of these costs by gear type as well as other coverage levels and monitoring types are provided in Table 96.

**TABLE 96.  MONITORING COSTS ASSOCIATED WITH DECLARED HERRING TRIPS THAT DID NOT LAND HERRING IN 2014.**

|  | Small Mesh Bottom Trawl | Single Midwater Trawl | Paired Midwater Trawl | Total |
|---|---|---|---|---|
| Permit Category | A | A | A |  |
| Total Number of Days | 111 | 6 | 4 | 121 |
| Total NEFOP Cost – 100% Coverage | $90,586 | $5,217 | $3,212 | $99,015 |
| Total ASM Cost – | $78,626 | $4,528 | $2,788 | $85,943 |

_0000014117

| 100% Coverage | | | | |
|---|---|---|---|---|
| Total ASM Cost – 75% Coverage | $58,970 | $3,396 | $2,091 | $64,457 |
| Total ASM Cost – 50% Coverage | $39,313 | $2,264 | $1,394 | $42,971 |
| Total ASM Cost – 25% Coverage | $19,657 | $1,132 | $697 | $21,486 |
| Total EM Cost, Year 2 – $325 per day | | $2,073 | $1,276 | $3,349 |
| Total EM Cost, Year 2 – $187 per day | | $1,193 | $734 | $1,927 |

The tables and box plots on the following pages provide summarized economic data for each of the herring coverage target alternatives. The economic impact on vessels associated with paying for monitoring coverage is described as a percentage of RTO for each herring coverage target alternative in the following figures. The tables provide the mean and median number of sea days per vessel that would result from each of the alternatives, as well as the mean and median RTO that would ultimately be reduced by the industry-funded monitoring costs. Additionally, fleet level effort, revenue, and monitoring cost information for each herring coverage target alternative are also provided. Additional economic analysis is available in Appendix 8.

### 4.2.5.1  Impacts of Herring Alternatives 1 and 2 on Fishery-Related Businesses

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP. Monitoring for herring vessels would be allocated according to SBRM. If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis. Under Herring Alternative 1, additional costs to vessels participating in the herring fishery associated with monitoring coverage, if there were any, would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-by-FMP basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 will not likely affect the setting of

_0000014118

*15. Observer Policy Committee (April 18-20, 2017)*

#9a

# ADDITIONAL
# CORRESPONDENCE

# CAUSE *of* ACTION
## ═══ I N S T I T U T E ═══
Pursuing Freedom and Opportunity through Justice and Accountability

April 12, 2017

**VIA ELECTRONIC MAIL**



New England Fishery Management Council
ATTN: Dr. John Quinn, Chairman
50 Water Street, Mill 2
Newburyport, MA 01950
E-mail: comments@nefmc.org

**Re:    Industry-Funded Monitoring (IFM) Omnibus Amendment**

Dear Chairman Quinn:

I write on behalf of Cause of Action Institute ("CoA Institute") with respect to the New England Fishery Management Council's ("NEFMC" or "Council") consideration of final action on the Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment").[1] The Omnibus Amendment raises a number of serious legal questions concerning the Council's authority to compel regulated parties, *i.e.*, fishermen, to pay for supplemental monitoring services. As set forth in detail below, there is no authority under the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, for industry funding requirements in most of the Atlantic fisheries. As such, the Omnibus Amendment, and future attempts to implement industry-funded monitoring under the Omnibus Amendment's framework, will almost certainly face legal challenge. CoA Institute requests that the Council either abandon the Omnibus Amendment or develop alternative ways to achieve the Council's goals of increased data collection and expanded policing of annual catch totals.[2] The NEFMC could, for example, work with the National Marine Fisheries Service ("NMFS") to reallocate existing funds for monitoring or petition Congress to appropriate funding specific to expanded monitoring. Attempting to shift monitoring costs without legal authority onto an already economically-beleaguered industry would be ill-advised.

---

[1] New Eng. Fishery Mgmt. Council & Mid-Atl. Fishery Mgmt. Council, Industry-Funded Monitoring Omnibus Amend. (Sept. 2016) [hereinafter Omnibus Amend.], *available at* http://bit.ly/2mQxrtn.

[2] CoA Institute acknowledges that the Council has chosen its preferred alternatives, including Omnibus Alternatives 2.2 and 2.6 and Herring Alternatives 2.5 and 2.7. *See, e.g.*, New Eng. Fishery Mgmt. Council, Press Release: Council Selects Industry-Funded Monitoring Alternatives for Omnibus Amendment, Atlantic Herring Category A and B Boats (Jan. 25, 2017), *available at* http://bit.ly/2nKW463. Nevertheless, final approval by the NEFMC and the Mid-Atlantic Fishery Management Council are required before the Omnibus Amendment is submitted to NMFS for secretarial review and publication in the Federal Register. *See* 16 U.S.C. § 1854(a), (f)(1).



A 501(C)(3) NONPROFIT CORPORATION

_0000015938

Dr. John Quinn, NEFMC
April 12, 2017
Page 2

CoA Institute is a nonpartisan 501(c)(3) nonprofit strategic oversight group committed to ensuring that government decision-making is open, honest, and fair.[3]  In carrying out its mission, CoA Institute uses various investigative and legal tools to educate the public about the importance of government transparency and accountability, as well as agency adherence to the rule of law.  CoA Institute advocates on behalf of clients facing federal overreach and overregulation, including members of the New England fishing industry.  CoA Institute currently represents David Goethel— a former member of the NEFMC—and the members of Northeast Fishery Sector XIII in a challenge to the Northeast multispecies industry-funded sector at-sea monitoring program.[4]  That case raises many of the same issues faced by the Council vis-à-vis the Omnibus Amendment.

## I.    The Magnuson-Stevens Act Does Not Authorize the Industry-Funded Monitoring Programs Intended by the Omnibus Amendment.

The stated purpose of the Omnibus Amendment is straightforward: the Council is "interested in increasing monitoring and/or other types of data collection to assess the amount and type of catch, to more precisely monitor annual catch limits, and/or provide other information for management,"[5] but its ability to fund that increased monitoring is limited.[6]  The proposed solution is to design a standardized mechanism that would permit the government to order fishermen to cover a substantial portion of monitoring costs.[7]  Yet the Council fails to point to *any provision* in the MSA that gives it the authority to implement such a plan.

---

[3] CAUSE OF ACTION INST., *About,* http://www.causeofaction.org/about (last visited Apr. 12, 2017).
[4] *See Goethel v. Pritzker,* No. 16-2103 (1st Cir. argued Mar. 7, 2017); *Goethel v. Pritzker,* No. 15-497, 2016 WL 4076831 (D.N.H. July 29, 2016).
[5] *See* Omnibus Amend. at 41.
[6] *See id.* at 43–44 ("NMFS has limited funding for monitoring, so both Councils have considered requiring industry to contribute to the cost of monitoring."); Greater Atl. Reg'l Fisheries Office, Nat'l Marine Fisheries Serv., Press Release: Industry-Funded Monitoring Omnibus Amendment, Public Hearings and Comment Period (Sept. 20, 2016) ("The amount of available Federal funding to support additional monitoring is limited[.]"), *available at* http://bit.ly/2nHNpl1.
[7] *See, e.g.,* Omnibus Amend. at 62 ("Under Omnibus Alternative 2, there would be an established, standardized structure for new industry-funded monitoring programs . . . [that addresses] (1) standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry, (2) a process for FMP-specific industry-funded monitoring to be implemented via [amendment and revised via] a . . . framework adjustment action, (3) standard administrative requirements [for industry-funded monitoring service providers] . . . (4) [a] process to prioritize new industry-funded monitoring programs in order to allocate available Federal resources for industry-funded monitoring across FMPs, including the type of weighing approach and the timing of revising the weighing approach, and [(5)] a process for FMP-specific monitoring set-aside programs to be

Dr. John Quinn, NEFMC
April 12, 2017
Page 3

### a. The Council Requires Explicit Statutory Authorization to Require Industry to Fund Supplemental Discretionary Monitoring Programs

Federal agencies do not enjoy unbridled power in choosing which programs to pursue; they cannot impose new fees or taxes, nor can they simply demand that citizens pay for programs that the government ought to be financing in the first place. In this sense, the most basic presumption in the Omnibus Amendment, namely, that the Council can order industry to fund a monitoring program, is gravely mistaken and runs afoul of a fundamental principle of administrative law: "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."[8] The Council appears to acknowledge as much, but does not give the principle due credit: "A Federal agency cannot spend money on a program beyond the maximum authorized program level without authorization from Congress. [It] also cannot get around the maximum authorized program level by adding to its appropriations from sources outside the government without permission from Congress."[9]

The MSA does not authorize the Council to redesign fishery management plans to introduce the sort of industry-funded monitoring envisioned by the Omnibus Amendment. At most, the MSA authorizes the *placement* of observers and monitors.[10] The Council, however, is not at liberty to design any particular *funding* mechanism for those monitors. The plain meaning of the MSA, here, is clear and unambiguous.[11] The statute only authorizes industry-funded monitoring in a few specific regions and circumstances: (1) foreign fishing,[12] (2) limited access privilege programs,[13] and (3) the North Pacific fisheries research plan.[14] Congress's decision to permit NMFS and the regional councils to require industry-funded monitoring and observing in those, and

---

implemented via a future framework adjustment action. Additionally, [it] would include a range of options for the process to prioritize industry-funded monitoring across all FMPs.") (alternations indicate changes in the April 2017 Omnibus Amendment draft, *available at* http://bit.ly/2omwA0Q).

[8] *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986); *see Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 134 S. Ct. 2427, 2466 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law.").

[9] *See* Omnibus Amend. at 45.

[10] 16 U.S.C. § 1853(b)(8); 50 C.F.R. § 648.2.

[11] *See generally Palmieri v. Nynex Long Distance Co.*, 437 F.3d 111, 115 (1st Cir. 2006); *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 n.2 (1st Cir. 1999).

[12] *Id.* § 1821(h)(4).

[13] *Id.* § 1853a(e). The Greater Atlantic Region contains two fisheries that permit cost recovery through a fee system: the Atlantic sea scallop individual fishing quota and golden tilefish individual fishing quota limited access privilege programs. *See* Omnibus Amend. at 51.

[14] 16 U.S.C. § 1862(a).

Dr. John Quinn, NEFMC
April 12, 2017
Page 4

only those, three situations shows its intent to disallow industry funding in other instances.[15] To read the statute otherwise violates Congress's clear intent and the well-established legislative history of the MSA.[16]

### b. The Omnibus Amendment's Industry-Funded Monitoring Scheme Would Violate the National Standards and Other Important Legal Principles.

Notwithstanding the Council's lack of explicit legal authority, the introduction of industry-funded monitoring across the Greater Atlantic fisheries would also impose a tremendous economic burden on the fishing industry and could lead to the elimination of small-scale fishing. This result would violate National Standards 7 and 8.[17] Congress never intended to grant the Council the authority to regulate a substantial portion of the Atlantic fleet out of existence.[18] Indeed, as the Supreme Court has held, "Congress . . . does not alter the fundamental details of a regulatory scheme [such as the one intended by the MSA] in vague terms or ancillary provisions,"[19] nor does it "delegate a decision of such economic and political significance [as the introduction of

---

[15] Any other reading of the MSA would render provisions discussing industry funding surplusage, *Nat'l Credit Union Admin v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998), and offend important canons of construction. *Duncan v. Walker*, 533 U.S. 167, 173 (2001); *see also EchoStar Satellite L.L.C. v. Fed. Commc'ns Comm'n*, 704 F.3d 992, 999 (D.C. Cir. 2013); *Ry. Labor Execs.' Ass'n v. Natl' Mediation Bd.*, 29 F.3d 655 (D.C. Cir. 1994); *cf. Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.9 (D.D.C. 2015) ("'[C]ost sharing' programs with industry participants in other fisheries in order to provide higher observer coverage levels . . . were expressly authorized by statute *for particular fisheries only*.") (emphasis added) (citing 16 U.S.C. § 1862).

[16] There is no evidence of Congressional recognition for some pre-existing, implied authority to impose monitoring costs on industry. Congress has repeatedly declined the opportunity to permit industry funding nationwide. Each time the MSA has been reauthorized, Congress considered (and rejected) bills that would have created blanket authority for mandatory industry funding. H.R. 1554, 101st Cong. § 2(a)(3) (1989); H.R. 39, 104th Cong. § 9(b)(4) (1995); H.R. 5018, 109th Cong. § 9(b) (2006).

[17] *See* 16 U.S.C. § 1851(a)(7)–(8). It should not lightly be concluded that Congress intend to grant authority for the Council and NMFS to take actions that would put fishermen out of business. *See Arctic Sole Seafoods v. Gutierrez*, 622 F. Supp. 2d 1050, 1061 (W.D. Wash. 2008) (rejecting agency interpretation because it "leads to absurd results—the inevitable elimination of the fishery); *W. Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140 (D. Mass. 2010) ("[The MSA] creates a duty to allow for harvesting at optimum yield in the present, while at the same time protecting fishery output for the future[.]").

[18] The Council could certainly repeal or revoke any of its fishery management plans, but it must do so explicitly and by three-quarters majority approval of its voting members. 16 U.S.C. § 1854(h).

[19] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

Dr. John Quinn, NEFMC
April 12, 2017
Page 5

industry-funded monitoring] in so cryptic a fashion."[20]  Industry-funded monitoring as a normal course of fishery regulation is not only novel, but represents a shift of economic and political significance.

In the absence of authorization for the sort of industry-funded monitoring programs contemplated by the Omnibus Amendment, the Council can only be described as preparing to impose a "tax" to extract money from regulated parties in order to fund desired regulatory programs.  This cannot stand as "only Congress has the power to levy taxes."[21]  The Omnibus Amendment, as applied in future fishery management plan amendments, would also violate numerous statutes governing agency finance, such as the Anti-Deficiency Act[22] and the Miscellaneous Receipts Statutes.[23]  Finally, industry funding requirements would impermissibly compel fishermen into commercial transactions in violation of the Commerce Clause[24] and violate other parts of the Constitution, including the Fourth Amendment.

## II.    The Expected Economic Impact of the Omnibus Amendment, including Provisions for the Herring and Mackerel Fisheries, and Stakeholder Feedback Expose Other Important Deficiencies.

In line with the National Standards, the Omnibus Amendment and future industry-funded monitoring programs must "minimize costs,"[25] "provide for the sustained participation of [fishing] communities,"[26] and "minimize adverse economic impacts."[27]  The Omnibus Amendment fails to meet these standards, both generally

---

[20] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting the argument that Congress would delegate "broad and unusual authority through an implicit delegation").

[21] *Thomas v. Network Solutions*, 2 F. Supp. 2d 22, 29 (D.D.C. 1998); *see* U.S. Const., art. I., § 8, cl. 1; *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes[.]").

[22] *See* 31 U.S.C. § 1341(a)(1)(A)–(B); *see also Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir. 1995).

[23] *See* 31 U.S.C. § 3302(b); *see also Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996).  The Government Accountability Office has rejected the proposition that an agency can avoid the Miscellaneous Receipts Statute "by authorizing a contractor to charge fees to outside parties and keep the payments in order to offset costs that would otherwise be borne by agency appropriations."  Gov't Accountability Office, 2 Principles of Fed. Appropriations L. at 6-177 (3d ed. 2006).

[24] *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2587 (2012) (The government cannot "compel[] individuals to become active in commerce by purchasing a product.").

[25] 16 U.S.C. § 1851(a)(7).

[26] *Id.* § 1851(a)(8).

[27] *Id.*

Dr. John Quinn, NEFMC
April 12, 2017
Page 6

and with respect to the herring and mackerel alternatives, because it will have a severe and adverse impact on the fishing industry.

The expected economic impact on fishery-related business and communities is uniformly negative.[28] Monitoring costs in the herring fishery, for example, will likely exceed $710 per sea day for an at-sea monitor and $818 per sea day for a NEFOP-level observer.[29] Such costs are probably higher than the daily landings revenue of the typical small-scale vessel. This is certainly the case in the Northeast multispecies fishery. Under the groundfish sector at-sea monitoring program, up to 60% of the fleet is expected to "see negative returns to owner when full" monitoring costs "are factored in."[30] The Council cannot ignore the devastating economic effects of industry funding in the herring and mackerel fisheries, just as it cannot ignore the costs associated with the Omnibus Alternatives, which it has deemed too "speculative" to consider.[31]

It is worth noting the overwhelmingly negative feedback that the Council and NMFS have received in pursing the Omnibus Amendment. Of the eighty-three (83) submissions posted to the electronic docket during the last round of public comment, only six (6) voiced various levels of support for industry-funded monitoring; the vast majority — 93% — opposed it.[32] The reasons for this opposition are straightforward enough. Many small-scale fishermen cannot remain profitable if they must assume

---

[28] *See, e.g.,* Omnibus Amend. at xiii–xxiv; *id.* at 244 ("Overall, there will be *negative direct economic impacts to fishing vessels* as a result of selecting Omnibus Alternative 2[.]") (emphasis added).

[29] *Id.* at 291 (Table 89). For fishermen active in both the herring and the mackerel fisheries, these costs could rise even further. *See id.* at 301 ("Many of the vessels that would be impacted by industry-funded monitoring costs in the herring fishery would also be impacted by industry-funded monitoring costs in the mackerel fishery."). Total estimated costs for vessels active in the mackerel fishery will depend, of course, on the Mid-Atlantic Fishery Management Council's preferred mackerel coverage target alternatives, which have not yet been chosen.

[30] New Eng. Fishery Mgmt. Council, Draft Report: Preliminary Evaluation of the Impact of Groundfish-Sector Funded At Sea Monitoring on Groundfish Fishery Profits at 10 (June 19, 2015), *available at* http://bit.ly/28QUXwT. These costs are predicted to be heaviest for small vessels. *Id.* at 13 (Table 12). NMFS recognized these prospects, describing them as a "restructuring of the fleet." *Id.* at 10.

[31] Omnibus Amend. at 237 ("[P]otential downstream effects (e.g., subsequent management measures to address bycatch issues) of this action are considered too remote and speculative to be appropriate for consideration[.]").

[32] Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin., 81 Fed. Reg. 64,426 (Sept. 20, 2016), Docket No. NOAA-NMFS-2016-0139-0001, *available at* http://bit.ly/2p5NO1s.

Dr. John Quinn, NEFMC
April 12, 2017
Page 7

monitoring costs.[33]  The Long Island Commercial Fishing Association, for example, expects that the Omnibus Amendment's approximately $800 per sea day cost would force more than half of the entire New York-based fleet out of business.[34]  Stakeholders are also skeptical that increased monitoring has any connection to conservation or maintaining the sustainability of the fisheries, and they question the quality of the data collected.  Most importantly, however, the public recognizes that the MSA does *not*, in fact, authorize industry-funded monitoring simply because the Council or NMFS wishes it to do so,[35] and they acknowledge the potential constitutional problems.[36]

Apart from the lack of authority under the MSA for the Council and NMFS to impose monitoring costs on vessels, the Council has also failed to provide an adequate explanation for why increased monitoring is necessary, let alone justify that monitoring in light of the extreme financial burden it will put on fishermen.  Industry-funded monitoring, as proposed, would destroy multi-generational, small-business fishermen up-and-down the East Coast while benefitting industrial fishing firms.  That result is unacceptable.

---

[33] *See* Comment of Meghan Lapp, Seafreeze Ltd., on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0009, *available at* http://bit.ly/2nUf8Ph (discussing impact of herring and mackerel alternatives).

[34] *See* Comment of Long Island Commercial Fishing Ass'n on Omnibus Amend. (Nov. 8, 2016), Docket No. NOAA-NMFS-2016-0139-0084, *available at* http://bit.ly/2odOrsX ("The onus for NMFS required observer coverage should be on NMFS, not industry.  It is cost prohibitive.").

[35] *See, e.g.*, Comment of David Goethel on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0010, *available at* http://bit.ly/2o04Mye ("Monitoring is a function of government and should be funded at levels Congress deems appropriate through NOAA line items in the budget. . . . [The MSA] allows for the placement of observers on fishing boats but is silent on cost recovery except in specific fisheries in the North Pacific Region."); *see also* Comment of Gregg Morris on Omnibus Amend. (Nov. 8, 2016), Docket No. NOAA-NMFS-2016-0139-0080, *available at* http://bit.ly/2o09hJp (same).

[36] *E.g.*, Comment of N.C. Fisheries Ass'n on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0082, *available at* http://bit.ly/2oXBtAa (raising due process concerns) ("There was no reasonable opportunity for [public hearings] down in the affected states of Maryland, Virginia, and North Carolina.  Their involvement in the public hearings process was substantially truncate.  [Those] whose stand to be severely impacted . . . have not been given a single public hearing reasonably close enough for them to be expected to attend."); *cf.* Brooke Constance White, *Stonington fishermen, first selectman: Camera proposal violates Fourth Amendment rights*, THE WESTERLY SUN (Apr. 7, 2017), http://bit.ly/2o00maB.

Dr. John Quinn, NEFMC
April 12, 2017
Page 8

### III.    Conclusion

Thank you for your consideration of the foregoing comments.  If you have any questions, please do not hesitate to contact me at julie.smith@causeofaction.org or (202) 499-4232.

Sincerely,

JULIE A. SMITH
VICE PRESIDENT
CAUSE OF ACTION INSTITUTE

cc:    Mr. Michael Luisi, Chairman
Mid-Atlantic Fishery Management Council
800 North State Street, Ste. 201
Dover, DE 19901
E-mail: michael.luisi@maryland.gov

Mr. John Bullard, Administrator
Greater Atlantic Regional Fisheries Office
National Marine Fisheries Service
55 Great Republic Drive
Gloucester, MA 01930
E-mail: john.bullard@noaa.gov

Mr. Benjamin Friedman
Acting Administrator
National Oceanic and Atmospheric Administration
1401 Constitution Avenue NW, Rm. 5128
Washington, D.C. 20230

Hon. Wilbur L. Ross
Secretary of Commerce
U.S. Department of Commerce
1401 Constitutional Avenue N.W.
Washington, D.C. 20230

*15. Observer Policy Committee (April 18-20, 2017) M)*

#9

# CORRESPONDENCE

_0000015946

**Seafreeze Ltd.** 

100 Davisville Pier
North Kingstown, R.I. 02852 U.S.A.
Tel: (401)295-2585

March 30, 2017



RECEIVED

MAR 3 0 2017

NEW ENGLAND FISHERY
MANAGEMENT COUNCIL

Dear Herring Committee members,

Please find below information we submitted in our written comments for the IFM amendment. We believe they warrant serious consideration at the Committee's meeting on April 5.

———————————

Two of the major goals and objectives identified by the NEFMC for increasing monitoring in the herring fishery are "accurate catch estimates for incidental species for which catch caps apply", and "affordable monitoring for the herring fishery". The catch cap species being discussed with relation to small mesh bottom trawl vessels, which include our vessels, are river herring and shad. According to analysis of small mesh bottom trawl observer data (all fisheries), approximately 5%-22% coverage is needed to obtain a 30% CV for river herring and shad catch in that gear type.[1] These coverage levels are already being covered by SBRM[2] and the associated CV is already below 30%. In fact the small mesh bottom trawl herring fishery RH/S catch cap CV was 28.4% in 2014, and 24.5% in 2015.[3] Additionally, due to the fact that the small mesh bottom trawl fleet includes vessels with permits other than A and B permits, which are targeted by this amendment, the herring alternatives presented would never achieve a 0% CV, even at 100% coverage rates (which is why even 100% observer coverage on small mesh bottom trawl would only have a "Low Positive" on tracking catch caps)[4]. Even staff documents developed during this amendment process have indicated that even Alternative 2.2, <u>up to 100% ASM coverage on small mesh bottom trawl, will have "Negligible" effect on catch tracked against catch caps.[5] But it will not have a negligible economic effect, on small mesh bottom trawl vessels in general but particularly Seafreeze vessels.</u>

---

[1] Industry Funded Monitoring Omnibus Amendment Discussion Document, Mackerel Alternatives, Mid Atlantic Fishery Management Council, April 12-14, 2016. See https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/56fec92c04426225f77234f4/145953822336 8/Tab02_MSB-RHS-Committees.pdf, page 28.

[2] According to the Herring PDT Meeting Summary Dec 10, 2015, revised Jan 15, 2016, in 2014 observers covered 26.2% of all small mesh bottom trawl trips targeting herring, and preliminary estimates indicated 31% coverage on trips from January-June 2015. See http://s3.amazonaws.com/nefmc.org/3.151210-Herring-PDT-mtg-summary-REVISED.pdf.

[3] Industry Funded Monitoring Amendment Document, Mid Atlantic Fishery Management Council, May 2016. See https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57504cae746fb9ccc234ba75/14648803089 12/Tab09_IFM-Amendment.pdf, page 88.

[4] See http://s3.amazonaws.com/nefmc.org/3D_Staff-Presentation-on-Herring-Alternatives.pdf, slide 35.

[5] Ibid.

db 3/3/17

Coverage target considerations, according to the development of this amendment, should ensure that "Benefits of increased monitoring should equal or outweigh the costs of monitoring".[6] However, the amendment does not consider the daily catch capacity of vessels in its analysis or alternatives. Small mesh bottom trawl vessels, including Seafreeze vessels, are limited in daily harvesting capacity compared to other herring fishery gear types. Therefore, the daily financial burden on smaller capacity vessels is higher than on large capacity vessels. We have repeatedly raised this issue with the Councils.[7] The "Negligible" benefits of potential additional catch cap tracking do not outweigh the costs of monitoring for our lesser-daily-capacity small mesh bottom trawl vessels.

None of the additional monitoring alternatives in the document provide for "affordable monitoring for the herring fishery", especially Seafreeze vessels. Our vessels do not operate solely in the herring/mackerel fisheries; we have multiple permits. We do not always know what species will be available when we leave the dock, so we complete the regulatory call in/declaration process for all appropriate fisheries. We do not fish like other "herring" vessels. If the availability of one species changes, or is not what we had anticipated, we then have the flexibility to cover our operating costs by switching over to a different species. Because our vessels freeze at sea and have limited daily capacity, our trips are also of extended duration, so any daily at sea monitoring costs would impact us disproportionately to all other herring vessels.

To demonstrate this dynamic, several trips are highlighted below. Pre-trip declaration combined with length of trip is what will determine coverage and cost, not herring landed.

For example, on this 10 day trip below, our primary pre-trip declaration was herring, but the trip consists of no herring and is primarily loligo squid. A per day monitoring cost would be very expensive on a trip of that length. And all of the cost would be borne by squid revenue. This is not unusual. The following 5 day trip was also a declared "herring" trip, but landed no herring. These types of "herring" trips, if they were to incur an at sea monitoring cost would have to be paid for not by herring revenue, but other revenue:

1/15/14-1/24/14; 10 Days

Catch: Loligo - 97.67%

---

[6] Ibid, slide 38.
[7] See for example, our letter to the Councils at https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/551edc4ae4b0576112dc4bf3/142808583466 9/Tab+06_Industry+Funded+Observer+Amendment.pdf and http://s3.amazonaws.com/nefmc.org/5.-Council-Letter-Observer-Concerns.Seafreeze.pdf.

12/20/14-12/24/14; 5 Days (Shortened trip because of Christmas)

Catch: Butterfish - 88.92%, Loligo - 11.08%

Conversely, we have trips where we expect to find other species but do not, therefore relying on the flexibility to catch herring as a way to cover our costs. For example, these two trips, during which the primary pre-trip declaration was squid, herring was the primary species landed:

12/11/14-12/18/14; 8 Days

Herring - 100%

12/27/14-1/3/15; 8 Days

Herring - 98.1%

Sub Option 5 would exempt trips landing less than 25 mt from industry funded monitoring requirements, and has been suggested at meetings of a way to address this issue. However, that option will still not account for the fact that the decision whether or not to catch more significant amounts herring will still need to be made prior to leaving the dock. As the information above demonstrates, our primary declaration/intent is not always what determines what species our vessels land, which is why we ensure that we appropriately declare into all possible fisheries in order to maintain flexibility of operations. If that flexibility were taken away, not only would our entire style of fishing would be nullified, but could result in the above trips losing rather than making money. A 25 mt landing will not cover the cost of an 8 day trip.

Pages 301-302 of the EA (attached) illustrate this dynamic. Out of declared herring days in 2014 that did not land herring, 111 are attributed to small mesh bottom trawl, as compared to only 6 single midwater trawl and 4 paired midwater trawl. That would be 111 days of industry funded monitoring on small mesh bottom trawl vessels that would have to be covered by income from other fisheries. Small mesh bottom trawl costs for declared herring trips not landing herring range from $90,586 compared to $3,212 at paired midwater trawl and $5,217 at single midwater trawl for the same monitoring option. This is a function of the type of fishing style described above. Industry funded monitoring costs in this amendment are significantly heavier on small mesh bottom trawl vessels than other vessel types. This is combined with the fact that even on declared herring trips landing herring, small mesh bottom trawl

(i.e. "squid" vessels), have a 7% RTO compared to typical "herring and mackerel" vessels, which have a 15% RTO (page 299 of the EA ,attached). This is also a function of what has been previously mentioned due to daily capacity. Even at 25% ASM coverage, the cheapest cost estimate for small mesh bottom trawl, there is still a $19,657 annual cost burden for trips that do not even land herring. This amendment is about the erosion of profitability for our vessels.

The herring and mackerel alternatives in the IFM amendment were primarily initiated to address low observer coverage in the midwater trawl herring fishery due to changes with SBRM. It was not to make an entire style of fishing economically or operationally nonviable.  It is also not equitable that revenue from other fisheries be siphoned to pay for herring/mackerel monitoring. If our vessels are required to pay for a per day monitoring cost, we could be required to raise the prices on all our products to cover that expenditure.  Compounding that, we compete on and against a world market with all of our products, including herring. All of our products are food grade, which means that we have developed and rely on markets that solicit international competition. We are also competing price-wise with companies and vessels from nations where the fishing industry is subsidized by their national government. If forced to raise our prices to pay for an IFM cost, Seafreeze, as well as the United States, will be put at a competitive disadvantage internationally. If we do not increase our prices and the cost were to be paid for by the vessels and crew, the per day monitoring cost may outweigh daily crew compensation, and crews would be forced to pay for "benefits (vacation and sick leave)"[8] afforded to observers that crew themselves do not receive, all while receiving a smaller paycheck. This is inequitable.

Regardless, the industry funded monitoring amendment saddles Seafreeze vessels in particular with more economic harm than any other "herring" vessels due to the nature of our operations. This is unacceptable. Therefore, the only alternatives that we can support would be Alternative 1, No Action, or Alternatives 2.4-2.6, which would keep our vessels at SBRM coverage.

Thank you for your consideration.

Sincerely,

Meghan Lapp
Fisheries Laision, Seafreeze Ltd.

---

[8] See http://s3.amazonaws.com/nefmc.org/150701-Discussion-Document-Appendix.pdf, page 11.

TABLE 95. SUMMARY OF TOTAL TRIP COSTS FOR HERRING AND MACKEREL VESSELS IN 2014

| Cost Category | Description | Average Percent of 2014 Gross Revenue for Herring and Mackerel Vessels | Average Percent of 2014 Gross Revenue for Squid Vessels |
|---|---|---|---|
| Variable Costs | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| Crew Share | Total annual payments to crew | 28% | 26% |
| Repair, Maintenance, Upgrades, Haulout (RMUH) | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, safety equipment, upgrades and haulout. Because these costs vary considerably from year to year and are typically spread out over several years, only a portion of these costs were applied to 2014 revenue | 13% | 11% |
| Fixed Costs | Annual mooring, dockage, permits and licenses, insurance, quota and DAS lease, crew benefits, vessel monitoring, workshop and storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs Note: depreciation expense of the vessel is not included in fixed costs. | 19% | 21% |
| Return to Owner | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

The NEFMC is considering four types of industry-funded monitoring for the herring fishery, including NEFOP-level observers, at-sea monitors, EM, and portside sampling coverage. NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

_0000015951

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811,000 to $75,000 – a 91% reduction. However, Herring Alternative 2.5 only provides increased monitoring in the Groundfish Closed Areas.

Initial industry cost assumptions for Herring Alternative 2.4 estimated $325 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected for the duration of the trip, 100% vide review) and $5.12 per mt for portside sampling (administration and sampling cost) on close to 100% of trips. Revised industry cost assumptions for Herring Alternative 2.4 estimated $187 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected around haulback, 50% video review) and $3.84 per mt for portside sampling (only sampling costs) on close to 50% of trips. Using the revised cost assumptions rather than the initial cost assumption for Herring Alternative 2.4 reduces total industry monitoring costs by 51% ($457,595 to $222,958) in Year 2 for paired midwater trawl vessels and reduces costs by 54% ($134,165 to $61,067) in Year 2 for single midwater trawl vessels.

Many of the vessels that would be impacted by industry-funded monitoring costs in the herring fishery would also be impacted by industry-funded monitoring costs in the mackerel fishery. For example, all the vessels impacted by Herring Alternative 2.1 would also be impacted by Mackerel Alternative 2.1.

A trip must be a declared herring trip in order to land 1 lb or more of herring. The economic analysis focused on trips that landed 1 lb or more of herring because those are the trips that would be subject to industry-funded monitoring. However, industry participants also requested consideration of the economic impacts associated with declared herring trips that did not land any herring.

In 2014, there were 121 sea days for 22 trips that had no herring landings. If 100% NEFOP-level observer coverage was required on those trips, then $98,978 would have been spent monitoring those trips. If 100% at-sea monitoring coverage was required on those trips, then $85,910 would have been spent monitoring those trips. The breakdowns of these costs by gear type as well as other coverage levels and monitoring types are provided in Table 96.

TABLE 96. MONITORING COSTS ASSOCIATED WITH DECLARED HERRING TRIPS THAT DID NOT LAND HERRING IN 2014.

| | Small Mesh Bottom Trawl | Single Midwater Trawl | Paired Midwater Trawl | Total |
|---|---|---|---|---|
| Permit Category | A | A | A | |
| Total Number of Days | 111 | 6 | 4 | 121 |
| Total NEFOP Cost – 100% Coverage | $90,586 | $5,217 | $3,212 | $99,015 |
| Total ASM Cost – | $78,626 | $4,528 | $2,788 | $85,943 |

_0000015952

Industry-Funded Monitoring Omnibus Amendment

| | | | | |
|---|---|---|---|---|
| **100% Coverage** | | | | |
| **Total ASM Cost – 75% Coverage** | $58,970 | $3,396 | $2,091 | $64,457 |
| **Total ASM Cost – 50% Coverage** | $39,313 | $2,264 | $1,394 | $42,971 |
| **Total ASM Cost – 25% Coverage** | $19,657 | $1,132 | $697 | $21,486 |
| **Total EM Cost, Year 2 – $325 per day** | | $2,073 | $1,276 | $3,349 |
| **Total EM Cost, Year 2 – $187 per day** | | $1,193 | $734 | $1,927 |

The tables and box plots on the following pages provide summarized economic data for each of the herring coverage target alternatives. The economic impact on vessels associated with paying for monitoring coverage is described as a percentage of RTO for each herring coverage target alternative in the following figures. The tables provide the mean and median number of sea days per vessel that would result from each of the alternatives, as well as the mean and median RTO that would ultimately be reduced by the industry-funded monitoring costs. Additionally, fleet level effort, revenue, and monitoring cost information for each herring coverage target alternative are also provided. Additional economic analysis is available in Appendix 8.

### 4.2.5.1  Impacts of Herring Alternatives 1 and 2 on Fishery-Related Businesses

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP. Monitoring for herring vessels would be allocated according to SBRM. If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis. Under Herring Alternative 1, additional costs to vessels participating in the herring fishery associated with monitoring coverage, if there were any, would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-by-FMP basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 will not likely affect the setting of

_0000015953

 

the TownDock

RECEIVED

MAR 3 0 2017

NEW ENGLAND FISHERY
MANAGEMENT COUNCIL

March 28, 2017

Dear Herring Advisory Panel/Committee Members,

I am writing to comment on the Omnibus Industry Funded Monitoring Amendment as it pertains to herring.

I've submitted several written comments to both the New England and Mid-Atlantic Councils regarding this Amendment and made public comments at each meeting stating our opposition to this Amendment on the grounds of our vessels not being able to afford to pay for the additional monitoring. The majority of our vessels do not have the capacity to hold enough fish to offset the cost of $700/day after the costs of simply going out to fish (ex. fuel, oil, boat tracs, food and gear) are taken off the top.

In order to curb this, would the Committee and Advisory Panel consider recommending an exemption to those vessels landing 50MT or less? We would understand that a regulation would be necessary for us to call in ahead of time stating we would not bring in any more than 50MT of herring, in order to be exempt from monitoring. This would help us keep herring an affordable fishery to participate in.

Thank you for providing us the opportunity to comment and considering my request.

Sincerely,

Katie Almeida
Fishery Policy Analyst

The Town Dock: P.O. Box 608; 45 State St Narragansett, RI 02882
PH: 401-789-2200  FAX: 401-782-4421
Website: www.towndock.com





RECEIVED
APR 07 2017
NEW ENGLAND FISHERY
MANAGEMENT COUNCIL

April 7, 2017

Dear Council Members,

I am writing to comment on the Omnibus Industry Funded Monitoring Amendment as it pertains to herring. I've submitted several written comments to the Council regarding this Amendment and the lack of affordability since its start. The majority of our vessels do not have the capacity to hold enough fish to offset the cost of $700/day after the costs of simply going out to fish (ex. fuel, oil, boat tracs, food and gear) are taken off the top.

This past week the herring AP and Committee passed motions regarding this issue and are sending them along to the Council in hopes they will consider adding these new alternatives to the Amendment.

We strongly support the 50MT exemption for all gear types and the 50MT/day exemption for the frozen at sea processor vessels. We ask that you please consider these two additions to the Amendment as this would continue to make herring a profitable fishery for the port of Point Judith to participate in.

Thank you considering my request.


Sincerely,


Katie Almeida
Fishery Policy Analyst

_0000015955

_0000015956



| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| * | * | * | | * |
| Iiwi (honeycreeper) .................... | *Drepanis coccinea* .................... | Wherever found ........................ | T | [**Federal Register** citation when published as a final rule]. |
| * | * | * | | * |

Dated: September 2, 2016.

**Bryan Arroyo,**

*Acting Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2016–22592 Filed 9–19–16; 8:45 am]

**BILLING CODE 4333–15–P**

---

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 648

RIN 0648–XE888

### Mid-Atlantic Fishery Management Council (MAFMC); New England Fishery Management Council (NEFMC); Public Hearings

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice of public hearings; request for comments.

**SUMMARY:** The Mid-Atlantic and New England Fishery Management Councils are developing an omnibus amendment to allow for industry-funded monitoring. This amendment includes omnibus alternatives that would modify all the fishery management plans managed by the Mid-Atlantic and New England Fishery Management Councils to allow for standardized and streamlined development of future industry-funded monitoring programs. Additionally, this amendment includes alternatives for new industry-funded monitoring programs for the Atlantic Herring Fishery Management Plan and the Atlantic Mackerel, Squid, and Butterfish Fishery Management Plan.

**DATES:** Written comments on the Industry-Funded Monitoring Omnibus Amendment (IFM Amendment) will be accepted from Friday, September 23, 2016, until Monday, November 7, 2016.

**ADDRESSES:** You may submit written comments by any of the following methods:

• *Electronic Submission:* Submit all electronic public comments via the Federal e-Rulemaking Portal. Go to *www.regulations.gov/*

*#!docketDetail;D=NOAA-NMFS-2016-0125*, click the "Comment Now!" icon, complete the required fields, and enter or attach your comments;

• *Mail:* John K. Bullard, Regional Administrator, NMFS, Greater Atlantic Regional Fisheries Office, 55 Great Republic Drive, Gloucester, MA 01930. Mark the outside of the envelope "Comments on IFM Omnibus Amendment;"

• Comments may also be provided verbally at any of the five public hearings. See **SUPPLEMENTARY INFORMATION** for dates, times, and locations.

**FOR FURTHER INFORMATION CONTACT:** Daniel Luers, Fishery Management Specialist, (978) 282–8457. The IFM Amendment will be available on the NMFS Greater Atlantic Regional Office Web site (*www.greateratlantic.fisheries.noaa.gov*) and the Council Web sites (*www.mafmc.org, www.nefmc.org*) starting on September 23, 2016. In addition, please visit any of the Web sites for details on meeting locations, webinar listen-in access, and public hearing materials.

**SUPPLEMENTARY INFORMATION:** The Mid-Atlantic and the New England Fishery Management Councils have initiated an amendment to allow for industry-funded monitoring in all of the fishery management plans managed by the Councils. The industry-funded monitoring would be used to assess the amount and type of catch, more precisely monitor annual catch limits, and provide other information for management. This increased monitoring would be above coverage required under the standardized bycatch reporting methodology, the Endangered Species Act, or the Marine Mammal Protection Act. The amount of available Federal funding to support additional monitoring and legal constraints associated with sharing the costs of industry-funded monitoring between NMFS and the fishing industry have recently prevented NMFS from approving proposals for industry-funded monitoring in some fisheries.

The Omnibus Alternatives consider the following for new industry-funded monitoring programs: (1) Standard cost

responsibilities associated with industry-funded monitoring for NMFS and the fishing industry; (2) a process for fishery management plan-specific industry-funded monitoring to be implemented via a future framework adjustment action; (3) standard administrative requirements for industry-funded monitoring service providers; (4) a process to prioritize industry-funded monitoring programs in order to allocate available Federal resources across all fishery management plans; and (5) a process for monitoring set-aside programs to be implemented via a future framework adjustment action.

This amendment also includes industry-funded monitoring coverage target alternatives for the Atlantic herring and mackerel fisheries. Specifically, this amendment considers a variety of monitoring types and coverage targets to address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species for which catch caps apply; and (3) effective and affordable monitoring for the herring and mackerel fisheries.

### Public Hearings

The dates and locations of the public hearings are as follows.

• *Tuesday, October 4, 2016, 6–8 p.m.,* Greater Atlantic Regional Fisheries Office, 55 Great Republic Drive, Gloucester, MA 01930, telephone: (978) 281–9300;

• *Monday, October 17, 2016, 5–7 p.m.,* Internet webinar, connection information to be available at (*http://mafmc.adobeconnect.com/ifm-hearing/*) or by contacting NMFS or either Council at the above addresses.

• *Thursday, October 20, 2016, 6–8 p.m.,* Double Tree by Hilton Hotels, 363 Maine Mall Road, Portland, ME 04106, telephone: (207) 775–6161;

• *Thursday, October 27, 2016, 5–7 p.m.,* Congress Hall, 200 Congress Place, Cape May, NJ 08204, telephone: (888) 944–1816;

• *Tuesday, November 1, 2016, 6–8 p.m.,* Corless Auditorium, Watkins Building University of Rhode Island Graduate School of Oceanography, 218 Ferry Road, Narragansett, RI 02874.

**Special Accommodations**

These public hearings are accessible to people with disabilities. Requests for sign language interpretation or other auxiliary aid should be directed to Dr.

Fiona Hogan (NEFMC) at *fhogan@ nefmc.org*, (978) 465–0492 (x121), or Jason Didden (MAFMC) at *jdidden@ mafmc.org*, (302) 526–5254, at least 5 days prior to the meeting date.

**Authority:** 16 U.S.C. 1801 *et seq.*

Dated: September 14, 2016.

**Emily H. Menashes,**

*Acting Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*

[FR Doc. 2016–22493 Filed 9–19–16; 8:45 am]

**BILLING CODE 3510–22–P**

_0000016722

# Document Metadata:NOAA-NMFS-2016-0139-0002



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA_FRDOC_0001-DRAFT-20815 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0002 |
| **Title:** | Comment from jean  publiee |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 09/20/2016 |
| **Date Posted:** | 10/25/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 10/25/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Jaburek, Shannah (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8s0j-vmo4 |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

setting up a voluntary systemn where the fish cathcers monitor their ownj fish catching is an invitaiton to corruption. it certainly will nver work. they all work together to poach and shoot marine life so nothnig will affect their fish murder. this system that you proposae is worthless. it is simply allowing the robber tto keep robbing onlyh in greater numbers and pounds., its clear we have surveillance and can look from satellites of what is going on in these plundering boats that are taking one thousand percent more than the quotas they get. the poaching is enormous. the stealing is enormous. no way is this a sound idea. its just ridiculous, specious, unsound and a stupid idea. the robbbers will never turn themselves in. this comemtn is for hte public record. on this nonsense you are putting out. of course you are in their bailiwick so you wouldnt do a thing to curtail their takes. your reglations is a fake.  *

**First Name:** jean  *

**Middle Name:**

**Last Name:** publiee  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0003



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA_FRDOC_0001-DRAFT-20817 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0003 |
| **Title:** | Comment from Jason Amaru |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 09/26/2016 |
| **Date Posted:** | 10/25/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 10/25/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Jaburek, Shannah (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**    1k0-8s4e-vz1g

**Page Count:**    1

**Total Page Count**    1
**Including Attachments:**

## Submitter Info

**Comment:**    I, along with many other small scale commercial fishing
operations around New England, will not have enough money left
over after lease expenses, operating expenses, etc, to pay my
crew or myself a reasonable wage if hundreds of dollars has to
come off the settlement to pay an observer. The fact that many
years of cumulative data have already been collected should
ease the necessity of having to take observer on board, as the
discard rates and applied discard rates can now be averaged to
a vessel in a certain fishery, a certain gear type, a certain
area. Honestly, this program is a bottomless money pit which
does not justify it's expense and overbearing intrusion of
privacy. The outcomes of what is caught and discarded is
predictable and this program is unwarranted on merit and on
cost, despite what the ngo's would have the public believe. ✱

**First Name:**    Jason ✱

**Middle Name:**

**Last Name:**    Amaru ✱

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0004



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA_FRDOC_0001-DRAFT-20816 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0004 |
| **Title:** | Comment from Rachael  Anonymous |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 09/26/2016 |
| **Date Posted:** | 10/25/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 10/25/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Jaburek, Shannah (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8s4d-dg0d |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

If industry funded observer coverage is implemented, please reconsider using a solicitation based observer coverage plan. Solicitation based coverage will place an unbalanced financial burden on those boats that are either favored by the observers or those that are easier to solicit by an observer. This would would put a financial burden on the boats that are willing to take observers and make the role of soliciting even more difficult for the observer provider. A randomized selection system will need to be used. Also please consider using landing incentives for those boats that will be carrying an observer in order to allow the crew to afford the observer. The burden of the paying for the observer will most likely be taken from the captain and crew's income, not the boat-owners. Landing incentives may be difficult in fisheries with state-specific quotas, but hopefully a portion of the TAL for the year for that specific fishery can be set aside for those boats carrying observers. Currently non-groundfish or scallop fisheries do not have an option in their observer provider. Please consider opening the market to more observer provider options if the program becomes industry funded. This will allow market competition to choose for those providers that are able to be the most cost effective while providing the necessary data. It is apparent in the NEFOP observer program that an inefficient solicitation based program is costing the program money. It will be unfair to pass this burden to fishermen without allowing the market to clean up the inefficiencies in the process. *

| | |
|---|---|
| **First Name:** | Rachael * |
| **Middle Name:** | |
| **Last Name:** | Anonymous * |
| **Mailing Address:** | 26364 Walters Hwy |
| **Mailing Address 2:** | |
| **City:** | Windsor |
| **Country:** | |
| **State or Province:** | |
| **ZIP/Postal Code:** | 23487 |
| **Email Address:** | mauloricor@gmail.com |
| **Phone Number:** | 7852203902 |

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2016-0139-0005



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139 🌐

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  * 🌐

**Document File:** 📄HTML

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned 🌐

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0004

**Current Document ID:** NOAA-NMFS-2016-0139-0005

**Title:** Comment from Mark S Phillips 🌐

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS  * 🌐

**Document Subtype:** 🌐

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001 🌐

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings 🌐

**Status:** Posted 🌐

**Received Date:** 11/04/2016  * 🌐

**Date Posted:** 11/07/2016 🌐

**Posting Restriction:** No restrictions 🌐

**Submission Type:** Web

**Number of Submissions:** 1  *

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016 🌐

**Comment Due Date:** 11/07/2016 🌐

**DOC Docket No.:**

_0000016732

**XRIN:**

**Tracking Number:** 1k0-8sug-xtga

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** I do not support the Industry funding of monitors. Fishermen can not afford this in groundfish and can not afford this in any other fishery. The quality of data provided is questionable at best with over 50% of monitors/observers having less than 12 months experience. This is an industry funded training program that encourages people with questionable ideals about fishing to be enviro police with limited knowledge. The issue is whether a fisherman with more than 50 years experience is more knowledgeable than a monitor with a few days of experience. I can support Herring Alternatives 2.4,2.5,2.6 when fishing in large mesh areas. Although I am against them paying for this coverage. Mark S Phillips   *

**First Name:** Mark S   *

**Middle Name:**

**Last Name:** Phillips   *

**Mailing Address:** 210 Atlantic Ave

**Mailing Address 2:**

**City:** Greenport

**Country:** United States

**State or Province:** New York

**ZIP/Postal Code:** 11944

**Email Address:** mark.st.phillips@gmail.com

**Phone Number:** 516-361-3253

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0006



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0005 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0006 |
| **Title:** | Comment from Dick  Grachek |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/04/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**          1k0-8sug-rnrs

**Page Count:**               1

**Total Page Count**          1
**Including Attachments:**

## Submitter Info

**Comment:**                  NOAA's "fast track" and "agency priority" aquaculture campaign
                              devotes hundreds of millions to push this unhealthy way to
                              raise fish in captivity--but NOAA can't seem to find the money
                              in their $8 billion budget to finance its own mandated "at sea
                              monitor program" on fishing vessels---just to "keep the
                              fishermen honest"? NOAA is shunting over to the fishermen the
                              cost of these useless onboard monitors to the tune of $700 to
                              $800 per day. My vessel provides income for four families
                              directly and any added financial burden will put us out of
                              business. This is a disgrace and an obvious ploy to further
                              "reduce fleet overcapacity" which of course is also bogus
                              since the "fleet' has been reduced by some 80% already over
                              the last decades. We cannot take any more of this disrespect
                              and hostility towards our local fishing communities. Stop this
                              insanity and realize how outrageous it is to burden an
                              industry with the cost of a government mandated program! *

**First Name:**               Dick *

**Middle Name:**

**Last Name:**                Grachek *

**Mailing Address:**          6 Godfrey Street

**Mailing Address 2:**

**City:**                     Mystic

**Country:**                  United States

**State or Province:**        Connecticut

**ZIP/Postal Code:**          06355

**Email Address:**            dickgrachek@gmail.com

**Phone Number:**             860-536-1356

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0007



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0006 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0007 |
| **Title:** | Comment from Katie Almeida |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/04/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**  1k0-8sui-kyd5

**Page Count:**  1

**Total Page Count Including Attachments:**  1

## Submitter Info

**Comment:**  See attached file(s)  *

**First Name:**  Katie  *

**Middle Name:**

**Last Name:**  Almeida  *

**Mailing Address:**  45 State Street

**Mailing Address 2:**

**City:**  Narragansett

**Country:**  United States

**State or Province:**  Rhode Island

**ZIP/Postal Code:**  02882

**Email Address:**  kalmeida@towndock.com

**Phone Number:**  (508) 930 2633

**Fax Number:**

**Organization Name:**

**Cover Page:**



November 4, 2016

John K Bullard
Regional Administrator
Greater Atlantic Fisheries Office
55 Great Republic Drive
Gloucester MA, 01930

Dear Mr. Bullard,

I am writing to comment on the Omnibus Industry Funded Monitoring Amendment.
Back in August of 2015 I submitted comments to both the New England and Mid-Atlantic
Councils regarding this Amendment.  I was also present at the Philadelphia Council meeting
that year where I again stated my opposition to this Amendment on the grounds of our vessels
not being able to afford to pay for the additional monitoring.  Back then I wrote and spoke
about this Amendment in regards to our herring vessels; today I'd like to add that we are
against the Amendment as a whole.  Asking vessels to pay more for observers in all FMPS while
those in sectors have started paying for coverage this year is a huge financial burden.
We understand and appreciate that more information is wanted on various species in order to
make better management decisions and we think that this would be a perfect time and reason
to resurrect the Research Set-Aside Program to help pay for the additional data that needs to
be gathered.
Bringing the RSA program back would benefit both the fishermen and the scientists as it would
provide a cost covering mechanism to make sure that fishermen are not losing money while
they provide the increased information that the scientists are looking for.
Looking into developing an FMP specific RSA program is something we'd like to see analyzed.

Thank you for providing us the opportunity to comment.

Sincerely,

Katie Almeida
Fishery Policy Analyst

**The Town Dock:  P.O. Box 608; 45 State St  Narragansett, RI 02882**
**PH: 401-789-2200  FAX: 401-782-4421**
**Website: www.towndock.com**

# Document Metadata:NOAA-NMFS-2016-0139-0008



## Document Details

**Docket ID:**                    NOAA-NMFS-2016-0139

**Docket Title:**             Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings　＊

**Document File:**           HTML

**Docket Phase:**             Notice

**Phase Sequence:**         1

**RIN:**                          Not Assigned

**Original Document ID:**    NOAA-NMFS-2016-0139-DRAFT-0007

**Current Document ID:**    NOAA-NMFS-2016-0139-0008

**Title:**                   Comment from Mark S Phillips

**Number of Attachments:**    0

**Document Type:**         PUBLIC SUBMISSIONS　＊

**Document Subtype:**

**Comment on Document ID:**    NOAA-NMFS-2016-0139-0001

**Comment on Document Title:**  Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:**               Posted

**Received Date:**         11/04/2016　＊

**Date Posted:**            11/07/2016

**Posting Restriction:**     No restrictions

**Submission Type:**       Web

**Number of Submissions:**    1　＊

## Document Optional Details

**Status Set Date:**         11/07/2016

**Current Assignee:**       NA

**Status Set By:**            Luers, Daniel (NOAA)

**Comment Start Date:**      09/20/2016

**Comment Due Date:**       11/07/2016

**DOC Docket No.:**

**XRIN:**

**Tracking Number:**      1k0-8suk-s1yr

**Page Count:**      1

**Total Page Count
Including Attachments:**      1

# Submitter Info

**Comment:**      I do not support the Industry funding of monitors. Fishermen can not afford this in groundfish and can not afford this in any other fishery. The quality of data provided is questionable at best with over 50% of monitors/observers having less than 12 months experience. This is an industry funded training program that encourages people with questionable ideals about fishing to be enviro police with limited knowledge. The issue is whether a fisherman with more than 50 years experience is more knowledgeable than a monitor with a few days of experience. I was in a fishery with 100% observer coverage and even though the data was very favorable the deterination wrote that although no birds were caught or observed we musty be catching them because other fisheries on another coast was catching them. That fishery was tuna pair trawling and although politically contentous it was very clean. Observer data meant nothing, facts meant nothing. The moral of this is no matter how good the data is if perception is not the same as the data then 100% observer coverage will not be good enough. Mark S Phillips *

**First Name:**      Mark S *

**Middle Name:**

**Last Name:**      Phillips *

**Mailing Address:**      210 Atlantic Ave

**Mailing Address 2:**

**City:**      Greenport

**Country:**      United States

**State or Province:**      New York

**ZIP/Postal Code:**      11944

**Email Address:**      mark.st.phillips@gmail.com

**Phone Number:**      516-361-3253

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0009



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0008 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0009 |
| **Title:** | Comment from Meghan Lapp |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/04/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**    1k0-8suk-pll2

**Page Count:**    1

**Total Page Count**    1
**Including Attachments:**

## Submitter Info

**Comment:**    Please find our comments attached.  *

**First Name:**    Meghan  *

**Middle Name:**

**Last Name:**    Lapp  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**    Seafreeze Ltd.

**Cover Page:**

**Seafreeze Ltd.** 

November 4, 2016

100 Davisville Pier
North Kingstown, R.I. 02852 U.S.A.
Tel: (401)295-2585

**Re: Comments on Industry-Funded Monitoring Omnibus Amendment Public Hearing Document
September 2016**

1. **Omnibus Alternatives**.

    According to the document, the purpose of this omnibus amendment is to "allow the NEFMC and MAFMC to develop industry funded monitoring programs for the collection of information in addition to SBRM", because the "amount of available Federal funding to support additional monitoring" has been a constraint in the past and "this action is needed for the Councils to prioritize industry-funded monitoring programs across fishery management plans when available Federal funding falls short of the total needed to fully fund all monitoring programs." (Page 5). Discussions surrounding this document have highlighted the desire by Councils and other groups for more collection of management-related and even scientific information, as well as information related to enforcement of management measures and regulations. We do not agree that programs for collection of information or monitoring/enforcement of regulations are a cost that should be financially borne by industry, particularly when the Federal government is at a loss for finances to do so.

    The Magnuson Stevens Act (MSA) specifically addresses the purpose/need for the amendment as specified on page 5 of the public information document "for the collection of information in addition to SBRM". Section 402 of the Act, "Information Collection", reads as follows:
    (a) COLLECTION PROGRAMS.-
       (1) COUNCIL REQUESTS.- If a Council determines that additional information would be beneficial for developing, implementing, or revising a fishery management plan….the Council may request that the Secretary implement an information collection program which would provide the types of information specified by the Council……
       (2) SECRETARIAL INITIATION.-If the Secretary determines that additional information is necessary for developing, implementing, revising **or monitoring** a fishery management plan…the Secretary may, by regulation, **implement an information collection or observer program requiring submission of such additional information for the fishery."** (emphasis ours).

    Therefore, the MSA is clear how additional Council desired information collection programs for fishery management plans, including monitoring or observer programs, are to be implemented. Section 402(d) details how the Secretary may provide grants, contracts, or other financial assistance for the purposes of carrying out information collection programs. Should the Council or NMFS wish to see observers involved in the "collection of information in addition to

1

SBRM" (page 5), evident considering that IFM documents prepared during the development of this amendment provided breakdowns of monitor/observer training costs sought to be shared between the agency and the industry,[1] the MSA also provides for sharing of observer training costs, but not with industry. Section 403 OBSERVERS reads as follows:

(b)  TRAINING.- The Secretary, in cooperation with the appropriate states and the National Sea Grant College Program, shall- ….

(3)  make use of university and any appropriate private nonprofit organization training facilities and resources, where possible, in carrying out this subsection.

Therefore, it appears that universities or nonprofit organizations concerned with specific observer data collection in an FMP may share cost responsibilities of observer training for those programs or observer information collection programs. However, the section says nothing about industry sharing these costs.

Furthermore, management bodies are continually searching for more and better information, and public pressure can and will direct their searches both in magnitude and specificity. In fact, the initial basis for this amendment- the herring and mackerel alternatives- were created in response to various special interest groups and allegations with regards to those fisheries resulting from what was described at a Joint Observer/Herring Committee Meeting on July 1, 2015 as a "public perception problem". At that meeting, the Joint Committees approved a motion recommending that the problem statement for the herring and mackerel components of the IFM amendment be: "The public questions the accuracy of catch (landings and discards) estimates in the fishery….".[2] Private individuals should not be required to foot the bill to address a public perception problem. This is inequitable, and leaves the door open for uninformed public media campaigns to pressure Councils into forcing fishing vessels to pay for all publicly desired information in the future at personal financial loss. Public funds should be used for public purposes. However, as previously mentioned, the MSA does allow for observer training costs to be shared with universities and non-profit organizations should those organizations desire to make facilities and resources available for so doing.

Because the amendment does not address or acknowledge any of these issues, we can only support Omnibus Alternative 1, No Action.

2.  **Herring Alternatives**.

Two of the major goals and objectives identified by the NEFMC for increasing monitoring in the herring fishery are "accurate catch estimates for incidental species for which catch caps apply", and "affordable monitoring for the herring fishery". The catch cap species being discussed with relation to small mesh bottom trawl vessels, which include our vessels, are river herring and shad. According to analysis of small mesh bottom trawl observer data (all fisheries), approximately 5%-22% coverage is needed to obtain a 30% CV for river herring and shad catch in that gear type.[3] These coverage levels are

---

[1] See Industry Funded Monitoring Omnibus Amendment July 1, 2015 Discussion Document Appendix, http://s3.amazonaws.com/nefmc.org/150701-Discussion-Document-Appendix.pdf, page 10-11, which lists NMFS annual training costs for monitors and a cost per observed sea day of $61 per day to industry vessels for training.

[2] See http://s3.amazonaws.com/nefmc.org/7_July-1-final-mtg-summary-observer_herring.pdf.

[3] Industry Funded Monitoring Omnibus Amendment Discussion Document, Mackerel Alternatives, Mid Atlantic Fishery Management Council, April 12-14, 2016. See

2

_0000016744

already being covered by SBRM[4] and the associated CV is already below 30%. In fact the small mesh bottom trawl herring fishery RH/S catch cap CV was 28.4% in 2014, and 24.5% in 2015.[5] Additionally, due to the fact that the small mesh bottom trawl fleet includes vessels with permits other than A and B permits, which are targeted by this amendment, the herring alternatives presented would never achieve a 0% CV, even at 100% coverage rates (which is why even 100% observer coverage on small mesh bottom trawl would only have a "Low Positive" on tracking catch caps)[6]. Even staff documents developed during this amendment process have indicated that even Alternative 2.2, up to 100% ASM coverage on small mesh bottom trawl, will have "Negligible" effect on catch tracked against catch caps.[7] But it will not have a negligible economic effect, on small mesh bottom trawl vessels in general but particularly Seafreeze vessels.

Coverage target considerations, according to the development of this amendment, should ensure that "Benefits of increased monitoring should equal or outweigh the costs of monitoring".[8] However, the amendment does not consider the daily catch capacity of vessels in its analysis or alternatives. Small mesh bottom trawl vessels, including Seafreeze vessels, are limited in daily harvesting capacity compared to other herring fishery gear types. Therefore, the daily financial burden on smaller capacity vessels is higher than on large capacity vessels. We have repeatedly raised this issue with the Councils.[9] The "Negligible" benefits of potential additional catch cap tracking do not outweigh the costs of monitoring for our lesser-daily-capacity small mesh bottom trawl vessels.

None of the additional monitoring alternatives in the document provide for "affordable monitoring for the herring fishery", especially Seafreeze vessels. Our vessels do not operate solely in the herring/mackerel fisheries; we have multiple permits. We do not always know what species will be available when we leave the dock, so we complete the regulatory call in/declaration process for all appropriate fisheries. We do not fish like other "herring" vessels. If the availability of one species changes, or is not what we had anticipated, we then have the flexibility to cover our operating costs by switching over to a different species.  Because our vessels freeze at sea and have limited daily capacity, our trips are also of extended duration, so any daily at sea monitoring costs would impact us disproportionately to all  other herring vessels.

To demonstrate this dynamic, several trips are highlighted below. Pre-trip declaration combined with length of trip is what will determine coverage and cost, not herring landed.

---

[4] https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/56fec92c04426225f77234f4/1459538223368/Tab02_MSB-RHS-Committees.pdf, page 28.

[4] According to the Herring PDT Meeting Summary Dec 10, 2015, revised Jan 15, 2016, in 2014 observers covered 26.2% of all small mesh bottom trawl trips targeting herring, and preliminary estimates indicated 31% coverage on trips from January-June 2015. See http://s3.amazonaws.com/nefmc.org/3.151210-Herring-PDT-mtg-summary-REVISED.pdf.

[5] Industry Funded Monitoring Amendment Document, Mid Atlantic Fishery Management Council, May 2016. See https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57504cae746fb9ccc234ba75/1464880308912/Tab09_IFM-Amendment.pdf, page 88.

[6] See http://s3.amazonaws.com/nefmc.org/3D_Staff-Presentation-on-Herring-Alternatives.pdf, slide 35.

[7] Ibid.

[8] Ibid, slide 38.

[9] See for example, our letter to the Councils at https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/551edc4ae4b0576112dc4bf3/1428085834669/Tab+06_Industry+Funded+Observer+Amendment.pdf and http://s3.amazonaws.com/nefmc.org/5.-Council-Letter-Observer-Concerns.Seafreeze.pdf.

3

For example, on this 10 day trip below, our primary pre-trip declaration was herring, but the trip consists of no herring and is primarily loligo squid. A per day monitoring cost would be very expensive on a trip of that length. And all of the cost would be borne by squid revenue. This is not unusual. The following 5 day trip was also a declared "herring" trip, but landed no herring. These types of "herring" trips, if they were to incur an at sea monitoring cost would have to be paid for not by herring revenue, but other revenue:

1/15/14-1/24/14; 10 Days
Bluefish - .03%
Butterfish - .36%
Loligo - 97.67%
Illex - 1.45%

12/20/14-12/24/14; 5 Days (Shortened trip because of Christmas)
Butterfish - 88.92%
Loligo - 11.08%

Conversely, we have trips where we expect to find other species but do not, therefore relying on the flexibility to catch herring as a way to cover our costs.  For example, these two trips, during which the primary pre-trip declaration was squid, herring was the primary species landed:

12/11/14-12/18/14; 8 Days
Herring - 100%

12/27/14-1/3/15; 8 Days
Butterfish - 1.2%
Mackerel - .26%
Herring - 98.1%
Loligo - .44%

Sub Option 5 would exempt trips landing less than 25 mt from industry funded monitoring requirements, and has been suggested at meetings of a way to address this issue. However, that option will still not account for the fact that the decision whether or not to catch more significant amounts herring will still need to be made prior to leaving the dock. As the information above demonstrates, our primary declaration/intent is not always what determines what species our vessels land, which is why we ensure that we appropriately declare into all possible fisheries in order to maintain flexibility of operations. If that flexibility were taken away, not only would our entire style of fishing would be nullified, but could result in the above trips losing rather than making money.  A 25 mt landing will not cover the cost of an 8 day trip.

Pages 301-302 of the EA (attached) illustrate this dynamic. Out of declared herring days in 2014 that did not land herring, 111 are attributed to small mesh bottom trawl, as compared to only 6 single midwater trawl and 4 paired midwater trawl. That would be 111 days of industry funded monitoring on small mesh bottom trawl vessels that would have to be covered by income from other fisheries. Small mesh bottom trawl costs for declared herring trips not landing herring range from $90,586 compared to $3,212 at paired midwater trawl and $5,217 at single midwater trawl for the same monitoring option. This is a function of the type of fishing style described above. Industry funded monitoring costs in this amendment are significantly heavier on small mesh bottom trawl vessels than other vessel types. This is

4

combined with the fact that even on declared herring trips landing herring, small mesh bottom trawl (i.e. "squid" vessels), have a 7% RTO compared to typical "herring and mackerel" vessels, which have a 15% RTO (page 299 of the EA ,attached). This is also a function of what has been previously mentioned due to daily capacity. Even at 25% ASM coverage, the cheapest cost estimate for small mesh bottom trawl, there is still a $19,657 annual cost burden for trips that do not even land herring. This amendment is about the erosion of profitability for our vessels.

The herring and mackerel alternatives in the IFM amendment were primarily initiated to address low observer coverage in the midwater trawl herring fishery due to changes with SBRM. It was not to make an entire style of fishing economically or operationally nonviable.  It is also not equitable that revenue from other fisheries be siphoned to pay for herring/mackerel monitoring. If our vessels are required to pay for a per day monitoring cost, we could be required to raise the prices on all our products to cover that expenditure.  Compounding that, we compete on and against a world market with all of our products, including herring. All of our products are food grade, which means that we have developed and rely on markets that solicit international competition. We are also competing price-wise with companies and vessels from nations where the fishing industry is subsidized by their national government. If forced to raise our prices to pay for an IFM cost, Seafreeze, as well as the United States, will be put at a competitive disadvantage internationally. If we do not increase our prices and the cost were to be paid for by the vessels and crew, the per day monitoring cost may outweigh daily crew compensation, and crews would be forced to pay for "benefits (vacation and sick leave)"[10] afforded to observers that crew themselves do not receive, all while receiving a smaller paycheck. This is inequitable.

Regardless, the industry funded monitoring amendment saddles Seafreeze vessels in particular with more economic harm than any other "herring" vessels due to the nature of our operations. This is unacceptable. Therefore, the only alternatives that we can support would be Alternative 1, No Action, or Alternatives 2.4-2.6, which would keep our vessels at SBRM coverage.

3.  **Mackerel Alternatives**.

All of the comments above pertaining to the herring alternatives also apply to the mackerel alternatives. However, mackerel itself deserves special comment. The current state of the mackerel fishery is less of a directed fishery than in years past. Requiring an industry funded monitoring requirement for mackerel will discourage any directed fishing, including looking for mackerel on any part of a trip fishing for other species. The cost for monitors would without a doubt outweigh the benefits of any coverage in this fishery at this time. Many vessels at this time catch mackerel as an incidental species in the herring fishery, and herring fishery coverage would therefore cover these trips. However, Seafreeze vessels occasionally target mackerel on trips of squid or butterfish. See for example, the composition of these trips:

2/17/14-2/27/14; 11 Days
Butterfish- 72.55%
Mackerel - 27.32%
Loligo - .13%

3/4/14-3/12/14; 9 Days

---

[10] See http://s3.amazonaws.com/nefmc.org/150701-Discussion-Document-Appendix.pdf, page 11.

5

_0000016747

Butterfish- 8.72%
Mackerel - 23.03%
Loligo - 67.97%
Illex - .25%

The trips are of extended duration, which would require considerable cost to the vessels, and the monitoring cost would undoubtedly need to be covered from revenue other than mackerel. Due to the sporadic/diminished state of the mackerel fishery, a requirement to pay for monitoring would discourage trips like these, and would therefore essentially reduce the mackerel fishery to a bycatch fishery in the herring fishery only. This cannot be consistent with the requirement to achieve optimum yield.

Therefore, for the reasons above as well as those detailed for the herring alternatives, we can only support Mackerel Alternative 1, No Action.

4. **Outstanding Issues**.

There are still several outstanding issues associated with this amendment:

A. <u>ASM</u>: At its June 2015 meeting, the NEFMC voted 13/2/2 to "evaluate the ASM program for its effectiveness in support of stock assessments, its total costs to the groundfish fishery (e.g. returns to owner vs ASM costs), data precision and accuracy, and whether it is actually ensuring catch accountability."[11] This was due to concerns raised at both the Groundfish Committee and Council levels of the cost/benefit of the program, the quality of the data produced, the utility and effectiveness of the program. [12] While these motions pertained to the groundfish ASM program, this is all the industry has to compare any future ASM programs to. This evaluation has never been completed, but the Councils are seeking to expand the program to other fisheries. All evaluations should be completed prior to a future action concerning ASM.

B. <u>Unforeseen circumstances/Industry Profitability</u>: The IFM amendment does not take into account any changes in fishery profitability over time, and industry's future ability to afford IFM. Sub Option 4 allows the Councils to examine the results of increased herring/mackerel coverage two years after implementation, and allows adjustments via framework or amendment. However, it does not specifically state that industry's ability to pay should be a driving factor in industry funded monitoring programs. Although costs to industry as a result of the groundfish ASM program represented a large portion of total revenue of the fishery, causing significant numbers of vessels to become unprofitable or face bankruptcy,[13] and although the Council voted subsequently to request emergency action of NMFS to suspend the groundfish ASM program,[14] this request was rejected by the agency. There is no safeguard for industry in the IFM amendment document to ensure a similar situation would not occur with future industry funded monitoring programs. There is only assurance that the programs would not be activated if the agency did not have the finances for its administration costs. This is unacceptable. It is also something that would not occur should the Councils follow the Magnuson Stevens Act requirements for Information Collection Programs.

---

[11] See http://s3.amazonaws.com/nefmc.org/150615-18_final_motions2.pdf.

[12] See http://s3.amazonaws.com/nefmc.org/11_150604_GF_CTE_Draft_Summary-2.pdf.

[13] Ibid.

[14] See http://s3.amazonaws.com/nefmc.org/150615-18_final_motions2.pdf

6

_0000016748

C. Equality of Trip Selection: The IFM document contains no provisions to ensure equal allocation of observer or monitoring coverage among vessels. This would result in certain vessels being required to individually pay for monitoring costs for the whole fleet's coverage target. For example, below is a log detailing how one Seafreeze vessel received 50% observer coverage for the herring/mackerel fishing year, while the fleet as a whole had a much lower average of coverage:

**Observer Coverage for Herring/Mackerel Season, Nov. 2014-April 2015, F/V Relentless**

Trip 655 11/21/14-11/25/14; Observer (forced to come in in middle of trip for weather/mechanical problems, but did not offload; counts as one trip for dealer report; counts as two trips for NEFOP purposes)

Trip 656 11/28/14-12/8/14; Observer

Trip 657 12/12/14-12/18/14; No Observer

Trip 658 12/21/14-12/24/14; Observer

Trip 659 12/27/14- 1/3/15; No Observer

Trip 660 (660 A) 1/10/15-1/13/15; Observer (For trip 660, weather problems, had to come to dock, but did not offload; counts as one trip for dealer report; counts as multiple trips for NEFOP purposes)

Trip (660 B) 1/19/15-1/24/15; Observer

Trip (660 C) 1/28/15-2/8/15; No Observer

Trip 661 2/16/15-2/24/15; No Observer

Trip 662 3/6/15-3/17/15; No Observer

Trip 663 3/21/15-3/30/15; No Observer

Trip 664 4/4/15-4/15/15; Observer

Should this occur under an industry funded monitoring program, our vessel would have been significantly and unfairly burdened with costs that other vessels were not.

D. Discrepancies in Coverage Calculation: The IFM document does not detail how coverage would be calculated. After observing discrepancies in various Council documents as to the level of observer coverage on catch cap trips in 2014 on small mesh bottom trawl vessels,[15] we discovered that coverage levels can be calculated in multiple ways. The amendment does not specify how IFM coverage would be calculated, and therefore we have not been given the opportunity to comment effectively, and the Council has not been given the opportunity to effectively discuss or weigh the options presented.

E. Limited Public Input: Due to the fact that the initial focus of this amendment was herring and mackerel, the majority of public input has only been through those venues. No other Council Advisory Panels, which are bodies designed to give industry input to the Councils and Committees, were given opportunities to discuss the Omnibus portions of the amendment, and public hearings were not held south of New Jersey, although the Omnibus has the potential to apply to every FMP in the Greater Atlantic Region.

---

[15] According to the Herring PDT Meeting Summary Dec 10, 2015, revised Jan 15, 2016, in 2014 observers covered approximately 26 % of herring catch cap trips; see http://s3.amazonaws.com/nefmc.org/3.151210-Herring-PDT-mtg-summary-REVISED.pdf. However, similar analysis in the MAFMC Supplement to IFM Draft Environmental Assessment document, the same coverage was calculated to be approximately 17%; see https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57504cae746fb9ccc234ba75/1464880308912/Tab09_IFM-Amendment.pdf, page 88. Upon further investigation, this was discovered to be due to differences in calculation parameters.

_0000016749

Thank you for the opportunity to comment.

Sincerely,
Meghan Lapp
Fisheries Liaison, Seafreeze Ltd.

8

**TABLE 95.** SUMMARY OF TOTAL TRIP COSTS FOR HERRING AND MACKEREL VESSELS IN 2014

| Cost Category | Description | Average Percent of 2014 Gross Revenue for Herring and Mackerel Vessels | Average Percent of 2014 Gross Revenue for Squid Vessels |
|---|---|---|---|
| Variable Costs | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| Crew Share | Total annual payments to crew | 28% | 26% |
| Repair, Maintenance, Upgrades, Haulout (RMUH) | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, safety equipment, upgrades and haulout. Because these costs vary considerably from year to year and are typically spread out over several years, only a portion of these costs were applied to 2014 revenue | 13% | 11% |
| Fixed Costs | Annual mooring, dockage, permits and licenses, insurance, quota and DAS lease, crew benefits, vessel monitoring, workshop and storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs. Note: depreciation expense of the vessel is not included in fixed costs. | 19% | 21% |
| Return to Owner | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

The NEFMC is considering four types of industry-funded monitoring for the herring fishery, including NEFOP-level observers, at-sea monitors, EM, and portside sampling coverage. NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

_0000016751

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811,000 to $75,000 – a 91% reduction. However, Herring Alternative 2.5 only provides increased monitoring in the Groundfish Closed Areas.

Initial industry cost assumptions for Herring Alternative 2.4 estimated $325 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected for the duration of the trip, 100% vide review) and $5.12 per mt for portside sampling (administration and sampling cost) on close to 100% of trips. Revised industry cost assumptions for Herring Alternative 2.4 estimated $187 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected around haulback, 50% video review) and $3.84 per mt for portside sampling (only sampling costs) on close to 50% of trips. Using the revised cost assumptions rather than the initial cost assumption for Herring Alternative 2.4 reduces total industry monitoring costs by 51% ($457,595 to $222,958) in Year 2 for paired midwater trawl vessels and reduces costs by 54% ($134,165 to $61,067) in Year 2 for single midwater trawl vessels.

Many of the vessels that would be impacted by industry-funded monitoring costs in the herring fishery would also be impacted by industry-funded monitoring costs in the mackerel fishery. For example, all the vessels impacted by Herring Alternative 2.1 would also be impacted by Mackerel Alternative 2.1.

A trip must be a declared herring trip in order to land 1 lb or more of herring. The economic analysis focused on trips that landed 1 lb or more of herring because those are the trips that would be subject to industry-funded monitoring. However, industry participants also requested consideration of the economic impacts associated with declared herring trips that did not land any herring.

In 2014, there were 121 sea days for 22 trips that had no herring landings. If 100% NEFOP-level observer coverage was required on those trips, then $98,978 would have been spent monitoring those trips. If 100% at-sea monitoring coverage was required on those trips, then $85,910 would have been spent monitoring those trips. The breakdowns of these costs by gear type as well as other coverage levels and monitoring types are provided in Table 96.

TABLE 96. MONITORING COSTS ASSOCIATED WITH DECLARED HERRING TRIPS THAT DID NOT LAND HERRING IN 2014.

|  | Small Mesh Bottom Trawl | Single Midwater Trawl | Paired Midwater Trawl | Total |
|---|---|---|---|---|
| Permit Category | A | A | A |  |
| Total Number of Days | 111 | 6 | 4 | 121 |
| Total NEFOP Cost – 100% Coverage | $90,586 | $5,217 | $3,212 | $99,015 |
| Total ASM Cost – | $78,626 | $4,528 | $2,788 | $85,943 |

_0000016752

Industry-Funded Monitoring Omnibus Amendment

| | | | | |
|---|---|---|---|---|
| **100% Coverage** | | | | |
| **Total ASM Cost – 75% Coverage** | $58,970 | $3,396 | $2,091 | $64,457 |
| **Total ASM Cost – 50% Coverage** | $39,313 | $2,264 | $1,394 | $42,971 |
| **Total ASM Cost – 25% Coverage** | $19,657 | $1,132 | $697 | $21,486 |
| **Total EM Cost, Year 2 – $325 per day** | | $2,073 | $1,276 | $3,349 |
| **Total EM Cost, Year 2 – $187 per day** | | $1,193 | $734 | $1,927 |

The tables and box plots on the following pages provide summarized economic data for each of the herring coverage target alternatives. The economic impact on vessels associated with paying for monitoring coverage is described as a percentage of RTO for each herring coverage target alternative in the following figures. The tables provide the mean and median number of sea days per vessel that would result from each of the alternatives, as well as the mean and median RTO that would ultimately be reduced by the industry-funded monitoring costs. Additionally, fleet level effort, revenue, and monitoring cost information for each herring coverage target alternative are also provided. Additional economic analysis is available in Appendix 8.

### 4.2.5.1 Impacts of Herring Alternatives 1 and 2 on Fishery-Related Businesses

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP. Monitoring for herring vessels would be allocated according to SBRM. If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis. Under Herring Alternative 1, additional costs to vessels participating in the herring fishery associated with monitoring coverage, if there were any, would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-by-FMP basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 will not likely affect the setting of

_0000016753

# Document Metadata:NOAA-NMFS-2016-0139-0010



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 🔵 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  ★🔵 |
| **Document File:** | 🗎 |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned 🔵 |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0009 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0010 |
| **Title:** | Comment from David Goethel 🔵 |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS  ★🔵 |
| **Document Subtype:** | 🔵 |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 🔵 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings 🔵 |
| **Status:** | Posted 🔵 |
| **Received Date:** | 11/04/2016  ★🔵 |
| **Date Posted:** | 11/07/2016 🔵 |
| **Posting Restriction:** | No restrictions 🔵 |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1  ★ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 🔵 |
| **Comment Due Date:** | 11/07/2016 🔵 |
| **DOC Docket No.:** | |

**XRIN:**                    🔵

**Tracking Number:**         1k0-8sul-bb9l  🔵

**Page Count:**              1  🔵

**Total Page Count**         1
**Including Attachments:**

# Submitter Info

**Comment:**                 John K. Bullard, Regional Administrator NMFS, Greater Atlantic
Regional Fisheries Office 55 Great Republic Drive Gloucester,
MA 01930. Please consider these my public comments on the
omnibus industry funding amendment. I would like to offer the
following general comments: 1. The public hearing document
does not make it sufficiently clear to the public, that while
the mackerel and herring fisheries are the only fisheries
immediately impacted by the action, the blueprint for funding
provided in this amendment affects all federal fisheries
except groundfish and scallops going forward. In short, the
vast majority of fishermen have not commented on this action
because they did not realize that it pertained to their
fishery. 2. Most fishermen in fisheries such as lobster will
be extremely surprised to find out that costs they will bear,
are being determined now in this action. The document does not
sufficiently explain that how and if the lobster fishery will
have to pay, will be determined by a framework sometime in the
future. Thus, their ability to challenge the legality will be
closed because they did not file suit in a timely manner after
this action is finalized. Most fisherman are small businesses
and not large corporations with a legal staff on full time
retainer to review government actions and therefore do not
understand that they must object now to something hypothetical
in the future. Thus, I think a new public hearing document
should be drafted and a new round of public hearings held, to
make sure every single fishery in federal waters is notified
that they will be potentially liable for costs determined in
this amendment. For this reason, I also believe a full
economic and social cost analysis should be done by fishery
before the amendment is taken out to public hearing. Many
small boat fishermen become instantly non- viable across a
whole host of fisheries should costs be imposed on them. This
amendment has the immediate and foreseeable impact of
decreasing the value of their permits even if no further
action is taken. Who will want to buy a permit of a vessel
that has insufficient revenue to cover the costs of observers?
I have heard the defense that this action does not cause any
economic impact but puts that decision and action on future
councils so an EIS is not needed. I disagree, just the fact of
adding another expense onto a faltering industry has an
immediate impact on owners and vessels for long term decisions
and one more uncertainty in the decision-making process. Just
because this does not impose an actual amount on any one
fishery, it changes the dynamics of the economics of all
fisheries and should be analyzed to allow the fishing industry
to make informed comments. It is disingenuous to say that
there are not any economic or social impacts connected with
this action. In addition, I will offer some specific comments
on the Amendment that I think have not been addressed by the

Council or NOAA. I made many of these comments at the January 2016 Council meeting in Portsmouth, New Hampshire. They were not addressed then, and so far, as I can discern, have not been addressed since. Comment1) Monitoring is a function of government and should be funded at levels Congress deems appropriate through NOAA line items in the budget. Comment2) Magnusson allows for the placement of observers on fishing boats but is silent on cost recovery except in specific fisheries in the North Pacific Region. Comment3) The ability to place an additional economic burden on future fisheries without regard to the economic viability of that fishery is not addressed and could easily put future fisheries out of business. Comment4) Comment 3 requires a EIS not an EA to analyze fully the effects on the human environment. Comment5) Data ownership and price negotiation should be clarified. If fishermen are forced to pay government approved, for profit private contractors, fishermen should own the resulting data and have the ability to negotiate the costs on a vessel by vessel basis. Comment6) No discussion of the issue of observer bias is present in the document. When the government pays the observers, they are beholden to the government. When the industry pays, some observers could become biased in favor of the person paying the bill. This is already occurring in groundfish. It is subtle, but occurring, and probably unstoppable. Thus, the scientific utility of the data collected is uncertain. As a scientist, I would be very concerned with this issue. For all these reasons, I believe the best course of action is to withdraw the omnibus amendment and take up the issue with Congress when Magnusson is reauthorized. Sincerely, David Goethel Owner/Operator F/V Ellen Diane 23 Ridgeview Terrace Hampton, NH 03842   *

**First Name:**       David   *

**Middle Name:**

**Last Name:**        Goethel   *

**Mailing Address:**  23 Ridgeview Terr

**Mailing Address 2:**

**City:**             Hampton

**Country:**          United States

**State or Province:** New Hampshire

**ZIP/Postal Code:**  03842

**Email Address:**    egoethel@comcast.net

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

Mr. John Bullard,


Please consider these my public comments on the omnibus industry funding amendment. I would like to offer the following **general comments:**

1. The public hearing document does not make it sufficiently clear to the public, that while the mackerel and herring fisheries are the only fisheries immediately impacted by the action, the blueprint for funding provided in this amendment affects all federal fisheries except groundfish and scallops going forward. In short, the vast majority of fishermen have not commented on this action because they did not realize that it pertained to their fishery.

2. Most fishermen in fisheries such as lobster will be extremely surprised to find out that costs they will bear, are being determined now in this action.   The document does not sufficiently explain that how and if the lobster fishery will have to pay, will be determined by a framework sometime in the future.  Thus, their ability to challenge the legality will be closed because they did not file suit in a timely manner after this action is finalized.  Most fisherman are small businesses and not large corporations with a legal staff on full time retainer to review government actions and therefore do not understand that they must object now to something hypothetical in the future.

**Thus, I think a new public hearing document should be drafted and a new round of public hearings held, to make sure every single fishery in federal waters is notified that they will be potentially liable for costs determined in this amendment.**

For this reason, I also believe a full economic and social cost analysis should be done by fishery before the amendment is taken out to public hearing. Many small boat fishermen become instantly non- viable across a whole host of fisheries should costs be imposed on them.  This amendment has the immediate and foreseeable impact of decreasing the value of their permits even if no further action is taken. Who will want to buy a permit of a vessel that has insufficient revenue to cover the costs of observers? I have heard the defense that this action does not cause any economic impact but puts that decision and action on future councils so an EIS is not needed. I disagree, just the fact of adding another expense onto a faltering industry has an immediate impact on owners and vessels for long term decisions and one more uncertainty in the decision-making process.  Just because this does not impose an actual amount on any one fishery, it changes the dynamics of the economics of all fisheries and should be analyzed to allow the fishing industry to make informed comments.  It is disingenuous to say that there are not any economic or social impacts connected with this action.

In addition, I will offer some specific comments on the Amendment that I think have not been addressed by the Council or NOAA. I made many of these comments at the January 2016 Council meeting in Portsmouth, New Hampshire. They were not addressed then, and so far, as I can discern, have not been addressed since.

**Comment1)** Monitoring is a function of government and should be funded at levels Congress deems appropriate through NOAA line items in the budget.

**Comment2)** Magnusson allows for the placement of observers on fishing boats but is silent on cost recovery except in specific fisheries in the North Pacific Region.

**Comment3)** The ability to place an additional economic burden on future fisheries without regard to the economic viability of that fishery is not addressed and could easily put future fisheries out of business.

**Comment4)** Comment 3 requires a EIS not an EA to analyze fully the effects on the human environment.

**Comment5)** Data ownership and price negotiation should be clarified. If fishermen are forced to pay government approved, for profit private contractors, fishermen should own the resulting data and have the ability to negotiate the costs on a vessel by vessel basis.

**Comment6)** No discussion of the issue of observer bias is present in the document. When the government pays the observers, they are beholden to the government. When the industry pays, some observers could become biased in favor of the person paying the bill. This is already occurring in groundfish. It is subtle, but occurring, and probably unstoppable. Thus, the scientific utility of the data collected is uncertain. As a scientist, I would be very concerned with this issue.

For all these reasons, I believe the best course of action is to withdraw the omnibus amendment and take up the issue with Congress when Magnusson is reauthorized.

Sincerely,

David Goethel
Owner/Operator F/V Ellen Diane
23 Ridgeview Terrace
Hampton, NH 03842



# Document Metadata: NOAA-NMFS-2016-0139-0011

## Document Details

**Docket ID:** NOAA-NMFS-2016-0139

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  ✶🌐

**Document File:** 🗎

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned 🌐

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0010

**Current Document ID:** NOAA-NMFS-2016-0139-0011

**Title:** Comment from William Reed 🌐

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS  ✶🌐

**Document Subtype:** 🌐

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001 🌐

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings 🌐

**Status:** Posted 🌐

**Received Date:** 11/05/2016  ✶🌐

**Date Posted:** 11/07/2016 🌐

**Posting Restriction:** No restrictions 🌐

**Submission Type:** Web

**Number of Submissions:** 1  ✶

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016 🌐

**Comment Due Date:** 11/07/2016 🌐

**DOC Docket No.:**

**XRIN:**

**Tracking Number:** 1k0-8suz-6iwr

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** There should be percent based cap on the amount the observer gets paid. What I am saying is if for example squid is at a daily limit of 2500 lbs at .90 cents back to the boat after shipping expense that leaves a net take of 2250.00 fuel and ice cost another 500.00 leaving 1750.00. now we have to split the money. Boat and crew. What is economically fair. Normally the boat gets between 40-50 %. roughly 850 dollars to the boat owner to cover his expense and 950 split between the crew of 2 or 3 men. Now take observer and do the numbers. 1750 -750 observer leaves 1000. 450 for boat owner 550 split up by crew. Men will quit or not show up for work. We can make more money digging clams. How about when flk is 70 pounds all summer and you have a small boat with a little other stuff. The day might add up to 700.00. What I am suggesting is maximum 20% cap on the daily catch up to pay for the observer. Let all partake in the bad day or slow day of fishing. Our year is made full by the small days. I call them singles as a baseball reference. We do not hit many home runs. This will sink us having to pay for observers. *

**First Name:** William *

**Middle Name:**

**Last Name:** Reed *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:** United States

**State or Province:**

**ZIP/Postal Code:**

**Email Address:** providencefisheries@gmail.com

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0012



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0011 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0012 |
| **Title:** | Comment from Brent Loftes |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/05/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8sv1-bwvs

**Page Count:** 1

**Total Page Count Including Attachments:** 1

# Submitter Info

**Comment:** For the record I am a small boat owner under 60 Feet a 2 man operation. Frequently I have heard complaints from many observers I have had over the years that they know fisheries managers are not using observer data at all possibly for biological information but not for obundance. So why are paying someone to do a job that has little or no benefit to fish or the people catching them??? Good question??? I think so. So this brings the Next question why the hell should I have to pay someone that is contributing next to zero for the industry??? I personally wouldn't have a problem taking or paying for observers if the data was being used proffesionally instead a tool to screw fisherman over. You know how I know because NOAA has done nothing but cut quota on nearly every fishery THEY consider threatened through bogus trawl surverys from the Bigelow or blatantly ignorning any colaborative reasearch within the industry. I am opposed to ALL industry funded observers. Do the right thing for a change!!! *

**First Name:** Brent *

**Middle Name:**

**Last Name:** Loftes *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0013



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0012 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0013 |
| **Title:** | Comment from Concerned Fisherman |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/05/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8sv7-3ctl |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

# Submitter Info

**Comment:** Industry funded observer coverage is an incredible burden on any sized vessel. Small, medium, large. We have a fraction of a fleet catching a fraction of the fish we are even allowed to catch. Every year changes as far as what we can harvest because of horrible stock assessments. We are cut back every year, causing businesses to fold, shoreside operations to close up, families ruined, ports going by the wayside, etc. having to now pay for observer coverage on top of everything else that has been shoved down the pike for us is insane! This industry is hanging by a thread and here we are again having the rug pulled out from under are feet again. I AM NOT IN FAVOR OF INDUSTRY FUNDED OBSERVER COVERAGE. *

**First Name:** Concerned *

**Middle Name:**

**Last Name:** Fisherman *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:** United States

**State or Province:**

**ZIP/Postal Code:**

**Email Address:** Tradfisheries@gmail.com

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0014



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0013 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0014 |
| **Title:** | Comment from Pete Loane |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8svn-54tg |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | Our discards on the F/V Rose Marie are manageable and the cost to us would be larger than our fuel bill. * |
| **First Name:** | Pete * |
| **Middle Name:** | |
| **Last Name:** | Loane * |
| **Mailing Address:** | |
| **Mailing Address 2:** | |
| **City:** | |
| **Country:** | |
| **State or Province:** | |
| **ZIP/Postal Code:** | |
| **Email Address:** | |
| **Phone Number:** | |
| **Fax Number:** | |
| **Organization Name:** | |
| **Cover Page:** | |

# Document Metadata:NOAA-NMFS-2016-0139-0015



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139 ⊙

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  ∗⊙

**Document File:** 🗎

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned ⊙

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0014

**Current Document ID:** NOAA-NMFS-2016-0139-0015

**Title:** Comment from Joel Hovanesian ⊙

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS  ∗⊙

**Document Subtype:** ⊙

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001 ⊙

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings ⊙

**Status:** Posted ⊙

**Received Date:** 11/06/2016 ∗⊙

**Date Posted:** 11/07/2016 ⊙

**Posting Restriction:** No restrictions ⊙

**Submission Type:** Web

**Number of Submissions:** 1 ∗

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016 ⊙

**Comment Due Date:** 11/07/2016 ⊙

**DOC Docket No.:**

**XRIN:**

**Tracking Number:** 1k0-8svo-gg25

**Page Count:** 1

**Total Page Count
Including Attachments:** 1

## Submitter Info

**Comment:** THIS WILL BE THE FINAL NAIL IN THE COFFIN FOR MANY IF NOT ALL FISHING ENTERPRISES ON THE EAST COAST. With all the cutbacks this plan is unaffordable. I am reluctant to even say this because it is my belief that this is exactly what those in power are seeking. Totally opposed to this job/industry killing plan. ∗

**First Name:** Joel ∗

**Middle Name:**

**Last Name:** Hovanesian ∗

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0016



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0015 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0016 |
| **Title:** | Comment from Pete Loane |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**    1k0-8svo-mi1a

**Page Count:**    1

**Page Count:**    1

**Total Page Count**    1
**Including Attachments:**

## Submitter Info

**Comment:**    I am making a second comment about this bill as the cost to
individual boats whether large or small is more than they can
afford and still make a decent profit. Industry funded
monitoring should never be allowed! *

**First Name:**    Pete *

**Middle Name:**

**Last Name:**    Loane *

**Mailing Address:**    7 Leona Lane

**Mailing Address 2:**

**City:**    Osterville

**Country:**    United States

**State or Province:**    Massachusetts

**ZIP/Postal Code:**    02655

**Email Address:**    captainpete1946@gmail.com

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0017



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings ✱

**Document File:** 📄

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0016

**Current Document ID:** NOAA-NMFS-2016-0139-0017

**Title:** Comment from Susan Hovanesian

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS ✱

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:** Posted

**Received Date:** 11/06/2016 ✱

**Date Posted:** 11/07/2016

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1 ✱

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016

**Comment Due Date:** 11/07/2016

**DOC Docket No.:**

**XRIN:**

**Tracking Number:**          1k0-8svo-dq5t

**Page Count:**               1

**Total Page Count**          1
**Including Attachments:**

## Submitter Info

**Comment:**                  This will kill our family business that we have been running
                              for over thirty years. And thanks for such a short notice. It
                              also seems there is some slight of hand going on here as this
                              plan has been camouflaged by making people think it is a
                              herring mackerel plan. Shame on all of those who are pushing
                              this industry killing scam.   *

**First Name:**               Susan   *

**Middle Name:**

**Last Name:**                Hovanesian   *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**



# Document Metadata:NOAA-NMFS-2016-0139-0018

## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings * |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0017 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0018 |
| **Title:** | Comment from Pete Loane |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 * |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8svo-610i

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** This bill applies to all fisheries not to just herring and mackerel. Squid fishing has a low and manageable discard. *

**First Name:** Pete *

**Middle Name:**

**Last Name:** Loane *

**Mailing Address:** 7 Leona Lane

**Mailing Address 2:**

**City:** Osterville

**Country:** United States

**State or Province:** Massachusetts

**ZIP/Postal Code:** 02655

**Email Address:** captainpete1946@gmail.com

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0019



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0018 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0019 |
| **Title:** | Comment from Mark Zaccaria |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8svp-py27

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** Adding this kind of overhead to the operations of an industry already groaning under the weight of questionable regulations does two bad things: 1) It further depresses the number of US Fishing Sorties per year - which further cuts into the contribution the industry makes to the productive economy, and 2) It signals to one and all that the Government does not have faith in its citizens to participate in the management of the Fisheries. You fool-proof a system only when you mean for it to be operated by fools. Note to NOAA: Your bias and prejudice is showing, and it's showing at our expense. *

**First Name:** Mark *

**Middle Name:**

**Last Name:** Zaccaria *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0020



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  * |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0019 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0020 |
| **Title:** | Comment from JG RIE |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS  * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016  * |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1  * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

XRIN:

**Tracking Number:**    1k0-8svp-hi6i

**Page Count:**    1

**Total Page Count**    1
**Including Attachments:**

# Submitter Info

**Comment:**    It is my opinion that if the government feels it needs more
monitoring on fishing vessels in the northeast, the government
should bear the costs. If it's the governments responsibilty
to regulate the fisheries, then it is also their responsibilty
to bear the costs of data gathering or monitoring to do their
job. If the police need to question a witness of an accident,
would it be right to make the witness pay for the officers
time? And if observers are not data gatherers, but are really
monitors it's worse, then it's like making a victim or suspect
under surveillance pay for the police persons time. Obviously
it comes down to the fact that the government doesn't have
enough tools (fishing vessels) to perform their job properly.
So in effect they are not only forcing the owners of those
tools (fishing vessels) to provide them for free, they are
making them pay for their operator (observer). Go to Home
Depot and see how you make out with that proposal. I am a
shoreside repair and maintence facility that has supported the
fishing fleets in New England for over 60 years. I also have
owned, and do own fishing vessels, so I see it from both
sides. I have seen the destruction of families, businesses and
lively hoods due to fishing regulation. Whether you agree with
the need for more fishing regulation has nothing to do with
this question. The fact is that fishing regulation has reduced
effort, but in the process has ruined lives and families of
both fishermen and shoreside support people, almost my own. To
ask those of us that survived that regulation to pay for more
of the very thing that almost killed us, is not only
irresponsible, but immoral. At the end of the year there is no
extra money just barely enough for survival, repairs, and
maintenance. If we have to pay for monitoring something else
will have to be let go, hopefully not safety and maintenance.
In my business I have seen the overall effect of fisheries
management. I was lucky being able to service other
industries, but if you have a fishing boat it's impossible to
diversify.  *

**First Name:**    JG  *

**Middle Name:**

**Last Name:**    RIE  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0021



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0020 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0021 |
| **Title:** | Comment from Eric Paskerian |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**  1k0-8svq-7ova

**Page Count:**  1

**Total Page Count Including Attachments:**  1

## Submitter Info

**Comment:**  This amendment will destroy what is left of the small fishing businesses that are family owned. They can not afford the additional cost to put observers on the their boats. The government should absorb this cost like they do for other industries. Adding additional expenses to an already marginal industry will likely kill the privately owned small fishing fleet and all that will be left will be corporate owned vessels.  *

**First Name:**  Eric  *

**Middle Name:**

**Last Name:**  Paskerian  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2016-0139-0022



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings ✱ |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0021 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0022 |
| **Title:** | Comment from stephen welch |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS ✱ |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 ✱ |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 ✱ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**          1k0-8svq-gn54

**Page Count:**               1

**Total Page Count**          1
**Including Attachments:**

## Submitter Info

**Comment:**                  Why is this even being considered? Look what has happened to
                              the ground fish fleet in New England. I DO NOT make enough
                              money now to pay for observers, my operating expenses are very
                              high. Get the money from the tariffs on imported fish coming
                              into this country. Imported seafood and onerous government
                              regulations have destroyed what was once a viable industry in
                              this country. Please find another industry to destroy ! *

**First Name:**               stephen *

**Middle Name:**

**Last Name:**                welch *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2016-0139-0023



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0022 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0023 |
| **Title:** | Comment from Craig Turner |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8svr-zd6f

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** "Industry funded monitoring" is un-American. It reeks of the "guilty until proven innocent" attitude at NMFS. It will surely bankrupt all the family businesses built around local fishing fleets. Why would you want that?  *

**First Name:** Craig  *

**Middle Name:**

**Last Name:** Turner  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0024



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0023 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0024 |
| **Title:** | Comment from Bob Westcott |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8svs-qror |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

I totally agree with what Jason Amaru commented on about our financial burden that would be incurred. This would be a stake in the heart of every fisherman. There is no need to have this implemented with all the cooperative research that has been done and what is currently going on. Better things are coming ahead with this. Please do not implement this Omnibus for it will destroy our fisheries and families. This is totally unacceptable. Magnuson act says to absolutely protect the fishermen also!!!! Thank you,Bob Westcott-F/V OCEAN STATE, POINT JUDITH,RI. *

**First Name:** Bob *

**Middle Name:**

**Last Name:** Westcott *

**Mailing Address:** 4972 Tower Hill Rd.

**Mailing Address 2:**

**City:** Wakefield,

**Country:** United States

**State or Province:**

**ZIP/Postal Code:** 02879

**Email Address:** FVOCEANSTATE@GMAIL.COM

**Phone Number:** 401-212-6110

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0025



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0024 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0025 |
| **Title:** | Comment from Charles  Etzel |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**          1k0-8svs-qtuy

**Page Count:**               1

**Total Page Count            1
Including Attachments:**

## Submitter Info

**Comment:**                  I do not support any form of industry funded observer funding
                              . The observer program is a failure . No good data has came
                              out of the observer program. As a taxpayer they have been
                              taken advantage of. As a fishermen we have been taken
                              advantage of. I would recommend we go the other way. Repeal
                              the marine mammal protection act. Scrap the observer program.
                              Classify marine mammals the same way sea gulls are protected.
                              Do not make fishermen pay for NOAA, NMFS, and the Counciled
                              failed policies.   *

**First Name:**               Charles   *

**Middle Name:**

**Last Name:**                Etzel   *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0026



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139 🌐

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings ✱🌐

**Document File:** 📄

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned 🌐

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0025

**Current Document ID:** NOAA-NMFS-2016-0139-0026

**Title:** Comment from Jim Durda 🌐

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS ✱🌐

**Document Subtype:** 🌐

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001 🌐

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings 🌐

**Status:** Posted 🌐

**Received Date:** 11/06/2016 ✱🌐

**Date Posted:** 11/07/2016 🌐

**Posting Restriction:** No restrictions 🌐

**Submission Type:** Web

**Number of Submissions:** 1 ✱

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016 🌐

**Comment Due Date:** 11/07/2016 🌐

**DOC Docket No.:**

**XRIN:**

**Tracking Number:**     1k0-8svt-xwjd

**Page Count:**     1

**Total Page Count**     1
**Including Attachments:**

## Submitter Info

**Comment:**     This is crazy. On any given trip the observer would be making
more than the crew working hard to harvest what he needs to
sample. This is just another way for some insider to make
money off of the backs of blue collar workers. And put more
small boats out of business  *

**First Name:**     Jim  *

**Middle Name:**

**Last Name:**     Durda  *

**Mailing Address:**     71 Oak st

**Mailing Address 2:**

**City:**     Ashaway

**Country:**     United States

**State or Province:**     Rhode Island

**ZIP/Postal Code:**     02804

**Email Address:**     honeydoservices@gmail.com

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0027



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings *

**Document File:** [HTML]

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0026

**Current Document ID:** NOAA-NMFS-2016-0139-0027

**Title:** Comment from Karen Stefani

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS *

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:** Posted

**Received Date:** 11/06/2016 *

**Date Posted:** 11/07/2016

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1 *

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016

**Comment Due Date:** 11/07/2016

**DOC Docket No.:**

**XRIN:**

**Tracking Number:** 1k0-8svt-88ut

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** To impose this type of regulation will be the end of small fishing fleets. It is unfair to put this burden on fisherman, their families and consumers. This is an unfair regulation!

**First Name:** Karen

**Middle Name:**

**Last Name:** Stefani

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0028



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0027 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0028 |
| **Title:** | Comment from Anonymous Anonymous |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8svu-ebm9 |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | I am against the mandated observer fees for the simple reason that most fishermen, especially small boat fishermen, cannot afford to pay to the observer fees. While we are subsidizing other industries, why are we penalizing commercial fishermen by forcing mandated observer fees on them?   * |
| **First Name:** | Anonymous   * |
| **Middle Name:** | |
| **Last Name:** | Anonymous   * |
| **Mailing Address:** | |
| **Mailing Address 2:** | |
| **City:** | |
| **Country:** | |
| **State or Province:** | |
| **ZIP/Postal Code:** | |
| **Email Address:** | |
| **Phone Number:** | |
| **Fax Number:** | |
| **Organization Name:** | |
| **Cover Page:** | |

# Document Metadata:NOAA-NMFS-2016-0139-0029



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 ⊙ |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  ∗⊙ |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned ⊙ |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0028 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0029 |
| **Title:** | Comment from Jennylyn Beaudette ⊙ |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS  ∗⊙ |
| **Document Subtype:** | ⊙ |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 ⊙ |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings ⊙ |
| **Status:** | Posted ⊙ |
| **Received Date:** | 11/06/2016 ∗⊙ |
| **Date Posted:** | 11/07/2016 ⊙ |
| **Posting Restriction:** | No restrictions ⊙ |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 ∗ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 ⊙ |
| **Comment Due Date:** | 11/07/2016 ⊙ |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**          1k0-8svu-31st

**Page Count:**               1

**Total Page Count**          1
**Including Attachments:**

# Submitter Info

**Comment:**                  My dad fished for 33 years but back in 1983 he stopped he had
                              said they were putting more and more regulations on us to the
                              point we just can't make a living, he understood no one wanted
                              over fishing but what you don't understand is you allow other
                              countries to come in with there big processing ships and kill
                              the little man so as you sit back and allow " Walmart " in
                              affect to come in you are shutting each small boat down my dad
                              was right ack in 1983 he said then "they will regulate us out
                              of business " little did he know how right he was I'm so glad
                              he is not here to see his world go under.  *

**First Name:**               Jennylyn  *

**Middle Name:**

**Last Name:**                Beaudette  *

**Mailing Address:**          307 Walden Pond Road

**Mailing Address 2:**

**City:**                     Headland

**Country:**                  United States

**State or Province:**        Alabama

**ZIP/Postal Code:**          36345

**Email Address:**            jennylyn186@gmail.com

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0030



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0029 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0030 |
| **Title:** | Comment from Wayne  Paskerian |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**          1k0-8svu-1c5p

**Page Count:**               1

**Total Page Count
Including Attachments:**      1

## Submitter Info

**Comment:**                  Small fishing families have made tremulous sacrifices. The
                              small boat fleet has been decimated in New England. The
                              pending amendment requiring all fishermen to pay for
                              government mandated observers will be the final death knell.
                              The government should absorb this cost or prorate it as a
                              percentage of the catch. The current amendment should not be
                              passed. *

**First Name:**               Wayne *

**Middle Name:**

**Last Name:**                Paskerian *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0031



## Document Details

**Docket ID:**  NOAA-NMFS-2016-0139

**Docket Title:**  Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  *

**Document File:**

**Docket Phase:**  Notice

**Phase Sequence:**  1

**RIN:**  Not Assigned

**Original Document ID:**  NOAA-NMFS-2016-0139-DRAFT-0030

**Current Document ID:**  NOAA-NMFS-2016-0139-0031

**Title:**  Comment from John Peabody

**Number of Attachments:**  0

**Document Type:**  PUBLIC SUBMISSIONS  *

**Document Subtype:**

**Comment on Document ID:**  NOAA-NMFS-2016-0139-0001

**Comment on Document Title:**  Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:**  Posted

**Received Date:**  11/06/2016  *

**Date Posted:**  11/07/2016

**Posting Restriction:**  No restrictions

**Submission Type:**  Web

**Number of Submissions:**  1  *

## Document Optional Details

**Status Set Date:**  11/07/2016

**Current Assignee:**  NA

**Status Set By:**  Luers, Daniel (NOAA)

**Comment Start Date:**  09/20/2016

**Comment Due Date:**  11/07/2016

**DOC Docket No.:**

**XRIN:**

**Tracking Number:**  1k0-8svu-tdvu

**Page Count:**  1

**Total Page Count Including Attachments:**  1

## Submitter Info

**Comment:**  We are just hanging on now. Another big expense like this may finish us off. Please do not pass this expense on to us.  *

**First Name:**  John  *

**Middle Name:**

**Last Name:**  Peabody  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0032



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0031 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0032 |
| **Title:** | Comment from Thomas Williams |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8svv-sqze |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

I would like to comment on the Omnibus Amendment for industry funded observer program. As a commercial fishermen for 49 yrs and owner of three commercial vessels I can state unequivicably that I could not afford to pay for observers. With continual cuts in groundfish quotas,fluke quotas,closures for sand dabs and a myriad of other restrictions it is hard enough to exist at a profitable level. The industry as a whole made their position clear when a lawsuit was filed in their behalf at the outset of this process. No other industry in this country pays for monitoring.Our industry has many times offered the very information that now appears to be so critical only to have it termed anecdotal. I find this proposal insulting on a personal and professional level. My three sons and I have well over 100 yrs of fishing experience and represent four generations of fishermen. We do not need outsiders with an average of 6 mos of training to determine our fate. The negative effects of industry funding will far outweigh any positives for the industry. *

**First Name:** Thomas *

**Middle Name:**

**Last Name:** Williams *

**Mailing Address:** 6 Rhody Dr.

**Mailing Address 2:**

**City:** Westerly

**Country:** United States

**State or Province:** Rhode Island

**ZIP/Postal Code:** 02891

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0033



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | HTML |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0032 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0033 |
| **Title:** | Comment from Patrick  Knapp |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8svv-x13y

**Page Count:** 1

**Total Page Count Including Attachments:** 1

# Submitter Info

**Comment:** The very idea of saddling what little remains of my industry with $700-per-day observers is revolting. I've stood and watched as the asinine catch share system created Carlos seafood , incredulous that agencies acted surprised that there was corruption. Little regard was paid as hundreds of jobs were lost and families ruined. It is little wonder fishermens tempers around the planet are about to boil over in rage. We are fishing leaner and cleaner and more efficiently than ever, and there is simply no money left at the end of the trip. Now, you want plow under the last few independents and unload the permits on some other faceless entity, who has little regard for the north Atlantic fisheries and won't cower before the baseless lawsuits that are driving this very action? While obviously incapable of shame or morality, you should at least consider what is just and fair, and not make the same mistake yet again. I'm embarrassed on your behalf on how little our fisheries agencies care to learn about the fish stocks they are supposedly protecting. This is disgusting. ★

**First Name:** Patrick ★

**Middle Name:**

**Last Name:** Knapp ★

**Mailing Address:** 24 burlingame drive

**Mailing Address 2:**

**City:** Charlestown

**Country:** United States

**State or Province:** Rhode Island

**ZIP/Postal Code:** 02813

**Email Address:** Pckutah7@aol.com

**Phone Number:** 4015694828

**Fax Number:** 02813

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0034



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0033 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0034 |
| **Title:** | Comment from cory King |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**    1k0-8svv-odg5

**Page Count:**    1

**Total Page Count**    1
**Including Attachments:**

## Submitter Info

**Comment:**    Another nail in the coffin for commercial fishing.... For as
much money you get for a fiscal year you think you would have
enough too pay the observers yourselves instead of screwing
the commercial fishermen who are already regulated to the
point of bankruptcy ....  *

**First Name:**    cory  *

**Middle Name:**

**Last Name:**    King  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0035



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0034 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0035 |
| **Title:** | Comment from Michael MacQuarrie |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8svv-vbq5

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** This amendment will destroy what is left of the small fishing families. The government should absorb this cost like they do for other industries. Adding additional expenses to an already marginal industry is unconstitutional. If the "government" wants to regulate, regulate. If the Government is insistent on dealing a death blow to an industry, at least be honest about it. ★

**First Name:** Michael ★

**Middle Name:**

**Last Name:** MacQuarrie ★

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2016-0139-0036



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Document File:** [HTML]

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0035

**Current Document ID:** NOAA-NMFS-2016-0139-0036

**Title:** Comment from Michael Matulaitis

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:** Posted

**Received Date:** 11/06/2016

**Date Posted:** 11/07/2016

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016

**Comment Due Date:** 11/07/2016

**DOC Docket No.:**

**XRIN:**

**Tracking Number:**   1k0-8svw-b473

**Page Count:**   1

**Total Page Count**   1
**Including Attachments:**

# Submitter Info

**Comment:**   I have been fishing for 38 yrs. I have had the observer
program on the boat since 1990 roughly 26 years for absolutely
no benefit to me or the resource. I Guess NEFOP can't get the
job if the councils need IFM. And the councils asking my
business to pay is absurd! I don't like being threatened by
the councils and NMFS with lower quotas The cost to me and my
crew far outweighs the benefit. *

**First Name:**   Michael *

**Middle Name:**

**Last Name:**   Matulaitis *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2016-0139-0037



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0036 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0037 |
| **Title:** | Comment from John Rice |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**   1k0-8svw-37j0

**Page Count:**   1

**Total Page Count Including Attachments:**   1

## Submitter Info

**Comment:**   If scientific observers are to be used in any fishery in the United States, that science supports the entire food security of the United States and should be paid for by the U.S. govt. To unduly burden the fishing industry is conter-intuitive to supporting a sustainable fishery. The imposition of the expense of paying for observer/s is a tax and all taxes must be approved by congress, which makes this action illegal.   *

**First Name:**   John   *

**Middle Name:**

**Last Name:**   Rice   *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2016-0139-0038



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0037 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0038 |
| **Title:** | Comment from Troy Sawyer |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8svx-wh3p

**Page Count:** 1

**Total Page Count Including Attachments:** 1

# Submitter Info

**Comment:** Industry funded observer coverage will be a tremendous financial burden, to many fisheries. while it seems to work well in the scallop fishery ,less profitable ones cannot afford the hit.100 percent coverage in my eyes is unattainable. PUSH back from industry will be tremendous. With whatever tricks loopholes available observers could not get steady work while you try to amp up.observer coverage is probably a necessary evil, but should remain in its present form.funded by the agency with the responsibility of managing it. *

**First Name:** Troy *

**Middle Name:**

**Last Name:** Sawyer *

**Mailing Address:** 181macarthur blvd

**Mailing Address 2:**

**City:** Wakefield

**Country:** United States

**State or Province:** Rhode Island

**ZIP/Postal Code:**

**Email Address:** Tsawyer9849@aol.com

**Phone Number:** 401 741 5551

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2016-0139-0039



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0038 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0039 |
| **Title:** | Comment from Jon Waldrop |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8svy-mtme |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

The proposed rule to implement industry funded observers is not only uncalled for its ludicrous. With the rising cost of expenses and the harsher fishing restrictions that fisherman have to deal with at present,this would cripple the industry. We have had observer coverage for years and the information collected has shown that our discard rate has fallen under government standards. This proposed rule will not only hurt we the fisherman,but everyone involved in the fishing industry shoreside as well, from gear shops to lumpers all the way to the consumer. Lastly, having an observer on board that a fisherman is financially responsible for will create more friction between regulators and the fishing industry, placing both fishermen and observers in awkward situations and ultimately creating more disciplinary problems. The real question is why doesn't a fisherman get compensated for carrying an observer? The government is collecting data at the fisherman's expense-he should be getting compensated for it, and it would help build relations between fishery regulators and the fisherman as well as help alleviate loss of income under strict fishing regulations. If this proposal goes through it will potentially end a lot of careers and have dire consequences on the U.S. fish market. Jon Waldrop - mate F/V Rose Marie *

**First Name:** Jon *

**Middle Name:**

**Last Name:** Waldrop *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2016-0139-0040



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0039 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0040 |
| **Title:** | Comment from Avis Hazard Spears |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**     1k0-8sw0-gsng

**Page Count:**     1

**Total Page Count**     1
**Including Attachments:**

## Submitter Info

**Comment:**     I live by the ocean, I am a NARRAGANSETT INDIAN, our meals,
FISH, economic burden, costly living, FRESH I want, do not
burden those who have been providers for so long   *

**First Name:**     Avis   *

**Middle Name:**

**Last Name:**     Hazard Spears   *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0041



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings ✱

**Document File:**

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0040

**Current Document ID:** NOAA-NMFS-2016-0139-0041

**Title:** Comment from Erik Anderson

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS ✱

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:** Posted

**Received Date:** 11/06/2016 ✱

**Date Posted:** 11/07/2016

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1 ✱

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016

**Comment Due Date:** 11/07/2016

**DOC Docket No.:**

_0000016821

**XRIN:**

**Tracking Number:**            1k0-8sw0-fwtp

**Page Count:**            1

**Total Page Count**            1
**Including Attachments:**

## Submitter Info

**Comment:**            While the amendment is comprehensive the scope of its effect
is stated on pg V of the Executive Summary to state that it
has capability"that would modify ALL FMPs managed by the New
England and Mid-Atlantic Fishery Management Councils". With
the word "ALL" stated clearly it unfolds into a potential
scenario at some unknown time in the future that "ALL" FMPs
have the prospect of great negative economic consequences in
assuming the cost responsibility of industry funded
monitoring. Further to the concern is the fact that the
amendment clearly states that these industry funded monitoring
costs can be implemented through framework action witch
relieves the obligation of an Economic Impact Statement (EIS).
This is a fundamental flaw within this amendment that leaves
the public affected parties unknown to the economic effects of
their future obligation to absorb the costs associated with
industry funded monitoring programs. It has been clearly
witnessed and experienced within the groundfish fishery that
the costs to industry for "at sea monitors" that many small
boat fishermen were required to pay made it difficult and
impossible to absorb and remain fiscally viable . THat issue
still remains controversial today so to enter into a set of
circumstances as described in this amendment in this comment
is irresponsible. The terms and conditions described in this
amendment create the same probability of chaos, volatility,
and fiscal discourse. There is limited ability to specifically
comment at this time and will also not have the ability to
adequately comment at some point in the future since this
amendment sets the stage to implement industry funded
monitoring programs across "ALL" FMPs without the obligation
of providing an EIS through the abbreviated framework process.
The amendment does address the many unknown ingredients that
would be needed to create an EIS for the range of FMPs it
effects BUT BY NO MEANS SHOULD THIS AMENDMENT RELIEVE OR
IGNORE THE OBLIGATION AT SOME POINT IN THE FUTURE WHEN IT
WOULD BE CONSIDERED OR IMPLEMENTED. In conclusion the Omnibus
Amendment is imperfect and derelict of the conditions
described above. While it may have satisfied conditions for
implementation to the herring and mackerel FMPs does not
deserve satus as an Omnibus Amendment across "ALL" FMPs under
management of the New England and Mid-Atlantic Councils. As
comprehensive as it is, it is not ready to proceed through
further process towards implementation under the subjects
petaining to FMPs in the future that would have to incur the
cost of industry funded monitoring programs through a
framework process without the requirement of an EIS and the
significant negative economic consequences that would occur

**First Name:**            Erik

**Middle Name:**

**Last Name:**          Anderson  *

**Mailing Address:**     38 Georges Terrace

**Mailing Address 2:**

**City:**               Portsmouth

**Country:**            United States

**State or Province:**  New Hampshire

**ZIP/Postal Code:**    03801

**Email Address:**      andy42152@aol.com

**Phone Number:**       603-234-7038

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2016-0139-0042



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings * |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0041 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0042 |
| **Title:** | Comment from Kathleen  MacQuarrie |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 * |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | ⊗ |
| **Tracking Number:** | 1k0-8sw1-zhrf ⊗ |
| **Page Count:** | 1 ⊗ |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | The idea of a forced mandate upon independent fishermen is more government Over- reach! We, the People are tired of our government sticking it's nose into all of our business! The already stringent regulations forced upon the Fishing industry are forcing small private boats out of business.... You are responsible for sinking this Industry and Destroying it! The corporate owned fleet will be the sole survivors, probably because the Fat Cat owners can lobby our corrupt Congressmen. Enough is enough alreay.... They are already OVER Regulated! Perhaps our Congressmen & Senators would like citizen monitors,( and they would be responsible to pay us out of their pockets) to make sure they are actually doing their jobs and taking care of their constituents like they promise to do during election time! Limited Government is what we want, be responsible and back off the few hard working men & women who are trying to make a decent living at an extremely dangerous job! - A very concerned citizen  *⊗ |
| **First Name:** | Kathleen  *⊗ |
| **Middle Name:** | ⊗ |
| **Last Name:** | MacQuarrie  *⊗ |
| **Mailing Address:** | 26 North Road |
| **Mailing Address 2:** | |
| **City:** | Kensington  ⊗ |
| **Country:** | United States  ⊗ |
| **State or Province:** | New Hampshire  ⊗ |
| **ZIP/Postal Code:** | 03833 |
| **Email Address:** | kwmacq@myfairpoint.net |
| **Phone Number:** | 603.957.1522 |
| **Fax Number:** | |
| **Organization Name:** | ⊗ |
| **Cover Page:** | 🗎 |

# Document Metadata:NOAA-NMFS-2016-0139-0043



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0042 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0043 |
| **Title:** | Comment from Eric Lundvall |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8sw1-ujz4 |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:** SIMPLY PUT, THIS PROPOSED AMENDMENT WILL BE THE STRAW THA BREAKS THE CAMELS BACK FOR MYSELF AND ALL INDEPENDENT COMMERCIAL FISHING OPERATIONS. THERE IS ABSOLUTELY NOT AN COST THAT MY BUSINESS CAN ABSORB, WITHOUT GOING BANKRUP MORE OBSERVER COVERAGE IS DESIRED, LET IT COME OUT OF THE DEEP POCKETS OF PEW AND ALL OF THE OTHER BILLION DOLLAR GI GROUPS WHO WANT TO PUT AN END TO THE FEW REMAINING INDEP FISHERMEN. NOAA/NMFS KNOWS WHAT OUR BOATS ARE SCRAPING BECAUSE OF THEIR ABSURDLY LOW QUOTAS,ON MOST FISH. DO THE MATH! THIS WILL PUT AN END TO US, OR IS THAT WHAT THE END G( IS ANY WAY?? I DO NOT AGREE WITH ANY PART OF THIS INDUSTRY FUNDED OBSERVER AMENDMENT. ERIC LUNDVALL, F/V ESTRELA D( POINT JUDITH , RHODE ISLAND ✱

**First Name:** Eric ✱

**Middle Name:**

**Last Name:** Lundvall ✱

**Mailing Address:** 31 INDIAN TRAIL

**Mailing Address 2:**

**City:** SAUNDERSTOWN

**Country:** United States

**State or Province:** Rhode Island

**ZIP/Postal Code:** 02874

**Email Address:** CAPT.LARS@COMCAST.NET

**Phone Number:** 6096185360

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0044



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0043 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0044 |
| **Title:** | Comment from john haran |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8sw1-s3yg |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | The sectors are no longer financially viable. The groundfishing industry is almost nonexistent and NOAA sits quietly by knowing full well that industry can never ever afford to pay for industry funded monitoring. Electronic monitoring is not the answer. Sector 13 has asked for an arbitration board for years and its request have always fallen on deaf ears. How can NOAA and its partner EDF push for electronic monitoring without answering the question, who owns the data? |
| **First Name:** | john |
| **Middle Name:** | |
| **Last Name:** | haran |
| **Mailing Address:** | 205 rockland street |
| **Mailing Address 2:** | |
| **City:** | Dartmouth |
| **Country:** | United States |
| **State or Province:** | Massachusetts |
| **ZIP/Postal Code:** | 02748 |
| **Email Address:** | sector13@comcast.net |
| **Phone Number:** | |
| **Fax Number:** | |
| **Organization Name:** | |
| **Cover Page:** | |

# Document Metadata:NOAA-NMFS-2016-0139-0045



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings ✱ |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0044 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0045 |
| **Title:** | Comment from Robert Westcott |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS ✱ |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 ✱ |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | API |
| **Number of Submissions:** | 1 ✱ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**    1k0-8sw2-4ndg

**Page Count:**    1

**Total Page Count Including Attachments:**    1

# Submitter Info

**Comment:**    I totally agree with Jason Amaru's comment. We fishermen cannot afford more expenses. We do a lot of industry related projects with NOAA and other agencies over the years and we all do not deserve to be treated this way.The fishermen want to ply their trade. The Magnuson act also promised to protect the fishermen along with the fish. Coexistence is a must!!!! Please do not implement this Omnibus amendment. It would be an economic disaster on small businesses on the sea and those on land. We have had economic studies done up and down the East coast. Please use these assessments and help the fishing communities SURVIVE!! Thank you,Bob Westcott,F/V OCEAN STATE, POINT JUDITH RI.  ＊

**First Name:**    Robert  ＊

**Middle Name:**

**Last Name:**    Westcott  ＊

**Mailing Address:**    4972 Tower Hill rd.

**Mailing Address 2:**

**City:**    Wakefield

**Country:**    United States

**State or Province:**    Rhode Island

**ZIP/Postal Code:**    02879

**Email Address:**    FVOCEANSTATE@GMAIL.COM

**Phone Number:**    401-212-6110

**Fax Number:**

**Organization Name:**    Ocean State Fisheries Inc.

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0046



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0045 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0046 |
| **Title:** | Comment from Susan Anne Palange |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | ⊙ |
| **Tracking Number:** | 1k0-8sw3-b42v  ⊙ |
| **Page Count:** | 1  ⊙ |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | I am a native Rhode Islander, and had the pleasure of being raised in South Kingstown, near our Port of Galilee. I am strongly and adamantly against this proposed rule as a fish and seafood consumer, and as a concerned citizen, and in support of our local fisherman in our state, and neighboring states. Many efforts and regulations in recent years have been far overreaching and have seriously hurt this industry for most if not all the hard working members of our community in this profession, many with a long history and heritage in the fishing and seafood business, as well as, our local economy, other businesses, and the individuals and families affected by it, and we as consumers. This is yet another economic burden that our fisherman simply cannot afford. It will completely and forever damage their industry, whether it be small, medium or large fishing boats. And as a consumer, we want and prefer access to local wild caught fresh fish and seafood by OUR local fisherman that we know, appreciate, and wish to continue supporting. I, and I am certain we, do not want to lose that access. With this proposal, we will either be forced to pay far more for fresh wild caught fish and seafood or forced to buy it farm raised from foreign sources, neither which is acceptable, the latter which I and I am sure many, shall not. Why should our fishermen be penalized and the consumer forced to pay higher prices when the NOAA's budget is over $9 billion dollars a year??? They can't find $2 million a year for observers?!?! We want access to buy local fresh wild caught fish and seafood by OUR fishermen at the lowest fair cost possible. Thank you in advance for your careful and thoughtful attention to this matter.  *⊙ |
| **First Name:** | Susan Anne  *⊙ |
| **Middle Name:** | ⊙ |
| **Last Name:** | Palange  *⊙ |
| **Mailing Address:** | |
| **Mailing Address 2:** | |
| **City:** | ⊙ |
| **Country:** | ⊙ |
| **State or Province:** | ⊙ |
| **ZIP/Postal Code:** | |
| **Email Address:** | |

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0047



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0046 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0047 |
| **Title:** | Comment from Jim Kendall |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/06/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | ⊗ |
| **Tracking Number:** | 1k0-8sw4-24oo  ⊗ |
| **Page Count:** | 1  ⊗ |
| **Total Page Count Including Attachments:** | 1 |

# Submitter Info

| | |
|---|---|
| **Comment:** | Industry Funded Monitoring Costs, Public Comment Nov. 6, 2016 First off, I would like to voice the same opinions & objections that David Goethel has previously, submitted with regard to this issue of "Industry Funded Monitoring Costs" . If for some reason you are unable to locate these comments, I have attached & provided you with a copy of them. Secondly, I feel that there is an enigmatic attempt to misconstrue the differences between an observer program & that of a monitoring program. The educational qualifications, & requirements, along with the reporting classifications of the two levels of oversight are very much different, & are designed for entirely different results; Scientific, vs. Enforcement! Yet, the costs to the industry are reportedly the same! In a recent industry article on the functions of a West Coast observer, it was reported that the per day cost to the fisherman was $400.00, while the costs that have been reported for observers on East coast groundfish vessels are $700+/per day. There are an awful lot of questions that need to be responded to, & answered in that "second" point! Thirdly: it seems as if this issue has been deliberately made to look or seem as if it is fairly local in the general area of concern. So much so, that I believe that there has been a reluctance from other sectors of the fishing industry community to get involved in an issue that doesn't appear to affect them. Their reluctance to get "involved" is just so as to not bring the wrath of the NMFS & NOAA. down upon themselves. Once again, the divide & conquer concept that has served the Service throughout the management process is seemingly at work again. I believe that this is borne out by the paucity of public comments from members of the commercial fishing industry! If this is the common belief of many sectors of the fishing industry, then I feel that due diligence has not been done & that the omnibus amendment should be withdrawn & if necessary, should be resubmitted as a standalone amendment. Jim Kendall New Bedford Seafood Consulting Nov. 6, 2016  * ⊗ |
| **First Name:** | Jim  * ⊗ |
| **Middle Name:** | ⊗ |
| **Last Name:** | Kendall  * ⊗ |
| **Mailing Address:** | New Bedford Seafood Consulting |
| **Mailing Address 2:** | 19 Weaver Street |
| **City:** | New Bedford  ⊗ |
| **Country:** | United States  ⊗ |

**State or Province:**        Massachusetts

**ZIP/Postal Code:**          02740

**Email Address:**            nbsc@comcast.net

**Phone Number:**             (508) 997-0013

**Fax Number:**               N/A

**Organization Name:**

**Cover Page:**

# Industry Funded Monitoring Amendment Public Comments

This is the comment portal for the industry funded monitoring amendment. It's only open until Monday, so we need to get comments in quickly. The omnibus part can apply to every fishery in the future, and that needs to be stopped. Please send to anyone else you know and get them and all their crew to write in comments. Even quick one liners. This is a big deal. And if they all thought it was only herring and mackerel originally, make sure to say that. That was the original plan but the sneaks at NMFS are trying to pull a fast one and make EVERY FISHERY PAY FOR OBSERVERS TO THE TUNE OF $700.00+ PER DAY. The Councils/NMFS have not publicized this to other fisheries or advisory panels, etc. But the omnibus part will affect every fishery. Nobody can afford that in the future, so I would suggest that you and everyone you know comment.

Also even if you are a seafood consumer or run a support business. Your ability to buy local seafood and your business's will be affected immensely. It is VERY IMPORTANT that you comment. Sorry for such short notice but this was just thrown at us and it is critical we comment before the day is over….TODAY! This has to be stopped.  Regulations.gov

**"Previous statement not attributed to a particular author!"  JMK**

Mr. John Bullard,

 Please consider these my public comments on the omnibus industry funding amendment. I would like to offer the following **general comments:**

1.  The public hearing document does not make it sufficiently clear to the public, that while the mackerel and herring fisheries are the only fisheries immediately impacted by the action, the blueprint for funding provided in this amendment affects all federal fisheries except groundfish and scallops going forward. In short, the vast majority of fishermen have not commented on this action because they did not realize that it pertained to their fishery.
2.  Most fishermen in fisheries such as lobster will be extremely surprised to find out that costs they will bear, are being determined now in this action. The document does not sufficiently explain that how and if the lobster fishery will have to pay, will be determined by a framework sometime in the future.  Thus, their ability to challenge the legality will be closed because they did not file suit in a timely manner after this action is finalized.  Most fisherman are small businesses and not large corporations with a legal staff on full time retainer to review government actions and therefore do not understand that they must object now to something hypothetical in the future.

**Thus, I think a new public hearing document should be drafted and a new round of public hearings held, to make sure every single fishery in federal waters is notified that they will be potentially liable for costs determined in this amendment.**
For this reason, I also believe a full economic and social cost analysis should be done by fishery before the amendment is taken out to public hearing. Many small boat fishermen become instantly non- viable across a whole host of fisheries should costs be imposed on them.  This amendment has the immediate and foreseeable impact of decreasing the value of their permits even if no further action is taken. Who will want to buy a permit of a vessel that has insufficient revenue to cover the costs of observers? I have heard the defense that this action does not cause any economic impact but puts that decision and action on future councils so an EIS is not needed. I disagree, just the fact of adding another expense onto a faltering industry has an immediate impact on owners and vessels for long term decisions and one more uncertainty in the decision-making process.  Just because this does not impose an actual amount on any one fishery, it changes the dynamics of the economics of all fisheries and should be analyzed to allow the fishing industry to make informed comments.  It is disingenuous to say that there are not any economic or social impacts connected with this action.

In addition, I will offer some specific comments on the Amendment that I think have not been addressed by the Council or NOAA. I made many of these comments at the January 2016 Council meeting in Portsmouth, New Hampshire. They were not addressed then, and so far, as I can discern, have not been addressed since.

**Comment1)** Monitoring is a function of government and should be funded at levels Congress deems appropriate through NOAA line items in the budget.
**Comment2)** Magnusson allows for the placement of observers on fishing boats but is silent on cost recovery except in specific fisheries in the North Pacific Region.
**Comment3)** The ability to place an additional economic burden on future fisheries without regard to the economic viability of that fishery is not addressed and could easily put future fisheries out of business.
**Comment4)** Comment 3 requires a EIS not an EA to analyze fully the effects on the human environment.
**Comment5)** Data ownership and price negotiation should be clarified. If fishermen are forced to pay government approved, for profit private contractors, fishermen should own the resulting data and have the ability to negotiate the costs on a vessel by vessel basis.
**Comment6)** No discussion of the issue of observer bias is present in the document. When the government pays the observers, they are beholden to the government. When the industry pays, some observers could become biased in favor of the person paying the bill. This

is already occurring in groundfish. It is subtle, but occurring, and probably unstoppable. Thus, the scientific utility of the data collected is uncertain. As a scientist, I would be very concerned with this issue.

For all these reasons, I believe the best course of action is to withdraw the omnibus amendment and take up the issue with Congress when Magnusson is reauthorized.

Sincerely,

David Goethel

Owner/Operator F/V Ellen Diane

23 Ridgeview Terrace

Hampton, NH 03842

# Document Metadata: NOAA-NMFS-2016-0139-0048



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0047 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0048 |
| **Title:** | Comment from Anonymous Anonymous |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8sw5-a4of

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** I am not in favor of industry funded observer program. My husband is a commercial fishing vessel owner and captain. With regulation after regulation this industry is drowning. To make them responsible for the cost of an observer that is hurting them in the long run is obsurd. *

**First Name:** Anonymous *

**Middle Name:**

**Last Name:** Anonymous *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0049



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  *

**Document File:** 

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0048

**Current Document ID:** NOAA-NMFS-2016-0139-0049

**Title:** Comment from Chris Scola

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS  *

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:** Posted

**Received Date:** 11/07/2016  *

**Date Posted:** 11/07/2016

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1  *

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016

**Comment Due Date:** 11/07/2016

**DOC Docket No.:**

**XRIN:**

**Tracking Number:**    1k0-8swb-lg4m

**Page Count:**    1

**Total Page Count Including Attachments:**    1

# Submitter Info

**Comment:**    Dear Mr Bullard This madness has to stop. Its ridiculous that our commercial fishing fleet , who has already been forced to the edge of survival will be forced to bear another unnecessary cost. If NOAA Fisheries insists on putting more inexperienced and unworthy people on the decks of fishing boats then you should do so on your own dime. This endeavor to increase monitoring has nothing to do with sustainability and conservation , its only true objective is to continue the financial strangulation of the industry at the behest of the professional ENGO industry that has corrupted our industry and our nation. The fishing industry, NMFS, and the environmental liars know that this measure will help drive more of the fleet out of business. These are mom and pop stores on main street USA that YOU are financially strangling for no other reason than to appease your masters from big energy that use these ENGO groups as a weapon to clear fishermen from the sea. If our nations food security and the well being of our costal communities is of any importance to our government then this plan must halt immeadiately.  *

**First Name:**    Chris  *

**Middle Name:**

**Last Name:**    Scola  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0050



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0049 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0050 |
| **Title:** | Comment from Faye Passanisi |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8swc-eikq |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

These observers are outrageously being forced upon fishermen, against their will and to make matters even worse, fishermen should not have to bear the expense of this as well! This is just another nail in the coffin of generations of those that derive their living from the sea. It is just another an unfair burden on fishermen which ultimately will prohibit consumers from being able to buy local and fresh seafood. I live in the oldest seaport in America and am sad to say that there are very few fleets in operation here, most were driven out by the government's harsh and unreasonable regulations. What frightens me most is the very real possibility of consumers being railroaded into a foreign market where we read about garbage seafood being passed on the the consumer. The human element is being replaced by the BAS, relying on Best Available Science in a field that has been worked by hard working, honest fishermen/women that know, love and respect the sea as have generations of fishermen/women before them. There are just some things that cannot be REPLACED by technology and fishing happens to be one....Something needs to be done to stop this destructive tsunami by governing authorities and soon before it's too late! The very lifeblood is being strangled from those that derive their living from the sea, it is in their veins and the governing authorities have applied a tourniquet which is stopping the flow, resulting in losing a limb at a time and eventually, God forbid! A slow painful death is being observed and these fishermen/women are paying for this with and out of their livelihood. OUTRAGEOUS!  *

| | |
|---|---|
| **First Name:** | Faye  * |
| **Middle Name:** | |
| **Last Name:** | Passanisi  * |
| **Mailing Address:** | 9 Oxford Road |
| **Mailing Address 2:** | same |
| **City:** | Gloucester |
| **Country:** | United States |
| **State or Province:** | Massachusetts |
| **ZIP/Postal Code:** | 01930 |
| **Email Address:** | fayepass@yahoo.com |

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0051



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0050 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0051 |
| **Title:** | Comment from Leslie Welch |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8swc-6b7q

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** You continue to take away from the small honest fishermen, they cannot afford this additional expense! The amendment will destroy what is left of the small fishing families. The government should absorb the cost like they do for other industries. Adding additional expenses to an already marginal industry is unconstitutional. *

**First Name:** Leslie *

**Middle Name:**

**Last Name:** Welch *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0052



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0051 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0052 |
| **Title:** | Comment from AMANDA ODLIN |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8swc-2bip

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** This is an Economic Burden that the industry CANNOT bear. *

**First Name:** AMANDA *

**Middle Name:**

**Last Name:** ODLIN *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0053



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0052 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0053 |
| **Title:** | Comment from Jeff Jordan |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | ⊗ |
| **Tracking Number:** | 1k0-8swd-tz0p  ⊗ |
| **Page Count:** | 1  ⊗ |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

My name is Jeff Jordan and I fish out of Pt. Judith, Rhode Island on the F/V Prevail. One of our main focuses is herring fishing during the late fall and winter, sometimes extending into the early spring. One of our favorite aspects of the fishery is not only it's efficiency but also how clean the fishery is in terms of bycatch. We have taken observers many times while herring fishing and it turns out to be about the most ineffective use of observer coverage in all of the fisheries that we participate in. On a good day we make just a handful of tows which consist of nothing but herring. I feel as though we (single net trawlers) are being lumped in with mid-water pair trawl vessels which is like comparing bluefin stick boats to giant factory sized tuna seiners. Just because the species being harvested is the same, the method implemented to harvest said fish is what should be the determining factor in the scope of oversight. The majority of vessels that fish the way we do are small operations that absolutely cannot afford these onerous costs for observer coverage that is totally unnecessary. By far the most disturbing part of this conversation is the idea that this type of coverage could be extended to any and all fisheries. If the foundation of this concept is that observers are needed on every vessel that harvests herring than your building will collapse. Unfortunately we are not talking about bricks and mortar, we are talking about human lives and livelihoods. If this goes through many operations will be put out of business due to a flawed concept. Please rescind this concept as it's totally unnecessary and could be the death knell to many fishers and consequently to many communities and their infrastructure. Sincerely, Jeff Jordan  ⋆⊗

| | |
|---|---|
| **First Name:** | Jeff   ⋆⊗ |
| **Middle Name:** | ⊗ |
| **Last Name:** | Jordan   ⋆⊗ |
| **Mailing Address:** | PO Box 1146 |
| **Mailing Address 2:** | |
| **City:** | Charlestown   ⊗ |
| **Country:** | United States   ⊗ |
| **State or Province:** | ⊗ |
| **ZIP/Postal Code:** | 02813 |

**Email Address:**          jj6196@msn.com

**Phone Number:**          4015296504

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0054



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0053 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0054 |
| **Title:** | Comment from Wesley Peterson |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

_0000016854

**XRIN:**

**Tracking Number:**    1k0-8swe-czfb

**Page Count:**    1

**Total Page Count Including Attachments:**    1

## Submitter Info

**Comment:**    This is absolutely ludicrous passing observer costs in to small Independent fishermen will put them out of business. We absolutely can not afford industry funded observers  ＊

**First Name:**    Wesley  ＊

**Middle Name:**

**Last Name:**    Peterson  ＊

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0055



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  * |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0054 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0055 |
| **Title:** | Comment from bradley keene |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS  * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016  * |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1  * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

_0000016856

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8swe-y8im |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

If the agency's involved want more information from observers they should pay for the observers. The small fishers barely make a living now without extra expenses of observers. U. S. A. fishermen are the most restricted fishermen in the world and don't need this added burden. We produce healthy natural food sources for the general public. Our products help strengthen the economy. Paying for observers would break the back of small fishing operations. I say no to fishermen funded observers. Thank you. Captain Bradley R. Keene Jr.  *

**First Name:** bradley  *

**Middle Name:**

**Last Name:** keene  *

**Mailing Address:** 2463 babylon street

**Mailing Address 2:**

**City:** wantagh

**Country:** United States

**State or Province:** New York

**ZIP/Postal Code:** 11793

**Email Address:** brkeenejr@gmail.com

**Phone Number:** 5169433083

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0056



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139 🔵

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings ✱🔵

**Document File:** 🗎

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned 🔵

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0055

**Current Document ID:** NOAA-NMFS-2016-0139-0056

**Title:** Comment from Citizen jones 🔵

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS ✱🔵

**Document Subtype:** 🔵

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001 🔵

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings 🔵

**Status:** Posted 🔵

**Received Date:** 11/07/2016 ✱🔵

**Date Posted:** 11/07/2016 🔵

**Posting Restriction:** No restrictions 🔵

**Submission Type:** Web

**Number of Submissions:** 1 ✱

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016 🔵

**Comment Due Date:** 11/07/2016 🔵

**DOC Docket No.:**

_0000016858

**XRIN:**

**Tracking Number:** 1k0-8swf-2oc3

**Page Count:** 1

**Total Page Count
Including Attachments:** 1

## Submitter Info

**Comment:** Monitoring is a function of government and should be funded at levels Congress deems appropriate through NOAA line items in the budget. Period. ✶

**First Name:** Citizen ✶

**Middle Name:**

**Last Name:** jones ✶

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0057



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0056 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0057 |
| **Title:** | Comment from Jason Jarvis |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8swf-tpxl

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** I oppose the proposal to have the industry fund observers. We are on the verge of a systemic collapse financially as an industry. *

**First Name:** Jason *

**Middle Name:**

**Last Name:** Jarvis *

**Mailing Address:** 70 beach street

**Mailing Address 2:**

**City:** Westerly

**Country:** United States

**State or Province:**

**ZIP/Postal Code:** 02891

**Email Address:** buddhajay108@yahoo.com

**Phone Number:** 4012073118

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0058



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0057 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0058 |
| **Title:** | Comment from Maraliese Beveridge |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**    1k0-8swf-zxg0

**Page Count:**    1

**Total Page Count Including Attachments:**    1

# Submitter Info

**Comment:**    The NMFS already has a program in place to force fishermen to take along an observer at will, on their boats. NOW you want the fishermen to pay the NMFS $700 per trip for NMFS observers! Shame on you! Find another way to fund your program! This is a ridiculous demand and absurd amount of money! Some trips fishermen go out there in grueling conditions and don't even make $700. How dare you ask them to reach further into their pockets to fund YOUR observer program. What is your true motive? Are you intentionally trying to put them out of business? Are you trying to put an end to fishing in the Atlantic Ocean? Are you promoting a monopoly on the purchase of imported fish only from foreign countries? If this goes through--the local fishermen may as well just tie-up their boats--this is unjustifiable and plain un-American. The NMFS is supposed to be supporting a healthy and balanced environment for fish and fishing--not try to end fishing, which is our inherent right as people and as Americans. Makes you wonder whose idea this was! Shame on you again!  *

**First Name:**    Maraliese  *

**Middle Name:**

**Last Name:**    Beveridge  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**    United States

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**    redhouse5@optonline.net

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0059



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0058 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0059 |
| **Title:** | Comment from John Windels |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8swf-4pwe |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

I am an independent owner/operator of a small fishing vessel. I am opposed to ANY industry funded monitors. I am allready required to pay for monitors in the groundfish and scallop fisheries. This has allready curtailed my participation in those fisheries and caused unnecessary financial hardship for myself and my son who works with me. We are also Forced to take observers/monitors at least twice a month on all other trips during the year in which I have cooperated fully (yet grudgingly ) . If I am forced to pay for these monitors also I may not be able to stay in business. This is serious and I doubt it is legal or constitutional. I hope the entire industry can unite and fight this in court if necessary.

| | |
|---|---|
| **First Name:** | John |
| **Middle Name:** | |
| **Last Name:** | Windels |
| **Mailing Address:** | 52 Squiretown Road |
| **Mailing Address 2:** | |
| **City:** | Hampton Bays |
| **Country:** | United States |
| **State or Province:** | New York |
| **ZIP/Postal Code:** | 11946 |
| **Email Address:** | jwindels3@gmail.com |
| **Phone Number:** | 5167025063 |
| **Fax Number:** | |
| **Organization Name:** | |
| **Cover Page:** | |

_0000016865

# Document Metadata:NOAA-NMFS-2016-0139-0060



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | HTML |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0059 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0060 |
| **Title:** | Comment from adam dyer |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**            1k0-8swg-tvg7

**Page Count:**                 1

**Total Page Count**            1
**Including Attachments:**

## Submitter Info

**Comment:**                    this is a burden that myself as a small entity boat owner and
                                the entire industry as a whole could not afford. with the
                                regulations put on the fishermen this would be detrimental to
                                the fleet  ∗

**First Name:**                 adam  ∗

**Middle Name:**

**Last Name:**                  dyer  ∗

**Mailing Address:**            1431 boston neck road

**Mailing Address 2:**

**City:**                       saunderstown

**Country:**                    United States

**State or Province:**          Rhode Island

**ZIP/Postal Code:**            02874

**Email Address:**              adamdyer44@yahoo.com

**Phone Number:**               4019327990

**Fax Number:**                 none

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0061



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings ✱ |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0060 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0061 |
| **Title:** | Comment from Erica Fuller |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS ✱ |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 ✱ |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 ✱ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**  1k0-8swh-8mvj

**Page Count:**  1

**Total Page Count Including Attachments:**  1

# Submitter Info

**Comment:**  See attached file(s)  *

**First Name:**  Erica  *

**Middle Name:**

**Last Name:**  Fuller  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**  The Herring Alliance

**Cover Page:**



November 7, 2016

Mr. John Bullard
Regional Administrator
NOAA Fisheries
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930

**RE:   Public comment on the Industry-Funded Monitoring Omnibus Amendment
         (NOAA-NMFS-2016-0139)**

Dear Mr. Bullard:

    I am writing on behalf of the Herring Alliance[1] to offer comment on the Industry-Funded
Monitoring Omnibus Amendment ("Amendment").[2]  Three years ago NOAA Fisheries
disapproved measures[3] recommended by the New England and Mid-Atlantic Fishery
Management Councils ("Councils") that would have required 100 percent observer coverage on
the largest vessels in the herring and mackerel fleets,[4] and initiated this Amendment.
Unfortunately, despite longstanding concerns about lack of accountability and three years of
work, this Amendment still includes alternatives that, if selected, will leave the herring and
mackerel midwater trawl fleet under-monitored and far short of the Councils' intent.  For reasons
discussed below, the Herring Alliance continues to support 100 percent observer coverage on
midwater trawlers until a well-designed electronic monitoring ("EM") and portside sampling
("PS") program is shown to be an effective replacement for, or complement to, 100 percent
observer coverage.[5]

    The Amendment cannot satisfy its purpose related to industry funded monitoring
programs in the Atlantic Herring FMP and Atlantic Mackerel, Squid, and Butterfish FMP - "to

---

[1] The Herring Alliance includes 110 organizations representing nearly 2.5 million individuals concerned about the
Atlantic coast's forage fish, including the stocks managed in the MSB FMP, and the impacts of forage fish fisheries
on the ecosystem through food web depletion and bycatch.
[2] *See* 81 Fed. Reg. 64426 (Sep. 20, 2016) (request for public comment).  The IFM Amendment and its
environmental assessment (EA) are available at:
https://www.greateratlantic.fisheries.noaa.gov/regs/2016/September/160923_draft_ea_for_ifm_omniibus_amendme
nt_with_appendices.pdf ("Industry-Funded Monitoring Amendment").
[3] The disapproved monitoring provisions in Herring Amendment 5 and Mackerel Amendment 14 would have
required 100 percent observer coverage on all Category A and B limited access herring vessels and all mackerel
limited access midwater trawl and Tier 1 small-mesh bottom trawl vessels.
[4] *See* MAFMC (Apr. 2013). Amendment 14 to the Atlantic Mackerel, Squid, and Butterfish (MSB) Fishery
Management Plan, Final Environmental Impact Statement (FEIS); *see also* NEFMC (Mar. 2013). Amendment 5 to
the Fishery Management Plan (FMP) for Atlantic Herring, FEIS.
[5] The Herring Alliance most recently commented on the IFM Amendment on June 14, 2016, however, it has
commented on the need for adequate monitoring in these fisheries on numerous occasions.

_0000016870

help improve estimates of catch tracked against harvest limits and fishery catch caps"[6] – unless it ensures that midwater trawlers do not slip unwanted catch and that all catch  is made available for sampling.

Specifically, the Herring Alliance supports the following industry-funded monitoring coverage measures for the Atlantic Herring FMP and the Atlantic Mackerel, Squid, and Butterfish FMP:

- The development of an alternative that requires 100 percent NEFOP-level coverage on all midwater trawl vessels (as opposed to all Category A and B vessels) operating in the herring and mackerel fisheries (**Modified Herring and Mackerel Alternatives 2.1**);
- 100 percent NEFOP-Level Coverage on Midwater Trawl Fleet in Groundfish Closed Areas (**Herring Alternative 2.5**); and
- These requirements should remain in place until a fully effective EM/PS program is developed and implemented for the midwater trawl fleet.

The Herring Alliance does not support:

- **Sub-Option 1** that would allow vessels to be issued waivers to exempt them from industry-funded monitoring requirements, for either a trip or the fishing year, if coverage was unavailable due to funding or logistics;
- **Sub-Option 3** that would require industry-funded monitoring requirements to expire two years after implementation. The monitoring levels adopted by the Councils are intended to gather more information to meet FMP goals and objectives and therefore should not automatically sunset two years after implementation. Instead, the Councils could consider a two-year re-evaluation of the coverage levels (Sub-Option 4) to determine whether and to what degree monitoring should change to meet FMP goals; and
- **Sub-Option 5** that would exempt trips that land less than 25 mt of herring from industry-funded monitoring requirements. As explained in the DEIS, this exemption would bias data used to track against catch caps for haddock and river herring and shad.[7]
- **The pilot project as currently designed.**  Instead, NOAA Fisheries and the New England and Mid-Atlantic Councils should use the money received to immediately begin an EM/PS project with all of the core elements described below including maximized retention, slippage consequence measures, 100 percent video based monitoring, video data review, vessel monitoring plans with specific standards, 100 percent portside sampling, compliance measures, third party verification of landed catch, and mandatory participation.

* * *

The midwater trawl fleet participating in the Atlantic herring and mackerel fisheries include the most powerful fishing vessels operating in New England and the Mid-Atlantic, with very large small-mesh nets capable catching 100 metric tons of marine life in a single tow. The power and scale of this fleet makes the risks associated with unintended catch particularly high,

---

[6] *See* Industry-Funded Monitoring Omnibus Amendment Public Hearing Document (September 2016) at 5.
[7] *See* Industry-Funded Monitoring Amendment at 304, 353.

_0000016871

with impacts to other fisheries and the ecosystem as a whole.  Robust monitoring of the herring and mackerel fisheries should be a mandatory precondition for access to millions of pounds of these vital public resources (i.e., Atlantic herring, mackerel, river herring, shad, and other species incidentally caught).  Congress intended that there be both "limits" and "accountability" in fisheries to "protect, restore, and promote the long-term health and stability of the fishery."[8]  To achieve that accountability, FMPs must include those monitoring and reporting measures necessary to obtain accurate estimates of catch (retained and discarded) and bycatch, including a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery.[9]  Adequate monitoring and bycatch measures are also vital to ensuring that overfishing is prevented.[10]   None of this is possible without comprehensive monitoring.

## 1.  The Industry-Funded Herring and Mackerel Coverage Target Alternatives

The Amendment considers three types of monitoring for the herring and mackerel fisheries – Northeast Fisheries Observer Program-level ("NEFOP-level") observer coverage, at-sea monitoring coverage ("ASM"), and electronic monitoring and portside sampling ("EM/PS") coverage.  However, none of these programs will appropriately address slippage or the observer effect[11] without high levels of monitoring.

The Herring Alliance strongly urges NOAA Fisheries and the Councils to approve 100 percent observer coverage with no waivers on all midwater trawl vessels operating in the herring and mackerel fisheries (Modified Herring Alternative 2.1 and Mackerel Alternative 2.1). We recommend the Councils modify these alternatives to apply only to the midwater trawl fleet because these vessels comprise the majority of the directed herring and mackerel fisheries,[12] they are responsible for the majority of river herring and shad catch (57 percent),[13] and they account for nearly all of the haddock caught by the herring fishery.[14] Vessels of this size and fishing power, using small-mesh gear prone to catastrophic bycatch events of depleted species like river herring and shad, require very high levels of observer coverage.

Also, as explained in the DEIS, allocating monitoring coverage by fishing fleet may be preferable to coverage by permit type because the catch estimation methodology would match the SBRM's sampling design:[15]

---

[8] 16 U.S.C. § 1853(a)(1)(A).

[9] See 16 U.S.C. §§ 1853(a)(5), (a)(11).

[10] See e.g., Flaherty v. Bryson, 850 F. Supp. 2d 38, 57 (D.D.C. 2012).

[11]  An observer effect  results when vessels change their fishing practice or location as a result of having an observer on board; See, e.g. Benoît H. P. and J. Allard 2009. Can the data from at-sea observer surveys be used to make general inferences about catch composition and discards? Canadian Journal of Fisheries and Aquatic Sciences 66:2025-2039; Babcock, E.A., E.K. Pikitch, and C.G. Hudson 2003. How much observer coverage is enough to adequately estimate bycatch? Report of the Pew Institute for Ocean Science. Rosenstiel School of Marine and Atmospheric Science, University of Miami, Miami, FL.

[12] For example, the herring midwater trawl fleet harvested the majority (70%) of landings from 2008 to 2014; See Industry-Funded Monitoring Omnibus Amendment (September 2016) at 217 (Tables 60 and 61) and 232 (Table 70).

[13] See Industry-Funded Monitoring Omnibus Amendment (September 2016) at 106.

[14] See Amendment 5FEIS at 201

[15] See Industry-Funded Monitoring Omnibus Amendment (September 2016) at 263, 342.

_0000016872

Under SBRM, vessels are selected for observer coverage by fishing fleet (based on gear, mesh and area), not based on FMP or permit category. Valid estimates of catch or bycatch (and their variances) rely on formulas that are consistent with the underlying sampling design. Estimates that are inconsistent with the sampling design may be biased, which may impact the utility of the data.

One hundred percent observer coverage also fits the purpose and need of the Amendment and advances the major goals and objectives of the monitoring program,[16] which include implementation of industry-funded monitoring to improve the accuracy of catch estimation and catch caps for river herring and shad and haddock.[17]  Additionally, 100 percent observer coverage, especially for vessels using midwater trawl gear, is supported by a majority of stakeholders, including commercial and recreational fishermen, watershed organizations who work to restore river herring, and other conservation groups and ecosystem-dependent businesses throughout New England and the Mid-Atlantic.[18]  Finally, it bears repeating that both Councils already voted to adopt requirements for 100 percent observer coverage on the largest vessels in the herring and mackerel fisheries in 2012, which NOAA Fisheries subsequently disapproved citing limited federal funding and legal constraints on the sharing of costs between NOAA Fisheries and the fishing industry.

As explained in the DEIS,[19] "more monitoring could be more effective to meet monitoring goals than less monitoring" and "choosing a higher coverage target has the potential to benefit the herring resource," "mackerel resource," and "non-target species," "by improving management through better data."  Similarly, because the Councils are "interested in increasing monitoring to improve the accuracy of catch estimates, in particular the ability to track catch against catch caps, more monitoring could be more effective than less monitoring."

Unfortunately, observer coverage in the herring fishery has dropped dramatically since 2014 when 41 percent of all midwater trawl trips were observed.[20]  In 2015, just 4.7 percent of midwater trawl trips were monitored by observers.[21]  As noted in the Amendment, "the level of observer coverage during 2015 may be more indicative of future observer coverage levels than observer coverage levels from previous years" due to revisions in the SBRM that changed how federal funding is used to allocate observer coverage.[22]  This is unacceptable.  Monitoring this fleet at these extremely low levels could lead to even less robust estimation of catch and bycatch, compromise monitoring of catch caps, and greatly reduce our ability to understand the true

---

[16] Id. at 107, 136.

[17] Id. at 59.

[18] For example, over 70,000 public comments were received prior to final action decisions on Amendment 5 and Amendment 14 in support of 100 percent at-sea monitoring on all midwater trawl fishing trips.

[19] See Industry-Funded Monitoring Omnibus Amendment (September 2016) at 269, 278, 348, 356, 309, and 383.

[20] See Atlantic Herring Fishery Specifications for the 2016-2018 Fishing Years Including an Environmental Assessment (NEFMC submitted March 1, 2016), at 48.

[21] See Industry-Funded Monitoring Omnibus Amendment (September 2016) at 251 (Table 79) and 338 (Table 108).

[22] See Industry-Funded Monitoring Omnibus Amendment (September 2016) at 251 and 338.

_0000016873

nature and extent of bycatch occurring in these fisheries.[23]  Unless higher levels of observer coverage are achieved the accuracy and reliability of the data collected will remain questionable. As explained in previous Herring Alliance comments,[24] high levels of observer coverage is the only meaningful way to address net slippage and at-sea discarding of incidentally caught species and to eliminate any concerns that observed trips are different from non-observed trips (i.e., the observer effect).

Although a recently added alternative provides the flexibility to mix and match monitoring programs by gear type, it assumes a transition to EM/PS (*see* Herring Alternative 2.7 and Mackerel Alternative 2.5) without providing any standards for the decision whether it is "an adequate substitute" or not.   Further, informed decision making on the proposed EM/PS monitoring program is nearly impossible due to the asynchronous timing of it all as the Councils will take final action on the industry-funded monitoring coverage target alternatives in the herring and mackerel fisheries *before* completion of the EM pilot program,[25] the purpose of which is to analyze the utility of EM in monitoring these fisheries.  The Councils should use the experience and results from EM project to inform its decision making on the implementation of an effective program.

For all of these reasons, the Herring Alliance opposes anything other than 100 percent observer coverage on midwater trawlers in these fisheries until NOAA Fisheries can prove that it has an effective EM/PS program in place.

## 2.   Transition to Electronic Monitoring and Portside Sampling

As this Amendment has been delayed, the interest in electronic monitoring and portside sampling has increased as a potential alternative to at-sea observer coverage.  The Herring Alliance supports a transition to an EM/PS monitoring program provided it is well designed and fully implemented prior to moving to anything less the 100 percent observer coverage.   NOAA Fisheries has received nearly a million dollars in funding for a pilot EM project for midwater trawl vessels and provided summaries of the key aspects of its intended project at multiple meetings including most recently at the September 20, 2016 New England Council meeting.  In order to facilitate development of an effective EM/PS monitoring program – one that could provide an alternative or a complement to observers[26]– the Herring Alliance recommends that

---

[23] For example, species that are infrequently encountered or species with high inter-annual and seasonal variability in distribution (such as river herring and shad) are likely to be missed when observer coverage rates are at lower levels.

[24] Prior comment letters include the September 28, 2015 Letter to John Bullard regarding the Proposed Rule for Framework 4 to the Atlantic Herring FMP; June 18, 2015 Letter to John Bullard regarding the Proposed Rule for Framework 9 to the MSB FMP; August 14, 2014 Letter to John Bullard, Chris Moore and Thomas Nies regarding the IFM Amendment; July 18, 2013 Letter to John Bullard regarding the DEIS and Proposed Rule for Amendment 5 to the Atlantic Herring FMP; June 21, 2013 Letter to John Bullard regarding the FEIS and Proposed Rule for Amendment 5; June 4, 2012 Letter to Chris Moore regarding the DEIS for Amendment 14 to the MSB FMP; June 4, 2012 Letter to Paul Howard regarding the DEIS for Amendment 5 to the Atlantic Herring FMP.

[25] As presented at Herring Committee Meeting (September 20, 2016) the final EM project report is anticipated to be complete by December 2017, nearly a full year after final action on the amendment anticipated in January 2017.

[26] EM would not replace the NEFOP sampling program that NOAA Fisheries deems necessary for its scientific needs. NEFOP observers would still be randomly deployed on vessels to collect biological samples and other scientific information.

_0000016874

NOAA Fisheries and the New England and Mid-Atlantic Councils use the money received to immediately begin a project with mandatory participation that includes all of the following core elements:

- **100% video-based monitoring** – The EM system should include a configuration of cameras and gear sensors to verify retention of catch for portside sampling and to verify retention of catch for portside sampling and monitor compliance with discarding/slippage requirements. Cameras should be on from the start of the vessel's first haul back until the vessel returns to port, and should provide views of all areas where catch is retrieved, sorted and discarded (i.e., haul back, pumping and areas of the deck where catch sorting and discarding occurs). Gear sensors (i.e., drum rotation and hydraulic pressure) must be on for duration of trip to detect fishing activity and activate camera recording. GPS data must be collected to provide high resolution location information for all gear sensor and video data. All information must be captured and stored on a secure, tamper-evident control unit/hard drive. A vessel monitoring plan should be required to outline protocols for the installation, operation and maintenance of the EM system.

- **Maximized retention** – EM/PS will only be effective in the long term if integrated within a maximized retention program requiring vessels to land all fish, including target and non-target species (excluding protected and/or prohibited species). Exempted Fishing Permits could be issued on a temporary basis to allow vessels to retain and land non-permitted catch so all catch is made available for sampling. This would allow NOAA Fisheries to gather the information needed to develop options for retention requirements that may be considered for future adoption. Under maximized retention, minor discarding of non-target species may be allowed. Allowable discarding should occur at a designated location or discard chute equipped with a dedicated high-resolution camera(s) so that all catch can be sampled/estimated through either video recordings or discard logbooks with video imagery reviewed to validate discard amounts. The logbook audit approach is being pursued in the Pacific whiting midwater trawl fishery because it was found to produce reliable estimates at reduced cost.[27]

- **Slippage measures** – Slippage prohibitions, reporting requirements and consequence measures must apply to trips monitored with EM. These requirements can be monitored through a combination of EM sensors and video cameras, which can be later reviewed to verify whether the vessel operator complied with reporting the event and any consequences that applied. This will require regulatory changes as slippage measures currently only apply to trips monitored by NEFOP observers.[28] If it is determined that EM cannot identify the cause of a slippage event, NOAA Fisheries and the Councils should apply the same consequence to all slippage events to aid enforcement while still

---

[27] *See* PFMC, Electronic Monitoring Draft Environmental Analysis, April 2016, at 44, available at: http://www.pcouncil.org/wp-content/uploads/2016/04/F4_Att2_EM_Analysis_Full_ElectricOnly_APR2016BB.pdf.

[28] The slippage consequence measures implemented in Framework 4 to the Atlantic Herring FMP and Framework 9 to the Mackerel, Squid, and Butterfish FMP require all Category A and B herring vessels and Tier 1, 2, and 3 mackerel vessels on observed trips to move 15 nautical miles following an allowable slippage event (i.e., slippage due to safety, mechanical failure, or excess catch of spiny dogfish) and to terminate a fishing trip and return to port following a non-allowable slippage event (i.e., slippage for any other reason).

_0000016875

providing a strong incentive for herring vessels to minimize slippage.  Without this accountability (i.e. consequences) there will be continued uncertainty around the effectiveness of the river herring and shad catch caps and the accuracy, completeness, and reliability of catch estimates in these fisheries.

- **Video data review** – Four types of video review should be required: 1) review of footage recorded during haul back and pumping operations to verify retention of catch during fishing operations, 2) review of wide-angle camera view(s) of the deck to monitor discarding outside fishing events, 3) review of allowable discarding of non-target species at designated discard locations or chutes, and 4) review for compliance with slippage prohibitions, reporting requirements and consequence measures.  We support 100 percent review of video footage until analysis shows that random subsampling of video can provide a high level of confidence that discarding activity and slippage will be detected.

- **Vessel monitoring plans** – VMPs should provide explicit details how vessels will meet the catch monitoring standards set by NMFS and the Councils.  NOAA Fisheries should present a list of specific standards/requirements for council/public consideration and input prior to approval of the EM/PS program. The EM program being developed for the Pacific whiting fishery has an excellent set of performance standards in draft regulatory form that can be used as a starting point for analysis.[29]  Standards should include, but not be limited to, the following:
    o Protocols for installation, operation and maintenance of the EM system (such as camera and sensor configurations, functionality testing, periodic cleaning of cameras and ensuring the EM system is turned on for the entire fishing trip);
    o Procedures for data storage and transfer;
    o Procedures to follow when an EM system fails;
    o Notification requirements in advance of a landing;
    o Provision of safe and convenient access points and sampling locations for observers and portside samplers; and
    o Procedures to ensure that no unobserved pre-sorting occurs (such as identification of locations on deck where fish retrieval, sorting and discarding should occur so all activity remains in view of the cameras and procedures for demonstrating the cod-end is empty after each haul and that no catch is slipped).

- **100% portside sampling –** 100 percent of vessel landings should be sampled by portside monitors to obtain accurate weights by species of the retained catch.  Currently, some offload locations cannot be sampled due to safety or logistical reasons.  This should be addressed so sampling can occur at all offload sites.  Midwater trawl vessels should be prohibited from landing catch in ports where portside sampling is not available to ensure complete and accurate species composition of the retained catch, to improve tracking of catch caps, and to prevent a loophole scenario where a vessel could avoid being sampled.

---

[29] *See* PFMC, Deeming of Electronic Monitoring Regulations for Whiting and Fixed Gear Fisheries, April 2016, available at: http://www.pcouncil.org/wp-content/uploads/2016/03/F4a_NMFS_Rpt_EM_reg_deeming_APR2016BB-.

- **Compliance measures -** Rules must be defined that stipulate consequences for non-compliance with VMPs. This can include fines for non-compliance and/or requiring higher levels of data review at the vessel's expense. For example, failure to document discarding events could require increased rates of video review on subsequent fishing trips or for the remainder of the fishing year.

- **Third party verification of landed catch -** Independent verification of landings should be considered a core element of a robust portside sampling program. NOAA Fisheries should explore ways to facilitate third party landings verification through proposed portside sampling program.

Until a fully operational and effective EM/PS solution is implemented, the Herring Alliance continues to support a requirement for an observer on every midwater trawl vessel. NOAA Fisheries and the Councils should ensure that any future EM/PS program contains the measures necessary to effectively monitor this high volume fishery, including a maximized retention policy that brings the vast majority of catch to shore for sampling.

Thank you for considering our recommendations for the IFM Amendment.

Sincerely,

Erica A. Fuller
Attorney Earthjustice

*On behalf of the Herring Alliance*

_0000016877

# Document Metadata:NOAA-NMFS-2016-0139-0062



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0061 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0062 |
| **Title:** | Comment from Pam Lyons Gromen |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**       1k0-8swh-5cul

**Page Count:**            1

**Total Page Count**       1
**Including Attachments:**

## Submitter Info

**Comment:**               On behalf of Wild Oceans, I respectfully submit the attached
                           comments on the Industry Funded Monitoring (IFM) Omnibus
                           Amendment.  *

**First Name:**            Pam  *

**Middle Name:**

**Last Name:**             Lyons Gromen  *

**Mailing Address:**       P.O. Box 258

**Mailing Address 2:**

**City:**                  Waterford

**Country:**               United States

**State or Province:**     Virginia

**ZIP/Postal Code:**       20197

**Email Address:**         plgromen@wildoceans.org

**Phone Number:**

**Fax Number:**

**Organization Name:**     Wild Oceans

**Cover Page:**



November 7, 2016

John K. Bullard
Regional Administrator
NMFS, Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930

**RE:  COMMENTS ON IFM OMNIBUS AMENDMENT**

Dear Mr. Bullard,

*Wild Oceans* appreciates the agency's commitment to work with both the New England and Mid-Atlantic Fishery Management Councils to provide a structure for targeted and enhanced catch monitoring through the Industry Funded Monitoring (IFM) Omnibus Amendment.  Uncertainty about incidental catch estimates and the effectiveness of catch caps for severely depleted yet ecologically-critical river herring and shad, often retained and therefore overlooked by the discard-based Standardized Bycatch Reporting Methodology (SBRM), underscores the importance of providing the regional councils with tools to fund fishery-specific monitoring programs to meet management goals and objectives.

The IFM Omnibus Amendment was initiated in response to the disapproval of key measures contained in Amendment 5 to the Atlantic Herring Fishery Management Plan (FMP) and Amendment 14 to the Atlantic Mackerel, Squid and Butterfish FMP that would have greatly improved our understanding of retained and discarded incidental catch in these high-volume fisheries.  The measures chosen by both councils for inclusion in their respective plan amendments were the result of five years of amendment development informed by comments and testimony from tens of thousands of stakeholders.  We strongly supported the original catch monitoring measures and continue to believe that they are the best course forward.  Therefore, we support the IFM Omnibus Amendment alternatives that reflect the original intent of the Amendment 5 and Amendment 14 monitoring alternatives.  **We urge the Council to select the following as final alternatives to include in the omnibus:**

- **Omnibus Alternative 2:** Standardized structure for industry-funded monitoring programs

  - **Omnibus Alternative 2.2:** Council-led prioritization process

- **Herring Alternative 2:** Coverage targets for IFM Program **(NO SUB-OPTIONS)**

**P.O. BOX 258  •  WATERFORD, VA 20197**
**WWW.WILDOCEANS.ORG**

- o **Herring Alternative 2.1:** 100% NEFOP-Level Coverage on Category A and B vessels combined with **Herring Alternative 2.5:** 100% NEFOP-level coverage on mid-water trawl fleet in groundfish closed areas

- **Mackerel Alternative 2:** Coverage targets for IFM Program **(NO SUB-OPTIONS)**

  - o **Mackerel Alternative 2.1:** NEFOP-Level Coverage [100% on all mid-water trawl vessels, 100% on Tier 1 small-mesh bottom trawl (SMBT), 50% on Tier 2 SMBT and 25% on Tier 3 SMBT]

We appreciate the suite of alternatives explored through this amendment to develop monitoring options that are both effective and affordable. After evaluating options that differ from the original measures chosen for Atlantic Herring Amendment 5 and Atlantic Mackerel, Squid and Butterfish Amendment 14, we determined the best action at this time is to continue to support the councils' final decisions in Amendments 5 and 14 through IFM Omnibus Amendment alternatives that dedicate limited resources to Northeast Fisheries Observer Program (NEFOP) at-sea monitoring focused on the most active participants in each fishery.

**NEFOP Coverage Allocation Alternatives**

As explained in the IFM Omnibus Amendment (Appendix 5, p. 40), NEFOP observers are trained to collect an array of data and samples that feed essential information into stock assessments and management protocols. There is a key difference between the NEFOP observers and the At-Sea Monitors (ASM): NEFOP observers collect whole specimens, photos and biological samples (etc., scales, otoliths and vertebrae). As a result, there are more applications for the data collected by NEFOP observers, including obtaining valuable age information for use in stock assessments – applications that more than offset the modest cost savings of using ASMs.

In the case of river herring and shad, information obtained by NEFOP observers will be critical for monitoring catch caps as well as for providing useful biological information for improving stock assessments and conservation measures. We note that the recent river herring stock assessment flagged the collection of age information as well as genetic information obtained from biological samples as high priorities for research.[1] Follow-up work by Palkovacs et al. 2014[2] and Hasselman et al. 2015[3] has demonstrated the importance of genetic information for evaluating fishery impacts on anadromous stocks and for targeting conservation strategies.

---

[1] Atlantic States Marine Fisheries Commission. 2012. River Herring Benchmark Stock Assessment. Stock Assessment Report No. 12-02, pp. 21-23. Available at: http://www.asmfc.org/shadRiverHerring.htm.

[2] Palkovacs, E.P., Hasselman, D.J., Argo, E.E., Gephard, S.R., Limburg, K.E., Post, D.M., Schultz, T.F. and Willis, T.V., 2014. Combining genetic and demographic information to prioritize conservation efforts for anadromous alewife and blueback herring. Evolutionary Applications, 7(2), pp.212-226.

[3] Hasselman, D.J., Anderson, E.C., Argo, E.E., Bethoney, N.D., Gephard, S.R., Post, D.M., Schondelmeier, B.P., Schultz, T.F., Willis, T.V. and Palkovacs, E.P., 2015. Genetic stock composition of marine bycatch reveals disproportional impacts on depleted river herring genetic stocks. Canadian Journal of Fisheries and Aquatic Sciences, 73(6), pp.951-963.

_0000016881

Because river herring and shad are known to mix with Atlantic herring and mackerel at sea, it is imperative to focus monitoring on the vessels that expend the greatest effort pursuing these target species.

- **Category A & B Permit Holders in the Atlantic Herring Fishery**

  Industry funding is necessary to achieve coverage levels above SBRM levels, so it is important to distribute the observer cost burden equitably among fishery participants, imposing the highest coverage levels on the vessels that derive the most benefit from the Atlantic herring fishery. In 2010, C vessel revenues from herring were just $150,000 compared to $18.4 million for A and B vessels.[4]

  Thirty Category A /B vessels (14 mid-water trawls, 9 small mesh bottom trawls, and 7 purse seines) are active in the fishery,[5] and these vessels account for the vast majority (around 98%) of Atlantic herring landings.[6] Over 60% of Category A/B vessels are greater than 80 ft. in length.[7] Given the high volume nature of these vessels, the high inter-annual and seasonal variation in river herring and shad distribution, and the fact that shad and river herring catch events can be rare but quite large when they occur, 100% coverage is necessary for an accurate accounting of incidental catch.

  While estimates indicate that mid-water trawl vessels are responsible for the majority of river herring and shad incidental catch,[8] small mesh bottom trawl (SMBT) interactions with river herring and shad are a growing concern. In the 2016-2018 Atlantic Herring specifications package, the Plan Development Team states that "upon reviewing catch data from the most recent two years (2013-2014), it has become apparent that discards now constitute a much larger proportion of total RH/S catch, particularly for SNE/MA bottom trawl (up to ~73% in 2014)."[9] We feel strongly that observer coverage must be expanded to SMBT vessels carrying Category A & B permits, even though this gear type catches a small percentage of annual sea herring landings, in order to help ascertain the severity of the problem and effectively track the river herring and shad cap.

  Because all mid-water trawl vessels hold either a Category A or B permit, we anticipate that 100% NEFOP coverage for these permits will translate into 100% coverage on mid-water trawl vessels accessing the groundfish closed areas. However, we emphasize our support for Herring Alternative 2.5 because of the great biological and ecological significance of the closed areas.

---

[4] NEFMC. 2012. Amendment 5 to the Fishery Management Plan for Atlantic Herring Final Environmental Impact Statement (FEIS), Table 52, p. 255. Available at: http://s3.amazonaws.com/nefmc.org/Volume_I_forfinalsubmission.pdf.

[5] IFM Omnibus Amendment, Appendix 9, p. 20.

[6] IFM Omnibus Amendment, p.270.

[7] See note 4, p. 259.

[8] IFM Omnibus Amendment, p. 106.

[9] NEFMC. 2016. 2016-2018 Atlantic Herring Specifications, Appendix 1: Development of Options for River Herring and Shad Catch Caps in the Atlantic Herring Fishery, 2016-2018. Available at: http://s3.amazonaws.com/nefmc.org/160301-2016-2018-Herring-Specs-Formal-Submission.pdf

_0000016882

○ **Limited Access (Tiers 1, 2 and 3) Permit Holders in the Atlantic Mackerel Fishery**

As discussed in the Final Rule for Amendment 14:

> …the Council recommended increases in the observer coverage in the mackerel fishery, specifically 100-percent observer coverage on all limited access mackerel vessels using mid-water trawl (i.e., Tiers 1, 2 and 3) and Tier 1 mackerel vessels using small-mesh bottom trawl, 50-percent coverage on Tier 2 mackerel vessels using small-mesh bottom trawl, and 25-percent on Tier 3 mackerel vessels using small-mesh bottom trawl. Many stakeholders believe this measure is necessary to accurately determine the extent of bycatch and incidental catch in the mackerel fishery. *The Council recommended this measure to gather more information on the mackerel fishery so that it may better evaluate and, if necessary, implement additional measures to address catch and discards of river herring and shad* [emphasis added].[10]

The Mid-Atlantic Council's decision was in response to the chronic low levels of observer coverage in mackerel and squid fisheries, which hamper an accurate assessment of river herring and shad bycatch. Amendment 14 explains that from 2006-2010, only 6.5% of total mackerel caught, 11% of shortfin squid caught and 3.5% of longfin squid caught were observed.[11]

Analyses indicate that that mid-water trawl vessels accounted for 57% of river herring and shad incidental catch between 2010 and 2013.[12] Mid-water trawl vessels are also responsible for a sizable portion of mackerel landings, accounting for 39%, 61% and 47% of landings in 2012, 2013 and 2014 respectively.[13] According to information presented in Amendment 11 to the MSB FMP, there are 15 mid-water trawl vessels that are eligible for the mackerel limited access program (13 in Tier 1 and 2 in Tier 2).[14] In addition, these same mid-water trawl vessels hold Category A or B permits for the Atlantic herring limited access fishery.[15] Given the overlap in the mid-water trawl fisheries for Atlantic herring and mackerel,[16] observer coverage levels should be consistent between the FMPs.

---

[10] IFM Omnibus Amendment, Appendix 1, p. 422.

[11] MAFMC. 2013. Amendment 14 to the Atlantic Mackerel, Squid and Butterfish Fishery Management Plan (MSB FMP) FEIS, p.204. Available at:
https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/53e3d5fbe4b0e88e72d231c6/1407440379012/Am14FEIS.pdf

[12] See note 8.

[13] IFM Omnibus Amendment, Table 70, p. 232.

[14] MAFMC. 2011. Amendment 11 to the Atlantic Mackerel, Squid, and Butterfish Fishery Management Plan, Tables 94-96, pp. 447-448. Available at:
https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/518968c5e4b0884a65fe5067/136795974907/Amendment+11+FEIS+-+FINAL_2011_05_12.pdf

[15] Memorandum from Lori Steele, NEFMC Staff, Herring PDT Chair, to Herring Committee and Advisory Panel Members. "Background Information re. Herring/Mackerel Fishery Interactions," July 22, 2008.

[16] See note 11, Appendix 4.

_0000016883

SMBT vessels are accountable for 33% of river herring and shad incidental catch[17] and also contribute significantly to the overall mackerel catch.  For example, in 2012, SMBT landed 57% of the total landings.[18]  Therefore, it is important to improve observer coverage in this fleet to achieve precision in incidental catch estimates.

As with the herring fishery, observer cost burden should be distributed equitably among fishery participants.  For the mackerel limited access program, 10 SMBT vessels are eligible for Tier 1, and 19 are eligible for Tier 2.[19]  Neither Tier 1 nor Tier 2 vessels are capped by a percentage of the quota, and there are no trip limits for Tier 1 vessels.  For Tier 3, however, 138 vessels qualify,[20] and this tier is capped at 7% of the annual quota.  Additionally, the average length of a Tier 3 vessel is 65 ft., compared to 78 ft. for Tier 2 and 110 ft. for Tier 1[21], making the observer costs significantly more burdensome for vessels in Tier 3 relative to their daily operating costs.

### Transition to an Electronic Monitoring /Portside Sampling Program

Portside sampling only captures information for catch that is kept, and therefore misses an important part of the equation.  Without maximized retention, not considered in this omnibus, we cannot support a portside monitoring program at this time. However, we do believe that electronic monitoring combined with maximized retention and portside sampling holds great promise.

We are pleased that GARFO and the Northeast Fisheries Science Center are embarking on a pilot program to explore the feasibility of electronic monitoring and portside sampling (EM/PS) for mid-water trawl vessels operating in the Atlantic herring and mackerel fisheries. We encourage the agency to regularly share information about the program with stakeholders and solicit feedback in order to ultimately design a program that fully addresses monitoring needs articulated by the public through the development of Amendments 5 and 14.  Until that time, we continue to support 100% NEFOP coverage for the major participants in the herring and mackerel fisheries.

Sincerely,

Pam Lyons Gromen
Executive Director

---

[17] See note 8.

[18] IFM Omnibus Amendment, p. 232.

[19] See note 14.

[20] See note 14.

[21] See note 14, Table 82, p. 435.

5 of 5

_0000016884

# Document Metadata: NOAA-NMFS-2016-0139-0063



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0062 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0063 |
| **Title:** | Comment from Kristine Harder |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

_0000016885

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8swi-f2hf |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**  As a person who prefers to eat American caught fish, I am very concerned with the financial burden being placed on our fishermen to pay for observers. Stop and think about it, could you afford to make such payments to someone who "observed" you doing YOUR job? Imagine how it would affect your bottom-line . Sadly the market won't adsorb these costs. The fishermen will be paid the same amount, and more and more of them will be forced to find other work. Aren't we trying to GROW the American economy not shrink it? And why is this increased Observer coverage hidden in the Omnibus bill in the first place? Why hasn't this gone to the Regional Councils and gone through die process?  *

**First Name:**  Kristine  *

**Middle Name:**

**Last Name:**  Harder  *

**Mailing Address:**  P.O. Box 136

**Mailing Address 2:**

**City:**  Haines

**Country:**  United States

**State or Province:**  Alaska

**ZIP/Postal Code:**  99827

**Email Address:**  kristine.harder@gmail.com

**Phone Number:**  907-766-3059

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0064



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0063 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0064 |
| **Title:** | Comment from Paul Farnham |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8swk-2ucg |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**            Thank you for allowing me to comment. I am strongly opposed to this Industry-Funded Monitoring Omnibus Amendment. I believe that all cost responsibilities associated with monitoring commercial fisherman should be funded totally by NMFS. *

**First Name:**          Paul *

**Middle Name:**

**Last Name:**           Farnham *

**Mailing Address:**     po box 2048

**Mailing Address 2:**

**City:**                montauk

**Country:**             United States

**State or Province:**   New York

**ZIP/Postal Code:**     11954

**Email Address:**       paulfarnham1@gmail.com

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0065



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0064 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0065 |
| **Title:** | Comment from Jeffrey Valli |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8swk-n0z4

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** I thought this was only going to be for herring and squid now you want to encompass all fisheries this needs to go back for public comment Jeff valli f/v Bella -v ✱

**First Name:** Jeffrey ✱

**Middle Name:**

**Last Name:** Valli ✱

**Mailing Address:** 360 gov.premce Rd

**Mailing Address 2:**

**City:** Eastham

**Country:**

**State or Province:**

**ZIP/Postal Code:** 02642

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0066



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0065 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0066 |
| **Title:** | Comment from Robert Cabral |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/07/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/07/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8swl-b00e |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**

I simply can not believe that we are even faced with this situation. I can not put into words how much I am opposed to this idea of industry funded observers. You people have gone too far with this. No other industry is forced to pay to police itself. I for one will do everything in my power, should you go forward with this, to organize members of our industry to simply refuse to take observers, period. It is the next step for us if you continue down this path.

**First Name:** Robert

**Middle Name:**

**Last Name:** Cabral

**Mailing Address:** 85 Auburn Dr

**Mailing Address 2:**

**City:** Charlestown

**Country:** United States

**State or Province:** Rhode Island

**ZIP/Postal Code:** 02813

**Email Address:** rcabral33@verizon.net

**Phone Number:** 4019653364

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0067



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings *

**Document File:** 

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0066

**Current Document ID:** NOAA-NMFS-2016-0139-0067

**Title:** Comment from James R Lovgren

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS *

**Document Subtype:** 

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:** Posted

**Received Date:** 11/07/2016 *

**Date Posted:** 11/07/2016

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1 *

## Document Optional Details

**Status Set Date:** 11/07/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016

**Comment Due Date:** 11/07/2016

**DOC Docket No.:**

**XRIN:** ⊗

**Tracking Number:** 1k0-8swl-kocp ⊗

**Page Count:** 1 ⊗

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:**
I, and the 12 members of the Fishermans Dock Co-op of Point Pleasant totally oppose any industry funding of fishery observers on board our vessels. we believe the program to be totally corrupt and without any benefit to our nation. we have carried observers for over 20 years and have yet to see any valid science or use of this information. the same fisheries are covered over and over again as if something might change, the observers fight over going out on the same comfortable boats, [the ones with the best mattresses] while ignoring smaller vessels. a former Regional administrator continues to enrich himself with his own observer company which was created due to his efforts to push observers into every fishery both while he was administrator and after he left and was funded by NGO's to push his agenda. [He's obviously a Clinton supporter]. To expect a boat that may stock $1,500.00 a day to pay a worthless observer and the company that employs him half of their daily stock that day is nothing more then insanity. the observer will make more then the captain and his crew, for BS information that will be thrown in the trash can unless it shows a marine mammal or turtle interaction. NMFS should have a lot better ways to waste taxpayers dollars then this government job creation program whose employees last on average only 8 months. The observers quickly learn that what they are doing is a complete and unnecessary waste of taxpayer dollars and quit to find a real job, while the few that stick around do so because they don't have the courage to leave the governments tit. Just like most employees of NMFS, especially the politically appointed hypocrites who run the show solely to enrich their pension and benefit packages. Cancel the observer program and eliminate both NMFS and the corrupt Commerce department that pulls their strings. Thanks, Jim Lovgren ＊⊗

**First Name:** James R ＊⊗

**Middle Name:** ⊗

**Last Name:** Lovgren ＊⊗

**Mailing Address:**

**Mailing Address 2:**

**City:** ⊗

**Country:** ⊗

**State or Province:** ⊗

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

_0000016895

# Document Metadata:NOAA-NMFS-2016-0139-0068



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings *

**Document File:**

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0067

**Current Document ID:** NOAA-NMFS-2016-0139-0068

**Title:** Comment from Jeff Reichle

**Number of Attachments:** 1

**Document Type:** PUBLIC SUBMISSIONS *

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:** Posted

**Received Date:** 11/07/2016 *

**Date Posted:** 11/08/2016

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1 *

## Document Optional Details

**Status Set Date:** 11/08/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016

**Comment Due Date:** 11/07/2016

**DOC Docket No.:**

_0000016896

**XRIN:**

**Tracking Number:**    1k0-8swl-288i

**Page Count:**    1

**Total Page Count Including Attachments:**    1

## Submitter Info

**Comment:**    Please accept these comments from Jeff Reichle, President, Lund's Fisheries, Inc., Cape May, NJ  ★

**First Name:**    Jeff  ★

**Middle Name:**

**Last Name:**    Reichle  ★

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**



**LUND'S FISHERIES INCORPORATED**

Phone: (609) 884 - 7600  Fax: (609) 884 - 0664  lundsfish@lundsfish.com
997 Ocean Drive, Cape May, New Jersey 08204, U.S.A.
Email to: jreichle@lundsfish.com

November 7, 2016

Mr. John K. Bullard
Regional Administrator
NMFS-GARFO
55 Great Republic Drive
Gloucester, MA 01930-2298
Via Federal e-Rulemaking Portal

Administrator Bullard:

On behalf of the 250 employees of our family-owned, vertically-integrated seafood processing facility and the company-owned and independently-owned commercial fishing vessels and crew working to support us here in the port of Cape May, I am writing to provide our comments on the Joint-Council Omnibus Industry-Funded Monitoring Amendment.

Our comments principally focus on the types of monitoring being considered for the Atlantic herring and Atlantic mackerel fisheries, which we are engaged in.

***We are opposed to the Omnibus Amendment being adopted by either Council and encourage both Councils to at least delay further consideration of the Amendment until after the completion of the midwater trawl (MWT) Electronic Monitoring (EM) pilot project and until NMFS can incorporate existing state shoreside monitoring information into river herring and haddock bycatch estimates and projections.***

We believe the use of this shoreside monitoring data will improve the CV's around the accuracy and precision of bycatch estimates use to regulate these important pelagic fisheries.  If it does, then the Councils may be further guided as to whether or not additional shoreside monitoring of the fleet has value or not and at what cost to the government and/or industry.

Before offering further comments on the Amendment, however, we want to sincerely thank you and your staff at GARFO for finding the resources ($995,000) to further evaluate the utility, and costs of EM in the herring and mackerel fisheries.  There will be 'lessons learned' from this project, which supports delaying the amendment until the project has been completed and the data from it analyzed.

Approving the Omnibus in the GARFO region would mark a turning point in regional fishery management policy by requiring industry funding for monitoring programs, at some unknown cost, which have been funded by the federal government since the passage of the MSA in 1977. Assumingly, this would be forever, potentially for every fishery under New England and Mid-Atlantic Council management, when agreed to at some point by the Councils and the Agency.

1

This mandate would be in opposition to our reading of Section 402 of the Magnuson Act, however, where it is clearly stated that "information collection" programs in "addition to SBRM" should use grants, contracts or other financial assistance for establishing additional information collection programs.  Congress specifically amended the Act to create a basis for industry funded monitoring in the North Pacific, but only at the request of the industry at that time.

This amendment came about following the partial disapproval of two previous Council amendments, which, combined, would have required our herring and mackerel vessels to have a Federally-approved observer on board, for every trip, with the vessel owners agreeing to limit their costs to $350/day, a sea-day cost for similar monitoring purposes on the West Coast, as understood at that time.  The projected costs from every option included in this amendment are much, much higher, however and we are questioning whether or not the additional biological information that may be gathered is worth that additional cost.

Lund's Fisheries agreed to this $350/day proposal, at that time, in the hope that questions about our pelagic fisheries' impacts on incidently-caught species could finally be answered to the satisfaction of all stakeholders and so that we could move ahead with meeting reasonable, biologically-based management goals and objectives in these important regional fisheries in the future.  Tremendous uncertainty has existed in these fisheries as a result of the anti-midwater trawl compaign, which has been waged in this region by certain stakeholders for nearly a decade, who refuse to agree with the quality information being provided to the public by the Agency.

Since that time, the Observer Committee has done a good job focusing on what is possible, and at what cost to both government and industry may be expected.  The projected costs are steep, howver, and most are likely to be unsustainable from our company's perspective.

Balancing the gathering of more data from these fisheries, with the cost of producing it, is the fundamental issue presented by this Amendment.   We believe it is important for the Councils to consider the relative value of gathering additional information in the herring and mackerel fisheries, against comparable estimates of precision, CV's and accuracy and consistency estimates used to monitor all of the other fisheries under Council management, and we do not believe we have the information in front of us to be certain that equity will exist in the future, relative to most of the options presented in the Amendment.

In the case of the herring and mackerel fisheries that we participate in, however, we realize we are likely going to have to incur some additional costs in the future, but these costs need to be sustainable and balanced, again, with some biological benefits accruing to the herring and mackerel resources.  It does not appear that the government is seeking additional monitoring in these fisheries but, instead, as stated above, stakeholder campaigns have created the 'need' for this Omnibus Amendment.

At this time our herring and mackerel fishing vessels, the F/V Enterprise and the F/V Retriever, are working with the Observer Program to implement the pilot Electronic Monitoring (EM) program.  Again, we sincerely appreciate the Agency's applying nearly a million dollars into this program to see if the concept works and will meet the seemingly endless concerns of some stakeholders.

_0000016899

Given all of the projected costs with all of the options in the document, some combination of EM and shoreside information (such as what has been gathered in the last several years in the Massachusetts/Maine/SMAST/Cornell voluntary programs) seems like the most-cost effective route forward for our company and the fishereis, but the costs projected in the PID are high and highly uncertain.

We have been supporting the herring RSA program (3% of TAL set aside) in recent years so that the herring and mackerel midwater trawl fishing fleet can fund the voluntary state shoreside program, which targets 50% of landings. We appreciate the Nature Conservancy's support for sustaining the voluntary shoreside monitoring program over the years, also, by making the small mesh bottom trawl fleet's participation possible. Original funding for the program came from the National Fish and Wildlife Foundation several years ago.

Some months ago, the fishing companies who control the information from the voluntary shoreside monitoring program have asked that it be made available to the Councils, as it will likely lower some of the CVs used in projections made in this document, and in the FW 5 document, relative to monitoring incidental catches of river herring or haddock.

All of the future costs and CV's found in the document, no matter which approach is taken – whether it may be some level of at-sea observation (ASM), or cameras, or shoreside monitoring, or some combination of these - can clearly not be projected or compared at this time, so we ask both Councils to set this amendment aside, at least until after the completion of the MWT EM pilot project and until NMFS can incorporate state shoreside information into bycatch estimates and projections of the accuracy and precision of those estimates as they are used to regulate these important pelagic fisheries.

We know, also. that the issue of this existing shoreside information is now being pursued by the New England Council as part of Amendment 8, which, along with FW 5, is producing additional uncertainty in the herring fishery from North Carolina to Maine. Since it is also impossible to project Amendment 8 or FW 5 outcomes at this time, the need to slow down the monitoring amendment becomes even more acute, at this time, in our view.

***If the amendment is to be approved in some form by the Councils this year, we urge them not to approve options in the document that would be punitive, such as the 'no waiver' options in Alternative 2. Instead, we strongly support the waiver allowance in herring and mackerel Alternatives 2, sub-option 1.***

***We believe that the options not to grant waivers if federal funds are not available, for any of the monitoring options in the document, is unlawful as this option would violate National Standard 1 since OY could not be achieved, National Standard 2 because the best available scientific information demonstrates that the SBRM collects precise and accurate information, National Standard 8 since it does not minimize adverse economic impacts on fishing communities and National Standard 9 because it is not practicable to leave a sustainable herring resource in the ocean when adequate bycatch information is already being collected.***

***We also support both Alternative 2 sub-options, 2 (wing vessel exemption), 4 (2-year reevaluation), and 5 (25 mt threshold) if the amendment were to move ahead this winter.***

3

**Omnibus Alternatives:**

If the amendment is to move ahead this winter, we offer the following comments on these alternatives and on the herring and mackerel alternatives (below).

We support the Councils' preferred Alternative 2 (Standardized Structure for industry-funded monitoring programs) and the preferred Alternative 2.2 (Council-led prioritization process) as potentially offering the best possibility of industry, Agency and Councils to create reasonable outcomes for the future.

We also support Omnibus Alternative 2.6 (Monitoring Set-Aside) so that a future framework amendment could be used to equitably spread out additional monitoring costs to all permit holders in both the herring and mackerel fisheries.

**Herring Alternatives:**

**Alternative 1 – No coverage target for IFM program, SBRM only, no action.**

While we believe this should be a sufficient level of monitoring to manage these fisheries, as is the case in nearly all the other fisheries under the management of both Councils, we do not expect this alternative to prevail.

**Alternative 2 – Coverage targets for IFM program**

See the above comments relative to sub-options 1-5.

**Alternative 2.1 – 100% NEFOP-level coverage on Category A and B vessels**

**While we support outcomes that would affect Category A and B vessels equally, no matter what gear is being used to harvest herring, we are opposed to this option**. The cost is not sustainable, the NEFOP program cannot provide the resources to meet this goal, nor do we believe it is it necessary to do so. Some lower level of coverage, perhaps a 25% ASM target should be adequate to understand the biological implications of these fisheries, if an ASM option is to be implemented.

**Alternative 2.2 - ASM Coverage on Category A and B vessels**

**As noted above, if an ASM target option becomes and outcome of this amendment, the target should be no greater than 25%.** While we do not know if this goal is either possible or affordable, this level of coverage seems to equate to monitoring levels in other fisheries under Council management in the region and should provide sufficiently adequate levels of accuracy and precision to manage these fisheries into the future.

_0000016901

**Alternative 2.3 – Combination Coverage on Category A and B Vessels and MWT Fleet**

**If an EM/Portside option emerges from this amendment for the MWT fleet, the target level of coverage should be no higher than 50% of trips although it is not clear what those actual costs may be if there were to be a federal, mandatory requirement in the future.** A 50% target has been in place for the voluntary program for some time although the information from the program has yet to be analyzed to determine CV, accuracy and precision estimates.

As stated above, a 25% target ASM level should be adequate for both the purse seine and SMBT fleets, if an ASM option were to be selected for these fleets. **We strongly believe that any added monitoring costs should be applied equally and fairly across the purse seine and MWT fleets due to the competitive position of these fleets in the region's herring fishery.**

**Alternative 2.4 – EM and Portside Coverage on MWT Fleet**

**We do not support this option as it would not apportion future costs equally across the Category A and B MWT and purse seine fleets.**

**Alternative 2.5 – 100% NEFOP-Level coverage on MWT fleet in Groundfish CAs**

**We continue to oppose this regulation as being punitive since the MWT fleet does not catch any significant amount of groundfish, other than haddock due to their often residing in the water column, an incidental catch that is being managed with a catch cap.** The regulation has led to a needless loss of fishing grounds unless a NEFOP observer is available and should be replaced with other fleet-wide monitoring options.

**Alternative 2.6 – Combination coverage on MWT fleet in Groundfish Closed Areas**

**While we understand this option to provide some other fleet-wide monitoring alternatives for the MWT fleet, which we support, it would provide no purse seine monitoring above SBRM coverage, an approach we are opposed to due to the competitive position of these fleets in the region's herring fishery. It is our understanding that this option would apply to the ultimately-chosen MWT monitoring program, across the herring fishery, and that special GFCA rules would no longer be in place. There is no biological reason for special GFCA monitoring, which we continue to oppose.**

**Alternative 2.7 ASM coverage on Category A and B vessels, then vessels may choose either ASM or EM/Portside Coverage**

**This option seems to be the fairest option in the document in that additional monitoring costs would be applied equally across the herring fleets. We urge the Council to support the a 25% ASM target level and a shoreside monitoring target of no more than 50% of trips. However, as stated above, we do not support this amendment moving forward until the pilot EM project is completed and analyzed and the Agency has considered the value of the information that has been gathered in the voluntary shoreside monitoring program in recent years.**

5

_0000016902

**Mackerel Alternatives:**

**While there are 7 herring alternatives, there are 5 mackerel alternatives. Our mackerel comments mirror our herring comments relative to the support for Alternative 2 sub-options, 1 (waiver), 2 (wing vessel exemption), 4 (2-year re-evaluation) and 5 (25 mt threshold).**

**We are opposed to a 100% ASM requirement as not practical since Agency resources could not meet this goal, the cost to the industry is too high and this level of coverage is not necessary, from a biological perspective, to sustainably manage the fishery.**

**Any shoreside level of coverage should not exceed a 50% target and any ASM target should not exceed 25% for the reasons provided above relative to costs and data accuracy and precision estimates across other fisheries under management.**

Thank you for the opportunity to provide you with our comments on this important Amendment. Please do not hesitate to contact me with any additional information regarding our concerns and recommendations.

With best regards,

*Jeff Reichle*

Jeffrey B. Reichle
President

Cc:  Chris Moore / Tom Nies

6

# Document Metadata:NOAA-NMFS-2016-0139-0069



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  * |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0068 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0069 |
| **Title:** | Comment from Tina  Jackson |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS   * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016  * |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1   * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**                          ⊗

**Tracking Number:**               1k0-8swm-4qmn  ⊗

**Page Count:**                    1  ⊗

**Total Page Count**               1
**Including Attachments:**

## Submitter Info

**Comment:**                       11/7/16 To Whom It May Concern, Please accept this letter as
public comment in OPPOSITION of forcing Fishing Vessels to pay
for Government observers during fishing trips. At no time,
during the course of this omnibus, has it been made clear that
paying for observer coverage was going to apply to the entire
fisheries. It has only been listed and discussed under the
herring and mackerel management plan. It has given the
illusion that coverage was only being considered for those two
particular fisheries. At no time did the council make clear
the coverage was pertaining to the entire fishing sectors, nor
has it been discussed that the council was considering it for
all fisheries. Many fishermen have not voiced their opposition
until recently, for several reasons. Number one being they are
working and cannot be at meetings. That is a consistent
problem. Number two is they were not aware of which fisheries
this mandate was going to affect. Reiterating the herring and
mackerel issue as stated previously. That could be cause for
industry to take legal action. It can be construed as
deliberate misrepresentation. Knowledge and intent to force
monetary obligations onto the industry when obligation is
clearly outlined in Magnuson and strictly states it is the
responsibility of the Agencies involved, not the industry. The
industry simply cannot afford to pay $800 per day to a company
that is and has been owned by a former Regional Management
Administrator. There is clear conflict of interest regarding
this issue. There always has been. Simply stating, the NEFMC
suspended observer coverage because they couldn't pay for it.
But, the company that provides a large portion of that
coverage needs its meal ticket, so make the industry pay?????
What makes the federal govt think we can afford to pay for it.
NOAA has a budget of 9 billion dollars, the industry pays
those taxes providing that budget, and NOAA can't find 2
million to pay for their legally obligated duty of stock
assessments???? There is money under the Salston/Kennedy Act
that can be utilized. In fact, NOAA still owes the industry
hundreds of millions of dollars regarding the fund that was
never paid back after the agency completely misappropriated
and illegally mis-spent hundreds of millions on luxury boats,
taking judges on foreign trips to Amsterdam, and the likes.
That information is documented under the G-cell investigation
by the Inspector General of Commerce. The illusion that this
information is going to be used for stock assessments and
utilized as it is required to, is simply that, an illusion.
History clearly shows that any information collected during
observed trips in the past does not get included in the actual
assessments. NOAA and the councils have publicly admitted that
the information sits in a box on the floor of an office for 5
plus years and rarely sees the light of day. That in itself is
wasteful and completely unacceptable, but now they want the

fleet to waste their money by paying outrageous costs for observers just to let the info sit on a floor somewhere and fade away??? It cannot be allowed to happen. The industry cannot afford to pay for this. We are barely hanging on as it is. We will be forced to forego maintenance and safety necessities to pay for this coverage. Loss of life will become an issue if we are continually forced to pay for any type of govt assessments and govt science. It is the duty of the govt to provide those services. Even if Electronic Monitoring is considered, the assumption and uncertainty of what is in the net and what discards there are, are not going to be evaluated. It simply eliminates the whole process to begin with. The EM is there to count fish show what is caught and what discards are going to be, but the EM cannot show how much fish are in the net, what type of fish is most abundant, and what is going to go over the side. It completely counter-acts the reason for the $50,000 camera. Another cost we would be forced to pay. The fact that this program is being rushed into without any thought of what the consequences are going to be, is unacceptable as well. Once it is implemented, it cannot be revoked. Many more boats will be forced to sell and the already large monopoly that exists will only get bigger. It exacerbates the industry, especially crew members, infrastructure, shore-side related businesses, and will ultimately force consumers to pay exorbitantly higher prices for their seafood. It is completely and utterly unacceptable to force the fishing industry to pay for observers on the whim of the agency. The only action to take is to take no action at all. Thank you for consideration of my comments. Sincerely, Tina Jackson, Commercial Fisherman and previous President of AAFC (American Alliance of Fishermen and their Communities) - [ ] *Ⓢ

**First Name:**              Tina  *Ⓢ

**Middle Name:**                   Ⓢ

**Last Name:**               Jackson  *Ⓢ

**Mailing Address:**          PO Box 1274, 75 Skagerrak Rd

**Mailing Address 2:**

**City:**                    Charlestown  Ⓢ

**Country:**                 United States  Ⓢ

**State or Province:**             Ⓢ

**ZIP/Postal Code:**         02813

**Email Address:**           tinajaafc@gmail.com

**Phone Number:**            401-837-6932

**Fax Number:**

**Organization Name:**             Ⓢ

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0070



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0069 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0070 |
| **Title:** | Comment from Pj Beckwith |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**  1k0-8swm-fa6p

**Page Count:**  1

**Total Page Count Including Attachments:**  1

## Submitter Info

**Comment:**  I do not support industry funded observer coverage . There is no way this industry could afford the additional cost.  ✱

**First Name:**  Pj  ✱

**Middle Name:**

**Last Name:**  Beckwith  ✱

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0071



## Document Details

**Docket ID:** NOAA-NMFS-2016-0139

**Docket Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Document File:**

**Docket Phase:** Notice

**Phase Sequence:** 1

**RIN:** Not Assigned

**Original Document ID:** NOAA-NMFS-2016-0139-DRAFT-0070

**Current Document ID:** NOAA-NMFS-2016-0139-0071

**Title:** Comment from roy diehl

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2016-0139-0001

**Comment on Document Title:** Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

**Status:** Posted

**Received Date:** 11/07/2016

**Date Posted:** 11/08/2016

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1

## Document Optional Details

**Status Set Date:** 11/08/2016

**Current Assignee:** NA

**Status Set By:** Luers, Daniel (NOAA)

**Comment Start Date:** 09/20/2016

**Comment Due Date:** 11/07/2016

**DOC Docket No.:**

**XRIN:**

**Tracking Number:**        1k0-8swm-pchg

**Page Count:**             1

**Total Page Count**        1
**Including Attachments:**

## Submitter Info

**Comment:**                I don't believe the fisherman should have to pay the expensive
                            costs of monitoring they're fishery. There has to be a better
                            way I suggest that more trip limits and mesh sizes be used and
                            do away with sectors days at sea monitors observers too put   *

**First Name:**             roy   *

**Middle Name:**

**Last Name:**              diehl   *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**      belford seafood coop

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0072



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | [HTML] |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0071 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0072 |
| **Title:** | Comment from Shaun Gehan |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**          1k0-8swn-1xig

**Page Count:**               1

**Total Page Count Including Attachments:**   1

## Submitter Info

**Comment:**                  please see attached. *

**First Name:**               Shaun *

**Middle Name:**

**Last Name:**                Gehan *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**        Ad Hoc Pelagics Coalition

**Cover Page:**



November 7, 2016

***Via Electronic Mail***

John K. Bullard, Regional Administrator
NMFS, Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA  01930

> **RE:**    Comments on the Draft Environmental Assessment for the Omnibus Industry
> Funded Monitoring Amendment

Dear Regional Administrator Bullard:

These comments are submitted on behalf of the Ad Hoc Pelagics Coalition ("AHPC"), comprised of mackerel and herring midwater trawlers, purse seiners, and processors fishing out of the Gloucester, Massachusetts fishing community.  We appreciate this opportunity to comment on the Draft Environmental Assessment for the Industry-Funded Monitoring ("IFM") Omnibus Amendment ("IFM EA").  As explained below, AHPC can support the creation of an IFM program for the herring and mackerel fisheries, provided the elements of the programs are identical and cost-effective.  However, final action on this program should be delayed until after the Councils have the results from the electronic monitoring pilot project.  The basis for these positions, as well as details on the specific proposals are set forth below.

First, though, as a general matter, AHPC does not believe the Atlantic herring and mackerel fisheries require enhanced monitoring.   Intensive monitoring, particularly of the midwater trawl fleet, in recent years has demonstrated that this fishery is has the highest retention and lowest bycatch of any major fishery in the New England region.  Certainly, as representatives of the Northeast Fisheries Science Center ("NEFSC") have repeatedly testified, there is no scientific justification for extremely high levels of monitoring, least of all 100 percent.  The science of sampling can provide precise and accurate information at much lower levels of coverage.

That said, we acknowledge the concerns expressed by other stakeholders and appreciate the New England and Mid-Atlantic Fishery Management Councils' desire for greater coverage to collect better information for management and to resolve questions raised.  It was for these reasons AHPC participants, along with many in these fisheries, supported the cost-sharing proposal contained in Amendment 5 to the Atlantic Herring Fishery Management Plan ("FMP") and Atlantic Mackerel, Squid, and Butterfish Amendment 14, which the National Marine Fisheries Service ("NMFS") rightly rejected as contrary to applicable law.

_0000016913

These proposals were deemed by industry participants to be practicable means for addressing the issues and concerns raised regarding the operation of the midwater trawl fleet. The $325 cap on daily observer expenses represented a compromise that would not make the herring and mackerel fisheries unprofitable. More importantly, this provision was to be reviewed after two years. Given that we know existing science accurately portrays the midwater trawl sector's catch, bycatch, and operations, the industry was confident that this review would result in a rollback of the industry-funded monitoring component of these FMPs. More information will only help dispel myths that have been circulated about our fishery.

Unfortunately, under the revised Standardized Bycatch Reporting Methodology ("SBRM"), which has been stripped of all administrative flexibility due to Oceana Inc.'s lawsuits, the herring and mackerel fisheries lost a significant amount of observer coverage. In effect, these fisheries' exceptional record of minimal bycatch has led to a significant reduction in Northeast Fisheries Observer Program ("NEFOP") sea days. This reduction has upset the industry's critics and has negatively impacted herring and mackerel fishermen by making projections of haddock and river herring/shad ("RH/S"), each subject to bycatch caps, highly volatile.

As such, AHPC can support a new IFM program that adheres to the following principles: It must be –

- practicable in the legal sense. That is, it must not unduly restrict fishing activity nor be so expensive as to render the fisheries unprofitable or only minimal profitable;

- narrowly tailored to provide scientifically robust information, not punitively expansive as some members of the public who oppose these fisheries may wish;

- minimally intrusive on fishing operations;

- consistent for both the Atlantic herring and mackerel fisheries; and

- subject to review and revision by time certain.

That said, no program should be finalized until the results of the electronic monitoring ("EM") pilot program are available. That means the two Councils should defer final action, which is now currently scheduled for December and January by the Mid-Atlantic and New England Councils, respectively. (As an aside, the public would be best served if the two Councils met jointly to take final action in order to both ensure consistency and an equal opportunity for input on the final rules.)

EM and port side monitoring have the potential to be a cost-effective means of achieving the IFM Amendment's goals and objectives. Currently, however, the industry, Councils, National Marine Fisheries Service ("NMFS"), and the public lack vital information on the cost and utility of EM. The current pilot project underway among NEFSC, the Greater Atlantic Regional Fisheries Office ("GARFO"), and Saltwater, Inc., set to be finalized by next fall, will aid the Councils and GARFO in making reasoned decisions. That information will also be useful to the industry and public in making informed comments.

There are no exigencies that counsel for undue haste in making a final determination on the specifics of the herring and mackerel IFM program. For instance, there is no indication that NMFS will have additional funded to shoulder its share of the costs next year or in the foreseeable future. As such, there is no reason to rush to a final decision as to these elements of the amendment. The same considerations do not apply to the omnibus portion of the amendment, which could proceed on the current schedule.

Below AHPC comments on the specific measures proposed in the Omnibus IFM Amendment.

## I.     Comments on Options and Alternatives in the IFM Amendment

As you are aware, the IFM Amendment is comprised of three parts: (1) an omnibus section that would amend all New England and Mid-Atlantic FMPs to allow for future creation of IFM programs for all fisheries, while also establishing general parameters of such programs; (2) creation of an IFM program for the herring fishery; and (3) creation a program for the mackerel fishery. AHPC has only one broad comment on the first section and will discuss the herring and mackerel programs together, consistent with our position that these two highly integrated fisheries must be subject to common rules.

As to the omnibus section, AHPC believes that the preferred alternative for a prioritization process, *i.e.*, a Council-led process, is the least effective or efficient of those offered. It appears to be the most time and resource intensive of limited Council resources of all the alternatives, particularly given the need for coordination between the two Councils. As such, it may detract from other management priorities, of which there is no lack. We note that the NMFS-led process does provide for Council input, while the formulaic approaches have the benefit of being self-implementing and time-efficient. Among those other alternatives, AHPC has no preference.

Turning to the herring and mackerel IFM program, AHPC cannot stress enough the importance for agreement between the Councils on all aspects of the amendment. Particularly for the midwater trawl sector, the two fisheries are integrally connected. On most trips, a vessel will declare into each fishery because, *a priori*, one does not know if they will encounter one or the other species. Both are important economically. Inconsistent rules will hamstring fishermen and create administrative problems for NMFS.

In terms of specifics, we will first discuss the various sub-options and then the alternatives.

### A.     AHPC's Preferred Sub-Options

As mentioned above, we firmly believe that the IFM program is legally approvable only if whichever enhanced coverage level selected is waivable in years when NMFS lacks funds for its share of the program's cost. AHPC thus strongly agrees with NMFS preliminary assessment that "[r]educing fishing effort to match available monitoring may lack sufficient justification and be inconsistent with National Standards." IFM EA at 111. Thus, the Councils must select Sub-Option 1. Failing that, NMFS should disapprove this aspect of the amendment.

To be clear, without waivers it would be impossible to harvest optimum yield from either fishery, particularly herring, whose annual catch level ("ACL") is generally fully utilized. A lack of

waivers will reduce allowable fishing effort in most years to a small fraction of current levels. Undoubtedly, this is exactly why some oppose this option.

Such a dramatic reduction in effort and landings would not be effectuated for resource conservation purposes. Those decisions are made by the Councils in consultation with their Scientific and Statistical Committees when determining ACLs for these stocks. It is that science-driven process that determines optimum yield and prevents overfishing as required by National Standard 1.[1]

Having determined that the ACL will prevent overfishing and achieve optimum yield, NMFS' duty is provide the fishing industry the means for "achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." *Id.* That means management measures, unless absolutely mandated by the Magnuson-Stevens Act or other applicable law, cannot unduly deny fishermen a reasonable opportunity to catch the allowable harvest levels.[2]

The monitoring requirements of the IFM Amendment are not being developed in response to a legal requirement that would otherwise trump the obligations imposed by National Standard 1. They are an adjunct of NMFS' and the Councils' duties under National Standard 9[3] and 16 U.S.C. 1853(a)(11), which respectively require minimization of bycatch and bycatch mortality and establishment of an SBRM. Notably, the herring and mackerel fisheries are already monitored in accordance with the SBRM. Additional monitoring provided by an IFM program is utterly discretionary. It is neither "practicable" within the meaning of Magnuson-Stevens Act nor otherwise consistent with the law's substance and intent to restrict sustainable harvest and the economic and social benefits it provides merely for some greater quantum of certainty in catch and bycatch estimates.

In short, an amendment that does not provide waivers is inconsistent with law and must be disapproved in this respect.

Sub-Option 2 would exempt a vessel in a pair trawl operation that does not retain fish from carrying an observer or at-sea monitor under the program. AHPC strongly supports this option. Requiring paid monitoring of a vessel harvesting no fish would increase industry costs while providing no benefits. Any such requirement could be construed as arbitrary and capricious. It is also likely contrary to National Standards 7, requiring cost minimization and unnecessary duplication, and 8, which mandates minimization of adverse economic impacts of management rules.[4]

Sub-Options 3 and 4 are alternatives. Sub-Option 3 would sunset the IFM program after two years. By contrast, Sub-Option 4 calls for review and potential revision of the monitoring requirements after the same amount of time. AHPC can support the review, Sub-Option 4. This option is consistent with the approach the two Councils took in the partially disapproved herring and

---

[1]  16 U.S.C. § 1851(a)(1).

[2]  *See Western Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140 (D. Mass. 2010) ("Once optimal yield is set, the Secretary is charged with 'achieving' the optimum yield.").

[3]  16 U.S.C. § 1851(a)(9)

[4]  *Id.* § (7), (8).

mackerel amendments.  It is commonsense to review a program's performance and costs once experienced is gained.  Not reviewing the program, which would be the default if this option is not chosen, is simply untenable.  No legitimate public policy purpose is served by failure to adopt this review process.

Finally, Sub-Option 5 exempts trips that "land" less than twenty-five metric tons of herring and mackerel from the program.  In general, we are supportive of measures that reduce economic impacts of management measures.  However, this is not a measure that would likely affect AHPC's participants.  Its adoption would mostly benefit small mesh bottom trawl vessels and other multispecies gear.  If the Council believes that improved catch and bycatch information from these fleets is not necessary, they should consider adopting this sub-option.  Countervailing considerations include the potential that exempting these trips from coverage "may bias (either higher or lower) the catch tracked against catch caps."  IFM EA at 275.  This is an important consideration given that improving such tracking is one of the amendment's objectives.

One thing that is unclear, however, is how this exemption would be administered.  As it is triggered by the amount of fish landed, presumably one would declare their intent not to land more than the threshold amount to qualify.  This could potentially lead to additional discarding.  More to the point, the Councils must be clear on how this sub-option will be administered.

### B.    AHPC's Preferred Alternatives

As noted above, AHPC does not believe additional monitoring is legally necessary or justified by the documented operation of the purse seine and mid-water trawl vessels over time.  That said, we share with the Councils and NMFS a desire to put to rest some of the more egregious claims, such as those relating to so-called "slippage," bycatch, and catch reporting.  The industry also has a strong interest in more robust estimation of catch in conjunction with the administration of the haddock and RH/S catch caps.  The closure of the directed herring fishery due to projections that the haddock cap had been harvested based on a minimal number of observed trips last year demonstrates the need for better systems.  We do not want to be at the mercy of one or two bad tows.

While AHPC does support increased monitoring at industry expense in years when NMFS has the resources to fund its share of the costs, its share must be reasonable.  The IFM EA makes clear that the benefits of this program on catch accounting, discards, bycatch, protected resources, and the environment are minimal.  The IFM program's costs, on the other hand, are very real.  Some alternatives, such as 100 percent NEFOP observer coverage, would drain profits to such an extent that many would not be able to continue to fish.

Moreover, 100 percent, or even seventy-five percent, of any method – observers, ASM, or EM review – is, as NEFSC representatives have repeatedly informed the Councils, completely unnecessary.  The IFM program goals of accurate catch and bycatch estimation, better ability to administer incidental catch caps, and, most certainly, an affordable program can be met at much

lower coverage levels. A failure to recognize the best available science on bycatch monitoring and estimation, may be found contrary to National Standard 2.[5]

Alternatives that reduce "return to owner" ("RTO") by twenty percent or more should also be avoided. *See* IFM EA at 308 (Table 97). Such expensive alternatives are likely inconsistent with several national standards. For instance, National Standard 8 provides that conservation and management measures be designed to "provide for the sustained participation of [fishing] communities," such as Gloucester, and to "minimize adverse economic impacts," so long as such efforts are "consistent with the conservation requirements of this Act."[6] This standard has particular resonance in a rulemaking such as this where existing monitoring already meets legal standards.

National Standard 7, which provides that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication,"[7] also speaks directly to this issue. The revised guidelines, just recently published by NMFS, note that management councils "should impose not impose unnecessary burdens on … individuals."[8] "Factors such as fuel costs, enforcement costs, or the burdens of collecting data may well suggest a preferred alternative." *Id.* The guidelines further specify that "FMPs should demonstrate that the benefits of fishery regulation are real and substantial relative to the added … costs, as well as costs to the industry of compliance."[9] In this case, marginal improvements in data quality can only be achieved at significantly higher costs. Under this standard, it is impossible to determine these illusory benefits are "substantial" when balanced against the very real costs.

In sum, the IFM program that this amendment would establish is entirely discretionary, designed to improve upon these existing systems. As such, the minimization of adverse economic impacts of concern to National Standard 8, and of costs within the meaning of National Standard 7, are particularly relevant.

There is no question that a loss of twenty percent of income, or even ten percent, is significant. Any business would be hard pressed to weather such economic reductions. Moreover, these new monitoring outlays must be considered in light of a series of past and pending future actions that have increased operating costs and reduced efficiency and harvest opportunities for herring and mackerel fishermen. These include area closures, bycatch catch caps, "move along" provisions, and operational requirements. The cumulative impacts of these past, current, and foreseeable future actions on the economic viability of the herring and mackerel fleet are significant. It is seems this fishery is being subject to a death by a thousand cuts.

---

[5]    *Id.* § (s) ("Conservation and management measures shall be based upon the best scientific information available.").

[6]    16 U.S.C. § 1851(a)(8).

[7]    *Id.* § (7).

[8]    50 C.F.R. § 600.340(b).

[9]    *Id.* § (c).

P a g e | 7

For all these reasons, it is vitally important as both a matter of law and policy to minimize the IFM program costs to the greatest extent possible. In this regard, AHPC notes that coverage targets of twenty-five percent produce coefficients of variation of thirty percent or less – the SBRM standard – for most catch caps. IFM EA at 276. Alternatives that utilize the twenty-five percent levels therefore should be preferred. These best meet <u>all</u> the Councils' goals and objectives, balancing affordability with improvements in catch, bycatch, and catch cap monitoring.

In this regard, electronic monitoring and portside sampling have the potential to provide the desired information in cost-effective manner. However, EM's utility and costs are still highly uncertain. The plain fact is that until the electronic monitoring pilot project is complete, neither the industry, the Councils, nor NMFS has any basis for determining if this approach better meets the IFM programs goals than, for example, some level of at-sea monitoring. For this reason, AHPC reiterates its call to postpone final action on the herring and mackerel program until the results of the project are available.

One of the potential drawbacks to the EM approach is the high upfront costs it entails. It is estimated that the cost of the equipment, its installation, and initial set-up are around $15,000. That is a very large investment given that NMFS will not have money to fund its expenses to cover additional monitoring for the herring and mackerel IFM program for the foreseeable future. The IFM EA does not specify when this equipment must be purchased and installed should the Councils select an EM option. This makes it very difficult for the AHPC's participants to determine whether EM/portside sampling would be more affordable than at-sea monitoring.

Should the Councils decide to move forward with a vote on this IFM program on the current schedule and select an alternative that includes at least the option for EM, this uncertainty needs to be addressed. AHPC suggest that the Councils recommend that those wishing to use EM be required to develop a vessel monitoring plan once, of course, NMFS develops its operational standards. However, the requirement to purchase and install the equipment should be delayed until NMFS announces that funding is available for the subsequent fishing year.[10]

In light of the foregoing principles and discussion, at this time AHPC believes that Alternative 2.7 with a twenty-five percent at-sea monitoring coverage level and either twenty-five or fifty percent level for EM review and portside sampling for all fleets is the only reasonable and lawful option. This approach minimizes costs and adverse impacts while still meeting the Councils' improved data collection goals. It also has the benefit of providing flexibility as between two approaches that will allow individual operators to select the one that best fits his or her business.

AHPC also believes that monitoring requirements for trips in the groundfish closed areas should be the same as the rest of the fishery. There is now years' worth of data from 100 percent observer coverage from such trips that demonstrate haddock bycatch rates in these areas are low and differ

---

[10] These are the types of details that should be discussed and resolved in a document upon which the public is being asked to comment in advance of final decisions. The lack of such forethought is further evidence that this measure is not ready for prime time.

little from others.  There is simply no reason to maintain a separate monitoring program for these areas.[11]

# # # #

AHPC appreciates your close attention to and consideration of these comments.  Please do not hesitate to contact me if you have any questions.

Sincerely,

*/s/ Shaun M. Gehan*
*Counsel to the Ad Hoc Pelagics Coalition*

cc:   Thomas A. Nies, Executive Director, New England Fishery Management
      Council
      Dr. Christopher M. Moore, Executive Director, Mid-Atlantic Fishery
      Management Council

---

[11] The wording of Alternative 2.6 is somewhat ambiguous.  If the effect of this alternative is to align all requirements, including the trip coverage level, with the requirements chosen for the rest of the fishery, then AHPC supports it.  If it is meant to require all trips into the groundfish closed areas must be monitored by the method chosen, it should be rejected for lack of a scientific basis.

# Document Metadata: NOAA-NMFS-2016-0139-0073



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | HTML |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0072 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0073 |
| **Title:** | Comment from Mary Beth Tooley |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**     1k0-8swn-9bk4

**Page Count:**     1

**Total Page Count**     1
**Including Attachments:**

## Submitter Info

**Comment:**     See attached file(s)   *

**First Name:**     Mary Beth   *

**Middle Name:**

**Last Name:**     Tooley   *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

## F/V STARLIGHT & F/V SUNLIGHT

O'Hara Corporation                                                  Starlight Inc.
120 Tillson Ave                                                     Vinalhaven ME 04863
Rockland ME 04841


November 6, 2016

John Bullard
Regional Administer
NMFS, Greater Atlantic Regional Office
55 Republic Drive
Gloucester MA 01930-2298

RE: IFM Omnibus Amendment

Dear John Bullard:

I am writing to provide comments on behalf of the F/V Sunlight and F/V Starlight on the Draft
Industry Funded Monitoring (IFM) Omnibus Amendment. These vessels, owned and operated
by the O'Hara Corporation and Starlight Inc. respectively, fish for Atlantic Herring throughout
the range of the fishery using both midwater trawl and purse seine gear.

The F/Vs Sunlight and Starlight land herring for the lobster bait market in Rockland and
Vinalhaven Maine. Vinalhaven is a coastal island community in Penobscot Bay 10 miles from the
mainland. The island, with the largest year round population of Maine's islands, is supported by
fishing for lobsters. The F/V Starlight is the primary bait delivery vessel for the island. The
vessels also fish in southern New England in the winter months, landing in New Bedford,
Massachusetts. Our operations support the bait needs of local lobster fishermen that number
in the many hundreds in Midcoast Maine.

In general, we were supportive of an affordable monitoring program for the fishery in
Amendment 5 to the Atlantic Herring Fishery Management Plan (FMP), and continue to support
a practicable, affordable plan. Our vessels are currently participating in the recently initiated
electronic monitoring pilot program for this fishery; and it is our hope that this program may
provide a cost effective program in the future.

**Omnibus Herring Alternatives:**

We support Alternative 2, which would implement a mechanism to allow industry funded
monitoring if it remains consistent with the goals and objectives of this action to obtain

_0000016923

accurate estimates of catch and discards, including incidental species for which catch caps apply; and be an affordable program for the fishery.

*Alternative 2.6*
We believe there has been a lack of clarity as this alternative has developed. There have been very high levels of observer coverage in recent years on Georges Bank, especially Closed Area II. This data indicates very low interactions with groundfish species other than haddock, and this mortality is controlled through the incidental catch cap. The costs associated with current requirements are not supported by the data or actual benefits to groundfish stocks. Monitoring for these areas should be set equal to all other areas.

*Alternative 2.7*
This alternative appears to be the most reasonable of those offered in the document, which would allow a category A/B vessel to choose between at-sea monitors and electronic monitoring/portside sampling (EM/PS) (if/when the program is available). As stated above, our vessels utilize midwater trawls and purse seine gear at different times of the year. It is not practicable to invest in equipment under EM/PS for a portion of the year if the program is not available to both gear types.  Additionally, there is a need for waivers under the portside sampling program proposed here for landing in remote island communities. There is not any reasonable substitute for delivering herring to offshore ports.

The high degree of uncertainty in the projected costs for all of the programs proposed in this amendment is a challenge in determining practicability.  The electronic monitoring/portside sampling program is particularly concerning as some cost estimates exceed at-sea observer costs. The at-sea coverage target should be limited to no more than 25%, which equates to 9.6% of the return to owner estimate for paired midwater trawls; and an EM/PS target should be set at no more than 50%. Finally, it is important to set equivalent coverage targets for all gear types and sectors in the fishery. The fishery operates in a competitive market and it is imperative to not impose costs on one sector of the fishery that creates imbalanced market access.

*We support Sub-Options 1, 2, 4 and 5.*

1. Waivers will be necessary maintain stability in the fishery and achieve optimum yield. Any alternatives that would not allow fishing due to federal funding constraints is not consistent with federal law.
2. Exempting wing vessels in a pair trawl that do not carry fish is a practical alternative.
3. Do not support
4. A Council review after 2 years of implementation is appropriate
5. Exempting small trip of less than 25 mt. is appropriate.

**In Summary:**
We remain in support of an affordable monitoring program for the herring fishery, but are concerned the costs estimates in this action may not be sustainable. Our vessels operate at

_0000016924

approximately 2x the mean number of days (83) utilized to estimate costs to the fishery. In the summer months we are operating out of northern New England ports, often landing in a remote location; and in the winter months there is considerable market variation resulting in vessel trips at much less than capacity.

To maintain the viability of our operations, we request this action be as flexible as possible to meet the needs of our activities; and consider a high degree of caution in implementing significant unknown costs that provide low positive benefits to the herring resource and other managed species, negligible benefits to the environment and negative impacts to the herring fishery.

Thank you for the opportunity to comment on this Draft IFM Omnibus Amendment,

*Mary Beth Tooley*

Government Affairs
O'Hara Corporation

3

_0000016925

# Document Metadata:NOAA-NMFS-2016-0139-0074



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0073 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0074 |
| **Title:** | Comment from Steve Weiner |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**    1k0-8swn-osq2

**Page Count:**    1

**Total Page Count Including Attachments:**    1

## Submitter Info

**Comment:**    Please find the attached comment from CHOIR. Thanks

**First Name:**    Steve

**Middle Name:**

**Last Name:**    Weiner

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**



*Coalition for the Atlantic Herring Fishery's Orderly, Informed and Responsible Long Term Development*

November 7th, 2016

Mr. John K. Bullard
Regional Administrator, NMFS
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930

Re: Comment on the Industry Funded Monitoring Omnibus Amendment

Dear John,

I am writing on behalf of CHOIR to comment on the Industry Funded Monitoring Omnibus Amendment ("Amendment"). CHOIR is an industry coalition made up of over 650 commercial and recreational fishing organizations, fishing and shore-side businesses, researchers and eco-tourism companies that all rely on healthy herring and mackerel resources. Before going into specific comments on the Amendment, we will first make a couple general comments.

This action is the culmination of a great deal of effort on behalf of fishery managers and stakeholders that began in 2008 in response to serious and widespread concern over the lack of accountability in the herring and mackerel midwater trawl fisheries. It must be noted that this is the second final action that has occurred in relation to this important matter. After four years of work, the public came out in force in 2012 during the comment period for final action on Amendment 5 in support of 100% observer coverage and a prohibition on slippage. Few fishery actions in recent times have garnered the level of public response that was seen during that comment period. In turn, the Council voted overwhelmingly in support of 100% coverage and strong slippage measures. But, as we all know, the agency then declined to approve the amendment—leading us to where we stand today.

Despite the strong support for 100% coverage and slippage accountability four years ago, we have somehow seen a decline in coverage rates in the herring midwater trawl fishery ever since. In fact, coverage over the past year was the lowest in a decade. The result: the largest and most powerful fleet in the region—a fleet that targets keystone forage species and is proven to have serious problems with bycatch—has been allowed to operate with essentially zero observer coverage. When you combine all the relevant factors—small mesh size, vessel speed and power, volume landed per tow, and the ability to fish anywhere in the water column—the potential for impacts by this fleet on the ecosystem

1

_0000016928

and those that rely on it are very high, and the excuses for allowing such a lack of accountability are non-existent.

As such, there is arguably more concern over what is happening on the water today than there was four years ago. But the public has lost faith in both the Council and NMFS after watching their massive level of effort and support lead to a disapproved action and an actual decline in accountability since 2012.  The time has come for both the Council and NMFS to do what is necessary by choosing and implementing measures that finally address the lack of accountability in this fishery.  As we have said all along, that will require two things: 100% monitoring and full slippage accountability. And both parts are equally important—it is a total waste of time if you put a system in place that addresses one without the other.

We will now offer our recommendations on how to get there.

**<u>Specific Recommendations</u>**

*Herring*

First and foremost, we want to make it very clear that our focus in this action is the midwater trawl fleet. While some in the herring industry have tried to lump both seiners and small-mesh bottom trawl (SMBT) vessels into the program in order to create delay and inaction, we believe the only priority moving forward should be to address the lack of accountability in the midwater trawl segment of the fishery. These boats are responsible for the majority of landings and have the most potential for bycatch due to the nature of their gear. While the Council and NMFS may choose to address the rest of the herring and mackerel fisheries at a later date, we strongly urge you to focus on the large midwater trawlers at this point in time.

Second, when we first began work on this action back in 2008, CHOIR's initial stance was that the best long-term solution in this fishery was to use Electronic Monitoring (EM). Our initial proposal laid out a maximized retention system that would couple the use of cameras on the vessels with a shoreside-monitoring program to allow for managers to gather adequate data on what was being caught in the fishery. After facing stiff opposition from the industry, we eventually shifted to supporting 100% observer coverage, but all along we believed that EM was the future. We have now come back to that position and feel that EM holds the most promise moving forward.

But there are a number of questions that arise when we start to envision an EM program in the herring and mackerel midwater trawl fisheries. First, is it possible that developing the EM system will take time? If so, we do not want to see a total lack of coverage in the interim. This fleet needs coverage now—not in a year or two—and so something needs to be in place while we develop the EM program. Second, is it also possible that after spending time developing an EM program, the Council and NMFS may determine it is not a feasible option? If so, we need a backup plan.

As such, we support moving forward with a ***modified* Herring Alternative 2.7**. We support a modified version because we only want it to cover the midwater trawl fleet, while the purse seine and SMBT vessels would remain under SBRM coverage. We recommend choosing 100% ASM coverage under this alternative. And under an EM

2

program, we would recommend running the cameras from when the gear first goes into the water until the vessel hits the dock, while having a minimum of 50% shore-side monitoring. Levels of video review will be less important than the level of video coverage, but we would recommend 50% video review at a minimum.

Such a modified Alternative 2.7 will ensure that many of our concerns are covered. First, it will give the Council and NMFS time to develop the EM program without a period of time with little or no coverage. Under this alternative, while the pilot project is ongoing there will be a high level of ASM coverage in place to ensure accountability. Second, it will ensure that there is a strong monitoring program in place if the Council and NMFS find that EM will not work. And third—because ASMs are less expensive than NEFOP observers—it will do all of the above in a more affordable fashion than if NEFOP-level observers were chosen.

Now, it should be noted that this alternative technically allows for the industry to choose to use ASMs even if EM is shown to work, and therefore it could appear to go against our call for using an EM program in the future. But we are confident that a well-designed and effectively implemented EM program will be the obvious choice for those in the industry, and so this mixed alternative will ultimately turn into an EM alternative. But, in the unlikely scenario that ASMs are seen as the cheaper and better alternative, we are confident that they will allow for full monitoring and slippage accountability moving forward.

In regards to the **sub-options** listed in the document, we only support sub-options 2 and 4, and do not support the other sub-options. We *strongly* oppose sub-options 1 and 4. Sub-option 1, in allowing waivers, would potentially undercut the entire system since a waiver could theoretically be used on every trip in a fishing year. If the Council and NMFS foresee specific, genuine examples of when a waiver would be needed that does not create a massive loophole, it should try and limit the scope of the waiver sub-option in the document rather than simply allowing waivers across the board. And sub-option 3 makes absolutely no sense whatsoever—we have spent almost a decade on this action, it would be ridiculous to only put in a system for two years after implementation. This fleet needs strong monitoring forever if it wants to operate off our coasts.

Lastly, we will reiterate that any monitoring system that does not address slippage is a waste of time. So we hope that no matter what choices are made in the future, that the Council and NMFS ensure that slippage is fully considered. That means that, whether we use EM or ASMs, that slippage is accounted for and, if we do move forward with EM, that the slippage consequence measures in place now be carried forward.

*Mackerel*

We support choosing **Mackerel Alternative 2.5.** We would again recommend 100% ASM coverage. And under an EM program we would again recommend running the cameras from the moment the gear is first set into the water until the vessel is back at the dock along with a minimum of 50% shore-side monitoring. This would be partnered with a minimum of 50% video review. And as mentioned in the Herring section above, we only support sub-options 2 and 4, and strongly oppose sub-options 1 and 3.

## Designing an EM Program

3

*EM Pilot Project*

First, we strongly support the effort by NMFS to conduct an EM pilot project in the midwater trawl fishery. But we believe that it is critically important for the agency to ensure that all relevant stakeholders are allowed to oversee the ongoing work being done under the project. There are two reasons for this. First, many of the non-herring stakeholders involved in management of the herring fishery have expertise on the ocean that may help inform the pilot project. If non-herring stakeholders are excluded from the process, it may hinder the project's success. And second, transparency is an important matter moving forward. If the public is kept in the dark as the project moves forward, it will only make matters worse. As such, we again strongly urge NMFS to find a way to keep interested stakeholders involved as the project is undertaken.

Also, we will attach at the bottom of this letter another letter we submitted to the agency in June of this year. This second letter outlines many of our concerns with how the PIP was structured at that time. While some of these concerns may have been addressed, we want to include the letter in full to have it on the record for this action.

Lastly, we would strongly urge the agency to bring in people involved in the day-to-day operation of the project that understand the gear and are able to troubleshoot in order to truly figure out if a certain problem can be addressed or not. These boats are not the most complex boats on the ocean, but it is vital to have people involved that can answer questions on their own instead of relying on a captain or crew to tell them if something can be done. The captain and crew may have something to gain by the project failing, and so the agency needs to remain vigilant.

In short, we strongly believe that a pilot project is absolutely essential to the efficacy of an EM program in the herring and mackerel midwater trawl fisheries. We commend agency staff for taking the initiative to find the necessary funding and time to get this rolling. But if the project is not done correctly than it may lead to a lot of lost time and money, and so we hope NMFS will do all it can to make sure the project is effective.

*Specific EM Program Recommendations*

First, as mentioned above, we believe that it is important for the EM program to be part of a larger system of maximized retention. Make the boats bring everything to port so that the shore-side monitors can sample and account for what was caught. This is the key to an EM program. And you must keep the slippage consequences in place to deter slippage—otherwise there is zero incentive for the captains to follow the rules. And to be clear, an affidavit is NOT adequate.

Second, it is critical that the cameras run from the moment the gear first goes into the water until the vessel hits the dock. If you stop running the cameras at any point after the first tow, then you will provide the vessel with a loophole. The level of video review is less important to the efficacy of an EM system than the video coverage level itself, but we would still recommend no less than 30% review. As long as the level is high enough, you can provide a deterrent without wasting money.

4

Third, as with any monitoring system in the herring and mackerel midwater trawl fisheries—it is critical for a full and accurate accounting of slippage to be central to the system. No amount of observer or camera coverage will be useful if slippage is not accounted for fully. We strongly recommend that the Council and NMFS keep the goal of slippage accountability front and center at all times.

While there are a number of steps that can be taken to ensure that an EM program accounts for slippage, we believe that using net sensors is of critical importance. These vessels all have net sensors that give the captains an accurate idea of what is in the net while it is being towed. By looping this data into the EM system, NMFS will have an easy method for knowing if slippage is occurring. For example, if the net sensors show that the net has 200,000 pounds in it, and then that net comes aboard empty, you will know catch was slipped. Perhaps the Study Fleet data can be brought into the system to help you in this regard. This and other steps are critical to an effective EM system.

Lastly, we urge the agency to work with HMS staff and other parts of the agency that have dealt with the implementation of EM programs in the past. There is a lot of expertise that can be brought into this process by talking with those that have already been down a similar road.

## Conclusion

The herring and mackerel midwater trawl fleets are the most powerful fleets on the east coast. There is simply no excuse for these boats to have such a weak and inadequate monitoring system. While we understand that this has not been an easy process and that some delay was needed to get things right, the time has now come for action. We urge both the Council and NMFS to do what is right and put a strong monitoring system in place when it meets to make decisions on this Amendment.

Thanks for your time,

Steve Weiner, Chair

5

_0000016932



*Coalition for the Atlantic Herring Fishery's Orderly, Informed and Responsible Long Term Development*

June 13th, 2016

Mr. John Bullard, Regional Administrator
National Marine Fisheries Service
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930

Re: Mackerel and Herring Electronic Monitoring Pre-Implementation Plan

Dear John,

I am writing on behalf of CHOIR to provide comments on the Pre-Implementation Plan (PIP or pilot program) for electronic monitoring in the Atlantic mackerel and herring fisheries. CHOIR is an industry coalition made up of over 650 commercial and recreational fishing organizations, fishing and shore side businesses, researchers and eco-tourism companies.

We appreciate that GARFO has sought the money to develop this pilot program and that your staff has taken time to meet with us and provide some of the details we've been seeking for the last few months.  However, the PIP, which is scheduled to begin in less than a month, will be unable to inform the future monitoring program unless serious changes are made to its design. We have identified the following problems and practical solutions that should be addressed prior to the start of this pilot program:

Problem No. 1: There is insufficient accountability in this fishery.  Solution: We support the "key data analysis and reporting tasks" outlined in NMFS project summary document.  In particular, we support efforts to: review 100% of all fishing activity, identify all discards, identify contents of the net at the end of pumping (i.e., operational discards), and identify interactions with protected species.  However, the pilot goals are currently administrative in nature and should reflect the collection of this information. We recommend an additional goal to evaluate the efficacy of EM to detect all discarding activity and compliance with slippage requirements.

Problem No. 2: The slippage reporting and consequence measures will not apply to a PIP trip without an observer.  Solution: Slippage restrictions and reporting requirements must apply on every "observed" trip (PIP or NEFOP). Testing EM's ability to monitor compliance with

1

slippage measures on only a portion of observed trips is not acceptable. The PIP must provide a complete examination of this issue, which is of tremendous concern to CHOIR and many other stakeholders.

Problem No. 3: The importance of operational discards is underestimated. Large amounts of slippage can occur at the end of a trip. Solution: Operational discards should be documented on all trips. This should be an explicit goal for this PIP. Pumping in the water is a problem to the degree that it is an obstacle to monitoring this fishery. Operators need to find a way to bring the net onboard—and we believe this is possible. But if they are unable to make their catch available for viewing, then maybe this gear is not fit for use in these fisheries.

Problem No. 4: The PIP standards are not well understood. Solution: NMFS should provide a list of specific standards that will guide the proposed EM/PS program through the PIP.

Problem No. 5: There is continued reliance on self-reporting in this fishery and there is trust that slippage is accurately documented. Solution: NMFS should ensure redundancy during the PIP and compare video review of the EM/PS PIP trips with the reports filed by the NEFOP observers on those same trips (37% of the time) for discrepancies. This analysis should be made public.

Problem No. 6: The PIP will not document the weight of slipped catch. Solution: NMFS should coordinate with the study fleet to ensure that participating vessels with net sensors document the weight of slipped catch.

Problem No. 7: The PIP should meet the goals of the IFM Amendment. NMFS project summary indicates that "identification of discarded fish is not necessary for the purpose of this project" but obtaining accurate estimates of catch (retained and discarded) is a specific goal for the IFM amendment. Solution: Revise the goals of the PIP.

Problem No. 8: The PIP will not improve the documentation of all catch (species composition) in this fishery. NMFS, NEFMC and MAFMC should view the PIP as an opportunity to collect necessary information to inform the development of a comprehensive EM/PS program, including design and implementation of a maximized retention (which should be a necessary component of this program). Solution: (1) NMFS should signal a move towards maximized retention – require all catch in this PIP to come to port (with limited exceptions) and audited discard logbook similar to the one used on the West Coast; (2) all vessels in the PIP should land in a port capable of portside sampling.

Problem No. 10: There's a mismatch between PIP and final decisions on the IFM Amendment – the PIP concludes in fall 2017, final action in fall 2016, effective date is March 2017. Solution: Perhaps a Letter of Authorization to fish?

Problem No. 11: The funding limitation of $400,000 will not allow all of these solutions. Solution: Run a pilot program with fewer vessels (2 or 3) in order to gather all of the information necessary to inform a future EM/PS program. Find incentives to reward these few participating boats. Maybe give them the cameras at the end of the PIP.

2

We have fought for many years to bring about better monitoring in this fishery.  While we believe an EM pilot program has a lot of worth, it must be done right of else there will be a lot of wasted time and money. And we believe that unless the steps above are taken, this project will not have the ability to inform  an effective monitoring program down the road.

Thanks for your time,

*Stephen B Weiner*

Steve Weiner, Chair

_0000016935

# Document Metadata:NOAA-NMFS-2016-0139-0075



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0074 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0075 |
| **Title:** | Comment from Bruce  Beckwith |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**          1k0-8swo-k1wu

**Page Count:**               1

**Total Page Count
Including Attachments:**      1

## Submitter Info

**Comment:**                  Independent fishermen cannot afford to pay for observer
                              coverage and stay in business under the current depressed
                              fishing situation. It seems to me the observer program is a
                              failure. I do not support industry funded observers.  *

**First Name:**               Bruce  *

**Middle Name:**

**Last Name:**                Beckwith  *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

_0000016937

# Document Metadata:NOAA-NMFS-2016-0139-0076



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0075 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0076 |
| **Title:** | Comment from Denisl Lovgren |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:** 1k0-8swo-onk0

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** I am totally against paying for observers.I own and cooperate a 78 Dragged out of Point Pleasant N.J. Between paying for fuel and observers would put most fishing boats out of business.Only the Scallop fleet would survive.Paying observers 700dollars is the biggest Waste of money I know of.

**First Name:** Denisl

**Middle Name:**

**Last Name:** Lovgren

**Mailing Address:** 306sudburyrd

**Mailing Address 2:**

**City:** Ptpleasant

**Country:** United States

**State or Province:** New Jersey

**ZIP/Postal Code:** 08742

**Email Address:** Denislovgren@gmail.com

**Phone Number:** 7322952123

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0077



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0076 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0077 |
| **Title:** | Comment from EC Newellman |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:** 

**Tracking Number:** 1k0-8swq-bg77

**Page Count:** 1

**Total Page Count Including Attachments:** 1

## Submitter Info

**Comment:** One has to wonder how much more costly economic and regulatory burdens have to be ram-rodded down the throats of fishermen, especially with the commercial fishing industry becoming one of the most regulated small business industries in the United States? NOAA, a federal agency with a 5.4 billion dollar budget, somehow believes that observers placed upon commercial vessels will some how provide them with more data on catch when NMFS already has years of this type of data that has already been collected in their files. This brings us to the point of the observers, with the North East Observer program currently having somewhere in the vicinity of a turnover rate of 50% of "so-called" trained observers leaving their job within the first year. What does this tell those in other industries with a federal government program that has a churn rate that high...something inherently wrong with those going into the program and the information they collect if they leave this type of work within such a short period of time? It also leads of to the question of "why"....why shift the full cost to the fishing industry to collect fishery data? If a government agency wants this data, aren't they already being provided with the most updated fishery harvest and discard data which is already being sent to them through trip VTR reporting? If NMFS requires this type of commercial fishing data, then NMFS should find that money within their own bloated budget to fund such a program. If they cannot, then it is a BIG NO for the fishing industry to pay the cost of observers on their vessels. ★

**First Name:** EC ★

**Middle Name:** 

**Last Name:** Newellman ★

**Mailing Address:** 

**Mailing Address 2:** 

**City:** 

**Country:** 

**State or Province:** 

**ZIP/Postal Code:** 

**Email Address:** 

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0078



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 🜨 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  ＊🜨 |
| **Document File:** | 🗎 |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned  🜨 |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0077 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0078 |
| **Title:** | Comment from Thomas Anderson  🜨 |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS  ＊🜨 |
| **Document Subtype:** | 🜨 |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001  🜨 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings  🜨 |
| **Status:** | Posted  🜨 |
| **Received Date:** | 11/07/2016  ＊🜨 |
| **Date Posted:** | 11/08/2016  🜨 |
| **Posting Restriction:** | No restrictions  🜨 |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1  ＊ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016  🜨 |
| **Comment Due Date:** | 11/07/2016  🜨 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**        1k0-8swr-9g7c

**Page Count:**             1

**Total Page Count**        1
**Including Attachments:**

## Submitter Info

**Comment:**                I am strongly against industry funded monitoring. If the
                            government wants all this useless information, let them pay
                            for it. This added expense will put a lot of people out of
                            business. ✱

**First Name:**             Thomas ✱

**Middle Name:**

**Last Name:**              Anderson ✱

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0079



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0078 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0079 |
| **Title:** | Comment from Dave Aripotch |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | 🔵 |
| **Tracking Number:** | 1k0-8swr-b0nd 🔵 |
| **Page Count:** | 1 🔵 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | These are my comments on the Omnibus amendment regarding and industry funded observer program. As an owner/operator in Southern New England, I cannot afford to pay for observer coverage. I support Omnibus Alternative one, No Action. We do not make enough profit to cover the expense of paying for observer coverage. I would like to point out that the ground fish fishery is now decimated even further than what catch shares initially did to the fleet in 2010 because of now being forced to pay for observer coverage. Scallopers, who are not affected by this amendment, get extra poundage on their trip to offset their costs. If NMFS/NOAA made the industry-funded program exactly like the scallop FMP and I was given a few hundred pounds extra of fish per trip to cover the cost, above the overall quota limit/TAC, depending on the fishery, say a few hundred pounds of seabass and a few hundred pounds of fluke on top of our small quotas, each time I took an observer it would make it more doable. $800 to pay for an observer per trip would put me in the red on many of my trips otherwise. I'd have to remain tied to the dock. But since monitoring set-aside like the scallop FMP is only discussed as a part of Alternative Two, I cannot support that at this time. I cannot as an owner/operator, afford to pay for an observer on fishing trips. ⭐🔵 |
| **First Name:** | Dave ⭐🔵 |
| **Middle Name:** | 🔵 |
| **Last Name:** | Aripotch ⭐🔵 |
| **Mailing Address:** | P.O. Box 1036 |
| **Mailing Address 2:** | |
| **City:** | Montauk 🔵 |
| **Country:** | United States 🔵 |
| **State or Province:** | New York 🔵 |
| **ZIP/Postal Code:** | 11954 |
| **Email Address:** | captainhappy@optonline.net |
| **Phone Number:** | 631-668-7654 |
| **Fax Number:** | |
| **Organization Name:** | 🔵 |

_0000016946

**Cover Page:**

_0000016947

# Document Metadata:NOAA-NMFS-2016-0139-0080



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0079 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0080 |
| **Title:** | Comment from Gregg Morris |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**          1k0-8swr-norv

**Page Count:**               1

**Total Page Count**          1
**Including Attachments:**

## Submitter Info

**Comment:**          Mr. John Bullard, As one that has been involved with the NMFS
Fisheries observer program (as an observer and staff) for over
7 years, I share the many thoughts below and hope you rethink
your payment plan for the observer program. It is the death
nail to the small scale fishing industry if you don't. If you
want to pay for it, then have the Saltonstall-Kennedy (SK)
funds pay for it, after all the Fishery service has stole
(taken it for themselves) for over a decade stayed from the
original intent of the SKfund. I agree and share David Goethel
comments as my own as well. Comment1) Monitoring is a function
of government and should be funded at levels Congress deems
appropriate through NOAA line items in the budget. Comment2)
Magnusson allows for the placement of observers on fishing
boats but is silent on cost recovery except in specific
fisheries in the North Pacific Region. Comment3) The ability
to place an additional economic burden on future fisheries
without regard to the economic viability of that fishery is
not addressed and could easily put future fisheries out of
business. Comment4) Comment 3 requires a EIS not an EA to
analyze fully the effects on the human environment. Comment5)
Data ownership and price negotiation should be clarified. If
fishermen are forced to pay government approved, for profit
private contractors, fishermen should own the resulting data
and have the ability to negotiate the costs on a vessel by
vessel basis. Comment6) No discussion of the issue of observer
bias is present in the document. When the government pays the
observers, they are beholden to the government. When the
industry pays, some observers could become biased in favor of
the person paying the bill. This is already occurring in
groundfish. It is subtle, but occurring, and probably
unstoppable. Thus, the scientific utility of the data
collected is uncertain. As a scientist, I would be very
concerned with this issue. For all these reasons, I believe
the best course of action is to withdraw the omnibus amendment
and take up the issue with Congress when Magnusson is
reauthorized. Sincerely Gregg Morris 187 Keene st Duxbury, Ma
02332 USA *

**First Name:**          Gregg *

**Middle Name:**

**Last Name:**          Morris *

**Mailing Address:**          187 Keene st

**Mailing Address 2:**

**City:**          Duxbury

**Country:**               United States  🌐

**State or Province:**      Massachusetts  🌐

**ZIP/Postal Code:**       02332

**Email Address:**         Greggsoyster@gmail.com

**Phone Number:**          781-319-1977

**Fax Number:**

**Organization Name:**                🌐

**Cover Page:**                   HTML

_0000016950

# Document Metadata:NOAA-NMFS-2016-0139-0081



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0080 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0081 |
| **Title:** | Comment from Tim Champlin |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | 🌐 |
| **Tracking Number:** | 1k0-8swr-c1s6  🌐 |
| **Page Count:** | 1  🌐 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | To Whom It May Concern: As a lifelong commercial fisherman and small boat owner/operator, I cannot support this omnibus legislation. NOAA has a terrible reputation for over-regulating this industry. They currently have a budget of 9 billion dollars and they cannot find 2 million to fund current observer programs. It is not my responsibility to fund govt science and stock assessments. It is strictly the sole responsibility of the agency to provide funding for their federal observers to take the necessary readings and evaluations for stocks. Magnuson has legal stipulations regarding this particular funding. At present, most boats are barely earning a living now with strict quotas and strict trip limits being forced upon the industry. To ask us to foot the bill at $800.00 per day is unconscionable!! It is unacceptable, and I am saying NO!!! I will not pay federal taxes on the income that I do make give it over to NOAA and then be forced to pay again. They still owe the fishing industry hundreds of millions of dollars that they mis-spent under the Salston/Kennedy Act. They also abused their authority with charging vessels in the northeast 4 xs the amount of money in fines and violations over a 15-20 year period. Documentation is noted in the inspector generals report under the Gcell investigation prior to 2009. Forcing the industry to pay for observers at $800 or even forcing us to use Electronic Monitoring at the ridiculous rate of $50,000 is completely out of the scope of industry's ability. The federal govt must find another way or dissolve the program. It is that simple. Considering NOAA does not have the money with a budget of 9 billion, how does the agency expect us to pay when we are barely paying for maintenance and repairs to keep safety a priority. If they force us to pay for observers, we will forego maintenance and proper repairs and you will begin to see loss of life quickly coming into the picture. It is a necessity to stop the observer program or the agency must find the money elsewhere. We simply cannot afford to pay for it Sincerely, Tim Champlin Owner/operator FV Slacker Pt. Judith RI  *🌐 |
| **First Name:** | Tim  *🌐 |
| **Middle Name:** | 🌐 |
| **Last Name:** | Champlin  *🌐 |
| **Mailing Address:** | PO Box 1274 |
| **Mailing Address 2:** | |
| **City:** | Charlestown  🌐 |

**Country:**                United States  ⊙

**State or Province:**      Rhode Island  ⊙

**ZIP/Postal Code:**        02813

**Email Address:**          Ub1tim@aol.com

**Phone Number:**

**Fax Number:**

**Organization Name:**              ⊙

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0082



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0081 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0082 |
| **Title:** | Comment from David Bush |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

**XRIN:**

**Tracking Number:**    1k0-8swr-d8j1

**Page Count:**    1

**Total Page Count**    1
**Including Attachments:**

## Submitter Info

**Comment:**    Please find our comments attached.    *

**First Name:**    David    *

**Middle Name:**

**Last Name:**    Bush    *

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**    NC Fisheries Association

**Cover Page:**



November 7, 2016

NC Fisheries Association
2807 Neuse Blvd
New Bern, NC 28562

Re: Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings

North Carolina Fisheries Association does not support additional financial burdens on our fishermen that are already struggling to adapt to ever-increasing regulations and harvest reductions, and as such opposes this amendment. Increasing the financial burden on fishermen not only increases the cost to the consumer, but further forces fishermen to increase effort on the stocks to make up for the loss, and potentially increases their risk of safety to do so.

In this case, the proposed amendment covers "…*all of the fishery management plans managed by the Councils*…" While there was a single opportunity described on the federal register for a webinar, for those who possess the capability of doing so in a characteristically non-technologically savvy demographic; the jurisdiction of these councils extends far below New Jersey. There was no reasonable opportunity for this representation down into the affected states of Maryland, Virginia, and North Carolina. Their involvement in the public hearings process was substantially truncated. NC fishermen, who stand to be severely impacted by this amendment, have not been given a single public hearing reasonably close enough for them to be expected to attend.

In addition to the lack of fair opportunity for representation, we further contest that this decision is not solely up to the council(s). While not applying specifically to this situation, areas where the industry shares or covers financial responsibility for information gathering and monitoring governed by the Magnuson-Stevens Act, the industry is represented and is part of the voting body. To demonstrate this, SEC. 312.  TRANSITION TO SUSTAINABLE FISHERIES,  paragraph (d), subsection (1) (B), states that "*The industry fee system shall be considered approved if the referendum votes which are cast in favor of the proposed system constitute at least a majority of the permit holders in the fishery, or 50 percent of the permitted allocation of the fishery, who participated in the fishery.*" Again, while not specifically applicable to this amendment, it has been made clear in the Magnuson-Stevens Act that participants in affected fisheries be given more than just an opportunity for public comment when an additional financial responsibility is placed upon them. Other than standard licensing fees and quota management agreements that may not specifically apply to this amendment, the MSA limits industry-funded programs to specific instances and only with industry agreement.

Furthermore, according to the Federal Register entry, the purpose of industry-funded monitoring would be to "…assess the amount and type of catch, more precisely monitor annual catch limits, and provide other information for management." SEC. 402.  INFORMATION COLLECTION, paragraph (a), subsection (1), states that "…*If a Council determines that additional information would be beneficial for developing, implementing, or revising a fishery management plan or for determining whether a fishery is in need of*

*management, the Council may request that the Secretary implement an information collection program for the fishery which would provide the types of information specified by the Council.  The Secretary shall undertake such an information collection program if he determines that the need is justified, and shall promulgate regulations to implement the program within 60 days after such determination is made…"* Subsection (2) goes on to state *"…If the Secretary determines that additional information is necessary for developing, implementing, revising, or monitoring a fishery management plan, or for determining whether a fishery is in need of management, the Secretary may, by regulation, implement an information collection or observer program requiring submission of such additional information for the fishery…"* The only mention of fiscal responsibility regarding this, spells out contracting authority for the performance of such information gathering by the Secretary to qualified entities. Again, where the Secretary will provide funding to those collecting the information.

If the need of this information is justified, it is specific and repeated in the Magnuson-Stevens Act, that it is the responsibility of the Secretary to obtain and provide for such funding as required to gather it.

In summary, the burden of funding is by doctrine and spirit the prerogative and responsibility of the Secretary. We adamantly oppose this amendment and ask that you revisit the recently reauthorized Magnuson-Stevens Act to ensure that that you have met the requirements of, and are operating in the spirit of its guidance. In addition, it should be a priority of these councils to ensure that if they truly value input by stakeholders, this notification should serve to inform them that they have missed a substantial segment.


David E. Bush Jr
Fisheries Biologist,
NC Fisheries Association
2807 Neuse Blvd
New Bern, NC 28562

_0000016957

# Document Metadata:NOAA-NMFS-2016-0139-0083



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings * |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0082 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0083 |
| **Title:** | Comment from William Briggs |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 * |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

_0000016958

XRIN:                                          ⊛

Tracking Number:               1k0-8swr-qts5  ⊛

Page Count:                    1  ⊛

Total Page Count               1
Including Attachments:

## Submitter Info

Comment:            Dear sirs, Please accept this letter as. Moment in full
                    opposition against this regulation. As a owner/operator in the
                    northeast fishing industry, I cannot support any measure that
                    forces such an outrageous amount of money to pay for a federal
                    observer. It is strictly the obligation of NOAA to pay for
                    this program and Magnuson specifically states that inclusion.
                    This ref was only discussed under the herring and mackerel
                    management plans and now without warning, the council tells us
                    it's for every fishery. This is unacceptable. It was never
                    made clear that forced payment for observers were going to
                    pertain to everyone. It seems very deceptive to suddenly state
                    this reg was always meant for everyone when clearly discussion
                    was limited to strictly herring and mackerel. NOAA has a
                    massive budget of over 9 billion and they must find the money.
                    Considering a former regional administrator owns the largest
                    company that provides these observers is a huge conflict of
                    interest. It must be said that it is absolutely unacceptable
                    that this political insider continue to collect funds off the
                    back of the industry, let alone the federal govt. The industry
                    cannot afford to pay over $750 per day to federal observers if
                    NOAA clearly states they cannot pay for it either. If they
                    have such a huge budget, they can find the money. I will not
                    be able to continue in this industry if this omnibus goes
                    forward. It is too much to ask of us and it is high time we
                    said "Absolutely Not". We will no longer be told again and
                    again that we must pay for something the federal govt is
                    responsible for. Without having to go too far into politics,
                    it is a simple question of how much does the agency expect of
                    the very Industry it manages?? The heavily funded and well
                    lobbied enviros are pushing this to sustain one particular
                    company that has already been making millions of off tax
                    dollars and now the NGOs are lobbying for more to fund this
                    particular company. This cannot be allowed to go forward. This
                    will completely bankrupt all the fishermen that have survived
                    since catch shares. Sincerely, William Briggs Pt Judith RI  *⊛

First Name:          William  *⊛

Middle Name:         ⊛

Last Name:           Briggs  *⊛

Mailing Address:     PO Box 12, 26 Old Yawgoo School Rd

Mailing Address 2:

City:                Exeter  ⊛

Country:             United States  ⊛

_0000016959

**State or Province:**      Rhode Island

**ZIP/Postal Code:**      02877

**Email Address:**      bucku1960@gmail.com

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2016-0139-0084



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2016-0139 |
| **Docket Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | Not Assigned |
| **Original Document ID:** | NOAA-NMFS-2016-0139-DRAFT-0083 |
| **Current Document ID:** | NOAA-NMFS-2016-0139-0084 |
| **Title:** | Comment from Bonnie Brady |
| **Number of Attachments:** | 1 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2016-0139-0001 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Omnibus Amendment Public Hearings |
| **Status:** | Posted |
| **Received Date:** | 11/07/2016 |
| **Date Posted:** | 11/08/2016 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/08/2016 |
| **Current Assignee:** | NA |
| **Status Set By:** | Luers, Daniel (NOAA) |
| **Comment Start Date:** | 09/20/2016 |
| **Comment Due Date:** | 11/07/2016 |
| **DOC Docket No.:** | |

| | |
|---|---|
| **XRIN:** | |
| **Tracking Number:** | 1k0-8sws-l6zu |
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | Please accept these comments on behalf of the Long island Commercial Fishing Association: Please see attached |
| **First Name:** | Bonnie |
| **Middle Name:** | |
| **Last Name:** | Brady |
| **Mailing Address:** | |
| **Mailing Address 2:** | |
| **City:** | |
| **Country:** | |
| **State or Province:** | |
| **ZIP/Postal Code:** | |
| **Email Address:** | |
| **Phone Number:** | |
| **Fax Number:** | |
| **Organization Name:** | |
| **Cover Page:** | |



## Long Island Commercial Fishing Association

P.O. Box 191~Montauk, N.Y. ~11954
Phone 516-527-3099~ Fax 631-668-7654~E-mail Greenfluke@optonline.net
www.licfa.org https://www.facebook.com/LICFA Twitter@LICommFishAssn
Sustainable Fisheries *and* Fishermen for the 21st Century

Nov 7, 2016

Mr. John K. Bullard,
Regional Administrator, NMFS
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930
Re: Comments on the IFM Omnibus Amendment

Dear John:

I am writing today on behalf of the Long Island Commercial Fishing Association,
(LICFA) which represents fishermen from 11 different fishing-gear types in 14 ports
throughout Long Island, where 99% of New York's seafood is landed. In 2015, New
York's fishermen caught over 24 million pounds of sustainable seafood, worth just
under $50 million dollars to our coastal economies.

These comments below are directed to the Industry-Funded Monitoring Omnibus
Amendment.

LICFA supports Omnibus Alternative 1 (No Action) for the following reasons:

As one of the smaller fishing fleets in Southern New England, those that are
primarily owner/operators, New York fishermen cannot afford the cost of paying
for observer coverage. Not to augment the data requests of the councils, nor to pay
for SBRM under the possibility that SBRM may become somewhat defunded in the
future.

At present rates according to the draft document, the cost for an observer would be
on average $800/per day. There are days when fishermen make less than half of
that, with a crew of three. Forcing that cost onto industry would force probably
more than half of the entire NY fleet to be tied to the dock. If we were to, as an
example, use the 2016 SBRM and other observer coverage that NY has been
assigned for seadays, 2,961 for 2016, that cost would equal almost $2.4 million to

the fleet. If New York's fleet were forced to pay for that, it would cripple New York's commercial fishing industry.

Now, while the IFM-Omnibus Amendment states that the industry-funded observer coverage paid for would only be used for additional data requests of the councils, it also refers, on Page 5, second paragraph of the public hearing document, to "this action is needed for the Councils to prioritize industry-funded monitoring programs across fishery management plans when available Federal funding falls short of the total needed to fully fund all monitoring programs."

So should federal funding of SBRM somehow become unavailable, as was discussed in the Standardized Bycatch Reporting Methodology Amendment of the Greater Atlantic Region, approved on July 30, 2015, https://www.federalregister.gov/d/2015-15619 the possibility exists that if the Omnibus IFM amendment were to be approved, it may in fact be used to pay for SBRM if NMFS for whatever reason loses funding. This is unacceptable.

The only possible way to move forward with any form of this amendment is to first and foremost create a process, as is listed in Omnibus Alternative 2.6, to help fund any new or augment any present observer cost program through a cost-recovery setaside program.  In other words, NMFS must create a setaside funding mechanism, one that does not penalize industry, prior to creating any further FMP observer programs.

One suggestion would be to mirror the funding mechanism of the scallop fleet as they created in their Amendment 13 to the Atlantic Sea Scallop program, in which they have funded their observer program by being given an additional overall quota above the TAC to cover observed trips across the fleet, renegotiated on a yearly basis, so that they are not put in a position where they are penalized financially for carrying an observer. That is the ONLY portion of the "Omnibus Alternative 2" of this amendment that should go forward. Everything else, Omnibus Alternative One, No Action.

As far as the public comment period of this amendment, as an omnibus amendment every state could be affected, yet NMFS did not even attempt to have at least one meeting in each state. The closest meeting to NY was in Rhode Island.

Additionally, though this amendment could have far-reaching consequences for industry across multiple fisheries, there was not so much as one discussion of this subject that I recall in the last two years of MAFMC and NEFMC advisory panel meetings that at least I have attended as an advisor to the groundfish, spiny dogfish, scup/seabass/fluke, or ecosystem and ocean planning advisory panels. Especially in light of the discussion on page 14 of the document re valued ecosystem components, (VECs), the fishery management council Advisory panels should have been notified and a discussion should have taken place far before now.

The ports in which there were actual public meetings held were only those ports that were considered mackerel and herring ports, though as I mentioned before, this amendment is in fact an omnibus amendment, ergo, all Greater Atlantic region fisheries

may be affected. Every state, at least every state's largest fishing port, should have had a public meeting held. That is also unacceptable.

If NMFS/NOAA is to require observer coverage of the commercial fishing industry as a prerequisite to going fishing, then it is the opinion of our association that NMFS/NOAA and NMFS/NOAA alone should be the agency in charge funding it, through FY budget funding, a line-item appropriation, or through a setaside program that allocates additional quota above the TAC. The onus for NMFS required observer coverage should be on NMFS, not industry. It is cost prohibitive.

Thank you for allowing me to submit comments.
Sincerely
Bonnie Brady
Long Island Commercial Fishing Association

X Northeast Fishery Sector Inc.
205 Rockland St.
Dartmouth, MA 02748

November 4, 2016

John Bullard, Regional Administrator
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930

John Bullard:

Sector 10 only has one boat fishing and there are 20 permits in the sector. The Sirius, the only boat to continue fishing has been landing 500 to 700 lbs of fish a trip. It is financially impossible to take $700 a day from the daily catch and remain in business.

It is unconscionable of NOAA to pursue any program of shifting the cost of ASM to the industry, since NOAA has known for years industry cannot and will never be able to absorb these costs.

Sincerely,

X Northeast Fishery Sector Inc.

NOV − 7 2016

XIII Northeast Fishery Sector Inc.
205 Rockland St.
Dartmouth, MA  02748

November 4, 2016

John Bullard, Regional Administrator
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930

John Bullard:

For the last four years, Sector 13 has predicted only one boat out of fifty permits will continue to
fish once At Sea Monitoring costs are shifted to industry. Our prediction has come true. The
Buzzards bay is the only boat of the original 50 permits still fishing. Sector 13 was fortunate to
have ten permits join the sector for FY 2016 and only 2 of those ten are fishing for groundfish.

The burden of ASM costs is unsustainable for the groundfish industry.

Sector 13 continues to have problems with observers and requests an arbitration board be set up
to hear our issues and complaints.


Sincerely,

XIII Northeast Fishery Sector Inc.

NOV - 7 2016

11/07/16

To whom it may concern

I am writing this letter against paying for observer coverage. Just the thought of paying up to 700.00 dollars for an observer before even leaving the dock or any price is unacceptable. With the current quota reductions in gom cod to lease or buy at market price is a middle class jobs killer theirs no money to be made. Especially in a small day boat fishery to have an observer lined up to go fishing to have bad weather happen to cancel fishing trip at last minute without proper notice and still having to pay observer coverage is also unbelievable. Please except these comments in good will because iam living on a thread of dignity.

Philip Brazao
F/V Sarah Ann

NOV -8 2016

_0000016968

| Rule No. | Rule title | State effective date | EPA effective date | Final rule citation date | Comments |
|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| (32) XXXII ........... | Wyoming State Implementation Plan 5-Year Progress Report for Regional Haze, Appendix B: Alternative to BART for NO$_X$ and PM for PacifiCorp Naughton Unit 3. | November 28, 2017. | December 7, 2018. | [Federal Register citation], November 7, 2018. | Only includes Appendix B: Alternative to BART for NO$_X$ and PM for PacifiCorp Naughton Unit 3. |

■ 3. Section 52.2636 is amended by revising paragraph (a)(1)(vii) and amending paragraph(c)(1) by revising Table 1 to § 52.2636 to read as follows:

**§ 52.2636   Implementation plan for regional haze.**

(a) * * *

(1) * * *

(vii) PacifiCorp Naughton Power Plant Units 1 and 2 (PM and NO$_X$); and

* * * * *

(c) * * *

(1) * * *

TABLE 1 TO § 52.2636

[Emission limits for BART units for which EPA approved the State's BART and Reasonable Progress determinations]

| Source name/BART unit | PM emission limits—lb/MMBtu | NO$_X$ emission limits—lb/MMBtu (30-day rolling average) |
|---|---|---|
| FMC Westvaco Trona Plant/Unit NS–1A | 0.05 | 0.35 |
| FMC Westvaco Trona Plant/Unit NS–1B | 0.05 | 0.35 |
| TATA Chemicals Partners (General Chemical) Green River Trona Plant/Boiler C | 0.09 | 0.28 |
| TATA Chemicals Partners (General Chemical) Green River Trona Plant/Boiler D | 0.09 | 0.28 |
| Basin Electric Power Cooperative Laramie River Station/Unit 1 | 0.03 | N/A |
| Basin Electric Power Cooperative Laramie River Station/Unit 2 | 0.03 | N/A |
| Basin Electric Power Cooperative Laramie River Station/Unit 3 | 0.03 | N/A |
| PacifiCorp Dave Johnston Power Plant/Unit 3 | 0.015 | N/A |
| PacifiCorp Dave Johnston Power Plant/Unit 4 | 0.015 | 0.15 |
| PacifiCorp Jim Bridger Power Plant/Unit 1 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 2 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 3 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 4 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Naughton Power Plant/Unit 1 | 0.04 | 0.26 |
| PacifiCorp Naughton Power Plant/Unit 2 | 0.04 | 0.26 |
| PacifiCorp Wyodak Power Plant/Unit 1 | 0.015 | N/A |

[1] The owners and operators of PacifiCorp Jim Bridger Units 1, 2, 3, and 4 shall comply with the NO$_X$ emission limit for BART of 0.26 lb/MMBtu and PM emission limit for BART of 0.03 lb/MMBtu and other requirements of this section by March 1, 2019. The owners and operators of PacifiCorp Jim Bridger Units 1, 2, 3 and 4 shall comply with the NO$_X$ emission limit for reasonable progress of 0.07 lb/MMBtu by: December 31, 2022, for Unit 1, December 31, 2021, for Unit 2, December 31, 2015, for Unit 3, and December 31, 2016, for Unit 4.

* * * * *

[FR Doc. 2018–24372 Filed 11–6–18; 8:45 am]

**BILLING CODE 6560–50–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 648**

[Docket No. 170831847–8853–01]

**RIN 0648–BG91**

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Proposed rule, request for comments.

**SUMMARY:** This action proposes regulations to implement the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment. The New England Council is considering ways to increase monitoring in certain fisheries to assess the amount and type of catch and reduce uncertainty around catch estimates. This amendment would implement a process to standardize future industry-funded monitoring programs in New England Council fishery management plans and industry-funded monitoring in the Atlantic herring fishery. This action would ensure consistency in industry-funded monitoring programs across fisheries and increase monitoring in the Atlantic herring fishery.

**DATES:** Public comments must be received by December 24, 2018.

**ADDRESSES:** You may submit comments, identified by NOAA–NMFS–2018–0109, by either of the following methods:

• *Electronic Submission:* Submit all electronic public comments via the Federal eRulemaking Portal.

1. Go to *www.regulations.gov/ #!docketDetail;D=NOAA-NMFS-2018-0109;*

2. Click the ''Comment Now!'' icon and complete the required fields; and

3. Enter or attach your comments.

• *Mail:* Submit written comments to Michael Pentony, Regional Administrator, National Marine Fisheries Service, 55 Great Republic Drive, Gloucester, MA 01930. Mark the outside of the envelope, ''Comments on

the Proposed Rule for the Industry-Funded Monitoring Amendment."

*Instructions:* Comments sent by any other method, to any other address or individual, or received after the end of the comment period, may not be considered by us. All comments received are a part of the public record and will generally be posted for public viewing on *www.regulations.gov* without change. All personal identifying information (*e.g.,* name, address, etc.), confidential business information, or otherwise sensitive information submitted voluntarily by the sender will be publicly accessible. We will accept anonymous comments (enter "N/A" in the required fields if you wish to remain anonymous).

Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this proposed rule may be submitted to the Greater Atlantic Regional Fisheries Office and by email to *OIRA_Submission@omb.eop.gov* or fax to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:**
Carrie Nordeen, Fishery Policy Analyst, phone: (978) 282–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Background

In 2013, the Mid-Atlantic and New England Fishery Management Councils initiated a joint omnibus amendment to allow industry-funded monitoring in all of the fishery management plans (FMP) that the Councils manage. The joint amendment would provide a mechanism to support industry-funded monitoring and remedy issues that prevented NMFS from approving some of the Councils' previous industry-funded monitoring proposals. The industry-funded monitoring would be in addition to monitoring requirements associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA). The Councils were interested in increasing monitoring

in certain FMPs to assess the amount and type of catch and to reduce uncertainty around catch estimates. Previous Council proposals for industry-funded monitoring either required NMFS to spend money that was not yet appropriated or split monitoring costs between the fishing industry and NMFS in ways that were inconsistent with Federal law.

In their development of the joint amendment, the Councils needed to remedy disapproved monitoring measures in Amendment 5 to the Atlantic Herring FMP (Amendment 5) (79 FR 8786, February 13, 2014) and Amendment 14 to the Atlantic Mackerel, Squid, and Butterfish FMP (Amendment 14) (79 FR 10029, February 24, 2014). Those measures recommended 100-percent observer coverage for the herring and mackerel fisheries and that NMFS would fund the increased monitoring along with a contribution by the fishing industry. Because NMFS's spending is limited by its Congressional appropriations, NMFS could not approve the Councils' recommendation because it could not guarantee that it would have sufficient funds to pay for the required increase in monitoring. Amendments 5 and 14 also recommended that the fishing industry contribution for industry-funded monitoring would be no more than $325 per day. Similarly, Framework 48 to the Northeast Multispecies FMP (78 FR 53363, August 29, 2013) recommended limiting the types of costs that industry would be responsible for paying in an industry-funded program, such that the industry would only have to pay for observer salaries. NMFS disapproved these proposals because they proposed to share monitoring costs with the government in ways that were inconsistent with Federal law.

To remedy the disapproved measures, the joint amendment would use a monitoring coverage target, as opposed to a mandatory coverage level, to allow NMFS to approve new monitoring programs without committing to support coverage levels above appropriated funding or before funding is determined to be available. Using a coverage target instead of mandatory coverage level means the realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year. Industry-funded monitoring coverage targets would be specified in individual FMPs and realized coverage for a fishery in a given year would be anywhere from no additional coverage above SBRM up to the specified coverage target. Additionally, the joint amendment

would define cost responsibilities for industry-funded monitoring programs between the fishing industry and NMFS in a manner that is consistent with legal requirements. Monitoring cost responsibilities may be divided between the industry and the government, provided government cost responsibilities are paid by the government and the government's costs are differentiated from the industry's cost responsibilities. Currently, that cost delineation is between administrative and sampling costs. The joint omnibus amendment would use that delineation to define cost responsibilities for future industry-funded monitoring programs.

The omnibus alternatives in the joint amendment, meaning those alternatives that would apply to all Council FMPs, considered measures to standardize the development and administration of future industry-funded monitoring programs. The joint amendment also included industry-funded monitoring coverage targets for the herring and mackerel fisheries. Information from industry-funded monitoring would primarily be used to help track catch (retained and discarded) against catch limits. The industry-funded monitoring types considered in the joint amendment for the herring and mackerel fisheries included observers, at-sea monitors, electronic monitoring, and portside sampling. To help the Councils evaluate the utility of electronic monitoring to verify catch retention and track discarded catch, NMFS conducted a voluntary electronic monitoring study in 2016 and 2017 with midwater trawl vessels that participate in the herring and mackerel fisheries.

At its April 2017 meeting, the Mid-Atlantic Council decided to postpone action on the joint amendment until the midwater trawl electronic monitoring study was completed. The Mid-Atlantic Council's decision was based, in part, on its desire to have more information on the use of electronic monitoring to track catch against catch limits and the monitoring costs associated with electronic monitoring that would be borne by the mackerel industry. The Mid-Atlantic Council is expected to re-consider whether it wants to continue developing industry-funded monitoring measures for its FMPs at its October 2018 meeting. The New England Council selected preferred omnibus and herring coverage target alternatives at its April 2017 meeting, and recommended NMFS consider the amendment for approval and implementation. Therefore, the joint amendment initiated by both Councils to allow for industry-funded monitoring has become the New England Industry-Funded

Monitoring Omnibus Amendment and the proposed measures would only apply to FMPs that the New England Council manages.

The midwater electronic monitoring study concluded in January 2018. NMFS, New England Council, and Mid-Atlantic Council staff reviewed the study's final report in March 2018 and concluded that electronic monitoring was suitable for detecting discarding events aboard midwater trawl vessels. The study also evaluated costs associated with using EM in the herring fishery, especially the sampling costs that would be paid by the fishing industry. Based on the study, NMFS estimated the industry's costs for EM at approximately $296 per coverage day, not including the initial costs of purchasing and installing equipment. The EA for the amendment estimated the industry's annual costs for portside sampling at $96,000 for the midwater trawl fleet and $8,700 per vessel. Therefore, NMFS estimated the industry's costs for using electronic monitoring and portside sampling would be approximately $515 per coverage day.

A Notice of Availability (NOA) for the New England Industry-Funded Omnibus Amendment was published in the **Federal Register** on September 19, 2018 (83 FR47326). The comment period for the NOA ends on November 19, 2018. Comments submitted on the NOA and/or this proposed rule prior to November 19, 2018, will be considered in our decision to approve, partially approve, or disapprove the Industry-Funded Monitoring Omnibus Amendment. We will consider comments received by the end of the comment period for this proposed rule December 24, 2018 in our decision to implement measures proposed by the Council.

**Proposed Omnibus Measures**

This amendment would standardize the development and administration of future industry-funded monitoring programs for New England Council FMPs only. However, only the Atlantic Herring FMP would be subject to an industry-funded monitoring program resulting from this amendment. In the future, if the New England Council develops an industry-funded monitoring program, the New England Council would develop those programs consistent with the specifications and requirements for industry-funded programs established in this amendment. The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be affected by

this amendment. While proposed cost responsibilities and monitoring service provider requirements are consistent with the existing programs, the industry-funded monitoring programs in the Multispecies and Scallop FMPS would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding. The New England Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Additionally, future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the proposed omnibus measures.

As described previously, NMFS cannot approve and implement monitoring requirements for which it does not have available Federal funding to cover NMFS cost responsibilities. For that reason, this amendment proposes establishing industry-funded monitoring coverage targets in New England FMP with the understanding that annual funding available to cover NMFS cost responsibilities would likely vary and dictate realized coverage levels. The realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

The standardized structure for future industry-funded monitoring programs in New England fisheries would apply to several types of monitoring, including observing, at-sea monitoring, electronic monitoring, portside sampling, and dockside monitoring. This rule proposes the following principles to guide the selection and implementation of future industry-funded monitoring programs. The Council's development of an industry-funded monitoring program must consider or include the following:

• A clear need or reason for the data collection;
• Objective design criteria;
• Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;
• Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;
• Prioritize the use of modern technology to the extent practicable; and
• Incentives for reliable self-reporting.

All proposed omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-

aside programs, and do not directly affect fishing effort or amounts of fish harvested. However, the proposed omnibus measures may have indirect effects on New England FMPs. Standardizing the process for developing and administering future industry-funded monitoring programs may help reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected through industry-funded monitoring programs. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources. The prioritization process may help ensure that available Federal funding is used to support industry-funded monitoring programs consistent with Council monitoring priorities. While industry-funded monitoring programs are expected to have an economic impact on the fishing industry, standard cost responsibilities may help the industry better understand and plan for their industry-funded monitoring cost responsibilities. Standard cost responsibilities may also aid the industry in negotiating coverage costs with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Lastly, monitoring set-aside programs may help minimize the economic burden on the fishing industry associated with paying for monitoring coverage.

*1. Standard Process To Implement and Revise Industry-Funded Monitoring Programs*

This amendment would specify that future industry-funded monitoring programs would be implemented through an amendment to the relevant FMP. Because industry-funded monitoring programs have the potential to economically impact the fishing industry, the Council determined that implementing new industry-funded monitoring programs through an amendment would help ensure additional public notice and comment during the development of new programs. The details of any new industry-funded monitoring program implemented via amendment may include, but are not limited to:

• Level and type of coverage target;
• Rationale for level and type of coverage;
• Minimum level of coverage necessary to meet coverage goals;
• Consideration of waivers if coverage targets cannot be met;
• Process for vessel notification and selection;

• Cost collection and administration;
• Standards for monitoring service providers; and
• Any other measures necessary to implement the industry-funded monitoring program.

This amendment would also specify that future industry-funded monitoring programs, implemented through an amendment, may be revised through framework adjustments to the relevant FMP. Additional National Environmental Policy Act (NEPA) analysis would be required for any action implementing and/or modifying industry-funded monitoring programs, regardless if the vehicle is an amendment or framework adjustment.

*2. Standard Cost Responsibilities*

Cost responsibilities for industry-funded monitoring must be divided by cost category, rather than a dollar amount or percentage of total cost, between the fishing industry and NMFS. NMFS is obligated to pay any cost for which the benefit of the expenditure accrues to the government. This means that NMFS would be responsible for administrative costs to support industry-funded programs, but not the costs associated with sampling activities. Costs associated with sampling activities would be paid by the fishing industry. NMFS may help offset industry cost responsibilities through reimbursement if Federal funding is available, but NMFS cannot be obligated to pay sampling costs in industry-funded sampling programs. Cost responsibilities dictated by legal requirements cannot be modified through this amendment. Instead, this amendment would codify NMFS cost responsibilities for industry-funded monitoring in New England FMPs to ensure consistency and compliance with legal requirements.

NMFS would be responsible for paying costs associated with setting standards for, monitoring the performance of, and administering, industry-funded monitoring programs. These program elements would include:
• The labor and facilities costs associated with training and debriefing of monitors;
• NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);
• Certification of monitoring providers and individual observers or monitors;
• Performance monitoring to maintain certificates;
• Developing and executing vessel selection;
• Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and
• Costs associated with liaison activities between service providers, NMFS, Coast Guard, Council, sector managers, and other partners.

NMFS's costs to administer industry-funded monitoring for all monitoring types would be paid with Federal funds. The industry would be responsible for funding all other costs of the monitoring program, those costs would include, but are not limited to:
• Costs to the service provider for deployments and sampling (*e.g.,* travel and salary for observer deployments and debriefing);
• Equipment, as specified by NMFS, to the extent not provided by NMFS (*e.g.,* electronic monitoring system);
• Costs to the service provider for observer or monitor time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time;
• Costs to the service provider for installation and maintenance of electronic monitoring systems;
• Provider overhead and project management costs (*e.g.,* provider office space, administrative and management staff, recruitment costs, salary and per diem for trainees); and
• Other costs of the service provider to meet performance standards laid out by a FMP.

The cost responsibilities described above are consistent with the existing scallop and multispecies industry-funded monitoring programs, although cost responsibilities are not explicitly defined in those FMPs. This amendment would codify NMFS cost responsibilities for industry-funded monitoring for all New England FMPs, but it would not alter current requirements for existing industry-funded monitoring programs.

*3. Standard Requirements for Monitoring Service Providers and Observers/Monitors*

The SBRM Omnibus Amendment adopted general industry-funded observer service provider and observer requirements (at 50 CFR 648.11(h) and (i), respectively) should a Council develop and implement a requirement or option for an industry-funded observer program to support SBRM in any New England or Mid-Atlantic Council FMP. However, the SBRM Amendment did not address requirements for other types of industry-funded monitoring programs or coverage in addition to SBRM.

This action would modify existing observer and service provider requirements to apply more broadly to monitoring by observers, at-sea monitors, portside samplers, and dockside monitors. Additionally, this amendment would apply those requirements to supplementing coverage required by SBRM, ESA, and MMPA. This rule proposes to expand and modify existing observer service provider requirements at § 648.11(h) to apply to service providers for observers, at-sea monitors, portside samplers, and dockside monitors. Similarly, this rule proposes to expand and modify existing observer requirements at § 648.11(i) to apply to observers, at-sea monitors, portside samplers, and dockside monitors, described collectively as observers/monitors. These observer/monitor requirements would serve as the default requirements for any future industry-funded monitoring programs in New England Council FMPs. The Council may specify new requirements or revise existing requirements for FMP-specific industry-funded monitoring programs, as part of the amendment developing those programs or the framework adjustment revising those programs.

*4. Prioritization Process*

This amendment would establish a Council-led process to prioritize industry-funded monitoring programs for available Federal funding across New England Council FMPs. This prioritization process would allow the Council discretion to align Council monitoring priorities with available funding to pay NMFS cost responsibilities associated with industry-funded monitoring. Revising the prioritization process would be done in a framework adjustment. The existing scallop and multispecies industry-funded monitoring programs would not be included in the proposed prioritization process, unless the New England Council takes action in the future to include those programs in the prioritization process or develops new industry-funded monitoring programs within those FMPs consistent with this amendment.

Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements that may be used to cover the government's costs associated with supporting industry-funded monitoring programs. Funding for SBRM, ESA, and MMPA observer coverage would not be affected by this prioritization process. Any industry-funded monitoring programs would be prioritized separately from and in addition to any SBRM coverage or other statutory coverage requirements. The realized industry-funded monitoring coverage in

a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring programs would operate that year. If available funding in a given year is sufficient to support all industry-funded monitoring programs, the prioritization process would fully operationalize the industry-funded monitoring coverage targets specified in each FMP. If there is some available funding, but not enough to support all industry-funded monitoring programs, the Council would determine how to prioritize industry-funded monitoring coverage targets for available funding across FMPs.

As part of the Council-led prioritization process, this amendment would establish an equal weighting approach to prioritize industry-funded monitoring programs for available funding. An example of an equal weighting approach would be funding all industry-funded monitoring programs at 70 percent, if only 70 percent of the Federal funding needed to administer all the programs was available. Additionally, this rule proposes that the Council would adjust the equal weighting approach on an as-needed basis. This means that the equal weighting approach would be adjusted whenever a new industry-funded monitoring program is approved or whenever an existing industry-funded monitoring program is adjusted or terminated. The Council would revise the weighting approach for the Council-led prioritization process in a framework adjustment or by considering a new weighting approach at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the weighting approach, consistent with the Administrative Procedure Act (APA).

The SBRM coverage year begins in April and extends through March. SBRM coverage levels in a given year are determined by the variability of discard rates from the previous year and the availability of SBRM funding. During the spring, NMFS determines SBRM coverage for the upcoming year. Once NMFS finalizes SBRM coverage levels for the upcoming year, NMFS would then evaluate what Federal funding was available to cover its costs for meeting the industry-funded monitoring coverage targets for the next year. For example, once NMFS determines SBRM coverage for 2018, it would then evaluate what amount of

government coverage costs could be covered by available Federal funding to meet industry-funded monitoring coverage targets for 2019. NMFS would provide the Council, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels, incorporating the prioritization process and weighting approach and based on available funding, for each FMP-specific monitoring program; and (2) the rationale for the industry-funded monitoring coverage levels, including the reason for any deviation from the Council's recommendations. NMFS would inform the Council of the estimated industry-funded coverage levels during a Council meeting. At that time, the Council may recommend revisions and additional considerations by the Regional Administrator and Science and Research Director. If NMFS costs associated with industry-funded coverage targets are fully funded in a given year, NMFS would also determine, in consultation with the Council, the allocation, if any, of any remaining available funding to offset industry costs. The earlier in the year that industry-funded monitoring coverage targets are set for the following year, the more time the affected fishing industry would have to plan for industry-funded monitoring the following year. FMP-specific industry-funded monitoring programs would determine if industry-funded coverage targets were administered consistent with the FMP's fishing year or the SBRM year.

### 5. Monitoring Set-Aside Programs

This amendment would standardize the process to develop future monitoring set-aside programs and would allow monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP. A monitoring set-aside program would use a portion of the annual catch limit (ACL) from a fishery to help offset industry cost responsibilities associated with industry-funded monitoring coverage targets. There are many possible ways to structure a monitoring set-aside program, and the details of each program would be developed on an FMP-by-FMP basis. Monitoring set-aside programs are an option to help ease industry cost responsibilities associated with industry-funded monitoring, but they likely would only help offset a portion of the industry's cost responsibilities.

The details of monitoring set-aside programs may include, but are not limited to:

• The basis for the monitoring set-aside;
• The amount of the set-aside (*e.g.,* percentage of ACL, days-at-sea (DAS));
• How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* increased possession limit, differential DAS counting, additional trips against a percent of the ACL);
• The process for vessel notification;
• How funds are collected and administered to cover the industry's costs of monitoring coverage; and
• Any other measures necessary to develop and implement a monitoring set-aside.

### Proposed Atlantic Herring Measures

This amendment would establish an industry-funded monitoring program in the Atlantic herring fishery that is expected to provide increased accuracy in catch estimates. Increased monitoring in the herring fishery would address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and (3) affordable monitoring for the herring fishery.

This amendment would establish a 50-percent industry-funded monitoring coverage target on vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permits fishing on a declared herring trip. The Council considered other coverage targets, including 100-percent, 75-percent, and 25-percent, but the 50-percent coverage target balanced the benefits and costs of additional monitoring. When tracking catch against catch caps in the herring fishery, analyses in the EA supporting this amendment suggest that a 50-percent coverage target would greatly reduce the uncertainty around catch estimates, and likely result in a coefficient of variation less than 30 percent almost all of the time. Additionally, the industry's cost responsibilities associated with a 50-percent coverage target are substantially less than those associated with higher coverage targets. Vessels participating in the herring fishery also participate in the Atlantic mackerel fishery. Currently, the mackerel fishery does not have an industry-funded monitoring program. If the Mid-Atlantic Council develops industry-funded monitoring in the mackerel fishery and the industry-funded coverage targets do not match for the herring and mackerel fisheries, then the higher coverage target would apply on all trips declared into the fishery with the higher coverage target.

Herring coverage targets would be calculated for the herring fishing year, January through December, by

combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. For example, if there is 10-percent SBRM coverage in a given year, then 40-percent industry-funded monitoring coverage would be needed to achieve the 50-percent coverage target. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. Any vessel selected for SBRM coverage on a particular trip would not have the option of industry-funded monitoring on that trip. Per the prioritization process in the proposed omnibus measures, the realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the herring fishery in a given year would fall somewhere between no additional coverage in addition to SBRM and the specified coverage target. Combined coverage targets are intended to help reduce the cost of industry-funded coverage, but the level of SBRM coverage in the herring fishery varies by gear type and has the potential to vary year to year. The variability of SBRM coverage has the potential to make it difficult for the herring industry to plan for industry-funded monitoring year to year.

In addition to the proposed standard monitoring and service provider requirements in the proposed omnibus measures, this amendment would specify that requirements for industry-funded observers and at-sea monitors in the herring fishery include a high volume fishery (HVF) certification. Currently, NMFS's Northeast Fisheries Observer Program (NEFOP) observers must possess a HVF certification in order to observe the herring fishery. NMFS developed the HVF certification to more effectively train observers in high volume catch sampling and documentation. NEFOP determined that data quality on herring trips was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers. Having additional training to identify these practices improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Additionally, this amendment would require the Council to examine the results of any increased coverage in the herring fishery two years after implementation of this amendment, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate. Measures implemented in this amendment would remain in place unless revised by the Council.

*1. Industry-Funded At-Sea Monitoring Coverage on Vessels Issued Category A or B Herring Permits*

This rule proposes that vessels issued Category A or B herring permits would carry an industry-funded at-sea monitor on declared herring trips that are selected for coverage by NMFS, unless NMFS issues the vessel a waiver for coverage on that trip. Vessels would be selected for coverage by NMFS to meet the 50-percent coverage target. Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits would be required to notify NMFS for monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether an at-sea monitor must be procured through a monitoring service provider. Because the 50-percent coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer on the same trip that would carry an at-sea monitor. If NMFS informs the vessel representative that they need at-sea monitoring coverage, they would then be required to obtain and pay for an at-sea monitor to carry on that trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on that trip. If NMFS informs the vessel representative that the vessel is not selected for at-sea monitoring coverage, NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip.

This rule proposes three reasons for issuing vessels waivers from industry-funded monitoring requirements on a trip-by-trip basis. First, if an at-sea monitor was not available to cover a specific herring trip (either due to logistics or a lack of available Federal funding to cover NMFS cost responsibilities), NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip. Second, if a vessel using midwater trawl gear intended to operate as a wing vessel on a trip, meaning that it would pair trawl with another midwater trawl vessel but would not pump or carry any fish onboard, then that vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the wing vessel trip, and NMFS would issue a waiver for industry-funded monitoring requirements on that trip. Wing vessels would be prohibited from carrying fish onboard during these trips. If a wing vessel did carry fish, the vessel would be out of compliance with industry-funded monitoring requirements on that trip. Third, if a vessel intended to land less than 50 metric tons (mt) of herring on a trip, then the vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the trip on which they intend to land less than 50 mt of herring, and NMFS would issue a waiver for industry-funded monitoring requirements on that trip. Vessels would be prohibited from landing 50 mt or more of herring on these trips. If the vessel landed 50 mt or more of herring, the vessel would be out of compliance with industry-funded monitoring requirements on that trip.

At-sea monitors would collect the following information on herring trips:
• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);
• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);
• Species, weight, and disposition of all retained and discarded catch on observed hauls;
• Species, weight, and disposition of all retained catch on unobserved hauls;
• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
• Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;
• Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
• Vessel trip costs (*i.e.,* operational costs for trips including food, fuel, oil, and ice).

The primary biological data that at-sea monitors would collect are length data on retained and discarded catch. However, to verify species identification, at-sea monitors may also collect whole specimens or photos. In the future, the Council may recommend that at-sea monitors collect additional biological information upon request. Revising what information an at-sea monitor collects could be done in a framework adjustment. Alternatively,

the Council may recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors, consistent with the APA.

In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection.

Currently, vessels issued Category A or B herring permits are required to comply with all slippage restrictions, slippage reporting requirements, and slippage consequence measures when carrying an observer for SBRM coverage (§ 648.11(m)(4)). Because the purpose of slippage restrictions is to help ensure catch is made available for sampling, this rule proposes that existing slippage requirements would also apply when vessels are carrying an industry-funded at-sea monitor. Specifically, when vessels issued Category A or B herring permits are carrying either an SBRM observer or industry-funded at-sea monitor, vessels would be required to bring catch aboard the vessel and make it available for sampling prior to discarding. If vessels slipped catch for any reason, they would be required to report that slippage event on the daily vessel monitoring catch report and complete a slipped catch affidavit. If vessels slip catch due to excess catch of spiny dogfish, mechanical failure, or safety, then vessels would be required to move 15 nautical miles (27.78 km) following that slippage event and remain 15 nautical miles (27.78 km) away from that slippage event before making another haul and for the duration of that fishing trip. If vessels slip catch for any other reason, they would be required to terminate that fishing trip and immediately return to port.

Industry-funded monitoring would have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery. The EA estimated the industry's cost responsibility associated with carrying an at-sea monitor at $710 per day. The EA uses returns-to-owner (RTO) to estimate the potential reduction in annual RTO associated with paying for monitoring coverage. RTO was calculated by subtracting annual

operating costs from annual gross revenue and was used instead of net revenues to more accurately reflect fishing income. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of the proposed at-sea monitoring coverage may reduce the annual RTO for vessels with Category A or B herring permits up to approximately 20 percent. Waiving at-sea monitoring coverage requirements for wing vessel trips or trips that land less than 50 mt of herring would help reduce the cost of at-sea monitoring coverage on those trips, but those waivers are not an option for all vessels.

### 2. Industry-Funded Observer Coverage on Midwater Trawl Vessels Fishing in Groundfish Closed Areas

Midwater trawl vessels fishing in the Groundfish Closed Areas are required to carry an observer by measures at § 648.202(b). When Amendment 5 established that requirement, the Groundfish Closed Areas included Closed Area I, Closed Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Currently, the only mechanism for midwater trawl vessels to carry an observer is if an observer is assigned through the SBRM. As described previously, SBRM coverage for midwater trawl vessels has recently been variable (approximately 4 percent to 40 percent from 2015 through 2017). This rule would maintain the requirement to carry an observer for midwater trawl vessels fishing in a Groundfish Closed Area, but it proposes that midwater trawl vessels would be able to purchase observer coverage in order to access Groundfish Closed Areas.

Prior to any trip declared into a Groundfish Closed Area, representatives for midwater trawl vessels would be required to provide notice to NMFS for monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that an observer may be procured through a monitoring service provider. The vessel would be prohibited from fishing in the Groundfish Closed Areas without carrying an observer. Observers would collect the following information on midwater trawl trips:

• Fishing gear information (*i.e.*, size of nets, mesh sizes, and gear configurations);

• Tow-specific information (*i.e.*, depth, water temperature, wave height,

and location and time when fishing begins and ends);

• Species, weight, and disposition of all retained and discarded catch on observed hauls;

• Species, weight, and disposition of all retained catch on unobserved hauls;

• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

• Whole specimens, photos, length information, and biological samples (*i.e.*, scales, otoliths, and/or vertebrae);

• Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

• Vessel trip costs (*i.e.*, operational costs for trip including food, fuel, oil, and ice).

The proposed measure to allow midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas would also have economic impacts on vessels participating in the herring fishery. The EA estimated the industry's cost responsibility associated with carrying an observer at $818 per day. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of observer coverage may reduce the annual RTO for midwater trawl vessels up to 5 percent. That 5 percent reduction in RTO would be in additional to any reduction in RTO due to other types of industry-funded monitoring coverage. Coverage waivers are not an option to reduce the cost of observer coverage because coverage waivers do not apply on midwater trawl vessels fishing in the Groundfish Closed Areas.

If the Groundfish Closed Areas are modified, eliminated, or added in the future, existing observer coverage requirements for midwater trawl vessels would apply to the modified areas. Anticipating changes to the Groundfish Closed Areas in the Omnibus Essential Fish Habitat Amendment 2 (Habitat Amendment), the Industry-Funded Monitoring Amendment Development Team/Fishery Management Action Team (PDT/FMAT) recommended the Council clarify its intent regarding the requirement that midwater trawl vessels fishing in Groundfish Closed Areas must carry an observer. In a March 17, 2017, memorandum, the PDT/FMAT noted that the Habitat Amendment proposed changes to Groundfish Closed Areas, such as eliminating areas, boundary changes, and seasonality. That same memorandum proposed the Council clarify that this amendment maintains the 100-percent observer coverage requirement on midwater trawl

vessels fishing in Groundfish Closed Areas, as modified by the Habitat Amendment. The Council accepted the FM PDT/FMAT's proposed clarification when it took final action on this amendment in April 2017.

In January 2018, NMFS partially approved the Habitat Amendment, including changes to Closed Area I, Nantucket Lightship Closed Area, and the Western Gulf of Maine Closure Area. Consistent with Council intent regarding observer coverage, the final rule for the Habitat Amendment (83 FR 15240, April 9, 2018) maintained the 100-percent observer requirement for midwater trawl vessels fishing in Closed Area I North (February 1–April 15), Closed Area II, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Because the Habitat Amendment removed the Nantucket Lightship Closed Area from the list of Groundfish Closed Areas, the 100-percent observer coverage requirement no longer applies to midwater trawl vessels fishing in the area previously known as the Nantucket Lightship Closed Area.

Recognizing that it recommended multiple industry-funded monitoring types, including at-sea monitoring coverage and observer coverage in Groundfish Closed Areas, for the herring fishery, the Council also recommended prioritizing coverage aboard Category A and B vessels because those vessels harvest the majority of the herring. Consistent with that recommendation, if available Federal funding is insufficient to cover NMFS cost responsibilities associated with administering multiple monitoring programs for the herring fishery, this rule proposes prioritizing industry-funded monitoring coverage on Category A and B vessels before supporting observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.

### Atlantic Herring Exempted Fishing Permit

On April 19, 2018, the New England Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to address monitoring goals for the herring fishery. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition

data along with age and length information. After reviewing the midwater trawl electronic monitoring study, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.

The EFP would exempt midwater vessels from the proposed requirement for industry-funded at-sea monitoring coverage and would allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. The recent midwater trawl electronic monitoring study provides a good foundation for an electronic monitoring program. However, using an EFP would provide NMFS with further information about how to most effectively and efficiently administer the electronic monitoring and portside sampling program, while allowing NMFS the flexibility to respond quickly to emerging issues, helping to make the monitoring program more robust. An EFP would also enable NMFS to evaluate other monitoring issues in the herring fishery that are of interest to the Council and herring industry. Lastly, NMFS could use an EFP to evaluate the utility of electronic monitoring and portside sampling when midwater trawl vessels switch to purse seining and/or fish in Groundfish Closed Areas.

The EFP would be developed concurrently with rulemaking for this amendment. If the proposed herring measures are approved, then midwater trawl vessels issued EFPs would be allowed to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. The Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

### Proposed Corrections and Clarification

NMFS proposes the following corrections and updates under the authority of section 305(d) to the Magnuson-Stevens Fishery

Conservation and Management Act (Magnuson-Stevens Act), which provides that the Secretary of Commerce may promulgate regulations necessary to carry out a FMP or the Magnuson-Stevens Act.

First, this rule proposes correcting the typographic error in § 648.7(b)(2)(i). This correction would correct "opn 9access" to "open access" and is necessary to clarify the intent of the regulation.

Second, this rule proposes updating outdated requirements for vessels operating under the midwater trawl and purse seine exempted fisheries. Regulations at § 648.80(d)(5) and (e)(5) require vessels to notify NMFS 72 hours in advance of a fishing trip to coordinate observer deployment. Amendment 5 replaced the 72-hour notification requirement with a 48-hour notification requirement to allow herring vessels more flexibility in their trip planning and scheduling. The 72-hour notification requirements for herring vessels in § 648.80 were overlooked in Amendment 5, so this rule proposes updating the 72-hour notification requirements with 48-hour notification requirements for midwater trawl and purse seine vessels to ensure consistent requirements across the herring fishery. Regulations at § 648.80(d)(5) also require midwater trawl vessels to inform NMFS if the vessels intends to fish in Groundfish Closed Area I. This requirement initially facilitated placing observers on midwater vessels fishing in Groundfish Closed Area I, but is no longer necessary. Therefore, this rule proposes removing the reference to Groundfish Closed Area I from the notification requirements so that requirements are consistent with proposed notification requirements at § 648.11(m)(2).

Third, this rule proposes allowing us to use both observer and monitor data to track catch against the haddock catch caps. Regulations at § 648.86(a)(3)(ii) state that the Regional Administrator shall use haddock catches observed by observers to estimate of total haddock catch in a given haddock stock area. However, the Council has spent the last several years considering additional monitoring types to increase monitoring in the herring fishery, particularly to track catch against haddock and river herring/shad catch caps. In a February 2016 letter, the Council requested that we use observer and portside sampling data to monitor fishery catch caps. Additionally, in this amendment, the Council recommended that vessels issued Category A and B herring permits carry at-sea monitors to meet a 50-percent industry-funded monitoring

coverage target. In § 648.2, this rule proposes defining observers or monitors to include NMFS-certified observers, at-sea monitors, portside samplers, and dockside monitors. For these reasons, this rule also proposes updating § 648.86(a)(3)(ii) to allow the Regional Administrator to use observer and monitor data to track catch against haddock catch caps.

**Classification**

Pursuant to section 304(a)(1)(A) of the Magnuson-Stevens Act, the NMFS Assistant Administrator has made a preliminary determination that this proposed rule is consistent the Magnuson-Stevens Act and other applicable law. In making the final determination, we will consider the data, views, and comments received during the public comment period.

This proposed rule has been preliminarily determined to be not significant for purposes of Executive Orders (E.O.) 12866.

NMFS prepared an Initial Regulatory Flexibility Analysis (IRFA) for this proposed rule, as required by section 603 of the Regulatory Flexibility Act (RFA), 5 U.S.C. 603. The IRFA describes the economic impact that this proposed rule would have on small entities, including small businesses, and also determines ways to minimize these impacts. The proposed omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the proposed omnibus measures have no direct economic impacts, they will not be discussed in this section. The proposed Atlantic herring measures affect levels of monitoring, rather than harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities due to the costs associated with the industry-funded monitoring measures for the herring fishery.

A description of the action, why it is being considered, and the legal basis for this action are contained at the beginning of this section in the preamble and in the **SUMMARY** section. The IRFA includes this section of the preamble to this rule and analyses contained in the Industry-Funded Monitoring Omnibus Amendment and its accompanying EA/RIR/IRFA. A copy of the full analysis is available from the Council (see **ADDRESSES**). A summary of the IRFA follows.

*Description of the Reason Why Action by the Agency Is Being Considered and Statement of the Objective of, and Legal Basis for, This Proposed Rule*

This action proposes management measures for New England Fishery Management Council FMPs. A complete description of the reasons why this action is being considered, and the objectives of and legal basis for this action, are contained in the preamble to this proposed rule and are not repeated here.

*Description and Estimate of the Number of Small Entities To Which the Proposed Rule Would Apply*

Effective July 1, 2016, NMFS established a small business size standard of $11 million in annual gross receipts for all businesses primarily engaged in the commercial fishing industry for RFA compliance purposes only (80 FR 81194, December 29, 2015). The directly regulated entities are businesses that own at least one limited access Atlantic herring vessel. As of 2016, there are 66 businesses that own at least one limited access herring vessel. Four businesses are large entities (gross receipts greater than $11 million). The remaining 62 businesses are small entities. Gross receipts and gross receipts from herring fishing for the small entities are characterized in Table 1.

TABLE 1—GROSS REVENUES AND REVENUES FROM HERRING FOR THE DIRECTLY REGULATED SMALL ENTITIES

| | Gross receipts from herring permitted firms | Gross receipts from herring fishing |
|---|---|---|
| Mean | $1,847,392 | $422,210 |
| Median | $1,076,172 | $0 |
| 25th Percentile | $656,965 | $0 |
| 75th Percentile | $2,684,753 | $95,218 |
| Permitted Small Entities | 62 | 62 |

*Source:* NMFS.

Many of the businesses that hold limited access herring permits are not actively fishing for herring. Of those businesses actively fishing for herring, there are 32 directly regulated entities with herring landings. Two firms are large entities (gross receipts over $11 million). The remaining 30 businesses are small entities. Table 2 characterizes gross receipts and gross receipts from the herring fishery for the active firms.

TABLE 2—GROSS REVENUES AND REVENUES FROM HERRING FOR THE ACTIVE DIRECTLY REGULATED SMALL ENTITIES

| | Gross receipts from active herring permitted firms | Gross receipts from herring fishing |
|---|---|---|
| Mean | $2,070,541 | $872,567 |
| Median | $1,030,411 | $95,558 |
| 25th Percentile | $554,628 | $6,570 |
| 75th Percentile | $2,955,883 | $1,696,758 |
| Active Small Entities | 30 | 30 |

*Source:* NMFS.

For the 30 small entities, herring represents an average of 36 percent of gross receipts. For 12 of the small entities, herring represents the single largest source of gross receipts. For eight of the small entities, longfin squid is the largest source of gross receipts and Atlantic sea scallops is the largest source of gross receipts for five of the small entities. The largest source of gross receipts for the remaining five small entities are mixed across different fisheries. Eight of the 30 small entities derived zero revenues from herring.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements*

This proposed rule contains collection-of-information requirements subject to review and approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA). The new requirements, which are described in detail in the preamble, have been submitted to OMB for approval as a new collection. The proposed action does not duplicate, overlap, or conflict with any other Federal rules.

The Industry-Funded Monitoring Amendment would replace the current phone-based observer pre-trip notification system with a new web-based pre-trip notification system. There would be no additional reporting burden associated with this measure because the new notification system would increase convenience and will require approximately the same time burden (5 minutes).

This amendment would implement a 50-percent industry-funded monitoring coverage target on vessels issued Category A or B herring permits. The herring industry would be required to pay for industry cost responsibilities associated with at-sea monitoring. There are an estimated 42 vessels with Category A or B permits in the herring fishery. After considering SBRM coverage, NMFS estimates that each vessel would incur monitoring costs for

an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an at-sea monitor for Category A and B vessels would be $566,580, with an average cost per vessel of $13,490.

In addition to the 50-percent industry-funded monitoring coverage target, midwater trawl vessels would have the option to purchase observer coverage to allow them to fish in Groundfish Closed Areas. This option would be available to the estimated 12 vessels that fish with midwater trawl gear. Since this option would be available on all trips not otherwise selected for SBRM or industry-funded at-sea monitoring coverage, it is estimated that each vessel may use this option for up to 21 days per year, at an estimated maximum cost of $818 per sea day. Therefore, the annual cost associated with industry-funded observer coverage for midwater trawl vessels fishing in Groundfish Closed Areas is estimated to be $206,136, with an average annual cost per vessel of $17,178.

To access Groundfish Closed Areas, owners/operators of the 12 affected midwater trawl vessels would request an observer by calling one of the approved monitoring service providers. The average midwater trawl vessel is estimated to take 7 of these trips per year, and each call would take an estimated 5 minutes at a rate of $0.10 per minute. Thus, the total annual burden estimate to the industry for calls

to obtain industry-funded observer coverage would be 7 hours and $42 (Per vessel: 1 hr and $3.50). For each of the 7 estimated trips that the vessel calls in to request an industry-funded observer to access Groundfish Closed Areas, the vessel has the option to cancel that trip. The call to cancel the trip would take an estimated 1 minute at a rate of $0.10 per minute. The total annual burden estimated to the industry for cancelling these trips would be 1 hour and $8 (Per vessel: 1 hr and $1).

NMFS expects that some monitoring service providers would apply for approval under the service provider requirements at § 648.11(h), specifically that four out of six providers may apply for approval, and would be subject to these requirements. These providers would submit reports and information required of service providers as part of their application for approval. Service providers must comply with the following requirements, submitted via email, phone, web-portal, fax, or postal service: Submit applications for approval as a monitoring service provider; formally request industry-funded at-sea monitor training by the NEFOP; submit industry-funded at-sea monitor deployment and availability reports; submit biological samples, safety refusal reports, and other reports; give notification of industry-funded at-sea monitor availability within 24 hours of the vessel owner's notification of a prospective trip; provide vessels with notification of industry-funded observer

availability in advance of each trip; maintain an updated contact list of all industry-funded observers/ observers that includes the monitor's/ observer's identification number, name, mailing and email address, phone numbers, homeports or fisheries/trip types assigned, and whether or not the monitor/observer is ''in service'' (*i.e.,* available to provide coverage services). Monitoring service providers would have to provide raw at-sea monitoring data to NMFS and make at-sea monitors available to NMFS for debriefing upon request. The regulations would also require monitoring service providers to submit any outreach materials, such as informational pamphlets, payment notification, and descriptions of monitor duties, as well as all contracts between the service provider and entities requiring monitoring services for review to NMFS. Monitoring service providers also have the option to respond to application denials, and submit a rebuttal in response to a pending removal from the list of approved monitoring service providers. NMFS expects that all of these reporting requirements combined are expected to take 1,192 hours of response time per year for a total annual cost of $12,483 for all affected monitoring service providers ($3,121 per provider). The following table provides the detailed time and cost information for each response item.

TABLE 3—BURDEN ESTIMATE FOR PROPOSED MEASURES

| Monitoring service provider requirements | Number of entities | Total number of items | Response time per response (minutes) | Total time burden (hours) | Cost per response ($) | Total annual public cost ($) |
|---|---|---|---|---|---|---|
| Monitor deployment report by email | 4 | 444 | 10 | 74 | 0.00 | 0.00 |
| Monitor availability report by email | 4 | 216 | 20 | 72 | 0.00 | 0.00 |
| Safety refusals by email | 4 | 40 | 30 | 20 | 0.00 | 0.00 |
| Raw monitor data by express mail | 4 | 444 | 5 | 37 | 23.75 | 10,545 |
| Monitor debriefing | 4 | 124 | 120 | 248 | 12.00 | 1,488 |
| Other reports | 4 | 68 | 30 | 34 | 0.00 | 0.00 |
| Biological samples | 4 | 516 | 60 | 516 | 0.50 | 258 |
| New application to be a service provider | 4 | 4 | 600 | 40 | 0.49 | 2 |
| Applicant response to denial | 1 | 1 | 600 | 10 | 0.49 | 1 |
| Request to service provider to procure a monitor by web-portal | 90 | 360 | 10 | 60 | 0.00 | 0.00 |
| Notification of unavailability of monitors | 90 | 360 | 5 | 30 | 0.00 | 0.00 |
| Request to service provider to procure an observer for Groundfish Closed Areas by phone | 21 | 84 | 10 | 14 | 1.00 | 84.00 |
| Notification of unavailability of observers for Groundfish Closed Areas | 21 | 84 | 5 | 7 | 0.50 | 42.00 |
| Request for monitor training | 4 | 12 | 30 | 6 | 1.80 | 21.60 |
| Rebuttal of pending removal from list of approved service providers | 1 | 1 | 480 | 8 | 0.49 | 1 |
| Monitor contact list updates | 4 | 48 | 5 | 4 | 0.00 | 0.00 |
| Monitor availability updates | 4 | 48 | 5 | 4 | 0.00 | 0.00 |
| Service provider material submissions | 4 | 8 | 30 | 4 | 2.50 | 20.00 |
| Service provider contracts | 4 | 8 | 30 | 4 | 2.50 | 20.00 |
| Total | ............ | ............ | ............ | 1,192 | ............ | 12,483 |

Public comment is sought regarding the following: Whether this proposed collection of information is necessary for the proper performance of agency functions, including whether the information shall have practical utility; the accuracy of the burden estimate; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the collection of information, including through the use of automated collection techniques or other forms of information technology. Send comments on these or any other aspects of the collection of information to the Regional Administrator (see **ADDRESSES**) and email to *OIRA_Submission@ omb.eop.gov* or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

*Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule*

This action does not duplicate, overlap, or conflict with any other Federal rules.

*Description of Significant Alternatives to the Proposed Action Which Accomplish the Stated Objectives of Applicable Statues and Which Minimize Any Significant Economic Impact on Small Entities*

None of the non-preferred herring alternatives would be expected to accomplish the stated objectives for monitoring in the herring fishery as well as the proposed action. The following are objectives for increased monitoring in the herring fishery: (1) Accurate estimates of catch (retained and discarded), (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad), and (3) affordable monitoring for the herring fishery. Herring alternatives considered different combinations of monitoring types (observers, at-sea monitors, electronic monitoring, portside sampling) and coverage targets (100 percent, 75 percent, 50 percent, 25 percent) on herring fleets (vessels with Category A or B permits, midwater trawl vessels). Non-preferred herring alternatives with coverage targets of 100 percent or 75 percent would have higher costs than the proposed action. Non-preferred herring alternatives for the midwater trawl fleet or those with 25-percent coverage targets may not have

improved monitoring in the herring fishery as well as the proposed action.

List of Subjects in 50 CFR Part 648

Fisheries, Fishing, Recordkeeping and reporting requirements.

Dated: October 30, 2018.

**Samuel D. Rauch, III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons set out in the preamble, 50 CFR part 648 is proposed to be amended as follows:

## PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.2, add the definition for ''Observer or monitor'' and revise the definitions for ''Electronic monitoring'' and ''Slippage in the Atlantic herring fishery'' and ''Slip(s) or slipping catch in the Atlantic herring fishery'' in alphabetical order to read as follows:

### § 648.2  Definitions.

\*    \*    \*    \*    \*

*Electronic monitoring* means a network of equipment that uses a software operating system connected to one or more technology components, including, but not limited to, cameras and recording devices to collect data on catch and vessel operations.

\*    \*    \*    \*    \*

*Observer or monitor* means any person certified by NMFS to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels as part of NMFS' Northeast Fisheries Observer Program. Observers or monitors include NMFS-certified fisheries observers, at-sea monitors, portside samplers, and dockside monitors.

\*    \*    \*    \*    \*

*Slippage in the Atlantic herring fishery* means catch that is discarded prior to it being brought aboard a vessel issued an Atlantic herring permit and/ or prior to making it available for sampling and inspection by a NMFS-certified observer or monitor. Slippage also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slippage includes releasing catch from a codend or seine prior to the completion of pumping the catch aboard and the release of catch from a codend or seine while the codend or seine is in

the water. Fish that cannot be pumped and remain in the codend or seine at the end of pumping operations are not considered slippage. Discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor are also not considered slippage.

*Slip(s) or slipping catch in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-approved observer or monitor after the catch is on board. Slip(s) or slipping catch also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slip(s) or slipping catch includes releasing fish from a codend or seine prior to the completion of pumping the fish on board and the release of fish from a codend or seine while the codend or seine is in the water. Slippage or slipped catch refers to fish that are slipped. Slippage or slipped catch does not include operational discards, discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor, or fish that inadvertently fall out of or off fishing gear as gear is being brought on board the vessel.

\*    \*    \*    \*    \*

■ 3. In § 648.7, revise paragraph (b)(2)(i) to read as follows:

### § 648.7  Record keeping and reporting requirements.

\*    \*    \*    \*    \*

(b) \* \* \*

(2) \* \* \*

(i) *Atlantic herring owners or operators issued an All Areas open access permit.* The owner or operator of a vessel issued an All Areas open access permit to fish for herring must report catch (retained and discarded) of herring via an IVR system for each week herring was caught, unless exempted by the Regional Administrator. IVR reports are not required for weeks when no herring was caught. The report shall include at least the following information, and any other information required by the Regional Administrator: Vessel identification; week in which herring are caught; management areas fished; and pounds retained and pounds discarded of herring caught in each management area. The IVR reporting week begins on Sunday at 0001 hour

(hr) (12:01 a.m.) local time and ends Saturday at 2400 hr (12 midnight). Weekly Atlantic herring catch reports must be submitted via the IVR system by midnight each Tuesday, eastern time, for the previous week. Reports are required even if herring caught during the week has not yet been landed. This report does not exempt the owner or operator from other applicable reporting requirements of this section.

\*    \*    \*    \*    \*

■ 4. Revise § 648.11 and the section heading to read as follows:

### § 648.11  Monitoring coverage.

(a) The Regional Administrator may request any vessel holding a permit for Atlantic sea scallops, NE multispecies, monkfish, skates, Atlantic mackerel, squid, butterfish, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, tilefish, Atlantic surfclam, ocean quahog, or Atlantic deep-sea red crab; or a moratorium permit for summer flounder; to carry a NMFS-certified fisheries observer. A vessel holding a permit for Atlantic sea scallops is subject to the additional requirements specified in paragraph (k) of this section. A vessel holding an All Areas or Areas 2/3 Limited Access Herring Permit is subject to the additional requirements specified in paragraph (m) of this section. Also, any vessel or vessel owner/operator that fishes for, catches or lands hagfish, or intends to fish for, catch, or land hagfish in or from the exclusive economic zone must carry a NMFS-certified fisheries observer when requested by the Regional Administrator in accordance with the requirements of this section.

(b) If requested by the Regional Administrator or their designees, including NMFS-certified observers, monitors, and NMFS staff, to be sampled by an observer or monitor, it is the responsibility of the vessel owner or vessel operator to arrange for and facilitate observer or monitor placement. Owners or operators of vessels selected for observer or monitor coverage must notify the appropriate monitoring service provider before commencing any fishing trip that may result in the harvest of resources of the respective fishery. Notification procedures will be specified in selection letters to vessel owners or permit holder letters.

(c) The Regional Administrator may waive the requirement to be sampled by an observer or monitor if the facilities on a vessel for housing the observer or monitor, or for carrying out observer or monitor functions, are so inadequate or unsafe that the health or safety of the observer or monitor, or the safe operation of the vessel, would be jeopardized.

(d) An owner or operator of a vessel on which a NMFS-certified observer or monitor is embarked must:

(1) Provide accommodations and food that are equivalent to those provided to the crew.

(2) Allow the observer or monitor access to and use of the vessel's communications equipment and personnel upon request for the transmission and receipt of messages related to the observer's or monitor's duties.

(3) Provide true vessel locations, by latitude and longitude or loran coordinates, as requested by the observer or monitor, and allow the observer or monitor access to and use of the vessel's navigation equipment and personnel upon request to determine the vessel's position.

(4) Notify the observer or monitor in a timely fashion of when fishing operations are to begin and end.

(5) Allow for the embarking and debarking of the observer or monitor, as specified by the Regional Administrator, ensuring that transfers of observers or monitors at sea are accomplished in a safe manner, via small boat or raft, during daylight hours as weather and sea conditions allow, and with the agreement of the observers or monitors involved.

(6) Allow the observer or monitor free and unobstructed access to the vessel's bridge, working decks, holding bins, weight scales, holds, and any other space used to hold, process, weigh, or store fish.

(7) Allow the observer or monitor to inspect and copy any the vessel's log, communications log, and records associated with the catch and distribution of fish for that trip.

(e) The owner or operator of a vessel issued a summer flounder moratorium permit, a scup moratorium permit, a black sea bass moratorium permit, a bluefish permit, a spiny dogfish permit, an Atlantic herring permit, an Atlantic deep-sea red crab permit, a skate permit, or a tilefish permit, if requested by the observer or monitor, also must:

(1) Notify the observer or monitor of any sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, tilefish, skates (including discards) or other specimens taken by the vessel.

(2) Provide the observer or monitor with sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, skates, tilefish, or other specimens taken by the vessel.

(f) NMFS may accept observer or monitor coverage funded by outside sources if:

(1) All coverage conducted by such observers or monitors is determined by NMFS to be in compliance with NMFS' observer or monitor guidelines and procedures.

(2) The owner or operator of the vessel complies with all other provisions of this part.

(3) The observer or monitor is approved by the Regional Administrator.

(g) *Industry-Funded Monitoring Programs.* Fishery management plans (FMPs) managed by the New England Fishery Management Council (New England Council), including Atlantic Herring, Atlantic Salmon, Atlantic Sea Scallops, Deep-Sea Red Crab, Northeast Multispecies, and Northeast Skate Complex, may include industry-funded monitoring programs (IFM) to supplement existing monitoring required by the Standard Bycatch Reporting Methodology (SBRM), Endangered Species Act, and the Marine Mammal Protection Act. IFM programs may use observers, monitors, including at-sea monitors and portside samplers, and electronic monitoring to meet specified IFM coverage targets. The ability to meet IFM coverage targets may be constrained by the availability of Federal funding to pay NMFS cost responsibilities associated with IFM.

(1) *Guiding Principles for New IFM Programs.* The Council's development of an IFM program must consider or include the following:

(i) A clear need or reason for the data collection;

(ii) Objective design criteria;

(iii) Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;

(iv) Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;

(v) Prioritize the use of modern technology to the extent practicable; and

(vi) Incentives for reliable self-reporting.

(2) *Process To Implement and Revise New IFM Programs.* New IFM programs shall be developed via an amendment to a specific FMP. IFM programs implemented in an FMP may be revised via a framework adjustment. The details of an IFM program may include, but are not limited to:

(i) Level and type of coverage target,

(ii) Rationale for level and type of coverage,

(iii) Minimum level of coverage necessary to meet coverage goals,

(iv) Consideration of waivers if coverage targets cannot be met,

(v) Process for vessel notification and selection,

(vi) Cost collection and administration,

(vii) Standards for monitoring service providers, and

(viii) Any other measures necessary to implement the industry-funded monitoring program.

(3) *NMFS Cost Responsibilities.* IFM programs have two types of costs, NMFS and industry costs. Cost responsibilities are delineated by the type of cost. NMFS cost responsibilities include the following:

(i) The labor and facilities associated with training and debriefing of monitors;

(ii) NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);

(iii) Certification of monitoring service providers and individual observers or monitors; performance monitoring to maintain certificates;

(iv) Developing and executing vessel selection;

(v) Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and

(vi) Costs associated with liaison activities between service providers, and NMFS, Coast Guard, New England Council, sector managers, and other partners.

(vii) The industry is responsible for all other costs associated with IFM programs.

(4) *Prioritization Process to Cover NMFS IFM Cost Responsibilities.* (i) Available Federal funding refers to any funds in excess of those allocated to meet SBRM requirements or the existing IFM programs in the Atlantic Sea Scallop and Northeast Multispecies FMPs that may be used to cover NMFS cost responsibilities associated with IFM coverage targets. If there is no available Federal funding in a given year to cover NMFS IFM cost responsibilities, then there shall be no IFM coverage during that year. If there is some available Federal funding in a given year, but not enough to cover all of NMFS cost responsibilities associated with IFM coverage targets, then the New England Council will prioritize available Federal funding across IFM programs during that year. Existing IFM programs for Atlantic sea scallops and Northeast multispecies fisheries shall

not be included in this prioritization process.

(ii) Programs with IFM coverage targets shall be prioritized using an equal weighting approach, such that any available Federal funding shall be divided equally among programs.

(iii) After NMFS determines the amount of available Federal funding for the next fishing year, NMFS shall provide the New England Council with the estimated IFM coverage levels for the next fishing year. The estimated IFM coverage levels would be based on the equal weighting approach and would include the rationale for any deviations from the equal weighting approach. The New England Council may recommend revisions and additional considerations to the Regional Administrator and Science and Research Director.

(A) If available Federal funding exceeds that needed to pay all of NMFS cost responsibilities for administering IFM programs, the New England Council may request NMFS to use available funding to help offset industry cost responsibilities through reimbursement.

(B) [Reserved]

(iv) Revisions to the prioritization process may be made via a framework adjustment to all New England FMPs.

(v) Revisions to the weighting approach for the New England Council-led prioritization process may be made via a framework adjustment to all New England FMPs or by the New England Council considering a new weighting approach at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the weighting approach. NMFS shall implement revisions to the weighting approach in a manner consistent with the Administrative Procedure Act.

(5) *IFM Program Monitoring Service Provider Requirements.* IFM monitoring service provider requirements shall be consistent with requirements in paragraphs (h) of this section and observer or monitor requirements shall be consistent with requirements in paragraph (i) of this section.

(6) *Monitoring Set-Aside.* The New England Council may develop a monitoring set-aside program for individual FMPs that would devote a portion of the annual catch limit for a fishery to help offset the industry cost responsibilities for monitoring coverage, including observers, at-sea monitors, portside samplers, and electronic monitoring.

(i) The details of a monitoring set-aside program may include, but are not limited to:

(A) The basis for the monitoring set-aside;

(B) The amount of the set-aside (*e.g.,* quota, days at sea);

(C) How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* an increased trip limit, differential days at sea counting, additional trips, an allocation of the quota);

(D) The process for vessel notification;

(E) How funds are collected and administered to cover the industry's costs of monitoring; and

(F) Any other measures necessary to develop and implement a monitoring set-aside.

(ii) The New England Council may develop new monitoring set-asides and revise those monitoring set-asides via a framework adjustment to the relevant FMP.

(h) *Monitoring service provider approval and responsibilities*—(1) General. An entity seeking to provide monitoring services, including services for IFM Programs described in paragraph (g) of this section, must apply for and obtain approval from NMFS following submission of a complete application. Monitoring services include providing NMFS-certified observers, monitors (at-sea monitors and portside samplers), and/or electronic monitoring. A list of approved monitoring service providers shall be distributed to vessel owners and shall be posted on the NMFS Fisheries Sampling Branch (FSB) website at: *https://www.nefsc.noaa.gov/ femad/fsb/.*

(2) [Reserved]

(3) *Contents of application.* An application to become an approved monitoring service provider shall contain the following:

(i) Identification of the management, organizational structure, and ownership structure of the applicant's business, including identification by name and general function of all controlling management interests in the company, including but not limited to owners, board members, officers, authorized agents, and staff. If the applicant is a corporation, the articles of incorporation must be provided. If the applicant is a partnership, the partnership agreement must be provided.

(ii) The permanent mailing address, phone and fax numbers where the owner(s) can be contacted for official correspondence, and the current physical location, business mailing address, business telephone and fax numbers, and business email address for each office.

(iii) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, that they are free from a

conflict of interest as described under paragraph (h)(6) of this section.

(iv) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, describing any criminal conviction(s), Federal contract(s) they have had and the performance rating they received on the contracts, and previous decertification action(s) while working as an observer or monitor or monitoring service provider.

(v) A description of any prior experience the applicant may have in placing individuals in remote field and/or marine work environments. This includes, but is not limited to, recruiting, hiring, deployment, and personnel administration.

(vi) A description of the applicant's ability to carry out the responsibilities and duties of a monitoring service provider as set out under paragraph (h)(5) of this section, and the arrangements to be used.

(vii) Evidence of holding adequate insurance to cover injury, liability, and accidental death for observers or monitors, whether contracted or employed by the service provider, during their period of employment (including during training). Workers' Compensation and Maritime Employer's Liability insurance must be provided to cover the observer or monitor, vessel owner, and observer provider. The minimum coverage required is $5 million. Monitoring service providers shall provide copies of the insurance policies to observers or monitors to display to the vessel owner, operator, or vessel manager, when requested.

(viii) Proof that its observers or monitors, whether contracted or employed by the service provider, are compensated with salaries that meet or exceed the U.S. Department of Labor (DOL) guidelines for observers. Observers shall be compensated as Fair Labor Standards Act (FLSA) non-exempt employees. Monitoring service providers shall provide any other benefits and personnel services in accordance with the terms of each observer's or monitor's contract or employment status.

(ix) The names of its fully equipped, NMFS/FSB certified, observers or monitors on staff or a list of its training candidates (with resumes) and a request for an appropriate NMFS/FSB Training class. All training classes have a minimum class size of eight individuals, which may be split among multiple vendors requesting training. Requests for training classes with fewer than eight individuals will be delayed until further requests make up the full training class size.

(x) An Emergency Action Plan (EAP) describing its response to an "at sea" emergency with an observer or monitor, including, but not limited to, personal injury, death, harassment, or intimidation. An EAP that details a monitoring service provider's responses to emergencies involving observers, monitors, or monitoring service provider personnel. The EAP shall include communications protocol and appropriate contact information in an emergency.

(4) *Application evaluation.* (i) NMFS shall review and evaluate each application submitted under paragraph (h)(3) of this section. Issuance of approval as a monitoring service provider shall be based on completeness of the application, and a determination by NMFS of the applicant's ability to perform the duties and responsibilities of a monitoring service provider, as demonstrated in the application information. A decision to approve or deny an application shall be made by NMFS within 15 business days of receipt of the application by NMFS.

(ii) If NMFS approves the application, the monitoring service provider's name will be added to the list of approved monitoring service providers found on the NMFS/FSB website specified in paragraph (h)(1) of this section, and in any outreach information to the industry. Approved monitoring service providers shall be notified in writing and provided with any information pertinent to its participation in the observer or monitor programs.

(iii) An application shall be denied if NMFS determines that the information provided in the application is not complete or the evaluation criteria are not met. NMFS shall notify the applicant in writing of any deficiencies in the application or information submitted in support of the application. An applicant who receives a denial of his or her application may present additional information to rectify the deficiencies specified in the written denial, provided such information is submitted to NMFS within 30 days of the applicant's receipt of the denial notification from NMFS. In the absence of additional information, and after 30 days from an applicant's receipt of a denial, a monitoring service provider is required to resubmit an application containing all of the information required under the application process specified in paragraph (h)(3) of this section to be re-considered for being added to the list of approved monitoring service providers.

(5) *Responsibilities of monitoring service providers.* (i) A monitoring service must provide observers or monitors certified by NMFS/FSB pursuant to paragraph (i) of this section for deployment in a fishery when contacted and contracted by the owner, operator, or vessel manager of a fishing vessel, unless the monitoring service provider refuses to deploy an observer or monitor on a requesting vessel for any of the reasons specified at paragraph (h)(5)(viii) of this section.

(ii) A monitoring service provider must provide to each of its observers or monitors:

(A) All necessary transportation, lodging costs and support for arrangements and logistics of travel for observers and monitors to and from the initial location of deployment, to all subsequent vessel assignments, to any debriefing locations, and for appearances in Court for monitoring-related trials as necessary;

(B) Lodging, per diem, and any other services necessary for observers or monitors assigned to a fishing vessel or to attend an appropriate NMFS/FSB training class;

(C) The required observer or monitor equipment, in accordance with equipment requirements listed on the NMFS/FSB website specified in paragraph (h)(1) of this section, prior to any deployment and/or prior to NMFS observer or monitor certification training; and

(D) Individually assigned communication equipment, in working order, such as a mobile phone, for all necessary communication. A monitoring service provider may alternatively compensate observers or monitors for the use of the observer's or monitor's personal mobile phone, or other device, for communications made in support of, or necessary for, the observer's or monitor's duties.

(iii) *Observer and monitor deployment logistics.* Each approved monitoring service provider must assign an available certified observer or monitor to a vessel upon request. Each approved monitoring service provider must be accessible 24 hours per day, 7 days per week, to enable an owner, operator, or manager of a vessel to secure monitoring coverage when requested. The telephone or other notification system must be monitored a minimum of four times daily to ensure rapid response to industry requests. Monitoring service providers approved under paragraph (h) of this section are required to report observer or monitor deployments to NMFS for the purpose of determining whether the predetermined coverage levels are being achieved in the appropriate fishery.

(iv) *Observer deployment limitations.* (A) A candidate observer's first several

deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/FSB prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified. For further information, see *https://www.nefsc.noaa.gov/fsb/ training/.*

(B) For the purpose of coverage to meet SBRM requirements, unless alternative arrangements are approved by NMFS, a monitoring service provider must not deploy any NMFS-certified observer on the same vessel for more than two consecutive multi-day trips, and not more than twice in any given month for multi-day deployments.

(C) For the purpose of coverage to meet IFM requirements, a monitoring service provider may deploy any NMFS-certified observer or monitor on the same vessel for more than two consecutive multi-day trips and more than twice in any given month for multi-day deployments.

(v) *Communications with observers and monitors.* A monitoring service provider must have an employee responsible for observer or monitor activities on call 24 hours a day to handle emergencies involving observers or monitors or problems concerning observer or monitor logistics, whenever observers or monitors are at sea, stationed portside, in transit, or in port awaiting vessel assignment.

(vi) *Observer and monitor training requirements.* A request for a NMFS/ FSB Observer or Monitor Training class must be submitted to NMFS/FSB 45 calendar days in advance of the requested training. The following information must be submitted to NMFS/FSB at least 15 business days prior to the beginning of the proposed training: A list of observer or monitor candidates; candidate resumes, cover letters and academic transcripts; and a statement signed by the candidate, under penalty of perjury, that discloses the candidate's criminal convictions, if any. A medical report certified by a physician for each candidate is required 7 business days prior to the first day of training. CPR/First Aid certificates and a final list of training candidates with candidate contact information (email, phone, number, mailing address and emergency contact information) are due 7 business days prior to the first day of training. NMFS may reject a candidate for training if the candidate does not meet the minimum qualification requirements as outlined by NMFS/FSB minimum eligibility standards for observers or monitors as described on the NMFS/FSB website.

(vii) *Reports and Requirements*—(A) Deployment reports. The monitoring service provider must report to NMFS/ FSB when, where, to whom, and to what vessel an observer or monitor has been deployed, as soon as practicable, and according to requirements outlined on the NMFS/FSB website. The deployment report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week. The monitoring service provider must ensure that the observer or monitor reports to NMFS the required electronic data, as described in the NMFS/FSB training. Electronic data submission protocols will be outlined in training and may include accessing government websites via personal computers/ devices or submitting data through government issued electronics. The monitoring service provider shall provide the raw (unedited) data collected by the observer or monitor to NMFS at the specified time per program. For further information, see *https://www.nefsc.noaa.gov/fsb/scallop/ .*

(B) *Safety refusals.* The monitoring service provider must report to NMFS any trip or landing that has been refused due to safety issues (*e.g.,* failure to hold a valid USCG Commercial Fishing Vessel Safety Examination Decal or to meet the safety requirements of the observer's or monitor's safety checklist) within 12 hours of the refusal.

(C) *Biological samples.* The monitoring service provider must ensure that biological samples, including whole marine mammals, sea turtles, sea birds, and fin clips or other DNA samples, are stored/handled properly and transported to NMFS within 5 days of landing. If transport to NMFS/FSB Observer Training Facility is not immediately available then whole animals requiring freezing shall be received by the nearest NMFS freezer facility within 24 hours of vessel landing.

(D) *Debriefing.* The monitoring service provider must ensure that the observer or monitor remains available to NMFS, either in-person or via phone, at NMFS' discretion, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any monitored trip. If requested by NMFS, an observer or monitor that is at sea during the 2-week period must contact NMFS upon his or her return. Monitoring service providers must pay for travel and land hours for any requested debriefings.

(E) *Availability report.* The monitoring service provider must report to NMFS any occurrence of inability to respond to an industry request for observer or monitor coverage due to the lack of available observers or monitors as soon as practicable if the provider is unable to respond to an industry request for monitoring coverage. Availability report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week.

(F) *Incident reports.* The monitoring service provider must report possible observer or monitor harassment, discrimination, concerns about vessel safety or marine casualty, or observer or monitor illness or injury; and any information, allegations, or reports regarding observer or monitor conflict of interest or breach of the standards of behavior, to NMFS/FSB within 12 hours of the event or within 12 hours of learning of the event.

(G) *Status report.* The monitoring service provider must provide NMFS/ FSB with an updated list of contact information for all observers or monitors that includes the identification number, name, mailing address, email address, phone numbers, homeports or fisheries/ trip types assigned, and must include whether or not the observer or monitor is ''in service,'' indicating when the observer or monitor has requested leave and/or is not currently working for an industry-funded program. Any Federally contracted NMFS-certified observer not actively deployed on a vessel for 30 days will be placed on Leave of Absence (LOA) status (or as specified by NMFS/FSB according to most recent Information Technology Security Guidelines at *https:// www.nefsc.noaa.gov/fsb/memos/.* Those Federally contracted NMFS-certified observers on LOA for 90 days or more will need to conduct an exit interview with NMFS/FSB and return any NMFS/ FSB issued gear and Common Access Card (CAC), unless alternative arrangements are approved by NMFS/ FSB. NMFS/FSB requires 2-week advance notification when a Federally contracted NMFS-certified observer is leaving the program so that an exit interview may be arranged and gear returned.

(H) *Vessel contract.* The monitoring service provider must submit to NMFS/ FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and those entities requiring monitoring services.

(I) *Observer and monitor contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between

the monitoring service provider and specific observers or monitors.

(J) *Additional information.* The monitoring service provider must submit to NMFS/FSB, if requested, copies of any information developed and/or used by the monitoring service provider and distributed to vessels, observers, or monitors, such as informational pamphlets, payment notification, daily rate of monitoring services, description of observer or monitor duties, etc.

(viii) *Refusal to deploy an observer or monitor.* (A) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider does not have an available observer or monitor within the required time and must report all refusals to NMFS/FSB.

(B) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described at § 600.746.

(C) The monitoring service provider may refuse to deploy an observer or monitor on a fishing vessel that is otherwise eligible to carry an observer or monitor for any other reason, including failure to pay for previous monitoring deployments, provided the monitoring service provider has received prior written confirmation from NMFS authorizing such refusal.

(6) *Limitations on conflict of interest.* A monitoring service provider:

(i) Must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, a fishing vessel, fish dealer, and/or fishery advocacy group (other than providing monitoring services);

(ii) Must assign observers or monitors without regard to any preference by representatives of vessels other than when an observer or monitor will be deployed for the trip that was selected for coverage; and

(iii) Must not solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing related activities that are regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of monitoring service providers.

(7) *Removal of monitoring service provider from the list of approved service providers.* A monitoring service provider that fails to meet the requirements, conditions, and

responsibilities specified in paragraphs (h)(5) and (6) of this section shall be notified by NMFS, in writing, that it is subject to removal from the list of approved monitoring service providers. Such notification shall specify the reasons for the pending removal. A monitoring service provider that has received notification that it is subject to removal from the list of approved monitoring service providers may submit written information to rebut the reasons for removal from the list. Such rebuttal must be submitted within 30 days of notification received by the monitoring service provider that the monitoring service provider is subject to removal and must be accompanied by written evidence rebutting the basis for removal. NMFS shall review information rebutting the pending removal and shall notify the monitoring service provider within 15 days of receipt of the rebuttal whether or not the removal is warranted. If no response to a pending removal is received by NMFS, the monitoring service provider shall be automatically removed from the list of approved monitoring service providers. The decision to remove the monitoring service provider from the list, either after reviewing a rebuttal, or if no rebuttal is submitted, shall be the final decision of NMFS and the Department of Commerce. Removal from the list of approved monitoring service providers does not necessarily prevent such monitoring service provider from obtaining an approval in the future if a new application is submitted that demonstrates that the reasons for removal are remedied. Certified observers and monitors under contract with observer monitoring service provider that has been removed from the list of approved service providers must complete their assigned duties for any fishing trips on which the observers or monitors are deployed at the time the monitoring service provider is removed from the list of approved monitoring service providers. A monitoring service provider removed from the list of approved monitoring service providers is responsible for providing NMFS with the information required in paragraph (h)(5)(vii) of this section following completion of the trip. NMFS may consider, but is not limited to, the following in determining if a monitoring service provider may remain on the list of approved monitoring service providers:

(i) Failure to meet the requirements, conditions, and responsibilities of monitoring service providers specified in paragraphs (h)(5) and (h)(6) of this section;

(ii) Evidence of conflict of interest as defined under paragraph (h)(6) of this section;

(iii) Evidence of criminal convictions related to:

(A) Embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; or

(B) The commission of any other crimes of dishonesty, as defined by state law or Federal law, that would seriously and directly affect the fitness of an applicant in providing monitoring services under this section;

(iv) Unsatisfactory performance ratings on any Federal contracts held by the applicant; and

(v) Evidence of any history of decertification as either an observer, monitor, or monitoring service provider.

(i) *Observer or monitor certification.* (1) To be certified, employees or sub-contractors operating as observers or monitors for monitoring service providers approved under paragraph (h) of this section. In addition, observers must meet NMFS National Minimum Eligibility Standards for observers specified at the National Observer Program website: *https:// www.nmfs.noaa.gov/op/pds/categories/ scienceandtechnology.html.* For further information, see *https:// www.st.nmfs.noaa.gov/observer-home/.*

(2) *Observer or monitor training.* In order to be deployed on any fishing vessel, a candidate observer or monitor must have passed an appropriate NMFS/FSB Observer Training course and must adhere to all NMFS/FSB program standards and policies (refer to website for program standards, *https:// www.nefsc.noaa.gov/fsb/training/*). If a candidate fails training, the candidate and monitoring service provider shall be notified immediately by NMFS/FSB. Observer training may include an observer training trip, as part of the observer's training, aboard a fishing vessel with a trainer. Refer to the NMFS/FSB website for the required number of program specific observer and monitor training certification trips for full certification following training, *https://www.nefsc.noaa.gov/fsb/ training/.*

(3) *Observer requirements.* All observers must:

(i) Have a valid NMFS/FSB fisheries observer certification pursuant to paragraph (i)(1) of this section;

(ii) Be physically and mentally capable of carrying out the responsibilities of an observer on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this

section and shall be provided to each approved monitoring service provider;

(iii) Have successfully completed all NMFS-required training and briefings for observers before deployment, pursuant to paragraph (i)(2) of this section;

(iv) Hold a current Red Cross (or equivalence) CPR/First Aid certification;

(v) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vi) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(4) *Monitor requirements.* All monitors must:

(i) Hold a high school diploma or legal equivalent;

(ii) Have a valid NMFS/FSB certification pursuant to paragraph (i)(1) of this section;

(iii) Be physically and mentally capable of carrying out the responsibilities of a monitor on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iv) Have successfully completed all NMFS-required training and briefings for monitors before deployment, pursuant to paragraph (i)(2) of this section;

(v) Hold a current Red Cross (or equivalence) CPR/First Aid certification if the monitor is to be employed as an at-sea monitor;

(vi) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vii) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(5) Probation and decertification. NMFS may review observer and monitor certifications and issue observer and monitor certification probation and/or decertification as described in NMFS policy found on the NMFS/FSB website specified in paragraph (h)(1) of this section.

(6) *Issuance of decertification.* Upon determination that decertification is warranted under paragraph (i)(5) of this section, NMFS shall issue a written decision to decertify the observer or monitor to the observer or monitor and approved monitoring service provider via certified mail at the observer's or monitor's most current address provided to NMFS. The decision shall identify whether a certification is

revoked and shall identify the specific reasons for the action taken. Decertification is effective immediately as of the date of issuance, unless the decertification official notes a compelling reason for maintaining certification for a specified period and under specified conditions. Decertification is the final decision of NMFS and the Department of Commerce and may not be appealed.

(j) In the event that a vessel is requested by the Regional Administrator to carry a NMFS-certified fisheries observer pursuant to paragraph (a) of this section and is also selected to carry an at-sea monitor as part of an approved sector at-sea monitoring program specified in § 648.87(b)(1)(v) for the same trip, only the NMFS-certified fisheries observer is required to go on that particular trip.

(k) *Atlantic sea scallop observer program*—(1) *General.* Unless otherwise specified, owners, operators, and/or managers of vessels issued a Federal scallop permit under § 648.4(a)(2), and specified in paragraph (a) of this section, must comply with this section and are jointly and severally responsible for their vessel's compliance with this section. To facilitate the deployment of at-sea observers, all sea scallop vessels issued limited access and LAGC IFQ permits are required to comply with the additional notification requirements specified in paragraph (k)(2) of this section. When NMFS notifies the vessel owner, operator, and/or manager of any requirement to carry an observer on a specified trip in either an Access Area or Open Area as specified in paragraph (k)(3) of this section, the vessel may not fish for, take, retain, possess, or land any scallops without carrying an observer. Vessels may only embark on a scallop trip in open areas or Access Areas without an observer if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver of the observer requirement for that trip pursuant to paragraphs (k)(3) and (k)(4)(ii) of this section.

(2) *Vessel notification procedures*—(i) *Limited access vessels.* Limited access vessel owners, operators, or managers shall notify NMFS/FSB by telephone not more than 10 days prior to the beginning of any scallop trip of the time, port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl, or general category vessel.

(ii) *LAGC IFQ vessels.* LAGC IFQ vessel owners, operators, or managers must notify the NMFS/FSB by telephone by 0001 hr of the Thursday preceding the week (Sunday through

Saturday) that they intend to start any open area or access area scallop trip and must include the port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl vessel. If selected, up to two trips that start during the specified week (Sunday through Saturday) can be selected to be covered by an observer. NMFS/FSB must be notified by the owner, operator, or vessel manager of any trip plan changes at least 48 hr prior to vessel departure.

(3) *Selection of scallop trips for observer coverage.* Based on predetermined coverage levels for various permit categories and areas of the scallop fishery that are provided by NMFS in writing to all observer service providers approved pursuant to paragraph (h) of this section, NMFS shall notify the vessel owner, operator, or vessel manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified scallop trip, within 24 hr of the vessel owner's, operator's, or vessel manager's notification of the prospective scallop trip, as specified in paragraph (k)(2) of this section. Any request to carry an observer may be waived by NMFS. All waivers for observer coverage shall be issued to the vessel by VMS so as to have on-board verification of the waiver. A vessel may not fish in an area with an observer waiver confirmation number that does not match the scallop trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(4) *Procurement of observer services by scallop vessels.* (i) An owner of a scallop vessel required to carry an observer under paragraph (k)(3) of this section must arrange for carrying an observer certified through the observer training class operated by the NMFS/FSB from an observer service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected to carry an observer must contact the observer service provider and must provide at least 48-hr notice in advance of the fishing trip for the provider to arrange for observer deployment for the specified trip. The observer service provider will notify the vessel owner, operator, or manager within 18 hr whether they have an available observer. A list of approved observer service providers shall be posted on the NMFS/FSB website at *https:// www.nefsc.noaa.gov/femad/fsb/*. The observer service provider may take up to 48 hr to arrange for observer

deployment for the specified scallop trip.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure a certified observer within 48 hr of the advance notification to the provider due to the unavailability of an observer may request a waiver from NMFS/FSB from the requirement for observer coverage for that trip, but only if the owner, operator, or vessel manager has contacted all of the available observer service providers to secure observer coverage and no observer is available. NMFS/FSB shall issue such a waiver within 24 hr, if the conditions of this paragraph (g)(4)(ii) are met. A vessel may not begin the trip without being issued a waiver.

(5) Owners of scallop vessels shall be responsible for paying the cost of the observer for all scallop trips on which an observer is carried onboard the vessel, regardless of whether the vessel lands or sells sea scallops on that trip, and regardless of the availability of set-aside for an increased possession limit or reduced DAS accrual rate. The owners of vessels that carry an observer may be compensated with a reduced DAS accrual rate for open area scallop trips or additional scallop catch per day in Sea Scallop Access Areas or additional catch per open area or access area trip for LAGC IFQ trips in order to help defray the cost of the observer, under the program specified in §§ 648.53 and 648.60.

(i) Observer service providers shall establish the daily rate for observer coverage on a scallop vessel on an Access Area trip or open area DAS or IFQ scallop trip consistent with paragraphs (k)(5)(i)(A) and (B), respectively, of this section.

(A) *Access Area trips.* (*1*) For purposes of determining the daily rate for an observed scallop trip on a limited access vessel in a Sea Scallop Access Area when that specific Access Area's observer set-aside specified in § 648.60(d)(1) has not been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, or any portion of a 24-hr period, regardless of the calendar day. For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time at sea equals 27 hr, which would equate to 2 full ''days.''

(*2*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for an observed scallop trip on a limited access vessel taken after NMFS has announced the industry-funded observer set-aside in that specific Access Area has been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(*3*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for observed scallop trips on a LAGC vessel, regardless of the status of the industry-funded observer set-aside, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(B) *Open area scallop trips.* For purposes of determining the daily rate for an observed scallop trip for DAS or LAGC IFQ open area trips, regardless of the status of the industry-funded observer set-aside, a service provider shall charge dock to dock where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on the July 1st at 10 p.m. and lands on July 3rd at 1 a.m., the time at sea equals 27 hr, so the provider would charge 1 day and 3 hr.

(ii) NMFS shall determine any reduced DAS accrual rate and the amount of additional pounds of scallops per day fished in a Sea Scallop Access Area or on an open area LAGC IFQ trips for the applicable fishing year based on the economic conditions of the scallop fishery, as determined by best available information. Vessel owners and observer service providers shall be notified through the Small Entity Compliance Guide of any DAS accrual rate changes and any changes in additional pounds of scallops determined by the Regional Administrator to be necessary. NMFS shall notify vessel owners and observer providers of any adjustments.

(iii) Owners of scallop vessels shall pay observer service providers for

observer services within 45 days of the end of a fishing trip on which an observer deployed.

(6) When the available DAS or TAC set-aside for observer coverage is exhausted, vessels shall still be required to carry an observer as specified in this section, and shall be responsible for paying for the cost of the observer, but shall not be authorized to harvest additional pounds or fish at a reduced DAS accrual rate.

(l) *NE multispecies observer coverage*—(1) *Pre-trip notification.* Unless otherwise specified in this paragraph (l), or notified by the Regional Administrator, the owner, operator, or manager of a vessel (*i.e.,* vessel manager or sector manager) issued a limited access NE multispecies permit that is fishing under a NE multispecies DAS or on a sector trip, as defined in this part, must provide advanced notice to NMFS of the vessel name, permit number, and sector to which the vessel belongs, if applicable; contact name and telephone number for coordination of observer deployment; date, time, and port of departure; and the vessel's trip plan, including area to be fished, whether a monkfish DAS will be used, and gear type to be used at least 48 hr prior to departing port on any trip declared into the NE multispecies fishery pursuant to § 648.10 or § 648.85, as instructed by the Regional Administrator, for the purposes of selecting vessels for observer deployment. For trips lasting 48 hr or less in duration from the time the vessel leaves port to begin a fishing trip until the time the vessel returns to port upon the completion of the fishing trip, the vessel owner, operator, or manager may make a weekly notification rather than trip-by-trip calls. For weekly notifications, a vessel must notify NMFS by 0001 hr of the Friday preceding the week (Sunday through Saturday) that it intends to complete at least one NE multispecies DAS or sector trip during the following week and provide the date, time, port of departure, area to be fished, whether a monkfish DAS will be used, and gear type to be used for each trip during that week. Trip notification calls must be made no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS of any trip plan changes at least 24 hr prior to vessel departure from port. A vessel may not begin the trip without being issued an observer notification or a waiver by NMFS.

(2) *Vessel selection for observer coverage.* NMFS shall notify the vessel owner, operator, or manager whether the vessel must carry an observer, or if a waiver has been granted, for the

specified trip within 24 hr of the vessel owner's, operator's or manager's notification of the prospective trip, as specified in paragraph (l)(1) of this section. All trip notifications shall be issued a unique confirmation number. A vessel may not fish on a NE multispecies DAS or sector trip with an observer waiver confirmation number that does not match the trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are valid for 48 hr from the intended sail date. If a trip is interrupted and returns to port due to bad weather or other circumstance beyond the operator's control, and goes back out within 48 hr, the same confirmation number and observer status remains. If the layover time is greater than 48 hr, a new trip notification must be made by the operator, owner, or manager of the vessel.

(3) *NE multispecies monitoring program goals and objectives.* Monitoring programs established for the NE multispecies are to be designed and evaluated consistent with the following goals and objectives:

(i) Improve documentation of catch:

(A) Determine total catch and effort, for each sector and common pool, of target or regulated species; and

(B) Achieve coverage level sufficient to minimize effects of potential monitoring bias to the extent possible while maintaining as much flexibility as possible to enhance fleet viability.

(ii) Reduce the cost of monitoring:

(A) Streamline data management and eliminate redundancy;

(B) Explore options for cost-sharing and deferment of cost to industry; and

(C) Recognize opportunity costs of insufficient monitoring.

(iii) Incentivize reducing discards:

(A) Determine discard rate by smallest possible strata while maintaining cost-effectiveness; and

(B) Collect information by gear type to accurately calculate discard rates.

(iv) Provide additional data streams for stock assessments:

(A) Reduce management and/or biological uncertainty; and

(B) Perform biological sampling if it may be used to enhance accuracy of mortality or recruitment calculations.

(v) Enhance safety of monitoring program.

(vi) Perform periodic review of monitoring program for effectiveness.

(m) *Atlantic herring monitoring coverage*—(1) *Monitoring requirements.* (i) In addition to the requirement for any vessel holding an Atlantic herring permit to carry a NMFS-certified observer described in paragraph (a) of this section, vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to industry-funded monitoring (IFM) requirements on declared Atlantic herring trips, unless the vessel is carrying a NMFS-certified observer to fulfill Standard Bycatch Reporting Methodology requirements. An owner of a midwater trawl vessel, required to carry a NMFS-certified observer when fishing in Northeast Multispecies Closed Areas at § 648.202(b), may purchase an IFM high volume fisheries (HVF) observer to access Closed Areas on a trip-by-trip basis. General requirements for IFM programs in New England Council FMPs are specified in paragraph (g) of this section. Possible IFM monitoring for the Atlantic herring fishery includes NMFS-certified observers, at-sea monitors, and electronic monitoring and portside samplers, as defined in § 648.2.

(A) IFM HVF observers shall collect the following information:

(1) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);

(2) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(4) Species, weight, and disposition of all retained catch on unobserved hauls;

(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(6) Whole specimens, photos, length information, and biological samples (*e.g.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);

(7) Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(8) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(B) IFM HVF at-sea monitors shall collect the following information:

(1) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);

(2) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(4) Species, weight, and disposition of all retained catch on unobserved hauls;

(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(6) Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

(7) Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(8) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(9) The New England Council may recommend that at-sea monitors collect additional biological information upon request. Revisions to the duties of an at-sea monitor, such that additional biological information would be collected, may be done via a framework adjustment. At-sea monitor duties may also be revised to collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the duties for at-sea monitors. NMFS shall implement revisions to at-sea monitor duties in accordance with the APA.

(C) IFM Portside samplers shall collect the following information:

(1) Species, weight, and disposition of all retained catch (fish, sharks, crustaceans, invertebrates, and debris) on sampled trips;

(2) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling; and

(3) Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes).

(ii) Vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to IFM at-sea monitoring coverage. If the New England Council determines that electronic monitoring, used in conjunction with portside sampling, is an adequate substitute for at-sea monitoring on vessels fishing with midwater trawl gear, and it is approved by the Regional Administrator as specified in (m)(1)(iii), then owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose either IFM at-sea monitoring coverage or IFM electronic monitoring and IFM portside sampling coverage, pursuant with requirements in paragraphs (h) and (i) of this section. Once owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose an IFM monitoring type, vessel owners must select one IFM monitoring type per fishing year and notify NMFS of their selected IFM monitoring type via selection form six months in advance of

the beginning of the fishing year. NMFS will provide vessels owners with selection forms no later than June 1 of each year.

(A) In a future framework adjustment, the New England Council may consider if electronic monitoring and portside sampling coverage is an adequate substitute for at-sea monitoring coverage for Atlantic herring vessels that fish with purse seine and/or bottom trawl gear.

(B) IFM coverage targets for the Atlantic herring fishery are calculated by NMFS, in consultation with New England Council staff.

(C) If IFM coverage targets do not match for the Atlantic herring and Atlantic mackerel fisheries, then the higher IFM coverage target would apply on trips declared into both fisheries.

(D) Vessels intending to land less than 50 mt of Atlantic herring are exempt from IFM requirements, provided that the vessel requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(B) and (m)(3) of this section. Vessels issued a waiver must land less than 50 mt of Atlantic herring on that trip.

(E) A wing vessel (*i.e.*, midwater trawl vessel pair trawling with another midwater trawl vessel) is exempt from IFM requirements on a trip, provided the wing vessel does not possess or land any fish on that trip and requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(C) and (m)(3) of this section.

(F) Two years after implementation of IFM in the Atlantic herring fishery, the New England Council will examine the results of any increased coverage in the Atlantic herring fishery and consider if adjustments to the IFM coverage targets are warranted.

(iii) Electronic monitoring and portside sampling coverage may be used in place of at-sea monitoring coverage in the Atlantic herring fishery, if the electronic monitoring technology is deemed sufficient by the New England Council. The Regional Administrator, in consultation with the New England Council, may approve the use of electronic monitoring and portside sampling for the Atlantic herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the **Federal Register**. A vessel electing to use electronic monitoring and portside sampling in lieu of at-sea monitoring must develop a vessel monitoring plan to implement an electronic monitoring and portside sampling program that NMFS determines is sufficient for monitoring catch, discards and slippage events. The electronic monitoring and

portside sampling program shall be reviewed and approved by NMFS as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

(iv) Owners, operators, or managers of vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit are responsible for their vessel's compliance with IFM requirements. When NMFS notifies a vessel owner, operator, or manager of the requirement to have monitoring coverage on a specific declared Atlantic herring trip, that vessel may not fish for, take, retain, possess, or land any Atlantic herring without the required monitoring coverage. Vessels may only embark on a declared Atlantic herring trip without the required monitoring coverage if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver for the required monitoring coverage for that trip, pursuant to paragraphs (m(2)(iii)(B) and (C) and paragraph (m)(3) of this section.

(v) To provide the required IFM coverage aboard declared Atlantic herring trips, NMFS-certified observers and monitors must hold a high volume fisheries certification from NMFS/FSB. See details of high volume certification at *https://www.nefsc.noaa.gov/fsb/ training/*.

(2) *Pre-trip notification.* (i) At least 48 hr prior to the beginning of any trip on which a vessel may harvest, possess, or land Atlantic herring, the owner, operator, or manager of a vessel issued a Limited Access Herring Permit, or a vessel issued an Areas 2/3 Open Access Herring Permit on a declared herring trip, or a vessel issued an All Areas Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), or a vessel acting as a herring carrier must notify NMFS/FSB of the trip.

(ii) The notification to NMFS/FSB must include the following information: Vessel name or names in the cases of paired midwater trawlers, permit category, and permit number; contact name for coordination of monitoring coverage; telephone number for contact; the date, time, and port of departure; gear type; target species; trip length and port of landing; and intended area of fishing.

(iii) For vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit, the trip notification must also include the following requests, if appropriate:

(A) For IFM NMFS-certified observer coverage aboard vessels fishing with midwater trawl gear to access the

Northeast Multispecies Closed Areas, consistent with requirements at § 648.202(b), at any point during the trip;

(B) For a waiver of IFM requirements on a trip that shall land less than 50 mt of Atlantic herring; and

(C) For a waiver of IFM requirements on trip by a wing vessel as described in paragraph (m)(ii)(E) of this section.

(iv) Trip notification must be provided no more than 9 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS/FSB of any trip plan changes at least 12 hr prior to vessel departure from port.

(3) *Selection of trips for monitoring coverage.* NMFS shall notify the owner, operator, and/or manager of a vessel with an Atlantic herring permit whether a declared Atlantic herring trip requires coverage by a NMFS-funded observer or whether a trip requires IFM coverage. NMFS shall also notify the owner, operator, and/or manager of vessel if a waiver has been granted, either for the NMFS-funded observer or for IFM coverage, as specified in paragraph (m)(2) of this section. All waivers for monitoring coverage shall be issued to the vessel by VMS so that there is an on-board verification of the waiver. A waiver is invalid if the fishing behavior on that trip is inconsistent with the terms of the waiver.

(4) *Procurement of monitoring services by Atlantic herring vessels.* (i) An owner of an Atlantic herring vessel required to have monitoring under paragraph (m)(3) of this section must arrange for monitoring by an individual certified through training classes operated by the NMFS/FSB and from a monitoring service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected for monitoring must contact a monitoring service provider prior to the beginning of the trip and the monitoring service provider will notify the vessel owner, operator, or manager whether monitoring is available. A list of approved monitoring service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/ femad/fsb/*.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure monitoring due to the unavailability of monitoring may request a waiver from NMFS/FSB from the requirement for monitoring on that trip, but only if the owner, operator, or vessel manager has contacted all of the available monitoring service providers to secure monitoring and no monitoring is available. NMFS/ FSB shall issue a waiver, if the

conditions of this paragraph (m)(4)(ii) are met. A vessel without monitoring coverage may not begin a declared Atlantic herring trip without having been issued a waiver.

(iii) Vessel owners shall pay service providers for monitoring services within 45 days of the end of a fishing trip that was monitored.

(5) When vessels issued limited access herring permits are working cooperatively in the Atlantic herring fishery, including pair trawling, purse seining, and transferring herring at-sea, each vessel must provide to observers or monitors, when requested, the estimated weight of each species brought on board and the estimated weight of each species released on each tow.

(6) *Sampling requirements for NMFS-certified observer and monitors.* In addition to the requirements at § 648.11(d)(1) through (7), an owner or operator of a vessel issued a limited access herring permit on which a NMFS-certified observer or monitor is embarked must provide observers or monitors:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers or monitors to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers or monitors; and collecting and carrying baskets of fish when requested by the observers or monitors.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(iv) Visual access to the net, the codend of the net, and the purse seine bunt and any of its contents after pumping has ended and before the pump is removed from the net. On trawl vessels, the codend including any remaining contents must be brought on board, unless bringing the codend on board is not possible. If bringing the codend on board is not possible, the vessel operator must ensure that the observer or monitor can see the codend and its contents as clearly as possible before releasing its contents.

(7) *Measures to address slippage.* (i) No vessel issued a limited access herring permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish which can be pumped from the net prior to release.

(ii) Vessels may make test tows without pumping catch on board if the net is re-set without releasing its contents provided that all catch from test tows is available to the observer to sample when the next tow is brought on board for sampling.

(iii) If a vessel issued any limited access herring permit slips catch, the vessel operator must report the slippage event on the Atlantic herring daily VMS catch report and indicate the reason for slipping catch. Additionally, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iv) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any of the reasons described in paragraph (m)(4)(i) of this section when an observer or monitor is aboard, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(v) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any reason on a trip selected by NMFS for portside sampling, pursuant to paragraph (m)(3) of this section, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(vi) If catch is slipped by a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit for any reason not described in paragraph (m)(4)(i) of this section when an observer or monitor is aboard, the vessel

operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

(n) *Atlantic mackerel, squid, and butterfish observer coverage*—(1) *Pre-trip notification.* (i) A vessel issued a limited access Atlantic mackerel permit, as specified at § 648.4(a)(5)(iii), must, for the purposes of observer deployment, have a representative provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, telephone number or email address for contact; and the date, time, port of departure, gear type, and approximate trip duration, at least 48 hr, but no more than 10 days, prior to beginning any fishing trip, unless it complies with the possession restrictions in paragraph (n)(1)(iii) of this section.

(ii) A vessel that has a representative provide notification to NMFS as described in paragraph (n)(1)(i) of this section may only embark on a mackerel trip without an observer if a vessel representative has been notified by NMFS that the vessel has received a waiver of the observer requirement for that trip. NMFS shall notify a vessel representative whether the vessel must carry an observer, or if a waiver has been granted, for the specific mackerel trip, within 24 hr of the vessel representative's notification of the prospective mackerel trip, as specified in paragraph (n)(1)(i) of this section. Any request to carry an observer may be waived by NMFS. A vessel that fishes with an observer waiver confirmation number that does not match the mackerel trip plan that was called in to NMFS is prohibited from fishing for, possessing, harvesting, or landing mackerel except as specified in paragraph (n)(1)(iii) of this section. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(iii) *Trip limits:* A vessel issued a limited access mackerel permit, as specified in § 648.4(a)(5)(iii), that does not have a representative provide the trip notification required in paragraph (n)(1)(i) of this section is prohibited from fishing for, possessing, harvesting, or landing more than 20,000 lb (9.07 mt) of mackerel per trip at any time, and may only land mackerel once on any calendar day, which is defined as the 24-hr period beginning at 0001 hours and ending at 2400 hours.

(iv) If a vessel issued a limited access Atlantic mackerel permit, as specified in § 648.4(a)(5)(iii), intends to possess, harvest, or land more than 20,000 lb (9.07 mt) of mackerel per trip or per

calendar day, and has a representative notify NMFS of an upcoming trip, is selected by NMFS to carry an observer, and then cancels that trip, the representative is required to provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, and telephone number or email address for contact, and the intended date, time, and port of departure for the cancelled trip prior to the planned departure time. In addition, if a trip selected for observer coverage is cancelled, then that vessel is required to carry an observer, provided an observer is available, on its next trip.

(2) *Sampling requirements for limited access Atlantic mackerel and longfin squid/butterfish moratorium permit holders.* In addition to the requirements in paragraphs (d)(1) through (7) of this section, an owner or operator of a vessel issued a limited access Atlantic mackerel or longfin squid/butterfish moratorium permit on which a NMFS-certified observer is embarked must provide observers:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers; and collecting and carrying baskets of fish when requested by the observers.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(3) *Measures to address slippage.* (i) No vessel issued a limited access Atlantic mackerel permit or a longfin squid/butterfish moratorium permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for sampling and inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish that can be pumped from the net prior to release.

(ii) If a vessel issued any limited access Atlantic mackerel permit slips catch, the vessel operator must report the slippage event on the Atlantic mackerel and longfin squid daily VMS catch report and indicate the reason for slipping catch. Additionally, vessels issued a limited Atlantic mackerel permit or a longfin squid/butterfish moratorium permit, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iii) If a vessel issued a limited access Atlantic mackerel permit slips catch for any of the reasons described in paragraph (n)(3)(i) of this section, the vessel operator must move at least 15 nm (27.8 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.8 km) from the slippage event location for the remainder of the fishing trip.

(iv) If catch is slipped by a vessel issued a limited access Atlantic mackerel permit for any reason not described in paragraph (n)(3)(i) of this section, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

■ 5. Amend § 648.14 by revising paragraphs (e), (r)(1)(vi)(A), (r)(2)(v), and (r)(2)(ix) through (xi) and adding paragraphs (r)(2)(xiii) and (xiv) to read as follows:

### § 648.14 Prohibitions.

* * * * *

(e) *Observer program.* It is unlawful for any person to do any of the following:

(1) Assault, resist, oppose, impede, harass, intimidate, or interfere with or bar by command, impediment, threat, or coercion any NMFS-certified observer or monitor conducting his or her duties; any authorized officer conducting any search, inspection, investigation, or seizure in connection with enforcement of this part; any official designee of the Regional Administrator conducting his or her duties, including those duties authorized in § 648.7(g).

(2) Refuse monitoring coverage by a NMFS-certified observer or monitor if selected for monitoring coverage by the Regional Administrator or the Regional Administrator's designee.

(3) Fail to provide information, notification, accommodations, access, or reasonable assistance to either a NMFS-certified observer or monitor conducting his or her duties as specified in § 648.11.

(4) Submit false or inaccurate data, statements, or reports.

* * * * *

(r) * * *

(1) * * *

(vi) * * *

(A) For the purposes of observer deployment, fail to notify NMFS at least 48 hr prior to departing on a declared herring trip with a vessel issued an All Areas Limited Access Herring Permit and/or an Area 2 and 3 Limited Access Herring Permit and fishing with midwater trawl or purse seine gear, or on a trip with a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit that is fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), pursuant to the requirements in § 648.80(d) and (e).

* * * * *

(2) * * *

(v) Fish with midwater trawl gear in any Northeast Multispecies Closed Area, as defined in § 648.81(a)(3),(4), (5), and (c)(3) and (4), without a NMFS-certified observer on board, if the vessel has been issued an Atlantic herring permit.

* * * *

(ix) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to move 15 nm (27.78 km), as required by §§ 648.11(m)(8)(iv) and (v) and § 648.202(b)(4)(iv).

(x) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to immediately return to port, as required by § 648.11(m)(8)(vi) and § 648.202(b)(4)(iv).

(xi) Fail to complete, sign, and submit a Released Catch Affidavit as required by § 648.11(m)(8)(iii) and § 648.202(b)(4)(ii).

* * * *

(xiii) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to comply with industry-funded monitoring requirements at § 648.11(m).

(xiv) For a vessel with All Areas or Areas 2/3 Limited Access Herring Permit, fail to comply with its NMFS-approved vessel monitoring plan requirements, as described at § 648.11(m).

* * * * *

■ 6. In § 648.80 revise paragraph (d)(5) and (e)(5) to read as follows:

_0000016990

**§ 648.80  NE Multispecies regulated mesh areas and restrictions on gear and methods of fishing.**

\* \* \* \* \*

(d) \* \* \*

(5) To fish for herring under this exemption, a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, or a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), must provide notice of the following information to NMFS at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment: Vessel name; contact name for coordination of observer deployment; telephone number for contact; the date, time, and port of departure; and

\* \* \* \* \*

(e) \* \* \*

(5) To fish for herring under this exemption, vessels that have an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit must provide notice to NMFS of the vessel name; contact name for coordination of observer deployment; telephone number for contact; and the date, time, and port of departure, at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment; and

\* \* \* \* \*

■ 7. In § 648.86 revise paragraph (a)(3)(ii)(A)(*1*) to read as follows:

**§ 648.86  NE Multispecies possession restrictions.**

\* \* \* \* \*

(a) \* \* \*

(3) \* \* \*

(ii) \* \* \*

(A) \* \* \*

(*1*) 648.86(a)(3)(ii) *Haddock incidental catch cap.* (A)(*1*) When the Regional Administrator has determined that the incidental catch allowance for a given haddock stock, as specified in § 648.90(a)(4)(iii)(D), has been caught, no vessel issued an Atlantic herring permit and fishing with midwater trawl gear in the applicable stock area, *i.e.,* the Herring GOM Haddock Accountability Measure (AM) Area or Herring GB Haddock AM Area, as defined in paragraphs (a)(3)(ii)(A)(*2*) and (*3*) of this section, may fish for, possess, or land herring in excess of 2,000 lb (907.2 kg) per trip in or from that area, unless all herring possessed and landed by the vessel were caught outside the applicable AM Area and the vessel's gear is stowed and not available for immediate use as defined in § 648.2 while transiting the AM Area. Upon this determination, the haddock possession limit is reduced to 0 lb (0 kg) for a vessel issued a Federal Atlantic herring permit and fishing with midwater trawl gear or for a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, regardless of area fished or gear used, in the applicable AM area, unless the vessel also possesses a NE multispecies permit and is operating on a declared (consistent with § 648.10(g)) NE multispecies trip. In making this determination, the Regional Administrator shall use haddock catches observed by NMFS-certified observers or monitors by herring vessel trips using midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), expanded to an estimate of total haddock catch for all such trips in a given haddock stock area.

\* \* \* \* \*

**§§ 648.10, 648.14, 648.51, 648.59, 648.80, and 648.86    [Amended]**

■ 8. In the table below, for each section indicated in the left column, remove the text indicated in the middle column from wherever it appears in the section, and add the text indicated in the right column:

| Section | Remove | Add |
|---|---|---|
| 648.10(f)(4) ............................................. | NMFS-approved ..................................................... | NMFS-certified. |
| 648.14(i)(3)(ix) ...................................... | NMFS-approved ..................................................... | NMFS-certified. |
| 648.14(i)(3)(ix)(C) ................................ | 648.11(g) ............................................................... | 648.11(k). |
| 648.14(k)(2)(iii) ..................................... | 648.11(k) ............................................................... | 648.11(l). |
| 648.14(k)(2)(iv) ..................................... | 648.11(k) ............................................................... | 648.11(l). |
| 648.51(c)(4) ........................................... | 648.11(g) ............................................................... | 648.11(k). |
| 648.51(e)(3)(iii) ..................................... | 648.11(g) ............................................................... | 648.11(k). |
| 648.59(b)(2) ........................................... | 648.11(g) ............................................................... | 648.11(k). |
| 648.80(d)(3) ........................................... | NMFS-approved sea sampler/observer ................ | NMFS-certified observer. |
| 648.80(e)(2)(ii) ...................................... | NMFS-approved sea sampler/observer ................ | NMFS-certified observer. |
| 648.86(a)(3)(ii) ...................................... | NMFS-approved ..................................................... | NMFS-certified. |
| 648.202(b)(4)(iv) ................................... | 648.11(m)(4)(iv) and (v) ...................................... | 648.11(m)(4)(iv) and (vi). |

[FR Doc. 2018–24087 Filed 11–6–18; 8:45 am]

**BILLING CODE 3510–22–P**



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

**SEP 1 1 2018**

MEMORANDUM FOR:    Chris Oliver
                   Assistant Administrator for Fisheries

FROM:              Michael Pentony
                   Regional Administrator

SUBJECT:           Clearance of a Proposed Rule; New England Industry-Funded
                   Monitoring Omnibus Amendment (RIN 0648-BG91)--DECISION
                   MEMORANDUM

I request that you make determinations about the proposed rule and transmit it to the NOAA
General Counsel and the Department of Commerce General Counsel for clearance to publish in
the *Federal Register*.

**BACKGROUND**

***Amendment Development***

The New England Fishery Management Council is considering ways to increase monitoring in
some fisheries above the baseline levels required by the Standardized Bycatch Reporting
Methodology (SBRM) to assess the amount and type of catch and to reduce uncertainty around
catch estimates. We have limited funding for monitoring, so the Council would like the option to
allow the fishing industry to pay its costs for additional monitoring, when Federal funding is
unavailable to cover industry's costs. In these cases, the industry would pay for its cost
responsibilities associated with additional monitoring to meet fishery management plan (FMP)-
specific coverage targets.

We disapproved past Council proposals for industry-funded monitoring because the proposals
either required NOAA's National Marine Fisheries Service (NMFS) to spend money that was not
yet appropriated or they tried to split monitoring costs between the industry and NMFS in ways
that were inconsistent with Federal law. This amendment remedies issues related to those
disapprovals by establishing a process through which we can: 1) Approve new monitoring
programs without committing funding that is not yet appropriated; and 2) allow the industry to pay
its monitoring costs to meet coverage targets in a manner consistent with Federal law.
Additionally, this amendment would establish a process to prioritize industry-funded monitoring
programs according to Council monitoring priorities.

Initially, this amendment was a joint effort between the New England and Mid-Atlantic Fishery
Management Councils to allow for industry-funded monitoring in all their managed fisheries. The
amendment included alternatives that would have modified all the FMPs managed by both
Councils to allow for the standardized development of future industry-funded monitoring

programs. The amendment also included specific alternatives for industry-funded monitoring in the Atlantic Herring FMP and the Atlantic Mackerel, Squid, and Butterfish FMP. In April 2017, the Mid-Atlantic Council decided to postpone further action on the amendment, while the New England Council selected preferred alternatives and recommended the amendment be submitted to us for approval and implementation. Therefore, the joint omnibus amendment was refined to apply only to New England Council fisheries. At its October 2018 meeting, the Mid-Atlantic Council is scheduled to re-consider whether it wants to continue developing industry-funded monitoring measures for its FMPs. If the Mid-Atlantic Council decides to move ahead with this action, we expect it would complete the Mid-Atlantic version of the amendment sometime in 2019.

### Proposed Omnibus Measures

The proposed omnibus measures would amend all New England Council FMPs to standardize the development and administration of future industry-funded monitoring programs.

The proposed omnibus measures include:
- A process for FMP-specific industry-funded monitoring to be implemented via amendment and revised via framework adjustment;
- Standard cost responsibilities for us and the fishing industry;
- Standard administrative requirements for industry-funded observers/monitors and monitoring service providers;
- A process to prioritize monitoring coverage that may be provided by available Federal funding across FMPs for new industry-funded monitoring programs; and
- A process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding. The New England Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the proposed omnibus measures.

### Proposed Atlantic Herring Measures

The proposed Atlantic herring measures would implement an industry-funded monitoring program in the herring fishery. This rule proposes a 50-percent monitoring coverage target for vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permit. Fewer than 40 vessels have Category A or B herring permits, but those vessels typically catch over 95 percent of the herring harvest.

The proposed 50-percent coverage target includes a combination of SBRM and industry-funded monitoring coverage. Industry participants would pay for any additional monitoring coverage above SBRM to meet the 50-percent coverage target. The Council recommended this combined method to achieve the coverage target to help reduce monitoring costs for the fishing industry.

2

During 2016 and 2017, we conducted an electronic monitoring project aboard herring vessels using midwater trawl gear. The purpose of the project was to evaluate the feasibility of using electronic monitoring to verify catch retention and track discarded catch. In April 2018, the New England Council reviewed results from the electronic monitoring project and approved electronic monitoring, in combination with portside sampling, as a monitoring option for midwater trawl vessels to meet industry-funded monitoring requirements. But the Council did not recommend requiring electronic monitoring and portside sampling as part of this action; instead it recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. Additionally, the EFP would provide us with the flexibility to respond quickly to emerging issues, thus helping make the monitoring program more robust. Using the results of the EFP, the Council would consider establishing electronic monitoring and portside sampling requirements in regulation via a framework adjustment when it revisits industry-funded monitoring requirements two years after implementation.

Lastly, this rule maintains the existing requirement that any midwater trawl vessels fishing in the Groundfish Closed Areas must carry an observer, but it would allow vessels to purchase observer coverage to access Groundfish Closed Areas. Midwater trawl vessels are currently only able to fish in the Groundfish Closed Areas if they are carrying an observer to meet SBRM requirements.

### Proposed Correction and Updates

This rule also proposes a correction and updates under the authority of section 305(d) to the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), which provides that the Secretary of Commerce may promulgate regulations necessary to carry out an FMP or the Magnuson-Steven Act. The correction would remedy a typographical error in an existing regulation. The updates would revise existing regulations to ensure consistent notification requirements across the herring fishery and allow us to use catch data from both observers and monitors (i.e., at-sea monitors or portside samplers) to track catch against haddock catch caps in the herring fishery.

## CONTROVERSIALITY

This action is controversial. Development of this action has been contentious and has taken several years. Some participants in New England fisheries, including those in the Atlantic herring fishery, have expressed concern that they cannot afford industry-funded monitoring or that the Magnuson-Stevens Act does not authorize industry-funded monitoring. Environmental advocates (e.g., Pew Environment, Earth Justice, Herring Alliance) and individuals in other fisheries (e.g., groundfish, tuna, recreational) are adamant that the herring fishery, in particular the midwater trawl fleet, needs monitoring in addition to coverage required by the SBRM.

SBRM coverage on vessels participating in the herring fishery is variable. Coverage aboard midwater trawl vessels ranged from 40 percent to 5 percent from 2015 to 2017. The 50-percent industry-funded monitoring coverage target for vessels with Category A or B herring permits has the potential to reduce the uncertainty around catch estimates. Analysis in the environmental assessment supporting this action suggests a 50-percent coverage target would likely result in a coefficient of variation of less than 30 percent on catch tracked against fishery catch caps.

3

However, that same 50-percent coverage target has the potential to reduce annual returns-to-owner for vessels with Category A and B herring permits up to 20 percent for at-sea monitoring coverage and up to an additional 5 percent for access to Groundfish Closed Areas. The Council considered other coverage targets, including 100 percent, 75 percent, and 25 percent, but recommended the 50-percent coverage target to balance the benefit of increased monitoring with the cost of increased monitoring.

## RECOMMENDATIONS

I recommend that you sign the attached clearance memorandum to the NOAA General Counsel, and sign the attached clearance memorandum to the Chief Counsel for Regulation, Department of Commerce.

1. I concur _____ *Chris Oliver* _____ 9/19/18.

                                                                                                 Date

2. I do not concur _____.

                                                                                                    Date

Attachment

4

_0000016995

**DETERMINATIONS**

MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT
(MAGNUSON-STEVENS ACT)

Pursuant to section 304 (b)(1)(A) of the Magnuson-Stevens Act, I have preliminarily determined
that this proposed rule is consistent with the New England Industry-Funded Monitoring
Amendment, other provisions of the Magnuson-Stevens Act, and other applicable law, subject to
further consideration after public comment.

NATIONAL ENVIRONMENTAL POLICY ACT

An environmental assessment (EA) has been prepared that describes the impact on the human
environment that would result from implementation of this action.  Based on the EA, and review
of the NEPA criteria for significant events (40 CFR 1508.27), and NMFS criteria for significance
evaluated above (NOA 216-6 Section 6.02), no significant effect on the quality of the human
environment is anticipated from this action.

COASTAL ZONE MANAGEMENT ACT (CZMA)

NMFS determined that this action is consistent to the maximum extent practicable with the
enforceable policies of the approved coastal management programs of Maine, New Hampshire,
Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware,
Maryland, Virginia, and North Carolina.  This determination was submitted on December 21,
2017, for review by the responsible state agencies under section 307 of the CZMA.

REGULATORY FLEXIBILITY ACT (RFA)

An Initial Regulatory Flexibility Analysis (IRFA) was prepared, as required by section 603 of the
RFA, as part of the regulatory impact review.  The IRFA describes the impact this proposed rule,
if adopted, would have on small entities.  Each of the statutory requirements of section 603(b) and
(c) has been addressed and is summarized in the Classification section of the attached proposed
rule.

PAPERWORK REDUCTION ACT (PRA)

This proposed rule contains a collection-of-information requirement subject to review and
approval by the Office of Management and Budget (OMB) under the PRA.  This requirement has
been submitted to OMB for approval under Control Number 0648-0674.

ESSENTIAL FISH HABITAT (EFH)

The area affected by the proposed action has been identified as EFH for species managed under
the following FMPs:  Northeast Multispecies; Monkfish; Atlantic Sea Scallop; Atlantic Mackerel,
Squid, and Butterfish; Spiny Dogfish; Summer Flounder, Scup, and Black Sea Bass; Atlantic
Bluefish; Surfclam and Ocean Quahog; Tilefish; and Atlantic Tunas, Swordfish, and Sharks.  The

5

_0000016996

proposed action will not have an adverse impact on EFH; therefore, an EFH consultation is not required. The basis for this determination is described in a memorandum dated October 18, 2017.

ENDANGERED SPECIES ACT (ESA)

The batched fisheries Biological Opinion completed on December 16, 2013, concluded that the continued operation of several fisheries would not jeopardize the continued existence of any ESA-listed species and would not result in the destruction or adverse modification of designated critical habitat. On October 17, 2017, NMFS reinitiated consultation on the batched Biological Opinion due to updated information on the decline of North Atlantic right whale abundance. New information on all listed species will be incorporated into an updated batched Biological Opinion that will be used to evaluate the impact of these fisheries on listed species.

Section 7(d) of the ESA prohibits Federal agencies from making any irreversible or irretrievable commitment of resources with respect to the agency action that would have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives during the consultation period. Resource commitments may occur and non-jeopardizing activities may proceed as long as their implementation would not violate section 7(d) and would allow the action agency to retain sufficient discretion and flexibility to modify its action to allow formulation and implementation of an appropriate reasonable and prudent alternative.

This action does not represent any irreversible or irretrievable commitment of resources with respect to the FMP that would affect the development or implementation of reasonable and prudent measures during the consultation period. NMFS has discretion to amend its Magnuson-Stevens Act and ESA regulations, and may do so at any time subject to the Administrative Procedure Act and other applicable laws. As a result, I have determined preliminarily that fishing activities conducted pursuant to proposed rule is consistent with Section 7(d) of the ESA and will not affect endangered and threatened species or critical habitat in any manner beyond what has been considered in prior consultations on this fishery.

MARINE MAMMAL PROTECTION ACT (MMPA)

I have preliminarily determined that fishing activities conducted under this rule will have no adverse impact on marine mammals. This action would not result in any substantial change in fishing activity.

EXECUTIVE ORDER (E.O.) 12866

Pursuant to the procedures established to implement section 6 of E.O. 12866, OMB has determined that this proposed rule is not significant.

EXECUTIVE ORDER 13132

This proposed rule does not contain policies with federalism implications under E.O. 13132.

6

_0000016997

INFORMATION QUALITY ACT

Pursuant to section 515 of Public Law 106-554, this information product has undergone a pre-dissemination review by the Sustainable Fisheries Division, Greater Atlantic Regional Fisheries Office, completed on July 26, 2018. The signed Pre-dissemination Review and Documentation Form is on file in that Office, and a copy of the form is included with this package.

NATIONAL MARINE SANCTUARIES ACT (NMSA)

I have preliminarily determined that this action will not destroy, cause the loss of, or injure any sanctuary resource subject to consultation with the Secretary under the NMSA.

_0000016998



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

NOV 0 6 2018

MEMORANDUM FOR:    Major Clark, III
                        Acting Chief Counsel for Advocacy
                        Small Business Administration

FROM:                Alan Risenhoover
                        Director
                        Office of Sustainable Fisheries

SUBJECT:          Request for Comments on an Initial Regulatory Flexibility Analysis
                        for the Proposed Rule Implementing the New England Industry-
                        Funded Monitoring Omnibus Amendment (RIN 0648-BG91)

In accordance with the Regulatory Flexibility Act (RFA), we have prepared an initial regulatory flexibility analysis (IRFA), as required by section 603(a) of the RFA. The requirements for an IRFA are satisfied by the attached economic analysis.

Please send me any comments you have on the IRFA or proposed rule by December 24, 2018.

If you have any questions concerning the attached analysis, please contact Alan Risenhoover, Director for the Office of Sustainable Fisheries, 301-427-8500.

Attachments



Printed on Recycled Paper

_0000016999

# Industry-Funded Monitoring

An Omnibus Amendment to
the Fishery Management Plans of the
New England Fishery Management Council

## December 2018





_0000017000

**This page intentionally left blank.**

_0000017001

**Amendment 7 to the Atlantic Herring FMP;**

**Amendment 5 to the Atlantic Salmon FMP;**

**Amendment 17 to the Atlantic Sea Scallop FMP;**

**Amendment 5 to the Deep-Sea Red Crab FMP;**

**Amendment 21 to the Northeast Multispecies FMP; and**

**Amendment 6 to the Northeast Skate Complex FMP**

**Including an Environmental Assessment**
**December 2018**

Prepared by the

National Marine Fisheries Service
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 1930

National Marine Fisheries Service
Northeast Fisheries Science Center
166 Water Street
Woods Hole, MA 02543

New England Fishery Management Council
50 Water Street, Mill 2
Newburyport, MA 01950

Draft Environmental Assessment Adopted by NEFMC:  June 23, 2016
Draft Environmental Assessment Available for Public Comment:  September 23, 2016
Final Environmental Assessment Submitted to NMFS:  May 7, 2018

_0000017002

**This page intentionally left blank.**

_0000017003

# Executive Summary

The New England Fishery Management Council (Council) is interested in increasing monitoring in some fishery management plans (FMPs) to assess the amount and type of catch and more precisely monitor annual catch limits. This increased monitoring would be in addition to coverage required through the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA) or Marine Mammal Protection Act (MMPA). The amount of available Federal funding to support additional monitoring and legal constraints associated with industry-funded monitoring cost responsibilities have prevented the National Marine Fisheries Service (NMFS) from approving recent industry-funded monitoring proposals, specifically Atlantic Herring Amendment 5 and Northeast (NE) Multispecies Framework Adjustment 48.

The New England Industry-Funded Monitoring Omnibus Amendment would provide the measures necessary for industry funding and available Federal funding to pay for additional monitoring to meet specific monitoring coverage targets for each FMP. This amendment would allow the Council to prioritize industry-funded monitoring programs across FMPs, should available Federal funding fall short of the total needed to fully fund all monitoring programs. This amendment would also ensure consistency for industry-funded monitoring programs across FMPs.

This amendment includes a set of Omnibus Alternatives that would modify all the FMPs managed by the Council to allow standardized development and administration of future FMP-specific industry-funded monitoring programs. Additionally, this amendment includes alternatives for an industry-funded monitoring program for the Atlantic Herring FMP.

## Preferred Omnibus Alternatives

The Council selected Omnibus Alternative 2 as a preferred alternative. Omnibus Alternative 2 would standardize the development and administration of future industry-funded monitoring programs, including:

- Standard definition for cost responsibilities of industry and NMFS;
- Standard amendment process to implement industry-funded monitoring programs and standard framework adjustment process to revise industry-funded monitoring programs;
- Standard monitoring service provider requirements;
- Process for prioritizing industry-funded monitoring programs in order to allocate available Federal resources across all FMPs; and
- Standard framework adjustment process to implement future monitoring set-aside programs.

Omnibus Alternative 2 would apply to new at-sea monitoring, portside monitoring, and electronic monitoring programs.

_0000017004

The Council also selected Omnibus Alternative 2.2 as a preferred alternative. Omnibus Alternative 2.2 would specify a Council-led process to prioritize available Federal funding to cover NMFS cost responsibilities associated with administering industry-funded monitoring programs across all FMPs.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring program would operate during that year. If some Federal funding is available, but it is not sufficient to cover NMFS cost responsibilities for all industry-funded monitoring programs, the Council would apply an equal weighting approach to prioritize available funding to support industry-funded monitoring coverage targets across FMPs. This equal weighting approach would be revised on an as-needed basis. This prioritization process would apply to new industry-funded monitoring programs and would not apply to the existing scallop and groundfish industry-funded monitoring programs.

Lastly, the Council selected Omnibus Alternative 2.6 as a preferred alternative. Omnibus Alternative 2.6 would standardize the development of future monitoring set-aside programs. Monitoring set-aside programs would allocate a portion of an annual catch limit to help offset industry cost responsibilities associated with industry-funded monitoring. The details and impacts analysis of any monitoring set-aside program would be specified in a subsequent framework adjustment to the relevant FMP.

### Preferred Herring Alternatives

The Council selected Herring Alternative 2 as a preferred alternative. Herring Alternative 2 would establish an industry-funded monitoring program for the Atlantic herring fishery.

Under Herring Alternative 2, monitoring coverage targets would be calculated by combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities and would fall somewhere between no additional coverage in addition to SBRM and the specified coverage target.

The Council selected several sub-options as preferred alternatives:
- Sub-Option 1 would allow vessels to be issued waivers to exempt them from industry-funded monitoring requirements; for either a trip or the fishing year, if coverage was unavailable due to funding or logistics;
- Sub-Option 2 would exempt a wing vessel pair trawling with another vessel from industry-funded monitoring requirements, provided the vessel does not pump or carry any fish onboard;

_0000017005

- Sub-Option 4 would require the Council to examine the results of any increased coverage in the herring fishery two years after implementation, and consider if adjustments to the coverage targets are warranted; and
- Sub-Option 5 would exempt trips that land less than 50 mt of herring from industry-funded monitoring requirements.

Herring Alternative 2 would also specify monitoring service provider requirements for the herring fishery. It would specify that requirements for industry-funded observers and at-sea monitors include a high volume fisheries (HVF) certification.

The Council also selected Herring Alternative 2.5 as a preferred alternative. Herring Alternative 2.5 would maintain the existing requirement that midwater trawl vessels fishing in the Groundfish Closed Areas to carry a NEFOP-level observer, but would allow vessels to pay for observer coverage to access the Groundfish Closed Areas. Sub-options do not apply to Herring Alternative 2.5. If the Groundfish Closed Areas are modified or eliminated in the future, coverage requirements for midwater trawl vessels will be adjusted accordingly. Existing slippage restrictions, reporting requirements, and consequence measures would apply to midwater trawl vessels fishing in Groundfish Closed Areas.

Lastly, the Council selected Herring Alternative 2.7 as a preferred alternative. Herring Alternative 2.7 would specify a 50% monitoring coverage target on vessels with Category A or B herring permits. The 50% coverage target would apply to at-sea monitoring coverage or electronic monitoring in conjunction with portside sampling, once electronic monitoring and portside sampling is approved by the Council and NMFS. Preferred sub-options would apply under Herring Alternative 2.7, along with existing slippage restrictions and reporting requirements. Existing slippage consequence measures would apply on all trips with at-sea monitoring coverage and the existing requirement to move 15 nautical miles following a slippage event would apply on all trips selected for portside sampling.

At its April 2018 meeting, the Council determined that electronic monitoring, used in conjunction with portside sampling coverage, is an adequate substitute for at-sea monitoring coverage aboard vessels using midwater trawl gear, but did not recommend requiring electronic monitoring and portside sampling as part of this amendment. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. The EFP would exempt midwater vessels from the proposed requirement for industry-funded at-sea monitoring coverage and would allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50% coverage target. An EFP would enable NMFS to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. The Council previously recommended reconsidering herring industry-funded monitoring requirements two years after implementation. Using the results of the EFP, the Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

_0000017006

The Massachusetts Division on Marine Fisheries and Maine Department of Marine Resources currently administer voluntary portside sampling programs for the herring fishery. Both states have funding to continue to administer those portside programs through 2018. Therefore, in 2018, the portside sampling of Category A and B vessels using midwater trawl gear would be administered by the states, participation in the sampling program would be voluntary, and the resulting data would be considered by NMFS for catch monitoring. In 2019 (or possibly 2020) and beyond, NMFS would administer a Federal portside sampling program with a 50% coverage target for vessels with Category A or B herring permits using midwater trawl gear.

## Affected Environment

The Affected Environment describes valued ecosystem components (VECs) for this amendment. The VECs associated with the Omnibus Alternatives include biological resources (target, non-target, and protected species), the physical environment, and fishery-related businesses and human communities. The VECs associated with the Herring Alternatives include the herring resource, non-target species (haddock, river herring and shad, and mackerel), protected species (fish, turtles, and marine mammals), the physical environment, and fishery-related businesses and human communities.

## Impacts Associated with Preferred Omnibus Alternatives

There are no direct impacts on biological resources (target, non-target, and protected species), the physical environment, or fishery-related businesses and human communities associated with the preferred Omnibus Alternatives because they are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort, fishing operations, amount of fish harvested, or area fished.

Under Omnibus Alternative 2, there is the potential for an indirect low positive impacts on biological resources associated with establishing standardized industry-funded service provider requirements. Standardized provider requirements may lead to greater consistency in the information collected about target, non-target, and protected species through industry-funded monitoring programs. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources.

Omnibus Alternative 2 may provide an indirect low positive impact on biological resources if the prioritization process increases the likelihood that available Federal funding would be used to support industry-funded monitoring programs. Additionally, Omnibus Alternative 2.2 may have the greatest potential for indirect low positive impacts to biological resources because it would provide the discretion to prioritize available Federal funding towards industry-funded monitoring programs that improve information about specific target, non-target, and protected species.

_0000017007

In the future, if the Council developed an IFM program for a particular FMP, there would be direct negative economic impacts to fishing vessels resulting from the standardized cost responsibilities included in Omnibus Alternative 2, provided there was available Federal funding to support that IFM program and vessels were required to pay for increased monitoring. However, any direct negative economic impacts to fishing vessels resulting from a future IMF program would be evaluated in the amendment to establish that IFM program and are not considered in this amendment.

There may be indirect low positive economic impacts associated with standardizing a process to develop new industry-funded monitoring programs on fishery-related business and communities resulting from Omnibus Alternative 2 if standardizing that process increases the potential for improved management.

Under Omnibus Alternative 2, there is a potential for indirect low positive economic impacts associated with the establishment of standardized IFM service provider requirements. If standardized service provider requirements leads to greater consistency in the information collected by industry-funded monitoring programs, that may lead to better management of biological resources, which may eventually lead to higher harvest levels.

Establishing standardized cost responsibilities under Omnibus Alternative 2 may have low positive economic impacts if it provides the industry with information to better understand and plan for their industry-funded monitoring cost responsibilities, as well as negotiate better contracts with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities.

Lastly, Omnibus Alternative 2.2 may have the greatest potential for indirect low positive impacts on businesses and communities because it may help align available Federal funding with the Council's monitoring priorities. Improved catch information that results from the opportunity to align funding with the most critical industry-funded monitoring programs may lead to better management of biological resources, which may eventually lead to higher harvest levels.

**TABLE 1. SUMMARY OF THE INDIRECT IMPACTS OF OMNIBUS ALTERNATIVES (*PREFERRED ALTERNATIVES IN BOLD*)**

| Alternatives | Impacts on Biological Resources | Impacts on Fishery-Related Businesses and Communities |
|---|---|---|
| Alternative 1: No Standardized Industry-Funded Monitoring Programs (No Action) | Low negative impact related to allocating funding to IFM programs on a case-by-case basis, rather than evaluating funding across FMPs | Low negative impact related to continued uncertainty about catch rates that may lead to overly cautious management |

_0000017008

| Alternatives | Impacts on Biological Resources | Impacts on Fishery-Related Businesses and Communities |
|---|---|---|
| **Alternative 2: Standardized Industry-Funded Monitoring Programs (Action Alternative)** | **Negligible impact related to standardized cost responsibilities and process for future IFM programs implemented via amendment and revised via framework**<br><br>**Low positive impact related to standardized service provider requirements and process to prioritize funding for monitoring** | **Low positive impact related to standardized cost responsibilities and process for future IFM programs implemented via amendment and revised via framework**<br><br>**Low positive impact related to standardized service provider requirements and process to prioritize funding for monitoring** |
| Alternative 2.1: NMFS-Led Prioritization Process | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities |
| **Alternative 2.2: Council-Led Prioritization Process** | **Low positive impact related to process to prioritize funding for IFM programs across FMPs**<br><br>**Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities** | **Low positive impact related to process to prioritize funding for IFM programs across FMPs**<br><br>**Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities** |
| Alternative 2.3: Proportional Prioritization Process | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities |
| Alternative 2.4 and 2.5: Coverage Ratio-Based Prioritization Processes | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities |
| **Alternative 2.6 Monitoring Set-Aside** | **Negligible impact related to standardized process for monitoring set-asides implemented via framework** | **Negligible impact related to standardized process for monitoring set-asides implemented via framework** |
| **Impacts to physical environment are not described in this table because they are negligible.  These alternatives will not alter fishing behavior or directly impact fishing regulations (gears used or areas fished).** | | |

_0000017009

### Impacts Associated with Preferred Herring Alternatives

The impacts of preferred Herring Alternatives on biological resources (herring resource, non-target species, and protected species) are indirect because they affect levels of monitoring rather than harvest specifications.

Indirect low positive impacts to biological resources are possible if the increased monitoring associated with Herring Alternatives 2.5 and 2.7 can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments and improve management. However, these preferred Herring Alternatives may lead to direct positive impacts on biological resources if herring fishing effort is limited, by increased information on catch tracked against catch limits, leading to increased reproductive potential of the herring resource and non-target species and reduced interactions between the herring fishery and protected species.

Because additional monitoring under Herring Alternative 2.5 is confined to the Groundfish Closed Areas, a low positive biological impact is likely because the area with 100% observer coverage is limited. The 50% coverage associated with Herring Alternative 2.7 is expected to have low positive impacts on the herring resource and non-target species (haddock and river herring and shad) if the uncertainty around catch track against catch caps is reduced.

Sub-Options 1 and 2 have the potential for low negative impacts on biological resources if additional coverage is waived. Sub-Option 5 also has the potential for a low negative impact on the herring resource and non-target species. A low negative impact is possible if the disconnect between vessels with additional monitoring (trips greater than 50 mt of herring) and trips subject to fishery catch caps (trips greater than either 1 lb of herring or 6,600 lb of herring) if it biases data used to track catch against catch caps.

The impacts of these preferred Herring Alternatives on biological resources are not significant because they would not cause any biological resource to become overfished, would not result in overfishing, and/or would not cause a change in population status.

The impacts of preferred Herring Alternatives on the physical environment are expected to be negligible. The impact of the herring fishery on the physical environment is thought to be minimal and temporary. Therefore, the expected impact on the physical environment of increased monitoring in the herring fishery is expected to be negligible under Herring Alternatives 2.5 and 2.7.

If fishing effort is limited, by increased information on catch tracked against catch limits, and there are few interactions between fishing gear and the physical environment, there is the potential for a positive impact on the physical environment associated with the preferred Herring Alternatives. However, the magnitude of any potential positive impact is low because the herring fishery has only minimal and temporary impacts on the environment.

_0000017010

The impacts of preferred Herring Alternatives on fishery-related businesses and human communities are negative and result from reductions in returns-to-owner (RTO). RTO is calculated by subtracting fixed and operational costs from gross revenue and was used rather than net revenues to more accurately reflect income from fishing trips. Reductions in RTO are related to paying for monitoring coverage. Under Herring Alternative 2.7, the potential reduction in RTO may be up to 20% for at-sea monitoring coverage and up to 10% for electronic monitoring in conjunction with portside sampling. Annual returns-to-owner for midwater trawl vessels paying for observer coverage to access Groundfish Closed Areas may be reduced up to an additional 5%. The total annual cost to the herring fishery is up to $294,999 for Herring Alternative 2.7 and $75,000 for Herring Alternative 2.5.

Because midwater trawl vessels average more sea days than other gear types, midwater trawl vessels have a greater negative economic impact associated with paying for monitoring coverage, followed by purse seine vessels, and small mesh bottom trawl vessels.

Sub-Options 1 and 2 have the potential to reduce monitoring costs for herring vessels if coverage is waived. Sub-Option 5 would eliminate monitoring costs for vessels that always land less than 50 mt of herring on a trip. Additionally, Sub-Option 5 may reduce monitoring costs for vessels than often land less than 50 mt of herring on a trip. There benefits will vary with gear type. Small mesh bottom trawl vessels and single midwater trawl vessels take the most trips that land less than 50 mt of herring, 81% and 60%, respectively, followed by purse seine vessels (33% of trips) and paired midwater trawl vessels (13% of trips). The potential reduction in RTO associated with at sea-monitoring coverage in combination with Sub-Option 5 is up to 16% for paired midwater trawl vessels, up to 4% for single midwater trawl vessels, and up to 3% for purse seine and small mesh bottom trawl vessels.

Indirect positive economic impacts on herring vessels associated with preferred Herring Alternatives may result from increased monitoring helping to reduce uncertainty around retained and discarded catch estimates leading to additional harvesting opportunities. If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be less likely to be constrained by catch caps and more likely to be able to fully harvest herring sub-ACLs.

Conversely, indirect negative economic impacts on herring vessels associated with preferred Herring Alternatives may result if additional monitoring illustrates higher than expected catch of haddock and river herring and shad, such that vessels would be less likely be less likely to be able to fully harvest herring sub-ACLs because they were constrained by catch caps.

_0000017011

TABLE 2.  SUMMARY OF OVERALL IMPACTS ASSOCIATED WITH HERRING COVERAGE TARGET ALTERNATIVES (*PREFERRED ALTERNATIVES IN BOLD*)

| Alternatives | Herring Resource | Non-Target Species | Protected Species | Physical Environment | Fishery-Related Businesses and Communities |
|---|---|---|---|---|---|
| Herring Alternative 1:  No Coverage Target Specified For IFM Programs  (No Action) | Low Positive | Low Positive | Low Positive | Negligible | Low Positive |
| **Herring Alternative 2: Coverage Target Specified For IFM Programs** | **Low Positive** | **Low Positive** | **Low Positive** | **Negligible** | **Negative** |
| Herring Alternative 2.1: 100% NEFOP-Level Observers Coverage on Category A and B Vessels | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| Herring Alternative 2.2: ASM Coverage on Category A and B Vessels | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| Herring Alternative 2.3: Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| Herring Alternative 2.4: EM and Portside Sampling on Midwater Trawl Fleet | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| **Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas** | **Low Positive** | **Low Positive** | **Low Positive** | **Negligible** | **Negative** |
| Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| **Herring Alternative 2.7: ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | **Low Positive** | **Low Positive** | **Low Positive** | **Negligible** | **Negative** |

_0000017012

**List of Acronyms and Abbreviations**

| | |
|---|---|
| ABC | Acceptable Biological Catch |
| ACCSP | Atlantic Coastal Cooperative Statistics Program |
| ACFCMA | Atlantic Coastal Fishery Cooperative Management Act |
| ACL | Annual Catch Limit |
| AM | Accountability Measure |
| APA | Administrative Procedure Act |
| APAIS | Access Point Angler Intercept Survey |
| ASMFC | Atlantic States Marine Fisheries Commission |
| CEQ | Council of Environmental Quality |
| CFDBS | Commercial Fisheries Database System |
| CV | Coefficient of Variation |
| CZMA | Coastal Zone Management Act |
| DAS | Days-at-sea |
| EA | Environmental Assessment |
| EEZ | Exclusive Economic Zone |
| EFH | Essential Fish Habitat |
| EO | Executive Order |
| ESA | Endangered Species Act |
| eVTR | Electronic Fishing Vessel Trip Report |
| FMP | Fishery Management Plan |
| FOIA | Freedom of Information Act |
| FONSI | Finding Of No Significant Impact |
| FVTR | Fishing Vessel Trip Report |
| GAM | Generalized Additive Model |
| GARFO | Greater Atlantic Regional Fisheries Office (formerly NERO) |
| GPS | Global Positioning System |
| IBS | Industry-Based Survey |
| ICNAF | International Commission for the Northwest Atlantic Fisheries |
| IFQ | Individual Fishing Quota |
| IQA | Information Quality Act (also known as the Data Quality Act or DQA) |

_0000017013

| | |
|---|---|
| IRFA | Initial Regulatory Flexibility Analysis |
| ITQ | Individual Transferable Quota |
| km | Kilometer |
| lb | Pounds |
| MA | Mid-Atlantic |
| MAFMC | Mid-Atlantic Fishery Management Council |
| MMPA | Marine Mammal Protection Act |
| MRIP | Marine Recreational Information Program |
| MRFSS | Marine Recreational Fisheries Statistics Survey |
| MSR | Master Site Register |
| NAFO | Northwest Atlantic Fisheries Organization |
| NASCO | North Atlantic Salmon Conservation Organization |
| NE | New England |
| NEAMAP | Northeast Area Monitoring and Assessment Program |
| NEFMC | New England Fishery Management Council |
| NEFOP | Northeast Fisheries Observer Program |
| NEFSC | Northeast Fisheries Science Center |
| NEPA | National Environmental Policy Act |
| NERO | Northeast Regional Office (renamed GARFO in 2014) |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NRC | National Research Council of the National Academies of Science |
| NWGB | National Working Group on Bycatch |
| OLE | NOAA Office of Law Enforcement |
| PRA | Paperwork Reduction Act |
| PREE | Preliminary Regulatory Economic Evaluation |
| PSP | Paralytic Shellfish Poisoning |
| QA/QC | Quality Assurance/Quality Control |
| RFA | Regulatory Flexibility Act |
| RIR | Regulatory Impact Review |
| SAFE | Stock Assessment and Fishery Evaluation |
| SAFIS | Standard Atlantic Fisheries Information System |
| SAP | Special Access Program |

_0000017014

| | |
|---|---|
| SAW/SARC | Stock Assessment Workshop/Stock Assessment Review Committee |
| SBRM | Standardized Bycatch Reporting Methodology |
| SFCPO | State-Federal Constituent Programs Office |
| SSC | Scientific and Statistical Committee |
| TAC | Total Allowable Catch |
| TAL | Total Allowable Landings |
| U.S. | United States |
| USFWS | United States Fish and Wildlife Service |
| VMS | Vessel Monitoring System |

_0000017015

# Table of Contents

1.0     INTRODUCTION AND BACKGROUND......................................................................... 28

    1.1.1   GENERAL QUESTIONS AND ANSWERS ABOUT THE INDUSTRY-FUNDEDED MONITORING OMNIBUS AMENDMENT.................................................................. 30

    1.1.2   QUESTIONS AND ANSWERS ABOUT COST RESPONSIBILITIES ............................ 37

    1.1.3   QUESTIONS AND ANSWERS ABOUT NMFS ADMINISTATIVE COSTS .................. 40

    1.1.4   QUESTIONS AND ANSWERS ABOUT INDUSTRY COSTS ........................................... 44

1.2     PURPOSE AND NEED FOR ACTION................................................................. 46

2.0     MANAGEMENT ALTERNATIVES................................................................................ 46

2.1     OMNIBUS ALTERNATIVES................................................................................ 47

    2.1.1   OMNIBUS ALTERNATIVE 1:  NO STANDARDIZED INDUSTRY-FUNDED MONITORING PROGRAMS ................................................................................ 49

    2.1.2   OMNIBUS ALTERNATIVE 2:  STANDARDIZED INDUSTY-FUNDED MONITORING PROGRAMS (*PREFERRED ALTERNATIVE*)................................................................. 51

    2.1.3   CONSIDERED BUT REJECTED OMNIBUS ALTERNATIVES ....................................... 69

2.2     ATLANTIC HERRING MONITORING ALTERNATIVES ........................................... 70

    2.2.1   HERRING ALTERNATIVE1: NO COVERAGE TAREGET SPECIFIED FOR INDUSTRY-FUNDED MONITORING PROGRAM................................................................. 76

    2.2.2   HERRING ALTERNATIVE 2: COVERAGE TAREGET SPECIFIED FOR INDUSTRY-FUNDED MONITORING PROGRAM (*PREFERRED ALTERNATIVE*)....................................... 79

    2.2.3   CONSIDERED BUT REJECTED HERRING ALTERNATIVES.................................... 102

3.0     DESCRIPTION OF THE AFFECTED ENVIRONMENT ........................................... 102

3.1     INTRODUCTION ....................................................................................... 102

    3.1.1   TARGET SPECIES........................................................................................ 103

    3.1.2   NON-TARGET AND BYCATCH SPECIES............................................................ 134

    3.1.3   PHYSICAL ENVIRONMENT............................................................................ 136

    3.1.4   ENDANGERED AND OTHER PROTECTED SPECIES................................................ 138

_0000017016

3.1.5    HUMAN COMMUNITIES..................................................................152

4.0    ENVIRONMENTAL CONSEQUENCES OF THE ALTERNATIVES .....................................178

4.1    OMNIBUS ALTERATIVE IMPACTS ............................................................... 178

4.1.1    IMPACTS SUMMARY FOR PREFERRED OMNIBUS ALTERNATIVES ...................180

4.1.2    OMNIBUS ALTERNATIVE IMPACTS TO BIOLOGICAL RESOURCES.....................181

4.1.3    OMNIBUS ALTERNATIVE IMPACTS TO PHYSICAL ENVIRONMENT ..................184

4.1.4    OMNIBUS ALTERNATIVE IMPACTS TO HUMAN COMMUNITIES .......................184

4.1.5    IMPACTS SUMMARY FOR OMNIBUS ALTERNATIVES................................................187

4.2    ATLANTIC HERRING ALTERNATIVE IMPACTS ....................................................... 189

4.2.1    IMPACTS SUMMARY FOR PREFERRED HERRING ALTERNATIVES....................190

4.2.2    BACKGROUND ON BIOLOGICAL IMPACTS OF HERRING ALTERNATIVES........192

4.2.3    IMPACTS OF HERRING ALTERNATIVES ON TARGET SPECIES .............................209

4.2.4    IMPACTS OF HERRING ALTERNATIVES ON NON-TARGET SPECIES .................220

4.2.5    IMPACTS OF HERRING ALTERNATIVES ON PROTECTED RESOURCES.............231

4.2.6    IMPACTS OF HERRING ALTERNATIVES ON THE PHYSICAL ENVIRONMENT.240

4.2.7    BACKGROUND ON ECONOMIC IMPACTS OF HERRING ALTERNATIVES...........242

4.2.8    IMPACTS OF HERRING ALTERNATIVES ON HUMAN COMMUNITIES ...............252

4.2.9    IMPACTS SUMMARY FOR HERRING ALTERNATIVES .................................................288

5.0    CUMULATIVE EFFECTS ANALYSIS ........................................................................289

5.1    VALUED ECOSTEM COMPONENTS........................................................................... 289

5.2    SPATIAL AND TEMPORAL BOUNDARIES ................................................................. 290

5.3    ANALYSIS OF TOTAL CUMULATIVE EFECTS........................................................... 292

5.4    PAST, PRESENT, AND REASONABLY FORSEEABLE FUTURE ACTIONS ....... 293

5.4.1    ATLANTIC HERRING RESOURCE ...........................................................................294

5.4.2    NON-TARGET SPECIES...............................................................................................296

_0000017017

    5.4.3   FISHERY-RELATED BUSINESSES AND COMMUNITIES ............................................298

5.5     BASELINE CONDITIONS................................................................................... 302

5.6     SUMMARY OF IMPACTS FROM PREFERRED OMNIBUS ALTERNATIVES.... 304

5.7     SUMMARY OF IMPACTS FROM PREFERRED HERRING ALTERNATIVES..... 306

5.8     CUMMULATIVE EFFECTS SUMMARY ........................................................... 310

6.0     OTHER APPLICABLE LAWS...........................................................................312

6.1     MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT312

6.2     NATIONAL ENVIRONMENTAL POLICY ACT ........................................... 326

    6.2.1   FINDING OF NO SIGNIFICANT IMPACT...........................................................326

6.3     MARINE MAMMAL PROTECTION ACT (MMPA).................................... 333

6.4     ENDANGERED SPECIES ACT (ESA) ....................................................... 333

6.5     PAPERWORK REDUCTION ACT (PRA).................................................... 334

6.6     INFORMATION QUALITY ACT ............................................................... 334

6.7     IMPACTS OF FEDERALISM/EXECTIVE ORDER 13132 ....................... 337

6.8     ADMINISTRATIVE PROCEDURES ACT .................................................. 337

6.9     COASTAL ZONE MANAGEMENT ACT (CZMA)....................................... 338

6.10    REGULATORY FLEXIBILITY ACT/EXECUTIVE ORDER 12866......................... 338

    6.10.1   E.O. 12866 (REGULATORY PLANNING AND REVIEW)........................................338

    6.10.2   REGULATORY FLEXIBILITY ACT - INITIAL REGULATORY FLEXIBILITY ANALYSIS.................................................................................................................340

7.0     LITERATURE CITED ..................................................................................347

8.0     LIST OF PREPARERS AND AGENCIES CONSULTED .............................................358

9.0     LIST OF MEETINGS ..................................................................................359

10.0    GLOSSARY OF TERMS ..............................................................................365

11.0    APPENDIX..................................................................................................369

_0000017018

# List of Tables

Table 1.  Summary of the Indirect Impacts of Omnibus Alternatives (*preferred alternatives in bold*) .................................................................................................................................... ix

Table 2.  Summary of Overall Impacts Associated with Herring Coverage Target Alternatives (*preferred alternatives in bold*)................................................................. xiii

Table 3.  Status Quo Timing of Greater Atlantic Region SBRM, Sector and Scallop Monitoring Allocation and Analysis ....................................................................................... 50

Table 4.  Summary of Prioritization Alternatives.................................................................... 56

Table 5.  Timing for Discretionary Alternatives (Alternatives 2.1 and 2.2).............................. 62

Table 6.  Timing for Formulaic Alternatives (Alternatives 2.3, 2.4, and 2.5)........................... 67

Table 7.  Purpose and Need of Amendment 5 to Herring FMP........................................... 71

Table 8.  Monitoring Needs of Herring Fishery ...................................................................... 72

Table 9.  Range of Industry-Funded Monitoring Herring Coverage Target Alternatives (*Preferred alternatives in bold*)........................................................................................ 76

Table 10.  Proposed and Observed Sea Days for Fleets that Target Herring............................ 77

Table 11.  List of Example Biological Resources and the Geographic Regions Where the Resources are Most Commonly Found........................................................................104

Table 12.  Recent Commercial Landings and Ex-vessel Values of Atlantic Herring..............106

Table 13.  Primary Ports Associated with the Atlantic Herring Fishery (values are averaged for 2010-2014)....................................................................................................................106

Table 14.  Recent Commercial Landings and Ex-vessel Values of Atlantic Sea Scallops. .....109

Table 15.  Primary Ports Associated with the Sea Scallop Fishery (values are averaged for 2010-2014). *Data excluded for confidentiality........................................................109

Table 16.  Recent Commercial Landings and Ex-vessel Values of Deep-sea Red Crabs.  *Data excluded for confidentiality........................................................................................111

Table 17.  Recent Commercial Landings and Ex-vessel Values in the Atlantic Mackerel, Butterfish, and Squid Fisheries. ...............................................................................113

Table 18.  Primary Ports Associated with the Atlantic Mackerel, Butterfish, and Squid Fisheries (values are averaged for 2010-2014). *Data excluded for confidentiality...113

_0000017019

Table 19.  Recent Commercial Landings and Ex-vessel Values of Monkfish............................115

Table 20.  Primary Ports Associated with the Monkfish Fishery (values are averaged for 2010-2014)..............................................................................................................................115

Table 21.  Recent Commercial Landings and Ex-vessel Values of Large-mesh Multispecies (aggregated). ...................................................................................................................121

Table 22.  Primary Ports Associated with the Large-mesh Multispecies Fishery (values are aggregated and averaged for 2010-2014)...............................................................121

Table 23.  Recent Commercial Landings and Ex-vessel Values of Small-mesh Multispecies (aggregated). ...................................................................................................................121

Table 24.  Primary Ports Associated with the Small-mesh Multispecies Fishery (values are aggregated and averaged for 2010-2014)...............................................................121

Table 25.  Recent Commercial Landings and Ex-vessel Values of Skates (aggregated). ......123

Table 26.  Primary Ports Associated with the Skate Fishery (2010-2014 values are averaged).  *Data excluded for confidentiality...........................................................124

Table 27.  Recent Commercial Landings and Ex-vessel Values of Spiny Dogfish...................125

Table 28.  Primary Ports Associated with the Spiny Dogfish Fishery (values averaged for 2010-2014). *Data excluded for confidentiality.........................................................126

Table 29.  Recent Commercial Landings and Ex-vessel Values in the Summer Flounder, Scup, and Black Sea Bass Fisheries.....................................................................................130

Table 30.  Primary Ports Associated with the Summer Flounder, Scup, and Black Sea Bass Commercial Fisheries (values are averaged for 2010-2014)................................130

Table 31.  Recent Commercial Landings and Ex-vessel Values in the Surfclam and Ocean Quahog Fisheries. ...........................................................................................................132

Table 32.  Primary Ports Associated with the Surfclam and Ocean Quahog Commercial Fisheries (values are averaged for 2010-2014). *Data excluded for confidentiality...133

Table 33.  Recent Commercial Landings and Ex-vessel Value of Golden Tilefish. .................134

Table 34.  Primary Ports Associated with the Golden Tilefish Fishery (values are averaged for 2010-2014)..............................................................................................................134

Table 35.  Species Protected Under the ESA and/or MMPA that May Occur in the Affected Environment of the Atlantic Herring FMP...................................................................140

_0000017020

Table 36.  LOF Fisheries Likely to Occur in the Affected Environment of the Herring Fishery. ...................................................................................................................................146

Table 37.  Small Cetacean and Pinniped Species Observed Seriously Injured and/or Killed by Trawl Fisheries in the Affected Environment of the Amendment.................................147

Table 38.  2004-2014 Observed Gray and Harbor Seal Interaction with the GOM Atlantic Herring Purse Seine Fishery ......................................................................................149

Table 39.  2016-2018 Atlantic Herring Fishery Specifications (Initial allocations). .............154

Table 40.  Atlantic Herring Catch by Year and Management Area, 2004-2014 ......................155

Table 41.  Total Annual Atlantic Herring Catch 2003-2014 ..............................................157

Table 42.  Fishing Vessels with Federal Atlantic Herring Permits, 2009-2014.......................158

Table 43.  Fishing Gear Distribution of Total Herring Landings from Atlantic Herring Management Areas (2008-2011)....................................................................................159

Table 44.  Fishing Gear Distribution of Total Herring Landings from Atlantic Herring Management Areas (2012-2014)....................................................................................159

Table 45.  Fishing Gear Distribution of Herring Landings by Permit Category (2008-2011) ...................................................................................................................................160

Table 46.  Distribution of 2012 Atlantic Herring Permit Holders that have an Atlantic Herring Community of Interest as a Homeport.........................................................163

Table 47.  Atlantic Herring Landing Distribution by Port and Management Area ................163

Table 48.  Atlantic Mackerel Quota Performance...............................................................171

Table 49.  2014 Data for Permitted and Active Atlantic Mackerel Vessels ...............................172

Table 50.  2014 Vessel Dependence on Mackerel (revenue-based)............................................172

Table 51.  Recent Landings by State (mt) .........................................................................172

Table 52.  Recent Landings by Month (mt)........................................................................173

Table 53.  Recent Landings by Gear (mt)...........................................................................173

Table 54.  Tier 1/2 Homeports .........................................................................................174

Table 55.  Tier 1/2 Principal Ports....................................................................................175

Table 56.  Recent Numbers of Active Dealers ...................................................................175

_0000017021

Table 57.  Kept Catch (mt) in Statistical Areas with at Least 1,000 mt of Mackerel Caught in at Least One Recent Year ...................................................................................................176

Table 58.  Recreational Harvest (rounded to nearest mt) of Mackerel, 2005-2014..............178

Table 59.  Summary of the Indirect Impacts of Omnibus Alternatives (*Preferred alternatives shown in bold*) ..............................................................................................................187

Table 60.  Range of Industry-Funded Monitoring Herring Coverage Target Alternatives (*preferred alternatives shown in bold*)..............................................................................189

Table 61.  Comparison of Information Collected Across Herring Coverage Target Alternatives....................................................................................................................193

Table 62.  2015 Midwater Trawl[1], Purse Seine[2], and Small Mesh Bottom Trawl[3] Observer Coverage Rates ......................................................................................................194

Table 63.  Herring Catch Cap CV and observer coverage, 2011-2015........................................196

Table 64. Alternative 2.2: Simulated mean CV at 25%, 50%, 75% and 100% ASM coverage ........................................................................................................................................200

Table 65. Alternative 2.2: Simulated mean CV at 25%, 50%, 75% and 100% ASM coverage with 25 mt trip exemption........................................................................................201

Table 67.  Pros and Cons of Allocating Monitoring Coverage by Fleet Versus Permit Category ................................................................................................................................208

Table 68.  Proposed and Observed Sea Days for Fleets that Target Herring...........................210

Table 69.  Impacts Summary of Herring Alternatives on Herring Resource (*Preferred Alternatives shown in bold*) .............................................................................................219

Table 70.  Impacts Summary of Herring Coverage Target Alternatives on Non-target Species (*Preferred alternatives shown in bold*)...........................................................................230

Table 71.  Impacts Summary of Herring Alternatives on Protected Species  (*Preferred alternatives shown in bold*) .............................................................................................239

Table 72.  Summary of Physical Environment Impacts of Herring Alternatives  (*Preferred alternatives shown in bold*) .............................................................................................242

Table 73.  Monitoring Cost estimates for the Herring Fishery .......................................243

Table 74.  Industry Cost Responsibilities for NEFOP-level Observer and At-Sea Monitors244

Table 75.  Industry Cost Responsibilities for Electronic Monitoring Implementation.........245

_0000017022

Table 76.  Industry Cost Responsibilities for Ongoing Electronic Monitoring Costs per sea day ....................................................................................................................................245

Table 77.  Landing Ports for MWT Vessels and Portside Sampling Issues ...............................246

Table 78.  Summary of Total Trip Costs for Herring and Mackerel Vessels in 2014 .............249

Table 79.  Monitoring Costs Associated with Declared Herring Trips that Did Not Land Herring in 2014.................................................................................................................250

Table 80.  Number of Category A and B herring vessels by trip size during 2012-2014.....251

Table 81.  Trips by Category A and B herring vessels by size and gear type during 2012-2014...................................................................................................................................251

Table 82.  Potential Reduction to Return-To-Owner for Herring Coverage Target Alternatives.....................................................................................................................262

Table 83.  Summary of Economic Impacts of Herring Coverage Target Alternatives (*Preferred alternatives shown in bold*)..........................................................................266

Table 84.  Herring Alternatives 2.1, 2.2, 2.3, 2.7 (purse seine and smbt) – Annual Average Per Vessel Summary.....................................................................................................269

Table 85.  Herring Alternatives 2.1, 2.2, 2.3 (purse seine and smbt) – Annual Fleet Summary ........................................................................................................................276

Table 86.  Herring Alternatives 2.3 and 2.4 – Annual Average Per Midwater Trawl Vessel Summary........................................................................................................................276

Table 87.  Herring Alternatives 2.3 and 2.4 – Annual Midwater Trawl Fleet Summary ......279

Table 88.  Herring Alternative 2.5 – Annual Average Per Midwater Trawl Vessel Summary ........................................................................................................................280

Table 89.  Herring Alternative 2.5 – Annual Midwater Trawl Fleet Summary .......................281

Table 90.  Herring Alternative 2.7 – Annual Fleet Summary .........................................................282

Table 91.  Summary of Overall Impacts Associated with Herring Alternatives (*preferred alternatives shown in bold*) ......................................................................................288

Table 92.  Summary of Effects of Past, Present, and Reasonable Foreseeable Future Actions on VECs............................................................................................................................302

Table 93.  Cumulative Effects Assessment Baseline Condition of VECs.....................................303

Table 94.  Summary of Impacts of Omnibus Alternatives................................................................305

_0000017023

Table 95.  Summary of Impacts of Herring Alternatives ...................................................308

Table 96.    Annual Cost to Vessels Associated with preferred Herring Alternatives............339

Table 97.  Gross Revenues and Revenues from Herring for the directly Regulated Small
        Entities....................................................................................................................341

Table 98.  Gross Revenues and Revenues from Herring for the Active directly Regulated
        Small Entities..........................................................................................................342

Table 99.  Impacts on the Small, Active Directly Regulated Entities...........................344

Table 100.  Impacts on the Large, Active Directly Regulated Entities........................344

Table 101.  Vessel-Level Impacts on the Small, Active Directly Regulated Entities..............346

Table 102.  Vessel-Level Impacts on the Large, Active Directly Regulated Entities .............346

_0000017024

# List of Figures

Figure 1.  Map of the Gulf of Maine, Georges Bank, and Mid-Atlantic Bight.............................136

Figure 2.  Atlantic Herring Management Areas. ..................................................................153

Figure 3.  Monthly average price per metric ton for Atlantic herring. ........................................160

Figure 4.  Historical Atlantic Mackerel Landings in the U.S. EEZ..................................................170

Figure 5. Mackerel Nominal Ex-Vessel Revenues 1982-2013.........................................................171

Figure 6.  NMFS Statistical Areas ......................................................................................176

Figure 7.  World Production of Mackerel, 1950-2013. ..................................................................177

Figure 8. Herring Catch Cap CV and observer coverage (dot size) in relation to a 30% CV. ..................................................................................197

Figure 9. 2011-2015 derived CV curve for each catch cap based on SBRM sample size analysis methodology, with realized CV for each catch cap year (black dot). ................198

Figure 10. 2011-2015 simulated GB Haddock Catch Cap mean CV (+/- 2 standard errors) in response to increasing observer coverage on Category A/B herring vessels, with realized CV for each fishing year (black dot).  Includes 25 MT trip exemption option. ..................................................................................204

Figure 11.  2014-2015 simulated RHS Catch Cap mean CV (+/- 2 standard errors) in response to increasing observer coverage on Category A/B herring vessels, with realized CV for each fishing year (black dot).  Includes 25 MT trip exemption option. ..................................................................................205

Figure 12. 2011-2015 simulated GB Haddock Catch Cap mean CV (+/- 2 standard errors) in response to increasing observer coverage on Category A/B herring vessels, with realized CV for each fishing year (black dot).  Includes 50 MT trip exemption option. ..................................................................................206

Figure 13.  2014-2015 simulated RHS Catch Cap mean CV (+/- 2 standard errors) in response to increasing observer coverage on Category A/B herring vessels, with realized CV for each fishing year (black dot).  Includes 50 MT trip exemption option. ..................................................................................207

Figure 14.  Herring Alternative 2.1 100% NEFOP Cost and percent of RTO............................270

Figure 15.  Herring Alternative 2.2 100% ASM Cost and Percent of RTO................................272

Figure 16.  Herring Alternative 2.2 75% ASM Cost and Percent of RTO ...................................273

_0000017025

Figure 17.  Herring Alternative 2.2 50% ASM Cost and Percent of RTO ...................................274

Figure 18.  Herring Alternative 2.2 25% ASM Cost and Percent of RTO ...................................275

Figure 19.  Herring Alternative 2.4 100% EM and Portside Cost and Percent of RTO .........277

Figure 20.  Herring Alternative 2.4  50% EM and Portside Cost and Percent of RTO...........278

Figure 21.  Herring Alternative 2.5 100% NEFOP for Midwater Trawl vessels in Groundfish Closed Areas Cost and Percent of RTO.........................................................................................280

Figure 22.  Herring Alternative 2.7 100% EM and Portside on all vessels...............................283

Figure 23.  Herring Alternative 2.7 75% EM and Portside on all vessels..................................284

Figure 24.  Herring Alternative 2.7 50% EM and Portside on all vessels..................................285

Figure 25.  Herring Alternative 2.7 25% EM and Portside on all vessels..................................286

_0000017026

# 1.0   INTRODUCTION AND BACKGROUND

The New England Fishery Management Council (Council) is interested in increasing monitoring in some fishery management plans (FMPs) to assess the amount and type of catch, to more precisely monitor annual catch limits, and/or provide other information for management.  This increased monitoring would be in addition to coverage required through the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA) or Marine Mammal Protection Act (MMPA).  The Council previously proposed industry-funded monitoring requirements in some fisheries to meet monitoring goals beyond SBRM.  However, the National Marine Fisheries Service (NMFS) disapproved these proposals because they were inconsistent with Federal law (see Appendix 1).

The New England Industry-Funded Monitoring (IFM) Omnibus Amendment would provide the measures necessary for industry funding and available Federal funding to pay for additional monitoring to meet specific monitoring coverage targets for each FMP.  This amendment would allow the Council to prioritize industry-funded monitoring programs across FMPs should available Federal funding fall short of the total needed to fully fund all monitoring programs.  This amendment would also ensure consistency for industry-funded monitoring programs across FMPs.  These programs would be used in conjunction with existing monitoring programs to provide for additional monitoring to meet fishery-specific coverage targets in a way that would not conflict with other Federal laws.

Industry-funded monitoring is a complex and highly sensitive issue.  In addition to accounting for socioeconomic conditions of the fleets that must bear the cost of industry-funded monitoring requirements, it involves the Federal budgeting and appropriations process and a diverse suite of Federal mandates.  In an effort to simplify these issues for fisheries stakeholders, we use a question and answer format for the introduction and background section of this document.  We hope this approach helps clarify the considerations that drove the development of the alternatives considered in this action, as well as the expected function and impacts of the alternatives.

Initially, the Mid-Atlantic Fishery Management Council and the New England Council were jointly developing an omnibus amendment to allow for industry-funded monitoring.  The amendment included omnibus alternatives that would have modified all the fishery management plans managed by both Councils to allow for the standardized development and administration of future industry-funded monitoring programs.  Additionally, the amendment included alternatives for industry-funded monitoring coverage for the Atlantic Herring Fishery Management Plan (FMP) and the Atlantic Mackerel, Squid, and Butterfish FMP.  In April 2017, the Mid-Atlantic Council decided to postpone action on the amendment, while the New England Council selected preferred alternatives and recommended the amendment to NMFS for approval and implementation.  Therefore, the joint omnibus amendment has become the New England Industry-Funded Monitoring Omnibus Amendment.  If approved by NMFS, this amendment will only apply to FMPs managed by the New England Council.  Specifically, this amendment would modify New England Council FMPs to allow for the standardized development and administration of

_0000017027

future industry-funded monitoring programs.  This amendment would also implement an industry-funded monitoring program in the Atlantic Herring FMP.  If the Mid-Atlantic Council re-considers an amendment to allow industry-funded monitoring, that amendment would only apply to FMPs managed by the Mid-Atlantic Council.  The New England Industry-Funded Monitoring Omnibus Amendment will undergo rulemaking in 2018 and, if approved, the amendment would likely be implemented during 2019 or 2020.

The introduction and background section includes four categories of questions and answers, including: 1) General questions about the Industry-Funded Monitoring Omnibus Amendment; 2) Cost responsibilities; 3) NMFS administrative costs; and 4) Industry Costs. The list of questions under each of these categories is summarized below.

If you are viewing this document electronically, click on any question of interest, and the hyperlink will take you to the page with the answer.

General Questions and Answers about the Industry-Funded Monitoring Omnibus Amendment
- How is this document organized?
- Why is the Council establishing industry-funded monitoring programs?
- How is the Federal budget for monitoring decided each year?
- Why did NMFS disapprove past Council proposals for industry-funded monitoring programs?
- How does this amendment address the issues that resulted in the recent disapprovals?
- Under this amendment, would setting an industry-funded monitoring coverage target for a given FMP mean the fishery is guaranteed that level of coverage for a given year?  For example, if the Atlantic Herring FMP sets a coverage target of 100% for 2019, does this amendment ensure that level of coverage would be achieved?
- How are existing industry-funded monitoring programs administered in the Greater Atlantic Region?
- Why does this action propose to consider industry-funded monitoring programs in a different way than they are considered for the NE Multispecies and Scallop FMPs?
- Why does NMFS caution the Council about additional costs for monitoring but not for other FMP requirements, such as vessel trip reports?
- What types of monitoring are considered in this amendment?

Questions and Answers about Cost Responsibilities
- What are the cost components for monitoring programs?
- Why can't industry split the cost of monitoring with the government by some percent (e.g., industry pays for 30%, NMFS pays for 70%) or some dollar amount (e.g., industry pays for $325, NMFS pays for the rest)?
- Why can't NMFS directly collect fees for monitoring programs?
- Why has it been difficult for NMFS to give cost estimates for various types of monitoring programs?

_0000017028

Questions and Answers about NMFS Administrative Costs
- How was the use of certain funding lines changed in relation to SBRM?
- What funding lines are available to fund administrative costs for industry-funded monitoring programs?
- Can NMFS accept funding from external groups to fund administrative costs for fisheries monitoring?
- How does NMFS cover its administrative costs for the groundfish at-sea monitoring program? (
- When could SBRM funds be used to cover the administrative costs for monitoring?
- If SBRM isn't fully funded every year, how could there be discretionary funding available to cover industry-funded programs?

Questions and Answers about Industry Costs
- The expected industry contribution for monitoring in the Greater Atlantic Region seems a lot higher than other regions.  Don't Alaska fishermen only pay $325 per sea day for observer coverage?
- The scallop fishery has an observer set-aside to help defray industry costs for monitoring.  Can other FMPs use this approach?  What are some of the challenges of using a monitoring set-aside to pay for industry costs?
- Can there be a fully industry-funded program where industry pays for both administrative and monitoring costs, and hands packaged data over to NMFS?
- If NMFS has extra funding available, can the money be passed along to industry to help defray its cost responsibilities for monitoring?

## 1.1.1 GENERAL QUESTIONS AND ANSWERS ABOUT THE INDUSTRY-FUNDEDED MONITORING OMNIBUS AMENDMENT

**How is this document organized?**

This amendment has three sets of alternatives.

The first set of alternatives is referred to as the "Omnibus Alternatives."  These alternatives include:  (1) Standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry; (2) a process for FMP-specific industry-funded monitoring to be implemented via amendment and revised via framework adjustment; (3) standard administrative requirements for industry-funded monitoring service providers; (4) process to prioritize available Federal funding across FMPs for new industry-funded monitoring programs, including the type of weighting approach and the timing of revising the weighting approach; and (5) process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

These alternatives would apply to all Council FMPs.  The Omnibus Alternatives are described in Section 2.1 of this document.  The impacts of the Omnibus Alternatives are analyzed in Section 4.1.

_0000017029

The second set of alternatives includes monitoring coverage target alternatives specific to the Atlantic Herring FMP. These alternatives are referred to as the "Herring Alternatives." The Herring Alternatives are described in Section 2.2 of this document. The impacts of the Herring Alternatives are analyzed in Section 4.2.

[Back to list of questions.]

**Why is the Council establishing industry-funded monitoring programs?**

The Council is interested in increasing monitoring and/or other types of data collection in some FMPs to assess the amount and type of catch, to more accurately monitor annual catch limits, and/or provide other information for management. NMFS has limited funding for monitoring, so the Council is considering requiring industry to contribute to the cost of monitoring. Therefore, this amendment considers measures that would provide options to allow the Council to implement industry-funded monitoring coverage in New England FMPs. Industry funding would be used in conjunction with available Federal funding to pay for additional monitoring to meet FMP-specific coverage targets. This amendment would also set priorities for meeting coverage targets when Federal funding is limited.

[Back to list of questions.]

**How is the Federal budget for monitoring decided each year?**

Each year, the White House Office of Management and Budget submits a budget request for the entire Federal government for the following fiscal year, which starts in October. The budget request contains numerous funding lines and Congress makes the final determination on that request. Each of these funding lines is accompanied by a brief description which explains to Congress and the public how the funding in that line will be used. Funds cannot be used for programs, projects, or activities that are not included in the description of the budget line, or as directed by Congress in appropriations bills.

[Back to list of questions.]

**Why did NMFS disapprove past Council proposals for industry-funded monitoring programs?**

Recent Council proposals for industry-funded monitoring either attempted to require NMFS to spend money that was not in the budget, or attempted to split monitoring costs between industry and NMFS in ways that are not consistent with Federal law. These actions raised concerns relating to the Miscellaneous Receipts Statute,[1] the Anti-Deficiency

---

[1] The Miscellaneous Receipts Statute provides that "an official or agent of the United States Government having custody or possession of public money shall keep the money safe" and may not lend, use, deposit in a

_0000017030

Act,[2] and other statutes and regulations that govern Federal budgets.  More detailed explanations of recent NMFS disapprovals of industry-funded monitoring provisions in Atlantic Herring Amendment 5 and Northeast (NE) Multispecies Framework Adjustment 48 are included in Appendix 1.  The concepts behind the disapprovals are also summarized here.

Congress must decide how to finance any program, project, or activity (program) it establishes.  Typically, programs are funded by appropriating funds from the U.S. Treasury. In addition to designating the funds necessary for a program, a congressional appropriation sets a maximum authorized program level.  The maximum authorized program level functions as a cap on funding for a program.  A Federal agency cannot spend money on a program beyond the maximum authorized program level without authorization from Congress.  A Federal agency also cannot get around the maximum authorized program level by adding to its appropriations from sources outside the government without permission from Congress.

The disapproved monitoring provision in Herring Amendment 5 would have required NMFS to fund very high levels of observer coverage in the herring fishery.  Because NMFS's spending is limited by its Congressional appropriations, NMFS cannot approve a monitoring program that it does not have enough money to fund.  NMFS also cannot take money from budget lines intended for other activities in order to fund monitoring programs.

Second, the Herring Amendment 5 attempted to specify a set industry contribution for industry-funded monitoring (i.e., industry would only pay $325 per sea day).  Similarly, the NE Multispecies Framework 48 attempted to limit the types of costs that industry would be responsible for in an industry-funded program (i.e., industry would only have to pay for observer salary).  These proposals were disapproved because the government cannot commit to pay for costs that are not inherently the responsibility of the government.  In the case of industry-funded monitoring, NMFS interpreted this to mean that it is only obligated to pay for its administrative costs to support industry-funded programs and is not obligated to pay for any costs generated from sampling activities for these programs.  This standard was applied to the monitoring cost provisions recently proposed in the Herring and NE Multispecies FMPs and resulted in the disapproval of those measures.

[Back to list of questions.]

---

bank or exchange the money for other amounts.  31 U.S.C. § 3302(a). It obliges government officials "receiving money for the Government from any source [to] deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." *Id.*

[2] The Anti-Deficiency Act prevents federal officers from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation" from Congress or "involv[ing] either government in a contract or obligation for the payment of money before an appropriation is made [by Congress] unless authorized by law."  31 U.S.C. § 1341(a)(1).

_0000017031

**How does this amendment fix the issues that resulted in the recent disapprovals?**

The amendment addresses the disapprovals by: (1) Establishing a process through which NMFS can approve new monitoring programs without committing funding that is not in the budget; and (2) establishing a legal approach to allow industry funding to be used in conjunction with Federal funding to pay for additional monitoring to meet fishery-specific coverage targets.

First, the concept of a monitoring *coverage target*, as opposed to a mandatory monitoring coverage level, allows NMFS to approve new monitoring programs without committing to support coverage levels above appropriated funding or before funding is determined to be available. The realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year. Fishery management plans interested in coverage above SBRM would set coverage targets in individual fishery management plan amendments. Realized coverage for a fishery in a given year would be anywhere from no additional coverage above SBRM up to the specified coverage target.

Second, this amendment establishes a description of the division of cost responsibilities for industry-funded monitoring programs between industry and NMFS that is consistent with legal requirements. This division of costs is described under the heading "Standardized Cost Responsibilities" in Omnibus Alternative 2. Department of Commerce General Counsel has advised NMFS that monitoring cost responsibilities may be allocated between industry and the government as long as government cost responsibilities are paid by the government, and the government's costs are differentiated from the industries responsibilities. Currently, the delineation has been made between administrative and sampling costs. This amendment will set a standard delimitation to avoid confusion and ensure compliance with appropriations requirements. Establishing a common definition means that all future Council proposals for industry-funded monitoring programs would consider NMFS and industry cost responsibilities in the same way.

[Back to list of questions.]

**Would setting an industry-funded monitoring coverage target for a given FMP in this amendment mean that the fishery is guaranteed that level of coverage for a given year? For example, if the Herring FMP sets a coverage target of 100% for 2019, does this amendment ensure that level of coverage would be achieved?**

No. This amendment establishes tools that NMFS and the Council could use to provide for and prioritize additional monitoring across New England fisheries when Federal funding is available, but it cannot resolve the underlying issue of limited Federal funding. This means that this Industry-Funded Omnibus Amendment WOULD NOT automatically allow for higher coverage levels in New England fisheries. During years when there is no additional funding to cover NMFS cost responsibilities above funding for SBRM, there would be no additional monitoring coverage, even if industry is able to fully fund their cost responsibilities.

_0000017032

[Back to list of questions.]

**How are existing industry-funded monitoring programs administered in the Greater Atlantic Region?**

The Greater Atlantic Region currently administers an industry-funded monitoring program for the Atlantic sea scallop FMP and for groundfish sectors in the NE Multispecies FMP. Additional details about the industry-funded monitoring programs for these fisheries are provided below.

The IFM Omnibus Amendment would not modify the coverage levels or allocation of funding for NMFS administrative costs for the scallop or groundfish sector industry-funded monitoring programs. The standardized structure and prioritization process considered in the IFM Omnibus Amendment could apply to groundfish sectors and/or the scallop fishery if, in a future action, if the Council wants to include those programs in this prioritization process, or develops new IFM programs within those FMPs.

*Scallop Industry-Funded Observer Program.* NMFS incorporated the industry-funded observer program into the Atlantic Sea Scallop FMP in 1999 in Framework Adjustment 11 (64 FR 31144, June 10, 1999). The scallop industry-funded observer program first applied to the Closed Area II scallop fishery exemption program. Six subsequent management actions addressed major aspects of the industry-funded observer program:
- Framework 13 to the Scallop FMP (65 FR 37903, June 19, 2000) kept the program in place for the Closed Area I, Closed Area II, and Nantucket Lightship exemption program;
- Framework 14 to the Scallop FMP (66 FR 24052, May 11, 2001) kept the program in place for the Hudson Canyon and Virginia Beach Area Access program;
- Amendment 10 to the Scallop FMP (69 FR 35194, June 23, 2004) formally included the program for all limited access scallop fishing under the area access and open area days-at-sea programs;
- Framework 16 to the Scallop FMP (69 FR 63460, November 2, 2004) established observer coverage levels to meet a 30-percent coefficient of variation (CV) (a measurement of the precision of the estimate) for Closed Area I, Closed Area II, and the Nantucket Lightship area access fisheries;
- Secretarial Emergency Rule (71 FR 34832, June 16, 2006; extension 71 FR 69073, November 29, 2006) established a mechanism for vessels to contract directly with observer service providers to resolve legal constraints of industry paying for observer coverage; and
- Amendment 13 to the Scallop FMP (72 FR 32549, June 13, 2007) formally incorporated the emergency action industry-funded observer measures into the Scallop FMP.
- As monitoring needs expanded and administration of the program became more efficient, the Council and NMFS ultimately expanded the scallop industry-funded monitoring program to all access areas, open areas, and to the limited access general

_0000017033

category individual fishing quota fleet.  The Council and NMFS have made minor operational modifications to the program over the years.  The Scallop FMP's program is a good example of an effective industry-funded program that phased in changes as program and administration needs evolved.

The need for the scallop industry-funded program consistently has been to collect catch information (kept fish and bycatch) through levels of at-sea observer coverage that could not otherwise be consistently achieved through NMFS observer program funding alone. NMFS has, and continues to be able to pay for its costs of administering the scallop industry-funded observer program because the coverage level is primarily set through SBRM.  Prior to the implementation of the 2007 SBRM amendment, the Council concluded that industry-funded coverage levels set to achieve a 30% CV performance standard would appropriately reduce variability in bycatch estimates for yellowtail flounder, other finfish, and sea turtles.  When the SBRM was first implemented, this goal for monitoring the scallop fishery was included in the SBRM coverage goals.  The scallop industry-funded observer program provides funding through a quota set-aside (described below) that enables the scallop fishery to pay for coverage levels that meet or exceed the SBRM coverage targets.

The observer set-aside model works well in the scallop fishery because the high value of scallops allocated to vessels that carry an observer helps compensate the vessel for the cost of the observer.  The vessel receives extra pounds or days-at-sea on each observed trip that provides additional funds to pay for the observer.  However, vessel owners are required to pay for the observer even if the vessel does not catch any scallops or the additional set-aside of scallops, or if there is insufficient set-aside allocated to compensate the vessel. NMFS's goal is to set a compensation rate (the amount of extra pounds of scallops allocated to trips that carry observers) that covers the cost of an observer, without providing financial incentive for a vessel to desire observer coverage, which could bias sampling.

*Groundfish Industry-Funded At-Sea Monitoring (ASM).*  The groundfish sector ASM program was first developed by the Council in Amendment 16 to the Northeast Multispecies FMP (75 FR 18262, April 9, 2010).  Amendment 16 stated that the primary purpose of the groundfish ASM program was to verify area fished, catch, and discards by species on sector trips, and that coverage levels must be sufficient to at least meet the CV performance standard in SBRM (i.e., a 30% CV).  This CV standard is achieved through a combination of SBRM (fully-NMFS funded) and ASM (industry-funded) coverage.  Framework 48 to the Northeast Multispecies FMP (78 FR 26118, May 3, 2013) further defined specific goals and objectives for the ASM program, and also clarified that the 30% CV standard for ASM should apply at the stock level (i.e., each stock of fish for the fishery as a whole).  In contrast, the SBRM CV standard for groundfish applies at the stock complex level (e.g., for all groundfish stocks in aggregate).

The groundfish ASM program was designed to transition to an industry-funded program in 2012, but from groundfish fishing years 2010 through 2014, NMFS was able to fully fund both the NMFS and industry cost responsibilities for groundfish ASM.  Though NMFS has paid both sampling and administrative costs for ASM for groundfish sectors since 2010,

_0000017034

groundfish sectors are responsible for covering the sampling costs for the ASM program if NMFS is unable.  Fishermen have recently begun to fund their ASM program costs.

[Back to list of questions.]

**Why does this action propose to consider industry-funded monitoring programs in a different way than it is considered for the NE Multispecies and Scallop FMPs?**

The Atlantic sea scallop and NE Multispecies monitoring programs have already been established by the Council, and the operation of their fisheries depends on these programs. For example, the sector fishery requires at-sea monitoring to reliably estimate catch to ensure that the groundfish catch limits are not exceeded and that overfishing does not occur.  Sectors could not operate without sufficient at-sea monitoring programs.  In addition to the programs they already established, the Council has been increasingly interested in requiring monitoring coverage for purposes different than those for which NMFS is legally required to provide monitoring coverage (e.g., Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), MMPA, ESA).  NMFS's limited budget requires NMFS to prioritize resources across competing monitoring interests.  The standardized process for industry-funded programs described in this amendment, including the prioritization process detailed under Omnibus Alternative 2, provides a method to address the Council's identified monitoring needs and priorities in consideration of NMFS's budget limitations.  This process would allow available funding for coverage to be applied where it is most needed to achieve the highest priority objectives, and allows both the Council and the public to be informed about funding limitations and to contribute to the decision-making process.

[Back to list of questions.]

**Why does NMFS caution the Council about additional costs for monitoring but not for other FMP requirements, such as vessel trip reports?**

NMFS evaluates its ability to financially administer all of the Council's recommendations prior to approval.  Certain requirements, for example, an increase to weekly vessel trip reports (VTRs) for a fishery, can be administered within existing resources because they are either cost neutral under the existing administrative infrastructure, or they only add marginally to NMFS costs.  In the example of VTRs, NMFS already has staff processing weekly VTRs for a number of fisheries, and most Greater Atlantic Region permit holders already submit VTRs weekly related to permit requirements for the NE Multispecies and Atlantic herring fisheries.

In contrast, the costs associated with implementing new at-sea monitoring, portside sampling, or electronic monitoring programs are often substantial and cannot be easily completed by existing staff using the existing budget.  In addition, the amount of money Congress appropriates to fund monitoring costs fluctuates from year to year, so NMFS cannot commit to pay for new, expensive monitoring programs indefinitely.  For these

_0000017035

reasons, NMFS has made efforts to communicate to the Council that funding for new monitoring programs must be a significant consideration during program development.

[Back to list of questions.]

**What types of monitoring are considered in this amendment?**

This amendment discusses industry-funded programs to implement four types of monitoring: (1) NEFOP-level observer monitoring; (2) at-sea monitoring; (3) portside monitoring; and (4) electronic monitoring. These four types of monitoring are briefly described below, and described in more detail in Appendix 3 to this document.

1. NEFOP-level observer monitoring focuses on data collection at sea, recording an advanced and diverse set of information on the type and quantity of retained and discarded catch on fishing trips.
2. At-sea monitoring focuses on data collection at sea, recording the type and quantity of retained and/or discarded catch, but a more limited set of information on fishing trips than NEFOP-level observers. There are fishery-specific at-sea monitoring programs that support FMP-specific goals (i.e., groundfish ASM program).
3. Portside monitoring focuses on data collection at the dock, accounting for landings of target species and incidental catch. If all fish caught are retained and landed, portside monitoring can also record type and quantity of total catch.
4. Electronic monitoring (EM) uses video cameras and other sensors to monitor discards at sea or to monitor compliance with retention requirements.

[Back to list of questions.]

## 1.1.2 QUESTIONS AND ANSWERS ABOUT COST RESPONSIBILITIES

**What are the cost components for monitoring programs?**

There are two types of costs associated with monitoring programs: (1) Sampling costs, such as observer salary and travel costs; and (2) NMFS administrative costs, such as observer training and data processing. This amendment would codify the separation of monitoring cost responsibilities such that industry is responsible for sampling costs and NMFS is responsible for administrative costs. This division of costs is described under the heading "Standardized Cost Responsibilities" in Omnibus Alternative 2.

[Back to list of questions.]

**What is cost sharing? Can industry split the cost of monitoring with the government by some percent (e.g., industry pays for 30%, NMFS pays for 70%) or some dollar amount (e.g., industry pays for $325, NMFS pays for the rest)?**

_0000017036

The concept of "cost sharing" has come up throughout the discussions of industry-funded monitoring.  Conceptually, cost sharing implies that industry and the government both contribute to the cost of the monitoring program.  However, legal constraints prevent NMFS from receiving industry funds to pay for government costs in an industry-funded monitoring program.  Therefore, it is necessary to specify appropriate cost responsibilities for NMFS and industry to avoid NMFS and industry sharing costs.

Department of Commerce General Counsel has advised NMFS that monitoring cost responsibilities can be allocated between industry and the government by delineating the sampling and administrative portions of the costs of monitoring.  Industry would be responsible for costs directly attributable to the sampling portion of a monitoring program, and NMFS would be responsible for costs directly attributable to the administrative portion of the monitoring program (See Omnibus Alternative 2 under "Standardized Cost Responsibilities").  This division of cost responsibilities should remain the same and should differentiate between inherently governmental responsibilities and industry costs.

It is illegal for industry to pay inherently government costs (e.g., administrative costs), but either group can pay for sampling costs.  Actual payment of different cost responsibilities for monitoring programs can work in two ways:  (1) NMFS can pay for its cost responsibilities, such as support and administrative costs, and also pay for the industry's cost responsibilities, such as sampling costs (e.g., the Northeast Fisheries Observer Program); or (2) NMFS can pay for its cost responsibilities, such as support and administrative costs, and industry can pay for its cost responsibilities, such as sampling costs (e.g., industry-funded Atlantic scallop observer program).  Additionally, NMFS can help to offset industry's monitoring cost responsibilities by reimbursing vessel owners through cooperative agreements with third parties when funding is available.

[Back to list of questions.]

**Why cannot NMFS directly collect fees for monitoring programs?**

The Miscellaneous Receipts Act requires Federal employees to deposit any money received on behalf of the government into the general Treasury, unless otherwise directed by law.  This means that if NMFS accepted funds from the industry, NMFS would be required to direct those funds to the Treasury and would not be able to reserve them to pay for monitoring in the Greater Atlantic Region without a change in law to allow that to happen.  For example, the Alaska Region has special authorization in the Magnuson-Stevens Act to collect fees from the industry and to put those fees into a fund to be used to defray the costs of monitoring in that region (Magnuson-Stevens Act § 313).  The Greater Atlantic Region does not have such authority, except for cost recovery for Limited Access Privilege Programs (LAPPs).  Currently, cost recovery is applicable only to the Atlantic sea scallop limited access general category individual fishing quota (IFQ) and the golden tilefish IFQ programs (both are forms of LAPPs).  These fisheries, along with the surfclam and ocean quahog fisheries, are the only programs in the Greater Atlantic Region that are subject to the cost recovery requirement.

_0000017037

Under the LAPP cost recovery authority (Magnuson-Stevens Act § 303A(e)) and the authority to establish fees (Magnuson-Stevens Act § 304(d)), the Magnuson-Stevens Act requires NMFS to collect a fee to recover the actual costs directly related to the management, data collection, and enforcement of any LAPP and community development quota program that allocates a percentage of the total allowable catch of a fishery to such program. NMFS must collect a fee not to exceed 3% of the ex-vessel value of fish harvested under these programs. The fees are deposited into a unique fund that NMFS uses to directly pay for the management, data collection, and enforcement of the program. The relevant costs to recover are the incremental costs, meaning those costs that would not have been incurred but for the LAPP. If the Council decides at some future point to develop LAPPs in other fisheries, cost recovery programs could be implemented in those fisheries. Development of LAPPs and cost recovery programs are complex and often take several years.

[Back to list of questions.]

**Why has it been difficult for NMFS to give cost estimates for various types of monitoring programs?**

Monitoring program costs include a variety of administrative and sampling costs that vary substantially within and between years. This variability affects the estimates of both NMFS and industry costs for monitoring programs, which means that the estimate of the total or per sea day cost for the same monitoring program can vary depending on the time period of interest. A discussion of the difficulties with generating a cost estimates for monitoring is included in the 2015 Program Review of the Northeast Fisheries Science Center Fisheries Sampling Branch, available at http://www.nefsc.noaa.gov/fsb/index.html#fsb-review.

Some of the reasons why estimates of NMFS administrative costs can vary include:

- The costs associated with training vary substantially within and between years because of the high monitor turnover rate.
- The costs associated with data editing varies greatly depending on the experience of the cohort of monitors for a given time period. Data editing costs may be lower for a given period if the cohort of monitors is highly experienced. Conversely, data editing costs may be higher for a period with a large cohort with less experienced monitors.

In addition, the breakdown of industry costs for sampling for a single sea day can vary depending on:

- How close the monitor's home port is to the port of deployment (an observer will be reimbursed travel costs which include mileage and an hourly wage for time traveling if traveling greater than 50 miles from their assigned home port);

_0000017038

- How long monitors are retained by the service provider (training costs are amortized over the career span of the monitors);
- Trip length;
- How accurately a vessel schedules its departure time; and
- A given service providers' business models (provider observer support, strategies for retention, observer bonus structure, benefits).

Finally, with the exception of the industry-funded scallop observer program, industry-funded monitoring is a relatively new arrangement for funding monitoring programs in the Greater Atlantic Region.  Most of the monitoring program cost estimates in this document are based on costs negotiated and structured as part of Federal contracts between NMFS and various monitoring service providers.  When individual vessels or groups of vessels form contracts with service providers for monitoring coverage in future industry-funded monitoring programs, the terms and structure of the contracts may differ from those in recent and existing Federal contracts.  This means that the actual costs that industry may pay to service providers for monitoring may differ from the available estimates.

For these reasons, this document presents several of the available Greater Atlantic Region and national cost estimates for at-sea, dockside, and electronic monitoring programs.  With each estimate, we state the source and assumptions that generated the estimate.  Although this may be confusing, we hope that providing the managers and the public a full understanding of the potential costs will allow for informed decision making when establishing industry-funded monitoring programs.

[Back to list of questions.]

## 1.1.3 QUESTIONS AND ANSWERS ABOUT NMFS ADMINISTRATIVE COSTS

**How was the use of certain funding lines changed in relation to SBRM?**

The Court order in *Oceana* v. *Locke*, which vacated the 2007 SBRM Omnibus Amendment, found legal fault with two aspects of the process used to prioritize funding for observer coverage.  First, the Court found that NMFS had too much discretion in determining whether there were sufficient resources available to fully implement the estimated number of sea days needed to achieve the CV-based SBRM performance standard.  Second, the Court found that NMFS had too much discretion in how observer sea days were redistributed under the prioritization process.  To address these two aspects of the court order, the revised SBRM established a process for distributing the available observer sea days if resources are limited.

Under the revised SBRM prioritization process, the amount of money available for the SBRM will be the funding allocated to the Region under four specific historically-appropriated observer funding lines.  The Northeast Fisheries Observer funding line is now fully committed to funding SBRM.  The three other observer funding lines now dedicated to SBRM are allocated among different NMFS regions, including the Greater Atlantic Region, to

_0000017039

meet national observer program needs. The total amount of the funds allocated to the Greater Atlantic Region from these three funding lines will constitute the remainder of the available SBRM funds.

Historically, the available SBRM funding has been insufficient to fully meet the CV-based performance standard for all of the fishing modes (gear type, access area, trip category, region, and mesh group combinations analyzed under SBRM). If the available funding continues to be insufficient to meet the CV-based performance standard, the SBRM amendment establishes a non-discretionary formulaic processes for prioritizing how the available observer sea-days would be allocated to the various fishing modes to maximize the effectiveness of bycatch reporting and bycatch determinations.

[Back to list of questions.]

**What funding lines are available to fund administrative costs for industry-funded monitoring programs?**

A number of different funding lines contribute to monitoring programs in the Greater Atlantic Region.

NMFS Greater Atlantic Regional Fisheries Office (GARFO) and Northeast Fisheries Science Center (NEFSC) receive funding amounts through specific budget line items to cover its costs for monitoring programs. Some of the funding lines must be used for specific monitoring programs. With implementation of the Greater Atlantic Region SBRM amendment, NMFS no longer has the flexibility to use certain funding lines as we have in the past, as described above. In addition, there are certain funding lines specifically designated for other monitoring priorities (e.g., protected species monitoring). Thus, there are certain funding lines that will not be available to support industry-funded programs, unless there is excess available funding in these lines above the amount needed to meet the designated monitoring obligations for that year.

Other funding lines that include monitoring or administrative aspects of monitoring programs in their described purpose could be used to cover NMFS costs for industry-funded monitoring programs. Once the Council establishes industry-funded monitoring programs, NMFS will be able to determine the funding lines that could contribute to NMFS costs for industry-funded monitoring programs. If there is not enough money to cover NMFS costs related to industry-funded monitoring programs for a given year, depending on the alternatives chosen the Amendment, either NMFS or the Council would need to prioritize which programs are funded first.

[Back to list of questions.]

_0000017040

**Can NMFS accept funding from external groups to fund administrative costs for monitoring programs?**

Consistent with current law, there are two mechanisms by which the Greater Atlantic Region may accept outside resources for monitoring.  First, Section 208 of the Magnuson-Stevens Act established a Fisheries Conservation and Management Fund, which may be funded through quota set-asides, appropriations, states or other public sources, and private or nonprofit organizations.  This fund may be used to expand the use of electronic monitoring, and each region must be apportioned at least 5% of any money contributed to this fund.  There have been inquiries about the fund over the years, but to date no contributions have been made.

Second, Section 403(b) of the Magnuson-Stevens Act allows for NMFS to accept resources and facilities for observer training from state, university, and any appropriate private nonprofit organizations on a limited basis.  This provision has not been previously implemented and may have limitations that might undermine its utility for this region's fisheries.

[Back to list of questions.]

**How does NMFS cover its administrative costs for the groundfish ASM program?**

In part, NMFS has used funding in budget line items related to Catch Shares to fund administrative and sampling costs for the groundfish ASM program.  The groundfish ASM program was designed to be an industry-funded program, but from groundfish fishing years 2010 through 2014, NMFS was able to fully fund both the NMFS and industry cost responsibilities for groundfish ASM.  Groundfish sectors are required to pay for their sampling costs responsibilities for the ASM program if NMFS is unable.  Fishermen have recently begun to pay for their ASM program costs.

[Back to list of questions.]

**When could SBRM funds be used to cover the administrative costs for monitoring?**

SBRM funding is used to cover the administrative costs for the industry-funded Atlantic sea scallop observer program.  NMFS could explore using SBRM funding to cover the administrative costs for NEFOP-level observer coverage for other FMPs, but there three important considerations for this approach.

First, the sampling criteria (i.e., the gears and areas combinations) that the observer coverage applies to would need to match SBRM modes (gear type, access area, trip category, region, and mesh group combinations analyzed under SBRM).  This means that this approach could not be used if the Council desired to use an industry-funded program to cover specific permit categories, unless those permit categories directly aligned with SBRM modes.  In the case of the scallop industry-funded observer program, the observer coverage requirements apply to gear and area combinations that match SBRM modes.

_0000017041

Second, industry would be fully responsible for paying the sampling costs for NEFOP-level observer coverage, currently estimated at $818 per sea day.  In addition, this approach could not be used for other types of monitoring coverage, including fishery specific at-sea monitors, portside sampling, or electronic monitoring.  The scallop industry-funded observer program uses a set-aside to help defray industry costs for monitoring.  However, vessel owners are required to pay for the observer even if the vessel does not catch any scallops or the additional set-aside of scallops, or if there is insufficient set-aside allocated to compensate the vessel.  These same requirements would apply to other FMPs desiring to use SBRM funding to cover the administrative costs for monitoring.

Third, this approach could only be used to reach SBRM monitoring coverage levels for a given FMP.  SBRM seeks to allocate observer coverage to reach a 30% CV on the discard estimate for managed species.  This means that if only 10% observer coverage on a given SBRM mode is needed to reach the 30% CV, then this approach would only allow for 10% coverage for that gear and area combination in a given year.  The Council has been interested in higher levels of monitoring coverage for a number of FMPs, so this approach may not provide the level of coverage necessary to meet FMP goals.

[Back to list of questions.]

**If SBRM isn't fully funded every year, how could there be discretionary funding available to cover administrative costs from industry-funded programs?**

Under the revised SBRM prioritization process, the amount of money available for the SBRM will be the funding allocated to the Region under four specific historically-appropriated observer funding lines.  Unless there is excess funding in these lines above the amount needed to meet the designated monitoring obligations for that year, SBRM funding will not be available to fund industry-funded monitoring programs.  Historically, the available SBRM funding has been insufficient to fully meet the CV-based performance standard for all of the fishing modes (i.e., gear type, access area, trip category, region, and mesh group combinations analyzed under SBRM).  Thus, there is stakeholder concern that there will never be funding available to cover NMFS administrative costs for industry-funded monitoring programs.  However, past funding availability is not a predictor of future funding availability.

We reiterate that other funding lines that include monitoring or administrative aspects of monitoring programs in their described purpose, other than the four funding lines designated for SBRM, could be used to cover NMFS costs for industry-funded monitoring programs.  Until the Council establishes industry-funded monitoring programs, it will not be clear what NMFS costs might be related to these new programs, and what amount and type of administrative support will be necessary.  Thus it is not possible to list the funding lines that could contribute to NMFS costs for industry-funded monitoring programs at this time.  If there is not enough money to cover NMFS costs related to industry-funded monitoring programs for a given year, either NMFS or the Council would need to prioritize which programs are funded first.

_0000017042

[Back to list of questions.]

## 1.1.4  QUESTIONS AND ANSWERS ABOUT INDUSTRY COSTS

**The expected industry contribution for monitoring in the Greater Atlantic Region seems a lot higher than other regions.  Do Alaska fishermen only pay $325 per sea day for observer coverage?**

There are a number of factors that influence industry costs for monitoring programs.  A 2012 MRAG Americas report titled "Comparison of At-Sea Catch Monitoring Programs with Full Observer Coverage to the Directed Atlantic Herring Fishery – New England" compared the industry costs for Northeast Fishery Observer Program monitoring in the Atlantic herring fisheries to the industry contribution for several other fisheries that require 100% industry-funded monitoring coverage, including the Hawaii longline swordfish fishery, the Alaska pollock midwater trawl fishery, the West Coast at-sea whiting (hake) midwater trawl fishery, and the West Coast non-whiting trawl Individual Fishing Quota fishery.  The report estimated industry contributions for these programs in the range of $360-420 per sea day.  However, the report noted that the short trip duration (1-5 days) and complicated deployment logistics for the herring fleet result in higher per sea day costs for monitoring.  In contrast, some of the other fisheries reviewed in the report have much longer trip duration (21-90 days) and have vessels that operate out of a limited number of ports, which simplifies deployment logistics.

[Back to list of questions.]

**The scallop fishery has an observer set-aside to help defray industry costs for monitoring.  Can other FMPs use this approach?  What are some of the challenges of using a monitoring set-aside to pay for industry costs?**

There are aspects of the scallop fishery, including the health and value of the stock, the management regime, and the predictability of landings, which allow the observer set-aside model to work well.

First, the health of the scallop resource means that a certain amount of the quota can be set aside to compensate the vessel for the cost of the observer.  If a fishery resource is in poor shape, it may not be possible to allocate enough of the quota to a set-aside to effectively offset industry costs for monitoring.  In addition, the high value of scallops allocated to vessels that carry observers helps compensate the vessel for the cost of the observer.  Other fisheries with a lower price per pound (e.g., herring fishery) may need to set aside a much larger portion of the resource to compensate industry for monitoring cost.

Second, the management regime of the scallop fishery supports the set-aside model.  The scallop fishery uses trip or days-at-sea limits for many of its permits, and vessels receive extra pounds or days-at-sea on each observed trip that provides additional funds to pay for

_0000017043

the observer.  The set-aside approach may not be appropriate for fisheries that have permits without possession limits (e.g., Herring Category A), or would require those fisheries to adjust their management regimes to allow the set-aside program to function.

Finally, scallop trips are more predictable than trips targeting other species, specifically migratory species like herring and mackerel.  While it is fairly likely that a given scallop trip could land the set-aside amount necessary to offset the cost of observers, the availability of herring is much less predictable, and is influenced by a number of environmental factors.  On a given herring trip, it is much less likely that a vessel may be able to land a set-aside amount necessary to offset the cost of an observer.

[Back to list of questions.]

**Can there be a fully industry-funded program where industry pays for both administrative and monitoring costs, and hands packaged data over to NMFS?**

All governmental agencies perform some work that is so intimately related to the public interest that it requires performance by a Federal employee, rather than a contractor or third party.  This type of work is classified as an "inherently government function."  Guidance about the types of work that is classified as an inherently government function can be found in the Office of Federal Procurement Policy Letter 11-01, Performance of Inherently Governmental and Critical Functions (76 FR 56227, September 12, 2011).

For NMFS, the responsibility for maintaining the public interest are governed by a number of Federal mandates, including the Magnuson-Stevens Act, the MMPA and the ESA.  Because NMFS monitoring programs are used to support our mission to conserve and manage fisheries and other marine resources, NMFS is obligated to assure the quality of data collected through these programs.  Ultimately, this means that there are certain aspects of monitoring programs that NMFS must manage and fund, even if industry contributes for sampling costs.

Department of Commerce General Counsel has advised NMFS that monitoring cost responsibilities may be allocated between industry and the government by delineating the sampling and administrative portions of the costs of monitoring.  Industry can be responsible for costs directly attributable to the sampling portion of a monitoring program, but NMFS must be responsible for costs directly attributable to the administrative portion of the monitoring program (See Omnibus Alternative 2 under "Standardized Cost Responsibilities") in cases where the monitoring programs support our management objectives.  If industry were to pay for inherently governmental costs such as the administrative costs for monitoring programs that directly support our Federal mandates, it would mean that industry was supplementing Federal appropriations, which would violate appropriations laws.

While it is not possible for industry to fully fund a monitoring program that supports our obligations under the Magnuson-Stevens Act, the MMPA and the ESA, it is possible for industry to fully fund a monitoring program to gather information in support of future

_0000017044

management actions.  For example, industry could fully fund a monitoring program to gather data on a gear modification to reduce incidental catch of river herring and shad in midwater trawl gear.  Industry could then provide the results of the study to the Council and NMFS, who could in turn make the gear modification a regulatory requirement.

[Back to list of questions.]

**If NMFS has extra funding available, can the money be passed along to industry to help defray its cost responsibilities for monitoring?**

Yes, NMFS could reimburse industry for sampling costs through cooperative agreements with third parties if additional funding is available.  This model was used to reimburse groundfish sectors for dockside monitoring costs.

[Back to list of questions.]

## 1.2  PURPOSE AND NEED FOR ACTION

This amendment includes two types of alternatives, the Omnibus Alternatives and the Herring Alternatives.  The Omnibus Alternatives would apply to all New England FMPs and the Herring Alternatives would only apply to the Atlantic Herring FMP.

| Purpose | Need |
|---|---|
| **Omnibus Alternatives** | |
| ➢ Establish separate cost responsibilities for NMFS and the industry during collection of monitoring data <br> ➢ Establish administrative requirements for service providers of industry funded monitoring <br> ➢ Allow industry-funded monitoring programs to be revised via framework adjustment | ➢ To enable the Councils to develop industry funded monitoring programs for the collection of information in addition to that collected by SBRM |
| ➢ Establish a process for prioritizing between new industry funded monitoring programs | ➢ If funding shortfalls occur, identify process for prioritizing which monitoring programs should be funded |
| **Herring Alternatives** | |
| ➢ Establish an industry funded monitoring program for the Atlantic herring fishery | ➢ Improve the accuracy of catch monitoring, specifically for river herring/ shad and haddock catch caps |

## 2.0  MANAGEMENT ALTERNATIVES

The Council, in collaboration with its Committees, Advisory Panels, and the Plan Development Team/Fishery Management Action Team (PDT/FMAT) for this action, has developed a range of management alternatives.

_0000017045

The Omnibus Alternatives would apply to all New England FMPs and include the following:
- Standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry;
- Process for FMP-specific industry-funded monitoring to be implemented via amendment and revised via  framework adjustment;
- Standard administrative requirements for industry-funded monitoring service providers;
- Process to prioritize available Federal funding across FMPs for new industry-funded monitoring programs, including the type of weighting approach and the timing of revising the weighting approach; and
- Process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

The Herring Alternatives would only apply to the Atlantic Herring FMP and include monitoring coverage targets for specific permit categories and/or gear types in the herring fishery.

## 2.1  OMNIBUS ALTERNATIVES

### Overview of the Omnibus Alternatives

This amendment includes a set of Omnibus Alternatives that would modify all the FMPs managed by the Council to allow standardized development of future FMP-specific industry-funded monitoring programs.

The Council adopted the following principles to guide the selection and implementation of future industry-funded monitoring programs.  Data collection program for the estimation of fishery catch should:
- Be fit for purpose – the reason, or clear need, for data collection should be identified to ensure objective design criteria.
- Be affordable – the cost of data collection programs should not diminish net benefits to the nation, nor threaten the continued existence of our fisheries.  However, essential data collection is needed to assure conservation and sustainability, and is reason to seek less data intensive ways to assess and manage fisheries on the economic margins.
- Should apply modern technology – data collection should prioritize the utilization of modern technology to the extent possible to meet our data collection needs, while recognizing an affordable, robust program is likely to need a mix of data collection by people and technology.
- Incentivize reliable self-reporting.

_0000017046

The Council finalized its selection of preferred alternatives at its April 18-20, 2017, meeting.

| Omnibus Alternatives | Preferred Alternatives |
|---|---|
| **Alternative 1** (No Standardized Structure for IFM Programs) | No |
| **Alternative 2** (Standardized Structure for IFM Programs) | Yes |
| **Alternative 2.1** (NMFS-Led Prioritization Process) | No |
| **Alternative 2.2** (Council-Led Prioritization Process) | Yes |
| **Alternative 2.3** (Proportional Prioritization Process) | No |
| **Alternative 2.4** (Lowest Ratio-Based Prioritization Process) | No |
| **Alternative 2.5** (Highest Ratio-Based Prioritization Process) | No |
| **Alternative 2.6** (Monitoring Set-Aside) | Yes |

Omnibus Alternative 1 (No Action) – No standardized structure for industry-funded monitoring programs.  Programs developed on an FMP-by-FMP basis.
- No standard definition of cost responsibilities for NMFS or industry;
- No standard amendment process to implement industry-funded monitoring programs and no standard framework adjustment process to revise industry-funded monitoring programs;
- No standardized service provider requirements;
- No process for prioritizing available Federal funding to support industry-funded monitoring programs across all New England FMPs; and
- No standardized framework adjustment process to implement future monitoring set-aside programs.

Omnibus Alternative 2 (**Preferred Alternative**) – Standardized structure for industry-funded monitoring programs and option for monitoring set-aside provision.
- Standard definition for cost responsibilities for NMFS or industry;
- Standard amendment process to implement industry-funded monitoring programs and standard framework adjustment process to revise industry-funded monitoring programs;
- Standard service provider requirements;
- Process for prioritizing available Federal funding to support industry-funded monitoring programs across all New England FMP; and
- Option for standard framework adjustment process to implement future monitoring set-aside programs.

Omnibus Alternatives 2.1-2.5 are variations on the prioritization process in Omnibus Alternative 2, and consider specific options for what to do when Federal funding is not sufficient to cover NMFS cost responsibilities to support the Council's desired level of industry-funded monitoring for a given FMP.

_0000017047

- Omnibus Alternative 2.1 – NMFS-led prioritization process.  NMFS prepares analysis and prioritization in consultation with the Councils.
- Omnibus Alternative 2.2 (**Preferred Alternative**) – Council-led prioritization process.  Council prepares analysis and recommends priorities to NMFS.  Council recommended an equal weighting approach that would be adjusted on an as-needed basis.
- Omnibus Alternative 2.3 – Proportional prioritization process.  Available Federal funding would be allocated proportionally among all industry-funded monitoring programs.
- Omnibus Alternative 2.4 – Coverage ratio-based prioritization process.  The amount of available Federal funding would be allocated to each FMP relative to the extra coverage needed and total fleet activity.  Alternative 2.4 would favor coverage for the FMPs that need little additional monitoring to meet coverage targets and have the most active fleets.
- Omnibus Alternative 2.5 – Coverage ratio-based prioritization process.  The amount of available Federal funding would be allocated to each FMP relative to the extra coverage needed and total fleet activity.  Alternative 2.5 would favor coverage for the FMPs that need more additional monitoring to meet coverage targets and have the least active fleets.

Omnibus Alternative 2.6 (**Preferred Alternative**) (Monitoring Set-Aside) would provide a structure to develop future monitoring set-aside programs to help offset vessel/non-governmental cost responsibilities associated with industry-funded monitoring coverage targets.  No monitoring set-aside programs would be established in this amendment.

Background on the development of the Omnibus Alternatives can be found in Appendix 6.

### 2.1.1 OMNIBUS ALTERNATIVE 1: NO STANDARDIZED INDUSTRY-FUNDED MONITORING PROGRAMS

Under Omnibus Alternative 1 (No Action), there would be no standardized structure developed for New England industry-funded monitoring programs.  There would be no standard definition of costs and cost responsibility for industry-funded monitoring in the New England fisheries.  Cost definitions and the determination of who pays for them would be considered individually by each FMP as industry-funded monitoring programs are developed.  Under Omnibus Alternative 1, there would be no process to prioritize industry-funded monitoring programs to allocate available Federal resources to meet Council desired monitoring coverage target above SBRM coverage and no standard administrative requirements for industry-funded monitoring service providers.  The allocation of available Federal funding to increase monitoring in order to meet Council desired coverage levels and observer service provider requirements for industry-funded monitoring would be evaluated on a case-by-case, FMP-by-FMP basis.  Additionally, under Omnibus Alternative 1, there would be no framework adjustment process to revise FMP-specific industry-funded monitoring and no framework adjustment process to implement FMP-specific

_0000017048

monitoring set-aside programs.  Rather, industry-funded monitoring programs and monitoring set-aside programs would be developed and established in FMP-specific amendments.

### Timing for the Omnibus Alternative 1 (No Action)

The following table outlines the existing timeline for sea day allocation related to SBRM, Sector At-Sea monitoring, and the scallop fishery (compensation rate determination).  The SBRM year runs from April to March, the NE Multispecies fishing year runs from May to April, and the scallop fishing year runs from March to February.  The schedule below would remain unchanged under the status quo alternative.

### TABLE 3.  STATUS QUO TIMING OF GREATER ATLANTIC REGION SBRM, SECTOR AND SCALLOP MONITORING ALLOCATION AND ANALYSIS

| Year | Month | SBRM schedule | Sector ASM Schedule | Scallop Compensation Rate Determination Schedule |
|---|---|---|---|---|
| Year 1 | January to September | SBRM analyses are completed late January/early February | | |
| | October | • Observer data July Year 0 – June Year 1 available<br>• Begin analysis for SBRM | Work on analysis for sector ASM using most recent complete fishing year (May Year 0 – April Year 1) | |
| | November | Work on discard estimation analysis for SBRM from November through early February | | |
| | December | | | |
| Year 2 | January | Receive Year 2 budget | Sector ASM coverage rates published in proposed rule | Determine compensation rate |
| | February | | Collect public comment | |
| | March | If funding shortfall, run SBRM prioritization process | Sector ASM coverage rates published in final rule | Begin Year 2 |
| | April | Determine and begin Year 2 seaday schedule | Determine seaday schedule | Determine and begin seaday schedule |
| | May | | Begin Sector ASM Year 2 | |

_0000017049

### 2.1.2 OMNIBUS ALTERNATIVE 2: STANDARDIZED INDUSTY-FUNDED MONITORING PROGRAMS (*PREFERRED ALTERNATIVE*)

Under Omnibus Alternative 2, there would be a standardized structure for new industry-funded monitoring programs in New England fisheries, including at-sea monitoring, portside monitoring, and electronic monitoring.  The existing scallop and groundfish industry-funded programs would not be affected by this action.

The Council selected Omnibus Alternative 2 as a preferred alternative.

This industry-funded monitoring program structure would include the following components:

(1) Standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry;
(2) a process for FMP-specific industry-funded monitoring to be implemented via amendment and revised via framework adjustment;
(3) standard administrative requirements for industry-funded monitoring service providers;
(4) process to prioritize available Federal resources across FMPs for new industry-funded monitoring programs, including the type of weighting approach and the timing of revising the weighting approach; and
(5) process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

No individual FMP would be subject to an industry-funded monitoring program as a result of implementation of the Omnibus Alternatives proposed in this action.  Rather, any FMP that wishes to develop an industry-funded monitoring program and, optionally, a monitoring set-aside program would need to develop the program that meets the specifications of this action in a future action.

#### Standard Cost Responsibilities

Omnibus Alternative 2 would include standard cost responsibilities between NMFS and the industry for supporting monitoring programs targeting coverage in addition to SBRM.  As described in Section 1.0, legal requirements dictate that certain cost responsibilities must be borne by NMFS.  Cost responsibilities that are dictated by legal requirements cannot be modified through this action.  This action seeks to codify cost responsibilities into regulation for industry-funded monitoring in New England FMPs to ensure consistency and compliance with legal requirements.  If Omnibus Alternative 2 was not selected by the Councils, cost responsibilities for industry-funded monitoring would be codified on an FMP-by-FMP basis.

The cost responsibilities described below would be considered by the Council when developing any industry-funded monitoring program for New England FMPs in future

_0000017050

amendments.  The cost responsibilities described below are already in operation in the Atlantic Sea Scallop and NE Multispecies FMPs, although the cost responsibilities are not explicitly defined in those FMPs.  Selection of the Omnibus Alternative 2 would codify NMFS cost responsibilities for industry-funded monitoring into regulation for all New England FMPs, but it would not change NMFS cost responsibilities for the industry-funded monitoring programs currently established in the scallop or multispecies fisheries.

NMFS Cost Responsibilities
NMFS would be responsible for funding the costs to set standards for, monitor performance of, and administer industry-funded monitoring programs.  These program elements would include:
- The labor and facilities costs associated training and debriefing of monitors;
- NMFS-issued gear (e.g., electronic reporting aids used by human monitors to record trip information);
- Certification of monitoring providers and individual monitors; performance monitoring to maintain certificates;
- Developing and executing vessel selection;
- Data processing (including electronic monitoring video audit, but excluding electronic video review); and
- Costs associated with liaison activities between service providers, and NMFS, Coast Guard, Council, sector managers, and other partners.

NMFS cost responsibilities for all types of existing monitoring, including Northeast Fisheries Observer Program-level (NEFOP-level) observer coverage, fishery-specific at-sea monitoring programs, portside monitoring, and electronic monitoring, including details on how NMFS cost responsibilities were derived, are included in the text below.

Industry Cost Responsibilities
The industry would be responsible for funding all other costs of the monitoring program. These program elements and activities would include, but are not limited to:
- Costs to the provider for deployments and sampling (e.g., travel and salary for observer deployments and debriefing);
- Equipment, as specified by NMFS, to the extent not provided by NMFS (e.g., electronic monitoring system);
- Costs to the provider for observer time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time;
- Costs to the provider for installation and maintenance of electronic monitoring systems;
- Provider overhead and project management costs (e.g., provider office space, administrative and management staff, recruitment costs, salary and per diem for trainees); and
- Other costs of the provider to meet performance standards laid out by a fishery management plan.

_0000017051

NMFS costs to administer industry-funded monitoring would be fully funded with Federal funds.  More information on cost sharing, including external funding, can be found in Section 1.0.  The industry would be responsible for its costs; unless it was determined that appropriately designated Federal funds were also available to offset industry cost responsibilities.  If NMFS has funds to cover its administrative cost responsibilities with additional funds remaining, then NMFS may be able to help cover some of the industry's cost responsibilities through reimbursement.  Omnibus Alternative 2 does not prevent NMFS from offsetting industry cost responsibilities through reimbursement if additional funds are available.

Cost for industry-funded monitoring programs is a very important consideration.  The requirement to pay for an observer substantially increases operating costs for fishing vessels, which in turn reduces revenues.  The best ways to limit the financial burden of an industry-funded monitoring program is to carefully design the program to minimize total program costs necessary to meet the FMP-specific goals for monitoring.  This can be accomplished by selecting the appropriate type of coverage or setting coverage levels at the lowest level necessary to meet FMP goals.

Background information on factors that affect industry costs for monitoring can be found in Appendix 4.

### Framework Adjustment Process

Omnibus Alternative 2 would include the ability for the Council to implement new industry-funded monitoring programs, including at-sea monitoring, dockside monitoring, or electronic monitoring, through amendments and revise programs through framework adjustments to the relevant FMP.  If Omnibus Alternative 2 was not selected by the Council, the Council would not have the option to use a framework adjustment to revise FMP-specific industry-monitoring programs.  Therefore, a full FMP amendment would be required to revise industry-funded monitoring programs for any New England fisheries, excluding existing industry funded monitoring programs in the Scallop and Multispecies FMP.

Under Omnibus Alternative 2, the details of any new industry-funded monitoring program, including at-sea, portside, or electronic monitoring, would be specified in an amendment and modified in a subsequent framework adjustment to the relevant FMP.  These details may include, but are not limited to:  (1) Level and type of coverage target; (2) rationale for level and type of coverage; (3) minimum level of coverage necessary to meet coverage goals; (4) consideration of coverage waivers if coverage target cannot be met; (5) process for vessel notification and selection; (6) fee collection and administration; (7) standards for monitoring service providers; and (8) any other measures necessary to implement the industry-funded monitoring program.  Additional National Environmental Policy Act (NEPA) analysis would be required for any action implementing and/or modifying industry-funded monitoring programs regardless if an amendment or framework adjustment was used.

_0000017052

If an additional industry-funded monitoring program is established through an amendment, it would become subject to prioritization for funding under one of the alternatives for the prioritization process described in Sections 2.1.2.1 to 2.1.2.5 of this document.

### Monitoring Service Providers

Omnibus Alternative 2 would include standard administrative requirements for industry-funded monitoring service providers, including at-sea monitoring, dockside monitoring and electronic monitoring.  These service provider requirements would serve as the default service provider requirements for any future industry-funded monitoring programs developed through future amendments.  If Omnibus Alternative 2 is not selected by the Council, service provider requirements for industry-funded monitoring programs would be developed and implemented in individual FMPs.

*Monitoring service provider regulations for industry-funded at-sea and portside monitoring programs.*  The SBRM Omnibus Amendment modified the scallop industry-funded observer service provider requirements (at 50 CFR 648.11(h) and (i)) to apply to all New England FMPs.  Specifically, the SBRM Amendment authorized observer service provider approval and certification for all applicable fisheries, should a Council develop and implement a requirement or option for an industry-funded observer program to support SBRM in other fisheries beside scallops.  However, the SBRM Amendment did not address service provider requirements for other types of industry-funded monitoring programs.

Omnibus Alternative 2 would modify the SBRM observer service provider approval and certification process to be a monitoring service provider approval and certification process that would apply to observer and portside service providers for all New England FMPs. The selection of Omnibus Alternative 2 would not implement any new at-sea observer or portside monitoring programs, but would only implement a process and standards to approve and certify monitoring service providers.  In the future, if the Council implements any industry-funded at-sea or portside monitoring programs through a future amendment, the service provider requirements for those monitoring programs would be standardized.

Omnibus Alternative 2 would include standard monitoring and service provider requirements based on current regulations.  Appendix 2 contains existing service provider regulations for NEFOP-level observers, at-sea monitors, and portside samplers.  If Omnibus Alternative 2 is not selected by the Council, server provider requirements for industry-funded monitoring program would be developed and implemented in individual FMPs.

A monitoring and service provider provision previously only considered under Herring Alternative 2 was recommend by the Council to be included in the standard monitoring and service provider requirements in Omnibus Alternative 2.  That provision would allow NEFOP-level observers and at-sea monitors to be deployed on the same vessel for more than two consecutive multi-day trips or more than twice in a given month.

_0000017053

*Monitoring service provider regulations for electronic monitoring programs.* Electronic monitoring service provider regulations are currently in place for the NE multispecies fishery. At its April 2018 meeting, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring program for the Atlantic herring fishery. Using the results of the EFP, the Council would consider establishing electronic monitoring service provider requirements into regulation via a future framework action.

Background information on monitoring service provider requirements can be found in Appendix 2.

## Prioritization Process

Omnibus Alternative 2 includes a process to prioritize available Federal funding to cover NMFS cost responsibilities associated with new industry-funded monitoring programs across New England FMPs. This prioritization process would be used when Federal funding is not sufficient to support the Council's IFM coverage targets, above SBRM and independent from ESA and MMPA requirements, across FMPs with established IFM programs.

Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements that may be used to support industry-funded monitoring programs. The prioritization processes would determine how to allocate available Federal funding to cover NMFS cost responsibilities associated with new industry-funded monitoring programs across FMPs with the exception of the existing scallop and groundfish IFM programs. The prioritization process alternatives in the IFM Omnibus Amendment could apply to groundfish sectors and/or the scallop fishery if, in a future action, if the Council takes action to include these programs in the prioritization process, or develops new IFM programs within those FMPs.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring program would operate during that year. In the event that some Federal funding is available in a given year, and the IFM program does not allow for vessels to be issued waivers to exempt them from industry-funded monitoring requirements, then fishing effort would be reduced to match available monitoring during that year. In the event that some Federal funding is available in a given year, and the IFM program does allow for vessels to be issued waivers to exempt them from industry-funded monitoring requirements, then there would be some additional monitoring during that year.

Due to legal and budgetary constraints described in Section 1.0, NMFS cannot approve and implement monitoring requirements for which it does not have available Federal funding to cover NMFS cost responsibilities. NMFS may, however, approve coverage targets associated with industry-funded monitoring programs for FMPs with the understanding that annual funding available to cover NMFS cost responsibilities may vary and could dictate realized coverage levels.

_0000017054

Omnibus Alternatives 2.1-2.5 specify different processes to prioritize available Federal funding to new IFM programs across New England FMPs.  The Council would select only one prioritization process.  Alternatives 2.1 and 2.2 provide the Council and NMFS with more discretion to make trade-offs between FMPs, but also require more recurring analysis and resources.  The primary difference between these two alternatives is who (NMFS or the Council) would lead the prioritization process and analysis.  Alternatives 2.3, 2.4, and 2.5 use formulaic approaches, eliminating much of the discretion and analytical burden of Alternatives 2.1 and 2.2.  However, the formulaic approaches in Alternatives 2.3, 2.4, and 2.5 may reduce the effectiveness of the resulting outcome relative to Council priorities.  Under all of the alternatives described below, the industry would be responsible for covering its cost responsibilities, unless it was determined that Federal funds were otherwise available to be used to offset industry cost responsibilities through reimbursement.  If Omnibus Alternative 2 was not selected by the Councils, available Federal funding would be allocated to industry-funded monitoring on an FMP-by-FMP basis.

Revising the prioritization process (e.g., change from Council-led to NMFS-led) could be done in a future framework action.  The following table summarizes the discretionary and formulaic prioritization alternatives to facilitate comparisons.

Additional information on the prioritization processes can be found in Appendix 6.

**TABLE 4.  SUMMARY OF PRIORITIZATION ALTERNATIVES**

| | Alternative | Summary |
|---|---|---|
| **Discretio** | 2.1 NMFS-led | NMFS staff would use a weighting approach, in consultation with the Councils, to allocate Federal funding to applicable IFM programs. |
| | 2.2 Council-led | The Council would use a weighting approach to allocate Federal funding to applicable IFM programs. |
| **Formulaic** | 2.3 Proportional | Federal funding for each applicable IFM program would be reduced proportional to the total funding shortfall.  For example, if NMFS funding is short by 20%, each applicable IFM program would receive 80% of its Federal funding. |
| | 2.4 Lowest Coverage Ratio-based | Federal funding would be prioritized to applicable IFM programs with fisheries that have the lowest coverage needs relative to fleet activity.  This alternative would favor coverage for the FMPs that do not need much additional monitoring to meet coverage targets and have the most active fleets. |
| | 2.5 Highest Coverage Ratio-based | Federal funding would be prioritized to applicable IFM programs with fisheries that have the highest coverage relative to fleet activity.  This alternative would favor coverage for the FMPs that need much more additional monitoring to meet coverage targets and have the least active fleets. |

_0000017055

### 2.1.2.1  Omnibus Alternative 2.1:  NMFS-led Prioritization Process for Industry-Funded Monitoring Programs

Under Omnibus Alternative 2.1, the Regional Administrator and Science and Research Director would use a criteria-based weighting approach to determine, in consultation with the Councils, how to prioritize available Federal funding to cover NMFS cost responsibilities associated with IFM coverage targets across New England FMPs.

If available funding in a given year was sufficient, this distribution would be based on the allocation necessary to fully implement the industry-funded monitoring coverage targets specified in each FMP.  If available funding was not sufficient, NMFS would apply a weighting approach to determine how to prioritize available funding to support IFM coverage targets across FMPs.

Once NMFS costs associated with IFM coverage targets are funded, NMFS would also determine, in consultation with the Council, the allocation of any remaining available funding to offset industry costs.  NMFS and industry costs would be defined as described in Omnibus Alternative 2 (Section 2.1.2).  Funding for SBRM, ESA, and MMPA observer coverage would not be changed by this alternative.  Any funding for industry-funded monitoring programs would be prioritized separately from any funding for SBRM or other statutory requirements and any industry-funded coverage would be in addition to coverage for SBRM or other statutory requirements.

The prioritization process would have the following steps:

1.  NMFS would apply a criteria-based weighting approach to develop proposed priorities for industry-funded monitoring coverage in order to allocate Federal resources across FMPs with industry-funded monitoring programs.  If available funding in a given year is sufficient, this distribution would be based on the allocation necessary to fully implement the industry-funded monitoring coverage targets specified in each FMP.  If available funding is not sufficient to fully fund all industry-funded monitoring programs, then NMFS would recommend a prioritization of industry-funded monitoring coverage in order to allocate resources across FMPs that would include:
    - The total amount of funding and sea days necessary to meet the coverage targets specified by each FMP if each FMP were fully funded, including each FMP's share of the total;
    - The coverage level for each FMP if each FMP maintains its percentage share of the total funding (e.g., a fishery with a bigger proportion of the total funding would absorb a bigger proportion of the shortfall);
    - The coverage levels that incorporate the weighting approach; and
    - The rationale for the recommended prioritization.

2.  At a Council meeting, the Council would review NMFS's proposed prioritization of industry-funded monitoring coverage and allocation of funding, and recommend any modifications to the prioritization.

_0000017056

3.    NMFS would provide the Council, at the earliest practicable opportunity:  (1) The estimated industry-funded monitoring coverage levels that incorporate the recommended prioritization, based on available funding; and (2) the rationale for the recommended prioritization, including the reason for any deviation from the Council's recommendations.  The Council may recommend revisions and additional considerations to be made by the Regional Administrator and Science and Research Director.

Step 3 allows the Council and NMFS to discuss any final revisions to the distribution, which might be necessary if the final budget is not known at the time of initial prioritization and is less than expected.

## Weighting Approach

If the Council selects Alternative 2.1 (NMFS-led Prioritization), NMFS would use a criteria-based weighting approach to prioritize industry-funded programs in order to allocate available NMFS funding.  This proposed weighting approach would compare industry-funded monitoring criteria (e.g., stock status, risk to management, ecosystem importance) to each other to determine the relative weight of each criteria.  Then each industry-funded monitoring program would be evaluated to see how it meets each criteria.

The weighting approach could give NMFS a transparent, deliberative process for prioritizing industry funded monitoring coverage in order to allocate NMFS's available resources for funding of NMFS cost responsibilities required to achieve coverage targets for industry-funded monitoring.

Background information on details of this proposed weighting approach can be found in Appendix 6.

**Rationale**:  Omnibus Alterative 2.1 would allow NMFS to determine IFM funding priorities among New England FMPs with IFM programs.  Because Omnibus Alternative 2.1 is a discretionary alternative, the prioritization process is more complex, takes longer, and involves more staff resources than formulaic alternatives.  However, the criteria-based weighting approach associated with Omnibus Alternative 2.1 increases the likelihood that available funding is prioritized to IFM programs that address current monitoring needs.

### 2.1.2.2   Omnibus Alternative 2.2 (Preferred Alternative):  Council-led Prioritization Process for Industry-funded Monitoring Programs

Under Omnibus Alternative 2.2, the Regional Administrator and Science and Research Director would inform the Council of NMFS's available funding to cover NMFS cost responsibilities associated with IFM coverage targets across New England FMPs.

The Council selected Omnibus Alternative 2.2 as a preferred alternative.

_0000017057

If available funding in a given year was sufficient, this distribution would be based on the allocation necessary to fully implement the industry-funded monitoring coverage targets specified in each FMP.  If available funding was not sufficient, the Council would apply a weighting approach to determine how to prioritize available funding to support IFM coverage targets across FMPs.

Once NMFS costs associated with IFM coverage targets are funded, NMFS would also determine, in consultation with the Council, the allocation of any remaining available funding to offset industry costs.  NMFS and industry costs would be defined as described in Omnibus Alternative 2 (Section 2.1.2).  Funding for SBRM, ESA, and MMPA observer coverage would not be changed by this alternative.  Any funding for industry-funded monitoring programs would be prioritized separately from any funding for SBRM or other statutory requirements and any industry-funded coverage would be in addition to coverage for SBRM or other statutory requirements.

The prioritization process would have the following steps:

1. If available funding is not sufficient to fully fund all industry-funded monitoring programs, the Council would use a weighing approach to evaluate and prioritize industry-funded monitoring programs to allocate NMFS resources across FMPs with industry-funded monitoring programs that would include:
   - The total amount of funding and seadays necessary to meet the coverage targets specified by each FMP if each FMP were fully funded, including each FMP's share of the total;
   - The coverage level for each FMP if each FMP maintains its percentage share of the total funding (e.g., a fishery with a bigger proportion of the total funding would absorb a bigger proportion of the shortfall);
   - The coverage levels that incorporate the weighting approach; and
   - The rationale for the recommended prioritization.

2. The Council would propose priorities in order to allocate funding for NMFS infrastructure costs and offsets for industry costs.  The Council would also coordinate any modifications to the prioritization process and recommend a prioritization to NMFS.

3. NMFS would provide the Council, at the earliest practicable opportunity:  (1) The estimated industry-funded monitoring coverage levels that incorporate the recommended prioritization, based on available funding; and (2) the rationale for the recommended prioritization, including the reason for any deviation from the Council's recommendations.  The Council may recommend revisions and additional considerations to be made by the Regional Administrator and Science and Research Director.

_0000017058

### Weighting Approach

Since the Council selected Omnibus Alternative 2.2 as its preferred alternative, the Council would also identify a weighting approach to operationalize prioritizing funding across industry-funded monitoring programs.  The Council may use a criteria-based weighting approach or develop its own weighting approach for prioritization, provided that criteria used to evaluate industry-funded monitoring programs, as well as the rationale for the recommended prioritization approach, are made available to the public in advance.

The Council selected an equal weighting approach as a preferred alternative.

This amendment would establish an equal weighting approach to prioritize funding across industry-funded monitoring programs, acknowledging that a more complex weighting approach could be developed in the future.   An example of an equal weighting approach would be funding all industry-funded monitoring programs at 70%, if only 70% of the Federal funding needed to administer all the programs was available.

The Council could change the weighting approach for the Council-led prioritization process by considering a new weighting approach at a public meeting, where public comment is taken, and asking NMFS to publish a notice or rulemaking modifying the weighting approach.

**Rationale**:  Omnibus Alterative 2.2 would allow the Council to determine IFM funding priorities among Council FMPs.  Because Omnibus Alternative 2.2 is a discretionary alternative, the prioritization process is more complex, takes longer, and involves more staff resources than formulaic alternatives.  However, the equal weighting approach selected by the Council would be less complicated to implement than Omnibus Alternative 2.1.  Establishing an equal weighting approach in this amendment would ensure equity across industry-funded monitoring programs and allow time for more complex weighting systems to be developed without delaying implementation of this amendment.

### Timing for discretionary alternatives (Alternatives 2.1 and 2.2)

The discretionary prioritization alternatives (Alternatives 2.1 and 2.2) require a more time-intensive evaluation and ranking of industry funded monitoring programs, and would require rulemaking to solicit public comment on NMFS or the Council's recommended allocation of available funding.  The status quo timing outlined under the status quo alternative would still apply, and this new process would apply alongside the existing timeline (Table 5).

There are two options for this process so that it could be matched with annual funding levels and the SBRM cycle:

1.    Preferred Alternative - The Council would adjust the weighting approach on an as-needed basis (i.e., whenever new IFM programs are approved, or whenever existing IFM programs are adjusted or terminated), with the adjusted prioritization

_0000017059

implemented in time for the next SBRM cycle.  This means that once the prioritization was developed, it could be in place indefinitely until the next industry-funded monitoring program was finalized.  Readjusting the weighting approach on an as-needed basis would mean that, after going through the entire timeline, the process outlined in Year 2 below would repeat each year until new programs were added/old programs were adjusted or terminated, at which point the timeline would start over as outlined for Year 1.

2. Alternatively, the Council could elect to adjust the weighting approach every 3 years unless new IFM programs are approved, or whenever existing IFM programs are adjusted or terminated.

_0000017060

**TABLE 5. TIMING FOR DISCRETIONARY ALTERNATIVES (ALTERNATIVES 2.1 AND 2.2)**

| Year | Month | SBRM/ASM/Scallop Schedule (status quo) | Alternatives 2.1 and 2.2 |
|---|---|---|---|
| Year 1 | January to April | SBRM analyses are completed late January/early February | • NMFS (2.1) prepares and analyze weighting approach for Year 2 **–OR**<br>• Joint Committee or Council meeting to conduct weighting approach (2.2) |
| | April to May | | Council and NFMS meet to review/finalize ranking of existing IFM programs (2.1 and 2.2) |
| | May to October | | NMFS conducts proposed and final rulemaking to finalize rankings for IFM programs for Years 2-4 (or for indefinite period). |
| | October to December | • Observer data July Year 0 – June Year 1 available<br>• Begin analysis for SBRM<br>• Work on discard estimation analysis for SBRM from November through early February<br>• Work on analysis for sector ASM using most recent complete fishing year (May Year 0 – April Year 1) | Begin analysis to determine necessary IFM seadays |
| Year 2 | January to February | • Receive Year 2 budget<br>• Sector ASM coverage rates published in proposed rule/collect public comment<br>• Determine scallop compensation rate | |
| | March | • If funding shortfall, run SBRM prioritization process<br>• Start of scallop Year 2 | If funding shortfall, issue funding based on finalized weighting approach |
| | April | • Begin Year 2 seaday schedule<br>• Sector ASM coverage rates published in final rule | Implement Year 2 IFM coverage levels |
| | May | Begin Sector ASM Year 2 | |
| | June | | NMFS briefs Council on final year 2 IFM seaday allocation |

_0000017061

### 2.1.2.3  Omnibus Alternative 2.3:  Proportional Prioritization Process for Industry-Funded Monitoring Programs

Under Omnibus Alternative 2.3, the amount of Federal funding available to support industry-funded monitoring in each FMP would be reduced by the same percentage as the funding shortfall.  If the available Federal funding falls short, the amount of the shortfall would be deducted from the total amount of funding to be allocated to each FMP, proportional to that FMP's share of the total funding need.  For example, an FMP that represents 20% of the total funding need would absorb 20% of the total funding shortfall.

There could be a scenario where the available Federal funding for a given FMP would produce a coverage level below the coverage target specified by the FMP as providing sufficient information to meet an FMP's objectives for monitoring.  For example, an additional 10 observed trips may provide additional data, but not sufficient data to provide a robust estimate of bycatch of the species of interest.  In this case, that FMP would not receive additional coverage and the funding for that FMP would be re-allocated proportionally to other FMPs.

NMFS would determine and provide the Council with:  (1) The estimated industry-funded monitoring coverage levels that incorporates the proportional adjustments, based on available funding; and (2) the rationale for the recommended prioritization, including how it deviates from the fully funded coverage levels across all FMPs.  This could be done on an annual basis or the allocation of resources could remain as specified unless revised.

Example    FMP 1 needs $3 million, FMP 2 needs $5 million, and FMP 3 needs $2 million to fully implement their coverage targets.  The total funding need is $10 million.  If there is only $8 million in Federal funds for the coming year, then there is a $2 million shortfall, or a 20% shortfall.  Using the proportional prioritization process, NMFS would allocate the $8 million such that each FMP has a 20% shortfall, i.e., they would all be funded at 80%.  FMP 1 would get 80% of $3 million, or $2.4 million, FMP 2 would get 80% of $5 million, or $4 million, and FMP 3 would get 80% of $2 million, or $1.6 million.  These would be the total funds available to the FMPs to fund NMFS's costs for coverage days above SBRM.

**Rationale**:  Omnibus Alterative 2.3 is a formulaic alternative that would reduce Federal funding for each IFM program proportional to the total funding shortfall. It has the advantage of taking less time and staff resources to implement, but does not allow the discretion to fund one IFM monitoring programs other another and may result in funding priorities that do not match current Council monitoring interests.

### 2.1.2.4  Omnibus Alternative 2.4:  Lowest Coverage Ratio-based Prioritization Process for Industry-Funded Monitoring Programs

Under Omnibus Alternative 2.4, the amount of funding would be allocated to each FMP by prioritizing coverage in fisheries that have the lowest coverage needs (based on projections

_0000017062

for the coming year) relative to effort (based on vessel trip reports from the previous year). In practice, this would mean that fisheries with the highest ratio of coverage to effort would be sequentially eliminated until the available Federal funding is sufficient to meet the coverage targets of the remaining FMPs. This alternative would favor fleets with low additional needed coverage days and/or high overall activity.

NMFS would determine and provide the Council with: (1) the estimated industry-funded monitoring coverage levels that incorporate the prioritization, based on available funding; and (2) the rationale for the recommended prioritization, including how it deviates from the fully funded coverage levels across all FMPs. This could be done on an annual basis or the allocation of resources could remain as specified unless revised.

Example       FMP 1 needs $3 million, FMP 2 needs $5 million, and FMP 3 needs $2 million to fully implement their coverage targets. The total funding needed is $10 million, but there is only $8 million in Federal funds for the coming year, so there is a $2 million shortfall. Under the coverage ratio-based prioritization approach, NMFS would calculate the following ratio for each FMP:

$$\text{Coverage Ratio} = \frac{\text{Projected coverage days needed in the coming year}}{\text{Level of effort in the previous year}}$$

If FMP 1 had a ratio of 0.1, FMP 2 a ratio of 0.08, and FMP 3 a ratio of 0.2, FMP 3 would be eliminated from coverage first. Because the total funding need of the remaining programs, $8 million, can be met by the available Federal funding, $8 million, coverage for FMP 1 and FMP 2 would be fully funded. FMP 3 would receive no additional coverage in the coming year. The key here is that fewer needed coverage days and/or higher levels of effort in the previous year will both lead to a higher prioritization, and it is the interplay of these two factors that would determine the prioritization.

This alternative is based on an approach selected by the Council in the SBRM amendment. SBRM sets "minimum pilot coverage" levels for each fishing mode to ensure that a fleet is not allocated too few observer sea days to generate meaningful discard estimations. If the total of agency funded sea days is greater than the total minimum pilot coverage, then the Penultimate Cell approach would be applied. If the funded days exactly equals the total minimum pilot coverage sea days then the sea days would be assigned to fishing modes according to the minimum pilot coverage. However, it is theoretically possible that the available funding for SBRM observers in a given year could be so restricted that the minimum pilot coverage for each fleet could not be achieved. In such a case, it would be necessary to determine which fleets would get enough observer coverage to reach the minimum pilot coverage and which would not. The Council's preferred alternative for adjusting coverage levels below minimum pilot coverage would eliminate the funding shortfall by sequentially removing coverage in fleets that had the highest ratio of minimum pilot coverage to days absent from port based on VTR reports in the previous year. Because the number of days absent from port is typically much larger than the minimum

_0000017063

pilot coverage for a fishing mode, this alternative would maintain at-sea observer coverage on the most active fishing modes.

**Rationale**:  Omnibus Alterative 2.4 is a formulaic alternative that would prioritize Federal funding to IFM programs with fisheries that have the lowest coverage needs relative to fleet activity.  It has the advantage of taking less time and staff resources to implement, but does not allow the discretion to fund one IFM monitoring programs other another and may result in funding priorities that do not match current Council monitoring interests.  This alternative would favor funding for FMPs that do not need much additional monitoring to meet coverage targets and have the most active fleets.

### *2.1.2.5   Omnibus Alternative 2.5:  Highest Coverage Ratio-based Prioritization Process for Industry-Funded Monitoring Programs*

Under Omnibus Alternative 2.5, the amount of funding would be allocated to each FMP by prioritizing coverage in fisheries that have the highest coverage needs (based on projections for the coming year) relative to effort (based on vessel trip reports from the previous year).  In practice, this would mean that fisheries with the lowest ratio of coverage to effort would be sequentially eliminated until the available Federal funding is sufficient to meet the coverage targets of the remaining FMPs.  This alternative would favor fleets with high additional needed coverage days and/or low overall activity.

NMFS would determine and provide the Council with:  (1) the estimated industry-funded monitoring coverage levels that incorporate the prioritization, based on available funding; and (2) the rationale for the recommended prioritization, including how it deviates from the fully funded coverage levels across all FMPs.  This could be done on an annual basis or the allocation of resources could remain as specified unless revised.

Example           FMP 1 needs $3 million, FMP 2 needs $5 million, and FMP 3 needs $2 million to fully implement their coverage targets.  The total funding needed is $10 million, but there is only $8 million in Federal funds for the coming year, so there is a $2 million shortfall.  Under the coverage ratio-based prioritization approach, NMFS would calculate the following ratio for each FMP:

$$\text{Coverage Ratio} = \frac{\text{Projected coverage days needed in the coming year}}{\text{Level of effort in the previous year}}$$

If FMP 1 had a ratio of 0.1, FMP 2 a ratio of 0.08, and FMP 3 a ratio of 0.2, FMP 2 would be eliminated from coverage first.  Because the total funding need of the remaining programs, $5 million, can be met by the available Federal funding, $8 million, coverage for FMPs 1 and 3.  FMP 2 would receive no additional coverage in the coming year.  The key here is that greater needed coverage days and/or lower levels of effort in the previous year will both lead to a higher prioritization, and

_0000017064

it is the interplay of these two factors that would determine the prioritization.

**Rationale**:  Omnibus Alterative 2.5 is a formulaic alternative that would prioritize Federal funding to IFM programs with fisheries that have the highest coverage needs relative to fleet activity.  It has the advantage of taking less time and staff resources to implement, but does not allow the discretion to fund one IFM monitoring programs other another and may result in funding priorities that do not match current Council monitoring interests.  This alternative would favor funding for FMPs that need much more additional monitoring to meet coverage targets and have the least active fleets.

_0000017065

### Timing for formulaic alternatives (Alternatives 2.3, 2.4 and 2.5)

The formulaic alternatives (Alternatives 2.3, 2.4, and 2.5) could be implemented annually in concert with the existing SBRM cycle.  Rulemaking would not be required, and the process outlined in Year 2 below would occur on an annual basis for all subsequent years (Table 6).

### TABLE 6.  TIMING FOR FORMULAIC ALTERNATIVES (ALTERNATIVES 2.3, 2.4, AND 2.5)

| Year | Month | SBRM/ASM/Scallop Schedule (status quo) | Alternatives 2.3, 2.4, and 2.5 |
|---|---|---|---|
| Year 1 | January to September | SBRM analyses are completed late January/early February | |
| | October | • Observer data July Year 0 – June Year 1 available<br>• Begin analysis for SBRM<br>• Work on discard estimation analysis for SBRM from November through early February<br>• Work on analysis for sector ASM using most recent complete fishing year (May Year 0 – April Year 1) | Begin analysis for required IFM coverage rates |
| | November | | |
| | December | | |
| Year 2 | January | • Receive Year 2 budget<br>• Sector ASM coverage rates published in proposed rule/collect public comment<br>• Determine compensation rate | |
| | February | | |
| | March | • If funding shortfall, run SBRM prioritization process<br>• Start of scallop Year 2 | If funding shortfall exists, run IFM prioritization |
| | April | • Begin Year 2 sea day schedule<br>• Sector ASM coverage rates published in final rule | Implement Year 2 IFM coverage levels |
| | May | Begin Sector ASM Year 2 | |
| | June | | NMFS briefs Council on final year 2 IFM sea day allocation |

_0000017066

### 2.1.2.6   Omnibus Alternative 2.6 (Preferred Alternative):  Monitoring Set-Aside

Omnibus Alternative 2.6 would include general language in the regulations of each FMP that would allow monitoring set-aside provisions to be implemented via a framework adjustment.  A monitoring set-aside program would devote a portion of the annual catch limit (ACL) from a fishery to offset the industry cost responsibilities for at-sea, electronic, or dockside monitoring.  However, there are many possible ways to structure a monitoring set-aside program, and the details of each program would need to be developed on an FMP-by-FMP basis.  All potential monitoring set-aside programs should be considered as an alternative to off-set monitoring cost, and should not be expected to fully cover monitoring costs.  Most fisheries will not have enough value, capacity, or abundance/availability (i.e., stock size, distribution, etc.) to fully cover the costs of intense monitoring goals.

The Council selected Omnibus Alternative 2.6 as a preferred alternative.

One monitoring set-aside model for a fishery that uses possession limits could consist of reserving some percentage of the ACL (e.g., up to 3 percent) to be allocated to certain vessels to help off-set the additional monitoring costs.  In this example, if a vessel in that fishery is selected to carry an at-sea observer, that vessel would be granted a certain amount of pounds from the monitoring set-aside allocation to land above the possession limit.  The revenue obtained from the sale of the additional landings would help offset the vessel's costs of carrying an at-sea observer.  This example is very similar to the monitoring set-aside program that currently operates in the scallop fishery.  Preliminary analysis suggests that set-asides for monitoring will work best in profitable fisheries and when only a modest increase in monitoring is desired (like scallops).

Absent this measure, a full FMP amendment would be required for all fisheries to implement a monitoring set-aside to defray industry costs for monitoring programs.  Adopting this measure would not implement a monitoring set-aside for any individual FMP.  Rather, it would expedite the development of monitoring set-aside provisions for FMPs in future framework adjustments.

Under Omnibus Alternative 2.6, the details and impacts analysis of any monitoring set-aside program would be specified and/or modified in a subsequent framework adjustment to the relevant FMP.  These details may include, but are not limited to:  (1) the basis for the monitoring set-aside; (2) the amount of the set-aside (e.g., quota, DAS, etc.); (3) how the set-aside is allocated to vessels required to pay for monitoring (e.g., an increased trip limit, differential DAS counting, additional trips, an allocation of the quota, etc.); (4) the process for vessel notification; (5) how funds are collected and administered from the industry to cover the costs of monitoring coverage; and (6) any other measures necessary to develop and implement a monitoring set-aside.  Additional NEPA analysis would be required for any action implementing and/or modifying monitoring set-aside provisions, regardless if it required a framework adjustment or full amendment.

Additional information on considerations for monitoring set-asides can be found in Appendix 6.

_0000017067

**Rationale**:  Omnibus Alterative 2.6 would provide a structure to develop future monitoring set-aside programs to help offset vessel/non-governmental cost responsibilities associated with IFM coverage targets.  Standardizing monitoring set-aside programs and allowing them to be implemented via a framework may help reduce the administrative burden associated with implementing new monitoring set-aside programs and the economic burden associated with IFM coverage targets.

## 2.1.3  CONSIDERED BUT REJECTED OMNIBUS ALTERNATIVES

### 2.1.3.1  Vessel Cancellation Charge

This alternative included discussion of a fee to be paid by the vessel to the at-sea observer service provider when vessels are a "no show" or when they cancel trips less than 12 hours before the scheduled departure time.  That option also discussed that payment of fees would be a vessel permit requirement and that outstanding fees would result in non-renewal of vessel permits.

As the PDT/FMAT further developed this option, the Department of Commerce Office of General Counsel advised that the government may not dictate the terms of a private transaction such as this fee.  As a result, the Vessel Cancellation Charge Option is likely not legal because it involves the terms of a private business contract between a vessel and an observer service provider.  While an observer service provider or a vessel could specify a cancellation fee as part of a contract, thereby eliminating the necessity of increasing the base rate that all vessels pay, it is unlikely that NMFS could legally require or specify the amount of such a fee.

The August 2014 version of the Discussion Document contained a Cost-based Prioritization Process for Industry-Funded Monitoring Programs Option.  Under that option, the Federal funding would be assigned to each FMP by sequentially eliminating coverage in FMPs that have the highest funding need until the available funding is sufficient to meet the funding needs of the FMPs remaining.  That process would have prioritized fisheries with the least expensive programs first.  NMFS would have determined and provided the Councils with: (1) The estimated industry-funded monitoring coverage levels that incorporates the prioritization, based on available funding; and (2) the rationale for the recommended prioritization, including how it deviates from the fully-funded coverage target across all FMPs.  This option could be done on an annual basis or the allocation of resources could remain as specified unless revised.

At its August 19, 2014, meeting the Council's Observer Policy Committee recommended that this option be considered but rejected because cost-based prioritization option lacked rationale and eliminating FMPs with the highest funding needs would not likely meet the goals/objectives of the industry-funded monitoring programs established by the Council.

_0000017068

## 2.2  ATLANTIC HERRING MONITORING ALTERNATIVES

As described in the Introduction, the Council is interested in increasing catch monitoring in the Atlantic Herring FMP.  This increased monitoring is in addition to coverage required through the SBRM, the ESA, or MMPA.  Limited Federal funding and legal constraints on the sharing of costs between NMFS and the fishing industry have recently prevented NMFS from approving new industry-funded monitoring programs.  Examples of new industry-funded monitoring programs that were not approved include Amendment 5 to the Atlantic Herring FMP and Framework Adjustment 48 to the Northeast Multispecies FMP.  This amendment is intended to remedy the industry-funded monitoring program disapproval in Herring Amendment 5 by establishing (1) a process by which available Federal funding could be allocated to the Herring FMP to support industry-funded monitoring; and (2) an industry-funded monitoring coverage target to meet Herring FMP objectives.

Establishing monitoring coverage targets would allow NMFS to approve and implement new industry-funded monitoring programs, without committing to support industry-funded monitoring coverage targets above appropriated funding or before funding is determined to be available.

Although this action may select desired coverage targets beyond SBRM requirements, the availability of Federal funds to support industry-funded monitoring may impact the realized coverage level in any given year.  The realized coverage level for the Herring FMP in a given year may be constrained if available Federal funding fall short of NMFS cost responsibilities for administering new industry-funded monitoring programs.  During years when there is no additional funding to cover NMFS cost responsibilities above SBRM requirements, there would be no additional monitoring coverage in the herring fishery, even if industry is able to fully fund their cost responsibilities.  However, if Federal funding is available to allow NMFS to meet its administrative responsibilities for new industry-funded monitoring programs, the specified coverage target levels would likely be met.  Therefore, over time, the realized coverage level for the Herring FMP would fall between SBRM requirements and the industry-funded monitoring coverage target.

### Amendment 5 to the Atlantic Herring FMP

The Council is interested in improving catch and bycatch monitoring in the herring fishery consistent with recommendations in Amendment 5 to the Herring FMP. Amendment 5 to the Herring FMP recommended 100% observer coverage on vessels with the All Areas Limited Access Herring Permit (Category A) and the Areas 2/3 Limited Access Herring Permit (Category B).  The provisions for observer coverage recommended in Amendment 5 were intended to enhance catch monitoring and achieve many of the goals and objectives of that amendment.  Support for 100% observer coverage on Category A and B herring vessels was driven by stakeholders, as well as some members of the herring industry, who believed that 100% observer coverage was necessary for the most active vessels to either confirm or disprove the claims regarding catch and bycatch in the herring fishery.

_0000017069

Amendment 5 also recommended that the requirement for 100% observer coverage should apply to the most active vessels in the herring fishery. Based on analyses in Amendment 5, vessels with Category A and B permits harvest greater than 98% of the herring catch. Recognizing that NMFS would not have sufficient funding to cover the costs of additional observer coverage, Amendment 5 recommended that the industry contribute $325 per sea day to help pay the costs of expanding the herring monitoring program. The recommendation for 100% observer coverage on Category A and B vessels in Amendment 5 was ultimately disapproved. The rationale for the disapproval was described previously in the Introduction.

Amendment 5 to the Herring FMP required 100% observer coverage on midwater trawl vessels fishing in the Groundfish Closed Areas. If the Groundfish Closed Areas are modified or eliminated in the future, coverage requirements for midwater trawl vessels will be reconsidered at that time. Analyses in Amendment 5 suggest that midwater trawl vessels are not catching significant amounts of groundfish either inside or outside the Closed Areas. Additionally, the majority of groundfish catch by midwater trawl vessels is haddock, and the catch of haddock by midwater trawl vessels is already managed through a haddock catch cap for the herring fishery. However, the rationale in Amendment 5 described is important to determine the extent and nature of bycatch in the herring fishery. This measure still allowed the herring midwater trawl fishery to operate in the Groundfish Closed Areas, but it ensured that opportunities for sampling were maximized.

**TABLE 7. PURPOSE AND NEED OF AMENDMENT 5 TO HERRING FMP**

| Purpose | Need |
|---|---|
| Address long term health of the herring resource, including how herring is harvested in order to sustain the important biological role of herring as a forage fish in the Northeast Atlantic | To improve long term catch monitoring and to ensure better compliance with the provisions of the MSA |
| Improve how catch and bycatch from the herring fishery are accounted for | Better monitor bycatch* in the herring fishery, including specifically monitoring river herring bycatch, and to ensure that the FMP is consistent with the bycatch provisions of the MSA |
| *In Amendment 5, "bycatch" means fish that are discarded or fish that are retained and/or sold when harvested in the herring fishery.* | |

### Monitoring of the Herring Fishery

Harvest in the herring fishery is managed by annual catch limits (ACLs) and catch caps. Catch (retained and discarded) of herring and other species is tracked against catch limits

_0000017070

using data reported by the herring industry (vessels and dealers) and data collected by at-sea observers.

The Council and stakeholders in the herring fishery have expressed interest in increased monitoring in the herring fishery to better estimate catch in the fishery (both of herring and other species that are incidentally caught with herring) and minimize reliance on industry-reported data.  Various types of monitoring are being considered in the herring fishery to increase the use of independently collected catch data to verify industry-reported data and track catch against harvest limits.

**TABLE 8.  MONITORING NEEDS OF HERRING FISHERY**

| Monitoring Needs | Vessels to be Monitored |
|---|---|
| **Sub-ACLs for Herring Management Areas** | All permits, gears, and areas |
| **Haddock catch caps** | Midwater trawl vessels fishing in Georges Bank and Gulf of Maine haddock stock areas |
| **Groundfish Closed Areas** | Midwater trawl vessels fishing in Groundfish Closed Areas |
| **River Herring and Shad Catch Caps** | Midwater trawl and small mesh bottom trawl vessels harvesting more than 6,600 lb of herring from Gulf of Maine, Cape Cod, and Southern New England river herring and shad catch cap areas |

Sub-ACLs for Herring Management Areas

The herring stock complex is assessed as a unit stock, but is comprised of inshore (Gulf of Maine) and offshore (Georges Bank) stock components.  These stock components segregate during spawning and mix during feeding and migration.  Herring management areas were developed in recognition of these different stock components and provide a method to manage the fishing mortality of each stock component somewhat independently.  The management areas are located in the Gulf of Maine (Areas 1A and 1B), along the New England coast (Area 2), and Georges Bank (Area 3).   The inshore herring stock component is found in 3 of the 4 management areas (i.e., Area 1A, 1B, and 2).  These same management areas are of particular economic importance to the industry because of herring availability and proximity of the fishing grounds to shore.

The stock-wide herring ACL is divided by the herring management areas to create management area sub-ACLs.  If herring catch reaches 92% of the management area sub-ACL before the end of the fishing year, vessels will be prohibited from possessing more than 2,000 lb of herring per trip or calendar day from that management area until the end of the fishing year.  Additionally, if herring catch reaches 95% of the stock-wide ACL before the end of the fishing year, vessels will be prohibited from possessing more than 2,000 lb of herring per trip in or from any management area until the end of the fishing year.

_0000017071

If total herring catch exceeds the stock wide-ACL or any management area sub-ACL during a fishing year, then the amount of the overage will be deducted from that ACL or sub-ACL in a subsequent year.  Overages are calculated during the year following the fishing year and deducted the next year.  For example, any overages in 2015 are calculated during 2016 and deducted during 2017.

If total herring catch does not exceed the stock wide-ACL and if a management area's sub-ACL has not been fully harvested during a fishing year, then the amount of the underage, up to 10% of the sub-ACL, will be carried over and added to the sub-ACL for that management area in a subsequent year, similar to overage deductions.   However, the additional herring harvest added to each sub-ACL is not also added to the stock-wide herring ACL, so the stock-wide ACL remains unchanged.  Adding additional harvest to a management area sub-ACL, but not the stock-wide ACL, allows for additional harvest opportunities in particular management areas, while still limiting total catch to the stock-wide ACL.

Haddock Catch Caps

Haddock catch caps for the herring fishery are equivalent to a percentage of the haddock acceptable biological catch for each stock of haddock for each multispecies fishing year (May 1 – April 30).  That percentage equals 1% for the Gulf of Maine haddock stock and 1.5% for the Georges Bank haddock stock.

When the haddock incidental catch cap for a particular haddock stock (Gulf of Maine or Georges Bank) has been caught, all herring vessels fishing with midwater trawl gear will be prohibited from fishing for, possessing, or landing, more than 2,000 lb of herring in that particular haddock accountability measure area (Gulf of Maine or Georges Bank) for the remainder of the multispecies fishing year.  In addition, the haddock possession limit will be reduced to 0 lb, in the applicable haddock accountability measure area.

Midwater Trawl Vessels Fishing in Groundfish Closed Areas

In 2014, Amendment 5 expanded the existing requirements for midwater trawl vessels fishing in Groundfish Closed Area I to all herring vessels fishing with midwater trawl gear in all the Groundfish Closed Areas.  These Closed Areas include:  Closed Area I, Closed Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and Western Gulf of Maine Closure Area.

Amendment 5 required vessels with a herring permit fishing with midwater trawl gear in the Groundfish Closed Areas to carry a NMFS-level observer and bring all catch aboard the vessel and make it available for sampling by an observer.  Herring vessels not carrying a NMFS-approved observer may not fish for, possess, or land fish in or from the Closed Areas. Vessels may make test tows without pumping catch on board, provided that all catch from test tows is available to the observer when the next tow is brought aboard.

Amendment 5 allowed catch to be released before it was pumped aboard the vessel if:  (1) Pumping the catch aboard could compromise the safety of the vessel, (2) mechanical failure

_0000017072

prevents the catch from being pumped aboard, or (3) spiny dogfish have clogged the pump and prevent the catch from being pumped aboard.  But if catch is released for any of the reasons stated above, the vessel operator would be required to immediately exit the Groundfish Closed Area.  The vessel may continue to fish, but it may not fish in any Groundfish Closed Area for the remainder of that trip.  Additionally, vessels that release catch before it has been sampled by an observer must complete a midwater trawl released catch affidavit within 48 hr of the end of the fishing trip.  The released catch affidavit details:  (1) Why catch was released; (2) an estimate of the weight of fish caught and released; and (3) the time and location of the released catch.

In past years, observer coverage for midwater trawl vessels fishing in the Groundfish Closed Areas was allocated by NEFOP independent of the SBRM.  However, the revised SBRM prohibited observer coverage from being allocated to midwater trawl vessels fishing in the Groundfish Closed Areas independent of the SBRM.  In order to increase monitoring on midwater trawl vessels fishing in the Groundfish Closed Areas, coverage would need to be incorporated in an industry-funded monitoring program.

River Herring and Shad Catch Caps

Once abundant along the East Coast, populations of river herring (alewife and blueback herring) and shad (American and hickory) have declined compared to historical levels due to various factors.  Governmental agencies, non-profit organizations, tribal groups, academia, industry, and others are currently engaged in numerous efforts to further river herring and shad conservation.

Vessels fishing for herring can encounter river herring and shad.  The Council recommended river herring and shad caps for the herring fishery beginning in 2014. Managers don't currently have enough data to determine biologically based river herring and shad catch caps or to assess the potential effects of such catch caps on river herring and shad populations coastwide.  However, the Council believes river herring and shad catch caps provide a strong incentive for the herring fishery to continue avoiding river herring and shad.  These catch caps are intended to allow for the full harvest of herring annual catch limits, while reducing river herring and shad incidental catch Framework 3 to the Herring FMP established river herring and shad catch caps for midwater and bottom trawl gear in the herring fishery beginning in 2014.  The amounts of the river herring and shad caps were based on the median of historical catch for the herring fishery, specifically for midwater trawl gear in the Gulf of Maine (86 mt), midwater trawl gear in the Cape Cod area (13 mt), and bottom trawl gear (89 mt) and midwater trawl gear (124 mt) in Southern New England.  River herring and shad caught on all trips that land 6,600 pounds or more of herring would count against the caps.  If the directed herring fishery harvests the river herring and shad caps, NMFS would implement a 2,000-pound herring possession limit, effectively closing the directed herring fishery for that area and gear type.

Monitoring is critical to understanding the nature and extent of river herring and shad catch in the herring and mackerel fisheries.  Because the seasonal and inter-annual

_0000017073

distribution of river herring and shad are highly variable, the Council believes that the most effective measures to address river herring and shad catch would be those that increase at-sea sampling, improve catch accounting, and promote cooperative efforts with the industry to minimize catch

Analysis of river herring and shad catch from 2010-2013 done as part of this amendment indicates that the fleets responsible for catching the majority of river herring and shad are the midwater trawl fleet (57%) followed by the small mesh bottom trawl fleet (33%). The analysis also indicated that the purse seine fleet is responsible for a negligible amount of river herring and shad catch (0.3%).

As part of the 2016-2018 herring specifications, the Council revised the methodology used to calculate river herring and shad catch caps. Instead of the median of historical catch, the Council recommended, and NMFS implemented, catch caps based on a weighted mean of historical river herring and shad catch. The weighted mean better accounts for variable sampling levels (both at-sea and portside) by giving more weight to years with more sampling. The resulting catch caps were as follows: 76.7 mt for midwater trawl gear in the Gulf of Maine, 32.4 mt for midwater trawl gear in the Cape Cod area, 122.3 mt for bottom trawl gear in Southern New England, and 129.6 mt for midwater trawl gear in Southern New England.

### Overview of Herring Industry-Funded Monitoring Coverage Target Alternatives

The Council recommended increased monitoring in the herring fishery to address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species for which catch caps apply; and (3) affordable monitoring for the herring fishery.

The industry-funded monitoring coverage target alternatives for the herring fishery provide a range of data collections and monitoring costs. This amendment evaluates how different coverage target alternatives meet specific monitoring goals identified by the Council while comparing the costs of the monitoring programs, particularly costs that would be borne by the fishing industry. The herring coverage target action alternatives include Northeast Fisheries Observer Program-level (NEFOP-level) observer, at-sea monitoring (ASM) coverage, electronic monitoring (EM), and portside sampling coverage.

Under any of the herring coverage target action alternatives, existing industry reporting requirements and observer coverage to meet MSA, ESA, and MMPA requirements under the No Action alternative would continue. Any information collected under the herring coverage target action alternatives would be in addition to existing reporting and monitoring.

The Council finalized its selection of preferred alternatives at its April 18-20, 2017, meeting. The Council selected the following preferred alternatives:

_0000017074

- Herring Alternative 2, including Sub-Options 1 (Waiver Allowed), 2 (Wing Vessel Exemption), 4 (2-Year Re-Evaluation), and 5 (50 mt Exemption Threshold);
- Herring Alternative 2.5 (100% NEFOP-Level Coverage on Midwater Trawl Fleet in Groundfish Closed Areas); and
- Herring Alternative 2.7 (ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage).

**TABLE 9. RANGE OF INDUSTRY-FUNDED MONITORING HERRING COVERAGE TARGET ALTERNATIVES (*PREFERRED ALTERNATIVES IN BOLD*)**

| Gear Type | Midwater Trawl | Purse Seine | Small Mesh Bottom Trawl |
|---|---|---|---|
| Herring Alternative 1:  No Coverage Target for IFM Program (No Action) | SBRM | | |
| **Herring Alternative 2:  Coverage Targets for IFM Program** | Includes Sub-Options:  1) **Wavier Allowed**, 2) **Wing Vessel Exemption**, 3) 2-Year Sunset, 4) **2-Year Re-evaluation**, and 5) 25 mt or **50 mt Exemption Threshold** | | |
| Herring Alternative 2.1:  100% NEFOP-Level Coverage on Category A and B Vessels | 100% NEFOP-Level Observer | | |
| Herring Alternative 2.2:  ASM Coverage on Category A and B Vessels | 25%, 50%, 75% or 100% ASM | | |
| Herring Alternative 2.3:  Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | 50% or 100% EM/Portside | 25%, 50%, 75% or 100% ASM | |
| Herring Alternative 2.4:  EM and Portside Coverage on Midwater Trawl Fleet | 50% or 100% EM/Portside | SBRM (No Action) | |
| **Herring Alternative 2.5:  100% NEFOP-Level Coverage on Midwater Trawl Fleet in Groundfish Closed Areas\*** | **100% NEFOP-Level Coverage** | **SBRM (No Action)** | |
| Herring Alternative 2.6:  Combination Coverage on Midwater Trawl Fleet in Groundfish Closed Areas | Coverage would match selected alternative 2.1-2.4 | SBRM (No Action) | |
| **Herring Alternative 2.7:  ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | **50% ASM or EM/Portside** | **50% ASM** | **50% ASM** |
| \* Sub-Options do not apply to Herring Alternative 2.5. | | | |

## 2.2.1 HERRING ALTERNATIVE1: NO COVERAGE TARGET SPECIFIED FOR INDUSTRY-FUNDED MONITORING PROGRAM

Under Herring Alternative 1 (No Action), there would be no coverage target specified for an industry-funded monitoring program in the Herring FMP.  Observer coverage for herring vessels would be allocated according to SBRM, and there would be no additional cost to the herring industry for monitoring coverage.   If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis.

_0000017075

Under SBRM, the Atlantic herring fishery receives NEFOP observer coverage under the following six fleets:  New England and Mid-Atlantic small mesh otter trawl; New England and Mid-Atlantic purse seine; and New England and Mid-Atlantic paired and single midwater trawl.  The Table 10 describes the sea days proposed for April 2016 through March 2017.  The sea days listed below for small mesh otter trawl cover all FMPs that use this gear type, so only a portion would cover trips targeting herring.  The purse seine and midwater trawl fleets are largely comprised of vessels targeting herring, so a majority of the sea days in these categories will be used to observe trips targeting herring.

**TABLE 10.  PROPOSED AND OBSERVED SEA DAYS FOR FLEETS THAT TARGET HERRING**

| Fleet | Region | Proposed sea days for April 2016 to March 2017 | Observed sea days, July 2014 to June 2015 | VTR sea days, July 2014 to June 2015 | Observed trips, July 2014 to June 2015 | VTR trips, July 2014 to June 2015 |
|---|---|---|---|---|---|---|
| Small Mesh Bottom Trawl | MA | 1,171 | 997 | 6,761 | 360 | 3,088 |
| Small Mesh Bottom Trawl | NE | 798 | 933 | 8,847 | 319 | 3,381 |
| Purse seine | MA | 6 | 0 | 174 | 0 | 172 |
| Purse seine | NE | 19 | 29 | 661 | 13 | 315 |
| Midwater Trawl (Pair and Single) | MA | 30 | 8 | 134 | 1 | 26 |
| Midwater Trawl (Pair and Single) | NE | 440 | 160 | 1,189 | 43 | 363 |

*Source: 2016 Discard Estimation, Precision, and Sample Size Analyses for 14 Federally Managed Species Groups in the Waters off the Northeastern United States; Wigley et al., 2016.*

Under SBRM, NEFOP observers collect the following information on declared herring trips:
- Fishing gear information (i.e., size of nets, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Retained catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Whole specimens, photos, and biological samples (i.e., scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);

_0000017076

- Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

Currently, NEFOP observers are required to possess a High Volume Fisheries (HVF) certification in order to observe the herring fishery. The HVF certification was developed in order to more effectively train certified NEFOP observers in high volume catch sampling and documentation. This certification was developed to prepare observers for changes in the regulations and new requirements that were under consideration in Herring Amendment 5.

NEFOP determined that data quality on herring trips was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers. Having additional training to identify these practices allowed for improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

In order to qualify for HVF training, NEFOP observers need to be certified and in a positive data quality standing with all trip data. Prior data and data quality history are critically examined in order to determine if an observer would be a good candidate for certification.

Currently, the HVF training is conducted at the NEFOP training center in Falmouth, MA and is one to two days in duration. Training consists of species identification, sampling and subsampling methodologies, practice and documentation, gear identification and a review of the regulations. Regulations are discussed in order to educate observers in regard to Groundfish Closed Area coverage, haddock and river herring/shad catch accounting, slippage and operational discarding. Sampling and subsampling high volume catch is the main focus of training to ensure that observers understand the challenges that exist in trying to account for and accurately extrapolate catch on a haul-by-haul basis. Training on the use of a Marel scale is also conducted as most of the high volume vessels have volunteered to keep Marel scales onboard for the observers to utilize. An exam is administered at the end of training and if successfully completed, an observer is certified to observe the high volume fisheries.

Vessels with limited access herring permits (Categories A, B, and C) and midwater trawl vessels fishing in the Groundfish Closed Areas are required to bring catch aboard and make it available to the observer for sampling. If catch is discarded prior to making it available to the observer for sampling, discarded catch is considered "slippage." Vessels are prohibited from slipping catch unless it is due to safety concerns, mechanical failure, or if excess catch of dogfish prevents catch from being pumped aboard the vessel. Vessels with limited access permits are required to report slippage on the daily herring VMS catch report and complete a released catch affidavit. Vessels that slip catch are subject to slippage consequence measures. Midwater trawl vessels fishing in the Groundfish Closed Areas are required to leave the Groundfish Closed Areas following a slippage event and remain out of

_0000017077

the Groundfish Closed Areas for the duration of that fishing trip.  Additionally, vessels with Category A and B permits are required to move 15 nautical miles following a slippage event due to safety, mechanical failure, or dogfish and terminate the fishing trip following slippage for any other reason.

### 2.2.2  HERRING ALTERNATIVE 2: COVERAGE TARGET SPECIFIED FOR INDUSTRY-FUNDED MONITORING PROGRAM (*PREFERRED ALTERNATIVE*)

Under Herring Alternative 2, the Council would specify the details of an industry-funded monitoring program for the Herring FMP.  These details may include, but are not limited to: (1) Level and type of coverage target; (2) rationale for level and type of coverage; (3) minimum level of coverage necessary to meet coverage goals; (4) consideration of coverage waivers if coverage target cannot be met; (5) process for vessel notification and selection; (6) process for payment of industry cost responsibilities; (7) standards for monitoring service providers; and (8) any other measures necessary to implement the industry-funded monitoring program.  Additional NEPA analysis would be required for any subsequent FMP action implementing and/or modifying the specified industry-funded monitoring programs.

The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in a given year.  The realized coverage for the fishery in a given year would fall somewhere between no additional coverage in addition to SBRM and the specified coverage target.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage.  NMFS would determine how to calculate the combined coverage target, in consultation with Council staff.  Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip.  The Council recommended these combined coverage targets to help reduce the cost of industry-funded coverage.  But because SBRM coverage has the potential to vary year to year, the cost of monitoring paid by industry may also vary year to year and may be difficult to plan/budget.

Herring Alternative 2 would allow several sub-options to apply to the herring coverage target alternatives.  Sub-options could apply to any of the alternatives except Herring Alternative 2.5.

The Council finalized its selection of preferred alternatives at its April 18-20, 2017, meeting.  The Council selected Sub-Options 1 (Waiver Allowed), 2 (Wing Vessel Exemption), 4 (2-Year Re-Evaluation), and 5 (50 mt Exemption Threshold) as preferred alternatives.

- Sub-Option 1 would allow vessels to be issued waivers to exempt them from industry-funded monitoring requirements, for either a trip or the fishing year, if

_0000017078

coverage was unavailable due to funding or logistics. This would include coverage for NEFOP-level observers (except in Groundfish Closed Areas), ASM, EM, and portside sampling. Selection of this sub-option preserves the Council's intent for additional monitoring in the herring fishery, but would not prevent vessels from participating in the herring fishery if monitoring coverage was not available. Should the Council not select Sub-Option 1, the fishing effort would be reduced to match the available level of monitoring (i.e., the fleet would not fish if NMFS does not have funding for the program). Reducing fishing effort to match available monitoring may lack sufficient justification and be inconsistent with National Standards.

- Sub-Option 2 would exempt a wing vessel pair trawling with another vessel from industry-funded monitoring requirements, provided the vessel does not pump or carry any fish onboard. Vessels would notify NMFS via the pre-trip notification system (PTNS) in advance of the wing vessel trip and NMFS would issue a waiver for IFM coverage requirements on that trip. If the vessel carried herring on that trip, the vessel would be out of compliance with IFM coverage requirements.
- Sub-Option 3 would require that industry-funded monitoring requirements expire two years after implementation.
- Sub-Option 4 would require the Council to examine the results of any increased coverage in the herring fishery two years after implementation, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate.
- Sub-Option 5 would exempt trips that land less than 25 mt of herring or trips that land less than 50 mt of herring from industry-funded monitoring requirements. The Council selected the 50 mt exemption threshold as a preferred alternatives. Therefore, vessels would notify NMFS via the PTNS in advance of the trip on which they intend to land less than 50 mt of herring and NMFS would issue a waiver for IFM coverage requirements on that trip. If the vessel landed more than 50 mt of herring on that trip, the vessel would be out of compliance with IFM coverage requirements.

Omnibus Alternative 2 would include standard monitoring and service provider requirements for industry-funded monitoring, including NEFOP-level observers, at-sea monitors, electronic monitoring, and portside samplers. (See Appendix 2 for the details of the standard requirements.) If Omnibus Alternative 2 is not selected by the Council, service provider requirements for industry-funded monitoring programs would be developed and implemented in individual FMPs.

Monitoring and service provider provisions previously only considered under Herring Alternative 2 was recommend by the Council in January 2016 to be included in the standard monitoring and service provider requirements in Omnibus Alternative 2. That provision would allow NEFOP-level observers and at-sea monitors to be deployed on the same vessel for more than two consecutive multi-day trips or more than twice in a given month.

_0000017079

In addition to the standard monitoring and service provider requirements specified in Omnibus Alternative 2, Herring Alternative 2 would specify that requirements for industry-funded observer and at-sea monitors include a HVF certification for the herring fishery. The existing NEFOP HVF certification training program would be available to industry-funded observers and NEFOP would develop a new HVF certification training program for industry-funded at-sea monitors.

Under Herring Alternative 2, the process for vessel notification and selection and payment of industry cost responsibilities would be developed during the rulemaking and amendment approval process.

The Massachusetts Division of Marine Fisheries and Maine Department of Marine Resources currently administer voluntary portside sampling programs for the herring fishery. Both states have funding to continue to administer those portside programs through 2018. Therefore, in 2018, the portside sampling of Category A and B vessels using midwater trawl gear would be administered by the states and the resulting data would be used by NMFS for catch monitoring. In 2019 (or possibly 2020) and beyond, NMFS would administer a Federal portside sampling program for vessels with Category A or B herring permits using midwater trawl gear.

Many vessels participating in the herring fishery also participate in the Atlantic mackerel fishery. If IFM coverage targets do not match for the herring and mackerel fisheries, then the higher coverage target would apply on trips declared in both the herring and mackerel fisheries.

### 2.2.2.1 Herring Alternative 2.1: 100% NEFOP-Level Observer Coverage on Category A and B Vessels

Council would select 100% NEFOP-Level coverage for all Category A and B vessels regardless of gear type.

Herring Alternative 2.1 would require vessels with All Areas (Category A) and Areas 2/3 (Category B) Limited Access Herring Permits to carry a NEFOP-level observer on every declared herring trip.

NEFOP-level observers would be required to possess a NEFOP certification, including a HVF certification, and they would collect comprehensive catch data consistent with NEFOP protocols for observer data collected under the SBRM.

Prior to any trip declared into the herring fishery, representatives for vessels with Category A and B herring permits would be required to provide notice to NMFS and request a NEFOP-level observer through the pre-trip notification system. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that NEFOP-level observer coverage must be procured through an industry-funded monitoring service provider. The vessel representative would then be required to contact an industry-funded monitoring service provider to obtain and pay for a NEFOP-level observer to carry on its

_0000017080

next fishing trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying a NEFOP-level observer on its next trip.

NEFOP-level observers would collect the following information on herring trips:

- Fishing gear information (i.e., size of nets, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Retained catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Whole specimens, photos, length information, and biological samples (i.e., scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);
- Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

The 100% NEFOP-level observer coverage target for this alternative would be calculated by combining SBRM and industry-funding monitoring coverage to reach the 100% coverage target in a given year. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer and industry-funded observer on the same trip.

The realized observer coverage level for this alternative in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities. The realized observer coverage level would fall anywhere between SBRM coverage and 100% NEFOP-level coverage on vessels with Category A and B herring permits.

Herring Alternative 2.1 would require all vessels with Category A and B permits to carry a NEFOP-level observer on every declared herring trip. If a NEFOP-level observer was not available to cover a specific herring trip (either due to logistics or a lack of funding), NMFS would issue the vessel a monitoring coverage waiver for that trip.

Under Herring Alternative 2.1, all slippage restrictions, reporting requirements, and slippage consequences would apply to vessels with Category A and B herring permits.

**Rationale**: Amendment 5 recommended 100% NEFOP-level observer coverage on vessels with Category A and B herring permits. The increased coverage recommended in Amendment 5 was intended to help determine the true nature and extent of catch and bycatch in the fishery and better address and manage bycatch issues in the future. The requirement for 100% NEFOP-level observer coverage was recommended to apply to the most active vessel in the herring fishery. Based on analyses in Amendment 5, vessels with Category A and B herring permits harvest greater than 98% of herring catch while vessels

_0000017081

with Limited Access Herring Incidental Catch Permits (Category C) harvest only a small percentage of the overall herring catch (0.6%).  Because of the costs associated with industry-funded monitoring, Herring Amendment 5 recommended limiting industry-funded observer coverage to vessels with Category A and B permits.  The recommendation to increase coverage just on vessels with Category A and B permits was intended to improve catch monitoring in the herring fishery, while minimizing the negative economic impacts associated with industry-funded observer coverage on fishery-related businesses and communities.

Support for 100% NEFOP-level observer coverage on Category A and B herring vessels in Amendment 5 was driven by a majority of fishing industry stakeholders (e.g., groundfish fishing industry, recreational fishery participants, environmental advocates).  Those stakeholders, as well as some members of the herring industry, believed that 100% NEFOP-level observer coverage on the most active vessels was important to either confirm or disprove the claims that have been made by many regarding bycatch in the herring fishery.

Slippage restrictions, reporting requirements, and consequences are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling.  Combining SBRM coverage with industry-funded monitoring coverage to achieve the coverage target (100%) is intended to reduce the costs associated with industry-funded monitoring coverage.

### 2.2.2.2  Herring Alternative 2.2:  At-Sea Monitor Coverage on Category A and B Vessels

Council would select one ASM coverage target (25%, 50%, 75%, or 100%) for all Category A and B vessels regardless of gear type.

Herring Alternative 2.2 would require vessels with Category A and B herring permits to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS.  Vessels would be selected to carry an at-sea monitor by NMFS to meet the at-sea monitor coverage target (25%, 50%, 75%, or 100%) specified in this action.

Prior to any trip declared into the herring fishery, representatives for vessels with Category A and B herring permits would be required to provide notice to NMFS and request an at-sea monitor through the pre-trip notification system.  If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether or not an at-sea monitor must be procured through an industry-funded monitoring service provider.  If NMFS informs the vessel representative that at-sea monitoring coverage is necessary, they would then be required to contact an industry-funded monitoring service provider to obtain and pay for an at-sea monitor to carry on its next fishing trip.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on its next trip.  If NMFS informs the vessel representative that at-sea monitoring coverage is not necessary on its next trip, NMFS would issue the vessel an at-sea monitoring coverage waiver.

_0000017082

At-sea monitors would collect the following information on herring trips:

- Fishing gear information (i.e., size of nets, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Retained catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;
- Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

Currently, the primary biological data that at-sea monitors would collect are length data on retained and discarded catch. However, to verify species identification, at-sea monitors may also collect whole specimens or photos. In the future, the Council may recommend that at-sea monitors collect additional biological information upon request. Revising the duties for an at-sea monitor, such that additional biological information would be collected, could be done in a future framework action. The Council may also recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is taken, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors.

Initially, the Council recommended that at-sea monitors only collect data from discarded and not retained catch. The Council recommended that at-sea monitors collect only a limited data set compared to NEFOP-level observers to allow for any possible cost savings associated with reducing training time, gear requirements, and internal support resources necessary to administer an at-sea monitoring program for the herring fishery. However, the herring fishery only discards a small percentage of it catch, so there was only a minimal gain in information when at-sea monitors only collected data on discarded catch. In April 2016, to increase the data utility of information collected by at-sea monitors, the Council recommended that at-sea monitors collect information on both retained and discarded catch.

The ASM coverage target (25%, 50%, 75%, or 100%) for this alternative would be calculated by combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer and industry-funded at-sea monitor on the same trip.

The realized observer coverage level for this alternative in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities.

_0000017083

The realized observer coverage level would fall anywhere between SBRM coverage and the specified at-sea monitoring coverage level on vessels with Category A and B herring permits.

Herring Alternative 2.2 would require all vessels with Category A and B permits to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS. If an at-sea monitor was not available to cover a specific herring trip (either due to logistics or a lack of funding), NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip.

Under Herring Alternative 2.2, all slippage restrictions, reporting requirements, and slippage consequences would apply to vessels with Category A and B herring permits.

**Rationale**:  In contrast to NEFOP-level observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch or sighting data on protected species.  The Council recommended that at-sea monitors collect only a limited data set compared to NEFOP-level observers to allow for any possible cost savings associated with reducing training time, gear requirements, and internal support resources necessary to administer an at-sea monitoring program for the herring fishery.  (See Appendix 4 for additional details.)

Slippage restrictions, reporting requirements, and consequences are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling.  Combining SBRM coverage with industry-funded monitoring coverage to achieve the coverage target (25%, 50%, 75%, or 100%) is intended to reduce the costs associated with industry-funded monitoring coverage.

### 2.2.2.3   Herring Alternative 2.3:  Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet

**Category A and B Vessels**

Council would select one ASM coverage target (25%, 50%, 75%, or 100%) for all Category A and B vessels using either purse seine or bottom trawl gear.

Herring Alternative 2.3 would require vessels with Category A and B herring permits using purse seine and small mesh bottom trawl gear to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS.  Vessels would be selected to carry an at-sea monitor by NMFS to meet the at-sea monitor coverage target (25%, 50%, 75%, or 100%) specified in this action.

Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits using purse seine or small mesh bottom trawl gear would be required to provide notice to NMFS and request an at-sea monitor through the pre-trip notification system.  If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether or not an at-sea monitor must be procured through an industry-funded monitoring service provider.  If NMFS informs vessel representative that

_0000017084

they needed at-sea monitoring coverage, they would then be required to contact an industry-funded monitoring service provider to obtain and pay for an at-sea monitor to carry on its next fishing trip.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on its next trip.  If NMFS informs the vessel representative that at-sea monitoring coverage is not needed on its next trip, NMFS would issue the vessel an at-sea monitoring coverage waiver.

At-sea monitors would collect the following information on herring trips:
- Fishing gear information (i.e., size of nets, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Retained catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;
- Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

Currently, the primary biological data that at-sea monitors would collect are length data on retained and discarded catch.  However, to verify species identification, at-sea monitors may also collect whole specimens or photos.  In the future, the Council may recommend that at-sea monitors collect additional biological information upon request.  Revising the duties for an at-sea monitor, such that additional biological information would be collected, could be done in a future framework action.  The Council may also recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is taken, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors.

The ASM coverage target (25%, 50%, 75%, or 100%) for this alternative would be calculated by combining SBRM and industry-funding monitoring coverage.  NMFS would determine how to calculate the combined coverage target, in consultation with Council staff.  Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer and industry-funded at-sea monitor on the same trip.

Herring Alternative 2.3 would require all vessels with Category A and B permits using purse seine or small mesh bottom trawl gear to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS.  If an at-sea monitor was not available to cover a specific herring trip (either due to logistics or a lack of funding), NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip.

_0000017085

Under Herring Alternative 2.3, all slippage restrictions, reporting requirements, and slippage consequences would apply to vessels with Category A and B herring permits with ASM coverage.

**Rationale**: In contrast to NEFOP-level observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch or sighting data on protected species. The Council recommended that at-sea monitors collect only a limited data set compared to NEFOP-level observers to allow for any possible cost savings associated with reducing training time, gear requirements, and internal support resources necessary to administer an at-sea monitoring program for the herring fishery. (See Appendix 4 for additional details.*)

Slippage restrictions, reporting requirements, and consequences are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling. Combining SBRM coverage with industry-funded monitoring coverage to achieve the coverage target (25%, 50%, 75%, or 100%) is intended to reduce the costs associated with industry-funded monitoring coverage.

**Midwater Trawl Fleet**

Council would select one electronic monitoring (EM)/portside sampling coverage target (50% or 100%) for all vessels using midwater trawl gear.

Herring Alternative 2.3 would also require midwater trawl vessels to carry an operating EM system on every trip declared into the herring fishery and portside sampling of catch on declared herring trips selected for coverage by NMFS. The intention of the Council would be that all declared herring trips by midwater trawl vessels would have some percentage of EM footage sampled (50% or 100%) and that same percentage of trips sampled portside (50% or 100%). However, factors such as where catch is landed, ability to access the offload, and infrastructure limitations at certain landing ports, may prevent the program from achieving 100% coverage, even if funding is not limiting.

Prior to any trip declared into the herring fishery, representatives for vessels using midwater trawl gear would be required to have an operational EM system installed aboard their vessel and provide notice to NMFS and request a portside sampler through the pre-trip notification system.

NMFS would notify the vessel representative whether or not portside sampling coverage must be procured through an industry-funded monitoring service provider. If NMFS informs the vessel representative that they needed portside sampling coverage, they would then be required to contact an industry-funded monitoring service provider to obtain and pay for a portside sampler for its next fishing trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without portside sampling of its offload on its next trip. If NMFS informs the vessel representative that portside sampling coverage is not needed on its next trip, NMFS would issue the vessel a portside sampling coverage waiver.

_0000017086

The EM footage and portside sampling coverage target (50% or 100%) for this alternative would be calculated by combining SBRM and industry-funding monitoring coverage.  NMFS would determine how to calculate the combined coverage target, in consultation with Council staff.  Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer on the same trip that would be sampled portside.

<u>Electronic Monitoring</u>

Under Herring Alternative 2.3, owners or operators of vessels issued a herring permit and using midwater trawl gear would be required to install EM equipment and maintain the equipment on board for the duration of the fishing year.  Though the system would have to be installed for the duration of the fishing year, it would only need to be turned on and recording video footage during declared herring trips using midwater trawl gear.

Video footage would be used to confirm retention of catch on midwater trawl trips to ensure that all catch is available to be sampled portside for a given trip.  Video footage would be recorded either throughout the duration of the trip or just around haulback.   For analysis purposes, haulback would be defined as the time gear sensors document the start of gear retrieval to some set amount of time after the time gear sensors sense the end of gear retrieval, in order to ensure that all catch has been transferred into the hold or discarded.  In addition, one wide angle camera may remain on for the duration of the trip to monitor for discard compliance.

While video footage was intended to only initially be used to verify retention of catch for portside sampling, the Council also recommended that EM would be used to verify compliance with slippage restrictions, reporting requirements, and a requirement to move 15 nautical miles following any slippage event.  Footage would not initially be used to identify species, nor estimate the amount of catch released if a haul were slipped.  The Council may expand the uses of video footage to include species identification or quantification of released catch in the future, if footage proves useful for these purposes.  Such an expansion would be done via a framework adjustment or amendment, as appropriate.

In 2016 and 2017, GARFO and NEFSC, in cooperation with Saltwater Inc., evaluated the utility of EM aboard midwater trawl vessel participating in the herring and mackerel fisheries.  The purpose of the program is to:
- Analyze the utility of EM in monitoring fisheries as a means of informing future EM programs.
- Deploy and test an EM program in an operational setting, allowing analysis and adjustment of EM program requirements.
- Evaluate the range of information that can be gathered with EM systems, such as: Verify slippage events; categorize the types of slippage events; verify other discard

_0000017087

sources; and determine if EM can help estimate the amount of catch retained (if not all catch is retained).
- Refine EM cost estimates for NMFS and the fishing industry.

*Equipment*

The EM system, installed by a NMFS-approved contractor, would be comprised of video camera(s), recording equipment, and other related equipment with the following components and capabilities:
- Video cameras.  Video cameras would need to be mounted so to provide clear, unobstructed, and well illuminated views of the area(s) where the midwater trawl gear is retrieved prior to being placed in the hold.  There would need to be a sufficient number of cameras with sufficient resolution for NMFS, the US Coast Guard, and other authorized officers/designees to determine that all catch was brought aboard the vessel during haulback.  The EM system must be capable of initiating video recording at the time gear retrieval starts, and record all periods of time when the gear is being retrieved and until catch is placed in the hold or discarded.
- Global Positioning System (GPS) receiver.  A GPS receiver would be required to document coordinates, velocity, and heading data.
- Hydraulic and drum rotation sensors.  Hydraulic sensors would be required to continuously monitor the hydraulic pressure.  Drum rotation sensor would be required to continuously monitor drum rotations.
- EM control box.  The system would need to include a control box that receives and stores the raw data provided by the sensors and cameras.  The control box would need to contain removable hard drives and sufficient storage system capability to record data for the full duration of a trip (i.e., the longest expected trip length for the vessel).
- EM systems monitor.  A wheelhouse monitor would be necessary to provide a graphical user interface for the vessel operator to monitor: 1) The state and performance of the control box, 2) information on the current date and time synchronized via GPS, 3) GPS coordinates, 4) current hydraulic pressure reading, 5) presence of a data disk, 6) percentage used of the data disk, and 7) video recording status.

NMFS would announce specifics about this equipment list, as well as any additional design requirements for the EM system, during the rulemaking and implementation process. Industry will be responsible for contracting with a NMFS-approved provider for technical and maintenance services.

*Data Transfer*

After completing a fishing trip, a vessel representative would be required to mail or transmit the removable EM system hard drive(s) containing all data to NMFS or a NMFS-approved contractor, according to instructions provided by NMFS.  The method of transfer

_0000017088

that would be allowed under the EM program will be developed during implementation and included in individual vessel monitoring plans, as described below.  Prior to departing on a subsequent trip, a vessel representative would be required to install a replacement EM system hard drive(s) to enable data collection and video recording.  A vessel representative would be responsible for contacting NMFS or a NMFS-approved contractor if they have requested but not received a replacement hard drive(s) and for informing NMFS or NMFS-approved contractor of any lapse in the hard drive management procedures described in the vessel monitoring plan.

*Retention Requirements*

Initially, Herring Alternative 2.3 would maintain the existing retention requirements for the midwater trawl fleet.  Vessels would continue to operate under the regulations and possession limits for any fisheries for which they possess permits.  There are also some statutory measures under the ESA and MMPA that may dictate retention of protected species.

*Review of EM Video Footage*

Video footage would be sampled at a predetermined percent of review (50% or 100%) and then could be compared to released catch affidavits, VMS reports describing discard events, and/or observer data on slippage.  The sampling of video footage would evaluate whether or not catch was discarded.  To use the optimum and most cost-effective rate to achieve the goal for this action, the rate of review may be adjusted by the Council via a future framework or specification action, if appropriate.

*Compliance Measures*

In the future, the Council may consider modifications to the rates of video footage recording and/or sampling rates to ensure compliance with slippage measures.  For example, if a vessel is found to have undocumented discarding events on more than a specified number of trips during a fishing year, then the Council may adjust the rates of video footage recording and/or sampling.

*Vessel Monitoring Plans*

Individual Vessel Monitoring Plans (VMPs) would serve as a comprehensive plan for discard documentation, installation and maintenance, protocols for data storage and transfer, and other important information regarding a vessel's specific EM system.  Each vessel operator or owner would be responsible for working with NMFS or a NMFS-approved contractor to develop a VMP, and would be required to keep the VMP aboard the vessel at all times.  NMFS would specify VMP requirements in the regulations.  VMPs may include, but are not limited to, information on the locations of EM system components, contact information for technical support, instructions on how to conduct a pre-trip system test, instructions on how to verify proper system functions, location(s) on deck where fish retrieval should occur to remain in view of the cameras, procedures for how to manage EM

_0000017089

system hard drives, catch handling procedures, periodic checks of the monitor during the retrieval of gear to verify proper functioning, and reporting procedures.  The VMP should minimize, as much as possible, any impact on the current operating procedures of the vessel, and should help ensure the safety of the crew.  NMFS or a NMFS-approved contractor would review VMPs biennially prior to the start of the upcoming fishing year.

<u>Portside Sampling</u>

Under Herring Alternative 2.3, vessels with herring permits using midwater trawl gear would be subject to portside sampling requirements for declared herring trips selected for coverage by NMFS.  Portside sampling would be used to verify the amount and species composition of catch in the herring fishery and help track catch against catch caps for haddock and river herring and shad.  Portside samplers would also collect age and length data.

*Sampling Design*

The sampling design for portside sampling alternatives would be based on existing portside sampling programs for the herring fishery, administered by the Massachusetts Division on Marine Fisheries and Maine Department of Marine Resources, and consistent with NEFOP sampling methodology.  Midwater trawl vessels returning from a declared herring trip would be sampled portside during the offload.  Initially, the level of sampling for midwater trawl trips would be approximately 50% or 100%.  However, the sampling rate may be adjusted by the Council, in a future framework or specification action, to use the optimum and most cost effective rate to achieve management goals.  Such factors as where catch is landed, ability to access the offload, and infrastructure limitations at certain landing ports, may prevent the program from achieving 100% coverage, even if funding is not limiting.

Basket samples would be collected from the vessel's dewatering box at specified intervals throughout the duration of the offload.  Basket samples would be sorted and weighed by species and extrapolated based on vessel hail weight to represent the total trip.  Actual weights could be verified against the vessel trip report and/or dealer data.  Age and length data would be collected consistent with NEFOP sampling methodology.

*Landing Ports*

Midwater trawl vessels returning from declared herring trips would be required to land catch in specific ports.  In past years, the midwater trawl fleet has landed catch in Maine (Portland, Rockland, Vinalhaven, Prospect Harbor, Jonesport), New Hampshire (Newington), Massachusetts (Boston, Gloucester, New Bedford), Rhode Island (Point Judith, North Kingston), and New Jersey (Cape May).

Approximately 95% of midwater trawl landings are made in ports currently sampled by the state programs.  However, if certain ports are not suitable for portside sampling, then vessels may not be able to land in those ports on trips that are selected for portside

_0000017090

sampling. Some vessels only land in a single port and that port is not currently sampled. Some vessels land in both sampled and unsampled ports, but changing past practices to land only in sampled ports may not be easy. Without a predictive model, the analysis of requiring vessels to land in specified ports will be qualitative. Additionally, data confidentiality will limit a quantitative analysis. If the Council selects Herring Alternative 2.3 as a preferred alternative, NMFS would further evaluate how to enable portside sampling in midwater trawl landing ports during implementation of this amendment.

*Vessel Responsibilities*

Midwater trawl vessels would be responsible for offloading catch consistent with offloading requirements and contracting a service provider to arrange a portside sampler to sample catch from declared herring trips.

Herring Alternative 2.3 would require midwater trawl vessels to carry an operating EM system on every trip declared into the herring fishery and portside sampling of catch on every declared herring trip selected for coverage by NMFS. If an operating EM system or portside sampler was not available to cover a specific herring trip (either due to logistics or lack of funding), NMFS would issue the vessel a coverage waiver for that trip.

As recommended by the Council, Herring Alternative 2.3 would have a pre-implementation plan to help the industry understand any new EM and portside monitoring requirements and become compliant with sampling equipment, notification, sampling, and reporting requirements.

Under Herring Alternative 2.3, all slippage restrictions and reporting requirements would apply to all midwater trawl vessels with limited access herring permits. Additionally, on trips selected by NMFS to be sampled portside, a requirement to move 15 nautical miles following any slippage event would apply to all midwater trawl vessels with Category A and B herring permits.

**Rationale**: Because the midwater trawl fleet discards only a small percentage of its catch at sea, EM and portside sampling have the potential to be a cost effective way to address monitoring goals for the midwater trawl fleet harvesting herring. EM would be used to verify retention of catch on the midwater trawl fleet and portside sampling would be used to verify amount and species composition of landed catch.

The implementation of EM in the herring fishery would be informed by NMFS's evaluation of EM aboard midwater trawl vessels participating in the herring fishery as well as the exempted fishing permit program for the West Coast whiting fishery. The implementation of portside sampling in the herring fishery would be informed by the existing portside sampling programs operated by the Massachusetts Division of Marine Fisheries and Maine Department of Marine Resources.

Slippage restrictions, reporting requirements, a requirement to move 15 nautical miles following any slippage event are intended to improve catch monitoring by minimizing

_0000017091

discarding events to help ensure that total catch is available for sampling. Combining SBRM coverage with industry-funded monitoring coverage to achieve the coverage target (50% or 100%) is intended to reduce the costs associated with industry-funded monitoring coverage.

### 2.2.2.4  Herring Alternative 2.4:  Electronic Monitoring and Portside Sampling on the Midwater Trawl Fleet

Council would select one EM/Portside sampling coverage target (50% or 100%) for all vessels using midwater trawl gear.

Herring Alternative 2.4 would require midwater trawl vessels to carry an operating EM system on every trip declared into the herring fishery and portside sampling of their catch on declared herring trip selected for coverage by NMFS. The intention of the Council would be that all declared herring trips by midwater trawl vessels would have some percentage of EM footage sampled (50% or 100%) and that same percentage of trips sampled portside (50% or 100%). However, factors such as where catch is landed, ability to access the offload, and infrastructure limitations at certain landing ports, may prevent the program from achieving 100% coverage, even if funding is not limiting. For complete details of EM and portside sampling, see the description of Herring Alternative 2.3

Herring Alternative 2.4, similar to Herring Alternative 2.3, would require midwater trawl vessels to carry an operating EM system on every trip declared into the herring fishery and portside sampling of their catch on every declared herring trip selected for coverage by NMFS. If an operative EM system or portside sampler was not available to cover a specific herring trip (either due to logistics or a lack of funding), NMFS would issue the vessel a coverage waiver for that trip.

The EM footage and portside sampling coverage target (50% or 100%) for this alternative would be calculated by combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer on the same trip that would be sampled portside.

As recommended by the Council, Herring Alternative 2.4 would have a pre-implementation plan to help the industry understand any new EM and portside monitoring requirements and become compliant with sampling equipment, notification, sampling, and reporting requirements.

Under Herring Alternative 2.4, all slippage restrictions and reporting requirements would apply to all midwater trawl vessels with limited access herring permits. Additionally, on a trips selected by NMFS to be sampled portside, a requirement to move 15 nautical miles following any slippage event would apply to all midwater trawl vessels with Category A and B herring permits.

_0000017092

**Rationale**:  Because the midwater trawl fleet discards only a small percentage of its catch at sea, EM and portside sampling have the potential to be a cost effective way to address monitoring goals for the midwater trawl fleet harvesting herring.  EM would be used to verify retention of catch on the midwater trawl fleet and portside sampling would be used to verify amount and species composition of landed catch.

The implementation of EM in the herring fishery would be informed by NMFS's evaluation of EM aboard midwater trawl vessels participating in the herring fishery as well as the exempted fishing permit program for the West Coast whiting fishery.  The implementation of portside sampling in the herring fishery would be informed by the existing portside sampling programs operated by the Massachusetts Division of Marine Fisheries and Maine Department of Marine Resources.

Slippage restrictions, reporting requirements, a requirement to move 15 nautical miles following any slippage event are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling.  Combining SBRM coverage with industry-funded monitoring coverage to achieve the coverage target (50% or 100%) is intended to reduce the costs associated with industry-funded monitoring coverage.

### 2.2.2.5   Herring Alternative 2.5 (Preferred Alternative): 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas

Council selected 100% NEFOP-Level coverage for all vessels using midwater trawl gear and fishing in Groundfish Closed Areas as a preferred alternative.  Sub-Options do not apply to this preferred alternative.

Herring Alternative 2.5 would maintain the existing requirement that midwater trawl vessels fishing in the Groundfish Closed Areas to carry a NEFOP-level observer, but would allow vessels to pay for coverage to access the Groundfish Closed Areas.  The sub-options (i.e., waiver allowed, wing vessel exemption, 2-year sunset, 2-year evaluation, and 25 mt or 50 mt exemption thresholds) described under Herring Alternative 2 would not apply to Herring Alternative 2.5.

Initially, the Groundfish Closed Areas included:  Closed Area I, Closed Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and Western Gulf of Maine Closure Area.  Based on Amendment 5, if the Groundfish Closed Areas are modified or eliminated in the future, coverage requirements for midwater trawl vessels will be reconsidered at that time.

In January 2018, NMFS partially approved Omnibus Essential Fish Habitat Amendment 2 (Habitat Amendment), including changes to Closed Area I, Nantucket Lightship Closed Area, and the Western Gulf of Maine Closure Area.  Consistent with Council intent regarding observer coverage, the final rule for the Habitat Amendment (83 FR 15240, April 9, 2018) maintained the 100% observer requirement for midwater trawl vessels fishing in Closed Area I North (February 1 – April 15), Closed Area II, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area.  Because the Habitat Amendment removed the

_0000017093

Nantucket Lightship Closed Area from the list of Groundfish Closed Areas, the 100% observer coverage requirement no longer applies to midwater trawl vessels fishing in the area previously known as the Nantucket Lightship Closed Area.

Prior to any Groundfish Closed Area trip declared into the herring fishery, representatives for vessels with midwater trawl gear would be required to provide notice to NMFS and request a NEFOP-level observer through the pre-trip notification system. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that NEFOP-level observer coverage must be procured through an industry-funded at-sea monitoring service provider. The vessel representative would then be required to contact an industry-funded monitoring service provider to obtain and pay for a NEFOP-level observer to carry on its next fishing trip within a Groundfish Closed Area. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring on any trip within a Groundfish Closed Area without carrying a NEFOP-level observer for that trip.

NEFOP-level observers would collect the following information on herring trips in Groundfish Closed Areas:
- Fishing gear information (i.e., size of nets, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Retained catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Whole specimens, photos, length information, and biological samples (i.e., scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);
- Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

The 100% NEFOP-level observer coverage for this alternative would be calculated by combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. Because the coverage is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer and industry-funded observer on the same trip.

Herring Alternative 2.5 would maintain the existing requirement that vessels fishing with midwater trawl gear in the Groundfish Closed Areas to carry a NEFOP-level observer. If a NEFOP-level observer was not available to cover a specific herring trip inside a Groundfish Closed Area (either due to logistics or a lack of funding), that vessel would be prohibited from fishing inside a Groundfish Closed Area on that trip. Acknowledging that available Federal funding to cover NMFS cost responsibilities may be limited, this alternative would likely reduce the ability of the midwater trawl fleet to participate in the herring fishery inside the Groundfish Closed Areas.

_0000017094

Under Herring Alternative 2.5, slippage restrictions and reporting requirements would apply to all midwater trawl vessels with limited access herring permits fishing in Groundfish Closed Areas and slippage consequences would apply to all midwater trawl vessels with Category A and B herring permits fishing in Groundfish Closed Areas.

The Council selected NEFOP-level observer coverage (Herring Alternative 2.5) and ASM and EM/Portside sampling coverage (Herring Alternative 2.7) as preferred monitoring types for the herring fishery. If available Federal funding is insufficient to cover NMFS costs responsibilities associated with administering multiple monitoring programs for the herring fishery, the Council recommended that funding be prioritized to ASM and EM/Portside coverage on Category A and B vessels and then to support NEFOP-level observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas. This recommendation is intended to prioritize coverage aboard Category A and B vessels because they harvest the majority of the herring and then to facilitate midwater trawl access to Groundfish Closed Areas.

**Rationale**: The requirement that midwater trawl vessels fishing in the Groundfish Closed Areas carry a NEFOP-level observer was established in Herring Amendment 5. Analyses in Amendment 5 suggest that midwater trawl vessels are not catching significant amounts of groundfish either inside or outside the Groundfish Closed Areas. Additionally, the majority of groundfish catch by midwater trawl vessels is haddock, and the catch of haddock by midwater trawl vessels is already managed through a haddock catch cap for the herring fishery. However, the rationale in Amendment 5 described the importance of determining the extent and nature of catch and bycatch in the herring fishery. This alternative would still allow the herring midwater trawl fishery to operate in the Groundfish Closed Areas, but it would ensure that opportunities for sampling are maximized.

Revisions to the SBRM in April 2015 affected how funding is used to allocate observer coverage, such that SBRM funding must first be used to provide SBRM coverage. SBRM coverage is used to estimate amount of fish discarded at sea. Since midwater trawl vessels generally discard only a small percentage of catch at sea, SBRM coverage allocated to midwater trawl vessels is relative low compared to coverage allocated to other gear types that have higher discard rates. Thus, the realized coverage level of midwater trawl vessels fishing in Groundfish Closed Areas will only be equivalent to SBRM coverage aboard midwater trawl vessels, likely less than 100% observer coverage. This alternative is intended to increase observer coverage on midwater trawl vessels and allow those vessels access to the Groundfish Closed Areas with industry-funded monitoring.

If the Groundfish Closed Areas are modified or eliminated in the future, coverage requirements for midwater trawl vessels will be reconsidered at that time.

_0000017095

### 2.2.2.6  Herring Alternative 2.6:  Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas

If the Council had selected Herring Alternative 2.2, 2.3, 2.4, or 2.7 as the preferred alternative, then the monitoring type and coverage target associated with that alternative would apply to vessels using midwater trawl gear and fishing in Groundfish Closed Areas.

Herring Alternative 2.6 would require vessels fishing with midwater trawl gear in the Groundfish Closed Areas to comply with any ASM or EM and portside monitoring requirements specified for the herring fishery in this amendment.

Prior to any Groundfish Closed Area trip declared into the herring fishery, representatives for vessels with midwater trawl gear would be required to provide notice to NMFS and request the appropriate type of industry-funded monitoring coverage through the pre-trip notification system.  If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that industry-funded monitoring coverage must be procured through an industry-funded at-sea monitoring service provider.  The vessel representative would then be required to contact an industry-funded monitoring service provider to obtain and pay the appropriate type of industry-funded monitoring coverage to carry on its next fishing trip within a Groundfish Closed Area.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring on any trip within a Groundfish Closed Area without the appropriate type of monitoring coverage for that trip.

The coverage target under this alternative would be calculated by combining SBRM and industry-funded monitoring coverage.  NMFS would calculate the coverage target.  If the Groundfish Closed Areas are modified or eliminated in the future, coverage requirements for midwater trawl vessels will be reconsidered at that time.

Herring Alternative 2.6 would require vessels fishing with midwater trawl gear in the Groundfish Closed Areas to comply with any ASM or EM and portside monitoring requirements specified for the herring fishery in this amendment.  If the appropriate type of monitoring coverage was not available to cover a specific herring trip inside a Groundfish Closed Area (either due to logistics or a lack of funding), NMFS would issue the vessel a monitoring coverage waiver for that trip.

Under Herring Alternative 2.6, slippage restrictions and reporting requirements would apply to midwater trawl vessels with limited access herring permits fishing in Groundfish Closed Areas and slippage consequences would apply to midwater trawl vessels with Category A and B herring permits fishing in Groundfish Closed Areas.

**Rationale**:  This alternative was recommended by the Council to balance stakeholder interest in additional catch monitoring on midwater trawl vessels with the ability of the herring fishery to operate within the Groundfish Closed Areas and the economic impacts of paying for monitoring on trips within the Groundfish Closed Areas.

_0000017096

Revisions to the SBRM in April 2015 affected how funding is used to allocate observer coverage, such that SBRM funding must first be used to provide SBRM coverage. SBRM coverage is used to estimate amount of fish discarded at sea. Since midwater trawl vessels generally discard only a small percentage of catch at sea, SBRM coverage allocated to midwater trawl vessels is relative low compared to coverage allocated to other gear types that have higher discard rates. Thus, SBRM coverage allocated to midwater trawl vessels would likely be less than 100% observer coverage.

This alternative is intended to increase monitoring on midwater trawl vessels and allow those vessels access to the Groundfish Closed Areas with industry-funded monitoring.

### 2.2.2.7  *Herring Alternative 2.7 (Preferred Alternative):  At-Sea Monitoring Coverage on Category A and B Vessels, Then Eventually Vessels May Choose Either At-Sea Monitoring Coverage or Electronic Monitoring and Portside Sampling Coverage*

Council selected a 50% coverage target for all Category A and B vessels as a preferred alternative. Different coverage targets (25%, 50%, 75%, or 100%) were analyzed for each gear type (midwater trawl, purse seine, bottom trawl), but the Council selected a 50% coverage target for all gear types.

Initially, vessels would be required to carry an at-sea monitor, then eventually, once EM was approved by the Council and NMFS, specific gear types would be able choose between ASM or EM/portside coverage.

This amendment would establish a general process for NMFS to consult with the Council to approve EM coverage for the herring fishery. EM may be used in place of ASM in the herring fishery if the technology is deemed sufficient by the Council. The Regional Administrator, in consultation with the Council, may approve the use of EM systems for the herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the *Federal Register*. A vessel electing to use EM in lieu of ASM must develop a vessel monitoring plan to implement EM requirements that is satisfactory to, and approved by, NMFS for monitoring catch, discards and slippage events. The vessel monitoring plan must meet the EM operational standards. The EM program shall be reviewed and approved by the Regional Administrator as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

In 2016 and 2017, GARFO and NEFSC, in cooperation with Saltwater Inc., evaluated the utility of EM aboard midwater trawl vessel participating in the herring and mackerel fisheries. The purpose of the program is to:
- Analyze the utility of EM in monitoring fisheries as a means of informing future EM programs.
- Deploy and test an EM program in an operational setting, allowing analysis and adjustment of EM program requirements.

_0000017097

- Evaluate the range of information that can be gathered with EM systems, such as: Verify slippage events; categorize the types of slippage events; verify other discard sources; and determine if EM can help estimate the amount of catch retained (if not all catch is retained).
- Refine EM cost estimates for NMFS and the fishing industry.

At its April 2018 meeting, the Council determined that electronic monitoring, used in conjunction with portside sampling coverage, is an adequate substitute for at-sea monitoring coverage aboard vessels using midwater trawl gear, but did not recommend requiring electronic monitoring and portside sampling as part of this amendment.  Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.  The EFP would exempt midwater vessels from the proposed requirement for industry-funded at-sea monitoring coverage and would allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50% coverage target.  An EFP would enable NMFS to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. The Council previously recommended reconsidering herring industry-funded monitoring requirements two years after implementation.  Using the results of the EFP, the Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

In 2018, the Council only evaluated if EM/Portside is an adequate substitute for ASM coverage aboard Category A and B vessels using midwater trawl gear.  Midwater trawl would be required to:  (1) Choose one monitoring type per fishing year; and (2) declare their preferred monitoring type six months in advance of the fishing year.   In the future, the Council may determine that EM/Portside sampling is an adequate substitute for ASM coverage aboard purse seine or bottom trawl vessels.  If so, then the ability of Category A and B vessels using purse seine or bottom trawl gear to choose whether to use ASM or EM/Portside sampling coverage would be considered in a future framework.

The Council selected NEFOP-level observer coverage (Herring Alternative 2.5) and ASM and EM/Portside sampling coverage (Herring Alternative 2.7) as preferred monitoring types for the herring fishery.  If available Federal funding is insufficient to cover NMFS costs responsibilities associated with administering multiple monitoring programs for the herring fishery, the Council recommended that funding be prioritized to ASM and EM/Portside coverage on Category A and B vessels and then to support NEFOP-level observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.  This recommendation is intended to prioritize coverage aboard Category A and B vessels because they harvest the majority of the herring and then to facilitate midwater trawl access to Groundfish Closed Areas.

**ASM Coverage**

Herring Alternative 2.7 would require vessels with Category A and B herring permits to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS.

_0000017098

Vessels would be selected to carry an at-sea monitor by NMFS to meet the 50% coverage target recommended by the Council.

Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits would be required to provide notice to NMFS and request an at-sea monitor through the pre-trip notification system.  If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether or not an at-sea monitor must be procured through an industry-funded monitoring service provider.  If NMFS informs vessel representative that they needed at-sea monitoring coverage, they would then be required to contact an industry-funded monitoring service provider to obtain and pay for an at-sea monitor to carry on its next fishing trip.  The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on its next trip.  If NMFS informs the vessel representative that at-sea monitoring coverage is not needed on its next trip, NMFS would issue the vessel an at-sea monitoring coverage waiver.

At-sea monitors would collect the following information on herring trips:
- Fishing gear information (i.e., size of nets, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Retained catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
- Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;
- Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

Currently, the primary biological data that at-sea monitors would collect are length data on retained and discarded catch.  However, to verify species identification, at-sea monitors may also collect whole specimens or photos.  In the future, the Council may recommend that at-sea monitors collect additional biological information upon request.  Revising the duties for an at-sea monitor, such that additional biological information would be collected, could be done in a future framework action.  The Council may also recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is taken, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors.

The ASM coverage target (50%) for this alternative would be calculated by combining SBRM and industry-funding monitoring coverage.  NMFS would determine how to calculate the combined coverage target, in consultation with Council staff.  Because the coverage

_0000017099

target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer and industry-funded at-sea monitor on the same trip.

Herring Alternative 2.7 would require all vessels with Category A and B permits to carry an at-sea monitor on every declared herring trip selected for coverage by NMFS. If an at-sea monitor was not available to cover a specific herring trip (either due to logistics or a lack of funding), NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip.

Under Herring Alternative 2.7, all slippage restrictions, reporting requirements, and slippage consequences would apply to vessels with Category A and B herring permits with ASM coverage.

### EM/Portside Coverage

Requirements for EM/Portside sampling coverage would not be specified in the amendment. Instead, the Council recommended NMFS use an exempted fishing permit EFP to further evaluate how to best permanently administer an EM/Portside sampling program. See Herring Alternative 2.3, for a general description of EM/Portside sampling.

The EFP would exempt midwater vessels from ASM coverage and the details of the EFP would be development concurrently with the rulemaking for this amendment. If the proposed herring measures are approved, then midwater trawl vessels issued EFPs would be allowed to use EM/Portside sampling coverage to comply with the 50% coverage target.

**Rationale**: To ensure an equitable monitoring burden across Category A and B vessels, the Council recommended Category A and B vessels be able to choose between ASM and EM/Portside monitoring coverage for a given fishing year.

In contrast to NEFOP-level observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch or sighting data on protected species. The Council recommended that at-sea monitors collect only a limited data set compared to NEFOP-level observers to allow for any possible cost savings associated with reducing training time, gear requirements, and internal support resources necessary to administer an at-sea monitoring program for the herring fishery. (See Appendix 4 for additional details.)

EM and portside sampling have the potential to be a cost effective way to address monitoring goals for vessels harvesting herring. EM would be used to verify retention of catch and portside sampling would be used to verify amount and species composition of landed catch.

Slippage restrictions, reporting requirements, and consequences are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling. Combining SBRM coverage with industry-funded monitoring coverage to achieve the 50% coverage target is intended to reduce the costs associated with industry-funded monitoring coverage.

_0000017100

### 2.2.3 CONSIDERED BUT REJECTED HERRING ALTERNATIVES

The alternative specifying NEFOP-level observer coverage on the midwater trawl fleet to obtain a 30% CV (coefficient of variation) on river herring and shad catch was considered but rejected by the Council.

The monitoring of the river herring and shad catch in the herring fishery was identified as a Herring FMP need in Amendment 5. This alternative was developed from an analysis that evaluated catch of river herring and shad in the herring and mackerel fisheries and was designed to complement SBRM coverage.

This alternative would have focused observer coverage on the midwater trawl fleet because that fleet had caught the majority of river herring and shad (57%) during 2010 to 2013. Additionally, consistent with the need identified in Amendment 5 to monitor all catch in the herring fishery, this alternative would have focused coverage on the fleet that catches the majority of the herring harvest (73%) and on the vessels with Category A and B permits that harvest the majority of the herring harvest (83%) based on analyses in Amendment 5. Based on 2013 data, the percent coverage to achieve a 30% CV on river herring and shad catch by the midwater trawl fleet would have been up to 61%.

The Council recommended this alternative be considered but rejected because it was not considered consistent with the goals of Herring Amendment 5 and it could not be revised to apply only to vessels with Category A and B herring permits.

## 3.0 DESCRIPTION OF THE AFFECTED ENVIRONMENT

### 3.1 INTRODUCTION

The purpose of this action is to consider measures that would allow the Council to implement IFM coverage in New England FMPs. This amendment would allow industry funding to be used in conjunction with available Federal funding to pay for additional monitoring to meet FMP-specific coverage targets.

This section will provide specific information on the FMPs subject to this amendment and summarize the relevant environmental features at a broader scale that crosses all subject FMPs and their constituent fisheries.

Data in this section is through 2014. Those are the data that informed the impacts discussion in Section 4.0 of this document that was used by the New England Council when it selected preferred alternatives. NMFS did not add additional years of data after the Council selected its preferred alternatives because additional data would not have altered the impacts of the preferred alternatives.

_0000017101

Because the omnibus portion of this amendment is concerned with the process to create and prioritize IFM programs across FMPs, the scope of the "environment" affected by this amendment is atypical for an FMP amendment.  As the focus of the omnibus portions of the process to creating and prioritizing IFM programs for available Federal funds, the impacts of the omnibus alternatives are administrative in nature.  Therefore, a detailed description of the environmental components including the biological resources, physical environment, and socio-economic structure that could be affected by the alternatives under consideration is not necessary.  Instead, this section of the amendment will include a brief overview of the areas in which the fishing activities affected by the subject FMPs occur, a brief overview of the primary ports engaged in the subject fishing activities, and a brief overview of the fishery and non-fishery living marine resources most frequently encountered by the subject fishing activities.  This section will also include references for more detailed information on these topics, should any reader wish to become more familiar with the features of the environment in which the subject fisheries occur.

The herring alternatives in this amendment are consistent with typical FMP amendments.  The potential increases in monitoring for the herring fishery may directly impact fishing vessel operations and the ways in which herring fishing activities directly or indirectly interact with living marine resources, marine habitat, and the socio-economic constructs of the human environment.  Thus, where necessary, as in the "Affected Environment" section for a standard FMP amendment, detailed information is included regarding the herring resource, non-target and protected species encountered in these fisheries, the habitats of these species, and the fishing businesses and communities expected to be directly or indirectly affected by the proposed action.

### 3.1.1 TARGET SPECIES

The fishery resources under management by the Council include a variety of managed and non-managed species that are caught and landed by commercial and recreational fishermen operating in the region (Table 26).  These fishery resources include many species of both demersal and pelagic finfish, several species of crustaceans, mollusks, and other invertebrates.  These species occupy broad ranges within the Greater Atlantic Region (Table 26) and a wide variety of habitats from the pelagic waters of the open ocean to sand, mud, gravel, and rock beds in coastal waters.

All of the FMP summaries below incorporate data from the seafood dealer purchase report database, from 2010-2014, inclusive.  For some FMPs, the fishing year is offset from the calendar year, and starts on March 1 (Sea Scallops and Deep-Sea Red Crab) or May 1 (Northeast Multispecies and Skates).  For ease of analysis and consistency of presentation, the landings data for these FMPs are summarized based on calendar year, not fishing year.

_0000017102

**TABLE 11. LIST OF EXAMPLE BIOLOGICAL RESOURCES AND THE GEOGRAPHIC REGIONS WHERE THE RESOURCES ARE MOST COMMONLY FOUND.**

| Species | Gulf of Maine | Georges Bank | Middle Atlantic Bight |
|---|---|---|---|
| American lobster | X | X | X |
| American plaice | X | | |
| Atlantic bluefish | X | | X |
| Atlantic cod | X | X | |
| Atlantic croaker | | | X |
| Atlantic halibut | X | | |
| Atlantic herring | X | X | X |
| Atlantic mackerel | X | X | X |
| Atlantic sea scallop | | X | X |
| Atlantic surfclam | X | X | X |
| Atlantic wolffish | X | X | |
| Black sea bass | | X | X |
| Blue crab | | | X |
| Butterfish | | X | X |
| Clearnose skate | | | X |
| Deep-sea red crab | X | X | X |
| Golden tilefish | | | X |
| Haddock | X | X | |
| Hagfish | X | X | X |
| Horseshoe crab | X | X | X |
| Jonah crab | X | X | |
| King whiting | | | X |
| Little skate | | X | X |
| Longfin squid | | X | X |
| Menhaden | X | X | X |
| Monkfish | X | X | X |
| Ocean pout | X | X | X |
| Ocean quahog | X | X | X |
| Offshore hake | | X | X |
| Pandalid shrimp | X | | |
| Pollock | X | X | |
| Red hake | X | X | X |
| Redfish | X | | |
| Rock crab | X | X | X |
| Rosette skate | | | X |
| Scup | | | X |
| Shortfin squid | X | X | X |
| Silver hake | X | X | X |
| Smooth dogfish | | X | X |
| Spiny dogfish | X | X | X |
| Spot | | | X |
| Striped bass | X | X | X |
| Summer flounder | | X | X |
| Whelks | X | X | X |
| White hake | X | X | X |
| Windowpane | | X | X |
| Winter flounder | X | X | X |
| Winter skate | X | X | X |
| Witch flounder | X | | |
| Yellowtail flounder | X | X | X |

Fishery Resources

| Species | Gulf of Maine | Georges Bank | Middle Atlantic Bight |
|---|---|---|---|
| Amphipods (spp.) | X | X | X |
| Annelid worm (spp.) | X | X | X |
| Barndoor skate | | X | |
| Brittle star (spp.) | X | X | X |
| Coral (spp.) | X | X | X |
| Greater shearwater | X | | |
| Grenadier (spp.) | X | X | X |
| Hermit crab (spp.) | X | X | X |
| Jellyfish (spp.) | X | X | X |
| Kelp (spp.) | X | X | X |
| Lumpfish | X | X | X |
| Northern gannet | X | X | X |
| Northern stone crab | X | X | X |
| Sand dollar (spp.) | X | X | X |
| Sand lance (spp.) | X | X | X |
| Sculpin (spp.) | X | X | X |
| Sea anemone (spp.) | X | X | X |
| Sea cucumber (spp.) | X | | X |
| Sea raven | X | X | X |
| Sea robin (spp.) | X | X | X |
| Sea squirt (spp.) | X | X | X |
| Snail (spp.) | X | X | X |
| Spider crab (spp.) | X | | X |
| Sponge (spp.) | X | X | X |
| Spotted hake | | X | X |
| Starfish (spp.) | X | X | X |
| Thorny skate | X | X | |
| Zooplankton (spp.) | X | X | X |

Other Non-fishery Resources

### 3.1.1.1 Atlantic Herring FMP

Atlantic herring are dispersed along the Atlantic coast from North Carolina to the Canadian Maritime provinces. Schooling, or the formation of large aggregations for feeding and migration, is characteristic of herring species. This behavior begins as early as the onset of metamorphosis during larval development. Although herring schools are sometimes visible at the water's surface during the day, they typically undertake diurnal vertical migrations, sinking to the seafloor during the day and rising to the surface after dusk. Schools of adult herring make extensive migrations to areas where they feed, spawn, and overwinter.

_0000017103

Spawning occurs in the summer and fall, starting earlier along the eastern Maine coast and southwest Nova Scotia (August-September) than in the southwestern GOM (early to mid-October in the Jeffreys Ledge area) and GB (as late as November-December; Reid et al. 1999). In general, GOM herring migrate from summer feeding grounds along the Maine coast and on GB to SNE/MA areas during winter, with larger individuals tending to migrate farther distances. Presently, herring from the GOM (inshore) and GB (offshore) stock components are combined for assessment purposes into a single coastal stock complex.

Atlantic sea herring stocks were first managed in 1972 through the International Commission for the Northwest Atlantic Fisheries (ICNAF),[3] which regulated the high-seas international fishery. Upon implementation of the original Magnuson Fishery Conservation and Management Act in 1976, the NEFMC developed an FMP for herring. This FMP was implemented in late 1978; however, the FMP was withdrawn in 1982 due to concerns over the lack of enforcement of state waters quotas. In 1996, the Council began development of a new FMP for herring that was intended to closely coordinate Federal management with that of the ASMFC. This FMP was implemented in 2000.

The Atlantic Herring FMP established total allowable catches (TACs) for each of four management areas in the Gulf of Maine and Georges Bank. This FMP established requirements for vessel, dealer, and processor permits, as well as reporting requirements and restrictions on the size of vessels that can catch herring. Amendment 1 to the FMP was completed in 2006 and implemented a limited access qualification program, changes to management areas, and improved monitoring of catch. Amendment 2 to the FMP was part of the 2007 SBRM Omnibus Amendment. In 2011, Amendment 4 implemented a process for establishing ACLs and AMs in the herring fishery and brought the Herring FMP into compliance with the recently reauthorized Magnuson-Stevens Act.

Although some herring are caught incidentally in recreational fisheries for Atlantic mackerel and silver hake, this is limited to coastal New Jersey, and almost all herring are caught for commercial purposes. There are two primary uses of commercially-caught herring: As bait (in either the tuna fishery or the lobster fishery) or as a food fish. Other than tuna vessels catching their own herring to use as bait, almost all herring is caught with either midwater trawls (single and paired) or purse seines. The majority of herring landings are made with midwater trawls; purse seines accounted for approximately one-fifth to one-fourth of landings from 2008-2014. Herring is also targeted by small-mesh bottom trawl vessels.

While herring is caught over a wide range, there are seasonal patterns to the fishery. During the winter months (December-March), the fishery is most active in the coastal waters south of New England, as adult herring move into this area. The fishery generally moves offshore and into the Gulf of Maine as spring approaches, and by late summer or

---

[3] ICNAF formerly coordinated management of many fisheries off the east coast of North America. ICNAF lasted until 1979, when it was partly replaced by Northwest Atlantic Fisheries Organization (NAFO).

_0000017104

early fall, the fishery concentrates on the coastal waters of Maine, New Hampshire, and Massachusetts as herring move into these areas prior to spawning. The Georges Bank fishery is most active in summer and early fall. Table 29 lists recent landings, and Table 30 identifies the major herring ports.

**TABLE 12. RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES OF ATLANTIC HERRING.**

|  | **Commercial Landings (lb)** | **Ex-vessel Value** |
|---|---|---|
| 2010 | 144,977,070 | $18,367,932 |
| 2011 | 177,107,581 | $23,274,094 |
| 2012 | 193,505,848 | $26,508,368 |
| 2013 | 208,029,532 | $29,867,601 |
| 2014 | 207,142,256 | $29,043,286 |

**TABLE 13. PRIMARY PORTS ASSOCIATED WITH THE ATLANTIC HERRING FISHERY (VALUES ARE AVERAGED FOR 2010-2014).**

| Primary Ports | Commercial Landings | Ex-vessel Value of Landings |
|---|---|---|
| PORTLAND, ME | 44,303,973 | $6,702,608 |
| GLOUCESTER, MA | 39,013,924 | $5,198,761 |
| NEW BEDFORD, MA | 32,145,797 | $2,816,966 |
| ROCKLAND, ME | 30,422,155 | $4,683,919 |
| POINT JUDITH, RI | 8,690,315 | $922,628 |

### 3.1.1.2 Atlantic Salmon FMP

Atlantic salmon are a migratory anadromous fish with a complex life history, going through several distinct phases marked by changes in physiology and behavior. Spawning and juvenile development of Atlantic salmon occur in fresh water New England streams, with adults undergoing a highly migratory life on the open ocean and returning to fresh water to reproduce. North American origin Atlantic salmon are either from migratory stocks, undergoing long ocean migrations, or resident stocks, with more limited ocean migrations. Northern Canadian stocks are residential, while New England stocks tend to be migratory, traveling vast distances across open ocean to feeding grounds off the coast of southwestern Greenland and later returning to their New England spawning grounds. Although rivers from Maine to Connecticut once supported healthy populations of Atlantic salmon, native Atlantic salmon have since become extirpated in all but a portion of Maine supporting the remaining Gulf of Maine Distinct Population Segment.

The NEFMC developed an FMP for Atlantic salmon that was implemented by NMFS in 1988. The FMP established explicit U.S. management authority over all Atlantic salmon of U.S. origin. The plan was intended to complement state management programs in coastal and

_0000017105

inland waters and Federal management authority on the high seas (conferred to the U.S. as a signatory nation to the North Atlantic Salmon Conservation Organization).

The FMP prohibits possession of Atlantic salmon and any directed or incidental (bycatch) commercial fishery for Atlantic salmon in Federal waters.  The Council's Atlantic salmon plan strengthens the efforts of local groups, such as the Connecticut River Atlantic Salmon Commission, that are working towards the restoration of salmon stocks in New England river systems.  The first change to the Atlantic Salmon FMP, Amendment 1, was implemented in 1999 to designate essential fish habitat and provide for a framework adjustment mechanism related to aquaculture.  Amendment 2 to this FMP was the 2007 SBRM Omnibus Amendment.

The Atlantic salmon fishery expanded during the late 1800s from a reported 183 weirs and nets capturing 7,320 salmon in 1867, to 230 weirs and 36 gillnets capturing over 10,016 salmon in 1880.  The catch peaked in 1889 with over 17,000 salmon and began a steady decline during the 20th century, with landings falling to as low as 40 salmon in 1947 (Collette and Klein-MacPhee 2002).  Because no reporting requirements were established for the fishery, landings data are incomplete.  In 1989, all state and Federal commercial salmon fisheries in New England were closed by law.  Recreational fishing for sea-run Atlantic salmon is currently prohibited in all New England States. A small local fishery is ongoing for captive reared domestic Atlantic salmon released into select rivers in Connecticut and New Hampshire; these fisheries are individually regulated by each State. In spite of the decline of wild salmon populations, Atlantic salmon remains an important fishery resource in New England through the development of fish farming efforts (aquaculture and mariculture).  Salmon mariculture is especially important in Maine, where harvest of farmed Atlantic salmon typically averages between 10 to 12 million pounds and reached almost 25 million pounds in 2010.

### 3.1.1.3  Atlantic Sea Scallop FMP

The Atlantic sea scallop is a bivalve mollusk that is highly valued for the meat in the large adductor muscle that holds the top and bottom portions of the shell together.  Sea scallops are semi-mobile, bottom dwelling organisms.  They are most abundant on coarse sand, gravel, and cobble.  Mature females are highly fecund and produce millions of eggs during the late summer and autumn months.  The Atlantic sea scallop is managed as a single unit throughout its range in United States waters.  Five stock components are recognized:  The Gulf of Maine; eastern Georges Bank; the Great South Channel; the New York Bight; and the waters adjacent to Delaware, Maryland, and Virginia.

The Atlantic Sea Scallop FMP, prepared by the NEFMC, was implemented in 1982 to restore adult scallop stocks and reduce year-to-year fluctuations in stock abundance caused by variation in recruitment.  Amendments 4 and 7 significantly reduced fishing effort by limiting access to the resource, instituting day-at-sea (DAS) allocations (limiting the number of days a vessel is allowed to fish for scallops each year), implementing gear restrictions to improve escapement of small scallops and finfish, and limiting crew size. Area closures in New England and the Mid-Atlantic and above-average recruitment have

_0000017106

resulted in increased scallop biomass both within and outside of the Groundfish Closed Areas.

One of the foundations of the Scallop FMP is its area rotational management programs, established in 2004 under Amendment 10. Under this program, areas are defined and closed and reopened to fishing on a rotational basis, depending on the condition and size of the scallop resource in the areas. As a result of Amendment 10, controls on scallop effort differ depending on whether a fishing trip occurs in an access area or in an open area. Vessels either fish in access areas under allocated trips, or in open areas under DAS. Amendment 12 was the 2007 SBRM Omnibus Amendment, and Amendment 13 permanently re-activated the industry-funded observer program in the same year. Amendment 11, implemented in 2008, included measures to control capacity and mortality in the general category scallop fishery. Primary measures included a limited entry program for general category vessels, as well as other permit provisions including an individual fishing quota program (IFQ). The most recent amendment, Amendment 15, introduced annual catch limits and accountability measures to the Scallop FMP in 2011, as required by the Magnuson-Stevens Act. Various frameworks have set annual or biennial scallop specifications and have included a variety of other management measures aimed at improving the effectiveness of the various aspects of scallop fishery management.

Under current regulations, the scallop fleet can be differentiated by vessel permit category: Limited access vessels that are subject to area-specific DAS controls and trip allocations; and limited access general category vessels that are not subject to DAS controls, but are subject to a possession limit per fishing trip. There are three types of limited access general category permits: IFQ permits with a possession limit of 600 lb per trip; Northern Gulf of Maine permits with a possession limit of 200 lb per trip; and incidental permits with a possession limit of 40 lb. per trip. The limited access and limited access general category scallop fleets receives a total allocation of 94.5 percent and 5 percent, respectively, of the scallop fishery's ACL, with the remaining 0.5 percent allocated to IFQ permits on vessels that have both limited access general category IFQ and limited access scallop permits. There are no open access permits in this fishery.

Another unique aspect of the Scallop FMP is its industry-funded observer program. Every year, 1 percent of the ACL allocated to the scallop fishery is set-aside to be used as compensation for limited access or limited access general category IFQ vessels that are assigned an observer in open or access areas. If a limited access vessel is assigned an observer while fishing on an open area DAS trip, it will accrue DAS at a reduced rate for the trip. For limited access vessels on access area trips, and IFQ vessels on any trip, vessels receive additional scallop catch above the possession limit on observed trips in order to pay for the observer. If the set-aside is exhausted in a given fishing year, vessel owners must continue to pay for observers assigned to their vessel without receiving any compensation. NMFS sets the compensation rates (i.e., the appropriate scallop lb/trip for each observed trip) at the start of each fishing year based on that year's observer set-aside allocation and closely monitors the set-aside usage each year to avoid fully harvesting it whenever possible.

_0000017107

Scallops are harvested primarily through the use of scallop dredges and trawls.  In recent years (2007-2011), almost 98 percent of all scallop landings are by dredge vessels.  During the 2007-2011 fishing years, trawl vessels landed another 1-2 percent, with other gear types contributing only trace amounts of scallop landings.

The Atlantic sea scallop fishery is rebuilt to sustainable levels, following declines in fishing mortality from effort reductions, gear restrictions, and closed areas, combined with above average recruitment in some areas and in multiple years since 1999.  Revenues from commercial scallop landings for New England and Mid-Atlantic states in the year 2000 were estimated at $161 million.  Increased landings since the early 2000's were made possible by an increase in scallop biomass and favorable recruitment.  In recent years, total commercial landings have remained relatively constant while revenue has increased by over 50 percent (Table 31).  The majority of limited access vessels are based in Massachusetts, Virginia, New Jersey, and North Carolina, and the primary scallop ports are located in New Bedford, MA, Cape May, NJ, and Newport News, VA (Table 32).

TABLE 14.  RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES OF ATLANTIC SEA SCALLOPS.

|  | Commercial Landings (lb) | Ex-vessel Value |
|---|---|---|
| 2010 | 57,060,115 | $450,801,783 |
| 2011 | 58,900,068 | $582,252,024 |
| 2012 | 57,131,552 | $559,565,071 |
| 2013 | 41,203,699 | $466,710,023 |
| 2014 | 33,895,977 | $424,489,183 |

TABLE 15.  PRIMARY PORTS ASSOCIATED WITH THE SEA SCALLOP FISHERY (VALUES ARE AVERAGED FOR 2010-2014). *DATA EXCLUDED FOR CONFIDENTIALITY.

| Primary Ports | Commercial Landings (lb) | Ex-vessel Value of Landings |
|---|---|---|
| NEW BEDFORD, MA | 27,888,156 | $285,450,065 |
| CAPE MAY, NJ | 5,913,650 | $55,983,038 |
| NEWPORT NEWS, VA | 3,187,051 | $28,824,513 |
| BARNEGAT LIGHT/LONG BEACH, NJ | 2,019,534 | $20,801,691 |
| SEAFORD, VA | * | * |

### 3.1.1.4  Deep-Sea Red Crab FMP

The deep-sea red crab is a deep-water brachyuran crab that occurs in a patchy distribution on the continental shelf and slope from Nova Scotia to Florida.  Though the species is found

_0000017108

primarily within a 200-1800 meter depth band along the continental shelf and slope, red crabs have also been located in some deep-water canyons along the shelf and can also be found in the Gulf of Maine.  Preferred depth depends, in part, on the characteristics of individual crabs.  Young crabs dwell in considerably deeper water than adults and males are typically found deeper than females.  The red crab is a slow-growing species that may not spawn annually.  It is long-lived, with some individuals surviving for up to 15 years.  These characteristics make it particularly susceptible to depletion by overfishing.

There has been a small directed fishery off the coast of New England and in the Mid-Atlantic for deep-sea red crab since the early 1970s.  Though the size and intensity of this fishery has fluctuated, it has remained consistently small relative to more prominent New England fisheries such as groundfish, sea scallops, and lobster.  Landings increased substantially after 1994, when implementation of Amendment 5 to the Northeast Multispecies FMP may have led some fishing effort to redirect onto "under-exploited" fishery resources such as red crab.

In 1999, at the request of members of the red crab fishing industry, the NEFMC began development of an FMP to prevent overfishing of the red crab resource and address a threat of overcapitalization of the red crab fishery.  A control date was established in 2000 to discourage "speculative entry," or rapid entry of new vessels into the fishery and, in 2001, NMFS implemented emergency regulations to prevent overfishing of the resource during the time the FMP was being developed.  The FMP was implemented in 2002.  The primary management control was to establish a limited access permit program for qualifying vessels with documented history in the fishery.  Other measures implemented under the FMP included DAS limits, trip limits, gear restrictions, and limits on processing crabs at sea.  Framework Adjustment 1 provided for a 3-year, rather than annual, specification-setting process.  Amendment 3 was implemented in 2011 to bring the FMP into compliance with the revised Magnuson-Stevens Act by implementing annual catch limits and accountability measures.  Amendment 3 also revised the management measures, by eliminating DAS and the vessel trip limit.  The directed, limited access red crab fishery is a male-only fishery, that is currently managed with a "hard" quota (i.e., the fishery is closed when the quota is reached), gear restrictions, and limits on processing crabs at sea.

Although there is an open access permit category, the small possession limit of 500 lb per trip has kept this sector of the fishery very small.  The directed red crab fishery is limited to using parlor-less crab pots, and is considered to have little, if any, incidental catch of other species.  There is no known recreational fishery for deep-sea red crab.  Landings of red crab varied somewhat before the implementation of the FMP, but have stabilized since (see Table 16).  All vessels with limited access permits now fish out of Fall River, MA.

_0000017109

**TABLE 16.  RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES OF DEEP-SEA RED CRABS.**
**\*DATA EXCLUDED FOR CONFIDENTIALITY.**

|      | Commercial Landings (lb) | Ex-vessel Value |
|------|--------------------------|-----------------|
| 2010 | 3,124,311                | $3,060,452      |
| 2011 | 3,607,148                | $3,492,893      |
| 2012 | *                        | *               |
| 2013 | *                        | *               |
| 2014 | *                        | *               |

### 3.1.1.5  Mackerel, Squid, and Butterfish FMP

Atlantic mackerel, *Illex* and longfin squid, and butterfish are all schooling pelagic species that range from at least the Gulf of St. Lawrence south to at least Cape Lookout, NC.[4] Butterfish and the two squids are fast-growing, short-lived species, while Atlantic mackerel grows more slowly and lives several years longer.  All four species are most abundant from Georges Bank to Cape Hatteras, NC, and follow seasonal migration patterns based largely on water temperature.  Longfin inshore squid was previously referred to as *Loligo* squid. Due to a recent change in the scientific name of longfin inshore squid from *Loligo pealeii* to *Doryteuthis (Amerigo) pealeii*, the common name "longfin squid" is now used in all official documents to avoid confusion.

The FMP was developed by the Mid-Atlantic Council and was implemented in 1983.  Early amendments to the FMP changed permit and reporting requirements, the fishing year, quota adjustment mechanisms, foreign fishing and joint venture provisions, and implemented limited access systems for butterfish and the two squid fisheries.  In recent years, amendments have been implemented to rebuild the butterfish stock and address bycatch in the longfin squid fishery (Amendment 10, in 2010), limit access in the mackerel fishery (Amendment 11, in 2011), and establish ACLs and AMs for the mackerel and butterfish fisheries (Amendment 13, in 2012).  Amendment 12 to this FMP was the 2007 SBRM Omnibus Amendment.  Amendment 14, in 2014, improved monitoring in the mackerel, squid, and butterfish fisheries and developed measures to reduce river herring and shad bycatch.  Amendment 15 was intended to add river herring and shad as stocks in the Mackerel, Squid, and Butterfish FMP, but the Council determined not to pursue this action.  Other amendments are currently under development to address interactions with deep-sea corals (Amendment 16), and to address latent effort in the squid fishery.

---

[4] Atlantic mackerel ranges from the Gulf of St. Lawrence to Cape Lookout, NC; *Loligo* squid ranges from Newfoundland to the Gulf of Venezuela; *Illex* squid ranges from the Labrador Sea to the Florida Straits; and butterfish range from the Gulf of St. Lawrence to the coast of Florida.

_0000017110

The mackerel, squid, and butterfish fisheries are all managed by directly controlling harvest.  The directed mackerel fishery can be closed when landings are projected to reach 95 percent of the total domestic harvest.  The mackerel incidental catch fishery can be closed when landings are projected to reach 100 percent of the total domestic harvest.  The directed longfin squid fishery is managed via trimester quota allocations and the directed fishery is closed when 90 percent of the trimester quota allocations or 95 percent of the total domestic harvest is projected to be landed.  There is also a cap on butterfish discards in the longfin squid fishery that is allocated by trimester, and closes the longfin squid fishery to directed harvest once it has been exceeded.  The directed *Illex* fishery closes when 95 percent of the total domestic harvest is projected to be landed.  Finally, the butterfish possession limit is reduced when annual landings have reached a limit that is 1,411 mt less than the total domestic harvest, and the fishery is closed when the total domestic harvest has been landed.  During closures of the directed longfin squid, *Illex*, or butterfish fisheries, incidental catch fisheries for these species are permitted.

Although 1.5 percent of butterfish landed from 2007-2011 were reported as caught with gillnets, and trace amount of these species were reported as caught with a variety of fishing gears, more than 98 percent of reported landings of all four species during this period were caught with otter trawls (midwater and bottom).  Management measures implemented under this FMP restrict only the commercial fishing sectors, although there is a recreational fishery for Atlantic mackerel.

Fishing for Atlantic mackerel occurs year-round, although most fishing activity occurs from January through April.  The *Illex* squid fishery occurs largely from June through October, although this can vary somewhat from year to year.  In some years, the longfin squid fishery remains relatively consistent throughout the year, but in most years, landings peak during October through April.  Butterfish are landed year-round, with no apparent seasonal patterns.  Table 17 and Table 18 identify the recent landings, ex-vessel value, and primary ports for these fisheries.

_0000017111

**TABLE 17.  RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES IN THE ATLANTIC MACKEREL, BUTTERFISH, AND SQUID FISHERIES.**

| | Atlantic mackerel | | Butterfish | | *Illex* squid | | Longfin squid | |
|---|---|---|---|---|---|---|---|---|
| | Commercial Landings (1,000 lb) | Ex-vessel Value ($1,000) | Commercial Landings (1,000 lb) | Ex-vessel Value ($1,000) | Commercial Landings (1,000 lb) | Ex-vessel Value ($1,000) | Commercial Landings (1,000 lb) | Ex-vessel Value ($1,000) |
| 2010 | 21,775 | 3,808 | 1,270 | 836 | 34,887 | 11,459 | 14,878 | 15,811 |
| 2011 | 1,170 | 401 | 1,463 | 1,141 | 41,440 | 18,976 | 21,049 | 24,872 |
| 2012 | 11,756 | 3,879 | 1,410 | 1,034 | 25,813 | 10,630 | 28,222 | 31,339 |
| 2013 | 9,119 | 1,773 | 2,382 | 1,621 | 8,359 | 2,343 | 24,667 | 26,434 |
| 2014 | 13,178 | 2,991 | 6,923 | 4,596 | 19,332 | 5,856 | 26,564 | 25,954 |

**TABLE 18.  PRIMARY PORTS ASSOCIATED WITH THE ATLANTIC MACKEREL, BUTTERFISH, AND SQUID FISHERIES (VALUES ARE AVERAGED FOR 2010-2014). *DATA EXCLUDED FOR CONFIDENTIALITY**

| Atlantic mackerel Primary Ports | Ex-vessel Value | Butterfish Primary Ports | Ex-vessel Value | *Illex* squid Primary Ports | Ex-vessel Value | Longfin squid Primary Ports | Ex-vessel Value |
|---|---|---|---|---|---|---|---|
| NEW BEDFORD, MA | $487,918 | NORTH KINGSTOWN, RI | $715,128 | CAPE MAY, NJ | $4,467,948 | POINT JUDITH, RI | $9,441,237 |
| GLOUCESTER, MA | $486,364 | POINT JUDITH, RI | $381,804 | NORTH KINGSTOWN, RI | * | CAPE MAY, NJ | $2,885,825 |
| NORTH KINGSTOWN, RI | * | MONTAUK, NY | $293,912 | HAMPTON, VA | * | MONTAUK, NY | $3,575,063 |
| CAPE MAY, NJ | $168,671 | NEW BEDFORD, MA | $83,127 | WANCHESE, NC | $114,807 | NORTH KINGSTOWN, RI | $2,177,443 |
| PORTLAND, ME | $118,672 | STONINGTON, CT | $42,241 | POINT JUDITH, RI | $163,069 | HAMPTON BAYS, NY | $2,081,842 |

_0000017112

### 3.1.1.6  Monkfish FMP

The monkfish (also known as goosefish) is a member of the anglerfish family Lophiidae, fishes distinguished by an appendage on the head known as the illicium which has a fleshy end (esca) that acts as a lure to attract prey to within range of its large mouth.  Monkfish have a large, bony head and are harvested for their livers and the tender meat in their tails.  The species is distributed widely throughout the Northwest Atlantic, from the northern Gulf of St. Lawrence to Cape Hatteras, NC, and is known to inhabit waters from the tide-line to depths as great at 840 meters across a wide range of temperatures.

Adults have been found on a variety of substrate types including hard sand, gravel, broken shell, and soft mud.  Spawning occurs in May and June from Cape Hatteras to southern New England.  Mature females, which are slightly larger than males, produce a non-adhesive, mucoid egg raft or veil which can reach 20-40 feet in length and ½-5 feet in width.  During spawning, this large mass of eggs can account for up to 50 percent of a female's body mass.  Monkfish are managed as two stocks, a northern stock from Maine to Cape Cod, MA, and a southern stock from Cape Cod to North Carolina.

During the early 1990s, fishermen and dealers in the monkfish fishery addressed both the New England and MAFMCs with concerns about the increasing amount of small fish being landed, the increasing frequency of gear conflicts between monkfish vessels and those in other fisheries, and the expanding directed trawl fishery.  In response, the Councils developed a joint FMP that was implemented in 1999.  The FMP was designed to stop overfishing and rebuild the stocks through a number of measures, including:  Limiting the number of vessels with access to the fishery and allocating DAS to those vessels; setting trip limits for vessels fishing for monkfish; minimum fish size limits; gear restrictions; mandatory time out of the fishery during the spawning season; and a framework adjustment process.

Reported landings of monkfish increased dramatically from the late 1970s until the mid-1990s and have remained high (Table 19).  Burgeoning markets for monkfish tails and livers in the 1980s allowed fishermen to fish profitably for monkfish, landing increasingly smaller monkfish as the stocks became depleted.  Since the implementation of the FMP, however, vessels are more commonly landing large, whole monkfish for export to Asian markets.  Revenues have generally increased since the mid-1980s and the relative value of monkfish is currently at its highest point since 1996 (Table 19 and Table 20).

_0000017113

**TABLE 19.  RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES OF MONKFISH.**

|       | Commercial Landings (lb) | Ex-vessel Value |
|-------|--------------------------|-----------------|
| 2010  | 8,840,157                | $19,210,647     |
| 2011  | 10,647,111               | $26,589,688     |
| 2012  | 11,505,017               | $27,133,777     |
| 2013  | 9,844,989                | $18,708,988     |
| 2014  | 9,549,031                | $19,047,301     |

**TABLE 20.  PRIMARY PORTS ASSOCIATED WITH THE MONKFISH FISHERY (VALUES ARE AVERAGED FOR 2010-2014).**

| Primary Ports | Commercial Landings (lb) | Ex-vessel Value of Landings |
|---------------|--------------------------|-----------------------------|
| NEW BEDFORD, MA | 1,874,329 | $4,697,797 |
| GLOUCESTER, MA | 1,053,099 | $3,127,155 |
| BARNEGAT LIGHT/LONG BEACH, NJ | 1,004,247 | $1,951,212 |
| POINT JUDITH, RI | 900,255 | $2,028,754 |
| BOSTON, MA | 591,428 | $1,802,295 |
| CHATHAM, MA | 544,087 | $925,923 |
| MONTAUK, NY | 541,351 | $939,915 |
| LITTLE COMPTON, RI | 530,971 | $796,790 |
| NEW LONDON, CT | 431,321 | $707,725 |

The majority of commercial landings are made using gillnets (67 percent) with another 26 percent landed by otter trawls (according to the VTR database, 2007-2011).  Scallop dredges also catch monkfish, but in much smaller amounts (7 percent of reported landings, 2007-2011).  No other gear types account for more than trace landings of monkfish.  There is no recreational component to this fishery.

The Monkfish FMP has been modified by three amendments and 7 framework adjustment actions since 1999.  Amendments have implemented more substantial changes to the FMP, while framework adjustments implement less substantive revisions to existing measures, or specify annual catch levels.  Amendment 1 implemented the Essential Fish Habitat (EFH) provisions of the Magnuson-Stevens Act in 1999.  Amendment 2, implemented in 2005, included restrictions on otter trawls in certain areas, made the minimum fish size consistent in all areas, closed two offshore canyons to monkfish fishing, created a monkfish research DAS set-aside program, and created new permit categories for fishing in designated areas, among other measures.  Amendment 3 was the 2007 SBRM Omnibus Amendment. In 2011, Amendment 5 implemented a process to establish acceptable biological catch amounts and annual catch limits, along with accountability measures to prevent overfishing if such catch limits are exceeded, to bring the FMP into

_0000017114

compliance with the Magnuson-Stevens Reauthorization Act.  Framework adjustments have generally specified appropriate fishing measures (DAS and trip limits) for each management area to achieve, but not exceed annual catch targets.

### 3.1.1.7  Northeast Multispecies FMP

Sixteen species of groundfish are managed under this FMP.  Thirteen species are managed as part of the large-mesh complex, based on fish size and type of gear used to harvest the fish, and five species are managed under a separate small-mesh multispecies FMP.  While these eighteen groundfish species exhibit unique body types, behaviors, and habitat preferences, all are demersal, living near the bottom and feeding on benthic organisms.  Groundfish are found throughout New England waters, from the Gulf of Maine to southern New England.

In 1977, the Council's first groundfish FMP, including only cod, haddock, and yellowtail flounder, was implemented.  This plan was primarily developed by NMFS and its individual species quotas were a continuation of the International Commission for the Northwest Atlantic quota-based management system.  Although the quotas did reduce the catch of these species, the system had a number of serious flaws.  Because there was no limit on the number of participants, the number of vessels increased dramatically as the stocks improved between 1977 and 1980.  The increasing number of vessels caught the quota in less time causing the fishery to be closed more frequently and for longer periods of time.  The quotas forced vessels to catch fish as fast as possible to get the largest possible share before the fishery was closed (known as a "derby" fishery).  In 1977, the Gulf of Maine cod quota was taken in 5 months and the Georges Bank quota was caught in 6 months.

The Council implemented a system of individual vessel trip limits that helped to prevent long closures that disrupted market supplies.  This action was also intended to mitigate the derby fishery, which caused safety concerns, and to give small boats a greater chance to catch a share of fish proportional to their traditional participation levels.  Limits were set for each species and stock area for each of three vessel categories.  Because of problems associated with data reliability, enforcement, and equity among the vessel sectors, the Council eliminated the quota-based management system when it adopted the Interim Groundfish FMP in 1982.  This plan replaced the catch quotas with minimum fish size and codend mesh size regulations for Georges Bank and the Gulf of Maine.  It also allowed small-mesh fishing to continue throughout the Gulf of Maine.  Closed areas intended to protect spawning haddock were left in place.

What we now consider the Northeast Multispecies FMP was implemented in 1986.  It was the first plan in the world to set biological targets in terms of maximum spawning potential.  This mechanism allows the Council to meet its biological objectives either by increasing the age-at-first capture (size of fish caught) or by controlling fishing mortality.  The plan also greatly expanded the number of species included in the management unit.  In its first year, the plan set minimum fish sizes

_0000017115

for some species and changed minimum fish sizes for others. The plan also enlarged one of the haddock spawning closed areas, Area I, and established a large closed area off of southern New England to protect spawning yellowtail and to help reduce fishing mortality. The Exempted Fisheries Program substantially reduced the area and time period available for small-mesh fishing in the Gulf of Maine.

In 1987, the Council adopted Amendment 1 to the FMP, which decreased the area for the silver hake exempted fishery, increased the large-mesh area to include some important yellowtail flounder grounds to the south, and tightened existing mesh size regulations and regulations for the southern New England yellowtail flounder area. Amendment 2 eliminated a scheduled increase in codend mesh size, and implemented the following measures: (1) Trip bycatch limits and stricter non-reporting penalties in the Exempted Fisheries Program; (2) increased some minimum fish sizes; (3) established a seasonal large-mesh area on Nantucket Shoals to protect cod; (4) applied mesh size regulations to the whole nets rather than only to the codend; (5) set all recreational minimum sizes to be consistent with commercial minimum sizes; and (6) excluded trawlers from Closed Area II during the closure to improve enforcement of the closure.

Amendment 3, implemented in 1989, established the Flexible Area Action System. Its purpose was to enable the Council and NMFS to respond quickly to protect large concentrations of juvenile, sub-legal (smaller than the minimum legal size) and spawning fish. Amendment 4 was implemented in 1991 and added more restrictions to the Exempted Fisheries Program; established a procedure for the Council to make recommendations for modifying northern shrimp gear to reduce the bycatch of groundfish; expanded the management unit to include silver hake, ocean pout, and red hake; established management measures for the Cultivator Shoals silver hake fishery; further tightened restrictions on the carrying of small mesh while fishing in the Regulated Mesh Area; and established a minimum mesh size in the southern New England yellowtail flounder area.

Amendment 5 was implemented in 1994 to address the overfishing of principal groundfish stocks that occurred in the late 1980s and early 1990s and reflected a significant turning point in the management of the Northeast multispecies fishery. Amendment 5 established a moratorium on new vessel permits during the rebuilding period (creating the current limited access permit system based on history in the fishery), implemented a DAS effort reduction program (the first of its kind), added additional mesh size restrictions, and also included interim gillnet regulations to reduce harbor porpoise bycatch, a mandatory vessel trip reporting system for landings, a prohibition on pair-trawling, a requirement for a finfish excluder device for shrimp fishery, changed some minimum fish sizes, and expanded the size of Closed Area II. Amendment 6 followed shortly after to implement additional haddock conservation measures.

Amendment 7, implemented in 1996, accelerated the DAS effort reduction program established in Amendment 5, eliminated significant exemptions from the current

_0000017116

effort control program, provided incentives to fish exclusively with mesh larger than the minimum required, broadened the area closures to protect juvenile and spawning fish, and increased the haddock possession limit. It established a rebuilding program for Georges Bank and Southern New England yellowtail flounder, Georges Bank and Gulf of Maine cod, and Georges Bank haddock based primarily on DAS controls, area closures, and minimum mesh size. Additionally, the amendment changed existing permit categories and initiated several new ones, including an open access multispecies permit for limited access sea scallop vessels. Amendment 7 also created a program for reviewing the management measures annually and making changes to the regulations through the framework adjustment process to insure that plan goals would be met.

Amendment 8 was implemented to address gear conflict issues between the mobile gear participants of the groundfish and scallop fisheries and the fixed gear participants of the lobster fishery. Amendment 9 established new status determination criteria (overfishing definitions) and set optimum yield for twelve groundfish species to bring the plan into compliance with the Sustainable Fisheries Act. Amendment 9 also added Atlantic halibut to the FMP's management unit. Amendment 10, known as the "consistency amendment," was developed to make the vessel upgrading and replacement provisions consistent across all New England and MAFMC FMPs. Amendment 11 addressed the Sustainable Fisheries Act EFH requirements. Amendment 12 addressed the Sustainable Fisheries Act requirements for silver hake, red hake, and offshore hake through a separate small-mesh multispecies management program implemented in 2000.

In addition to the amendments implemented prior to Amendment 13, the FMP was modified through a number of framework adjustments designed to achieve the Amendment 7 fishing mortality targets or to fulfill the requirement for annual adjustments to management measures. Several joint frameworks with the Sea Scallop FMP were implemented to provide scallop vessels access to the groundfish closed areas. Frameworks 32, 35, 37, and 38 instituted additional changes to management of the small-mesh fishery, including several new small-mesh gear exemption areas and elimination of default rebuilding measures.

The Council began work on Amendment 13 in February 1999. The purpose for this amendment included a need to develop rebuilding programs to meet the Amendment 9 status determination criteria and to address problems identified with the effort control program (DAS). After this amendment was begun, the Council submitted Framework 33 to meet the Amendment 7 requirement for an annual adjustment to the FMP. This framework was implemented May 1, 2000. On May 19, 2000, a coalition of conservation organizations challenged Framework 33 alleging that it failed to implement programs necessary to rebuild groundfish stocks to the Amendment 9 targets and did not meet bycatch requirements of the Magnuson-Stevens Act (*Conservation Law Foundation et al.* v. *Evans et al.*). The Court found in favor of the plaintiffs on December 28, 2001. After a series of negotiations among various parties, interim measures were adopted by the Court in 2002 and NMFS was

_0000017117

instructed to submit a management plan that complied with the Magnuson-Stevens Act. Amendment 13–already in development–was recognized as the most appropriate vehicle to meet the Court's requirement.

Amendment 13 was implemented in 2004, and included several new management features. The amendment classified multispecies DAS into three categories (unrestricted A DAS, restricted use B DAS, and C DAS, which cannot be used at this time); enables the Council to create/allow "special access programs" (SAPs)[5] for healthy stocks, such as Georges Bank haddock; allows sectors of the groundfish fishing industry to develop their own sector allocation plan; includes an adaptive approach for rebuilding groundfish stocks that requires biennial adjustments to management measures; and implements several provisions of the U.S./Canada Resource Sharing Understanding.[6] Since Amendment 13 was implemented, several framework adjustments have been developed to modify, fully implement, and/or comply with various provisions of Amendment 13. Several environmental groups challenged Amendment 13, claiming that the rebuilding programs did not comply with the Magnuson-Stevens Act, the management measures would be ineffective, an SBRM was not included, and the amendment did not consider a sufficiently broad range of alternatives. The Court upheld the amendment with the exception of the reference to the SBRM.

Amendment 16 was implemented May 1, 2010, and provided major changes in the realm of groundfish management. Notably, it greatly expanded the sector program and implemented Annual Catch Limits in compliance with 2006 revisions to the Magnuson-Stevens Act. As a result of this amendment, about 95 percent of the fishery chose to operate in a form of cooperative referred to as a sector, subject to strict limits on catch. These vessels are not subject to trip limit or days-at-sea controls. This management system drastically changed the way the fishery operates. At the time of its implementation, Amendment 16 was expected to reduce bycatch as it reduces regulatory discards. Possession of some species was prohibited to reduce catches (ocean pout, windowpane flounder, wolffish, SNE/MA winter flounder). The amendment also included a host of mortality reduction

---

[5] There are three SAPs currently in place: The Closed Area I Hook Gear Haddock SAP is open to NE multispecies DAS vessels fishing with hook gear in a portion of Closed Area I; the Eastern U.S./Canada Haddock SAP Pilot Program is open to NE multispecies DAS vessels using a haddock "separator" trawl in portions of the Eastern U.S./Canada Area and Closed Area II; and the Closed Area II Yellowtail Flounder SAP is open to NE multispecies DAS vessels fishing for yellowtail flounder in the southern portion of Closed Area II.

[6] The U.S./Canada Resource Sharing Understanding (Understanding) was reached between the United States and Canada regarding the management of Georges Bank cod, Georges Bank haddock, and Georges Bank yellowtail flounder resources found within the waters of both countries in an area known as the U.S./Canada Management Area. Amendment 13 implements certain measures consistent with the Understanding, including a requirement to use VMS, an area declaration requirement, and specific gear requirements (flatfish net or haddock separator trawl).

_0000017118

measures for "common pool" (i.e., non-sector) vessels and the recreational component of the fishery.

The Council developed Amendment 19 with the initial goal of bringing the small-mesh multispecies portion of the NE Multispecies FMP into compliance with the ACL and AM requirements of the reauthorized Magnuson-Stevens Act.  However, development of Amendment 19 was delayed for several reasons, so NMFS implemented ACLs and AMs for the small-mesh multispecies in 2012 through a Secretarial Amendment.  The Council continued development of Amendment 19 in order to adopt the ACL framework used by the Secretarial Amendment, as well as to modify other management measures for the small-mesh multispecies fishery.  The management measures in the Secretarial Amendment and Amendment 19 include an incidental trip limit trigger to prevent the ACL from being exceeded, a year-round trip limit for red hake, and the potential to implement a quarterly quota system in the southern area, should landings increase rapidly.  Because these species are caught incidentally in many fisheries, landings are never prohibited if a quota is projected to be reached, just reduced to an incidental limit to discourage directed fishing.  In general, the small-mesh multispecies portion of the fishery is managed using mesh-size dependent trip limits for whiting (silver and offshore hake, combined), area restrictions on small-mesh, and a new year-round trip limit for red hake.

The NE Multispecies FMP has been modified through a number of framework adjustments designed to achieve fishing mortality targets or to fulfill the requirement for annual adjustments to management measures.  Several joint frameworks with the Atlantic Scallop FMP were implemented to provide scallop vessels access to the groundfish closed areas.  Frameworks 32, 35, 37, and 38 each instituted additional changes to management of the small-mesh fishery, including several new small-mesh gear exemption areas and elimination of default rebuilding measures.

There are a variety of fishing gears used in the commercial groundfish fishery.  Otter trawls are the primary gear type used for all species in both the large-mesh and small-mesh complexes and flatfish and silver hake are caught almost exclusively with otter trawls.  Based on VTR data for 2007-2011, gillnets contribute substantial amounts of Atlantic cod, pollock, redfish, and white hake.  Other gears identified in the FVTR data associated with landings of groundfish include handlines, longlines, and fish pots.  Recreational fishing for groundfish is focused primarily Atlantic cod, pollock, haddock, red hake, and winter flounder.  Recreational fishing is conducted by shore-based anglers and anglers with private boats, as well as by anglers aboard party/charter vessels.  See below for recent commercial landings of large-mesh (Table 38) and small-mesh (Table 40) multispecies, aggregated across the complexes.  Table 39 and Table 41 identify the primary ports associated with the large-mesh and small-mesh multispecies complexes, respectively, along with the average recent landings and ex-vessel values for each of the primary ports.

_0000017119

**TABLE 21. RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES OF LARGE-MESH MULTISPECIES (AGGREGATED).**

|  | Commercial Landings (lb) | Ex-vessel Value |
|---|---|---|
| 2010 | 62,165,855 | $85,239,958 |
| 2011 | 63,161,506 | $91,237,378 |
| 2012 | 55,095,497 | $82,169,154 |
| 2013 | 44,894,643 | $63,362,159 |
| 2014 | 48,139,099 | $65,853,590 |

**TABLE 22. PRIMARY PORTS ASSOCIATED WITH THE LARGE-MESH MULTISPECIES FISHERY (VALUES ARE AGGREGATED AND AVERAGED FOR 2010-2014).**

| Primary Ports | Commercial Landings (lb) | Ex-vessel Value of Landings |
|---|---|---|
| GLOUCESTER, MA | 17,615,768 | $24,212,104 |
| NEW BEDFORD, MA | 17,037,387 | $24,821,492 |
| BOSTON, MA | 8,903,765 | $11,379,312 |
| PORTLAND, ME | 3,679,354 | $5,199,408 |
| POINT JUDITH, RI | 1,148,478 | $1,946,519 |

**TABLE 23. RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES OF SMALL-MESH MULTISPECIES (AGGREGATED).**

|  | Commercial Landings (lb) | Ex-vessel Value |
|---|---|---|
| 2010 | 19,072,767 | $11,550,525 |
| 2011 | 18,347,731 | $11,584,240 |
| 2012 | 17,674,293 | $11,329,843 |
| 2013 | 14,872,507 | $9,318,464 |
| 2014 | 17,495,471 | $12,030,911 |

**TABLE 24. PRIMARY PORTS ASSOCIATED WITH THE SMALL-MESH MULTISPECIES FISHERY (VALUES ARE AGGREGATED AND AVERAGED FOR 2010-2014).**

| Primary Ports | Commercial Landings (lb) | Ex-vessel Value of Landings |
|---|---|---|
| NEW BEDFORD, MA | 6,263,913 | $3,816,393 |
| POINT JUDITH, RI | 3,092,415 | $1,600,930 |
| MONTAUK, NY | 2,710,013 | $2,055,788 |
| NEW LONDON, CT | 1,376,807 | $1,079,459 |
| GLOUCESTER, MA | 1,082,682 | $742,413 |

_0000017120

### 3.1.1.8  Northeast Skate FMP

There are seven species included in the Northeast skate complex:  Barndoor skate, clearnose skate, little skate, rosette skate, smooth skate, thorny skate, and winter skate.  The Northeast skate complex is distributed along the coast of the northeastern United States from near the tide line to depths exceeding 700 meters.  Within the complex, the ranges of the individual species vary.  The center of distribution for little and winter skates is Georges Bank and southern New England.  Barndoor skate is most common in the offshore Gulf of Maine, on Georges Bank, and in southern New England.  Thorny and smooth skates are commonly found in the Gulf of Maine.  Clearnose and rosette skates have a more southern distribution, and are found in southern New England and the Chesapeake Bight.  Skates are not known to undertake large-scale migrations, but they do move seasonally in response to changes in water temperature, moving offshore in summer and early autumn and returning inshore during winter and spring.

A Northeast Skate Complex FMP was developed by the Council and was implemented in 2003.  The regulations implementing the FMP require the Council to monitor the status of the subject skates and the fishery on an annual basis.  The initial regulations under the FMP included the following:  Permit requirements for vessels possessing skates and dealers purchasing skates; reporting requirements; a possession limit for skate wings; an exemption from the wing possession limit for vessels fishing only for skates for the bait market; and prohibitions on the possession of smooth skates from or in the Gulf of Maine, and barndoor and thorny skates throughout their range.  The original FMP also incorporated a baseline of management measures implemented under other FMPs (Northeast Multispecies, Sea Scallops, and Monkfish) that directly or indirectly control fishing effort on skates.  Any proposed changes to these FMPs that could result in an increase in fishing effort on skates were required to first undergo a "skate baseline review" to determine whether, and to what degree, the change may have an impact on skate conservation.  The FMP was developed, in part, to collect more complete and accurate information on the catch and disposition of skates in Northeast fisheries, at the species level.  Stock assessments and efforts to manage fishing mortality have been hampered by a lack of species-specific catch information.  The first amendment to the Skate FMP was the 2007 SBRM Omnibus Amendment.

Amendment 3 to the Skate FMP was implemented in 2010, to establish ACLs and AMs for the skate complex as required by the re-authorized Magnuson-Stevens Act, and to implement measures to rebuild overfished skate stocks.  Amendment 3 implemented a stock complex ACL for skates, but created separate landing quotas for the skate wing and bait fisheries, and reduced the skate wing and bait possession limits.  The skate bait fishery annual total allowable landings were divided into three separate seasonal quotas to maintain year-round supply of bait.  AMs would be triggered if the total allowable landings or ACL were exceeded.  Amendment 3 also replaced the skate baseline review with annual review and specification procedures.  Framework Adjustment 1 to the Skate FMP was subsequently

_0000017121

implemented in 2011, to further reduce the skate wing possession limits, and adjust the in-season trigger of the incidental possession limit. Skates are harvested for two very different commercial markets—one market supplies whole skates to be used as bait in the lobster fishery, and one market supplies skate wings for human consumption. The skate bait fishery is a directed fishery and is more traditional, involving vessels primarily from southern New England ports that target a combination of little skates (>90 percent) and, to a much lesser extent, juvenile winter skates (<10 percent). The vessels supplying skates for the bait market tend to make dedicated trips targeting skates and land large quantities of skates per trip.

The skate wing fishery developed in the 1990s when skates were promoted as "underutilized species," and fishermen shifted effort from groundfish and other fisheries to skates and spiny dogfish. The wing fishery is largely an incidental catch fishery that involves vessels that also participate in the groundfish and/or monkfish fisheries. Although some vessels will make trips specifically targeting winter skates for the wing market, most skates caught for this market are retained by vessels engaged in other fisheries. Most skates are caught using an otter trawl (according to the VTR) database for 2007-2011, almost 65 percent of landings were from an otter trawl), although gillnets are also used (the remaining 35 percent of 2007-2011 landings were from gillnets). Small amounts of landings are associated with hook and line gear and scallop dredges.

Even though skates are now managed under a Federal FMP, reported landings remain incomplete at the species level. Although some skates are caught by recreational fishermen, recreational landings of skates are negligible both in the context of all recreational fisheries and in the context of the overall skate fisheries. Thus, Table 42 reports recent commercial landings and the ex-vessel value of skates aggregated across all species. Table 43 identifies the primary ports associated with the skate fishery.

**TABLE 25.  RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES OF SKATES (AGGREGATED).**

|  | Commercial Landings (lb) | Ex-vessel Value |
|---|---|---|
| 2010 | 24,581,085 | $7,624,482 |
| 2011 | 22,345,312 | $8,425,052 |
| 2012 | 22,968,345 | $7,937,143 |
| 2013 | 20,377,800 | $7,303,131 |
| 2014 | 21,394,736 | $9,623,271 |

_0000017122

**TABLE 26. PRIMARY PORTS ASSOCIATED WITH THE SKATE FISHERY (2010-2014 VALUES ARE AVERAGED). *DATA EXCLUDED FOR CONFIDENTIALITY.**

| Primary Ports | Commercial Landings (lb) | Ex-vessel Value of Landings |
|---|---|---|
| POINT JUDITH, RI | 7,382,750 | $1,415,613 |
| NEW BEDFORD, MA | 3,050,385 | $1,642,701 |
| CHATHAM, MA | 2,822,778 | $1,634,998 |
| NEWPORT, RI | 2,440,504 | $497,633 |
| FALL RIVER, MA | * | * |

### 3.1.1.9  Spiny Dogfish FMP

Spiny dogfish are the most abundant sharks in the western North Atlantic, and range from Labrador to Florida, although they are most abundant from Nova Scotia to Cape Hatteras, North Carolina.  Spiny dogfish are highly migratory, often traveling in large troops, and they move northward in the spring and summer and southward in the fall and winter.  Spiny dogfish are known to be opportunistic predators, consuming whatever prey are readily abundant in their environment, including pelagic and benthic invertebrates and fishes.  Although dogfish have a varied diet, most of what they eat are invertebrates (ctenophores in particular) and a recent study of 40,000 stomachs found that less than 1 percent of their diet was composed of principal groundfish species (Link et al. 2002).

In spite of their large numbers and opportunistic feeding, spiny dogfish, like many elasmobranches, suffer from several reproductive constraints.  Females may take 7-12 years to reach maturity, growing more than one-third larger than their mature male counterparts before becoming sexually mature.  Fertilization and egg development are internal, and gestation takes roughly 2 years, resulting in litters that usually average 6-7 dogfish "pups."  As a result of these factors (long time to maturity, long gestation periods, and low fecundity), spiny dogfish are vulnerable to overfishing, particularly if fishing activities focus on the largest individuals, which are almost all mature females.

As a result of increased fishing pressure, spiny dogfish were classified as overfished in 1998.  The Mid-Atlantic and NEFMCs jointly developed an FMP for spiny dogfish.  This plan was partially approved in 1999 and implemented in 2000 and the management measures included an overall commercial quota, allocated into two semiannual periods; restrictive trip limits; a prohibition on finning; an annual quota adjustment process; and permit and reporting requirements.  The Atlantic States Marine Fisheries Commission implements complementary management measures for spiny dogfish in state waters.  The most significant effect of the original FMP

_0000017123

measures was the elimination of the directed dogfish fishery in Federal waters.[7] Framework Adjustment 1 to the FMP, implemented in 2006, provided for a multi-year, rather than annual, specification-setting process.  Framework Adjustment 2, implemented in 2009, adjusted the FMP to allow for more efficient implementation of new scientific information on stock status and biological reference points.  The spiny dogfish stock was officially declared to be rebuilt in 2010, and commercial quotas have been significantly increased in recent years.  Amendment 1 to the Spiny Dogfish FMP was the 2007 SBRM Omnibus Amendment.  Amendment 2 was implemented in 2011 to bring the FMP into compliance with the revised Magnuson-Stevens Act by implementing annual catch limits and accountability measures.

By far most spiny dogfish landings are the result of commercial fishing activities, as reported recreational landings comprise less than 2 percent of the total catch.  Sink gillnets, bottom longlines, and bottom otter trawls are the primary commercial fishing gears that catch spiny dogfish and these three gear types accounted for 97 percent of all dogfish landed in 2007-2011.  Over the last several years, commercial landings ranged from 6.6 million lb in 2007 up to as 20.9 million lb in 2011 (see Table 44).  For fishing years 2007-2011 combined, the Massachusetts ports had the most commercial landings (42.5 percent), with another 19 percent made in Virginia, and 10 percent in New Hampshire.  Table 45 identifies the primary ports of spiny dogfish landings from 2007 to 2011.

**TABLE 27.  RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES OF SPINY DOGFISH.**

|  | Commercial Landings (lb) | Ex-vessel Value |
|---|---|---|
| 2010 | 12,141,697 | $2,499,603 |
| 2011 | 20,901,761 | $4,549,273 |
| 2012 | 23,335,350 | $5,005,201 |
| 2013 | 16,023,231 | $2,399,488 |
| 2014 | 23,711,400 | $4,080,792 |

---

[7] Directed fishing for spiny dogfish continued in state waters until 2004, by which time the states had followed suit to implement restrictive trip limits and eliminate the directed dogfish fishery.

_0000017124

**TABLE 28. PRIMARY PORTS ASSOCIATED WITH THE SPINY DOGFISH FISHERY (VALUES AVERAGED FOR 2010-2014). *DATA EXCLUDED FOR CONFIDENTIALITY.**

| Primary Ports | Commercial Landings (lb) | Ex-vessel Value of Landings |
|---|---|---|
| CHATHAM, MA | 3,708,318 | $699,407 |
| GLOUCESTER, MA | 2,060,339 | $442,056 |
| HATTERAS, NC | 1,733,815 | $207,335 |
| VIRGINIA BEACH/LYNNHAVEN, VA | * | * |
| SCITUATE, MA | 918,516 | $192,327 |

### 3.1.1.10 Summer Flounder, Scup, and Black Sea Bass FMP

Summer flounder, scup, and black sea bass are three demersal finfish species that occur primarily in the Middle Atlantic Bight from Cape Cod, MA, to Cape Hatteras, NC.[8] All three species exhibit seasonal movement or migration patterns. Summer flounder move inshore to shallow coastal and estuarine waters during warmer months and move offshore during colder months. Scup is a schooling species that undertakes extensive migrations between the coastal waters in the summer and outer continental shelf waters in the winter. Black sea bass are most often found in association with structured habitats, and they migrate offshore and to the south as waters cool in the fall, returning north and inshore to coastal areas and bays as waters warm in the spring.

The FMP was developed by the MAFMC, initially just for summer flounder, and approved by the Secretary of Commerce in 1988. This original Summer Flounder FMP was based largely on the ASMFC plan. The first major amendment, Amendment 2, was implemented in 1993 and it established much of the current management regime, including a commercial quota allocated to the states, a recreational harvest limit, minimum size limits, gear restrictions, permit and reporting requirements, and an annual review process to establish specifications for the coming fishing year. Amendments 4 through 7 made relatively minor adjustments to the management program.

Although initially intended to be separate FMPs, work on the development of the Scup FMP and the Black Sea Bass FMP was folded into the Summer Flounder FMP, which was broadened to incorporate management measures for scup and black sea bass through Amendments 8 and 9, respectively. These amendments included management measures for scup and black sea bass such as commercial quotas and quota periods, commercial fishing gear requirements, minimum fish size limits,

---

[8] Summer flounder range from Nova Scotia to Florida; scup range from the Bay of Fundy to Florida; and black sea bass range from southern Nova Scotia to southern Florida and into the Gulf of Mexico.

_0000017125

recreational harvest limits, and permit and reporting requirements. Both amendments were implemented in 1996. Amendments 10 and 11 made relatively minor changes to the management systems for these fisheries, including removing the sunset provisions related to the limited access (moratorium) permits, gear requirements, and to achieve consistency among all Mid-Atlantic and NEFMC FMPs regarding vessel replacement and upgrade provisions.

Amendment 12 was developed to bring the FMP into compliance with the provisions of the Sustainable Fisheries Act. This amendment included revised overfishing definitions for all three species, established rebuilding programs, addressed bycatch and habitat issues, and established a framework adjustment procedure for the FMP to allow relatively minor changes to management measures to be implemented through a streamlined process. Amendment 12 was implemented in 1999, although not all of the elements of the amendment were approved by NMFS. In particular, the EFH provisions for all three species and the rebuilding program for scup were not approved.

Implemented in 2003, Amendment 13 focused primarily on the commercial black sea bass fishery, although it also served to bring the FMP into compliance with the Sustainable Fisheries Act regarding the EFH requirements for all three species. The most significant change to the commercial black sea bass fishery eliminated the quarterly quota system, replaced with an annual coastwide quota. This change provided a framework for the ASMFC to allocate the annual quota on a state-by-state basis.

Amendment 14 to the FMP, implemented in 2007, addressed the requirement to establish a rebuilding program for scup, which was declared in 2005 to be overfished. Scup was declared rebuilt as of 2009, and is no longer under a rebuilding plan. An upcoming amendment (Amendment 18) is planned to address a wide range of issues associated with the management of scup (including the commercial/recreational split and the allocation of commercial scup quota among the three quota periods, among other issues). Amendment 17 has been initiated, but not yet completed, to discuss the potential for the black sea bass recreational fishery to be managed using conservation equivalency.

In order to come into compliance with the revised Magnuson-Stevens Act, the MAFMC developed an omnibus amendment for all of its FMPs. The ACL/AM Omnibus Amendment (Amendment 15 to the Summer Flounder, Scup, and Black Sea Bass FMP) implemented ACLs and AMs for these three fisheries. Amendment 16 to the FMP was the 2007 SBRM Omnibus Amendment.

For each of these three species, an annual acceptable biological catch (ABC) is established by the Council. The ABC is then divided, using percentages identified in

_0000017126

the FMP[9], into a commercial ACL and a recreational ACL.  The Council then sets corresponding annual catch targets (ACT) for each fishing sector.  The commercial quota and recreational harvest limit are the amount of landings remaining after deducting discards from the respective ACTs.  The commercial fisheries for all three species are managed through a combination of limited access (moratorium) fishing vessel permits, annual quotas that result in closures of the fisheries upon reaching the quota, gear restrictions, and minimum fish sizes.  The summer flounder and black sea bass commercial quotas are managed on an annual basis, but the scup commercial quota is sub-divided into three quota periods (Winter I, Summer, and Winter II); although the black sea bass and scup quotas are managed on a coastwide basis, the summer flounder quota is managed on a state-by-state basis.[10]  The annual specifications for these three fisheries may be set each year or for up to 3 years in advance.

The recreational fisheries are not subject to a "hard" quota, but instead are subject to a set of management measures designed to constrain catch to a target level. Management measures used include minimum fish sizes, bag (possession) limits, and fishing seasons.  AMs for the recreational fisheries include a pound-for-pound payback of any overage of the ACL.[11]  Party/charter vessels operating in Federal waters are required to obtain Federal permits.  Coastwide management measures are established for the black sea bass and scup recreational fisheries operating in Federal waters, but for summer flounder, the states have the option to develop state-by-state measures that, in sum, would achieve the equivalent level of conservation as would the coastwide measures.  All decisions regarding annual quotas and management measures for these commercial and recreational fisheries are made in conjunction with the ASMFC.

All three of these species support significant recreational as well as commercial fisheries.  On average, commercial landings over the last several years accounted for slightly more than half to two-thirds of the total landings of summer flounder and scup, while black sea bass recreational landings typically exceed commercial landings.  The primary gears used in the commercial fisheries for these species vary. Based on fishing vessel trip report data from 2007-2011, summer flounder are caught almost exclusively (95 percent) with bottom otter trawls; scup are caught

---

[9] The summer flounder TAL is allocated 60 percent to the commercial fishery and 40 percent to the recreational.  The scup TAL is allocated 78 percent to the commercial fishery, while 22 percent is allocated to the recreational fishery.  The black sea bass TAL is allocated 49 percent to the commercial fishery, with 51 percent allocated to the recreational fishery.

[10] Similar to the percentage allocation of the TAL to the commercial and recreational fisheries, the FMP allocates the commercial summer flounder quota among the states from North Carolina to Maine according to specific percentage shares.

[11] An Omnibus Amendment (Amendment 19 to the Summer Flounder, Scup, and Black Sea Bass FMP) is under development that may revise the AMs for the Mid-Atlantic Council's recreational fisheries.

_0000017127

primarily (92 percent) with bottom otter trawls, but handlines/rod and reel combined with pots, traps, and weirs accounted for another 6 percent; and black sea bass are caught in roughly equal amounts by bottom otter trawls (47 percent), and pots and traps (46 percent), and to a much lesser extent by handlines/rod and reel (5 percent).  Recreational fishing for these species is enjoyed by shore-based anglers, private recreational boat anglers, and anglers on party and charter vessels. Table 46 and Table 47 identify the recent commercial landings as well as the primary ports and ex-vessel value of the commercial fishery.

_0000017128

**TABLE 29. RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES IN THE SUMMER FLOUNDER, SCUP, AND BLACK SEA BASS FISHERIES.**

| | Summer Flounder | | Scup | | Black Sea Bass | |
|---|---|---|---|---|---|---|
| | Commercial Landings (lb) | Ex-vessel Value | Commercial Landings (lb) | Ex-vessel Value | Commercial Landings (lb) | Ex-vessel Value |
| 2010 | 13,400,584 | $26,980,011 | 10,437,483 | $6,912,378 | 1,734,077 | $5,367,706 |
| 2011 | 16,567,658 | $30,184,226 | 15,017,382 | $8,362,455 | 1,688,258 | $5,508,102 |
| 2012 | 13,049,845 | $30,254,138 | 14,885,859 | $10,438,115 | 1,724,548 | $5,747,616 |
| 2013 | 12,441,067 | $29,051,149 | 17,869,273 | $9,791,416 | 2,262,330 | $7,381,708 |
| 2014 | 10,999,319 | $30,206,753 | 15,964,207 | $9,526,277 | 2,621,123 | $8,383,370 |

**TABLE 30. PRIMARY PORTS ASSOCIATED WITH THE SUMMER FLOUNDER, SCUP, AND BLACK SEA BASS COMMERCIAL FISHERIES (VALUES ARE AVERAGED FOR 2010-2014).**

| Summer Flounder | | Scup | | Black Sea Bass | |
|---|---|---|---|---|---|
| Primary Ports | Ex-vessel Value | Primary Ports | Ex-vessel Value | Primary Ports | Ex-vessel Value |
| POINT JUDITH, RI | $5,645,826 | POINT JUDITH, RI | $2,853,004 | OCEAN CITY, MD | $563,564 |
| NEWPORT NEWS, VA | $2,896,245 | | $1,852,083 | POINT PLEASANT, NJ | $624,918 |
| | | MONTAUK, NY | | | |
| HAMPTON, VA | $2,440,962 | POINT PLEASANT, NJ | $547,945 | | $569,412 |
| POINT PLEASANT, NJ | $2,243,934 | | $529,606 | POINT JUDITH, RI | $433,635 |
| | | NEW BEDFORD, MA | | CAPE MAY, NJ | |
| CHINCOTEAGUE, VA | $1,289,621 | LITTLE COMPTON, RI | $312,836 | | $422,115 |
| | | | | HAMPTON, VA | |
| WANCHESE, NC | $1,172,201 | CAPE MAY, NJ | $232,319 | CHINCOTEAGUE, VA | $413,046 |

_0000017129

### 3.1.1.11 Surfclam and Ocean Quahog FMP

The Atlantic surfclam and ocean quahog are both bivalve mollusks that are found in continental shelf waters from Cape Hatteras, NC, north to the Gulf of St. Lawrence/Newfoundland.  Major concentrations of surfclams are found on Georges Bank, south of Cape Cod, off Long Island, southern New Jersey, and the Delmarva Peninsula.  The greatest concentrations of ocean quahogs are fished in offshore waters south of Nantucket to the Delmarva Peninsula.  In general, surfclams are found in water shallower than that in which ocean quahogs are found.

The MAFMC developed the FMP in the mid 1970's (it was the first FMP the Council developed) and the FMP was implemented in 1977.  Initially, the FMP instituted a moratorium on participation in the surfclam fishery, while a more detailed limited entry system could be developed, and established quarterly quotas for surfclams and an annual quota for ocean quahogs.  The first several amendments dealt mostly with the duration of the management measures and permit moratorium (made indefinite in Amendment 3), reporting requirements, management areas (Amendment 2 divided the surfclam portion of the management unit into the New England and Mid-Atlantic areas) minimum size limits, cage tags, and quota period issues.

Amendment 8 to the FMP, implemented in 1990, established an individual transferable quota (ITQ) system for the fisheries.  The fishing vessel owners that received allocation under the ITQ system were those whose vessels had reported landings under the mandatory logbook requirement in place since 1978.  The initial allocation was based on the vessel's average historical catch and vessel size, calculated as a percentage of historical quota allocations.  Quota shareholders are allowed to purchase, sell, or lease quota to and from other shareholders.  This amendment also merged the Mid-Atlantic and New England management areas back into a single management area.

Amendment 9 revised the overfishing definitions, and Amendment 10 incorporated management measures for the Maine "mahogany clam."[12]  Amendment 11 represented the "consistency amendment" to bring all New England and MAFMC FMPs into consistency in regards to vessel replacement and upgrade provisions.  Amendment 12 was intended to bring the FMP into compliance with the provisions of the Sustainable Fisheries Act, and included revisions to overfishing definitions, the designation of EFH, a provision allowing framework adjustments to the FMP, and a requirement for an operator permit.  Amendment 13 rectified aspects of Amendment 12 that were not approved (surfclam overfishing definition and an analysis of the impacts of fishing on EFH), and included provision for multiple year quota setting.  A framework adjustment in 2007 implemented a requirement to use VMS for all vessels participating in the surfclam or ocean quahog

---

[12] The Maine mahogany clam is the same species as the ocean quahog, but is found in the inshore waters of the State of Maine and supports a small artisanal fishery.  This fishery had been operating on an experimental basis since 1990, but was beginning to move offshore into Federal waters.

_0000017130

fisheries.  Amendment 14 to this FMP was the 2007 SBRM Omnibus Amendment, and Amendment 16 was the 2011 ACL/AM Omnibus Amendment.

Both species live in the sediment and are not vulnerable to most types of fishing gears. Almost 100 percent of landings are associated with the hydraulic clam dredge, although the relatively small Maine fishery uses the so-called "dry" dredge.  Landings of surfclams and ocean quahogs from recreational fishing are negligible.  Table 48 identifies the recent commercial landings and ex-vessel value of both species, and Table 49 identifies the primary ports of landings for both species.

Waters of the Gulf of Maine and Georges Bank are subject to intermittent harmful algal blooms, or "red tide," caused by the dinoflagellate *Alexandrium fundyense*, which produces a toxin known to cause paralytic shellfish poisoning (PSP) in people consuming contaminated clams.  Because of a history of harmful algal blooms and limited testing in the area, eastern Georges Bank has been closed to the harvest of clams since 1990.  In 2013 a portion of Georges Bank was opened for the harvest of surfclams and ocean quahog by vessels using a new PSP testing protocol.  Other areas in the Gulf of Maine and western Georges Bank have been closed since 2005 due to an outbreak of *A. fundyense* in these areas.

TABLE 31.  RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUES IN THE SURFCLAM AND OCEAN QUAHOG FISHERIES.

|  | Atlantic Surfclam | | Ocean Quahog | |
|  | Commercial Landings (lb) | Ex-vessel Value | Commercial Landings (lb) | Ex-vessel Value |
|---|---|---|---|---|
| 2010 | 44,049,455 | $30,336,346 | 36,071,850 | $23,184,691 |
| 2011 | 43,885,111 | $30,086,829 | 31,771,210 | $22,094,549 |
| 2012 | 45,131,331 | $32,436,365 | 35,119,940 | $25,867,115 |
| 2013 | 44,062,576 | $31,483,011 | 32,267,010 | $23,654,062 |
| 2014 | 43,254,654 | $30,979,326 | 31,391,827 | $23,839,278 |

_0000017131

**TABLE 32. PRIMARY PORTS ASSOCIATED WITH THE SURFCLAM AND OCEAN QUAHOG COMMERCIAL FISHERIES (VALUES ARE AVERAGED FOR 2010-2014). *DATA EXCLUDED FOR CONFIDENTIALITY.**

| Atlantic Surfclam | | | Ocean Quahog | | |
|---|---|---|---|---|---|
| Primary Ports | Landings (lb) | Ex-vessel Value | Primary Ports | Landings (lb) | Ex-vessel Value |
| ATLANTIC CITY, NJ | 20,032,756 | $12,451,256 | NEW BEDFORD, MA | * | * |
| NEW BEDFORD, MA | 10,680,503 | $8,465,441 | POINT PLEASANT, NJ | * | * |
| OTHER BARNSTABLE, MA | 2,390,581 | $2,274,196 | ATLANTIC CITY, NJ | 7,572,472 | $6,289,987 |
| POINT PLEASANT, NJ | 2,154,607 | $1,039,619 | OCEAN CITY, MD | 1,413,696 | $1,193,949 |
| OCEAN CITY, MD | 2,146,733 | $1,371,187 | WARREN, RI | * | * |

### 3.1.1.12 Tilefish FMP

The golden tilefish is the largest and longest lived of all the tilefish species, and in U.S. waters ranges from Georges Bank to Key West, FL, and throughout the Gulf of Mexico. Golden tilefish occupy a fairly restrictive band along the outer continental shelf and are most abundant in depths of 100-240 meters. Temperature may also constrain their range, as they are most abundant near the 15° C isotherm. Although this species occupies a variety of habitats, it is somewhat unique in that they create and modify existing vertical burrows in the sediment as their dominant habitat in U.S. waters.

The Tilefish FMP was developed by the MAFMC to implement management measures for the tilefish fishery north of the Virginia/North Carolina border intended to address the overfished status of the species.[13] The FMP was implemented in 2001, and in the FMP's short existence it has been the subject of two legal challenges. *Natural Resources Defense Council* v. *Evans* (2001) challenged the essential fish habitat provisions of the FMP, and *Hadaja* v. *Evans* (2001) challenged the ban on trawl gear and the permit category designations. The latter temporarily voided the limited access permit categories in the FMP.

Amendment 1 to the Tilefish FMP, implemented in 2009, eliminated the limited access permit categories and adopted an IFQ program. Initially, thirteen allocation holders received quota share based primarily on historical participation in the fishery. Any vessel

---

[13] The tilefish fishery south of the Virginia/North Carolina border is currently managed as part of the Snapper-Grouper Complex FMP developed by the South Atlantic Fishery Management Council.

_0000017132

is required to have an open access permit in order to land tilefish. The open access permit alone authorizes a vessel to land tilefish under a 500 lb per trip incidental possession limit. If the vessel is authorized to land under tilefish an IFQ allocation permit, it is exempt from the possession limit. Each year, 95 percent of the total allowable landings are allocated to the IFQ fishery. The remaining 5 percent is allocated to the incidental fishery. If landings in the incidental fishery reach or exceed the amount allocated, the incidental fishery would be shut down for the remainder of the fishing year. Amendment 2 was the 2007 SBRM Omnibus Amendment, and Amendment 3 was the 2011 ACL/AM Omnibus Amendment.

The commercial tilefish fishery is relatively small, with only a dozen vessels participating in the IFQ fishery. Tilefish are primarily caught with bottom longlines (98 percent of landings reported in the fishing vessel trip report database from 2007-2011), and approximately 1.8 percent of landings are associated with bottom otter trawls. There is a minimal recreational fishery for this species, with less than 8,300 lb landed annually for the last 30 years and in only two years since 2000 does the MRIP database report trips with tilefish as the primary target species. Table 50 and Table 51 identify the recent commercial landings as well as the primary ports and ex-vessel value of the commercial fishery.

TABLE 33. RECENT COMMERCIAL LANDINGS AND EX-VESSEL VALUE OF GOLDEN TILEFISH.

|  | Commercial Landings (lb) | Ex-vessel Value |
| --- | --- | --- |
| 2010 | 1,866,799 | $5,185,807 |
| 2011 | 1,750,152 | $5,633,296 |
| 2012 | 1,686,401 | $5,466,872 |
| 2013 | 1,710,344 | $5,877,742 |
| 2014 | 1,649,080 | $5,689,066 |

TABLE 34. PRIMARY PORTS ASSOCIATED WITH THE GOLDEN TILEFISH FISHERY (VALUES ARE AVERAGED FOR 2010-2014).

| Primary Ports | Commercial Landings (lb) | Ex-vessel Value of Landings |
| --- | --- | --- |
| MONTAUK, NY | 1,129,561 | $3,628,707 |
| BARNEGAT LIGHT/LONG BEACH, NJ | 344,015 | $1,128,285 |
| HAMPTON BAYS, NY | 214,551 | $701,704 |
| POINT JUDITH, RI | 17,141 | $34,112 |

## 3.1.2 NON-TARGET AND BYCATCH SPECIES

Various species are caught incidentally by the Atlantic herring fishery. For non-target species that are managed under their own FMP, incidental catch/discards are considered as part of the management of that fishery. These species will be impacted to some degree by the prosecution of the herring fishery. The primary non-target species of current

_0000017133

concern for the herring fishery are river herring (alewife and blueback herring) and shad (American shad and hickory shad), so additional information is provided below.  Haddock is also a primary non-target species.

## River Herring

In the recent Atlantic States Marine Fisheries Commission river herring stock assessment (ASMFC 2012), of the 24 river herring stocks for which sufficient data are available to make a conclusion, 23 were depleted relative to historic levels and one was increasing.  The status of 28 additional stocks could not be determined because the time-series of available data was too short.  Estimates of coastwide abundance and fishing mortality could not be developed because of the lack of adequate data.  The "depleted" determination was used instead of "overfished" because of the many factors that have contributed to the declining abundance of river herring, which include not just directed and incidental fishing, but likely also habitat issues (including dam passage, water quality, and water quantity), predation, and climate change.  There are no coastwide reference points.  The NEFSC trawl survey, which is the only coastwide fisheries-independent survey, showed increasing trends in relative abundance beginning in 2008 (ASMFC 2012).

As part of a recent river herring status review under the Endangered Species Act, NMFS completed an extinction risk analysis (http://www.greateratlantic.fisheries.noaa.gov/protected/pcp/soc/river_herring.html). This analysis investigated trends in river herring relative abundance for each species range-wide as well as for each identified stock complex.  This analysis found that "the abundance of alewife range-wide significantly increased over time (mid 1970s-2012), but the increase in blueback herring abundance was not significant (page 7 and Figures 8 and 9 of the referenced document).  These range-wide analyses incorporated data from fishery independent surveys with the widest geographic extent, specifically the Northeast Fisheries Science Center spring and fall bottom trawl surveys and Canada's Department of Fisheries and Oceans (DFO) Scotian Shelf survey.  Stock-specific analyses incorporated run count data and stock-specific fishery-independent surveys.  Stock-specific analyses indicated that the abundance of the Canadian alewife stock complex was significantly increasing, the abundance of the mid-Atlantic blueback herring stock complex was significantly decreasing, and all other analyzed stock complexes were not significantly increasing or decreasing in abundance.  The status review concluded that the species did not currently warrant listing under the ESA.

NMFS and the ASMFC are engaged in a proactive conservation strategy for river herring and the Council is also involved in the endeavor.  This strategy is described at http://www.greateratlantic.fisheries.noaa.gov/protected/riverherring/tewg/index.html, and will bring a variety of management partners and stakeholders together to address river herring threats and plan conservation and data gathering activities.

_0000017134

**Shad**

The recent American shad stock assessment report (ASMFC 2007) identified that American shad stocks are highly depressed from historical levels. Of the 24 stocks of American shad for which sufficient information was available, 11 were depleted relative to historic levels, 2 were increasing, and 11 were stable (but still below historic levels). The status of 8 additional stocks could not be determined because the time-series of data was too short or analyses indicated conflicting trends. Taken in total, American shad stocks do not appear to be recovering. The assessment concluded that current restoration actions need to be reviewed and new ones need to be identified and applied. These include fishing rates, dam passage, stocking, and habitat restoration. There are no coastwide reference points for American shad. There is no stock assessment available for hickory shad.

### 3.1.3 PHYSICAL ENVIRONMENT

The fishing activities affected by the FMPs subject to this amendment occur off the Atlantic coast of the U.S., primarily from Cape Hatteras, NC, to the U.S./Canada border. This area of the Northwest Atlantic Ocean is also known as the Northeast U.S. Continental Shelf Large Marine Ecosystem (Sherman et al. 1996) and includes the subsystems known as the Gulf of Maine, Georges Bank, and the Mid-Atlantic Bight. For more information about the physical characteristics of the environment described below, reference NEFMC (2004a); NEFMC (2004b); Sherman et al. (1996); and Stevenson et al. (2004). See Figure 1 for a map of the Greater Atlantic Region with the three major subsystems identified.



**FIGURE 1. MAP OF THE GULF OF MAINE, GEORGES BANK, AND MID-ATLANTIC BIGHT.**

_0000017135

## Gulf of Maine

The Gulf of Maine is an enclosed coastal sea characterized by relatively cold waters and deep basins.  The Gulf of Maine is bounded on the east by Browns Bank, on the north by Maine and Nova Scotia, on the west by Maine, New Hampshire, and Massachusetts, and on the south by Cape Cod and Georges Bank.  Retreating glaciers (18,000-14,000 years ago) formed a complex system of deep basins, moraines, and rocky protrusions, leaving behind a variety of sediment types including silt, sand, clay, gravel, and boulders.  These sediments are patchily distributed throughout the Gulf of Maine, and are largely related to the topography of the bottom.

Water patterns in the Gulf of Maine exhibit a general counterclockwise current, influenced primarily by cold water masses moving in from the Scotian Shelf and offshore.  Although large-scale water patterns are generally counterclockwise around the Gulf, many small gyres and minor currents do occur.  Freshwater runoff from the many rivers along the coast of the Gulf of Maine influences coastal circulation, as well.  These water movements feed into and affect the circulation patterns on Georges Bank and in Southern New England, both of which are discussed below.

## Georges Bank

Georges Bank is a shallow, elongate extension of the northeastern U.S. continental shelf, and it is characterized by a steep slope on its northern edge and a broad, flat, and gently sloping southern flank.  The Gulf of Maine lies to the north of Georges Bank, the Northeast Channel (between Georges Bank and Browns Bank) is to the east, the continental slope lies to the south, and the Great South Channel separates Georges Bank and Southern New England to the west.  Although the top of Georges Bank is predominantly sandy sediment, glacial retreat during the late Pleistocene era resulted in deposits of gravel along the northern edge of the Bank, and some patches of silt and clay can be found.

The most dominant oceanographic features of Georges Bank include a weak but persistent clockwise gyre that circulates over the whole of the Bank, strong tidal flows (predominantly northwest and southeast), and strong but intermittent storm-induced currents.  The strong tidal currents result in waters over the Bank that are well-mixed vertically.  The clockwise Georges Bank gyre is in part driven by the southwestern flow of shelf and slope water that forms a countervailing current to the Gulf Stream.

## Mid-Atlantic Bight and Southern New England

The Mid-Atlantic Bight includes the continental shelf and slope waters from Georges Bank to Cape Hatteras, North Carolina.  Occasionally discussed separately, most texts consider

_0000017136

Southern New England a sub-region within the Mid-Atlantic Bight.[14]  The basic morphology and sediments of the Mid-Atlantic Bight were shaped during the retreat of the last ice sheet. The continental shelf south of New England is broad and flat, dominated by fine grained sediments (sand and silt).  Patches of gravel can be found in places, such as on the western flank of the Great South Channel.

The shelf slopes gently away from the shore out to 100-200 km offshore, where it transforms into the continental slope at the shelf break (at water depths of 100-200 m). Along the shelf break, numerous deep-water canyons incise the slope and into the shelf. The sediments and topography of the canyons are much more heterogeneous than the predominantly sandy top of the shelf, with steep walls and outcroppings of bedrock and deposits of clay.

The southwestern flow of cold shelf water feeding out of the Gulf of Maine and off Georges Bank dominates the circulatory patterns in this area.  The countervailing Gulf Stream provides a source of warmer water along the coast as warm-core rings and meanders break off from the Gulf Stream and move shoreward, mixing with the colder shelf and slope water.  As the shelf plain narrows to the south (the extent of the continental shelf is narrowest at Cape Hatteras), the warmer Gulf Stream waters run closer to shore.

## 3.1.4  ENDANGERED AND OTHER PROTECTED SPECIES

### 3.1.4.1  Omnibus discussion of endangered and other protected species

There are many protected species inhabiting the Northeast Continental Shelf Large Marine Ecosystem.  These include Atlantic salmon, two species of listed sturgeon, several species of endangered and threatened sea turtles, and several species of whales, small cetaceans, and pinnipeds.  Although there may be many species that occur in this area, this section will not provide a detailed description of protected species in the affected environment as the omnibus potion of this amendment focuses on the process of creating and allocating Federal funds to IFM programs and therefore, any impacts are procedural in nature and will not cause any direct or indirect effects to protected species.  As a result, a detailed description of these species that could be affected by omnibus alternatives in this amendment is not warranted.

### 3.1.4.2  Herring Fishery discussion of endangered and protected species interactions

The herring coverage target alternatives in this amendment are consistent with typical FMP amendments.  The potential changes in monitoring for the herring fishery may directly or indirectly impact fishing vessel operations (by modifying where, when, and/or how fishing may take place), and the ways in which herring fishing activities directly or

---

[14] Southern New England is generally considered to be the area of the continental shelf off the coasts of Massachusetts, Rhode Island, and Long Island, New York, from the Great South Channel to Hudson Canyon.

_0000017137

indirectly  interact with living marine resources, including protected species.  As a result, this section will provide information on protected species that may be affected by the action alternatives in the herring section of the amendment.  Specifically, protected species may be caught in or otherwise interact with one or more of the fishing gears utilized in a fishery addressed in this amendment (i.e., midwater trawl, bottom trawl, and purse seine). Therefore, information on protected species gear interaction risks with specific gear types used in the herring fishery will be provided.

Most of the following information is adapted from Framework Adjustment 4 to the Atlantic Herring FMP (NEFMC 2015).  Data on endangered and protected species is generally collected, analyzed, and presented by gear type.  The Atlantic herring fishery uses midwater and bottom trawls, purse seines, stop seines, and weirs.  However, midwater trawls and purse seines are the primary gear type used to prosecute this fishery (followed by bottom trawl gear) and therefore, will also be the  gear types addressed in this section.

There are numerous species of fish, marine mammals, and sea turtles which inhabit the management unit of the Atlantic Herring FMP that are afforded protection under the Endangered Species Act (ESA) of 1973 (i.e., for those designated as threatened or endangered) and/or the Marine Mammal Protection Act (MMPA) of 1972 (Table 52). Detailed information on the range-wide status of marine mammal and sea turtle species that occur in the area can be found in a number of published documents.  These include sea turtle status reviews, biological reports, and recovery plans (Conant et al. 2009; NMFS and USFWS 1991, 1992, 1995, 1998a, 1998b, 2007a, 2007b, 2008, 2013, 2015; Hirth 1997; Turtle Expert Working Group (TEWG) 1998, 2000, 2007, 2009; Seminoff et al. 2015; NMFS et al. 2011).  For marine mammals this includes marine mammal stock assessment reports and recovery plans (e.g., Waring et al. 2016; Hayes et al. 2017, NMFS 1991, 2005, 2010, 2011, 2012).  Additional background information on the Gulf of Maine Distinct Population Segment of Atlantic salmon and the five distinct population segments of Atlantic sturgeon can be found in the respective status reviews (Fay et al. 2006; ASSRT 2007) and listing determinations for Atlantic salmon (74 FR 29344; June 19, 2009) and Atlantic sturgeon (77 FR 5880 and 77 FR 5914; February 3, 2012).  Additional information on the species provided in the table below (e.g., life history, distribution, stock status) can also be found at the following sites:  http://www.greateratlantic.fisheries.noaa.gov/Protected/ and http://www.nmfs.noaa.gov/pr/sars/region.htm.

_0000017138

**TABLE 35. SPECIES PROTECTED UNDER THE ESA AND/OR MMPA THAT MAY OCCUR IN THE AFFECTED ENVIRONMENT OF THE ATLANTIC HERRING FMP.**

| Species | Status[2] | Potential to interact with Atlantic herring fishing gear? |
|---|---|---|
| **Cetaceans** | | |
| ***North Atlantic right whale (Eubalaena glacialis)*** | ***Endangered*** | ***No*** |
| Humpback whale, West Indies DPS, (*Megaptera novaeangliae*) | Protected (MMPA) | Yes |
| ***Fin whale (Balaenoptera physalus)*** | ***Endangered*** | ***Yes*** |
| ***Sei whale (Balaenoptera borealis)*** | ***Endangered*** | ***Yes*** |
| ***Blue whale (Balaenoptera musculus)*** | ***Endangered*** | ***No*** |
| ***Sperm whale (Physeter macrocephalus*** | ***Endangered*** | ***No*** |
| Minke whale (*Balaenoptera acutorostrata*) | Protected (MMPA) | Yes |
| ***Pilot whale (Globicephala spp.)[3]*** | ***Protected (MMPA)*** | ***Yes*** |
| Pygmy sperm whale (*Kogia breviceps*) | Protected (MMPA) | No |
| Dwarf sperm whale (*Kogia sima*) | Protected (MMPA) | No |
| Risso's dolphin (*Grampus griseus*) | Protected (MMPA) | Yes |
| Atlantic white-sided dolphin (*Lagenorhynchus acutus*) | Protected (MMPA) | Yes |
| Short Beaked Common dolphin (*Delphinus delphis*) | Protected (MMPA) | Yes |
| Atlantic Spotted dolphin (*Stenella frontalis*) | Protected (MMPA) | No |
| Striped dolphin (*Stenella coeruleoalba*) | Protected (MMPA) | No |
| Beaked whales (*Ziphius and Mesoplodon spp*)[4] | Protected (MMPA) | No |
| ***Bottlenose dolphin (Tursiops truncatus)[5]*** | ***Protected (MMPA)*** | ***Yes*** |
| Harbor porpoise (*Phocoena phocoena*) | Protected (MMPA) | Yes |
| **Pinnipeds** | | |
| Harbor seal (*Phoca vitulina*) | Protected (MMPA) | Yes |
| Gray seal (*Halichoerus grypus*) | Protected (MMPA) | Yes |
| Harp seal (*Phoca groenlandicus*) | Protected (MMPA) | Yes |
| Hooded seal (*Cystophora cristata*) | Protected (MMPA) | No |
| **Sea Turtles** | | |
| Leatherback sea turtle (*Dermochelys coriacea*) | Endangered | Yes |
| Kemp's ridley sea turtle (*Lepidochelys kempii*) | Endangered | Yes |
| Green sea turtle, North Atlantic DPS (*Chelonia mydas*) | Threatened | Yes |
| Loggerhead sea turtle (*Caretta caretta*), Northwest Atlantic Ocean DPS | Threatened | Yes |
| Hawksbill sea turtle (*Eretmochelys imbricate*) | Endangered | No |
| **Fish** | | |
| Atlantic salmon | Endangered | Yes |
| Atlantic sturgeon (*Acipenser oxyrinchus*) | | |

_0000017139

| Species | Status[2] | Potential to interact with Atlantic herring fishing gear? |
|---|---|---|
| *Gulf of Maine DPS* | Threatened | Yes |
| *New York Bight DPS, Chesapeake Bay DPS, Carolina DPS & South Atlantic DPS* | Endangered | Yes |
| Cusk *(Brosme brosme)* | Candidate | Yes |
| Alewife (*Alosa pseudoharengus*) | Candidate | Yes |
| Blueback herring (*Alosa aestivalis*) | Candidate | Yes |
| **Critical Habitat** | | |
| Northwest Atlantic DPS of Loggerhead Sea Turtle | ESA (Protected) | No |
| North Atlantic Right Whale Critical Habitat | ESA (Protected) | No |

Notes:

[1] A strategic stock is defined under the MMPA as a marine mammal stock for which: (1) the level of direct human-caused mortality exceeds the potential biological removal level; (2) based on the best available scientific information, is declining and is likely to be listed as a threatened species under the ESA within the foreseeable future; and/or (3) is listed as a threatened or endangered species under the ESA, or is designated as depleted under the MMPA (Section 3 of the MMPA of 1972).

[2] Status is defined by whether the species is listed under the ESA as endangered (i.e. at risk of extinction) or threatened (i.e. at risk of endangerment), or protected under the MMPA. Marine mammals listed under the ESA are also protected under the MMPA. Candidate species are those species for which ESA listing may be warranted.

[3] There are 2 species of pilot whales: short finned (*G. melas melas*) and long finned (*G. macrorhynchus*). Due to the difficulties in identifying the species at sea, they are often referred to as *Globicephala spp.*

[4] There are multiple species of beaked whales in the Northwest Atlantic. They include the cuvier's (*Ziphius cavirostris*), blainville's (*Mesoplodon densirostris*), gervais' (*Mesoplodon europaeus*), sowerbys' (*Mesoplodon bidens*), and trues' (*Mesoplodon mirus*) beaked whales. Species of *Mesoplodon* are difficult to identify at sea, therefore, much of the available characterization for beaked whales is to the genus level only.

[5] This includes the Western North Atlantic Offshore, Northern Migratory Coastal, and Southern Migratory Coastal Stocks of Bottlenose Dolphins.

Marine mammal species (cetaceans and pinnipeds) italicized and in bold are considered MMPA strategic stocks.[1] Shaded rows indicate species who prefer continental shelf edge/slope waters (i.e., >200 meters).

In Table 35, please note that cusk, alewife, and blueback herring are NMFS "candidate species" under the ESA. Candidate species are those petitioned species for which NMFS has determined that listing may be warranted under the ESA and those species for which NMFS has initiated an ESA status review through an announcement in the Federal Register. If a species is proposed for listing the conference provisions under Section 7 of the ESA apply (see 50 CFR 402.10); however, candidate species receive no substantive or procedural protection under the ESA. As a result, these species will not be discussed further in this and the following sections; however, NMFS recommends that project proponents consider implementing conservation actions to limit the potential for adverse effects on candidate

_0000017140

species from any proposed action. Additional information on cusk, alewife, and blueback herring can be found at: http://www.nmfs.noaa.gov/pr/species/esa/candidate.htm.

## Protected Species and Critical Habitat Not Likely to be Affected by the Proposed Action

In Table 35, protected species or critical habitat that are not likely to be affected by the proposed action are provided.  This determination has been made because either the occurrence of the protected species is not known to overlap with the herring fishery and/or there have never been documented interactions between the species and the fishery (NMFS NEFSC FSB 2014, 2015, 2016, 2017; See: http://www.nefsc.noaa.gov/fsb/take_reports/nefop.html, and http://www.nmfs.noaa.gov/pr/sars/region.htm).  In the case of critical habitat, this determination has been made because the herring fishery will not affect the essential physical or biological features of North Atlantic right whale or loggerhead (NWA DPS) critical habitat, and therefore, will not result in the destruction or adverse modification of either species critical habitat (NMFS 2014; NMFS 2015).

## Protected Species Potentially Affected by the Proposed Action

### *Large Whales*

Large whales, such as humpback,  fin, sei, and minke whales, are found throughout the waters of the Northwest Atlantic Ocean.  In general, these species follow an annual pattern of migration between low latitude (south of 35°N) wintering/calving grounds and high latitude spring/summer foraging grounds (primarily north of 41°N; Hayes et al. 2017; NMFS 1991, 2010, 2011; 2012).  This, however, is a simplification of whale movements, particularly as it relates to winter movements.  It remains unknown if all individuals of a population migrate to low latitudes in the winter, although, increasing evidence suggests that for some species (e.g., humpback whales), some portion of the population remains in higher latitudes throughout the winter (Clapham et al. 1993;Swingle et al. 1993; Vu et al. 2012; Hayes et al. 2017).  Although further research is needed to provide a clearer understanding of large whale movements and distribution in winter, the distribution and movements of large whales to foraging ground in the spring/summer is well understood. Movements of whales into higher latitudes coincide with peak productivity in these waters. As a result, the distribution of large whales in higher latitudes is strongly governed by prey availability and distribution, with large numbers of whales coinciding with dense patches of preferred forage (Payne *et al.*1986, 1990; Schilling *et al.* 1992; Waring *et al.* 2014a; Waring *et al.* 2015; Waring *et al.* 2016; Hayes *et al.* 2017). For additional information on the biology, status, and range wide distribution of each whale species please refer to: Waring *et al.* 2014a; Waring *et al.* 2015; Waring *et al.* 2016; Hayes *et al.* 2017; NMFS 1991, 2010, 2011.  For additional information on the biology, status, and range wide distribution of each whale species please refer to:  Hayes et al. 2017; NMFS 1991, 2010, 2011.

_0000017141

*Small Cetaceans*

Numerous small cetacean species (dolphins, pilot whales, harbor porpoise) occur within the area from Cape Hatteras through the Gulf of Maine. Seasonal shifts in abundance and distribution of each species in Mid-Atlantic, Georges Bank, and/or Gulf of Maine waters varies with respect to life history characteristics. Some species primarily occupy continental shelf waters (e.g., white sided dolphins, bottlenose dolphin, harbor porpoise), while others are found primarily in continental shelf edge and slope waters (e.g., Risso's and short beaked common dolphin). For additional information on the biology and range wide distribution of all small cetacean species identified in Table 52, please refer to Waring et al. 2014 and Waring et a. 2015.

*Pinnipeds*

Of the four species of seals expected to occur in the area, harbor and gray are the most common seal species in EEZ waters of the United States. Gray and harbor seals are primarily found throughout the year or seasonally from New Jersey to Maine; however, increasing evidence indicates that some species (e.g., harbor seals, gray seals) may be extending their range seasonally into Mid-Atlantic waters as far south as the Cape Hatteras, North Carolina (35°N) (Hayes et al. 2017). Harp and hooded seals are less commonly observed in EEZ waters; however, individuals of both species are also known to travel south into EEZ waters and sightings, as well as strandings of each species have been recorded for both New England and Mid-Atlantic waters (Waring et al. 2007; Waring et al. 2015). For additional information on the biology and range wide distribution of gray, harbor, harp, and hooded seals, please refer to marine mammal stock assessment reports provided at http://www.nmfs.noaa.gov/pr/sars/region.htm..

*Sea Turtles*

In U.S. Northwest Atlantic waters, hard-shelled turtles commonly occur throughout the continental shelf from Florida to Cape Cod, MA, although their presence varies with the seasons due to changes in water temperature (Braun-McNeill et al. 2008; Braun & Epperly 1996; Epperly et al. 1995a,b; Mitchell et al. 2003; Shoop & Kenney 1992; TEWG 2009; Blumenthal et al. 2006; Braun-McNeill & Epperly 2004; Griffin et al. 2013; Hawkes et al. 2006; Hawkes et al. 2011; Mansfield et al. 2009; McClellan & Read 2007; Mitchell et al. 2003; Morreal & Standora 2005). As coastal water temperatures warm in the spring, hard-shelled sea turtles begin to migrate north up the Atlantic Coast from southeastern waters, occurring in Virginia foraging areas as early as late April and on the most northern foraging ground in the GOM in June (Braun-McNeill & Epperly 2004; Epperly et al. 1995a,b,c; Griffin et al. 2013; Morreale & Standora 2005; Shoop & Kenney 1992). The trend is reversed in the fall as water temperatures cool, with a large majority leaving the GOM by September, and some remaining in Mid-Atlantic and Northeast areas until late fall (i.e., November). By December, sea turtles have migrated south to waters offshore of North Carolina, particularly south of Cape Hatteras, and further south (Epperly et al. 1995b; Griffin et al.

_0000017142

2013; Hawkes et al. 2011; Shoop & Kenney 1992).[15]  Leatherback sea turtles also engage in routine migrations between northern temperate and tropical waters (Dodge et al. 2014; James et al. 2005; James et al. 2006; NMFS & USFWS 1992).

Leatherbacks, a pelagic species, are known to use coastal waters of the U.S. continental shelf and to have a greater tolerance for colder water than hard-shelled sea turtles (James *et al.* 2005; Eckert *et al.* 2006; Murphy *et al.* 2006; NMFS and USFWS 2013; Dodge *et al.* 2014). Leatherback sea turtles engage in routine migrations between northern temperate and tropical waters (NMFS and USFWS 1992; James *et al.* 2005; James *et al.* 2006; Dodge *et al.* 2014). They are found in more northern waters (i.e., Gulf of Maine) later in the year (i.e., similar time frame as hard-shelled sea turtles), with most leaving the Northwest Atlantic shelves by mid-November (James *et al.* 2005; James *et al.* 2006; Dodge *et al.* 2014).

### Atlantic Sturgeon

The marine range of U.S. Atlantic sturgeon extends from Labrador, Canada, to Cape Canaveral, Florida.  All five DPSs of Atlantic sturgeon have the potential to be located anywhere in this marine range (ASSRT 2007; Dovel and Berggren 1983; Dadswell et al. 1984; Kynard et al. 2000; Stein et al. 2004a; Dadswell 2006; Laney et al. 2007; Dunton et al. 2010; Dunton et al. 2012; Dunton et al. 2015;Erickson et al. 2011; Wirgin et al. 2012, 2015a,b; Waldman et al. 2013; O'Leary et al. 2014;).  Based on fishery-independent and –dependent data, as well as data collected from tracking and tagging studies, in the marine environment, Atlantic sturgeon appear to primarily occur inshore of the 50 meter depth contour (Stein et al. 2004a,b; Erickson et al. 2011; Dunton et al. 2010); however, Atlantic sturgeon are not restricted to these depths, as excursions into deeper continental shelf waters have been documented (Timoshkin 1968; Collins and Smith 1997; Stein et al. 2004a, b; Dunton et al 2010; Erickson et al. 2011).  Data from fishery-independent surveys and tagging and tracking studies also indicate that Atlantic sturgeon may undertake seasonal movements along the coast (Dunton et al. 2010; Erickson et al. 2011; Wipplehauser 2012). However, there is no evidence to date that all Atlantic sturgeon make these seasonal movements and therefore, they may be present throughout the marine environment throughout the year.  For additional information on the biology, status, and range wide distribution of each distinct population segment of Atlantic sturgeon please refer to 77 FR 5880 and 77 FR 5914 (finalized February 6, 2012), as well as the Atlantic Sturgeon Status Review Team's (ASSRT) 2007 status review of the Atlantic sturgeon (ASSRT 2007).

### Atlantic Salmon

The wild populations of Atlantic salmon are listed as endangered under the ESA.  Their freshwater range occurs in the watersheds from the Androscoggin River northward along the Maine coast to the Dennys River, while the marine range of the GOM DPS extends from

---

[15] Hard-shelled sea turtles can occur year-round in waters off Cape Hatteras and waters south of this area.

_0000017143

the GOM (primarily northern portion of the GOM), to the coast of Greenland (NMFS and USFWS 2005, 2016; Fay et al. 2006).  In general, smolts, post-smolts, and adult Atlantic salmon may be present in the GOM and coastal waters of Maine in the spring (beginning in April), and adults may be present throughout the summer and fall months (Baum 1997; Fay et al. 2006; USASAC 2004; Hyvarinen et al. 2006; Lacroix & McCurdy 1996; Lacroix et al. 2004, 2005; Reddin 1985; Reddin & Short 1991; Reddin & Friedland 1993; Sheehan et al. 2012; NMFS and USFWS 2005,2016; Fay et al. 2006).  For additional information on the biology, status, and range wide distribution of the GOM DPS of Atlantic salmon please refer to NMFS and USFWS 2005, 2016; Fay et al. 2006.

## Protected Species Interactions with Commercial Trawl Gear and Purse Seines

The Atlantic herring fishery is prosecuted primarily with midwater trawls and purse seines, but bottom trawls are also used to some extent.  In addition, weirs and stop seines are used, but are responsible for only a small fraction of herring landings.  Since weirs and stop seines operate exclusively within State waters and are not regulated by the Federal Atlantic Herring FMP, they will not be discussed further in this document relative to protected species.  A subset of protected species of fish, marine mammals, and sea turtles (see Table 52) are known to be vulnerable to interactions with midwater trawl, bottom trawl, and purse seines.  In the following sections, available information on protected species interactions with these gear types will be provided.  Please note, these sections are not a comprehensive review of all fishing gear types know to interact with a given species; emphasis is only being placed on those gear types primarily used to prosecute the Atlantic herring fishery.

## Marine Mammals

Pursuant to the MMPA, NMFS publishes a List of Fisheries (LOF) annual, classifying U.S. commercial fisheries into one of the three categories based on the relative frequency of incidental serious injuries and/or mortalities of marine mammals in each fishery (i.e., Category I=frequent; Category II=occasional; Category III=remote likelihood or no known interactions; 82 FR 3655 (January 12, 2017)).  The categorization in the LOF determines whether participants in that fishery are subject to certain provisions of the MMPA such as registration, observer coverage, and take reduction plan requirements.  Individuals fishing in Category I or II fisheries must comply with requirements of any applicable take reduction plan.  Table 36 provides fishing gear types considered in the herring fishery and the prescribed LOF fishery Category for commercial fisheries in the (Northwestern) Atlantic Ocean.

_0000017144

**TABLE 36. LOF FISHERIES LIKELY TO OCCUR IN THE AFFECTED ENVIRONMENT OF THE HERRING FISHERY.**

| Fishery | Category |
|---------|----------|
| Mid-Atlantic Midwater Trawl (Including Pair Trawl) | II |
| Northeast Midwater Trawl (Including Pair Trawl) | II |
| Northeast Bottom Trawl | II |
| Mid-Atlantic Bottom Trawl | II |
| Purse Seine (GOM Atlantic Herring) | III |

## Large Whales

*Trawl (Bottom and Midwater) Gear*

With the exception of one species (minke whales), there have been no observed interactions with large whales and trawl (bottom or mid-water) gear. Minke whales have been observed seriously injured and killed in both types of trawl gear. Specifically, over the past 10 years, there have been two (2) observed minke whales incidentally taken in mid-water trawl gear. These occurred in 2009 and 2013, with the 2009 incident resulting from entanglement in NOAA research mid-water trawl gear (whale released alive, but seriously injured), and the 2013 incident resulting from entanglement in a Northeast mid-water trawl (including pair trawl) fishery (whale was dead, moderately decomposed) (see http://www.nefsc.noaa.gov/fsb/take_reports/nefop.html; Waring *et al.* 2016; Henry *et al.* 2015). Based on the latter incident, as provided in Waring *et al.* (2016), the estimated annual average minke whale mortality and serious injury from the Northeast mid-water trawl (including pair trawl) fishery from 2009 to 2013 is 0.2; Hayes *et al.* (2017) provided the same estimated annual average minke whale mortality and serious injury from the Northeast mid-water trawl (including pair trawl) fishery from 2010 to 2014.

In bottom trawl gear, to date, interactions have only been observed in the northeast bottom trawl fisheries. From the period of 2008-2012, the estimated annual mortality attributed to this fishery was 7.8 minke whales for 2008 and zero minke whales from 2009-2012; no serious injuries were reported during this time (Waring *et al.* 2015). Based on this information, from 2008-2012, the estimated annual average minke whale mortality and serious injury attributed to the northeast bottom trawl fishery was 1.6 (CV=0.69) whales (Waring *et al.* 2015). Lyssikatos (2015) estimated that from 2008-2013, mean annual serious injuries and mortalities from the northeast bottom trawl fishery were 1.40 (CV=0.58) minke whales. Serious injury and mortality records for minke whales in U.S. waters from 2010-2014 showed zero interactions with bottom trawl (northeast or Mid-Atlantic) gear (Henry *et al.* 2016; Hayes *et al.* 2017).

Based on above information, trawl gear is likely to pose a low interaction risk to any large whale species. Should an interaction occur, serious injury or mortality to any large whale is possible; however, relative to other gear types discussed below (i.e., fixed gear), trawl gear represents a low source serious injury or mortality to any large whale.

_0000017145

*Purse Seine Gear*

Since 2008, three (3) humpback whales and one (1) unidentified (fin or sei) whale have been documented as interacting with purse seines, specifically those operating in the GOM targeting Atlantic herring (see: http://www.nefsc.noaa.gov/fsb/take_reports/nefop.html). All interactions; however, resulted in the animals being released from the nets unharmed (Waring et al. 2016; Hayes et al. 2017; Henry et al. 2015; http://www.nefsc.noaa.gov/fsb/take_reports/nefop.html).  Based on this information, although interactions are possible with large whales, purse seines are not expected to pose a serious injury or mortality risk to these species.

### Small Cetaceans and Pinnipeds

*Trawl (Bottom and Midwater) Gear*

Small cetaceans and pinnipeds are vulnerable to interactions with trawl (bottom or midwater) gear (Table 37).  Based on the 2017 MMPA LOF and the most recent five years of observer data (2010-2014), Table 54 provides a list of species that have been observed (incidentally) seriously injured and/or killed by List of Fisheries Category II trawl fisheries that operate in the affected environment of the Atlantic herring fishery ( Hayes *et al*. 2017; 82 FR 3655 (January 12, 2017)).

**TABLE 37.  SMALL CETACEAN AND PINNIPED SPECIES OBSERVED SERIOUSLY INJURED AND/OR KILLED BY TRAWL FISHERIES IN THE AFFECTED ENVIRONMENT OF THE AMENDMENT.**

| Fishery | Category | Species Reported Injured/Killed |
|---|---|---|
| **Mid-Atlantic Mid-Water Trawl (Including Pair Trawl)** | II | White-sided dolphin |
| | | Gray seal |
| | | Harbor seal |
| **Northeast Mid-Water Trawl (Including Pair Trawl)** | II | Short-beaked common dolphin |
| | | Long-finned pilot whales |
| | | Gray seal |
| | | Harbor seal |
| **Northeast Bottom Trawl** | II | Harp seal |
| | | Harbor seal |
| | | Gray seal |
| | | Long-finned pilot whales |
| | | Short-beaked common dolphin |
| | | White-sided dolphin |
| | | Harbor porpoise |
| | | Bottlenose dolphin (offshore) |
| | | Risso's dolphin |
| **Mid-Atlantic Bottom Trawl** | II | White-sided dolphin |

_0000017146

| Fishery | Category | Species Reported Injured/Killed |
|---------|----------|---------------------------------|
| | | Short-beaked common dolphin |
| | | Risso's dolphin |
| | | Bottlenose dolphin (offshore) |
| | | Gray seal |
| | | Harbor seal |
| Sources: Hayes et al. 2017; MMPA LOF 82 FR 3655 (January 12, 2017) | | |

*Atlantic Trawl Gear Take Reduction Strategy (ATGTRS).* In 2006, the Atlantic Trawl Gear Take Reduction Team (ATGTRT) was convened to address the incidental mortality and serious injury of long-finned pilot whales (*Globicephala melas*), short-finned pilot whales (*Globicephala macrorhynchus*), common dolphins (*Delphinus delphis*), and white sided dolphins (*Lagenorhynchus acutus*) incidental to bottom and midwater trawl fisheries operating in both the Northeast and Mid-Atlantic regions. Because none of the marine mammal stocks of concern to the ATGTRT are classified as a "strategic stock," nor do they currently interact with a Category I fishery, it was determined at the time that development of a take reduction plan was not necessary.[16]

In lieu of a take reduction plan, the ATGTRT agreed to develop an ATGTRS. The ATGTRS identifies informational and research tasks, as well as educational and outreach needs the ATGTRT believes are necessary, to provide the basis for decreasing mortalities and serious injuries of marine mammals to insignificant levels approaching zero mortality and serious injury rates. The ATGTRS also identifies several potential voluntary measures that can be adopted by certain trawl fishing sectors to potentially reduce the incidental capture of marine mammals. For additional details on the ATGTRS, please visit: http://www.greateratlantic.fisheries.noaa.gov/Protected/mmp/atgtrp/.

*Purse Seine Gear*

There have been no observed small cetacean interactions with purse seines used to prosecute any of the Council fisheries (primarily GOM Atlantic herring). As a result, this gear type is not expected to pose an interaction risk with small cetacean species, and therefore, is not expected to be source of serious injury or mortality to any small cetacean.

However, purse seines - specifically those operating in the Gulf of Maine targeting Atlantic herring - are known to interact with pinniped species. Since 2004, pinniped species have been observed in purse seine gear; however, none of these interactions have resulted in

---

[16] A strategic stock is defined under the MMPA as a marine mammal stock: for which the level of direct human-caused mortality exceeds the potential biological removal level; which, based on the best available scientific information, is declining and is likely to be listed as a threatened species under the ESA within the foreseeable future; or which is listed as a threatened or endangered species under the ESA, or is designated as depleted under the MMPA.

_0000017147

mortality or confirmed serious injury to the seal (Table 55; http://www.nefsc.noaa.gov/fsb/take_reports/nefop.html; Waring et al. 2014b,Hayes et al. 2017).  As a result, although interactions are possible with seals, purse seines are not expected to pose a significant serious injury or mortality risk to these species.  This conclusion is further supported by the fact that the MMPA LOF has identified the Gulf of Maine Atlantic herring purse seine fishery as a Category III fishery; a fishery that has a remote to no likelihood of causing serious injury or mortality to marine mammals .

**TABLE 38.  2004-2014 OBSERVED GRAY AND HARBOR SEAL INTERACTION WITH THE GOM ATLANTIC HERRING PURSE SEINE FISHERY**

| Seal Species | Number of Observed Interactions | Released Alive (No Serious Injury or Mortality) |
|---|---|---|
| Unknown | 16 | Yes |
| Harbor Seal | 21 | Yes |
| Gray Seal | 114 | Yes |

## Sea Turtles

*Bottom Trawl Gear*

Bottom trawl gear poses an interaction risk to sea turtles.  Sea turtle interactions with bottom trawl gear have been observed on Georges Bank, and in the Mid-Atlantic; however, most of the observed interactions have occurred in the Mid-Atlantic (Warden 2011a,b; Murray 2015). As no sea turtle interactions with bottom trawl gear have been observed in the Gulf of Maine, and few sea turtle interactions have been observed on Georges Bank, there is insufficient data available to conduct a robust model-based analysis on sea turtle interactions with bottom trawl gear in these regions or produce a bycatch estimate for these regions.  As a result, the following bycatch estimates are based on observed sea turtle interactions in bottom trawl gear in the Mid-Atlantic.

Bottom trawl gear poses an injury and mortality risk to sea turtles, specifically due to forced submergence (Sasso and Epperly 2006). Green, Kemp's ridley, leatherback, loggerhead, and unidentified sea turtles have been documented interacting (e.g., bycaught) with bottom trawl gear. However, estimates are available only for loggerhead sea turtles. Warden (2011a,b) estimated that from 2005-2008, the average annual loggerhead interactions in bottom trawl gear in the Mid-Atlantic[17] was 292 (CV=0.13, 95% CI=221-369), with an additional 61 loggerheads (CV=0.17, 95% CI=41-83) interacting with trawls,

---

[17] Warden (2011a) defined the Mid-Atlantic as south of Cape Cod, Massachusetts, to approximately the North Carolina/South Carolina border.

_0000017148

but released through a Turtle Excluder Device (TED).[18] The 292 average annual observable loggerhead interactions equates to approximately 44 adult equivalents (Warden 2011a,b). Most recently, Murray (2015) estimated that from 2009-2013, the total average annual loggerhead interactions in bottom trawl gear in the Mid-Atlantic[19] was 231 (CV=0.13, 95% CI=182-298); this equates to approximately 33 adult equivalents (Murray 2015). Bycatch estimates provided in Warden (2011a) and Murray (2015) are a decrease from the average annual loggerhead bycatch in bottom otter trawls during 1996-2004, which Murray (2008) estimated at 616 sea turtles (CV=0.23, 95% CI over the nine-year period: 367-890). This decrease is likely due to decreased fishing effort in high-interaction areas (Warden 2011a, b).

*Midwater Trawl Gear*

NEFOP and ASM observer data from 1989-2016 have recorded five sea turtle interactions with midwater trawl gear; the primary species landed during these interactions was tuna (NMFS NEFS FSB 2015, 2016, 2017). These takes were in the early 1990s in an experimental Highly Migratory Species fishery that no longer operates. No takes have been documents in other midwater trawl fisheries operating in the Greater Atlantic Region. Based on the best available information, sea turtle interactions in midwater trawl gear are expected to be rare.

*Purse Seine Gear*

Sea turtle interactions with this gear type are possible; however, based on available information (NMFS NEFSC FSB 2015, 2016, 2017), the risk of a sea turtle interacting with purse seine is low (i.e., only several sea turtle interactions observed since 1989). Sea turtle may be capture in the net and could become entangled in the mesh. Captured turtles can be released alive if they are quickly retrieved and removed from the net.

## Atlantic Sturgeon

*Bottom Trawl Gear*

Atlantic sturgeon interactions (i.e., bycatch) with bottom trawl gear have been observed since 1989; these interactions have the potential to result in the injury or mortality of Atlantic sturgeon (NMFS NEFSC FSB 2015, 2016, 2017). Three documents, covering three time periods, that use data collected by the Northeast Fisheries Observer Program to describe bycatch of Atlantic sturgeon in bottom trawl gear: Stein et al. (2004b) for 1989-2000; ASMFC (2007) for 2001-2006; and Miller and Shepard (2011) for 2006-2010; none

---

[18] TEDs allow sea turtles to escape the trawl net, reducing injury and mortality resulting from capture in the net. Approved TEDs are required in the shrimp and summer trawl fishery. For further information on TEDs see 50 CFR 223.206 and 68 FR 8456 (February 21, 2003).

[19] Murray 2015b defined the Mid-Atlantic as the boundaries of the Mid-Atlantic Ecological Production; roughly waters west of 71°W to the North Carolina/South Carolina border)

_0000017149

of these documents provide estimates of Atlantic sturgeon bycatch by Distinct Population Segment. Miller and Shepard (2011), the most recent of the three documents, analyzed fishery observer data and VTR data in order to estimate the average annual number of Atlantic sturgeon interactions in otter trawl in the Northeast Atlantic that occurred from 2006 to 2010. This timeframe included the most recent, complete data and as a result, Miller and Shepard (2011) is considered to represent the most accurate predictor of annual Atlantic sturgeon interactions in the Northeast bottom trawl fisheries (NMFS 2013).

Based on the findings of Miller and Shepard (2011), NMFS (2013) estimated that the annual bycatch of Atlantic sturgeon in bottom trawl gear to be 1,342 sturgeon. Miller and Shepard (2011) reported observed Atlantic sturgeon interactions in trawl gear with small (< 5.5 inches) and large (≥ 5.5 inches) mesh sizes and concluded that, based on NEFOP observed sturgeon mortalities, relative to gillnet gear, bottom trawl gear posed less risk of mortality to Atlantic sturgeon. Estimated mortality rates in gillnet gear were 20.0%, while those in otter trawl gear were 5.0% (Miller and Shepard 2011; NMFS 2013). Similar conclusions were reached in Stein *et al.* (2004b) and ASMFC (2007) reports; after review of observer data from 1989-2000 and 2001-2006, both studies concluded that observed mortality is much higher in gillnet gear than in trawl gear. However, an important consideration to these findings is that observed mortality is considered a minimum of what actually occurs and therefore, the conclusions reached by Stein *et al.* (2004b), ASMFC (2007), and Miller and Shepard (2011) are not reflective of the total mortality associated with either gear type. To date, total Atlantic sturgeon mortality associated with gillnet or trawl gear remains uncertain.

*Midwater Trawl Gear*

To date, there have been no observed/documented interactions with Atlantic sturgeon with midwater trawl gear (NMFS NEFSC FSB 2015, 2016, 2017).  Based on this information, midwater trawl gear is not expected to pose a significant interaction risk to any Atlantic sturgeon and therefore, is not expected to be a source of serious injury or mortality to this species.

*Purse Seine Gear*

Capture of sturgeon in purse seine gear type is possible; however, interactions have been extremely rare over the past 27 years.  NEFOP and ASM observer data from 1989-2016 have recorded two Atlantic sturgeon interactions with purse seine gear targeting Atlantic herring in the GOM (NMFS NEFSC FSB 2015, 2016, 2017).  These interactions were recorded in 2004 and 2005, prior to the listing of Atlantic sturgeon under the ESA.  Based on this information, although Atlantic sturgeon interactions with purse seine gear are possible, the risk of an interaction is expected to be low.

_0000017150

**Atlantic Salmon**

*Bottom Trawl Gear*

According to the Biological Opinion issued by NMFS Greater Atlantic Regional Fisheries Office on December 16, 2013, NMFS NEFSC NEFOP and ASM program documented a total of 15 individual salmon incidentally caught on over 60,000 observed commercial fishing trips from 1989 through August 2013 (NMFS 2013; Kocik et al. 2014). Four out of the 15 individuals were observed bycaught in bottom otter trawl gear, the remainder were observed in gillnet gear (Kocik NEFSC, pers. comm (February 11, 2013) in NMFS 2013). This information suggests that interactions with Atlantic salmon are rare events (NMFS 2013; Kocik et al. 2014). Since 2013, no additional Atlantic salmon have been observed in gillnet or bottom trawl (NMFS NEFSC FSB 2015, 2016, 2017). Based on the above information, interactions with Atlantic salmon are likely rare (NMFS 2013; Kocik *et al.* 2014).

*Midwater Trawl and Purse Seine Gear*

To date, there have been no observed/documented interactions with Atlantic salmon and midwater trawl or purse seine gear (NMFS NEFSC FSB 2015, 2016, 2017). Based on this information, midwater trawl and purse seine gear are not expected to pose an interaction risk to any Atlantic salmon and therefore, are not expected to be source of serious injury or mortality to this species.

## 3.1.5 HUMAN COMMUNITIES

### 3.1.5.1 ATLANTIC HERRING FISHERY INFORMATION

The following information is adapted from Framework Adjustment 4 to the Atlantic Herring FMP (NEFSC, 2015). Additional description of the herring fishery is included in section 3.1.1.2 of this document.

The herring resource is managed as one stock complex, but this stock is thought to be composed of inshore and offshore components that segregate during spawning. In recognition of the spatial structure of the herring resource, the herring annual catch limit (ACL) is divided into sub-ACLs and assigned to four herring management areas. Area 1 is the Gulf of Maine (GOM) divided into an inshore (Area 1A) and offshore section (Area 1B); Area 2 is located in the coastal waters between MA and NC, and Area 3 is on Georges Bank (GB) (Figure 2).

_0000017151



**FIGURE 2. ATLANTIC HERRING MANAGEMENT AREAS.**

The Atlantic herring fishery is generally prosecuted south of New England in Area 2 during the winter (January-April), and oftentimes as part of the directed mackerel fishery. There is overlap between the herring and mackerel fisheries in Area 2 and in Area 3 during the winter months, although catches in Area 3 tend to be relatively low. The herring summer fishery (May-August) is generally prosecuted throughout the GOM in Areas 1A, 1B and in Area 3 (GB) as fish are available. Restrictions in Area 1A have pushed the fishery in the inshore GOM to later months (late summer). The midwater trawl (single and paired) fleet is restricted from fishing in Area 1A in the months of January through September because of the Area 1A sub-ACL split (0% January-May) and the purse seine-fixed gear only area (all of Area 1A) that is effective June-September. A sub-ACL split for Area 1B (0% January-April, 100% May-December) is effective for all vessels during the 2014 and 2015 fishing years.

Fall fishing (September-December) tends to be more variable and dependent on fish availability; the Area 1A inshore Gulf of Maine sub-ACL is always fully utilized, and the fishery usually closes sometime around November. Once the 1A and 1B quotas are taken, larger vessels become increasingly dependent on offshore fishing opportunities (Georges Bank, Area 3).

Businesses related to the Atlantic herring fishery include fishing vessel owners and employees (captains/crew) and herring dealers and processors. Refer to the Herring

_0000017152

Amendment 5 FEIS (Section 4.5) for information in addition to that provided in the following subsections.

The 2013-2015 Atlantic herring fishery specifications were approved by NMFS concurrently with Framework 2 to the Herring FMP, which allows the Council to split sub-ACLs seasonally (by month) and establishes provisions for the carryover of some un-utilized sub-ACL during the specifications process. The specifications summarized below in Table 39 are effective for the 2013-2015 fishing years (initial allocations, not including overage deductions, carryovers, or set-aside deductions).

**TABLE 39. 2016-2018 ATLANTIC HERRING FISHERY SPECIFICATIONS (INITIAL ALLOCATIONS).**

|  | 2016-2018 |
|---|---|
| **Overfishing Limit** | 138,000 – 2016<br>117,000 – 2017<br>111,000 – 2018 |
| **Acceptable Biological Catch (ABC)** | 111,000 |
| **Optimum Yield/ACL** | 104,800* |
| **Domestic Annual Harvest (DAH)** | 104,800 |
| **Border Transfer** | 4,000 |
| **Domestic Annual Processing (DAP)** | 100,800 |
| **U.S. At-Sea Processing (USAP)** | 0 |
| **Area 1A Sub-ACL** | 30,300* |
| **Area 1B Sub-ACL** | 4,500 |
| **Area 2 Sub-ACL** | 29,100 |
| **Area 3 Sub-ACL** | 40,900 |
| **Fixed Gear Set-Aside** | 295 |
| **Research Set-Aside** | 3 percent of each sub-ACL |
| * If New Brunswick weir fishery catch harvested through October 1 is less than 4,000 mt, then 1,000 mt will be subtracted from the management uncertainty buffer and added to the ACL and Area 1A Sub-ACL. | |

## Atlantic Herring Catch

The Atlantic herring ACL and management area sub-ACLs are tracked/ monitored based on the total catch – landings and discards – which are provided and required by herring permitted vessels through daily VMS and weekly VTRs as well as through Federal/state dealer data.  Herring harvesters are required to report discards in addition to landed catch through these independent methods.

_0000017153

NMFS' catch estimation methods for the Atlantic herring fishery are described in detail in both Framework Adjustment 2 and Framework Adjustment 3 to the Atlantic Herring FMP (see Section 3.6.1 of Framework 3, NEFMC 2014).

Table 40 summarizes recent Atlantic herring catch estimates by year and management area from 2004-2014.  The following bullets describe how these estimates were derived:
- 2004-2006 herring catch estimates are provided from quota management implemented by NMFS through the Atlantic Herring FMP and are based on interactive voice reporting (IVR) data from the call-in system used to monitor TACs. Reported herring discards are included in the totals.
- 2007-2009 herring catch estimates are based on IVR data supplemented with dealer data.  Reported discards are included in the totals.
- 2010-2014 Atlantic herring catch estimates are based on a comprehensive methodology developed by NMFS in response to Amendment 4 provisions and the need to better monitor sub-ACLs.  The methodology for estimating catch is based on landings data obtained from dealer reports (Federal and State) supplemented with VTRs (Federal and State of Maine) and VMS catch reports with the addition of discard data from extrapolated observer data.

**TABLE 40.  ATLANTIC HERRING CATCH BY YEAR AND MANAGEMENT AREA, 2004-2014**

| Year | Area (sub-ACL) | Catch (mt) | Quota (mt) | Percent of quota caught |
|------|----------------|-----------|-----------|-------------------------|
| 2004 | 1A | 60,095 | 60,000 | 100% |
|      | 1B | 9,044 | 10,000 | 90% |
|      | 2 | 12,992 | 50,000 | 26% |
|      | 3 | 11,074 | 60,000 | 18% |
| 2005 | 1A | 61,102 | 60,000 | 102% |
|      | 1B | 7,873 | 10,000 | 79% |
|      | 2 | 14,203 | 30,000 | 47% |
|      | 3 | 12,938 | 50,000 | 26% |
| 2006 | 1A | 59,989 | 60,000 | 100% |
|      | 1B | 13,010 | 10,000 | 130% |
|      | 2 | 21,270 | 30,000 | 71% |
|      | 3 | 4,445 | 50,000 | 9% |
| 2007 | 1A | 49,992 | 50,000 | 100% |
|      | 1B | 7,323 | 10,000 | 73% |
|      | 2 | 17,268 | 30,000 | 58% |
|      | 3 | 11,236 | 55,000 | 20% |
| 2008 | 1A | 42,257 | 43,650 | 97% |
|      | 1B | 8,671 | 9,700 | 89% |
|      | 2 | 20,881 | 30,000 | 70% |

_0000017154

| Year | Area (sub-ACL) | Catch (mt) | Quota (mt) | Percent of quota caught |
|------|----------------|------------|------------|-------------------------|
|      | 3 | 11,431 | 60,000 | 19% |
| 2009 | 1A | 44,088 | 43,650 | 101% |
|      | 1B | 1,799 | 9,700 | 19% |
|      | 2 | 28,032 | 30,000 | 93% |
|      | 3 | 30,024 | 60,000 | 50% |
| 2010 | 1A | 28,424 | 26,546 | 107% |
|      | 1B | 6,001 | 4,362 | 138% |
|      | 2 | 20,831 | 22,146 | 94% |
|      | 3 | 17,596 | 38,146 | 46% |
| 2011 | 1A | 30,676 | 29,251 | 105% |
|      | 1B | 3,530 | 4,362 | 81% |
|      | 2 | 15,001 | 22,146 | 68% |
|      | 3 | 37,038 | 38,146 | 97% |
| 2012 | 1A | 24,302 | 27,668 | 88% |
|      | 1B | 4,307 | 2,723 | 158% |
|      | 2 | 22,482 | 22,146 | 102% |
|      | 3 | 39,471 | 38,146 | 103% |
| 2013 | 1A | 29,820 | 29,775 | 100% |
|      | 1B | 2,458 | 4,600 | 53% |
|      | 2 | 27,569 | 30,000 | 92% |
|      | 3 | 37,833 | 42,000 | 90% |
| 2014 | 1A | 32,898 | 33,031 | 100% |
|      | 1B | 4,399 | 2,878 | 153% |
|      | 2 | 19,626 | 28,764 | 68% |
|      | 3 | 36,323 | 39,415 | 92% |

*Source: NMFS*

Table 41 summarizes total Atlantic herring catch as a percentage of the total available catch in each year from 2003-2014 based on NMFS catch estimation methods. Atlantic herring catch has been somewhat consistent over the time period (and in previous years), averaging about 91,500 mt, with the highest catch of the time series observed in 2009 and lowest in 2008. However, the quota allocated to the fishery (stockwide ACL/OY) has decreased 50% over the ten-year period. The herring fishery has therefore become more fully utilized in recent years and utilized 100% of the total ACL in 2012. The 2013-2015 Atlantic herring fishery specifications increased the stockwide Atlantic herring ACL available to the fishery by more than 15,000 mt; an additional 7,000 mt was caught under the higher quota in 2013, and overall, the fishery utilized 92% of the stockwide herring ACL.

_0000017185

**TABLE 41. TOTAL ANNUAL ATLANTIC HERRING CATCH 2003-2014**

| Year | Total Herring Catch (mt) | Total quota allocated (mt) | Percent of total quota caught |
|------|------|------|------|
| 2003 | 101,607 | 180,000 | 57% |
| 2004 | 93,205 | 180,000 | 52% |
| 2005 | 96,116 | 150,000 | 64% |
| 2006 | 98,714 | 150,000 | 66% |
| 2007 | 85,819 | 145,000 | 59% |
| 2008 | 83,240 | 143,350 | 58% |
| 2009 | 103,943 | 143,350 | 73% |
| 2010 | 72,852 | 91,200 | 80% |
| 2011 | 86,245 | 93,905 | 92% |
| 2012 | 90,561 | 90,683 | 100% |
| 2013 | 97,680 | 106,375 | 92% |
| 2014 | 93,247 | 104,088 | 90% |

*Source: NMFS*

## Atlantic Herring Vessels

This section provides summary information regarding the vessels participating in the Atlantic herring fishery from 2008-2014. Additional information can be found in the FEIS for Amendment 5 to the Herring FMP. In this section, a herring trip is defined broadly as any trip in which at least one pound of Atlantic herring is retained.

## Atlantic Herring Permits

Atlantic herring vessel permit categories are: Category A limited access all management areas; Category B limited access Areas 2 and 3 only; Category C limited access incidental catch of 55,000 lb per trip; Category D open access incidental catch of 6,600 lb per trip; and Category E limited access mackerel vessels that did not qualify for a limited access herring permit with a 20,000 lb herring possession limit in Areas 2/3. At this time, Category A and B vessels comprise the majority of the directed herring fishery. Many of the Category A, B, and C (limited access) vessels are also active in the Atlantic mackerel fishery (managed by the MAFMC). Approximately 50 vessels generally own a Category E permit.

Aside from a small increase in 2013, the number of vessels with either a limited access or an open access Atlantic herring permit has decreased annually since 2008 (Table 59). This includes a general annual decrease in limited access directed fishery vessels (Categories A and B), with a low of 40 vessels permitted in 2012. One cause could have been the substantial cuts in herring catch limits from prior levels beginning with the 2010-2012 specifications.

In 2014, 28 of the 43 (65%) Category A and B vessels were active (defined broadly as landing at least one pound of Atlantic herring during the fishing year). For the Category C

vessels, 9 of 42 (23%) were active. Just 55 of the 1,842 (3%) Category D vessels were active. Although there have been far fewer active limited access versus open access vessels, data presented in the remainder of this section show that the limited access fishery comprises over 99% of the fishery in terms of revenues.

**TABLE 42. FISHING VESSELS WITH FEDERAL ATLANTIC HERRING PERMITS, 2009-2014**

| Permit Category | | A | B,C | C | Total LA | D |
|---|---|---|---|---|---|---|
| 2009 | All | 44 | 4 | 51 | 99 | 2,373 |
| | Active | 29 | 3 | 15 | 47 | 78 |
| 2010 | All | 42 | 4 | 49 | 95 | 2,277 |
| | Active | 29 | 3 | 19 | 51 | 99 |
| 2011 | All | 38 | 4 | 44 | 86 | 1,991 |
| | Active | 29 | 2 | 10 | 41 | 84 |
| 2012 | All | 36 | 4 | 41 | 81 | 1869 |
| | Active | 24 | 3 | 13 | 40 | 80 |
| 2013 | All | 40 | 4 | 44 | 88 | 1,909 |
| | Active | 25 | 3 | 15 | 43 | 76 |
| 2014 | All | 39 | 4 | 42 | 85 | 1,842 |
| | Active | 26 | 2 | 9 | 37 | 55 |

*Source: NMFS Permit database and VTR database*
*Notes: Active vessels are defined as having landed at least one pound of Atlantic herring. This includes pair trawl vessels whose partner vessels landed the catch. Permit data for 2009-2011 are as of November 2012. Permit data for 2012-2013 are as of August 23, 2013.*

**Atlantic Herring Fishing Gear**

Atlantic herring vessels primarily use purse seines, single midwater trawls or midwater pair trawls for fishing gear, with the combined single and pair midwater trawl fleet harvesting the majority of landings from 2008 to 2014 (70%; Tables 60 and 61). Some vessels use multiple fishing areas. The midwater trawl fleet uses all management areas, while the purse seine fishery focuses in Area 1A. Small mesh bottom otter trawls comprise about 5% of the fishery, and other gear types (e.g., pots, traps, shrimp trawls, handlines) comprise less than 1% of the herring fishery.

Table 60, 61 and 62 show the distribution of Atlantic herring landings by gear type, permit category, and management area. The data indicate that the vast majority of midwater trawl vessels are Category A permit holders. All pair trawl vessels possess Category A permits, and a small number of single midwater trawl vessels have both Category B and C herring permits.

_0000017157

**TABLE 43. FISHING GEAR DISTRIBUTION OF TOTAL HERRING LANDINGS FROM ATLANTIC HERRING MANAGEMENT AREAS (2008-2011)**

| Gear Type | Area 1A (mt) | Area 1B (mt) | Area 2 (mt) | Area 3 (mt) | Total |
|---|---|---|---|---|---|
| Single Midwater Trawl | 6,340 (5%) | 3,246 (17%) | 4,886 (5%) | 12,830 (14%) | **27,302 (8%)** |
| Midwater Pair Trawl | 56,769 (43%) | 12,612 (64%) | 68,336 (76%) | 78,518 (86%) | **216,235 (65%)** |
| Purse Seine | 69,074 (52%) | 3,696 (19%) | 2,221 (2%) | 0 (0%) | **74,991 (22%)** |
| Small Mesh Bottom Trawl | 463 (0.3%) | * (0%) | 14,288 (16%) | 117 (0.1%) | **14,869 (4%)** |
| Other | 817 (0.6%) | 0 (0%) | 17 (0%) | * (0%) | **834 (0.2%)** |
| Total | **133,463 (100%)** | **19,555 (100%)** | **89,748 (100%)** | **91,466 (100%)** | **334,231 (100%)** |

*Data Confidentiality Concern
Source: VTR database. Data are updated as of September, 2012.

**TABLE 44. FISHING GEAR DISTRIBUTION OF TOTAL HERRING LANDINGS FROM ATLANTIC HERRING MANAGEMENT AREAS (2012-2014)**

| Gear Type | Area 1A (mt) | Area 1B (mt) | Area 2 (mt) | Area 3 (mt) | Total |
|---|---|---|---|---|---|
| Single and Pair Midwater Trawl | 14,677 (18%) | 9,068 (34%) | 44,746 (100%) | 110,227 (100%) | **178,718 (67%)** |
| Purse Seine | 68,409 (82%) | 310 (1%) | 0 (0%) | 0 (0%) | **68,719 (26%)** |
| Small Mesh Bottom Trawl | 534 (1%) | 16,967 (64%) | 0 (0%) | 267 (0%) | **17,768 (7%)** |
| Other | 3 (0%) | 0 (0%) | 3 (0%) | 0 (0%) | **6 (0%)** |
| Total | **83,623 (100%)** | **26,345 (100%)** | **44,749 (100%)** | **110,494 (100%)** | **265,211 (100%)** |

Source: VTR database. Data are updated as of August 2015.

_0000017158

**TABLE 45. FISHING GEAR DISTRIBUTION OF HERRING LANDINGS BY PERMIT CATEGORY (2008-2011)**

| Gear Type | Category A (mt) | Category B/C (mt) | Category C (mt) | Category D (mt) | Total |
|---|---|---|---|---|---|
| Single Midwater Trawl | 26,915 (8%) | 383 (9%) | 0 (0.0%) | 5 (0%) | 27,302 (8%) |
| Midwater Pair Trawl | 216,235 (66%) | 0 (0%) | 0 (0.0%) | 0 (0%) | 216,235 (65%) |
| Purse Seine | 73,261 (22%) | 0 (0%) | 1,350 (62%) | 514 (41%) | 74,991 (22%) |
| Small Mesh Bottom Trawl | 9,922 (3%) | 3,990 (91%) | 538 (25%) | 418 (34%) | 14,869 (4%) |
| Other | 249 (0%) | 0 (0%) | 278 (13%) | 307 (25%) | 834 (0%) |
| Total | 326,583 (100%) | 4,373 (100%) | 2,166 (100%) | 1,244 (100%) | 334,365 (100%) |

## Atlantic Herring Prices

Average Atlantic herring prices have increased from approximately $221/mt in 2009 to approximately $300/mt in 2012. For January-June 2013, herring prices averaged $306/mt. Figure 3 plots the monthly average nominal prices for Atlantic herring, omitting December of 2011 and 2012 (prices were quite high during these months, but quantities were very low, and these months are not representative of normal operating conditions for the directed herring fishery).



**FIGURE 3. MONTHLY AVERAGE PRICE PER METRIC TON FOR ATLANTIC HERRING.**

_0000017159

### Atlantic Herring Fishing Communities

In this document, for the purposes of gaining a better perspective on the nature of the Atlantic herring fishery and the character of the affected human environment, a broader interpretation of fishing community has been applied to include almost all communities with a substantial involvement in or dependence on the Atlantic herring fishery. In terms of National Standard 8 (NS 8), some of the communities identified in this section may not fit the strict interpretation of the criteria for substantial dependence on fishing. The fishing communities that meet the legal definition (as promulgated through NS 8) are likely to be considered a subset of the broader group of communities of interest that are engaged in the herring fishery and identified in this document. A description concerning NS 8 is seen below.

In the 1996 amendments to the MSA, Congress added provisions directly related to social and economic factors for consideration by Councils and NMFS. NS 8 of the MSA states that:

*Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.*

NS 8 requires the consideration of impacts on fishing communities. Section 316 of MSA defines a fishing community as:

*"A community which is substantially dependent on or substantially engaged in the harvesting or processing of fishery resources to meet social and economic needs, and includes fishing vessel owners, operators, and crew and United States fish processors that are based in such community."*

Because herring is widely used as bait for the lobster fishery, especially in Maine, it is not practical to identify every community with substantial involvement in the lobster fishery (and consequently some level of dependence on the herring fishery) for assessment in this document. However, some of the communities of interest were selected, in part, because of their involvement in or dependence on the lobster fishery. Assessment of the impacts of the Amendment 1 measures on these communities should provide enough context to understand the potential impacts on any community with substantial involvement in the lobster fishery. Parallels can be drawn between the communities that are identified in this section and other similar communities engaged in the lobster fishery.

NS 8 requires the Council to consider the importance of fishery resources to affected communities and provide those communities with continuing access to fishery resources, but it does not allow the Council to compromise the conservation objectives of the management measures. "Sustained participation" is interpreted as continued access to the fishery within the constraints of the condition of the resource.

_0000017160

## Atlantic Herring Communities of Interest

The following five criteria were used in Amendments 1 and 5 to the Herring FMP to define *Communities of Interest* for the Atlantic herring fishery, which must meet at least one criterion:

1. Atlantic herring landings of at least 10M pounds (4,536 mt) per year from 1997-2008, or anticipated landings above this level based on interviews and documented fishery-related developments.
2. Infrastructure dependent in part or whole on Atlantic herring.
3. Dependence on herring as lobster and/or tuna bait.
4. Geographic isolation in combination with some level of dependence on the Atlantic herring fishery.
5. Utilization of Atlantic herring for value-added production.

Based on the above criteria, there are 11 *Communities of Interest* for the Atlantic herring fishery, identified below and further evaluated in Amendment 5 to the FMP for Atlantic Herring (Section 4.5.3).  Also, community profiles of each are available from the NEFSC Social Sciences Branch website (Clay et al. 2007).  Since Amendment 1, this list has changed slightly with changes in harvesting and processing sectors.

1. Portland, Maine
2. Rockland, Maine
3. Stonington/Deer Isle, Maine
4. Vinalhaven, Maine
5. Lubec/Eastport, Maine
6. Sebasco Estates, Maine
7. NH Seacoast (Newington, Portsmouth, Hampton/Seabrook)
8. Gloucester, Massachusetts
9. New Bedford, Massachusetts
10. Southern Rhode Island (Point Judith, Newport, North Kingstown)
11. Cape May, New Jersey

## Atlantic Herring Home Ports

Of the Atlantic herring *Communities of Interest*, Gloucester, New Bedford, Southern RI, and Cape May are homeports with largest concentrations of vessels that have Atlantic Herring Category A or B limited access permits (Table 63).  Mid-Coast ME, Portland ME, and Seacoast NH also are home to a few of these permit holders.  Beyond the communities of interest, a few Category A and B permit holders have homeports in Bath, Cundys Harbor, Hampden, Owls Head, and West Rockport ME; Boston and Woods Hole MA; and Wanchese NC.  For the most part, these vessels use a community of interest as a landing port (NMFS 2012).

The communities of interest also reflect concentrated locations of other stakeholders who rely on herring as a secondary resource.  Examples include lobster fishing industry members who use herring for bait, and tuna fishermen and whale watch companies that rely on herring as forage to attract their target species.

_0000017161

**TABLE 46. DISTRIBUTION OF 2012 ATLANTIC HERRING PERMIT HOLDERS THAT HAVE AN ATLANTIC HERRING COMMUNITY OF INTEREST AS A HOMEPORT**

| Homeport | | Permit Category | | | | |
|---|---|---|---|---|---|---|
| | | A | B,C | C | D | Total |
| **Maine** | Portland | 2 | 0 | 1 | 36 | 39 |
| | Rockland | 1 | 0 | 0 | 3 | 4 |
| | Stonington/Deer Isle | 1 | 0 | 0 | 0 | 1 |
| | Vinalhaven | 0 | 0 | 0 | 2 | 2 |
| | Lubec/Eastport | 0 | 0 | 0 | 2 | 2 |
| | Sebasco Estates | 0 | 0 | 0 | 3 | 3 |
| | Maine, other | 5 | 0 | 5 | 180 | 190 |
| **New Hampshire** | Seacoast | 2 | 0 | 4 | 90 | 96 |
| **Massachusetts** | Gloucester | 5 | 0 | 2 | 155 | 162 |
| | New Bedford | 5 | 0 | 2 | 195 | 202 |
| | Massachusetts, other | 5 | 1 | 1 | 356 | 363 |
| **Rhode Island** | Southern | 3 | 3 | 7 | 115 | 128 |
| **New Jersey** | Cape May | 6 | 0 | 8 | 85 | 99 |
| | New Jersey, other | 0 | 0 | 0 | 184 | 184 |
| **Other States** | | 1 | 0 | 11 | 463 | 475 |

*Source: NMFS*

## Atlantic Herring Landing Ports

Atlantic herring harvested from Areas 1A and 1B are landed in fishing communities in Maine, New Hampshire, and Massachusetts, whereas herring from Areas 2 and 3 are landed in a wider range of ports (Table 64). Communities in Rhode Island and New Jersey fish for herring almost exclusively in Area 2. Portland, Rockland, Gloucester, and New Bedford are ports with the most herring landings in recent years. Within New Jersey, Cape May is the most active landing port.

**TABLE 47. ATLANTIC HERRING LANDING DISTRIBUTION BY PORT AND MANAGEMENT AREA**

| Landing Port | | Area 1A | Area 1B | Area 2 | Area 3 |
|---|---|---|---|---|---|
| **Maine** | Portland | 25% | 20% | 0% | 26% |
| | Rockland | 27% | 14% | 0% | 11% |
| | Stonington/Deer Isle | 8% | 12% | 0% | 0% |
| | Vinalhaven | 1.7% | 3.9% | 0% | 2.3% |

_0000017162

| Landing Port | | Area 1A | Area 1B | Area 2 | Area 3 |
|---|---|---|---|---|---|
| | Lubec/Eastport | 0% | 0% | 0% | 0% |
| | Sebasco Estates | 0% | 0% | 0% | 0% |
| | Maine, other | 6.1% | 1.1% | 0% | 4% |
| **New Hampshire** | Seacoast | 2.5% | 0.7% | 0.1% | 0.9% |
| **Massachusetts** | Gloucester | 22% | 45% | 10% | 44% |
| | New Bedford | 6.9% | 4.4% | 53% | 12% |
| | Massachusetts, other | 1.1% | 0.1% | 3.6% | 0% |
| **Rhode Island** | Southern | 0% | 0% | 22% | 0.1% |
| **New Jersey** | Cape May | 0% | 0% | 12% | 0% |
| | New Jersey, other | 0% | 0% | 0% | 0% |
| **Other States** | | 0% | 0% | 0.1% | 0% |
| Total | | 163,269 (100%) | 23,289 (100%) | 101,542 (100%) | 133,368 (100%) |

*Source: NMFS*

## Atlantic Herring Community Descriptions

### 1. Portland, Maine

Portland is the largest city in Maine, with a population of 66,194 (Bureau 2010).  Of the civilian employed population 16 years and older, 0.3% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (29.3%) is the largest industry sector (Bureau 2011).  Portland's waterfront provides most of the community's fishing industry infrastructure (e.g., Portland Fish Exchange) alongside other industries including recreation, tourism, light industry, transportation, cargo, and marine-related research.  Portland's landings come primarily from the large mesh groundfish species and from lobster.  Herring brings in about 8.6% of the dollar value of landings in Portland.  Portland ranked third in herring landings in the region, taking a six-year (2005-2010) average (13.5K mt).  Taking a four-year average (2007-2010), Portland ranked fourth among ports with herring revenue ($3.1M) (Dealer and VTR data).

### 2. Rockland, Maine

Rockland has a total population of 7,297 (Bureau 2010).  Of the civilian employed population 16 years and older, 3.1% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (18.3%) is the largest industry sector (Bureau 2011).  Other than fishing and boat building/repair, other stabilizing businesses include furniture and playground equipment manufacturing, biotechnology industries, wholesale distribution, marine-related businesses, seaweed processing, metal fabricating, and food related industries.

_0000017163

Rockland's landings consist primarily of lobster and herring. Herring brings in about 36% of the dollar value of landings in Rockland. Rockland ranked fourth in herring landings in the region, with a six-year (2005-2010) average (12.5K mt). Taking a four-year average (2007-2010), Rockland ranked second among ports with herring revenue ($3.4M), though 2009 and 2010 revenues were noticeably lower (Dealer and VTR data).

## 3. Stonington/Deer Isle, Maine

Stonington and Deer Isle have a total population of 3,018 (Bureau 2010). Of the civilian employed population 16 years and older, 29% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average). This is the largest industry sector (Bureau 2011). Deer Isle is home to the Commercial Fisheries News, the widely-read monthly fishing industry newspaper for the Atlantic coast. Stonington is one of the few Maine fishing communities that have secured waterfront access for commercial fishing, because property values have remained stable relative to other coastal cities. Stonington's landings come primarily from lobster. Herring brings in about 0.10% of the dollar value of landings in Stonington and Deer Isle. Stonington and Deer Isle landed 3.9K mt of herring on average over six years (2005-2010). Taking a four-year average (2007-2010), Stonington ranked fifth among ports with herring revenue ($1.0M), though 2009 and 2010 revenues were noticeably lower (Dealer and VTR data). Stonington and Deer Isle are involved in the Atlantic herring fishery primarily through their dependence on herring for lobster bait.

## 4. Vinalhaven, Maine

The island town of Vinalhaven has a total population of 1,165 (Bureau 2010). Of the civilian employed population 16 years and older, 32.4% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average). This is the largest industry sector (Bureau 2011). Vinalhaven is intimately involved with the Atlantic herring fishery because of its dependence on herring for lobster bait. Many of the year-round residents are participants in the lobster fishery. Several lobster bait dealers, including floating stations and a co-op, are located in Vinalhaven. Vinalhaven has several packaging and wholesale companies (including Vinalhaven Lobster Co., Vinalhaven Fishermen's Co-op, Inland Seafood, and Alfred Osgood) that ship lobster to Portland and other mainland locations for processing and distribution. Bait dealers on Vinalhaven pay a higher price for bait than dealers on the mainland. This is due to the limited bait storage capacity on the island and insufficient space bait transshipments on the ferry that transports goods and people from the mainland during the height of the lobster season. Herring brings in about 2.7% of the dollar value of landings in Vinalhaven. Vinalhaven ranked ninth in herring landings in 2004 (2,674 mt) and tenth cumulatively from 1995-2004 (24,779 mt).

## 5. Lubec/Eastport, Maine

Lubec and Eastport have a total population of 2,690 (Bureau 2010). Of the civilian employed population 16 years and older, 5.4% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average). Educational services and health care and social assistance (31%) is the largest industry sector (Bureau 2011). Lubec and

_0000017164

Eastport have a diversity of employment, including medical centers, schools, an apparel company, and an Atlantic salmon aquaculture facility.  Eastport also has the only nori seaweed processing plant in the USA. Eastport and Lubec are involved in a diversity of fisheries, including lobster, scallops, urchins, clams, and sea cucumbers.  No herring landings were reported in Lubec/Eastport in 2004.  Lubec and Eastport are representative of geographically isolated small ports that depend on herring for lobster bait.

6. Sebasco Estates, Maine

Sebasco Estates is a small village within the town of Phippsburg, which has a total population of 2,216 (Bureau 2010).  Of the civilian employed population of Phippsburg 16 years and older, 5.2% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (22.6%) is the largest industry sector (Bureau 2011).  Herring brings in about 0.076% of the dollar value of landings in Sebasco Estates.  Several lobster bait dealers, large and small, are located in this area.  Sebasco Estates is involved in the Atlantic herring fishery primarily due to its dependence on herring for lobster bait, and is representative of small ports that depend on herring for lobster bait.

7. NH Seacoast – Newington, Portsmouth, Hampton/Seabrook

Newington has a total population of 753 (Bureau 2010).  Of the civilian employed population of Newington 16 years and older, 1.0% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (15.8%) is the largest industry sector (Bureau 2011).  Major employers in Newington include Fox Run Mall (retail) and Neslab (light manufacturing lab equipment).  Herring brings in about 4.8% of the dollar value of landings in Newington.  Newington ranked fifth in herring landings in 2004 (5,660 mt) and 12th cumulatively from 1995-2004 (16,805 mt), with herring landings increasing in more recent years.  Newington is primarily dependent on the herring fishery because of the bait it provides for lobster operations based in Great Bay estuary.  Commercial fisheries in the Great Bay estuary include herring, alewives, mummichogs (*Fundulus sp.*) and tomcod, eels, and smelt.  Newington has several large and small herring bait dealers, and freezer facilities to store lobster bait.  The Little Bay Lobster Company and the Shafmaster Fleet Services both harvest and deliver lobster nationally and internationally.  The Newington fishing industry also competes with other water-dependent industries, including tallow, steel scrap, and wood chip export industries.

Portsmouth has a total population of 20,779 (Bureau 2010).  Of the civilian employed population of Portsmouth 16 years and older, 0.7% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (25.5%) is the largest industry sector (Bureau 2011).  Portsmouth is somewhat involved in the herring fishery, primarily through its dependence on herring for lobster and tuna bait.  Herring brings in about 1.2% of the dollar value of landings in Portsmouth.  The port is centrally-located with good transportation

_0000017165

infrastructure and provides other fishing related services.  Portsmouth ranked 13th in herring landings in 2004 (800 mt) and 11th cumulatively from 1995-2004 (18,060 mt).

Hampton and Seabrook have a total population of 24,123 (Bureau 2010).  Of the civilian employed population 16 years and older, 0.5% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (21.5%) and retail trade (21.8%) are the largest industry sectors, in Hampton and Seabrook, respectively (Bureau 2011).  Hampton and Seabrook are somewhat involved in the herring fishery through their dependence on herring for lobster and tuna bait.  Herring brings in about 0.2% of the dollar value of landings in Hampton and Seabrook.  Only 2 mt of herring were reported to have been landed in Hampton in 2004. Seabrook ranked 17th in herring landings in 2004 (96 mt).

8. Gloucester, Massachusetts

Gloucester has a total population of 28,789 (Bureau 2010).  Of the civilian employed population of Gloucester 16 years and older, 2.2% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (25.5%) is the largest industry sector (Bureau 2011). Herring brings in about 11% of the dollar value of landings in Gloucester.  Gloucester was the top-ranked port for herring landings in 2004 (26,891 mt) and cumulatively from 1995-2004 (227,579 mt).  Taking a four-year average (2007-2010), Gloucester ranked first among ports with herring revenue ($6.4M) (Dealer and VTR data).  Gloucester lobster fishermen depend on the harvested herring as bait for their traps and tuna fishermen use herring as bait for their lines.  Several lobster bait dealers and a pumping station for offloading herring are located in Gloucester.  In addition, Cape Seafoods, one of the largest processors of herring for frozen export, is located at the State Pier and owns several dedicated pelagic fishing vessels.

9. New Bedford, Massachusetts

New Bedford has a total population of 95,072 (Bureau 2010).  Of the civilian employed population of New Bedford 16 years and older, 1.2% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (26.1%) is the largest industry sector (Bureau 2011). New Bedford contains approximately 44 fish wholesale companies, 75 seafood processors and 200 shore side industries (Hall-Arber et. al. 2001).  Maritime International, which has one of the largest U.S. Department of Agriculture-approved cold treatment centers on the East Coast, is also located in New Bedford.  Herring brings in about 0.7% of the dollar value of landings in New Bedford.  New Bedford ranked fourth in herring landings in 2004 (7,791 mt) and seventh cumulatively from 1995-2004 (31,089 mt).  Taking a four-year average (2007-2010), New Bedford ranked third among ports with herring revenue ($6.4M) (Dealer and VTR data).

_0000017166

10. Southern Rhode Island – Point Judith, Newport, North Kingstown

Census data are not available for Point Judith itself, but are available for the county subdivision "Narragansett Pier CDP" which includes Point Judith.  Narragansett Pier CDP has a total population of 3,409 (Bureau 2010).  Of the civilian employed population of Narragansett Pier CDP 16 years and older, 0.5% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (27.7%) is the largest industry sector (Bureau 2011).  Several lobster bait dealers are located in Point Judith, and some herring is trucked from there to Maine for processing.  Landings of herring in Point Judith were much higher in the early 1990s, possibly due to increased participation in the Atlantic mackerel fishery.  Today, herring brings in about 1.2% of the dollar value of landings in Point Judith.  Point Judith ranked 10th in herring landings in 2004 (2,129 mt) and fourth cumulatively from 1995-2004 (71,289 mt).  Taking a four-year average (2007-2010), Point Judith ranked seventh among ports with herring revenue ($469K) (Dealer and VTR data).

Newport has a total population of 24,672 (Bureau 2010).  Of the civilian employed population of Newport 16 years and older, less than 0.01% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (25.1%) is the largest industry sector (Bureau 2011).  Herring brings in less than 0.01% of the dollar value of landings in Newport.  Newport is marginally involved in the Atlantic herring fishery, and ranked 15th in herring landings in 2004 (313 mt) and 17th cumulatively from 1995-2004 (3,757 mt).  Aquidneck Lobster Co., Dry Dock Seafood, International Marine Industries Inc., Long Wharf Seafood, Neptune Trading Group Ltd., Parascandolo and Sons Inc., and Omega Sea are wholesalers and retailers of seafood in Newport.

North Kingstown has a total population of 26,486 (Bureau 2010).  Of the civilian employed population of North Kingstown 16 years and older, 1.1% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Educational services and health care and social assistance (25.4%) is the largest industry sector (Bureau 2011).  Herring brings in about 6.9% of the dollar value of landings in North Kingstown, which is involved in the herring fishery primarily through its involvement in the bait market.  North Kingstown ranked 12th in herring landings in 2004 (1,065 mt) and fifth cumulatively from 1995-2004 (69,094 mt).  Several lobster bait dealers and freezer facilities are located in North Kingstown, and some herring is trucked from there to Maine for processing.  North Kingston's Sea Freeze, Ltd. is the largest producer of sea-frozen fish on the U.S. east coast.  It supplies sea-frozen and land-frozen fish to domestic and international markets including bait products to long-line fleets.  Sea Freeze owns two freezer trawlers that provide *Illex* and *Loligo* squid, mackerel and herring to the Sea Freeze facilities.  Although herring is among the least financially valuable species that Sea Freeze harvests and processes, it is nevertheless important to the business due to its year round availability.

_0000017167

11. Cape May, New Jersey

Cape May has a total population of 3,607 (Bureau 2010).  Of the civilian employed population of Cape May 16 years and older, less than 0.01% are employed in the agriculture, forestry, fishing, hunting, or mining sectors (2007-2011 average).  Arts, entertainment, recreation, accommodation and food services (19.3%) is the largest industry sector (Bureau 2011).  Herring brings in about 0.6% of the dollar value of landings in Cape May.  Only 8 mt of herring were reported to have been landed in Cape May in 2004. A pumping station for offloading herring and Lund's Fisheries, a processor of herring and mackerel, are located in Cape May.  Lund's' also owns a number of dedicated pelagic fishing vessels, and is a member of the Garden State Seafood Association.  There are two other exporters of seafood in Cape May.  These include the Atlantic Cape Fisheries Inc., which exports marine fish and shellfish, oysters, scallops, clams and squid, and the Axelsson and Johnson Fish Company Inc., which exports shad, marine fish, conch, American lobster, lobster tails, scallops and whole squid.

### 3.1.5.2  *ATLANTIC MACKEREL FISHERY INFORMATION*

The following information is adapted from 2015-2017 Specifications and Management Measures for the Atlantic Mackerel, Squid, and Butterfish FMP (MAFMC, 2014).  Additional description of the mackerel fishery is included in Section 3.1.1.6 of this document.

**Historical Atlantic Mackerel Commercial Fishery**

The modern northwest mackerel fishery began with the arrival of the European distant-water fleets in the early 1960's.  Total international commercial landings (Northwest Atlantic Fisheries Organization Subareas 2-6,) peaked at 437,000 mt in 1973 and then declined sharply to 77,000 by 1977 (Overholtz 1989).  The MSA established control of the portion of the mackerel fishery occurring in US waters (Northwest Atlantic Fisheries Organization Subareas 5-6) under the auspices of the Council.  Reported foreign landings in US waters declined from an unregulated level of 385,000 mt in 1972 to less than 400 mt from 1978-1980 under the MSA (the foreign mackerel fishery was restricted by NOAA Foreign Fishing regulations to certain areas or "windows").  Under the MSB FMP foreign mackerel catches were permitted to increase gradually to 15,000 mt in 1984 and then to a peak of almost 43,000 mt in 1988 before being phased out again.

_0000017168



*Source: TRAC 2010, unpublished NEFSC dealer reports*

**FIGURE 4.  HISTORICAL ATLANTIC MACKEREL LANDINGS IN THE U.S. EEZ.**

US commercial landings of mackerel increased steadily from roughly 3000 mt in the early 1980s to greater than 31,000 mt by 1990.  US mackerel landings declined to relatively low levels 1992-2000 before increasing in the early 2000's.  The most recent years have seen a significant drop-off in harvest.  In 2014, 6,726 mt of mackerel was landed.

Nominally ex-vessel price has generally varied between about $200-$700 per mt but when inflation is taken into account there was erosion in the ex-vessel per-pound value of mackerel from 1982-2010.  2011 and 2012 prices increased substantially (near $700/mt), which is likely at least partially related to the low levels of mackerel landed.  2014 ex-vessel prices were about $491/mt.  Total ex-vessel value tracks both price and the quantity of fish landed (see Fishery Information Document at http://www.mafmc.org/ssc-meetings/2013/april-may for details).  2014 landings totaled 5,490 mt and generated $2.9 million in ex-vessel revenues.



*Source: unpublished NEFSC dealer reports*

**FIGURE 5. MACKEREL NOMINAL EX-VESSEL REVENUES 1982-2013.**

### Atlantic Mackerel Fishery Performance

Weekly dealer data triggers in-season management actions that institute relatively low trip limits when 90% of the commercial DAH is landed. Table 65 lists the performance of the mackerel fishery (commercial and recreational together) compared to the effective quota from 2005-2014. There have been no quota overages over this period, and the fisheries have not approached the quotas. Since 2012 any ABC overages must be repaid pound for pound. Discard information is not available since 2011, but it does not appear that mackerel would have approached anywhere near its ABC since discards are usually quite low according to the most recent assessment (TRAC 2010). The 2013 and 2014 ABC was 43,781 mt.

**TABLE 48. ATLANTIC MACKEREL QUOTA PERFORMANCE**

| Year | Harvest (mt) (Commercial and Recreational) | Quota (mt) (Rec+Com) | Percent of Quota Landed |
|---|---|---|---|
| 2005 | 43,275 | 115,000 | 38% |
| 2006 | 58,352 | 115,000 | 51% |
| 2007 | 26,142 | 115,000 | 23% |
| 2008 | 22,498 | 115,000 | 20% |
| 2009 | 23,235 | 115,000 | 20% |
| 2010 | 10,739 | 115,000 | 9% |
| 2011 | 1,478 | 47,395 | 3% |
| 2012 | 6,015 | 36,264 | 17% |
| 2013 | 5,029 | 36,264 | 14% |
| 2014 | 6,726 | 33,821 | 20% |

*Source: Unpublished NMFS dealer reports and MRIP data*

_0000017170

Participation in the fishery was low in 2014 related to the low availability of mackerel.  The tables and figures below and on the following pages describe vessel participation, vessel dependency, distribution of landings by state/month/gear/port, dealer participation, and the general at-sea location of recent mackerel landings/catches.

**TABLE 49.  2014 DATA FOR PERMITTED AND ACTIVE ATLANTIC MACKEREL VESSELS**

| Landings (lb) | 1,000,000 | 100,000-1,000,000 | 50,000-100,000 | 10,000-50,000 |
|---|---|---|---|---|
| No. of Vessels (All States) | 6 | 5 | 1 | 14 |

*Source: Unpublished NMFS dealer reports and permit data. Data confidentiality rules do not allow state by state breakdowns.*

The mackerel fishery became a limited access fishery in 2013 except for open-access incidental catch permits.  The current numbers of permits are approximately 31 Tier 1 permits, 24 Tier 2 permits, and 80 Tier 3 permits.  When the directed fishery is open, there are no trip limits for Tier 1, Tier 2 has a 135,000 pound trip limit and Tier 3 has a 100,000 pound trip limit.  Tier 3's trip limit is reduced to 20,000 pounds if it catches 7% of the commercial quota.  Open access incidental permits have a 20,000 pound per trip limit. Only a few vessels accounted for most mackerel landings in 2014 (Table 66).

**TABLE 50.  2014 VESSEL DEPENDENCE ON MACKEREL (REVENUE-BASED)**

| Dependence on Mackerel | Number of Vessels in Each Dependency Category |
|---|---|
| 1%-%5 | 10 |
| 5%-25% | 12 |
| 25%-50% | 3 |
| More than 50% | 1 |

*Source: Unpublished NMFS dealer reports – not at state level due to data confidentiality issues*

**TABLE 51.  RECENT LANDINGS BY STATE (MT)**

| Year | CT | MA | ME | NJ | NY | RI | Other |
|---|---|---|---|---|---|---|---|
| 2012 | 4 | 1,874 | 19 | 915 | 25 | 2,493 | 2 |
| 2013 | 9 | 3,302 | 465 | 21 | 9 | 324 | 5 |
| 2014 | 9 | 4,924 | 622 | 13 | 57 | 245 | 71 |

*Source: Unpublished NMFS dealer reports*

_0000017171

**TABLE 52. RECENT LANDINGS BY MONTH (MT)**

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|-----|
| **2012** | 668 | 3,576 | 948 | 19 | 48 | 4 | 5 | 1 | 35 | 18 | 5 | 4 |
| **2013** | 109 | 2,075 | 1,149 | 148 | 26 | 9 | 29 | 28 | 21 | 23 | 33 | 485 |
| **2014** | 109 | 2,560 | 936 | 67 | 21 | 13 | 29 | 33 | 42 | 61 | 1,958 | 111 |

*Source: Unpublished NMFS dealer reports*

**TABLE 53. RECENT LANDINGS BY GEAR (MT)**

| Year | Gill Nets | Bottom Trawl | Single Mid-Water Trawl | Pair Mid-Water Trawl | Trap/Pots/Pound Nets/Weir | Other/Unknown |
|------|-----------|--------------|------------------------|----------------------|---------------------------|---------------|
| **2012** | 4 | 3,059 | 576 | 1,488 | 24 | 181 |
| **2013** | 6 | 749 | 166 | 2,338 | 15 | 861 |
| **2014** | 33 | 1,126 | 1,299 | 1,484 | 16 | 1,981 |

*Source: Unpublished NMFS dealer reports*

Because of data confidentiality issues, details for port revenues from mackerel cannot be provided. Ports that had at least $100,000 in ex-vessel revenues from mackerel over 2011-2014 (combined) included (from more mackerel dollars to less): North Kingstown, RI; Gloucester, MA; New Bedford, MA; Portland, ME; Cape May, NJ; Marshfield, MA; Provincetown, MA; and Point Judith, RI. (Source: Unpublished NMFS dealer reports.). Descriptions of these communities are provided in Section 3.1.5.1.

Permit data is public, and the tables below provide the homeport and principal landing port for the 57 mackerel vessels with Tier 1 and Tier 2 permits, which land almost all of the mackerel in a given year and would be the most likely to be affected by this action. While more principal ports are listed in the permit data, the majority of mackerel would be expected to be landed in the above listed ports with recent substantial landings even if mackerel became more available and landings increased substantially.

_0000017172

**TABLE 54. TIER 1/2 HOMEPORTS**

| Home Port State | Home Port City | Total |
|---|---|---|
| MA | Boston | 4 |
| | Gloucester | 4 |
| | New Bedford | 8 |
| | Woods Hole | 1 |
| MA Total | | 17 |
| | Bath | 1 |
| | Cundys Harbor | 1 |
| | Portland | 1 |
| | Rockland | 1 |
| ME Total | | 4 |
| NC | Wanchese | 1 |
| NC Total | | 1 |
| NH | Newington | 2 |
| NH Total | | 2 |
| NJ | Cape May | 21 |
| NJ Total | | 21 |
| NY | Greenport | 1 |
| | Montauk | 2 |
| NY Total | | 3 |
| PA | Philidelphia | 2 |
| PA Total | | 2 |
| RI | Davisville | 1 |
| | Narragansett | 1 |
| | Point Judith | 4 |
| | Tiverton | 1 |
| RI Total | | 7 |
| Grand Total | | 57 |

_0000017173

**TABLE 55. TIER 1/2 PRINCIPAL PORTS**

| PRINCIPAL PORT STATE | PRINCIPAL PORT CITY | Total |
|---|---|---|
| ⊟ MA | FAIRHAVEN | 1 |
| | GLOUCESTER | 4 |
| | NEW BEDFORD | 7 |
| | WOODS HOLE | 1 |
| MA Total | | 13 |
| ⊟ ME | PORTLAND | 3 |
| | ROCKLAND | 1 |
| | VINALHAVEN | 1 |
| ME Total | | 5 |
| ⊟ NH | NEWINGTON | 2 |
| NH Total | | 2 |
| ⊟ NJ | CAPE MAY | 22 |
| | WILDWOOD | 1 |
| NJ Total | | 23 |
| ⊟ NY | GREENPORT | 1 |
| | MONTAUK | 2 |
| NY Total | | 3 |
| ⊟ RI | DAVISVILLE | 2 |
| | NARRAGANSETT | 2 |
| | POINT JUDITH | 5 |
| | TIVERTON | 1 |
| RI Total | | 10 |
| ⊟ VA | HAMPTON | 1 |
| VA Total | | 1 |
| Grand Total | | 57 |

*Source: NMFS*

**TABLE 56. RECENT NUMBERS OF ACTIVE DEALERS**

| | Number of dealers buying at least $10,000 Mackerel | Number of dealers buying at least $100,000 Mackerel |
|---|---|---|
| 2012 | 5 | 5 |
| 2013 | 16 | 4 |
| 2014 | 18 | 5 |

*Source: Unpublished NMFS dealer reports*

_0000017174

**TABLE 57. KEPT CATCH (MT) IN STATISTICAL AREAS WITH AT LEAST 1,000 MT OF MACKEREL CAUGHT IN AT LEAST ONE RECENT YEAR**

| YEAR | _612 | _521 | _616 | _522 |
|------|------|------|------|------|
| 2011 | 4 | . | 100 | 13 |
| 2012 | 2,393 | 38 | 1,527 | 45 |
| 2013 | 15 | 2,010 | . | 1,511 |

*Source: Unpublished NMFS vessel trip reports*

Data confidentiality concerns preclude listing mackerel catch by statistical area, but statistical areas with more than 1,000 mt of mackerel catch combined over 2012-2014 include (in descending order of catch amounts) 522, 612, 521, 616, and 514.



**FIGURE 6. NMFS STATISTICAL AREAS**

## Current Market Overview for Mackerel and World Production (Required by FMP)

U.S. mackerel (western Atlantic) are a substitute for European mackerel (eastern Atlantic), which are caught in much larger quantities. It is unclear how demand for U.S. mackerel may be impacted by European catches, but the MSB advisory panel has indicated that the demand for mackerel is high enough to support catches near the quotas if the product is of high quality.



*Source: http://www.fao.org/fishery/statistics/*
**Figure 7. World Production of Mackerel, 1950-2013.**

## Recreational Atlantic Mackerel Fishery

Mackerel can be seasonally important to the recreational fisheries of the Mid-Atlantic and New England regions. They may be available to recreational anglers in the Mid-Atlantic primarily during the winter and spring, depending on annual conditions. Mackerel are caught in New England in the summer and fall and are often targeted for purposes of collecting live bait, especially for large striped bass. 2005-2014 recreational landings of mackerel, as estimated from the Marine Recreational Information Program ("MRIP"), are given in Table 75. Most mackerel are caught in the private/rental mode but some are caught in the party/charter and shore modes as well. Approximately 20% of all mackerel caught (by number) are released (2013-2014 combined). Compared to other recreationally-important species, estimates for mackerel recreational harvest have low precisions due to low encounter rates. Earlier years (1980s-1991) had higher catches (consistently in the 1,000-4,000 mt range) but recent years have been below 1,000 mt.

_0000017176

**TABLE 58. RECREATIONAL HARVEST (ROUNDED TO NEAREST MT) OF MACKEREL, 2005-2014.**

| Year | Harvest (MT) |
|------|-------------|
| 2005 | 1,005 |
| 2006 | 1,491 |
| 2007 | 596 |
| 2008 | 755 |
| 2009 | 600 |
| 2010 | 845 |
| 2011 | 947 |
| 2012 | 683 |
| 2013 | 888 |
| 2014 | 792 |

*Source: Personal Communication from NMFS Fisheries Statistics Division.*

## 4.0   ENVIRONMENTAL CONSEQUENCES OF THE ALTERNATIVES

The National Environmental Policy Act requires that an EA briefly describe the probable environmental impacts of the proposed action and alternatives to the proposed action considered by the action agency (NEPA, section 102(2)(E)).  The following sections address the reasonably foreseeable direct, indirect, and cumulative effects of the alternatives considered in this amendment.

### 4.1   OMNIBUS ALTERATIVE IMPACTS

This amendment includes a set of Omnibus Alternatives that would modify all the FMPs managed by the Council to allow standardized development of future FMP-specific IFM programs.

The Council finalized its selection of preferred alternatives at its April 18-20, 2017, meeting.

| Omnibus Alternatives | Preferred Alternatives |
|---|---|
| **Alternative 1** (No Standardized Structure for IFM Programs) | No |
| **Alternative 2** (Standardized Structure for IFM Programs) | Yes |
| **Alternative 2.1** (NMFS-Led Prioritization Process) | No |
| **Alternative 2.2** (Council-Led Prioritization Process) | Yes |
| **Alternative 2.3** (Proportional Prioritization Process) | No |
| **Alternative 2.4** (Lowest Ratio-Based Prioritization Process) | No |
| **Alternative 2.5** (Highest Ratio-Based Prioritization Process) | No |
| **Alternative 2.6** (Monitoring Set-Aside) | Yes |

Omnibus Alternative 1 (No Action) – No standardized structure for IFM programs. Programs developed on an FMP-by-FMP basis.
- No standard definition of cost responsibilities for NMFS or industry;
- No standard amendment process to implement IFM programs and no standard framework adjustment process to revise IFM programs;

_0000017177

- No standardized service provider requirements;
- No process for prioritizing available Federal funding to support IFM programs across all New England FMPs; and
- No standardized framework adjustment process to implement future monitoring set-aside programs.

Omnibus Alternative 2 (**Preferred Alternative**) – Standardized structure for IFM programs and option for monitoring set-aside provision.
- Standard definition for cost responsibilities for NMFS or industry;
- Standard amendment process to implement IFM programs and standard framework adjustment process to revise IFM programs;
- Standard service provider requirements;
- Process for prioritizing available Federal funding to support IFM programs across all New England FMP; and
- Option for standard framework adjustment process to implement future monitoring set-aside programs.

Omnibus Alternatives 2.1-2.5 are variations on the prioritization process in Omnibus Alternative 2, and consider specific options for what to do when Federal funding is not sufficient to cover NMFS cost responsibilities to support the Council's desired level of IFM for a given FMP.

- Omnibus Alternative 2.1 – NMFS-led prioritization process. NMFS prepares analysis and prioritization in consultation with the Council.
- Omnibus Alternative 2.2 (**Preferred Alternative**) – Council-led prioritization process. Council prepares analysis and recommends priorities to NMFS. Council recommended an equal weighting approach that would be adjusted on an as-needed basis.
- Omnibus Alternative 2.3 – Proportional prioritization process. Available Federal funding would be allocated proportionally among all IFM programs.
- Omnibus Alternative 2.4 – Coverage ratio-based prioritization process. The amount of available Federal funding would be allocated to each FMP relative to the extra coverage needed and total fleet activity. Alternative 2.4 would favor coverage for the FMPs that need little additional monitoring to meet coverage targets and have the most active fleets.
- Omnibus Alternative 2.5 – Coverage ratio-based prioritization process. The amount of available Federal funding would be allocated to each FMP relative to the extra coverage needed and total fleet activity. Alternative 2.5 would favor coverage for the FMPs that need more additional monitoring to meet coverage targets and have the least active fleets.

Omnibus Alternative 2.6 (**Preferred Alternative**) (Monitoring Set-Aside) would provide a structure to develop future monitoring set-aside programs to help offset vessel/non-governmental cost responsibilities associated with IFM coverage targets. No monitoring set-aside programs would be established in this amendment.

**IFM Omnibus Amendment**                    179                    **December 2018**

## 4.1.1 IMPACTS SUMMARY FOR PREFERRED OMNIBUS ALTERNATIVES

In general, there are no direct impacts on biological resources (target, non-target, and protected species), the physical environment, or fishery-related businesses and human communities associated with the Council's preferred alternatives, Omnibus Alternatives 2, 2.2, and 2.6.

If approved and implemented by NMFS, these preferred alternatives would become tools for the Council to use when developing future IFM programs. Because these alternatives would not directly affect the level of fishing, fishing operations, amount of fish harvested, or area fished, they do not have direct impacts on biological resources or the physical environment. Additionally, these alternatives do not have any direct economic impacts on fishery-related business or human communities because they do not require the development of IFM programs nor do they directly impose any costs.

In the future, if the Council developed an IFM program for a particular FMP, there would be direct negative economic impacts to fishing vessels resulting from the standardized cost responsibilities included in Omnibus Alternative 2, provided there was available Federal funding to support that IFM program and vessels were required to pay for increased monitoring. However, any direct negative economic impacts to fishing vessels resulting from a future IMF program would be evaluated in the amendment to establish that IFM program and are not considered in this amendment.

Preferred Omnibus Alternatives 2 and 2.2 would have an indirect low positive impact on biological resources. Standard monitoring service provider requirements have the potential to help improve data collections for IFM programs. A process to prioritize available Federal funding across New England FMPs allows IFM programs to align with Council monitoring priorities.

There would also likely be indirect low positive economic impacts associated with the Council's preferred alternatives, Omnibus Alternatives 2 and 2.2. These indirect impacts would result from standardized cost responsibilities, standardized service provider requirements, and a process to prioritize available Federal funding. Standardized cost responsibilities and service provider requirements may allow the fishing industry to negotiate contracts with service providers and increase the efficiency of administering IFM programs, thereby, potentially reducing future sampling costs for the industry.

The impacts (biological, physical, socioeconomic) of preferred Omnibus Alternative 2.6 would be negligible because the alternative details the mechanism to develop and implement future monitoring set-aside programs. Any impacts that may be associated with actually implementing a monitoring set-aside program through a framework adjustment to an FMP would be fully analyzed in the documents supporting the action.

_0000017179

## 4.1.2 OMNIBUS ALTERNATIVE IMPACTS TO BIOLOGICAL RESOURCES

In general, there are no direct impacts on biological resources (target, non-target, and protected species) associated with either Omnibus Alternative 1 or Omnibus Alternative 2. These alternatives specify the process to develop future IFM programs and, thus, do not directly affect the level of fishing, fishing operations, amount of fish harvested, or area fished.

Standardized cost responsibilities and a standardized process for implementing and revising future IFM programs in Omnibus Alternative 2 have a negligible impact on biological resources.  These aspects of Omnibus Alternative 2 detail the process of standardizing future IFM programs, but do not directly affect the level of fishing, fishing operations, amount of fish harvested, or area fished.  As there are negligible biological impacts associated with standardizing cost responsibilities and the process to develop new IFM programs, there are no differences in the impacts of these aspects of Omnibus Alternatives 1 and 2.

Under Omnibus Alternative 2, there is the potential for an indirect low positive impact on biological resources related to establishing standardized IFM service provider requirements.  Standardized service provider requirements may lead to greater consistency in the information collected about target, non-target, and protected species through IFM programs, provided that individual FMPs do not drastically alter the service provider requirements when establishing monitoring programs.   Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources.  In contrast, under Omnibus Alternative 1, there is the potential for an indirect low negative impact on biological resources because IFM service provider requirements would need to be established separately for each FMP, which could delay the implementation of new monitoring programs and may provide less consistent data.

Under Omnibus Alternative 2, if adequate Federal funding was available to cover NMFS cost responsibilities associated with IFM coverage targets after SBRM coverage requirements were met, those IFM programs would operate at the target coverage levels established through each individual FMP.  If there is some Federal funding available after SBRM coverage requirements are met, but not enough to cover all of the IFM programs, a prioritization process would be used to allocate available Federal funding across FMPs.  If no Federal funding was available after SBRM coverage requirements were met, then, similar to Omnibus Alternative 1, there would be no IFM in addition to SBRM requirements.

Under the Omnibus Alternative 1, there is no specified process to prioritize available Federal funding between IFM programs, so funding is allocated on a case-by-case basis. There is the potential for a low negative impact on biological resources under Omnibus Alternative 1 if IFM programs gathering important catch information go unfunded because there is no mechanism to use available Federal funding in a timely manner.  Without the funding to gather important catch information, there could be indirect low negative

_0000017180

impacts on biological resources if limited information prevents appropriate management or the implementation of measures to conserve a species.

In contrast, Omnibus Alternative 2 may provide an indirect low positive impact on biological resources, compared to Omnibus Alternative 1, because the prioritization process would allow Federal funding to support IFM when funding was available.

The magnitude of potential indirect impacts of the prioritization process on biological resources varies by prioritization process. The impacts discussed below apply when there is some Federal funding available to support NMFS cost responsibilities associated with IFM coverage targets, after SBRM coverage requirements are met, but not enough to support all the IFM coverage targets.

The discretionary prioritization alternatives (Omnibus Alternatives 2.1 and 2.2) have the greatest potential for indirect low positive impacts to biological resources, compared to Omnibus Alternative 1 and the formulaic prioritization alternatives (Alternatives 2.3-2.5), because they allow for the evaluation of program need and design when assigning funding priorities. This means that, in years where there is Federal funding available to support IFM programs, the discretionary prioritization alternatives allow the potential to direct funding towards monitoring programs that improve information about specific target, non-target, and protected species. For example, if IFM programs were developed to address concerns with the precision of bycatch of target, non-target, or protected species the discretionary prioritization alternatives (Omnibus Alternatives 2.1 and 2.2) would allow for NMFS or the Council to prioritize funding to those programs rather than other IFM programs that do not address the same biological concerns. When funding is prioritized to specific IFM programs, those programs are better able to gather data and provide increased information on biological resources.

Omnibus Alternatives 2.1 and 2.2 would use a weighting approach to prioritize available Federal funding. Omnibus Alternative 2.1 specifies a criteria-based weighting approach, while the Council recommended an equal weighting approach, adjusted on an as-need basis, for Omnibus Alternative 2.2. The equal weighting approach is an effective and administratively simple tool to prioritize funding when the number of IFM programs are limited. If the number of IFM programs across New England FMPs increases, the Council may want to consider another type of weighting approach, similar to the criteria-based approach, to help ensure that available Federal funding is prioritized consistent with Council monitoring priorities.

The formulaic prioritization alternatives (Omnibus Alternative 2.3-2.5) all provide an indirect low positive impact on biological resources, compared to Omnibus Alternative 1, because the formulaic prioritization alternatives would consider all New England IFM programs when allocating Federal funds, rather than considering IFM programs on a case-by-case basis. Omnibus Alternative 2.3 would allocate available Federal funding proportionally to IFM programs. So that during years when funding was available, all New England IFM programs would receive some additional monitoring, which may have indirect low positive impacts on biological resources resulting from information collection.

_0000017181

Omnibus Alternative 2.4 would allocate funding to those IFM programs that need limited IFM coverage to meet cover targets and involve the most active fisheries, while Omnibus Alternative 2.5 would allocate funding to those IFM programs that need more IFM coverage to meet cover targets and involve the least active fisheries.  Even though Omnibus Alternatives 2.4 and 2.5 do not evaluate program need and design and may result in some IFM programs not receiving funding, there is still some potential for indirect low positive impacts on biological resources by using a funding prioritization process, rather than allocating funding on a case-by-case basis as in Omnibus Alternative 1.  The efficiency of allocating Federal funding under Alternatives 2.3-2.5 would indirectly benefit biological resources by helping ensure funding is available in a timely manner to gather information which could improve catch monitoring or fishery management.

Because Omnibus Alternative 2.6 details the mechanism to develop and implement future monitoring set-aside programs, to help offset industry/non-government cost responsibilities associated with IFM programs, there are no direct or indirect impacts on any biological resources anticipated for this alternative.  Any impacts that may be associated with actually implementing a monitoring set-aside program through a framework adjustment to an FMP would be fully analyzed in the documents supporting the action.

The Council's selection of Omnibus Alternatives 2 and 2.2 as preferred alternatives will likely have potential downstream impacts (e.g., subsequent management measures to address issues discovered by increased monitoring) but these impacts are too remote and speculative to be appropriate for consideration in this amendment.

First, while the omnibus alternatives consider expanding monitoring coverage above the level required under SBRM, implementation of this amendment does not, by itself, automatically allow for increased monitoring in New England FMPs.  While increases in monitoring coverage targets for some fisheries may be expected to improve data quality, actual improvements in data quality are contingent upon sufficient funding to expand coverage beyond SBRM.

Second, there is no way to predict the impact that improvements in data quality would have for managing the affected fisheries.  Increased monitoring should allow for improvements in data quality, which may then give assessment scientists and fishery managers more confidence in the data.  However, there is no way to predict outcomes from increased monitoring because but any resulting data trends are unknown at this time.

Third, the type of management measures implemented in response to improvements in data quality cannot be predicted.  Depending on the fishery, species, time, area, and type to the concern, different types of management measures would be appropriate.  Therefore, there is no way to speculate as to what the most likely impacts resulting from those management measures may entail.

_0000017182

### 4.1.3  OMNIBUS ALTERNATIVE IMPACTS TO PHYSICAL ENVIRONMENT

Neither Omnibus Alternative 1 nor Omnibus Alternative 2 would directly impose or likely result in any changes in fishing effort or behavior, fishing gears used, or areas fished. Similarly, Omnibus Alternatives 2.1 – 2.5 would not result in any changes in fishing behavior or areas fished.  Therefore, there are no potential impacts (direct or indirect) on the physical environment (including essential fish habitat) associated with the omnibus alternatives in this amendment.  Because there are no potential impacts to the physical environment associated with the omnibus alternatives, there are no differences in impacts between omnibus alternatives.

Omnibus Alternative 2.6 details the mechanism to develop and implement future monitoring set-aside programs.  Accordingly, there are no direct or indirect impacts on the physical environment (including essential fish habitat) anticipated for this alternative.  Any impacts that may be associated with implementing a future monitoring set-aside program through a framework adjustment to an FMP would be fully analyzed in the document supporting the action.

### 4.1.4  OMNIBUS ALTERNATIVE IMPACTS TO HUMAN COMMUNITIES

In general, there are no direct impacts on fishery-related businesses or communities associated with either Omnibus Alternative 1 or Omnibus Alternative 2.  These alternatives specify the process to develop future IFM programs, but do not require the development of IFM programs nor do they directly impose any cost responsibilities.

In the future, if the Council developed an IFM program for a particular FMP, there would be direct negative economic impacts to fishing vessels resulting from the standardized cost responsibilities included in Omnibus Alternative 2, provided there was available Federal funding to support that IFM program and vessels were required to pay for increased monitoring.  However, any direct negative economic impacts to fishing vessels resulting from a future IMF program would be evaluated in the amendment to establish that IFM program and are not considered in this amendment.

Omnibus Alternative 1 would have an indirect low negative impact if, in the absence of additional monitoring, continued uncertainty about catch led to overly cautious management.  Standardizing a process to develop new IFM programs and a process to prioritize funding for those new IFM programs in Omnibus Alternative 2 may have indirect low positive impacts on fishery-related businesses and communities associated with the potential for additional monitoring and improved management.  The indirect low positive impacts associated with Omnibus Alternative 2 may not be realized under Omnibus Alternative 1.

Similar to Omnibus Alternative 1, establishing an amendment process to allow for the future establishment of IFM programs and a framework process to revise IFM programs in Omnibus Alternative 2 has a negligible impact on fishery-related businesses and human

_0000017183

communities.  This aspect of Omnibus Alternative 2 specifies the process to establish and revise IFM programs, and thus does not affect fishing vessels, fleets, or ports.  As there are no impacts to fishery-related businesses and communities associated with these process aspects of the Omnibus Alternative 2, operationally there are no differences in impacts between Omnibus Alternatives 1 and 2.

Under Omnibus Alternative 2, there is a potential for indirect low positive impacts on fishery-related businesses and communities associated with the establishment of standardized IFM service provider requirements.  The service provider requirements generally match the existing service provider requirements codified for other New England IFM programs, such as Northeast multispecies and Atlantic scallop.  Standardized service provider requirements may allow for efficiencies in the administration of IFM programs (e.g., process for service provider approval, data requirements, training requirements for observers and at-sea monitors) compared to Omnibus Alternative 1, which could ultimately reduce the dollar amount associated with industry cost responsibilities.  In addition, standardized service provider requirements could lead to greater consistency in the information collected by IFM programs, provided that individual FMPs do not drastically alter the service provider requirements when establishing monitoring programs.  Improved catch information that results from greater consistency in information collection may lead to better management of biological resources, which may eventually lead to higher harvest levels.  In contrast, under Omnibus Alternative 1,IFM service provider requirements would be established separately for each FMP and would likely lack any economic benefits associated with standardized those requirements.

Establishing standardized cost responsibility definitions in Omnibus Alternative 2 could have low positive impacts compared to Omnibus Alternative 1.  While industry cost responsibilities are not codified in this action, categorizing and characterizing industry cost responsibilities in this action could provide the industry with information to better understand and plan for their IFM cost responsibilities as well negotiate better contracts with IFM service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities.

In conjunction with Omnibus Alternative 2, the Council recommended that existing service provider requirements be revised to allow observers or at-sea monitors to be deployed on the same vessel for more than two consecutive multi-day trips or more than twice in a given month.  This is less restrictive than existing deployment requirements, prohibiting multiple deployments on the same vessel, under Omnibus Alternative 1.  Omnibus Alternative 2 may have indirect low positive economic impacts on fishing vessels, compared to Omnibus Alternative 1, if relaxing deployment restrictions helps reduce the dollar amount associated with industry cost responsibilities.

Under Omnibus Alternative 2, if adequate Federal funding was available to cover NMFS cost responsibilities associated with IFM coverage targets after SBRM coverage requirements were met, those IFM programs would operate at the target coverage levels established through each individual FMP.  If there is some Federal funding available after SBRM coverage requirements are met, but not enough to cover all of the IFM programs, a

_0000017184

prioritization process would be used to allocate available Federal funding across FMPs. If no Federal funding was available after SBRM coverage requirements were met, then, similar to Omnibus Alternative 1, there would be no IFM in addition to SBRM requirements.

Under the Omnibus Alternative 1, there is no specified process to prioritize available Federal funding between IFM programs, so funding is allocated on a case-by-case basis. There is the potential for a low negative impact on fishery-related business and communities under Omnibus Alternative 1 if IFM programs gathering important catch information go unfunded because there is no mechanism to use available Federal funding in a timely manner. Without the funding to gather important catch information, there could be indirect low negative impacts on fishery-related business and communities if limited information prevents appropriate management or results in overly cautious management.

In contrast, Omnibus Alternative 2 may provide an indirect low positive impact on fishery-related businesses and communities, compared to Omnibus Alternative 1, because the prioritization process would allow Federal funding to support IFM when funding was available.

The magnitude of potential indirect impacts of the prioritization process on business and communities varies by prioritization process. The impacts discussed below apply when there is some Federal funding available to support NMFS cost responsibilities associated with IFM coverage targets, after SBRM coverage requirements are met, but not enough to support all the IFM coverage targets.

The discretionary prioritization alternatives (Omnibus Alternatives 2.1 and 2.2) have the greatest potential for indirect low positive impacts to businesses and communities, compared to Omnibus Alternative 1 and the formulaic prioritization alternatives (Alternatives 2.3-2.5), because they could help align available funding with the Council's monitoring priorities. This means that, in years where there is Federal funding available to support IFM programs, the discretionary prioritization alternatives allow the potential to direct funding towards monitoring programs with specific characteristics. These alternatives could allow the Council or NMFS to choose to support IFM programs for species with high economic value, programs where the industry can better afford the cost of additional monitoring, or programs that gather information about species with special ecosystem importance (e.g., overfished species or forage species). Improved catch information that results from the opportunity to align funding with the most critical IFM programs may lead to better management of biological resources, which may eventually lead to higher harvest levels.

Omnibus Alternatives 2.1 and 2.2 would use a weighting approach to prioritize available Federal funding. Omnibus Alternative 2.1 specifies a criteria-based weighting approach, while the Council recommend an equal weighting approach, adjusted on an as-need basis, for Omnibus Alternative 2.2. The equal weighting approach is an effective and administratively simple tool to prioritize funding when the number of IFM programs are limited. If the number of IFM programs across New England FMPs increases, the Council

_0000017185

may want to consider another type of weighting approach, similar to the criteria-based approach, to help ensure that available Federal funding is prioritized consistent with Council monitoring priorities.

The formulaic prioritization alternatives (Omnibus Alternative 2.3-2.5) all provide an indirect low positive impact on business and communities, compared to Omnibus Alternative 1, because the formulaic prioritization alternatives would consider all New England IFM programs when allocating Federal funds, rather than considering IFM programs on a case-by-case basis. Omnibus Alternative 2.3 would allocate available Federal funding proportionally to IFM programs. So that during years when funding was available, all New England IFM programs would receive some additional monitoring, which may have indirect low positive impacts on businesses and communities resulting from information collection.

Omnibus Alternative 2.4 would allocate funding to those IFM programs that need limited IFM coverage to meet cover targets and involve the most active fisheries, while Omnibus Alternative 2.5 would allocate funding to those IFM programs that need more IFM coverage to meet cover targets and involve the least active fisheries. Even though Omnibus Alternatives 2.4 and 2.5 do not evaluate program need and design and may result in some IFM programs not receiving funding, there is still some potential for indirect low positive impacts on businesses and communities by using a funding prioritization process, rather than allocating funding on a case-by-case basis as in Omnibus Alternative 1. The efficiency of allocating Federal funding under Alternatives 2.3-2.5 would indirectly benefit businesses and communities by helping ensure funding is available in a timely manner to gather information which could improve fishery management.

Because Omnibus Alternative 2.6 details the mechanism to develop and implement future monitoring set-aside programs, to help offset industry/non-government cost responsibilities associated with IFM programs, there are no direct or indirect impacts on businesses or communities anticipated for this alternative, similar to Omnibus Alternative 1. Any impacts that may be associated with actually implementing a monitoring set-aside program through a framework adjustment to an FMP would be fully analyzed in the documents supporting the action.

## 4.1.5 IMPACTS SUMMARY FOR OMNIBUS ALTERNATIVES

TABLE 59. SUMMARY OF THE INDIRECT IMPACTS OF OMNIBUS ALTERNATIVES (*PREFERRED ALTERNATIVES SHOWN IN BOLD*)

| Alternatives | Impacts on Biological Resources | Impacts on Fishery-Related Businesses and Communities |
|---|---|---|
| Alternative 1: No Standardized Industry-Funded Monitoring Programs (No Action) | Low negative impact related to allocating funding to IFM programs on a case-by-case basis, rather than evaluating funding across FMPs | Low negative impact related to continued uncertainty about catch rates that may lead to overly cautious management |

_0000017186

| Alternatives | Impacts on Biological Resources | Impacts on Fishery-Related Businesses and Communities |
|---|---|---|
| **Alternative 2: Standardized Industry-Funded Monitoring Programs (Action Alternative)** | **Negligible impact related to standardized cost responsibilities and process for future IFM programs implemented via amendment and revised via framework**<br><br>**Low positive impact related to standardized service provider requirements and process to prioritize funding for monitoring** | **Low positive impact related to standardized cost responsibilities and process for future IFM programs implemented via amendment and revised via framework**<br><br>**Low positive impact related to standardized service provider requirements and process to prioritize funding for monitoring** |
| Alternative 2.1: NMFS-Led Prioritization Process | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities |
| **Alternative 2.2: Council-Led Prioritization Process** | **Low positive impact related to process to prioritize funding for IFM programs across FMPs**<br><br>**Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities** | **Low positive impact related to process to prioritize funding for IFM programs across FMPs**<br><br>**Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities** |
| Alternative 2.3: Proportional Prioritization Process | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities |
| Alternative 2.4 and 2.5: Coverage Ratio-Based Prioritization Processes | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities |
| **Alternative 2.6 Monitoring Set-Aside** | **Negligible impact related to standardized process for monitoring set-asides implemented via framework** | **Negligible impact related to standardized process for monitoring set-asides implemented via framework** |
| **Impacts to physical environment are not described in this table because they are negligible. These alternatives will not alter fishing behavior or directly impact fishing regulations (gears used or areas fished).** | | |

_0000017187

## 4.2    ATLANTIC HERRING ALTERNATIVE IMPACTS

The Council recommended that increased monitoring in the herring fishery address the following goals:  (1)  Accurate estimates of catch (retained and discarded), (2) accurate catch estimates for incidental species for which catch caps apply, and (3) affordable monitoring for the herring fishery.

This section considers the potential impacts of alternatives considered by the Council to specify IFM coverage targets for the herring fishery on valued ecosystem components (VEC), including target species, non-target species, protected species, physical environment, and human communities.

For each VEC, the impacts associated with Herring Alternatives 1 and 2 will be discussed, followed by a discussion of impacts associated with Herring Alternatives 2.1-2.7.

The Council finalized its selection of preferred alternatives at its April 18-20, 2017, meeting.  The Council selected the following preferred alternatives:

- Herring Alternative 2, including Sub-Options 1 (Waiver Allowed), 2 (Wing Vessel Exemption), 4 (2-Year Re-Evaluation), and 5 (50 mt Exemption Threshold);
- Herring Alternative 2.5 (100% NEFOP-Level Coverage on Midwater Trawl Fleet in Groundfish Closed Areas); and
- Herring Alternative 2.7 (ASM Coverage on Category A and B Vessels, then Eventually Vessels may choose either ASM or EM/Portside Coverage).

**TABLE 60.  RANGE OF INDUSTRY-FUNDED MONITORING HERRING COVERAGE TARGET ALTERNATIVES (*PREFERRED ALTERNATIVES SHOWN IN BOLD*)**

| Gear Type | Midwater Trawl | Purse Seine | Small Mesh Bottom Trawl |
|---|---|---|---|
| Herring Alternative 1:  No Coverage Target for IFM Program (No Action) | SBRM | | |
| **Herring Alternative 2:  Coverage Targets for IFM Program** | Includes Sub-Options:  1) **Wavier Allowed**, 2) **Wing Vessel Exemption**, 3) 2-Year Sunset, 4) **2-Year Re-evaluation**, and 5) 25 mt or **50 mt Exemption Threshold** | | |
| Herring Alternative 2.1:  100% NEFOP-Level Coverage on Category A and B Vessels | 100% NEFOP-Level Observer | | |
| Herring Alternative 2.2:  ASM Coverage on Category A and B Vessels | 25%, 50%, 75% or 100% ASM | | |
| Herring Alternative 2.3:  Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | 50% or 100% EM/Portside | 25%, 50%, 75% or 100% ASM | |
| Herring Alternative 2.4:  EM and Portside Coverage on Midwater Trawl Fleet | 50% or 100% EM/Portside | SBRM (No Action) | |

_0000017188

| Gear Type | Midwater Trawl | Purse Seine | Small Mesh Bottom Trawl |
|---|---|---|---|
| **Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet in Groundfish Closed Areas\*** | **100% NEFOP-Level Coverage** | **SBRM (No Action)** | |
| Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet in Groundfish Closed Areas | Coverage would match selected alternative 2.1-2.4 | SBRM (No Action) | |
| **Herring Alternative 2.7: ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | **50% ASM or EM/Portside** | **50% ASM** | **50% ASM** |
| * Sub-Options do not apply to Herring Alternative 2.5. | | | |

## 4.2.1 IMPACTS SUMMARY FOR PREFERRED HERRING ALTERNATIVES

The impacts of preferred Herring Alternatives on biological resources (herring resource, non-target species, and protected species) are indirect because they affect levels of monitoring rather than harvest specifications.

Indirect low positive impacts to biological resources are possible if the increased monitoring associated with Herring Alternatives 2.5 and 2.7 can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments and improve management. However, these preferred Herring Alternatives may lead to direct positive impacts on biological resources if herring fishing effort is limited, by increased information on catch tracked against catch limits, leading to increased reproductive potential of the herring resource and non-target species and reduced interactions between the herring fishery and protected species.

Because additional monitoring under Herring Alternative 2.5 is confined to the Groundfish Closed Areas, a low positive biological impact is likely because the area with 100% observer coverage is limited. The 50% coverage associated with Herring Alternative 2.7 is expected to have low positive impacts on the herring resource and non-target species (haddock and river herring and shad) if the uncertainty around catch track against catch caps is reduced.

Sub-Options 1 and 2 have the potential for low negative impacts on biological resources if additional coverage is waived. Sub-Option 5 also has the potential for a low negative impact on the herring resource and non-target species. A low negative impact is possible if the disconnect between vessels with additional monitoring (trips greater than 50 mt of herring) and trips subject to fishery catch caps (trips greater than either 1 lb of herring or 6,600 lb of herring) if it biases data used to track catch against catch caps.

_0000017189

The impacts of these preferred Herring Alternatives on biological resources are not significant because they would not cause any biological resource to become overfished, would not result in overfishing, and/or would not cause a change in population status.

The impacts of preferred Herring Alternatives on the physical environment are expected to be negligible.  The impact of the herring fishery on the physical environment is thought to be minimal and temporary.  Therefore, the expected impact on the physical environment of increased monitoring in the herring fishery is expected to be negligible under Herring Alternatives 2.5 and 2.7.

If fishing effort is limited, by increased information on catch tracked against catch limits, and there are few interactions between fishing gear and the physical environment, there is the potential for a positive impact on the physical environment associated with the preferred Herring Alternatives.  However, the magnitude of any potential positive impact is low because the herring fishery has only minimal and temporary impacts on the environment.

The impacts of preferred Herring Alternatives on fishery-related businesses and human communities are negative and result from reductions in returns-to-owner (RTO).  RTO is calculated by subtracting fixed and operational costs from gross revenue and was used rather than net revenues to more accurately reflect income from fishing trips.  Reductions in RTO are related to paying for monitoring coverage.  Under Herring Alternative 2.7, the potential reduction in RTO may be up to 20% for at-sea monitoring coverage and up to 10% for electronic monitoring in conjunction with portside sampling.  Annual RTO for midwater trawl vessels paying for observer coverage to access Groundfish Closed Areas may be reduced up to an additional 5%.  The total annual cost to the herring fishery is up to $294,999 for Herring Alternative 2.7 and $75,000 for Herring Alternative 2.5.

Because midwater trawl vessels average more sea days than other gear types, midwater trawl vessels have a greater negative economic impact associated with paying for monitoring coverage, followed by purse seine vessels, and small mesh bottom trawl vessels.

Sub-Options 1 and 2 have the potential to reduce monitoring costs for herring vessels if coverage is waived.  Sub-Option 5 would eliminate monitoring costs for vessels that always land less than 50 mt of herring on a trip.  Additionally, Sub-Option 5 may reduce monitoring costs for vessels than often land less than 50 mt of herring on a trip.  There benefits will vary with gear type.  Small mesh bottom trawl vessels and single midwater trawl vessels take the most trips that land less than 50 mt of herring, 81% and 60%, respectively, followed by purse seine vessels (33% of trips) and paired midwater trawl vessels (13% of trips).  The potential reduction in RTO associated with at sea-monitoring coverage in combination with Sub-Option 5 is up to 16% for paired midwater trawl vessels, up to 4% for single midwater trawl vessels, and up to 3% for purse seine and small mesh bottom trawl vessels.

_0000017190

Indirect positive economic impacts on herring vessels associated with preferred Herring Alternatives may result from increased monitoring helping to reduce uncertainty around retained and discarded catch estimates leading to additional harvesting opportunities. If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be less likely to be constrained by catch caps and more likely to be able to fully harvest herring sub-ACLs.

Conversely, indirect negative economic impacts on herring vessels associated with preferred Herring Alternatives may result if additional monitoring illustrates higher than expected catch of haddock and river herring and shad, such that vessels would be less likely be less likely to be able to fully harvest herring sub-ACLs because they were constrained by catch caps.

## 4.2.2 BACKGROUND ON BIOLOGICAL IMPACTS OF HERRING ALTERNATIVES

When evaluating IFM for the herring fishery, one major consideration is whether a monitoring alternative provides the type and quality of data necessary to meet the Council's information collection goals for the herring fishery.

**Type of Information Collected**

Different types of monitoring can provide different kinds of information with varying levels of verification (Table 61).

Currently, vessel trip reports (VTRs) provide information on fishing effort, retained catch, and discarded catch. Dealer reports provide information on retained catch and vessel monitoring systems (VMS) provided information on fishing location and behavior. Affidavits of slippage events and discard reports can provide details of why slippage and/or discard events occur.

Under the industry-funded herring coverage target alternatives, NEFOP-level observers and at-sea monitors would both provide information on fishing effort. NEFOP-level observers and at-sea monitors would be collecting species composition data on retained and discarded catch, while portside samplers would be collecting species composition data on retained catch. NEFOP-level observers and portside samplers would be collecting age and length data, while at-sea monitors would be collecting length data. EM would be used to confirm retention of catch.

_0000017191

**TABLE 61. COMPARISON OF INFORMATION COLLECTED ACROSS HERRING COVERAGE TARGET ALTERNATIVES**

| Herring Data Interests | Current Information Collections That Would Continue Under Any Alternative | HER Alt 1 | HER Alt 2.1 | HER Alt 2.2 | HER Alts 2.3 & 2.7 | HER Alt 2.4 | HER Alt 2.5 |
|---|---|---|---|---|---|---|---|
| | | No Action (NEFOP coverage for SBRM only) | 100% NEFOP on Category A and B Vessels | ASM (25, 50, 75, or 100%) on Category A and B Vessels | ASM and/or EM/Portside (25, 50, 75, or 100%) on Category A and B vessels and/or MWT vessels | EM/Portside (50 or 100%) on MWT vessels | 100% NEFOP On MWT Vessels Fishing in Groundfish Closed Areas |
| Retained Catch | • Vessel trip reports • Dealer reports • VMS catch reports | Information on effort, area, gear, and economics<br><br>Species composition data | Information on effort, area, gear, and economics<br><br>Species composition data | Information on effort, area, gear, and economics<br><br>Species composition data | ASM - Information on effort, area, gear, economics; species composition data<br><br>EM/Portside - Confirms retention; species composition data | Confirms retention<br><br>Species composition data | Information on effort, area, gear, and economics<br><br>Species composition data |
| Discarded Catch | • Vessel trip reports • VMS catch reports | Discard estimate<br><br>Species composition data | Discard estimate<br><br>Species composition data | Discard estimate<br><br>Species composition data | ASM - Discard estimate; species composition data<br><br>EM - Flags discarding | Flags discarding | Discard estimate<br><br>Species composition of discarded catch |
| Catch Cap Monitoring | • Vessel trip reports • Dealer reports • VMS catch reports • Affidavits | Species composition of retained catch<br><br>Discard estimate and species composition of discarded catch | Species composition of retained catch<br><br>Discard estimate and species composition of discarded catch | Species composition of retained catch<br><br>Discard estimate and species composition of discarded catch | ASM - Discard estimate; species composition data on catch<br><br>EM/Portside - Confirms retention; species composition data on retained catch | Confirms retention<br><br>Species composition of retained catch | Species composition of retained catch<br><br>Species composition of discarded catch |
| Stock Assessments | • Vessel trip reports | Age and length data on catch | Age and length data on catch | Length data on catch | ASM - Length data on catch<br><br>EM/Portside - Age and length data on retained catch | Age and length data on retained catch | Age and length data on catch |
| Data collected under HER Alt 2.6 would be consistent with the data collected by ASM (25, 50, 75, or 100%) or EM/PRT (25, 50, 75, 100%) on MWT vessels fishing in Groundfish Closed Areas. | | | | | | | |

Ability to meet data interest: ☐ High  ☐ Medium  ▆ Low

_0000017192

**Amount of Coverage**

The amount of coverage can affect the uncertainty around catch estimates. The table below describes NEFOP coverage by gear type. Revisions to the SBRM in April 2015 affected how funding is used to allocate observer coverage. Therefore, the level of observer coverage during 2015 may be more indicative of future observer coverage levels than observer coverage levels from previous years.

TABLE 62. 2015 MIDWATER TRAWL[1], PURSE SEINE[2], AND SMALL MESH BOTTOM TRAWL[3] OBSERVER COVERAGE RATES

| Gear | Observer Coverage[4] |
| --- | --- |
| Midwater Trawl | 4.7% |
| Purse Seine | 2.5% |
| Small Mesh Bottom Trawl | 9.1% |

Source: DMIS and ODBS databases as of 2016-05-21

[1]Midwater Trawl: Includes both single and paired midwater trawl gears

[2]Purse Seine: Includes all purse seine gears (including tuna)

[3]Small Mesh Bottom Trawl: Includes bottom trawl gear w/codend mesh size less than 5.5" excluding bottom otter twin trawl, scallop and shrimp trawl trips

[4]Includes observer trips w/at least 1 observed haul divided by VTR trips reporting kept catch

*Monitoring Catch Caps in the Herring Fishery*

The monitoring coverage levels for the herring fishery described in Herring Alternatives 2.1 and 2.2 were evaluated with regard to their impact on haddock and river herring/shad catch estimate precision. Only fishing years (FYs) when catch caps were in effect were included in the analysis. The haddock catch cap analysis includes 2011-2015 and the river herring/shad catch cap analysis includes 2014-2015. Herring discards were not evaluated. Herring discards are generally a small component of the overall herring catch. Herring discards are estimated by extrapolating discards from NEFOP observed hauls only. In recent years, herring discards have accounted for well less than 1% of the total herring catch.

The herring fishery currently has six catch caps: (1) Haddock: Georges Bank (GB) Midwater Trawl, (2) Haddock: Gulf of Maine (GOM) Midwater Trawl, (3) River Herring/Shad (RHS): Cape Cod (CC) Midwater Trawl, (4) RHS: GOM Midwater Trawl, (5) RHS: Southern New England (SNE) Bottom Trawl, and (6) SNE Midwater Trawl.

The GB and GOM Haddock Catch Caps were implemented through NE Multispecies Framework 46 in 2011, which separated the previous existing haddock catch cap into GB and GOM stock areas and adjusted the estimation methodology to the current extrapolation method. Herring Framework Adjustment 3 implemented RHS Catch Caps for 2014-2015;

_0000017193

caps were effective on December 4, 2014.  The haddock catch caps operate on a May-April Fishing Year, while the river herring/shad catch caps operate on a January-December Fishing Year.  For river herring/shad catch caps, trips landing greater than 6,600 pounds of herring are counted against an individual catch cap, depending on the gear and area of the trip.  For haddock catch caps, all midwater trawl trips in GB and GOM are counted against the catch caps.

Catch cap estimates in the herring fishery are comprised of both incidental kept and discard components.  Current quota monitoring methodology for these catch caps employs the cumulative method to extrapolate  incidental catch (kept and discard) to the fleet based on a ratio estimator (incidental catch divided by total catch) derived from NEFOP data.  Only observed trips are used to derive the ratio estimator.  Fleet kept all (KALL) is obtained from VTRs and dealer data, which provides effort information (gear and area) and landings information respectively.  Actual observed incidental catch amounts are used in lieu of estimated incidental catch amounts whenever possible.

This analysis uses the same data sources as quota monitoring.  However, this analysis focuses strictly on the precision of the incidental catch ratio estimator in each catch cap, and does not incorporate the replacement of actual observed values for estimated incidental catch based on the ratio estimator (described above).  Furthermore, this analysis is constrained to trips that count towards a specific catch cap (e.g., river herring/shad cap trips must land >6,600 pounds of herring regardless of gear).  Trips that would not be count against a catch cap are not included in the analysis.

The coefficient of variation (CV), defined for this analysis as the ratio of the standard error of total catch (incidental kept and discards) to was used to quantify the precision of the estimated catch.  The CV is sensitive to sample size.  In a finite population, the CV will converge to zero as the sample size approaches the population size.  The total fishing trips within a stratum is considered finite, therefore, as sampling coverage approaches 100%, the CV will converge to zero for that stratum.  The CV analysis follows the guidelines detailed by the SBRM and uses the trip as the sampling unit.  Only observed trips (trips with at least one observed haul) and trips reporting kept catch on their VTR were used in the CV analysis.  This distinction is important to understand when interpreting observer coverage rates (referred to below as "realized" observer coverage) because in the paired midwater trawl fishery it is not uncommon for wing vessels to carry observers and but not carry any catch.  These trips would not be reflected in the observer coverage rates described in this analysis.   Furthermore, trips that did not yield any observed hauls are excluded from this analysis.

At-sea monitors would collect both retained and discarded catch composition in a manner consistent with existing NEFOP protocols.  Therefore it is assumed that there will be no difference in the catch composition data collected by NEFOP observers and at-sea monitors under Herring Alternatives 2.1 and 2.2.  This analysis uses NEFOP data as a proxy for potential future ASM coverage estimate simulations.  Also, observer and ASM coverage targets proposed in the IFM Amendment are additive, so simulated CV estimates based on

_0000017194

proposed coverage targets assume both SBRM and IFM coverage will contribute to the target.

Monitoring Catch Caps Under Herring Alternative 1

Table 63 and Figure 8 summarize the CV calculated according to SBRM methodology as well as the realized observer coverage for each catch cap during the years when catch caps were in place. For each year and catch cap, the CV and the realized observer coverage in italics are shown in Table 63.

Although there is no defined CV target, a 30% CV was provided for context. The GB Haddock Catch Cap remained below a CV of 30% for all years except for 2015, while the GOM haddock had a CV of 0% for all years because no GOM haddock catch was observed. The river herring/shad catch cap CVs are more variable, but it is difficult to infer a trend based on the limited data.

Table 63 and Figure 8 characterize the history of catch cap estimate precision produced from NEFOP coverage (Herring Alternative 1). It must be noted that due to the implementation of river herring/shad catch caps in late 2014, most of the 2014 effort was not subject to the river herring/shad catch caps. Furthermore, the 2015 GB Haddock Catch Cap was closed in October, effectively truncating the May-April fishing year

**TABLE 63.** HERRING CATCH CAP CV AND OBSERVER COVERAGE, 2011-2015

| Catch Cap Fishery | Fishing Year[1]: CV (Observer Coverage) | | | | |
|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015** |
| Haddock: GB MW Trawl | 17.6% *(41.7%)* | 12.3% *(62.9%)* | 21.3% *(35.6%)* | 20.5% *(27.2%)* | 61.4% *(4.9%)*** |
| Haddock: GOM MW Trawl | 0.0% *(30.4%)* | 0.0% *(29.2%)* | 0.0% *(34.8%)* | 0.0% *(46.3%)* | 0.0% *(8.6%)* |
| RHS: CC MW Trawl | | | | 36.2% *(48.0%)** | 81.4% *(10.1%)* |
| RHS: GOM MW Trawl | | | | 37.3% *(50.0%)** | 94.8% *(8.7%)* |
| RHS: SNE Bottom Trawl | | | | 28.4% *(17.4%)** | 24.5% *(15.0%)* |
| RHS: SNE MW Trawl | | | | 70.2% *(3.4%)** | 11.8% *(2.3%)* |

Source: GARFO Quota Monitoring Database as of 5/22/2016
[1]Catch cap fishing year: river herring/shad = calendar year; haddock = May-April
*2014 Herring RHS fishing year partially covered by RHS Catch Caps which was implemented on December, 4 2014
**2015 GB Haddock fishing year truncated due to the closure of the GB Haddock AM Area on October 22, 2015

_0000017195



**FIGURE 8. HERRING CATCH CAP CV AND OBSERVER COVERAGE (DOT SIZE) IN RELATION TO A 30% CV.**

Figure 9 details CV curves calculated according to SBRM methodology across varying coverage levels in relation to a 30% CV. These curves are solely based on observer data within each catch cap and year and are estimated on those data and how observer coverage was assigned for that particular year.



**FIGURE 9. 2011-2015 DERIVED CV CURVE FOR EACH CATCH CAP BASED ON SBRM SAMPLE SIZE ANALYSIS METHODOLOGY, WITH REALIZED CV FOR EACH CATCH CAP YEAR (BLACK DOT).**

Monitoring Catch Caps Under Herring Alternatives 2.1 and 2.2

Due to the structure of Herring Alternatives 2.1 and 2.2, and how coverage is being selectively assigned based on gear, permit, category, and 25 mt and 50 mt landing thresholds, estimated CVs based on proposed coverage levels could not be estimated formulaically according to SBRM. Simulation based on resampling of observed trips was required instead.

Simulations were performed for each catch cap and year and based on NEFOP observer data. Proposed coverage levels were simulated by resampling the required amount of observer trips to obtain the target coverage level based on the effort profile for a particular catch cap and year. Herring Alternatives 2.1 and 2.2 focus coverage on Category A and B herring vessels. Due to this, simulated increasing coverage was confined to Category A and B vessel trips until 100% of those trips were simulated as observed. Observed non-category A and B herring vessel trips were assumed to be SBRM coverage and were fully resampled in each simulation without increasing coverage. Within each simulation, a CV was calculated for the catch cap based on the specified coverage level. This process was repeated 1,000 times for each proposed coverage level, which yielded a distribution of simulated CVs. Table 64 summarizes the mean CV from those distributions for each proposed coverage level. Table 65 provides the simulated results if a 25 mt trip exemption existed, and Table 66 provides the simulated results if 50mt trip exemption existed. This process was repeated for each catch cap and year.

Due to the amount of observer data available within each catch cap, different approaches were taken in order to obtain a minimum sampling pool. Haddock catch cap strata yielded higher numbers of observed trips within each year allowing for simulation of observed trips within each fishing year; observer data from multiple fishing years were not grouped. The GB Haddock accountability measure closure in 2015 resulted in a small number (n<10) of observed trips to be simulated. The river herring/shad catch cap strata yielded smaller amounts of observed trips and needed to be combined across 2014 and 2015 into a single resampling group that was used to simulate 2014 and 2015 based on their respective effort profiles (total trips in strata for each year). Even after grouping 2014 and 2015, the RHS SNE Midwater Trawl Catch Cap had a small number (n<10) of trips to simulate. The RHS SNE Bottom Trawl Catch Cap also experienced a small number of observed trips to simulate from when the 25 mt and 50 mt trip exemptions were applied (this was not the case when the 25 mt and 50 mt trip exemptions were removed).

For catch caps where all of the effort is comprised of Category A and B herring vessels, the CV should converge to zero in 100% coverage scenarios. This was the case for all catch caps confined to midwater trawl trips except for RHS SNE Midwater Trawl, which includes non-Category A and B vessels. The effect of mixed permit categories in RHS SNE Midwater Trawl Catch Cap is that proposed coverage will not cover all trips in that catch cap at 100% coverage of Category A and B vessels and results in the CV not converging to zero. The effect is more pronounced in the RHS SNE Bottom Trawl Catch Cap, where on average 38% of 2014-2015 trips were by non-Category A and B vessels.

_0000017198

The 25 mt and 50 mt trip exemptions allow for a certain number of trips within each catch cap to go unobserved and therefore impact the simulated CV.  Generally, the exemptions cause the CV to increase when compared to simulations without the exemption.  The effect becomes more pronounced at higher coverage levels.  This results in CVs that do not converge to zero at 100% coverage levels, even in catch caps with 100% Category A and B vessels because not all trips will be covered.  Tables 65 and 66 describe the CV effects for all catch caps.   The GOM Haddock Catch Cap is not impacted because the CV is always zero due to no observed incidental haddock catch.  The effect is very small in the GB Haddock Catch Cap where trips tend to be consistently above 25 mt and/or 50 mt compared to the RHS catch caps where catches are small or more variable.  Both the 25 mt and 50 mt exemptions exert the same general effect on CV performance, which gets amplified as the exemption threshold increases.  Thus, the 50 mt exemption yields the highest simulated CVs in catch caps that are sensitive to exemptions.

**TABLE 64**. ALTERNATIVE 2.2: SIMULATED MEAN CV AT 25%, 50%, 75% AND 100% ASM COVERAGE

| Catch Cap | Fishing Year[1] | Simulated Mean CV (%) | | | |
|---|---|---|---|---|---|
| | | 25% Coverage | 50% Coverage | 75% Coverage | 100% Coverage |
| Haddock:  GB Midwater Trawl | 2011 | 25.8% | 14.8% | 8.6% | 0.0% |
| | 2012 | 24.2% | 14.9% | 8.8% | 0.0% |
| | 2013 | 26.4% | 15.5% | 9.1% | 0.0% |
| | 2014 | 21.7% | 12.5% | 7.2% | 0.0% |
| | 2015** | 22.7% | 13.1% | 7.5% | 0.0% |
| Haddock:  GOM Midwater Trawl | 2011 | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2012 | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2013 | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2014* | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2015** | 0.0% | 0.0% | 0.0% | 0.0% |
| Herring-RHS: CC Midwater Trawl | 2014* | 63.2% | 39.5% | 22.7% | 0.0% |
| | 2015 | 62.4% | 41.8% | 24.9% | 0.0% |
| Herring-RHS: GOM Midwater Trawl | 2014* | 64.3% | 39.1% | 22.8% | 0.0% |
| | 2015[3] | 61.1% | 35.3% | 20.8% | 0.0% |
| Herring-RHS: SNE Bottom Trawl | 2014* | 24.1% | 17.3% | 13.2% | 9.8% |
| | 2015 | 28.0% | 18.6% | 13.3% | 9.2% |
| Herring-RHS: SNE Midwater Trawl | 2014* | 23.0% | 13.6% | 8.5% | 3.9% |
| | 2015 | 22.7% | 13.1% | 7.5% | 0.0% |

Source: GARFO Quota Monitoring Database as of 5/22/2016
[1]Catch cap fishing year: river herring/shad = calendar year; haddock = May-April

*2014 Herring RHS fishing year partially covered by RHS Catch Caps which was implemented on December, 4 2014
**2015 GB Haddock fishing year truncated due to the closure of the GB Haddock AM Area on October 22, 2015

_0000017199

TABLE 65. ALTERNATIVE 2.2: SIMULATED MEAN CV AT 25%, 50%, 75% AND 100% ASM COVERAGE WITH 25 MT TRIP EXEMPTION

| Catch Cap | Fishing | Simulated Mean CV (%) | | | |
|---|---|---|---|---|---|
| | | 25% | 50% | 75% | 100% |
| Haddock: GB Midwater Trawl | 2011 | 25.4% | 15.0% | 8.9% | 2.4% |
| | 2012 | 24.8% | 15.4% | 9.7% | 4.0% |
| | 2013 | 26.1% | 15.5% | 9.3% | 2.2% |
| | 2014 | 22.2% | 12.9% | 7.6% | 2.2% |
| | 2015** | 23.1% | 13.5% | 8.1% | 2.7% |
| Haddock: GOM Midwater Trawl | 2011 | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2012 | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2013 | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2014* | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2015** | 0.0% | 0.0% | 0.0% | 0.0% |
| Herring-RHS: CC Midwater Trawl | 2014* | 61.9% | 39.7% | 23.4% | 4.5% |
| | 2015 | 63.7% | 42.0% | 24.2% | 5.0% |
| Herring-RHS: GOM Midwater Trawl | 2014* | 62.8% | 41.8% | 25.8% | 11.5% |
| | 2015 | 63.6% | 39.8% | 25.0% | 13.4% |
| Herring-RHS: SNE Bottom Trawl | 2014* | 24.2% | 17.5% | 14.1% | 11.5% |
| | 2015 | 24.8% | 19.3% | 15.4% | 12.6% |
| Herring-RHS: SNE Midwater Trawl | 2014* | 32.5% | 21.7% | 16.2% | 12.4% |
| | 2015 | 34.3% | 22.1% | 15.9% | 11.5% |

Source: GARFO Quota Monitoring Database as of 5/22/2016
[1]Catch cap fishing year: river herring/shad = calendar year; haddock = May-April

*2014 Herring RHS fishing year partially covered by RHS Catch Caps which was implemented on December 4, 2014
**2015 GB Haddock fishing year truncated due to the closure of the GB Haddock AM Area on October 22, 2015

_0000017200

**Table 66**. Alternative 2.2: Simulated mean CV at 25%, 50%, 75% and 100% ASM coverage with 50 mt trip exemption

| Catch Cap | Fishing | Simulated Mean CV (%) | | | |
|---|---|---|---|---|---|
| | | 25% | 50% | 75% | 100% |
| Haddock:  GB Midwater Trawl | 2011 | 25.1% | 15.1% | 9.4% | 4.1% |
| | 2012 | 22.8% | 14.9% | 9.6% | 4.1% |
| | 2013 | 25.1% | 15.4% | 9.3% | 3.2% |
| | 2014 | 22.9% | 13.5% | 8.6% | 4.4% |
| | 2015** | 26.0% | 15.9% | 10.3% | 5.5% |
| Haddock:  GOM Midwater Trawl | 2011 | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2012 | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2013 | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2014* | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2015** | 0.0% | 0.0% | 0.0% | 0.0% |
| Herring-RHS: CC Midwater Trawl | 2014* | 63.5% | 41.3% | 25.0% | 9.0% |
| | 2015 | 64.5% | 45.8% | 30.4% | 16.5% |
| Herring-RHS: GOM Midwater Trawl | 2014* | 66.4% | 46.3% | 31.2% | 18.9% |
| | 2015 | 62.0% | 39.3% | 25.7% | 14.0% |
| Herring-RHS: SNE Bottom Trawl | 2014* | 24.5% | 20.6% | 17.7% | 15.7% |
| | 2015 | 28.3% | 24.9% | 21.7% | 19.4% |
| Herring-RHS: SNE Midwater Trawl | 2014* | 41.0% | 28.2% | 22.2% | 18.0% |
| | 2015 | 41.2% | 27.4% | 20.5% | 16.1% |

Source: GARFO Quota Monitoring Database as of 5/22/2016
[1]Catch cap fishing year: river herring/shad = calendar year; haddock = May-April
*2014 Herring RHS fishing year partially covered by RHS Catch Caps which was implemented on December 4, 2014
**2015 GB Haddock fishing year truncated due to the closure of the GB Haddock AM Area on October 22, 2015

Figures 10, 11, 12, and 13 detail the simulation results by year and catch cap.  The dotted line represents the mean simulated CV based on increasing Category A and B vessel coverage, while the solid line indicates the same simulation with the 25 mt and 50 mt trip exemptions applied.  The grey area around the solid and dashed lines represents the two standard error envelope around the mean simulated CV.  It is important to understand that these are simulated CVs, therefore by their nature there is a range of resulting CVs for each coverage rate.  The variability of the simulated CV (expressed by the standard error) is related to the variability of the underlying incidental catch data.  The overlap (black dots on Figures) between the realized CV for these catch caps and the range of simulated CVs is a good indicator of that variability.  All realized CVs fell within +/- 2 standard errors of the mean simulated CV, which implies the simulation is reasonable within that margin of error. For catch caps, the realized CV does not closely track the mean simulated CV.  This effect is

_0000017201

likely due to underlying variability in incidental catch data and/or small numbers of observed trips.  The simulated GOM Haddock CV Catch Cap was not shown because no haddock catch was observed from 2011-2015.

Overall, the GB Haddock Catch Cap, RHS SNE Bottom Trawl, and RHS SNE Midwater Trawl catch caps yielded a mean simulated CV < 30% for all simulated years at or below a 25% coverage rate.  RHS CC Midwater Trawl and RHS GOM Midwater Trawl Catch Caps were the only catch caps that clearly did not reduce below 30% at a 25% observer coverage rate. Given the broad range in the simulated CV for these caps (wide standard error envelope) it is difficult to draw strong conclusions from these results.  Furthermore, the relatively short (2 years) worth of data available from the river herring/shad catch caps adds to this difficulty.

The performance was nearly identical under the 25 mt trip exemption option with the exception of RHS SNE Midwater Trawl Catch Cap, which shows the simulated mean CV slightly increase above 30% at a 25% coverage rate.  The 50 mt exemption option has more pronounced effects than the 25 mt option. These effects can be seen in the RHS catch caps where the 50 mt exemption simulated CVs diverge from the non-exemption CV more strongly and at lower coverage levels (Figure 13).

The simulated CV results must be interpreted as an estimate of what may happen in the future based on existing information.  The simulations were based on past fishing behavior and observed incidental catch from within the catch caps.  Therefore, they may not hold if either factor changes in the future.

_0000017202



**FIGURE 10. 2011-2015 SIMULATED GB HADDOCK CATCH CAP MEAN CV (+/- 2 STANDARD ERRORS) IN RESPONSE TO INCREASING OBSERVER COVERAGE ON CATEGORY A/B HERRING VESSELS, WITH REALIZED CV FOR EACH FISHING YEAR (BLACK DOT). INCLUDES 25 MT TRIP EXEMPTION OPTION.**

_0000017203



**FIGURE 11. 2014-2015 SIMULATED RHS CATCH CAP MEAN CV (+/- 2 STANDARD ERRORS) IN RESPONSE TO INCREASING OBSERVER COVERAGE ON CATEGORY A/B HERRING VESSELS, WITH REALIZED CV FOR EACH FISHING YEAR (BLACK DOT). INCLUDES 25 MT TRIP EXEMPTION OPTION.**

_0000017204



**FIGURE 12. 2011-2015 SIMULATED GB HADDOCK CATCH CAP MEAN CV (+/- 2 STANDARD ERRORS) IN RESPONSE TO INCREASING OBSERVER COVERAGE ON CATEGORY A/B HERRING VESSELS, WITH REALIZED CV FOR EACH FISHING YEAR (BLACK DOT). INCLUDES 50 MT TRIP EXEMPTION OPTION.**

_0000017205



**FIGURE 13. 2014-2015 SIMULATED RHS CATCH CAP MEAN CV (+/- 2 STANDARD ERRORS) IN RESPONSE TO INCREASING OBSERVER COVERAGE ON CATEGORY A/B HERRING VESSELS, WITH REALIZED CV FOR EACH FISHING YEAR (BLACK DOT). INCLUDES 50 MT TRIP EXEMPTION OPTION.**

_0000017206

**How Coverage is Allocated**

The allocation of monitoring, or the basis of selecting a vessel for monitoring coverage, affects how the resulting data can be used for management.

Under SBRM, vessels are selected for observer coverage by fishing fleet (based on gear, mesh and area), not based on FMP or permit category.  Valid estimates of catch or bycatch (and their variances) rely on formulas that are consistent with the underlying sampling design.  Estimates that are inconsistent with the sampling design may be biased, which may impact the utility of the data.

Observed trips that were selected for coverage based on permit category, and not fleet, may be treated separately by the NEFSC in catch and bycatch analyses.  These data may not be used in stock assessments or total catch estimation because the vessel selection for observer coverage is no longer done in a randomized way and is inconsistent with SBRM's sampling design.  Data collected by permit category could be used to track catch against annual catch limits (ACLs) or fishery catch caps that are specific to the permits that are being targeted for coverage because the data collection and catch estimation method would match.  However, the utility of data collected by permit category would likely be limited as compared to data that were collected by fishing fleet because the catch estimate method does not match SBRM's sampling design.

To summarize, the decision to allocate observer coverage by FMP (i.e., permits) or fishing fleet depends on the objectives of the additional coverage and how the data will subsequently be used.  If one of the objectives of additional coverage is to improve catch estimates for use in stock assessments, and not just solely for monitoring harvest, then monitoring coverage should be allocated by fishing fleet and not FMP, fishery, or permit category.

**TABLE 67.  PROS AND CONS OF ALLOCATING MONITORING COVERAGE BY FLEET VERSUS PERMIT CATEGORY**

|  | Pros | Cons |
|---|---|---|
| **Permit-Based Coverage Target Alternatives** | Councils manage fisheries by FMP and vessel permit | Not consistent with how SBRM allocates observers |
|  | Can be used to monitor FMP-specific quotas and catch caps | Resulting data may be biased and not used for stock assessment and/or total removals |
|  | Can be used to monitor FMP-specific quotas and catch caps | Difficult to design, deploy and analyze results because vessels typically don't structure trips by permit category |

_0000017207

|  | Pros | Cons |
|---|---|---|
| **Fleet-Based Coverage Target Alternatives** | Consistent with how SBRM allocates observer coverage | Typically extends across FMPs |
|  | Resulting data may be combined with SBRM data for stock assessments and/or total removals | Not consistent with how Councils manage fisheries by FMP and vessel permit |

## 4.2.3 IMPACTS OF HERRING ALTERNATIVES ON TARGET SPECIES

### 4.2.3.1 Impacts of Herring Alternatives 1 and 2 on the Herring Resource

In general, the impacts of Herring Alternatives 1 and 2 on the herring resource are indirect because they affect levels of monitoring rather than harvest specifications. Indirect benefits to the herring resources are possible if increased monitoring can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments. However, Herring Alternatives 1 and 2 may lead to direct positive impacts on the herring resource if fishing effort is limited, either through monitoring availability or catch tracked against catch limits, and that increases the reproductive potential of the herring resource.

Herring Alternative 1 would not specify a coverage target for an IFM program in the Herring FMP. Monitoring for herring vessels would be allocated according to SBRM. If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-specific basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

For example, New England vessels using extra-large mesh gillnets catch monkfish, skates, and Northeast multispecies, often on the same fishing trip, and, therefore, most participants in this fishery must operate according to the regulations implemented under three different FMPs. To distinguish between the management units identified in individual FMPs and the fisheries that operate under one or more FMPs, the SBRM is designed around "fishing modes" defined by the type of fishing gear used and the area from which the vessels depart.

_0000017208

There are 56 fishing modes defined in the SBRM, some of which further subdivide a fishery by the mesh size of the gear used (for gillnets and otter trawls), or by the type of permit and access area program (for sea scallop dredges).  Although there are differences among the modes, the participants in these fishing modes fish throughout the Gulf of Maine, Georges Bank, and the Mid-Atlantic Bight, and land their catch across a large number of fishing ports from the Outer Banks of North Carolina to Downeast Maine.  The SBRM is limited to those fisheries that are prosecuted in the Federal waters of the Greater Atlantic Region and managed through a FMP developed by either the New England or Mid-Atlantic Fishery Management Council.  Current observer coverage allocated to the herring fishery through SBRM is described in Table 67.

Under SBRM, the Atlantic herring fishery will receive at-sea observer coverage under the following 6 fleets:  New England and Mid-Atlantic small mesh otter trawl; New England and Mid-Atlantic purse seine; and New England and Mid-Atlantic paired and single midwater trawl.  The table below describes the sea days proposed for April 2016 through March 2017.  The sea days listed below for small mesh otter trawl cover all FMPs that use this gear type, so only a portion would cover trips targeting herring.  The purse seine and midwater trawl fleets are largely comprised of vessels targeting herring, so a majority of these sea days in these categories will be used to observe trips targeting herring.

**TABLE 68.  PROPOSED AND OBSERVED SEA DAYS FOR FLEETS THAT TARGET HERRING**

| Fleet | Region | Proposed sea days for April 2016 to March 2017 | Observed sea days, July 2014 to June 2015 | VTR sea days, July 2014 to June 2015 | Observed trips, July 2014 to June 2015 | VTR trips, July 2014 to June 2015 |
|---|---|---|---|---|---|---|
| **Small Mesh Bottom Trawl** | MA | 1,171 | 997 | 6,761 | 360 | 3,088 |
| **Small Mesh Bottom Trawl** | NE | 798 | 933 | 8,847 | 319 | 3,381 |
| **Purse seine** | MA | 6 | 0 | 174 | 0 | 172 |
| **Purse seine** | NE | 19 | 29 | 661 | 13 | 315 |
| **Midwater Trawl (Pair and Single)** | MA | 30 | 8 | 134 | 1 | 26 |
| **Midwater Trawl (Pair and Single)** | NE | 440 | 160 | 1,189 | 43 | 363 |

*Source: 2016 Discard Estimation, Precision, and Sample Size Analyses for 14 Federally Managed Species Groups in the Waters off the Northeastern United States; Wigley et al., 2016.*

The herring fishery is managed through a stock-wide ACL (reduced from the overfishing limit and acceptable biological catch to address scientific uncertainty and management

uncertainty) and sub-ACLs (allocated by herring management area) that are designed to prevent overfishing on individual stock components. Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 will not likely affect the setting of herring harvest specifications but it may affect the ability of the herring fishery to fully harvest the ACLs if less monitoring (when compared to herring Alternative 2) results in catch caps for haddock and river herring/shad limiting effort in the herring fishery.

The Council selected Herring Alternative 2 as a preferred alternative. Under Herring Alternative 2, the Council would specify the details of an IFM program for the Herring FMP. These details may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) minimum level of coverage necessary to meet coverage goals, (4) consideration of coverage waivers if coverage target cannot be met, (5) process for vessel notification and selection, (6) process for payment of industry cost responsibilities, (7) standards for monitoring service providers, and (8) any other measures necessary to implement the IFM program. Additional NEPA analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying the specified IFM programs.

Herring Alternative 2 is intended to allow for additional monitoring in the herring fishery by specifying coverage targets, above SBRM (Herring Alternative 1), for industry-funded monitoring. The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year. The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM and the specified coverage target. If Federal funding is available to cover NMFS cost responsibilities associated with IFM in the herring fishery, Herring Alternative 2 may have a positive impact on the herring resource by increasing monitoring in the herring fishery. While the benefits to the herring resource may be difficult to quantify under Herring Alternative 2, they may not be realized under Herring Alternative 1.

Under Alternative 2, benefits to the herring resource would depend on the type of additional monitoring and specified coverage targets for the herring fishery, but could result from increased monitoring to verify retained and discarded catch. As catch information increases, the uncertainty around catch estimates in the herring fishery may be reduced, potentially improving the tracking of harvest against ACLs and allowing for discard estimates to be incorporated into future herring stock assessments. These benefits may not be realized under Herring Alternative 1.

Similar to Herring Alternative 1, the selection of Herring Alternative 2 will not likely affect the setting of herring harvest specifications. However, similar to Herring Alternative 1, the selection of Herring Alternative 2 may affect the ability of the herring fishery to fully harvest ACLs. Under Herring Alternative 2, if fishing effort is limited by the availability of monitoring coverage or increased monitoring results in catch caps for haddock and river herring/shad limiting effort in the herring fishery, then the herring fishery may not be able to fully harvest the ACLs.

_0000017210

Impacts under Herring Alternative 2 assume that the future behavior of fishery participants will be similar to that in past years, when in reality fishery participants are likely to engage in a range of mitigation behaviors to reduce the economic impact associated with industry-funded monitoring.  For example, vessels that have historically participated in many fisheries may stop fishing for herring and only participate in fisheries that do not have industry-funded monitoring requirements.  However, it is unlikely that those effort shifts would have biological impacts on other fisheries, especially when those fisheries are managed by catch limits.  At this time, it is not possible to predict what, if any, mitigation behaviors may be used by herring fishery participants.

Herring Alternative 2 would allow several sub-options to apply to the IFM alternatives.

Sub-Option 1 (Preferred Alternative) would allow vessels to be issued waivers to exempt them from IFM requirements, for either a trip or the fishing year, if coverage was unavailable due to funding or logistics.  Sub-Option 2 (Preferred Alternative) would exempt a wing vessel pair trawling with another vessel from IFM requirements, provided the vessel does not carry any fish.  Sub-Option 3 would require that IFM requirements expire two years after implementation.  Sub-Option 4 (Preferred Alternative) would require the Council to examine the results of any increased coverage in herring fishery two years after implementation, and consider if adjustments to the coverage targets are warranted.  Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via specifications, a framework adjustment, or an amendment to the Herring FMP, as appropriate.  Lastly, Sub-Option 5 would exempt trips that land less than 25 mt or 50 mt (Preferred Alternative) of herring from IFM requirements.

If the increased monitoring associated with Herring Alternative 2 is reduced or minimized by selection of any of the sub-options, the benefits of additional monitoring to the herring resource may be reduced and/or be similar to impacts under Herring Alternative 1.

Because the Council selected Sub-Options 1 and 2 as preferred alternatives, the additional coverage associated with Herring Alternative 2 may be waived if additional monitoring is unavailable or a wing vessel is pair trawling with another vessel.  If additional coverage is waived under Sub-Options 1 and 2, then any benefits associated with the additional coverage may be reduced, similar to Herring Alternative 1.

A positive impact is associated with Sub-Option 1 not being selected, if fishing effort is limited, either due to funding or logistics, and that increases the reproductive potential of herring.  Selection of Sub-Option 1 preserves the Council's intent to increase monitoring in the herring fishery, but would not prevent vessels from participating in the herring fishery if monitoring coverage was not available.  Had the Council not select Sub-Option 1, then any IFM requirements established in this amendment would have the potential to reduce effort in the herring fishery.  However, reducing fishing effort to match available monitoring may lack sufficient justification and be inconsistent with National Standards.

_0000017211

Sub-Option 3 (2-year sunset of coverage targets) and Sub-Option 4 (2-year re-evaluation of coverage targets and preferred alternative) are both administrative and would not impact the herring resource, thus both alternatives should have a negligible difference on impacts between Herring Alternatives 1 and 2.

The Council's selection of Sub-Option 5 as a preferred alternative means that the threshold for additional coverage (50 mt of herring) and the threshold for which trips count against catch caps for haddock (1 lb of herring) and river herring and shad (6,600 lb of herring) would differ. The data generated by the selection of Sub-Option 5 has the potential to bias (either higher or lower) the catch tracked against catch caps when compared to not selecting Sub-Option 5. Additionally, the Council's selection of the 50 mt threshold as a preferred alternative would result in fewer trips with additional coverage, thereby reducing the benefits of additional coverage under Herring Alternative 2, but the additional coverage would still be higher than under Herring Alternative 1.

Both Herring Alternative 1 and Herring Alternative 2 would require compliance with slippage restrictions, reporting requirements, and consequence measures. These measures are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling. Because these measures apply similarly to both Herring Alternatives 1 and 2, the benefits of slippage restrictions and requirements to the herring resource would be similar under both alternatives.

## Coverage Target Alternatives

Herring Alternative 2 would specify a level and type of IFM for the herring fishery. The types of IFM considered by the Council for the herring fishery include: NEFOP-level observers, at-sea monitors, and electronic monitoring (EM), and portside sampling. Monitoring alternatives allocate coverage by fleet or permit category. Monitoring requirements could apply across all herring management areas or to just midwater trawl vessels fishing in the Groundfish Closed Areas.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. Because the coverage target is calculated by combining SBRM and IFM coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. How coverage targets are calculated would not impact the herring resource, but any benefits associated with additional monitoring would be greater under Herring Alternative 2 than under Herring Alternative 1.

Under Herring Alternative 2, the amount and quality of information collected as part of an IFM program would vary with the type of coverage target alternative specified for the herring fishery. Impacts on the herring resource associated with specific coverage target alternatives (Herring Alternatives 2.1-2.7) are discussed in a subsequent section.

_0000017212

**Monitoring and Service Provider Requirements**

Herring Alternative 2 would specify that requirements for industry-funded observers and at-sea monitors include a HVF certification for the herring fishery. The HVF certification was developed in order to more effectively train certified NEFOP observers in high volume catch sampling and documentation. This certification was developed to prepare observers for changes in the regulations and new requirements that were under consideration in Herring Amendment 5.

NEFOP determined that data quality in the herring fishery was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers. Having an additional training to identify these practices allowed for improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Observers in the herring fishery are currently required to possess a HVF certification under Herring Alternative 1 and both observers and at-sea monitors would be required to possess a HVF certification under Herring Alternative 2. Therefore, the impacts of a HVF certification requirement under Herring Alternative 2 on the herring resource would be similar to the impacts under Herring Alternative 1.

Under Herring Alternative 2, the process for vessel notification and selection and payment of industry cost responsibilities would be developed during the rulemaking and amendment approval process.

To the extent that increased information on herring catch benefits the herring resource under Herring Alternative 2, those benefits may not be realized under Herring Alternative 1.

### 4.2.3.2  *Impacts of Herring Coverage Target Alternatives 2.1- 2.7 on the Herring Resource*

The Council selected Herring Alternatives 2.5 and 2.7 as preferred alternatives.

Herring Alternatives 2.1-2.7 are intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above SBRM, for industry-funded monitoring. If Federal funding is available to cover NMFS cost responsibilities associated with IFM in the herring fishery, the increased monitoring associated with Herring Alternatives 2.1-2.7 may have a positive impact on the herring resource. That positive impact would result from reducing the uncertainty around catch and bycatch estimates of herring and potentially increasing the amount of information available for use in the herring stock assessment. While the benefits to the herring resource may be difficult to quantify under Herring Alternatives 2.1-2.7, they may not be realized under Herring Alternative 1.

_0000017213

The magnitude of positive impacts to the herring resource associated with additional catch information is expected to vary with the monitoring coverage target specified and the realized coverage level in that year. The realized coverage level in a given year would be largely driven by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM (Herring Alternative 1) and the specified monitoring coverage target (Herring Alternatives 2.1-2.7).

Herring Alternatives 2.1-2.7 differ by (1) the type of information collected, (2) the specified amount of coverage, and (3) how coverage is allocated.

## Type of Information Collected

Currently, vessel and dealer data are used to track retained herring catch and SBRM observer data are used to track discarded herring catch. Additionally, vessel (i.e., catch and effort) and portside sampler (i.e., age and length) data are used in herring stock assessments.

Herring Alternatives 2.1and 2.5 would specify NEFOP-level observer coverage, Herring Alternative 2.2 would specify ASM coverage, Herring Alternatives 2.3, 2.6, and 2.7 would specify ASM coverage and/or EM and portside sampling coverage, and Herring Alternative 2.4 would specify EM and portside sampling coverage.

Both NEFOP-level observer coverage and at-sea monitoring coverage would provide species composition data on retained and discarded catch, while portside sampling coverage would provide species composition data on retained catch. NEFOP-level observers and at-sea monitors can estimate amounts of discarded catch. While EM cannot estimate the amount of discarded catch, it can verify retention of catch. Because discarding in the herring fishery is minimal, alternatives that increase the amount of information on retained and discarded catch (Herring Alternatives 2.1, 2.2, 2.3, 2.5, 2.6, and 2.7) will likely have the same potential to benefit the herring resource as alternatives that increase the amount of information on retained catch (Herring Alternative 2.4).

Because discarding in the herring fishery is minimal, alternatives that increase the amount of information on retained and discarded catch (Herring Alternatives 2.1, 2.2, 2.3, 2.5, 2.6, and 2.7) will likely have the same likelihood of affecting the data tracked against catch caps than alternatives that increase the amount of information on just retained catch (Herring Alternative 2.4). Increased monitoring of haddock and river herring and shad catch may help reduce uncertainty in estimates of catch that is tracked against catch caps, when that uncertainty may have otherwise led to effort restrictions in the herring fishery. Conversely, additional monitoring may illustrate higher than expected catch of haddock and river herring and shad, resulting in catch caps that are fully harvested earlier than expected and reduced opportunities to harvest herring. Increased information to help track catch against catch caps may help allow the herring fishery to fully harvest the ACLs or it may curtail the harvest of herring by the herring fishery.

_0000017214

Both NEFOP-level observers and portside samplers would collect age and length on herring, while at-sea monitors would collect length data on herring.  Currently, age and length data collected portside by Maine Department of Marine Resources are used in the herring stock assessment.  Because Herring Alternatives 2.1, 2.3 (portside sampling), 2.4, 2.5, 2.6, and 2.7 (portside sampling) would collect both age and length data on herring, those alternatives have the potential to benefit the herring resource more than Herring Alternatives 2.2 that would just collect length data on herring.

### Amount of Coverage

Herring Alternatives 2.1 and 2.5 specify monitoring coverage at 100%, while Herring Alternatives 2.2-2.4 and 2.7 allow monitoring coverage to range between 25% and 100%.

One monitoring objective for the herring coverage targets are accurate estimates of herring catch.  While high levels of monitoring are not always necessary to address a monitoring goal, more monitoring could be more effective to meet monitoring goals than less monitoring.  Therefore, across alternatives, choosing a higher coverage target has the potential to benefit the herring resource by improving management through better data.

The Council's preferred alternatives would require 100% coverage in Groundfish Closed Areas and 50% coverage on Category A and B vessels everywhere else.  These coverage targets are high to moderate compared to other alternatives and have the potential to improve herring catch estimates and ultimately improve management.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage.  NMFS would determine how to calculate the combined coverage target, in consultation with Council staff.  Because the coverage target is calculated by combining SBRM and IFM coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip.  The Council recommended these combined coverage targets to help reduce the cost of industry-funded coverage.  But because SBRM coverage has the potential to vary year to year, the cost of monitoring paid by industry may also vary year to year and may be difficult to plan/budget.

### How Coverage is Allocated

Herring Alternatives 2.1, 2.2, and 2.7 would allocate monitoring coverage by vessel permit category (i.e., Category A and B herring permits), Herring Alternative 2.4 would allocate monitoring coverage by fishing fleet (i.e., midwater trawl fleet), and Herring Alternative 2.3 would allocate monitoring coverage by permit category and fishing fleet.

The extent to which the allocation of industry-funded coverage is consistent with the SBRM fishing fleet will determine how the resulting data can be used.  Data collected by vessel permit category can be used for catch limit and catch cap monitoring, while data collected by fleet can be used for catch monitoring and generating discard estimates for stock assessments. Therefore, a positive biological impact is expected when coverage is allocated by fleet and a low positive biological impact is expected when coverage is allocated by

_0000017215

vessel permit category. However, the only alternatives allocating coverage by fleet (Herring Alternatives 2.3 (portside sampling) and 2.4) would not be collecting an estimate of discards.

Vessels with Category A and B herring permits harvested approximately 98% of recent herring catch (2008-2011) and the midwater trawl fleet harvested approximately 73% of recent herring catch (2008-2012). Based on recent catch, allocating coverage by Category A and B herring permits (Herring Alternatives 2.1, 2.2, 2.3, and 2.7) would increase monitoring on vessels that harvest the majority of catch in the herring fishery as compared to allocating coverage to the midwater trawl fleet (Herring Alternative 2.4). Therefore, any benefit to herring associated with increased monitoring may be higher under Herring Alternatives 2.1-2.3 and 2.7 than under Herring Alternative 2.4.

Overall, a similar low positive impact is likely if coverage is allocated by permit or by fleet.

Herring Alternative 2.5 specifies that midwater trawl vessels fishing in the Groundfish Closed Areas must carry a NEFOP-level observer while Herring Alternative 2.6 would specify that coverage for midwater trawl vessels fishing in Groundfish Closed Areas would match the coverage targets recommended by the Council for the rest of the fishery. Herring Alternative 2 Sub-Options would apply to Herring Alternative 2.6 but not to Herring Alternative 2.5. If increased monitoring associated with Herring Alternative 2.6 is reduced or minimized by the selection of any of the sub-options, the benefits of additional monitoring to the non-target species may be less than under Herring Alternative 2.6 than under Herring Alternative 2.5.

During 2005-2010, prior to any observer coverage requirements for midwater trawl vessels fishing in Groundfish Closed Areas, less than 12% of total catch by the midwater trawl fleet came from inside the Groundfish Closed Areas. Because a relatively small percentage of the midwater trawl fleet's herring harvest comes from inside Groundfish Closed Areas, any positive impact to the herring resource associated with additional catch information under Herring Alternatives 2.5 and 2.6 would be similar, but likely reduced, compared to impacts under Herring Alternatives 2.1-2.4 and 2.7.

### Slippage Requirements

Herring Alternatives 2.1–2.7 would require compliance with slippage restrictions, reporting requirements, and consequence measures. Specifically, all existing slippage restrictions, reporting requirements, and consequence measures would apply on all trips with a NEFOP-level observer or at-sea monitor was aboard. Additionally, slippage restrictions, reporting requirements, and the 15-mile move requirement would apply on all trips selected for portside sampling.

Slippage requirements are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling. Any benefits to the herring resource from slippage requirements would likely be similar across Herring Alternatives 2.1-2.7.

_0000017216

## Summary of Impacts to Herring Resource

The impacts of herring alternatives on the herring resource are indirect because they affect levels of monitoring rather than harvest specifications. Indirect benefits to herring are possible if increased monitoring can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments.

However, these alternatives may lead to direct positive impacts on herring if fishing effort is limited, either through monitoring availability or catch tracked against catch limits, and that increases the reproductive potential of herring.

The impact of Herring Alternative 1 (No Action) on herring is likely low positive because monitoring coverage is allocated by SBRM, but there is no additional monitoring to reduce uncertainty around catch and bycatch estimates. The impact of Herring Alternative 2 on herring is generally positive because there would be additional monitoring to reduce the uncertainty around catch estimates, but the magnitude of the impact is dependent on the type of information collected, amount of coverage, and how coverage is allocated. The realized coverage in any given year will also largely depend on and amount of Federal funding available to cover NMFS cost responsibilities.

A positive biological impact on herring is expected if data are collected on both retained and discarded catch and a low positive impact if data are collected on just retained catch. But since discards are minimal in the herring fishery, a similar positive impact is likely if data are collected on just retained catch. Data collected by vessel permit category can be used for catch limit and catch cap monitoring, while data collected by fleet can be used for catch monitoring and generating discard estimates for stock assessments. Therefore, a positive biological impact is expected when coverage is allocated by fleet and a low positive biological impact is expected when coverage is allocated by vessel permit category. However, the only alternative solely allocating coverage by fleet (Herring Alternative 2.4) would not be collecting an estimate of discards. Additionally, vessels with Category A and B herring permits harvest approximately 98% of total herring catch, compared to the midwater trawl fleet that harvests approximately 73% of total herring catch. Therefore, a similar low positive impact is likely if coverage is allocated by permit or by fleet.

If coverage is only allocated to Groundfish Closed Areas (Herring Alternatives 2.5 and 2.6), then a low positive biological impact is likely because the area of coverage is limited.

A positive impact is associated with Sub-Options 1 and 2 not being selected, if fishing effort is limited, either due to funding or logistics, and that increases the reproductive potential of herring. Sub-Option 5 would only require additional coverage on trips that land more than 25 mt or 50 mt mt of herring, so there is the potential for a low negative impact on herring associated with Sub-Option 5 if it biases data used to track catch against catch caps.

Given all these factors, the impact on the herring resource is likely low positive for Herring Alternatives 2.1-2.7. Additionally, the impacts of these herring alternatives on the herring

_0000017217

resource are not significant because they would not cause the herring resource to become overfished and would not result in overfishing.

TABLE 69. IMPACTS SUMMARY OF HERRING ALTERNATIVES ON HERRING RESOURCE (*PREFERRED ALTERNATIVES SHOWN IN BOLD*)

| Alternatives | Impacts on Herring Resource |
|---|---|
| Herring Alternative 1: No Coverage Target Specified For IFM Programs (No Action) | • Low positive impact associated with observer coverage allocated by SBRM<br>• Low negative impact associated with no additional monitoring to reduce uncertainty around catch estimates |
| **Herring Alternative 2: Coverage Target Specified For IFM Programs** | • **Positive impact associated with additional monitoring to reduce uncertainty around catch estimates**<br>• **Low negative impact associated with no additional monitoring unless available Federal funding can cover NMFS cost responsibilities**<br>• **Magnitude of impacts associated with additional monitoring would be primarily dependent on the type of information collected, amount of coverage, how coverage is allocated, and amount of available Federal funding**<br>• **Positive impact associated with not selecting Sub-Option 1 if fishing effort is limited and that increases the reproductive potential of herring**<br>• **Low negative impact associated with selecting Sub-Options 1 and 2 if additional monitoring is waived**<br>• **Low negative impact associated with selecting Sub-Option 5 if it biases data used to track catch against catch caps** |
| Herring Alternative 2.1: 100% NEFOP-Level Coverage on Category A and B Vessels | • Low positive impact associated with additional information to reduce uncertainty around retained and discarded catch estimates associated with 100% coverage on Category A and B vessels |
| Herring Alternative 2.2: ASM Coverage on Category A and B Vessels | • Low positive impact associated with additional information to reduce around uncertainty around retained and discarded catch estimates associated with 100%-25% coverage on Category A and B vessels |
| Herring Alternative 2.3: Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | • Low positive impact associated with additional information to reduce uncertainty around retained and discarded catch estimates associated with 100%-25% coverage on Category A and B vessels<br>• Low positive impact associated with additional information to reduce uncertainty around retained catch estimates associated with 100% or 50% coverage on the midwater trawl fleet |
| Herring Alternative 2.4: EM and Portside Sampling on Midwater Trawl Fleet | • Low positive impact associated with additional information to reduce uncertainty around retained catch estimates associated with 100% or 50% coverage on the midwater trawl fleet |
| **Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas** | • **Low positive impact associated with additional information to reduce uncertainty around retained and discarded catch estimates associated with 100% coverage on the midwater trawl fleet fishing in Groundfish Closed Areas**<br>• **Negligible impact associated with Sub-Options** |
| Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet | • Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with 100%-25% coverage on the midwater trawl fleet fishing in Groundfish Closed Areas |

_0000017218

| Alternatives | Impacts on Herring Resource |
|---|---|
| Fishing in Groundfish Closed Areas | |
| **Herring Alternative 2.7: ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | • **Low positive impact associated with additional information to reduce uncertainty around retained and discarded catch estimates associated with 50% coverage on Category A and B vessels** |

## 4.2.4  IMPACTS OF HERRING ALTERNATIVES ON NON-TARGET SPECIES

The non-target species of interest that are harvested by the herring fishery are haddock, river herring and shad, and mackerel.

Current management of the herring fishery specifies gear and area specific catch caps for non-target species of interest harvested in the herring fishery.  River herring/shad catch (RHS) caps for vessels using midwater trawl gear exist for the Gulf of Maine (GOM), Cape Cod (CC), and Southern New England (SNE).  River herring and shad catch caps for vessels using small mesh bottom trawl gear exist for Southern New England.  The haddock catch cap in the herring fishery applies to vessels using midwater trawl gear in the GOM and Georges Bank (GB).

### 4.2.4.1  Impacts of Herring Alternatives 1 and 2 on Non-Target Species

In general, the impacts of Herring Alternatives 1 and 2 on non-target species are indirect because they affect levels of monitoring rather than harvest specifications.  Indirect benefits to non-target species are possible if increased monitoring can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments.  However, Herring Alternatives 1 and 2 may lead to direct positive impacts on non-target species if fishing effort is limited, either through monitoring availability or catch tracked against catch limits, and that increases the reproductive potential of non-target species.

Herring Alternative 1 would not specify a coverage target for an IFM program in the Herring FMP.  Monitoring for herring vessels would be allocated according to SBRM.  If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM.  The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries.  The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species.  Although management measures are typically developed and implemented on an FMP-specific basis, from the perspective of developing a bycatch reporting system, there is overlap among the

_0000017219

FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

For example, New England vessels using extra-large mesh gillnets catch monkfish, skates, and Northeast multispecies, often on the same fishing trip, and, therefore, most participants in this fishery must operate according to the regulations implemented under three different FMPs.  To distinguish between the management units identified in individual FMPs and the fisheries that operate under one or more FMPs, the SBRM is designed around "fishing modes" defined by the type of fishing gear used and the area from which the vessels depart.

There are 56 fishing modes defined in the SBRM, some of which further subdivide a fishery by the mesh size of the gear used (for gillnets and otter trawls), or by the type of permit and access area program (for sea scallop dredges).  Although there are differences among the modes, the participants in these fishing modes fish throughout the Gulf of Maine, Georges Bank, and the Mid-Atlantic Bight, and land their catch across a large number of fishing ports from the Outer Banks of North Carolina to Downeast Maine.  The SBRM is limited to those fisheries that are prosecuted in the Federal waters of the Greater Atlantic Region and managed through a FMP developed by either the MAFMC or NEFMC.  Current observer coverage allocated to the herring fishery through SBRM is described in Table 84.

The catch of mackerel in the herring fishery is managed by the Mid-Atlantic Council in the mackerel fishery specifications and the catch of haddock in the herring fishery is managed by the Council in the Northeast multispecies specifications.  The catch of haddock, river herring, and shad in the herring fishery is managed by fishery specific catch caps established by the Council.  Selection of Herring Alternative 1 will not likely affect the setting of harvest specifications for mackerel or haddock, but less monitoring (when compared to Herring Alternative 2) may affect the setting of catch caps and tracking catch against those catch caps.

The Council selected Herring Alternative 2 as a preferred alternative.  Under Herring Alternative 2, the Council would specify the details of an IFM program for the Herring FMP.  These details may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) minimum level of coverage necessary to meet coverage goals, (4) consideration of coverage waivers if coverage target cannot be met, (5) process for vessel notification and selection, (6) process for payment of industry cost responsibilities, (7) standards for monitoring service providers, and (8) any other measures necessary to implement the IFM program.  Additional NEPA analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying the specified IFM programs.

Herring Alternative 2 is intended to allow for additional monitoring in the herring fishery by specifying coverage targets, above SBRM (Herring Alternative 1), for industry-funded monitoring.  The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year.  The realized coverage for the fishery in a given year would fall somewhere between no additional

_0000017220

coverage above SBRM (Herring Alternative 1) and the specified coverage target (Herring Alternatives 2.1-2.7).  If Federal funding is available to cover NMFS cost responsibilities associated with IFM in the herring fishery, Herring Alternative 2 may have a positive impact on non-target species by increasing monitoring in the herring fishery.  While the benefits to non-target species may be difficult to quantify under Herring Alternative 2, they may not be realized under Herring Alternative 1.

Under Herring Alternative 2, benefits to non-target species would  depend on the type of additional monitoring and specified coverage targets for the herring fishery, but could result from increased monitoring to verify retained and discarded catch.  As catch information increases, the uncertainty around catch estimates in the herring fishery may be reduced, potentially improving the tracking of haddock, river herring, and shad catch against catch caps.  Additionally, increased monitoring may result in higher or lower documented catch of haddock, river herring, and shad, potentially leading to changes to the basis for setting catch caps and/or fishery catch caps being fully harvested more often or less often than expected.  These benefits may not be realized under Herring Alternative 1.

Impacts under Herring Alternative 2 assume that the future behavior of fishery participants will be similar to that in past years, when in reality fishery participants are likely to engage in a range of mitigation behaviors to reduce the economic impact associated with industry-funded monitoring.  For example, vessels that have historically participated in many fisheries may stop fishing for herring and only participate in fisheries that do not have industry-funded monitoring requirements.  However, it is unlikely that those effort shifts would have biological impacts on other fisheries or non-target species, especially when those fisheries are managed by catch limits.  At this time, it is not possible to predict what, if any, mitigation behaviors may be used by herring fishery participants.

Herring Alternative 2 would allow several sub-options to apply to the IFM alternatives.

Sub-Option 1 (Preferred Alternative) would allow vessels to be issued waivers to exempt them from IFM requirements, for either a trip or the fishing year, if coverage was unavailable due to funding or logistics.  Sub-Option 2 (Preferred Alternative) would exempt a wing vessel pair trawling with another vessel from IFM requirements, provided the vessel does not carry any fish.  Sub-Option 3 would require that IFM requirements expire two years after implementation.  Sub-Option 4 (Preferred Alternative) would require the Council to examine the results of any increased coverage in the herring fishery two years after implementation, and consider if adjustments to the coverage targets are warranted.  Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via specifications, a framework adjustment, or an amendment to the Herring FMP, as appropriate.  Lastly, Sub-Option 5 would exempt trips that land less than 25 mt or 50 mt (Preferred Alternative) of herring from IFM requirements.

If the increased monitoring associated with Herring Alternative 2 is reduced or minimized by selection of any of the sub-options, the benefits of additional monitoring to non-target species may be reduced and/or similar to impacts under Herring Alternative 1.

_0000017221

Because the Council selected Sub-Options 1 and 2 as preferred alternatives, the additional coverage associated with Herring Alternative 2 may be waived if additional monitoring is unavailable or a wing vessel is pair trawling with another vessel. If additional coverage is waived under Sub-Options 1 and 2, then any benefits associated with the additional coverage may be reduced, similar to Herring Alternative 1.

A positive impact is associated with Sub-Option 1 not being selected, if fishing effort is limited, either due to funding or logistics, and that increases the reproductive potential of non-target species. The positive impact would result from the increased reproductive potential of the individuals that are unharvested. However, larger numbers of spawning fish do not guarantee increased recruitment and high densities of fish may result in slow growth and poor condition. Selection of Sub-Option 1 preserves the Council's intent to increase monitoring in the herring fishery, but would not prevent vessels from participating in the herring fishery if monitoring coverage was not available. Had the Council not select Sub-Option 1, then any IFM requirements established in this amendment would have the potential to reduce effort in the herring fishery. However, reducing fishing effort to match available monitoring may lack sufficient justification and be inconsistent with National Standards.

Sub-Option 3 (2-year sunset of coverage targets) and Sub-Option 4 (2-year re-evaluation of coverage targets and preferred alternative) are both administrative and would not impact non-target species, thus both alternatives should have a negligible difference on impacts between Herring Alternatives 1 and 2.

The Council's selection of Sub-Option 5 as a preferred alternative means that the threshold for additional coverage (50 mt of herring) and the threshold for which trips count against catch caps for haddock (1 lb of herring) and river herring and shad (6,600 lb of herring) would differ. The data generated by the selection of Sub-Option 5 has the potential to bias (either higher or lower) the catch tracked against catch caps when compared to not selecting Sub-Option 5. Additionally, the Council's selection of the 50 mt threshold as a preferred alternative would result in fewer trips with additional coverage, thereby reducing the benefits of additional coverage under Herring Alternative 2, but the additional coverage would still be higher than under Herring Alternative 1.

Both Herring Alternative 1 and Herring Alternative 2 would require compliance with slippage restrictions, reporting requirements, and consequence measures. These measures are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling. Because these measures apply similarly to both Herring Alternatives 1 and 2, the benefits of slippage restrictions and requirements to non-target species would be similar under both alternatives.

## Coverage Target Alternatives

Herring Alternative 2 would specify a level and type of IFM for the herring fishery. The types of IFM considered by the Council for the herring fishery include: NEFOP-level

_0000017222

observers, at-sea monitors, and electronic monitoring and portside sampling. Monitoring alternatives allocate coverage by fleet or permit category. Monitoring requirements could apply across all herring management areas or to just midwater trawl vessels fishing in the Groundfish Closed Areas.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. Because the coverage target is calculated by combining SBRM and IFM coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. How coverage targets are calculated would not impact non-target species, but any benefits associated with additional monitoring would be greater under Herring Alternative 2 than under Herring Alternative 1.

Under Herring Alternative 2, the amount and quality of information collected as part of an IFM would vary with the type of coverage target alternative specified for the herring fishery.

A CV analysis was used to simulate the precision associated with tracking catch against catch caps. Although there is no defined CV target, results are compared to a 30% CV for context. Under Herring Alternative 1, based on data from 2011-2015, CVs for the GB Haddock Catch Cap were generally less than 30%, except in 2015. Since there has not been any observed GOM haddock catch, the CV is zero. In comparison, under Herring Alternative 2, coverage targets of 25% and higher will generate CVs less than 30% for the GB Haddock Catch Cap. Results of the CV simulation are more varied for river herring/shad catch caps. Under Herring Alternative 1, CVs for SNE catch caps were less than 30%, while CVs for GOM and CC caps ranged from 61.4% to 94.8%. Under Herring Alternative 2, coverage targets of 25% and higher would generated CVs less than 30% for the SNE catch caps. Additionally, for the GOM and CC catch caps, coverage targets of 50% and higher would generate CVs around 30% and lower.

Additional impacts on non-target species associated with specific coverage target alternatives (Herring Alternatives 2.1-2.7) are discussed in a subsequent section.

### Monitoring and Service Provider Requirements

Herring Alternative 2 would specify that requirements for industry-funded observers and at-sea monitors include a HVF certification for the herring fishery. The HVF certification was developed in order to more effectively train certified NEFOP observers in high volume catch sampling and documentation. This certification was developed to prepare observers for changes in the regulations and new requirements that were under consideration in Herring Amendment 5.

NEFOP determined that data quality in the herring fishery was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers. Having an additional training to identify these

_0000017223

practices allowed for improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Observers in the herring fishery are currently required to possess a HVF certification under Herring Alternative 1 and both observers and at-sea monitors would be required to possess a HVF certification under Herring Alternative 2. Therefore, the impacts of a HVF certification requirement under Herring Alternative 2 on non-target species would be similar to the impacts under Herring Alternative 1.

Under Herring Alternative 2, the process for vessel notification and selection and payment of industry cost responsibilities would be developed during the rulemaking and amendment approval process.

To the extent that increased information on non-target species catch benefits non-target species under Herring Alternative 2, those benefits may not be realized under Herring Alternative 1.

### 4.2.4.2  *Impacts of Herring Coverage Target Alternatives 2.1- 2.7 on Non-Target Species*

The Council selected Herring Alternatives 2.5 and 2.7 as preferred alternatives.

Herring Alternatives 2.1-2.7 are intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above SBRM, for industry-funded monitoring. If Federal funding is available to cover NMFS cost responsibilities associated with IFM in the herring fishery, the increased monitoring associated with Herring Alternatives 2.1-2.7 may have a positive impact on non-target species. That positive impact would result from reducing the uncertainty around catch and bycatch estimates of non-target species in the herring fishery and potentially increasing the amount of information available for use in stock assessments for non-target species. While the benefits to non-target species may be difficult to quantify under Herring Alternatives 2.1-2.7, they may not be realized under Herring Alternative 1.

The magnitude of positive impacts to non-target species associated with additional catch information is expected to vary with the monitoring coverage target specified and the realized coverage level in that year. The realized coverage level in a given year would be largely driven by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM (Herring Alternative 1) and the specified monitoring coverage target (Herring Alternatives 2.1-2.7).

Herring Alternatives 2.1-2.7 differ by (1) the type of information collected, (2) the specified amount of coverage, and (3) how coverage is allocated.

_0000017224

**Type of Information Collected**

Currently, vessel and dealer data are used to track retained catch of mackerel and haddock while SBRM observer data are used to track retained and discarded catch of river herring and shad, as well as the discarded catch of mackerel and haddock. Additionally, SBRM observer (i.e., discard and length) and survey (i.e., age) data are used for stock assessments and to estimate total removals.

Herring Alternatives 2.1 and 2.5 would specify NEFOP-level observer coverage, Herring Alternatives 2.2 would specify ASM coverage, Herring Alternatives 2.3, 2.6, and 2.7 would specify ASM coverage and/or EM and portside sampling coverage, and Herring Alternative 2.4 would specify EM and portside sampling coverage.

Both NEFOP-level observer coverage and at-sea monitoring coverage would provide species composition data on retained and discarded catch, while portside sampling coverage would provide species composition data on retained catch. NEFOP-level observers and at-sea monitors can estimate amounts of discarded catch. While EM cannot estimate the amount of discarded catch, it can verify retention of catch. Because discarding in the herring fishery is minimal, alternatives that increase the amount of information on retained and discarded catch (Herring Alternatives 2.1, 2.2, 2.3, 2.5, 2.6, and 2.7) will likely have the same potential to benefit non-target species as alternatives that increase the amount of information on retained catch (Herring Alternative 2.4).

Because discarding in the herring fishery is minimal, alternatives that increase the amount of information on retained and discarded catch (Herring Alternatives 2.1, 2.2, 2.3, 2.5, 2.6, and 2.7) will likely have the same likelihood of affecting the data tracked against catch caps than alternatives that increase the amount of information on just retained catch (Herring Alternative 2.4). Increased monitoring of haddock and river herring and shad catch may help reduce uncertainty in estimates of catch that is tracked against catch caps and illustrate higher or lower than expected catch of haddock and river herring and shad.

Both NEFOP-level observers and portside samplers would collect age and length on non-target species, while at-sea monitors would collect length data on non-target species. Currently, length data collected by SBRM observers and age data collected during NMFS research surveys are considered in the stock assessments for haddock, mackerel, river herring, and shad. Because Herring Alternatives 2.1, 2.3 (portside sampling), 2.4, 2.5, 2.6, and 2.7 (portside sampling) would collect both age and length data on non-target species, those alternatives have the potential to benefit non-target species more than Herring Alternatives 2.2 that would collect just length data on non-target species.

**Amount of Coverage**

Herring Alternatives 2.1 and 2.5 specify monitoring coverage at 100% while Herring Alternatives 2.2-2.4 and 2.7 allow monitoring coverage to range between 25% and 100%.

_0000017225

The monitoring objectives for the herring coverage targets are accurate estimates of herring catch and the catch of haddock and river herring/shad to track against catch caps.

The Council's preferred alternatives would require 100% coverage in Groundfish Closed Areas and 50% coverage on Category A and B vessels. While high levels of monitoring are not always necessary to address a monitoring goal, more monitoring could be more effective to meet monitoring goals than less monitoring. Therefore, across alternatives, choosing a higher coverage target has the potential to benefit the non-target species by improving management through better data.

A CV analysis of Herring Alternatives 2.1 and 2.2 was used simulate the precision associated with tracking catch against catch caps. For the GB Haddock Catch Cap, coverage targets of 25% and higher would have generated CVs less than 30%. For the RHS SNE catch caps, coverage targets of 25% and higher would generated CVs less than 30%. For the RHS GOM and CC catch caps, coverage targets of 50% and higher would generate CVs around 30% and lower. Based on this analysis, coverage targets of 50%, and often times even 25%, would generate CVs on the catch tracked against catch caps of 30% or lower.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. Because the coverage target is calculated by combining SBRM and IFM coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. The Council recommended these combined coverage targets to help reduce the cost of industry-funded coverage. But because SBRM coverage has the potential to vary year to year, the cost of monitoring paid by industry may also vary year to year and may be difficult to plan/budget.

## How Coverage is Allocated

Herring Alternatives primarily 2.1, 2.2, and 2.7 would allocate monitoring coverage by vessel permit category (i.e., Category A and B herring permits), Herring Alternative 2.4 would allocate monitoring coverage by fishing fleet (i.e., midwater trawl fleet), and Herring Alternative 2.3 would allocate monitoring coverage by permit category and fishing fleet.

The extent to which the allocation of industry-funded coverage is consistent with the SBRM fishing fleet will determine how the resulting data can be used. Data collected by vessel permit category can be used for catch limit and catch cap monitoring, while data collected by fleet can be used for catch monitoring and generating discard estimates for stock assessments. Therefore, a positive biological impact is expected when coverage is allocated by fleet and a low positive biological impact is expected when coverage is allocated by vessel permit category. However, the only alternatives allocating coverage by fleet (Herring Alternatives 2.3 (portside sampling) and 2.4) would not be collecting an estimate of discards.

Vessels with Category A and B herring permits harvested approximately 98% of recent herring catch (2008-2011) and the midwater trawl fleet harvested approximately 73% of

_0000017226

recent herring catch (2008-2012). Based on recent catch, allocating coverage by Category A and B herring permits (Herring Alternatives 2.1, 2.2, 2.3, and 2.7) would increase monitoring on vessels that harvest the majority of catch in the herring fishery as compared to allocating coverage to the midwater trawl fleet (Herring Alternative 2.4). Therefore, any benefit to non-target species associated with increased monitoring may be higher under Herring Alternatives 2.1-2.3 and 2.7 than under Herring Alternative 2.4

Overall, a similar low positive impact is likely if coverage is allocated by permit or by fleet.

Herring Alternative 2.5 specifies that midwater trawl vessels fishing in the Groundfish Closed Areas must carry a NEFOP-level observer while Herring Alternative 2.6 would specify that coverage for midwater trawl vessels fishing in Groundfish Closed Areas would match the coverage targets recommended by the Council for the rest of the fishery. Herring Alternative 2 Sub-Options would apply to Herring Alternative 2.6 but not to Herring Alternative 2.5. If increased monitoring associated with Herring Alternative 2.6 is reduced or minimized by the selection of any of the sub-options, the benefits of additional monitoring to the non-target species may be less than under Herring Alternative 2.6 than under Herring Alternative 2.5.

Haddock is the only non-target species of interest that is typically harvested by midwater vessels inside the Groundfish Closed Areas. The catch of haddock by midwater trawl vessels inside Groundfish Closed Areas would be tracked against the haddock catch caps. Because a relatively small percentage of the midwater trawl fleet's harvest comes from inside Groundfish Closed Areas, any positive impact to haddock associated with additional catch information under Herring Alternatives 2.5 and 2.6 would be similar, but likely reduced, compared to impacts under Herring Alternatives 2.1-2.4 and 2.7.

### Slippage Requirements

Herring Alternatives 2.1–2.7 would require compliance with slippage restrictions, reporting requirements, and consequence measures. Specifically, all existing slippage restrictions, reporting requirements, and consequence measures would apply on all trips with a NEFOP-level observer or at-sea monitor was aboard. Additionally, slippage restrictions, reporting requirements, and the 15-mile move requirement would apply on all trips selected for portside sampling.

Slippage requirements are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling. Any benefits to non-target species from slippage requirements would likely be similar across Herring Alternatives 2.1-2.7.

### Summary of Impacts to Non-Target Species

The impacts of herring alternatives on non-target species are indirect because they affect levels of monitoring rather than harvest specifications. Indirect benefits to non-target

_0000017227

species are possible if increased monitoring can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments.

However, these alternatives may lead to direct positive impacts on non-target species if fishing effort is limited, either through monitoring availability or catch tracked against catch limits, and that increases the reproductive potential of non-target species.

The impact of Herring Alternative 1 (No Action) on non-target species is likely low positive because monitoring coverage is allocated by SBRM, but there is no additional monitoring to reduce uncertainty around catch and bycatch estimates. The impact of Herring Alternative 2 on non-target species is generally positive because there would be additional monitoring to reduce the uncertainty around catch estimates, but the magnitude of the impact is dependent on the type of information collected, amount of coverage, and how coverage is allocated. The realized coverage in any given year will also largely depend on and amount of Federal funding available to cover NMFS cost responsibilities.

A positive biological impact on non-target species is expected if data are collected on both retained and discarded catch and a low positive impact if data are collected on just retained catch. But since discards are minimal in the herring fishery, a similar positive impact is likely if data are collected on just retained catch. Data collected by vessel permit category can be used for catch limit and catch cap monitoring, while data collected by fleet can be used for catch monitoring and generating discard estimates for stock assessments. Therefore, a positive biological impact is expected when coverage is allocated by fleet and a low positive biological impact is expected when coverage is allocated by vessel permit category. However, the only alternative solely allocating coverage by fleet (Herring Alternative 2.4) would not be collecting an estimate of discards. Additionally, vessels with Category A and B herring permits harvest approximately 98% of total herring catch, compared to the midwater trawl fleet that harvests approximately 73% of total herring catch. Therefore, a similar low positive impact is likely if coverage is allocated by permit or by fleet.

If coverage is only allocated to Groundfish Closed Areas (Herring Alternatives 2.5 and 2.6), then a low positive biological impact is likely because the area of coverage is limited.

A positive impact is associated with Sub-Options 1 and 2 not being selected, if fishing effort is limited, either due to funding or logistics, and that increases the reproductive potential of non-target species. Sub-Option 5 would only require additional coverage on trips that land more than 25 mt or 50 mt of herring, so there is the potential for a low negative impact on haddock and river herring and shad associated with Sub-Option 5 if it biases data used to track catch against catch caps.

Given all these factors, the impact on non-target species is likely low positive for Herring Alternatives 2.1-2.7. Additionally, the impacts of these herring alternatives on non-target species are not significant because they would not cause non-target species to become overfished, would not result in overfishing, and would not cause a change in population status.

_0000017228

**TABLE 70. IMPACTS SUMMARY OF HERRING COVERAGE TARGET ALTERNATIVES ON NON-TARGET SPECIES (*PREFERRED ALTERNATIVES SHOWN IN BOLD*)**

| Alternatives | Impacts on Non-Target Species (Haddock, River Herring and Shad, Mackerel) |
|---|---|
| Herring Alternative 1:  No Coverage Target Specified For IFM Programs  (No Action) | • Low positive impact associated with observer coverage allocated by SBRM<br>• Low negative impact associated with no additional monitoring to reduce uncertainty around catch estimates |
| **Herring Alternative 2: Coverage Target Specified For IFM Programs** | • **Positive impact associated with additional monitoring to reduce uncertainty around catch estimates**<br>• **Low negative impact associated with no additional monitoring unless available Federal funding can cover NMFS cost responsibilities**<br>• **Magnitude of impacts associated with additional monitoring would be primarily dependent on the type of information collected, amount of coverage, how coverage is allocated, and amount of available Federal funding**<br>• **Positive impact associated with not selecting Sub-Option 1 if fishing effort is limited and that increases the reproductive potential of non-target species**<br>• **Low negative impact associated with selecting Sub-Options 1 and 2 if additional coverage is waived**<br>• **Low negative impact associated with Sub-Option 5 if it biases data used to track catch against catch caps** |
| Herring Alternative 2.1:  100% NEFOP-Level Coverage on Category A and B Vessels | • Low positive impact associated with additional information to reduce uncertainty around retained and discarded catch estimates associated with 100% coverage on Category A and B vessels to track against catch caps |
| Herring Alternative 2.2:  ASM Coverage on Category A and B Vessels | • Low positive impact associated with additional information to reduce uncertainty around retained and discarded catch estimates associated with 100%-25% coverage on Category A and B vessels to track catch against catch caps |
| Herring Alternative 2.3: Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | • Low positive impact associated with additional information to reduce uncertainty around retained and discarded catch estimates associated with 100%-25% coverage on Category A and B vessels to track catch against catch caps<br>• Low positive impact associated with additional information to reduce uncertainty around retained catch estimates associated with 100% or 50% coverage on the midwater trawl fleet to track catch against catch caps |
| Herring Alternative 2.4:  EM and Portside Sampling on Midwater Trawl Fleet | • Low positive impact associated with additional information to reduce uncertainty around retained catch estimates associated with 100% or 50% coverage on the midwater trawl fleet to track catch against catch caps |
| **Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas** | • **Low positive impact associated with additional information to reduce uncertainty around retained and discarded catch estimates associated with 100% coverage on the midwater trawl fleet fishing in Groundfish Closed Areas to track catch against catch caps**<br>• **Negligible impact associated with Sub-Options** |

_0000017229

| Alternatives | Impacts on Non-Target Species (Haddock, River Herring and Shad, Mackerel) |
|---|---|
| Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | • Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with 100%-25% coverage on the midwater trawl fleet fishing in Groundfish Closed Areas to track catch against catch caps |
| **Herring Alternative 2.7:  ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | • **Low positive impact associated with additional information to reduce uncertainty around retained and discarded catch estimates associated with 50% coverage on Category A and B vessels to track catch against catch caps** |

## 4.2.5 IMPACTS OF HERRING ALTERNATIVES ON PROTECTED RESOURCES

Protected species include fish, turtles, and marine mammals listed under the ESA and marine mammals protected under the MMPA.

### 4.2.5.1  Impacts of Herring Alternatives 1 and 2 on Protected Species

In general, the impacts of Herring Alternatives 1 and 2 on protected species are indirect because they affect levels of monitoring rather than harvest specifications.  Indirect benefits to protected species are possible if increased monitoring can reduce uncertainty around interactions between protected species and the herring fishery and generate more information for stock assessments.  However, Herring Alternatives 1 and 2 may lead to direct positive impacts on protected species if fishing effort is limited, either through monitoring availability or catch tracked against catch limits, so that interactions between the herring fishery and protected species are reduced.

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP.  Monitoring for herring vessels would be allocated according to SBRM.  If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM.  The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries.  The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species.  Although management measures are typically developed and implemented on an FMP-specific basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

For example, New England vessels using extra-large mesh gillnets catch monkfish, skates, and Northeast multispecies, often on the same fishing trip, and, therefore, most participants in this fishery must operate according to the regulations implemented under

_0000017230

three different FMPs.  To distinguish between the management units identified in individual FMPs and the fisheries that operate under one or more FMPs, the SBRM is designed around "fishing modes" defined by the type of fishing gear used and the area from which the vessels depart.

There are 56 fishing modes defined in the SBRM, some of which further subdivide a fishery by the mesh size of the gear used (for gillnets and otter trawls), or by the type of permit and access area program (for sea scallop dredges).  Although there are differences among the modes, the participants in these fishing modes fish throughout the Gulf of Maine, Georges Bank, and the Mid-Atlantic Bight, and land their catch across a large number of fishing ports from the Outer Banks of North Carolina to Downeast Maine.  The SBRM is limited to those fisheries that are prosecuted in the Federal waters of the Greater Atlantic Region and managed through a FMP developed by either the MAFMC or NEFMC.  Current observer coverage allocated to the herring fishery through SBRM is described in Table 84.

Selection of Herring Alternative 1 will not likely affect the setting of harvest specifications for herring, but less monitoring (when compared to Herring Alternative 2) may affect the setting of catch caps in the herring fishery and tracking catch against those catch caps.

The Council selected Herring Alternative 2 as a preferred alternative.  Herring Alternative 2, the Council would specify the details of an industry-funded monitoring program for the Herring FMP.  These details may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) minimum level of coverage necessary to meet coverage goals, (4) consideration of coverage waivers if coverage target cannot be met, (5) process for vessel notification and selection, (6) process for payment of industry cost responsibilities, (7) standards for monitoring service providers, and (8) any other measures necessary to implement the industry-funded monitoring program.  Additional NEPA analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying the specified industry-funded monitoring programs.

Herring Alternative 2 is intended to allow for additional monitoring in the herring fishery by specifying coverage targets, above SBRM (Herring Alternative 1), for industry-funded monitoring.  The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year.  The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM and the specified coverage target.  If Federal funding is available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, Herring Alternative 2 may have a positive impact on protected species by increasing monitoring in the herring fishery.  While the benefits to protected species may be difficult to quantify under Herring Alternative 2, they may not be realized under Herring Alternative 1.

Under Herring Alternative 2, benefits to protected species would  depend on the type of additional monitoring and specified coverage targets for the herring fishery, but could result from increased monitoring to verify retained and discarded catch.  As catch

_0000017231

information increases, the uncertainty around catch estimates in the herring fishery may be reduced, potentially improving protected species bycatch estimates to be incorporated into future stock assessments and improving the available information for protected species management decisions.  These benefits may not be realized under Herring Alternative 1.

Herring Alternative 2 would allow several sub-options to apply to the industry-funded monitoring alternatives.

Sub-Option 1 (Preferred Alternative) would allow vessels to be issued waivers to exempt them from industry-funded monitoring requirements, for either a trip or the fishing year, if coverage was unavailable due to funding or logistics.  Sub-Option 2 (Preferred Alternative) would exempt a wing vessel pair trawling with another vessel from industry-funded monitoring requirements, provided the vessel does not carry any fish.  Sub-Option 3 would require that industry-funded monitoring requirements expire two years after implementation.  Sub-Option 4 (Preferred Alternative) would require the Council to examine the results of any increased coverage in the herring fishery two years after implementation, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via specifications, a framework adjustment, or an amendment to the Herring FMP, as appropriate.  Lastly, Sub-Option 5 would exempt trips that land less than 25 mt or 50 mt (Preferred Alternative) of herring from industry-funded monitoring requirements.

If the increased monitoring associated with Herring Alternative 2 is reduced or minimized by selection of any of the sub-options, the benefits of improved catch estimates in stock assessments and improving the available information for protected species management decisions may be reduced and/or similar to impacts under Herring Alternative 1.

Because the Council selected Sub-Options 1 and 2 as preferred alternatives, the additional coverage associated with Herring Alternative 2 may be waived if additional monitoring is unavailable or a wing vessel is pair trawling with another vessel.  If additional coverage is waived under Sub-Options 1 and 2, then any benefits associated with the additional coverage may be reduced, similar to Herring Alternative 1.

A positive impact is associated with Sub-Option 1 not being selected, if fishing effort is limited, either due to funding or logistics, and that reduces interactions between the herring fishery and protected species.  The positive impact would result from reduced interactions between the herring fishery and protected species and the potential for reducing the fishing mortality of protected species.  Selection of Sub-Option 1 preserves the Council's intent to increase monitoring in the herring fishery, but would not prevent vessels from participating in the herring fishery if monitoring coverage was not available. Had the Council not select Sub-Option 1, then any industry-funded monitoring requirements established in this amendment would have the potential to reduce effort in the herring fishery.  Reducing fishing effort to match available monitoring may lack sufficient justification and be inconsistent with National Standards.

_0000017232

Sub-Option 3 (2-year sunset of coverage targets) and Sub-Option 4 (2-year re-evaluation of coverage targets and preferred alternative) are both administrative and would not impact protected species, thus both alternatives should have a negligible difference on impacts between Herring Alternatives 1 and 2.

The Council's selection of Sub-Option 5 as a preferred alternative means that the threshold for additional coverage (50 mt of herring) and the threshold for which trips count against catch caps for haddock (1 lb of herring) and river herring and shad (6,600 lb of herring) would differ.  The data generated by the selection of Sub-Option 5 has the potential to bias (either higher or lower) the catch tracked against catch caps when compared to not selecting Sub-Option 5.  Additionally, the Council's selection of the 50 mt threshold as a preferred alternative would result in fewer trips with additional coverage, thereby reducing the benefits of additional coverage under Herring Alternative 2, but the additional coverage would still be higher than under Herring Alternative 1.

Both Herring Alternative 1 and Herring Alternative 2 would require compliance with slippage restrictions, reporting requirements, and consequence measures.  These measures are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling.  Because these measures apply similarly to both Herring Alternatives 1 and 2, the benefits of slippage restrictions and requirements to protected species would be similar under both alternatives.

## Coverage Target Alternatives

Herring Alternative 2 would specify a level and type of industry-funded monitoring for the herring fishery.  The types of industry-funded monitoring considered by the Council for the herring fishery include:  NEFOP-level observers, at-sea monitors, and electronic monitoring and portside sampling.  Monitoring alternatives allocate coverage by fleet or permit category.  Monitoring requirements could apply across all herring management areas or to just midwater trawl vessels fishing in the Groundfish Closed Areas.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage.  NMFS would determine how to calculate the combined coverage target, in consultation with Council staff.  Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip.  How coverage targets are calculated would not impact protected species, but any benefits associated with additional monitoring would be greater under Herring Alternative 2 than under Herring Alternative 1.

Under Herring Alternative 2, the amount and quality of information collected as part of an industry-funded monitoring would vary with the type of coverage target alternative specified for the herring fishery.  Additional impacts on protected species associated with specific coverage target alternatives (Herring Alternatives 2.1-2.7) are discussed in a subsequent section.

_0000017233

### Monitoring and Service Provider Requirements

Herring Alternative 2 would specify that requirements for industry-funded observers and at-sea monitors include a HVF certification for the herring fishery.  The HVF certification was developed in order to more effectively train certified NEFOP observers in high volume catch sampling and documentation.  This certification was developed to prepare observers for changes in the regulations and new requirements that were under consideration in Herring Amendment 5.

NEFOP determined that data quality in the herring fishery was sub-optimal when collected by observers without specialized training, potentially resulting in data loss.  In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers.  Having an additional training to identify these practices allowed for improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Observers in the herring fishery are currently required to possess a HVF certification under Herring Alternative 1 and both observers and at-sea monitors would be required to possess a HVF certification under Herring Alternative 2.  Therefore, the impacts of a HVF certification requirement under Herring Alternative 2 on protected species would be similar to the impacts under Herring Alternative 1.

Under Herring Alternative 2, the process for vessel notification and selection and payment of industry cost responsibilities would be developed during the rulemaking and amendment approval process.

To the extent that increased information on protected species catch benefits protected species under Herring Alternative 2, those benefits may not be realized under Herring Alternative 1.

### 4.2.5.2   Impacts of Herring Coverage Target Alternatives 2.1- 2.7 on Protected Species

The Council selected Herring Alternatives 2.5 and 2.7 as preferred alternatives.

Herring Alternatives 2.1-2.7 are intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above SBRM, for industry-funded monitoring.  If Federal funding is available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, the increased monitoring associated with Herring Alternatives 2.1-2.7 may have a positive impact on protected species.  That positive impact may result from reducing uncertainty around the bycatch of protected species in the herring fishery, thereby, potentially improving bycatch estimates to be incorporated into future stock assessments and improving the available information for protected species management decisions.  While the benefits to protected species may be difficult to quantify under Herring Alternatives 2.1-2.7, they may not be realized under Herring Alternative 1.

_0000017234

The magnitude of positive impacts to protected species associated with additional catch information is expected to vary with the monitoring coverage target specified and the realized coverage level in that year. The realized coverage level in a given year would be largely driven by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM (Herring Alternative 1) and the specified monitoring coverage target (Herring Alternatives 2.1-2.7).

Herring Alternatives 2.1-2.7 differ by (1) the type of information collected, (2) the specified amount of coverage, and (3) how coverage is allocated.

## Type of Information Collected

Herring Alternatives 2.1 and 2.5 would specify NEFOP-level observer coverage, Herring Alternatives 2.2 would specify ASM coverage, Herring Alternatives 2.3, 2.6, and 2.7 would specify ASM coverage and/or EM and portside sampling coverage, and Herring Alternative 2.4 would specify EM and portside sampling coverage.

Both NEFOP-level observer coverage and at-sea monitoring coverage would provide species composition data on retained and discarded catch, while portside sampling coverage would provide species composition data on retained catch. NEFOP-level observers and at-sea monitors can estimate amounts of discarded catch. While EM cannot estimate the amount of discarded catch, it can verify retention of catch.

Because interactions between protected species and the herring fishery occur at sea, alternatives that increase the amount of information collected at sea (Herring Alternatives 2.1, 2.2, 2.3, 2.5, 2.6, and 2.7) will likely benefit protected species more than alternatives that only increase the amount of information collected portside (Herring Alternative 2.4).

NEFOP-level observers would collect data on interactions with protected species, such as sea turtles, marine mammals, and sea birds, as well as sighting data on protected species. In contrast, at-sea monitors would collect data on interactions with protected species, but not sighting data. While the purpose of EM is not to collect protected species information, EM has proven useful at documenting interactions with protected species and may be able to document protected species sightings. However, Herring Alternative 2.1 would likely generate more information on protected species and has the potential to benefit protected species more than Herring Alternatives 2.2-2.7.

## Amount of Coverage

Herring Alternatives 2.1 and 2.5 specify monitoring coverage at 100% while Herring Alternatives 2.2-2.4 and 2.7 allow monitoring coverage to range between 25% and 100%.

The Council's preferred alternatives would require 100% coverage in Groundfish Closed Areas and 50% coverage on Category A and B vessels. While high levels of monitoring are not always necessary to generate information, more monitoring could be more effective at

_0000017235

generating information on the interactions between protected species and the herring fishery than less information.  In general, interactions between ESA-listed species and the herring fishery occur infrequently, while interactions between marine mammals and the herring fishery are more frequent.  Therefore, across alternatives, choosing a higher coverage target has the potential to benefit the protected species by improving management through better data.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage.  NMFS would determine how to calculate the combined coverage target, in consultation with Council staff.  Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip.  The Council recommended these combined coverage targets to help reduce the cost of industry-funded coverage.  But because SBRM coverage has the potential to vary year to year, the cost of monitoring paid by industry may also vary year to year and may be difficult to plan/budget.

### How Coverage is Allocated

Herring Alternatives primarily 2.1, 2.2, and 2.7 would allocate monitoring coverage by vessel permit category (i.e., Category A and B herring permits), Herring Alternative 2.4 would allocate monitoring coverage by fishing fleet (i.e., midwater trawl fleet), and Herring Alternative 2.3 would allocate monitoring coverage by permit category and fishing fleet.

Vessels with Category A and B herring permits harvested approximately 98% of recent herring catch (2008-2011) and the midwater trawl fleet harvested approximately 73% of recent herring catch (2008-2012).  Based on recent catch, allocating coverage by Category A and B herring permits (Herring Alternatives 2.1, 2.2, 2.3, and 2.7) would increase monitoring on vessels that harvest the majority of catch in the herring fishery as compared to allocating coverage to the midwater trawl fleet (Herring Alternative 2.4).  Therefore, any benefit to protected species associated with increased monitoring may be higher under Herring Alternatives 2.1-2.3 and 2.7 than under Herring Alternative 2.4

Overall, a similar low positive impact is likely if coverage is allocated by permit or by fleet.

Herring Alternative 2.5 specifies that midwater trawl vessels fishing in the Groundfish Closed Areas must carry a NEFOP-level observer while Herring Alternative 2.6 would specify that coverage for midwater trawl vessels fishing in Groundfish Closed Areas would match the coverage targets recommended by the Council for the rest of the fishery.  Herring Alternative 2 Sub-Options would apply to Herring Alternative 2.6 but not to Herring Alternative 2.5.  If increased monitoring associated with Herring Alternative 2.6 is reduced or minimized by the selection of any of the sub-options, the benefits of additional monitoring to the protected species may be less than under Herring Alternative 2.6 than under Herring Alternative 2.5.

Because only a relatively small percentage of the midwater trawl fleet's harvest comes from inside the Groundfish Closed Areas, any positive impact to protected species

_0000017236

associated with additional monitoring under Herring Alternatives 2.5 and 2.6 would be similar, but likely reduced, compared to impacts under Herring Alternatives 2.1-2.4 and 2.7.

## Slippage Requirements

Herring Alternatives 2.1–2.7 would require compliance with slippage restrictions, reporting requirements, and consequence measures. Specifically, all existing slippage restrictions, reporting requirements, and consequence measures would apply on all trips with a NEFOP-level observer or at-sea monitor was aboard. Additionally, slippage restrictions, reporting requirements, and the 15-mile move requirement would apply on all trips selected for portside sampling.

Slippage requirements are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling. Any benefits to protected species from slippage requirements would likely be similar across Herring Alternatives 2.1-2.7.

## Summary of Impacts to Protected Species

The impacts of herring alternatives on protected species are indirect because they affect levels of monitoring rather than harvest specifications. Indirect benefits to protected species are possible if increased monitoring can reduce uncertainty around interactions between protected species and the herring fishery and generate more information for stock assessments.

However, these alternatives may lead to direct positive impacts on protected species if fishing effort is limited, either through monitoring availability or catch tracked against catch limits, so that interactions between the herring fishery and protected species are reduced.

The impact of Herring Alternative 1 (No Action) on protected species is likely low positive because monitoring coverage is allocated by SBRM, but there is no additional monitoring to reduce uncertainty around catch and bycatch estimates. The impact of Herring Alternative 2 on protected species is generally positive because there would be additional monitoring to reduce the uncertainty around bycatch estimates and generate more information for stock assessments, but the magnitude of the impact is dependent on the type of information collected, amount of coverage, and how coverage is allocated. The realized coverage in any given year will also largely depend on and amount of Federal funding available to cover NMFS cost responsibilities.

A positive biological impact on protected species is expected if data are collected at sea rather than just portside. However, EM has proven useful at documenting interactions with protected species and may be able to document protected species sightings.

_0000017237

Vessels with Category A and B herring permits harvest approximately 98% of total herring catch, compared to the midwater trawl fleet that harvests approximately 73% of total herring catch.  Therefore, a similar low positive impact is likely if coverage is allocated by permit or by fleet.

If coverage is only allocated to Groundfish Closed Areas (Herring Alternatives 2.5 and 2.6), then a low positive biological impact is likely because the area of coverage is limited.

A positive impact is associated with Sub-Options 1 and 2 not being selected, if fishing effort is limited, either due to funding or logistics, and that reduces interactions between the herring fishery and protected species.  Sub-Option 5 would only require additional coverage on trips that land more than 25 mt or 50 mt of herring, so there is the potential for a low negative impact on protected species if selecting Sub-Option 5 biases data used to track catch against catch caps and affects the overall amount of herring effort or harvest.

Given all these factors, the impact on protected species is likely low positive for Herring Alternatives 2.1-2.7.  Additionally, the impacts of these herring alternatives on protected species are not significant because they would not cause a change in population status.

TABLE 71.  IMPACTS SUMMARY OF HERRING ALTERNATIVES ON PROTECTED SPECIES (*PREFERRED ALTERNATIVES SHOWN IN BOLD*)

| Alternatives | Impacts on Protected Species |
|---|---|
| Herring Alternative 1: No Coverage Target Specified For IFM Programs  (No Action) | • Low positive impact associated with observer coverage allocated by SBRM<br>• Low negative impact associated with no additional monitoring to reduce uncertainty around bycatch estimates |
| **Herring Alternative 2: Coverage Target Specified For IFM Programs** | • **Positive impact associated with additional monitoring to reduce uncertainty around bycatch estimates**<br>• **Low negative impact associated with no additional monitoring unless available Federal funding can cover NMFS cost responsibilities**<br>• **Magnitude of impacts associated with additional monitoring would be primarily dependent on the type of information collected, how coverage is allocated, amount of coverage, and amount of available Federal funding**<br>• **Positive impacts associated with not selecting Sub-Option 1 if fishing effort is limited and that reduces interactions between the herring fishery and protected species**<br>• **Low negative impact associated with selecting Sub-Options 1 and 2 if additional monitoring is waived**<br>• **Low negative impact associated with selecting Sub-Option 5 if it bias data used to track catch against catch caps** |
| Herring Alternative 2.1: 100% NEFOP-Level Coverage on Category A and B Vessels | • Low positive impact associated with additional information to reduce uncertainty around bycatch estimates associated with 100% coverage on Category A and B vessels |
| Herring Alternative 2.2: ASM Coverage on Category A and B Vessels | • Low positive impact associated with additional information to reduce uncertainty around bycatch estimates associated with 100%-25% coverage on Category A and B vessels |

_0000017238

| Alternatives | Impacts on Protected Species |
|---|---|
| Herring Alternative 2.3: Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | • Low positive impact associated with additional information to reduce uncertainty around bycatch estimates associated with 100%-25% coverage on Category A and B vessels<br>• Low positive impact associated with additional information to reduce uncertainty around retained catch estimates associated with 100% or 50% coverage on the midwater trawl fleet |
| Herring Alternative 2.4: EM and Portside Sampling on Midwater Trawl Fleet | • Low positive impact associated with additional information to reduce uncertainty around retained catch estimates associated with 100% or 50% coverage on the midwater trawl fleet |
| **Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas** | • **Low positive impact associated with additional to reduce uncertainty around** bycatch **estimates associated with 100% coverage on the midwater trawl fleet fishing in Groundfish Closed Areas**<br>• **Negligible impact associated with Sub-Options** |
| Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | • Low positive impact associated with additional to reduce uncertainty of bycatch estimates associated with 100%-25% coverage on the midwater trawl fleet fishing in Groundfish Closed Areas |
| **Herring Alternative 2.7: ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | • **Low positive impact associated with additional information to reduce uncertainty of** bycatch **estimates associated with 50% coverage on Category A and B vessels** |

## 4.2.6  IMPACTS OF HERRING ALTERNATIVES ON THE PHYSICAL ENVIRONMENT

### 4.2.6.1  *Impacts of Herring Alternatives on the Physical Environment*

In general, the impact of the herring fishery on the physical environment is expected to be minimal and temporary.  Therefore, the expected impact on the physical environment of increased monitoring in the herring fishery is expected to be negligible under both Herring Alternatives 1 and 2.

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP.  Monitoring for herring vessels would be allocated according to SBRM.  If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis.

The Council selected Herring Alternative 2 as a preferred alternative.  Under Herring Alternative 2, the Council would specify the details of an industry-funded monitoring program for the Herring FMP.  These details may include, but are not limited to: (1) Level

and type of coverage target, (2) rationale for level and type of coverage, (3) minimum level of coverage necessary to meet coverage goals, (4) consideration of coverage waivers if coverage target cannot be met, (5) process for vessel notification and selection, (6) process for payment of industry cost responsibilities, (7) standards for monitoring service providers, and (8) any other measures necessary to implement the industry-funded monitoring program. Additional NEPA analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying the specified industry-funded monitoring programs.

Herring Alternative 2 is intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above SBRM (Herring Alternative 1), for industry-funded monitoring. The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year. The realized coverage for the fishery in a given year would fall somewhere between no additional coverage above SBRM requirements (Herring Alternative 1) and the specified coverage target (Herring Alternatives 2.1-2.7).

The realized coverage level would be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. If coverage is not available (either due to logistics or a lack of funding) for a specific trip, Herring Alternatives 2.1-2.7 specify that the vessel would be prohibited from participating in the herring fishery on that trip, unless Sub-Option 1 is selected.

The Council selected Sub-Option 1 as a preferred alternative. The selection Sub-Option 1 preserves the Council's intent to increase monitoring in the herring fishery, but would not prevent vessels from participating in the herring fishery if monitoring coverage was not available.

A positive impact is associated with Sub-Option 1 not being selected, if fishing effort is limited, either due to funding or logistics, and there are few interactions between fishing gear and the physical environment. However, the magnitude of any potential positive impact is low because the herring fishery has only minimal and temporary impacts on the environment.

Vessels may switch gear modes to minimize economic impacts associated with gear-specific requirements. However changes to gear modes associated with Herring Alternatives 2.1-2.7 are not expected to affect the overall impact of the herring fishery on the physical environment. Therefore, impacts on the physical environment are expected to be similar under Herring Alternatives 1 and 2.

_0000017240

TABLE 72. SUMMARY OF PHYSICAL ENVIRONMENT IMPACTS OF HERRING ALTERNATIVES (*PREFERRED ALTERNATIVES SHOWN IN BOLD*)

| Alternatives | Impacts on Physical Environment |
|---|---|
| Herring Alternative 1: No Coverage Target Specified For IFM Programs (No Action) | • Negligible impact associated with minimal and temporary effects on the environment from herring fishery |
| **Herring Alternative 2: Coverage Target Specified For IFM Programs** | • **Negligible impact associated with minimal and temporary effects on the environment from herring fishery**<br>• **Low positive impacts associated with not selecting Sub-Option 1 if fishing effort is limited and interactions between fishing gear and the physical environment are reduced**<br>• **Negligible impact associated with switching gear modes** |

## 4.2.7 BACKGROUND ON ECONOMIC IMPACTS OF HERRING ALTERNATIVES

When evaluating IFM for the herring fishery, another major consideration is the cost of the monitoring program. The requirement to pay for monitoring coverage increases operating costs for fishing vessels, which in turn reduces vessel revenue.

There are two primary approaches for minimizing the cost of monitoring paid by industry. The first approach is to select the most cost effective type of coverage to meet program goals. For example, it may be more cost effective to use electronic monitoring rather than observers to confirm retention of catch on herring vessels.

The second approach to limit costs to industry is to set coverage levels at the lowest level necessary to gather information to meet program goals. For example, it may be possible to increase precision around catch estimates for a certain species by setting a coverage target of 50%, rather than a coverage target of 100%.

Table 72 shows the range of costs associated with the different types of monitoring under consideration for the herring fishery. A detailed description of industry cost responsibilities associated with each of these types of monitoring can be found in Appendix 4.

_0000017241

**TABLE 73. MONITORING COST ESTIMATES FOR THE HERRING FISHERY**

| Types of Monitoring | NMFS Cost | Vessel Cost |
|---|---|---|
| NEFOP-Level Observer | $479 per sea day | $818 per sea day |
| At-Sea Monitor | $530 per sea day | $710 per sea day |
| Electronic Monitoring[1] | Year 1: $36,000 startup plus $97 per sea day<br><br>Year 2: $97 per sea day | Year 1: $15,000 startup plus $325-$172 per sea day (depending on coverage target)<br><br>Year 2: $325-$172 per sea day (depending on coverage target) |
| Portside Sampling[2] | $479-$530 per sea day | $5.12[1] or $3.84[2] per mt |

1 – EM cost assumptions: EM on every vessel, video collected throughout the duration of a trip (100%) or only around haulback (25%, 50%, or 75%), and 25%, 50%, 75% or 100% video review. Costs for coverage targets are: $325 for 100%, $202 for 75%, $187 for 50%, and $172 for 25%.
2 – Portside cost assumptions: $5.12 includes portside administration costs. $3.84 does not include portside administration. $5.12 mt would apply to 100% of trips, while $3.84 would apply to 25%, 50%, or 75% of trips.

## Assumptions Used to Generate Estimates of Industry Cost Responsibilities

While the cost of a sea day can vary between service providers, the individual components of a sea day cost are necessary to successfully execute a monitoring program. Because each of these components is essential, in most cases, it is not appropriate to reduce industry's cost responsibilities by removing or adjusting components of the sea day cost.

NEFOP-Level Observer Cost Estimate

The $818 per sea day industry cost responsibility related to NEFOP-level observer coverage is based on sampling costs from October 2012 through May 2014 averaged across 3 service providers. The program elements and activities covered in this cost would include, but are not limited to, costs to the provider for deployments and sampling (e.g., travel and salary for observer deployments and debriefing), equipment, costs to the provider for observer time and travel to a scheduled deployment that does not sail and was not canceled by the vessel prior to the sail time, and provider overhead.

At-Sea Monitor Cost Estimate

The $710 per sea day industry cost responsibility related to a herring at-sea monitoring program is based on the current sea day rate for the groundfish at-sea monitoring program. In the absence of an estimate specific to the herring at-sea monitoring program, the PDT/FMAT determined that using the groundfish at-sea monitoring sea day rate was appropriate, but the actual cost of a herring at-sea monitor may be more or less.

_0000017242

TABLE 74. INDUSTRY COST RESPONSIBILITIES FOR NEFOP-LEVEL OBSERVER AND AT-SEA MONITORS

| Industry Cost Responsibilities | NEFOP-level observer cost per sea day | At-sea monitor cost per sea day |
|---|---|---|
| Provider costs for deployments and sampling (e.g., travel and salary for observer deployments and debriefing) | Sea day charges paid to providers: $640<br>Travel: $71<br>Meals: $22<br>Other non-sea day charges: $12 | Sea day charge paid to providers: $561<br>Travel: $67<br>Meals: $18<br>Other non-sea day charges: $14 |
| Equipment, as specified by NMFS, to the extent not provided by NMFS | $11 | |
| Provider costs for observer time and travel to a scheduled deployment that does not sail and was not canceled by the vessel prior to the sail time. | $1 | |
| Provider overhead and project management costs not included in sea day charges above (e.g., per diem costs for trainees) | Training: $61 | Training: $50 |
| Provider costs to meet performance standards laid out by a fishery management plan | TBD – won't know these costs until an industry funded observer coverage program is implemented in a fishery | TBD – won't know these costs until an industry funded observer coverage program is implemented in a fishery |
| Total (not including other costs) | $818 | $710 |

Electronic Monitoring Cost Estimate

Because no Federal electronic monitoring program exists for the herring fishery, industry cost responsibilities associated with an electronic monitoring program were difficult to estimate. Electronic monitoring cost estimates include a one-time implementation cost, as well as ongoing annual operational program costs. Cost components include equipment, field services, data services, and program management. The implementation costs associated with EM are summarized in Table 91 and the ongoing costs associated with EM are summarized in Table 92. Costs for Year 1 of using EM include both the implementation and ongoing costs, while the cost for Year 2 of using EM only includes the ongoing costs. For these reasons, the industry cost responsibility of operating EM in Year 1 would be higher than during Year 2 or any subsequent year. Additional details on monitoring costs are available in Appendix 4.

_0000017243

**TABLE 75. INDUSTRY COST RESPONSIBILITIES FOR ELECTRONIC MONITORING IMPLEMENTATION**

| Industry Cost Responsibilities | Electronic Monitoring Implementation Costs Per Vessel |
|---|---|
| Equipment, including initial purchase and installation of the cameras, associated sensors, integrated GPS, control box, and hard drives | $9,018 |
| Field Services, including technician's labor and travel associated with the installation of equipment | $2,952 |
| Program Management, including one-time labor, equipment, facilities, and administrative costs associated with getting the new EM program operational | $3,493 |
| Total | $15,463 |

Initially, the sea day cost for EM was estimated at $325. The $325 cost estimate is likely high because it assumes video footage is collected for the duration of a trip and 100% of the video footage is reviewed. Subsequently, the PDT/FMAT generated cost estimates for other coverage targets (25%, 50%, and 75%) with the assumption that video footage is just collected around haulback and that the level of video footage review matches the coverage target. The breakdown of these costs is shown in Table 75.

**TABLE 76. INDUSTRY COST RESPONSIBILITIES FOR ONGOING ELECTRONIC MONITORING COSTS PER SEA DAY**

| Industry Cost Responsibilities | 100% Coverage | 75% Coverage | 50% Coverage | 25% Coverage |
|---|---|---|---|---|
| Equipment, including annual equipment costs estimated here include spare parts to replace broken or aging equipment, as well as licenses for the use of proprietary software | $11 | $11 | $11 | $11 |
| Field Services, including labor, travel, and other costs associated with repairs, technical support, and retrieving hard drives from the vessels and shipping them to the service provider for analysis | $78 | $47 | $47 | $47 |
| Data Services, including the costs associated with review and analysis of the video, reporting to NMFS, and archiving of the data | $160 | $67 | $52 | $37 |
| Program Management, including costs of the day-to-day operations of the service provider for running the EM program | $77 | $77 | $77 | $77 |
| Total | $325 | $202 | $187 | $172 |

_0000017244

Portside Sampling Cost Estimate

The analysis assumes the cost per amount of fish landed is the most accurate way to represent the potential industry costs for monitoring. Because no Federal portside sampling program exists for the herring fishery, industry cost responsibilities associated with a portside sampling program for the herring fishery were difficult to estimate.

The average cost per pound of groundfish landed for the Northeast Multispecies dockside monitoring program ranged from $0.01 - $0.12 per pound for all sectors. The average cost per pound landed per trip is inversely related to the average pounds landed – that is, trips that land larger amounts are less expensive to monitor than trips that land smaller amounts. Larger trips are less expensive to monitor because they typically land in principle ports with a dedicated monitor, therefore, there are no additional costs for monitors to travel to offload locations.

Initially, the industry cost responsibility associated with portside sampling was estimated to be as much as $5.12 per mt. This cost estimate was generated using information from the Massachusetts Division of Marine Fisheries portside sampling program for the herring fishery. The $5.12 per mt cost estimate is likely high as it includes program administration costs as well as sampling costs and was intended to apply to all trips for a target sampling rate of 100%.

Subsequently, the PDT/FMAT generated a revised cost estimate ($3.84 per mt) that does not include portside administration costs. This cost estimate may be closer to the actual industry cost responsibilities associated with portside sampling and would apply to 25%, 50%, or 75% of trips, consistent with the coverage target selected by the Council. The price per mt is the best estimate of the total industry cost responsibilities associated with portside sampling.

Under the Herring Alternatives 2.3, 2.4, and 2.7, midwater trawl vessels returning from declared herring trips would be required to land catch in specific ports for sampling. Table 76 describes the ports where midwater trawl vessel currently land catch and whether those ports are currently sampled by existing portside sampling program for the herring fishery operated by the Massachusetts Division of Marine Fisheries and Maine Department of Marine Resources.

**TABLE 77. LANDING PORTS FOR MWT VESSELS AND PORTSIDE SAMPLING ISSUES**

| Ports | Currently Sampled (Y/N) | Issues Affecting Sampling |
|---|---|---|
| **Maine** | | |
| Portland | Y | None |
| Rockland | Y | None |
| Vinalhaven | N | Not cost effective; fish sold over the side of vessels |
| Prospect Harbor | Y | None |
| Jonesport | Y | None |

_0000017245

| Ports | Currently Sampled (Y/N) | Issues Affecting Sampling |
|---|---|---|
| **Massachusetts** | | |
| Boston | N | Costly to sample; logistically challenging; unsafe area |
| Gloucester | Y | Only a few landings during the year |
| New Bedford | Y | Logistically challenging; safety issues |
| **Rhode Island** | | |
| Point Judith | Y | None |
| North Kingstown | N | Only frozen product is landed |
| Newport | N | Safety issues |
| **New Jersey** | | |
| Cape May | Y | None |

Approximately 95% of midwater trawl landings are made in ports currently sampled by the state programs. However, if certain ports are not suitable for portside sampling, then vessels may not be able to land in those ports on trips that are selected for portside sampling. Some vessels only land in a single port and that port is not currently sampled. Some vessels land in both sampled and unsampled ports, but changing past practices to land only in sampled ports may not be easy.

Travel time and seller/buyer arrangements are likely to be most affected by requiring midwater trawl vessels to land in specified ports. Seasonal fishing conditions may make travel time to specified ports an issue of concern. But seller/buyer arrangements are likely the larger concern. A vessel may need to substantially revise its business plan if it must land in a port not previously used.

Without a predictive model, the analysis of requiring vessels to land in specified ports will be qualitative. Additionally, data confidentiality will limit a quantitative analysis. However, if certain ports are not suitable for portside sampling, then vessels may not be able to land in those ports on trips selected for portside sampling.

The Massachusetts Division of Marine Fisheries and Maine Department of Marine Resources will continue their existing portside sampling programs in 2018. If the Council approves EM and portside sampling as a monitoring option for midwater trawl vessels, then midwater trawl vessels would continue to participate in the voluntary state portside sampling programs in 2018. Because midwater trawl vessels would be participating in the state portside sampling programs in 2018, they would not be paying for portside sampling coverage in 2018. In 2019 or 2020, a Federal portside sampling program would replace the portside sampling program administered by the Massachusetts Division of Marine Fisheries and midwater trawl vessels would be responsible for paying for portside sampling starting in 2019 or 2020. The Maine Department of Marine Resources will likely continue its portside sampling program at no cost to midwater trawl vessels.

_0000017246

Estimating Total Trip Costs

The previous analysis of economic impacts of herring coverage target alternatives on the herring industry was based on trip cost data collected by NEFOP and showed the economic impact of the alternatives on partial vessel net revenues (gross revenues less certain trip costs). Because NEFOP only collects a limited amount of cost data, industry participants expressed concern that an analysis of net revenues underestimated vessel costs. In response, Jason Didden, staff of the Mid-Atlantic Fishery Management Council, offered to coordinate a survey of herring and mackerel vessels to collect more detailed cost information.

The survey requested information from vessel owners on total trip costs in 2014. The cost survey collected information on variable costs; payments to crew; the cost of repairs, maintenance, upgrades; and fixed costs. These data were used to update the impact analyses. To profile vessels, data were averaged across vessel types, by vessel characteristics, and by primary species caught. The cost profiles of vessels, as adjusted by the estimated industry cost responsibilities of each herring coverage target alternative, were used to describe the economic impact on herring vessels. Economic impacts are described at an annual level. Surveys were sent to approximately 18 vessel owners (representing about 26 vessels) in the herring and/or mackerel fisheries. Surveys were sent in May 2015 and information was submitted for 16 of the 26 vessels. A copy of the survey is included in Appendix 9.

Analysis of the economic impact of industry-funded monitoring herring coverage target alternatives on fishery-related businesses compared industry cost responsibilities to 2014 herring vessel returns-to owner (RTO). RTO is calculated by subtracting fixed and operational costs from gross revenue (Table 77) and was used rather than net revenues to more accurately reflect income from fishing trips. RTO is similar to net income from a financial income statement. Other financial statement approaches, such as a balance sheet or a cash flow statement, are not used. These approaches consider other financial aspects of a business, such as total assets and liabilities and the ability to cover expenses within a particular time frame. Principal payments on loans, which matter from a balance sheet and cash flow perspective, are not typically used in the calculation of RTO/net income. Depreciation of capital assets is typically part of a RTO/net income calculation. In this analysis, depreciation of vessel improvements is included but the depreciation of the vessel is not included because that information was not collected in the survey.

_0000017247

**TABLE 78. SUMMARY OF TOTAL TRIP COSTS FOR HERRING AND MACKEREL VESSELS IN 2014**

| Cost Category | Description | Average Percent of 2014 Gross Revenue for Herring and Mackerel Vessels | Average Percent of 2014 Gross Revenue for Squid Vessels |
|---|---|---|---|
| Variable Costs | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| Crew Share | Total annual payments to crew | 28% | 26% |
| Repair, Maintenance, Upgrades, Haulout (RMUH) | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, safety equipment, upgrades and haulout. Because these costs vary considerably from year to year and are typically spread out over several years, only a portion of these costs were applied to 2014 revenue | 13% | 11% |
| Fixed Costs | Annual mooring, dockage, permits and licenses, insurance, quota and DAS lease, crew benefits, vessel monitoring, workshop and storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs Note: depreciation expense of the vessel is not included in fixed costs. | 19% | 21% |
| Return to Owner | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

The Council is considering four types of industry-funded monitoring for the herring fishery, including NEFOP-level observers, at-sea monitors, EM, and portside sampling coverage. NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

Prior to any trip declared into the herring fishery, vessel representatives would be required contact NMFS and request monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether monitoring coverage must be procured through an industry-funded monitoring service provider. For the

_0000017248

purposes of this analysis, however, it is assumed that there would be no SBRM coverage of trips.  Therefore, the economic impacts of industry-funded monitoring cost alternatives described in this section may be an overestimate of actual costs.

Declared Herring Trips That Do Not Land Herring

A trip must be a declared herring trip in order to land 1 lb or more of herring.  The economic analysis focused on trips that landed 1 lb or more of herring because those are the trips that would be subject to industry-funded monitoring.  However, industry participants also requested consideration of the economic impacts associated with declared herring trips that did not land any herring.

In 2014, there were 121 sea days for 22 trips that had no herring landings.  If 100% NEFOP-level observer coverage was required on those trips, then $98,978 would have been spent monitoring those trips.   If 100% at-sea monitoring coverage was required on those trips, then $85,910 would have been spent monitoring those trips.  The breakdowns of these costs by gear type as well as other coverage levels and monitoring types are provided in Table 78.

**TABLE 79.  MONITORING COSTS ASSOCIATED WITH DECLARED HERRING TRIPS THAT DID NOT LAND HERRING IN 2014.**

|  | Small Mesh Bottom Trawl | Single Midwater Trawl | Paired Midwater Trawl | Total |
|---|---|---|---|---|
| Permit Category | A | A | A |  |
| Total Number of Days | 111 | 6 | 4 | 121 |
| Total NEFOP Cost – 100% Coverage | $90,586 | $5,217 | $3,212 | $99,015 |
| Total ASM Cost – 100% Coverage | $78,626 | $4,528 | $2,788 | $85,943 |
| Total ASM Cost – 75% Coverage | $58,970 | $3,396 | $2,091 | $64,457 |
| Total ASM Cost – 50% Coverage | $39,313 | $2,264 | $1,394 | $42,971 |
| Total ASM Cost – 25% Coverage | $19,657 | $1,132 | $697 | $21,486 |
| Total EM Cost, Year 2 – $325 per day | NA | $2,073 | $1,276 | $3,349 |
| Total EM Cost, Year 2 – $187 per day | NA | $1,193 | $734 | $1,927 |

_0000017249

Declared Herring Trips That Land Less Than 50 mt of Herring

During 2012-2014, there were 32 vessels with Category A and B herring permits and those vessels made 2,329 trips.

**TABLE 80. NUMBER OF CATEGORY A AND B HERRING VESSELS BY TRIP SIZE DURING 2012-2014.**

| Number of vessels with trips always under 25 mt of herring | Number of vessels with less than 50% of trips under 25 mt of herring | Number of vessels with trips always under 50 mt of herring | Number of vessels with less than 50% of trips under 50 mt of herring |
|---|---|---|---|
| 5* | 22 | 8* | 20 |

\* Four of these vessels made less than four trips during 2012-2014.

*Source:  VTR Data*

**TABLE 81. TRIPS BY CATEGORY A AND B HERRING VESSELS BY SIZE AND GEAR TYPE DURING 2012-2014.**

| Gear Type | Percentage of trips under 25 mt of herring | Percentage of trips over 25 mt of herring | Percentage of trips under 50 mt of herring | Percentage of trips over 50 mt of herring |
|---|---|---|---|---|
| Small Mesh Bottom Trawl | 45% | 55% | 81% | 19% |
| Single Midwater Trawl | 40% | 60% | 60% | 40% |
| Paired Midwater Trawl | 6% | 94% | 13% | 87% |
| Purse Seine | 16% | 84% | 33% | 67% |

*Source:  VTR Data*

Under Sub-Option 5, the Council selected 50 mt of herring per trip as the threshold below which vessels would be exempt from IFM requirements.  This preferred alternative would result in fewer trips with additional coverage, thereby reducing the costs of additional coverage.

## 4.2.8 IMPACTS OF HERRING ALTERNATIVES ON HUMAN COMMUNITIES

### 4.2.8.1 Impacts of Herring Alternatives 1 and 2 on Fishery-Related Businesses

In general, Herring Alternatives 1 and 2 would have direct negative economic impacts and potentially indirect positive and negative economic impacts on fishery-related businesses and communities.

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP. Monitoring for herring vessels would be allocated according to SBRM. If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis. Under Herring Alternative 1, additional costs to vessels participating in the herring fishery associated with monitoring coverage, if there were any, would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-by-FMP basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 would not likely affect the setting of herring harvest specifications, but it may affect the ability of the herring fishery to fully harvest the ACLs if less monitoring (when compared to Herring Alternative 2) results in catch caps for haddock and river herring/shad limiting effort in the herring fishery.

The Council selected Herring Alternative 2 as a preferred alternative. Under Herring Alternative 2, the Council would specify the details of an industry-funded monitoring program for the Herring FMP. These details may include, but are not limited to: (1) Level and type of coverage target, (2) rationale for level and type of coverage, (3) minimum level of coverage necessary to meet coverage goals, (4) consideration of coverage waivers if coverage target cannot be met, (5) process for vessel notification and selection, (6) process for payment of industry cost responsibilities, (7) standards for monitoring service providers, and (8) any other measures necessary to implement the industry-funded monitoring program. Additional NEPA analysis would be required for any subsequent FMP framework adjustment action implementing and/or modifying the specified industry-funded monitoring programs.

_0000017251

Herring Alternative 2 is intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above SBRM (Herring Alternative 1), for industry-funded monitoring.  The realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in that year and would fall somewhere between no additional coverage above SBRM (Herring Alternative 1) and the specified coverage target.

If Federal funding is available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, Herring Alternative 2 may have both positive and negative economic impacts on vessels participating in the herring fishery.

Indirect positive impacts on herring vessels associated with Herring Alternative 2 may result from increased monitoring helping to reduce uncertainty around retained and discarded catch estimates in the herring fishery leading to additional harvesting opportunities.  If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be less likely to be constrained by catch caps and more likely to be able to fully harvest herring sub-ACLs.

Direct negative impacts on herring vessels associated with Herring Alternative 2 would likely result from reduced RTO after paying for monitoring coverage.  The magnitude of the economic impact associated with paying for monitoring coverage would vary with herring coverage target alternative (Herring Alternatives 2.1-2.7).  If increased monitoring results in fishery catch caps being harvested more often than expected, an indirect negative impact on herring vessels may result if vessels are not able to fully harvest herring sub-ACLs. While the full extent of positive and negative impacts to herring vessels may be difficult to quantify under Herring Alternative 2, the impacts may not be realized under Herring Alternative 1.

If Federal funding is not available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, fishing effort may be reduced under Herring Alternative 2 to match available levels of monitoring coverage, unless Sub-Option 1 is selected.  If fishing effort is reduced to match available monitoring levels, herring vessels may not be able to fully harvest herring sub-ACLs.  This direct negative economic impact associated with Herring Alternative 2 would be less likely to be realized under Herring Alternative 1.

Herring Alternative 2 would allow several sub-options to apply to the IFM alternatives.

Sub-Option 1 (Preferred Alternative) would allow vessels to be issued waivers to exempt them from IFM requirements, for either a trip or the fishing year, if coverage was unavailable due to funding or logistics.  Sub-Option 2 (Preferred Alternative) would exempt a wing vessel pair trawling with another vessel from IFM requirements, provided the vessel does not carry any fish.  Sub-Option 3 would require that IFM requirements expire two years after implementation.  Sub-Option 4 (Preferred Alternative) would require the Council to examine the results of any increased coverage in herring fishery two years after implementation, and consider if adjustments to the coverage targets are warranted.

_0000017252

Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via specifications, a framework adjustment, or an amendment to the Herring FMP, as appropriate.  Lastly, Sub-Option 5 would exempt trips that land less than 25 mt or 50 mt (Preferred Alternative) of herring from IFM requirements.

If selection of the sub-options under Herring Alternative 2 minimizes the likelihood of positive or negative economic impacts on herring vessels, then the economic impacts associated with the sub-options may be reduced and/or similar to impacts under Herring Alternative 1.

Because the Council selected Sub-Options 1 and 2 as preferred alternatives, the additional coverage associated with Herring Alternative 2 may be waived if additional monitoring is unavailable or a wing vessel is pair trawling with another vessel.

Had the Council not selected Sub-Option 1, then any industry-funded monitoring requirements established in this amendment would have the potential to reduce effort in the herring fishery to match monitoring availability.  However, reducing fishing effort to match available monitoring availability may lack sufficient justification and be inconsistent with National Standards.

Because the Council selected Sub-Option 2 as a preferred alternative, the negative economic impacts on pair trawl vessels associated with paying for additional monitoring would be reduced if one of the vessels acted as a wing vessel and did not carry fish.

If additional coverage is waived under Sub-Options 1 and 2, then any indirect benefits associated with the additional coverage may be reduced, similar to Herring Alternative 1.

Sub-Option 3 (2-year sunset of coverage targets) and Sub-Option 4 (2-year re-evaluation of coverage targets and preferred alternative) are both administrative and would not impact fishery-related business and communities, thus both alternatives should have a negligible difference on impacts between Herring Alternatives 1 and 2.

Under Sub-Option 5, the Council selected 50 mt of herring per trip as the threshold below which vessels would be exempt from IFM requirements.  This preferred alternative would result in fewer trips with additional coverage, thereby reducing the costs of additional coverage under Herring Alternative 2.  Small mesh bottom trawl and single midwater trawl vessels have the greatest potential to benefit from Sub-Option 5 because greater than 50% of their trips typically land under 50 mt of herring.  Additionally, 8 Category A and B vessels almost always make trips than land under 50 mt of herring.   Despite the selection of Sub-Option 5, the indirect benefits of additional monitoring associated with Herring Alternative 2 would still be higher than under Herring Alternative 1.

The Council's selection of Sub-Option 5 as a preferred alternative means that the threshold for additional monitoring (50 mt of herring) and the threshold for which trips count against catch caps for haddock (1 lb of herring) and river herring and shad (6,600 lb of herring) would differ.  The data generated by the selection of Sub-Option 5 has the

_0000017253

potential to bias (either higher or lower) the catch tracked against catch caps when compared to not selecting Sub-Option 5.

Both Herring Alternative 1 and Herring Alternative 2 would require compliance with slippage restrictions, reporting requirements, and consequence measures.  These measures are intended to improve catch monitoring by minimizing discarding.  Because these measures apply to both Herring Alternatives 1 and 2, the cost of complying with these requirements may be similar under Herring Alternatives 1 and 2, unless monitoring coverage is substantially higher under Herring Alternative 2.  In that case, the cost of complying with these requirements may be higher under Herring Alternative 2.

Impacts under Herring Alternative 2 assume that the future behavior of fishery participants will be similar to that in past years, when in reality fishery participants are likely to engage in a range of mitigation behaviors to reduce the economic impact associated with industry-funded monitoring.  For example, vessels that have historically participated in many fisheries may stop fishing for herring and only participate in fisheries that do not have industry-funded monitoring requirements.  However, if a vessel does not have the ability to participate in other fisheries, it may not be able to mitigate the impacts of industry-funded monitoring in that way.  At this time, it is not possible to predict what, if any, mitigation behaviors may be used by herring fishery participants.

## Coverage Target Alternatives

Herring Alternative 2 would specify a level and type of industry-funded monitoring for the herring fishery.  The types of industry-funded monitoring considered by the Council for the herring fishery include:  NEFOP-level observers, at-sea monitors, and electronic monitoring and portside sampling.  Monitoring alternatives allocate coverage by fleet or permit category.  Monitoring requirements could apply across all herring management areas or to just midwater trawl vessels fishing in the Groundfish Closed Areas.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage.  NMFS would determine how to calculate the combined coverage target, in consultation with Council staff.  Because the coverage target is calculated by combining SBRM and IFM coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip.  SBRM coverage varies across gear types and years.  For this reason, the economic analysis of the coverage targets assumed that there would be no SBRM coverage on trips.  Therefore, the estimated costs and economic impacts of industry-funded monitoring cost alternatives described in this section are likely an overestimate of actual costs.

Under Herring Alternative 2, the amount, quality, and cost of information collected as part of an industry-funded monitoring would vary with the type of coverage target alternative specified for the herring fishery.  Economic impacts on vessels participating in the herring fishery associated with specific coverage target alternatives (Herring Alternatives 2.1-2.7) are discussed in a subsequent section.

_0000017254

**Monitoring and Service Provider Requirements**

Herring Alternative 2 would specify that requirements for industry-funded observers and at-sea monitors include a HVF certification for the herring fishery.  The HVF certification was developed in order to more effectively train certified NEFOP observers in high volume catch sampling and documentation.  This certification was developed to prepare observers for changes in the regulations and new requirements that were under consideration in Herring Amendment 5.

Observers in the herring fishery are currently required to possess a HVF certification under Herring Alternative 1 and both observers and at-sea monitors would be required to possess a HVF certification under Herring Alternative 2.  Herring vessels do not pay for observer training under Herring Alternative 1, but vessels would be responsible for additional observer and at-sea monitor training costs under Herring Alternative 2.  Therefore, the economic impact on herring vessels of a HVF certification requirement under Herring Alternative 2 would be more negative than under Herring Alternative 1.

Under Herring Alternative 2, the process for vessel notification and selection and payment of industry cost responsibilities would be developed during the rulemaking and amendment approval process.

The direct economic impacts on herring vessels would be more negative under Herring Alternative 2 than under Herring Alternative 1 because vessels would be paying for additional monitoring coverage.  To the extent that increased information on herring catch has indirect economic benefits for herring vessels under Herring Alternative 2, those indirect impacts may not be realized under Herring Alternative 1.

### 4.2.8.2  Impacts of Herring Coverage Target Alternatives 2.1- 2.7 on Fishery-Related Businesses

The Council selected Herring Alternatives 2.5 and 2.7 as preferred alternatives.

Herring Alternatives 2.1-2.7 are intended to allow for increased monitoring in the herring fishery by specifying coverage targets, above SBRM, for industry-funded monitoring.  If Federal funding is available to cover NMFS cost responsibilities associated with industry-funded monitoring in the herring fishery, Herring Alternative 2 may have both positive and negative economic impacts on vessels participating in the herring fishery.

While the positive and negative economic impacts on herring vessels may be difficult to quantify under Herring Alternatives 2.1-2.7, the impacts would be less likely to be realized under Herring Alternative 1.

The magnitude of positive and negative economic impacts on herring vessels is expected to vary with the monitoring coverage target specified and the realized coverage level in a given year.  The realized coverage level in a given year would be largely driven by the amount of funding available to cover NMFS cost responsibilities in that year and would fall

_0000017255

somewhere between no additional coverage above SBRM (Herring Alternative 1) and the specified monitoring coverage target (Herring Alternatives 2.1-2.7).

Herring Alternatives 2.1-2.7 differ by (1) the type of information collected, (2) the specified amount of coverage, and (3) how coverage is allocated. Both the type of information collected and the amount of monitoring coverage would have a direct economic impact on vessels paying for monitoring coverage in the herring fishery.

### Type of Information Collected

Currently, vessel and dealer data are used to track retained catch of herring, haddock, and mackerel and SBRM observer data are used to track catch of river herring and shad as well as the discarded catch of herring, haddock, and mackerel. Additionally, vessel, SBRM observer data, and portside sampler data are used for stock assessments.

The herring fishery is managed with gear and area specific catch caps for haddock and river herring and shad. If a catch cap is harvested, effort in the fishery using that gear in that area is restricted. River herring and shad catch caps are in place for vessels using midwater trawl gear (Gulf of Maine, Cape Cod, and Southern New England catch caps) and small mesh bottom trawl gear (Southern New England catch cap), while the haddock catch cap is only specified for vessels using midwater trawl gear (Gulf of Maine and Georges Bank catch cap).

Herring Alternatives 2.1and 2.5 would specify NEFOP-level observer coverage, Herring Alternative 2.2 would specify ASM coverage, Herring Alternatives 2.3, 2.6, and 2.7 would specify ASM coverage and/or EM and portside sampling coverage, and Herring Alternative 2.4 would specify EM and portside sampling coverage.

Both NEFOP-level observer coverage and at-sea monitoring coverage would provide species composition data on retained and discarded catch, while portside sampling coverage would provide species composition data on retained catch. NEFOP-level observers and at-sea monitors can estimate amounts of discards. EM cannot estimate the amount of discards, but EM can verify retention of catch.

Because discarding in the herring fishery is minimal, Alternatives that increase the amount of information on retained and discarded catch (Herring Alternatives 2.1, 2.2, 2.3, 2.5, 2.6, and 2.7) will likely have the same likelihood of affecting the data tracked against catch caps than alternatives that increase the amount of information on just retained catch (Herring Alternative 2.4).

Increased monitoring of haddock and river herring and shad catch may help reduce uncertainty in estimates of catch that is tracked against catch caps, when that uncertainty may have otherwise led to effort restrictions in the herring fishery. Conversely, additional monitoring may illustrate higher than expected catch of haddock and river herring and shad, resulting in catch caps that are fully harvested earlier than expected and reduced opportunities to harvest herring. Increased information to help track catch against catch

_0000017256

caps may help allow the herring fishery to fully harvest the ACLs or it may curtail the harvest of herring by the herring fishery.

## Amount of Coverage

Herring Alternatives 2.1 and 2.5 specify monitoring coverage at 100%, while Herring Alternatives 2.2-2.4 and 2.7 allow monitoring coverage to range between 25% and 100%.

The economic impact on herring vessels of paying for higher levels of monitoring coverage would be more negative than paying for lower levels of monitoring.  Therefore, alternatives that specify higher coverage targets may have a more negative direct impact on herring vessels paying for monitoring coverage than alternatives with lower coverage targets.

While high levels of monitoring are not always necessary to address a monitoring goal, because the Council is interested in increasing monitoring to improve the accuracy of catch estimates, in particular the ability to track catch against catch caps, more monitoring could be more effective than less monitoring.  Additionally, because the catch of river herring and shad is highly variable, both spatially and temporally, increased monitoring for those species may be more effective than less monitoring.  To the extent that increased monitoring helps reduce the uncertainty of data tracked against catch caps and helps increase the likelihood that vessels can fully harvest herring sub-ACLs, specifying a higher coverage target may have more indirect positive economic impacts on herring vessels than specifying a lower coverage target.

The Council's selection of Herring Alternative 2.5 as a preferred alternative would maintain the existing requirement for 100% NEFOP-level observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas, but would allow those vessels to pay for NEFOP-level observers to access Groundfish Closed Areas.  The Council also selected a 50% coverage on Category A and B vessels (Alternative 2.7) as a preferred alternative.  These coverage targets are high to moderate compared to other alternatives.  Therefore, the direct economic impacts associated with paying for additional monitoring are high to moderate compared to other alternatives and any indirect benefits associated with additional monitoring to reduce the uncertainty around catch estimates are high to moderate compared to other alternatives.

A CV analysis of Herring Alternatives 2.1 and 2.2 was used simulate the precision associated with tracking catch against catch caps.  For the GB Haddock Catch Cap, coverage targets of 25% and higher would have generated CVs less than 30%.  For the RHS SNE catch caps, coverage targets of 25% and higher would generated CVs less than 30%.  For the RHS GOM and CC catch caps, coverage targets of 50% and higher would generate CVs around 30% and lower.  Based on this analysis, coverage targets of 50%, and often times even 25%, would generate CVs on the catch tracked against catch caps of 30% or lower.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage.  NMFS would determine how to calculate the combined coverage target, in consultation with Council staff.  Because the coverage target

_0000017257

is calculated by combining SBRM and IFM coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. The Council recommended these combined coverage targets to help reduce the cost of industry-funded coverage. But because SBRM coverage has the potential to vary year to year, the cost of monitoring paid by industry may also vary year to year and may be difficult to plan/budget.

## How Coverage is Allocated

Herring Alternatives 2.1, 2.2, and 2.7 would allocate monitoring coverage by vessel permit category (i.e., Category A and B herring permits), Herring Alternative 2.4 would allocate monitoring coverage by fishing fleet (i.e., midwater trawl fleet), and Herring Alternative 2.3 would allocate monitoring coverage by permit category and fishing fleet.

The extent to which the allocation of industry-funded coverage is consistent with the SBRM fishing fleet will determine how the resulting data can be used. Data collected by vessel permit category can be used for catch limit and catch cap monitoring, while data collected by fleet can be used for catch monitoring and generating discard estimates for stock assessments. Therefore, a positive biological impact is expected when coverage is allocated by fleet and a low positive biological impact is expected when coverage is allocated by vessel permit category. However, the only alternatives allocating coverage by fleet (Herring Alternatives 2.3 (portside sampling) and 2.4) would not be collecting an estimate of discards.

Overall, data utility would be similar whether coverage is allocated by permit or by fleet. Therefore any indirect economic benefits for herring vessels related to data utility would be similar across alternatives.

Herring Alternative 2.5 maintains the requirement that midwater trawl vessels fishing in the Groundfish Closed Areas must carry a NEFOP-level observer while Herring Alternative 2.6 would specify that coverage for midwater trawl vessels fishing in Groundfish Closed Areas matches the coverage target recommend by the Council for the rest of the fishery. The Herring Alternative 2 Sub-Options would apply to Herring Alternative 2.6 but not to Herring Alternative 2.5.

Even though Herring Alternative 2.5 would not allow coverage requirements to be waived (Sub-Option 1) for a trip inside the Groundfish Closed Areas, it is unlikely that reduced fishing effort in the Groundfish Closed Areas would prevent herring the ACL from being harvested. If the benefits associated with increased monitoring and/or the negative economic impacts of paying for monitoring coverage associated with Herring Alternative 2.6 are reduced or minimized by the selection of Sub-Options, 1, 2 or 5, then the benefits of increased monitoring and/or negative economic impacts associated with paying for monitoring coverage may be less under Herring Alternative 2.6 than under Herring Alternative 2.5.

During 2005-2010, prior to any observer coverage requirements for midwater trawl vessels fishing in Groundfish Closed Areas, less than 10% of the herring effort, less than

_0000017258

12% of the herring harvest, and less than 13% of the herring revenue for the midwater trawl fleet came from inside the Groundfish Closed Areas. Additionally, herring catch accounted for almost 100% of the revenue generated by the midwater trawl fleet. Haddock is the only non-target species of interest that is typically harvested by midwater trawl vessels inside the Groundfish Closed Areas. The haddock catch by midwater trawl vessels inside Groundfish Closed Areas is tracked against the haddock catch caps and haddock ACL.

The magnitude of negative economic impacts associated with Herring Alternative 2.5 is much less than under Herring Alternatives 2.1-2.4 and 2.7 because of the limited amount of time the midwater trawl fleet spends inside the Groundfish Closed Areas. The indirect benefits of increased monitoring to herring vessels associated with Herring Alternative 2.5 would be similar to other alternatives that specify NEFOP-level observer coverage (Herring 2.1) and allocate monitoring coverage by midwater trawl fleet (Herring Alternatives 2.3-2.4) or permit category (Herring Alternatives 2.2 and 2.7). However, the magnitude of those benefits would be less than Herring Alternatives 2.1-2.4 and 2.7 because increased monitoring would be focused on effort in the Groundfish Closed Areas and not across all herring management areas.

Herring Alternative 2.6 specifies that industry-funded monitoring requirements inside Groundfish Closed Areas would match monitoring requirements for the general herring fishery. Therefore, the economic impacts, both positive and negative, associated with Herring Alternative 2.6 would have already been considered as part of the alternative selected by the Council as a preferred alternative (Herring Alternative 2.7).

### Slippage Requirements

Herring Alternatives 2.1–2.7 would require compliance with slippage restrictions, reporting requirements, and consequence measures. Specifically, all existing slippage restrictions, reporting requirements, and consequence measures would apply on all trips with a NEFOP-level observer or at-sea monitor was aboard. Additionally, slippage restrictions, reporting requirements, and the 15-mile move requirement would apply on all trips selected for portside sampling.

Slippage requirements are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling. Any indirect benefits associated with improved catch monitoring from slippage requirements would likely be similar across Herring Alternatives 2.1-2.7.

Any potential negative economic impacts associated with complying with slippage restrictions, reporting requirements, and consequence measures would be similar across Herring Alternatives 2.1-2.7. However, there is the potential for slightly reduced negative economic impacts associated with the 15-mile move requirement associated with Herring Alternatives 2.3, 2.4, and 2.7. The lower impact associated with the 15-mile move requirement is compared to the impact of terminating a fishing trip and returning to port, if catch was slipped for reasons other than safety, mechanical failure, or excess catch of dogfish, associated with Herring Alternatives 2.1, 2.2, and 2.5.

_0000017259

**Potential Reductions in Returns-to-Owner**

The industry cost responsibility associated with NEFOP-level observer coverage is the most expensive ($818 per sea day) followed by at-sea monitor coverage ($717 per sea day), and EM ($172-$325 per sea day) plus portside sampling ($3.84-$5.12 per mt).

Returns-to-owner (RTO) is calculated by subtracting fixed and operational costs from gross revenue (Table 82) and was used rather than net revenues to more accurately reflect income from fishing trips.

The following table describes the potential reduction to RTO associated with paying for monitoring coverage across herring coverage target alternatives.  Shaded cells in the following table indicate when the potential reduction to RTO associated with paying for monitoring coverage exceeds 10%.  Additional background and summary information can be found in the tables and box plots starting on page 268.

_0000017260

**TABLE 82. POTENTIAL REDUCTION TO RETURN-TO-OWNER FOR HERRING COVERAGE TARGET ALTERNATIVES.**

| Herring Coverage Target Alternatives | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Alternative | Gear Type | Paired MWT | | Single MWT | | Purse Seine | | SMBT | |
| | Median potential reduction to RTO from coverage | ≥1 lb | > 25 MT | ≥1 lb | > 25 MT | ≥1 lb | > 25 MT | ≥1 lb | > 25 MT |
| 2.1 | 100% NEFOP-level | 44.7% | 42.2% | 24.4% | 5.8% | 13.9% | 10.4% | 11.5% | 14.2% |
| 2.2 and 2.3 | 100% ASM | 38.9% | 36.7% | 21.3% | 5.1% | 12.1% | 9.1% | 10.0% | 12.3% |
| | 75% ASM | 29.5% | 28.2% | 15.9% | 3.8% | 9.1% | 6.8% | 7.5% | 9.4% |
| | 50% ASM | 20.4% | 18.9% | 10.5% | 2.5% | 6.0% | 4.5% | 5.4% | 6.4% |
| | 25% ASM | 10.1% | 9.6% | 5.6% | 1.4% | 3.0% | 2.2% | 3.5% | 3.8% |
| 2.3 and 2.4 | 100% EM/PS Year 1 | 42.2% | 40.1% | 37.3% | 19.5% | N/A | | N/A | |
| | 100% EM/PS Year 2 | 29.1% | 27.5% | 12.8% | 4.9% | | | | |
| | 50% EM/PS Year 1 | 25.1% | 24.2% | 26.7% | 16.9% | | | | |
| | 50% EM/PS Year 2 | 14.4% | 13.3% | 6.9% | 2.4% | | | | |
| 2.5 | 100% NEFOP-level | 5.4% | 5.4% | 1.0% | 1.0% | | | | |
| 2.6 | Potential Reduction to RTO would depend on which other Herring Alternative was selected (2.2-2.4 or 2.7) | | | | | | | | |
| 2.7 | Potential Reduction to RTO associated with ASM would be the same as Herring Alternatives 2.2 and 2.3 | | | | | | | | |
| | 100% EM/PS Year 1 | 42.3% | 39.7% | 38.1% | 29.2% | 19.4% | 18.3% | 21.0% | 19.9% |
| | 100% EM/PS Year 2 | 29.2% | 27.1% | 17.3% | 6.2% | 15.3% | 14.1% | 6.3% | 8.8% |
| | 75% EM/PS Year 1 | 25.6% | 24.8% | 27.6% | 23.5% | 13.0% | 12.6% | 16.8% | 15.4% |
| | 75% EM/PS Year 2 | 14.8% | 13.7% | 8.5% | 3.3% | 8.1% | 7.6% | 3.0% | 4.3% |
| | 50% EM/PS Year 1 | 19.8% | 19.3% | 23.7% | 21.1% | 10.5% | 10.3% | 14.3% | 13.8% |
| | 50% EM/PS Year 2 | 9.5% | 8.8% | 5.4% | 2.1% | 5.3% | 4.9% | 1.8% | 2.7% |
| | 25% EM/PS Year 1 | 14.4% | 14.2% | 20.0% | 18.8% | 8.2% | 8.4% | 13.3% | 12.4% |
| | 25% EM/PS Year 2 | 4.5% | 4.2% | 2.5% | 1.0% | 2.6% | 2.4% | 0.8% | 1.3% |

For EM/Portside Costs = Year 1 includes $15,000 for purchase and installation of EM equipment and Year 2 does not include the $15,000 purchase and installation costs.

The Council revised Alternative 2.7 when it took final action. It recommended a > 50 mt option for 50% ASM coverage. Median potential reduction in RTO with the > 50 mt option is 15.7% for paired MWT, 3.5% for single MWT, 2.6% for purse seine, and 2.5% for SMBT.

_0000017261

When considering potential reduction in annual RTO, Herring Alternative 2.1 has the greatest potential reduction in RTO (44.7%-11.5%) followed by Herring Alternative 2.2 (38.9%-3.5%).  The range in potential reduction in RTO for Herring Alternative 2.1 depends on gear type and it depends on the amount of coverage and gear type for Herring Alternative 2.2.

Herring Alternatives 2.3 and 2.7 both have broad ranges of potential reductions in RTO associated with at-sea monitoring coverage and electronic monitoring and portside sampling.  When considering the same coverage target, the potential reduction in RTO associated with at-sea monitoring coverage is generally greater than the potential reduction in RTO associated with electronic monitoring and portside sampling.  For example, for Herring Alternatives 2.3 and 2.7, the potential reduction in RTO associated with at-sea monitoring coverage at a 50% coverage target (38.9%-10.0%) is greater than the potential reduction in RTO associated with a 50% coverage target for electronic monitoring and portside sampling (9.5%-5.4%).

The potential reduction in RTO associated with Herring Alternative 2.5 is the lowest (5.4%-1.0%) of all the herring alternatives because RTO reductions were limited to trips by midwater trawl vessels within the Groundfish Closed Areas.  The potential reduction in RTO associated with Herring Alternative 2.6 would depend on which other Herring Alternative was selected (2.2-2.4 or 2.7) and is already considered within the RTO analyses for those alternatives.

Based on data in Table 82, the Council's selection of Herring Alternative 2.7 (50% coverage target) as a preferred alternative has the potential to reduce potential RTO up to 20.4% for midwater trawl vessels, up to 6.0% for purse seine vessels,, and up to 5.4 % for small mesh bottom trawl vessels.  The Council's selection of Herring Alternative 2.5 as a preferred alternative has the potential to further reduce RTO for midwater trawl vessels paying for NEFOP-level observer coverage to access Groundfish Closed Areas up to an additional 5.4%.

Paired midwater trawl vessels have the highest monitoring costs as a percentage of RTO because these vessels have, on average, more sea days declared into the herring fishery than other gear types.  Therefore, midwater trawl vessels have more sea days that would be subject to monitoring costs than vessels that use other gear types.

There are differences across gear types regarding the sources of revenue that would be used to pay for monitoring costs.  For example, for small mesh bottom trawl vessels, approximately 50% of their revenue is generated by participating in the herring fishery and the other 50% is generated by participating in other fisheries.  This means that if small mesh bottom trawl vessels want to continue to declare herring trips, they may need to use revenue from other fisheries to pay the industry-funded monitoring costs associated with the herring fishery.  A metric for considering different revenue sources across gear types is evaluating monitoring costs as a percent of herring revenue.  For small mesh bottom trawl

vessels, industry-funded monitoring costs as a percent of herring revenue are higher than for other gear types.

Another method for accounting for these differential impacts on small mesh bottom trawl vessels is to apportion the overall RTO to the different fisheries and then reduce the herring RTO by the monitoring cost. However, to properly apportion RTO to fisheries, much more detailed cost data is required. If data were available on a trip basis, costs that are specific to the fishery pursued on that trip could be assigned. Fuel is a good example of this type of cost. However, the trip related cost data used in the RTO analysis is at an annual level. Even with highly detailed cost information there are still costs that do not vary by trip, such as insurance costs. It is unclear in this instance what method should be used to apportion these costs. For these reasons, herring as a percentage of revenue, rather than herring RTO, is shown in the following tables (starting on page 268) to evaluate impacts on small mesh bottom trawl vessels.

Exempting trips that land less than 25 mt or 50 mt of herring (Sub-Option 5) from industry-funded monitoring costs has the potential greatly reduce industry-funded monitoring costs. Sub-Option 5 would eliminate monitoring costs for vessels who always land less herring than 25 mt or 50 mt of herring and Sub-Option 5 may substantially reduce monitoring costs for particular gear types.

Based on past performance, small mesh bottom trawl vessels landed less than 25 mt of herring on 45% of trips and less than 50 mt of herring on 81% of trips. Similarly, 40% of single midwater trawl trips landed less than 25 mt of herring and 60% of trips landed less than 50 mt of herring. Sub-Option 5 is likely to benefit paired midwater trawl and purse seine vessels less. Only 13% of paired midwater trawl trips landed less than 50 mt of herring and only 33% of purse seine trips landed less than 50 mt of herring.

The total annual costs to vessels associated with additional monitoring ranges from $673,000 (Herring Alternative 2.1) to $75,000 (Herring Alternative 2.5). The Council's selection of a 50 mt-threshold for Sub-Option 5 as a preferred alternative has a greater potential to reduce the cost of additional monitoring than selecting a 25-mt threshold. Single midwater trawl vessels may not need to pay for additional monitoring on up to 60% of trips (possible $36,500 savings across the fleet) and small mesh bottom trawl vessels may not need to pay for additional monitoring on up to 80% of trips (possible $60,000 savings across the fleet).

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811,000 to $75,000 – a 91% reduction. However, Herring Alternative 2.5 only provides increased monitoring on midwater trawl vessels fishing in the Groundfish Closed Areas.

_0000017263

## Summary of Impacts to Fishery-Related Businesses and Communities

In general, the direct economic impact on herring vessels associated with Herring Alternatives 2.1-2.7 is negative.  The total annual costs to vessels associated with additional monitoring ranges from $673,000 (Herring Alternative 2.1) to $75,000 (Herring Alternative 2.5).  Similarly, the negative economic impact on herring vessels of paying for monitoring coverage (as measures by the potential reduction in the RTO) is greatest with Herring Alternative 2.1 and the least with Herring Alternative 2.5.  The magnitude of the economic impact associated with paying for monitoring coverage associated with Herring Alternatives 2.2-2.6 would vary with the type of information collected and amount of coverage.

Because midwater trawl vessels average more sea days than other gear types, midwater trawl vessels have a greater negative economic impact associated with paying for monitoring coverage, followed by purse seine vessels, and small mesh bottom trawl vessels.

The Council's selection of a 50-mt threshold for Sub-Option 5 as a preferred alternative has a greater potential to reduce the cost of additional monitoring than selecting a 25-mt threshold.  Single midwater trawl vessels may not need to pay for additional monitoring on up to 60% of trips (possible $36,500 savings across the fleet) and small mesh bottom trawl vessels may not need to pay for additional monitoring on up to 80% of trips (possible $60,000 savings across the fleet).

Indirect positive impacts on herring vessels associated with Herring Alternative 2 may result from increased monitoring helping to reduce uncertainty around retained and discarded catch estimates leading to additional harvesting opportunities.  If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be less likely to be constrained by catch caps and more likely to be able to fully harvest herring sub-ACLs.  These benefits may not be realized under Herring Alternative 1.

Indirect negative impacts on herring vessels associated with Herring Alternative 2 may result if additional monitoring illustrates higher than expected catch of haddock and river herring and shad, resulting in catch caps that are fully harvested earlier than expected and reduced opportunities to harvest herring.  These impacts may be similar to impacts under Herring Alternative 1 if no additional monitoring results in overly cautious management and limits herring harvest.

_0000017264

**TABLE 83. SUMMARY OF ECONOMIC IMPACTS OF HERRING COVERAGE TARGET ALTERNATIVES (*PREFERRED ALTERNATIVES SHOWN IN BOLD*)**

| Alternatives | Impacts on Fishery Related-Businesses |
|---|---|
| Herring Alternative 1: No Coverage Target Specified For IFM Programs (No Action) | • Low positive impact associated with observer coverage allocated by SBRM<br>• Low negative impact associated with no additional monitoring to reduce uncertainty around catch estimates |
| **Herring Alternative 2: Coverage Target Specified For IFM Programs** | • **Negative impact associated with potential reduction in returns-to-to owner (RTO)**<br>• **Negative impact associated with not selecting Sub-Option 1 if fishing effort is limited by monitoring availability and herring ACLs are not harvested**<br>• **Low positive impact associated with selecting Sub-Options 1 and 2 if additional monitoring is waived**<br>• **Low positive impact associated with selecting Sub-Option 5 if it reduces monitoring costs**<br>• **Low positive impact associated with additional monitoring to reduce uncertainty around catch estimates in the herring fishery**<br>• **Magnitude of impacts associated with additional monitoring would be dependent on the type of information collected, amount of coverage, how coverage is allocated, and amount of available Federal funding** |
| Herring Alternative 2.1: 100% NEFOP-Level Coverage on Category A and B Vessels | • Negative impact associated with potential reduction in RTO up to 44.7%<br>• Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with 100% coverage on Category A and B vessels |
| Herring Alternative 2.2: ASM Coverage on Category A and B Vessels | • Negative impact associated with potential reduction in RTO up to 38.9%<br>• Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with 100%-25% coverage on Category A and B vessels |
| Herring Alternative 2.3: Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | • Negative impact associated with potential reduction in RTO up to 38.5%<br>• Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with 100%-25% coverage on Category A and B vessels and 100% or 50% coverage on the midwater trawl fleet |

_0000017265

| Alternatives | Impacts on Fishery Related-Businesses |
|---|---|
| Herring Alternative 2.4: EM and Portside Sampling on Midwater Trawl Fleet | • Negative impact associated with potential reduction in RTO up to 29.1%*<br>• Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with 100% or 50% coverage on the midwater trawl fleet |
| **Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas** | • **Negative impact associated with potential reduction in RTO up to 5.4%**<br>• **Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with 100% coverage on the midwater trawl fleet fishing in Groundfish Closed Areas** |
| Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | • Negative impact associated with potential reduction in RTO<br>• Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with 100%-25% coverage on the midwater trawl fleet fishing in the Groundfish Closed Areas |
| **Herring Alternative 2.7: ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | • **Negative impact associated with potential reduction in RTO up to 20.4%**<br>• **Low positive impact associated with additional information to reduce uncertainty around catch estimates associated with 50% coverage on Category A and B vessels** |
| * Reflects RTO from Year 2 | |

## Additional Information on Monitoring Costs

The tables and box plots on the following pages provide summarized economic data for each of the herring coverage target alternatives. The economic impact on vessels associated with paying for monitoring coverage is described as a percentage of RTO for each herring coverage target alternative in the following figures. The tables provide the mean and median number of sea days per vessel that would result from each of the alternatives, as well as the mean and median RTO that would ultimately be reduced by the industry-funded monitoring costs. Additionally, fleet level effort, revenue, and monitoring cost information for each herring coverage target alternative are also provided. Additional economic analysis is available in Appendix 5.

_0000017266

Box plots are a useful tool to show how data are distributed. The following schematic shows what the various pieces of a box plot show regarding the distribution of data:



When examining the box plots, it is important to note the differences between mean and median values by gear type and by alternatives, as well as the differences in the variability of values by these criteria.  For example, in the first figure (Herring Alternative 2.1) there is a much wider range of costs for purse seine vessels than small mesh bottom trawl vessels, as represented by the length of the rectangle.  Further, the difference between alternatives for purse seine vessels shows that the mean and median values are lower under the 25-mt threshold (Sub-Option 5) but also that the likely range of NEFOP costs are much narrower.

_0000017267

TABLE 84. HERRING ALTERNATIVES 2.1, 2.2, 2.3, 2.7 (PURSE SEINE AND SMBT) – ANNUAL AVERAGE PER VESSEL SUMMARY

| | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | > 1 lb | > 25 mt | > 1 lb | > 25 mt | > 1 lb | > 25 mt | > 1 lb | > 25 mt |
| Mean RTO | $163,080 | | $241,180 | | $141,169 | | $144,125 | $163,329 |
| Median RTO | $159,529 | | $253,048 | | $60,156 | | $121,026 | $135,782 |
| Mean Sea Days (100%) | 103 | 83 | 56 | 29 | 28 | 19 | 21 | 20 |
| Median Sea Days (100%) | 104 | 84 | 57 | 26 | 23 | 16 | 17 | 15 |
| Mean Sea Days (75%) | 77 | 62 | 42 | 22 | 21 | 15 | 17 | 15 |
| Median Sea Days (75%) | 77 | 63 | 43 | 20 | 18 | 12 | 13 | 11 |
| Mean Sea Days (50%) | 52 | 42 | 28 | 15 | 14 | 10 | 12 | 10 |
| Median Sea Days (50%) | 51 | 42 | 29 | 13 | 12 | 8 | 9 | 8 |
| Mean Sea Days (25%) | 26 | 21 | 14 | 8 | 8 | 6 | 8 | 7 |
| Median Sea Days (25%) | 26 | 21 | 14 | 7 | 7 | 5 | 6 | 6 |

_0000017268



**FIGURE 14. HERRING ALTERNATIVE 2.1 100% NEFOP COST AND PERCENT OF RTO**

Figure 12 describes the approximate costs that applicable vessels with various gear types would incur annually from Herring Alternative 2.1, which would require 100% coverage by NEFOP-level observers on Category A and B vessels (includes vessels that use midwater trawl, small mesh bottom trawl, and purse seine gear). The Council included thresholds of >1 lb (light grey) or > 25 mt (55,115 pounds) (darker grey) for trips that would require monitoring – a 25-mt threshold would reduce the number of trips that had to be monitored and thus reduce costs.

Since this type of figure is used often in this document, additional detail on how to interpret the figure is provided to serve as a guide for interpreting other similar figures. All costs are based on the fleets operating as they did in 2014, and are derived from the number of days that they fished in 2014 on trips when they landed either 1 lb of herring or 25 mt of herring (the two thresholds being considered that would trigger monitoring). The line in the bar is the median (half of vessels would have higher or lower costs than the median cost) and the "o" or "+" within the bar shows the mean (average). Where the mean and median do not align there is some degree of skewedness to the data (generally if the mean is higher than the median there are a few unusually high values and if

_0000017269

the median is higher than the mean there are a few unusually low values).  When the median and mean are substantially different the median is more illustrative of the typical monitoring costs for vessels, so the median is the focus of this analysis.

The shaded bars show where 50% of the data are (the "interquartile range") and the whiskers show the range of values that lie within 1.5 times the interquartile percentile range.  Together, the bars and whiskers illustrate whether the data are tightly grouped or highly variable (here highly variable would mean that some vessels would have high costs and some vessels would have low costs).  An "o" or "+" outside the whiskers shows an extreme outlier.  For example, there is a low outlier data point with the costs for paired midwater trawl vessels at a 1-lb threshold for monitoring.

For Herring Alternative 2.1, due to the higher number of trips that landed herring, paired midwater trawl vessels are most impacted, followed by purse seine.  Single midwater trawl and small mesh bottom trawl vessels are least impacted.  Median costs for the gear types at the 1 lb of herring threshold (light grey bars) would have been approximately $85,000 for paired midwater trawl vessels, $47,000 for purse seine vessels, $14,000 for small mesh bottom trawl vessels, and $19,000 for single midwater trawl vessels.  Recall the median is the point at which half of the vessels would pay more and half would pay less than that amount, and that wide bars and long whiskers indicate a wider range of costs/impacts across vessels.

Costs are generally lower when a 25-mt threshold is used since not as many trips trigger a monitoring requirement.  For the analysis of the 25-mt threshold, some vessels had no qualifying trips and drop out of the analysis, so even if the medians/averages stay similar the total fleet costs may still substantially decline.  If a 25-mt threshold is used (darker grey bars), median costs are approximately $69,000 for paired midwater trawl vessels, $21,000 for purse seine vessels, $12,000 for small mesh bottom trawl vessels, and $13,000 for single midwater trawl vessels.

Percent of RTO at the 1-lb threshold is most impacted for paired midwater trawl vessels, followed by single midwater trawl  vessels, and then purse seine and small mesh bottom trawl.   For the 1-lb threshold, RTO for paired midwater trawl vessels is 44.7%, while RTO for single midwater trawl vessels is 24.4%.  Purse seine and small mesh bottom trawl vessel RTO is about 12%-14%.  At the 25-mt threshold, RTO for paired midwater trawl vessels is 42.2%, while the RTO for single midwater trawl, small mesh bottom trawl, and purse seine vessels is less than 15%.  Purse seine vessel RTO (especially at the 1-lb threshold) displayed a high level of variance and also skewed very high, indicating that a portion of vessels face substantially higher impacts to RTO.

Additionally, since vessels would have to declare their intent to fish for herring and the monitoring would be triggered based on that declaration of intent, costs may be higher if vessels want the option to fish for herring on more days than they actually caught herring in 2014.

_0000017270



**FIGURE 15. HERRING ALTERNATIVE 2.2 100% ASM COST AND PERCENT OF RTO**

Due to the higher number of trips that landed herring, paired midwater trawl vessels are most impacted, followed by purse seine vessels. Single midwater trawl and small mesh bottom trawl vessels are least impacted. Median costs for the gear types at the 1-lb of herring threshold (light grey bars) are $73,000 for paired midwater trawl vessels, $41,000 for purse seine vessels, $12,000 for small mesh bottom trawl vessels, and $17,000 for single midwater trawl vessels. If a 25-mt threshold is used (darker grey bars), median costs are $60,000 for paired midwater trawl vessels, $18,000 for purse seine vessels, $10,000 for small mesh bottom trawl vessels, and $11,000 for single midwater trawl vessels.

Percent of RTO at the 1-lb threshold is most impacted for paired midwater trawl vessels, followed by single midwater trawl vessels, and then purse seine and small mesh bottom trawl vessels. For the 1-lb threshold, RTO for paired midwater trawl vessels is 38.9%, while RTO for single midwater trawl vessels is 21.3%. Purse seine and small mesh bottom trawl vessel RTO is about 10%-12%. At the 25-mt threshold, RTO for paired midwater trawl vessels is 36.7% and 12.3% for small mesh bottom trawl vessels. RTO for single midwater trawl and purse seine vessels is less than 10%. Purse seine vessel RTO (especially at the 1-lb threshold) displayed a high level of variance and also skewed very high, indicating that a portion of vessels face substantially higher impacts to RTO.

_0000017271



**FIGURE 16. HERRING ALTERNATIVE 2.2 75% ASM COST AND PERCENT OF RTO**

At 75% ASM coverage, paired midwater trawl vessels are most impacted, followed by purse seine vessels. Single midwater trawl and small mesh bottom trawl vessels are least impacted. Median costs for the gear types at the 1-lb of herring threshold (light grey bars) are $55,000 for paired midwater trawl vessels, $31,000 for purse seine vessels, $9,000 for small mesh bottom trawl vessels, and $12,000 for single midwater trawl vessels. If a 25-mt threshold is used (darker grey bars), median costs are $45,000 for paired midwater trawl vessels, $14,000 for purse seine vessels, $8,000 for small mesh bottom trawl vessels, and $8,000 for single midwater trawl vessels.

Percent of RTO at the 1-lb threshold is most impacted for paired midwater trawl vessels, followed by single midwater trawl vessels, and then purse seine and small mesh bottom trawl vessels. For the 1-lb threshold, RTO for paired midwater trawl vessels is 29.7%, while RTO for single midwater trawl vessels is 15.9%. Purse seine vessel and small mesh bottom trawl vessel RTO are less than 10%. At the 25-mt threshold, RTO for paired midwater trawl vessels is 28.2%, while RTO for single midwater trawl, small mesh bottom trawl, and purse seine vessels is less than 10%. Purse seine vessel RTO (especially at the 1-lb threshold) displayed a high level of variance and also skewed very high, indicating that a portion of vessels face substantially higher impacts to RTO.

**IFM Omnibus Amendment**                    273                    **December 2018**

_0000017272



**FIGURE 17.  HERRING ALTERNATIVE 2.2 50% ASM COST AND PERCENT OF RTO**

At 50% ASM coverage, paired midwater trawl vessels are most impacted, followed by purse seine vessels.  Single midwater trawl and small mesh bottom trawl vessels are least impacted.  Median costs for the gear types at the 1-lb of herring threshold (light grey bars) are $36,000 for paired midwater trawl vessels, $20,000 for purse seine vessels, $7,000 for small mesh bottom trawl vessels and $8,000 for single midwater trawl vessels.  If a 25-mt threshold is used (darker grey bars), median costs are $30,000 for paired midwater trawl vessels, $9,000 for purse seine vessels, $6,000 for small mesh bottom trawl vessels, and $6,000 for single midwater trawl vessels.

Percent of RTO at the 1-lb threshold is most impacted for paired midwater trawl vessels, followed by single midwater vessels, and then purse seine and small mesh bottom trawl vessels.  For the 1lb threshold, RTO for paired midwater trawl vessels is 20.4%, while RTO for single midwater trawl vessels is 10.5%.  Purse seine and small mesh bottom trawl vessels RTO is less than 6%.  At the 25-mt threshold, RTO for paired midwater trawl vessels is approximately 18.9%, while RTO for single midwater trawl, small mesh bottom trawl, and purse seine vessels is less than 7%.  Purse seine vessel RTO (especially at the 1-lb threshold) displayed a high level of variance and also skewed very high, indicating that a portion of vessels face substantially higher impacts to RTO.

_0000017273

 

**FIGURE 18. HERRING ALTERNATIVE 2.2 25% ASM COST AND PERCENT OF RTO**

At 25% ASM coverage, paired midwater trawl vessels are most impacted, followed by purse seine vessels. Single midwater trawl and small mesh bottom trawl vessels are least impacted. Median costs for the gear types at the 1-lb of herring threshold (light grey bars) are $19,000 for paired midwater trawl vessels, $10,000 for purse seine vessels, $4,000 for small mesh bottom trawl vessels, and $5,000 for single midwater trawl vessels. If a 25-mt threshold is used (darker grey bars), median costs are $15,000 for paired midwater trawl vessels, $5,000 for purse seine vessels, $4,000 for small mesh bottom trawl vessels, and $4,000 for single midwater trawl vessels.

Percent of RTO at the 1-lb threshold is most impacted for paired midwater trawl vessels, followed by single midwater trawl vessels, and then purse seine and small mesh bottom trawl vessels. For the 1-lb threshold, RTO for paired midwater trawl vessels is 10.1%, while RTO for single midwater trawl vessels is 5.6%. Purse seine and small mesh bottom trawl vessel RTO is less than 4%. At the 25-mt threshold, RTO for paired midwater trawl vessels is 9.6%, while RTO for single midwater trawl, small mesh bottom trawl, and purse seine vessels is less than 4%. Purse seine vessel RTO (especially at the 1-lb threshold) displayed a high level of variance and also skewed very high, indicating that a portion of vessels face substantially higher impacts to RTO.

Note: The box plots for purse seine and small mesh bottom trawl vessels shown in Figures 13-16 under Herring Alternative 2.2 also describe the distribution of values for Herring Alternative 2.3.

**IFM Omnibus Amendment**                    275                    **December 2018**

**TABLE 85. HERRING ALTERNATIVES 2.1, 2.2, 2.3 (PURSE SEINE AND SMBT) – ANNUAL FLEET SUMMARY**

| Fleet Level | Paired MWT ≥ 1 LB | Paired MWT > 25 MT | Single MWT ≥ 1 LB | Single MWT > 25 MT | Purse Seine ≥ 1 LB | Purse Seine > 25 MT | SMBT ≥ 1 LB | SMBT > 25 MT |
|---|---|---|---|---|---|---|---|---|
| Number of Vessels | 8 | 8 | 6 | 6 | 7 | 7 | 9 | 6 |
| Days at Sea | 825 | 663 | 170 | 116 | 392 | 204 | 192 | 117 |
| Total NEFOP Cost (2.1) | $673k | $541k | $138k | $95k | $320k | $166k | $156k | $96k |
| Total ASM Cost (2.2) | $586k | $471k | $120k | $82k | $278k | $145k | $136k | $83k |
| Total Revenue | $10.6M | $9.8M | $4.5M | $4.2M | $11.0M | $10.3M | $2.6M | $1.8M |
| % Revenue Herring | 89% | 93% | 86% | | 100% | | 58% | 78% |
| % Revenue Mackerel | 11% | 7% | 13% | | - | | 3% | 2% |
| % Revenue Squid | - | | - | | - | | 20% | 10% |
| *Data shown by trips harvesting ≥ 1 lb of herring and > 25 mt of herring* | | | | | | | | |

**TABLE 86. HERRING ALTERNATIVES 2.3 AND 2.4 – ANNUAL AVERAGE PER MIDWATER TRAWL VESSEL SUMMARY**

| | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | > 1 lb | > 25 mt | > 1 lb | > 25 mt |
| Mean RTO | $163,080 | | $134,205 | $149,714 |
| Median RTO | $159,529 | | $60,156 | $80,070 |
| Mean EM Days (100%) | 103 | 83 | 22 | 17 |
| Median EM Days (100%) | 104 | 84 | 18 | 13 |

_0000017275



**FIGURE 19.  HERRING ALTERNATIVE 2.4 100% EM AND PORTSIDE COST AND PERCENT OF RTO**

100% EM and portside monitoring costs are substantially higher for paired midwater trawl vessels than for single midwater trawl vessels at both the 1-lb threshold and the 25-mt threshold.  Median costs for the gear types at the 1-lb threshold (light grey bars) is $60,000 for paired midwater trawl vessels and $10,000 for single midwater trawl vessels.  If a 25-mt threshold is used (darker grey bars), median costs are $54,000 for paired midwater trawl vessels and $6,000 for small mesh bottom trawl and single midwater trawl vessels.

Percent of RTO for paired midwater trawl vessels is substantially greater than for single midwater trawl vessels at both the 1-lb and 25-mt thresholds.  For the 1-lb threshold, RTO for paired midwater trawl vessels is 29.1%, while RTO for single midwater trawl vessels is 12.8%.  At the 25-mt threshold, RTO for paired midwater trawl vessels is 27.5%, while RTO for single midwater trawl vessels is 4.9%.

_0000017276



**FIGURE 20.  HERRING ALTERNATIVE 2.4  50% EM AND PORTSIDE COST AND PERCENT OF RTO**

50% EM and portside monitoring costs are substantially higher for paired midwater trawl vessels than for single midwater trawl vessels at both the 1-lb threshold and the 25-mt threshold.  Median costs for the gear types at the 1-lb threshold (light grey bars) is $29,000 for paired midwater trawl vessels and $5,000 for single midwater trawl vessels.  If a 25-mt threshold is used (darker grey bars), median costs are $25,000 for paired midwater trawl vessels and $3,000 for small mesh bottom trawl and single midwater trawl vessels.

Percent of RTO for paired midwater trawl vessels is substantially greater than for single midwater trawl vessels at both the 1-lb and 25-mt thresholds.  For the 1-lb threshold, RTO for paired midwater trawl vessels is 14.4%, while RTO for single midwater trawl vessels is 6.9%.  At the 25-mt threshold, RTO for paired midwater trawl vessels is 13.3%, while RTO for single midwater trawl vessels is 2.4%.

_0000017277

**TABLE 87.  HERRING ALTERNATIVES 2.3 AND 2.4 – ANNUAL MIDWATER TRAWL FLEET SUMMARY**

| Fleet Level | Paired MWT ≥ 1 LB | Paired MWT > 25 MT | Single MWT ≥ 1 LB | Single MWT > 25 MT |
|---|---|---|---|---|
| Number of Vessels | 8 | 8 | 8 | 7 |
| Days at Sea | 825 | 663 | 180 | 117 |
| Total Monitoring Cost (100% EM at $325/day, 100% PS at $5.12/mt, year 2) | $457,595 | $393,117 | $134,165 | $107,580 |
| Total Monitoring Cost (100% EM at $187/day, 50% PS at $3.84/mt, year 2) | $222,958 | $188,376 | $61,067 | $47,083 |
| Total Revenue | $10.6M | $9.8M | $4.5M | $4.2M |
| % Revenue Herring | 89% | 93% | 86% | 86% |
| % Revenue Mackerel | 11% | 7% | 13% | 14% |
| % Revenue Squid | - | | - | |
| *Data shown by trips harvesting ≥ 1 lb of herring and > 25 mt of herring* | | | | |

_0000017278

**TABLE 88.  HERRING ALTERNATIVE 2.5 – ANNUAL AVERAGE PER MIDWATER TRAWL VESSEL SUMMARY**

|  | Paired MWT | | Single MWT | |
| --- | --- | --- | --- | --- |
|  | > 1 lb | > 25 mt | > 1 lb | > 25 mt |
| Mean RTO | $172,922 | | $545,609 | |
| Median RTO | $159,529 | | $545,609 | |
| Mean Sea Days | 14 | 9 | 4 | 4 |
| Median Sea Days | 11 | 9 | 4 | 4 |



**FIGURE 21.  HERRING ALTERNATIVE 2.5 100% NEFOP FOR MIDWATER TRAWL VESSELS IN GROUNDFISH CLOSED AREAS COST AND PERCENT OF RTO**

_0000017279

Monitoring costs 100% NEFOP for midwater trawl vessels in Groundfish Closed Areas are substantially higher for paired midwater trawl vessels than for single midwater trawl vessels at both the 1-lb threshold and the 25-mt threshold.  Median costs for the gear types at the 1-lb threshold (light grey bars) is $9,000 for paired midwater trawl vessels and $3,000 for single midwater trawl vessels.  If a 25-mt threshold is used (darker grey bars), median costs are $7,000 for paired midwater trawl vessels and $3,000 for small mesh bottom trawl and single midwater trawl vessels.

Percent of RTO for paired midwater trawl vessels is substantially greater than for single midwater trawl vessels at both the 1-lb and 25-mt thresholds.  For both the 1-lb and the 25-mt thresholds, RTO for paired midwater trawl vessels is 5.4%, while RTO for single midwater trawl vessels is 1.0%.

**TABLE 89.  HERRING ALTERNATIVE 2.5 – ANNUAL MIDWATER TRAWL FLEET SUMMARY**

| Fleet Level | Single and Paired MWT ≥ 1 LB | Single and Paired MWT > 25 MT |
|---|---|---|
| Number of Vessels | 8 | 8 |
| Days at Sea | 92 | 62 |
| Total NEFOP Cost | $74,827 | $50,347 |
| Total Revenue | $1.4M | $1.4M |
| % Revenue Herring | 99.9% | 100% |
| % Revenue Mackerel | - | - |
| % Revenue Squid | - | - |
| % Other Species | 0.1% | 0% |
| *Data shown by trips harvesting ≥ 1 lb of herring and > 25 mt of herring* | | |

Economic and effort data for Herring Alternative 2.6 is included in tables for Herring Alternatives 2.1-2.4.

_0000017280

**TABLE 90.  HERRING ALTERNATIVE 2.7 – ANNUAL FLEET SUMMARY**

| Fleet Level | Paired MWT ≥ 1 LB | Paired MWT > 25 MT | Single MWT ≥ 1 LB | Single MWT > 25 MT | Purse Seine ≥ 1 LB | Purse Seine > 25 MT | SMBT ≥ 1 LB | SMBT > 25 MT |
|---|---|---|---|---|---|---|---|---|
| Number of Vessels | 8 | 8 | 6 | 6 | 7 | 7 | 9 | 6 |
| Days at Sea | 825 | 663 | 170 | 116 | 392 | 204 | 192 | 117 |
| Total EM & PS Costs, year 2 (100% EM and PS. EM at $325/day. PS at $5.12/mt) | $451k | $387k | $128k | $105k | $293k | $220k | $88k | $59k |
| Total EM & PS Costs, year 2 (75% EM and PS. EM at $202/day. PS at $3.84/mt) | $228k | $197k | $65k | $55k | $152k | $118k | $43k | $29k |
| Total EM & PS Costs, year 2 (50% EM and PS. EM at $187/day. PS at $3.84/mt) | $146k | $126k | $43k | $36k | $99k | $77k | $27k | $19k |
| Total EM & PS Costs, year 2 (25% EM and PS. EM at $172/day. PS at $3.84/mt) | $70k | $61k | $21k | $18k | $48k | $38k | $13k | $9k |
| Total Revenue | $10.6M | $9.8M | $4.5M | $4.2M | $11.0M | $10.3M | $2.6M | $1.8M |
| % Revenue Herring | 89% | 93% | 86% | 100% | 58% | 78% | | |
| % Revenue Mackerel | 11% | 7% | 13% | - | | | 3% | 2% |

_0000017281

| Fleet Level | Paired MWT ≥ 1 LB | Paired MWT > 25 MT | Single MWT ≥ 1 LB | Single MWT > 25 MT | Purse Seine ≥ 1 LB | Purse Seine > 25 MT | SMBT ≥ 1 LB | SMBT > 25 MT |
|---|---|---|---|---|---|---|---|---|
| % Revenue Squid | - | - | - | | 20% | | 10% | |
| *Data shown by trips harvesting ≥ 1 lb of herring and > 25 mt of herring* | | | | | | | | |



**FIGURE 22. HERRING ALTERNATIVE 2.7 100% EM AND PORTSIDE ON ALL VESSELS**

100% EM and portside monitoring costs, at both the 1-lb threshold and the 25-mt threshold, are greatest for paired midwater trawl vessels, followed by purse seine vessels. Single midwater trawl vessels and small mesh bottom trawl vessels have similar levels of monitoring costs. Median costs for the gear types at the 1-lb threshold (light grey bars) is $61,000 for paired midwater trawl

_0000017282

vessels, $47,000 for purse seine vessels, $16,000 for single midwater trawl vessels,  and $8,000 for SMBT vessels.  If a 25-mt threshold is used (darker grey bars), median costs are $53,000 for paired midwater trawl vessels $35,000 for purse seine vessels, $9,000 for single midwater trawl vessels, and $7,000 for SMBT vessels.

Percent RTO reductions at the 1-lb threshold are greatest for paired midwater trawl vessels, followed by single midwater trawl vessels, purse seine vessels, and then SMBT vessels.  For the 1-lb threshold, the median RTO reduction for paired midwater trawl vessels is 29.3%, while RTO reductions for single midwater trawl vessels is 17.3%, 15.3% for purse seine vessels, and 6.3% for SMBT vessels.  At the 25-mt threshold, RTO reductions for paired midwater trawl vessels are 27.1%, 14.1% for purse seine vessels, 8.8% for SMBT vessels, and 6.2% for single midwater trawl vessels.



**FIGURE 23.  HERRING ALTERNATIVE 2.7 75% EM AND PORTSIDE ON ALL VESSELS**

75% EM and portside monitoring costs, at both the 1-lb threshold and the 25-mt threshold, are greatest for paired midwater trawl vessels, followed by purse seine vessels.  Single midwater trawl vessels and small mesh bottom trawl vessels have similar levels of monitoring costs.  Median costs for the gear types at the 1-lb threshold (light grey bars) are $31,000 for paired midwater trawl vessels, $25,000 for purse seine vessels, $8,000 for single midwater trawl vessels,  and $4,000 for SMBT vessels.  If a 25-mt

_0000017283

threshold is used (darker grey bars), median costs are $27,000 for paired midwater trawl vessels $18,000 for purse seine vessels, $5,000 for single midwater trawl vessels, and $4,000 for SMBT vessels.

Percent RTO reductions at the 1-lb threshold are greatest for paired midwater trawl vessels, followed by single midwater trawl vessels, purse seine vessels, and then SMBT vessels.  For the 1-lb threshold, the median RTO reduction for paired midwater trawl vessels is 14.8%, while RTO reductions for single midwater trawl vessels are 8.5%, 8.1 % for purse seine vessels, and 3.0% for SMBT vessels.  At the 25-mt threshold, RTO reductions for paired midwater trawl vessels are 13.7%, 7.6% for purse seine vessels, 4.3% for SMBT vessels, and 3.3% for single midwater trawl vessels.



**FIGURE 24.  HERRING ALTERNATIVE 2.7 50% EM AND PORTSIDE ON ALL VESSELS**

50% EM and portside monitoring costs, at both the - lb threshold and the 25-mt threshold, are greatest for paired midwater trawl vessels, followed by purse seine vessels.  Single midwater trawl vessels and small mesh bottom trawl vessels have similar levels of monitoring costs.  Median costs for the gear types at the 1-lb threshold (light grey bars) is $20,000 for paired midwater trawl vessels, $16,000 for purse seine vessels, $5,000 for single midwater trawl vessels,  and $2,000 for SMBT vessels.  If a 25-mt

_0000017284

threshold is used (darker grey bars), median costs are $18,000 for paired midwater trawl vessels, $12,000 for purse seine vessels, $3,000 for single midwater trawl vessels, and $2,000 for SMBT vessels.

Percent RTO reductions at the 1-lb threshold is greatest for paired midwater trawl vessels, followed by single midwater trawl vessels, purse seine vessels, and then SMBT vessels. For the 1-lb threshold, the median RTO reduction for paired midwater trawl vessels is 9.5%, while RTO reductions for single midwater trawl vessels are 5.4%, 5.3% for purse seine vessels, and 1.8% for SMBT vessels. At the 25-mt threshold, RTO reductions for paired midwater trawl vessels are 8.8%, 4.9% for purse seine vessels, 2.7% for SMBT vessels, and 2.1% for single midwater trawl vessels.



**FIGURE 25. HERRING ALTERNATIVE 2.7 25% EM AND PORTSIDE ON ALL VESSELS**

25% EM and portside monitoring costs, at both the 1-lb threshold and the 25-mt threshold, are greatest for paired midwater trawl vessels, followed by purse seine vessels. Single midwater trawl vessels and small mesh bottom trawl vessels have similar levels of monitoring costs. Median costs for the gear types at the 1-lb threshold (light grey bars) are $10,000 for paired midwater trawl vessels, $8,000 for purse seine vessels, $2,000 for single midwater trawl vessels, and $1,000 for SMBT vessels. If a 25-mt threshold

_0000017285

is used (darker grey bars), median costs are $8,000 for paired midwater trawl vessels, $6,000 for purse seine vessels, $1,500 for single midwater trawl vessels, and $1,000 for SMBT vessels.

Percent RTO reductions at the 1-lb threshold is greatest for paired midwater trawl vessels, followed by single midwater trawl vessels, purse seine vessels, and then SMBT vessels. For the 1-lb threshold, the median RTO reduction for paired midwater trawl vessels is 4.5%, while RTO reductions for single midwater trawl vessels are 2.5%, 2.6% for purse seine vessels, and 0.8% for SMBT vessels. At the 25-mt threshold, RTO reductions for paired midwater trawl vessels are 4.1%, 2.4% for purse seine vessels, 1.3% for SMBT vessels, and 1.0% for single midwater trawl vessels.

_0000017286

## 4.2.9  IMPACTS SUMMARY FOR HERRING ALTERNATIVES

TABLE 91.  SUMMARY OF OVERALL IMPACTS ASSOCIATED WITH HERRING ALTERNATIVES (*PREFERRED ALTERNATIVES SHOWN IN BOLD*)

| Alternatives | Herring Resource | Non-Target Species | Protected Species | Physical Environment | Fishery-Related Businesses and Communities |
|---|---|---|---|---|---|
| Herring Alternative 1:  No Coverage Target Specified For IFM Programs  (No Action) | Low Positive | Low Positive | Low Positive | Negligible | Low Positive |
| **Herring Alternative 2: Coverage Target Specified For IFM Programs** | **Low Positive** | **Low Positive** | **Low Positive** | **Negligible** | **Negative** |
| Herring Alternative 2.1: 100% NEFOP-Level Observers Coverage on Category A and B Vessels | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| Herring Alternative 2.2: ASM Coverage on Category A and B Vessels | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| Herring Alternative 2.3: Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| Herring Alternative 2.4: EM and Portside Sampling on Midwater Trawl Fleet | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| **Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas** | **Low Positive** | **Low Positive** | **Low Positive** | **Negligible** | **Negative** |
| Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| **Herring Alternative 2.7: ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | **Low Positive** | **Low Positive** | **Low Positive** | **Negligible** | **Negative** |

_0000017287

# 5.0    CUMULATIVE EFFECTS ANALYSIS

A cumulative effects assessment (CEA) is a required part of an EIS or EA according to the Council on Environmental Quality (CEQ) (40 CFR part 1508.7) and NOAA's agency policy and procedures for NEPA, found in NOAA Administrative Order 216-6.  The purpose of the CEA is to integrate into the impact analyses the combined effects of many actions over time that would be missed if each action were evaluated separately.  CEQ guidelines recognize that it is not practical to analyze the cumulative effects of an action from every conceivable perspective but, rather, the intent is to focus on those effects that are truly meaningful.

This section serves to examine the potential direct and indirect effects of the preferred Herring Alternatives identified in this amendment together with past, present, and reasonably foreseeable future actions that affect the environment related to the herring fishery.  It should also be noted that the predictions of potential synergistic effects from multiple actions, past, present and/or future will generally be qualitative in nature.

The regulatory atmosphere within which Federal fishery management operates requires that management actions be taken in a manner that will optimize the conditions of biological resources, the physical environment and habitat, and human communities. Consistent with NEPA, the Magnuson-Stevens Act requires that management actions be implemented only after consideration of impacts to the biological, physical, economic, and social dimensions of the human environment.  Given this regulatory environment, and because fishery management actions must strive to create and maintain sustainable resources, impacts on all VECs (except short-term impacts to human communities) from past, present and reasonably foreseeable future actions, when combined with baseline conditions, have generally been positive and are expected to continue in that manner for the foreseeable future.  This is not to say that some aspects of the various VECs are not experiencing negative impacts, but rather that when taken as a whole and compared to the level of unsustainable effort that existed prior to and just after the fishery came under management control, the overall long-term trend is positive.

The following analysis will identify and characterize the impact on the environment from the preferred alternatives identified in this amendment when analyzed in the context of other past, present, and reasonably foreseeable future actions.  The analysis is generally qualitative in nature because of the limitations of determining effects over the large geographic areas under consideration.

## 5.1    VALUED ECOSTEM COMPONENTS

Consistent with the guidelines for CEA, cumulative effects can be more easily identified by analyzing the impacts of the propose action on VECs.  The affected environment is described in this document based on VECs that were identified for consideration relative to the preferred Herring Alternatives.  VECs represent the resources, areas, and human communities that may be affected by alternatives and by other actions that have occurred

_0000017288

or will occur.  VECs are generally the "place" where the impacts of management actions are exhibited.  An analysis of impacts is performed on each VEC to assess whether the direct/indirect effects of an alternative adds to or subtracts from the effects that are already affecting the VEC from past, present and future actions outside of the proposed action (i.e., cumulative effects).

The Affected Environment is described in this document (Section 3.0).  The VECs for consideration in this assessment include:

1.  Target Species (Section 3.1.1);

2.  Non-Target and Bycatch Species (Section 3.1.2);

3.  Physical Environment (Section 3.1.3);

4.  Endangered and Other Protected Species (Section 3.1.4); and

5.  Human Communities (Section 3.1.5).

Changes to the Atlantic Herring FMP have potential to directly affect the herring resource. Similarly, management actions that would alter the distribution and magnitude of fishing effort for herring could directly or indirectly affect non-target species and other fisheries, which, for the preferred Herring Alternatives, have been identified primarily as haddock, river herring and shad, and Atlantic mackerel.  The physical environment VEC focuses on habitat types vulnerable to activities related to directed fishing for herring.  The protected resources VEC focuses on those protected species with a history of encounters with the herring fishery.  The fishery-related businesses and communities VEC could be affected directly or indirectly through a variety of complex economic and social relationships associated with either target species VEC or any of the other VECs.

The descriptive and analytic components of this document are constructed in a consistent manner.  The Affected Environment section is designed to enhance the readers' understanding of the historical, current, and near-future conditions (baselines and trends) in order to fully understand the anticipated environmental impacts of the management alternatives and independent measures under consideration in this management action. The direct/indirect and cumulative impacts of these alternatives and measures are then assessed using a similar structure to that found in the Affected Environment.

The cumulative effects assessment will identify and characterize the impact on the VECs by the alternatives proposed in this document when analyzed in the context of other past, present, and reasonably foreseeable future actions.

## 5.2  SPATIAL AND TEMPORAL BOUNDARIES

The preferred Omnibus Alternatives identified in this amendment are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and would not directly affect any of the VECs.  Any new

_0000017289

industry-funded monitoring program would need to be developed in an amendment to the relevant FMP.  For biological resources (target, non-target, and protected resources), there may be indirect low positive benefits associated with standardizing new industry-funded monitoring programs if it improves the quality of the data collected.  The preferred Omnibus Alternatives would have negligible impacts on the physical environment because alternatives would not alter fishing behavior or affect fishing regulations.  For fishery-related business and human communities, there may be indirect low positive benefits associated with standardizing new industry-funded monitoring programs if it improves the quality of the data collected and helps reduce the cost of monitoring.

The impacts of preferred Herring Alternatives on the herring resource and non-target species are indirect because they affect levels of monitoring rather than harvest specifications.  Indirect low positive impacts to the herring resources and non-target species are possible if the increased monitoring associated with preferred Herring Alternatives can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments and improve management.  However, these preferred Herring Alternatives may lead to direct positive impacts on the herring resource and non-target species if herring fishing effort is limited, by increased information on catch tracked against catch limits, and that increases the reproductive potential of herring and non-target species.

The impacts of preferred Herring Alternatives on the physical environment are expected to be negligible.  The impact of the herring fishery on the physical environment is thought to be minimal and temporary.  Therefore, the expected impact on the physical environment of increased monitoring in the herring fishery is expected to be negligible under the preferred Herring Alternatives.

 The impacts of preferred Herring Alternatives on protected resources are indirect because they affect levels of monitoring rather than harvest specifications.  Indirect benefits to protected resources are possible if increased monitoring can improve catch estimates to be incorporated into future stock assessments and improving the available information for protected resources management decisions.  The impacts of preferred Herring Alternatives on protected resources are not significant because they would not cause a change in population status.

The impacts of preferred Herring Alternatives on fishery-related businesses and human communities are negative and result from reductions in returns-to-owner (RTO).  RTO is calculated by subtracting fixed and operational costs from gross revenue and was used rather than net revenues to more accurately reflect income from fishing trips.  Reductions in RTO are related to paying for monitoring coverage.  Under Herring Alternative 2.7, the potential reduction in RTO may be up to 20% for at-sea monitoring coverage and up to 10% for electronic monitoring in conjunction with portside sampling.  Annual returns-to-owner for midwater trawl vessels paying for observer coverage to access Groundfish Closed Areas may be reduced up to an additional 5%.  The total annual cost to the herring

_0000017290

fishery is up to $294,999 for Herring Alternative 2.7 and $75,000 for Herring Alternative 2.5.

Indirect positive economic impacts on herring vessels associated with preferred Herring Alternatives may result from increased monitoring helping to reduce uncertainty around retained and discarded catch estimates leading to additional harvesting opportunities. Conversely, indirect negative economic impacts on herring vessels associated with preferred Herring Alternatives may result if additional monitoring illustrates higher than expected catch of haddock and river herring and shad, such that vessels would be less likely be less likely to be able to fully harvest herring sub-ACLs because they were constrained by catch caps.

Because the preferred alternatives are not expected to impact the physical environment or protected resources, the cumulative impacts on the physical environment and protected resources will not be discussed.

The geographic area that encompasses the herring resource, non-target species, and human communities impacts to be considered in the cumulative effects analysis are described in detail in Section 3.0 of this document (Affected Environment).

Overall, while the effects of the historical herring fishery are important and are considered in the analysis, the temporal scope of past and present actions for herring, non-target species, and fishery-related businesses and communities is focused principally on actions that have occurred since 1996, when the Magnuson-Stevens Act was amended and implemented new fisheries management requirements. The temporal scope for herring is focused on the time since the Council's original Herring FMP was implemented at the beginning of the 2001 fishing year. The Atlantic Herring FMP serves as the primary management action for the herring fishery and has helped to shape the current condition of the resource.

The temporal scope of management measures considered in this cumulative impact assessment generally extends ten years into the future for the herring resource, non-target species, and fishery-related businesses and communities. This period was chosen because of the dynamic nature of resource management and lack of specific information on projects that may occur in the future, which make it difficult to predict impacts beyond this time frame with any certainty.

## 5.3   ANALYSIS OF TOTAL CUMULATIVE EFECTS

A cumulative effects assessment ideally makes effect determinations based on the culmination of the following: (1) impacts from past, present and reasonably foreseeable future actions; plus (2) the baseline condition for resources and human communities (note – the baseline condition consists of the present condition of the VECs plus the combined effects of past, present and reasonably foreseeable future actions); plus (3) impacts from the preferred alternatives.

_0000017291

A description of past, present and reasonably foreseeable future actions is presented in Section 5.4. The baseline conditions of the managed resources and human communities are subsequently summarized in Section 5.5, although it is important to note that quantitative metrics for the baseline conditions are often not available. Finally, a brief summary of the impacts from the preferred alternatives is included in Sections 5.6 and 5.7. The culmination of all these factors is considered when making the cumulative effects assessment.

## 5.4    PAST, PRESENT, AND REASONABLY FORSEEABLE FUTURE ACTIONS

Table 91 (p. 302) summarizes the combined effects of other past, present and reasonably foreseeable future actions that affect the VECs.

Note that most of the actions affecting the VECs related to this action and considered in Table 91 come from fishery-related activities (e.g., Federal fishery management actions). As expected, these activities have fairly straightforward effects on environmental conditions, and were, are, or will be taken, in large part, to improve those conditions. The reason for this is the statutory basis for Federal fisheries management – the reauthorized Magnuson-Stevens Act. That legislation was enacted to promote long-term positive impacts on the environment in the context of fisheries activities. More specifically, the Magnuson-Stevens Act stipulates that management comply with a set of National Standards that collectively serve to optimize the conditions of the human environment. Under this regulatory regime, the cumulative impacts of past, present, and future Federal fishery management actions on the VECs should be expected to result in positive long-term outcomes. Nevertheless, these actions are often associated with offsetting impacts. For example, constraining fishing effort frequently results in negative short-term socio-economic impacts for fishery participants. However, these impacts are usually necessary to bring about the long-term sustainability of a given resource and as such should, in the long-term, promote positive effects on human communities, especially those that are economically dependent upon the managed resource.

Non-fishing activities are also considered when determining the combined effects from past, present and reasonably foreseeable future actions. Activities that have meaningful effects on the VECs include the introduction of chemical pollutants, sewage, changes in water temperature, salinity, dissolved oxygen, and suspended sediment into the marine environment. These activities pose a risk to the all of the identified VECs in the long term. Human induced non-fishing activities that affect the VECs under consideration in this document are those that tend to be concentrated in near shore areas. Examples of these activities include, but are not limited to agriculture, port maintenance, beach nourishment, coastal development, marine transportation, marine mining, dredging and the disposal of dredged material. Wherever these activities co-occur, they are likely to work additively or synergistically to decrease habitat quality and, as such, may indirectly constrain the sustainability of the managed resources, non-target species, and protected resources. Decreased habitat suitability would tend to reduce the tolerance of these VECs to the

_0000017292

impacts of fishing effort.  Mitigation of this outcome through regulations that would reduce fishing effort could then negatively impact human communities.

## 5.4.1 ATLANTIC HERRING RESOURCE

**Past and Present Actions:**  Herring management measures were developed in two related, but separate FMPs in 1999 – one by the Council and one by the Atlantic States Marine Fisheries Commission (ASMFC).  The status of the herring resource is updated in Section 3.1.1 of this document, and the herring fishery is summarized in Section 3.1.5. of this document.  The offshore stock has recovered from its collapse in the early 1970s and, overall, the coastal herring resource is not overfished, and overfishing is not occurring. There is more concern for the inshore stock since it receives more fishing pressure, but the most recent stock assessment (2015) indicates that the herring resource is in a "rebuilt" condition (above the biomass target) and that fishing mortality is well below the overfishing threshold.

The ASMFC manages the Atlantic herring fishery in State waters.  The ASMFC adopted Amendment 2 in March of 2006, which revised management area boundaries, biological reference points, the specification process, research set-asides, internal waters processing operations, and measures to address fixed gear fisheries and required fixed gear fishermen to report herring catches through the IVR program.  This action is expected to have low positive impacts on the herring resource by allowing for research funded through research set-asides and increased catch reporting.

The ASMFC also adopted an Addendum in 2010 which modified Amendment 1 and Amendment 2 to the Interstate Fisheries Management Plan for Atlantic Sea Herring by changing the specification setting process and associated definitions.  The action is expected to have positive impacts on the herring resource by helping align the ASMFC's and the Council's processes for setting harvest specifications.

The ASMFC adopted Amendment 3 to the Interstate Fishery Management Plan for Atlantic Herring in February 2016.  The ASMFC adjusted the default closing dates and boundaries of the three inshore spawning areas and allowed for a rollover provision for the fixed gear set-aside.  This action is expected to have low positive impacts on the herring resource because it helps to better protect spawning herring.

The Standard Bycatch Reporting Methodology Amendment was implemented in 2007 and revised in 2015.  The amendment specified methods and processes to monitor bycatch in Greater Atlantic Region fisheries.  This action is expected to have a low positive impact on the herring resource because it improves information on herring discards and may help monitor the impacts of climate change.

Amendment 4 to the Atlantic Herring FMP, in 2011, established provisions for ACLs, set an interim ABC control rule, eliminated JVP, IWP, TALFF and reserve specifications, established provisions for sub-ACLs, and implemented accountability measures.  This

_0000017293

action is expected to have positive impacts on the herring resource by ensuring the fishery is sustainably managed using catch limits and accountability measures to prevent harvest overages.

Framework 2 to the Atlantic Herring FMP was implemented by NMFS concurrently with the 2013-2015 Atlantic herring fishery specifications on September 30, 2013. Framework 2 authorizes the Council to split sub-ACLs in all herring management areas seasonally and established a general policy for authorizing annual carryover of unutilized sub-ACL (up to 10%) under specific conditions. In additional to implementing harvest specifications, the 2013-2015 specifications established a new AM to limit catch when 95% of the herring ACL is projected to be reached and lowered the trigger (from 95% to 92% of the sub-ACL) to limit catch in each of the herring management areas. These action are expected to have positive impacts on the herring resource by helping prevent overfishing and supporting sustainable management.

Amendment 5 to the Atlantic Herring FMP was implemented in 2014. Amendment 5 implemented measures for catch reporting, vessel requirements for catch sampling by observers, and slippage restrictions to ensure catch is available for sampling by an observer. This action is expected to have low positive impacts on the herring resource by improving catch reporting and catch sampling.

Framework 4 to the Atlantic Herring FMP became effective in 2016, and built on measures implemented in Amendment 5 to the Atlantic Herring FMP. The action clarified slippage requirements, required slippage to be reported via VMS, and established slippage consequences. This action is expected to have low positive impacts on the herring resource by refining slippage measures to help ensure catch is available to be sampled by an observer.

The 2016-2018 Herring Specifications were effective in 2016. The action set herring harvest limits, as well as river herring/shad catch caps, for the herring fishery. Because the herring ABC was slightly reduced from previous years, based on the 2015 herring stock assessment update, this action is expected to have a positive impact on the herring resource by supporting sustainability.

**Reasonably Foreseeable Future Actions:** An Omnibus EFH Amendment is likely to be implemented in the foreseeable future (Amendment 3 to the Atlantic Herring FMP). This amendment may increase the protection of benthic habitats and modify the boundaries and access provisions of the Groundfish Closed Areas. This action may have low positive impacts on the herring resource if it increases protection for habitat important to herring and may help negate any negative impacts of climate change.

Amendment 8 to the Atlantic Herring FMP was initiated by the Council in January 2015 to address the need for an ABC control rule for Atlantic herring. The goals for Amendment 8 are to: (1) Account for the role of herring within the ecosystem, including its role as forage; (2) stabilize the fishery at a level designed to achieve optimum yield; and (3) address

_0000017294

localized depletion in inshore waters.  This action may have a positive impact on the herring resource if it takes into account the role of herring in the ecosystem when developing an ABC control rule and long-term harvest strategy and may help negate any negative impacts of climate change.

## 5.4.2 NON-TARGET SPECIES

**Past and Present Actions:**  Updated information about non-target species affected by the herring fishery is provided in Section 3.1.2. of this document.  River herring and shad (RH/S) are non-target species of particular concern in the herring fishery.  In addition to RH/S, haddock and Atlantic mackerel are other important non-target species encountered in the herring fishery.

The Northeast Multispecies FMP has a multitude of management measures.  Past and present actions to the regulated groundfish stocks have created mixed effects, as the combined effects of past actions have decreased effort, improved habitat protection, and implemented rebuilding plans when necessary, but some stocks remain overfished.  Overall, the impacts of the FMP on haddock have been mixed, but are currently low positive because the stock is not overfished and overfishing is not occurring.

In 2006, Framework 43 to the Northeast Multispecies FMP established a cap on the amount of herring caught in the herring fishery and prohibited some discarding of haddock.  In 2011, Framework 46 adjusted the cap provisions so that they only apply to midwater trawl vessels and created caps for both the Georges Bank and Gulf of Maine haddock stocks.  In 2017, Framework 56 increased the cap from 1% of the stock area ABC to 1.5% of the stock area ABC.  Overall, the impacts of these actions on haddock have been positive because they improve the accountability for haddock caught in the herring fishery.

The ASMFC adopted Amendment 1 to the FMP for Shad and River Herring in 1998.  The amendment included measures to improve data collection and stock assessment capabilities.  Amendments 2 and 3 to the Shad and River Herring FMP required approved sustainability plans for any state fishery.  Overall, the impacts of the FMP on shad and river herring have been mixed, but would be positive if they help these species no longer be considered depleted.

The Standard Bycatch Reporting Methodology Amendment was implemented in 2007 and revised in 2015.  The amendment specified methods and processes to monitor bycatch in Greater Atlantic Region fisheries.  This action is expected to have a low positive impact on non-target species because it improves information on non-target species discards and may help monitor the impacts of climate change.

Amendment 5 to the Atlantic Herring FMP was implemented in 2014.  Amendment 5 implemented measures for catch reporting, vessel requirements for catch sampling by observers, and slippage restrictions to ensure catch is available for sampling by an

_0000017295

observer. The amendment also expanded the 100% observer coverage requirement aboard midwater trawl vessels fishing in Closed Area I to apply to midwater trawl vessels fishing in any of the Groundfish Closed areas. Lastly, the amendment established provisions for river herring/shad catch caps in the herring fishery. This action is expected to have low positive impacts on non-target species by improving catch reporting and catch monitoring.

Amendment 14 to the Mackerel Squid Butterfish FMP was also implemented in 2014. Like Amendment 5, Amendment 14 implemented measures for catch reporting, vessel requirements for catch sampling by observers, and slippage restrictions to ensure catch is available for sampling by an observer. The amendment also established provisions for river herring/shad catch caps in the mackerel fishery. This action is expected to have low positive impacts on non-target species by improving catch reporting and catch monitoring.

Framework 3 to the Atlantic Herring FMP established catch caps for river herring/shad in the herring fishery. This action is expected to have a positive impact on river herring and shad, because it improves the accountability for river herring and shad caught in the herring fishery. However, the magnitude of that impact is uncertain because caps are not linked to river herring and shad stock status or fishing mortality at this time.

Framework 4 to the Atlantic Herring FMP became effective in 2016, and built on measures implemented in Amendment 5 to the Atlantic Herring FMP. The action clarified slippage requirements, required slippage to be reported via VMS, and established slippage consequences. This action is expected to have low positive impacts on non-target species by refining slippage measures to help ensure catch is available to be sampled by an observer.

The 2016-2016 Herring Specifications were effective in 2016. While this action increased the amount of the river herring/shad catch caps, the resulting caps are still lower than historical river herring and shad catch. This action is expected to have a positive impact on river herring and shad by providing a sufficient incentive for the herring fishery to avoid river herring and shad. However, the magnitude of that impact is uncertain because caps are not linked to river herring and shad stock status or fishing mortality at this time.

In early August 2013, when NMFS published its decision not to list river herring under the ESA, NMFS indicated that it would partner with ASMFC to form a technical expert working group (TEWG). The TEWG is focused on developing a dynamic conservation plan to help restore river herring throughout their range from Canada to Florida, identifying and implementing important conservation efforts, and conducting research to fill in some of the critical data gaps for these species. NMFS plans to continue to coordinate with all of management partners including the Mid-Atlantic and the New England Fishery Management Councils to maximize resources and identify ways to complement ongoing efforts to promote river herring restoration. This action is expected to have low positive impacts on river herring resulting from increased information about threats to river

_0000017296

herring and increased cooperation among management partners to address threats to river herring.

The Mid-Atlantic Unmanaged Forage Omnibus Amendment, implemented in September 2017, restricted the expansion of commercial fisheries for certain forage species. This action included an annual catch limit for Atlantic chub mackerel and possession limits for chub mackerel and other forage species caught within Mid-Atlantic federal waters. This action is expected to have positive impacts on non-target species by help prevent the overharvest of forage species.

**Reasonably Foreseeable Future Actions:**  Implementation of an Omnibus EFH Amendment may increase the protection of benthic habitats and modify the boundaries and access provisions of the Groundfish Closed Areas. This action may have low positive impacts on non-target species if it increases protection for habitat important to non-target species and may help negate any negative impacts of climate change.

Amendment 8 to the Atlantic Herring FMP was initiated by the Council in January 2015 to address the need for an ABC control rule for Atlantic herring. The goals for Amendment 8 are to:  (1) Account for the role of herring within the ecosystem, including its role as forage; (2) stabilize the fishery at a level designed to achieve optimum yield; and (3) address localized depletion in inshore waters. This action may have a low positive impact on the non-target species if it results in a more precautionary long-term herring harvest strategy and may help negate any negative impacts of climate change.

Amendment 23 to the Northeast Multispecies FMP was initiated by the Council in 2017. The purpose of Amendment 23 is to implement measures to improve reliability and accountability of catch reporting and to ensure a precise and accurate representation of catch (landings and discards). The amendment will consider alternatives such as electronic monitoring, dockside sampling, and methods to determine total monitoring coverage rate. This action may have a low positive impact on haddock if additional monitoring improves the information for stock assessments and management decisions.

### 5.4.3 FISHERY-RELATED BUSINESSES AND COMMUNITIES

**Past and Present Actions:**  A general description of fishery-related businesses and communities that may be affected by the proposed action is provided in Section 3.1.5. of this document. Past and present actions described in Section 5.4.1 affecting the herring resource have also affected fishery-related businesses and communities.

The ASMFC manages the Atlantic herring fishery in State waters. The ASMFC adopted Amendment 2 in March of 2006, which revised management area boundaries, biological reference points, the specification process, research set-asides, internal waters processing operations, and measures to address fixed gear fisheries and required fixed gear fishermen to report herring catches through the IVR program. The ASMFC also adopted an

_0000017297

Addendum in 2010 which modified Amendment 1 and Amendment 2 to the Interstate Fisheries Management Plan for Atlantic Sea Herring by changing the specification setting process and associated definitions.  The ASMFC adopted Amendment 3 to the Interstate Fishery Management Plan for Atlantic Herring in February 2016.  The amendment adjusted the default closing dates and boundaries of the three inshore spawning areas and allowed for a rollover provision for the fixed gear set-aside.  In the short-term, these actions are expected to have short-term low negative impacts on fishery-related businesses and communities because of increased reporting requirements and effort reductions.  But long-term impacts on fishery-related businesses and communities are expected to be low positive if these measures improve the sustainability of the herring resource.

In 2006, Framework 43 to the Northeast Multispecies FMP established a cap on the amount of herring caught in the herring fishery and prohibited some discarding of haddock.  In 2011, Framework 46 adjusted the cap provisions so that they only apply to midwater trawl vessels and created caps for both the Georges Bank and Gulf of Maine haddock stocks.  In 2017, Framework 56 increased the cap from 1% of the stock area ABC to 1.5% of the stock area ABC.  The impacts of these actions on fishery-related business and communities is expected to be low negative if the haddock measures restrict the fishery's ability to fully harvest the herring ACL.

The ASMFC adopted Amendment 1 to the FMP for Shad and River Herring in 1998.  The amendment included measures to improve data collection and stock assessment capabilities.  Amendments 2 and 3 to the Shad and River Herring FMP required approved sustainability plans for any state fishery.  Overall, the impacts of the Shad and River Herring FMP on fishery-related businesses and communities are expected to be low negative if river herring and shad harvesting opportunities are reduced.

The Standard Bycatch Reporting Methodology Amendment was implemented in 2007 and revised in 2015.  The amendment specified methods and processes to monitor bycatch in Greater Atlantic Region fisheries.  This action is expected to have a low positive impact on the fishery-related businesses and communities because it improves information on discards and may help ensure the sustainability of fishery resources and harvest opportunities.

Amendment 4 to the Atlantic Herring FMP, in 2011, established provisions for ACLs, set an interim ABC control rule, eliminated JVP, IWP, TALFF and reserve specifications, established provisions for sub-ACLs, and implemented accountability measures.  This action is expected to have low negative impacts on fishery-related businesses and communities in the short-term associated with reduced harvesting opportunities, but impacts in the long-term are expected to be low positive if the fishery is sustainably managed using catch limits and accountability measures to prevent harvest overages.

Framework 2 to the Atlantic Herring FMP was implemented by NMFS concurrently with the 2013-2015 Atlantic herring fishery specifications on September 30, 2013.  Framework 2 authorizes the Council to split sub-ACLs in all herring management areas seasonally and

_0000017298

established a general policy for authorizing annual carryover of unutilized sub-ACL (up to 10%) under specific conditions.  In additional to implementing harvest specifications, the 2013-2015 specifications established a new AM to limit catch when 95% of the herring ACL is projected to be reached and lowered the trigger (from 95% to 92% of the sub-ACL) to limit catch in each of the herring management areas.  These actions are expected to have mixed impacts on fishery-related businesses and communities.  Low positive impacts are expected to be associated with the ability to carryover unutilized sub-ACLs, while low negative impacts are expected to be associated with the new triggers for AMs to limit catch in the herring fishery.

Amendment 5 to the Atlantic Herring FMP and Amendment 14 to the Mackerel Squid Butterfish FMP were implemented in 2014.  These amendments implemented measures for catch reporting, vessel requirements for catch sampling by observers, and slippage restrictions to ensure catch is available for sampling by an observer.  These actions are expected to have low negative impacts on businesses operating vessels participating in the herring fishery associated with the increased costs of compliance with catch reporting, catch sampling requirements, and slippage requirements and consequence measures.

Framework 3 to the Atlantic Herring FMP established catch caps for river herring/shad in the herring fishery.  This action is expected to have a low negative impact on fishery-related businesses and communities resulting from potentially reduced harvest opportunities associated with the implementation of river herring/shad catch caps.

Framework 4 to the Atlantic Herring FMP became effective in 2016, and built on measures implemented in Amendment 5 to the Atlantic Herring FMP.  The action clarified slippage requirements, required slippage to be reported via VMS, and established slippage consequences.  This action is expected to have a low negative impact on businesses operating vessels participating in the herring fishery associated with the increased costs of compliance with slippage requirements and consequence measures.

The 2016-2018 Herring Specifications were effective in 2016.  The action set herring harvest limits, as well as river herring/shad catch caps, for the herring fishery.  This action is expected to have a low negative impact on fishery-related businesses and communities resulting from potentially reduced harvest opportunities associated with a lower ABC and river herring/shad catch caps.

**Reasonably Foreseeable Future Actions:**  Implementation of an Omnibus EFH Amendment may increase the protection of benthic habitats and modify the boundaries and access provisions of the Groundfish Closed Areas.  This action may have a low negative impact on fishery-related businesses and communities if increased protection for habitat restricts fishery access.

Amendment 8 to the Atlantic Herring FMP was initiated by the Council in January 2015 to address the need for an ABC control rule for Atlantic herring.  The goals for Amendment 8 are to:  (1) Account for the role of herring within the ecosystem, including its role as forage;

_0000017299

(2) stabilize the fishery at a level designed to achieve optimum yield; and (3) address localized depletion in inshore waters.  This action may have a negative impact on fishery-related businesses and communities if it results in a more precautionary long-term herring harvest strategy and restricts access to inshore areas to minimize localized depletion of herring.

_0000017300

**TABLE 92. SUMMARY OF EFFECTS OF PAST, PRESENT, AND REASONABLE FORESEEABLE FUTURE ACTIONS ON VECS**

| VEC | Past Actions | Present Actions | Reasonably Foreseeable Future Actions | Combined Effects of Past, Present, Future Actions |
|---|---|---|---|---|
| **Atlantic Herring Resource** | **Positive**<br><br>Combined effects of past actions have controlled effort and provided a sustainable fishery with a rebuilt resource | **Positive**<br><br>Current regulations continue to manage for a sustainable stock and improve monitoring | **Positive**<br><br>Future actions are anticipated to strive to maintain a sustainable stock and improve monitoring | **Positive**<br><br>Stock is being managed for sustainability |
| **Non-Target Species** | **Low Positive**<br><br>Combined effects of past actions have decreased effort and reduced incidental catch/bycatch | **Positive**<br><br>Current regulations continue to decrease effort, reduced incidental catch/bycatch, and improve monitoring | **Positive**<br><br>Future regulations are being developed to improve monitoring and further address incidental catch/bycatch issues | **Low Positive**<br><br>Decreased effort and reduced incidental catch/bycatch |
| **Fishery-Related Businesses and Communities** | **Mixed**<br><br>Combined effects of effort reductions and improved monitoring have reduced fishing opportunities | **Mixed**<br><br>Current regulations continue control effort and improve monitoring in support of sustainable fisheries | **Mixed**<br><br>Future regulations will likely control effort and improve monitoring, but as stocks improve fishery effort may increase | **Mixed**<br><br>Continued fisheries management will likely control effort and improve monitoring in support of sustainable fisheries |

## 5.5  BASELINE CONDITIONS

For the purposes of a cumulative effects assessment, the baseline conditions for resources and human communities are considered the present condition of the VECs plus the combined effects of the past, present, and reasonably foreseeable future actions. Table 92 summarizes the added effects of the condition of the VECs and the sum effect of the past,

_0000017301

present and reasonably foreseeable future actions (from Section 5.4 above).  The resulting CEA baseline for each VEC is exhibited in the last column (shaded).  In general, straightforward quantitative metrics of the baseline conditions are only available for the managed resources, non-target species, and protected resources.  The conditions of the habitat and human communities VECS are complex and varied.  As such, the reader should refer to the characterizations provided in Section 3.0 of this document (Affected Environment).

**TABLE 93.  CUMULATIVE EFFECTS ASSESSMENT BASELINE CONDITION OF VECs**

| VEC | Status/Trends | Combined Effects of Past, Present Reasonably Foreseeable Future Actions (Table 91) | Combined CEA Baseline Conditions |
|---|---|---|---|
| **Atlantic Herring Resource** | **Positive** - Not overfished and overfishing is not occurring | **Positive –** Stock is being managed for sustainability | **Positive –** Stock is being managed for sustainability |
| **Non-Target Species** | **Mixed** - Status of non-target species varies | **Low Positive –** Decreased effort and reduced incidental catch/bycatch | **Low Positive –** Decreased effort and reduced incidental catch/bycatch |
| **Fishery-Related Business and Communities** | **Mixed** - Catch has declined, but year to year catch and revenue have been variable | **Mixed –** Although sustainable resources should support future communities and economies, continued effort reductions have had negative impacts on communities | **Negative –** In the short-term, lower revenues would continue until stocks are sustainable<br><br>**Positive –** In the long-term, sustainable resources should support viable communities and economies |

_0000017302

## 5.6  SUMMARY OF IMPACTS FROM PREFERRED OMNIBUS ALTERNATIVES

There are no direct impacts on biological resources (target, non-target, and protected species), the physical environment, or fishery-related businesses and human communities associated with the preferred Omnibus Alternatives because they are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort, fishing operations, amount of fish harvested, or area fished.

Under Omnibus Alternative 2, there is the potential for an indirect low positive impacts on biological resources associated with establishing standardized industry-funded monitoring service provider requirements.  Standardized provider requirements may lead to greater consistency in the information collected about target, non-target, and protected species through industry-funded monitoring programs.  Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources.

Omnibus Alternative 2 may provide an indirect low positive impact on biological resources if the prioritization process increases the likelihood that available Federal funding would be used to support industry-funded monitoring programs.  Additionally, Omnibus Alternative 2.2 may have the greatest potential for indirect low positive impacts to biological resources because it would provide the discretion to prioritize available Federal funding towards industry-funded monitoring programs that improve information about specific target, non-target, and protected species.

In the future, if the Council developed an IFM program for a particular FMP, there would be direct negative economic impacts to fishing vessels resulting from the standardized cost responsibilities included in Omnibus Alternative 2, provided there was available Federal funding to support that IFM program and vessels were required to pay for increased monitoring.  However, any direct negative economic impacts to fishing vessels resulting from a future IMF program would be evaluated in the amendment to establish that IFM program and are not considered in this amendment.

There may be indirect low positive economic impacts associated with standardizing a process to develop new industry-funded monitoring programs on fishery-related business and communities resulting from Omnibus Alternative 2 if standardizing that process increases the potential for improved management.

Under Omnibus Alternative 2, there is a potential for indirect low positive economic impacts associated with the establishment of standardized IFM service provider requirements.  If standardized service provider requirements leads to greater consistency in the information collected by industry-funded monitoring programs, that may lead to better management of biological resources, which may eventually lead to higher harvest levels.

_0000017303

Establishing standardized cost responsibilities under Omnibus Alternative 2 may have low positive economic impacts if it provides the industry with information to better understand and plan for their industry-funded monitoring cost responsibilities, as well as negotiate better contracts with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities.

Lastly, Omnibus Alternative 2.2 may have the greatest potential for indirect low positive impacts on businesses and communities because it may help align available Federal funding with the Council's monitoring priorities. Improved catch information that results from the opportunity to align funding with the most critical industry-funded monitoring programs may lead to better management of biological resources, which may eventually lead to higher harvest levels.

TABLE 94. SUMMARY OF IMPACTS OF OMNIBUS ALTERNATIVES

| Alternatives | Impacts on Biological Resources | Impacts on Fishery-Related Businesses and Communities |
|---|---|---|
| Alternative 1: No Standardized Industry-Funded Monitoring Programs (No Action) | Low negative impact related to allocating funding to IFM programs on a case-by-case basis, rather than evaluating funding across FMPs | Low negative impact related to continued uncertainty about catch rates that may lead to overly cautious management |
| **Alternative 2: Standardized Industry-Funded Monitoring Programs (Action Alternative)** | **Negligible impact related to standardized cost responsibilities and process for future IFM programs implemented via amendment and revised via framework**<br><br>**Low positive impact related to standardized service provider requirements and process to prioritize funding for monitoring** | **Low positive impact related to standardized cost responsibilities and process for future IFM programs implemented via amendment and revised via framework**<br><br>**Low positive impact related to standardized service provider requirements and process to prioritize funding for monitoring** |
| Alternative 2.1: NMFS-Led Prioritization Process | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities |

_0000017304

| Alternatives | Impacts on Biological Resources | Impacts on Fishery-Related Businesses and Communities |
|---|---|---|
| **Alternative 2.2: Council-Led Prioritization Process** | **Low positive impact related to process to prioritize funding for IFM programs across FMPs**<br><br>**Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities** | **Low positive impact related to process to prioritize funding for IFM programs across FMPs**<br><br>**Allows an evaluation of program need/design when assigning priority and ability to align funding with Council priorities** |
| Alternative 2.3: Proportional Prioritization Process | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities |
| Alternative 2.4 and 2.5: Coverage Ratio-Based Prioritization Processes | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities | Low positive impact related to process to prioritize funding for IFM programs across FMPs<br><br>Does not allow an evaluation of program need/design when assigning priority and ability to align funding with Council priorities |
| **Alternative 2.6 Monitoring Set-Aside** | **Negligible impact related to standardized process for monitoring set-asides implemented via framework** | **Negligible impact related to standardized process for monitoring set-asides implemented via framework** |
| **Impacts to physical environment are not described in this table because they are negligible. These alternatives will not alter fishing behavior or directly impact fishing regulations (gears used or areas fished).** |||

## 5.7 SUMMARY OF IMPACTS FROM PREFERRED HERRING ALTERNATIVES

The impacts of preferred Herring Alternatives on biological resources (herring resource, non-target species, and protected species) are indirect because they affect levels of monitoring rather than harvest specifications.

Indirect low positive impacts to biological resources are possible if the increased monitoring associated with Herring Alternatives 2.5 and 2.7 can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments and improve management. However, these preferred Herring Alternatives may lead to direct positive impacts on biological resources if herring fishing effort is limited, by increased information on catch tracked against catch limits, leading to increased reproductive potential of the herring resource and non-target species and reduced interactions between the herring fishery and protected species.

_0000017305

Because additional monitoring under Herring Alternative 2.5 is confined to the Groundfish Closed Areas, a low positive biological impact is likely because the area with 100% observer coverage is limited.  The 50% coverage associated with Herring Alternative 2.7 is expected to have low positive impacts on the herring resource and non-target species (haddock and river herring and shad) if the uncertainty around catch track against catch caps is reduced.

Sub-Options 1 and 2 have the potential for low negative impacts on biological resources if additional coverage is waived.  Sub-Option 5 also has the potential for a low negative impact on the herring resource and non-target species.  A low negative impact is possible if the disconnect between vessels with additional monitoring (trips greater than 50 mt of herring) and trips subject to fishery catch caps (trips greater than either 1 lb of herring or 6,600 lb of herring) if it biases data used to track catch against catch caps.

The impacts of these preferred Herring Alternatives on biological resources are not significant because they would not cause any biological resource to become overfished, would not result in overfishing, and/or would not cause a change in population status.

The impacts of preferred Herring Alternatives on the physical environment are expected to be negligible.  The impact of the herring fishery on the physical environment is thought to be minimal and temporary.  Therefore, the expected impact on the physical environment of increased monitoring in the herring fishery is expected to be negligible under Herring Alternatives 2.5 and 2.7.

If fishing effort is limited, by increased information on catch tracked against catch limits, and there are few interactions between fishing gear and the physical environment, there is the potential for a positive impact on the physical environment associated with the preferred Herring Alternatives.  However, the magnitude of any potential positive impact is low because the herring fishery has only minimal and temporary impacts on the environment.

The impacts of preferred Herring Alternatives on fishery-related businesses and human communities are negative and result from reductions in returns-to-owner (RTO).  RTO is calculated by subtracting fixed and operational costs from gross revenue and was used rather than net revenues to more accurately reflect income from fishing trips.  Reductions in RTO are related to paying for monitoring coverage.  Under Herring Alternative 2.7, the potential reduction in RTO may be up to 20% for at-sea monitoring coverage and up to 10% for electronic monitoring in conjunction with portside sampling.  Annual returns-to-owner for midwater trawl vessels paying for observer coverage to access Groundfish Closed Areas may be reduced up to an additional 5%.  The total annual cost to the herring fishery is up to $294,999 for Herring Alternative 2.7 and $75,000 for Herring Alternative 2.5.

Because midwater trawl vessels average more sea days than other gear types, midwater trawl vessels have a greater negative economic impact associated with paying for

_0000017306

monitoring coverage, followed by purse seine vessels, and small mesh bottom trawl vessels.

Sub-Options 1 and 2 have the potential to reduce monitoring costs for herring vessels if coverage is waived.  Sub-Option 5 would eliminate monitoring costs for vessels that always land less than 50 mt of herring on a trip.  Additionally, Sub-Option 5 may reduce monitoring costs for vessels than often land less than 50 mt of herring on a trip.  There benefits will vary with gear type.  Small mesh bottom trawl vessels and single midwater trawl vessels take the most trips that land less than 50 mt of herring, 81% and 60%, respectively, followed by purse seine vessels (33% of trips) and paired midwater trawl vessels (13% of trips).

Indirect positive economic impacts on herring vessels associated with preferred Herring Alternatives may result from increased monitoring helping to reduce uncertainty around retained and discarded catch estimates leading to additional harvesting opportunities.  If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be less likely to be constrained by catch caps and more likely to be able to fully harvest herring sub-ACLs.

Conversely, indirect negative economic impacts on herring vessels associated with preferred Herring Alternatives may result if additional monitoring illustrates higher than expected catch of haddock and river herring and shad, such that vessels would be less likely be less likely to be able to fully harvest herring sub-ACLs because they were constrained by catch caps.

**TABLE 95. SUMMARY OF IMPACTS OF HERRING ALTERNATIVES**

| Alternatives | Herring Resource | Non-Target Species | Protected Species | Physical Environment | Fishery-Related Businesses and Communities |
|---|---|---|---|---|---|
| Herring Alternative 1:  No Coverage Target Specified For IFM Programs  (No Action) | Low Positive | Low Positive | Low Positive | Negligible | Low Positive |
| **Herring Alternative 2: Coverage Target Specified For IFM Programs** | **Low Positive** | **Low Positive** | **Low Positive** | **Negligible** | **Negative** |
| Herring Alternative 2.1: 100% NEFOP-Level | Low Positive | Low Positive | Low Positive | Negligible | Negative |

_0000017307

| Alternatives | Herring Resource | Non-Target Species | Protected Species | Physical Environment | Fishery-Related Businesses and Communities |
|---|---|---|---|---|---|
| Observers Coverage on Category A and B Vessels | | | | | |
| Herring Alternative 2.2: ASM Coverage on Category A and B Vessels | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| Herring Alternative 2.3: Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| Herring Alternative 2.4: EM and Portside Sampling on Midwater Trawl Fleet | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| **Herring Alternative 2.5: 100% NEFOP-Level Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas** | **Low Positive** | **Low Positive** | **Low Positive** | **Negligible** | **Negative** |
| Herring Alternative 2.6: Combination Coverage on Midwater Trawl Fleet Fishing in Groundfish Closed Areas | Low Positive | Low Positive | Low Positive | Negligible | Negative |
| **Herring Alternative 2.7: ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | **Low Positive** | **Low Positive** | **Low Positive** | **Negligible** | **Negative** |

_0000017308

## 5.8  CUMMULATIVE EFFECTS SUMMARY

Tables 93 and 94 in the previous sections provide a summary of likely impacts associated with the Omnibus and Herring Alternatives considered in this amendment.  Impacts are listed as positive, negative, or negligible.  Impacts listed as negligible include those alternatives that have no impact or have a negligible impact (either positive or negative).

The cumulative effect is the sum of the cumulative effects baseline plus the impacts from the preferred Omnibus and Herring Alternatives.  When an alternative has a positive effect on a VEC, for example, reduced fishing mortality on a managed species, it has a positive cumulative effect on the stock size of the species when combined with the "other" actions that were also designed to increase stock size.  In contrast, when an alternative has a negative effect on a VEC, such as increased mortality, the cumulative effect on the VEC would be negative and tend to reduce the positive effects of the "other" actions.  The resultant positive and negative cumulative effects are described below for each VEC.

The significance criteria that would apply to a VEC requires the consideration of whether or not the preferred Omnibus and Herring Alternatives are reasonably expected to jeopardize the sustainability of a VEC and whether or not the preferred Omnibus and Alternatives are expected to result in cumulative adverse impacts with a substantial effect on a VEC.

### Herring Resource

Sections 4.1.2 and 4.2.3 describe the impacts of the preferred alternatives on the herring resource.  The preferred Omnibus Alternatives are administrative and unlikely to contribute to cumulative impacts.  Overall, past and present impacts of other actions on the herring resource are considered positive as the herring resource is not overfished and overfishing is not occurring.  In general, cumulative impacts on the herring resource follow a positive trend as management supports a sustainable herring population.  The preferred Herring Alternatives will have a minimal impact on this cumulative positive trend given their indirect positive impacts associated with providing additional data for management purposes.

### Non-Target Species

Sections 4.1.2 and 4.2.4 describe the impacts of the preferred alternatives on non-target species.  The preferred Omnibus Alternatives are administrative and unlikely to contribute to cumulative impacts.  Overall, past and present impacts of other actions on non-target species are mixed as the status of non-target species varies.  In general, cumulative impacts on non-target species follow a low positive trend as management has decreased fishing effort to reduce incidental catch/bycatch of non-target species.  The preferred Herring Alternatives will have a minimal impact on this cumulative low positive trend given their indirect positive impacts associated with providing additional data for management purposes.

_0000017309

***Fishery-Related Businesses and Communities***

Sections 4.1.4 and 4.2.8 describe the impacts of the preferred alternatives on the fishery-related businesses and communities.  The preferred Omnibus Alternatives are administrative and unlikely to contribute to cumulative impacts.  Overall, past and present impacts of other actions on fishery-related businesses and communities are mixed. Management efforts to support sustainable fisheries have led to effort reductions that have had negative impacts on communities.  In general, cumulative impacts on fishery-related businesses and communities follow a mixed trend.  In the short-term, the cumulative impacts trend is negative with lower revenues continuing until stocks are sustainable.  In the long-term, the cumulative impacts trend is likely positive as sustainable resources should support viable fishery-related businesses and communities.  The preferred Herring Alternatives will help contribute to mixed cumulative trends given the negative impact associated with paying for additional monitoring and the indirect benefit of providing additional data for management purposes.

_0000017310

# 6.0   OTHER APPLICABLE LAWS
## 6.1   MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT

**National Standards**

Section 301 of the Magnuson-Stevens Fishery Conservation and Management Act requires that fishery management plans (FMPs) contain conservation and management measures that are consistent with ten National Standards:

*In General. – Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this title shall be consistent with the...national standards for fishery conservation and management.*

The preferred Omnibus Alternatives identified in this amendment do not propose to modify any of the management measures previously implemented, which were found in compliance with all National Standards of the Magnuson-Stevens Act, under the New England FMPs to be amended through this action.  The Omnibus Alternatives are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested.  They facilitate the establishment of future monitoring programs in a manner that is consistent with the National Standards.  For example, the prioritization process takes into account the need to develop monitoring programs that may adjust coverage levels, according to available funding, that meet FMP objectives, while ensuring they still meet National Standard requirements.  Likewise, the cost responsibilities component of the Omnibus Alternatives does not change existing cost responsibilities, but ensures cost responsibilities in future monitoring programs are consistent with existing programs.  Because the Omnibus Alternatives do not change measures that are consistent with the National Standards and establish a process that ensures consideration of and consistency with the National Standards, they are consistent with the National Standards and not addressed specifically below.

The Herring Alternatives affect levels of monitoring.  They may indirectly affect fishing behavior or harvest specifications, but they are not expected to have any direct impacts on biological resources or the physical environment.  The Herring Alternatives are expected to have direct economic impacts on fishery-related businesses and human communities.  Because the preferred Herring Alternatives include measures that change the operation of the fishery and affect businesses and communities, they are discussed below in relation to each National Standard.

*(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.*

_0000017311

The preferred Herring Alternatives may in increase monitoring and  that may improve management of the fishery and provide a better opportunity for achieving optimum yield. Increased monitoring may provide more accurate catch information that could reduce uncertainty of catch tracked against catch limits.  Increased monitoring may also generate more information for stock assessments, thereby potentially improving the accuracy of catch limits.  Reduced uncertainty around catch limits should provide for better gauging of the amount of fishing effort that prevents overfishing while achieving optimum yield.  For example, increased monitoring of haddock and river herring and shad catch may help reduce uncertainty in estimates of catch that is tracked against catch caps, when that uncertainty may have otherwise led to effort restrictions in the herring fishery. Conversely, additional monitoring may illustrate higher than expected catch of haddock and river herring and shad, resulting in catch caps that are fully harvested earlier than expected and reduced opportunities to harvest herring.

*(2) Conservation and management measures shall be based upon the best scientific information available.*

All information, data, and analyses within this document are based upon the best scientific information available, to the maximum extent practicable.  Qualitative discussion is provided in cases where quantitative information was unavailable.

The initial analysis of economic impacts of preferred Herring Alternatives on the herring industry was based on trip cost data collected by NMFS and showed the economic impact of the alternatives on vessel net revenues (gross revenues less certain trip costs).  Because NMFS only collects a limited amount of cost data, industry participants expressed concern that an analysis of net revenues underestimated vessel costs.  In response, Jason Didden, staff of the Mid-Atlantic Fishery Management Council, offered to coordinate a survey of herring and mackerel vessels to collect more detailed cost information.

The survey requested information from vessel owners on total trip costs in 2014.  The cost survey collected information on variable costs; payments to crew; the cost of repairs, maintenance, upgrades; and fixed costs.  These data were used to update the impact analyses.  To profile vessels, data were averaged across vessel types, by vessel characteristics, and by primary species caught.  The cost profiles of vessels, as adjusted by the estimated industry cost responsibilities of each herring coverage target alternative, were used to describe the economic impact on herring vessels.  Economic impacts are described at an annual level.  Surveys were sent to approximately 18 vessel owners (representing about 26 vessels) in the herring and/or mackerel fisheries.  Surveys were sent in May 2015 and information was submitted for 16 of the 26 vessels.  A copy of the survey is included in Appendix 9.

_0000017312

Analysis of the economic impact of preferred Herring Alternatives on fishery-related businesses compared industry cost responsibilities to 2014 herring vessel returns-to owner (RTO). RTO is calculated by subtracting fixed and operational costs from gross revenue and was used rather than net revenues to more accurately reflect income from fishing trips. RTO is similar to net income from a financial income statement. Other financial statement approaches, such as a balance sheet or a cash flow statement, are not used. These approaches consider other financial aspects of a business, such as total assets and liabilities and the ability to cover expenses within a particular time frame. Principal payments on loans, which matter from a balance sheet and cash flow perspective, are not typically sued in the calculation of RTO/net income. Depreciation of capital assets is typically part of a RTO/net income calculation. In this analysis, depreciation of vessel improvements is included but the depreciation of the vessel is not included because that information was not collected in the survey.

*(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.*

Atlantic herring is managed as a unit throughout its range. The impacts of preferred Herring Alternatives on the herring resource and non-target species are indirect because they affect levels of monitoring rather than harvest specifications. Indirect low positive impacts to the herring resource and non-target species are possible if the increased monitoring associated with Herring Alternatives 2.5 and 2.7 can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments and improve management.

*(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.*

_0000017313

The negative economic impacts of preferred Herring Alternatives are fairly and equitably distributed across participants in the herring fishery in a manner reasonably calculated to promote conservation. Herring Alternative 2.7 affects vessels with a Category A or B herring permits and Herring Alternative 2.5 affects vessels that use midwater trawl gear and fish in Groundfish Closed Areas. These permit categories and Closed Area requirements reasonably reflect current fishery conditions and are designed to meet conservation goals. Participants in the herring fishery whose vessels have Category A or B herring permits or use midwater trawl gear are distributed throughout the range of the herring fishery from Maine to New Jersey. The increased monitoring associated with Herring Alternatives 2.5 and 2.7 may reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments and improve management. No individual, corporation, or other entity receives an excessive share of any fishing privilege through this action.

*(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.*

The Herring Alternatives considered efficient utilization of fishery resources. Monitoring requirements are applied to permit categories that harvest the majority of available catch. The increased monitoring is designed to provide more accurate information that could lead to improved, more efficient management. The 50% coverage target selected by the Council for vessels with a Category A or B herring permit provides for the benefits of collecting additional information on biological resources while minimizing industry cost responsibilities, especially when compared to non-preferred coverage targets of 100% and 75%. The preferred Herring Alternatives would allow vessels owners to choose electronic monitoring, to the extent that it is suitable for the fishery and cost-effective. The monitoring requirements include waivers when coverage is not available or logistically impossible. Efficiency was also considered when requiring monitoring on trips only if a threshold amount of catch is intended to be harvested by a vessel. This targets coverage on higher volume trips, thereby covering trips with more catch and minimizing or removing costs on lower volume trips. These measures more efficiently focus monitoring resources rather than covering all trips regardless of amounts intended to be harvested. Efficient utilization of monitoring resources was also considered when the Council chose to calculate herring coverage targets by combining SBRM and industry-funding monitoring coverage. Because the coverage target is calculated by combining SBRM and industry-funded coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. This increases efficiency by reducing the cost of industry-funded coverage and minimizing unnecessary duplication.

*(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.*

_0000017314

The preferred Herring Alternatives take into account variations and contingencies in this fishery by adapting coverage levels to available funding or logistics and allowing vessels to choose electronic monitoring and portside sampling coverage, if it is suitable for the fishery and depending on a vessel owner's preference. Also, one of the preferred Herring Alternatives, Sub-Option 4, would require the Council to revisit the preferred Herring Alternatives two years after implementation and evaluate whether changes to management measures are necessary. This requirement to evaluate the impacts of increased monitoring in the herring fishery takes into account and allows for variations and contingencies in the fishery, fishery resources, and catches.

*(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.*

When selecting preferred Herring Alternatives, the Council weighed the value of additional monitoring against the industry's costs associated with additional monitoring. Herring Alternative 2.5 does not implement any new requirements on the herring fishery. Rather it maintains an existing requirement for 100% observer coverage on midwater trawl vessels fishing inside of Groundfish Closed Areas, but allows vessels to purchase observer coverage to access Groundfish Closed Areas. The 50% coverage target selected by the Council for vessels with a Category A or B herring permit provides for the benefits of collecting additional information on biological resources while minimizing industry cost responsibilities, especially when compared to non-preferred coverage targets of 100% and 75%.

Exempting trips that land less 50 mt of herring (Sub-Option 5) from industry-funded monitoring costs has the potential greatly reduce industry-funded monitoring costs. Sub-Option 5 would eliminate monitoring costs for vessels who always land less than 50 mt of herring and Sub-Option 5 may substantially reduce monitoring costs for particular gear types. Based on past performance, small mesh bottom trawl vessels landed less than 50 mt of herring on 81% of trips. Similarly, 60% of trips landed less than 50 mt of herring. Sub-Option 5 is likely to benefit paired midwater trawl and purse seine vessels less. Only 13% of paired midwater trawl trips landed less than 50 mt of herring and only 33% of purse seine trips landed less than 50 mt of herring.

The Council recommended that herring coverage targets be calculated by combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. Because the coverage target is calculated by combining SBRM and IFM coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. The Council recommended these combined coverage targets to help reduce the cost of industry-funded coverage and to minimize unnecessary duplication.

_0000017315

(8) *Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.*

As described previously, when selecting preferred Herring Alternatives, the Council weighed the value of additional monitoring against the industry's costs associated with additional monitoring. Additional monitoring is expected to reduce the uncertainty around catch estimates in the herring fishery to help improve the tracking of catch against catch limits and, ultimately, to help improve management. Improving management has the potential to provide for the sustained participation of fishing communities in the herring fishery. The Council also selected measures to minimize adverse economic impacts associated with industry-funded monitoring on the fishing industry and communities, such as a 50% coverage target, exempting trips that land less than 50 mt of herring from industry-funded monitoring, and combined coverage targets.

In an effort to provide the herring fishing industry and associated communities with flexibility in meeting industry-funded monitoring requirements, the Council recommended that vessels with Category A or B herring permits would be able to choose either at-sea monitoring coverage or electronic monitoring and portside sampling coverage. This flexibility is expected to help minimize adverse economic impacts associated with industry-funded monitoring.

(9) *Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.*

The impacts of preferred Herring Alternatives on biological resources are indirect because they affect levels of monitoring rather than harvest specifications or gear requirements. Any additional monitoring resulting from the preferred Herring Alternatives may inform bycatch accounting and methods to avoid bycatch.

(10) *Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.*

The preferred Herring Alternatives affect levels of monitoring, rather than fishing effort or fishing behavior, so these alternatives are not expected to impact the safety of human life at sea. When selecting preferred Herring Alternatives, the Council weighed the value of additional monitoring against the industry's costs associated with additional monitoring. While the preferred Herring Alternatives would not have any direct impact on safety at sea, the preferred alternatives may affect the amount of income that would be available to maintain the seaworthiness of fishing vessels.

_0000017316

Under Herring Alternative 2.7, industry-funded monitoring on vessels with Category A or B herring permits has the potential to reduce annual RTO up to 20% for at-sea monitoring coverage and up to 10% for electronic monitoring and portside sampling. Under Herring Alternative 2.5, annual RTO for midwater trawl vessels paying for observer coverage to access Groundfish Closed Areas may be reduced up to an additional 5%. These potential reductions in RTO may contribute to vessels being less seaworthy if vessels are not maintained because of reduced income.

**Other Required Provisions of the Magnuson-Stevens Act**

Section 303 of the Magnuson-Stevens Fishery Conservation and Management Act contains 14 additional required provisions for FMPs, which are discussed below. Any FMP prepared by any Council, or by the Secretary, with respect to any fishery, shall:

*(1)    contain the conservation and management measures, applicable to foreign fishing and fishing by vessels of the United States, which are-- (A) necessary and appropriate for the conservation and management of the fishery to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery; (B) described in this subsection or subsection (b), or both; and (C) consistent with the National Standards, the other provisions of this Act, regulations implementing recommendations by international organizations in which the United States participates (including but not limited to closed areas, quotas, and size limits), and any other applicable law;*

The Atlantic Herring FMP, modified through a number of amendments and framework adjustments, includes a comprehensive set of conservation and management measures applicable to U.S. fishing vessels which are necessary and appropriate for the conservation and management of the fishery to prevent overfishing, and to protect, restore, and promote the long-term health and stability of the herring fishery.

The original Atlantic Herring FMP (1999) provided the Magnuson-Stevens Act requirement to consider the total allowable level of foreign fishing (TALFF) when domestic fishing capacity is not adequate. Generally, foreign fishing for the herring resource is considered during the fishery specifications process when optimal yield (OY) is determined and the management area sub-ACLs are established for a fishing year. In previous specifications for the herring fishery, the Council would specify OY for herring and then consider a domestic annual harvest (DAH) specification. If, at any point in this process, DAH is not adequate to utilize the available OY, then TALFF would be specified. During recent fishing years, however, the domestic herring fleet has been shown to have the capacity to fully utilize DAH. As a result, the Council eliminated the need to annually consider TALFF in Amendment 4 to the Atlantic Herring FMP. However, eliminating the need to specify TALFF annually does not eliminate the legal requirement under the MSA to provide TALFF if DAH is not adequate.

_0000017317

The preferred Herring Alternatives identified in this amendment would not have any direct impacts on existing conservation or management measures in the Atlantic Herring FMP necessary for conservation and management of the herring resource or the herring fishery.

The impacts of preferred Herring Alternatives on the herring resource are indirect because they affect levels of monitoring rather than harvest specifications.  Indirect low positive impacts to the herring resource are possible if the increased monitoring associated with Herring Alternatives 2.5 and 2.7 can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments and improve management.

However, these preferred Herring Alternatives may lead to direct positive impacts on the herring resource and non-target species if herring fishing effort is limited, by increased information on catch tracked against catch limits, and that increases the reproductive potential of the herring resource and non-target species.

The preferred Herring Alternatives would have direct negative impacts on herring vessels associated with industry-funded monitoring requirements.  Indirect positive impacts on herring vessels may result if additional monitoring leads to less uncertainty around catch, improved management, and, ultimately, higher herring harvest limits.  Indirect negative economic impacts on herring vessels associated with preferred Herring Alternatives may result if additional monitoring illustrates higher than expected catch of haddock and river herring and shad, such that vessels would be less likely to be able to fully harvest the herring optimum yield because they were constrained by catch caps.

*(2)    contain a description of the fishery, including, but not limited to, the number of vessels involved, the type and quantity of fishing gear used, the species of fish involved and their location, the cost likely to be incurred in management, actual and potential revenues from the fishery, any recreational interest in the fishery, and the nature and extent of foreign fishing and Indian treaty fishing rights, if any;*

The information required by this provision can be found in Section 3.0 of this document as well as in the 2016-2018 Herring Specifications.  This document includes herring stock and fishery information through the 2014 fishing year when available.  A thorough description of the herring analysis regarding the catch information methods, fishing gear used, species of fish involved and their location, costs incurred in management, and actual and potential revenues from the fishery can be found in the 2016-2018 Herring Specifications.

 Herring vessels primarily use purse seines, single midwater trawls, midwater pair trawls, or small mesh bottom trawls for fishing gear, with the midwater trawl fleet (single and paired) harvesting the majority of landings in recent years, with over hundred million dollars in revenue.

_0000017318

Aside from the importance of herring as a forage species in the Northwest Atlantic and the use of herring as bait, both of which are considered in the 2016-2018 Herring Specifications, there is no recreational interest in the herring fishery.  Currently, there is neither foreign fishing for herring, nor are there any Indian treaty rights related to the herring fishery.

*(3)    assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery, and include a summary of the information utilized in making such specification;*

The preferred Herring Alternatives in this amendment only affect monitoring levels, not harvest levels.

The present and probable future condition of the herring resource and estimates of maximum yield were updated through the most recent herring operational stock assessment in April 2015.  Information related to the herring stock assessment and updated biological reference points are summarized in the 2016-2018 Herring Specifications.

The 2016-2018 Herring Specifications describe that the optimal yield should be less than or equal to acceptable biological catch minus the management uncertainty buffer, which accounts for expected catch of herring in the Canadian New Brunswick weir fishery.

*(4)    assess and specify-- (A) the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the optimum yield specified under paragraph (3); (B) the portion of such optimum yield which, on an annual basis, will not be harvested by fishing vessels of the United States and can be made available for foreign fishing; and (C) the capacity and extent to which United States fish processors, on an annual basis, will process that portion of such optimum yield that will be harvested by fishing vessels of the United States;*

The preferred Herring Alternatives in this amendment only affect monitoring levels, not harvest levels.  This provision relates directly to the herring fishery specification process and is addressed when the Council develops the specifications for the herring fishery, including OY, Domestic Annual Processing, and Domestic Annual Harvesting (DAH). Information related to DAP and DAH is described in the 2016-2018 Herring Specifications.

*(5)    specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational, and charter fishing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, and the estimated processing capacity of, and the actual processing capacity utilized by, United States fish processors;*

_0000017319

Regulations implemented through the Atlantic Herring FMP apply to all federally-permitted herring vessels and dealers.  Reporting requirements for the herring fishery are addressed in the Atlantic Herring FMP and its related amendments and framework adjustments, Frameworks 43 and 46 to the Northeast Multispecies FMP (haddock catch cap for the herring fishery), and the 2011 herring rulemaking by NMFS to clarify reporting and implement VMS reporting for limited access herring vessels.  All limited access herring vessels are required to utilize a VMS for reporting and enforcement purposes and open access vessels are required to report catch via an interactive voice recording.  There is no direct recreational component to the fishery, however it is recognized that herring is an important resource as bait throughout the businesses and communities.  Data regarding the type and quantity of fishing gear used, catch by species, areas fished, season, sea sampling hauls, and domestic harvesting/processing capacity are described in Section 3.0 of this document and in the 2016-2018 Herring Specifications.

*(6)    consider and provide for temporary adjustments, after consultation with the Coast Guard and persons utilizing the fishery, regarding access to the fishery for vessels otherwise prevented from harvesting because of weather or other ocean conditions affecting the safe conduct of the fishery; except that the adjustment shall not adversely affect conservation efforts in other fisheries or discriminate among participants in the affected fishery;*

The preferred Herring Alternatives identified in this amendment does not alter any adjustments made in the Atlantic Herring FMP that address opportunities for vessels that would otherwise be prevented from harvesting because of weather or other ocean conditions affecting the safe conduct of the fisheries.  The safety of fishing vessels and life at-sea is a high priority issue for the Council and was considered throughout the development of the Atlantic Herring FMP.

*(7)    describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary under section 305(b)(1)(A), minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat;*

Essential fish habitat was identified for herring in the Atlantic Herring FMP and has been addressed through all subsequent related management actions in a manner that is consistent with the Magnuson-Stevens Act.  This document provides a description of the physical environment and essential fish habitat in Section 3.1.3 and evaluates the impacts of the preferred Herring Alternatives and other Herring Alternatives considered on essential fish habitat in Section 4.2.5.  The preferred Herring Alternatives are expected to have negligible impacts on the Physical Environment and essential fish habitat.

_0000017320

*(8)      in the case of a fishery management plan that, after January 1, 1991, is submitted to the Secretary for review under section 304(a) (including any plan for which an amendment is submitted to the Secretary for such review) or is prepared by the Secretary, assess and specify the nature and extent of scientific data which is needed for effective implementation of the plan;*

The Amendment 5 to the Atlantic Herring FMP provides an updated list of data and research needs with respect to the herring fishery and its management program. Included are general research needs as well as those specific to cooperative research and improving information about the importance of herring as a forage species in the Northwest Atlantic ecosystem. These data and research needs will be reviewed and updated again as part of the next major herring management action.

Preferred Herring Alternatives identified in this amendment would increase monitoring the herring fishery. Data that would be collected includes: Fishing gear information (i.e., size of nets, mesh sizes, and gear configurations); tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends); all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition); actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling; length data on retained and discarded catch; information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

*(9)      include a fishery impact statement for the plan or amendment (in the case of a plan or amendment thereto submitted to or prepared by the Secretary after October 1, 1990) which shall assess, specify, and describe the likely effects, if any, of the conservation and management measures on-- (A) participants in the fisheries and fishing communities affected by the plan or amendment; and (B) participants in the fisheries conducted in adjacent areas under the authority of another Council, after consultation with such Council and representatives of those participants;*

The Council developed this amendment in consultation with the Mid-Atlantic Fishery Management Council. A description of fishery participants and fishing communities is included in Section 3.0 of this document. The fishery impact statement for this amendment, describing the direct and indirect impacts of Preferred Herring Alternatives on fishery participants and fishing communities, is contained in Section 4.0 of this document.

_0000017321

(10)    *specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery) and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery;*

The status determination criteria for herring were established in the original Atlantic Herring FMP and are further addressed in Amendment 4 to the Atlantic Herring FMP. Objective and measurable criteria for determining when the fishery is overfished, including an analysis of how the criteria were determined, can be found in the original Atlantic Herring FMP based on a report from the Council's Overfishing Definition Review Panel (1998).  Included in the status determination criteria (overfishing definition) is a rebuilding program (control rule) if the stock ever becomes overfished.  The preferred Herring Alternatives identified in this amendment would not modify existing status determination criteria.

(11)    *establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority-- (A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided;*

The first Standardized Bycatch Reporting Methodology (SBRM) Omnibus Amendment was implemented in February 2008.  That amendment addressed the requirements of the Magnuson-Stevens Act to include standardized bycatch reporting methodology in all FMPs of the New England and Mid-Atlantic Fishery Management Councils.  The SBRM can be viewed as the combination of sampling design, data collection procedures and analyses used to estimate bycatch and allocate observer coverage across multiple fisheries.  In response to litigation on the first SBRM Amendment, NMFS and the New England and Mid-Atlantic Fishery Management Councils developed a new omnibus amendment to ensure consistency with Magnuson-Stevens Act requirements for a standardized bycatch reporting methodology.  The revised SBRM Amendment was implemented in 2015.

The preferred Herring Alternatives identified in this amendment would not modify existing provisions for SBRM.  The impacts of preferred Herring Alternatives on biological resources are indirect because they affect levels of monitoring rather than harvest specifications or gear requirements.  Any additional monitoring resulting from the preferred Herring Alternatives may inform bycatch accounting and methods to avoid bycatch.

(12)    *assess the type and amount of fish caught and released alive during recreational fishing under catch and release fishery management programs and the mortality of such fish, and include conservation and management measures that, to the extent practicable, minimize mortality and ensure the extended survival of such fish;*

_0000017322

There is no direct recreational component to the herring fishery, however it is recognized that herring is an important resource as bait for businesses and communities. The preferred Herring Alternatives identified in this amendment do not address recreational fishing regulations.

(13)    *include a description of the commercial, recreational, and charter fishing sectors which participate in the fishery and, to the extent practicable, quantify trends in landings of the managed fishery resource by the commercial, recreational, and charter fishing sectors;*

A description of the participants in the herring fishery is included in Section 3.0 of this document and in the 2016-2018 Herring Specifications. Section 3.0 includes data for herring vessels, processors, dealers, communities, and information about industries and other sectors that are dependent on herring (lobster, tuna, ecotourism, recreational, other). It updates all available information about the fishery and characterizes trends through the 2014 fishing year wherever possible. Outside of the consideration of herring as a forage species in the Northwest Atlantic ecosystem and the use of herring as bait, there is no specific recreational interest in the fishery.

(14)    *to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery.*

The 2015 herring operational assessment evaluated status determination criteria and updated biological reference points for the herring stock complex. According to the best available scientific information, the herring stock is not in an overfished condition and overfishing is not occurring. Therefore, the herring stock is considered to be rebuilt at this time. The status of the herring stock was considered when the 2016-2018 Herring Specifications were developed. A rebuilding plan and/or other conservation and management measures to reduce the overall harvest in the fishery are not necessary at this time.

(15)    *establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability.*

Amendment 1 to the Atlantic Herring FMP implemented a multi-year specifications process for the Atlantic herring fishery (completed every three years). Amendment 4 to the Atlantic Herring FMP implemented changes to the herring fishery specifications process to comply with the new ACL/AM provisions adopted in the MSA. Future Council actions will continue to address the mechanism for specifying ACLs and the need to ensure accountability in the fishery.

_0000017323

The 2016-2018 Herring Specifications implemented multi-year ACLs and sub-ACLs at a level such that overfishing of the herring resource is not expected to occur. The preferred Herring Alternatives identified in this amendment would increase monitoring in the herring fishery and may reduce the uncertainty around catch estimates in the herring fishery. The Council will continue to work with NMFS to ensure adequate monitoring and accountability in the herring fishery so that overfishing does not occur.

_0000017324

## 6.2  NATIONAL ENVIRONMENTAL POLICY ACT

NEPA provides a mechanism for identifying and evaluating the full spectrum of environmental issues associated with federal actions, and for considering a reasonable range of alternatives to avoid or minimize adverse environmental impacts.  This document is designed to meet the requirements of both the Magnuson-Stevens Act and NEPA.  The Council on Environmental Quality (CEQ) has issued regulations specifying the requirements for NEPA documents (40 CFR 1500 – 1508).  All of those requirements are addressed in this document, as referenced below.

To develop the New England Industry-Funded Monitoring Omnibus Amendment, the Council held meetings of its Observer Policy Committee, Herring Oversight Committee, Herring Advisory Panel, and Plan Development/Fishery Management Action Team in addition to Council meetings.  All of these meetings were open to the public.  Final selection of the preferred alternatives in this document occurred at the April 2017Council meeting.

**Environmental Assessment**

The required elements of an Environmental Assessment (EA) are specified in 40 CFR 1508.9(b). They are included in this document, in addition to other relevant sections, as follows:

- An Executive Summary (beginning of the document);
- A Table of Contents (beginning of the document);
- The need for this action is described in Section 1.2;
- The alternatives that were considered are described in Section 2.0;
- A description of the Affected Environment is found in Section 3.0;
- The environmental impacts of the Proposed Action are described in Section 4.0;
- Cumulative impacts of the Proposed Action are discussed in Section 5.0;
- A Finding of No Significant Impact is provided in Section 6.2.1 (below);
- The list of preparers and agencies consulted on this action is provided in Section 8.0.

## 6.2.1  FINDING OF NO SIGNIFICANT IMPACT

The Council on Environmental Quality (CEQ) Regulations state that the determination of significance using an analysis of effects requires examination of both context and intensity, and lists ten criteria for intensity (40 CFR 1508.27).  In addition, the Companion Manual for National Oceanic and Atmospheric Administration Administrative Order 216-6A provides sixteen criteria, the same ten as the CEQ Regulations and six additional, for determining whether the impacts of a proposed action are significant.  Each criterion is discussed below with respect to the proposed action and considered individually as well as in combination with the others.

_0000017325

**1. Can the proposed action reasonably be expected to cause both beneficial and adverse impacts that overall may result in a significant effect, even if the effect will be beneficial?**

Response:  The proposed action is not expected to cause significant environmental impacts because it establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.

The preferred Omnibus Alternatives are administrative and would standardize the development of new industry-funded monitoring programs.  Standardized elements would include monitoring service provider requirements, NMFS cost responsibilities, a process to prioritize available Federal funding to new industry-funded monitoring programs, and monitoring set-asides.  Any new industry-funded monitoring program would be developed in an amendment to the relevant New England FMP.

The preferred Herring Alternatives would establish an industry-funded monitoring program for the Atlantic herring fishery.  That program would specify such things as coverage targets, information to be collected, and service provider requirements.  These alternatives would generally have indirect low positive impacts on biological resources if additional monitoring reduces uncertainty around catch in the herring fishery and leads to improved management.  These alternatives would have direct negative impacts on fishery-related businesses and communities associated with paying for monitoring.  Industry-funded monitoring on vessels with Category A or B herring permits has the potential to reduce annual returns-to-owner (RTO) up to 20% for at-sea monitoring coverage and up to 10% for electronic monitoring and portside sampling.  Annual RTO for midwater trawl vessels paying for observer coverage to access Groundfish Closed Areas may be reduced up to an additional 5%.  These economic impacts may be minimized by the provision to waive coverage on trips that land less than 50 mt of herring and allowing SBRM coverage to contribute toward the 50% industry-funded monitoring coverage target.  While these economic impacts are not expected to be significant, NMFS determined that despite the potential economic impacts, there is no need to prepare an environmental impact statement.

**2. Can the proposed action reasonably be expected to significantly affect public health or safety?**

Response:  The proposed action is not expected to significantly affect public health or safety because it establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.

While the preferred Herring Alternatives would not have any direct impact on safety at sea, the preferred alternatives may affect the amount of income that would be available to maintain the seaworthiness of fishing vessels.  As described previously, industry-funded monitoring has the potential to reduce annual RTO up to 20% for at-sea monitoring coverage, up to 10% for electronic monitoring and portside sampling coverage, and up to

_0000017326

an additional 5% for observer coverage in Groundfish Closed Areas. These potential reductions in RTO may contribute to vessels being less seaworthy if vessels are not maintained because of reduced income. The safety of human life at sea is discussed further in Section 6.1 (National Standard 10).

**3. Can the proposed action reasonably be expected to result in significant impacts to unique characteristics of the geographic area, such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas?**

Response: The proposed action is not expected to result in significant impacts to unique characteristics of the geographic area, such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas. The proposed action would establish a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.

**4. Are the proposed action's effects on the quality of the human environment likely to be highly controversial?**

Response: The effect of the proposed action on the quality of the human environment is not expected to be highly controversial, but it may be controversial for portions of the herring industry. During the development of this amendment, fishing industry participants expressed concern with potential economic impacts associated with industry-funded monitoring and insisted that NMFS should pay for all monitoring.

The Magnuson-Stevens Act allows for industry-funded monitoring and industry-funded monitoring is used in other fisheries in the Greater Atlantic Region, as well as in other regions of the United States. Industry-funded monitoring does, however, have the potential to reduce the annual RTO of industry participants. Some concerned stakeholders believe this amendment is inconsistent with the Magnuson-Stevens Act because the Act does not allow for industry-funded monitoring as described in this amendment.

As described previously, the preferred Herring Alternatives have the potential to reduce annual RTO up to 20% for at-sea monitoring coverage, up to 10% for electronic monitoring and portside sampling, and up to an additional 5% for observer coverage in Groundfish Closed Areas. However, these economic impacts may be minimized by the provision to waive coverage on trips that land less than 50 mt of herring and allowing SBRM coverage to contribute toward the 50% industry-funded monitoring coverage target.

Two years after implementation of this amendment, the Council will examine the results of additional monitoring in the herring fishery and consider if adjustments to herring coverage targets are warranted. This re-examination may help mitigate any potential controversy related to industry-funded monitoring in the herring fishery.

_0000017327

**5. Are the proposed action's effects on the human environment likely to be highly uncertain or involve unique or unknown risks?**

Response:  The proposed action's effects on the human environment are not likely to be highly uncertain or involve unique or unknown risks.  Section 4.0 of this document describes the impacts of the proposed action on the human environment.  The impacts of the proposed action on biological resources and the physical environment are well understood.  The industry costs associated with industry-funded monitoring can be variable and contingent upon negotiations with service providers.  Because Federal programs for electronic monitoring and portside sampling are relatively new to the Greater Atlantic Region, the industry costs associated with those programs are less certain.  However, the cost estimates used to generate the economic analyses for the preferred Herring Alternatives were based on similar programs in this region and represent the best available information.

**6. Can the proposed action reasonably be expected to establish a precedent for future actions with significant effects or represent a decision in principle about a future consideration?**

Response:  The proposed action is not expected to establish a precedent for future actions with significant effects or represent a decision in principle about a future consideration.

The preferred Omnibus Alternatives would standardize the development of new industry-funded monitoring programs.  Standardized elements would include monitoring service provider requirements, NMFS cost responsibilities, process to prioritize available Federal funding to new industry-funded monitoring programs, and monitoring set-asides.  But because any new industry-funded monitoring program would need to be developed in an amendment to the relevant New England FMP, all decisions whether or not to establish that program would be considered in a future action.  The preferred Herring Alternatives would establish an industry-funded monitoring program for the herring fishery, similar to other industry-funded programs in the Greater Atlantic Region and elsewhere in the United States.  Therefore, neither the preferred Omnibus Alternatives nor the preferred Herring Alternatives would guarantee the outcome of future actions or represent a decision in principle about a future consideration.

**7. Is the proposed action related to other actions that when considered together will have individually insignificant but cumulatively significant impacts?**

Response:  No.  The proposed action is not related to other actions that when considered together will have individually insignificant but cumulatively significant impacts.  The cumulative effects analysis presented in Section 5.0 of this document considers the impacts of the proposed action in combination with relevant past, present, and reasonably foreseeable future actions and concludes that no additional significant cumulative impacts are expected from the proposed action.

_0000017328

**8. Can the proposed action reasonably be expected to adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources?**

Response:  The proposed action cannot reasonably be expected to adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places, nor is the proposed action expected to cause loss or destruction to significant scientific, cultural, or historical resources.  The proposed action would establish a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.

**9. Can the proposed action reasonably be expected to have a significant impact on endangered or threatened species, or their critical habitat as defined under the Endangered Species Act of 1973?**

Response:  The proposed action cannot reasonably be expected to have a significant impact on endangered or threatened species or their critical habitat because it would establish a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.  The preferred Herring Alternatives would establish an industry-funded monitoring program for the herring fishery.  As described in Section 4.2.4 of this document, the preferred Herring Alternatives may have indirect low positive impacts on endangered or threatened species.  Indirect benefits to endangered or threatened species are possible if increased monitoring can generate more information for stock assessments and inform ways to reduce interactions between the herring fishery and endangered or threatened species.

**10. Can the proposed action reasonably be expected to threaten a violation of Federal, state, or local law or requirements imposed for environmental protection?**

Response:  The proposed action would affect levels monitoring, rather than harvest specifications, gear requirements, or changes in fishing behavior, and, therefore, it is not expected to threaten a violation of Federal, state, or local law or requirements to protect the environment.

**11. Can the proposed action reasonably be expected to adversely affect stocks of marine mammals as defined in the Marine Mammal Protection Act?**

Response:  The proposed action is not expected to adversely affect stocks of marine mammals because it establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.  The preferred Herring Alternatives would establish an industry-funded monitoring program for the herring fishery.  As described in Section 4.2.4 of this document, the preferred Herring Alternatives may have indirect low positive impacts on marine mammals.  Indirect benefits to marine mammals are possible if increased monitoring can generate more information for stock

_0000017329

assessments and inform ways to reduce interactions between the herring fishery and marine mammals.

**12. Can the proposed action reasonably be expected to adversely affect managed fish species?**

Response:  The proposed action is not expected to adversely affect managed fish species because it establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.  The proposed action is expected to have indirect low positive impacts on managed fish species if additional monitoring leads to improved management.

The preferred Omnibus Alternatives are administrative and would standardize the development of new industry-funded monitoring programs.  If new industry-funded monitoring programs were developed in an amendment to the relevant New England FMP, there may be indirect low positive impacts on those managed fish species if additional monitoring leads to improved management.

The preferred Herring Alternatives would establish an industry-funded monitoring program for the herring fishery.  These alternatives would generally have indirect low positive impacts on the herring resource and non-target species (i.e., haddock, river herring, shad, and Atlantic mackerel) if additional monitoring reduces uncertainty around catch in the herring fishery and leads to improved management.

**13. Can the proposed action reasonably be expected to adversely affect essential fish habitat as defined under the Magnuson-Stevens Fishery Conservation and Management Act?**

Response:  The proposed action is not expected to adversely affect essential fish habitat because it establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.

The preferred Omnibus Alternatives would not adversely affect essential fish habitat because they are administrative and would standardize the development of new industry-funded monitoring programs.  Any new industry-funded monitoring program would be developed in an amendment to the relevant FMP.

The preferred Herring Alternatives would not adversely affect essential fish habitat because it would establish an industry-funded monitoring program for the herring fishery, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.  In general, the impact of the herring fishery on the physical environment, including essential fish habitat, is thought to be minimal and temporary.  Therefore, the expected impact on the physical environment, including essential fish habitat, of increased monitoring in the herring fishery is expected to be negligible.

_0000017330

**14. Can the proposed action reasonably be expected to adversely affect vulnerable marine or coastal ecosystems, including but not limited to, deep coral ecosystems?**

<u>Response</u>:  The proposed action is not expected to adversely affect vulnerable marine or costal ecosystems, including but not limited to deep sea coral ecosystems.  As described previously, the proposed action establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior.  Therefore, the expected impact on vulnerable marine or coastal ecosystems of increased monitoring is expected to be negligible.  Information collected via industry-funded monitoring may augment existing information on vulnerable marine or costal ecosystem and, ultimately, lead to improved management.

**15. Can the proposed action reasonably be expected to adversely affect biodiversity or ecosystem functioning (e.g., benthic productivity, predator-prey relationships, etc.)?**

<u>Response</u>:  The proposed action is not expected to adversely affect biodiversity and ecosystem functioning.  The proposed action establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior. Information collected via industry-funded monitoring may augment existing information on biodiversity and ecosystem functioning and, ultimately, lead to improved management.

**16. Can the proposed action reasonably be expected to result in the introduction or spread of a nonindigenous species?**

<u>Response</u>:  The proposed action is not expected to result in the introduction or spread of a non-indigenous species.  The proposed action establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior. Vessels affected by the proposed action are those currently fishing in the Greater Atlantic Region.  The fishing-related activity of these vessels is anticipated to occur solely within the Greater Atlantic Region and should not result in the introduction or spread of a non-indigenous species.

_0000017331

DETERMINATION

In view of the information presented in this document and the analysis contained in the supporting Environmental Assessment prepared for the New England Industry-Funded Monitoring Omnibus Amendment, it is hereby determined that the New England Industry-Funded Monitoring Omnibus Amendment will not significantly impact the quality of the human environment as described above and in the supporting Environmental Assessment. In addition, all beneficial and adverse impacts of the proposed action have been addressed to reach the conclusion of no significant impacts.  Accordingly, preparation of an environmental impact statement for this action is not necessary.


Regional Administrator                              December 17, 2018
Greater Atlantic Region                             Date


## 6.3  MARINE MAMMAL PROTECTION ACT (MMPA)

A description of marine mammals potentially affected by the preferred alternatives in this amendment is provided in Section 3.1.4 of this document.  See Section 4.0 for further information on the potential impacts of the preferred alternatives and other alternatives considered by the Council.  The Council has concluded preliminarily that there would be no direct impacts on marine mammals, that the preferred alternatives appear consistent with the provisions of the MMPA, and that the preferred alternatives would not alter existing measures to protect the species likely to inhabit the management units of the subject fisheries.


## 6.4  ENDANGERED SPECIES ACT (ESA)

Section 7 of the ESA requires Federal agencies conducting, authorizing, or funding activities that affect threatened or endangered species to ensure that those effects do not jeopardize the continued existence of listed species.  A description of the protected resources potentially affected by the preferred alternatives in this amendment is provided in Section 3.1.4.  See Section 4.0 for further information on the potential impacts of the preferred alternatives and other alternatives considered by the Council.  The Council has determined preliminarily that there would be no direct impacts on protected resources, including endangered or threatened species, or their habitat.

_0000017332

## 6.5   PAPERWORK REDUCTION ACT (PRA)

The purpose of the PRA is to control and, to the extent possible, minimize the paperwork burden for individuals, small businesses, nonprofit institutions, and other persons resulting from the collection of information by or for the Federal Government.  The authority to manage information and recordkeeping requirements is vested with the Director of the Office of Management and Budget (OMB).  This authority encompasses establishment of guidelines and policies, approval of information collection requests, and reduction of paperwork burdens and duplications.

With changes recommended to the catch monitoring program for the Atlantic herring fishery, this amendment contains new collection of information requirements subject to the PRA.  The PRA package prepared in support of this action and the information collection required by the proposed action, including forms and supporting statements, will be submitted when this amendment is submitted.

## 6.6   INFORMATION QUALITY ACT

Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106-554, also known as the Data Quality Act or Information Quality Act) directed the Office of Management and Budget (OMB) to issue government-wide guidelines that "provide policy and procedural guidance to federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by federal agencies."  OMB directed each federal agency to issue its own guidelines, establish administrative mechanisms allowing affected persons to seek and obtain correction of information that does not comply with the OMB guidelines, and report periodically to OMB on the number and nature of complaints.  The NOAA Section 515 Information Quality Guidelines require a series of actions for each new information product subject to the Data Quality Act.  Information must meet standards of utility, integrity and objectivity.  This section provides information required to address these requirements.

### *Utility of Information Product*

The New England Industry-Funded Monitoring Omnibus Amendment includes:  A description of the management issues to be addressed, statement of goals and objectives, a description of the proposed action and other alternatives/options considered, analyses of the impacts of the proposed action and other alternatives/options on the affected environment, and the reasons for selecting the proposed action.  The proposed action implements conservation and management goals consistent with the Magnuson-Stevens Fishery Conservation and Management Act as well as all other existing applicable laws.

Utility means that disseminated information is useful to its intended users.  "Useful" means that the content of the information is helpful, beneficial, or serviceable to its intended users, or that the information supports the usefulness of other disseminated information by making it more accessible or easier to read, see, understand, obtain or use.  The

_0000017333

information presented in this document is helpful to the intended users (the affected public) by presenting a clear description of the purpose and need of the proposed action, the measures proposed, and the impacts of those measures.  A discussion of the reasons for selecting the proposed action is included so that intended users may have a full understanding of the proposed action and its implications.  The intended users of the information contained in this document are participants in the Atlantic herring fishery and other interested parties and members of the general public.  The information contained in this document may be useful to owners of vessels holding an Atlantic herring permit as well as Atlantic herring dealers and processors since it serves to notify these individuals of any potential changes to management measures for the fishery.  This information will enable these individuals to adjust their fishing practices and make appropriate business decisions based on the new management measures and corresponding regulations.

The information being provided in this amendment concerning the status of the Atlantic herring fishery is updated based on landings and effort information through the 2013 and 2014 fishing years when possible.  Information presented in this document is intended to support the proposed action, which has been developed through a multi-stage process involving all interested members of the public.  Consequently, the information pertaining to management measures contained in this document has been improved based on comments from the public, fishing industry, members of the Council, and NOAA Fisheries.

The media being used in the dissemination of the information contained in this document will be contained in a *Federal Register* notice announcing the Proposed and Final Rules for this action.  This information will be made available through printed publication and on the Internet website for the Greater Atlantic Regional Office (GARFO) of NOAA Fisheries.  In addition, the final New England Industry-Funded Monitoring Omnibus Amendment will be available on the Council's website (www.nefmc.org) in standard PDF format.  Copies will be available for anyone in the public on CD ROM and paper from the Council's office.

### *Integrity of Information Product*

Integrity refers to security – the protection of information from unauthorized access or revision, to ensure that the information is not compromised through corruption or falsification.  Prior to dissemination, NOAA information, independent of the intended mechanism for distribution, is safeguarded from improper access, modification, or destruction, to a degree commensurate with the risk and magnitude of harm that could result from the loss, misuse, or unauthorized access to or modification of such information.  All electronic information disseminated by NOAA adheres to the standards set out in Appendix III, "Security of Automated Information Resources," OMB Circular A-130; the Computer Security Act; and the Government Information Security Reform Act.  If information is confidential, it is safeguarded pursuant to the Privacy Act and Titles 13, 15, and 22 of the U.S. Code (confidentiality of census, business and financial information).

_0000017334

***Objectivity of Information Product***

Objective information is presented in an accurate, clear, complete, and unbiased manner, and in proper context. The substance of the information is accurate, reliable, and unbiased; in the scientific, financial, or statistical context, original and supporting data are generated and the analytical results are developed using sound, commonly-accepted scientific and research methods. "Accurate" means that information is within an acceptable degree of imprecision or error appropriate to the particular kind of information at issue and otherwise meets commonly accepted scientific, financial, and statistical standards.

For purposes of the Pre-Dissemination Review, this document is considered to be a "Natural Resource Plan." Accordingly, the document adheres to the published standards of the Magnuson-Stevens Act; the Operational Guidelines, Fishery Management Plan Process; the Essential Fish Habitat Guidelines; the National Standard Guidelines; and NOAA Administrative Order 216-6, Environmental Review Procedures for Implementing the National Environmental Policy Act. Several sources of data were used in the development of this document, including the analysis of potential impacts. These data sources include, but are not limited to: landings data from vessel trip reports, landings data from individual voice reports, information from resource trawl surveys, data from the dealer weighout purchase reports, descriptive information provided (on a voluntary basis) by processors and dealers of Atlantic herring, and ex-vessel price information. Although there are some limitations to the data used in the analysis of impacts of management measures and in the description of the affected environment, these data are considered to be the best available.

This information product uses information of known quality from sources acceptable to the relevant scientific and technical communities. Stock status (including estimates of biomass and fishing mortality) reported in this document are based on either assessments subject to peer-review through the Stock Assessment Review Committee (SARC) or on updates of those assessments. Landings and revenue information is based on information collected daily VMS catch reports and VTR reports, and supplemented with state/federal dealer data. Information on catch composition and bycatch is based on reports collected by the NOAA Fisheries Service observer program and incorporated into the sea sampling or observer database systems. These reports are developed using an approved, scientifically valid sampling process. In addition to these sources, additional information is presented that has been accepted and published in peer-reviewed journals or by scientific organizations. Original analyses in this document were prepared using data from accepted sources, and the analyses have been reviewed by members of the Plan Development/Fishery Management Action Team.

The proposed action is supported by the best available scientific information. The supporting science and analyses, upon which the proposed action is based, are summarized and described in Section 3.0 and Section 4.0 of this document. All supporting materials, information, data, and analyses within this document have been, to the maximum extent practicable, properly referenced according to commonly accepted standards for scientific

_0000017335

literature to ensure transparency.  Qualitative discussion is provided in cases where quantitative information was unavailable, utilizing appropriate references as necessary.

The review process for any action under an FMP involves the Greater Atlantic Regional Office (GARFO) of NOAA Fisheries, the Northeast Fisheries Science Center (Center), and NOAA Fisheries Headquarters (Headquarters).  The Council review process involves public meetings at which affected stakeholders have the opportunity to provide comments on the proposed changes to the FMP.  Reviews by staff at GARFO are conducted by those with expertise in fisheries management and policy, habitat conservation, protected species, and compliance with the applicable law.  The Center's technical review is conducted by senior-level scientists with specialties in population dynamics, stock assessment methodology, fishery resources, population biology, and the social sciences.

Final approval of the proposed action and clearance of the Proposed and Final Rules is conducted by staff at NOAA Fisheries Headquarters, the Department of Commerce, and the U.S. Office of Management and Budget.  This review process is standard for any action under an FMP, and provides input from individuals having various expertise who may not have been directly involved in the development of the proposed actions.  Thus, the review process for any FMP modification, including the proposed action, is performed by technically-qualified individuals to ensure the action is valid, complete, unbiased, objective, and relevant.

## 6.7  IMPACTS OF FEDERALISM/EXECTIVE ORDER 13132

This E.O. established nine fundamental federalism principles for Federal agencies to follow when developing and implementing actions with federalism implications.  The E.O. also lists a series of policy making criteria to which Federal agencies must adhere when formulating and implementing policies that have federalism implications.  However, no federalism issues or implications have been identified relative to the alternatives under consideration in the Industry-funded Monitoring Omnibus Amendment.  This action does not contain policies with federalism implications sufficient to warrant preparation of an assessment under E.O. 13132.  The affected States have been closely involved in the development of the proposed fishery specifications through their representation on the Council (all affected states are represented as voting members of at least one Regional Fishery Management Council) and coordination with the Atlantic States Marine Fisheries Commission and the Mid-Atlantic Fishery Management Council.

## 6.8  ADMINISTRATIVE PROCEDURES ACT

This action was developed in compliance with the requirements of the Administrative Procedures Act, and these requirements will continue to be followed when the proposed regulation is published.  Section 553 of the Administrative Procedure Act establishes procedural requirements applicable to informal rulemaking by Federal agencies.  The purpose of these requirements is to ensure public access to the Federal rulemaking

_0000017336

process, and to give the public adequate notice and opportunity for comment. At this time, the Council is not requesting any abridgement of the rulemaking process for this action.

## 6.9 COASTAL ZONE MANAGEMENT ACT (CZMA)

Section 307(c)(1) of the Federal CZMA of 1972 requires that all Federal activities that directly affect the coastal zone be consistent with approved state coastal zone management programs to the maximum extent practicable. Pursuant to the CZMA regulations at 15 CFR 930.35, a negative determination may be made if there are no coastal effects and the subject action: (1) Is identified by a state agency on its list, as described in § 930.34(b), or through case-by-case monitoring of unlisted activities; or (2) which is the same as or is similar to activities for which consistency determinations have been prepared in the past; or (3) for which the Federal agency undertook a thorough consistency assessment and developed initial findings on the coastal effects of the activity. The Council has determined that this action is consistent with the coastal zone management plan and policies of the coastal states in this region. NMFS will formally request consistency reviews by CZMA state agencies following submission of this amendment.

## 6.10 REGULATORY FLEXIBILITY ACT/EXECUTIVE ORDER 12866

### 6.10.1 E.O. 12866 (REGULATORY PLANNING AND REVIEW)

The purpose of Executive Order 12866 is to enhance planning and coordination with respect to new and existing regulations. This E.O. requires the Office of Management and Budget (OMB) to review regulatory programs that are considered to be "significant." E.O. 12866 requires a review of proposed regulations to determine whether or not the expected effects would be significant, where a significant action is any regulatory action that may:

1. Have an annual effect on the economy of $100 million or more, or adversely affect in a material way the economy, a sector of the economy, productivity, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

2. Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

3. Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

4. Raise novel legal or policy issues arising out of legal mandates, the President's priorities, of the principles set forth in the Executive Order.

In deciding how whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, include the alternative of not regulating. Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider.

_0000017337

The preferred Omnibus Alternatives are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the Omnibus Alternatives have no direct economic impacts, they will not be discussed in this section.

The preferred Herring Alternatives affect levels of monitoring, rather than fishing behavior or harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities.

### 6.10.1.1 Statement of the Problem

The purpose and need for the action are provided in Section 1.2 of this document.

### 6.10.1.2 Management Alternatives and Rationale

The management alternatives and their rationale is provided in Section 2.0 of this document.

### 6.10.1.3 Description of the Fishery

The fishery is described in Section 3.1.5 of this document.

### 6.10.1.4 Economic Analysis

The baseline is No Action (Herring Alternative 1). Sections 4.2.6 and 4.2.7 in this document describe the additional direct costs on herring fishing vessels associated with the preferred Herring Alternatives. Table 95 computes total direct costs to the herring industry. Recurring costs are likely to be between $274,000-$352,000. If vessels choose the electronic monitoring and portside sampling option, recurring costs are lower, however, there are additional startup costs during Year 1.

TABLE 96.   ANNUAL COST TO VESSELS ASSOCIATED WITH PREFERRED HERRING ALTERNATIVES

|  | Cost to Vessels Associated with At-Sea Monitoring Coverage | Cost to Vessels Associated with Electronic Monitoring and Portside Sampling Coverage |
|---|---|---|
| **Herring Alternative 2.7** | $304,136 | $226,234 |
| **Herring Alternative 2.5** | $47,906 | $47,906 |
| **Recurring Costs** | $352,042 | $274,140 |
| **Start Up Costs** | NA | $285,000 |
| **Total** | $352,042 | $559,140 |

*Source: NMFS*

_0000017338

There would also be additional costs associated with the preferred Herring Alternatives. The Federal government would incur additional costs to administer an industry-funded monitoring program for the herring fishery.  There would also be small non-pecuniary costs to herring vessels resulting from compliance with existing notification and reporting requirements (described in Section 2.2).

The economic benefits of the preferred Herring Alternatives are described in Section 4.2.7. It is difficult to quantify these benefits, but indirect positive impacts on herring vessels may result from increased monitoring helping to reduce uncertainty around retained and discarded catch estimates leading to additional harvesting opportunities.  If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be less likely to be constrained by catch caps and more likely to be able to fully harvest herring sub-ACLs.

### 6.10.1.5  Determination of Significance

Based on the analyses provided in this document, the preferred alternatives are not expected to constitute a "significant regulatory action."  This action is not expected to have an impact of $100M or more on the economy, or adversely affect in a material way the economy, a sector of the economy, productivity, jobs, the environment, public health or safety, or State, local, or tribal governments or communities.  This action is not expected to raise novel legal and policy issues or interfere with an action taken or planned by another agency.  Lastly, this action does not materially alter the budgetary impact of entitlements, grants, user fees, or loan programs, or the rights and obligations of recipients.

## 6.10.2    REGULATORY FLEXIBILITY ACT - INITIAL REGULATORY FLEXIBILITY ANALYSIS

### 6.10.2.1  Introduction

The purpose of the Regulatory Flexibility Act (RFA) is to reduce the impacts of burdensome regulations and recordkeeping requirements on small businesses.  To achieve this goal, the RFA requires Federal agencies to describe and analyze the effects of proposed regulations, and possible alternatives, on small business entities.  To this end, this section contains an Initial Regulatory Flexibility Analysis (IRFA), which includes an assessment of the effects that the Proposed Action and other alternatives are expected to have on small entities.

The preferred Omnibus Alternatives are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested.  Because the Omnibus Alternatives have no direct economic impacts, they will not be discussed in this section.

The preferred Herring Alternatives affect levels of monitoring, rather than fishing behavior or harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities.

_0000017339

### 6.10.2.2  Reasons for Considering the Action

The purpose and need for the action are provided in Section 1.2 of this document.

### 6.10.2.3  Objectives and Legal Basis for the Action

The objectives and legal basis for this action are provided in Section 1.0 of this document.

### 6.10.2.4  Description and Estimate of Small Entities to Which the Rule Applies

Effective July 1, 2016, NMFS established a small business size standard of $11 million in annual gross receipts for all businesses primarily engaged in the commercial fishing industry (NAICS 11411) for RFA compliance purposes only (80 FR 81194, December 29, 2015). The single size standard is to be used in place of the U.S. Small Business Administration's current standards of $20.5 million, $5.5 million, and $7.5 million for the finfish (NAICS 114111), shellfish (NAICS 114112), and other marine fishing (NAICS 114119) sectors of the U.S. commercial fishing industry in all NMFS rules subject to the RFA after July 1, 2016.

The directly regulated entities are business that own at least one limited access herring vessel. As of 2016, there are 66 businesses that own a least one limited access herring vessel. Four businesses are large entities (gross receipts greater than $11 million). The remaining 62 businesses are small entities. Gross receipts and gross receipts from herring fishing for the small entities are characterized in Table 96.

**TABLE 97.  GROSS REVENUES AND REVENUES FROM HERRING FOR THE DIRECTLY REGULATED SMALL ENTITIES**

|  | Gross Receipts from Herring Permitted Firms | Gross Receipts from Herring Fishing |
|---|---|---|
| Mean | $1,847,392 | $422,210 |
| Median | $1,076,172 | $0 |
| 25th Percentile | $656,965 | $0 |
| 75th Percentile | $2,684,753 | $95,218 |
| Permitted Small Entities | 62 | 62 |

*Source:  NMFS*

Many of the businesses that hold limited access herring permits are not actively fishing for herring. Of those businesses actively fishing for herring, there are 32 directly regulated entities with herring landings. Two firms are large entities (gross receipts over $11 million). The remaining 30 businesses are small entities. Table 97 characterizes gross receipts and gross receipts from the herring fishery for the active firms.

_0000017340

**TABLE 98. GROSS REVENUES AND REVENUES FROM HERRING FOR THE ACTIVE DIRECTLY REGULATED SMALL ENTITIES**

|  | Gross Receipts from Active Herring Permitted Firms | Gross Receipts from Herring Fishing |
|---|---|---|
| Mean | $2,070,541 | $872,567 |
| Median | $1,030,411 | $95,558 |
| 25th Percentile | $554,628 | $6,570 |
| 75th Percentile | $2,955,883 | $1,696,758 |
| Active Small Entities | 30 | 30 |

*Source: NMFS*

For the 30 small entities, herring represents an average of 36% of gross receipts. For 12 of the small entities, herring represents the single largest source of gross receipts. For 8 of the small entities, longfin squid is the largest source of gross receipts and Atlantic sea scallops is the largest source of gross receipts for 5 of the small entities. The largest source of gross receipts for the remaining 5 small entities are mixed across different fisheries. Eight of the 30 small entities derived zero revenues from herring.

### 6.10.2.5 Recordkeeping and Reporting Requirements

The preferred Herring Alternatives would require vessels to continue to comply with existing notification and reporting requirements as well as pay for industry-funded monitoring on trips selected for coverage by NMFS. These recordkeeping and reporting requirements would apply to 62 small entities, however, only 30 of those small entities are currently active in the herring fishery.

### 6.10.2.6 Duplication, Overlap, or Conflict with Other Federal Rules

No relevant Federal rules have been identified that would duplicate or overlap with the preferred alternatives.

### 6.10.2.7 Economic Impacts on Small Entities Resulting from the Action

Section 4.2.7 of this document describes the economic impacts of the preferred Herring Alternatives on fishing vessels. The first analysis examines the expected costs of monitoring regulations in comparison to the gross receipts at the business level. A business includes all fishing vessels that have identical owners. The second analysis examines the expected costs of monitoring regulations in comparison to vessel profits (revenues minus variable-costs and fixed-costs). Detailed cost data were voluntarily provided by the industry for affected vessels. However, this type analysis cannot be performed at the business level without information on *all* fishing activities by the businesses. The cost structure for those other fisheries is likely to be very different than the cost structure of herring fishing.

_0000017341

The gross receipts from all fishing activities and the additional costs to small businesses resulting from the preferred Herring Alternatives are shown in Table 98. The cost associated with electronic monitoring is from Year 2 and beyond, so it does not include startup costs resulting from the purchase and installation of electronic monitoring equipment. Because estimates of business profits are not available for activity from non-herring activity, gross receipts are used for insight into the ability of businesses to afford the proposed regulatory costs. For the affected small entities, the estimated costs associated with the preferred Herring Alternative are less than 1% of gross receipts.

Since Alternative 2.7 allows businesses to choose between electronic monitoring/portside sampling coverage (EM/PS) and at-sea monitoring coverage (ASM), businesses are expected to select the less costly of the two monitoring types (potentially EM/PS). However, the uncertainty around the monitoring costs estimates is high, thereby increasing the likelihood that businesses may select ASM. Therefore, estimates of costs-per-businesses associated with EM/PS and ASM are analyzed.

Ten small businesses are likely to only be affected by Herring Alternative 2.7 (identified as Group 1) and 6 small businesses are likely to be affected by both Herring Alternative 2.5 and Herring Alternative 2.7 (identified as Group 2) (Table 98). For the 10 small businesses in Group 1, the average cost of monitoring coverage is estimated at $7,228-7,434 per year. These are costs are from EM/PS or ASM. For the 6 businesses in Group 2, the average cost of monitoring is estimated at $25,413-$33,406 per year. These are costs are from EM/PS or ASM and observer coverage (OBS) in Groundfish Closed Areas.

Table 99 describes the additional costs to large businesses from the preferred Herring Alternatives. Only three businesses are expected to be directly regulated; these businesses were not divided into groups by alternative to avoid confidentiality restrictions. For the three large businesses, the average cost of monitoring is estimated at $16,446-$25,751 per year. Gross revenues for the large businesses are approximately $21 million per business. The large entities derive less revenue from herring than the small entities and may be *more likely* to exit the fishery if the cost of monitoring is perceived as too expensive. For large entities, the additional regulatory costs are well below 1% of gross receipts.

_0000017342

**TABLE 99. IMPACTS ON THE SMALL, ACTIVE DIRECTLY REGULATED ENTITIES**

| | Group 1 | | Group 2 | |
|---|---|---|---|---|
| | EM/PS | ASM | EM/PS + OBS | ASM+OBS |
| Additional Costs per Businesses | $7,228 | $7,434 | $25,413 | $33,406 |
| Standard Deviation | (6,854) | (7,177) | (14,065) | (20,145) |
| Firm Gross Revenue | $2,603,158 | | $3,896,903 | |
| Standard Deviation | (3,481,754) | | (2,989,036) | |
| Number of Small Businesses | 10 | | 6 | |

*Source: NMFS*

**TABLE 100. IMPACTS ON THE LARGE, ACTIVE DIRECTLY REGULATED ENTITIES**

| | EM/PS + OBS | ASM + OBS |
|---|---|---|
| Additional Costs per Business | $16,446 | $25,751 |
| Firm Gross Revenue | $21,000,000 | |
| Number of Large Business | 3 | |

*Source: NMFS*

_0000017343

The second part of this analysis compares estimated monitoring costs with estimates of vessel-level profits.  This comparison provides further insight into the ability of businesses to afford the proposed regulatory costs.  Estimated monitoring costs for small vessels range from approximately $6,500 for vessels in Group 1 to $20,000-27,000 for vessels in Group 2 (Table 100).  Operating profit at the vessel level is approximately $184,000 for Group 1 and approximately $282,000 for Group 2.

Monitoring costs associated with the preferred Herring Alternatives are estimated at 3.5% of operating profits for the small businesses in Group 1 and at 7%-10% for small businesses in Group 2.  During Year 1, the electronic monitoring and portside sampling coverage has an additional startup cost of approximately $15,000 per vessel.  This additional cost is estimated at 5%-8% of operating profits on small businesses.

Table 101 describes the cost of monitoring to large businesses at the vessel level.  As described previously, the large businesses were not divided into groups by alternative to avoid confidentiality restrictions.  For the three large businesses, the estimated cost of monitoring at the vessel level is identical to estimated cost of monitoring at the level of the business ($16,446-$25,751 per year).  Gross revenues from vessels owned by large business are approximately $838,000 per business.  Operating profits are approximately $91,000 per vessel for large businesses and additional monitoring costs are approximately 18%-28% of that profit.  Vessels that are large entities derive less revenue from herring than the small entities and may be *more likely* to exit the fishery if the cost of monitoring is perceived as too expensive.

_0000017344

**TABLE 101.  VESSEL-LEVEL IMPACTS ON THE SMALL, ACTIVE DIRECTLY REGULATED ENTITIES**

| | Group 1 | | Group 2 | |
|---|---|---|---|---|
| | EM/PS | ASM | EM/PS + OBS | ASM + OBS |
| Additional Costs per Vessel | $6,397 | $6,478 | $20,229 | $27,223 |
| Standard Deviation | (6,396) | (4,815) | (5,860) | (7,813) |
| Vessel Gross Revenue | $2,174,273 | | $1,802,965 | |
| Standard Deviation | (2,012,878) | | (888,036) | |
| Vessel Operating Profit | $184,146 | | $281,678 | |
| Standard Deviation | (1,355,980) | | (254,141) | |
| Vessels Owned by Small Businesses | 13 | | 7 | |

**TABLE 102.  VESSEL-LEVEL IMPACTS ON THE LARGE, ACTIVE DIRECTLY REGULATED ENTITIES**

| | EM/PS | ASM |
|---|---|---|
| Additional Costs per Vessel | $16,446 | $25,751 |
| Vessel Gross Revenue | $847,938 | |
| Vessel Operating Profit | $90,940 | |
| Vessels Owned by Large Businesses | 3 | |

_0000017345

When considering the non-preferred Herring Alternatives, Herring Alternatives 2.1, 2.2 (with 100% or 75% coverage), and 2.7 (with 100% or 75% coverage) would have higher costs than the preferred Herring Alternatives.  Additionally, the other non-preferred Herring Alternatives, including No Action (Herring Alternative 1) and those with lower coverage targets (25% coverage), may not have achieve the objectives for monitoring in the herring fishery (described in Sections 1.2 and 2.2) and analyzed in Section 4.0.

# 7.0  LITERATURE CITED

Atlantic States Marine Fisheries Commission (ASMFC).  2007.  American Shad Stock Assessment Report for Peer Review.  Stock Assessment Report No. 07-01.  Available at: http://www.asmfc.org/shadRiverHerring.htm.

Atlantic States Marine Fisheries Commission (ASMFC). 2007. Special Report to the Atlantic Sturgeon Management Board: Estimation of Atlantic sturgeon bycatch in coastal Atlantic commercial fisheries of New England and the Mid-Atlantic. August 2007. 95 pp.

Atlantic States Marine Fisheries Commission.  2012.  River Herring Benchmark Stock Assessment.  Stock Assessment Report No. 12-02.  Available at: http://www.asmfc.org/shadRiverHerring.htm.

ASSRT (Atlantic Sturgeon Status Review Team). 2007. Status review of Atlantic sturgeon (*Acipenser oxyrinchus oxyrinchus*). National Marine Fisheries Service 188 pp.

Baum, E.T.  1997.  Maine Atlantic Salmon: A National Treasure.  Atlantic Salmon Unlimited.  224 pp.

Baumgartner, M.F. and B.R. Mate. 2003. Summertime foraging ecology of North Atlantic right whales. Mar. Ecol. Prog. Ser. 264: 123–135.

Baumgartner, M.F., T.V.N. Cole, R.G. Campbell, G.J. Teegarden and E.G. Durbin. 2003. Associations between North Atlantic right whales and their prey, *Calanus finmarchicus*, over diel and tidal time scales. Mar. Ecol. Prog. Ser. 264: 155–166.

Beardsall, J.W., M. F. McLean, S. J. Cooke, B. C. Wilson, M. J. Dadswell, A. M. Redden, and M. J. W. Stokesbury. 2013. Consequences of Incidental Otter Trawl Capture on Survival and Physiological Condition of Threatened Atlantic Sturgeon. Transactions of the American Fisheries Society 142:1202–1214.

Blumenthal, J.M., J.L. Solomon, C.D. Bell, T.J. Austin, G. Ebanks-Petrie, M.S. Coyne, A.C. Broderick, and B.J. Godley.  2006.  Satellite tracking highlights the need for international cooperation in marine turtle management.  Endangered Species Research 2:51-61.

_0000017346

# Appendix 4

**Monitoring Cost Estimates for the Industry-Funded Monitoring Omnibus Amendment**

*NMFS Costs for NEFOP-level observers, at-sea monitors and dockside monitors.*  Based on fiscal year 2013 expenses, Table 1 shows the level of costs required to support the deployment of all Northeast Region at-sea monitoring programs, including NEFOP observers, and groundfish at-sea monitors, and the scallop industry-funded monitoring program.  These are presented as annual costs because while some components can be scaled up proportional to an increase in the total number of sea days, many cannot be scaled proportionally.  For example, an increase in observer days would increase the number of hours needed to process data and that need could be met by hiring additional data processing personnel (proportional to the increased need).   However, the facilities (particularly office space) needed to accommodate the additional data processing personnel is not proportionally scalable.  The approximately $5 million of NMFS costs, detailed below, supported 10,666 sea days in FY 2013, but could support about a maximum of 15,000 sea days per year.  The currently leased facilities could accommodate additional personnel to support an additional 2,000 sea days.  However, beyond that, new facilities cost would have to be incurred.  Facility costs cannot be obtained in small increments, so if sea days beyond 17,000 are considered, new facilities would have to be obtained so that there is sufficient capacity to cover the upper end of any anticipated increase.  NMFS costs for dockside monitoring programs are likely similar to the costs described in this annual estimate.

The operational costs are presented as a single figure and are not broken out by each of the three components because there is some overlap, particularly when allocating employees' time over these activities.

**Table 1. NMFS Cost Responsibilities for monitoring**

| NMFS Cost Responsibilities | | Annual Cost (FY2013) for all Programs (NEFOP, ASM, and industry funded scallops) |
|---|---|---|
| **Training and Data Processing Costs** | The labor and facilities costs associated with training and debriefing of monitors | $805,700 |
| | Data processing | $2,057,100 |
| **Operational Costs** | Certification of monitoring providers and individual monitors; performance monitoring to maintain certifications | $2,244,700 |
| | Developing and executing vessel selection | |

_0000017428

| NMFS Cost Responsibilities | | Annual Cost (FY2013) for all Programs (NEFOP, ASM, and industry funded scallops) |
|---|---|---|
| | Costs associated with liaison activities between service providers, NMFS, Councils, sectors and other partners | |
| **Total** | | $5,107,500 |

The groundfish electronic monitoring cost comparison report estimates NMFS costs for the groundfish at-sea monitoring program for fiscal year 2014 costs. In fiscal year 2014, NMFS spent an estimated $531,953 on training, $626,043 on data processing, and $719,548 on program management for the groundfish at-sea monitoring program for a total cost of $1,877,544 (Table 2).  This total cost is divided by the number of at-sea monitor sea days accomplished in 2014 (3,541 days) to get a per sea day administrative costs of $530 (Table 2).

**Table 13:  Annual At-Sea Monitoring Costs for NOAA Fisheries**

| | Estimated Cost | |
|---|---|---|
| Program Component | **Total** | **Per Sea Day** |
| **Training** | $531,953 | $150 |
| **Data Processing** | $626,043 | $177 |
| **Program Management** | $719,548 | $203 |
| **Total** | $1,877,544 | $530 |

*NMFS cost responsibilities for electronic monitoring.*  In this section, we estimate NMFS costs for administering the example EM programs for groundfish sectors (audit approach) and the midwater trawl fleet (optimized/full retention approach) based on the roles and responsibilities described above.  The reader should note that generalized descriptions for industry costs for electronic monitoring programs presented in this section were derived separately and differently than the NMFS costs presented here.

Many of the costs to NMFS for administering the example EM program would be driven by the scale of the program and the level of participation, although these costs do not necessarily increase linearly with the amount of sea days.  Thus, we present a range of potential NMFS costs from overseeing an audit approach EM program for a single hypothetical sector (20 vessels) to a program for the entire active groundfish fleet (400 vessels), and for an optimized/full retention approach EM program for an example midwater trawl fleet (9 vessels).  We based NMFS costs for the EM program on costs the Northeast

_0000017429

Fishery Observer Program incurred for administering programs with similar roles and responsibilities and from the New England EM Project (Archipelago, 2014).  These are rough estimates of NMFS potential costs and, unlike the NEFOP-level observer/at-sea monitoring program costs presented in the section above, may not reflect efficiencies or economies of scale that are possible in a mature program. NMFS would also have other incremental costs for enforcement and use of the data for management, which were not estimated here in order to be consistent with the estimates of the NEFOP-level observer/at-sea monitoring program.

In Table 3, training costs include labor and costs of licenses for any proprietary EM review software.  The number of annual trainings that would need to be held and, hence, the number of trainers, would depend on the number of EM reviewers employed by the service providers, which would depend on the number and activity levels of vessels using EM in the fishery.  For the audit model, training costs do not increase linearly.  Although the number of participants increases by a factor of 20 when scaling up from 20 vessels to a fleet-wide program, the training costs increase by a factor of 8.  This type of relationship makes it difficult to estimate costs at a unit that is easily multiplied (e.g., sea day cost).  For the optimized/full retention model, although the example fleet includes only 9 midwater trawlers, there is a large amount of video footage to be reviewed, due to a high number of assumed trips (500) and the assumed rate of video review (100 percent) used in the analysis.  This much video footage may require a larger cadre of EM reviewers than the number of vessels might indicate, also increasing demand for training and certifications and NMFS's training costs.

NMFS may also have some costs for reviewing and approving individual Vessel Monitoring Plans (VMPs), which are each vessels individualized plans for equipment specifications, installation, and catch handling, and inspecting equipment installation on the vessel.  Annual labor and travel associated with this activity is estimated at $15,500 for 9 vessels, $31,000 for 20 vessels and $232,500-$310,000 for 400 vessels.

For the audit model, NMFS costs for auditing the service provider's review of logbooks were estimated to be $46,795 for 20 vessels and $432,405-$525,905 for 400 vessels (Table 3), assuming NOAA Fisheries audits 5 percent of trips.  These costs include staff time and licenses for proprietary EM review software. Use of open source software would negate the cost of software licenses in this category.   For the optimized full retention model, the staff time and equipment costs to conduct periodic video reviews to audit the service providers are estimated at $26,295, assuming 5 percent of trips are audited.

Program management cost is labor for a program manager, which is necessary to administer the new program, liaise with the service providers, vessel, and enforcement, and coordinate staff.   Program management cost is estimated at $86,000 annually, irrespective of the number of vessels participating in the program.

Not included in these cost estimates is the cost of storing any EM data submitted by the service providers or sectors.  NMFS data storage costs would be driven by record-keeping and security

_0000017430

requirements for EM data, which NMFS is still working to determine.   Alternately, NMFS may be able to get remote access to EM data and video stored by the provider, and reduce or eliminate its data storage costs (Van Oyen, pers. comm., 2014).

**Table 3:  nmfs cost responsibilities for electronic monitoring programs**

| | Estimated NMFS Cost Responsibilities for Audit and Optimized/Full Retention EM program models | | |
|---|---|---|---|
| | Audit Model | | Optimized/Full Retention Model |
| Program Component | 20 vessels | 400 vessels | 9 vessels |
| EM Reviewer Training | $25,000 | $187,500 - $250,000 | $12,500 |
| VMP Approval, Inspections | $31,000 | $232,500 - $310,000 | $15,500 |
| EM Review Audit | $46,795 | $423,405 - $525,905 | $26,295 |
| Program Management | $86,000 | $86,000 | $86,000 |
| Total | $188,795 | $929,405 - $1,171,905 | $140,295 |

*Industry Costs for NEFOP-level observers and FMP-specific at-sea monitors.*  The industry cost responsibilities are presented as costs per sea day because these costs are, for the most part, proportionally scalable to the number of sea days.  These per day costs by cost component are shown in the tables below.  This per day cost estimate does not include "Other costs of the provider to meet performance standards laid out by a fishery management plan" because those costs will not be known until the details are made explicit in subsequent management plans.  These costs are based on the period from October 2012 through May 2014 and are averaged across the three service providers.

_0000017431

**Table 4. Industry Cost Responsibilities for NEFOP and At-Sea monitoring**

| Industry Cost Responsibilities | NEFOP-level observer cost per observed sea day (FY2013) | Fishery Specific At-sea monitoring cost per sea day |
|---|---|---|
| Costs to the provider for deployments and sampling (e.g., travel and salary for observer deployments and debriefing) | Sea day charges paid to providers: $640/day<br><br>Travel: $71/day<br><br>Meals: $22/day<br><br>Other non-sea day charges: $12/day | Sea day charge paid to providers: $561/day<br><br>Travel: $67/day<br><br>Meals: $18/day<br><br>Other non-sea day charges: $14/day |
| Equipment, as specified by NMFS, to the extent not provided by NMFS | $11/day | |
| Costs to the provider for observer time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time. | $1/day | |
| Provider overhead and project management costs not included in sea day charges above (e.g., per diem costs for trainees) | Training: $61/day | Training: $50/day |
| Other costs of the provider to meet performance standards laid out by a fishery management plan | TBD – won't know these costs until an industry funded observer coverage program is implemented in a fishery | TBD – won't know these costs until an industry funded observer coverage program is implemented in a fishery |
| Total (not including other costs) | $818/day | $710/day |

Additional estimates for industry contributions for NEFOP-level observer coverage and the groundfish at-sea monitoring program were provided in the Fisheries Monitoring Roadmap (Lowman et al., 2013). This report based the estimated costs on the 2011 fiscal year. For 2011, the industry cost for NEFOP-level coverage was estimated at $917 per sea day, and the industry cost groundfish at-sea monitoring

_0000017432

was estimated at $847 per sea day.  These additional estimates are provided to highlight the inter-annual variability in the sea day estimate for NMFS and industry costs, as outlined in the introduction (Section 1.0).

*Industry cost responsibilities for dockside monitoring*.  The industry costs of a dockside monitoring program are generally broken into several components:  Program management and overhead costs of the provider company; travel costs for the monitor to travel from home or office to offload port, for non-principle ports; and hourly salary for the monitor, including, in some instances, waiting time at the dock.

A number of example industry costs for dockside monitoring are presented below.  Dockside monitoring costs can be represented in three ways: 1) as a cost per sea day; 2) as a cost per landing event; and 3) as a cost per pound landed.  The paragraphs below will discuss the different available estimates of dockside monitoring costs using each of these representations, and the pros and cons of each representation.

- Cost per sea day – This document uses a cost estimate of $106 per sea day based on publicized estimates for other dockside monitoring programs.   In particular, the estimate is influenced by the industry costs for the NE Multispecies dockside monitoring program. The Fisheries Monitoring Roadmap (Lowman et al., 2013) provides per sea day rates of $51 and $82 for dockside monitoring for the British Columbia Hook and Line Groundfish fishery and the Pacific Groundfish (non-whiting) IFQ fishery, respectively.  The "cost per sea day" representation makes the cost of dockside monitoring easy to compare against industry costs for at-sea and electronic monitoring.  However, this representation of dockside monitoring costs implies that costs scale linearly with trip length, which does not accurately represent dockside monitoring costs.  For example, if we assume the cost for monitoring is $106 per sea day, then a 3 day trip would cost $318 and 10 day trip would cost $1,060 to monitor.  However, a 10-day trip could come back with its hold only half full with fish, or a 3-day trip could come back with a full hold.  In this example, the 3-day trip with the full hold would actually cost more to monitor than the 10-day trip.
- Cost per landing event - The average cost per landing event for the NE Multispecies groundfish dockside monitoring program ranged from $36.87-$212.32 for all sectors. Though this range is a more accurate representation of costs than the cost per sea day representations, it is not easy to compare against industry costs for at-sea and electronic monitoring.
- Cost per pound of fish landed – The analysis assumes the cost per pound landed for each specific FMP is the most accurate way to represent the potential industry costs for monitoring.  The average cost per pound of groundfish landed for the NE Multispecies groundfish dockside monitoring program range ranged from $0.006-$0.12 per pound for all sectors.  The average cost per pound landed and per trip is inversely related to the average pounds landed – that is, larger trips are less expensive to monitor, by pound, than

_0000017433

smaller trips.  This was due to several factors, including that larger trips typically landed in a principle port (no roving monitor required and, depending on the location, no travel costs) and much of the cost of providing a monitor is fixed, due to the logistics of having monitors present while vessels land their catch (e.g., insurance, administrative costs).  The analysis uses estimated a cost of $0.002 per pound of herring landed, based on state dockside monitoring programs for herring, to analyze the economic impacts of Herring Alternative 2.3 and 2.4 and Mackerel Alternative 2.3 and 2.4.

*Industry cost responsibilities for electronic monitoring.*  Portions of the discussion that follows were originally included in the March 2015 version of the Environmental Assessment for the Omnibus Standardized Bycatch Reporting Methodology Amendment.   The description of costs and costs responsibilities below is generalized to encompass a range of potential program designs.

The economic impacts associated with the alternative to implement an electronic video monitoring program for one or more fisheries in the Greater Atlantic Region are derived directly from the expected costs to purchase, install, and maintain the electronic monitoring systems.  Industry would be required to purchase, install, and maintain the electronic monitoring equipment aboard their vessels.

Based on cost estimates as of May 2006, it is likely that the cost to purchase a complete electronic video monitoring system would be approximately $7,200 per vessel (Archipelago Marine Research, Ltd. 2006).[1, 2]  Installation costs are highly variable and depend upon the size of the vessel, the number of cameras to be installed, and other complicating factors such as the need to retrofit the vessel to support the installation of the equipment.  Kinsolving (2006) estimates installation costs as ranging from $650 to $4,225 per vessel, based on a service rate of $65 per hour and the installation time ranging from 10 hours to as many as 65 hours per vessel, depending on the aforementioned complexity.  In addition to the cost to purchase and install a system, it is expected that an annual registration fee would be required by the contractor providing the equipment and this is estimated to be approximately $600 per year.  Maintenance costs would be expected to vary, but for the purposes of analysis, Kinsolving's (2006) estimate of $975 per year is used.  The total first year costs would be approximately $10,200 per vessel, with continuing costs of approximately $1,600 per vessel per year for the second year and beyond .

---

[1] Archipelago Marine Research, Ltd. (2006), identifies the costs to purchase, install, and maintain a complete electronic monitoring system.  While this fee schedule is focused on the British Columbia groundfish longline fisheries, the costs identified are presumed to be transferable to other fisheries.  Published costs in Canadian dollars were converted to U.S. dollars based on the published exchange rate for September 7, 2006.

[2] Kinsolving (2006) also provides estimates of the cost to purchase a complete electronic monitoring system, ranging from $4,250, if off-the-shelf components are used, to $8,000 if a package system is purchased from an approved contractor.  For the purposes of this analysis, the costs published by Archipelago Marine Research, Ltd. (2006), were used to simplify the analysis and to clearly identify the source of the costs used.

_0000017434

**Table 5. Estimated costs per fishing vessel to purchase, install, and maintain an electronic video monitoring system (Archipelago Marine Research, Ltd. 2006; Kinsolving 2006).**

|  | Year 1 (per vessel) | Year 2+ (per vessel) |
|---|---|---|
| Equipment purchase | $7,194 | N/A |
| Installation costs (average) | $2,438 | N/A |
| Annual program registration fee | $608 | $608 |
| Annual maintenance | N/A | $975 |
| **Total** | **$10,240** | **$1,583** |

The information presented above and in **Error! Reference source not found.** provide an estimate of the per vessel costs of implementing an industry-funded electronic monitoring requirement.  The next step is to estimate the number of affected vessels within the fisheries for which this alternative would be considered.

The costs discussed above address only the purchase, installation, and annual maintenance of the electronic video monitoring systems, but do not address the costs associated with extracting the data from the video recording systems, or storing, maintaining, editing, and reviewing the data.

Agency or contractor personnel would be required to obtain the video data from fishing vessels (either through dockside extraction or a mail-in hard drive exchange program), to review the video footage in order to document discard events, to oversee and perform quality control on the extracted data, and to archive and maintain the data.  Video reviewing and data archiving equipment would also be required. Kinsolving (2006) estimates that data storage systems would be required to support approximately 20 terabytes of data per year, but this was an estimate solely for the Pacific rockfish pilot program, which has a fleet of approximately 25 vessels (consolidating to 18 active vessels) that make an average of seven fishing trips per year, with trips averaging 3 days each.  Therefore, extrapolating to determine the data storage needs were this program implemented in the Greater Atlantic Region would most likely be orders of magnitude greater.

*Potential Industry Cost Saving with Electronic Monitoring and Portside Monitoring.*  For both electronic monitoring and portside monitoring it is difficult to predict whether and/or how costs may change if industry is contracting directly with providers (versus the federal government contracting with providers).  General program overhead/management is a substantial part of the costs and it is difficult to know whether these costs will be reduced when industry is contracting with providers, and if so how much.  Based on the amount of coverage/monitoring several potential cost savings have been identified however, as described below.  It is also important to remember that all of these cost figures (including the original values) are estimates, and may be higher or lower than actual costs once implemented.

_0000017435

Electronic Monitoring

Based on "A Cost Comparison of At-Sea Observers and Electronic Monitoring fora Hypothetical Midwater Trawl Herring/Mackerel Fishery."
https://www.greateratlantic.fisheries.noaa.gov/stories/2015/september/em_cost_assessment_for_gar_herring_150904_v6.pdf

100% recording, 100% Review: **_$325_**

Haulback Recording Only, 100% Review: $**_248_** - Reduction: $78 of the $160 data services cost (49%). [(325 − (.49*160)) = (325 − 78) = $248].  $82 of data services costs remaining.

Haulback Recording Only, 50% Review: **_$218_** - $61 is the cost for haulback review, so if only half of the trips are reviewed, this would save about another $30.  [(248 − (61/2)) = (248 − 30.5) = $218]

Field Services are $78/day, and "Field services costs are largely driven by the frequency of hard drive retrievals from the vessel, and the associated travel and labor costs."  "Repair and technical support needs also drive field services costs."  However, the document also states that repair and technical support costs were low because it was believed that minor problems could be addressed during data retrieval.  If 25% of costs were repair and technical support but this amount doubled due to additional single purpose technical support trips, an overall 40% savings from mailing hard drives appears reasonable.  40% of $78 = $31.  Saving $31 would reduce the overall cost to around **_$187_** per seaday. [(218 − 31) = $187]

Portside Monitoring

The Portside Monitoring cost estimate is $5.12/mt, but this includes administration costs that have been borne by the State of Massachusetts, and could be paid for by NMFS (subject to funds available to run such a program).  For NEFOP observers, the administrative cost for NMFS is approximately 37% ($479 NMFS cost $818 at-sea industry cost - http://s3.amazonaws.com/nefmc/150929-NEFMC-Meeting-Presentation-without-notes.pdf, slide 32).  If one assumes that 25% or 33% of these costs would not be directed at vessels (conservatively less than 37%), the cost for vessels per mt would be $3.84/mt and $3.41/mt respectively.

If only 50% of trips were sampled, while any particular trip might still have to pay $3.84/mt or $3.41/mt, over the course of a year it should reduce average costs to $1.92/mt or $1.71/mt.  The table below describes the total costs for trips landing different amounts of fish, and daily costs assuming a 3-day trip.

|  | 25% Admin | | 33% Admin | |
|---|---|---|---|---|
| Full Cost | $5.12 | Per day cost | $5.12 | Per day cost |
| Cost less Admin | $3.84 | with 3/day | $3.41 | with 3/day |
| 50% Coverage | $1.92 | trip | $1.71 | trip |
| 100 mt trip cost | $192 | $64 | $171 | $57 |
| 200 mt trip cost | $384 | $128 | $341 | $114 |
| 300 mt trip cost | $576 | $192 | $512 | $171 |
| 400 mt trip cost | $768 | $256 | $683 | $228 |

Appendix 4 – Monitoring Cost Estimates                                          December 2018

Table 6 summarizes the ways that sea day costs can be minimized reduced in an industry-funded monitoring program.  The discussion provided in Table 6 was generated from information provided by NEFOP personnel, observers, and representatives from service providers in the northeast and west coast.  To the extent that the issues identified in Table 6 can be addressed through the management measures that establish/implement the IFM program, sea day costs borne by the fishing industry can be reduced.

_0000017437

**Table 6  Summary Discussion – How to Reduce Sea Day Costs**

| How to Reduce Sea Day Costs | Discussion/Rationale |
|---|---|
| **Build from existing observer sampling protocols; do not require new/different data to be collected** | • Collecting data in a new/different way will require modifications to existing observer sampling protocols and training procedures, new/revised manuals/logs, possibly new/additional sampling equipment, and database design or restructure; this could increase administrative and training costs |
| **Eliminate SCA and related regulatory requirements for Federal contracts** | • Federal requirements for wage structure/overtime/paid holidays/vacation are not necessary for contracts between vessels/providers; without specifically implementing these requirements as part of the IFM regulations, wage structure and benefits for employees would be determined by individual service provider companies; MRAG report (June 2012) estimates that eliminating these requirements may reduce costs by $50-$100 per sea day;<br><br>• FLSA and other Federal labor laws would still apply to service provider companies; however, eliminating the SCA requirements from IFM regulations is likely to result in some reduction in sea day cost;<br><br>• Not likely to result in $100 per sea day cost savings in this region due to existing pay structure/benefits for observers required by Federal contracts |
| **"Grandfather in" current service providers approved for NEFOP observer coverage and GF ASM programs – approve these providers immediately for any new, fishery-specific ASM program** | • Reduces expense of applying/re-approving service provider companies already approved for other programs in the region; observers/monitors for approved service providers would still need to be certified for existing monitoring programs to participate as fishery-specific at-sea monitors;<br><br>• Allows vessels to select from multiple service providers when program is established; increases negotiating opportunities for vessels at onset of program by creating competition between companies;<br><br>• Provides opportunity for existing service providers to offer more work days to their observers (could reduce staff/overhead expenses for both programs) |
| **Allow cross-certification of NEFOP and GF ASM observers for new, fishery-specific ASM programs; combine/overlap training and recertification whenever possible** | • Cross-training and applying training courses to multiple certifications reduces training costs (travel, hotel, per diem for service providers);<br><br>• Reduces equipment costs for service providers – no need to purchase duplicative equipment<br><br>• As previously noted, this may reduce overhead costs for service providers by providing their observers with a greater number of days to work (improving ability for service providers to retain full-time employees) |

_0000017438

**Table 6 continued.  Summary Discussion – How to Reduce Sea Day Costs**

| How to Reduce Sea Day Costs | Discussion/Rationale |
|---|---|
| **Provide detailed information about fishing patterns for vessels participating in the industry-funded monitoring program** | • Allows providers to more accurately estimate manpower/resources needed, logistics, overhead, and travel costs - reduces need for providers to over-estimate these costs to cover expenses that cannot be predicted prior to the start of the year;<br><br>• Increases predictability of fishery for observer/monitor deployment;<br><br>• Increases efficiency for service providers |
| **Minimize observer deployment logistics** | • Simplifying the selection process for vessels/trips that require industry-funded observers/monitors reduces costs for service providers because vessel selection/notification would not require additional staff or resources |
| **Allow industry to negotiate less significant costs with providers** | • Structure the provisions in the industry-funded monitoring program to allow the industry to negotiate as many minor costs as possible with service providers, to better meet their individual vessel needs circumstances;<br><br>• These may include costs for trip cancellations and no-shows, meal reimbursements, partial day/hourly billing (see below), land-hour rates (if necessary), or other costs |
| **Encourage service providers/industry to negotiate billing by partial days (versus 24 hour days)** | • Sea scallop regulations 648.11(g)(5)(i)(A)(2) state that "For the purposes of determining a daily rate…a service provider may charge a vessel owner for not more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where a day is defined as a 24-hour period, and portions of other days would be pro-rated at an hourly charge."<br><br>• Industry participants should be aware that this can be negotiated in contracts with providers; may be an opportunity to reduce sea day costs for some vessels depending on fishing operations;<br><br>• Consideration should be given to the possibility of land hour time for observers/monitors, which may be necessary if days are billed partially or by the hour |
| **Allow observers to be deployed on the same vessel for more than two consecutive multi-day trips, and more than twice in any given month for multi-day deployments** | • Prohibited in current regulations for industry-funded observer coverage, implemented in SBRM amendment<br><br>• Increases flexibility and reduces travel costs for service providers; appears to be consistent with regulations for Groundfish ASM |

**Table 6 continued.  Summary Discussion – How to Reduce Sea Day Costs**

| How to Reduce Sea Day Costs | Discussion/Rationale |
|---|---|
| **Encourage vessels in close proximity to negotiate contracts together so that they can utilize the same observers and minimize travel expenses** | • Industry can reduce costs by collaborating with vessels that fish from same ports and/or during same seasons to reduce travel and related costs for observers/monitors |
| **Streamline debriefing and re-certification requirements** | • Reduces costs to service providers (travel/per diem) |
| **Insurance** | • There may be ways to reduce/streamline insurance requirements to reduce costs for providers.  To the extent that duplicative or redundant insurance requirements can be eliminated, costs can be reduced.  This issue requires further investigation. |
| **Combine the IFM programs for multiple fisheries, when appropriate** | • Would reduce complexity (PTNS, deployment, travel) and increase efficiency for service providers; increases number of sea days for amortizing travel/training expenses over the year;<br><br>• Could increase the total number of work days available for ASM-certified observers/monitors and may reduce staff/overhead costs for service providers |

*Cost drivers for electronic monitoring.*  There are a number of variables in the design of an electronic monitoring program.  The text below briefly summarizes some of the program specifications related to data submission, video review, video audit, and data storage that can reduce the industry contribution for electronic monitoring programs.

Data Submission
•
  • Allow the hard drives that store EM footage to be submitted by mail, rather than requiring them to be retrieved by a technician.
  • For fisheries that have dockside monitoring programs in addition to EM, consider having dockside monitor retrieve/transmit hard drives.
•
Video Review

  • Design a random sampling program to select trips or portions of trips (i.e., around haulback on herring and mackerel trips) from which video would be reviewed.
  • For audit approaches, specify an assumed discard rate in lieu of additional video review in the instances where the EM validation fails.
  • Documentation of discards at the species level, including identifying and counting the fish and measuring the length of the fish, for only a few species of interest (e.g., only species in the NE multispecies complex on groundfish trips).
  • Software solutions may be able to automate review of portions of video footage.

_0000017440

Data storage

- Allow video data to be stored in the "cloud" (as permitted within security and data confidentiality regulations).
- Determine the lowest possible frame rate and image resolution necessary to document the activity of interest for the EM program. Slow activities such as identifying large objects in a pile of fish being sorted, requires more frames per second. The higher the frame rate, the more likely it is that the camera will capture detailed information. Similarly, identifying fish to species requires higher resolution than verifying when fishing gear is deployed. Higher frame rate and resolution results in larger video files and requires additional storage requirements.

_0000017441

# Appendix 5

**ATLANTIC HERRING ALTERNATIVE ECONOMIC IMPACTS ON HERRING FISHING BUSINESSES**

Impact Analysis Methods

Four types of industry-funded monitoring for the herring fishery are being considered: Northeast Fisheries Observer Program (NEFOP) level observer, at-sea monitor (ASM), Electronic Monitoring (EM), and portside sampling (PS) coverage.  NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

## MONITORING COSTS TO INDUSTRY

| Types of Monitoring | NEFOP-Level Observer | At-Sea Monitor | Electronic Monitoring | Portside Sampling |
|---|---|---|---|---|
| **Industry Cost Responsibility** | $818 per seaday | $710 per seaday | Year 1: $15,000 one-time set up cost then $325 (also $187) per seaday<br>Year 2:  $325 (also $187) per seaday | $0.0023 per lb ($5.12 per mt) and at $0.00174 per lb ($3.84 per mt) |

Trips that occurred in 2014 were used to estimate the likely future impacts of the herring alternatives. This is the most recent year for which data is available and 2014 activity should represent what is likely to occur in future years in terms of the vessels participating in the fishery, the condition of the stock, the regulatory environment, and fishing methods. Each alternative has different criteria for defining which types of trips would be monitored (based on permit type, gear used, etc.). Trips from 2014 that met these criteria were evaluated in terms of how the monitoring costs impacted annual returns to owner (see below for description of how return-to-owner (RTO) was calculated). If an alternative specified 100% coverage, then the monitoring costs that would have been paid for all trips occurring in 2014 were calculated and assessed in terms of impacts to RTO. For alternatives that have options with less than 100% coverage, trips from the pool of 2014 trips were randomly selected until the coverage target was met. This was repeated 1,000 times for each trip selection simulation. Mean annual ASM/NEFOP costs per vessel are then calculated from the simulated trip selections.

 Vessels were assigned a major gear type based on the gear that earned the greatest revenue (from all species landed) among the trips selected for evaluation (according to the criteria in the alternative). It is not necessarily the major gear for the year for a particular vessel.

In the tables, any information that pertains to amounts of revenue from various species and numbers of days at sea and trips are for the trips that met the criteria under each of the alternatives only, not for the year.

_0000017442

Return-to-Owner

A previous analysis of economic impacts of herring and mackerel coverage target alternatives was based on trip cost data collected by the NEFOP and showed the economic impact of the alternatives on vessel net revenues (gross revenues less trip costs).  Because NEFOP only collects a limited amount of cost data, industry participants expressed concern that net revenue estimates used in the previous economic analysis underestimated vessel costs.  In response, Jason Didden, staff of the Mid-Atlantic Council, offered to survey herring and mackerel vessels to collect more detailed cost information.

The survey requested information from vessel owners on total trip costs in 2014.  The cost survey collected information on variable trip costs, the cost of repairs/maintenance/upgrades/haulout, fixed costs, and payments to crew.  These data were used to update the impact analyses. If the vessel owner completed a survey then that vessel's actual costs were used in the analysis. Otherwise, respondent data were used to project costs on other vessels that did not provide a survey response. To do this, responses from the surveys were categorized by the annual primary species caught based on value. Two categories were used: herring/mackerel vessels and squid vessels. For each of these vessel types, costs were assigned into one of four categories: variable costs, crew share, repair/maint/upgrades/haulout, and fixed costs. Average percentages of annual gross revenue by cost category and vessel type were used to estimate costs for vessels that did not have survey data. See table below for cost category descriptions and average percentages of gross revenue.

Surveys were sent to approximately 18 vessel owners (representing about 26 vessels) in the herring and/or mackerel fisheries.  Surveys were sent in May 2015 and information was submitted for 16 of the 26 vessels.

_0000017443

| Cost category | Description | Average percent of gross revenue | |
|---|---|---|---|
| | | Herring/ mackerel vessels | Squid vessels |
| **Variable costs** | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| **Crew share** | Total annual payments to crew | 28% | 26% |
| **Repair/ maintenance/ upgrades/ haulout (RMUH)** | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, and safety equipment. Includes haulout costs.<br><br>Because these costs vary considerably from year to year and upgrade costs were combined with repair/maintenance costs, half of these costs were amortized over 7 years. | 13% | 11% |
| **Fixed costs** | Annual mooring/dockage, permits/licenses, insurance, quota/DAS lease, crew benefits, vessel monitoring, workshop/storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs.<br><br>Note: principal payments on business loans are not included in fixed costs. | 19% | 21% |
| **Return to Owner (RTO)** | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

Major Findings

Across the vessel types examined, the paired MWT vessels have the highest monitoring costs as a percentage of RTO. This is due to the fact that these vessels have, on average, more sea days that would have monitoring costs than the other vessel types.

There are differences among vessel types in terms of the sources of revenue that would be used to pay for monitoring costs. For example, for SMBT vessels, half of their revenue comes from herring and the other half from other species. What this means is that for monitoring that is required for the herring fishery, other non-herring sources of revenue must be used to cover the herring related costs. A metric for evaluating these differences is monitoring cost as a percent of herring revenue. For SMBT monitoring costs as a percent of herring revenue are higher than for other vessel types.

Exempting trips less than 25 mt of herring (Herring Alternative 2 Sub-Option 5) from industry-funded monitoring costs reduces the monitoring cost substantially in many cases. The degree of saving varies by gear type. Using Alternative 2.1

_0000017444

as an example, aggregate NEFOP costs decline by 48% for purse seine vessels ($320k to $166k). For paired midwater trawl vessels, the percentage difference (20%; $673k to $541k) is not as great.

For midwater trawl vessels, selecting Herring Alternatives 2.3 or 2.4 rather than Herring Alternative 2.2 results in about a 60% cost saving for paired midwater vessels in Year 2 and beyond and about a 45% cost saving for single midwater trawl vessels.

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811k to $75k – a 91% reduction.

Reducing EM costs from $325 to $187 per day and only monitoring half of the portside sampling trips at a rate of $3.84 per mt, as opposed to all trips at $5.12 per mt, reduces total monitoring costs by 51% for paired MWT vessels ($457,595 to $222,958) in year 2. For single MWT vessels, costs are reduced by 54% ($134,165 to $61,067).

_0000017445

Herring Alternative 2.1

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| **Annual Gross Revenue** | $1,338,354 | $704,254 | $1,364,372 | $920,296 | $1,026,390 | $1,179,521 | $1,875,233 | $1,505,034 |
| **Annual Variable Costs** | $318,252 | $167,769 | $330,865 | $233,767 | $284,996 | $267,061 | $594,112 | $412,374 |
| **Annual Crew Share** | $410,406 | $213,633 | $358,167 | $270,086 | $292,093 | $332,733 | $519,728 | $451,846 |
| **Annual Repair/Maint/Upgrade/Haulout** | $177,888 | $98,231 | $182,172 | $119,312 | $120,240 | $101,172 | $149,714 | $94,073 |
| **Annual Fixed Costs** | $268,728 | $172,799 | $251,988 | $177,397 | $187,892 | $200,926 | $467,553 | $476,899 |
| **Annual Return-to-owner** | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $144,125 | $113,903 |
| **Annual Cost of NEFOP** | $84,150 | $37,945 | $45,700 | $28,075 | $23,077 | $13,108 | $17,380 | $14,134 |
| **NEFOP as pct of RTO (median)** | 44.7% | | 13.9% | | 24.4% | | 11.5% | |
| **post-NEFOP RTO** | $78,930 | $77,928 | $195,480 | $159,212 | $118,091 | $352,542 | $126,745 | $110,764 |
| **Percent of Revenue from Herring** | 91.2% | 9.5% | 100.0% | 0.0% | 81.9% | 17.0% | 52.4% | 42.0% |
| **Percent of Revenue from Mackerel** | 13.9% | 8.2% | | | 19.4% | 17.0% | 2.6% | 4.1% |
| **Percent of Revenue from Squids** | | | | | | | 44.3% | 39.7% |
| **Percent of Revenue from Other Species** | 0.1% | 0.1% | | | 7.7% | 17.0% | 21.5% | 17.9% |
| **Average Number of Days at Sea** | 103 | 47 | 56 | 34 | 28 | 16 | 21 | 17 |
| **Average Number of Trips** | 34 | 16 | 64 | 37 | 22 | 20 | 11 | 16 |

_0000017446

Herring Alternative 2.1

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 9 |
| Total Days at Sea | 825 | 392 | 170 | 192 |
| Total Number of Trips | 275 | 451 | 129 | 103 |
| Total Herring Revenue | $9,409,389 | $11,042,232 | $3,842,873 | $1,483,242 |
| Total Mackerel Revenue | $1,155,588 | $225 | $570,246 | $97,806 |
| Total Squid Revenue | | | | $529,723 |
| Total Other Species Revenue | $5,906 | | $50,399 | $485,180 |
| Total Revenue | $10,570,883 | $11,042,457 | $4,463,518 | $2,595,951 |
| Total NEFOP Cost | $673,200 | $319,902 | $138,463 | $156,420 |
| NEFOP as pct of Total Revenue | 6.4% | 2.9% | 3.1% | 6.0% |
| NEFOP as pct of Herring Revenue | 7.2% | 2.9% | 3.6% | 10.5% |

_0000017447

Herring Alternative 2.1 – Sub Option 5

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $1,364,372 | $920,296 | $1,026,390 | $1,179,521 | $2,057,720 | $1,835,879 |
| Annual Variable Costs | $318,252 | $167,769 | $330,865 | $233,767 | $284,996 | $267,061 | $626,872 | $501,818 |
| Annual Crew Share | $410,406 | $213,633 | $358,167 | $270,086 | $292,093 | $332,733 | $583,258 | $550,531 |
| Annual Repair/Maint/Upgrade/Haulout | $177,888 | $98,231 | $182,172 | $119,312 | $120,240 | $101,172 | $141,508 | $110,893 |
| Annual Fixed Costs | $268,728 | $172,799 | $251,988 | $177,397 | $187,892 | $200,926 | $542,753 | $581,061 |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of NEFOP | $67,626 | $36,730 | $23,759 | $13,141 | $15,756 | $13,934 | $15,975 | $12,682 |
| NEFOP as pct of RTO (median) | 42.2% | | 10.4% | | 5.8% | | 14.2% | |
| post-NEFOP RTO | $95,454 | $72,095 | $217,421 | $153,564 | $125,412 | $351,076 | $147,354 | $135,976 |
| Percent of Revenue from Herring | 94.9% | 6.3% | 100.0% | 0.0% | 88.0% | 15.0% | 88.5% | 17.9% |
| Percent of Revenue from Mackerel | 8.1% | 6.1% | | | 19.5% | 17.1% | 2.1% | 1.3% |
| Percent of Revenue from Squids | | | | | | | 12.2% | 8.5% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 0.4% | 0.5% | 20.3% | 12.5% |
| Average Number of Days at Sea | 83 | 45 | 29 | 16 | 19 | 17 | 20 | 16 |
| Average Number of Trips | 28 | 15 | 46 | 29 | 12 | 15 | 10 | 12 |

Herring Alternative 2.1 – Sub Option 5

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 663 | 204 | 116 | 117 |
| Total Number of Trips | 221 | 320 | 73 | 59 |
| Total Herring Revenue | $9,152,836 | $10,263,855 | $3,606,269 | $1,352,045 |
| Total Mackerel Revenue | $657,345 | $225 | $570,246 | $28,633 |
| Total Squid Revenue | | | | $171,323 |
| Total Other Species Revenue | $4,109 | | $2,721 | $237,472 |
| Total Revenue | $9,814,290 | $10,264,080 | $4,179,236 | $1,789,473 |
| Total NEFOP Cost | $541,008 | $166,313 | $94,538 | $95,852 |
| NEFOP as pct of Total Revenue | 5.5% | 1.6% | 2.3% | 5.4% |
| NEFOP as pct of Herring Revenue | 5.9% | 1.6% | 2.6% | 7.1% |

Appendix 5 – Economic Impacts on Fishing Businesses                                                    December 2018

Herring Alternative 2.2 & 2.3 (100%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $1,364,372 | $920,296 | $1,026,390 | $1,179,521 | $1,875,233 | $1,505,034 |
| Annual Variable Costs | $318,252 | $167,769 | $330,865 | $233,767 | $284,996 | $267,061 | $594,112 | $412,374 |
| Annual Crew Share | $410,406 | $213,633 | $358,167 | $270,086 | $292,093 | $332,733 | $519,728 | $451,846 |
| Annual Repair/Maint/Upgrade/Haulout | $177,888 | $98,231 | $182,172 | $119,312 | $120,240 | $101,172 | $149,714 | $94,073 |
| Annual Fixed Costs | $268,728 | $172,799 | $251,988 | $177,397 | $187,892 | $200,926 | $467,553 | $476,899 |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $144,125 | $113,903 |
| Annual Cost of ASM | $73,219 | $33,016 | $39,764 | $24,428 | $20,079 | $11,405 | $15,122 | $12,298 |
| ASM as pct of RTO (median) | 38.9% | | 12.1% | | 21.3% | | 10.0% | |
| post-ASM RTO | $89,862 | $78,545 | $201,417 | $159,318 | $121,089 | $353,817 | $129,003 | $111,075 |
| Percent of Revenue from Herring | 91.2% | 9.5% | 100.0% | 0.0% | 81.9% | 17.0% | 52.4% | 42.0% |
| Percent of Revenue from Mackerel | 13.9% | 8.2% | 0.0% | | 19.4% | 17.0% | 2.6% | 4.1% |
| Percent of Revenue from Squids | | | | | | | 44.3% | 39.7% |
| Percent of Revenue from Other Species | 0.1% | 0.1% | | | 7.7% | 17.0% | 21.5% | 17.9% |
| Average Number of Days at Sea | 103 | 47 | 56 | 34 | 28 | 16 | 21 | 17 |
| Average Number of Trips | 34 | 16 | 64 | 37 | 22 | 20 | 11 | 16 |

Herring Alternative 2.2 & 2.3 (100%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 9 |
| Total Days at Sea | 825 | 392 | 170 | 192 |
| Total Number of Trips | 275 | 451 | 129 | 103 |
| Total Herring Revenue | $9,409,389 | $11,042,232 | $3,842,873 | $1,483,242 |
| Total Mackerel Revenue | $1,155,588 | $225 | $570,246 | $97,806 |
| Total Squid Revenue | | | | $529,723 |
| Total Other Species Revenue | $5,906 | | $50,399 | $485,180 |
| Total Revenue | $10,570,883 | $11,042,457 | $4,463,518 | $2,595,951 |
| Total ASM Cost | $585,750 | $278,346 | $120,477 | $136,100 |
| ASM as pct of Total Revenue | 5.5% | 2.5% | 2.7% | 5.2% |
| ASM as pct of Herring Revenue | 6.2% | 2.5% | 3.1% | 9.2% |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (100%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $1,364,372 | $920,296 | $1,026,390 | $1,179,521 | $2,057,720 | $1,835,879 |
| Annual Variable Costs | $318,252 | $167,769 | $330,865 | $233,767 | $284,996 | $267,061 | $626,872 | $501,818 |
| Annual Crew Share | $410,406 | $213,633 | $358,167 | $270,086 | $292,093 | $332,733 | $583,258 | $550,531 |
| Annual Repair/Maint/Upgrade/Haulout | $177,888 | $98,231 | $182,172 | $119,312 | $120,240 | $101,172 | $141,508 | $110,893 |
| Annual Fixed Costs | $268,728 | $172,799 | $251,988 | $177,397 | $187,892 | $200,926 | $542,753 | $581,061 |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of ASM | $58,841 | $31,959 | $20,673 | $11,434 | $13,710 | $12,124 | $13,900 | $11,034 |
| ASM as pct of RTO (median) | 36.7% | | 9.1% | | 5.1% | | 12.3% | |
| post-ASM RTO | $104,239 | $73,608 | $220,508 | $154,643 | $127,459 | $352,543 | $149,429 | $136,046 |
| Percent of Revenue from Herring | 94.9% | 6.3% | 100.0% | 0.0% | 88.0% | 15.0% | 88.5% | 17.9% |
| Percent of Revenue from Mackerel | 8.1% | 6.1% | 0.0% | | 19.5% | 17.1% | 2.1% | 1.3% |
| Percent of Revenue from Squids | | | | | | | 12.2% | 8.5% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 0.4% | 0.5% | 20.3% | 12.5% |
| Average Number of Days at Sea | 83 | 45 | 29 | 16 | 19 | 17 | 20 | 16 |
| Average Number of Trips | 28 | 15 | 46 | 29 | 12 | 15 | 10 | 12 |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (100%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 663 | 204 | 116 | 117 |
| Total Number of Trips | 221 | 320 | 73 | 59 |
| Total Herring Revenue | $9,152,836 | $10,263,855 | $3,606,269 | $1,352,045 |
| Total Mackerel Revenue | $657,345 | $225 | $570,246 | $28,633 |
| Total Squid Revenue | | | | $171,323 |
| Total Other Species Revenue | $4,109 | | $2,721 | $237,472 |
| Total Revenue | $9,814,290 | $10,264,080 | $4,179,236 | $1,789,473 |
| Total ASM Cost | $470,730 | $144,709 | $82,257 | $83,400 |
| ASM as pct of Total Revenue | 4.8% | 1.4% | 2.0% | 4.7% |
| ASM as pct of Herring Revenue | 5.1% | 1.4% | 2.3% | 6.2% |

Appendix 5 – Economic Impacts on Fishing Businesses                    December 2018

_0000017450

Herring Alternative 2.2 & 2.3 (75%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $144,125 | $113,903 |
| Annual Cost of ASM | $54,936 | $24,736 | $29,898 | $18,339 | $15,021 | $8,472 | $11,709 | $9,100 |
| ASM as pct of RTO (median) | 29.7% | | 9.1% | | 15.9% | | 7.5% | |
| post-ASM RTO | $108,144 | $80,253 | $211,282 | $159,725 | $126,148 | $356,073 | $132,416 | $111,831 |
| Percent of Revenue from Herring | 91.3% | 9.4% | 100.0% | 0.0% | 82.5% | 16.2% | 52.7% | 42.0% |
| Percent of Revenue from Mackerel | 13.8% | 8.0% | 0.0% | | 19.3% | 16.7% | 2.6% | 4.0% |
| Percent of Revenue from Squids | | | | | | | 44.3% | 39.8% |
| Percent of Revenue from Other Species | 0.1% | 0.1% | | | 7.5% | 16.5% | 22.6% | 19.1% |
| Average Number of Days at Sea | 77 | 35 | 42 | 26 | 21 | 12 | 16 | 13 |

Herring Alternative 2.2 & 2.3 (75%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 9 |
| Total Days at Sea | 619 | 295 | 127 | 148 |
| Total Herring Revenue | $7,069,090 | $8,301,401 | $2,870,099 | $1,106,513 |
| Total Mackerel Revenue | $865,766 | $225 | $436,137 | $73,907 |
| Total Squid Revenue | | | | $440,897 |
| Total Other Species Revenue | $4,749 | | $39,714 | $385,635 |
| Total Revenue | $7,939,606 | $8,301,626 | $3,345,950 | $2,006,952 |
| Total ASM Cost | $439,489 | $209,288 | $90,126 | $105,382 |
| ASM as pct of Total Revenue | 5.5% | 2.5% | 2.7% | 5.3% |
| ASM as pct of Herring Revenue | 6.2% | 2.5% | 3.1% | 9.5% |

_0000017451

Herring Alternative 2.2 & 2.3 – Sub Option 5 (75%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of ASM | $44,198 | $23,997 | $15,571 | $8,472 | $10,298 | $9,099 | $10,474 | $8,230 |
| ASM as pct of RTO (median) | 28.2% | | 6.8% | | 3.8% | | 9.4% | |
| post-ASM RTO | $118,882 | $76,712 | $225,610 | $156,562 | $130,870 | $354,992 | $152,855 | $136,065 |
| Percent of Revenue from Herring | 94.9% | 6.2% | 100.0% | 0.0% | 88.1% | 14.8% | 89.2% | 16.8% |
| Percent of Revenue from Mackerel | 8.7% | 6.0% | 0.0% | | 19.4% | 17.0% | 2.2% | 1.1% |
| Percent of Revenue from Squids | | | | | | | 11.8% | 8.4% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 0.5% | 0.8% | 19.6% | 11.3% |
| Average Number of Days at Sea | 62 | 34 | 22 | 12 | 15 | 13 | 15 | 12 |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (75%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 498 | 154 | 87 | 89 |
| Total Herring Revenue | $6,874,690 | $7,702,188 | $2,712,401 | $1,024,121 |
| Total Mackerel Revenue | $526,863 | $225 | $433,487 | $21,556 |
| Total Squid Revenue | | | | $130,869 |
| Total Other Species Revenue | $3,148 | | $2,345 | $190,706 |
| Total Revenue | $7,404,700 | $7,702,413 | $3,148,233 | $1,367,252 |
| Total ASM Cost | $353,586 | $108,996 | $61,791 | $62,845 |
| ASM as pct of Total Revenue | 4.8% | 1.4% | 2.0% | 4.6% |
| ASM as pct of Herring Revenue | 5.1% | 1.4% | 2.3% | 6.1% |

Herring Alternative 2.2 & 2.3 (50%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $163,080 | $241,180 | $241,180 | $141,169 | $141,169 | $144,125 | $144,125 |
| Annual Cost of ASM | $36,875 | $16,417 | $19,846 | $12,053 | $10,145 | $5,662 | $8,483 | $6,375 |
| ASM as pct of RTO (median) | 20.4% | | 6.0% | | 10.5% | | 5.4% | |
| post-ASM RTO | $126,205 | $82,980 | $221,334 | $160,394 | $131,024 | $358,152 | $135,643 | $112,417 |
| Percent of Revenue from Herring | 91.4% | 9.3% | 100.0% | 0.0% | 83.3% | 15.4% | 53.6% | 42.2% |
| Percent of Revenue from Mackerel | 14.1% | 8.0% | 0.0% | | 19.1% | 16.2% | 2.9% | 4.4% |
| Percent of Revenue from Squids | | | | | | | 44.5% | 39.8% |
| Percent of Revenue from Other Species | 0.1% | 0.2% | | | 8.2% | 17.9% | 24.7% | 21.7% |
| Average Number of Days at Sea | 52 | 23 | 28 | 17 | 14 | 8 | 12 | 9 |

Herring Alternative 2.2 & 2.3 (50%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 9 |
| Total Days at Sea | 415 | 196 | 86 | 108 |
| Total Herring Revenue | 4,732,456 | 5,510,474 | 1,943,001 | 748,019 |
| Total Mackerel Revenue | 591,520 | 225 | 310,908 | 56,804 |
| Total Squid Revenue | | | | 369,787 |
| Total Other Species Revenue | 3,503 | | 33,722 | 312,508 |
| Total Revenue | 5,327,480 | 5,510,699 | 2,287,630 | 1,487,117 |
| Total ASM Cost | $294,999 | $138,922 | $60,867 | $76,346 |
| ASM as pct of Total Revenue | 5.5% | 2.5% | 2.7% | 5.1% |
| ASM as pct of Herring Revenue | 6.2% | 2.5% | 3.1% | 10.2% |

_0000017453

Herring Alternative 2.2 & 2.3 – Sub Option 5 (50%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of ASM | $29,489 | $15,844 | $10,464 | $5,525 | $6,999 | $6,001 | $7,247 | $5,562 |
| ASM as pct of RTO (median) | 18.9% | | 4.5% | | 2.5% | | 6.4% | |
| post-ASM RTO | $133,591 | $80,718 | $230,716 | $158,500 | $134,170 | $357,624 | $156,082 | $136,133 |
| Percent of Revenue from Herring | 95.0% | 6.2% | 100.0% | 0.0% | 88.5% | 14.0% | 90.2% | 15.2% |
| Percent of Revenue from Mackerel | 10.3% | 6.6% | 0.0% | | 19.3% | 16.4% | 2.7% | 0.6% |
| Percent of Revenue from Squids | | | | | | | 11.2% | 7.8% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 0.8% | 1.3% | 20.1% | 9.6% |
| Average Number of Days at Sea | 42 | 22 | 15 | 8 | 10 | 8 | 10 | 8 |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (50%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 332 | 103 | 59 | 61 |
| Total Herring Revenue | $4,580,747 | $5,158,742 | $1,820,329 | $708,574 |
| Total Mackerel Revenue | $417,898 | $225 | $310,536 | $15,657 |
| Total Squid Revenue | | | | $95,931 |
| Total Other Species Revenue | $2,109 | | $2,117 | $159,514 |
| Total Revenue | $5,000,754 | $5,158,967 | $2,132,982 | $979,676 |
| Total ASM Cost | $235,915 | $73,250 | $41,994 | $43,482 |
| ASM as pct of Total Revenue | 4.7% | 1.4% | 2.0% | 4.4% |
| ASM as pct of Herring Revenue | 5.2% | 1.4% | 2.3% | 6.1% |

_0000017454

Herring Alternative 2.2 & 2.3 (25%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $144,125 | $113,903 |
| Annual Cost of ASM | $18,578 | $7,854 | $10,041 | $5,914 | $5,498 | $2,600 | $5,642 | $4,539 |
| ASM as pct of RTO (median) | 10.1% | | 3.0% | | 5.6% | | 3.5% | |
| post-ASM RTO | $144,503 | $86,107 | $231,139 | $161,277 | $135,671 | $360,600 | $138,483 | $112,951 |
| Percent of Revenue from Herring | 91.8% | 9.0% | 100.0% | 0.0% | 85.0% | 13.7% | 55.0% | 42.1% |
| Percent of Revenue from Mackerel | 16.3% | 8.9% | 0.1% | | 20.0% | 15.2% | 3.1% | 4.4% |
| Percent of Revenue from Squids | | | | | | | 44.6% | 39.8% |
| Percent of Revenue from Other Species | 0.2% | 0.4% | | | 9.0% | 19.4% | 27.6% | 26.7% |
| Average Number of Days at Sea | 26 | 11 | 14 | 8 | 8 | 4 | 8 | 6 |

Herring Alternative 2.2 & 2.3 (25%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 9 |
| Total Days at Sea | 209 | 99 | 46 | 72 |
| Total Herring Revenue | $2,394,688 | $2,774,156 | $981,948 | $448,402 |
| Total Mackerel Revenue | $357,710 | $225 | $213,945 | $39,547 |
| Total Squid Revenue | | | | $305,034 |
| Total Other Species Revenue | $2,470 | | $28,154 | $249,797 |
| Total Revenue | $2,754,868 | $2,774,381 | $1,224,046 | $1,042,780 |
| Total ASM Cost | $148,622 | $70,288 | $32,987 | $50,782 |
| ASM as pct of Total Revenue | 5.4% | 2.5% | 2.7% | 4.9% |
| ASM as pct of Herring Revenue | 6.2% | 2.5% | 3.4% | 11.3% |

_0000017455

Herring Alternative 2.2 & 2.3 – Sub Option 5 (25%) – ASM Coverage Only

| Per Vessel | Paired MWT | | Purse Seine | | Single MWT | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $241,180 | $162,152 | $141,169 | $362,448 | $163,329 | $137,021 |
| Annual Cost of ASM | $14,949 | $7,649 | $5,370 | $2,578 | $3,994 | $2,978 | $4,560 | $3,380 |
| ASM as pct of RTO (median) | 9.6% | | 2.2% | | 1.4% | | 3.8% | |
| post-ASM RTO | $148,131 | $85,224 | $235,811 | $160,535 | $137,175 | $360,395 | $158,769 | $136,042 |
| Percent of Revenue from Herring | 95.4% | 5.8% | 100.0% | 0.0% | 89.3% | 12.8% | 90.9% | 14.1% |
| Percent of Revenue from Mackerel | 15.5% | 9.9% | 0.1% | | 20.1% | 15.6% | 3.1% | 0.1% |
| Percent of Revenue from Squids | | | | | | | 11.0% | 7.2% |
| Percent of Revenue from Other Species | 0.0% | 0.1% | | | 1.3% | 2.0% | 21.7% | 8.6% |
| Average Number of Days at Sea | 21 | 11 | 8 | 4 | 6 | 4 | 6 | 5 |

Herring Alternative 2.2 & 2.3 – Sub Option 5 (25%) – ASM Coverage Only

| Fleet Level | Paired MWT | Purse Seine | Single MWT | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 7 | 6 | 6 |
| Total Days at Sea | 168 | 53 | 34 | 39 |
| Total Herring Revenue | $2,317,299 | $2,591,280 | $940,773 | $452,532 |
| Total Mackerel Revenue | $336,069 | $225 | $205,825 | $10,562 |
| Total Squid Revenue | | | | $68,202 |
| Total Other Species Revenue | $1,128 | | $1,920 | $135,106 |
| Total Revenue | $2,654,496 | $2,591,505 | $1,148,518 | $666,402 |
| Total ASM Cost | $119,591 | $37,587 | $23,964 | $27,358 |
| ASM as pct of Total Revenue | 4.5% | 1.5% | 2.1% | 4.1% |
| ASM as pct of Herring Revenue | 5.2% | 1.5% | 2.5% | 6.0% |

_0000017456

Herring Alternative 2.3 and 2.4 (100% EM at $325 per day, 100% PS at $5.12 per mt)

| Per Vessel | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $912,105 | $1,024,851 |
| Annual Variable Costs | $318,252 | $167,769 | $264,620 | $232,352 |
| Annual Crew Share | $410,406 | $213,633 | $239,242 | $297,854 |
| Annual Repair/Maint/Haulout | $177,888 | $98,231 | $110,742 | $90,131 |
| Annual Fixed Costs | $268,728 | $172,799 | $163,296 | $175,943 |
| Annual Return-to-owner | $163,080 | $89,827 | $134,205 | $310,157 |
| Annual Cost of EM - year 1 | $48,516 | $15,113 | $22,300 | $5,316 |
| Annual Cost of EM - year 2 | $33,516 | $15,113 | $7,300 | $5,316 |
| Annual Cost of PS | $23,684 | $15,503 | $9,471 | $16,229 |
| Total Monitoring Costs as pct of RTO - year 1 (median) | 42.2% | | 37.3% | |
| Total Monitoring Costs as pct of RTO - year 2 (median) | 29.1% | | 12.8% | |
| Post-monitoring RTO -- year 1 | $90,881 | $74,211 | $102,434 | $292,275 |
| Post-monitoring RTO -- year 2 | $105,881 | $74,211 | $117,434 | $292,275 |
| Percent of Revenue from Herring | 91.2% | 9.5% | 86.0% | 16.3% |
| Percent of Revenue from Mackerel | 13.9% | 8.2% | 15.5% | 17.1% |
| Percent of Revenue from Squids | | | 2.9% | |
| Percent of Revenue from Other Species | 0.1% | 0.1% | 6.4% | 15.5% |
| Average Number of Days at Sea | 103 | 47 | 23 | 17 |
| Average Number of Trips | 34 | 16 | 18 | 18 |

December 2018

_0000017457

Herring Alternative 2.3 and 2.4 (100% EM at $187 per day, 50% PS at $3.84 per mt)

| Per Vessel | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $134,205 | $310,157 |
| Annual Cost of EM - year 1 | $34,284 | $8,696 | $19,200 | $3,059 |
| Annual Cost of EM - year 2 | $19,284 | $8,696 | $4,200 | $3,059 |
| Annual Cost of PS | $8,585 | $5,620 | $3,433 | $5,883 |
| Total Monitoring Costs as pct of RTO - year 1 (median) | 25.1% | | 26.7% | |
| Total Monitoring Costs as pct of RTO - year 2 (median) | 14.4% | | 6.9% | |
| Post-monitoring RTO -- year 1 | $120,211 | $82,109 | $111,572 | $302,913 |
| Post-monitoring RTO -- year 2 | $135,211 | $82,109 | $126,572 | $302,913 |

Herring Alternative 2.3 and 2.4(100% EM at $325 per day, 100% PS at $5.12 per mt)

| Fleet Level | Paired MWT | Single MWT |
|---|---|---|
| Number of Vessels | 8 | 8 |
| Total Days at Sea | 825 | 180 |
| Total Number of Trips | 275 | 140 |
| Total Herring Revenue | $9,409,389 | $3,873,778 |
| Total Mackerel Revenue | $1,155,588 | $570,248 |
| Total Squid Revenue | | $441 |
| Total Other Species Revenue | $5,906 | $50,421 |
| Total Revenue | $10,570,883 | $4,494,888 |
| Total EM Cost - year 1 | $388,125 | $178,398 |
| Total EM Cost - year 2 | $268,125 | $58,398 |
| Total PS Cost | $189,470 | $75,767 |
| Total Monitoring Costs - year 1 | $577,595 | $254,165 |
| Total Monitoring Costs - year 2 | $457,595 | $134,165 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 5.5% | 5.7% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 4.3% | 3.0% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 6.1% | 6.6% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 4.9% | 3.5% |

Appendix 5 – Economic Impacts on Fishing Businesses

December 2018

Herring Alternative 2.3 and 2.4 (100% EM at $187 per day, 50% PS at $3.84 per mt)

| Fleet Level | Paired MWT | Single MWT |
|---|---|---|
| Number of Vessels | 8 | 8 |
| Total Days at Sea | 825 | 180 |
| Total Number of Trips | 275 | 140 |
| Total Herring Revenue | $9,409,389 | $3,873,778 |
| Total Mackerel Revenue | $1,155,588 | $570,248 |
| Total Squid Revenue | | $441 |
| Total Other Species Revenue | $5,906 | $50,421 |
| Total Revenue | $10,570,883 | $4,494,888 |
| Total EM Cost - year 1 | $274,275 | $153,601 |
| Total EM Cost - year 2 | $154,275 | $33,601 |
| Total PS Cost | $68,683 | $27,465 |
| Total Monitoring Costs - year 1 | $342,958 | $181,067 |
| Total Monitoring Costs - year 2 | $222,958 | $61,067 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 3.2% | 4.0% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 2.1% | 1.4% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 3.6% | 4.7% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 2.4% | 1.6% |

_0000017459

Herring Alternative 2.3 and 2.4 – Sub Option 5 (100% EM at $325 per day, 100% PS at $5.12 per mt)

| Per Vessel | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev |
| Annual Gross Revenue | $1,338,354 | $704,254 | $990,082 | $1,081,027 |
| Annual Variable Costs | $318,252 | $167,769 | $284,110 | $243,803 |
| Annual Crew Share | $410,406 | $213,633 | $259,816 | $315,519 |
| Annual Repair/Maint/Haulout | $177,888 | $98,231 | $120,806 | $92,369 |
| Annual Fixed Costs | $268,728 | $172,799 | $175,636 | $186,264 |
| Annual Return-to-owner | $163,080 | $89,827 | $149,714 | $331,640 |
| Annual Cost of EM - year 1 | $41,934 | $14,629 | $20,425 | $5,543 |
| Annual Cost of EM - year 2 | $26,934 | $14,629 | $5,425 | $5,543 |
| Annual Cost of PS | $22,205 | $15,461 | $9,943 | $17,483 |
| Total Monitoring Costs as pct of RTO - year 1 (median) | 40.1% | | 19.5% | |
| Total Monitoring Costs as pct of RTO - year 2 (median) | 27.5% | | 4.9% | |
| Post-monitoring RTO -- year 1 | $98,941 | $73,425 | $119,346 | $312,177 |
| Post-monitoring RTO -- year 2 | $113,941 | $73,425 | $134,346 | $312,177 |
| Percent of Revenue from Herring | 94.9% | 6.3% | 89.7% | 14.4% |
| Percent of Revenue from Mackerel | 8.1% | 6.1% | 19.5% | 17.1% |
| Percent of Revenue from Squids | | | | |
| Percent of Revenue from Other Species | 0.0% | 0.1% | 0.4% | 0.5% |
| Average Number of Days at Sea | 83 | 45 | 17 | 17 |
| Average Number of Trips | 28 | 15 | 11 | 15 |

_0000017460

Herring Alternative 2.3 and 2.4 – Sub Option 5 (100% EM at $187 per day, 50% PS at $3.84 per mt)

| Per Vessel | Paired MWT | | Single MWT | |
|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $149,714 | $331,640 |
| Annual Cost of EM - year 1 | $30,498 | $8,417 | $18,122 | $3,189 |
| Annual Cost of EM - year 2 | $15,498 | $8,417 | $3,122 | $3,189 |
| Annual Cost of PS | $8,049 | $5,605 | $3,604 | $6,338 |
| Total Monitoring Costs as pct of RTO - year 1 (median) | 24.2% | | 16.9% | |
| Total Monitoring Costs as pct of RTO - year 2 (median) | 13.3% | | 2.4% | |
| Post-monitoring RTO -- year 1 | $124,533 | $81,356 | $127,988 | $323,695 |
| Post-monitoring RTO -- year 2 | $139,533 | $81,356 | $142,988 | $323,695 |

Herring Alternative 2.3 and 2.4 – Sub Option 5 (100% EM at $325 per day, 100% PS at $5.12 per mt)

| Fleet Level | Paired MWT | Single MWT |
|---|---|---|
| Number of Vessels | 8 | 7 |
| Total Days at Sea | 663 | 117 |
| Total Number of Trips | 221 | 75 |
| Total Herring Revenue | $9,152,836 | $3,618,705 |
| Total Mackerel Revenue | $657,345 | $570,246 |
| Total Squid Revenue | | |
| Total Other Species Revenue | $4,109 | $2,721 |
| Total Revenue | $9,814,290 | $4,191,672 |
| Total EM Cost - year 1 | $335,475 | $142,978 |
| Total EM Cost - year 2 | $215,475 | $37,978 |
| Total PS Cost | $177,642 | $69,602 |
| Total Monitoring Costs - year 1 | $513,117 | $212,580 |
| Total Monitoring Costs - year 2 | $393,117 | $107,580 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 5.2% | 5.1% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 4.0% | 2.6% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 5.6% | 5.9% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 4.3% | 3.0% |

_0000017461

Herring Alternative 2.3 and 2.4 – Sub Option 5 (100% EM at $187 per day, 50% PS at $3.84 per mt)

| Fleet Level | Paired MWT | Single MWT |
|---|---|---|
| **Number of Vessels** | 8 | 7 |
| **Total Days at Sea** | 663 | 117 |
| **Total Number of Trips** | 221 | 75 |
| **Total Herring Revenue** | $9,152,836 | $3,618,705 |
| **Total Mackerel Revenue** | $657,345 | $570,246 |
| **Total Squid Revenue** | | |
| **Total Other Species Revenue** | $4,109 | $2,721 |
| **Total Revenue** | $9,814,290 | $4,191,672 |
| **Total EM Cost - year 1** | $243,981 | $126,852 |
| **Total EM Cost - year 2** | $123,981 | $21,852 |
| **Total PS Cost** | $64,395 | $25,231 |
| **Total Monitoring Costs - year 1** | $308,376 | $152,083 |
| **Total Monitoring Costs - year 2** | $188,376 | $47,083 |
| **Monitoring Costs as pct of Total Revenue -- year 1** | 3.1% | 3.6% |
| **Monitoring Costs as pct of Total Revenue -- year 2** | 1.9% | 1.1% |
| **Monitoring Costs as pct of Herring Revenue -- year 1** | 3.4% | 4.2% |
| **Monitoring Costs as pct of Herring Revenue -- year 2** | 2.1% | 1.3% |

_0000017462

Herring Alternative 2.5

| Per Vessel | Average | Stnd Dev |
|---|---|---|
| Annual Gross Revenue | $1,752,994 | $822,480 |
| Annual Variable Costs | $409,945 | $181,028 |
| Annual Crew Share | $527,920 | $227,404 |
| Annual Repair/Maint/Upgrade/Haulout | $208,650 | $73,627 |
| Annual Fixed Costs | $340,386 | $171,281 |
| Annual Return-to-owner | $266,094 | $239,382 |
| Annual Cost of NEFOP | $9,353 | $7,604 |
| NEFOP as pct of RTO (median) | 4.0% | |
| post-NEFOP RTO | $256,740 | $244,116 |
| Percent of Revenue from Herring | 99.9% | 0.4% |
| Percent of Revenue from Mackerel | | |
| Percent of Revenue from Squids | | |
| Percent of Revenue from Other Species | 0.2% | 0.4% |
| Average Number of Days at Sea | 11 | 9 |
| Average Number of Trips | 4 | 3 |

| Fleet Level | |
|---|---|
| Number of Vessels | 8 |
| Total Days at Sea | 92 |
| Total Number of Trips | 33 |
| Total Herring Revenue | $1,437,094 |
| Total Mackerel Revenue | |
| Total Squid Revenue | |
| Total Other Species Revenue | $1,170 |
| Total Revenue | $1,438,264 |
| Total NEFOP Cost | $74,827 |
| NEFOP as pct of Total Revenue | 5.2% |
| NEFOP as pct of Herring Revenue | 5.2% |

Appendix 5 – Economic Impacts on Fishing Businesses                    December 2018

Herring Alternative 2.5 – Sub Option 5

| Per Vessel | Average | Stnd Dev |
|---|---|---|
| Annual Gross Revenue | $1,752,994 | $822,480 |
| Annual Variable Costs | $409,945 | $181,028 |
| Annual Crew Share | $527,920 | $227,404 |
| Annual Repair/Maint/Upgrade/Haulout | $208,650 | $73,627 |
| Annual Fixed Costs | $340,386 | $171,281 |
| Annual Return-to-owner | $266,094 | $239,382 |
| Annual Cost of NEFOP | $6,293 | $3,131 |
| NEFOP as pct of RTO (median) | 3.7% | |
| post-NEFOP RTO | $259,800 | $241,604 |
| Percent of Revenue from Herring | 100.0% | 0.0% |
| Percent of Revenue from Mackerel | | |
| Percent of Revenue from Squids | | |
| Percent of Revenue from Other Species | 0.0% | 0.0% |
| Average Number of Days at Sea | 8 | 4 |
| Average Number of Trips | 3 | 1 |

| Fleet Level | |
|---|---|
| Number of Vessels | 8 |
| Total Days at Sea | 62 |
| Total Number of Trips | 23 |
| Total Herring Revenue | $1,379,191 |
| Total Mackerel Revenue | |
| Total Squid Revenue | |
| Total Other Species Revenue | |
| Total Revenue | $1,379,191 |
| Total NEFOP Cost | $50,347 |
| NEFOP as pct of Total Revenue | 3.7% |
| NEFOP as pct of Herring Revenue | 3.7% |

_0000017464

Herring Alternative 2.6

Analyses are not yet complete for this alternative. Alternative 2.6 applies the same criteria as found in Alternatives 2.2, 2.3, and 2.4 but only for vessels that fish in groundfish closed areas. However, in order to provide a means for obtaining a reasonably reliable estimate of the impacts of Alternative 2.6, the following two tables are provided. The first table shows the major differences between Alternatives 2.1 and 2.5 at 100% coverage for trips with > 1 lb of herring landed (the second table shows the differences for trips > 25 mt – Sub-Option 5). These two alternatives are identical except that Alternative 2.5 applies only to vessels that fish in groundfish closed areas and applies to MWT vessels with category A through E herring permits whereas Alternative 2.1 applies to vessel with category A and B permits only. Therefore, these differences can be used to estimate the impacts of Alternative 2.6.

Trips with Herring Landings > 1 lb (includes all gear types)

| | Herring Alternative 2.1 | Herring Alternative 2.5 | Herring Alternative 2.5 as a Percent of Alternative 2.1 | |
|---|---|---|---|---|
| Number of Vessels | 30 | 8 | 26.7% | |
| Total Days at Sea | 1,579 | 92 | 5.8% | |
| Number of Trips | 958 | 33 | 3.4% | |
| Total Revenue | $28,672,809 | $1,438,264 | 5.0% | Use this for estimating portside sampling costs for Alternative 2.6 |
| Total NEFOP Cost | $1,287,985 | $74,827 | 5.8% | Use this for estimating EM and ASM costs for Alternative 2.6 |

_0000017465

Trips with Herring Landings > 25 mt (Sub-Option 5) (includes all gear types)

| | Herring Alternative 2.1 | Herring Alternative 2.5 | Herring Alternative 2.5 as a Percent of Alternative 2.1 | |
|---|---|---|---|---|
| Number of Vessels | 27 | 8 | 29.6% | |
| Total Days at Sea | 1,100 | 62 | 5.6% | |
| Number of Trips | 673 | 23 | 3.4% | |
| Total Revenue | $246,047,079 | $1,379,191 | 5.6% | Use this for estimating portside sampling costs for Alternative 2.6 |
| Total NEFOP Cost | $897,711 | $50,347 | 5.6% | Use this for estimating EM and ASM costs for Alternative 2.6 |

Herring Alternative 2.7. 100% EM and PS. EM at $325/day. PS at $5.12/mt

| Vessel Level | Paired MWT | | Single MWT | | PurseSeine | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $141,169 | $362,448 | $241,180 | $162,152 | $144,125 | $113,903 |
| Annual Cost of EM - year 1 | $48,516 | $15,113 | $24,191 | $5,221 | $33,202 | $11,182 | $21,922 | $5,629 |
| Annual Cost of EM - year 2 | $33,516 | $15,113 | $9,191 | $5,221 | $18,202 | $11,182 | $6,922 | $5,629 |
| Annual Cost of PS | $22,914 | $14,999 | $12,097 | $17,447 | $23,633 | $15,699 | $2,844 | $3,000 |
| Total Monitoring Costs as pct of RTO - year 1 | 43.8% | Median: 42.3% | 25.7% | Median: 38.1% | 23.6% | Median: 19.4% | 17.2% | Median: 21.0% |
| Total Monitoring Costs as pct of RTO - year 2 | 34.6% | Median: 29.2% | 15.1% | Median: 17.3% | 17.3% | Median: 15.3% | 6.8% | Median: 6.3% |
| Post-monitoring RTO -- year 1 | $91,651 | $74,471 | $104,881 | $341,867 | $184,345 | $144,814 | $119,359 | $111,844 |
| Post-monitoring RTO -- year 2 | $106,651 | $74,471 | $119,881 | $341,867 | $199,345 | $144,814 | $134,359 | $111,844 |

| Fleet Level | Paired MWT | Single MWT | PurseSeine | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 6 | 7 | 9 |
| Total Days at Sea | 825 | 170 | 392 | 192 |
| Total Number of Trips | 275 | 129 | 451 | 103 |
| Total Herring Revenue | $9,409,389 | $3,842,873 | $11,042,232 | $1,483,242 |
| Total Mackerel Revenue | $1,155,588 | $570,246 | $225 | $97,806 |
| Total Squid Revenue | | | | $529,723 |

Appendix 5 – Economic Impacts on Fishing Businesses                                            December 2018

| | | | | |
|---|---|---|---|---|
| Total Other Species Revenue | $5,906 | $50,399 | | $485,180 |
| Total Revenue | $10,570,883 | $4,463,518 | $11,042,457 | $2,595,951 |
| Total EM Cost - year 1 | $388,125 | $145,148 | $232,412 | $197,300 |
| Total EM Cost - year 2 | $268,125 | $55,148 | $127,412 | $62,300 |
| Total PS Cost | $183,313 | $72,580 | $165,433 | $25,597 |
| Total Monitoring Costs - year 1 | $571,438 | $217,728 | $397,845 | $222,897 |
| Total Monitoring Costs - year 2 | $451,438 | $127,728 | $292,845 | $87,897 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 5.4% | 4.9% | 3.6% | 8.6% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 4.3% | 2.9% | 2.7% | 3.4% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 6.1% | 5.7% | 3.6% | 15.0% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 4.8% | 3.3% | 2.7% | 5.9% |

Herring Alternative 2.7 – sub option 5. 100% EM and PS. EM at $325/day. PS at $5.12/mt

| Vessel Level | Paired MWT | | Single MWT | | PurseSeine | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $141,169 | $362,448 | $241,180 | $162,152 | $163,329 | $137,021 |
| Annual Cost of EM - year 1 | $41,934 | $14,629 | $21,276 | $5,550 | $24,463 | $5,234 | $21,363 | $5,051 |
| Annual Cost of EM - year 2 | $26,934 | $14,629 | $6,276 | $5,550 | $9,463 | $5,234 | $6,363 | $5,051 |
| Annual Cost of PS | $21,484 | $14,958 | $11,173 | $17,974 | $22,027 | $15,705 | $3,410 | $2,535 |
| Total Monitoring Costs as pct of RTO - year 1 | 38.9% | Median: 39.7% | 23.0% | Median: 29.2% | 19.3% | Median: 18.3% | 15.2% | Median: 19.9% |
| Total Monitoring Costs as pct of RTO - year 2 | 29.7% | Median: 27.1% | 12.4% | Median: 6.2% | 13.1% | Median: 14.1% | 6.0% | Median: 8.8% |
| Post-monitoring RTO -- year 1 | $99,662 | $73,641 | $108,720 | $341,047 | $194,691 | $143,060 | $138,556 | $136,267 |
| Post-monitoring RTO -- year 2 | $114,662 | $73,641 | $123,720 | $341,047 | $209,691 | $143,060 | $153,556 | $136,267 |

| Fleet Level | Paired MWT | Single MWT | PurseSeine | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 6 | 7 | 6 |
| Total Days at Sea | 663 | 116 | 204 | 117 |
| Total Number of Trips | 221 | 73 | 320 | 59 |
| Total Herring Revenue | $9,152,836 | $3,606,269 | $10,263,855 | $1,352,045 |
| Total Mackerel Revenue | $657,345 | $570,246 | $225 | $28,633 |
| Total Squid Revenue | | | $171,323 | |
| Total Other Species Revenue | $4,109 | $2,721 | $237,472 | |

Appendix 5 – Economic Impacts on Fishing Businesses                                                December 2018

| | | | | |
|---|---|---|---|---|
| Total Revenue | $9,814,290 | $4,179,236 | $10,264,080 | $1,789,473 |
| Total EM Cost - year 1 | $335,475 | $127,653 | $171,240 | $128,176 |
| Total EM Cost - year 2 | $215,475 | $37,653 | $66,240 | $38,176 |
| Total PS Cost | $171,869 | $67,038 | $154,189 | $20,461 |
| Total Monitoring Costs - year 1 | $507,344 | $194,691 | $325,429 | $148,637 |
| Total Monitoring Costs - year 2 | $387,344 | $104,691 | $220,429 | $58,637 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 5.2% | 4.7% | 3.2% | 8.3% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 3.9% | 2.5% | 2.1% | 3.3% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 5.5% | 5.4% | 3.2% | 11.0% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 4.2% | 2.9% | 2.1% | 4.3% |

Herring Alternative 2.7. 75% EM and PS. EM at $202/day. PS at $3.84/mt

| Vessel Level | Paired MWT | | Single MWT | | PurseSeine | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $141,169 | $362,448 | $241,180 | $162,152 | $144,125 | $113,903 |
| Annual Cost of EM - year 1 | $30,623 | $7,045 | $19,285 | $2,434 | $23,485 | $5,212 | $18,227 | $2,624 |
| Annual Cost of EM - year 2 | $15,623 | $7,045 | $4,285 | $2,434 | $8,485 | $5,212 | $3,227 | $2,624 |
| Annual Cost of PS | $12,878 | $8,430 | $6,798 | $9,805 | $13,282 | $8,823 | $1,598 | $1,686 |
| Total Monitoring Costs as pct of RTO - year 1 | 26.7% | Median: 25.6% | 18.5% | Median: 27.6% | 15.2% | Median: 13.0% | 13.8% | Median: 16.8% |
| Total Monitoring Costs as pct of RTO - year 2 | 17.5% | Median: 14.8% | 7.9% | Median: 8.5% | 9.0% | Median: 8.1% | 3.3% | Median: 3.0% |
| Post-monitoring RTO -- year 1 | $119,579 | $81,021 | $115,086 | $351,250 | $204,413 | $152,458 | $124,300 | $112,806 |
| Post-monitoring RTO -- year 2 | $134,579 | $81,021 | $130,086 | $351,250 | $219,413 | $152,458 | $139,300 | $112,806 |

| Fleet Level | Paired MWT | Single MWT | PurseSeine | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 6 | 7 | 9 |
| Total Days at Sea | 825 | 170 | 392 | 192 |
| Total Number of Trips | 275 | 129 | 451 | 103 |
| Total Herring Revenue | $9,409,389 | $3,842,873 | $11,042,232 | $1,483,242 |
| Total Mackerel Revenue | $1,155,588 | $570,246 | $225 | $97,806 |
| Total Squid Revenue | | | | $529,723 |

Appendix 5 – Economic Impacts on Fishing Businesses                                    December 2018

| | | | | |
|---|---|---|---|---|
| Total Other Species Revenue | $5,906 | $50,399 | | $485,180 |
| Total Revenue | $10,570,883 | $4,463,518 | $11,042,457 | $2,595,951 |
| Total EM Cost - year 1 | $244,988 | $115,707 | $164,394 | $164,041 |
| Total EM Cost - year 2 | $124,988 | $25,707 | $59,394 | $29,041 |
| Total PS Cost | $103,025 | $40,791 | $92,976 | $14,386 |
| Total Monitoring Costs - year 1 | $348,012 | $156,498 | $257,369 | $178,427 |
| Total Monitoring Costs - year 2 | $228,012 | $66,498 | $152,369 | $43,427 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 3.3% | 3.5% | 2.3% | 6.9% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 2.2% | 1.5% | 1.4% | 1.7% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 3.7% | 4.1% | 2.3% | 12.0% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 2.4% | 1.7% | 1.4% | 2.9% |

Herring Alternative 2.7 – sub option 5. 75% EM and PS. EM at $202/day. PS at $3.84/mt

| Vessel Level | Paired MWT | | Single MWT | | PurseSeine | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $141,169 | $362,448 | $241,180 | $162,152 | $163,329 | $137,021 |
| Annual Cost of EM - year 1 | $27,556 | $6,819 | $17,925 | $2,587 | $19,411 | $2,440 | $17,966 | $2,355 |
| Annual Cost of EM - year 2 | $12,556 | $6,819 | $2,925 | $2,587 | $4,411 | $2,440 | $2,966 | $2,355 |
| Annual Cost of PS | $12,074 | $8,407 | $6,279 | $10,102 | $12,380 | $8,826 | $1,917 | $1,425 |
| Total Monitoring Costs as pct of RTO - year 1 | 24.3% | Median: 24.8% | 17.1% | Median: 23.5% | 13.2% | Median: 12.6% | 12.2% | Median: 15.4% |
| Total Monitoring Costs as pct of RTO - year 2 | 15.1% | Median: 13.7% | 6.5% | Median: 3.3% | 7.0% | Median: 7.6% | 3.0% | Median: 4.3% |
| Post-monitoring RTO -- year 1 | $123,451 | $80,634 | $116,964 | $350,826 | $209,390 | $151,744 | $143,446 | $136,600 |
| Post-monitoring RTO -- year 2 | $138,451 | $80,634 | $131,964 | $350,826 | $224,390 | $151,744 | $158,446 | $136,600 |

| Fleet Level | Paired MWT | Single MWT | PurseSeine | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 6 | 7 | 6 |
| Total Days at Sea | 663 | 116 | 204 | 117 |
| Total Number of Trips | 221 | 73 | 320 | 59 |
| Total Herring Revenue | $9,152,836 | $3,606,269 | $10,263,855 | $1,352,045 |
| Total Mackerel Revenue | $657,345 | $570,246 | $225 | $28,633 |
| Total Squid Revenue | | | | $171,323 |
| Total Other Species Revenue | $4,109 | $2,721 | | $237,472 |

| | | | | |
|---|---|---|---|---|
| Total Revenue | $9,814,290 | $4,179,236 | $10,264,080 | $1,789,473 |
| Total EM Cost - year 1 | $220,445 | $107,552 | $135,878 | $107,796 |
| Total EM Cost - year 2 | $100,445 | $17,552 | $30,878 | $17,796 |
| Total PS Cost | $96,593 | $37,676 | $86,657 | $11,499 |
| Total Monitoring Costs - year 1 | $317,037 | $145,228 | $222,535 | $119,295 |
| Total Monitoring Costs - year 2 | $197,037 | $55,228 | $117,535 | $29,295 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 3.2% | 3.5% | 2.2% | 6.7% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 2.0% | 1.3% | 1.1% | 1.6% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 3.5% | 4.0% | 2.2% | 8.8% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 2.2% | 1.5% | 1.1% | 2.2% |

Herring Alternative 2.7. 50% EM and PS. EM at $187/day. PS at $3.84/mt

| Vessel Level | Paired MWT | | Single MWT | | PurseSeine | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $141,169 | $362,448 | $241,180 | $162,152 | $144,125 | $113,903 |
| Annual Cost of EM - year 1 | $24,642 | $4,348 | $17,644 | $1,502 | $20,236 | $3,217 | $16,991 | $1,619 |
| Annual Cost of EM - year 2 | $9,642 | $4,348 | $2,644 | $1,502 | $5,236 | $3,217 | $1,991 | $1,619 |
| Annual Cost of PS | $8,585 | $5,620 | $4,532 | $6,537 | $8,855 | $5,882 | $1,066 | $1,124 |
| Total Monitoring Costs as pct of RTO - year 1 | 20.4% | Median: 19.8% | 15.7% | Median: 23.7% | 12.1% | Median: 10.5% | 12.5% | Median: 14.3% |
| Total Monitoring Costs as pct of RTO - year 2 | 11.2% | Median: 9.5% | 5.1% | Median: 5.4% | 5.8% | Median: 5.3% | 2.1% | Median: 18.4% |
| Post-monitoring RTO -- year 1 | $129,853 | $83,958 | $118,992 | $355,072 | $212,089 | $155,712 | $126,068 | $113,189 |
| Post-monitoring RTO -- year 2 | $144,853 | $83,958 | $133,992 | $355,072 | $227,089 | $155,712 | $141,068 | $113,189 |

| Fleet Level | Paired MWT | Single MWT | PurseSeine | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 6 | 7 | 9 |
| Total Days at Sea | 825 | 170 | 392 | 192 |
| Total Number of Trips | 275 | 129 | 451 | 103 |
| Total Herring Revenue | $9,409,389 | $3,842,873 | $11,042,232 | $1,483,242 |
| Total Mackerel Revenue | $1,155,588 | $570,246 | $225 | $97,806 |
| Total Squid Revenue | | | | $529,723 |
| Total Other Species Revenue | $5,906 | $50,399 | | $485,180 |
| Total Revenue | $10,570,883 | $4,463,518 | $11,042,457 | $2,595,951 |

| | | | | |
|---|---|---|---|---|
| Total EM Cost - year 1 | $197,138 | $105,866 | $141,655 | $152,923 |
| Total EM Cost - year 2 | $77,138 | $15,866 | $36,655 | $17,923 |
| Total PS Cost | $68,683 | $27,194 | $61,984 | $9,591 |
| Total Monitoring Costs - year 1 | $265,821 | $133,060 | $203,639 | $162,514 |
| Total Monitoring Costs - year 2 | $145,821 | $43,060 | $98,639 | $27,514 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 2.5% | 3.0% | 1.8% | 6.3% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 1.4% | 1.0% | 0.9% | 1.1% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 2.8% | 3.5% | 1.8% | 11.0% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 1.5% | 1.1% | 0.9% | 1.9% |

Herring Alternative 2.7 – sub option 5. 50% EM and PS. EM at $187/day. PS at $3.84/mt

| Vessel Level | Paired MWT | | Single MWT | | PurseSeine | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $141,169 | $362,448 | $241,180 | $162,152 | $163,329 | $137,021 |
| Annual Cost of EM - year 1 | $22,749 | $4,209 | $16,805 | $1,597 | $17,722 | $1,506 | $16,831 | $1,453 |
| Annual Cost of EM - year 2 | $7,749 | $4,209 | $1,805 | $1,597 | $2,722 | $1,506 | $1,831 | $1,453 |
| Annual Cost of PS | $8,049 | $5,605 | $4,186 | $6,735 | $8,253 | $5,884 | $1,278 | $950 |
| Total Monitoring Costs as pct of RTO - year 1 | 18.9% | Median: 19.3% | 14.9% | Median: 21.1% | 10.8% | Median: 10.3% | 11.1% | Median: 13.8% |
| Total Monitoring Costs as pct of RTO - year 2 | 9.7% | Median: 8.8% | 4.2% | Median: 2.1% | 4.6% | Median: 4.9% | 1.9% | Median: 2.7% |
| Post-monitoring RTO -- year 1 | $132,282 | $83,719 | $120,177 | $354,798 | $215,205 | $155,292 | $145,221 | $136,744 |
| Post-monitoring RTO -- year 2 | $147,282 | $83,719 | $135,177 | $354,798 | $230,205 | $155,292 | $160,221 | $136,744 |

| Fleet Level | Paired MWT | Single MWT | PurseSeine | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 6 | 7 | 6 |
| Total Days at Sea | 663 | 116 | 204 | 117 |
| Total Number of Trips | 221 | 73 | 320 | 59 |
| Total Herring Revenue | $9,152,836 | $3,606,269 | $10,263,855 | $1,352,045 |
| Total Mackerel Revenue | $657,345 | $570,246 | $225 | $28,633 |
| Total Squid Revenue | | | | $171,323 |
| Total Other Species Revenue | $4,109 | $2,721 | | $237,472 |
| Total Revenue | $9,814,290 | $4,179,236 | $10,264,080 | $1,789,473 |
| Total EM Cost - year 1 | $181,991 | $100,832 | $124,057 | $100,983 |

| | | | | |
|---|---|---|---|---|
| Total EM Cost - year 2 | $61,991 | $10,832 | $19,057 | $10,983 |
| Total PS Cost | $64,395 | $25,118 | $57,771 | $7,666 |
| Total Monitoring Costs - year 1 | $246,386 | $125,950 | $181,828 | $108,649 |
| Total Monitoring Costs - year 2 | $126,386 | $35,950 | $76,828 | $18,649 |
| Monitoring Costs as pct of Total Revenue -- year 1 | 2.5% | 3.0% | 1.8% | 6.1% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 1.3% | 0.9% | 0.7% | 1.0% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 2.7% | 3.5% | 1.8% | 8.0% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 1.4% | 1.0% | 0.7% | 1.4% |

Herring Alternative 2.7. 25% EM and PS. EM at $172/day. PS at $3.84/mt

| Vessel Level | Paired MWT | | Single MWT | | PurseSeine | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $141,169 | $362,448 | $241,180 | $162,152 | $144,125 | $113,903 |
| Annual Cost of EM - year 1 | $19,434 | $2,000 | $16,216 | $691 | $17,408 | $1,479 | $15,916 | $745 |
| Annual Cost of EM - year 2 | $4,434 | $2,000 | $1,216 | $691 | $2,408 | $1,479 | $916 | $745 |
| Annual Cost of PS | $4,293 | $2,810 | $2,266 | $3,268 | $4,427 | $2,941 | $533 | $562 |
| Total Monitoring Costs as pct of RTO - year 1 | 14.5% | 14.4% | 13.1% | 20.0% | 9.1% | 8.2% | 11.4% | 13.3% |
| Total Monitoring Costs as pct of RTO - year 2 | 5.4% | 4.5% | 2.5% | 2.5% | 2.8% | 2.6% | 1.0% | 0.8% |
| Post-monitoring RTO -- year 1 | $139,353 | $86,909 | $122,686 | $358,805 | $219,345 | $158,946 | $127,677 | $113,557 |
| Post-monitoring RTO -- year 2 | $154,353 | $86,909 | $137,686 | $358,805 | $234,345 | $158,946 | $142,677 | $113,557 |

| Fleet Level | Paired MWT | Single MWT | PurseSeine | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 6 | 7 | 9 |
| Total Days at Sea | 825 | 170 | 392 | 192 |
| Total Number of Trips | 275 | 129 | 451 | 103 |
| Total Herring Revenue | $9,409,389 | $3,842,873 | $11,042,232 | $1,483,242 |
| Total Mackerel Revenue | $1,155,588 | $570,246 | $225 | $97,806 |
| Total Squid Revenue | | | | $529,723 |
| Total Other Species Revenue | $5,906 | $50,399 | | $485,180 |
| Total Revenue | $10,570,883 | $4,463,518 | $11,042,457 | $2,595,951 |
| Total EM Cost - year 1 | $155,475 | $97,296 | $121,858 | $143,243 |
| Total EM Cost - year 2 | $35,475 | $7,296 | $16,858 | $8,243 |
| Total PS Cost | $34,342 | $13,597 | $30,992 | $4,795 |
| Total Monitoring Costs - year 1 | $189,817 | $110,893 | $152,850 | $148,038 |

_0000017472

| | | | | |
|---|---|---|---|---|
| **Total Monitoring Costs - year 2** | $69,817 | $20,893 | $47,850 | $13,038 |
| **Monitoring Costs as pct of Total Revenue -- year 1** | 1.8% | 2.5% | 1.4% | 5.7% |
| **Monitoring Costs as pct of Total Revenue -- year 2** | 0.7% | 0.5% | 0.4% | 0.5% |
| **Monitoring Costs as pct of Herring Revenue -- year 1** | 2.0% | 2.9% | 1.4% | 10.0% |
| **Monitoring Costs as pct of Herring Revenue -- year 2** | 0.7% | 0.5% | 0.4% | 0.9% |

Herring Alternative 2.7 – sub option 5. 25% EM and PS. EM at $172/day. PS at $3.84/mt

| Vessel Level | Paired MWT | | Single MWT | | PurseSeine | | SMBT | |
|---|---|---|---|---|---|---|---|---|
| | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev | Average | Stnd Dev |
| Annual Return-to-owner | $163,080 | $89,827 | $141,169 | $362,448 | $241,180 | $162,152 | $163,329 | $137,021 |
| Annual Cost of EM - year 1 | $18,564 | $1,936 | $15,830 | $734 | $16,252 | $692 | $15,842 | $668 |
| Annual Cost of EM - year 2 | $3,564 | $1,936 | $830 | $734 | $1,252 | $692 | $842 | $668 |
| Annual Cost of PS | $4,025 | $2,802 | $2,093 | $3,367 | $4,127 | $2,942 | $639 | $475 |
| Total Monitoring Costs as pct of RTO - year 1 | 13.9% | Median: 14.2% | 12.7% | Median: 18.8% | 8.4% | Median: 8.4% | 10.1% | Median: 12.4% |
| Total Monitoring Costs as pct of RTO - year 2 | 4.7% | Median: 4.2% | 2.1% | Median: 1.0% | 2.2% | Median: 2.4% | 0.9% | Median: 1.3% |
| Post-monitoring RTO -- year 1 | $140,492 | $86,801 | $123,245 | $358,672 | $220,802 | $158,762 | $146,848 | $136,885 |
| Post-monitoring RTO -- year 2 | $155,492 | $86,801 | $138,245 | $358,672 | $235,802 | $158,762 | $161,848 | $136,885 |

| Fleet Level | Paired MWT | Single MWT | PurseSeine | SMBT |
|---|---|---|---|---|
| Number of Vessels | 8 | 6 | 7 | 6 |
| Total Days at Sea | 663 | 116 | 204 | 117 |
| Total Number of Trips | 221 | 73 | 320 | 59 |
| Total Herring Revenue | $9,152,836 | $3,606,269 | $10,263,855 | $1,352,045 |
| Total Mackerel Revenue | $657,345 | $570,246 | $225 | $28,633 |
| Total Squid Revenue | | | | $171,323 |
| Total Other Species Revenue | $4,109 | $2,721 | | $237,472 |
| Total Revenue | $9,814,290 | $4,179,236 | $10,264,080 | $1,789,473 |
| Total EM Cost - year 1 | $148,509 | $94,982 | $113,764 | $95,051 |
| Total EM Cost - year 2 | $28,509 | $4,982 | $8,764 | $5,051 |
| Total PS Cost | $32,198 | $12,559 | $28,886 | $3,833 |
| Total Monitoring Costs - year 1 | $180,707 | $107,541 | $142,650 | $98,884 |
| Total Monitoring Costs - year 2 | $60,707 | $17,541 | $37,650 | $8,884 |

Appendix 5 – Economic Impacts on Fishing Businesses                                     December 2018

| | | | | |
|---|---|---|---|---|
| Monitoring Costs as pct of Total Revenue -- year 1 | 1.8% | 2.6% | 1.4% | 5.5% |
| Monitoring Costs as pct of Total Revenue -- year 2 | 0.6% | 0.4% | 0.4% | 0.5% |
| Monitoring Costs as pct of Herring Revenue -- year 1 | 2.0% | 3.0% | 1.4% | 7.3% |
| Monitoring Costs as pct of Herring Revenue -- year 2 | 0.7% | 0.5% | 0.4% | 0.7% |

_0000017474

# Appendix 6

## Background on the Development of Omnibus Alternatives

The Council adopted the following principles to guide the selection and implementation of future industry-funded monitoring programs.  Data collection program for the estimation of fishery catch should:

- Be fit for purpose – the reason, or clear need, for data collection should be identified to ensure objective design criteria.
- Be affordable – the cost of data collection programs should not diminish net benefits to the nation, nor threaten the continued existence of our fisheries.  However, essential data collection is needed to assure conservation and sustainability, and is reason to seek less data intensive ways to assess and manage fisheries on the economic margins.
- Should apply modern technology – data collection should prioritize the utilization of modern technology to the extent possible to meet our data collection needs, while recognizing an affordable robust program is likely to need a mix of data collection by people and technology.
- Incentivize reliable self-reporting.

Existing Monitoring Types in New England Fisheries

The existing types of monitoring programs include:

1. NEFOP-level observer monitoring focuses data collection at sea, recording the type and quantity of retained and discarded catch on fishing trips.  In addition, NEFOP-level observers collect biological data and samples on marine mammal, sea birds, and sea turtles.
2. At-sea monitoring, which focuses on data collection at sea, recording the type and quantity of retained and discarded catch.
3. Portside monitoring, which focuses on data collection in port, accounting for landings of target species and incidental catch.  If all fish caught are retained and landed, portside monitoring can also record type and quantity of total catch.
4. Electronic monitoring (EM), which uses video cameras and other sensors to monitor discarding events at sea and/or to monitor compliance with full retention requirements or other at-sea requirements.

The following section provides further detail on these monitoring types, and their current uses in the Greater Atlantic Region.

*Basic description of monitoring at sea*.  Monitoring at sea is used to refer to the collection of data at sea aboard fishing vessels by human observers.  The NEFSC Fisheries Sampling Branch currently manages the collection and processing of data and biological samples obtained during commercial fishing trips through the NEFOP and groundfish ASM programs.

_0000017475

The Fisheries Sampling Branch oversees observer training, translates data requirements from the NEFSC research programs into a detailed schedule of fisheries to be sampled, manages data collected by observers, and provides qualified researchers with audited data files and summaries. Observers collect operational fishing data, biological data, and economic data while on board fishing vessels. Additionally, in support of the Marine Mammal Protection Act (MMPA) and Endangered Species Act (ESA), observers monitor interactions with protected and endangered species. Summaries of fishery observer data are provided to scientists and analysts of the GARFO, NEFSC, and the Regional Fishery Management Councils to support quantitative and qualitative evaluations of various management actions.

NEFOP-level observers collect a wide array of information on a subset of the trips in all Greater Atlantic Region fisheries. The information they collect includes:

- Fishing gear information (i.e., size of nets, mesh sizes, and gear configurations);
- Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
- All kept and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls (species, weight, and disposition);
- Kept catch on unobserved hauls (species, weight, and disposition);
- Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling methodologies;
- Whole specimens, photos, and biological samples (i.e., scales, ear bones, and/or vertebrae from fish, invertebrates, and incidental takes);
- Information on interactions with protected species, such as sea turtles, porpoise, dolphins, whales, and sea birds; and
- Vessel trip costs (i.e., operational costs for trip including food, fuel, oil, and ice).

In recent years, NEFOP-level observer coverage has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-specific basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

For example, New England vessels using extra-large mesh gillnets catch monkfish, skates, and Northeast multispecies, often on the same fishing trip, and, therefore, most participants in this fishery must operate according to the regulations implemented under three different FMPs. To distinguish between the management units identified in individual FMPs and the fisheries that operate under one or more FMPs, the SBRM is designed around "fishing modes" defined by the type of fishing gear used and the area from which the vessels depart.

_0000017476

There are 56 fishing modes defined in the SBRM, some of which further subdivide a fishery by the mesh size of the gear used (for gillnets and otter trawls), or by the type of permit and access area program (for sea scallop dredges).  Although there are differences among the modes, the participants in these fishing modes fish throughout the Gulf of Maine, Georges Bank, and the Mid-Atlantic Bight, and land their catch across a large number of fishing ports from the Outer Banks of North Carolina to Downeast Maine.  The SBRM is limited to those fisheries that are prosecuted in the Federal waters of the Greater Atlantic Region and managed through an FMP developed by either the Mid-Atlantic or NEFMC.

The Atlantic Sea Scallop observer program, described in further detail in the introduction section of this document, is the only existing industry-funded monitoring program in the region that uses NEFOP-level observer coverage.

While NEFOP-level observers are used to cover all fisheries, including sector trips, groundfish at-sea monitors are deployed on vessels participating in the groundfish sector program.  Groundfish at-sea monitors follow a rigorous sampling protocol to collect weights of fish catch (kept and discarded), to measure the lengths of groundfish species, and document interactions with protected species.  Groundfish at-sea monitors also collect information on trip costs, gear type, and tow locations.  In contrast to NEFOP-level observers, groundfish at-sea monitors collect a reduced set of data (i.e., no biological samples and reduced information on gear configurations), thereby reducing training time, gear requirements, and internal support resources necessary to administer this program.

*Basic description of portside (or dockside) monitoring.*  Portside monitoring programs deploy trained monitors to vessel landing locations to monitor the weights and species composition of landed catch.  Landings sampling protocols for portside monitoring differ between programs depending on the program goals.  Monitors typically monitor offloads directly to dealers, but roving monitoring programs can be established in cases where landings are offloaded to a truck for later delivery to a dealer.

There are not any Federal portside monitoring programs currently administered in the Greater Atlantic Region.  However, there was previously an industry-funded dockside monitoring requirement for groundfish sectors.  Sectors were required to implement a dockside monitoring program to validate dealer-reported landings, with 50-percent coverage of sector trips in the 2010 groundfish fishing year, and 20-percent coverage each year thereafter.  In 2010, NMFS reimbursed sectors for the costs of dockside monitoring.  Shortly after the implementation of Amendment 16 to the NE Multispecies FMP, the Council became concerned that the industry would not be able to support full responsibility for the costs of monitoring programs, beginning with dockside monitoring in 2011 and at-sea monitoring in 2012.  Through Framework 45 to the Northeast Multispecies FMP, the Council suspended the dockside monitoring requirements until FY 2013 and required dockside monitoring only to the extent that NMFS could fund it.  In 2011, NMFS made the determination that dockside intercepts by enforcement personnel were sufficient to monitor sector landings and reprioritized financial support for dockside monitoring to alleviate general sector operating costs.  The dockside monitoring program was ultimately

eliminated in Framework 48 to the Northeast Multispecies FMP in advance of the 2013 groundfish fishing year.

A number of states in this region administer portside monitoring programs related to state-managed species; a number of Federal permit holders are sampled through the state portside monitoring programs.   The Massachusetts Department of Marine Fisheries and Maine Department of Marine Resources portside monitoring programs for Atlantic herring are described under the herring coverage target alternatives.

*Basic description of electronic monitoring.*  The use of electronic monitoring (EM) systems on fishing vessels, namely electronic systems that incorporate video cameras, sensors, and electronic reporting systems into a vessel's fishing operations, has been a relatively recent development in fisheries around the world.  EM can be used to augment or replace onboard human observers in some data collection tasks.

The technology supporting electronic monitoring has advanced significantly in a short time span and issues of image quality that were once prevalent are virtually nonexistent when the cameras are properly placed.  There have been regional and national workshops to explore the technology and capabilities of EM, examine how EM can meet scientific and management needs, and understand the legal requirements, data integration, and costs of implementing EM.

The majority of applications using EM have been developed to monitor gear interactions with protected species and birds, to detect presence or absence of specific fish species occurring as bycatch, or to validate vessel landing and logbook information.  There are two primary approaches for EM: 1) the audit approach, and 2) the optimized or full retention approach.
- Under the audit approach, EM technology is used to account for catch, and catch estimation is substantiated through a data validation source, such as vessel trip reports.  This model is associated with increased captain responsibility and places a greater emphasis on industry-reported data.  EM applications have been deployed successfully in fixed gear fisheries (i.e., longline, pot/trap, mechanical jig) and in trawl fisheries with relatively homogeneous catch composition.
- Under optimized or full retention approach, EM is used to monitor for discards.  In this case, EM should be paired with portside monitoring to gather information about landed species composition.

In the Greater Atlantic Region, the NEFOP observer programs are very complex in their sampling schemes and in regards to the data collected.  EM technology is currently not capable of performing most of the detailed data collection tasks performed by human observers.  However, depending on the monitoring needs for a given fishery, EM could provide a cost-effective alternative to human observers.  EM is being developed for the groundfish fishery, as described below.  In addition, this amendment contains alternatives for EM for the midwater trawl vessels that participate in the herring fishery.

_0000017478

The need to balance the financial viability of sectors with the expectation to have the fishing industry fund groundfish ASM precipitated several efforts to explore electronic monitoring as an alternative to ASM. EM may be a suitable replacement to ASM, provided EM has the ability to identify species, and verify weights and counts of discards in the groundfish fishery. Balancing management data needs with the costs of a comprehensive EM system that satisfies monitoring requirements remains an ongoing endeavor.

From 2004-2006, the Cape Cod Commercial Fishermen's Alliance (CCCFA) and Archipelago Marine Research Ltd. (AMR) tested EM systems on longline and gillnet vessels targeting groundfish and compared EM and observer data. Beginning in 2010, NMFS and Archipelago conducted a more comprehensive study in three phases. Phase one identified baseline metrics for detecting fishing events, counting fish, and identifying species. Phase two addressed issues such as weight estimation and expanded species identification methods through catch handling. The third phase tested catch handling methods to simulate an operational EM program. Currently, the Gulf of Maine Research Institute (GMRI), the Maine Coast Community Sector (MCCS), The Nature Conservancy (TNC), and Ecotrust Canada (EC), have collaborated to operationalize an EM program using open-source software. Funding for this pilot project has come from grants through foundations. Their model uses EM to validate captain-reported data on vessel trip reports and has introduced a new EM provider to the fishery. The first year (2013) was designed to be a training period for captains. For 2014 and 2015, the project's goal was to complete the necessary data collection and analysis to demonstrate the ability that EM can replace ASM for sectors in the New England groundfish fishery.

Since these pilot projects, EM proponents have supported implementation of EM in the groundfish fishery. However, given legal, analytical, and logistical obstacles that remain, EM has not yet been approved for implementation as an alternative to ASM.

In January 2015, NMFS' GARFO and NEFSC released a Regional Electronic Technologies Implementation Plan that articulated the remaining aspects of a comprehensive EM program that need to be addressed. Some outstanding questions include:
- What are the detailed roles and responsibilities of the various parties involved?
- Who will have responsibility to store the data and for how long?
- Who will have access to the data and for what purpose?
- How much will it cost the government and the industry?

In concert with the release of the Plan, GARFO and NEFSC partnered with GMRI, MCCS, TNC, and EC as they continue their project to address these final issues and fully develop an EM model for groundfish sectors. This pre-implementation group has worked from an agreed set of questions and tasks, which has facilitated a transparent and coordinated process. The group holds monthly face-to-face meetings to discuss data collection, retrieval, review, and storage, the roles and responsibilities in a functional program, and the process for approving and implementing EM for 2016. These partnerships have provided GARFO and NEFSC with an understanding of how reasonable certain program requirements may be for a fisherman or an EM provider, and have also provided insight to

_0000017479

non-NMFS partners on the existing gaps between the pilot projects and fully implementing EM. The intention is that this group will continue to meet moving forward, adding additional partners such as CCCFA and AMR, to develop the final data and provider standards, EM monitoring plans, and regulatory framework for implementing EM for a portion of the groundfish fishery.

Currently, GARFO and NEFSC are building the database infrastructure and processing tools for data collected from EM video footage, conducting comparative analysis to the existing catch monitoring systems in the groundfish fishery, and addressing the final legal and logistical hurdles. The EM project partners have pursued having EM operational on all trips, with a portion of the video used to validate electronic vessel trip reports (the eVTR audit model). Given some of the challenges with using EM footage for species identification, the partners have shifted their experimental program design to having groundfish EM operate on only trips that would otherwise be covered by an at-sea monitor.

GARFO is developing an exempted fishing permit (EFP) with TNC for fishing year 2016, rather than making modifications to each sector's operations plan. Under the EFP and the new program design, the entire EM video will be reviewed and will serve as the basis for identifying and counting discards on trips that would otherwise have an at-sea monitor. The approach to using an EFP is similar to ongoing EM efforts on the West Coast and would provide us with an opportunity to address the remaining questions to implement the EM/eVTR audit model in a future fishing year.

GARFO expects the ongoing pre-implementation work to continue and may propose approval of EM standards and monitoring plans prior to next groundfish fishing year, set to begin May 1, 2017. GARFO expects that grant funding, through the partner organizations noted above, will be used to fund industry costs for the groundfish sector participants that use EM in 2016.

In 2016 and 2017, GARFO and NEFSC, in cooperation with Saltwater Inc., are evaluating the utility of EM aboard midwater trawl vessel participating in the Atlantic herring and mackerel fisheries. The purpose of the program is to:

- Analyze the utility of EM in monitoring fisheries as a means of informing future EM programs.
- Deploy and test an EM program in an operational setting, allowing analysis and adjustment of EM program requirements.
- Evaluate the range of information that can be gathered with EM systems, such as: Verify slippage events; categorize the types of slippage events; verify other discard sources; and determine if EM can help estimate the amount of catch retained (if not all catch is retained).
- Refine EM cost estimates for NMFS and the fishing industry.

<u>Factors that Affect Industry Costs for Monitoring</u>

The following section discusses the factors that affect industry costs for at-sea, dockside, and electronic monitoring programs.  There are several factors that can significantly affect industry cost responsibilities in any industry-funded monitoring program, and the per day at-sea component of these costs (sea day costs) can vary.  Industry costs would be largely determined by the contracts with the service providers.  For example, the $640/day paid to providers may cover such things as:  Labor and overtime, data editing, project management and administration, benefits (vacation and sick leave), health insurance, and workers compensation.  Additionally, service providers may have individual requirements for training and debriefing, such as annual observer training or semi-annual safety training.

Cost for industry-funded monitoring programs is a very important consideration.  The requirement to pay for an observer increases operating costs for fishing vessels, which in turn reduces net revenues and overall profitability (as described later in Section 4).  While the total cost for each sea day can vary between service providers, the individual components (i.e., costs for deployment and sampling, costs for equipment) are necessary to successfully execute a monitoring program.  Because each of these components is essential, in most cases, it is not appropriate to reduce industry's cost responsibilities by removing or adjusting components of the sea day cost.  Since vessels would be contracting directly with service providers they may be able to negotiate prices.  However, due to the requirements for monitoring coverage and a variety of other factors (including number of vessels participating and coverage rates), the ability to negotiate lower prices may be limited.  Since vessels are contracting with the providers for much smaller amounts of monitoring coverage than NMFS does, project management costs for service providers may increase, which could increase some costs that providers charge vessels.  However, unlike NMFS, vessels are not constrained by certain laws when establishing contracts, which could lower some costs that providers charge for contracts directly with vessels.

There are two ways to limit the costs of an industry-funded monitoring program for industry.  Both of these approaches limit the total cost of the observer program rather than adjusting the industry cost responsibilities.  The first way to limit costs to industry is to set coverage levels at the lowest level necessary to gather information to meet fishery management plan goals.  For example, it may be possible to sufficiently increase precision around catch and discard estimates for a certain species by setting a coverage target of 50%, rather than a coverage target of 100%.  The second way to limit costs to industry is to select the appropriate type of coverage for the fishery management plan goals.

*Factors that affect industry costs for at-sea and portside monitoring.*  Representatives from the NEFOP, service provider companies in the northeast U.S., and representatives from U.S. west coast service provider companies identified the following factors that most commonly increase sea day costs.  The cost drivers for at-sea and portside monitoring programs are similar, so are discussed together here.

_0000017481

- **Requirements for New Data Collection/New Equipment.** New or different sampling protocols require modifications to observer training, which could increase training costs for both the government and service providers. If new or different sampling equipment is required to meet the monitoring program needs, the expense of the additional equipment will be incurred by the service provider. In addition, re-designing existing observer databases to incorporate new data introduces a significant administrative expense.
- **SCA and FLSA Requirements.** Requirements associated with the Service Contract Act (SCA) and Fair Labor Standards Act (FLSA) apply to any contracts in which the Federal government is involved. There may be some reduction in sea day cost associated with eliminating any legal requirements that apply specifically to contracts involving the Federal government. However, service provider companies would still be subject to FLSA requirements and other applicable labor laws.
- **Ability to Predict the Fishery.** Sea day costs will likely be higher if service providers cannot predict how the fishery will operate (numbers of vessels/trips, length of trips, seasonality and spatial distribution of trips) in order to accurately estimate costs (administrative, overhead, communications, logistics) associated with deploying observers to meet the needs of the monitoring program. Predictability increases efficiency and therefore reduces costs. With limited information to predict the fishery, service providers are more likely to over-estimate costs associated with travel and observer deployment to ensure that they cover their costs.
- **Complicated Logistics (Vessel Selection and Observer Deployment).** The more infrastructure necessary to efficiently deploy observers to meet the needs of the monitoring program (field offices, coordinators, communications networks), then the higher the sea day costs will be. If pre-trip notification systems need to be expanded to determine observer/monitor deployment, this would likely increase costs.

Special considerations for service provider requirements

During development of this section of the Amendment, the Councils explored options to reduce the cost of industry-funded monitoring programs by adjusting the service provider requirements or modifying the monitor certification requirements. After analyzing the possible adjustments to the service provider regulations, the PDT/FMAT concluded that the best ways to limit the financial burden of an industry-funded monitoring program is to carefully design the program to minimize total program costs. This can be accomplished by selecting the appropriate type of coverage or setting coverage levels at the lowest level necessary to meet fishery management plan goals.

_0000017482

Given this, the overarching service provider requirements for all industry-funded programs, including at-sea, dockside, and electronic monitoring programs, are proposed to be the same for all FMPs.  This means that the overarching industry-funded monitoring service provider regulations will be standardized for all FMPs, whether industry funding is necessary to support statutory monitoring requirements (Magnuson-Stevens Act, MMPA, ESA), or monitoring coverage above statutory requirements.  However, the Amendment would allow individual FMPs to deviate from the overarching monitoring service provider requirements on an FMP-specific basis.  For example, the groundfish at-sea monitor service provider requirements only require a monitor to have a high school diploma, while the overarching industry-funded monitoring service provider regulations require a college degree.  The herring and mackerel at-sea monitoring programs also have deviations from the overarching monitoring service provider regulations, described in the herring and mackerel alternative descriptions in Sections 2.2 and 2.3.

The following is a description of some of the provisions in the overarching industry-funded monitoring service provider regulations that the Councils discussed adjusting during the development of this amendment.

Observer education requirements. The National Minimum Eligibility Standards for Marine Fisheries Observers were published in 2007 (04-109-01).  The development of the national standards grew out of concern from the Office of Inspector General, NOAA Science Board, National Observer Program Advisory Team, observer provider companies, professional observer associations, and the fishing industry that observers were not appropriately trained to observe fishing trips, that high levels of attrition were resource inefficient, and that the lack of standards was confusing and deterring interested and qualified observer candidates nationally.  All observer programs in the United States (Greater Atlantic Region, Southeast, Alaska, Northwest, Southwest, and Pacific Islands) currently follow the National Minimum Eligibility Standards.  The standards are also adopted and supported as best practices by the International Fisheries Observer and Monitoring Conference.

The most controversial standard is the requirement that observer candidates must have a bachelor's degree with a major in the natural sciences.  However, Regional Administrators and Science Directors may waive the education and experience requirements if a candidate has acquired the required skills to be considered eligible for observer training through a NMFS-approved alternative training program that includes activities such as:

a) Participating in or/and observing ocean fishing activities consistent with those that would be required during observer work performance;

b) Participating in fisheries research cruises;

Appendix 6 - Background on the Development of Omnibus Alternatives                    December 2018

c) Recording data on marine mammal sightings and fishing activities;

d) Tallying incidental take of marine mammals, sea turtles, and sea birds from fishing platforms;

e) Collecting biological samples and specimens from postmortem animals;

f) Entering data into a database using computers; and

g) Completion of a biological training program, equivalent to that received as part of a bachelor's degree, conducted by or approved by NMFS with the specific objective of preparing potential candidates for observer training.

The Council expressed interest in removing the bachelor's degree requirement from the overarching industry-funded monitoring service provider regulations for observers in order to save costs, with the rationale that monitors with bachelor's degrees may command a higher hourly wage than those without bachelor's degrees. While it is consistent with regional policy to require a lower education requirement for fishery specific at-sea monitoring programs, for the overarching industry-funded monitoring service provider requirement for observers a bachelor's degree is obligatory to comply with national standards and for the reasons detailed below. Through future development of FMP-specific industry-funded monitoring programs, the minimum education requirement for an observer can be reconsidered.

Contrary to the intent of negating the national education standard for becoming a fisheries observer, requiring only a high school diploma will likely not lower the cost of observer coverage. Nationally, there was no increase in sea day costs with the adoption of the educational standard national policy in 2007. Instead, national observer programs found that the education standard resulted in recruitment of higher quality observer candidates and better observer retention. There is not currently a shortage of interested and qualified applicants with bachelor's degrees, and many candidates have fishing and sea-going experience in addition to their bachelor's degrees. Observers often hold multiple certifications in a variety of observing programs, which helps with observer availability to meet coverage targets and improves retention of certified observers.

The information observers collect is necessary for assessing the nation's managed biological resources, and for evaluating the social and economic impacts of catch allocations, entitlements and fishing regulations on fishermen and their communities. Thus reducing education standards has a direct impact on the information used to support critical NMFS goals. Studies comparing observer candidates without a college degree to those with college degrees show that candidates without degrees had:

• Higher drop-out and failure occurrences during observer training, despite additional resources invested to support the candidates;

_0000017484

• Lower compliance in following detailed program requirements and meeting data loading deadlines;

• Lower accuracy with species identification and catch estimation;

• Lower data quality scores and overall performance; and

• Lower retention rates (Chilton et al. 2011).

In addition, there was concern that codifying the requirement in the overarching service provider regulations would prevent fisherman from participating as observers. However, we reiterate that the current education standard policy includes a waiver if the observer candidate has fishing experience. There are a number of current observers who were fishermen, though the policy does not outline potential conflicts of interest that may prohibit some fishermen who are still financially vested in the industry from participating as observers. In order to encourage and support employment of former fishermen, NEFOP developed an optional alternative training program for fishermen with interest in becoming observers.

The Fair Labor Standards Act and Service Contract Act requirements. The Services Contract Act (SCA) applies to every contract entered into by the United States (government) or the District of Columbia. Contractors and subcontractors performing on these Federal contracts must observe minimum wage standards (based on the prevailing wage for a locality, as determined by the Department of Labor) as well as safety and health standards, and they must maintain certain records. The SCA requires that every employee working under the contract must be paid not less than the monetary wages, and must be furnished fringe benefits, which are determined based on locality. Fringe benefits include paid holiday leave, vacation time, and minimum requirements for health and welfare (80/20 compensation for health insurance). Because contracts for industry-funded monitoring program will be between service providers and participants in the fishing industry, it will not be necessary for these contracts to meet the requirements of the SCA.

However, even without the SCA requirements, service provider companies will still be required to pay employees not less than the federal minimum wage provided in the Fair Labor Standards Act (FLSA). The FLSA establishes minimum wage, overtime pay, recordkeeping, and youth employment standards affecting employees in the private sector as well as in Federal, State, and local governments. Covered non-exempt workers are entitled to a minimum wage of not less than $7.25 per hour effective July 24, 2009. Overtime pay at a rate not less than one and one-half times the regular rate of pay is required after 40 hours of work in a workweek.

Appendix 6 - Background on the Development of Omnibus Alternatives          December 2018

According to a report published by MRAG Americas (June 2012), Northern Economics (2011) estimated that the SCA and FLSA requirements are likely to add $50-$100 to the sea day cost for an industry-funded monitoring program. However, eliminating SCA requirements by privatizing contracts in this region is not likely to decrease sea day costs by as much as $100 for two reasons: (1) FLSA requirements for minimum wage and overtime would still apply to vessel/provider contracts; and (2) employees working for companies currently providing observer coverage and at-sea monitoring services in this region have been working (some for many years) under government contracts, which are consistent with SCA requirements for wages and fringe benefits. It may be very difficult for service providers in this region to change the wage and benefit structure they offer to their employees, many of whom have been working in observer and ASM programs in this region for several years. Therefore, the reduction in sea day cost that can be expected from the privatization of contracts cannot be estimated with certainty but is likely to be on the lower end of the range predicted in the MRAG Report.

Streamlining the application process for observer service providers. The Councils discussed a number of options to simplify the application process for service providers, including "grandfathering in" states as service providers, allowing the service provider approval from one NMFS region to extend to other regions, or developing a standardized national application for service providers. The rationale for these provisions is that limiting the application process for service providers could translate into reductions in program administration costs, which could ultimately reduce sea day costs for industry. While there are potential cost savings with these approaches, many have national implications and will need to be investigated outside of this amendment. Ultimately, because the information collected through our monitoring programs support our mission to conserve and manage fisheries and other marine resources, we are obligated to assure the quality of data collected through these programs. This means that any process used to evaluate service providers ensures that the providers are able to comply with regional requirements. NMFS is investigating these ideas at a national level, and any results from this effort will not be available for informing this amendment.

**TABLE 14. PROS AND CONS OF DISCRETIONARY VERSUS FORMULAIC PRIORITIZATION ALTERNATIVES.**

|  | Pros | Cons |
|---|---|---|
| **Discretionary Alternatives:** **Alternative 2.1 and 2.2** | More discretion over funding priorities | Complex, and requires additional workload to prioritize |

_0000017486

| | Takes objectives, performance and fishery context into account | Timeline > 1 year |
|---|---|---|
| | Could result in funding of most important programs first | May require rulemaking |
| **Formulaic Alternatives: Alternatives 2.3, 2.4, and 2.5** | Shorter timeline | No discretion |
| | Adaptive to budget changes and timing | No flexibility to consider management objectives when prioritizing with a formulaic approach |

The weighting approach is generally based on the draft processes developed by the Mid-Atlantic Fishery Management Council's Scientific and Statistical Committee to prioritize research proposals.  The weighting approach could give NMFS or the Council a transparent, deliberative process for prioritizing industry funded monitoring coverage in order to allocate NMFS's available resources for funding of NMFS cost responsibilities required to achieve coverage targets for industry-funded monitoring.

If Alternative 2.1 (NMFS-led Prioritization) is selected, NMFS will use the approach outlined below to prioritize industry-funded programs in order to allocate available NMFS funding.  The proposed weighting approach has 2 steps outlined in more detail in the following pages:

## Step 1

- Compare industry-funded monitoring criteria to each other to create a criteria weighting

## Step 2

- Evaluate how each industry-funded monitoring program meets each criterion

### Step 1: Compare industry-funded monitoring criteria to each other to create a criteria weighting

The weighting approach first requires NMFS or the Council to determine the relative importance of criteria that will be used to evaluate the industry-funded monitoring programs.  The list of eight criteria proposed below would be used by NMFS, and could be used by the Council, for the first prioritization cycle, and every cycle thereafter, unless the Council changes the criteria in a framework adjustment.

_0000017487

1.    The industry-funded monitoring program relates to stocks that are overfished or subject to overfishing.

Overfished stocks have biomass levels depleted to a degree that the stock's capacity to produce maximum sustainable yield (MSY) is jeopardized.  Stocks subject to overfishing have a mortality rate that is higher than the rate that produces MSY.  Under this criterion, preference would be given to stocks that are in poor condition because those stocks may benefit from additional monitoring support.

2.    The species has high commercial or recreational value.

This criterion prioritizes industry-funded monitoring programs related to species with high dollar value in the case of a commercial fishery, or a high number of annual landings or gross weight in the case of a recreational fishery.

3.    The industry's daily revenue is high relative to the cost of industry costs for monitoring.

This criterion evaluates industry's ability to fund its cost responsibilities related to industry-funded monitoring programs requirements established by the Council.  Preference will be given to industry-funded monitoring programs with high daily revenue relative to the daily costs of the industry funded monitoring.

4.    The species has special importance to the ecosystem.

An industry-funded monitoring program may be important because of the biological relationship of the target species to the ecosystem.  For example, the species could be a choke species, a forage fish, or have positive or negative impacts on other species.  This criterion evaluates the need to prioritize industry-funded monitoring programs species with special ecosystem importance.

5.    Industry-funded monitoring program has clear objectives, and a strong statistical basis for the FMP coverage target, including evaluation of the basis for the coverage target.

_0000017488

Monitoring should have clear objectives and a statistical design for sampling that achieves those objectives.   Monitoring programs should also have a clear link to current or future FMP needs.  The basis for coverage rates, and/or target coefficient of variation (CV) or variance should be justified.  As an example, an industry funded monitoring program with a 100% coverage target should have statistical analysis supporting this need (e.g., identification/quantification of significant bias).

6.      Fleets monitored under the program are compatible with existing SBRM fleet definitions.

There are a number of reasons why it is beneficial to design monitoring programs to be compatible with SBRM fleet definitions.

First, NMFS must be able to identify trips *a priori* in order to deploy coverage effectively. The SBRM fleet definitions (gear, mesh size, area) are robust to this requirement.  Some other definitions (e.g., by target species or permit category) have proven difficult to implement coverage for, leading to inefficient use of resources.   One example is the design of the coverage requirements for the longfin squid fishery related to the butterfish cap. Vessels intending to land over 2,500 lb longfin squid must notify the observer program 48 hours prior to departure in order to facilitate observer placement.  Many vessels fishing with small mesh gear wished to have the option to land large quantities of longfin squid, should they encounter it.  However, in that case, requiring vessels to notify the observer program about intent to target squid could lead to coverage on trips that do not ultimately target squid.

Second, vessel trip reports typically include information on gear and statistical area associated with a trip, but do not include other identifiers to link the landed catch (e.g., several sector exempted fisheries).  If a vessel trip report does not include details on a specific type of gear (e.g., Ruhle Trawl) or indicate that the trip is part of an exempted fishery or in an access area, then one cannot properly use the information to obtain expanded discard totals for the fleet.

Finally, increasing coverage for a specific target species or certain permit types can bias discard estimates for a given SBRM fleet.

Overall, industry-funded monitoring programs designed to allocate observer coverage according to SBRM fleets should have priority over those that allocate observers using other

criteria because monitors can be deployed effectively, and can provide information to be included in SBRM discard analyses, which makes them more cost-efficient.

7.      Uncertainty surrounding catch estimates

This criterion prioritizes industry-funded monitoring programs related to target and non-target species with high uncertainty regarding catch estimates.  This means that species with higher CVs related to discards or landings would be rated higher and receive higher priority for funding.

8.      Risk to management based on fishery performance

A stock for which the quota is consistently under-harvested is unlikely to face the same management risk as one with a constraining quota.  Industry-funded monitoring programs related to fisheries for stocks with constraining quotas should have priority over those for under-harvested stocks.

Some of the information above would be defined or analyzed in the original FMP action that created the industry-funded monitoring program.  NMFS or the Council would first look to the original FMP action for information and update or supplement this information as necessary.

The eight criteria may not have equal importance, so NMFS or the Council would assign weights to the relative importance of these criteria.  The end result of this process is just a simple percentage weight for each criterion.  For example, one criterion might count for 15% of the decision.  The proposed method described below, and shown in Table 15 allows an explicit evaluation of each criterion against all the other criteria so that the final weights are consistent with the values decision makers actually place on the criteria.  While it seems intricate, it is a systematic way to arrive at weights for the criteria based on what decision makers really think is important.

- The comparison table is built by entering each criterion to be prioritized into a table, with criteria repeated along both the horizontal and vertical axis.

- The NMFS or the Council would then compare the criterion to each other to determine importance.  For example, first "stock status" is compared to "ecosystem importance", then "stock status" is compared to "SBRM compatibility," and so on, until all of the criteria have

_0000017490

been compared to each other.  Place an "x" in the boxes where the same two criteria are being compared.

- Each time a weight is recorded in a row cell, its reciprocal value must be recorded in the corresponding column.

- Comparison values:
  - 1 = criteria are equally important
  - 5 = criterion is more important
  - 10 = criterion is much more important
  - 0.2 = criterion is less important
  - 0.1 = criterion is much less important

- After completing the comparisons, total each horizontal row.

- The row totals should then be added to create a grand total.

- Then each row should be divided by the grand total to get a relative weighting value.  This value is termed the "IFM Criterion Weighting."

TABLE 15.  EXAMPLE IFM CRITERIA COMPARISON TABLE

| IFM Evaluation Criteria | Stock status | Com/ Rec Value | Ability to pay | Ecosystem importance | Strong statistical basis | SBRM compatibility | Catch estimate | Risk to management | Row total | IFM Criterion Weighting | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Stock status | x | 10 | 0.1 | 5 | 1 | 10 | 1 | 0.2 | 27.3 | 0.15 | 15% |
| Com/Rec Value | 0.1 | x | 5 | 1 | 10 | 0.1 | 0.2 | 10 | 26.4 | 0.14 | 14% |
| Ability to pay | 10 | 0.2 | x | 1 | 5 | 0.2 | 10 | 5 | 31.4 | 0.17 | 17% |
| Ecosystem importance | 0.2 | 1 | 1 | x | 0.2 | 1 | 10 | 1 | 14.4 | 0.08 | 8% |
| Strong statistical basis | 1 | 0.1 | 0.2 | 5 | x | 0.2 | 0.1 | 0.1 | 6.7 | 0.04 | 4% |

_0000017491

| SBRM compatibility | 0.1 | 10 | 5 | 1 | 5 | x | 10 | 0.2 | 31.3 | 0.17 | 17% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Catch estimate uncertainty** | 1 | 5 | 0.1 | 0.1 | 10 | 0.1 | x | 10 | 26.3 | 0.14 | 14% |
| **Risk to management** | 5 | 0.1 | 0.2 | 1 | 10 | 5 | 0.1 | x | 21.4 | 0.12 | 12% |
| | | | | | | | | Grand total | 185.2 | | |

In the above example, industry's ability to pay and SBRM compatibility are the most important criteria, and will each contribute 17% to the weight of the score of the industry-funded monitoring programs. The statistical basis for the program is the least important criterion, and will only contribute 4% to the weight of the score.

In practice, a very simple survey of Council members can be used to implement this exercise, and the NEFMC's Observer Policy Committee has already successfully participated in a trial of such a survey.

Once the relative importance of each evaluation criteria is determined, the next step is to compare how the industry-funded monitoring programs measure up against the criteria.

### Step 2: Evaluate how each industry-funded monitoring program rates relative to each criterion

Rate each industry-funded monitoring program:

- For criteria, reading across the vertical axis, assign a number based on how much each industry funded monitoring program meets the criterion. These are the ratings in the table below:
  - 0 = doesn't meet criterion at all
  - 1 = slightly meets criterion
  - 2 = somewhat meets criterion
  - 3 = mostly meets criterion
  - 4 = fully meets criterion

- After completing the comparisons, multiply the rating assigned to each criterion by the IFM Criterion Weighting in Step 1.

- Total the columns. Now the industry-funded monitoring programs can be ranked.

**TABLE 16.  EXAMPLE FMP RANKING USING IFM EVALUATION CRITERIA**

| IFM Evaluation Criteria | IFM Criteria Weighting | FMP 1 Ranking | IFM Criteria Weighting x FMP 1 Ranking | FMP 2 Ranking | IFM Criteria Weighting x FMP 2 Ranking | FMP 3 Ranking | IFM Criteria Weighting x FMP 3 Ranking |
|---|---|---|---|---|---|---|---|
| **Stock status** | 0.15 | 4 | 0.59 | 0 | 0.00 | 2 | 0.00 |
| **Com/Rec Value** | 0.14 | 1 | 0.14 | 3 | 0.43 | 1 | 0.43 |
| **Ability to Pay** | 0.17 | 2 | 0.34 | 1 | 0.34 | 0 | 0.00 |
| **Ecosystem importance** | 0.08 | 0 | 0.00 | 2 | 0.00 | 4 | 0.00 |
| **Strong objective** | 0.04 | 3 | 0.11 | 3 | 0.33 | 1 | 0.33 |
| **SBRM compatibility** | 0.17 | 1 | 0.17 | 3 | 0.51 | 4 | 2.03 |
| **Catch estimate uncertainty** | 0.14 | 0 | 0.00 | 4 | 0.00 | 4 | 0.00 |
| **Risk to management** | 0.12 | 1 | 0.12 | 1 | 0.12 | 4 | 0.46 |
| **IFM Program Overall Ranking** | | | 1.46 | | 1.71 | | 3.24 |

In the example, FMP 3 ranks the highest, followed by FMP 2, then FMP 1.

After the process is complete, NMFS and the Council may now use the rankings to prioritize the industry-funded monitoring program for allocation of available funding to the FMPs to cover NMFS's costs.  One possible way to do this would be to fully fund the highest ranked program, and then work through the ranking list sequentially until funding to cover NFMS's cost was completely allocated.  Funding would not be allocated to a program if the available allocation would fund less than ¼ of the necessary funding.

Considerations for Monitoring Set-Asides

The text below outlines some of the concepts for the Council and NMFS to consider when determining whether developing a future monitoring set-aside program for a given fishery could be successful.

Value of the Resource

It is important to determine if the value of a monitoring set-aside program would be significantly beneficial for the goals of off-setting additional monitoring costs.

For example, in 2010, the stock wide Atlantic herring ACL was 201 million lb and the herring ex-vessel price was approximately $0.13/lb.  Landings that year were approximately 145 million lb (approximately 72% of the ACL).  If 3 percent of the ACL was set-aside for monitoring (6.03 million lb), that would equate to approximately $784,140 to cover monitoring costs in the Atlantic herring fishery.  However, the fishery may only catch a portion of the monitoring set-aside.  For example, if only approximately 72 percent of the monitoring set-aside was harvested, then only approximately $564,581 (72% of $784,140) would be available to cover monitoring costs for the entire fishery (all gear types and permit categories).  There are also costs associated with fishing, and only the extra profits, not the full ex-vessel value, are a benefit to the fishermen.

Depending on the monitoring program in place, a set-aside would only partially cover monitoring costs.  The high ex-vessel value of scallops and modest level of additional sampling currently allows for the scallop monitoring set-aside program to fully off-set the monitoring costs in the scallop fishery, but if ex-vessel value of scallops falls to a low enough level, it may not allow full funding in the future.

Management Measures and Fishery Operations

When developing a monitoring set-aside program managers need to consider the operation of the fishery as well as the comprehensive management measures within a fishery to create a successful monitoring set-aside program.  It is also important to consider fishery management partners when developing exemptions or measures for a monitoring set-aside program.  Finally, and perhaps most importantly, there needs to be incentive and benefit to the vessels associated with the ability to harvest additional pounds to off-set additional monitoring costs.

In the scallop monitoring set-aside program, vessels can harvest additional scallops above the possession limit, or fish at a reduced days-at-sea accrual rate, when they carry an

_0000017494

observer.  This provides vessels additional revenue from that trip to off-set the costs of the observer.  However, in a fishery like Atlantic herring, some limited access vessels do not have a regulated possession limit and often fish to the maximum capacity of the vessel.  Since some vessels in this fishery do not have a possession limit, harvesting additional fish on a trip may not be an effective option.  However, there could be other management measure incentives such as allowing fishing during a closed season, in a closed area, or following a seasonal closure.  However, benefits from such exemptions would only occur in some fisheries and may not offer an immediate return of funds to offset monitoring costs.

In the summer flounder, scup, and black sea bass fisheries, in addition to Federal possession limits, states often implement possession limits for these species.  If vessels participating in these fisheries were provided exemptions to the Federal possession limits for a monitoring set-aside program, they would also need to be exempt from a state possession limit in order to land over the possession limit in that state.  This type of monitoring set-aside program would require coordination with the states and the Atlantic States Marine Fisheries Commission, and may create additional administrative burden for states.

ACL Allocation Within a Fishery

FMPs use a wide range of structures to apportion ACLs to different fishery participants (e.g., commercial and recreational allocations).  Monitoring set-aside program managers must consider how the ACL is distributed within the fishery when deciding how to structure the set-aside program.  For example, in the Bluefish FMP, there is only one ACL from which a commercial and a recreational annual catch target (ACT) are derived.  If 3 percent of the ACL is allocated for a monitoring set-aside program, both the commercial and recreational ACTs would be reduced proportionally.  However, it is most likely that only the commercial sector would have additional monitoring requirements, therefore the commercial fishery would benefit from the additional monitoring set-aside pounds to cover monitoring costs, but the recreational fishery would simply have a reduced quota.

On the other hand, Amendment 16 to the Northeast Multispecies FMP allows the Council to set sub-ACLs for groundfish stocks through framework adjustments.  This vehicle could be used to create a monitoring set-aside program by designating sub-ACLs for some, or all, of the groundfish stocks.  The landings allocated to those sub-ACLs could then be used to cover additional monitoring costs in that fishery.  It is important to consider how quotas are allocated within the fishery and how to most appropriately distribute the monitoring set-aside pounds.  As an aside, it is worth exploring whether the sub-ACL approach may be an alternative approach for establishing monitoring set-asides for the groundfish fishery.

Shared Burden and Benefit

It is important to consider whether the reallocation of quota for a monitoring set-aside program will be equally beneficial and/or burdensome to all fishery participants, and how monitoring set-aside programs could affect different permit categories or different gear types within a fishery.  For example, in the Atlantic herring fishery, hypothetically a

_0000017495

monitoring set-aside program could allocate 3 percent of the ACL to off-set monitoring costs. However, the monitoring alternatives under consideration for the herring fishery apply coverage to a subset of the herring fishery participants. For example, in some alternatives, the midwater trawl vessels may be the only gear type that has industry-funded monitoring requirements. If a monitoring set-aside were established to offset the costs of this program, the midwater trawl vessels would receive the benefits of additional pounds for monitoring costs, but the purse seine vessels would have a smaller annual quota to harvest, and may therefore endure increased hardship despite not having additional monitoring requirements.

In contrast, in the groundfish fishery, the burden of monitoring costs may be more evenly dispersed with the establishment of a monitoring set-aside program. Currently, not all vessels participating in sectors are active in the fishery. Those inactive vessels lease their allocation to the active vessels, but the active vessels would be responsible for additional monitoring costs. If the monitoring set-aside program reserved 3 percent of the overall ACL, then the allocation to each vessel would be equally reduced, therefore sharing the burden more evenly among all participants in the fishery as opposed to just the active vessels.

<u>Availability and Prevalence of the Resource</u>

The health and availability of a fishery will dictate whether the fishery can sustain a monitoring set-aside program. For example, the Atlantic mackerel fishery has continually been underperforming and annual landings have been declining for approximately the past 10 years (Table 65). At this time it is unclear if the mackerel stock is declining or if the fish are behaving differently in terms of migration or schooling. Providing mackerel vessels with additional pounds of fish to land to off-set additional monitoring cost would not be beneficial because the fish are predominately unavailable or unattainable and the quota has not been limiting.

Additionally, it is important to consider whether the monitoring set-aside program would affect fishing pressure on a sub-component of a stock. For example, if monitoring is only required for vessels fishing in certain areas, those vessels would be provided the additional monitoring set-aside pounds, and therefore could increase fishing effort in those areas. In this example, there may be disproportionate fishing pressure on a sub-component of the stock that exists in the area where additional monitoring is required. Managers need to consider the current health of the stock, the recent performance of the fishery, whether the current management measures appropriately address the potential for the effects of catch on different components of the stock, and how to create a dynamic monitoring set-aside program for changes in stock status and performance to develop a successful program.

<u>Enforcement Issues</u>

Fishery managers should also consider methods to enforce a monitoring set-aside program to prevent abuse to the system. The Mid-Atlantic Research Set-Aside (RSA) program was recently suspended, in part due to issues revolving around enforcement and abuse of the

_0000017496

program that resulted in overexploitation of some fisheries.  Some monitoring set-aside models could be structured similarly to the Mid-Atlantic RSA program where vessels receive exemptions from certain regulations (i.e., possession limits or closed seasons/areas) to harvest monitoring set-aside pounds.  Similar enforcement, monitoring, and reporting issues would need to be addressed when developing a monitoring set-aside program to prevent abuse and over-exploitation of a fishery resource.

Estimated Potential Revenue for Certain FMPs

An estimate of the amount of revenue that could be generated from a set aside is shown in the table below.  This table is generated using the lowest and highest average ex-vessel price of herring from the 2010-2014 fishing years.  Inability to locate herring, reductions in ABCs, or lower prices would reduce expected revenues from a monitoring set-aside.  In addition, changes to the management program (i.e., changes to the current unlimited possession limits for Category A herring) may be necessary, depending on the structure of the set aside.  For the herring fishery, using 1 to 5 percent of the 2015 annual catch limit could fund 357 to 2,020 NEFOP-level monitoring days at $818 per sea day, and 411 to 2,327 at-sea monitoring days at $710 per sea day.

_0000017497

_0000017498

APPENDIX 7

# Herring and Mackerel Fishery Electronic Monitoring Project

**Contract EA-133F-16-SE-1143**

**Prepared for:**

**U.S. Department of Commerce**

**National Oceanic and Atmospheric Administration**

**National Marine Fisheries Service**

**Northeast Fisheries Science Center**

**Woods Hole, MA 02543**

**Prepared By:**

**Morgan C. Wealti, Kathryn Carovano[1]**

**Andrew W. Jones, Glenn Chamberlain, Justin Potter [2]**

**[1] Saltwater Inc., 733 N. Street Anchorage, AK 99501**

**www.saltwaterinc.com**

**[2] Northeast Fisheries Science Center, 166 Water Street, Woods Hole, MA 02543**

_0000017499

## Table of Contents

**Acronyms**                                                                 7

**I. Executive Summary**                                                     **9**

    Summary Overview                                      9

    Summary of Data Findings                              10

    Summary of Lessons Learned                            11

**II. Project Background & Overview**                                        **13**

    The Atlantic Herring and Mackerel Fisheries          13

    Electronic Monitoring (EM)                            15

    Project Goals & Objectives                            18

**III. Project Implementation**                                             **20**

    Project Timeline                                      20

    Outreach                                              20

    EM systems Installations & Field Support              21

    NEFOP Data Collection                                 23

    VMS Data Collection                                   24

    Data Management & Review                              24

        Data Transfer                 24

        Data Security & Storage       24

        Data Review                   24

**IV. Data Analysis/Findings**                                              **26**

    Project Data Overview                                 26

    Comparison of Review Time                             33

    Comparison of Reviewer Annotations                    36

    Comparison to NEFOP Data                              40

    Additional Data                                       43

**V. Cost Drivers**                                                       46

    Start-Up Costs                                                  46

    Ongoing Costs                                                   49

**VI. Lessons Learned/Recommendations**                                  **53**

    Implementation                                                  53

        System Components                                    53

        System Use & Reliability                             53

        Compliance                                          55

        Incentives to Participate                           57

    Data Management & Review                                         58

        Data Retrieval                                      58

        Data Processing Times                               59

        Modified Catch Handling                             60

        Distinguishing Between Discarding Events             61

        Methods To Address Undetected Discard Events         61

        Fish Disposition Categorization For Fish Not Brought Onboard   62

    Applicability To Other Greater Atlantic Fisheries                62

**VII. Conclusions**                                                     **64**

**VIII. Acknowledgements**                                               **65**

**IX. References**                                                       **66**

**X. Appendices**                                                        **67**

    Appendix 1: Discarding Event Descriptions                       67

    Appendix 2: EM Study Outreach Sheet                             69

    Appendix 3: Vessel Reference Sheet                              71

    Appendix 4: Trip Feedback Form                                  77

    Appendix 5: Quarterly Summary Form                              80

    Appendix 6: Vessel Representative Exit Interview                81

    Appendix 7: Vessel Monitoring Plan                              86

_0000017501

Appendix 8: NMFS/NEFSC EM System Specifications    107

Appendix 9: Image Quality Assessment    113

Appendix 10: Data Release Form    114

_0000017502

## Table of Figures

Figure 1: Graphic User Interface (GUI) as seen on EM system monitor in wheehouse        16

Figure 2: Diagram of the electronic monitoring system used in this project        17

Figure 3: Project Timeline        20

Figure 4: Boom arm installed on one of the participating vessels.        22

Figure 5: View of fish pumping before and after installation of the boom arm.        22

Figure 6: EM data displayed using Saltwater's Open Source Review Software.        25

Figure 7: A timeline of trips included in the analysis.        27

Figure 8: Haul-level agreement throughout the course of the project.        28

Figure 9: The spatial distribution of discard records.        30

Figure 10: Breakdown of event types by vessel.        31

Figure 11: Effect of trip effort on the number of discard events.        32

Figure 12: Summary of review time for trips sampled.        34

Figure 13: Effect of trip effort on review time.        34

Figure 14: Total review time for trips with varying numbers of events.        35

Figure 15: Percent of trip length that is active fishing.        36

Figure 16: Comparison of EM reviewers' slippage annotations.        38

Figure 17: Comparison of EM reviewers' slippage annotations by vessel.        38

Figure 18: Comparison of EM reviewers' operational discard annotations.        39

Figure 19: Comparison of EM reviewers' operational discard annotations by vessel.        39

Figure 20: The distributions of estimated weights for each discard event type.        44

Figure 21: A comparison of reviewer notes of protected species interactions.        45

Figure 22: A comparison of reviewer notes of individual animal interactions.        45

Figure 23: Overall EM program costs broken down into startup costs and ongoing costs by category.        46

Figure 24: Startup costs for EM Project broken down into categories.        49

Figure 25: EM implementation ongoing costs broken down into categories.        52

Figure 26: Reasons for missing video data.        54

_0000017503

**Figure 27:  Image quality assessment.**                                                          55

**Figure 28:  Project Participation.**                                                              56

**Figure 29: Days between trip end and receipt of trip data**                                       59

## Table of Tables

**Table 1: IFM alternatives for the herring fishery**                                                19

**Table 2: Observer coverage rates.**                                                               23

**Table 3: The summary of camera installation information.**                                        26

**Table 4: Summary of events recorded by each review type.**                                        29

**Table 5:  Partial and full release agreement between census reviewer and NEFOP observer.**        40

**Table 6: Agreement among three sources of data: census EM, audit EM, and NEFOP observer.**        41

**Table 7: Discarding event descriptions**                                                          67

_0000017504

## Acronyms

| | |
|---|---|
| ASM | At-Sea Monitor |
| AWS | Amazon Web Service |
| EM | Electronic Monitoring |
| ESA | Endangered Species Act |
| ET | Electronic Technology |
| FMP | Fishery Management Plan |
| FOIA | Freedom of Information Act |
| GARFO | Greater Atlantic Regional Fisheries Office |
| GPS | Global Positioning System |
| GUI | Graphical User Interface |
| HDD | Hard Disk Drive |
| IFM | Industry Funded Monitoring |
| IP | Internet Protocol |
| MADMF | Massachusetts Division of Marine Fisheries |
| MAFMC | Mid-Atlantic Fisheries Management Council |
| MEDMR | Maine Department of Marine Resources |
| MMPA | Marine Mammal Protection Act |
| NAS | Network Attached Storage |
| NEFMC | New England Fishery Management Council |
| NEFOP | Northeast Fisheries Observer Program |
| NEFSC | Northeast Fisheries Science Center |
| NMFS | National Marine Fisheries Service |
| NFWF | National Fish and Wildlife Foundation |
| PoE | Power-over-Ethernet |
| RSA | Research Set-Aside |
| SBRM | Standardized Bycatch Reporting Methodology |

Appendix 7 – EM Project                                        December 2018

_0000017505

| UPS | Uninterruptible Power Supply |
| USB | Universal Serial Bus |
| VMP | Vessel Monitoring Plan |
| VMS | Vessel Monitoring System |
| VTR | Vessel Trip Report |

_0000017506

# I. EXECUTIVE SUMMARY

## SUMMARY OVERVIEW

Electronic Monitoring (EM) is increasingly being used as a tool for catch monitoring and reporting compliance in fisheries around the world. There are several EM initiatives and programs underway in the United States, but full program implementation in the Northeast remains limited. As part of the Greater Atlantic Region's Electronic Technology (ET) Implementation Plan, the New England Fishery Management Council (NEFMC) and the National Marine Fisheries Service (NMFS) are considering implementation of EM in the Atlantic herring midwater trawl fishery to improve catch monitoring. In the Industry Funded Monitoring (IFM) omnibus amendment, the New England Fishery Management Council recommended increased monitoring in the herring fishery to address the following goals: 1) accurate estimates of catch (retained and discarded), 2) accurate catch estimates for incidental species for which catch caps apply, and 3) affordable monitoring for the herring fishery. The IFM amendment evaluates how different coverage target alternatives meet the specific monitoring goals identified by the New England Council while comparing the costs of the monitoring programs, particularly costs that would be borne by the fishing industry. The herring coverage target action alternatives include Northeast Fisheries Observer Program-level (NEFOP-level) observer, at-sea monitoring (ASM), EM, and portside sampling (PS) coverage. Because midwater trawl vessels discard only a small percentage of catch at sea, EM and portside sampling have the potential to be a cost effective way to address monitoring goals for the midwater trawl vessels harvesting herring. EM would be used to verify retention of catch on the midwater trawl fleet and portside sampling would be used to verify amount and species composition of landed catch.

Additionally, the Mid-Atlantic Fishery Management Council is considering EM as a monitoring option in the mackerel fishery pending the results of this study. While EM has been successfully deployed in other fisheries, its suitability for use in the Atlantic herring (and potentially mackerel) has not been explored. To this end, the NMFS Northeast Fisheries Science Center (NEFSC) and the Greater Atlantic Regional Fisheries Office (GARFO) designed a project to simulate, test and refine an operational EM program.

In August 2016, the NEFSC contracted Saltwater Inc. (Saltwater) to conduct a project to determine if EM is an appropriate tool to improve monitoring and address bycatch issues in the Atlantic herring and Atlantic Mackerel midwater trawl fisheries. Specifically, the goals of this project were to inform:

- Development of EM program requirements;
- Development of a data program and EM service provider performance standards;
- The establishment of roles and responsibilities for the fishing industry, service providers, and NMFS;
- How EM data collected in this project could be integrated into other reporting requirements; and
- How information could be provided to enhance fishery-wide implementation requirements.

This information will assist NMFS and the Fishery Management Councils in the development of EM program requirements and EM performance standards. To achieve these objectives, NMFS identified the following Contractor specific project deliverables:

- Installation and deployment of EM systems on up to twelve (12) Atlantic herring midwater trawl vessels;
- Develop local infrastructure for vessel and program support;
- Develop Vessel Monitoring Plans (VMPs) and establish standards and procedures for approving VMPs and equipment installations;
- Use EM to monitor fishing activity to determine if there are discards on herring and mackerel trips;
- Review sensor and video data; and

_0000017507

- Work with NMFS to review program performance for refinement.

NMFS and Saltwater staff conducted industry outreach and recruited volunteers willing to participate in the EM study during the 2016 and 2017 fishing years. Saltwater EM technicians installed systems on eleven commercial herring and mackerel midwater trawl fishing vessels in Maine, Massachusetts and New Jersey. Video and sensor data were collected for over 12 months on 192 trips and reviewed by Saltwater and NEFSC staff. Using the collected data, the project team evaluated the EM system's ability to capture data to meet the forthcoming monitoring requirements in the herring fishery, evaluated the major drivers that could impact the costs associated with full implementation, and looked for applicability to other Northeast fisheries.

## SUMMARY OF DATA FINDINGS

As a result of collaborative voluntary participation by the fleet and the diligent work of Saltwater and NMFS staff, an expansive and unique data set was collected as a part of this project.

- Data was collected on 192 trips across the 11 actively fishing midwater trawl vessels.
- These data were initially reviewed by both Saltwater and a secondary review was performed by NMFS reviewers; Saltwater staff performed a comprehensive 'census' review while NMFS staff performed a shorter 'audit' that focused exclusively on fishing events.
- 'Dual reviews' were successfully completed on 126 trips (i.e., both 'census' and 'audit' reviews were completed).
- Of the 126 dual reviewed trips in this study, 32 trips (25%) had overlapping Northeast Fisheries Observer Program (NEFOP) coverage.
- Video reviewers were tasked with identifying and documenting discard events to determine what information could be consistently gathered and which types of discard events could be accurately categorized using EM. Please refer to *Appendix 1* for descriptions used by reviewers to categorize discard events.
- In total, review staff performed more than 1,000 hours of video review and catalogued 1,461 discard records (902 census reviewer records, 559 audit reviewer records).
- Of the the discard events as reported by the audit review, the most frequently assigned category was "discarded after being brought onboard," followed by "operational discards," "other," "unknown," "partial release," and "full release."
- Fishing activity made up approximately 23% of trips, suggesting that a reduced portion of the total video could be reviewed in detail to detect discard events.

Following the completion of the data collection period, the project team compiled the data and performed a series of summaries and analyses. Initial results of this work suggest that video-based EM has potential to be an effective monitoring tool in this fishery.

- Census and audit EM reviewers agreed that approximately 41 slippage events (26 partial release and 15 full release) had occurred in addition to another estimated 88 operational discard events.
- There was a high level of agreement among EM reviewers in categorizing full release events (94%).
- For smaller release events reviewers were generally able to identify that a release event had occurred, but often did not use the same classification to describe the events. For partial release events reviewers agreed in approximately 55% of the cases. In cases of disagreement, one reviewer typically classified a discard event as a partial release and the other reviewer classified the event as operational discards. The comments entered by reviewers suggested that in many of these events, reviewers were viewing similar releases of catch but categorizing them differently.

_0000017508

- Data comparisons between EM reviewers and NEFOP observers showed general agreement in identifying and categorizing slippage events. A close comparison of these events highlights the strengths and weaknesses of each data stream.
- Agreement between reviewers (our primary metric of performance in this study) was often impacted by factors such as the total number and placement of cameras on a vessel; factors that could be better controlled in an operational program where vessels would be expected to meet required standards and protocols regarding camera set-up (EM system set-up varied by participating vessel as participation was voluntary and vessels have different layouts).

In addition to comparisons of event categorization, data collected in this project assisted with the development of recommended operational considerations to maximize the effectiveness of video-based monitoring systems in this fleet. Specifically, results provide valuable information on the average times for EM video review and potential drivers of increased review time (mainly individual annotations of discard after being brought on board events). Further, our results suggest that an audit approach to video review may be sufficient, and may substantially reduce total review time, program costs, and storage requirements.

## SUMMARY OF LESSONS LEARNED

A primary goal of this project was to determine if EM technology was a suitable monitoring option for this fishery. Throughout the project, feedback was collected from project participants and with that input, the project team identified what worked well and where improvements were needed. Overall, EM was effective in detecting and categorizing full release slippage events when EM cameras were appropriately situated and used as recommended. Furthermore, EM was effective in detecting and categorizing catch discarded after being brought onboard. While EM was effective in the detection of discard events, reviewers had some difficulty in differentiating between operational discards and partial release slippage events consistently. Incorporating a mechanism which allows vessel operators to provide information regarding discard events throughout the trip may further aid when distinguishing among these events. The following are recommendations to promote a successful EM program in the herring midwater trawl fishery.

**Implementation**

**System components:** The EM systems provided by Saltwater functioned reliably and captured high quality data that allowed reviewers to identify discard events. Unnecessary recording occurred when the vessels engaged in non-fishing activity at the dock that incorporated the vessel hydraulics and initiated camera recording. The incorporation of using geofencing technology to restrict the onset and completion of video recording eliminated these unintended recordings and should be required in an operational program.

**System use and reliability:** Power interruptions to the EM system caused incidences of data loss. The use of voltage conditioners and uninterruptible power supplies (UPS) decreased the risk of power loss to the EM system. Camera connectivity issues that occurred were due to high vibration on the rail mounted cameras. Vibration resistant cameras are recommended for boom mounted cameras in this fishery.

**Compliance:** The project had lower participation in the last quarter for a variety of reasons that are addressed later in this report, but ultimately were a result of the voluntary structure of the study. In an operational program, vessels would be required to operate their systems or would be subject to consequence measures. Another common issue we encountered was a lack of proper training for the vessel personnel responsible for operating the EM system. The vessel representative trained by Saltwater during the install was often the vessel owner or fleet manager, not the captain. For this reason, captains and crews did not always fully understand their responsibilities. Under full implementation, the captain should be present during the install for operator training.

_0000017509

To maximize the ability of EM reviewers to view all discards, we determined that cameras should be installed to capture all 4 possible discard locations as listed below;

- Fish pumping
- Dewatering box
- Full deck
- Stern

These four views can generally be captured by three properly placed cameras. On most vessels, getting the required views will require the installation of a boom arm mount (as described in section III below).

**Data Management and Review:**

**Data review:** It is important for all project partners to work together at the onset of any EM project to determine which data fields should be collected and how they should be reported. Doing this early ensures the EM systems are installed with the best possible configuration to collect the necessary information and that data is properly documented in the review process. All events of interest should be clearly defined to prevent variation in the classification of discard events among reviewers. Data reviewers should be trained to ensure categorization of events and species identification is standardized.

**Data retrieval:** In fisheries with complex logistics where the vessels are not all located in the same port, in person data retrieval can be costly and logistically complicated. Mailing EM data to the review center can simplify this process and result in cost savings. However, mailing the data diminishes the opportunity for face to face contact, which allows vessel operators to ask questions, build working relationships with technicians and facilitates advantageous system performance checks. This issue may be mitigated by more frequent communication with the vessel operators early in the project (after the first few trips) to ensure EM responsibilities are understood and data collection is optimized. In an operational EM program with required compliance, vessel operators would be required to perform a "system check" prior to each trip, and ensure that any issues with the system are reported immediately to the EM service provider. In a fleet that makes frequent, short trips and is somewhat migratory, sufficient spare hard drives should be made available to the vessels to ensure data collection is not hindered due to HDD resource limitations.

_0000017510

## II. PROJECT BACKGROUND & OVERVIEW

Saltwater Inc. is an observer and EM service provider headquartered in Anchorage, Alaska with field offices in Massachusetts, Washington, and Kodiak, Alaska. Saltwater has collected high quality data on fisheries and oceans for government agencies, research organizations, and fishermen for nearly 30 years. Since 2010, Saltwater has provided electronic monitoring services on vessels in the Atlantic pelagic longline fishery, the North Pacific longline and pot cod fisheries, the Pacific/West Coast groundfish fishery, the Pacific Islands shallow and deep set longline fishery, and the Gulf of Mexico reef and shrimp fisheries. The EM systems in these fisheries consistently produce high quality digital imagery integrated with precise Global Positioning System (GPS) and sensor data. These projects have allowed Saltwater to engage with fishery managers, the fishing industry, and other stakeholders to identify key challenges and define the best means of implementing EM in each fishery. This includes hardware and software decisions, data retrieval and management planning, data review protocols and procedures, skipper engagement and training, and infrastructure development.

### THE ATLANTIC HERRING AND MACKEREL FISHERIES

Atlantic herring (*Clupea harengus*) are a schooling fish distributed throughout the North Atlantic and Arctic Oceans, including the eastern seaboard of North America, where they migrate between Canada and North Carolina to feed and spawn[3]. These herring are a slow-growing species, generally reaching maturity at age 3 (~10 in) and attaining lengths of 15 inches[4]. Herring are an important forage species for tuna, sharks, haddock, flounder, squid, and marine mammals[5]. They are commercially valuable as bait fish, for fish oil, fish meal, and for human consumption. The fishery is managed through a stock-wide annual catch limit allocated to four separate management areas overseen by NMFS and the NEFMC (for Federal waters), and the Atlantic States Marine Fisheries Commission and individual states (for coastal waters).[6] Atlantic herring are caught with a variety of gear types, including trawl, purse seines, and gillnets, with midwater trawls (paired and single) accounting for the majority of the catch, 35,074 metric tons of herring from all areas, landed in 2016. This amount includes Research Set-Aside (RSA) quota.

Atlantic mackerel (*Scomber scombrus*) have a similar distribution and life history as Atlantic herring, and the two are often caught in conjunction. Mackerel grow to lengths of up to 16 inches; like herring, they feed on zooplankton and small crustaceans, and are an important forage species for other animals. There is a recreational fishery for mackerel, and their stock-wide annual catch limit is divided between the commercial and recreational fishery, managed entirely by NMFS and the Mid-Atlantic Fisheries Management Council (MAFMC)[7]. Mackerel are commercially fished with a wide variety of gears, such as handline, longline, purse seine, pot/trap, gillnets, and trawls, with midwater trawls accounting for the majority of the catch.

Under the Northeast Fisheries Observer Program (NEFOP), when selected by NMFS, vessels operating in the herring and mackerel fisheries must carry at-sea observers who document catch and discards, economic information, gear characteristics, fishing location, and biologically sample the catch.[8]. The herring fishery is not currently characterized

---

[3] http://s3.amazonaws.com/nefmc.org/herring_FMP.PDF

[4] https://www.nefsc.noaa.gov/publications/tm/tm126/tm126.pdf

[5] https://www.mass.gov/service-details/learn-about-atlantic-herring

[6] https://www.greateratlantic.fisheries.noaa.gov/sustainable/species/atlherring/index.html

[7] https://www.fisheries.noaa.gov/species/atlantic-mackerel

[8] https://www.greateratlantic.fisheries.noaa.gov/regs/2015/June/15sbrmomnibusamendea.pdf, pg. 125, 4.5.1.1 Federal Observer Program

_0000017511

as overfished, or as experiencing overfishing[9], but stakeholders have expressed concerns with bycatch and interactions with marine mammals. Given the the findings of the recent Atlantic Mackerel assessment (available at https://www.nefsc.noaa.gov/saw/reports.html), its official status will soon change to overfished with overfishing occurring.  Plans are underway to implement a rebuilding program commencing January 2019 (pers com Jason Didden, MAFMC staff). The Standardized Bycatch Reporting Methodology (SBRM) sets the rate at which each fishery is covered; the actual rate depends on the amount of variability in the observer data used to complete the analysis. As a result, the coverage rate changes from year to year. The sea day schedule is released to the public in the spring each year.

Paired and single midwater trawling for Atlantic herring and mackerel are characterized as *High Volume Fisheries*, defined by large catch of many small fish, which are typically brought onboard using a high powered vacuum pump. Catches flow at a rate of 3,600 - 8,900pounds per minute (final loaded NEFOP data, 2010-2017, midwater trawl vessels only; flow rate estimate based on observed pump times and weights by permit) directly through a series of chutes into the vessel's hold, which contains refrigerated sea water. Currently monitored bycatch includes haddock, and river herring (alewife and blueback herring), and shads.

There are 12 vessels that actively fish for herring and mackerel with midwater trawl gear, and the vessels fish out of 5 main ports: Rockland, ME; Portland, ME; Gloucester, MA; New Bedford, MA; and Cape May, NJ. The vessels in these fisheries are usually large (80-150 feet or more in length), and in roughly half the fleet, two vessels fish together, which is referred to as "pair trawling". Trips typically last 3-5 days, though much of that time may be spent searching for fish via electronic sounders. The vessels rely heavily on their sonar systems (sounders, fish finders) to locate the targeted schools of fish.

Paired midwater trawling is only possible in relatively good weather because the paired vessels must maintain a uniform distance while towing and hauling back[10]. Setting begins with one vessel putting the net over the stern. The second vessel then approaches, pulling alongside its sister ship to retrieve a line attached to the net bridle from the vessel setting the net. The receiving vessel will then attach the bridle to their steel wire and, at the specified signal, both vessels begin to pay out a certain amount of wire in unison. Communications throughout the operation are maintained over VHF radio. Once the wire is paid out, towing begins, with the vessels on parallel courses and about one half to one third the warp length apart. Depth can be modified by increasing or decreasing wire length and towing speed.

One of the challenges to fishing with two vessels is that they need to be of similar size and power, and the captains must work in close cooperation for successful fishing to occur. Sensors are used to ensure the gear is fishing correctly and to monitor the catch in the net. Haul back begins at a given signal, with the warps being pulled in until the legs are brought up to the vessels. The vessels come alongside each other once more, when one of the vessels releases its cable and throws the line attached to the net bridle back to the hauling vessel, and the net is brought alongside at the surface to have the catch pumped onboard, into refrigerated saltwater tanks.

A primary objective of the study was to determine if EM technology could monitor catch retention in the midwater trawl fishery.  The NEFOP provides at-sea coverage in the high volume fisheries and classifies discards into three categories: 1) Catch discarded after being brought on board 2) Slippage, referred to as the partial or full release of catch 3) Operational Discards. This classification structure was utilized by video reviewers throughout the EM

---

[9] https://www.fisheries.noaa.gov/species/atlantic-herring

[10] Thomson, D. 1978 "Pair trawling and pair seining; the technology of two-boat fishing." Fishing New Books. 0-85238-087-9

_0000017512

project. Once a discard event was identified, reviewers selected one of five options to document the discard event type. These discard event types are defined in *Appendix 1.*

## ELECTRONIC MONITORING (EM)

The use of EM systems on fishing vessels is an increasingly popular addition to the monitoring portfolio of fishery management tools. The systems are comprised of video cameras, sensors, and data collection software. Data generated by the EM system includes vessel location, speed, gear deployment logs, and video of fishing activity, but does not collect audio. The data can augment or replace human observers to meet certain monitoring goals. EM has advanced significantly in the past 10 years, making high-quality, consistent data capture a cost-effective option to at-sea observers in some, if not all, fisheries. The following is a more detailed description of the EM system components:

*Digital Cameras:* Saltwater's internet protocol (IP) digital cameras have an ingress protection rating of IP67, which means they are manufactured with housings designed to protect against water immersion up to 1 meter and up to 30 minutes. Each camera is capable of capturing high-resolution imagery (1920 x 1080) at a rate of up to 30 frames per second. The cameras were selected for their low lux rating, ensuring clear imagery in low light, and use wide dynamic range technology to better handle fluctuating lighting conditions. Saltwater has deployed these cameras on vessels from Alaska to Hawaii, fishing in all kinds of challenging conditions. For this project, video resolution was set to 720p (1280x720) at a 15 fps, which is the recommended setting for smooth video playback.

*GPS Receiver:* Saltwater's GPS receiver is integrated within the control box which is coupled with an external antenna. It provides heading, velocity, latitude, longitude, and time/date. It begins producing data the moment it receives power and records continuously as long as there is power to the EM system. For this project, GPS data was logged every 10 seconds, though the capture rate can easily be adjusted to as often as every second (1 Hz) or as seldom as every hour. This information is used during data review to track vessel activity and to identify fishing effort.

*Hydraulic & Drum Rotation Sensors:* Hydraulic pressure transducers and rotation sensors are central to Saltwater's EM systems. Hydraulic pressure transducers monitor a vessel's hydraulic pressure and rotation sensors monitor mechanics, like line drums or warp winches. Sensor status is logged continuously from the start to the end of each fishing trip. This information helps reviewers identify fishing activity during the review process. The sensors can also be used to trigger video recording.

*Control Center:* Saltwater's small footprint EM control center (12" x 7.5" x 4.5") is fanless, noiseless, and ruggedized to withstand a wide temperature range, as well as shock and vibration. It includes a built in GPS receiver and two hard drive bays. All data collected by the EM system is recorded to high capacity (1 TB) hard disk drives (HDDs). The system is configured to write all information on encrypted HDDs to ensure data security and confidentiality. The system software monitors storage capacity and when one drive fills up, the system automatically stores additional data on the second drive.

The control center has eight built-in Power-over-Ethernet (PoE) ports for IP camera connectivity, which eliminates the need for additional power delivery to an external switch. Universal serial bus (USB) ports allow for simple system software upgrades via flash drive and the opportunity for the integration of other electronic devices. The control box and all of Saltwater's EM system components have low power requirements and can run off either alternating current (AC) or direct current (DC) power.

_0000017513

_Wheelhouse Monitor:_ A wheelhouse monitor with waterproof keyboard allows vessel crew to see current date, time and location data, live camera feeds that show camera views at all times, even when the cameras are not recording, camera status (e.g., recording or not), and view what is being recorded in real-time. Our graphical user interface (GUI) is designed to provide vessel operators with a clear, simple way to confirm that all system components are operating correctly, the presence of a functioning HDD, and the percentage of disk space used. The GUI also allows viewers to determine which HDD has data--and how much--and which drive to send in at the end of a trip.



**_Figure 1_**_: Graphic User Interface (GUI) as seen on the Saltwater EM system wheelhouse monitor ._

_0000017514



*Figure 2: Diagram of the Saltwater EM system used in this project.*

EM has been suggested to monitor gear interactions with protected species, compliance with discard and retention regulations, to account for catch and bycatch, and to validate vessel landing and logbook information. A key constraint to effective EM implementation in many fisheries is the cost of data review and storage. Operational implementation of EM requires not only collecting hours of video and sensor data, but also the ability to efficiently extract from that data, the meaningful information needed to manage a particular fishery. Saltwater has developed open-source review software that integrates video and sensor data for efficient data review and analysis. Open-source software avoids the limitations and expense associated with proprietary code, encourages collaboration and innovation, and will speed the development of cost effective review solutions. A key constraint to successful EM program implementation is the cost of data review. The use of open-source data review software will be critical to the long-term success and sustainability of EM programs. Open source software can be used, changed, and shared (in modified or unmodified form) by anyone. The open-source movement promotes collaborative development of computer source code by multiple independent developers. It is among the most transformative trends shaping technology in the 21st century and companies such as Google, Oracle, IBM, LinkedIn, Square, Twitter, Netflix and others already rely on it.

_0000017515

## PROJECT GOALS & OBJECTIVES

The overarching objectives were to evaluate the utility of EM for monitoring catch retention and to detect discard events in the Atlantic herring and mackerel midwater trawl fisheries according to the proposed use of EM in the IFM (as component of a monitoring option that would complement a portside sampling program). To assess the potential of EM to serve as a means for ensuring catch retention this project sought to 1) Compare annotations associated with discard event events among EM reviewers to quantify how consistently events can be detected by EM, 2) Compare the review times among review types to determine the review time needed, 3) Compare EM discard event detections to those noted by a NEFOP observer to assess the relative efficacy of the technology relative to existing monitoring options, and 4) Refine industry and NMFS EM cost estimates by identifying the variables that impacted the total project cost. The design of the program involved installing EM systems on volunteer vessels actively participating in these fisheries, collecting the video data after each trip, and reviewing 100% of the collected video data. The project team sought to determine if the collected data met specific monitoring needs, what factors were critical to successful program implementation, whether there were ways to improve any aspect of the program, and to identify the primary cost drivers and any cost efficiencies.

The NEFMC developed the Industry Funded Monitoring (IFM) Omnibus Amendment to increase monitoring and/or other types of data collection in some of its Fishery Management Plans (FMP). The goal of the IFM Amendment is to improve the amount and type of catch data, to more precisely monitor annual catch limits, and/or provide other information for management. This increased monitoring will be in addition to coverage required through SBRM, the Endangered Species Act (ESA) or Marine Mammal Protection Act (MMPA). The IFM Amendment specifically addresses increased monitoring in the Atlantic Herring FMP, and contains alternatives that maintain or increase observer coverage in the herring fishery. Although the IFM Amendment was originally intended to be a joint venture between the NEFMC and the MAFMC, the MAFMC has decided to delay any decision on an industry-funded monitoring action until the results of this study are complete.

At its April 2017 meeting, the NEFMC selected IFM Herring Alternative 2.7, which will implement a combined coverage target of 50% for all herring Category A and B vessels, and will provide herring midwater trawl vessels the option to choose between monitoring with At-Sea Monitors (ASM) or with the combination of EM and Portside monitoring. Final approval of EM as a monitoring option will be made at its April, 2018 meeting, and will be based largely upon results and recommendations of this study.

If approved by the New England Council, midwater trawl vessels could choose EM in association with portside monitoring. Since 2008, the Massachusetts Division of Marine Fisheries (MADMF) and the Maine Department of Marine Resources (MEDMR) have collected data (species, morphometrics) on the herring and mackerel midwater trawl fishery through independent portside data sampling programs. MADMF has opportunistically targeted 50% sampling of midwater trawl trips landed in MA, while MEDMR generally samples 5-10% of trips landed in ME. Though these programs are not currently used in NMFS quota monitoring, they have provided valuable and expedited information on catch composition to fishermen and fishery managers. In conjunction with EM, these states will continue to collect data through the first year of IFM implementation in 2018, after which a federal program (modeled after the state programs) will commence in 2019.

_0000017516

*Table 1:* *IFM alternatives for the herring fishery.*

| Gear Type | Midwater Trawl | Purse Seine | Small Mesh Bottom Trawl |
|---|---|---|---|
| **Herring Alternative 1:  No Coverage Target for IFM Program (No Action)** | SBRM | | |
| **Herring Alternative 2:  Coverage Targets for IFM Program** | Includes Sub-Options:  1) Waiver Allowed, 2) Wing Vessel Exemption, 3) 2-Year Sunset, 4) 2-Year Re-evaluation, and 5) 25 mt or 50 mt Exemption Threshold | | |
| **Herring Alternative 2.1:  100% NEFOP-Level Coverage on Category A and B Vessels** | 100% NEFOP-Level Observer | | |
| **Herring Alternative 2.2:  ASM Coverage on Category A and B Vessels** | 25%, 50%, 75% or 100% ASM | | |
| **Herring Alternative 2.3:  Combination Coverage on Category A and B Vessels and Midwater Trawl Fleet** | **50% or 100% EM/Portside** | 25%, 50%, 75% or 100% ASM | |
| **Herring Alternative 2.4:  EM and Portside Coverage on Midwater Trawl Fleet** | **50% or 100% EM/Portside** | SBRM (No Action) | |
| **Herring Alternative 2.5:  100% NEFOP-Level Coverage on Midwater Trawl Fleet in Groundfish Closed Areas**[*] | **100% NEFOP-Level Coverage** | SBRM (No Action) | |
| **Herring Alternative 2.6:  Combination Coverage on Midwater Trawl Fleet in Groundfish Closed Areas** | **Coverage would match selected alternative 2.1-2.4** | SBRM (No Action) | |
| **Herring Alternative 2.7:  ASM Coverage on Category A and B Vessels, then Vessels may choose either ASM or EM/Portside Coverage** | **50% ASM or EM/Portside** | **50% ASM** | **50% ASM** |
| **\* Sub-Options do not apply to Herring Alternative 2.5.** | | | |

_0000017517

## III. PROJECT IMPLEMENTATION

### PROJECT TIMELINE

The contract was awarded to Saltwater and signed on August 12, 2016. The timeline included a 2 month project setup period which included clarifying  project objectives, hardware and software specifications, vessel requirements, defining roles and responsibilities, and development of a project plan. In addition, Saltwater setup local capacity and infrastructure to provide and support field services. The EM operational and data collection period consisted of 13 months (October 2016 - October 2017). Activities included; vessel visits, installation and servicing of EM units, field and project support and data collection. Analysis and report writing occurred over 3 months.

#### Herring & Mackerel Midwater Trawl EM Program Timeline

| | Start Date | End Date | Timeline |
|---|---|---|---|
| Total Project Period | 8/12/2016 | 12/31/2017 | |
| Project Award | 8/12/2016 | 8/12/2016 | |
| Project Setup | 8/12/2016 | 10/12/2016 | |
| Project Outreach | 8/12/2016 | 12/1/2017 | |
| Component Procurement | 8/12/2016 | 9/23/2016 | |
| Installations | 9/30/2016 | 1/5/2017 | |
| Field Support | 10/1/2016 | 10/31/2017 | |
| Data Review | 10/14/2016 | 11/22/2017 | |
| EM System Removal | 9/21/2017 | 12/31/2017 | |
| Analysis and Reporting | 11/1/2017 | 1/31/2018 | |

*Figure 3: Project Timeline*

### OUTREACH

Beginning in 2016, NMFS conducted initial outreach, alerting the herring and mackerel midwater trawl fleet vessel owners that a voluntary EM project had been funded and would be taking place in 2016-17. Vessel owners were informed about the objectives of the project, the timeline, and their roles and responsibilities if they chose to volunteer. NMFS created an EM study outreach sheet (*Appendix 2*) to explain the project goals. Participation in the project was not remunerated and did not remove vessel owners from the requirement to carry observers on selected trips. Saltwater prepared a *Vessel Reference Sheet (Appendix 3),* outlining vessel power requirements and basic EM system operations that was provided to potential volunteer participants, along with a detailed description of the install process.

In order to prepare for the installations, an in-person vessel assessment was conducted on all but one vessel in October 2016. In order to make the best use of the limited time in port, the remaining vessel assessment took place in November, on the first day of the EM system installation on that vessel. During the vessel assessment meeting, members of NMFS and Saltwater met with the vessel owner and/or captain to create an EM installation plan. Saltwater worked with the owner or captain to determine where each of the components should be installed for optimal function. Project goals and objectives were also discussed at this meeting.

Throughout the project, vessel feedback was provided in a variety of formats. Saltwater staff contacted vessel owners or operators if there was something that needed more immediate feedback, such as keeping the EM system powered for the entirety of the trip. Video reviewers also filled out trip feedback forms *(Appendix 4)* to effectively

_0000017518

address issues on a particular trip. Quarterly evaluations summarizing all declared herring/mackerel trips and several metrics evaluating adherence to EM project requirements were sent to the vessel owners (*Appendix 5*). Throughout the project, representatives from NMFS and Saltwater met with vessel owners and operators to review the quarterly evaluations and trip feedback forms as well as go over video footage from that quarter and address any questions or concerns the owners or operators had about the project. At the end of the project, NMFS and Saltwater conducted exit interviews (*Appendix 6*) with representatives from each vessel to discuss the project and gather feedback. A total of 37 outreach meetings took place during the course of the project, including 10 vessel assessments/pre-install meetings, 17 quarterly feedback meetings and 10 exit interviews.

## EM SYSTEMS INSTALLATIONS & FIELD SUPPORT

Saltwater developed an EM system that has been successfully deployed in the past six years on well over 150 vessels in multiple fisheries, including over 100 vessels across the Atlantic Coast fishing in the Pelagic Longline fleet for Tuna and Swordfish. This EM system used for this project has proved capable of collecting high-quality digital video data and accurate, supporting sensor data. Saltwater's EM system consists of a control box with two bays for removable hard drives, one to three Internet protocol (IP) cameras per vessel, hydraulic pressure sensors, drum rotation sensors, a GPS receiver, and a monitor and keyboard for the vessel's wheelhouse. Saltwater's data acquisition software utilizes open-source code to log and process GPS, sensor, and video data into usable EM datasets. All of the EM systems were leased by NMFS for the duration of project. Industry participants were not required to pay for any of the components or service costs, but were given the option to purchase the systems for a nominal fee at the end of the project.

During the initial vessel visits, Saltwater and NMFS discussed the installation with the vessel representative. After discussing fishing operations, NMFS and Saltwater communicated the preferred location for the cameras to capture the ideal views. Typically, these vessels pull the net along the starboard side of the vessel to pump the fish and the catch is pumped through the dewatering box where discarding may occur. Once pumping is complete, the net is pulled back around to the stern where the codend is opened up and the net is brought back onboard on the net reel. With these fishing operations, there are three locations where discards could occur; at the pumping location, at the dewatering box, and at the stern. It was determined that cameras should be installed in a way that captures all 3 of these possible discard locations, usually requiring 3 cameras. A full deck view camera (often used to capture a view of the dewatering box) also proved helpful to allow the reviewer to be able to see when the vessel was setting out the net and hauling it back. There was one vessel in the project that pumped at the stern and therefore did not require a starboard camera.

The typical installation took 3 - 3.5 days for a two technician team (or roughly 60 man hours). Much of this time was spent running wires since many wire runs were behind wall and ceiling panels and were difficult to access. After reviewing the initial datasets from each vessel, it was determined that a camera mounted on a boom could provide a direct line of sight of the pump station, starboard rail, and water while eliminating physical obstructions unique to each vessel participant. It was determined that most pump views in this project, could be improved by the installation of a boom arm extending over the edge of the vessel, allowing the camera an unobstructed view of the pump in the water. Booms were installed on five vessels, however, all but one vessel would have benefited from the installation of a boom. In some situations, captains declined to install a boom because they felt that it would have been an obstruction during the offload process, and others felt the view without the boom should be sufficient for the project. Dewatering box/deck camera views were seen by some participants as unnecessary or intrusive to personal space for a project looking at documenting discard events, so those participants declined to have those views captured on their vessels. It was determined during the project that a deck view, dewatering box view, stern view and pump view were all required to accurately classify discard events. However, since this was a voluntary

_0000017519

project, booms and cameras were installed to capture the best views possible while adhering to the vessel owner's guidance and level of comfort.



*Figure 4*: *Boom arm installed on one of the participating vessels. Boom arms were added to 5 vessels in this project to determine if a better view of pumping activity and the contents of the net could be obtained. Photograph used with vessel owner's permission.*



Appendix 7 – EM Project                                December 2018

*Figure 5: View of fish pumping before and after  installation of the boom arm. Photograph used with vessel owner's permission.*

When the installation was complete, the vessel owner or operator was trained by the EM technician in system operation and maintenance. A system operating manual was provided at the time of install and a VMP (*Appendix 7*) was created and provided to the vessel operator once complete.

Saltwater established a call-in number and service tracking system that was used to meet the support needs of the 11 vessels participating in the project. During the system installs, Saltwater technicians provided vessel owners and/or operators the call-in number, available twenty-four hours a day, seven days a week, and appropriate email contact information. Trained Saltwater EM staff answered all calls and were able to carry out remote troubleshooting and help identify and/or resolve system issues. The majority of calls were answered by the same technicians who carried out the installs, had developed working relationships with the captains, and were familiar with the set up on the boats.

## NEFOP Data Collection

The Northeast Fisheries Observer Program (NEFOP) collects fishery dependent data from the midwater trawl herring fleet. Observers collect a suite of data on herring trips, including: trip-level information (costs, vessel description, safety), gear, catch (kept and discarded),  and data to assist NEFOP in the determination of slippage events, and incidental take information on protected species. For a complete description of all data collected by observers, refer to the observer program operations manual, data entry manual, and on-deck reference guide[11].

NEFOP data are used by GARFO to monitor catch caps for river herring/shad and haddock. The NEFSC uses NEFOP data in support of SBRM to estimate the amount of bycatch occurring in the fishery. The SBRM analysis is described in detail on the observer program website[12].

The SBRM sets the rate at which the fishery is covered; the actual rate is determined based on the amount of variability in the observer data used to complete the analysis. As a result, the coverage rate changes from year to year. The sea day schedule is released to the public in the spring each year. The table below demonstrates the observer coverage over the time-frame of the project.

*Table 2.  Midwater Trawl Quarterly Observer Coverage Rates, Nov. 2016-Oct. 2017. Includes observed (at least one observed haul per trip) single and paired midwater trawl trips divided by VTR trips reporting kept catch. Includes all fisheries, not just herring and mackerel fisheries. The herring EM project data collection period overlapped with two SBRM years, 2016-2017 and 2017-2018 (SBRM schedule runs from April-March). Observer coverage was relatively high Feb-Apr during the study as this aligned with increased SBRM coverage needs during this same period. SBRM coverage of the fleet can vary from year to year, driven by funding and data needs to monitor bycatch (Source:  GARFO's DMIS and NEFSC's OBDBS databases as of 2018-01-24).*

| Period | Observer Coverage |
|--------|------------------:|
| NOV-JAN | 14.60% |
| FEB-APR | 31.30% |
| MAY-JUL | 13.50% |
| AUG-OCT | 11.00% |

## VMS Data Collection

---

[11] https://www.nefsc.noaa.gov/fsb/training/
[12] https://www.nefsc.noaa.gov/fsb/SBRM/

_0000017521

All participants in the Atlantic herring fleet are required to carry a vessel monitoring system (VMS) for use by NMFS to track vessel activity as a condition of their federal fishing permit. VMS data were used during the project to aid in data retrieval. NMFS staff were able to verify vessel activity and communicate expected landing dates to EM technicians. This relay of information allowed the EM provider to plan ahead for data retrievals and system maintenance. VMS data were also used to compare declared herring trips with EM data, which allowed project staff to determine the proportion of trips that were recorded by the EM system. Vessel trip report (VTR) data were used as a second check to compare EM data collection with known fishing activity, particularly in cases where the cameras were not activated due to the absence of fishing activity. Lessons learned from using these tools are applicable to an operational program.

## DATA MANAGEMENT & REVIEW

### Data Transfer

Saltwater's onboard EM hardware and software are designed to facilitate data retrieval by vessel owner/operators. Vessel operators were asked to mail in HDDs after each trip. At the time of installation, they received training and written instructions on how to retrieve and replace the HDDs. Each vessel operator was also provided with four HDDs, with the understanding that two per trip was generally sufficient (one for data storage, and one as a backup). On average, each 1 TB HDD can hold about 8 full days of video with the 3 camera setup at 720p and 15 fps. To submit HDDs, vessel owners were given protective mailers and pre-paid envelopes with tracking information which they could drop in any USPS mailbox.

### Data Security & Storage

All of the EM data stored on the1 HDDs are encrypted and password protected to ensure that they cannot be tampered with and remains confidential. In addition, Saltwater's "system log" records the serial number of the HDDs that are in the system, and the dates of install and removal. This enables the establishment of chain of custody, documenting that the HDD installed is the one removed and the one received.

When the HDDs were received in the Saltwater office, they were decrypted and the data were copied onto a redundant Network Attached Storage (NAS) device. After being backed up and verified, HDDs were reformatted and sent back to participating vessels for future deployment. A chain-of-custody log showing when the drives were received, copied, reformatted, and returned to circulation was maintained during the duration of the project. Additional copies of data from each trip were made and shared with the NMFS project team. Once review was completed, all of the data, including all video files, were transferred from the NAS and uploaded to Glacier, the Amazon Web Cloud Service (AWS), where they will be stored for three years. Amazon Glacier is a secure, durable, and extremely low-cost cloud storage service for data archiving and long-term backup. It provides comprehensive security and compliance capabilities that can help meet even the most stringent regulatory requirements. Data can be stored in Glacier for as little as $0.004 per gigabyte per month, a significant savings compared to local storage solutions.

### Data Review

All of Saltwater's EM data reviewers are current or previously certified at-sea observers. This experience provides them with a keen understanding of the importance of data integrity, familiarity with reporting requirements, vessel operations and the fishery, and training and experience in species identification. For this project, two EM technicians (also former observers) were cross-trained to carry out data review, which allowed for the efficient use of time and talent. To ensure timely review, we also employed a current NEFOP observer as a part time reviewer to assist with video review during times when higher volumes of data were being collected.

Saltwater's onboard EM system collects high-quality digital imagery. Logged sensor data tracks fishing location and effort. Saltwater's open-source review software, which was used for all of the video review carried out under this project, integrates the collected EM video files and sensor data for efficient review and analysis.

Saltwater and Chordata, LLC, under a National Fish and Wildlife Foundation (NFWF) supported grant, developed the review software that was used for this project. The software is also being used by NMFS program in the Pacific Islands, Gulf of Mexico, and Alaska. The software is Windows-compatible, and produces data exports as comma separated value files.

All sensor data captured during a trip is displayed on a timeline to allow reviewers to identify events like gear deployment and retrieval, changes in vessel speed, and other key sensor readings. The reviewer can then click on any point in the timeline to see video imagery

_0000017522

captured at that time. A map showing the trip's GPS track is also synchronized to the video and timeline, allowing reviewers to click on a particular point on the map to access corresponding video imagery.



*Figure 6: EM data displayed using Saltwater's Open Source Review Software. Photographs used with vessel owner's permission.*

For this project, all of the EM sensor and video data collected for each trip were checked by Saltwater reviewers for completeness, loaded into the software, and reviewed in their entirety. Data reviewers documented all fishing activities and discard events. Summary reports were produced as comma separated value (CSV) files and were made available to NMFS. Along with a census review of all of the collected data, Saltwater reviewers performed an internal quality control audit on 89 (46%) of the trips. For this project, staff from both Saltwater and NMFS reviewed the trip footage and data and compared their findings to check for accuracy and consistency. The EM data and discard events were also compared for accuracy and consistency to observer data for all NEFOP observed trips.


## IV. DATA ANALYSIS/FINDINGS

This project generated a large volume of information. There are many ways that these data can be summarized and this report is not a comprehensive treatment of the data. Instead, we summarize data in an effort to address some of the primary goals of this project. First, we provide an overview of the data that were collected and provide some context and to explore how fishing effort recorded during this project compares to recent years. Second, we examine the review data generated by Saltwater and NMFS and explore the review time needed to generate observations of fishing effort. Finally, we delve into comparisons of trip and haul level notes and discard event classifications compiled by reviewers. We discuss how reviewer event classifications differ, and propose what might have led reviewers to categorize specific discard events in different discard event classifications. Through this analysis, we examine the potential pros and cons of using EM for monitoring slippage in the midwater trawl herring fishery.

### PROJECT DATA OVERVIEW

The number of cameras deployed on the 11 vessels varied from one to three cameras. Each vessel was slightly different in configuration leading to some differences in camera placement and the quality of the video framing. Booms were used to improve the framing of pump/rail camera views on some but not all vessels (Table 3). Vessels owners were voluntary participants in the study and ultimately determined the number and location of installed equipment.

*Table 3: The summary of camera installation information and a qualitative assessment of the views they provided. Some vessels are also currently outfitted with triplex rollers (see page 26 for description of triplex) that can be used in catch handling and may increase our ability to discern between different types of fishing events. Views that were clear had minimal obstructions and were ideal for the review of footage. Views that were adequate provided coverage of the area but had some defect (e.g., equipment blocking a portion*

_0000017523

*of the vessel from sight or slight blind spots). Obstructed views significantly impacted the ability of the reviewers to view and classify discard events.*

| Vessel number | Cameras installed | Boom installed | Stern view | Rail view | Dewatering box view | Deck view | Triplex present |
|---|---|---|---|---|---|---|---|
| 1 | 3 | N | Y | Clear | Adequate | None | N |
| 2 | 3 | N | Y | Clear | Obstructed | None | N |
| 3 | 3 | N | Y | Clear | Clear | Clear | N |
| 4 | 2 | N | N | Adequate | Clear | Clear | Y |
| 5 | 2 | N | Y | Clear | Adequate | Adequate | N |
| 6 | 3 | Y | Y | Clear | Clear | Clear | Y |
| 7 | 3 | Y | Y | Clear | Clear | Clear | N |
| 8 | 3 | Y | Y | Clear | Clear | Adequate | N |
| 9 | 3 | Y | Y | Clear | Clear | Clear | Y |
| 10 | 1 | N | Y | Clear | None | None | N |
| 11 | 3 | N | Y | Clear | Clear | Clear | N |

Our assessment of VTR and VMS data suggested that vessels participating in the project sailed on as many as 230 trips during the project period. This total represents a sum of VMS notifications and vessel trip reports that represent a range of vessel activity, and is an upper estimate for the number of trips sailed. The total number of trips with fishing activity that could be used for the analysis (i.e., where reviewer annotations could be compared) was 126 (hereafter referred to as trips with 'dual reviews'), which is likely a large proportion of trips with significant fishing activity. Some trips were excluded from analysis for a number of reasons, ranging from the lack of fishing activity on a trip (and thus no discard events to compare) to an incomplete data set (where the EM system was operational for only a portion of the trip). Ultimately, 126 trips were included in the analysis. Within the sample, vessels on average, completed 11.5 trips during the project period (minimum 3, max 16). In total, 32 of these complete trips (~25%) carried NEFOP observers allowing for an additional level of comparison. As detailed in the participation section (please see below), most of the trips where data were collected occurred prior to July 2017 (Figure 7 and Figure 8). There was no clear temporal pattern in the level of reviewer agreement across the study (i.e., trips where reviewers disagreed that slippage occured were not all clustered at the beginning or end of the of study period), suggesting that disagreement was likely not substantially impacted by the experience of the reviewers or by other factors related to the stage of the project. Similarly, slippage events do not appear to follow any specific pattern when the data is viewed in this way. Trips where complementary data were available from a NEFOP observer occurred across the range of trip dates, but were more prevalent at the beginning of the study.

_0000017524



*Figure 7: A timeline of trips sailed for each vessel that were included in the analysis. Each trip is represented by a short segment corresponding to sail and land dates. Trips with matching observer records are indicated by a blue point above their sail date (the beginning of each trip segment). Whether EM reviewers agreed that slippage occured during the trip is shown with the color of the segment. A gray segment indicates a trip where EM reviewers agreed that slippage did not occur, a black segment indicates a trip where the EM reviewer agreed that slippage did occur, and a red segment indicates a trip where reviewers disagreed as to whether slippage occurred on the trip.*



*Figure 8: Agreement at the haul level for each week of the project. The percent of hauls during a given week of the project where EM reviewers agreed that slippage occured during the trip is shown with the color of the bar. A gray bar indicates a trip where EM reviewers agreed that slippage did not occur, a black bar indicates a trip where the EM reviewer agreed that slippage did occur, and a red bar indicates a trip where reviewer annotations disagree as to whether slippage occurred on the trip.*

Within the set of trips with dual EM reviews (both census and audit) approximately 370 hauls were completed with vessels averaging 33 hauls in the project period (minimum 12, max 52). The mean number of hauls per trip was ~3 (min 1, max 10). This mean value of hauls is very similar to the mean number of hauls per trip in recent years for this fishery (mean number of hauls from the observer data is 2.9). Although not conclusive, this suggests that fishing activities during the project were similar to those in previous years.

Over the course of the project ~902 discard event records were logged by Saltwater while ~559 records were recorded by NMFS (Table 4). The large discrepancy in event totals was mostly due to the larger number of 'discarded after being brought on board' events

_0000017525

identified by Saltwater reviewers conducting a more comprehensive census review.  This was in part because there was a greater effort expended by census reviewers to group discard events by species instead of one event for all species in a haul. In comparison, the audit reviewers focused primarily on major discard events that occur within catch handling time intervals. Discarded finfish that could be tally counted were grouped together based on physical characteristics and consolidated into one discard event entry that included total counts. For a more complete description of the differences in review methods please see below. The total numbers of events in other categories were much closer in number, although Saltwater identified a larger number of partial release events and NMFS noted a larger number of operational discards, unknown, and other event types. The number of full releases identified by each reviewer was nearly identical, and suggests that this type of event is more easily documented by the EM systems. The more substantive differences in the number of operational discards detected by each review type (census recorded 139 while audit recorded 189) were likely driven by differences in the annotation protocol followed by EM reviewers. These differences were likely more pronounced because less emphasis was placed on aligning protocols for identifying operational discards between reviewers than for identifying partial and full release events.

_0000017526

*Table 4:* *The summary of events recorded by each review type across the entire project (all vessels combined) for the trips which dual reviews were generated. Each event category was given a priority listing of "High" or "Low" based on the project's objectives. Full release, partial release, and operational discards were identified at the haul level (totals represent essentially a sum of the number of hauls with a given event category), while other, unknown, and discarded after being brought onboard events were not summed at the haul level. Summarizing events at the haul level aided in matching and exploring discrepancies in event categorization. This table shows that there was close alignment for full release events. Alignment of partial release events was lower, as these events were often labeled as operational discards by one source. These events can be very similar in nature and difficult to distinguish from one another. Interestingly, when these event categories are summed together there is a higher level of alignment among review types (183 census and 220 for the audit).*

| Discard Event Type | Review priority | Saltwater census total | NMFS audit total |
|---|---|---|---|
| Full Release (slippage) | High | 15 | 16 |
| Partial Release (slippage) | High | 44 | 31 |
| Operational Discards | High | 139 | 189 |
| Unknown | High | 55 | 58 |
| Other | Low | 36 | 65 |
| Discarded after being brought onboard | Low | 613* | 200 |

*\* Large difference in this type of event are the result of differing review methodologies (please see below).*

When the locations of discard events (a proxy for fishing activity) are compared (both between reviewers and between reviewers and NEFOP observers), it appears that there is considerable overlap in the spatial extent of the data collected (reviewer annotations tend to cluster in the same locations). Further comparisons to maps of the spatial extent of fishing in recent years[13] suggest the spatial patterns of discarding closely aligned with the distribution of fishing effort and discarding reported previously (Figure 9). This again suggests that the fishing behavior observed in the study is representative of the current fishery practices.

---

[13]https://www.google.com/url?q=http://s3.amazonaws.com/nefmc.org/6.160325-PDT-memo-on-localized-depletion.pdf&sa=D&ust=1516848260876000&usg=AFQjCNEJ3mns8CKl57WLR-t-PBfjpRCrCQ

_0000017527



*Figure 9:* *The spatial distribution of events recorded by each review type across the entire project (all vessels combined) for trips with dual reviews. Heat map values represent the total number of discard events identified in each ten minute square by each reviewer. Closed areas are shown in red for reference. Borders of the current herring Management Areas are shown in white. The 50 fathom depth line is shown in light grey. Additionally, the three-nautical-mile limit is shown in pink. Two events categories (Other and Unknown) are not shown but reflect similar spatial patterns. Census and audit panels represent data from the full study while observer data represents data from the 25% study trips that carried observers (i.e., trips included in the analysis that also carried observers).*

When discard event counts are broken down by vessel (Figure 10), the largest discrepancies in categorizing discard events are again in the numbers of discarded after being brought onboard events (not shown in Figure 10) and in operational discard events. We see a relatively similar distributions of event types across vessels (full releases are uncommon while partial releases and operational discards more common). Differences among vessels in the proportions of event types are likely due to a combination of factors including the number of cameras installed, camera position, and varying catch handling practices. Number of cameras installed and placement was largely determined by study participants (Table 3), as was the decision to be fitted with booms to improve pump camera angles. Additionally, a few vessels utilized a triplex roller as part of their operations. A triplex roller is a multiple power hauling system where

the net is hauled by means of a synchronized triple roller net winch system. Use of the triplex roller allows the vessel to manipulate the net in a way that forces the fish into the cod end of the net and allows the vessel to pump more fish out of the net than if a triplex is not used. The use of the triplex may have led to differences in the way audit and census reviewers interpreted catch events. This is because vessels using a triplex should be able to pump more of the fish in the net in comparison to vessels not utilizing a triplex, meaning what would be considered an operational release on a boat without a triplex could be considered a partial release on a triplex vessel.



**Figure 10**: *The total count of each discard type is shown for each vessel participating in the study. Colors indicate the source and type of of each discard event (whether it is from Saltwater [census] or from NMFS [audit]). The break down of events by vessel suggested that there was variation among vessels in the frequency of different event types.*

Generally, the total number of discard events increased with the number of hauls completed by a vessel (Figure 11). This was mostly driven by the most common event categories; the discarded after being brought on board and operational discard categories. This pattern of reviewers identifying larger numbers of events on trips with larger numbers of hauls (i.e., more fishing effort) is important to note when considering selection of video review rates for an operational program. Additionally, the higher number of event records created by the census review versus the audit review was correlated with the increased amount of time they spent reviewing EM footage (see the description of review methods below).



*Figure 11: An estimate of the trip-level mean count of each discard type is shown for trips with varying levels of fishing effort (represented by number of hauls). The total number of discard events increased with the number of hauls on a trip for a subset of the event categories. This was most apparent in the common event types - operational discards and discarded after being brought on board. For the full release and partial release categories there was no clear relationship between the number of hauls on a trip and the number of events. Colors indicate the type of review (whether from a census review conducted by Saltwater or an audit review by NMFS). Points represent mean numbers of events per trip. Error bars shown represent standard errors.*

## COMPARISON OF REVIEW TIME

### Data Review Sampling Design

For this project, each EM system was set to record video continuously after the first sensor indicated that fishing was taking place. Recording continued until the vessel arrived back in port to offload fish. This ensured that any discards would be detected, even those that might occur outside of a fishing event (i.e. on the steam back to port). All of the trip data was reviewed by Saltwater and an audit was performed on all trips by a NMFS reviewer. The secondary review performed through the audit assisted with the development of video annotation standards, protocols for categorizing events, and incorporated quality control measures.

### Census Review

To ensure all possible discard events were documented, Saltwater reviewers were required to review 100% of the EM data (sensor and video) collected for each trip, including the time between fishing events and the steam back to port. The Saltwater reviewer also checked the EM system logs for system performance. The system performance check is completed as soon as possible after the data is received to identify any system performance issues, and hopefully resolve them prior to the vessel departing on a new trip. After the system performance check was completed, the reviewer then loaded the data into Saltwater's review software and reviewed the entire fishing trip. All of the collected video for each trip was reviewed, including all non-fishing video. Data quality was assessed, and all discard events were categorized and documented.

_0000017530

One of the project requirements was for the EM system to collect video continuously after the first indication of fishing activity, until the vessel returned to port. The reason for this requirement was to look for, and document, any instances where discarding occurred outside of fishing events.

**Audit Review**

To provide a second assessment of the video and sensor data, an audit of the trips was conducted by NMFS. This approach utilized sensor data, displayed in the EM review software, as a reviewer's method for locating sections of video that contained fishing activity. Video review was concentrated on periods when the gear was in motion (from the time the gear entered the water until the time when the gear was retrieved over the stern) and throughout all phases of catch handling. Playback speeds were increased between 8 times normal speed to 32 times normal speed during segments of video where the sensor data and GPS track suggested the vessel was not engaged in fishing activity. During audit trip review, abrupt changes in sensor output displays, such as, sensor dropouts or spikes, were also monitored to document potential system errors or gaps in video feeds that could result in lost fishing event data. If cameras malfunctioned for long periods of time, or if the system was not activated during a trip or shut down before the vessel had returned to port, VTRs and VMS records were researched to compare sail or land dates with the reviewer's estimated time entries and to verify possible data loss. In this manner, VMS and VTRs were used as resources in an effort to reduce review time. It must be noted that these resources were not used to directly influence a reviewer's evaluation of events that occurred while viewing fishing activity.



**Figure 12:** *Total review time, average review times, and the number of reviews for each vessel. Colors represent different reviewers and review types are shown in separate panels. Census reviews completed by Saltwater and audit reviews were complete by NMFS.*

_0000017531



**Figure 13:** *The total review time for census and audit reviewers is shown for trips consisting of different numbers of hauls. Mean review times are shown as points with error bars representing standard errors. Please note the y axis (review time) is on a log scale.*

For the subset of trips where comparisons could be conducted (the dual reviews), reviewers for Saltwater conducted ~720 hrs of census review while NMFS conducted approximately ~320 hours of video audit review. Average review time for the census reviewers was 5.7 hours per trip while the average for the audit reviewers was 2.6 hours. This suggests that the audit approach to video review required about half the time of the census approach. Average review times for census approach varied among reviewers and across vessels (Figure 12). This could, in part, be driven by the sample of trips drawn by individuals, as reviewers did not review the same trips. The mean review time for the audit approach did not exhibit as much variability across vessels, with the average review time for most vessels being somewhere between 120 and 240 minutes. Some correlation was noted in average review time across review types (i.e., vessels 2 & 8 had relatively short times for both methods, and vessel 11 & 9 had long review times for both methods). This suggests that factors like fishing practices and catch processing behavior may have an impact on the time it takes a reviewer to process a trip. Preliminary analysis was conducted to determine if the number of cameras or camera placement had a direct correlation with review time, however, the information was not conclusive. On any given trip there are a number of factors (time of day, weather, vessel set up, fishing practices, reviewer experience, etc.) that can impact review time and distinguishing which of these factors has a direct impact on review time is difficult.

Explorations of the review time data also suggested that review times did not vary through the course of the study (the time a review took was fairly constant). Instead, the amount of fishing effort recorded on a trip was positively related to the mean total review time (Figure 13). This positive relationship was more pronounced in the census method but seemed to reach an asymptote near three hauls (at ~360 minutes or six hours). For the audit review the mean total review time increased almost linearly with effort ( at ~60 min/ haul). There were relatively few trips in the data set with greater than 6 hauls, so it is somewhat unclear what review times might be for trips with greater than normal effort.

_0000017532



*Figure 14: The total review time (per trip) for audit (in red) and census (in blue) is shown for trips with different numbers of discard events. Opaque points represent mean values and bars represent standard errors. Slightly transparent points represent the raw data and are shown to highlight outliers. Review times tended to increase with an increasing number of events. This is most evident for the category of discarded after being brought onboard and operational discards.*

The pattern we observed of increased total review times with increased effort is likely a direct result of an increased number of discard events on trips with a larger number of hauls (fishing effort). This can be seen in the data as there was a notable increase in total review time for trips with higher numbers across most event types (Figure 14). This was especially true for the discard after being brought onboard events, which often require reviewers to count individual fish being discarded from the vessel's dewatering box and view the same portion of the trip from multiple camera perspectives. This can be time and energy intensive, as reviewers may view the footage repeatedly and may stop the footage to enter information for each event. A number of other factors also affected the total time to review including the time of day that the majority of fishing occurred and the weather that predominated. We were unable to test the effect of time of day and weather conditions, but they remain important avenues for future analyses.

One important factor driving differences in total review time between the audit and the census method was that the audit review focused on the sections of video where vessels were actively fishing. To explore how much of the total trip video this actually encompassed, we calculated the active fishing time for each trip as the summed fishing event time divided by the total trip length. We restricted this analysis to trips where active fishing occurred, as on trips with no active fishing there would be no need to review video footage. We found that in all cases, the amount of trip time that was considered active fishing effort was less than 50% of the total trip length (Figure 15). For most vessels the amount of active fishing time ranged from ~10% of the trip to ~40% of the trip with the mean being 23% of the total trip length.



*Figure 15: Estimates of the percent of total trip length that is active fishing time. A smoothed density estimate of the distribution is shown. Each horizontal band represents a vessel from the study. The mean value is shown as a dashed line.*

## COMPARISON OF REVIEWER ANNOTATIONS

### Data Matching

To explore the level of agreement in discard event annotations (here annotations refer specifically to how discard events are classified by reviewers) we attempted to match events in each type of review (census and audit) and then compared the number of annotations that were matching to those that did not match. This analysis focused specifically on the event types that can be categorized as slippage (full releases and partial releases) as well as operational discards; the latter being the most difficult event type to differentiate from slippage.

In the raw data set, each event was recorded with a timestamp and a haul number. For some trips, timestamps for dual reviews were consistently offset (e.g., all of the census events occurred three hours before audit events - likely due to an incorrect time setting on the onboard computer that was resolved during the project), and the haul numbers assigned events were occasionally entered incorrectly by a reviewer (events were entered on hauls 2 & 3 by one reviewer and 3 & 4 by the other but timestamps were identical). Therefore, to ensure that these unexpected systematic differences in the timing of annotations did not cause large errors in our summaries of matching events, we first assigned events to a haul and then matched events based on the assigned haul numbers. Thus, when each reviewer had identified the same type of event on a haul, the events were deemed to be matching. This was most effective for the slippage comparison, as multiple partial release slippage events occured on a very small number of hauls (~4 out of ~40). For example, a vessel may experience gear damage and a clogged pump on the same haul which may result in two distinct partial release events.  In rare cases where multiple partial release events occured on the same haul, annotations from each review type were matched by timestamp. In all cases, these events were further confirmed to be matching by plotting them, visually inspecting the plots, and reviewing the notes included for each event.

For operational discards a similar approach was followed by assigning the event to a haul and matching it to the alternate data set based on a combination of haul number and timestamp. When dual reviews differed in their annotations (e.g. one had noted a partial release and the other did not record that type of event), an effort was made to match the event with the designation assigned by the alternate reviewer. Using these dual annotations, we then summed the number events designations that agreed and those that did not agree. Hauls where neither reviewer had identified a slippage event are referred to as 'Agree no slip'. Hauls where both reviewers identified a slippage event are referred to as 'Agree slip'. When reviewers disagreed in their annotations, we refer to them as 'Disagree' and the mismatching pair of events is given. Similar designations are used for operational discards with 'op disc' replacing 'slip' (e.g., 'Agree op disc' for reviewers agreed operational discards had occured). Using these dual annotations, reviewer agreement was explored at the level of the vessel and  the project (all vessels together).

### Reviewer Annotation Comparison Results

At the project level, the majority of haul event designations agreed. Most of these events fell into the category of 'Agree no slip' where neither reviewer had observed an event that counts as slippage (~300 hauls). Reviewers also agreed that slippage events had occurred 41 times (26 partial releases and 15 full releases). These 'Agree slip' incidents were the second largest total when summed across vessels (Figure 16). For the subset of the slippage events that were full releases there was a high level of agreement among reviewers, with reviewers agreeing on the full release categorization on 15 of the 16 total events (94%). The disagreements included one case when one reviewer marked a full release as an unknown. Notes provided with the annotations suggested reviewers observed similar events but categorized them differently.

The type of events most commonly included in the category of  'Disagree' were those that typically consisted of one reviewer identifying a partial release while the other reviewer reported an operational discard (17 events). In practice, the difference between categorizing discards at the end of the haul as a partial release or operational discard often comes down to whether the reviewer believed there were not enough fish to pump left in the net (operational discard) or if the vessel could have continued to pump more of the fish before discarding (partial release). This situation can lead to tough decisions for reviewers as to how relatively small numbers of discarded fish can be classified, and increases the chance for disagreement between reviewers. When an observer is on board in these situations, the observer is able to ask better questions of the captain and crew to identify a reason for a release event. EM

_0000017534

reviewers are unable to do this and it is possible this contributed to the number of discrepancies we observed. The next most common type of disagreement was when a partial release was identified by one reviewer while the other did not report an event (five events), followed by cases where a partial release was noted by one reviewer and an unknown event by the other (four cases). These last two types of disagreement are likely due to the definition of partial release including fish that inadvertently fall into the water when a vessel disconnects the pump (to clear a clog, etc.) prior to the completion of the pumping process. This type of partial release is often difficult to identify, because as few as one or two fish could slip out and may go undetected by a reviewer or observer. In addition, fish are sometimes seen in the water (e.g. prior to a pump stop event; after the pump has been re-connected to the net) and it is difficult to determine where they came from.

When data are summarized at the vessel level there is more variation in the degree to which the two reviews align. While most vessels exhibited patterns similar to the aggregated data, there was notable variation among vessels (Figure 16). Specifically, some vessels had relatively few events of disagreement, whereas others had disagreement that was almost as common as agreement.



*Figure 16 & 17:* Agreement for dual reviewer annotations. Counts of matching annotations for full release and partial release events (slippage events) are shown in black. Counts of matching no slippage incidents are shown in grey. Cases where only a single reviewer noted a full or partial release are shown with the remaining colors. The nature of these discrepancies are shown by the text in the figure legend. Specifically, the paired capitalized letters represent the designation by each reviewer with 'FR' indicating a full release, 'PR' indicating a partial release, 'NA' indicating no event noted by the alternate reviewer, 'OD' indicating operational discards noted by the alternate reviewer, 'UN' indicating an unknown event was noted by the alternate reviewer, and 'OT' indicating that an event requiring

_0000017535

*more description was noted by the alternate reviewer. Generally, reviewers agreed on the classification of event types. There was especially high agreement for cases of full releases. Agreement for partial releases was lower, and these events were commonly confused with operational discards.*

The level of disagreement on these vessels is potentially driven by a combination of factors including the number of cameras deployed on a vessel (numbers ranged from 3 to 1), aspects of fishing behavior (e.g., the frequency with which a vessel detaches its pump), and the time of day that fishing occurs.





***Figure 18 & 19:*** *Agreement for dual reviewer annotations. Counts of matching annotations for operational discards are shown in black. Counts of matching no operational discard incidents are shown in grey. Cases where only a single reviewer noted operational discards are shown in with the remaining colors. The nature of these discrepancies are shown by the text in the figure legend. Specifically, the paired capitalized letters represent the designation by each reviewer with 'FR' indicating a full release, 'PR' indicating a partial release, 'NA' indicating no event noted by the alternate reviewer, 'OD' indicating operational discards noted by the alternated reviewer, 'UN' indicating an unknown event was noted by the alternate reviewer, and 'OT' indicating that an event requiring more description was noted by the alternate reviewer.*

It was outside the scope of our project to thoroughly investigate the drivers of these differences in agreement, but the experience of the reviewing staff can help to identify factors that are likely to contribute to higher levels of disagreement on some vessels. Therefore, while we can suggest a number of these factors that reviewers reported as important and likely impacted the degree of agreement, we can't provide a ranking of their importance.

_0000017536

Patterns of agreement for operational discard events were quite similar with the category of 'Agree no op disc' making up the majority of events and the 'Agree op disc' making up the next largest category (Figure 18). For hauls where reviewers annotations indicate a disagreement, the most common type of disagreement was NA-OD, where one reviewer recorded an operational discard event and the other did not note an event. This made up the vast majority of 'Disagree' events, with other categories each represented by less than 5 events. Together these results suggest that reviewers using both audit and census methods agree on the vast majority of operational discard event designations, and that disagreement was mostly driven by the omission of the event type by one of the two reviewers. Breaking these data down by vessel (Figure 19), we again see a more nuanced pattern where certain vessels have very high levels of agreement (i.e., vessels 2, 3, 4, & 8 ) while others have more moderate levels of agreement (i.e., vessels 6 & 9). Some of these are the same vessels (e.g., vessels 2 & 8) that also had high levels of agreement in the slippage data suggesting again that vessel specific considerations such as fishing behavior and camera placements may impact the ability of EM systems to reliably detect discard events. These types of considerations should be included when developing vessel management plans for vessels choosing EM as their monitoring option.

## COMPARISON TO NEFOP DATA

For the subset of trips which carried a NEFOP observer (n = 32), a similar comparison was conducted but including the event designations recorded by the human observer. At a high level, EM data review and the data collected by NEFOP observers aligned well. For example, if we focus on a comparison of the EM data from the census reviewer and the NEFOP observer we see high levels of agreement in detecting full release events (Table 5). Specifically, in all four cases where one of the sources (either EM reviewer or observer) identified a full release event, the other source detected this event (the release of fish) every time. In three out of four of these four events, both sources categorized the release events as full releases (one event was designated 'unknown' by the EM reviewer, but comments accurately characterize the event). In addition, of the ten hauls where either data source categorized a release event as a partial release, the census EM reviewer detected a release of fish on all of these occasions and correctly categorized the releases in all but one case (on one haul the census EM reviewer categorized an event as an operational discard). Together these results suggest that EM can detect and likely categorize release events important for monitoring catch retention. Interestingly, for potential partial release events the NEFOP observers seemed to detect and categorize a lower percentage of these events (although the sample size here is small), and again was better able to detect release events than to categorize them.

**Table 5:** *The number of release events detected and categorized by each data source that could be classified as slippage. Data from the census EM review and NEFOP data are shown. This data is for the subset of trips where a NEFOP observer was aboard (32 trips). These same events are broken down in greater detail in Table 6 with additional information from the audit reviewer.*

| Event type | Census EM | Observer | Total no. of events |
|---|---|---|---|
| Full Release (detected) | 4 (100%) | 4 (100%) | 4 |
| Full Release (categorized) | 3 (75%) | 4 (100%) | 4 |
| Partial Release (detected) | 10 (100%) | 8 (80%) | 10 |
| Partial Release (categorized) | 9 (90%) | 4 (40%) | 10 |

Taking a more nuanced view and incorporating data from both EM reviews we again see that data sources are all capable of detecting releases, but that for some events they differed on how the events were categorized. Again, for evaluating agreement we focused on hauls where a reviewer or an observer had identified slippage, and, in cases of disagreement, we note the event designation used by alternate data sources. For 87 of the 97 comparisons all three sources agreed (82 where all agreed no slippage, five where all agreed slippage had occurred, and 10 where at least one source disagreed). For four of the 10 events where at least one source disagreed, both EM reviewers agreed (EM reviewers agreed an event was a partial release or an operational discard event). For the remaining six events the observer agreed with the NMFS reviewer four times, with the saltwater reviewer once, and all three sources disagreed once.

**Table 6:** *A detailed breakdown of the the level of agreement among EM reviewers as well as NEFOP observers. Data represents event categorizations for slippage events on the 32 trips that carried observers and where two video reviews were available. Specifically, the*

_0000017537

*capitalized letters represent the designation by each reviewer with 'FR' indicating a full release, 'PR' indicating a partial release, 'NA' indicating no event noted by an alternate reviewer, 'DA' indicating discarded after being brought onboard, 'OD' indicating operational discards noted by an alternated reviewer, and 'UN' indicating an unknown event was noted by an alternate reviewer. Events in the left most position belong to Saltwater Inc. reviewers, middle events belong to NMFS reviewers, and the rightmost events belong to the NEFOP observer. The number of times that each event type occurred is shown in the rightmost column.*

| Agreement? | Who agrees? | Coding | Census event | Audit event | Observer event | Event sum |
|---|---|---|---|---|---|---|
| All agree no slip | All | NA-NA-NA | NA | NA | NA | 82 |
| All agree slip | All | FR-FR-FR | FR | FR | FR | 3 |
| All agree slip | All | PR-PR-PR | PR | PR | PR | 2 |
| Two agree slip | EM reviewers | PR-PR-NA | PR | PR | NA | 2 |
| Two agree slip | EM reviewers | PR-PR-DA | PR | PR | DA | 1 |
| Two agree no slip | EM reviewers | OD-OD-PR | OD | OD | PR | 1 |
| Two agree no slip | Audit EM reviewer & Observer | PR-OD-OD | PR | OD | OD | 2 |
| Two agree no slip | Audit  EM reviewer & Observer | PR-UN-UN | PR | UN | UN | 1 |
| Two agree slip | Audit  EM reviewer & Observer | UN-FR-FR | UN | FR | FR | 1 |
| Two agree slip | Census EM reviewer & Observer | PR-OD-PR | PR | OD | PR | 1 |
| All Disagree | None | OD-PR-UN | OD | PR | UN | 1 |

Because the slippage events designated by Saltwaters' census review were reviewed by the full project team we have high confidence in event characterizations in that data set. By comparing the audit EM reviewer's annotations to the group reviewed annotations, as well as the observer's, we can make some statement about the quality of the EM reviews. Using this framework it would seem that that the EM reviewers were able to identify at least as many  slippage events as observers. Specifically, there are five events where the audit EM reviewer and the census EM reviewer agree with one another but not with the observer, and only one event where the observer and census EM reviewer agree with one another but not with the audit EM reviewer. It is, however, important to note that this is a relatively small sample size of events, and that EM reviewers are reviewing identical footage so we might expect a higher level of agreement between them. Another point of comparison comes from the project team reviews of the slippage events identified by Saltwater. In these sessions all slippage events identified by the census review (Saltwater) were reviewed and the original annotation were deemed incorrect by the project team in a small number of cases (~10%). Together these lines of evidence suggest that the use of EM data instead of observer data could lead to a similar number of designated slippage events, and that EM reviewers seem to have very few issues detecting full release (FR) events (only one putative full release [UN-FR-FR] event here represents a disagreement).

A closer review of the cases of disagreement highlights three key findings of this study: 1) that human observers have an ability to use their situational awareness and their access to the crew to collect some information that cameras cannot (especially the reasons specific decisions are made by the by the captain and crew and catch discarded out of camera range). 2) cameras can be placed in locations that offer views unavailable to observers. 3) that often disagreement among EM reviewers did not come from their ability to detect events, but instead was a result of the way they categorized their observations.

The advantage human observers have in terms of being able to access the crew can be seen in a specific case of disagreement where the observer successfully documented a release during the observed trip and one EM reviewer did not. In this specific case, a partial release occurred underwater due to gear damage and the observer was able to determine this by talking to the captain. The observer also documented operational discards on the same partial release tow (matches both reviewer designations of operational discards).

Appendix 7 – EM Project                                                                December 2018

There did appear to be cases where cameras were able to record things that observers could not because of safety considerations. For example, on one haul where both EM reviewers documented a partial release and the observer documented catch discarded after being brought onboard, the observer was unable to view the release due to safety concerns. The camera was better suited to capture the details of the event because the observer had to follow safety protocols and vacate the area where clogs were being removed from the pump mechanism. In another instance, the census reviewer documented an operational discard event, the audit reviewer noted a partial release, and observer marked the event as unknown. While all three disagreed here, the observer classified the event as unknown because he/she was unable to view the discarding event due to safety concerns and low light conditions. In this case, the area where the release was taking place was not safe for the observer because the series of clogs being removed from the pump necessitated the use of heavy equipment. Some areas are consistently hard for observers to cover like areas near the stern of the vessel and rail areas in rough weather. By providing views of these areas camera systems may help to enhance monitoring.

A common feature of the data set created by this project is that sets of events that were categorized differently among reviewers often contained a higher level of agreement in the comments describing the events than the category codes used to bin them. One example of this comes from the single disagreement that involved a full release. Here the full release was noted by the observer as all catch being released due to the loss of the vessel's net. This was also marked as a full release by the audit reviewer, but the census reviewer marked this as an unknown. In describing the event, the census reviewer clearly described the loss of the net in the comments associated with the haul, suggesting that this reviewer had observed the same event but categorized it differently due to not actually seeing fish being discarded. Another example of this is the case where the census EM reviewer and observer agreed on a partial release event but the audit reviewer labeled the discarded catch as operational discards. The observer noted the presence of a clog resulting in a small amount of released catch in addition to operational discards when the pump was disconnected. Similarly, both reviewers commented on fish in the water after the pump was removed, but one called the event a partial release and the other saw it as operational discards. This again suggests that all three entities observed the same event but that they differed in which category they thought was most appropriate. A further example of this includes an event where the audit reviewer and observer both classified discarded catch as unknown for one haul and the census reviewer classified the catch as a partial release. In this instance, the census reviewer reported catch being released when the catch was being brought onboard (potentially a tear). The audit reviewer also noted a release near the end of the haul of 'more than few thousand pounds' but marked it as unknown. These again suggest that the fishing activity was captured by the video, but that there were differences in how they were captured by the reviewer.

A final illustrative example of the potential value of an EM system comes from inspecting another of these cases of disagreement between observers and EM systems. In this case, the census reviewer classified discarded catch on a haul where the observer and the audit reviewer classified the event as operational discards. The census reviewer noted the release after the observer recorded gear onboard and was off effort. As a requirement for this project, the EM system was configured to record continuously after engaging in fishing activity, until return to port. This requirement was to address concerns that the vessels may be discarding catch outside of hauls, when the observer may not be present on deck to witness the discard, or when an EM system set to record only during fishing activity may not be recording. During the project, the census reviewers watched all non-fishing video, allowing us to inspect the data and describe the amount of discarding occurring outside of fishing events (a period from the time the codend touched the water until the time the gear is retrieved back on deck). Excluding discard events that immediately followed fishing events (were within ~30 minutes of the end of a fishing event) the census review documented approximately 20 instances of vessels discarding a small amount of catch. This behavior typically occurred after a haul and fishing activity was completed and were relatively rare events, occurring on roughly 5% of the total hauls. These events ranged in size from 1 to approximately 50 fish (mostly herring bodied fish, fish nk, or dogfish) being discarded out of the dewatering box or while cleaning the deck and net. There was one instance where the vessel discarded fish by pumping out of the fish hold in between hauls. The presence of these discard events leads us to propose that a catch retention camera, covering the entire deck, should be set to record the entirety of the fishing trip to capture these events.

## ADDITIONAL DATA

### Estimated Discard Weights

Although species identification and weight estimation of discarded catch was not a direct goal in this study, when possible, the audit reviewer sought to collect this information. To quantify the relative size of different types of discard events the audit reviewer (NMFS) visually estimated weights for all event types when vessel catch handling allowed the reviewer a clear line of sight to identify finfish (based on physical characteristics). There were 88 records categorized as discarded after being brought onboard  and 109 operational

_0000017539

discard event records where the audit EM reviewer obtained a direct count of discarded fish to estimate a total weight (Figure 20). The audit reviewer visually estimated a weight for 2 out of 16 full releases and 13 out of 31 partial releases. Comparing these 4 event types, weights were estimated from ~32% of the combined full and partial releases records and ~50% of the combined events that were categorized as operational discards or catch the was discarded after being brought onboard. The audit reviewer was a former NEFOP observer and had directly observed in this fishery and was therefore utilizing his training and experience to determine visual estimated weights. This is similar to the methodology that an observer would use onboard the vessel to estimate and/or verify the captain's estimate of discard, however, in the case of EM, there is no opportunity for situational awareness or direct communication with the captain.



**Figure 20:** *The distribution of estimated weights (in lbs) associated with each type of discard event. Estimates were conducted by a single experienced reviewer from NMFS and only in cases when conditions favored estimation (shown in red). These include incidents where species were picked from the grate of a dewatering box, where catch was discard in bulk after being brought onboard, or release in the water in view of the cameras. For reference the distributions of weights associated with each type of discard event are show in blue. These values were estimated by NEFOP observers in coordination with vessel captains on trips between 2010 and 2017. Please note the x axis is on a log scale and the x axis extent varies among event types.*

This represents a subset of the events and was not compared to estimates of weights generated by an observer. Estimates were generated by the same reviewer in all cases to ensure a measure of consistency. Both of the weight estimates generated for full release events in this study were larger (1000s of lbs), whereas partial release events tended to be smaller (generally 10s to 100s of lbs). Operational discard events also tended to be smaller (10s of lbs). Somewhat surprisingly, events characterized as catch discarded after being brought onboard could on occasion be quite large (on par with full releases and the largest partial releases). This set of events spans a range of discard events. Including incidents where a large number of dogfish were picked off of the dewatering box grate and discarded by crew members. Or, situations where the catch overflowed equipment onto the deck and was washed overboard. Additionally, a vessel can also pump unwanted catch such that it flows onboard briefly then overboard. In doing so the vessel has technically made the catch available to the observer and thus avoided a slippage event. Taken together we believe this suggests that EM may be correctly categorizing the largest and most important discard events (i.e., full releases) as agreement among reviewers and between EM reviews and observer data was high for this this type of event.

## Interactions with Protected Species and Individual Animals

The census reviewer also catalogued interactions with protected species and larger individual animals (designations derived from the NEFOP program). These annotations could be associated with haul events or sightings that were incidental. Generally, less of an emphasis was placed on identifying these events (compared to catch retention). There were also limited guidelines for how the species

_0000017540

of animals being identified should be recorded. Here we present this information to give a sense of the diversity of species that were encountered during the project.





*Figure 21 & 22: 21) The breakdown of protected species interactions noted by reviewers for the set of trips with dual reviews. Total numbers of records recorded by the census reviewer. ). 22) The breakdown of individual animal interactions noted by reviewers for the set of trips with dual reviews. Total number of records recorded by the census reviewer.*

_0000017541

# V. Cost Drivers

There are multiple cost drivers that impact the cost and long-term viability of operational EM programs. Cost drivers include the number of vessels participating and their locations, how much data needs to be reviewed and stored, and for how long. One of the objectives of this project was to identify the cost drivers that would impact implementation of an operational EM program in the midwater trawl herring/mackerel fishery. To that end, Saltwater tracked costs over the duration of the project (17 months) differentiating between one-time startup costs (SU) and ongoing (OG) program implementation costs. Actual costs are considered proprietary and, as such, are not being presented in this report. NEFOP and GARFO will use the information and discussion in this section to help refine its prior cost estimates for the NEFMC, vessel owners, and other stakeholders who are considering whether EM should be an option for monitoring the herring fishery. The information will also be used to inform future NEFOP projections. This report identifies multiple cost drivers, how they relate to monitoring objectives, and how they might impact long-term program costs. This information is provided to help inform future program design in a way that meets required monitoring objectives and optimizes the use of resources.



*Figure 23: Overall EM program costs broken down into startup costs (SU) and ongoing (OG) costs by category.*

## Start-Up Costs

Equipment: EM system, procurement, shipping, handling, assembly, QC

One of the main start-up costs of any EM program is the cost of the equipment. How an EM system is setup is largely determined by the data collection requirements of a monitoring program and the size and configuration of the vessels to be monitored. The size and configuration of vessels determines the length of wire runs and mounting options, the number of cameras to be deployed, and whether additional supports (e.g., booms, swing arm mount, etc.) are required.

The vessels in the herring-mackerel fishery are relatively large (80'- 150'), and required long wire runs and typically three cameras. No major adaptations were required of Saltwater's standard EM system to meet the requirements of the program. On some vessels, power support such as an uninterruptible power supply (UPS) was required to ensure clean, consistent power to the EM system.

The lead time required to procure EM equipment and shipping costs can affect the cost of EM programs. All of the components of Saltwater's EM system are off-the-shelf and commercially available; the longest lead time for ordering is about 6 weeks. Saltwater maintains an inventory of supplies on the East Coast that allowed us to meet the project and boat schedules for equipment installation

_0000017542

in a timely manner without having to pay rush order or shipping charges. When booms were required, vessel operators helped identify local shops for fabrication or made them themselves. Saltwater's EM system met the technical requirements developed by NEFSC *(Appendix 8)*, and no adaptations were required. To meet particular data needs, Saltwater developed and tested new data acquisition software during the course of the project.[14]

Another variable that impacts the cost of EM equipment is the decision of whether to lease or purchase the systems. Under this contract, NMFS requested a lease for the duration of the project.[15] Leasing versus purchasing equipment could affect costs since most long-term leases end up costing more than a one-time purchase. If, however, industry were responsible for the cost of the equipment, a long-term lease could lower the initial start-up cost.

## Field Services (Start Up): Installs, Outreach, Vessel Assessments, Operator Training & VMPs

Factors that can impact the cost of installs include outreach and scheduling, vessel and technician locations, technician recruiting and training, and the time required to carry out the work. From our experience, outreach and scheduling is considerably more time consuming in a voluntary EM program. When EM is either mandatory or an approved alternative to observer coverage, vessels operators are motivated to make sure they schedule the installs in a timely manner. In a voluntary program, recruiting and scheduling can be quite time consuming.

The location of vessels and the location and availability of skilled EM technicians also affects installation costs. Prior to starting the project, Saltwater had one experienced EM Tech/Data Reviewer based in New England. For this project, we recruited and trained an additional EM Tech, who was also cross-trained to carry out data review in our Massachusetts office. Initial technician training is done in the office, but much of the training is hands on with the trainee working in partnership with an experienced EM Tech. This likely increased the time required to complete some of the installs, but resulted in two fully trained local techs available to provide ongoing support for the duration of the project. Because they were both locally based, travel costs were minimized.

Employing techs as part of Saltwater's EM team ensures they are available when needed, and this work is their first priority. They also develop an understanding of project goals, a commitment to customer service, and intimate knowledge of our system. In our experience, this is not the case when working with local marine technicians. They typically have many regular, repeat customers who have priority, and many also have limited experience working with EM technology. The exception to this has been in locations where Saltwater has a large number of boats carrying our EM system. In those instances, local marine technicians have been able to provide timely, quality service.

When it comes to the installation of EM systems, Saltwater has learned over time that every EM system install is a custom job. While many aspects of the job are consistent (e.g. what components need to be installed, how they are configured), the decision of where and how they are installed depends on the vessel's size, fishing practices, and set up. Having clear guidance from NMFS about data collection needs is critical to successful equipment installs Saltwater technicians worked closely with NMFS staff and vessel personnel during each install. The technicians also completed a VMP on each vessel that documented EM system overview, operator responsibilities, catch handling practices/locations, install configurations, camera views, and program contacts.

When a vessel owner or operator is available during an install, it can reduce the time it takes to complete the install. Saltwater typically requires a vessel operator's presence during an install to help determine where system components should be installed, and so vessel operators can receive training on the program objectives and the operation and care of the EM system.

## Program Management (Start Up): Project planning, data fields, protocols, recruiting, training and office equipment

At contract award, Saltwater already had a small, local office in Gloucester, MA with an experienced Project Manager and EM Technician on staff. We were able to easily expand the office space and recruit additional EM Techs and Data Reviewers. One recruitment and retention strategy that we believe has a significant impact on both costs and quality of service is to recruit EM staff

---

[14] Saltwater tested new software that uses geofencing to trigger video recording. This can limit recording so it is only triggered when vessels are in regulated areas, which can reduce the amount of data collected, which can impact costs related to data storage and review.

[15] Saltwater agreed to transfer the EM systems to the participating vessel owners for a nominal fee at the end of the project, if they were interested. Otherwise, the systems were/will be uninstalled.

Appendix 7 – EM Project                                                                                    December 2018

from the pool of experienced at-sea observers and/or portside monitors. Observers come with a demonstrated understanding and appreciation of data quality, integrity and confidentiality, and experience working directly in the fishing industry. For this project and others we found no shortage of qualified applicants for EM Tech or Data Reviewer positions, and had excellent retention rates (which saves on repeat training costs). We also cross-trained our EM Techs in data review, which aids data quality, keeps the job more interesting, and makes the best, most efficient use of our human resources.

A significant start-up cost for this program and many EM programs is the time required to determine review protocols and decide on the data fields to be incorporated into a database. In an operational EM program, it is important to ensure all of the data collected by the EM system can be compared to, and potentially integrated with, existing observer and portside monitor data streams. The development of the review protocol and templates took quite a bit of time, but most of the associated cost involved is a one-time startup cost. Because the template for review protocol had to be identical for all trips, changes made to the protocol after the project was underway meant that some data had to be re-reviewed, which increased ongoing costs.

Saltwater's data review software is template driven, so changes to the data fields required additional time to both create and adjust the template to capture the required data for this fishery. Saltwater does not charge software licensing fees, which can be a significant ongoing cost in other EM programs.



**Figure 24:** *EM Project Startup costs broken down into categories: Program Management, Equipment and Field Services.*

## ONGOING COSTS

Once a system has been installed, ongoing equipment costs are for maintenance and replacement of systems. Our experience is that the components of an EM system vary in their lifespan. The most expensive component, the control box, is estimated to have at least a 5 year lifespan. Because the project was so short (12 months of system deployment), equipment maintenance did not represent a significant cost driver. Maintenance costs were minimized due to Saltwater's local supply of critical components. Over time, equipment maintenance and parts replacement costs will increase. However, in our experience the associated labor costs are more significant (approximately 4:1) than the cost of equipment and supplies.

Field Services/Technical Support: Remote and field tech support, travel costs associated with tech support, replacement equipment and supplies.

When having a fully functioning EM system is a requirement, field services are a significant cost driver in a long-term program. Saltwater has worked in multiple EM programs that have challenged us to find the most efficient way to provide cost-effective technical support. Our experience ranges from providing over 4 years of support to over 100 vessels fishing up and down the Atlantic Coast in the HMS pelagic longline fishery, to serving small boats fishing in Alaska in remote ports that are not connected to the road system and are only accessible by boat or plane.

_0000017544

A key component to efficient field services is an emphasis on remote support and encouraging vessel operators to become involved in the care and operation of the EM system on their boat. Ideally, this starts with instructing the operator and engineer from each vessel on EM system usage  during the install, and providing an illustrated reference guide to the EM system. A second piece is a strong system of remote support including an established 800 call-in number, which is answered by trained technical staff who are able to troubleshoot problems with vessel operators. Technical staff who understand the boats and the EM equipment can help solve many problems without travelling to the port. Finally, timely system performance checks and data review allow problems that affect data quality to be identified and resolved early. Under this contract Saltwater was responsible for the data review which created a very tight feedback loop between the data and tech support. Problems which affected data quality, like a camera out of focus, could be identified and resolved in a timely manner.

Another set of costs that are often included under *Field Services*--and can be a significant cost driver-- are those related to data retrieval. In many programs, HDDs are retrieved in person from vessels by the EM service provider. This can be a significant cost, especially if data needs to be submitted after every trip. For this project, vessel operators were asked to mail all of their hard drives of data (HDDs) to Saltwater's Massachusetts office where the data was copied and archived. Vessel operators were supplied with extra HDDs, protective boxes, and pre-paid USPS flat rate mailers. Data was submitted after every trip. Due to the short duration of the trips in this project, an average of only 12% of the 1 TB of available data  on each HDD was used. For in-season management, data submissions after each trip may be necessary, which allows for timely review of system performance. Costs could be decreased if reporting requirements were to allow for weekly or monthly retrievals.

Over the course of the project, data was collected from 192 trips. Three of the most active vessels were located near the Massachusetts office. While the cost of doing in person data retrievals was still higher than mailing data even for these 3 local vessels, we believed it was a good opportunity to work more closely with these vessels and get more feedback and buy in from the vessel owners and operators for this project. Hard drives from 122 trips were retrieved by a Saltwater EM Tech, with the remaining 68 trips being mailed in by vessel owners or operators. No HDDs were lost or corrupted. For a long-term program, we estimate the cost of mailing HDDs to be about 10% of the cost of in-person retrieval, indicating a large cost savings associated with the mailing of data. Because data retrieval required only minimal field service for this project, the data transmission costs (mailing supplies, postage, etc.) are included in "*Data Services*".

Under the current proposed monitoring alternatives, there will also be a portside monitoring component. At this time, it is not known to whom the portside monitoring cost will fall, but will most likely be the vessel owner/operator. As this was not part of this pilot project, we are unsure what these costs would be, but it is likely they would be in line with the costs outlined in the Environmental Assessment for the IFM Amendment (link can be found on MAFMC website at http://www.mafmc.org/briefing/june-2016) and with those determined in the cost comparison report on the NEFOP Electronic Monitoring website https://www.nefsc.noaa.gov/fsb/ems/. As a potential cost savings, it would be  possible for the portside monitors to be cross trained as an EM technician and/or data  reviewer to allow for more efficient and flexible staffing.

Data Services: HDD retrieval and shipping, data processing, data checks, review, storage, data audits.

A key constraint to effective EM implementation in many fisheries is the cost of data review. Operational implementation of EM requires not only collecting hours of video and sensor data, but also the ability to efficiently extract from that data the meaningful information needed to manage a particular fishery. Saltwater has developed open-source review software that integrates video and sensor data for efficient data review and analysis. Many EM service providers charge a per-seat, annual licensing fee to use their review software. Saltwater does not charge licensing fees for the use of this software. The primary cost drivers under *Data Services* -- and perhaps the most significant cost drivers overall-- are the level of review required (e.g. 100% of trips vs. 10% of trips), the amount and type of data stored, and how long the data needs to be stored.

The amount of data collected and level of review required is determined by fishery managers and reflects their monitoring goals and data requirements. Under this contract, Saltwater reviewed 100% of hauls and 100% of the trips. The primary objectives of the review process were to identify and classify discard events of any type, document whether any fish remained in the net/cod end after pumping, and identify instances where the catch did not come onboard after a fishing event (e.g. gear issue, fish pumped to another vessel, etc.). For each trip, a data summary report was produced and provided to NMFS to incorporate into their database. NMFS was

_0000017545

also trained in review and provided copies of the data and review software which allowed them to audit the reviewed trips. Overall, data review costs represented approximately 52.5% of the ongoing program costs. Costs could be reduced in an operational program by setting requirements to review of only a subsample (e.g. 50%) of the haul or trip footage and data collected. Data storage can also be a major cost driver for EM program implementation. Under this contract, Saltwater was required to store all of the collected video and sensor data for three years. Saltwater's approach to this requirement has been to store redundant copies of all of the data on a local server (NAS). As requested, additional copies of data sets were made for NMFS for audit purposes. Once data review was complete on a volume of data, our Program Manager transferred the complete data sets to cloud storage, where it will remain for the 3-year contract period.

Another key factor that affects the overall cost of data service is the amount of data to be stored. When the SOW for this contract was written, NMFS provided estimates of how many trips would occur in a year and how many days of data would be collected. The actual amount of data collected is considerably less due to various factors that will be addressed in section IV.[16] Nevertheless, our projected estimate of the cost of storage is less than 3% of the overall cost of this project.

There is still some uncertainty as to what EM data is required by NMFS to be stored. This determination will impact the costs of storage. There is discussion nationwide among fishery managers, industry and EM service providers about whether all collected video and sensor needs to be archived, or if storing the data summaries that are extracted during the review process is enough. There are major cost implications of storing video files, whereas the cost of storing the extracted data, which is comparable to the data submitted by an observer, is exponentially less. Each trip summary report is approximately 9 KB, which would be a total of 0.00171 GB for all 192 trips in this project. In contrast, the total amount of video and sensor data collected and stored is nearly 37,000 GB. There are multiple options between these two extremes. For example, saving only short clips or stills of interest, or saving only reviewed trips (assuming less than 100% of trips are reviewed).

Program Management: Oversight of all staff, coordination and communication with all stakeholders, fiscal oversight, all reporting activities.

For a project of short-duration (17 months) it is difficult to distinguish start-up from ongoing costs. Program management costs included weekly conference calls and other communication with the NMFS team and industry, coordination and oversight of all tech support, and oversight of all data management and review activities. We tracked these costs for the duration of the project, and primarily used the date of the activity to determine whether to categorize it as a start-up or ongoing cost.

Based on this approach, program management costs represented 26% of the ongoing project costs. This was higher than we would project for full program implementation, based on our experience with other long-term EM programs (e.g. the Atlantic pelagic longline EM program). One of the main reasons the costs were higher was the extensive level of communication and coordination between NMFS and Saltwater and additional flexibility that was incorporated into the study design to address issues as they were presented, which was necessary to ensure that details that will affect full implementation were worked out during this trial phase.

---

[16] The reasons for the smaller amount of data during this project period need to be kept in mind when designing any future program.

_0000017546



*Figure 25:*  *Ongoing EM implementation costs broken down into categories: Program Management, Field Services and Data Services.*

_0000017547

# VI. LESSONS LEARNED/RECOMMENDATIONS

## IMPLEMENTATION

### System Components

The EM system was easily incorporated into the herring fleet vessel platform (e.g. space, power). The systems did not negatively impact fishing operations and had no effect on other vessel electronics.

During the course of the project, we determined that the hydraulic pressure sensors and rotation sensors used to trigger video recording were not ideal for this particular fishery. While we were able to successfully trigger video recording with these sensors in most instances, multiple vessel owners recommended that the system be triggered with an electric sensor. On pair trawl trips, sensors on the hydraulics and third wire or winch only activated cameras on the vessel whose net was being towed, so the cameras were not activated on the pair vessel. This was generally only an issue for the first haul, since most pairs alternated which boat towed the net after each haul, and cameras continuously recorded for the duration of the trip after first being triggered by sensors. Also, since the hauling/ pumping vessel was the only one with fish, this did not impact our ability to recognize or characterize fishing events or discard events. The only impact was the loss of video data from the pair vessel, which could offer complementary perspectives of fishing activity. Saltwater did develop and test software to trigger recording using geofencing, which was successful and would resolve this problem.

### System Use & Reliability

Overall, the EM systems installed on vessels for this project performed well and collected information useful to fishery managers. Data was collected on 192 trips. Of these 192 trips, full video and sensor data was collected for 61% of the trips. The 39% of the trips that were incomplete, include trips where the EM system was not powered on for a portion of the trip (most often turned on when already on or near fishing grounds), as well as trips where there was an issue with the EM system (see figure 26 for breakdown of missing data). Only 4% or 2 of the incomplete trips were missing the entire trip's data. The other 96% of the incomplete trips contained data that could be reviewed.

EM system issues are often classified as critical and non critical issues. Critical issues include issues with one or more essential cameras, the power supply, main computer, or the monitor. Non-critical issues are issues with sensors or a non-essential camera. During this project, 3 critical issues occurred, resulting in lost data. Since this was not an operational program, these vessels were allowed to continue fishing until the service provider could resolve the issue. In some cases, the system issue was discovered during the data review process, or the vessel was not available for service and therefore the vessel often had completed one or more trips before the issue could be addressed, leading to more system down time than would occur in an operational program where the vessel operator would be required to report a system issue as soon as it occured. The reasons for missing data is shown in the figure below.

_0000017548



*Figure 26:* *Gaps in the collected trip data were documented by the reviewers. Reasons for missing data were categorized into 6 Categories: Camera Issues, GPS Issues, Power Issues, Sensor Issues, Other and Unknown. Camera issues include times where one or more of the cameras was down. Issues categorized as unknown included times where the EM system was turned off by the crew at any point during the trip, or when the reviewer was unable to determine the cause of the data gap.*

Power loss to the EM system occurred occasionally, mostly in the form of system restarts. EM system restarts were short and usually resulted in 1-3 minutes of system down time. Uninterruptible Power Supplies (UPS) were installed on most vessels at the time of install to ensure the EM system would remain powered unless the vessel lost power for a significant amount of time. One vessel had an issue with the main computer freezing, resulting in lost data for 3 trips.

There were also camera connectivity issues on two vessels that caused the video feed to cut out intermittently. The main cause of the issue was related to the high level of strong vibrations in the area of the stationing of the cameras, and the camera's sensitivity to those vibrations. In response to this issue, a vibration resistant camera was sourced but Saltwater was unable to test it because both vessels experiencing this issue were no longer participating in the project by the time the cameras were ready to be deployed. During the course of the project, camera issues resulted in a loss of video on one or more cameras for 3.46% of the total trip time in the project. Of the camera down time, only 5.08% occurred during a haul.

For each fishing event, the reviewer assessed the overall quality of the video. Because the template only allowed us to enter data for one camera, the poorest camera was used for this assessment and comments were entered describing what the issue was and which cameras were affected by the issue. Examples include low light, water droplets on lens, snow on lens, glare, and condensation inside camera. The imagery rated poor was still usable to detect discard activity but made it very difficult to discern individual fish or speciation. In cases where one camera had poor image quality, the other cameras, installed in areas with different exposure to the elements or lighting conditions, could be used to help the reviewer categorize discard activity. Future iterations of the review template would allow for the reviewer to enter video quality for each camera. The video quality criteria are defined in Appendix 9.

_0000017549



*Figure 27: Using video quality criteria as described in Appendix 9, EM reviewers rated video quality for each fishing event. Overall, 53% of the collected video was rated as Excellent and 24% was rated as Good. Only 8% was rated as poor. Not Applicable includes hauls where video was not available for the haul and therefore image quality could not be assessed.*

## Compliance

Overall, vessel operators reported that the system was easy to operate. They were responsible for turning the system on at the beginning of the trip and off only upon return to port. Video and sensor data was collected for the duration of the trip. Project participation peaked in Quarter 3. Low initial usage could be attributed to the learning curve of a new system, or the requirement for the captain to remember to manually turn the EM system on when departing for a trip. In operational programs, the vessel operator is required to be present during the install for training and EM system certification. This certification is a way for the EM service provider to document full system function at the time of the install, and ensure that the vessel operator has a clear understanding of the project objectives and their responsibilities with regards to operating the EM system. This ensures that the person who will be responsible for operating the system clearly understands the requirements and expectations and has an opportunity to ask questions and see how everything works first hand. During this project, the vessel operator was not always available during the install, and the EM service provider trained the available vessel representative. During the project, a number of vessel owners reported that the transfer of knowledge from owner/manager present at install to captain/crew did not always take place. This led to dampened participation early in the project, which improved greatly after the first feedback meetings in early March.

One system-related factor that may have resulted in suboptimal participation was occasional unintended recording caused by operation of the hydraulics. Many vessels use their hydraulics when pushing away from the dock, which often triggered the EM system to start recording. This caused some unnecessary video recording during the steam to the fishing grounds. In some cases, this made the crew uncomfortable, and also resulted in more video data to review and store. This occurred on approximately 15% of trips. To mitigate this, we asked the crew to wait until just after they had left the dock before turning on the EM system. Unfortunately, the captain and crew are often very busy at this time and occasionally forgot to turn on the EM system until later in the trip, resulting in missed opportunities to collect data. Saltwater tested new software towards the end of the project that incorporated the use of geofencing (which doesn't trigger recording until the vessel has left the port box regardless of sensor readings) to eliminate this unintended recording. The new software and port boxes are described later in this report.

_0000017550



*Figure 28*: *Project Participation was tracked by Quarter. For this project, Quarter 1 was November 1, 2016 - January 31, 2017, Quarter 2 was February 1, 2017 - April 30, 2017, Quarter 3 was May 1, 2017 - July 31, 2017 and Quarter 4 was August 1, 2017 - October, 31, 2017. Total number of MWT herring trips declared by each vessel shown in blue. Total declared trips includes trips with no fishing activity. Number of trips where EM data was collected shown in orange. Project participation improved after the first round of feedback meetings at the end of Quarter 2 but dropped significantly in Quarter 4.*

Part of the challenge of any EM program is determining the best camera angles to capture necessary data. During the vessel assessments and after review of the first few trips from each vessel, Saltwater and NMFS determined there were 4 views that would be necessary for an operational compliance program. For participating vessels, there were four locations where discards could likely occur; 1) at the pumping location, 2) at the dewatering box, 3) from the deck through the scuppers (if there was any spillover out of the chute or dewatering box) and 4) at the stern where the net was brought back on board. The full deck view camera also proved helpful to allow the reviewer the ability to see when the vessel was setting out the net and hauling it back. It was determined that cameras should be installed in a way that captures all 4 possible discard locations, which would in most cases require 3 or 4 cameras depending on the layout of the vessel. This configuration would maximize the ability of EM reviewers to determine the source of any discard. After initial trip review, It was discovered that optimal placement for the pump-view camera could be achieved by installing a boom on the side of the vessel onto which the camera could be mounted. Of the eleven vessels that volunteered for the project, five agreed to have booms installed and to carry three cameras (the number requested in the approach); three vessels agreed to carry 3 cameras but did not want a boom, two carried two cameras, and one vessel carried only one camera. The number and location of cameras have a significant impact in the ability of the reviewer to view and accurately categorize discard events. This project was entirely voluntary and therefore the project team was respectful of the concerns and input of the study participants on items such as the number of camera and locations of cameras, which had to be agreed to by the vessel operators. Information learned through the varying numbers of cameras installed and placement was instrumental in developing recommended standards for an operational program.

When discard event types were classified as unknown, it was generally due to poor camera angles. Thus if slippage occurred, a reviewer could not determine whether it was slippage (i.e. full or partial release), another type of discard event (e.g. operational discard), or

potentially something else entirely. If the objective of an operational program in this fishery is to capture and properly identify all discard events, and not just slippage, each of the participating vessel's camera setups would need to be optimized in some way. The most common adjustment would be the addition of a boom arm to achieve an unobstructed view of the pumping activity and determine source and type of clog. Many of the vessels would also likely need a camera mounted on the aft gantry facing forward to capture discards from the aft side of the chute and dewatering box that were obscured from cameras in this study by the machinery on deck.

Saltwater and NMFS staff did provide regular feedback to vessel owners and operators and provided data and/or data summaries to them from their vessels upon request. Because participation was voluntary, any procedural feedback provided to vessel owners and captains by outreach staff was purely informational.

One of the concerns of the fleet about using EM for their monitoring choice was the uncertainty of what would happen if they wanted to fish and there was an issue with the EM system. In current operational programs, if the issue is noticed prior to departing for a fishing trip, the vessel owner should try to troubleshoot remotely with the assistance of a certified EM technician. If remote troubleshooting is unsuccessful and the EM service provider cannot get a technician to the vessel prior to the vessel's preferred departure date, the vessel may fish for one trip but the system must be fixed prior to departing on a subsequent trip. If the system malfunction is discovered at sea, remote troubleshooting should be performed, but if unsuccessful, the vessel may continue to fish on that trip, but may need to trigger the cameras to record manually or follow other directions given by the EM service provider. Upon return to port, the vessel may not depart on a fishing trip until the issue is resolved. In the HMS fishery, flexibility and communication between NMFS, the vessel owners, and the EM service provider has led to almost zero lost fishing time in the 2 ½ years since implementation.

## Incentives to Participate

The primary incentive noted for fleet participation in the project was to examine whether EM would prove to be more cost effective than at-sea monitors for this fishery. Because industry members would fund any additional monitoring efforts in this fishery, the cost-effectiveness of EM is of particular interest. Some operators also believed that EM could be used to counteract negative perceptions of the fishery through a monitoring source deemed indisputable. Additional reasons to participate can be found in the exit interview summary *(Appendix x)*.

Project participation was voluntary, and all of the eleven active vessels that fish predominantly with midwater trawl gear agreed to take part. In other fisheries, voluntary participation in EM projects has been as low as ten percent. While the project began with eleven vessels, by the fourth quarter of the project, only five boats were actively participating.

There were multiple reasons mentioned for this high level of attrition. When vessel attrition was first beginning at around the midway point of this project, NMFS asked participants what incentives would promote their continued participation in the project. They primarily responded that they wanted access to fishing in groundfish closed areas. Groundfish closed area access for midwater trawl vessels is otherwise predicated upon selection for observer coverage, and with very low coverage levels over the course of this project, vessels were largely prohibited from these areas. Some vessels operators were disappointed when NMFS was unable to offer access to closed areas with the EM system onboard as an incentive, which may have contributed to the reasons for withdrawal.

In addition, several industry members indicated that frustration with poor fishing was a leading factor in their decision to stop participating. Others stated that the fishing crews were frustrated about the inequity in monitoring and fishing restrictions between their vessels and other fleets that prosecute the herring fishery (i.e. purse seine, bottom trawl) who have less restricted fishing effort. As their frustration built over the course of this study, some of captains and crew refused to activate the EM systems. Finally, some study participants were disappointed that footage from one vessel was used in prosecution of a criminal case. They felt they were misled on how EM footage in this project would be used, and were disappointed that footage collected through voluntary participation was used as evidence in a criminal case. Several owners/operators noted that this contributed heavily to their decision to stop participating.

## DATA MANAGEMENT & REVIEW

_0000017552

Saltwater's review software uses templates that are tailored to each fishery. These templates are electronic forms that allow EM reviewers to use drop down menus and other structured forms to categorize events recorded by the EM system. Because this project was a first attempt at using EM to collect data in these fisheries, it was difficult for NMFS and Saltwater staff to accurately predict the most efficient way to process the data to meet monitoring and reporting requirements. The project team worked together to identify the necessary data fields and design a template to capture the required data. NMFS staff designed a database that allowed for data comparisons between EM viewers and observer data collected by the NEFOP. After the start of the project, it became apparent that the template would need to be revised to better capture fishing events (duration vs. single point events) in a more meaningful way. Unfortunately, each time a template is modified, all the previously analyzed data must be reprocessed using the newest template. Consequently, Saltwater reviewers had to spend significant amounts of time updating information, which increased data review times.

For future projects, it will be highly important for NMFS and project staff to agree on a template through a trial phase before implementation into an operational program. In addition, EM service providers would benefit from the development of standards in regards to data format, constraints, integrity, acceptable output, and software requirements provided by the Government.

## Data Retrieval

Allowing vessel operators to mail EM data resulted in cost savings and logistical simplicity over technician recovery. During the project, the biggest disadvantage of this approach was that it didn't allow for a face-to face opportunity for vessel operators to report any concerns or ask any questions about the EM system, or for technicians to verify that systems are being operated as requested. This resulted in some system issues going undetected until video review, when the reviewer checked the system performance on the drive. But by the time an issue was discovered during review, the vessel had often already departed for the next trip. In an operational program, this would not be an issue since the vessel operator will be required to run a system function test prior to departing for a trip, and also report any system issues to the service provider immediately. The owners reported that having to maintain, track, and mail the HDDs after each trip was onerous, and due to the short duration of the trips, oftentimes only about 12% of the drive's 1 Terabyte storage space had been used. A few captains/owners cited hard drive availability as a limiting factor for the feasibility of the hard drive mailing method as well.

In this project, three of the participating vessels were located near the Saltwater office. Since these vessels were so close, it made more sense for a technician to stop by the vessel when the vessel owner notified Saltwater of the vessel's return from a fishing trip. This allowed the technician a chance to check system function and make more frequent adjustments to the EM system as needed. Hard drives were collected in person from other participating vessels during vessel feedback meetings and service calls.

During the first month of the project, there were some concerns about the potential of data getting lost in transit. By using tracking numbers for all hard drives mailed, Saltwater was able to track hard drives to determine their location.

## Data Processing Times

As mentioned above, revisions to the reporting template meant that any data processed under an older version of the template had to be re-reviewed, which led to some delays in data processing.

Another factor that impacted data processing and review time overall was that the project design assumed that the data from each trip would be sent in within 48 hours of the vessel returning to port.. Occasionally though, Saltwater received HDDs with data from multiple fishing trips because the vessel owners either did not have time to mail the drive before leaving port again or forgot to switch to a new drive at the completion of a trip, or forgot to mail in the drive. Having multiple trips on a single HDD meant that the earlier trips on the drive could not be reviewed in a timely manner and feedback on protocol issues was delayed.



*Figure 29*: *Of the 192 trips where data was collected, 99 trips were received within 7 days of the end of the trip, 42 trips were received between 8 and 14 days, 12 trips were received between 15 and 21 days, 6 trips were received between 22 and 30 days, 18 trips were received between 31 and 60 days, 7 trips were received between 61 and 90 days and 8 trips were received more than 90 days after the trip ended.*

At the start of this project, Saltwater was working on creating the next version of onboard data acquisition software. During the installations and early months of data collection, vessel owners reported erroneous recording prior to fishing or at the dock and suggested different sensors to trigger recording. Saltwater shared this feedback with the software development team. In early October 2017, the new software was deployed on one of the participating vessels in this project to test out some of the new capabilities. The system received a major overhaul to how the software operates resulting in a more robust, reliable, and extensible framework. While the majority of changes are unseen modifications to the overall coding, the most notable changes come from the modular nature of the stack which allows for new pieces to be developed and deployed in an ongoing manner. As a result, the more fisheries that utilize and make new modules for the software, the more all fisheries with the system deployed will be able to tie into those additional functions. One such example is for port boxes to be utilized to eliminate unwanted recording when the vessel was in port and using hydraulics or winches (efficiencies in cost and storage). Port boxes use the system's GPS location to determine if a vessel falls within a specific set of known locations and it then tells the software that within this particular zone to behave a certain way. For this fishery it would mean hydraulic triggers while the vessel is using them at the dock a cause of spurious recordings. This will allow the vessel operator to leave the EM system on at all times and removes the burden of turning the system on and off when leaving for, or returning from, a fishing trip.

The new software can also accommodate many different kinds of sensors, hardware, and system add-ons. Another example of tested capabilities of the new software was the implementation of multiple configurable recording triggers. This means that video resolution and frame rate can be changed on an individual camera basis as well as depending on fishing activity. This allows for the collection of high resolution video at a high frame rate to be captured during fishing activity while reducing resolution and frame rate during non-fishing activities such as in between tows and when steaming back to port. It is critical for many discard compliance EM programs that video is recorded for the entirety of the fishing trip to ensure discards are not occurring outside of fishing events. This results in a large amount of video data that needs to be reviewed and stored. With the new software, during non fishing activity, the EM system can be set so that only one camera, such as the deck camera, is recording, and at a lower resolution. Since fishing activity makes up, on average, 23% of the entire trip, the amount of storage space used for a trip can be reduced by up to 70% using this method while still capturing all of the required data. The remainder of the software changes are related to the code development itself. These were not as visible to the end-users but the testing resulted in better performance and reliability.

_0000017554

## Modified Catch Handling

At the end of fish pumping, most vessels detach the pump from the net and then slacken lines to rotate the entire net aft beyond the stern to straighten the net before reeling the gear back onto the net drum. The net retrieval process commonly occurs while the vessel is moving forward at speeds of 2 to 5 knots. There are often fish remaining in the net that are subsequently released outside of the range of the camera. In these situations, the EM reviewer was sometimes unable to classify the type of discarding event observed between partial release or operational discards if they did not have a good view of the contents of the net prior to the discard event. In an operational EM program, it is likely the crew would need to bring the cod end fully into view of one of the cameras prior to releasing the catch, and they would need to release the cod end near the stern of the vessel to allow a reviewer to discern if fish were released from the net. This is similar to existing requirements laid out in Amendment 5 to the Atlantic Herring Fishery Management Plan. The plan states that vessels are required to provide observers visual access to the net/codend and any of its contents after pumping has ended, including bringing the codend and its contents aboard if possible.

Even when catch was brought on board, it was often difficult for the EM reviewer to discern whether fish removed from the dewatering box were discarded or retained if they were removed from the camera view. If an observer was on board, they filled their sample baskets and often took them out of camera view to do their sampling. With many of the current camera views, the EM reviewer was unable to determine if the fish removed from camera view were discarded or retained. While this was not an objective of the study, it was something we were interested in trying to document. This holds true for fish such as haddock, that must be retained by the vessel. If the crew sorted haddock out of the catch going into the fish hold, they often put them aside in a basket or bucket. This basket or bucket was generally taken out of view of the camera, so the EM reviewer was unable to determine the end disposition of those particular fish. In an operational program, EM-friendly catch handling specification should be established so catch set aside by either observer (for sampling) or crew (for sorting out bycatch) can be clearly determined.

Individual vessel monitoring plans (VMPs) which serve as a comprehensive strategy for discard documentation, installation and maintenance, protocols for data storage and transfer, and other important information regarding a vessel's specific EM system would be the governing tool to help facilitate required protocols. The VMP would define roles and responsibilities, incorporating all monitoring elements (portside, ASM, NEFOP, EM, etc.) to ensure cohesion and cooperation in support of data collection. Issues identified with observer interference, EM reviewer mis-categorization of discard events, vessel operator responsibilities for reporting critical and non-critical equipment failures, and vessel activities that complicate video review could be mitigated with firm protocols documented in the vessel's VMP.

## Distinguishing Between Discarding Events

During this project, an attempt was made to use many of the same data fields as the observer program. While this worked for many fields such as setting and hauling events, it was more difficult in situations where the event is defined using situational information, such as ability of the vessel to pump more fish, and is not black and white. Using EM it was often difficult to determine if a discard was operational or a partial release due to the difficulty for the reviewer to determine if a vessel is capable of pumping more of the fish using EM video. The lack of input from the captain/crew in the situations was also a challenge. An operational discard is defined as fish that are discarded at the end of a haul when the vessel is unable to pump the remainder of the fish. Since each vessel is different and some use mechanical methods such as a triplex roller, which in theory allows vessels to pump more of the fish, the determination of whether a vessel "could" have pumped more fish at the end of the haul was difficult and subjective.

There were many examples that needed group review to determine how to classify the discard event. It was also difficult to determine the reason for a slippage event. On observed trips, if a vessel slips the net, the observer is required to document the reason for the discard. It is easy for the observer to get this information from the vessel operator. EM reviewers do not have the ability to collect this information, which resulted in a classification of "unknown" as the reason for discard. One idea proposed by both NMFS and vessel operators was to modify the EM software to allow the vessel operator to make an entry for any discard events directly into the trip data. If the vessel operator could enter the reason for discard and the approximate quantity of fish discarded, this would make a date/time and location annotation at the point the vessel operator makes it. This entry would then be available to the EM video reviewer when they open the trip data. Saltwater is looking into adding this capability to the new data acquisition software.

_0000017555

## Methods To Address Undetected Discard Events

There are three main types of data that aid the reviewer in detecting discard events; location data, sensor data, and video data. Locations data are important to show the location and speed of the vessel, and may indicate whether a vessel is engaging in fishing activity. Sensor data is important to show rotation of the third wire and hydraulic pressure. Rotation sensor data would indicate setting or hauling of gear and hydraulic sensor data would indicate that the hydraulics are being used. These sensor data indicate gear activity and would key the reviewer to potential discard events. However, since vessels may discard fish at any time, all video data must be reviewed carefully in order to identify discard events, once fishing activity begins.

Camera framing must be established such that all discard events can be viewed remotely by the reviewer. Common views for discard events are; the stern view where the net is hauled back to the boat and back on board, the pump side view where the net is connected to the pump, and the dewatering box, chutes and deck view where the larger fish are sorted from the catch. Sometimes fish are also sorted from the chutes or fish may overflow from the fish holds while the crew fills the holds with water. These areas need to be captured by the cameras to ensure most or all of the discard events will be detected. Although all discard events may not be captured, proper camera placement can minimize the number of missed events.

Although every effort is made to capture all discard events, some may not be detected or a discard source may not be seen. During this project, there were a few times where fish were seen floating in the water near the vessel, but the reviewer was unsure where they came from. This occurred most often when reviewing video from the vessel with only one camera installed (at the stern of the vessel). It is likely the fish seen in the water were discarded from the dewatering box, but since there was no deck camera or dewatering box camera, the reviewer was unable to positively identify the source of the fish and as a result may have documented the event incorrectly. In cases like these where a discard source cannot be confirmed, the reviewer commented as much as possible about the apparent source and nature of the discard.

There were also times where the vessel would finish pumping and release the codend far behind the vessel. In cases like this where the reviewer could not determine if there any fish in the net prior to the codend being released, it was assumed there was no discard. Because an operational EM program would involve consequence measures for vessels that slipped catch (i.e. 15 mile move-along, exit groundfish closed areas for the remainder of that trip), there would likely need to be catch handling protocols, such that the reviewer could see the contents of the codend prior to release, or that the codend would be released close to the stern of the vessel to ensure that discards can be properly documented.

## Fish Disposition Categorization For Fish Not Brought On Board

Of the fish that were discarded before being brought on board, reviewers were asked to determine the reason for the discard. The discard disposition codes were based on the current codes in the observer manual. While some categories like operational discards and no market, were similar between reviewers, a couple of categories had less agreement. The majority of these discard events with disagreement between reviewers, occured when the pump was detached from the net or during a pump stop event. Since it is often difficult to see a clog inside the pump, the audit reviewer was cautious and marked these events as reason not specified, while the census reviewers considered fish released from the net during a pump stop event to be due to a clogged pump.  When compared to the observer data, the alignment for operational discards showed agreement but the observer was able to utilize codes like regulations prohibit any retention; poor quality due to gear damage; gear damage prevented capture and no market, reason not specified much more accurately since they are able to gather this information from the captain or crew or by being more situationally aware of what is going on.

Since this was not a primary focus of the project, less effort went into defining these events, leading to inconsistent categorization of discard dispositions. In a fully implemented EM program, discard disposition categories will need to be well defined as they pertain to EM to ensure consistency across all reviewers.

## APPLICABILITY TO OTHER GREATER ATLANTIC FISHERIES

There are many aspects of this EM program that are applicable to other fisheries in the Greater Atlantic region. As described in previous sections, the program relied on a collaborative relationship between NMFS staff and the EM service provider, Saltwater Inc. The group collaborated on outreach and industry engagement, data management and review, and in implementing ongoing program

_0000017556

improvements. Regularly scheduled meetings and the active participation of multiple NMFS staff representing different agency offices is something that other programs could benefit from, especially during the startup phase.

The EM system and software used for this program can be easily adapted for use in other fisheries. While each fishery has different monitoring objectives, the basic functions of the EM system of collecting sensor data for the duration of the trip, and triggering video recording as required, can be applied in any of the region's fisheries. The quality of data collected depends to some degree on monitoring requirements, with catch accounting potentially requiring higher frame rates and resolutions than compliance monitoring. In this project, when the cameras were installed in Saltwater's preferred locations, reviewers were able to accurately identify some catch and bycatch species from the video data. This is a promising indication of the potential applicability of the EM system for catch accounting  in this and other trawl fisheries.

Another transferable feature of this project was the integration by Saltwater of observers into the EM team and the cross-training of EM technicians and data reviewers; all of the EM technicians were current or former fishery observers, with background and training in this fleet's fishing operations, and all were also trained to do data review. This creates a very flexible and responsive workforce that translates into cost efficiencies because people can switch tasks as demand requires. This approach would also work well if there were an added portside monitoring requirement. Because all of the technician/reviewers were current or former fishery observers, it would be relatively easy to add portside monitoring duties to their job duties.

This program relied on third party data management and review, with all of the collected data submitted to the EM service provider, Saltwater Inc. and reviewed by their staff. Although the original program design stipulated that NMFS conduct an audit of the data, NMFS staff ultimately reviewed all of the data. However, the approach of having a primary review by the EM provider with an audit by NMFS for quality assurance worked well and could be applied to other fisheries. The timeliness and quality of review carried out by Saltwater consistently met program needs. Giving the service provider immediate access to the data helped with the early identification and resolution of any system problems that might affect data quality. There are also efficiencies to be gained by having contractors rather than government employees carry out data review, especially when they are cross trained and/or working on multiple EM contracts. Finally, this program has elucidated a  range of legal questions regarding the accessibility of EM data through public requests through the Freedom of Information Act (FOIA). Proprietary vessel data collected through an EM program (including EM footage) that is managed and stored by  an EM service provider is not subject to the same FOIA requirements as data held by NMFS.

Saltwater's EM review software is template driven and open source, which allows it to be easily adapted to the requirements of each fishery. Open source software also invites collaboration, which will hopefully lead to efficiencies and cost savings in the review process—which is the most expensive part of most, if not all, EM programs

# VII. CONCLUSIONS

This project set out to determine if EM could be an effective tool for detecting and categorizing discard events on midwater trawl vessels and to develop a framework for EM implementation in this fishery. We determined EM could successfully detect full release events to a high degree of accuracy (94%) and likely highly effective for identifying smaller releases. It was more challenging to categorize these smaller releases as either partial releases or operational discard events. Interestingly, in cases where audit and census reviewers categorized these events differently their notes often described similar events. This leads us to believe that better definition of the two events with regards to EM, and perhaps greater standardization among reviewers, could help to eliminate these discrepancies.

EM system installation varied among vessels and allowed us to evaluate the effectiveness of each unique configuration and determine the ideal camera setup to capture all discard activity in this fleet.  We determined three to four cameras, capturing the four areas where discarding occurs, would be required in an operational EM program. The EM system deployed in this fishery performed well and captured high quality data throughout the project with very few system performance issues.

Two review methodologies were used to determine efficacy of quantifying and categorizing discard events in this fleet.  An audit approach that focused primarily on fishing events as indicated by sensors installed on the vessel and a census approach that looked at all video captured during each trip. Preliminary results show that the audit method of review is comparable to the census review and would be a more cost effective model for implementation.

Multiple cost drivers impact the costs of full EM program implementation. Data services, which include data management, review and storage, were found to be the most significant. A key start-up cost for this program and many EM programs is the time required to decide on the data fields to be incorporated into a database and determine review protocols. In an operational EM program, it is important to ensure all of the data collected by the EM system can be compared to, and potentially integrated with, existing observer and portside monitor data streams. Data goals impact system install decisions as well as data management, review and reporting costs.

While video footage was intended to only initially be used to verify retention of catch for portside sampling, the New England Council also recommended that EM would be used to verify compliance with slippage restrictions, reporting requirements, and a requirement to move 15 nautical miles following any slippage event.  Slippage restrictions, reporting requirements, and consequences are intended to improve catch monitoring by minimizing discarding events to help ensure that total catch is available for sampling portside.

Initially, video footage would not  be used to identify species, or estimate the amount of catch released if a haul were slipped.  The New England Council may expand the uses of video footage to include species identification or quantification of released catch in the future, if footage proves useful for these purposes.

This project helped determine the critical factors necessary for full EM implementation in this fishery.  There is still work to be done to determine the level of review and catch handling protocols that would be necessary to adequately monitor this fleet, but preliminary results show that an EM and portside program could be used to meet the information needs for management of this fishery.

_0000017558

# VIII. ACKNOWLEDGEMENTS

This project was funded by a grant through the NOAA Fishery Information Systems Program and National Observer Program, and through the NMFS GARFO and NEFSC Offices. We thank our colleagues Nichole Rossi, Sara Weeks, Dan Luers, Carrie Nordeen and Corinne Endres for their contributions to this report. We thank Joan Palmer and Sandra Bernstein for their tireless work on building a database and uploading all of the project data. We would also like to express our gratitude to all of the vessel owners and operators for volunteering and participating in the project as well as providing valuable feedback. Several Saltwater staff contributed to this project including: Jared Fuller, Mark Hagianis, Adam Cook, Mark Seramur, Alan Perzanowski and Sam Moore. We are also thankful to Eric Torgerson, Chordata Ltd,  for his assistance with the further development of the onboard software and data review software used in this project.

_0000017559

# IX. REFERENCES

Mass.Gov. "Learn about Atlantic herring". *Mass.Gov*, www.mass.gov/service-details/learn-about-atlantic-herring.
        Accessed 10, November, 2017.

NEFMC. (1999). *Final Atlantic Herring Fishery Management Plan Incorporating the Environmental Impact
        Statement and Regulatory Impact Review*. Newburyport, MA: New England Fishery Management Council. 390 p.

NEFMC. (2015). *Standardized Bycatch Reporting Methodology: An Omnibus Amendment to the Fishery
        Management Plans of the Mid-Atlantic and New England Regional Fishery Management Councils.* Newburyport, MA: New
        England Fishery Management Council in consultation with the MAFMC and NMFS. 394 p.

NEFMC. (2016). *Localized Depletion of Atlantic Herring.* Memorandum. Newburyport, MA: New England Fishery
        Management Council Atlantic Herring Plan Development Team. 47 p.

NOAA. (1999). *Essential Fish Habitat Source Document: Atlantic Herring, Clupea Harengus, Life History and Habitat
        Characteristics.* Woods Hole, MA: NOAA Technical Memorandum NMFS-NE-126. 56 p.

NOAA. "Atlantic Herring". www.greateratlantic.fisheries.noaa.gov/sustainable/species/atlherring/. Accessed 10,
        November, 2017.

NOAA. "Atlantic Herring". www.fisheries.noaa.gov/species/atlantic-herring. Accessed 10, November, 2017.

NOAA. "Atlantic Mackerel". www.fisheries.noaa.gov/species/atlantic-mackerel. Accessed 10, November, 2017.

NOAA. "Northeast Fisheries Observer Training and Manuals". www.nefsc.noaa.gov/fsb/training/. Accessed 26,
        January, 2018.

NOAA. "Standardized Bycatch Reporting Methodology and Sea Day Schedule". www.nefsc.noaa.gov/fsb/SBRM/.
        Accessed 26, January, 2018.

Thomson, D. (1978) "Pair trawling and pair seining; the technology of two-boat fishing." *Fishing New Books.*
        0-85238-087-9

_0000017560

# X. APPENDICES

## APPENDIX 1: DISCARDING EVENT DESCRIPTIONS

An objective of the study was to determine if EM reviewers could identify and characterize discard p; events in the midwater trawl herring fishery. NEFOP observers trained to provide at-sea coverage in the high volume fisheries classify discard events into three categories: 1) Catch discarded after being brought on board 2) Slippage, categorized as the partial or full release of catch 3) Operational Discards. Video reviewers utilized this classification structure  throughout the EM project. Reviewers documented discarding events by selecting a lead descriptor that most accurately categorized the type of event witnessed during the trip review (Table 7). Discard event records were collected at the haul level in the software. Additional discard event data obtained by reviewers included identifying the camera view(s) that collected the footage, and providing comments and a catch disposition code for comparison to observer data when applicable.

Below is the regulatory definition of slippage in the Atlantic herring fishery followed by definitions for each discard event and examples that illustrate the differences between categories.

*Table 7: Discarding event descriptors used by EM video reviewers to distinguish slippage from other discard scenarios.*

| Operational Discards | Partial Release | Other |
|---|---|---|
| Discarded after being brought onboard | Full Release | Unknown |

Federal regulations (50 CFR 648.02) define slippage in the herring fishery as follows:

"*Slippage in the Atlantic herring fishery means catch that is discarded prior to it being brought aboard a vessel issued an Atlantic herring permit and/or prior to making catch available for sampling and inspection by a NMFS-approved observer. Slippage includes releasing catch from a codend or seine prior to the completion of pumping the catch aboard and the release of catch from a codend or seine while the codend or seine is in the water. Fish that cannot be pumped and remain in the codend or seine at the end of pumping operations (operational discards) are not considered slippage.*"

As described above, a slippage event can *currently* occur only on a trip with a NMFS-approved observer on board. However, if EM is approved by the New England Council, the definition of slippage will be expanded to include all trips that are sampled, regardless of whether that sampling is performed by an observer or ASM while a vessel is at sea or by a portside sampler when the vessel returns to port. Thus, when a vessel monitoring with EM/Portside is notified (vessel will be notified before a trip begins) that it will be portside sampled at the end of a trip, any partial or full release (as described below) will be considered slippage.

**Operational Discards**: Operational discards in the Atlantic herring fishery means small amounts of fish that can not be pumped onboard and remain in the codend or seine at the end of pumping operations. Leaving small amounts of fish in the net at the end of pumping activity is operationally discarded catch. For example, fish that remain in the net and pump intake system after the majority of the catch has been pumped onboard the vessel. Operational discards are often the result of fish that collect and become lodged in the net meshes or area surrounding the the net and pump connection; or fish that cycle back through the hose and out of the pump into the water. It must be clear to the video reviewer that pumping ended because the captain and crew determined that they had successfully emptied the contents of the net onto the vessel. Events categorized as operational discards represent only a small portion of fish that could not be pumped on board.

**Full Release:**  A slippage event defined as the release of the entire contents of the net back into the water. In general, slippage events (partial or full releases) may be intentional or unintentional. An unintentional slippage event classified as a full release would be gear damage resulting in the vessel losing the entire contents of the haul before the pump is attached or operated. A full release that is intentionally carried out can be the result of mechanical failure, low volume of fish captured during the tow, or an

_0000017561

overabundance of undesired species in the net (such as dogfish), among other bycatch. A captain's decision to slip the entire contents of the net can also be impacted by weather and/or safety concerns.

**Partial Release:** A slippage event that is characterized by the release of a portion of catch from net or components used to pump catch into the vessel's holding tanks. In order for a reviewer to classify a discard as a partial release, pumping activity must have begun and a portion of the catch must have been transferred onboard. A partial release often occurs when the vessel's crew perceives there is something blocking the pump because there is little or no fish entering the dewatering box. Clogs or twists in the net often necessitate lifting the pump from the water while it is still attached to the net. From this vantage point, the crew will then decide whether the pump must be disconnected from the net. Pump removal or adjustments can result in the release of catch into the water. Because these discarded fish are not brought onboard and made available to the observer for sampling, this is considered a slippage event (partial release). Other examples of a partial release/ slippage events occur when the vessel holds are full and unable to take on more catch, or when gear damage or mechanical failure result in the release of catch that the captain intended to pump onboard. In these situations, the vessel may start pumping fish from the net but end up releasing part of the catch prior to bringing it on board.

**Discarded after being brought onboard:** Prior to going into the holding tanks, the catch is pumped from the net into a dewatering box that leads catch through a system of chutes and a sorting grate, or dewatering box, where bycatch can be removed by the crew and set aside or immediately thrown overboard. Examples of bycatch species sorted at the dewatering box include dogfish and haddock. Regulations require vessels to retain haddock but other bycatch may be discarded while sorting. If the species composition is not satisfactory, the crew can operate the pump to transfer fish onboard and simultaneously block catch from entering a holding tank but this action is driven by market and rarely occurs. Any fish that land on the deck due to such actions as while the gear is being reeled over the stern or fish that overrun the dewatering box or chutes that are not retained for market, are classified by observers and EM reviewers as catch items discarded after being brought on board.

**Other:** Video reviewers assigned "Other" to discard events when fish were collected in baskets or taken out of camera view individually and deemed retained by crew based on regulations.

**Unknown:** Discard events that could not be classified during video review were logged in the review software as "Unknown". These events commonly involved situations where catch handling occurred out of camera view for extended periods of time, or instances when fish were observed in the water near the vessel or gear but the point source of entry into the water could not be determined from the video data.

_0000017562

## APPENDIX 2: EM STUDY OUTREACH SHEET





## NOAA FISHERIES

### Electronic Monitoring:
### Atlantic Herring and Mackerel Project Information Sheet

**The National Marine Fisheries Service (NMFS) is evaluating the utility of Electronic Monitoring (EM) in the Atlantic herring and mackerel midwater trawl fisheries. Saltwater Inc. has been contracted by NMFS to provide and install EM units on up to 12 commercial fishing vessels in the Northwest Atlantic. The purpose of the project is to evaluate the utility of EM for catch monitoring on midwater trawl vessels. Work from this project will help inform the implementation of the Industry-Funded Monitoring (IFM) Omnibus Amendment and the development of future EM programs. This 16 month project is currently underway and will run through December of 2017.**

For more information or questions regarding Electronic Monitoring in the Atlantic herring and mackerel fisheries please contact:
Dan Luers
(978) 282-8457
Daniel.Luers@noaa.gov or
Nichole Rossi at (508) 495-2128
Nichole.Rossi@noaa.gov





**Goals**
- Deploy and test an EM program in an operational setting, allowing analysis and adjustment of EM program requirements, and development of business practices to support an EM program.
- Evaluate the utility of EM for monitoring catch retention and identifying discard events in the Atlantic herring and mackerel midwater trawl fisheries.
- Additional goals include familiarizing the fishing fleet with EM, gaining industry input on EM operations, and refining industry and NMFS EM cost estimates.

**How Electronic Monitoring works, what it records, when it records:**
- EM consists of multiple cameras, a control box, a user-interface (monitor), a GPS receiver, and two sensors (hydraulic and rotation)
- Cameras begin recording when the sensors are triggered by the drum rotation or hydraulic pressure transducer; cameras target the vessel's deck and waters surrounding the vessel, including where the codend is pulled to the surface and pumping occurs.
- Camera views are focused only on the areas of the deck where catch handling occurs (i.e., net reel, pump, dewatering box, etc.)
- Cameras are set up to turn on when gear is first deployed, remain on for the duration of every trip, and turn off once the vessel returns to port
- 100% of EM footage collected on every trip would be reviewed
- The system does **NOT** record audio

**How are the data stored and transferred to Saltwater?**
Data are stored on a hard drive inside a control box (hard drives can hold up to a month's worth of data) and handled as confidential data. Vessel operators will mail the hard drives to Saltwater. Vessels operators will receive training on how to remove and mail their hard drives before their first fishing trip. Mailing hard drives is easy for the vessel and cost effective for the program.



EM Video Camera

U.S. Department of Commerce | National Oceanic and Atmospheric Administration | National Marine Fisheries Service

_0000017563



**Who owns the data collected during the project?**
The data will be the property of the government. Data collected are subject to the same data confidentiality regulations as observer data. Vessel owners may request copies of video collected aboard their boat.

**Would data gathered in this project be used in management of the fishery?**
The data will only be used to inform the utility of EM as a means of monitoring the fishery. It will not be used to monitor catch, catch caps, or compliance with existing regulations during this project.



**Who owns the equipment?**
Saltwater will supply all necessary equipment, and will remove all equipment at the end of the project. At the completion of the project, vessel ownership of the equipment or a lease agreement with Saltwater is possible, but should be discussed between Saltwater and vessel representatives.

**Will I have to take a NEFOP observer once EM equipment has been installed on my vessel?**
There would be no additional NEFOP coverage associated with this project, but if your vessel is selected for NEFOP coverage, you would be required to carry an observer and operate the EM system on the same trip. Data from trips with both NEFOP coverage and EM would be compared to evaluate the effectiveness of EM.



**When do I have to turn on the EM System?**
The EM system would need to be turned on for every declared Atlantic herring or mackerel trip. The EM system will be on for the duration of a trip, but the cameras will not be triggered to start recording until gear is first deployed and then cameras will stop recording when the vessel returns to port.

**Will the vessel incur any EM costs during this project?**
NMFS is responsible for equipment, data retrievals, data reviewing, data storage, and EM provider overhead costs. Vessels requiring power upgrades to accommodate the EM system are responsible for those costs.

**What happens if the EM equipment is not working properly and I want to leave on a trip?**
Participating vessels are acting in a voluntary capacity and, therefore, will not be prevented from fishing if the EM system malfunctions. Vessels will be required to report all system failures to Saltwater and allow Saltwater access to the vessel to fix the issue.



**Would vessels be required to modify fishing practices/effort or be subjected to additional regulations during this project?**
No, the objectives of this project are to evaluate the utility of EM for catch monitoring, and to educate the fleet in EM technology. It is important for vessels to fish in a normal manner to determine if EM can capture the elements necessary to monitor the fishery (e.g. catch retention, discard events).



Atlantic Herring (*Clupea harengus*)

**For more information or questions regarding electronic monitoring on Atlantic herring or mackerel vessels visit www.nefsc.noaa.gov/femad/fsb/ems or contact: Dan Luers by phone: (978) 282-8457 or email: Daniel.Luers@noaa.gov or Nichole Rossi (508) 495-2128 at Nichole.Rossi@noaa.gov**

U.S. Department of Commerce | National Oceanic and Atmospheric Administration | National Marine Fisheries Service

**APPENDIX 3: VESSEL REFERENCE SHEET**

# Install Requirements

You have agreed to carry an EM system that is being provided by Saltwater.  In order to install the system on your vessel, there are certain requirements that are described below.

1.  The EM system needs to tie into stable 12v DC power in your wheelhouse.  Please provide us with details of your power and ready a switch in your wheelhouse panel for us to wire the System to.  This switch will need to remain on during the entirety of your fishing trips, so please be mindful of the location you prepare.  The power consumption for the system is on par with a pair of incandescent light bulbs.  If you have a preferred type of monitor you may purchase one, otherwise a **10"** flat screen monitor will be provided.  The system needs to be placed in a secure, dry area which can be readily accessed for data retrieval.

2.  To check hydraulic pressure, a sensor will be installed on the pressure side of the hydraulic line in-line on the reel to determine hauling events.  Due to the sensitive nature of fishing gear, the vessel will be responsible for installing and securing the hydraulic fittings

3. A rotation sensor and a magnet will need to be fastened to your deck reel.

These wire runs from the sensors will return to the computer in the wheelhouse.  Please plan a safe route for your boat.  This may mean the wire will need to go through your deck.  Our techs can create this entry, or if you prefer you can do it yourself. Please let us know if you will be switching gear periodically.

4.  The cameras must have proper field of view to monitor all retained catch, processing, and discards.  If there is any fixed gear that is not being used during the time of monitoring that may move and obscure the camera fields, please fasten, move, or let us know about these potential obstructions.

5.  We will work with the crew to install wheelhouse components, deck components, and wire runs in order to achieve the necessary placement.  These will be done in such a way to be minimally invasive, allow data acquisition, and provide ease of maintenance and removal.

# Operator Responsibilities

**System Function Test**
Prior to leaving port, the vessel operator must turn the system on and conduct a system function test.  If the system function test identifies a malfunction, the vessel operator should contact Saltwater immediately to resolve the issue.  A Saltwater technician will determine if the malfunction is critical or noncritical.  A critical malfunction is one that prevents the data collection objectives from being achieved. If the malfunction is critical, Saltwater will make every effort to resolve the issue remotely or send a technician to resolve the issue as soon as possible.

**Equipment malfunction at sea**
In the event of a system malfunction at sea, the skipper should report the problem as soon as possible, preferably as soon as it occurs so a technician can attempt remote support and meet the vessel upon return to port to resolve issue if necessary.

**EM System Power**
The EM system must be turned on and recording data (e.g., GPS and sensors) continuously from the start of the fishing

_0000017565

trip until the vessel returns to port.

**Catch Handling**

The vessel operator will be responsible for ensuring all catch is handled within view of the cameras.  All discards must be done in view of the rail camera.

**Video Quality**

The vessel operator will be responsible to check the monitor before each haul and to wipe water and slime off the camera lenses as needed to maintain video quality.

**Hard Drives**

Upon completion of a trip, the vessel owner must send in the drive(s) that contain the data from that trip within 24 hours of returning to port.  This must be done after every trip.  Prior to departing for a fishing trip, the vessel operator must have adequate hard drive storage to record the entire trip.  The vessel operator must carry one or more spare hard drives as backup.

# EM System Components

A minimum of two cameras will be installed to record video of fishing activity. The video is recorded on a small, rugged computer called the (EMU) Electronic Monitoring Unit). Three sensors may also be installed—a GPS, a hydraulic pressure sensor, and/or a reel rotation sensor.  Data from the sensors is collected as a way to track fishing effort—when and where gear is set and hauled.  This data is collected by the Sensor Processing Unit (SPU.)

The complete system will be comprised of the cameras, the EMU and SPU, the GPS/Hydraulic/Rotation sensors, a keyboard with touchpad, and a monitor that will show a live feed whenever the system is turned on and indicate when it is recording video. Depending on the fishery, recording may be continuous or triggered by fishing events.

All of this hardware is designed to work together to monitor fishing effort and collect video data required by NMFS to allow for accurate catch accounting.

You can tell what the EM system sees, what the system is recording, and how the system is functioning by using the keyboard and monitor.  At the beginning, end, and during each trip you will have different responsibilities, which are described in this guide.

Feedback, questions, and comments on the system are a part of improving its use and function.  Please contact us at 1-800-770-3241.



The EMU, SPU, and a camera.

_0000017567

# System Operation & Skipper Duties

This section describes what the skipper and/or designated crew member must do to power up the system and ensure that the EM system is working while the vessel is fishing.

## Powering Up Before Your Trip Starts

1. Before you leave the port, power on the system at the breaker or switch where the system was installed.
2. Wait approximately 2-3 minutes for the system to power on. You should see lights and hear a series of beeps from the EMU (the larger green box).
3. Turn the monitor on. You will see a series of screen changes while the system boots.
4. The system is on once you see the live views from your cameras and the relevant system information on the display.

## System Check

**Prior to departing for a trip, the vessel operator must perform a system function check. Please carefully follow these steps.**

1. Go to the monitor and look at the screen.
2. On the screen you will see the view from the cameras installed on your vessel.
3. Look at the images from the cameras. Make sure they look right (the cameras are looking in the right direction, there is nothing blocking the view, they are clean).
   - You can make the live camera windows larger by clicking on the camera image you want to enlarge. It can be made smaller by clicking it again.
   - If there is slime or salt on the lens, use a **clean wet soft cloth** to wipe it clean. The plastic can scratch, so be careful not to damage it.
   - If there is anything blocking the view, move that object. DO NOT MOVE the camera.
4. Read the GPS, pressure sensor, and hard drive % filled on the screen. The drive will fill ~99% and jump to the next one if necessary. The drives should fill at a constant rate on days you're hauling back.
5. Click "System Check" to log that you have performed your daily check.

**Manual Recording -** If the system is not recording as intended, use the **"Manual Record"** button to start a manual recording.

**If you encounter any problems, please write them down and call Saltwater EM team at** 1-800-770-3241**.**

Appendix 7 – EM Project                                    December 2018

_0000017568

**Shutting Down the System**

If you need to power off the system for any reason (sleeping with the boat shut down to prevent battery drain, switching generators, or shutting off at the dock) simply power off the unit.  If your installation has a switch, please use it as instructed.

# End of Trip Duties

          

**Data Retrieval - End Trip**

At the end of each trip you will need to *end the trip to stop recording*, and remove the data that has been collected on the Hard Drive in the EMU and mail it to Saltwater. To do this, follow these instructions.

1. Click on the ***"End Trip"*** *icon* on the computer.  **This is essential to stop trip recording.**
2. It will ask if you are sure; click yes **only** if you are done with your trip.
3. You will be shown the serial number(s) of the Hard Drive you are to remove. Ensure to **accurately write the unique portion of these down.**
4. Click **"OK"** and wait for the system to **shut down -** the screen will turn gray/black**.**
5. Power off the system the system switch/breaker.
6. Look at the EMU and you will see two small labelled boxes with two thumb screws coming out of each. These are the Hard Drives that store the data.
7. **Match** the portion of the serial number you have written down with these labels
8. Carefully unscrew the spring loaded thumb screws from the drive you have matched and pull gently to remove the Hard Drive caddy. It will come all the way out and will have a flat, silver rectangle in it. That is the Hard Drive.
9. Place the whole device (Hard Drive and caddy with thumb screws still attached) into the provided **protective mailing box and bubble mailer**.
10. Repeat steps 6-9 with the other drive. **ONLY IF** you were presented with two separate serial numbers from the Data Retrieval program.
11. Please fill out the included form with vessel identification and a return mailing address and include with the hard drive in the protective hard drive mailing box provided by Saltwater. *An unidentified drive may delay the drives' return!*
12. Take this package and mail it using the **pre-paid postage label**.

# Preparing for the Next Trip

1. The Saltwater  technician will have left you with two new Hard Drives (installed in caddies), or you will have received them via mail from Saltwater.
2. You will put the new hard drives into the EMU in the slots where you removed the other ones.
3. Be sure the caddies are facing the right way. The Hard Drive and EMU should both be in the up orientation.



*EMU and hard drive in caddy in their "up" orientations.*

4. Carefully slide the caddy in until you feel a click. Hold it in place and screw the thumb screws in by hand. (DO NOT use a screwdriver. This will strip the screws).
5. Power on the system.
6. Turn on the monitor.
7. Look at the screen to check that the new Hard Drives are working. If they are working you will see their names and a Hard Drive use percentage.

**If you have any additional questions please call 1-800-770-3241.**

APPENDIX 4: TRIP FEEDBACK FORM

## VIEWER FEEDBACK FORM

| | |
|---|---|
| **Vessel Name:** | **Hard Drive #:** |
| **Review date:** | **Reviewed by:** |

**Summary:**

This document is designed to capture the details necessary to provide more timely feedback to the vessels (on an individual basis) to maximize obtaining high quality, useful, data. This will be facilitated by adhering to 3 principles:

Appendix 7 – EM Project                                    December 2018

1. Be timely. The form should be quick to fill out. *It is only filled out when there are problems that need fixing.* One form is filled out per hard drive to streamline the process, and comments can be made to indicate the span of trips or temporal nature of a problem to let techs know if its constant or intermittent

2. Consider root causes. The problem is not that the fisherman is blocking the view of pumping; it is that pumping is not visible. This gives us the option of moving the camera or the fisherman or both, depending.

3. Let them see what you see. It is possible that the person filling out this form will not be the person on the boat, so a picture will go a long way to describing a problem. There is a spot to paste a screen grab for a reason.

If a problem occurs across several trips or hauls on a single hard drive (very likely) then only fill out one feedback form and fill in the range of trip (trip number plus date) or haul numbers.

This form will be printed or saved to a laptop and taken down to the boat where problem solving will take place, hopefully with the assistance of the participating captain. If a solution is not obvious, then giving the parameters of what is needed will allow that interaction to proceed regardless.

**CAPTAIN/CREW:**

System test not performed before the trip.                                                      ☐

    **Comments:**

EM system not powered up upon leaving the dock.                                      ☐

    **Comments:**

Catch pumping outside of the expected pumping area (eg. not on starboard side).    ☐

    **Comments:**

Identification of catch utility impaired by crew position/action.                     ☐

    **Comments:**

**VESSEL SETUP:**

**System performance**

One or more cameras or sensors are not functioning during the trip (determined by looking at the thumbnails for the video files).

                                                     ☐

    **Comments:**

Gaps in imagery data are present during fishing events.                               ☐

    **Comments:**

_0000017571

Image quality impedes the identification of species or utility.                    ☐

    **Comments:**

## Camera angles

- Catch discarded in the water during/after the pumping process, view insufficient    ☐

    **Comments:**

- Catch discarded from the deck during/after the pumping process, view insufficient    ☐

    **Comments:**

- Blind spots on deck that require additional video coverage.                    ☐

    **Comments:**

**DEWATERING BOX:**

Clear view of crew picking fish at grate                    ☐

    **Comments:**

Catch items held up to camera for ID* (pilot basis)                    ☐

    **Comments:**

**OTHER**
Any outstanding feedback items not covered in the above sections

    **Comments:**


**DECISION TREE**
 (Changes in infrastructure should be proposed before changes in fishing practices)


1. Proposed changes in infrastructure:


2.  Proposed changes in fishing practices:


3. Parameters to guide decision making for changes proposed above.


SCREEN GRABS

_0000017572

## APPENDIX 5: QUARTERLY SUMMARY FORM

Atlantic Herring/Mackerel EM Project
Summary of EM Data Collection

Dear Fishing Vessel Owner,

Below you will find a summary of the EM data collected from the Fishing Vessel from Quarter x. Included in the summary are all declared herring/mackerel trips by the vessel during this quarter, total EM video data collected, and several metrics for evaluating your vessel's performance during the quarter. Note that during the first quarter of an EM project, we expect to see an adjustment period on the part of the captain and crew.

The vessel's captain and crew operated the EM system according to project guidance for x% of the trips. It is important to turn the EM system on when you leave the dock and keep it powered until you return to the dock.

We will continue to provide feedback in a timely manner via the feedback forms as data on each hard drive received from the vessel are processed. We plan to provide feedback via email/phone calls with regular (optional) in person meetings.

If you have any questions or concerns regarding this evaluation or the overall project, please contact:

Nichole Rossi (NMFS) at 508-495-2128 or Nichole.Rossi@noaa.gov

Morgan Wealti (Saltwater) at 907-406-3040 or Morgan.wealti@saltwaterinc.com

Sincerely,

NMFS & Saltwater

| Trip Number | Trip Start Date | Trip End Date | Total Sea Days | Data Collected (Hours) | Trip Start/End Recorded | % EM Data Collected During Trip | Hauls Recorded | System Check | Maintenance |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

**Notes:**

**Responsiveness:**

## APPENDIX 6: VESSEL PARTICIPANT EXIT INTERVIEWS

_0000017573

Between October and December 2017 project staff conducted final outreach meetings with representatives from each vessel. A total of 11 exit interviews were conducted by project staff.  The following section documents the exit interview questions  and summarized participants responses.

## Why did you decide to participate in the EM Study?

The majority of interviewees responded that they were interested in applying EM in an operational setting to test functionality of equipment and evaluate system performance at sea. Owners wanted to assess the pros and cons of the technology for future business planning. Overall, vessel participants acknowledged a need to gain hands-on experience with EM in the event that the technology is approved as a monitoring option for the fleet. Although vessel managers and owners made up the majority of  those interviewed, several of the captains who were interviewed expressed similar opinions regarding the need to test EM.  Some participants hoped that participation in the project could change what they believed was an unfair public perception of high bycatch rates. Members of the fleet also hoped that active involvement in the study would help build higher levels of trust in the NEFOP observer data that has been collected from the fleet for many years.

## Has field support for your vessel been sufficient during the study?

Participants agreed that field support was sufficient over the course of the project, however, several managers and operators discussed issues with the hard drives that were used to collect and store data. Representatives from the vessels commented that during busy fishing periods when there was less than 24 hours between trip deployments, it was difficult to find the time to package and ship hard drives through the mail. In several instances, captains complained that they were not given an adequate number of replacement hard drives during quarter 2 and that spares were mailed to incorrect addresses. The vessel manager did confirm that Saltwater was responsive to correcting the issue immediately. In a separate case, a vessel manager received new replacement hard drives that were not formatted properly. Another manager said there were delays in technicians resolving issues with onboard systems at the beginning of the study. However, this participant further noted ongoing improvements were made as captains and company personnel became more familiar with operating the equipment. Remote port locations (i.e. Maine, New Jersey etc.) and vessels transiting seasonally between multiple ports and states such as New Jersey, Massachusetts, and Maine were recognized by project participants as the main factors that delayed EM technician response time when onsite support was needed.

## Have you had any major issues with equipment? Do you feel it is reliable?

The majority of the participants did not report any major issues with the equipment during the study, however two separate system issues were discussed by representatives at their exit interviews. One vessel manager stated that he had recurring issues with the live camera feed displays on one of his trawlers throughout the project. The captain and engineer explained that the system locked up and had to be rebooted during many trips. There were also times when they could not determine if the system was actively recording footage. Another vessel experienced similar issues with the wheelhouse monitor freezing up but the problem was resolved by Saltwater after two trips.  Equipment malfunctions on individual vessels were infrequent and generally occurred early in the project. One vessel owner wondered what would happen under a mandatory program  if EM systems froze up or cameras stopped working.  *Would vessels be required to terminate their trip, if they were already engaged in fishing?* He believes the fleet should have an opportunity to review proposed regulations of a mandatory EM program before business decisions are made.

## Are you satisfied with reports that are provided to your vessel regarding the progress of the study?

Several vessel managers stated that they did not always have an opportunity to review the content of the report thoroughly but the majority of participants agreed that the quarterly reports were satisfactory and feedback was provided in a timely manner. Another vessel manager commented on Saltwater's professionalism and that their staff always took the time to address his questions and keep him updated with project developments. In a future operational setting, one vessel owner stated that the fleet would expect EM trip reports to be processed in a similar time frame as the observer data that is sent to owner/operators after each trip. The current timeline for processing data release requests for vessel owners and captains is 2 to 3 weeks after an observed trip.

## What kind of data would you like to see in the final report?

_0000017574

The main topics of interest in the final report are cost analysis data of EM compared to other monitoring options proposed by the NEFMC and the opportunity to evaluate cost drivers associated with IFM options. Several participants expressed interest in comparing the total time spent actively fishing with the total time transiting and searching for fish. Additionally, industry members hope the report gives an honest and detailed appraisal of EM's performance during the study. They anticipate a thorough examination of the capabilities and limitations of EM as a monitoring tool for documenting fishing activity, discard events, and more specifically an EM reviewer's level of accuracy and consistency when identifying and comparing slippage (partial and full releases) with other discard events. Some participants are interested in the analysis of how multiple reviewers labeled discarding events. Several interviewees posed similar questions in the comparison of the census and audit model review findings: *What level of agreement and consistency will there be between 2 video reviewers in identifying operational discards compared to slippage? Is it possible for reviewers to identify certain fish to species level?*

## Are there improvements you would like to see (hardware, software, logistics)? What were your top two challenges with the EM system or project in general?

There were many suggested improvements that participants shared during the exit interviews. Key improvements presented were: a) remote transmission of trip data rather than mailing or EM technician pickup; b) consolidating vessel monitoring and EM into one software package; c) requirement that EM software be activated/deactivated by port boxes (geo-fencing) to eliminate human error; and d) the use of electric current to activate the system rather than hydraulic pressure and rotational movement of winches.

Some participants believed there was a lot of unnecessary data collected as a result of cameras being triggered for prolonged periods while a vessel was in port. Participants felt space on drives was wasted as a result of mailing in hard drives after only one fishing trip. Several owners and operators felt that mailing hard drives on a per trip basis was excessive and they would have preferred an option to complete three or four trips before submitting data. A minority of participants responded that the the system was easy to use and only required plugging the system in and making sure the unit had a hard drive.

Participants said that when problems occurred, dealing with system issues between trips added challenges to their shoreside tasks. Some participants stated that EM does not deliver the real time catch estimates that an observer can provide to captains, and that on some trips observer catch estimates are highly valuable sources of information. Another challenge cited was captain and crew turn over. A manager stated that instructing new captains and engineers on operation of the system and trip data submission was somewhat time consuming, often resulting in errors because it took time for new operators and the crew to adapt to the additional tasks.

Participants still believe there are many unknowns with regards to how an EM program would operate and some owners would be reluctant to commit to EM based solely from their experience in the study. For example, there is a clear understanding among the fleet regarding the requirements and enforcement penalties associated with the observer program, but there has been no corresponding guidance or information shared with the herring fleet regarding proposed requirements and enforcement actions associated with EM regulations.

## Were there any alternative uses of EM (e.g. safety, docking) that you found useful?

Most participants stated that the system was not used for any other purposes. There was one operator that said he used the stern camera view in the wheelhouse periodically but the camera placement was adjusted at one point, and it no longer provided the full width of the stern. Alternative uses for EM that were shared during interviews included EM as a resource for insurance claims or legal actions and a potential method to monitor safety and deter certain crew behavior.

## Did you or the crew have any concerns (privacy, safety, etc.) with having EM systems onboard? Did the project measurably relieve or reinforce these concerns?

All interviewees responded that from the outset of the project there were various levels of concern expressed throughout the chain of command on individual vessels, mainly in regard to the amount of footage that would be collected. Several participants stated that captains and crews had difficulty acclimating to the cameras at first while performing their work and that others were entirely uncomfortable with the project, believing that EM was intrusive. There were also similar discussions about access and use of EM data between vessel crews and owners. Crew members did not know what parties had access to the footage or how the data was

_0000017575

being used and/or stored. Most of the participants commented on the criminal case that was built around EM video data and they referenced that incident as a turning point in the study. Discomfort with the project and concerns with how the data could be used against vessels greatly increased as some industry members felt it was wrong to use video from a voluntary study as evidence to prosecute. It is clear that the project sparked a heightened awareness for participants and a need to review further information and regulatory guidance issued by NMFS. Specifically, the fleet has significant concerns regarding EM data and how it will be utilized and managed in the future and what entities will have the authority to access the data.

## Did you have a clear understanding of the goals for this project and your responsibilities? Could you explain what they are?

The majority of those interviewed commented that they had a clear understanding of the goals of the project and their responsibilities. While owners and vessel managers understood their responsibilities, some admitted that maintaining the willingness of their crews and captains to participate in a voluntary study was at times difficult. Several vessel managers felt that multiple cameras were unnecessary and that there seemed to be a shift in the project goals and objectives during the study. In particular, vessel managers raised concerns regarding the use of a dewatering box camera because the frame often captured a significant amount of deck space and compromised the privacy of the crew. They noted that catch released at the dewatering box would not be classified as slippage and therefore did not always agree to camera angle set up by technicians during the primary installation.

## Do you feel that EM could sufficiently meet monitoring needs (slippage monitoring)?

Most participants agreed that EM could effectively monitor slippage events. At quarterly meetings with vessel representatives, clips of video from their vessel(s) were reviewed. Demonstrations aided first quarter meetings by allowing project managers to illustrate the level of video quality and propose requests for installing booms on vessels to improve the camera angle and video quality collected from pump view cameras. At the conclusion of the project, some vessel managers agreed that EM could meet the needs of monitoring slippage in the herring fishery but they shared similar opinions that equipment maintenance and vessel support would prove EM a more costly source of monitoring. These managers also pointed to the fact that there has not been a practical analysis of costs related to a portside sampling program for the herring fishery. One representative stated that EM was not capable of monitoring slippage. The vessel manager stated that EM would need to be part of a larger program with improved technology and greater vessel support from an EM provider company in order to meet the needs of monitoring slippage.

Slippage regulations are met with contention from members of the midwater trawl fleet. Ideally, participants would like regulators to revisit definitions of slippage in the herring fishery, most importantly partial release documentation by observers in the herring fishery. Industry members do not like how slippage is defined and categorized. One participant cited that the definition originated in the tuna fishery as a description for high grading. The definition for slippage was then transferred for regulatory use in the herring fishery where high grading does not occur.

## If EM is approved, are you considering it as your IFM monitoring choice? Why or why not? If you haven't decided, what further information will you consider in making this decision?

Vessel managers and owners concluded that cost would be the main factor in their decision to select EM as a monitoring option for their business. Captains that were interviewed stated that they would back the owners IFM decision. Without further details on projected costs or examples of regulatory changes and incentive options, the majority of the participants indicated that they will chose at-sea monitoring instead of EM. Captains and crews are more familiar and comfortable with human observers. They prefer the direct interaction with an observer coupled with the ability to witness how sampling methods are being carried out first hand. EM can not give haul level assessment of species composition or weights whereas NEFOP observers can provide catch estimates and species composition to the captain and crew as necessary.

Industry members strongly believe that EM will be cost prohibitive due to the portside program requirements. There is a consensus that EM needs to be more user-friendly for captains and personnel that oversee shoreside operations. In addition, participants that offload catch from a single trip at multiple ports and do not have offices centrally located

Appendix 7 – EM Project                                                                                                   December 2018

believe effort and costs to coordinate with the EM facilitator and portside sampler would be impractical for their business interests. This group of participants firmly concluded that they are not ready to choose EM unless the costs are significantly less than at-sea monitors.

## What would incentivize you to use EM over other options?

Cost comparisons between at-sea monitoring  and EM coupled with portside monitoring will be the leading factors for vessel owners in deciding what program they will choose. Items that would incentivize the selection of EM by participants would be the flexibility to access closed areas with EM in addition to trips where vessels are randomly assigned a NEFOP observer. Owners cited variable and dropping coverage of the fleet by NEFOP observers as a result of SBRM analysis used to assign sea days to the fleet each year. Some participants posited that EM should allow vessels to fish all access areas because in an operational program they assume captains would be required to operate cameras on 100% of their trips. One captain stated that the entire fleet would choose EM if it gave vessels year-round access to groundfish closed areas. Several participants believe that without guaranteed access to closed areas, there will be no real incentives for the fleet to use EM. A vessel manager stated that there have been increased regulations and restrictions placed on the fleet in the last 10 years and that EM could become a beneficial monitoring source for all stakeholders by providing consistent, regular access to fishery dependent data while granting increased fishing opportunity for the fleet. Participants also stated that there are many unknowns with EM that regulators have not discussed, and that they would be uncomfortable choosing this technology over human at-sea monitors until further details have been published for comment and review. Overall, participants expect that their hands-on experience with EM will be influential in management plans as well as show a common willingness to work with stakeholders.

_0000017577

APPENDIX 7: VESSEL MONITORING PLAN

_0000017578



# 2016/2017
# Atlantic Herring & Mackerel Midwater Trawl Program
# Vessel Monitoring Plan

This Vessel Monitoring Plan (VMP) describes how an Electronic Monitoring (EM) system is specifically configured on a vessel and how fishing operations on that vessel will be conducted to effectively monitor fishing activities to document catch. The 2017 VMP was developed to meet the objectives of the 2016/2017 Atlantic Herring and Mackerel Electronic Monitoring Project.

The data collection goal of 2017 EM cooperative research is to develop EM so that the data can be used for catch accounting of discarded catch. Work from this project will help inform the implementation of the Industry-Funded Monitoring (IFM) Omnibus Amendment and the development of future EM programs.

This is a living document that may be updated throughout the project. Feedback is always appreciated.

## Table of Contents

VMP Date and Version ............................................................................................................... 2

Vessel Summary ......................................................................................................................... 2

EM System Overview.................................................................................................................. 2

Operator Responsibilities .......................................................................................................... 3

    *Each Trip* ................................................................................................................................ 3

    *Each catch handling event (haul or set)* ............................................................................. 3

    *Trip End* ............................................................................................................................... 3

Equipment Malfunctions............................................................................................................ 4

    *Equipment Malfunction in Port* ........................................................................................... 4

    *Equipment Malfunction at Sea* ............................................................................................ 4

Appendix A – Vessel Installation Details .................................................................................... 5

Appendix B – Guide for Vessel Operator.................................................................................... 9

Appendix C – EM Program contacts (who to call) ...................................................................... 22

## VMP Date and Version

| VMP Submission Date: | 2016/10/17 |
|---|---|
| VMP version number: | 2017.02 |

## Vessel Summary

| Vessel Name: | |
|---|---|
| Vessel ID: | |
| Home port: | |
| Primary landing port(s): | |
| Gear type(s) to be used: | Midwater Trawl-Single |
| Vessel Owner name: | |
| Address: | |
| Email: | |
| Phone number(s): | |
| Vessel Primary Point of Contact: (if different from owner) | |
| Address: | |
| Email: | |
| Phone number(s): | |

## EM System Overview

- Your vessel is equipped with an electronic monitoring system, consisting of cameras, GPS, gear sensors, user interface, and control center.
- The system will record GPS and pressure sensor data while powered.
- Video will be collected from rail, stern and deck cameras during hauling and catch processing.
- For this pilot project, the EM system will record 24/7 from when the gear is first set until the system is turned off when the vessel returns to the dock.
- More specific information about your EM system is provided in *Appendix A - Vessel Installation Details*.

_0000017580

## Operator Responsibilities

Your vessel is part of a volunteer pilot project. Please turn your EM system on as soon as you leave the dock and turn off when you return to the dock. System operation details are included in this VMP under the Vessel Operator Responsibilities section in Appendix B.

### Each Trip

- **Confirm Hard Drive Storage Space:** The vessel operator must ensure that the system has adequate storage to record the entire trip. The vessel operator must carry one or more spare hard drives, sufficient to record the entire trip, as a back-up.
- **Power:** Maintain uninterrupted electrical power to the EM unit while the vessel is underway.
- **Function Test:** Prior to leaving port, the vessel operator must turn the system on and conduct a system function test following the instructions provided in *Appendix B – Guide for Vessel Operators*. If the function test identifies a malfunction, the vessel operator must follow the troubleshooting guidelines listed in *Appendix B – Guide for Vessel Operators*.

### Each catch handling event (haul or set)

- **Prior to each catch handling event**, the vessel operator should:
    - Verify that all cameras are recording and all sensors and other required EM system components are functioning as instructed in *Appendix B – Guide for Vessel Operators*.
    - Check the monitor and verify that the camera views are consistent with the images provided in *Appendix A - Vessel Installation Details*.
    - Clean camera lenses to maintain video quality. Video quality will be reported in the trip summary report.
- **Catch Handling:**
    - To effectively meet the goals of the study, we suggest the following catch handling procedures:
        - The vessel operator is responsible for ensuring all catch is handled within view of the cameras as defined in the camera descriptions and deck diagram in *Appendix A - Vessel Installation Details*.
        - At the completion of pumping, that the codend be brought in view of the camera to enable reviewer to see if there are any fish left in net.
        - If pump is clogged, the contents of the clog should be discarded in view of the camera.

### Trip End

- **Within 2 business days after each EM selected trip, ensure that the hard drive is mailed** to the contact provided in *Appendix C – EM Program Contacts*. If doing back to back trips and cannot mail drives when in port, it is okay to wait until after the next trip to send in the drives.
- Along with the hard drive, include vessel name, mailing address where replacement hard drives should be mailed, trip dates and whether an observer was on the vessel during this trip.

_0000017581

## Equipment Malfunctions

**\*Since this is a pilot project, at NO point during this project will a vessel be required to stay in port or return to port due to EM system malfunction.**

### Equipment Malfunction in Port

If the function test identifies a malfunction, the vessel operator should follow the troubleshooting guidelines listed in *Appendix B – Guide for Vessel Operators*. **If this does not resolve the issue, the vessel operator should contact the EM service provider immediately. The EM service provider will determine if the malfunction is critical or non-critical based on the EM Workgroup definitions.**

- **Non-Critical Malfunction**: If the malfunction cannot be repaired in a timely fashion, the vessel operator may depart on the scheduled trip, but must follow the service provider's instructions to trigger video recording manually.  Please call the service provider and make arrangements for them to service the vessel upon return from this trip.

- **Critical Malfunction**: A critical malfunction prevents the data collection objectives from being achieved. A Saltwater technician should be available to service the vessel within 48 hours of notification of the malfunction. Since this is a voluntary program, the vessel should notify the service provider if they will be departing for a fishing trip before they are able to service the vessel, but may proceed without the system malfunction being repaired.  The vessel operator should follow the service provider's instructions for this next trip and run the EM system if advised to do so as the system will still likely be collecting valuable data even with one component down.

### Equipment Malfunction at Sea

- If the system passed the function test prior to leaving port, and remains continuously powered during the trip, the vessel operator is NOT required to return to port in the event of a breakdown.

- Follow the instructions provided in *Appendix B – Guide for Vessel Operators*.

- If the malfunction cannot be resolved following the troubleshooting guide and/or with remote support, the vessel operator should continue to run the system with all functional parts, and contact the service provider immediately (from sea if possible) to assist with scheduling service at the time of landing.

- Any malfunctions should be fixed prior to departing on subsequent trips.

_0000017582

## Appendix A – Vessel Installation Details

| | |
|---|---|
| Vessel Name: | |
| USCG Vessel ID: | |
| Gear Type: | Midwater Trawl |
| Vessel Satellite Phone: | |
| Skipper Name: | |
| Skipper Phone: | |
| Skipper Email: | |
| Alternate Contact: | |
| Alternate Phone: | |
| Alternate Email: | |

## Vessel Diagram



**Legend**
- Camera
- EMU
- Pressure Sensor
- Discard Zone
- Rotation Sensor
- Sorting Table

| Camera Name: | Camera 1 | **Camera View** |
|---|---|---|
| Location: | Port side front gantry |  |
| View: | Dewatering box and sorting grate | |
| Aim: | Stern | |
| Hardware: | | |
| Resolution/FPS: | 720 @ 15 fps | |
| Recording Trigger: | Pressure and rotation | |
| Run On Time: | | |
| Recording Exceptions: | | |

| Camera Name: | Camera 2 | **Camera View** |
|---|---|---|
| Location: | Starboard side front gantry |  |
| View: | Starboard rail | |
| Aim: | Stern | |
| Hardware: | | |
| Resolution/FPS: | 720 @ 15 fps | |
| Recording Trigger: | Pressure and rotation | |
| Run On Time: | | |
| Recording Exceptions: | | |

Appendix 7 – EM Project                                    December 2018

_0000017584

| Camera Name: | Camera 3 | Camera View |
|---|---|---|
| Location: | Port side rear gantry | |
| View: | Aft rail/stern |  |
| Aim: | Stern | |
| Hardware: | | |
| Resolution/FPS: | 720 @ 15 fps | |
| Recording Trigger: | Pressure and rotation | |
| Run On Time: | | |
| Recording Exceptions: | | |

_0000017585

## Appendix B – Guide for Vessel Operator

Saltwater's EM system consists of 2-3 cameras, a small, rugged computer (Control Box), computer software, monitor & keyboard, a GPS receiver, a hydraulic pressure sensor, and a magnetic rotation sensor.

The cameras begin recording when gear is retrieved. Recording is triggered by changes in hydraulic pressure, which is monitored by the sensor installed on the hydraulic line, or the rotation sensor, which monitors the line drum or warp winch. The cameras are on a timer, and are set to record for a specific amount of time after gear is hauled. Data from the sensors is collected continuously as a way to track fishing effort—when and where gear is set and hauled

The EM system does **NOT** record audio.

## CONTROL BOX

The Control Box is a ruggedized computer that holds the system software and stores all of the recorded video and sensor data. It must be installed in the wheelhouse in a secure, dry area that can be easily accessed for data retrieval. The Control Box must tie into clean, stable 12v DC power or AC power.



*Control Box with two hard drive bays*

All of the data is stored on two removable hard drives. The data stored on the hard drives in the Control Box in encrypted and protected with a password. This means that no one can view the recorded video without the right software and password.

All of the components of the system are powered through the Control Box.  The power consumption for the system is similar to two incandescent light bulbs (less than 60 watts). Wires will need to be run from the Control Box to the sensors and cameras.

## PRESSURE SENSOR

The EM system uses hydraulic pressure to track fishing activity and trigger video recording.  In order to do this, a sensor will be installed on the pressure side of the hydraulic line to determine hauling events.

_0000017586

## DRUM ROTATION SENSOR

A magnetic drum rotation sensor is also used to track fishing effort and trigger the cameras. The system software can distinguish the direction of the drum rotation, which allows us to trigger recordings of retrievals only (and not sets).

## DIGITAL CAMERAS

Saltwater's uses internet protocol (IP) digital cameras with an ingress protection rating of IP67, which means they are designed for water immersion up to 1meter for up to 30 minutes.  Each camera is capable of capturing high-resolution imagery (1920 x 1080) at a rate of up to 30 frames per second. Cameras must be installed with a proper field of view to monitor all retained catch, processing, and discards. There will be two or three cameras installed on each vessel participating in this project: one to capture close-up images of the deck at the dewatering station, a second camera aimed at the water line to capture images of pumping activity and a third camera capturing the stern where the net is brought on board.



*EM camera installed on a fishing vessel*

## MONITOR & KEYBOARD

A monitor with waterproof keyboard allows vessel crew to see live camera feeds 24/7, view what is being recorded in real-time, and run system checks as required. Our user interface is designed to provide a clear, simple way to confirm that all system components are operating correctly, and determine which hard drive has data and needs to be retrieved. The monitor and keyboard must be installed in the wheelhouse, in a dry location, that is clearly visible and easily accessible to crew.

## USER INTERFACE

The following image shows an example (*from a pelagic longline vessel*) of what you will see on the monitor. This image shows two camera views, the status of the sensors, the amount of space available to store data, and basic system information. A green bar indicates that component is functioning properly. In this example the red bar indicates a problem with the GPS.



NOTE: When the system is recording, you will see the red "*REC*" symbol in the bottom right corner.

At the beginning, end, and during each trip you will have different responsibilities, which are described in the next section, *Vessel Operator Responsibilities*

The following are step-by-step instructions on how to run the EM system on your vessel, how to check system function, and how to retrieve data.

## POWERING UP THE EM SYSTEM

**To run the EM system, you must power on the system at the start of each trip. This means the EM system should be powered on when the vessel leaves the dock and should remain powered until the vessel returns to the dock. Please follow these steps.**

1. Power on the system at the breaker or switch where the system was installed.
2. Wait approximately 2-3 minutes for the system to power on. You should see lights and hear a series of beeps from the Control Box.
3. Turn the monitor on. You will see a series of screen changes while the system boots.
4. The system is on once you see the live views from your cameras and the relevant system information on the display.

## CAMERA CHECK

**One or two days before you plan to depart on a trip you should check the cameras and run a System Function Check. Please follow these steps.**

1. Power up the system.
2. Once the system is on, check the monitor to make sure the views are clear of obstructions, and there is no slime or salt on the camera lens.
   - You can make the live camera windows larger by clicking on the camera image on the monitor. It can be made smaller by clicking it again.
   - If there is slime or salt on a lens, use a *clean, wet, soft cloth* to wipe the camera lens clean. Although the camera case is durable, the plastic lens cover can scratch, so do not clean it with anything abrasive.
   - If there is anything blocking the view, move the object. *DO NOT MOVE* the camera.
3. Once you are done checking the cameras, please run the System Function Check.

_0000017589

# EM SYSTEM FUNCTION CHECK

**You should run this check one or two days before each trip to make sure there are no problems with the system. You must also run it at the start of each trip.**

1. Power up the system.
2. Once the system in on, locate the three tabs at the bottom of the screen: **System Check, End Trip,** and **Configure.**



3. Use the touch pad to click on "**System Check**". This can be done by simply tapping the touchpad when the cursor is over the tab or using the mouse "*left-click*" button next to the touchpad.
4. After you have done this, a new window will appear showing that the system check has been logged.
5. Click "**Okay**"



_0000017590

6. If you see all **green** on the status bars, that means that they system is **good to go.**



- If you see **RED** on the status bar, there is a problem with that component. Please call the Saltwater EM team at 1-800-770-3241 as soon as possible.

_0000017591

## END OF TRIP & POWERING OFF THE SYSTEM

**NMFS considers the end of the trip to be when you tie up at the dock.**
**At the end of each trip, you will need to power off the system to end recording**
**and avoid draining the vessel battery. Follow these steps.**

1. Look at the monitor.
2. Click on the tab that says **"End Trip"**. *This is essential to stop trip recording.*



3. You see an image on the screen asking, *"Are you sure?"*; click yes **only** if you are done with your trip.
4. If you do *not* need or want to retrieve data at that time, simply power off the system at the switch or breaker,
5. If you *do* want to retrieve the data, leave the power on and follow the next set of instructions.

**\*If you need to shut off the system during a trip for some reason (vessel engine**
**troubles, switching generators), simply power it off at the switch.**
**Do *not* hit "End Trip". Remember to power it back on as soon as you are up and**
**running again.**

_0000017592

## DATA RETRIEVAL

**Video and sensor data is stored on removable hard drives in the Control Box. Within two days after every selected trip data needs to be retrieved and sent to Saltwater's office in Gloucester, MA. If doing back to back trips and you cannot mail the drive, it is okay to leave in system and mail in after subsequent trip. Please follow these steps.**

1. Power up the system (if it is not already on).
2. Click on the "**End Trip**" tab.
3. You will be shown the serial number of the hard drive(s) you should remove.



4. Carefully **write down** this number. (If both serial numbers are shown on this screen, it means they both have data and you will need to remove and send in both drives).
5. Click **"Okay"** and wait for the system to **shut down** - the screen will turn gray/black.
6. Power off the system at the switch or breaker.

\* **BE SURE** the system is powered off before you remove the hard drive.

7. Look at the Control Box. You will see two small, labeled boxes with two thumbscrews on each. This is where the hard drives are stored.



Control Box showing hard drive bays and location of serial numbers and thumbscrews.

8. **Match the serial number you have written down with the serial number on the hard drive.**
9. Carefully unscrew the spring-loaded thumbscrews on that drive caddy.
10. You will feel the drive caddy release. *(Do **not** try to remove the screws).*
11. Pull gently to remove the caddy. The caddy will come all the way out. It will have a flat, silver rectangle in it. That is the hard drive. (Do **not** remove the hard drive from the caddy).
12. Place the whole device (hard drive caddy with thumb screws still attached and hard drive) into the **protective mailing box** provided by Saltwater.

\* If both hard drive serial numbers were shown when you ended the trip, remove the second drive by repeating steps 10-12. Put **both** drives in one mailing box.



Hard drive caddy with hard drive inside

_0000017594

## MAILING THE HARD DRIVE

1. Place the mailing box into a **Pre-paid USPS bubble mailer** that has been provided by Saltwater.
2. Fill out the form with vessel identification information. Place this form in the mailer with the hard drive.
3. Take this package to a US Post Office and mail it before your next trip.
4. Postage is pre-paid.

_0000017595

## PREPARING FOR THE NEXT TRIP

**After you send in the hard drives from your trip, you will need to put new hard drives in the EMU before your next trip. We recommend you do this right after removing a hard drive. Please follow these steps.**

1. You will be provided two replacements hard drives during the install.
2. Locate the new hard drive.
3. Make sure the caddy is right side up. You can tell it is in the right position if the serial numbers on the outside of the caddy are right side up. You will also see a printed white label on the drive as shown in the image above.
4. Push the drive into place until it is flush.
5. Carefully slide the caddy and hard drive into the EMU until you feel a click.
6. Hold the caddy in place and screw the thumbscrews in by hand. (**DO NOT** use a screwdriver. This will strip the screws).
7. Power on the system.
8. Turn on the monitor
9. Click in "**System Check**."



10. If the hard drive has been properly installed, "**Storage**" will be green on the status bar and there will be two disks listed: *Disk 1* and *Disk 2*.
11. Once you have correctly installed the new drive (s), you can power off the system at the switch or breaker.

_0000017596

Many problems can be solved by turning the system off and then restarting it. If that does not resolve the issue, use this guide to help. If the problem persists, call Saltwater Technical support.

| Problem | Check | Corrective Action |
|---------|-------|-------------------|
| EMU not powering on | Lights on EMU | If lights are not on, check power source. There is no "on/off" switch on the EMU. |
| | Power at switch and/or breaker | Turn on power at switch and/or breaker |
| | Loose connections | Ensure all connections are tight |
| System does not start/ No display | System is beeping constantly | Call Saltwater Technical Support |
| | System is stuck on "American Megatrends" or Purple "EM System Screen" | Restart machine by turning power off/on at switch and/or breaker. If that does not work pull both hard drives and restart. If functional, probable dead/corrupted drive. Call Saltwater Tech Support. |
| | System goes black after post (possible white cursor) | Restart machine by turning power off/on at switch and/or breaker. If that does not work pull both hard drives and restart. If functional, probable dead/corrupted drive. Call Saltwater Tech Support. |
| Monitor not powering on | Power on monitor | Turn monitor on by pressing power button on monitor |
| | Connections | Pull out VGA, put back in, and tighten fasteners. |
| Monitor not showing video | Connections | Pull out VGA, put back in, and tighten fasteners. |
| | Video mode | Press A/V mode button to cycle to VGA |
| One or both cameras are not detected | System Check | Click "System Check" to refresh cameras, or power system off/on at switch and/or breaker. |
| | Connections | Re-plug connections at unit, coupler, or camera. |
| | Power | Check brick for 48v power light on small green power adapter (two lights). If lit, please check connections are tight and there is still no power, call Saltwater Technical Support. |
| "Weirdness on screen" | System software loaded improperly | Turn system off/on to reboot at switch and/or breaker. If problem persists call Saltwater Tech Support. |
| Status bar for "Storage "showing red or yellow, "Disk Remaining: Not Present" | Hard drives in EMU | Pull out hard drive caddies and reinstall. Make sure the drive "clicks" into place. Tighten thumbscrews. |
| | Hard drives formatted incorrectly | Call Saltwater Tech Support |
| | Hard drives full - Percent remaining is 1% on each drive | New hard drives required |
| Status Bar for "Sensors" | Connections | Check SPU USB, sensor wires, sensor |

_0000017597

| showing red | | connections. |
| | SPU Unplugged | Plug back in and restart at switch and/or breaker. System must restart to reconnect to SPU. |
| | Improper software configuration | Call Saltwater Tech Support |
| Status bar for "Hydraulic Pressure" is red and pressure reads "309.xx", less than zero, or other value | A sensor has blown and shorted | Call Saltwater Tech Support |
| Hydraulic Pressure sensor readings are not changing during fishing | Connections | Call Saltwater Tech Support |
| | Sensor location | Make sure sensor is on the pressure side of the gear used for hauling, outside of any bypasses, and behind any relief valves as not to blow a sensor. |
| | Sensor Damaged | Sensor will often read 4.7+ if there has been damage to the sensor.  Sometimes this can even read as triple digits or "Invalid Reading."  Call Saltwater Technical Support. |
| Status bar for GPS showing red | System just booted up | Wait  3-5 minutes to see if GPS locks on |
| | Connections | Check GPS wire is properly screwed into the back of the EMU.  Trace wire for any damage. |
| | View of sky | Move or re-stick GPS unit to get clear view of the sky.  Call Saltwater Tech support if issue persists. |
| System not recording | Software Configuration problem | Call Saltwater Tech Support. |
| | Sensor not triggering recording | Call Saltwater Tech Support. |
| | Hard drive problem | Follow hard drive portion of guide. |
| System records for incorrect length of time | Configuration | Call Saltwater Tech Support. |
| | System lost power recently | System will start recording if there was an intermittent power loss during the last recording. It will record for one clip length |
| | Sensor Issue | See sensor section |
| System records at boot | System lost power recently | System will start recording if there was an intermittent power loss during the last recording. It will record for one clip length |
| | Failsafe Record | This is a failsafe setting in the software.  Contact Saltwater Tech Support.  This is a non-critical issue and should stop after one clip length. |

_0000017598

Appendix C – EM Program contacts (who to call)

# PRIMARY CONTACTS

## SALTWATER INC. TECHNICAL SUPPORT

Morgan Wealti (Project Manager) 907-406-3040 or
Morgan.wealti@saltwaterinc.com.

Mark Hagianis (Technical Services) 907-885-8290 or
Mark.hagianis@saltwaterinc.com.

Use this number to:

- Report problems or ask questions about the EM System
- Ask about Vessel Operator Responsibilities including catch handling and effort log
- Request assistance with data retrieval and shipping
- Schedule service
- Report the end of fishing.

Hard drives should be mailed to:

Saltwater Inc
PMB # 326
127 Eastern Ave
Gloucester, MA 01930

## NMFS

If you have any questions or concerns regarding the Atlantic Herring and
Mackerel Project or Omnibus Amendment, please contact:

Dan Luers (978) 282-8457 or Daniel.Luers@noaa.gov

Nichole Rossi (508) 495-2128 or Nichole.Rossi@noaa.gov

## APPENDIX 8: NMFS/NEFSC EM SYSTEM SPECIFICATIONS

_0000017599

National Marine Fisheries Service                                    April 22, 2016
Northeast Fisheries Science Center
Fisheries Sampling Branch

## Electronic Monitoring System Specifications

### Background

Electronic Monitoring (EM) technologies hold promise as data collection resources and could be used as a monitoring tool by integrating the system with other data collection programs. The Northeast Fisheries Science Center (NEFSC) conducted a collaborative four-year study (in 3 phases) from 2010-2014 with Archipelago Marine Research, Ltd. and 13 participating fishing vessels. The goal of the study was to investigate the utility of EM to observe fishing behavior and monitor catch allocations in the Northeast Multispecies Fishery.

Information presented in this paper was based on NEFSC's data collection with EM systems, and incorporates information obtained through numerous EM service providers. The purpose of this paper is to inform implementation planning activities in the consideration of developing EM standards in an operational program.

### Electronic Monitoring System

EM systems are designed for the automated collection of fisheries data while vessels are at sea. They collect high-frequency sensor data and closed-circuit television (CCTV) imagery during fishing or related activities which are then reviewed post-trip to provide data needed for fisheries management, compliance, and/or science. EM systems typically consist of a control center, a user interface (monitor and keyboard), a suite of sensors (GPS receiver, hydraulic pressure transducer, drum rotation sensor, etc.) and waterproof armored-dome CCTV digital cameras. Suitable technological alternatives (e.g., fast frame photographic systems) that are capable of meeting data needs may be accepted if approved by NMFS.

### Electronic Monitoring Data Needs

EM system features are determined by program needs and objectives. Program needs will dictate the specific features an EM system must have in order to meet defined objectives. The objectives listed below are not an exhaustive list, but rather, a synopsis of program goals used throughout the study period.

- Identify, count, and assign a catch disposition (kept or discarded) for individual catch items,
- Obtain an estimated length per catch item (required to obtain a weight estimate),
- Obtain an estimated weight per catch item, species, or species group by haul
  - Individual fish, volumetric weight, scale or tote weight, etc.
- Monitor fishing activity (as defined by program needs),
- Monitor regulatory compliance (as defined by program needs), and
- Verify area fished.

The purpose of this paper is to identify specific product features needed to meet primary objectives for fisheries management data. Product features presented in this report include those identified during the NEFSC study as an example of characteristics that may be needed for a catch share monitoring program. Additional product features may be needed for an operational program or will vary depending on the program data needs and objectives.

- Distinguish and identify commercially important species and/or common bycatch in the Northeast Multispecies Fishery.
- Maintain a running count of individual fish during a trip by species (trip duration estimated 1-15 days total).

Appendix 7 – EM Project                                           December 2018

_0000017600

- Provide a length estimate for each discarded item by species.
- Provide weight estimates (derived from length measurement) by species on a haul basis incorporating standardized length-weight regressions generated by the Northeast Fisheries Science Center.
- Monitor fishing activity, including; catch sorting, discarding, transit, towing gear, hauling gear, setting gear, and stowage of kept fish.
- Verify area fished through means of GPS data that corresponds to still shots, video clips, or video streams.
- Activate recording activity through the use of sensors or other means (e.g. manual, etc.).
- Store data for retrieval by or transmission to NMFS or approved vendor.
- Meet data confidentiality standards of the Magnuson-Stevens Act.
- Meet chain of custody and data integrity needs for enforcement purposes.

### Functional Requirements

An EM system consists of two major elements; hardware and software. The proposed specifications are based on the general EM program objectives included above for a catch share monitoring program. Incorporating more defined objectives (i.e., data timelines or turnaround, volumetric measurements, etc.) may negate or alter some of the specifications listed below. The standards below are set as minimum requirements, as advancements in technology improve these standards may be amended. Specifications listed in this document as "preferred" are not required.

### Hardware

I.  General

- Hardware should be adaptable and transferrable in application to enable deployment on a variety of fishing vessels (size, gear, target species).
- Hardware should be easily maintained by the vessel crew and spare parts readily available in close proximity to the vessel port.
- Hardware, including but not limited to wires, cameras, control box, and sensors, shall be adequately shielded to prevent radio frequency interference (RFI) with Vessel Monitoring System (VMS) units
  (http://www.nmfs.noaa.gov/ole/docs/2015/040815_noaa_fisheries_service_type.pdf).
- All vessel electronics need to work together simultaneously.

II. Power

- Ability to run off DC or AC power supply, inverters, or generators.
  - Power draw should be minimal (with 8 digital cameras, a maximum of 120 watts).
  - Power wires should be resistant to damage, water, weather, sun, etc.
  - Provide safeguards to retain data in the event of electrical failure or power spikes.
  - Vessels interested in using EM should note the power requirements of the system.

III. Vessel Data Storage

- The system should have sufficient data storage capacity to store all video and sensor data for an entire month (minimum of 500 gigabytes storage capacity). Each frame of stored image data should record a datetime stamp in the specified format[1].
  - Data storage hardware should be resistant to damage and data loss.

---

[1] Datetime: values are represented as a ten-digit number in the format YYMMDDHH24MI. YY = two digit year, MM = two digit month, DD = two digit day of the month, HH = two digit hour using 24 hour clock, MI = two digit minutes. All values are two digits padded with zeros. Full datetime must be a ten-digit numeric value. Dates and times should be determined based on local time on the fishing vessels at the time of fishing activity.

Appendix 7 – EM Project                                                                December 2018

_0000017601

- The system must include a means of removing data from the EM unit, such as;
  - At least two external USB ports,
  - Removable storage device (e.g., hard drive) approved by NMFS or,
  - Other approved means of transferring data approved by NMFS.

## IV.    Cameras and Review

- Cameras (number of cameras will vary by vessel and program needs) should be enclosed in a waterproof armored-dome. Cameras should have a minimum IP rating of 66.
- Cameras should be capable of point-to-point or point-to-multipoint transmission (not openly transmitted) on all monitors.
- All cameras within a system should operate in synchronization for review and analyses purposes. Synchronized playback should occur with a 10 second timeframe.
- Cameras should be capable of operating continuously to meet data needs.
- Each camera should be easily surface mounted on vessels and provide manually adjustable viewing positions.
- Each camera should be compatible with a range of fixed focal length lenses to enable swapping of lenses or have varifocal lenses to achieve monitoring goals.
- Cameras must provide the option to produce still images for enhanced species identification and measurement.
- Cameras must be able to be triggered to record fishing, catch handling, transiting or any other vessel activity.
- Camera resolution must be a minimum of 1,280 x 720 (720p) for enhanced identification and measurement during video review. Resolution must be sufficient to discern individual fish (detect, count, and identify to species level) from distance. NMFS strongly encourages the use of higher resolutions than those described above whenever possible.
- Each camera must record at a speed of no less than 15 unique frames per second when the use of a video monitoring system is required.
- Some manufacturers use proprietary compression formats that require the use of proprietary software in order to view the video sequence or images. Use of such software can prevent or hinder law enforcement from viewing or otherwise accessing these images. If such software is used, then steps must be taken to ensure that law enforcement will be able to access them when needed.
- Cameras must have sufficient fields of view to observe all areas where fish could be sorted, processed, and discarded.
- Cameras must have auto-iris capabilities and produce color footage with the ability to revert to black and white video output when light levels become too low for color recognition.
  - Cameras must be capable of functioning during low light conditions to account for nighttime fishing activity. "Functioning" is defined as allowing video reviewers to count, identify, and measure individual fish and otherwise account for fishing activity and catch handling.
- Monitors should be appropriate to the vessel size and power supply, such that the monitor size is sufficient for the captain and EM technician to access and evaluate the EM system performance before, during, and after a fishing trip. Power draw by the monitor should be such that it will not overburden the vessel's power supply. The video monitor must:
  - Display all cameras simultaneously;
  - Operate at all times, including when fish are handled or sorted; and
  - Be securely mounted and readily accessible to the EM technician and captain and crew.
- If required, measurement grids (discard chute, sorting table panel, etc.) should be designed and tailored to each gear type and vessel size, compatible with common species caught by the vessel.

_0000017602

- Measurement grids should be capable of calibration (through the EM software) to ensure data accuracy and precision.
  - Discard chutes should have a continuous flow of water across their surface at a speed which is conducive to identification, counting, and measurement of catch.
  - Grids should be constructed of a material that allows catch to flow smoothly, without snagging.
  - Grids should be fixed in place during fishing activity and be resilient to standard vessel motions.
  - Grids should be of an appropriate size and shape and not impede or hamper normal fishing practices.
- All components (including cameras, sensors, control box, and wiring) of a robust system must be capable of starting up and functioning during extreme weather conditions (temperatures in the Northeast range from -7 to 29 degrees Celsius) wherever and whenever groundfish vessels are actively fishing. The Northeast groundfish fleet includes a number of small boats with semi-enclosed wheelhouses. Spray, condensation, cold, and heat occasionally enter the wheelhouse on these vessels. Weather conditions include:
  - Extreme heat, freezing rain/spray, ice, snow, fog, and hail.
  - Waves ranging from spray inducing chop to damaging large waves.
  - Violent pitching or rolling.

## V.  Sensors
- The system must include a minimum of at least two sensors to trigger camera recording (one main sensor may be used to trigger recording but a second sensor is required as a back-up in case the primary sensor fails).
  - Sensors may include a hydraulic sensor, drum sensor, motion triggered sensors, or other means of triggering cameras (must be approved by NMFS).
  - Sensors must be compatible with standard vessel equipment.
- The system must include an independent GPS unit to produce track of vessel transit and fishing activity.

## VI.  Preferred Features
- The system should have electronic reporting capabilities and the option to link with eVTR software.
- Hard drives should be durable drives that are able to withstand postal mailing.
- Hard drives should be pre-formatted for ease of use and to allow the captain to exchange hard drives readily.
- Regular system upgrades as technology advances.

## Software
### I.  EM Data Review
- The software must include basic video and navigation functions (at a minimum: record, start, stop, bookmarking, play, synchronized playback, standard viewing capabilities copy and save functions, etc.).The system must output video files to an open source format or, if custom or licensed-based software is used, access to data must be supplied (server, licenses, etc.) to the government for data processing purposes throughout the duration of program.
- Software should include the ability to accomplish the below functions;
  - Assess video quality based on standard requirements including but not limited to; complete sensor data (if applicable), camera functionality, presence of video gaps (missing or incomplete), clarity of images (are cameras dirty, focused, covered by salt

_0000017603

spray, etc.), sufficient camera angle to monitor catch, species identification, and sufficient view of catch handling practices, etc.
  ○ Allow reviewers to identify each species caught or at minimum store images of unknown species for later identification and inclusion in the catch record.

## II.  Security
- Data encryption or tamper evident features (video and sensor).
- Software must be secure, have the ability to lock and protect data, and detect if the EM system was tampered with at any point during a fishing trip (tamper evident).

## III.  Compatibility
- Software must be compatible with:
  ○ Personal Computers (PC);
  ○ Windows-based operating systems; and
  ○ Internet Explorer and other commonly used browsers.
- Software must produce data in a file format such as .xls, or .xml that is compatible with an Oracle database.
- The system must use commercially available software or provide proprietary licenses.

## IV.  Pre-trip System Check
- Software must include a pre-trip assessment of the EM system to indicate all components are functional prior to trip start.

## V.  Data Validation
- Software must include the ability to verify a complete trip (complete EM trip is defined as a trip where video was recording 100% of the time, trip start to trip end).
- Software shall be capable of producing data elements outlined in the NOAA Fisheries Greater Atlantic Regional Fisheries Office Electronic Monitoring Summary Data File Technical Requirements[1];
  ○ Software shall include identifying datetime stamps[2], location, vessel name, and permit number, and a GPS unit to facilitate review.
  ○ Software shall utilize datetime stamp and sensor data to determine number of hauls and haul begin time for the trip (video data may be used to verify haul begin time).
  ○ Software shall capture and document all system failures and image or sensor data gaps resulting in data loss.
- Sensor data shall display vessel track, fishing start/end locations and times, transit locations and times, and provide a complete record of all fishing activity during a given trip.
  ○ Sensor data shall display data from the GPS as well as power to the EM system, and sensors used to trigger recording.

## VI.  Shoreside Data Storage
- System data and video footage should be stored by the provider for 3 years after collection and must include sufficient data backup features to protect data.

---

[1] Document outlines file format, security, submission protocol, and file structure for EM summary reports.
[2] Datetime: values are represented as a ten-digit number in the format YYMMDDHH24MI. YY = two digit year, MM = two digit month, DD = two digit day of the month, HH = two digit hour using 24 hour clock, MI = two digit minutes. All values are two digits padded with zeros. Full datetime must be a ten-digit numeric value. Dates and times should be determined based on local time on the fishing vessels at the time of fishing activity.

_0000017604

VII.    **Data Output**
- Software shall be capable of producing data elements outlined in the NOAA Fisheries Greater Atlantic Regional Fisheries Office Electronic Monitoring Summary Data File Technical Requirements[1];

VIII.   **Preferred Features**
- Automated species ID, automated measurement, and automated weight estimate.
  - Software should be able to incorporate additional species for automated processing.
  - Able to handle automated ID of multiple fish at a time (i.e. not single file fish fed down a chute), multiple fish orientations, weather conditions, light conditions, etc.
- Remote transmission of EM data within 24 hours of vessel landing.
- Software must be easily modified to incorporate regional preferences.
- The system should be portable between platforms (fishing vessels) where peripherals (cameras, sensors) are static and core components (computer, software, discard chute) are transferred.
- The system should have electronic reporting capabilities and the option to link with eVTR software.

---

[1] Document outlines file format, security, submission protocol, and file structure for EM summary reports.

Appendix 7 – EM Project                                    December 2018

_0000017605

## EM Video Quality Assessment

For each fishing event, the reviewer assessed the overall quality of the video. The video quality criteria are defined as follows:

| | |
|---|---|
|  | **Excellent**. The imagery was very clear providing excellent views of fishing activities, including speciation and discards. Focus was very good; light levels were high and all activities were readily discernible. This imagery could be classified as 'imperceptible'. |
|  | **Good.** The imagery was clear, providing good views of fishing activity, but not all discards were discernible. Focus was good with slight blurring or light conditions. All activities were discernible. This imagery could be classified as perceptible but not annoying. |
|  | **Fair.** The view was acceptable, but there may be some difficulty assessing discards. Moderate blurring or slightly darker conditions hamper, but do not impede analysis. This imagery could be classified as slightly annoying. |
|  | **Poor.** The imagery is difficult to assess. Imagery is somewhat blurred or impeded by low light or glare conditions making enumeration and speciation of fish very difficult. This imagery could be classified as annoying. Document the problem using the code in the Poor Quality Code field. |

_0000017606

## Trip Data Release Form

PAPERWORK REDUCTION ACT STATEMENT: The information provided on this form will be used to ensure that the data for a specific trip is not provided to a person who does not have authority to obtain that data under the confidentiality requirements of the Magnuson-Stevens Fishery Conservation and Management Act (MSA) and the Marine Mammal Protection Act (MMPA). Meeting those confidentiality requirements are critical for collecting information that is used in analyses that support the conservation and management of living marine resources and that are required under the MSA, the Endangered Species Act (ESA), the MMPA, the National Environmental Policy Act (NEPA), the Regulatory Flexibility Act (RFA), Executive Order 12866 (EO 12866), and other applicable laws. The public reporting burden for this form is estimated to average 2 minutes per response, including the time for completing, reviewing, and transmitting the information on the form. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden to: Amy Martins, National Marine Fisheries Service, Northeast Fisheries Science Center, Fisheries Sampling Branch, 166 Water Street, Woods Hole, MA 02543-2266. Providing the requested information is required to deliver the copy of the trip to the requested location and to release the trip data. The information on this form will be kept confidential as required under Section 402(b) of the MSA (18 U.S.C. 1881a(b)) and regulations at 50 C.F.R Part 600, Subpart E. Notwithstanding any other provision of the law, no person is required to respond to, nor shall any person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act, unless that collection of information displays a currently valid OMB Control Number. This is an approved information collection under OMB Control No. 0648-0593 through 10/31/2018.

### Policy for Data Requests of NMFS Observer-Obtained Information

1. The only individuals who may request and receive data include: the owner(s), or the captain acting as an authorized representative for the owner(s), of a vessel participating in the National Marine Fisheries Service (NMFS) Northeast Fisheries Science Center (NEFSC) Observer Program. No other individuals may be issued any data under this policy.

2. Any data request must be submitted in writing on a form letter which may be obtained from a NMFS Observer, or the address below. Two signatures are required on this letter: that of the individual requesting the data, and that of the individual releasing the data. All letters must then be returned to the following address:

   Chief, Fisheries Sampling Branch
   National Marine Fisheries Service
   Northeast Fisheries Science Center
   166 Water Street
   Woods Hole, MA 02543-1097

   Any questions or other requests relating to data release should also be directed to the above address.

3. It should be understood that upon release of the requested data, the recipient then becomes responsible for it.

4. The individual signing the letter as the "releasor" must issue the information in compliance with this policy.

5. Data may not be released upon an oral request, or without first completing and signing the authorized release letter mentioned above.

6. Field diaries do not meet the specifications of releasable data under the policy. No field diaries may be copied for, or reviewed by, vessel owners or captains.

7. Release of data for trips in which more than one vessel participated (*i.e.,* pair trawl trips) may only occur if both vessel owners or captains complete and sign data release letters.

8. Any requests for historical data (*i.e.,* data that an observer has already mailed in) should be forwarded to the address above.

9. All letters should be completed in pen, not pencil.

_0000017607

OMB Control No: 0648-0593
Expires on: 10/31/2018

## NMFS FISHERIES OBSERVER PROGRAM
## TRIP DATA RELEASE FORM

Request Date_____/_____/_____

Observer  Trip ID # _____

Vessel Name _____

USCG  Doc # _____

Date Landed_____/_____/_____

_____          _____

PRINT Name                                                         Signature

PRINT Mailing Address:                                      ☐ Captain
                                                                         ☐ Owner

_____

_____

_____

Copies Released By:_____Date_____Edited? Yes___  No____

**(For NMFS Office Use)**

▼ | TEAR AT PERFORATION AND RETAIN BELOW SECTION FOR YOUR RECORDS    ▼ |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The data you receive may be preliminary and not yet completely reviewed.

Observer Trip ID # _____

Date Requested _____

Mail Request To:                                     Questions or Comments:
Chief, Fisheries Sampling Branch           Gina Shield
National Marine Fisheries Service          508-495-2139
Northeast Fisheries Science Center
166 Water Street
Woods Hole, MA 02543-1097

_0000017608

## Appendix 8

**Cost Analysis of Electronic Monitoring Pilot Project**

**Prepared by the Greater Atlantic Regional Fisheries Office
with Consultation from Saltwater Inc. Staff**

**Executive Summary**

In the final report on the EM pilot study, Saltwater Inc. (Saltwater) provided information on cost drivers for EM, but the actual costs they incurred were deemed proprietary and could not be shared.  Thus, NMFS used Saltwater's final report to analyze costs for this project and scale them to estimated industry costs for an operational EM program.  Saltwater provided input and validation on the accuracy of these estimates. This analysis estimates that industry costs per vessel in year 1 will likely be around $11,482, or $287 per monitored fishing day.  However, several contingencies (i.e. purchasing new equipment, new service provider, additional data review and storage requirements) could drive these costs up to an estimated $39,482 ($987/day).  In year 2+ (i.e. every year after year 1), industry costs are projected at $11,845 per vessel ($296/day), but could approach $19,012 ($475/day) in several scenarios (i.e. shorter than anticipated equipment life, additional data review and storage requirements).  Because vessels would face minimal monitoring costs on trips with no fishing effort (no deployment of gear), the above cost estimates may be reduced by an estimated $1,200 per vessel per year ($30 per day).

**Assumptions/estimates**

In order to estimate the cost that a vessel will incur over the course of a day or a trip, certain assumptions must be made about fleet size, fishing effort, SBRM observer coverage, etc.  For fleet size, we assumed that 11 vessels participate in the midwater trawl fishery, and that each of these vessels chooses to monitor with EM/portside.  We used this estimate because this is the number of active vessels that participated in the midwater trawl fishery in 2017, as well as the number of active participants in the EM study conducted in 2016 and 2017.  Although several other vessels are permitted to participate in this fishery and other boats could enter it, we elected to use 11 vessels because it best represents recent effort.  If less than 11 vessels participate in EM monitoring, this could result in increased per vessel costs.

For fishing effort, we assumed that each vessel would fish for herring on 100 days over the course of the year.  Fishing effort varies widely among midwater trawl vessels, with some vessels fishing far more and some fishing far less than 100 days.  This estimate is based on recent effort across the fleet for what the average vessel would be expected to fish over the course of a year.

SBRM observer coverage varied widely from 2015-2017, with assigned fleet coverage days ranging from approximately 45-450 days per year (roughly equating to 5-45% coverage).  Because the SBRM coverage rate is based on bycatch rate and cannot be predicted in advance, we speculatively estimated that coverage rates would be 10%.  Although this estimate is not as low as coverage levels in 2015 and thus doesn't represent a maximum cost to industry, it does represent a "high

_0000017609

middle" estimate of costs that industry can expect in a given year, while not vastly underestimating costs in very low SBRM coverage years.

In total, we estimate that each of the 11 vessels will fish 100 days each year. Since the New England Council chose a coverage target of 50% combined SBRM and IFM coverage, vessels can expect coverage on 50 days. Of those 50 days, we estimate that SBRM (not covered by industry) will cover vessels on 10 of those days (10% of 100 fishing days). Thus, each vessel is expected to assume industry costs for 40 days of IFM coverage each year. Yearly and daily costs in this report are therefore based on 40 IFM coverage days per year. All references to "cost per day" in this document are per monitored day. Thus, the daily cost multiplied by 40 days is equal to the yearly cost.

**Cost Analysis**

Saltwater's final report on the EM Project outlined cost drivers in the pilot project. Costs were broken down into two categories; startup costs and ongoing costs. The amount of expenses in each cost category are diagrammed in Figure 1. Because Saltwater received $995,000 of funding for this project, this was the starting point from which we began to scale costs for an ongoing EM monitoring program. Details of how costs were scaled are outline in the sections below and in Table 1 (at the end of the document).



Figure 1: *Overall EM program costs broken down into startup costs (SU) and ongoing (OG) costs by category (from SWI Final EM Report).*

*Overhead*

_0000017610

Overhead costs are projected to remain relatively constant from year to year. For the pilot project, overhead costs were approximately 1% of project expenditures. While 1% of overall costs is a reasonable estimate for a large operational EM program, we believe this estimate is about half of that necessary for a small-scale program involving only a few vessels. There are minimum overhead costs that would be necessary independent of the number of vessels in the program. Given the small number of vessels enrolled in an EM monitoring program, we estimate overhead costs at $2,500 per year, which equates to approximately 2% of overall costs. Saltwater verified that this was a reasonable estimate.

## Year 1 Costs-Best Estimate

*Startup Costs/ Equipment*

At the beginning of the EM pilot project, each of the 11 herring midwater trawl vessels were outfitted with EM systems by Saltwater. Saltwater agreed to transfer ownership of these systems to the vessels at a reduced rate (estimated to be $1,000 per vessel). As such, vessels opting to take ownership of these cameras will have startup equipment costs of an estimated $1,000 per year ($25 per monitored fishing day). Since the majority of vessels have these systems already installed, the estimate of $1,000 is the "best estimate" for the fleet.

Several vessels in the project opted to be outfitted with less that complete (1 or 2 camera) systems which would need to be enhanced to meet the requirements of an operational program. In addition, there are latent vessels/permits that have not been outfitted with EM systems that could choose to re-enter the herring midwater trawl fishery and would be required to purchase new equipment if they chose to monitor with EM. For vessels requiring complete EM systems, costs are estimated at $10,000, resulting in an estimated $9,000 yearly (225$/day) increase in cost over the best estimate. Vessels with partial systems already installed would face only a portion of these costs, dependent on the equipment needed to meet IFM EM requirements.

*Startup Costs/ Field Services*

Startup field service costs include costs for installation of EM equipment and costs to get these systems into compliance with upcoming IFM regulations. Because EM systems are installed on most of the vessels in the fleet, these costs are expected to be relatively minor. Vessels may have the option to sign a contract with a service provider to cover costs associated with system activation, warranty, and ensuring compliance with IFM regulations. A contract of this nature will cost vessels an estimate of $1,000 per year ($25/day). Since the majority of vessels have EM systems already installed, $1,000 per vessel is the best estimate for the fleet.

As mentioned above, vessels that were not previously outfitted or fully outfitted with complete EM systems would face increased costs if they chose to monitor with EM. For vessels requiring installation of complete EM systems, costs are estimated at $3,500, resulting in an estimated $2,500 yearly ($63/day) increase in cost over the best estimate. Vessels with partial systems already installed would face only a portion of these field service costs, dependent on the equipment needed to meet IFM EM requirements.

_0000017611

*Startup Costs/ Program Management*

Startup program management costs are those costs for a service provider that are associated with starting a herring EM monitoring program, which will putatively be borne by vessels. These include cost to obtain office space, hire and train adequate staff (project manager, EM technicians, reviewers, etc.), and establish review protocols and templates. Since most of the midwater trawl vessel are outfitted with Saltwater cameras, and Saltwater established a program during the pilot program, the best estimate of cost for startup program management is $0.

If a vessel chose a different service provider, startup program management costs are estimated at $10,909 per vessel ($273/day). This cost is based on Saltwater's startup costs in the final report on the EM pilot project. This is likely a high-end estimate because it assumes that the new service provider has no infrastructure in place and must establish a completely new program. Service providers already established in midwater trawl fishing areas and those with experience in EM may offer substantially reduced costs.


*Ongoing Costs- Program Management*

Ongoing program management costs include oversight of the EM program, communication with NMFS and the industry, oversight of tech support, data management, and review activities, and oversight of other general program practices. In the final report, Saltwater estimated the ongoing program management costs made up about 26% of all ongoing costs, although this was higher than they would envision for an ongoing management program. While a large operational EM program would likely expect program management to be 8-10% of the overall cost of a program, the small EM program being developed for the midwater trawl fishery would require a higher percentage. With relatively few vessels enrolled in an EM monitoring program, we estimate program management costs to be $20,000/year. This equates to approximately 16% of overall costs. Saltwater verified that this was a reasonable estimate.

*Ongoing Costs- Field Services*

Ongoing field service costs include field tech support and travel costs associated with tech support, replacement equipment, and supplies. Because the EM study was only a 16-month project, it was difficult for Saltwater to discern between "startup" and "ongoing" field service costs. Saltwater estimated that the costs for field services is generally about four times greater than the cost of equipment (after the initial installation). Therefore, we estimate the total yearly cost to the fleet for ongoing field services at $29,000. These costs are not expected to vary appreciably between year 1 and any subsequent year.

*Ongoing Costs- Data Services*

Data services includes retrieval and shipping of hard drives, data processing, data checks, review, and storage. Data service costs in the pilot project accounted for about 52.5% of ongoing costs and 35.5% of overall costs. Data service costs are driven by the cost of video review, which Saltwater

_0000017612

estimates to account for about 90% of these costs. Saltwater also provided information indicating that each trip required an average of about 6.5 hours to review and 8.5-9 hours to complete analysis, storage, etc. Given that the average trip over the course of this project was about 3 days, this indicates that each day at sea is estimated to take about 3 hours to review, analyze, and store.

The cost drivers Saltwater included in the final report were based on review of 100% of footage collected, and often involved review of trips multiple times for testing/quality control purposes. In this analysis, we tried to scale costs accordingly. In an ongoing program, saltwater found that a review of data only around the haulback of gear (audit review) cost about 46% of what it would cost to review of all footage (census review). Because this was a pilot project, all footage collected must be retained for three years, which Saltwater estimated to add an additional 5% to expected ongoing data storage costs. We estimated that ongoing data service costs would be reduced in an operational program by an additional 15% by eliminating multiple reviews of data (to develop templates, QA/QC, etc.) and in efficiencies gained through experience with this study.

Thus, since our estimate is that EM coverage would apply on 40% of trips, the estimate cost per vessel is $4,800 ($120/day). This is calculated as such: $355,000 (data services cost in EM pilot) * 0.46 (cost of audit rather than census review) * 0.85 (correction for multiple review of EM footage) * 0.95 (correction for storage of all data from study) = $52,800 per year /11 vessels = $4,800 per vessel/year.


*Year 1- Possible Cost Increases*

Census Review (100%) of Footage (Rather than Audit Review)

The EM final report estimated that an audit review required about 46% of the time and cost necessary to do a census review. Because review of footage makes up an estimated 90% of ongoing data service costs, we estimate that census review would add an estimated $5,071 to yearly monitoring costs per vessel ($127 per day), resulting in an estimated total EM yearly costs per vessel of $16,553 ($414 per day). Since the Council elected for the audit review model, these additional costs would not be incurred in years 1 and 2, but could be incurred in subsequent years if the Council chose higher monitoring rates during the 2-year reanalysis of IFM.

New Service Provider /Equipment

The best estimates for this report assume that vessels would employ the previously installed EM systems (from the EM project) and use the service provider that provided equipment in future monitoring. We used this as the best estimate because: 1) the majority of vessel already had full EM systems onboard the vessel and would have minimal startup costs, 2) the vessel's EM equipment is compatible with the service provider's equipment, and 3) the service provider has established a footprint (including review protocols, staff, office space) that may allow them to initially operate cheaper than a competitor.

_0000017613

However, there are cases where vessels may choose other service providers.  Several vessels involved in this study did not have a full suite of EM system components installed, and would face additional costs in coming into compliance with a monitoring program.  It is possible that some vessels were not happy with the EM study service provider, and would be willing to pay more for a service provider that better suits their needs.  It is also possible that latent vessels (with inactive permits) or new vessels choose to re-enter/enter the fishery, and would require installation of all new equipment.  This would result in greater startup costs for the vessels.

If a vessel required a completely new system, we estimate that this would cost $10,000 for the equipment plus an additional $3,500 for installation costs.  Since the best estimate for year 1 costs for equipment/installation was $2,000, this purchase/install of all new equipment would cost a vessel $11,500 over the best estimate.

If a vessel chooses to monitor with a new service provider, they may face costs above those for equipment/installation.  We estimate that new service providers may need to establish infrastructure, hire staff, establish data management/review protocols, etc.  These costs would likely be borne by vessels choosing to monitor with this service provider.  Based on startup program management costs for the EM study, we estimate these costs to be about $10,909.  These costs would likely vary greatly by service provider, and could be mitigated by increasing the number of vessels monitoring with that service provider, thus spreading some of these costs across vessels.

When combined, a vessel requiring new equipment/installation and a new EM service provider could face costs of $33,891 for the first year of monitoring ($847/day), which is $22,409 more per year ($560/day) than the best estimate for year 1 monitoring costs.  After year 1, monitoring cost estimates would be the same for all vessels.

Storage Costs

Saltwater estimated that the overall costs of storage in this project was approximately 3%.  However, at a national level, NMFS headquarters is currently developing a retention schedule for EM footage, which will inform what EM footage/data needs to be retained and stored, and for how long. Therefore, we currently have no guidance as to what this retention schedule will include, and what the ongoing costs for data storage will be.  However, based on the Saltwater report, we expect that these costs will range from negligible up to $13 per day.  If the policy requires only retaining of summary footage/data and footage/data that contains events that may need to be reviewed in the future, these costs would be negligible.  If the policy requires that all footage from every trip be retained, these costs are estimated to be $520 per vessel per year ($13 per day).  There are multiple options that would likely result in costs between these two extremes, which could include retaining data only around hauls, retaining only reviewed trips, etc.

Year 1- Most Expensive

The most expensive estimate is calculated by taking the best estimate and adding in each of the "possible additional costs" (census review, new equipment/service provider, increased data service costs).  If a vessel were required to pay all of these increased costs, their total year 1 monitoring

_0000017614

cost would be $39,482 ($987 per monitored day). This is an estimated $28,000 higher per year ($700 per day) than the best estimate. This cost would only occur if all of these things occurred: 1) the Council/NMFS decided to require a census review of all footage (as noted above, the Council did not choose this option for implementation, but this does not preclude them from doing so in the required 2-year review), 2) the vessel required/opted for brand new equipment/installation and a new service provider, and 3) NMFS headquarters determined that 100% of footage collected must be stored.

**Year 2+ Costs-Best Estimate**

Year 2+ cost estimates are what we estimate for every year after year 1. Year 2+ cost best estimates mimic those for year-one in most categories. The only categories with different methods to calculate year 2+ costs (vs. year 1) were for "equipment costs" (replacement) and "field services" (equipment replacement). Based on the EM final report and conversations with Saltwater, we estimate that half of the equipment onboard a vessel will degrade and need replacing every five years. We use this estimate because different components of the installed EM gear will degrade at different rates, depending on the gear's durability, exposure to elements, etc. For this reason, it is likely that some equipment onboard (e.g. exposed camera) may be replaced several times before other pieces of equipment (e.g. wire runs). We felt the estimate of system "half-life" was a more appropriate method to estimate equipment replacement costs, and estimated that the best half-life estimate for the equipment was 5 years.

*Equipment (replacement)*

Purchasing all of the components of an EM system was estimated to cost $10,000 per vessel. Since we estimate that the vessels will have to replace half of that equipment every five years, vessels are expected to pay $1,000 each year in equipment costs ($10,000 divided by 2 (half of the equipment) divided by 5 (years)). This estimate is equivalent to the estimated equipment costs for year-1 for transfer of equipment from Saltwater to the vessels.

*Field Services (equipment replacement)*

Field Services for equipment replacement would involve costs associated with installing and replacing EM system equipment as it failed. For an ongoing program, Saltwater estimated that the cost of field services (including ongoing field service costs and equipment replacement service) would be four times the cost of the equipment itself. As such, we estimate that the total yearly cost for field services would be $44,000, and that $15,000 of those yearly costs would be associated with replacing EM system components.

*Year 2+- Possible Cost Increases*

*Census Review*

As in year 1, requiring census review vs. audit review would cost each vessel an additional $5,071 per year ($127 per monitored day).

*3-year equipment life*

As detailed above, our best estimate is that half of the EM equipment will need to be replaced every five years.  However, given that these vessels have not been monitored with a long-term EM program, and that costs will vary by vessel, we provide here an estimate of additional costs if we assume that 50% of the equipment would need to be replaced every 3 years (rather than 5).  With a 3-year half-life, vessels would face an average increase in costs of $1,576 per year ($39 per monitored day).

*Increased Data Storage Requirements*

As in year 1, the retention schedule being developed by NMFS headquarters could require data storage costs of up to $520 per vessel per year ($13 per monitored day).

*Year 2+- Most Expensive*

In year 2+, the most expensive estimate is calculated by taking the best estimate and adding in each of the "possible additional costs" (census review, 3-year equipment life, increased data service costs).  If a vessel were required to pay all of these increased costs, their total year 2+ monitoring cost would be $19,012 ($475 per monitored day), which is an increase of $7,167 per year ($179 per day) over the best estimate.  The "most expensive" estimate would only be incurred if all of the following occurred: 1) the Council/NMFS decided to require a census review of all footage (may occur in 2-year review, see above note), 2) the equipment on the vessel requires replacement more frequently than anticipated (half of equipment every 3 years), and 3) NMFS headquarters determined that 100% of footage collected must be stored.

*Possible Cost Reductions- All years*

*No Fishing Days*

EM systems have been set up to trigger collection of footage/data upon deployment of gear for the first time on each trip.  In cases where no fishing occurs (gear is not set) for an entire trip, there would be no footage or sensor data recorded (and no fish to portside sample), thus resulting in minimal monitoring costs for that trip.  Observer data for 2015-2017 indicates that about 25% of observed trips result in no fishing effort.  While we are not certain if this is representative of all trips or only observed trips, 25% is our best estimate for the percentage of trips with no fishing effort.  If 10 of the estimated 40 monitored trips (25%) have no fishing effort, this would result in a reduction in monitoring cost (from the above estimate) to the vessel of $1,200 per year ($30 per sea day).  Thus, we estimate monitoring costs at $10,282 – $38,282 per year ($257-$957 per day) in year 1 and $10,645-$17,812 per year ($266-$445 per day) in year 2+.

*Cost Reductions Associated with Greater Fishing Effort*

Many of the costs associated with an EM monitoring program include infrastructure, overhead, and program management costs to the service provider, which are then passed on to the vessel (Table 2).  These costs are generally upfront and must be paid regardless of the number of trips monitored. After these costs are paid off by the industry, the majority of expenses are for reviewing, analyzing,

and storing data from each trip, which accounts for a fraction of the total cost. As such, the costs to the vessel per trip over the course of a year may be reduced by having greater fishing effort.

**Table 2: Fishing Effort vs. EM Monitoring Costs**

| Costs | Per Boat Per Day (20 days/year) | Per Boat Per Day (40) | Per Boat Per Day (60) |
|---|---|---|---|
| Overhead | $11 | $6 | $4 |
| Ongoing Program Mgmt | $91 | $45 | $30 |
| Ongoing Field Services | $132 | $66 | $44 |
| Ongoing Data Services | $120 | $120 | $120 |
| Equipment (replacement) | $50 | $25 | $17 |
| Field Services (equip Repl.) | $68 | $34 | $23 |
| | **$473** | **$296** | **$238** |

*Comparison of EM industry costs based on the number of days a vessel is monitored each year. Because many costs are not dependent on the number of trips a vessel takes, they can be spread out across all trips for that year. Thus, per trips costs are estimated at $473 if 20 monitored days each year (50 total sea days), $296 if 40 monitored days each year (100 total sea days), and $238 if 60 monitored days each year (150 total sea days).*

*Portside Sampling*

The EM study did not involve any element of portside sampling. Therefore, the analyses contained in this report are taken directly from analysis performed in the (updated) Environmental Assessment of the IFM Amendment. The IFM Amendment estimates that the midwater trawl herring fleet will catch about 50,000 mt of herring each year. At a projected monitoring cost of $3.84 per metric ton, the midwater trawl fleet will incur portside sampling costs of approximately $96,000 per year. Based on 11 vessels requiring 40 additional monitored days each year, this would result in costs of $8,700 per vessel ($218/ monitored day).

The cost for portside sampling will vary based on yearly catch. As a high-end estimate, if the herring fleet captured the entire yearly quota (104,800 mt), and midwater trawlers captured 75% of that fish, it would cost the fleet an estimated $121,000, or $11,000 per year per vessel ($275/day). If the herring fleet captured their low for the last 5 year period (49k mt/2017) and midwater trawl vessels captured 75% of this fish, it would cost the fleet and estimated $56,500 per year, or $5,100 per vessel per year ($128/day).

Thus, portside sampling costs per vessel are expected to range between $5,100 and $11,000 per year ($128-$275/day), with a best estimate of $8,700 per year ($218/day).

_0000017617

*Summary: Combined EM and Portside Costs*

Year 1

Per vessel costs for year 1 of EM range between $10,232 and $39,482 ($257-$987 per monitored day).  The best estimate per vessel for EM coverage is $11,482 ($287 per monitored day), which does not include the costs for any equipment/installation.  Portside sampling costs are expected to range between $5,100 and $11,000 per vessel per year ($128-$275 per monitored day), with a best estimate of $8,700 per year ($218 per monitored day).  Thus, combined EM and portside sampling costs are expected to range between $15,332 and $50,482 ($385-$1,262 per monitored day), with a best estimate of $20,182 per vessel per year ($505 per monitored day).

Year 2+

Per vessel costs for year 2+ of EM range between $10,645 and $19,012 ($266-$475 per monitored day).  The best estimate per vessel for year 2+ EM coverage is $11,845 ($296 per monitored day).  Portside sampling costs are expected to range between $5,100 and $11,000 per vessel per year ($128-$275 per monitored day), with a best estimate of $8,700 per year ($218 per monitored day).  Thus, combined EM and portside sampling costs are expected to range between $15,745 and $30,012 ($394-$750 per monitored day), with a best estimate of $20,545 per vessel per year ($514 per monitored day).

_0000017618

**Table 1: Cost Breakdown for Year 1 and Year 2+**

| Estimate of Costs: Year 1 | Best Estimates | | | | Census Review (100%) | | New Contractor/Equipment | | Most Expensive: Census Review/New Contractor/New Equip, Data Storage 5% Data Services Costs | |
|---|---|---|---|---|---|---|---|---|---|---|
| Category | Cost | Percent of Total | Per Boat/Year (11) | Per Boat Per Day (40) | Per Boat (40 trips) | Per Day/ Census Review | Per Boat | Per Day | Per Boat | Per Day |
| Overhead | $2,500 | 1.98% | $227 | $6 | $227 | $6 | $227 | $6 | $227 | $6 |
| Ongoing/Program Mgmt | $20,000 | 15.84% | $1,818 | $45 | $1,818 | $45 | $1,818 | $45 | $1,818 | $45 |
| OG/Field Services | $29,000 | 22.96% | $2,636 | $66 | $2,636 | $66 | $2,636 | $66 | $2,636 | $66 |
| OG/Data Services | $52,800 | 41.81% | $4,800 | $120 | $9,871 | $247 | $4,800 | $120 | $10,391 | $260 |
| Startup/Equipment | $11,000 | 8.71% | $1,000 | $25 | $1,000 | $25 | $10,000 | $250 | $10,000 | $250 |
| SU/Field Services | $11,000 | 8.71% | $1,000 | $25 | $1,000 | $25 | $3,500 | $88 | $3,500 | $88 |
| SU/Program Mgt | $0 | 0.00% | $0 | $0 | 0 | $0 | $10,909 | $273 | $10,909 | $273 |
| Total Costs | $126,300 | 100.00% | $11,482 | $287 | $16,553 | $414 | $33,891 | $847 | $39,482 | $987 |
| Cost Added (above best estimate) | | | | | $5,071 | $127 | $22,409 | $560 | $28,000 | $700 |

_0000017619

**Estimate of Costs: Year 2+**

| Category | Cost | Percent of Total | Per Boat (11), Based on 5yr Equip. Life | Per Day (40), 5yr Life | Per Boat If Census Review (100%) of all trips (5yr/40) | Per Day/ Census Review | Per Boat (11), Based on 3yr Equip. Life | Per Day (40), 3yr Life | Per Boat | Per Day |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Best Estimates | | Census Review | | 3yr equipment life | | Most Expensive: 3yr and Census Review, Data Storage 5% Data Services Costs | |
| Overhead | $2,500 | 1.92% | $227 | $6 | $227 | $6 | $227 | $6 | $227 | $6 |
| OG/Program Mgt | $20,000 | 15.35% | $1,818 | $45 | $1,818 | $45 | $1,818 | $45 | $1,818 | $45 |
| Ongoing/Field Services | $29,000 | 22.26% | $2,636 | $66 | $2,636 | $66 | $2,636 | $66 | $2,636 | $66 |
| Ongoing/Data Services | $52,800 | 40.52% | $4,800 | $120 | $9,871 | $247 | $4,800 | $120 | $10,391 | $260 |
| Equipment (replacement) | $11,000 | 8.44% | $1,000 | $25 | $1,000 | $25 | $1,667 | $42 | $1,667 | $42 |
| Field Services (equip. replace) | $15,000 | 11.51% | $1,364 | $34 | $1,364 | $34 | $2,273 | $57 | $2,273 | $57 |
| SU/Program Mgt | $0 | 0.00% | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Costs** | **$130,300** | **100.00%** | **$11,845** | **$296** | **$16,916** | **$423** | **$13,421** | **$335** | **$19,012** | **$475** |
| **Cost Added (above best estimate)** | | | | | **$5,071** | **$127** | **$1,576** | **$39** | **$7,167** | **$179** |

**Final Estimates**

| Cost Estimates | Fleet | Best Estimate | | High End Estimate | |
|---|---|---|---|---|---|
| | | Per Vessel/ Year | Per Vessel/ Sea Day | Per Vessel/ Year | Per Vessel/ Sea Day |
| Year 1 | $126,300 | $11,482 | $287 | $39,482 | $987 |
| Year 2+ | $130,300 | $11,845 | $296 | $19,012 | $475 |

*Note that final estimates do not include possible per-vessel cost reductions ($30/day and $1,200/year) due to "no fishing" trip.*

_0000017621

Appendix 9

_0000017622

**Mid-Atlantic Fishery Management Council**
800 North State Street, Suite 201, Dover, DE 19901-3910  Phone:
320-674-2331 | FAX: 320-674-5399 | www.mafmc.org  Richard
B. Robins, Jr., Chairman | Lee G. Anderson, Vice  Chairman
| Christopher M. Moore, Ph.D., Executive  Director



March 24, 2015

Dear_____,

As you are most likely aware, the National Marine Fisheries Service in conjunction with both the
New England and Mid-Atlantic Fisheries Management Councils is developing an omnibus action
that would allow the Councils to implement industry-funded monitoring within their respective
jurisdictions. The Amendment will also consider specific coverage levels for the Atlantic  mackerel
and Atlantic herring fisheries. Please see http://www.mafmc.org/actions/observer-  funding-
omnibus for further information.

Preliminary analyses of economic factors related to the alternatives currently being considered  for
the herring and mackerel fisheries have highlighted the need for more detailed information  about
the cost of fishing in these two fisheries. It is important that the degree to which the cost  of
industry-funded coverage reduces the profitability of fishing for different types of vessels be
understood and described in the Environmental Assessment. The current analyses use fishing  cost
information collected by the Northeast Fisheries Observer Program but the type of costs  collected
and the coverage on herring and mackerel vessels are limited.

Thank you for agreeing to fill this information gap by completing the attached survey. This  survey
is being administered by the MAFMC. The survey will ask you a number of questions  about your
annual fishing costs.  Responses to the survey are completely confidential, as  required by law.
Once you complete the survey please return it using the enclosed stamped  envelope. The survey
should take no longer than one hour to complete. Responses to the  survey are voluntary, but by
completing it, you will be helping the Councils understand how the  policies currently being
considered affect you.

If you have any questions about how to complete the survey please contact Jason Didden (302-
526-5254 or jdidden@mafmc.org). Thank you in advance for your participation!

Sincerely,

Christopher M. Moore, Ph.D., *Executive Director MAFMC*

_0000017623

**Completed surveys should be mailed to:**

Jason Didden

Mid-Atlantic Fishery Management Council 800 North State Street, Suite 201

Dover, DE 19901-3910



# Herring and Mackerel Vessel Annual Cost Survey for 2014



## Thank you very much for participating in this important survey!

**The questions in this survey relate to the following vessel only**:
[**Vessel name**]
Coast Guard Documentation or State Registration Number: **[12345678]**

Your responses and participation in this survey are
**CONFIDENTIAL**

*Photo credit: Lisa Colburn, NOAA Fisheries*

Completed surveys should be mailed to:
Jason Didden
Mid-Atlantic Fishery Management Council
800 North State Street, Suite 201

**General Instructions:**

- **This survey is about your costs in 2014 for the vessel identified in this survey.** In your answers, include combined costs for all state and/or federal fisheries for this vessel in 2014, including costs incurred while the vessel was inactive.

**Please note that all responses are completely confidential.**

---

## Section A: Vessel Information

This section is only about the vessel identified in this survey. **All costs requested are for 2014.**

1. **Ownership type for this vessel (*check one*):**
   - ☐ Sole    proprietorship
   - ☐ General    partnership
   - ☐ Limited    partnership
   - ☐ C Corporation
   - ☐ S Corporation
   - ☐ Limited Liability Company (LLC)
   - ☐ Other _____

2. **Number of owners, including yourself:** _____

3. **Was this vessel acquired from a previous owner or was it bought new (*check one*)?**
   - ☐ Acquired from a previous owner
   - ☐ Purchased New

4. **In what calendar year did you become the owner of the vessel?** _____

5. **What port did this vessel operate from most of the time during 2014?**

   _____

_0000017626

## **Section B: Repair/Maintenance/Upgrade/Improvements Costs**

**6a. Was this vessel hauled out in 2014 for any reason?** (Possible reasons include regular repair and maintenance, emergency haul-out, long term storage, etc.)

☐ Yes
☐ No [please go to 6c]

**6b. What were the haul-out costs in 2014, including taking the vessel out of the water and any transportation?** *(Do not include any repair/maintenance costs – we'll ask you for them in question 7.)*

Haul out cost in 2014:  $ _____

**6c. How often do you usually haul-out this vessel?**

☐ Every year Every
☐ other year Every
☐ _____years
☐ Every_____months
☐ Other (please describe) _____

**7.  What were your repair/maintenance and upgrade/improvement costs for this vessel in 2014? Include the cost of any tools and equipment you may have purchased. If you did not have any expenses in 2014, then check $0.**

*We know that these kinds of costs may vary significantly year to year. However, **this survey is about 2014 expenses only.***

$_____          ☐ $0

**If you are able to provide a breakdown of these total repair/maintenance and upgrade/improvement costs, please do so in the following table. Otherwise, skip to question #8.**

_0000017627

| 7. | *Do not include vessel haul-out costs reported above in question 6b.* |
|---|---|
| **Expense Category** | **Repair/Maintenance/Upgrades/Improvements, 2014** |
| **Propulsion Engine** (such as engine, drive train, exhaust/cooling systems) | $_____<br><br>☐ $0<br>**Description:** |
| **Deck Equipment/ Other Machinery** (such as winches, haulers, generators, hydraulics, compressors, reels, pumps) | $_____<br><br>☐ $0<br>**Description:** |
| **Hull** (such as frame, deck, wheelhouse, keel, steering, rigging, fish holds, fuel tanks) | $_____<br><br>☐ $0<br>**Description:** |
| **Fishing Gear** (such as codends, nets/panels, dredges, buoys, highfliers, doors, pots/traps, cables) | $_____<br><br>☐ $0<br>**Describe Upgrade/Improvement:** |

## **Section C: Vessel Related Costs**

**8.  For each expense category listed in the table below,** *please enter the total amount spent in 2014 for this vessel (and average per day cost for crew and hired captain)*. If you did not  have an expense in 2014, then check $0.

| **Mooring/Dockage Fees** for this vessel in (2014  including upkeep expenses):<br><br>_____<br><br>     $0 | **Permit and/or License fees** for this vessel in   :<br><br>_____<br><br>     $0 |
|---|---|
| **Vessel insurance premium** in 2014 for this vessel (premium paid for either hull or P & I insurance):<br><br>_____<br><br>*Number of months insured:* _____<br><br>     $0 | **Quota or DAS lease payments** in 2014 for his vessel (if non-monetary payments were paided to obtain quota or DAS, please estimate the value of those non-monetary payments):<br><br>_____<br><br>     $0 |
| **Total payments to crew and hired captain**    in for this vessel only:<br><br>Crew:  Annual $_____Avg per day_____<br><br><br><br>Hired Cpt: Annual $_____Avg per day_____ **Do not include** what you earn when you are the captain)<br><br>     $0 | **Crew benefits** for this vessel in 2014 (the cost to you, as the vessel owner, for providing retirement benefits; health, life, or disability insurance premiums; and unemployment insurance for your <u>crew and hired captain</u>):<br><br>_____<br><br>     $0 |
| **Vessel Activity/Quota Monitoring Cost** for this vessel in 2014 (such as observer or dockside monitoring cost): | **Other costs** for this vessel in 2014:<br><br>*Describe*:<br>_____ |

_0000017629

$_____

☐  $0

$_____

☐  $0

## **Section D: Operating Costs**

7. **For each expense category listed in the table below,** *please enter the total amount spent in 2014 for this vessel, including all payments made by you and/or the crew. Also please enter the average cost per day.*
   - If nothing was spent in a category, please check $0.
   - *We are aware that these kinds of costs may vary significantly from year to year.* **Please bear in mind that this survey is about 2014 expenses only.**

| **Fuel/oil/filter** for this vessel in 2014: | **Food and Drinking Water** for this vessel in 2014: |
|---|---|
| Annual $_____ Avg per day_____  $0  ☐ I Don't Know | Annual $_____ Avg per day $_____  $0  ☐ I Don't Know |
| **Ice** for this vessel in 2014: | **Carrier vessel fees** for this vessel in 2014: |
| Annual $_____ Avg per day_____  $0  ☐ I Don't Know | Annual $_____ Avg per day $_____  $0  ☐ I Don't Know |
| **Fresh Water** for use in this vessel in 2014: | **Communication Costs** for this vessel in 2014 such as cell phones, radio, VMS etc.): *o not include office phone use.* |
| Annual $_____ Avg per day_____  $0  ☐ I Don't Know | Annual $_____ Avg per day $_____  $0  ☐ I Don't Know |
| **General Fishing Supplies** for this vessel in 2014 (such as knives, picks, hooks, bags, ties, lobster bands, rags, tape, ks/rings, lines/twine, etc.): | **General Crew Supplies** for this vessel in 2014 ( such as gloves, boot liners and foul-weather gear): |
| Annual $_____ Avg per day_____  $0  ☐ I Don't Know | Annual $_____ Avg per day $_____  $0  ☐ I Don't Know |
| **Catch Handling Costs** for this vessel in (such as auction, lumping, | **Other Costs** for this vessel in 2014: *Describe:*_____ |

_0000017631

grading, shipping and sales rep):

Annual $_____         Avg per day          Annual $_____          Avg per day $_____

☐   $0          ☐   I Don't Know          ☐   $0          ☐   I Don't Know

## Section E: Typical Crew Payment System

**10a.  Did you hire a captain for the majority of this vessel's trips in 2014, or were you the  captain for most trips?**

☐   Mostly Owner-operated
☐   Mostly Hired Captain
☐   Other   _____

**10b.  On average, how many crew were on this vessel when it went out in 2014? DO NOT COUNT YOURSELF OR THE CAPTAIN.**

_____ Average number of crew members, not including you or the captain, in  2014

- **If you answered 0 (you had no crew in 2014), SKIP TO QUESTION 11**

- **If your answer was > 0 (you had crew in 2014), please CONTINUE WITH QUESTION  10c**

**10c.  Please use the diagram on the next page to list the types of expenses that were normally taken out of gross revenue, crew's share, and captain's share in 2014.**

**You do not need to list the dollar amounts. Just list the *types* of expenses deducted  (for example: "fuel" "ice" "food").**

***NOTE: If the diagram below is not appropriate for your settlement system, please describe your system on the next page.***

_0000017632

**GROSS REVENUE**

EXPENSES YOU DEDUCT BEFORE ANY
DISTRIBUTION (list the types of expenses
only, not the amount):

_____

_____

_____

_____

_____

_____

Boat's percentage + Crew's percentage + Captain's
percentage = 100%

BOAT'S PERCENTAGE:          %

CREW'S PERCENTAGE :_____%

EXPENSES YOU DEDUCT FROM
CREW'S PERCENTAGE (list the
types of expenses only, not the
amount):

_____

_____

_____

_____

_____

_____

_____

CAPTAIN'S PERCENTAGE:_____%

EXPENSES YOU DEDUCT FROM
CAPTAIN'S PERCENTAGE (list the
types of expenses only, not the
amount):

_____

_____

_____

_____

_____

_____

_____

**If the diagram displayed on the previous page is not appropriate for your crew payment,
then please describe your crew payment system in the space below:**

Appendix 9 – Herring and Mackerel Cost Survey                    December 2018

_0000017633

**10d.  Please list the *types* (not the cost) of items crew members purchase for themselves.**

Examples include: "food on day boats", "foul weather gear", "gloves", etc.
(These expenses would NOT be included in the diagram above.)

_____    _____

_____    _____

_____    _____

## Section F: Overall Business Cost

**11a.  Including the vessel listed in this survey, how many vessels did your fishing
business  operate or maintain in 2014?**

_____vessel(s) operated or maintained in 2014

**11b**. **For each expense category listed below, please enter the amount spent for either
<u>all</u>  <u>your vessels</u> or <u>just this vessel</u> in 2014. Indicate by checking the appropriate
box.**

If you did not spend anything on that expense category in 2014, please check $0.

| **Workshop/Storage Expenses** for 2014 (such as gear shed rental and workshop expense): | **Office Expenses** for 2014 (such as office supplies, office ren home office, office utilities (such as electric, heat, etc.), posta photocopying, computer and office phone use, excluding **communication costs**): |
|---|---|
| $ ☐————☐————————☐<br>    $0        for all vessels      for this vessel only | $ ☐————☐————————☐<br>    $0        for all vessels      for this vessel only |
| **Business Vehicle Usage Costs** for 2014 (for fishing business related purposes only; such as number of miles the vehicle was used for business multiplied by a standard mileage rate): | **Business Travel Costs** for 2014 (such as cost of lodging, travel, and transportation for business associated travel **excluding business vehicle costs**): |
| $ ☐————☐————————☐<br>    $0        for all vessels      for this vessel only | $ ☐————☐————————☐<br>    $0        for all vessels      for this vessel only |
| **Association Fees Paid** in 2014 (such as co-operative, fishing organization, sector fees and union dues): | **Professional Fees Paid** in 2014 (such as settlement, accounting, and legal fees): |
| $ ☐————☐————————☐<br>    $0        for all vessels      for this vessel only | $ ☐————☐————————☐<br>    $0        for all vessels      for this vessel only |
| **Principal Paid on Business Loans** for 2014 (enter only payments made, *not* amount owed): | **Interest Paid on Business Loans** for 2014: |
| $ ☐————☐————————☐<br>    $0        for all vessels      for this vessel only | $ ☐————☐————————☐<br>    $0        for all vessels      for this vessel only |
| **Taxes paid (income, property, etc.)** for 2014: | **Non-Crew Labor Services** for 2014 (such as night watchman, shore engineer, and office secretary): |
| $ ☐————☐————————☐<br>    $0        for all vessels      for this vessel only | $ _____<br><br>*Describe:* _____ |

_0000017635

## Section G: Other Costs and Earnings

**12. Did you have any other costs in 2014 that we have not asked about in this survey? If so, please list them below. (Please do not report your personal costs).**

**Other costs for the <u>identified vessel</u> only:**

| Cost | Description of other annual costs incurred in 2014 |
|------|---------------------------------------------------|
| $ _____ | _____ |
| $ _____ | _____ |

**Other costs for your <u>entire business</u>:**

| Cost | Description of other annual costs incurred in 2014 |
|------|---------------------------------------------------|
| $ _____ | _____ |
| $ _____ | _____ |

**13. Please record the total gross revenue from all activities generated by this vessel in 2014.** *(Note: Although we collect revenue information from the dealer reporting system, this question is for cross-checking our record in order to improve our overall data quality.)* **:**

Gross revenue from commercial trips: $_____

Gross revenue from non-commercial trips (e.g. charter trips): $ _____

_____

☐     $0   (this vessel was inactive during 2014)

_0000017636

**14. In the following table, Please record the number of days this vessel spent in each fishery in 2014. Be as specific as possible in the fishery description noting things such as gear type, target species, fishing region, etc.**

| Fishery Description (gear/species/region) | Number of Days in 2014 |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Thank you for your response! Please use the space below for comments.

_0000017637



**United States Department of Commerce**
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
Greater Atlantic Region
55 Great Republic Drive
Gloucester, MA 01930

DATE:                              December 17, 2018

MEMORANDUM FOR:        Carrie Nordeen
                                    SFD Fishery Policy Analyst

FROM:                            Marianne Ferguson
                                    NEPA Policy Analyst

THROUGH:                      *Jennifer Anderson*
                                    Jennifer Anderson
                                    Regional NEPA Coordinator

SUBJECT:                        Clearance of the Environmental Assessment for the NEFMC's
                                    Industry Funded Monitoring Omnibus Amendment

I have reviewed the revised version of the subject Environmental Assessment. The economic
analysis of the updated exemption threshold has been sufficiently addressed and I have no further
comment on this document.

cc: Pete Christopher, SFD
    Mitch MacDonald, GCNE

_0000017638

Replies to an opposition must be filed on or before October 1, 2018.

**ADDRESSES:** Federal Communications Commission, 445 12th Street SW, Washington, DC 20554.

**FOR FURTHER INFORMATION CONTACT:** Michele Berlove, Wireline Competition Bureau, at: (202) 418–1477; email: *Michele.Berlove@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's document, Report No. 3101, released September 4, 2018. The full text of the Petition is available for viewing and copying at the FCC Reference Information Center, 445 12th Street SW, Room CY–A257, Washington, DC 20554. It also may be accessed online via the Commission's Electronic Comment Filing System at: *http://apps.fcc.gov/ ecfs/.* The Commission will not send a Congressional Review Act (CRA) submission to Congress or the Government Accountability Office pursuant to the CRA, 5 U.S.C. because no rules are being adopted by the Commission.

*Subject:* Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment, FCC 18–74, published at 83 FR 31659, July 9, 2018, in WC Docket No. 17–84. This document is being published pursuant to 47 CFR 1.429(e). *See also* 47 CFR 1.4(b)(1) and 1.429(f), (g).

*Number of Petitions Filed:* 1.

Federal Communications Commission.

**Katura Jackson,**

*Federal Register Liaison Officer, Office of the Secretary.*

[FR Doc. 2018–20238 Filed 9–18–18; 8:45 am]

**BILLING CODE 6712–01–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 648**

**RIN 0648–BG91**

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Availability of proposed fishery management plan amendment; request for comments.

**SUMMARY:** The New England Fishery Management Council submitted the New England Industry-Funded Monitoring Omnibus Amendment, incorporating the Environmental Assessment and the Initial Regulatory Flexibility Analysis, for review by the Secretary of Commerce. NMFS is requesting comments from the public on the proposed amendment, which was developed to allow for industry-funded monitoring in New England Council fishery management plans and implement industry-funded monitoring in the Atlantic herring fishery. This amendment would ensure consistency in industry-funded monitoring programs across New England fisheries and increase monitoring in the Atlantic herring fishery.

**DATES:** Public comments must be received on or before November 19, 2018.

**ADDRESSES:** You may submit comments on this document, identified by NOAA– NMFS–2018–0109, by any of the following methods:

• *Electronic Submission:* Submit all electronic public comments via the Federal eRulemaking Portal.

1. Go to *www.regulations.gov/ #!docketDetail;D=NOAA-NMFS-2018- 0109;*

2. Click the "Comment Now!" icon and complete the required fields; and

3. Enter or attach your comments.

• *Mail:* Submit written comments to Michael Pentony, Regional Administrator, National Marine Fisheries Service, 55 Great Republic Drive, Gloucester, MA 01930. Mark the outside of the envelope, "Comments on the Industry-Funded Monitoring Amendment."

*Instructions:* Comments sent by any other method, to any other address or individual, or received after the end of the comment period, may not be considered by us. All comments received are a part of the public record and will generally be posted for public viewing on *www.regulations.gov* without change. All personal identifying information (*e.g.,* name, address, etc.), confidential business information, or otherwise sensitive information submitted voluntarily by the sender will be publicly accessible. We will accept anonymous comments (enter "N/A" in the required fields if you wish to remain anonymous).

Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http:// www.nefmc.org.*

**FOR FURTHER INFORMATION CONTACT:** Carrie Nordeen, Fishery Policy Analyst, phone: (978) 281–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

In 2013, the Mid-Atlantic and New England Fishery Management Councils initiated a joint omnibus amendment to allow for industry-funded monitoring in all of the fishery management plans (FMPs) that the Councils manage. The joint omnibus amendment was intended to standardize the process to develop and administer future industry-funded monitoring programs for Council FMPs, and would have implemented industry-funded monitoring in the Atlantic herring and mackerel fisheries.

On September 20, 2016 (81 FR 64426), NMFS announced the public comment period for the draft joint omnibus amendment. The 45-day public comment period extended from September 23 through November 7, 2016. During that time, NMFS and the Councils hosted five public hearings on the draft joint omnibus amendment. NMFS and the Councils held public hearings in Gloucester, Massachusetts; Portland, Maine; Cape May, New Jersey; Narragansett, Rhode Island; and via webinar.

In April 2017, the New England Council finalized its selection of preferred alternatives and recommended that NMFS consider the joint omnibus amendment for approval and implementation, while the Mid-Atlantic Council decided to postpone action on the joint omnibus amendment. Therefore, the joint omnibus amendment, initiated by both Councils to allow for industry-funded monitoring, has become the New England Industry-Funded Monitoring Omnibus Amendment and would only apply to FMPs managed by the New England Council. Accordingly, this amendment would only implement industry-funded monitoring in the Atlantic herring fishery. At its October 2018 meeting, the Mid-Atlantic Council is scheduled to re-consider whether it wants to continue developing industry-funded monitoring measures for its FMPs.

**Proposed Measures**

*1. Omnibus Measures*

This amendment would standardize the development and administration of

_0000017639

future industry-funded monitoring programs in New England Council FMPs. The proposed omnibus measures include:

• Standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry;

• A process to implement FMP-specific industry-funded monitoring via an amendment and revise via a framework adjustment;

• Standard administrative requirements for industry-funded observers/monitors and monitoring service providers;

• A process to prioritize industry-funded monitoring programs in order to allocate available Federal resources across all FMPs; and

• A process for monitoring set-aside programs to be implemented via a future framework adjustment.

*2. Atlantic Herring Measures*

This amendment would implement industry-funded monitoring in the Atlantic herring fishery. The purpose of increased monitoring is to better understand the frequency of discarding in the herring fishery, as well as improve the tracking of the incidental catch of haddock and river herring/shad catch against their catch caps in the herring fishery. The proposed herring measures include:

• Implementing a 50-percent coverage target for industry-funded at-sea monitoring on vessels issued All Areas (Category A) or Areas ⅔ (Category B) Limited Access Herring Permits; and

• Allowing midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas.

On April 19, 2018, the New England Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition data along with age and length information. Following discussion and public comment, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. The EFP would exempt midwater vessels from the proposed requirement for industry-funded at-sea monitoring coverage and would allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. An EFP would enable NMFS to further evaluate monitoring issues in the herring fishery that are of interest to the Council and herring industry and provide an opportunity to improve the electronic monitoring and portside program's efficacy and efficiency. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. Using the results of the EFP, the Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

**Public Comment Instructions**

Public comments on the Industry-Funded Monitoring Omnibus Amendment and its incorporated documents may be submitted through the end of the comment period stated in this notice of availability. A proposed rule to implement the Amendment, including draft regulatory text, will be published in the **Federal Register** for public comment. Public comments on the proposed rule must be received by the end of the comment period provided in this notice of availability to be considered in the approval/disapproval decision on the amendment. All comments received by November 19, 2018, whether specifically directed to Industry-Funded Monitoring Omnibus Amendment or the proposed rule for this amendment, will be considered in the approval/disapproval decision on the Industry-Funded Monitoring Omnibus Amendment. Comments received after that date will not be considered in the decision to approve or disapprove the Amendment. To be considered, comments must be received by close of business on the last day of the comment period.

**Authority:** 16 U.S.C. 1801 *et seq.*

Dated: September 13, 2018.

**Margo B. Schulze-Haugen,**

*Acting Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*

[FR Doc. 2018–20259 Filed 9–18–18; 8:45 am]

**BILLING CODE 3510–22–P**



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

**SEP 1 1 2018**

MEMORANDUM FOR:    Alan Risenhoover
                   Director
                   Office of Sustainable Fisheries

FROM:              Michael Pentony
                   Regional Administrator

SUBJECT:           Clearance of Notice of Availability for the New England
                   Industry-Funded Monitoring Omnibus Amendment (RIN 0648-
                   BG91)--MEMORANDUM

The New England Fishery Management Council submitted the Industry-Funded Monitoring Omnibus Amendment for purposes of Secretarial review and approval under the Magnuson-Stevens Fishery Conservation and Management Act. I have determined that all the necessary documents have been provided. I have declared a transmittal date of September 11, 2018, and am attaching the complete package of documents.

I request that you clear the Notice of Availability, sign, and send it to the Office of the Federal Register for publication as soon as possible.

Attachments

*Federal Register* Notice



# Document Metadata:NOAA-NMFS-2018-0109-0005



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment ∗ |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0006 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0005 |
| **Title:** | Comment from Anonymous Anonymous |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS ∗ |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 11/14/2018 ∗ |
| **Date Posted:** | 11/19/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 ∗ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/19/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-96k4-s4yi |

**Page Count:** 1

**Total Page Count Including Attachments:** 1

# Submitter Info

**Comment:** I think monitoring areas where mammals are kept and trained is something that would benefit not only the animals but people too. I think there are so many places that mistreat animals that are used for entertainment. They are already being kept away from their environment, so they should be treated well and be provided with anything they need for survival. I think it is important to imitate the habitat where the animals came from for their safety.  ＊

**First Name:** Anonymous

**Middle Name:**

**Last Name:** Anonymous

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Government Agency Type:**

**Government Agency:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2018-0109-DRAFT-0022



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA_FRDOC_0001-DRAFT-21102 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0022 |
| **Title:** | Comment from bhgy dfre |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0021 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Pending_Post |
| **Received Date:** | 09/22/2018 |
| **Date Posted:** | |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 05/21/2019 |
| **Current Assignee:** | Thompson, Tracey (NOAA) |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-95kf-4caf |

| Page Count: | 1 |
| Total Page Count Including Attachments: | 1 |

## Submitter Info

**Comment:**   This misguided NEPA is an economic assault on small businesses, timber harvest, rural America, manufacturing and agriculture, farming, ranching, and natural resource development, and threatens the very livelihood of our fellow states. Small businesses and rural America are the backbone of this country, especially in rural America. Taxpayers have signaled that Americans are ready for the last eight years of past administration power grabbing mentality to come to an end. In transmitting any draft final regulation that has federalism implications to the Office of Management and Budget pursuant to Executive Order 12866 of September 30, 1993, each agency shall include a certification from the official designated to ensure compliance with order stating that the requirements of this order have been met in a meaningful and timely manner. In transmitting proposed legislation that has federalism implications to the Office of Management and Budget, each agency shall include a certification from the official designated to ensure compliance with the order that all relevant requirements of the order have been met. NEPA does require from agencies recognition of the legislative history and intent of NEPA, and of the efforts to respond to concerns of the local American people for a sustainable and harmonious economic future. Legislative priorities may change with voting majorities in successive Congresses, but the printed record of the history of NEPA should make clear the intentions of its architects preceding Congresses. Nevertheless NEPA appear to have interpreted it from subjective premises without inquiry into the legislative history of the Act or into the assumptions and expectations of the persons responsible for its language and content. These past agencies have missed the implications of NEPAs broad and basic principles and goals. It sets an agenda to be implemented through legislative and administrative action but with the state and local communities involved with rule making. Agencies need to wake up from past administration poor natural resource management, by using the importance of both rational supply behavior and economic compliance on public lands . This new, more logical approach to Public lands should provide agencies solid support. States rights first. With the growing number of NEPA concerns and appeals surrounding the cumulative rules impacting small business, oil and gas mining, ranchers, and farms, agencies need to develop new ideas to protect local workers and tax payers from Federal regulations on public lands . This would be truly a remarkable effort of consensus building, bringing together a wide variety of local business interests and state people to reach agreement on those actions that the agencies could take to resolve existing resource conflicts on our public lands. The use of the National Environmental, Policy Act (NEPA) discussion should be reached consensus on everyone effected. Recommendations to improve the implementation of NEPA in the process of Natural resources like timber, mining, farming, ranching and oil and gas development, small business. Before a rule is made, ask

the question who will be hurt the most and what can agencies do to help the ones most economically impacted. NEPA Streamlining Recommendations to change the common issues of concern like the lack of interagency coordination in the NEPA process. Recommended improving coordination and communication among project proponents, affected agencies and stakeholders to reduce adverse comments and time required. Specifically we all saw a need for Federal agencies to improve interagency coordination prior to and during the NEPA process. We all felt that there have been too many instances where one particular development project has resulted in two or more NEPA documents initiated by different Federal agencies. Such a lack of coordination results in unnecessary delays and an inadequate cumulative impacts analysis. One complaint is that the NEPA process results in significant delays. Many of these delays result from a lack of accurate field data detailing the status of existing wildlife and plant communities. We also recognized that industry and environmentalists alike are frustrated with the incompatibility of various Federal agency data bases, often precluding the sharing of key biological data. Federal agency data bases, often precluding the sharing of key biological data. Another recommendation addressed how to improve the format and content of the NEPA document while reducing its size. One way is to eliminate duplication in data requirements as well as consolidating and accessing existing data bases. To this end, recommend that Congress provide additional funding to Federal agencies with the purpose of consolidating various data bases to provide accurate and comprehensive biological data bases. Or allow the Forest Service to cut and sell more timber to finance operations for the public.   ✱🌐

**First Name:**            bhgy   🌐

**Middle Name:**

**Last Name:**             dfre   🌐

**Mailing Address:**

**Mailing Address 2:**

**City:**                          🌐

**Country:**                     🌐

**State or Province:**        🌐

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**       🌐

**Government Agency Type:**

**Government Agency:**

**Cover Page:**

**CAPE COD COMMERCIAL**

# FISHERMEN'S ALLIANCE

**Small Boats. Big Ideas.**

December 21, 2018

Michael Pentony, Regional Administrator
National Marine Fisheries Service
55 Great Republic Drive
Gloucester, MA 01930
Attn: Carrie Nordeen, Fishery Policy Specialist

Subject: Comments on Industry Funded Monitoring Amendment (NOAA-NMFS-2018-0109)

Dear Mr. Pentony-
Thank you for the opportunity to comment on the Omnibus Industry-Funded Monitoring omnibus amendment to the Atlantic Herring Fishery Management Plan (FMP).

The Cape Cod Commercial Fishermen's Alliance is a member-based non-profit organization which works to build lasting solutions to protect our ocean ecosystem and the future of our fisheries. The Fishermen's Alliance represents 150 fishing businesses and over 300 fishing families, making our organization the leading voice for commercial fishermen on Cape Cod.  We are supportive of the changes proposed in the IFM amendment and selected by the New England Fishery Management Council.

The proposed measure to increase observer coverage to 50% target levels is a significant improvement over previous monitoring target levels in the midwater trawl fishery, which were approximately 7.5% (75 sea days in 2018), 4.5% (45 sea days in 2017), and 44% (440 sea days in 2016). However, anything less than 100% coverage on midwater trawl vessels may result in inaccurate estimates of bycatch (river herring, shad, and haddock). Although we understand the agency's concern with the cost of administering 100% coverage targets, full coverage would allow the agency to entirely satisfy the purpose and need of the amendment, which are "to help improve estimates of catch, track against harvest limits and fishery catch caps and ensure that overfishing is not occurring." Additionally, we understand the justification for the issuing of a waiver, but are concerned that they may be too frequently issued given the number of provider issues that have arisen in other fisheries this year. NOAA recognizes that specially certified observes need to be placed on these vessels, which makes it even more difficult to supply the required observers for 50% of the trips.

Regarding the proposal to further evaluate the exempted fishing permit (EFP), we are supportive of the goals of the EFP and believe that the agency and council should work as quickly as possible to implement the transition from human observers to electronic monitoring (EM) coverage. The high-quality data provided by EM systems will help further achieve the purpose and need of the amendment without errors that could result from human coverage or lack thereof. Successful approval and implementation of this EFP into the fisheries monitoring plan will have important impact in developing and improving monitoring programs across other northeastern fisheries.

We also support the recommendation of allowing midwater trawl vessels to purchase observers in order to have 100% monitoring coverage in groundfish closed areas. This coverage supports the improvement in data needed to accurately estimate the amount of bycatch caught by these vessels, which make up the majority of the fleet and landings. Any additional midwater trawl access into closed areas, including those that were approved in the recent passage of the Omnibus Essential Fish Habitat Amendment 2, should not

---

**BOARD OF DIRECTORS** Nick Muto, *Chairman* • Gwen Holden Kelly, *Treasurer* • Greg Connors, *Vice-Chairman* • Brian Sherin, *Clerk*
Gregory Bilezikian • Charles Borkoski • Beau Gribbin • Eric Hesse • Barry Labar • Tim Linnell

1566 Main Street, Chatham, MA 02633  (508) 945-2432  info@capecodfishermen.org  **www.capecodfishermen.org**

be considered. These areas were designated in order to protect critical groundfish spawning areas and allow for further recovery of depleted stocks such as Gulf of Maine Cod. The high volume tows of midwater trawl gear make it incompatible with protecting spawning areas.

Thank you for your consideration and we look forward to supporting the expeditious implementation of this amendment.

Sincerely,



Nick Muto
Chairman, Board of Directors
Cape Cod Commercial Fishermen's Alliance



CAUSE *of* ACTION
I N S T I T U T E

Pursuing Freedom and Opportunity through Justice and Accountability

November 19, 2018

**VIA REGULATIONS.GOV**

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
ATTN: Michael Pentony, Regional Administrator
55 Great Republic Drive
Gloucester, MA 01930

Re:    **Industry-Funded Monitoring (IFM) Omnibus Amendment**
       **83 Fed. Reg. 47,326 (Sept. 19, 2018)**
       **Docket No. NOAA-NMFS-2018-0109 (RIN 0648-BG91)**

Dear Administrator Pentony:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government-oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]  CoA Institute has represented clients in challenging past efforts to compel the regulated industry to pay for discretionary supplemental at-sea monitoring services.[2]

I appreciate the opportunity to submit the following comments on the National Marine Fisheries Service's ("NMFS") proposed rule adopting the New England Industry-Funded Monitoring ("IFM") Omnibus Amendment.[3]  The Omnibus Amendment, which is sponsored by the New England Fishery Management Council ("NEFMC"),[4] would introduce provisions into all NEFMC-administered fishery management plans to allow for standardized implementation of industry-funded monitoring via plan-specific amendments and framework adjustments.  The Omnibus Amendment also contains measures applicable only to the Atlantic herring fishery, which would create a new IFM program for the herring fleet.  Importantly, these requirements would further extend to many other vessels across the Greater Atlantic region that declare herring when targeting other fish species.

In April 2017, prior to the final selection of preferred alternatives, CoA Institute advised the NEFMC that that the Omnibus Amendment raised serious legal questions concerning the authority of the federal government—by and through the NEFMC and NMFS—to compel regulated parties, *i.e.*, fishermen, to pay for supplemental at-sea monitoring outside of a formal fee system or limited access privilege program.[5]  To date, CoA Institute's objections have been ignored.  Neither the New England Council nor NMFS has made any effort in the final draft of the proposed Omnibus

---

[1] *About Us*, COA INST., https://causeofaction.org/about/ (last visited Nov. 19, 2018).
[2] *See generally Free the Fishermen*, COA INST., https://coainst.org/2Dp200f (last visited Nov. 19, 2018).
[3] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 47,326 (Sept. 19, 2018).
[4] NEW ENG. FISHERY MGMT. COUNCIL, INDUSTRY-FUNDED MONITORING OMNIBUS AMEND. (Aug. 2018) [hereinafter OMNIBUS AMEND.], *available at* http://bit.ly/2DGJils.
[5] Letter from CoA Inst. to New Eng. Fishery Mgmt. Council (Apr. 12, 2017), *available at* http://coainst.org/2pDsCnQ.

_0000017655

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 2

Amendment to address the concerns raised on the record by CoA Institute and other stakeholders. This failure, whether mere oversight or intentional avoidance, tends to demonstrate the prejudicial view of NMFS and the NEFMC towards fishermen.  It also reveals the government's unfortunate determination to impose unlawful and devastating costs on an already beleaguered heritage industry.

    As set forth in detail below, there is *no statutory authorization* under the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, for industry-funding requirements in most of the Atlantic fisheries. As such, the Omnibus Amendment—and any future attempts to implement industry-funded monitoring under the Omnibus Amendment's framework—will almost certainly face legal challenge. CoA Institute respectfully requests that NMFS disapprove the Omnibus Amendment and work with the NEFMC to develop alternative means of achieving the Council's desired goals of increased data collection and expanded policing of annual catch totals.  For example, NMFS and the NEFMC could work to reallocate existing funds for such supplemental monitoring or petition Congress to appropriate funding specific to expanded at-sea monitoring.

I.    **The Magnuson-Stevens Act does not authorize the industry-funded monitoring programs envisioned by the Omnibus Amendment.**

    The stated purpose of the Omnibus Amendment is straightforward: the NEFMC is "interested in increasing monitoring . . . to assess the amount and type of catch, to more precisely monitor annual catch limits, and/or provide other information for management."[6]  But the NEFMC's ability to fund that increased monitoring is limited.[7]  The Council's proposed solution is to design a standardized mechanism that would permit the government to order fishermen to cover a substantial portion of monitoring costs.[8]  Yet the Council fails to point to any specific provision in the MSA that grants it authority to implement such a plan.  The proposed rule adopting the Omnibus Amendment instead ambiguously points to the entirety of the MSA as the source of requisite authority.[9]

    a.    **The NEFMC must have explicit statutory authorization to force the regulated industry to fund discretionary supplemental at-sea monitoring programs.**

    Federal agencies do not enjoy unbridled power in choosing which programs to pursue; they cannot impose new fees or taxes, nor can they simply demand that citizens pay for programs that the government ought to be financing in the first place.  In this sense, the basic presumption in the

---

[6] *See, e.g.,* OMNIBUS AMEND. at 28, 31.

[7] *See id.* at 31 ("NMFS has limited funding for monitoring, so the Council is considering requiring industry to contribute to the cost of the monitoring."); *see also* Greater Atl. Reg'l Fisheries Office, Nat'l Marine Fisheries Serv., Press Release: Industry-Funded Monitoring Omnibus Amendment, Public Hearings and Comment Period (Sept. 20, 2016) ("The amount of available Federal funding to support additional monitoring is limited[.]"), *available at* http://bit.ly/2nHNpl1.

[8] *See, e.g.,* OMNIBUS AMEND. at 51 ("Under Omnibus Alternative 2, there would be a standardized structure for new industry-funded monitoring programs in New England fisheries, including at-sea monitoring, portside monitoring, and electronic monitoring. . . . This industry-funded monitoring program structure would include . . . (1) [s]tandard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry; (2) a process for FMP-specific industry-funded monitoring to be implemented via amendment and revised framework adjustment; (3) standard administrative requirements for industry-funded monitoring service providers; (4) [a] process to prioritize available Federal resources for industry-funded monitoring across FMPs; and (5) a process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.).

[9] 83 Fed. Reg. at 47,327 ("Authority: 16 U.S.C. 1801 *et seq.*").

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 3

Omnibus Amendment—that the NEFMC can require the industry by fiat to fund a non-essential supplemental monitoring program—is gravely mistaken and runs afoul of a fundamental principle of administrative law: "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."[10] The NEFMC acknowledges as much, but fails to give the principle due credit:

> Congress must decide how to finance any program, project, or activity . . . it establishes. Typically, programs are funded by appropriating funds from the U.S. Treasury. In addition to designating the funds necessary for a program, a congressional appropriation sets a maximum authorized program level. The maximum authorized program level functions as a cap on funding for a program. A Federal agency cannot spend money on a program beyond the maximum authorized program level without authorization from Congress. A Federal agency also cannot get around the maximum authorized program level by adding to its appropriations from sources outside the government without permission from Congress.[11]

The MSA does not authorize the NEFMC to redesign fishery management plans to introduce the sort of industry-funding requirement envisioned by the Omnibus Amendment. At most, the MSA authorizes the *placement* of observers and monitors.[12] Regional councils, however, are not at liberty to design particular or novel *funding* mechanisms for monitoring programs they choose to create.

The plain meaning of the MSA is clear and unambiguous.[13] The statute only authorizes IFM in a few specific regions and circumstances: (1) foreign fishing,[14] (2) limited access privilege programs,[15] and (3) the North Pacific fisheries research plan.[16] Congress's decision to permit NMFS and the councils to require industry-funded monitoring or observing in *only* these three situations clearly manifests Congress's intent not to authorize mandatory industry funding in other scenarios.[17] To read the MSA otherwise would render provisions discussing industry funding mere surplusage;[18] it would offend other important cannons of statutory construction;[19] and it would contradict the well-established legislative history of the MSA.

Indeed, with respect to the legislative history of the MSA, there is no evidence of congressional recognition for any sort of pre-existing, implied authority to impose monitoring costs on the regulated

---

[10] *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986); *see Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 134 S. Ct. 2427, 2466 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law.").

[11] OMNIBUS AMEND. at 32.

[12] 16 U.S.C. § 1853(b)(8); 50 C.F.R. § 648.2.

[13] *See generally Palmieri v. Nynex Long Distance Co.*, 437 F.3d 111, 115 (1st Cir. 2006); *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 n.2 (1st Cir. 1999).

[14] 16 U.S.C. § 1821(h)(4).

[15] *Id.* § 1853a(e). The Greater Atlantic Region contains two fisheries that permit cost recovery through a fee system: the Atlantic sea scallop individual fishing quota and golden tilefish individual fishing quota limited access privilege programs.

[16] *Id.* § 1862(a).

[17] *Cf. Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.9 (D.D.C. 2015) ("'[C]ost sharing' programs with industry participants in other fisheries in order to provide higher observer coverage levels . . . were expressly authorized by statute *for particular fisheries only*.") (emphasis added) (citing 16 U.S.C. § 1862).

[18] *Nat'l Credit Union Admin v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998).

[19] *See Duncan v. Walker*, 533 U.S. 167, 173 (2001); *see also EchoStar Satellite L.L.C. v. Fed. Commc'ns Comm'n*, 704 F.3d 992, 999 (D.C. Cir. 2013); *Ry. Labor Execs.' Ass'n v. Natl' Mediation Bd.*, 29 F.3d 655 (D.C. Cir. 1994)

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 4

industry.  Congress has, in fact, *repeatedly declined* the opportunity to permit IFM nationwide.  Each time that Congress has reauthorized the MSA, it has considered and rejected bills that would have created blanket authority for mandatory IFM programs.[20]  The IFM regime that the NEFMC now seeks to impose on the herring fishery—and the future IFM programs it envisions for the remaining New England fisheries—runs afoul of this legislative history.

The case of the groundfish monitoring program is instructive.  CoA Institute represented David Goethel, a New Hampshire-based fisherman, and the members of Northeast Fishery Sector XIII in a lawsuit challenging the legality of the Northeast multispecies sector at-sea monitoring program.[21]  Due to procedural technicalities, our clients were unable to obtain a decision on the merits that addressed the statutory authority concerns addressed in the foregoing paragraphs.  Congress subsequently appropriated funds to continue covering industry costs, which had been expected to exceed $700 per sea day and put nearly 60% of the fleet out of business.[22]  But the U.S. Court of Appeals for the First Circuit still commented on the underlying ambiguity of the government's position, particularly in light of a NEFMC-commissioned study that predicted the unsustainable burden of IFM:

> [G]iven [the government's] own study which indicated that the groundfish sector could face serious difficulties as a result of the industry funding requirement, . . . this may be a situation where further clarification from Congress would be helpful for the regulated fisheries and the agency itself as it balances the competing goals of conservation and the economic vitality of the fishery.[23]

The Omnibus Amendment, as discussed below, presents the herring fishery—and, ultimately, other fisheries under the purview of the NEFMC and other adjoining councils—with the same sort of threat to economic viability.  And the NEFMC and NMFS have yet again failed to point to any specific provision of the MSA that authorizes them to require the regulated industry to shoulder the cost of discretionary at-sea monitoring programs that the government cannot itself fund.  The Omnibus Amendment must be rejected on these grounds.

### b. The Omnibus Amendment's IFM scheme would violate the National Standards and other important legal principles.

Notwithstanding the NEFMC's lack of legal authority, the introduction of IFM across the Greater Atlantic region also would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing.  This result would violate National Standards 7 and 8.[24]  Congress never intended to grant the regional fishery management councils the authority

---

[20] H.R. 5018, 109th Cong. § 9(b) (2006); H.R. 39, 104th Cong. § 9(b)(4) (1995); H.R. 1554, 101st Cong. § 2(a)(3) (1989).

[21] *See generally Oversight Hearing on "Exploring the Successes and Challenges of the Magnuson-Stevens Act": Hearing Before the U.S. H.R. Comm. on Nat. Resources, Subcomm. on Water, Power, & Oceans*, 115th Cong. (July 19, 2017) (statement for the record of Ryan P. Mulvey, Counsel, Cause of Action Inst.), *available at* https://coainst.org/2FqgO10.

[22] *See* Eric Bolinder, *Congress Throws Fishermen a Lifeline*, COA INST. (Mar. 27, 2018), https://coainst.org/2zg1wqb.

[23] *Goethel v. Dep't of Commerce*, 854 F.3d 106, 116 (1st. Cir. 2017), *cert. denied*, 138 S. Ct. 221 (2017).

[24] *See* 16 U.S.C. § 1851(a)(7)–(8).  One should not lightly conclude that Congress intend to grant authority for the Council and NMFS to take actions that would put fishermen out of business.  *See Arctic Sole Seafoods v. Gutierrez*, 622 F. Supp. 2d 1050, 1061 (W.D. Wash. 2008) (rejecting agency interpretation because it "leads to absurd results—the inevitable

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 5

to regulate a substantial portion of the fleet out of existence.[25]  As the Supreme Court has held, "Congress . . . does not alter the fundamental details of a regulatory scheme [such as the one intended by the MSA] in vague terms or ancillary provisions,"[26] nor does it "delegate a decision of such economic and political significance [as the introduction of industry-funded monitoring] in so cryptic a fashion."[27]  IFM represents a shift of tremendous economic and political significance.

In the absence of authorization for the sort of IFM programs set forth in the Omnibus Amendment, the NEFMC and NMFS can only be described as preparing to impose a "tax" to extract money from regulated parties to fund desired regulatory programs.  This cannot stand: "only Congress has the power to levy taxes."[28]  The Omnibus Amendment, as applied in the herring fishery and other future fishery management plan amendments, also may violate numerous statutes governing agency finance, such as the Anti-Deficiency Act[29] and Miscellaneous Receipts Statute.[30]  For example, the Government Accountability Office has rejected the proposition that an agency can avoid the Miscellaneous Receipts Statute "by authorizing a contractor to charge fees to outside parties and keep the payments in order to offset costs that would otherwise be borne by agency appropriations."[31]  Yet this sort of rearrangement of financial obligations and receipts is exactly what would occur under the IFM programs envisioned under the Omnibus Amendment.  Instead of charging a "fee" to fishermen as a form of cost recovery, the NEFMC instead would order fishermen to pay monitoring service providers directly as a condition of retaining and using a permit.  Finally, IFM programs would impermissibly compel fishermen into commercial transactions in violation of the Commerce Clause[32] and violate other parts of the Constitution, including the Fourth Amendment.[33]

## II.   The expected economic impact of the Omnibus Amendment, including measures specific to the Atlantic herring fishery, and stakeholder feedback expose other important deficiencies.

In line with the National Standards, the Omnibus Amendment and future industry-funded monitoring programs must "minimize costs,"[34] "provide for the sustained participation of [fishing] communities,"[35] and "minimize adverse economic impacts."[36]  The Omnibus Amendment fails to

---

elimination of the fishery); *W. Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140 (D. Mass. 2010) ("[The MSA] creates a duty to allow for harvesting at optimum yield in the present, while . . . [also] protecting fishery output for the future[.]").

[25] The NEFMC could certainly repeal or revoke any of its fishery management plans, but it must do so explicitly and by three-quarters majority approval of its voting members.  16 U.S.C. § 1854(h).

[26] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

[27] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting argument that Congress would permit "broad and unusual authority through an implicit delegation").

[28] *Thomas v. Network Solutions*, 2 F. Supp. 2d 22, 29 (D.D.C. 1998); *see* U.S. Const., art. I., § 8, cl. 1; *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes[.]").

[29] *See* 31 U.S.C. § 1341(a)(1)(A)–(B); *see also Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir. 1995).

[30] *See* 31 U.S.C. § 3302(b); *see also Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996).

[31] GOV'T ACCOUNTABILITY OFFICE, 2 PRINCIPLES OF FED. APPROPRIATIONS L. at 6-177 (3d ed. 2006).

[32] *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2587 (2012) (The government cannot "compel[] individuals to become active in commerce by purchasing a product.").

[33] *See City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2452 (2015).

[34] 16 U.S.C. § 1851(a)(7).

[35] *Id.* § 1851(a)(8).

[36] *Id.*

_0000017659

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 6

meet these standards, both generally and with respect to the herring alternatives, because it will have a severe and adverse impact on the fishing industry.

With respect to the omnibus measures, the NEFMC attempts to mask the inevitable negative economic consequences of its amendment by suggesting that its measures "do not require the development of IFM programs nor do they directly impose any costs."[37] Although technically true, this claim is misleading. As the NEFMC itself recognizes, once future fishery-specific IFM programs are approved under the Omnibus Amendment's "streamlined" procedures, the expected economic impact on fishery-related business and communities will be uniformly negative: "[T]here would be *direct negative economic impacts to fishing vessels*[.]"[38]

As for the herring fishery, monitoring costs will likely exceed $710 per sea day for an at-sea monitor and $818 per sea day for a NEFOP-level observer.[39] Such costs are probably higher than the daily landings revenue of the typical small-scale vessel, particularly given the latest reduction in quota. This is certainly the case in the Northeast multispecies fishery. Under the groundfish sector at-sea monitoring program, up to 60% of the fleet was expected to "see negative returns to owner when full" monitoring costs were "factored in."[40] Although devastating economic impacts have been somewhat mitigated by congressional action,[41] a recent report from the Northeast Fisheries Science Center confirms the continued decline of the groundfish fishery, which will only accelerate once monitoring costs fully shift to sector fishermen.[42] The NEFMC cannot ignore the devastating economic effects of industry funding in the herring fishery, just as it cannot ignore the costs associated with the omnibus alternatives that it has deemed too "speculative" to analyze.[43]

In a previous draft of the Omnibus Amendment, the NEFMC suggested that monitoring costs could rise even further due to overlapping requirements for IFM in multiple fisheries. Specifically, the Council indicated that "[m]any of the vessels that would be impacted by [IFM] costs in the herring fishery would also be impacted by [IFM] costs in the mackerel fishery."[44] When the Mid-Atlantic Council decided to withdraw from the Omnibus Amendment, and thus concurrently tabled its proposed IFM regime for the mackerel fishery, it did so in large part because of its concern for overlapping IFM requirements: "The Council had originally considered IFM due to observer coverage concerns in the mackerel fishery, but *most mackerel catches will be subject to additional monitoring through a recent New England Council IFM action for the Atlantic herring fishery*."[45] Damningly, the NEFMC has not

---

[37] OMNIBUS AMEND. at 180.

[38] *See, e.g.*, *id.* (emphasis added); *see also id.* at 9, 304.

[39] *Id.* at 243 (Table 73).

[40] NEW ENG. FISHERY MGMT. COUNCIL, DRAFT REPORT: PRELIMINARY EVALUATION OF THE IMPACT OF GROUNDFISH-SECTOR FUNDED AT SEA MONITORING ON GROUNDFISH FISHERY PROFITS at 10 (June 19, 2015), *available at* http://bit.ly/28QUXwT. These costs were predicted to be heaviest for small vessels. *Id.* at 13 (Table 12). NMFS recognized these prospects, describing them as a "restructuring of the fleet." *Id.* at 10.

[41] *See supra* note 22.

[42] *See generally* NAT'L OCEANIC & ATMOSPHERIC ADMIN., 2015 FINAL REPORT ON THE PERFORMANCE OF THE NORTHEAST MULTISPECIES (GROUNDFISH) FISHERY (MAY 2007 – APRIL 2016), Ref. Doc. 18-13 (Nov. 2018).

[43] OMNIBUS AMEND. at 183 ("[P]otential downstream effects (e.g., subsequent management measures to address bycatch issues) of this action are considered too remote and speculative to be appropriate for consideration[.]").

[44] NEW ENG. FISHERY MGMT. COUNCIL & MID-ATL. FISHERY MGMT. COUNCIL, INDUSTRY-FUNDED MONITORING OMNIBUS AMEND. at 301 (Sept. 2016), *available at* http://bit.ly/2mQxrtn.

[45] Mid-Atl. Fishery Mgmt. Council, October 2018 Council Meeting Summary at 1–2 (Oct. 2018) (emphasis added), *available at* http://bit.ly/2PYRMdA.

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 7

undertaken any detailed analysis exploring the potential economic impact of IFM in a future scenario where multiple fisheries require such monitoring. It is reasonable to assume that some vessels, which declare into multiple fisheries for any given trip, could be continually subject to monitoring requirements. Further, the Council has made only meager efforts to consider how its preferred herring alternatives will impact the mackerel fleet and other vessels that incidentally declare herring yet may still be subject to IFM requirements.[46]

The NEFMC and NMFS have received overwhelmingly negative feedback in pursuing the Omnibus Amendment. Of the eighty-three submissions posted to the electronic docket during the last round of public comment in the *Federal Register* in 2016, only six stakeholders voiced various levels of support for IFM; the vast majority—93%—opposed it.[47] The reasons for this opposition are straightforward enough. Many small-scale fishermen cannot remain profitable if they must assume monitoring costs.[48] The Long Island Commercial Fishing Association, for example, expects that the Omnibus Amendment's approximately $800 per sea day cost will force more than half of the entire New York-based fleet out of business.[49] Stakeholders also are skeptical that increased monitoring has any connection to conservation or maintaining the sustainability of the fisheries, and they question the quality of the data collected. Most importantly, however, the public recognizes that the MSA does not authorize industry-funded monitoring simply because the Council or NMFS wishes it to do so,[50] and they acknowledge the potential constitutional problems.[51]

Apart from their lack of authority under the MSA to impose monitoring costs on vessels, the NEFMC and NMFS also have failed to provide an adequate explanation for why increased monitoring is even necessary in light of the extreme financial burden it will put on fishermen. As proposed, IFM could destroy multi-generational, small-business fishermen up and down the East Coast while benefitting industrial fishing firms. That result is unacceptable.

---

[46] *See, e.g.*, OMNIBUS AMEND. at 250–51.

[47] Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin., 81 Fed. Reg. 64,426 (Sept. 20, 2016), Docket No. NOAA-NMFS-2016-0139-0001, *available at* http://bit.ly/2p5NO1s.

[48] *See* Comment of Meghan Lapp, Seafreeze Ltd., on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0009, *available at* http://bit.ly/2nUf8Ph (discussing impact of herring and mackerel alternatives).

[49] *See* Comment of Long Island Commercial Fishing Ass'n on Omnibus Amend. (Nov. 8, 2016), Docket No. NOAA-NMFS-2016-0139-0084, *available at* http://bit.ly/2odOrsX ("The onus for NMFS required observer coverage should be on NMFS, not industry. It is cost prohibitive.").

[50] *See, e.g.*, Comment of David Goethel on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0010, *available at* http://bit.ly/2o04Mye ("Monitoring is a function of government and should be funded at levels Congress deems appropriate through NOAA line items in the budget. . . . [The MSA] allows for the placement of observers on fishing boats but is silent on cost recovery except in specific fisheries in the North Pacific Region."); *see also* Comment of Gregg Morris on Omnibus Amend. (Nov. 8, 2016), Docket No. NOAA-NMFS-2016-0139-0080, *available at* http://bit.ly/2o09hJp (same).

[51] *E.g.*, Comment of N.C. Fisheries Ass'n on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0082, *available at* http://bit.ly/2oXBtAa (raising due process concerns) ("There was no reasonable opportunity for [public hearings] down in the affected states of Maryland, Virginia, and North Carolina. Their involvement in the public hearings process was substantially truncate. [Those] whose stand to be severely impacted . . . have not been given a single public hearing reasonably close enough for them to be expected to attend."); *cf.* Brooke Constance White, *Stonington fishermen, first selectman: Camera proposal violates Fourth Amendment rights*, THE WESTERLY SUN (Apr. 7, 2017), http://bit.ly/2o00maB.

_0000017661

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 8

**III.    Conclusion**

Thank you for your consideration of the foregoing comments.  CoA Institute respectfully requests that NMFS disapprove the Omnibus Amendment.  NMFS should instead work with the NEFMC to pursue alternative means of achieving the Council's monitoring goals.  If you have any questions, please do not hesitate to contact me at ryan.mulvey@causeofaction.org or (202) 499-4232.

Sincerely,

RYAN P. MULVEY
COUNSEL
CAUSE OF ACTION INSTITUTE



# CAUSE *of* ACTION
## I N S T I T U T E

December 24, 2018

**VIA REGULATIONS.GOV**

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
ATTN: Michael Pentony, Regional Administrator
55 Great Republic Drive
Gloucester, MA 01930

> **Re:**  **Industry-Funded Monitoring (IFM) Omnibus Amendment**
> **83 Fed. Reg. 55,665 (Nov. 7, 2018)**
> **Docket No. NOAA-NMFS-2018-0109 (RIN 0648-BG91)**

Dear Administrator Pentony:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government-oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]  CoA Institute has represented clients in challenging past efforts to compel the regulated industry to pay for discretionary supplemental at-sea monitoring services.[2]

This comment concerns the National Marine Fisheries Service's ("NMFS") proposed rule for regulations implementing the New England Industry-Funded Monitoring ("IFM") Omnibus Amendment.[3]  Earlier this fall, NMFS published a separate notice of availability concerning the Omnibus Amendment.[4]  The agency has yet to finalize its action with respect to this earlier rulemaking, which would either approve or disapprove, in whole or in part, the Omnibus Amendment.[5]

In April 2017, prior to its final selection of preferred alternatives, CoA Institute advised the New England Fishery Management Council ("NEFMC") of serious legal questions concerning the authority of the federal government to compel regulated parties, *i.e.*, fishermen, to pay for supplemental at-sea monitoring outside of a formal fee system or limited access privilege program.[6]  More recently, CoA Institute reiterated its concerns in a regulatory comment[7] on NMFS's notice of availability and in public statements before the NEFMC and Mid-Atlantic Fishery Management Council.[8]  To date, these objections have been ignored.

---

[1] *About Us*, COA INST., https://causeofaction.org/about/ (last visited Dec. 24, 2018).
[2] *See generally Free the Fishermen*, COA INST., https://coainst.org/2Dp200f (last visited Dec. 24, 2018).
[3] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 55,665 (Nov. 7, 2018).
[4] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 47,326 (Sept. 19, 2018).
[5] NEW ENG. FISHERY MGMT. COUNCIL, INDUSTRY-FUNDED MONITORING OMNIBUS AMEND. (Aug. 2018) [hereinafter OMNIBUS AMEND.], *available at* http://bit.ly/2DGJils.
[6] Letter from CoA Inst. to New Eng. Fishery Mgmt. Council (Apr. 12, 2017), *available at* http://coainst.org/2pDsCnQ.
[7] Comment of CoA Inst. on 83 Fed. Reg. 47,326 (Nov. 19, 2018), *available at* https://coainst.org/2zWMBkW.
[8] *See, e.g.*, Pub. Statement of Ryan P. Mulvey, CoA Inst. (Dec. 13, 2018), *available at* https://coainst.org/2EkB7e5.

_0000017663

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 2

## Discussion

CoA Institute offers the following comments on the proposed implementing regulations:

1. **The Magnuson-Stevens Act does not authorize the industry-funded monitoring programs envisioned by the Omnibus Amendment.**

By reference, CoA Institute incorporates and reiterates the concerns raised in its November 19, 2018 comment on the Omnibus Amendment. There is no statutory authorization under the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, for industry-funding requirements in most of the Atlantic fisheries. At most, the MSA authorizes the placement of observers and monitors.[9] But the NEFMC cannot design novel funding mechanisms for monitoring programs. The plain meaning of the MSA is clear and unambiguous.[10] IFM is authorized in a few specific regions and circumstances: (1) foreign fishing,[11] (2) limited access privilege programs,[12] and (3) the North Pacific fisheries research plan.[13] Congress's decision to permit NMFS and the regional councils to require IFM or observing in *only* these three situations clearly manifests Congress's intent not to authorize mandatory industry funding in other scenarios.[14] To read the MSA otherwise would render provisions discussing industry funding mere surplusage;[15] it would offend other important cannons of statutory construction;[16] and it would contradict the well-established legislative history of the MSA.

2. **The Omnibus Amendment violates the MSA's National Standards.**

As described in detail in CoA Institute's previous comment, the introduction of IFM across the Greater Atlantic region would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing. This result would violate National Standards 7 and 8.[17] Congress never intended to grant the regional fishery management councils the authority to regulate a substantial portion of the fleet out of existence.[18] As the Supreme Court has held, "Congress . . . does not alter the fundamental details of a regulatory scheme [such as the one intended by the

---

[9] 16 U.S.C. § 1853(b)(8); 50 C.F.R. § 648.2.

[10] *See generally Palmieri v. Nynex Long Distance Co.*, 437 F.3d 111, 115 (1st Cir. 2006); *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 n.2 (1st Cir. 1999).

[11] 16 U.S.C. § 1821(h)(4).

[12] *Id.* § 1853a(e). The Greater Atlantic Region contains two fisheries that permit cost recovery through a fee system: the Atlantic sea scallop individual fishing quota and golden tilefish individual fishing quota limited access privilege programs.

[13] 16 U.S.C. § 1862(a).

[14] *Cf. Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.9 (D.D.C. 2015) ("'[C]ost sharing' programs with industry participants in other fisheries in order to provide higher observer coverage levels . . . were expressly authorized by statute *for particular fisheries only.*") (emphasis added) (citing 16 U.S.C. § 1862).

[15] *Nat'l Credit Union Admin v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998).

[16] *See Duncan v. Walker*, 533 U.S. 167, 173 (2001); *see also EchoStar Satellite L.L.C. v. Fed. Commc'ns Comm'n*, 704 F.3d 992, 999 (D.C. Cir. 2013); *Ry. Labor Execs.' Ass'n v. Natl' Mediation Bd.*, 29 F.3d 655 (D.C. Cir. 1994)

[17] *See* 16 U.S.C. § 1851(a)(7)–(8). One should not lightly conclude that Congress intend to grant authority for the Council and NMFS to take actions that would put fishermen out of business. *See Arctic Sole Seafoods v. Gutierrez*, 622 F. Supp. 2d 1050, 1061 (W.D. Wash. 2008) (rejecting agency interpretation because it "leads to absurd results—the inevitable elimination of the fishery); *W. Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140 (D. Mass. 2010) ("[The MSA] creates a duty to allow for harvesting at optimum yield in the present, while . . . [also] protecting fishery output for the future[.]").

[18] The NEFMC could certainly repeal or revoke any of its fishery management plans, but it must do so explicitly and by three-quarters majority approval of its voting members. 16 U.S.C. § 1854(h).

_0000017664

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 3

MSA] in vague terms or ancillary provisions,"[19] nor does it "delegate a decision of such economic and political significance [as the introduction of IFM] in so cryptic a fashion."[20] IFM represents a shift of tremendous economic and political significance.

With respect to the omnibus measures, the NEFMC attempts to mask the inevitable negative economic consequences of the Omnibus Amendment by suggesting that its measures "do not require the development of IFM programs nor do they directly impose any costs."[21] Although technically true, this claim is misleading. As the Council itself recognized, once future fishery-specific IFM programs are approved under the Omnibus Amendment's "streamlined" procedures, the expected economic impact on fishery-related business and communities will be uniformly negative: "[T]here would be *direct negative economic impacts to fishing vessels*[.]"[22]

As for the herring fishery, monitoring costs will likely exceed $710 per sea day for an at-sea monitor and $818 per sea day for a NEFOP-level observer.[23] Such costs are probably higher than the daily landings revenue of the typical small-scale vessel, particularly given the latest reduction in quota. Indeed, NMFS's proposed rule recognizes that the herring measures alone could result in an "approximately 20 percent" reduction in annual return-to-owner for Category A and B permit holders.[24] The Council—and NMFS—cannot ignore the devastating economic effects of industry funding in the herring fishery, just as it cannot ignore the costs associated with the omnibus alternatives that it has deemed too "speculative" to analyze.[25]

3. **The Environmental Assessment for the Omnibus Amendment is fatally flawed given recent developments and expected future action in the herring fishery.**

Two other commenters have impliedly suggested yet another problem for the Omnibus Amendment, namely, the fatal flaws in the accompanying Environmental Assessment ("EA"), which fails to account for recent developments in the herring fishery, as well as expected future management measures.[26] There are at least two such issues that NMFS should consider.

*First*, as CoA Institute previously explained, the Omnibus EA fails, at a general level, to account for possible overlapping requirements for IFM in multiple fisheries. It is reasonable to assume that some vessels, which declare into multiple fisheries for any given trip, could be continually subject to monitoring requirements. The NEFMC made only meager efforts to consider how its preferred

---

[19] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

[20] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting argument that Congress would permit "broad and unusual authority through an implicit delegation").

[21] OMNIBUS AMEND. at 180.

[22] *See, e.g., id.* (emphasis added); *see also id.* at 9, 304.

[23] *Id.* at 243 (Table 73).

[24] 83 Fed. Reg. at 55,671.

[25] OMNIBUS AMEND. at 183 ("[P]otential downstream effects (e.g., subsequent management measures to address bycatch issues) of this action are considered too remote and speculative to be appropriate for consideration[.]").

[26] *See* Comment of Lund's Fisheries Inc. on Omnibus Amend. (Nov. 19, 2018), Docket No. NOAA-NMFS-2018-0109-0009, *available at* http://bit.ly/2LtTgId; *see also* Comment of F/V Ocean Spray P'ship. on Omnibus Amend. (Dec. 18, 2019), Docket No. NOAA-NMFS-2018-0109-0012, *available at* http://bit.ly/2Cuz71B.

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 4

herring alternatives would impact the mackerel fleet and other vessels that incidentally declare herring yet would still be subject to IFM requirements.[27]

     *Second*, and more importantly, the Omnibus EA fails to address the interplay between IFM and recent in-season adjustments in the herring fishery.  This past summer, NMFS and the NEFMC reduced the annual catch limit for herring by over 50%.[28]  The Council and NMFS now seek again to lower the annual quota for calendar year 2019,[29] with an eye to further reductions in 2020 and 2021.  Although there is some uncertainty as to the precise level of reduction, all the possible specification adjustments will be economically devastating.  According to a report provided to the NEFMC at its December 2018 meeting, these alternatives will reduce herring revenue by between 80–87%.[30]  That, in turn, will result in a 20–22% reduction in total revenue for all vessels declaring into the fishery.[31]  Such a loss in profitability on top of the costs associated with IFM will cripple the fleet.  The EA for the Omnibus Amendment must be amended to consider the foregoing numbers.[32]

### 4.  NMFS's *Federal Register* actions have caused confusion and suggest prejudice.

     Stakeholders in the Greater Atlantic region already have raised concerns over the NEFMC's decision to move forward with the Omnibus Amendment, despite the lack of final action on the part of the Mid-Atlantic Council.  NMFS's unexpected publication of the September 19, 2018 "notice of availability" only added to this surprise and confusion.  It is unclear why the agency published a rule in September, seeking comment on the approval or disapproval of the Omnibus Amendment, and then subsequently published a proposed rule for implementing regulations in November before any action on the Omnibus Amendment was finalized.  To the extent rulemakings for the approval of the Omnibus Amendment and the introduction of implementing regulations are being done concurrently, it would seem to suggest that NMFS has already determined its course of action and will view public comments with prejudice.

### 5.  There are other inequities in the Omnibus Amendment's herring measures

     Beyond the foregoing deficiencies, there also appears to be some inequity in the design of the herring measures.  For example, vessels that intend to land less than fifty (50) metric tons (mt) of herring *on any given trip* are provided a waiver from IFM requirements.  Yet there are vessels in the fishery that have unique fishing behavior and daily capacity, including those that process at sea and return to port after extended multi-day trips.  Because the 50 mt exemption is provided *per trip*, rather than *per day*, the IFM program will favor small capacity vessels that make short, daily trips and land fresh fish.  Other vessels, which do not otherwise harvest at a higher daily rate, will be disproportionately impacted and likely subject to a higher monitoring coverage rate.  The inequity of

---

[27] *See, e.g.*, OMNIBUS AMEND. at 250–51.

[28] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Adjustment to 2018 Atlantic Herring Management Area Sub-Annual Catch Limits, 83 Fed. Reg. 42,450 (Aug. 22, 2018).

[29] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 83 Fed. Reg. 61,593 (Nov. 30, 2018).

[30] Presentation: In-Season Adjustment to Atlantic Herring Specifications for 2019, N. Eng. Fishery Mgmt. Council (Dec. 5, 2018), *available at* http://bit.ly/2V3w4Vk.

[31] *Id.*

[32] The EA should also more closely consider the impact of Atlantic herring Amendment 8, which is still in development but would create new cost burdens for fishermen, including the creation of new buffer zones.

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 5

this outcome is only heightened by the fact that these same vessels may declare into herring only incidentally, or without any real intention of primarily targeting herring. They will nevertheless be required to carry a herring monitor for one- or two-week trips at a time. The Omnibus EA does not adequately address these unique cost factors, and that raises questions about compliance with National Standard 6, which requires fishery management plans to attend to variations in fishing habits.[33]

## I.    Conclusion

Thank you for your consideration of these comments. CoA Institute respectfully requests that NMFS disapprove the Omnibus Amendment and decline final action on the proposed implementing regulations. If you have any questions, please do not hesitate to contact me at ryan.mulvey@causeofaction.org or (202) 499-4232.

Sincerely,

RYAN P. MULVEY
COUNSEL
CAUSE OF ACTION INSTITUTE

---

[33] 16 U.S.C. § 1851(a)(6).



For a thriving New England

CLF Massachusetts        62 Summer Street
Boston MA 02110
P: 617.350.0990
F: 617.350.4030
www.clf.org

November 19, 2018

Mr. Michael Pentony, Regional Administrator
NOAA Fisheries - GARFO
55 Greater Republic Drive
Gloucester, MA 01930

**RE:    Comments on the Industry-Funded Monitoring Amendment and the Proposed Rule
for the Industry-Funded Monitoring Amendment (NOAA-NMFS-2018-0109)**

Dear Mr. Pentony:

Conservation Law Foundation (CLF) thanks you for the opportunity to provide comments on the
New England Industry-Funded Monitoring Omnibus Amendment ("IFM Amendment" or
"Amendment") and Proposed Rule as published in the Federal Register. See 83 Fed. Reg. 47326
(Sept. 19, 2018); 83 Fed. Reg. 55665 (Nov. 7, 2018), respectively. Our comments focus on the
proposed Atlantic herring measures, and we do not offer any comments on the omnibus
measures at this time. While the proposed measures – developed in response to NOAA Fisheries'
partial disapproval of Amendment 5 to the Atlantic Herring FMP, where the New England
Fishery Management Council (Council) voted to require 100-percent observer coverage of this
fleet – are an improvement over status quo if implemented, we remain concerned that the agency
may not have secured sufficient federal funding to cover its costs and responsibilities as outlined
in the IFM Amendment.

Founded in 1966, CLF is a non-profit member-supported organization that works to solve
environmental problems threatening the people, natural environment, and communities of New
England. We have a long history of advocating for sustainable fisheries management in New
England, including the protection of forage fish populations like Atlantic herring and the need
for adequate accountability to "protect, restore, and promote the long-term health and stability"
of our fisheries.[1] To this end, CLF is generally supportive of the principles embodied in the IFM
Amendment but believe the Amendment does not go far enough to achieve the accountability
that is needed in the fishery. Taking action to improve accountability in the Atlantic herring
fishery in order to collect accurate and reliable data that can be used to better manage the fishery
is increasingly important given that recent stocks assessments indicate recruitment in the herring
fishery is at a historic low, increasing the chances for overfishing.[2]

---

[1] 16 U.S.C. § 1853(a)(1)(A).
[2] *See* 65th Northeast Regional Stock Assessment Workshop Assessment Summary Report by the Northeast Fisheries
Science Center (August 2018). Available at: https://s3.amazonaws.com/nefmc.org/3.2018-SARC65-summary-
report_herring-only.pdf

_0000017668



<u>Atlantic Herring Measures</u>

1. Industry-Funding Monitoring Coverage Target

The IFM Amendment proposes implementing a 50-percent coverage target for industry-funded at-sea monitoring on vessels issued Category A and B Limited Access Herring Permits. 83 Fed. Reg. at 55669. While this represents significant progress for the fishery over the current approximately 4-percent observer coverage on all midwater trawl vessels operating in the herring fishery, it may still not provide accurate estimates of retained and discarded catch.[3] The nets used by midwater trawl vessels are capable of catching millions of pounds of Atlantic herring and unintended catch – largely river herring, shad, and haddock – in a single tow, resulting in impacts to other fisheries and the ecosystem as a whole. Further, without 100-percent monitoring, neither NOAA Fisheries nor the fishery can guarantee that midwater trawlers do not slip unwanted catch or ensure that all catch is made available for sampling. Only the alternative with a 100-percent monitoring coverage target would have fully achieved the purpose and need of the Amendment, which was "to help improve estimates of catch tracked against harvest limits and fishery catch caps"[4] necessary to obtain accurate catch data of both intentional and unintentional catch (retained and discarded) and ensure that overfishing is not occurring.

Additionally, the Proposed Rule specifies three reasons for issuing a vessel waiver: (1) if an at-sea monitor is not available due to logistics or federal funding issues; (2) if a vessel is operating as a wing vessel and does not intend to pump or carry fish; and (3) if a vessel intends to land less than 50 metric tons of herring on a trip. 83 Fed. Reg. at 55670. CLF strongly urges NOAA Fisheries to keep a close watch on the allowance of waivers for midwater trawl vessels even if vessels do not intend to carry fish or land over 50 metric tons on a trip. These vessels are prone to large bycatch events and must be held accountable. In addition, NOAA Fisheries must ensure that all vessels are operating on a level playing field. Finally, CLF has concerns that waivers may be issued too frequently given the recent provider-related issues in the groundfish fishery contributing to sectors not meeting monitoring requirements for the 2018 fishing year.[5] NOAA Fisheries must act quickly to remedy these issues so that they do not bleed into the herring fishery.

2. Atlantic Herring Exempted Fishing Permit

The Proposed Rule describes the use of an exempted fishing permit (EFP) "to further evaluate how best to permanently administer an electronic monitoring program and portside sampling

---

[3] CLF and other ENGOs consistently advocated for 100-percent observer coverage for the largest vessels in the fleet. See the Herring Alliance public comment on the Industry-Funded Monitoring Omnibus Amendment (NOAA-NMFS-2016-0139) submitted November 7, 2016.

[4] *See* Industry-Funded Monitoring Omnibus Amendment Public Hearing Document (September 2016) at pg. 5.

[5] *See* letters to 14 groundfish sectors dated September 25, 2018, from Michael Pentony, Regional Administrator for NOAA Fisheries Greater Atlantic Regional Fisheries Office.

_0000017669



program" for midwater trawl vessels. 83 Fed. Reg. 55672. CLF is generally supportive of this path and requests that the EFP goals include: (1) evaluate the efficacy of electronic monitoring to detect all discarding activity and compliance with slippage; (2) review – at least initially – 100-percent of all fishing activity to identify all discards, contents of the net at the end of pumping (i.e. operational discards), and interactions with protected species; (3) require slippage reporting and consequence measures to apply; (4) ensure that operational discards are documented; (5) ensure redundancy with NEFOP observers; and (6) ensure that participating vessels with net sensors document the weight of slipped catch.

To better achieve the goals of the Amendment, CLF encourages a transition as quickly as possible to an electronic monitoring and portside sampling program as opposed to reliance on human at-sea observers to achieve monitoring coverage requirements in the herring fishery. Given that NOAA Fisheries and the New England Fishery Management Council have already determined electronic monitoring to be "suitable for detecting discarding events aboard midwater trawls" and economically feasible, 83 Fed. Reg. at 55667, it is our view that a one year EFP, as opposed to the proposed two years, should be enough time to evaluate the best way to administer the program.

3.  Midwater Trawls in Groundfish Closed Areas

As proposed in the IFM Amendment, CLF supports allowing midwater trawl vessels to purchase observers to access groundfish closed areas at 100-percent monitoring coverage as is required in Amendment 5 to the Atlantic Herring FMP.[6] These vessels are already exempted from other closure restrictions because of assumptions that the midwater trawl gear does not usually contact the seafloor or catch significant amounts of groundfish;[7] however, an observer is required to ensure accountability on both assumptions. Additionally, "the majority of groundfish catch by midwater trawl vessels is haddock, and the catch of haddock by midwater trawl vessels is already managed through a haddock catch cap for the herring fishery."[8] By allowing midwater trawl vessels to purchase observer coverage to access groundfish closed areas, the data needed to understand the "extent and nature of bycatch in the herring fishery"[9] can be collected without sacrificing fishing opportunities for the fleet.

CLF is strongly opposed, however, to allowing any increased fishing pressure in the Cashes Ledge (Groundfish) Closure Area under an EFP or by purchasing observer coverage. The Council and NOAA Fisheries recently maintained the Cashes Ledge Closure Area in the Omnibus Essential Fish Habitat Amendment 2 to protect critical groundfish life stages and

---

[6] *See* IFM Amendment Draft Environmental Assessment as submitted to NOAA Fisheries (August 2018) at pg. 71. Available at: https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf
[7] Id.
[8] Id.
[9] Id.

_0000017670



facilitate the recovery of Gulf of Maine cod and other important groundfish stocks.[10] To allow vessels with a propensity for high bycatch rates into this area would simply be irresponsible.

Lastly, NOAA Fisheries should ensure that it has available funding to pay for the agency's cost responsibilities associated with the IFM Amendment. Thank you for considering these comments.

Sincerely,

*Allison Lorenc*

Allison Lorenc
Policy Analyst
Conservation Law Foundation

Erica Fuller
Senior Attorney
Conservation Law Foundation

---

[10] 83 Fed. Reg. 15253 (April 9, 2018). Available at: https://www.gpo.gov/fdsys/pkg/FR-2018-04-09/pdf/2018-06760.pdf

_0000017671

# Document Metadata:NOAA-NMFS-2018-0109-0006



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0007 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0006 |
| **Title:** | Comment from Justin Leonard |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 11/15/2018 |
| **Date Posted:** | 11/19/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/19/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-96k6-vcn7 |

| | |
|---|---|
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:**    I think that it is very important that this proposed rule passes. Too often, we see overfishing happen in bodies of water. An example of this would be the rapid decline in the tuna population that we have seen in the last few decades. This proposal would be important because it would provide oversight to the industry. If more fisheries know exactly what is happening and how much fish they are taking out, then it will be beneficial in the long run because they won't overfish. I strongly urge that this passes.

**First Name:**    Justin

**Middle Name:**

**Last Name:**    Leonard

**Mailing Address:**

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Government Agency Type:**

**Government Agency:**

**Cover Page:**

# Document Metadata: NOAA-NMFS-2018-0109-0004



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0005 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0004 |
| **Title:** | Comment from Kasey Fagin |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 11/12/2018 |
| **Date Posted:** | 11/14/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/14/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-96in-9h3i |

| Page Count: | 1 🔄 |
|---|---|
| **Total Page Count Including Attachments:** | 1 |

# Submitter Info

| | |
|---|---|
| **Comment:** | The heightened monitoring associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA) take more money away from fishermen and funnel it into unnecessary federal positions. The New England Council thinks catch estimates are too inaccurate, but in fact, this is a result of herring being so numerous and equally small. It would take commercial fishermen and private fishermen much longer in preparing paperwork for this count to submit to the monitors. The heightened monitoring being enacted for the purpose of monitoring species is superfluous. The New England Council alludes to the Atlantic herring fishery population. However, herring is the most populous fish in the Atlantic Ocean, in no way are they at risk for extinction. This rule just seems like another attempt to create unnecessary office jobs and take money away from hardworking New England fishermen. At the very least, any of the above-mentioned agencies could choose to use their own federal funds or apply for grants instead of using the fishing industry itself for all funds. The Councils development of an industry-funded monitoring program must consider the following: a clear need or reason for the data collection, objective design criteria, cost of collection, less data intensive methods, prioritize modern technology, and incentives for reliable self-reporting. It does not appear to convince me of any of these factors. Perhaps a better idea would be to regulate and count on the business side of the fishing industry. It would be easy to regulate small, numerous fish by the pound upon sale. This way, when fishermen make a sale, they can record the weight and report to NOAA. However, due to the characteristics of the species, I think this rule is unnecessary. ＊🔄 |
| **First Name:** | Kasey 🔄 |
| **Middle Name:** | |
| **Last Name:** | Fagin 🔄 |
| **Mailing Address:** | 2858 E. 8th Street |
| **Mailing Address 2:** | Apartment 3821 |
| **City:** | Tulsa 🔄 |
| **Country:** | United States 🔄 |
| **State or Province:** | Oklahoma 🔄 |
| **ZIP/Postal Code:** | 74104 |
| **Email Address:** | kkf3900@utulsa.edu |
| **Phone Number:** | |

_0000017675

**Fax Number:**

**Organization Name:**

**Government Agency Type:**

**Government Agency:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2018-0109-0003



## Document Details

**Docket ID:** NOAA-NMFS-2018-0109

**Docket Title:** New England Industry-Funded Monitoring Omnibus Amendment ✱

**Document File:** 📄

**Docket Phase:** Proposed Rule

**Phase Sequence:** 1

**RIN:** 0648-BG91

**Original Document ID:** NOAA-NMFS-2018-0109-DRAFT-0004

**Current Document ID:** NOAA-NMFS-2018-0109-0003

**Title:** Comment from kljh yhgfd

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS ✱

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2018-0109-0002

**Comment on Document Title:** Fisheries of the Northeastern United States: Industry-Funded Monitoring

**Status:** Posted

**Received Date:** 11/11/2018 ✱

**Date Posted:** 11/14/2018

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1 ✱

## Document Optional Details

**Status Set Date:** 11/14/2018

**Current Assignee:** NA

**Status Set By:** Nordeen, Carrie (NOAA)

**DOC Docket No.:**

**XRIN:**

**Tracking Number:** 1k2-96hv-3oig

**Page Count:**                              1  🔵

**Total Page Count**                         1
**Including Attachments:**

# Submitter Info

**Comment:**                A Nature Conservancy report found that thinning forests to
make them healthier could increase downstream water yields by
up to 6 percent. The loss of diverse habitat under current
management practices includes the loss of valuable meadows.
Meadows absorb and hold water and release it. Overgrown
forests also trap more of the annual snowpack in their higher
branches, causing it to evaporate rather than reach the ground
and flow downhill to water storage facilities later in the
year when its most needed. Property damage and firefighting
costs for local, state and federal governments run into the
billions of dollars annually. Forest service mismanaging of
our national forests has brought an unprecedented
environmental catastrophe that impacts all taxpayers and with
it, a rare opportunity for transform a culture change in
forest management practices. rebuild healthy high-country
forests by building upfront dams for storing water, Investing upfront
to create these healthier forests will pay dividends in the
long run by curbing the spiraling costs of state firefighting
and tree removal while building stronger recreational and
sporting economies . Shame on California, Agency needs to step
in an protect, Wildfire was not even in the GHG rules and
regulations as a cause of greenhouse gas emissions.. Agencies
need to re examine all emission reports. California should be
part of Cross-State Air Pollution Rule (CSAPR). Forests are
reaching a breaking point. Poor management policies that
interrupted the natural and historical cycle of fire. Needed
to change a culture focused almost solely on emergency
firefighting to one that supports long-term forest restoration
and management. Forests largely restored to the less crowded
natural conditions of through greater use of prescribed
burning to replace unilateral policies of fire suppression and
mechanical thinning to remove buildup of forest fuels, also
will improve wildlife habitat, enhance environmental quality
and add to the resilience of mountain landscapes, immediate
crisis is visible to anyone who recently has traveled in the
forest, where entire mountainsides are brown from wildfires
with dying and dead forests. Dead trees threaten public
safety. Rural homeowners are having to tap their life savings
to take down dead trees near homes and buildings. Government
agencies need to remove dead trees in National Forest, near
highways and other public infrastructure. Costs have risen
year by year to battle as catastrophic wildfires during a
lengthening fire season on millions of acres of the states
dense, overgrown forests. energy providers are budgeting
emergency funds to remove dead and dying trees near power
lines. Water districts are spending their reserves to remove
soils from reservoirs in the wake of catastrophic mountain
wildfires. symptoms of a larger problem of forest
mismanagement and neglect giving us a environmental disaster
and communities need to see encouraging developing consensus
around policy changes that will begin to resolve it. If forest
service does not take appropriate action soon, National forest
risk losing the priceless benefits provided by forests.

healthier, less overgrown forests that enhance watersheds and wildlife, reduce the scale of catastrophic wildfires. Need to provide immediate, emergency consequences of its long-neglected forests. Forest are overrun with fire-intolerant trees and thick carpets of forest fuels that can turn even the smallest camp fire or sparking power line into a raging firestorm. Spending heavily to remove hazard trees as a result wildfires is a must. The costs of long neglecting and mismanaging forests have become an unsustainable burden on national forests.  ★ ◎

**First Name:**              kljh  ◎

**Middle Name:**

**Last Name:**               yhgfd  ◎

**Mailing Address:**

**Mailing Address 2:**

**City:**                          ◎

**Country:**                     ◎

**State or Province:**           ◎

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**           ◎

**Government Agency Type:**

**Government Agency:**

**Cover Page:**                  📄

# Document Metadata:NOAA-NMFS-2018-0109-0010



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0011 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0010 |
| **Title:** | Comment from lpijh xsde |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 11/25/2018 |
| **Date Posted:** | 11/26/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/26/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-96rc-rkri |

**Page Count:**                 1

**Total Page Count**            1
**Including Attachments:**

# Submitter Info

**Comment:**          People placed global warming at the bottom of the list in
terms of our planets priorities in a poll which ranked the
worlds most pressing problems . Less than two percent of the
climate studies in the survey actually endorsed the so-called
consensus view that human activity is driving global warming
and some of the studies actually opposed that view.
Redistribute de facto the world's wealth by climate policy,
Setting up illusion that international climate policy is
environmental policy but in reality nothing to do with
environmental policy. Despite a manufactured consensus, the
elites and leaders continued to ignore any attempt to question
the orthodoxy of climate alarmism. Each such alarmist article
is larded with words such as if, might, could, probably,
perhaps, expected, projected or modeled - and many involve
such deep dreaming, or ignorance of scientific facts and
principles, that they are akin to nonsense. Global warming is
about power for billionaires and elite against the poor and
work class. Was never really about science or data or climate;
Man-made global warming is a powerful justification for a
massive expansion of government controls over human
activities. The United Nations sees global warming and the
nations ( many hate USA), that make up the UN, as the ticket
to attaining the power of a world government and control of
its money . That is why the UN doctors the reports of its
science panels. massive increase in government power would
mean is a dramatic loss of freedom and prosperity for average
working people the world over. Global warming regulation, in
fact, would involve a massive assault on the standard of
living of the middle class, particularly in America. Man-made
global warming is a hoax developed to serve powerful special
interests. historical and geological evidence exist indicating
extreme weather events have been occurring for hundreds,
thousands, or even millions of years. NOAAs data on sea level
rise from 2005-2012, Accordingly, at the current rate of sea
level rise, it would take approximately 25,000 years (around
the year 27013) for the oceans to reach Hansens 2006
prediction levels rather than something we expect to reach by
the year 2100. 2014 IPCC meeting : Surface temperature
reconstructions show, with high confidence, multi-decadal
periods during the Medieval Climate Anomaly (year 950 to 1250)
that were in some regions as warm as in the late 20th century.
( a Non industrial period with fewer Humans) 2014 IPCC
Thousands of cities are undertaking climate action plans, but
their aggregate impact on urban emissions is.. uncertain.
England ; Margert Thatcher; found climate science , has an
ugly anti-growth, anti-capitalistic, anti-American political
agenda had emerged around the issue. Anti-progress, ,
anti-poor is not the Answer to Humans on Earth, she called
Gores a doomist predictions. Albert Einstein When the number
of factors coming into play in a phenomenological complex is
too large scientific method in most cases fails. One need only
think of the weather, in which case the prediction even for a
few days ahead is impossible. Reporting doomsday story with

straight-faced , no one trusts the science anymore. There were dozens of theories. scientific literature from 1965 to 1979 found 7 articles predicting cooling and 44 predicting warming many other articles on climate made no prediction; Since Earth has not warmed for the past 15 years, we see the term global warming abandoned and replaced in its entirety by climate change This is an example of why no one trusts.1995 IPCC meeting There are inadequate data to determine whether consistent global changes in climate variability or weather extremes have occurred over the 20th century. to date it has not been possible to firmly establish a clear connection between these regional changes and human activities. Professor Judith Curry, chair of the School of Earth and Atmospheric Sciences concern that past climate models have not proven true. public debate seems to be moving away from the 15-17 year pause to the cooling since 2002.   ★⊙

**First Name:**            lpijh  ⊙

**Middle Name:**

**Last Name:**             xsde  ⊙

**Mailing Address:**

**Mailing Address 2:**

**City:**                       ⊙

**Country:**                  ⊙

**State or Province:**       ⊙

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**       ⊙

**Government Agency Type:**

**Government Agency:**

**Cover Page:**              [HTML]



Phone: (609) 884 - 7600  Fax: (609) 884 - 0664  lundsfish@lundsfish.com
997 Ocean Drive, Cape May, New Jersey 08204, U.S.A.
Email to: wreichle@lundsfish.com

November 19, 2018

Michael Pentony, Regional Administrator
National Marine Fisheries Service
55 Great Republic Drive
Gloucester, MA 01930; www.regulations.gov

**Industry Funded Monitoring (IFM) Amendment NOA – NOAA-NMFS – 2018-0109**

Dear Administrator Pentony:

On behalf of our family-owned seafood harvesting and processing company and the 200 plant
and vessel employees who assist us in producing sustainable seafood from the Atlantic Ocean,
thank you for the opportunity to comment on the Notice of Availability of the NEFMC IFM
Amendment.  We may provide additional comments prior to the end of the comment period on
the proposed rule, next month.

Much has changed since the Councils first initiated IFM amendments and this one, approved by
the NEFMC, has the potential to add an impossible financial burden on those herring vessels that
may survive the coming, required 70% reduction in catch that we understand will be imposed in
each of the next 3 fishing years.

For this reason and those outlined below, we ask that you set this amendment aside until at least
the end of the 2021 fishing year, or until a new benchmark assessment of the herring resource
takes place, in the hope that catches will increase in the future to a level to afford some level of
IFM in the herring fishery, if determined to be necessary.  In the meantime, consider allowing
the SBRM process to continue to allocate NEFOP observers, given the fishery's very low
bycatch rate and limited impact on bycatch species normally encountered.  A 50% observer
coverage target is excessive and statistically unnecessary in this fishery or, apparently, any other
under Council management and represents a waste of scarce agency and industry resources
particularly in a fishery with low bycatch rates as occur in the herring fishery.

We do appreciate the amendment allowing midwater trawl vessels to purchase fishery monitors,
rather than have no NEFOP observer available, if a vessel intends to access a Groundfish Closed
Area during a trip. We hope this can be accomplished through your discretion, rather than
through this amendment. We also appreciate the suggestion to use an EFP to further evaluate a
future EM and shoreside monitoring program, rather than proposing to implement such a
program at this time.  We know that a 'critical mass' of vessel participants would be needed to
fund such a combined program, however, which will likely now be lost for some time, with the
significant loss of fishing opportunities ahead for the fleet.  At this time, our company and our
fishermen prefer observers over cameras, if any additional monitoring is required in the future.

1

_0000017683

**Administrator Pentony on NEFMC IFM Amendment NOA; November 16, 2018**

As you know, a shoreside monitoring program has been operated by SMAST and MADMF for several years, with the financial support of the herring midwater trawl fleet through the purchase of Area 1A RSA fish, in recent years.  Prior to our knowledge of the coming, disastrous quota cuts in the fishery, we had been working with these researchers to continue the shoreside monitoring program through Calendar Year 2021, using Area 1A RSA funds.

Now that the RSA quota in Area 1A may either not be available (the Council has yet to make this decision for fishing years 2020 & 2021) or too small to be of value as a result of the quota cuts, some other source of funding is needed to keep this program alive, even for fishing year 2019.  Bycatch data CVs are very low in this program, and comparable if not lower than those in the observer program.  We believe its continuation should be our first regional priority.  We do not go to sea to dump fish, as I believe the EM pilot project demonstrated, so it would seem that shoreside monitoring, combined with SBRM coverage that can still be prioritized to some degree by the Councils, is the best combined investment in learning more about what is taking place in the fishery although we know the biological implications of the bycatch in this fishery is limited.

It is our understanding that EM grant funds may be coming into the region.  We suggest that those dollars be used in the herring fishery to support the ongoing shoreside monitoring program during the next 3 years and, as requested above, set this amendment aside, or disapprove it, with reconsideration at a future period, perhaps, when the fishery may return to its recent level of productivity and profitability.

Thank you for your attention to and your consideration of our comments and concerns.  Please don't hesitate to contact me if I can provide you with any additional information.

With best regards,

*Wayne Reichle*

Wayne Reichle
President
Lund's Fisheries, Inc.
Cape May, NJ 08204

_0000017684

# Document Metadata:NOAA-NMFS-2018-0109-0013



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment * |
| **Document File:** | [HTML] |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0014 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0013 |
| **Title:** | Comment from Matthew Walls |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 12/20/2018 * |
| **Date Posted:** | 12/20/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 12/20/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-977w-rwqz |

**Page Count:**                              1  ◎

**Total Page Count**                         1
**Including Attachments:**

# Submitter Info

**Comment:**                I agree with the increase in regulations as it will help keep
                            commercial fish from being overfished and becoming endangered.
                            Whatever we can do to keep species off of the endangered
                            species list should be done. As long as appropriate steps are
                            being taken to ensure that peoples jobs will not be threatened
                            by these new regulations.   *◎

**First Name:**             Matthew  ◎

**Middle Name:**

**Last Name:**              Walls  ◎

**Mailing Address:**

**Mailing Address 2:**

**City:**                                ◎

**Country:**                             ◎

**State or Province:**                   ◎

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**                   ◎

**Government Agency Type:**

**Government Agency:**

**Cover Page:**             📄

# *New England Purse Seiner's Alliance*

December 24th, 2018

Michael Pentony
Regional Administrator
55 Great Republic Drive
Gloucester, MA 01930

Re: Comments on the Proposed Rule for the IFM Amendment

Dear Mike,

We are writing today to comment on the Proposed Rule for the Industry-Funded Monitoring Amendment (IFM Amendment). The New England Purse Seiner's Alliance (NEPSA) is an industry group consisting of purse seine vessels that fish the inshore Gulf of Maine. Our vessels supply fresh herring exclusively to U.S. lobstermen during times of peak bait demand. We are long-time participants in the fishery and have a vested interest in the future health of the herring resource.

Our sole purpose for writing today is to strongly urge the agency to ensure that Category A purse seine vessels are allowed the choice to take part in the exempted herring fishing permit (EFP) project that will be used to implement the use of Electronic Monitoring (EM) in the herring fishery. There is no reason that the EFP should be limited to midwater trawl vessels. The fact that only midwater trawl vessels were allowed into the pilot project does not mean that seiners should be excluded from the EFP. There are many basic similarities between the actual vessels: both midwater trawlers and purse seiners are relatively large steel vessels, both use nets to harvest herring, and both use pumps to bring the fish aboard from nets alongside the vessel. While the scale of the vessels may be different, the lessons learned in the pilot project will apply just as effectively to EM use on purse seine vessels as on midwater trawl vessel. The bottom line is that if the pilot project showed promise for EM use on midwater trawl vessels than the same promise exists for EM use on purse seiners.

On the one hand, this issues is one of fairness. It is patently unfair for midwater trawl vessels to be given the choice to use EM without extending the same choice to purse seiners. Not only are cameras easier for vessel operators to use—they do not take up valuable space on deck and in the can, and they do not require the captains to deal with difficult logistics of acquiring a human at-sea monitor (ASM)—but they are likely to prove cheaper in the long run. This forces seiners to choose a more difficult and expensive option, despite the fact that the main impetus for the IFM Amendment was to increase monitoring on the midwater trawl fleet. In this sense, the seiners are being punished for no apparent reason. While we understand the reasoning for the pilot project only including midwater vessels, there is no doubt that many purse seine vessels would have

# *New England Purse Seiner's Alliance*

chosen to be in the pilot project had they known exclusion from the project would somehow hurt them in the future.

Additionally, the inclusion of purse seine vessels in the EFP will help ensure that the EM project succeeds in the end. NMFS has put a tremendous amount of time, money, and effort into crafting the foundation of an EM program in this fishery. But looking ahead, this entire EM program is in jeopardy due to the apparent lack of interest in the midwater trawl fishery. Allowing purse seine vessels to take part in the EFP will increase the participants and allow this critical program to succeed. Not only is it important to have a critical mass of vessels to let the program even exist, but there also needs to be enough boats involved to drive the per-vessel costs down to levels that make sense. For these and others reasons, it benefits all involved if purse seiners are allowed in if they choose.

The bottom line is that EM is the future of monitoring. NMFS has made a lot of good progress in making it a reality in the herring fishery and we commend the agency for its leadership on this front. But we hope the agency will find a way to give seiners the option to take part in this EFP moving forward so that the program can succeed and that all can benefit from it.

Thanks for your time and consideration,

Chris Weiner
NEPSA



# F/V Ocean Spray Partnership

Deake's Wharf
446 Commercial St.
Portland, ME 04101

December 18, 2018

Michael Pentony,
Regional Administrator, National Marine Fisheries Service
55 Great Republic Drive, Gloucester, MA 01930

Michael Pentony,

I am writing to provide comments on behalf of the F/V Providian. The F/V Providian fishes for Atlantic Herring throughout the range of the fishery using both midwater trawl and purse seine gear. The F/V Providian harvests herring for the lobster bait markets in Maine, New Hampshire and Massachusetts.

**New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment**

Considering the significant quota cut, this amendment needs to be put on hold until we can understand the full effect the cuts will have on the fishing industry. Boats are going to struggle just to stay in business. We cannot weather the added burden of paying for our own observers. The economic and environmental impact study was based on a much higher overall quota, not the pending significant reduction of quota predicted for the 2019-21 specification. The impact study needs to be reevaluated and updated to reflect current events before any decisions can be made on this amendment.

These cuts will also significant reduce the number of fishing trips. Hopefully allowing, agency observers to requirements associated with the Standardized Bycatch Reporting Methodology (SBRM).

Sincerely,

John-Paul Bilodeau
Regulations and Compliance




(207) 253-5626 Telephone     (207) 253-5622 Fax     jp@fvprovidian.net

_0000017689

 

(207) 253-5626 Telephone          (207) 253-5622 Fax          jp@fvprovidian.net

_0000017690

# Document Metadata: NOAA-NMFS-2018-0109-0019



## Document Details

**Docket ID:** NOAA-NMFS-2018-0109

**Docket Title:** New England Industry-Funded Monitoring Omnibus Amendment *

**Document File:**

**Docket Phase:** Proposed Rule

**Phase Sequence:** 1

**RIN:** 0648-BG91

**Original Document ID:** NOAA-NMFS-2018-0109-DRAFT-0020

**Current Document ID:** NOAA-NMFS-2018-0109-0019

**Title:** Comment from Mary Beth Tooley

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS *

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2018-0109-0002

**Comment on Document Title:** Fisheries of the Northeastern United States: Industry-Funded Monitoring

**Status:** Posted

**Received Date:** 12/24/2018 *

**Date Posted:** 01/30/2019

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1 *

## Document Optional Details

**Status Set Date:** 01/30/2019

**Current Assignee:** NA

**Status Set By:** Nordeen, Carrie (NOAA)

**DOC Docket No.:**

**XRIN:**

**Tracking Number:** 1k2-97al-qs0t

**Page Count:**                              1

**Total Page Count**                         1
**Including Attachments:**

# Submitter Info

**Comment:**                    Michael Pentony, Regional Administrator National Marine
                                Fisheries Service 55 Great Republic Drive Gloucester, MA 01930
                                December 24, 2018 Re: Comments on the Proposed Rule for the
                                Industry- Funded Monitoring Amendment Dear Mr. Pentony: I am
                                writing on behalf of the OHara Corporation, which operates the
                                Atlantic herring F/V vessels Starlight and Sunlight, on the
                                Proposed Rule for the Industry-Funded Monitoring Amendment
                                that would implement a process to standardize future
                                industry-funded monitoring programs in New England Council
                                fishery management plans and industry- funded monitoring in
                                the Atlantic herring fishery. It has come to my attention that
                                the Secretary of Commerce has approved this amendment prior to
                                the closing of the Public Comment period. It is disappointing
                                to see the process proceed in this manner. How are public
                                comments considered when the amendment has already been
                                approved? As such, I will limit my comment to the intended
                                date of implementation. As you are aware, the Atlantic herring
                                fishery is facing a significant cute in quota in the near
                                term. Few, if any herring fishermen will be operating
                                profitable businesses. I am requesting that the date of
                                implementation be delayed until 2021. If herring fishermen do
                                not have enough income to pay the mortgage, they certainly
                                will have not funds for a monitoring program. Thank you for
                                the opportunity to comment, Mary Beth Tooley   *

**First Name:**                 Mary Beth

**Middle Name:**

**Last Name:**                  Tooley

**Mailing Address:**            120 Tillson Ave

**Mailing Address 2:**

**City:**                       Rockland

**Country:**                    United States

**State or Province:**          Maine

**ZIP/Postal Code:**            04841

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Government Agency Type:**

**Government Agency:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2018-0109-0011



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0012 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0011 |
| **Title:** | Comment from Patrick Byrne |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 12/07/2018 |
| **Date Posted:** | 12/10/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 12/10/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-96z7-tl7t |

| | |
|---|---|
| **Page Count:** | 1 🔄 |
| **Total Page Count Including Attachments:** | 1 |

# Submitter Info

**Comment:** To whom it may concern: I am writing today in support of 50 CFR Part 648, or the New England Industry-Funded Monitoring Omnibus Amendment. I believe that monitoring actions are necessary to perpetuate the accurate fulfillment of sustainable fishery management plans (FMPs). This has become even more vital as of late, as the combination of climate change and past overfishing have led to depletion of fish stocks in North Atlantic fisheries, fisheries which are a key part of the economy of coastal New England. The past several years have shown a decline in the catches of many common fish species, including cod, herring, and flounder. Besides the obvious ecological nature of this problem, this also hurts fishing communities in the Northeast US. As such, it is critical that FMPs be created with a high degree of nuance, having the least ecological impact possible while still providing sufficient economic support to local fishing industries. However, nuance in planning is meaningless without the ability to execute the same degree of nuance in the field. The ecological and economic models used to develop the FMPs will only be as accurate as the data they are given. Increased monitoring of catches is therefore necessary to improve the quality and quantity of the data for these models. Additionally, having this modeling be industry funded makes sense. Doing so will free up federal funding for other sectors of this industry that may need it more and will be more difficult to pre-allocate funding, such as economic support of the industry in years of reduced catch. Finally, standardizing the process by which industry-funded monitoring agreements may be created is sound logic. Doing so will ensure a fairer playing field in a competitive industry, and the interdependent nature of marine systems highlights the importance of correct fishing practices across a range of geographic locations. My only reservation about this proposed amendment is the cost to industry. While having industry input in the development of an industry-funded monitoring program stands a higher chance of optimal allocation of funding, care should be taken to not overburden an already struggling industry. For example, the proposed plan for the Atlantic herring fishery affects 66 businesses, all but four of which are small entities. As such, it is a responsible aspect of the proposed rule that the industry-funded monitoring programs be implemented via amendment to the relevant FMP to allow for public notice and comment during their development, and I urge that public input be carefully considered at the time to best protect the industry.  ★🔄

**First Name:** Patrick  🔄

**Middle Name:**

**Last Name:** Byrne  🔄

**Mailing Address:**

_0000017695

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Government Agency Type:**

**Government Agency:**

**Cover Page:**

# Document Metadata:NOAA-NMFS-2018-0109-0017



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment ✱ |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0018 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0017 |
| **Title:** | Comment from russ stoller |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS ✱ |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 12/24/2018 ✱ |
| **Date Posted:** | 01/30/2019 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 ✱ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 01/30/2019 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-97ag-j07n |

| | |
|---|---|
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | I support this proposed rule as I believe it would be a good thing to increase the accuracy of fish count estimates. * |
| **First Name:** | russ |
| **Middle Name:** | |
| **Last Name:** | stoller |
| **Mailing Address:** | 15906 cedar circle |
| **Mailing Address 2:** | |
| **City:** | omaha |
| **Country:** | United States |
| **State or Province:** | Nebraska |
| **ZIP/Postal Code:** | 68130 |
| **Email Address:** | treeman14@hotmail.com |
| **Phone Number:** | 0208803938 |
| **Fax Number:** | |
| **Organization Name:** | |
| **Government Agency Type:** | |
| **Government Agency:** | |
| **Cover Page:** | |



**Seafreeze Ltd.**

November 4, 2016

**100 Davisville Pier**
**North Kingstown, R.I. 02852 U.S.A.**
**Tel: (401)295-2585**

### Re: Comments on Industry-Funded Monitoring Omnibus Amendment Public Hearing Document September 2016

1. **Omnibus Alternatives**.

According to the document, the purpose of this omnibus amendment is to "allow the NEFMC and MAFMC to develop industry funded monitoring programs for the collection of information in addition to SBRM", because the "amount of available Federal funding to support additional monitoring" has been a constraint in the past and "this action is needed for the Councils to prioritize industry-funded monitoring programs across fishery management plans when available Federal funding falls short of the total needed to fully fund all monitoring programs." (Page 5). Discussions surrounding this document have highlighted the desire by Councils and other groups for more collection of management-related and even scientific information, as well as information related to enforcement of management measures and regulations. We do not agree that programs for collection of information or monitoring/enforcement of regulations are a cost that should be financially borne by industry, particularly when the Federal government is at a loss for finances to do so.

The Magnuson Stevens Act (MSA) specifically addresses the purpose/need for the amendment as specified on page 5 of the public information document "for the collection of information in addition to SBRM". Section 402 of the Act,"Information Collection", reads as follows:
    (a) COLLECTION PROGRAMS.-
        (1) COUNCIL REQUESTS.- If a Council determines that additional information would be beneficial for developing, implementing, or revising a fishery management plan….the Council may request that the Secretary implement an information collection program which would provide the types of information specified by the Council……
        (2) SECRETARIAL INITIATION.-If the Secretary determines that additional information is necessary for developing, implementing, revising **or monitoring** a fishery management plan…the Secretary may, by regulation, **implement an information collection or observer program requiring submission of such additional information for the fishery."** (emphasis ours).

Therefore, the MSA is clear how additional Council desired information collection programs for fishery management plans, including monitoring or observer programs, are to be implemented. Section 402(d) details how the Secretary may provide grants, contracts, or other financial assistance for the purposes of carrying out information collection programs. Should the Council or NMFS wish to see observers involved in the "collection of information in addition to

1

_0000017699

SBRM" (page 5), evident considering that IFM documents prepared during the development of this amendment provided breakdowns of monitor/observer training costs sought to be shared between the agency and the industry,[1] the MSA also provides for sharing of observer training costs, but not with industry. Section 403 OBSERVERS reads as follows:

> (b)  TRAINING.- The Secretary, in cooperation with the appropriate states and the National Sea Grant College Program, shall- ....
>
> > (3)  make use of university and any appropriate private nonprofit organization training facilities and resources, where possible, in carrying out this subsection.

Therefore, it appears that universities or nonprofit organizations concerned with specific observer data collection in an FMP may share cost responsibilities of observer training for those programs or observer information collection programs. However, the section says nothing about industry sharing these costs.

Furthermore, management bodies are continually searching for more and better information, and public pressure can and will direct their searches both in magnitude and specificity. In fact, the initial basis for this amendment- the herring and mackerel alternatives- were created in response to various special interest groups and allegations with regards to those fisheries resulting from what was described at a Joint Observer/Herring Committee Meeting on July 1, 2015 as a "public perception problem". At that meeting, the Joint Committees approved a motion recommending that the problem statement for the herring and mackerel components of the IFM amendment be: "The public questions the accuracy of catch (landings and discards) estimates in the fishery....".[2] Private individuals should not be required to foot the bill to address a public perception problem. This is inequitable, and leaves the door open for uninformed public media campaigns to pressure Councils into forcing fishing vessels to pay for all publicly desired information in the future at personal financial loss. Public funds should be used for public purposes. However, as previously mentioned, the MSA does allow for observer training costs to be shared with universities and non-profit organizations should those organizations desire to make facilities and resources available for so doing.

Because the amendment does not address or acknowledge any of these issues, we can only support Omnibus Alternative 1, No Action.

2.  **Herring Alternatives**.

Two of the major goals and objectives identified by the NEFMC for increasing monitoring in the herring fishery are "accurate catch estimates for incidental species for which catch caps apply", and "affordable monitoring for the herring fishery". The catch cap species being discussed with relation to small mesh bottom trawl vessels, which include our vessels, are river herring and shad. According to analysis of small mesh bottom trawl observer data (all fisheries), approximately 5%-22% coverage is needed to obtain a 30% CV for river herring and shad catch in that gear type.[3] These coverage levels are

---

[1] See Industry Funded Monitoring Omnibus Amendment July 1, 2015 Discussion Document Appendix, http://s3.amazonaws.com/nefmc/150701-Discussion-Document-Appendix.pdf, page 10-11, which lists NMFS annual training costs for monitors and a cost per observed sea day of $61 per day to industry vessels for training.
[2] See http://s3.amazonaws.com/nefmc.org/7_July-1-final-mtg-summary-observer_herring.pdf.
[3] Industry Funded Monitoring Omnibus Amendment Discussion Document, Mackerel Alternatives, Mid Atlantic Fishery Management Council, April 12-14, 2016. See

2

_0000017700

already being covered by SBRM[4] and the associated CV is already below 30%. In fact the small mesh bottom trawl herring fishery RH/S catch cap CV was 28.4% in 2014, and 24.5% in 2015.[5] Additionally, due to the fact that the small mesh bottom trawl fleet includes vessels with permits other than A and B permits, which are targeted by this amendment, the herring alternatives presented would never achieve a 0% CV, even at 100% coverage rates (which is why even 100% observer coverage on small mesh bottom trawl would only have a "Low Positive" on tracking catch caps)[6]. Even staff documents developed during this amendment process have indicated that even <u>up to 100% ASM coverage on small mesh bottom trawl, will have "Negligible" effect on catch tracked against catch caps.[7] But it will not have a negligible economic effect, on small mesh bottom trawl vessels in general but particularly Seafreeze vessels.</u>

Coverage target considerations, according to the development of this amendment, should ensure that <u>"Benefits of increased monitoring should equal or outweigh the costs of monitoring"</u>.[8] However, the amendment does not consider the <u>daily catch capacity of vessels</u> in its analysis or alternatives. Small mesh bottom trawl vessels, including Seafreeze vessels, are limited in daily harvesting capacity compared to other herring fishery gear types. <u>Therefore, the daily financial burden on smaller capacity vessels is higher than on large capacity vessels</u>. We have repeatedly raised this issue with the Councils.[9] The "Negligible" benefits of potential additional catch cap tracking <u>do not</u> <u>outweigh</u> the costs of monitoring for our lesser-daily-capacity small mesh bottom trawl vessels.

None of the additional monitoring alternatives in the document provide for "affordable monitoring for the herring fishery", <u>especially Seafreeze vessels.</u> Our vessels do not operate solely in the herring/mackerel fisheries; we have multiple permits. We do not always know what species will be available when we leave the dock, so we complete the regulatory call in/declaration process for all appropriate fisheries. We do not fish like other "herring" vessels. If the availability of one species changes, or is not what we had anticipated, we then have the flexibility to cover our operating costs by switching over to a different species.  Because our vessels freeze at sea and have limited daily capacity, our trips are also of extended duration, so <u>any daily at sea monitoring costs would impact us disproportionately to all  other herring vessels.</u>

To demonstrate this dynamic, several trips are highlighted below. Pre-trip declaration combined with length of trip is what will determine coverage and cost, not herring landed.

---

https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/56fec92c04426225f77234f4/1459538223368/Tab02_MSB-RHS-Committees.pdf, page 28.

[4] According to the Herring PDT Meeting Summary Dec 10, 2015, revised Jan 15, 2016, in 2014 observers covered 26.2% of all small mesh bottom trawl trips targeting herring, and preliminary estimates indicated 31% coverage on trips from January-June 2015. See http://s3.amazonaws.com/nefmc.org/3.151210-Herring-PDT-mtg-summary-REVISED.pdf.

[5] Industry Funded Monitoring Amendment Document, Mid Atlantic Fishery Management Council, May 2016. See https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57504cae746fb9ccc234ba75/1464880308912/Tab09_IFM-Amendment.pdf, page 88.

[6] See http://s3.amazonaws.com/nefmc.org/3D_Staff-Presentation-on-Herring-Alternatives.pdf, slide 35.

[7] Ibid.

[8] Ibid, slide 38.

[9] See for example, our letter to the Councils at https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/551edc4ae4b0576112dc4bf3/1428085834669/Tab+06_Industry+Funded+Observer+Amendment.pdf and http://s3.amazonaws.com/nefmc.org/5.-Council-Letter-Observer-Concerns.Seafreeze.pdf.

_0000017701

For example, on this 10 day trip below, our primary pre-trip declaration was herring, but the trip consists of no herring and is primarily loligo squid. A per day monitoring cost would be very expensive on a trip of that length. And all of the cost would be borne by squid revenue. This is not unusual. The following 5 day trip was also a declared "herring" trip, but landed no herring. These types of "herring" trips, if they were to incur an at sea monitoring cost would have to be paid for not by herring revenue, but other revenue:

1/15/14-1/24/14; 10 Days
Bluefish - .03%
Butterfish - .36%
Loligo - 97.67%
Illex - 1.45%

12/20/14-12/24/14; 5 Days (Shortened trip because of Christmas)
Butterfish - 88.92%
Loligo - 11.08%

Conversely, we have trips where we expect to find other species but do not, therefore relying on the flexibility to catch herring as a way to cover our costs.  For example, these two trips, during which the primary pre-trip declaration was squid, herring was the primary species landed:

12/11/14-12/18/14; 8 Days
Herring - 100%

12/27/14-1/3/15; 8 Days
Butterfish - 1.2%
Mackerel - .26%
Herring - 98.1%
Loligo - .44%

Sub Option 5 would exempt trips landing less than 25 mt from industry funded monitoring requirements, and has been suggested at meetings of a way to address this issue. However, that option will still not account for the fact that the decision whether or not to catch more significant amounts herring will still need to be made prior to leaving the dock. As the information above demonstrates, our primary declaration/intent is not always what determines what species our vessels land, which is why we ensure that we appropriately declare into all possible fisheries in order to maintain flexibility of operations. If that flexibility were taken away, not only would our entire style of fishing would be nullified, but could result in the above trips losing rather than making money.  A 25 mt landing will not cover the cost of an 8 day trip.

Pages 301-302 of the EA (attached) illustrate this dynamic. Out of declared herring days in 2014 that did not land herring, 111 are attributed to small mesh bottom trawl, as compared to only 6 single midwater trawl and 4 paired midwater trawl. That would be 111 days of industry funded monitoring on small mesh bottom trawl vessels that would have to be covered by income from other fisheries. Small mesh bottom trawl costs for declared herring trips not landing herring range from $90,586 compared to $3,212 at paired midwater trawl and $5,217 at single midwater trawl for the same monitoring option. This is a function of the type of fishing style described above. Industry funded monitoring costs in this amendment are significantly heavier on small mesh bottom trawl vessels than other vessel types. This is

4

combined with the fact that even on declared herring trips landing herring, small mesh bottom trawl (i.e. "squid" vessels), have a 7% RTO compared to typical "herring and mackerel" vessels, which have a 15% RTO (page 299 of the EA ,attached). This is also a function of what has been previously mentioned due to daily capacity. Even at 25% ASM coverage, the cheapest cost estimate for small mesh bottom trawl, there is still a $19,657 annual cost burden for trips that do not even land herring. This amendment is about the erosion of profitability for our vessels.

The herring and mackerel alternatives in the IFM amendment were primarily initiated to address low observer coverage in the midwater trawl herring fishery due to changes with SBRM. It was not to make an entire style of fishing economically or operationally nonviable.  It is also not equitable that revenue from other fisheries be siphoned off to pay for herring/mackerel monitoring. If our vessels are required to pay for a per day monitoring cost, we could be required to raise the prices on all our products to cover that expenditure.  Compounding that, we compete on and against a world market with all of our products, including herring. All of our products are food grade, which means that we have developed and rely on markets that solicit international competition. We are also competing price-wise with companies and vessels from nations where the fishing industry is subsidized by their national government. If forced to raise our prices to pay for an IFM cost, Seafreeze, as well as the United States, will be put at a competitive disadvantage internationally. If we do not increase our prices and the cost were to be paid for by the vessels and crew, the per day monitoring cost may outweigh daily crew compensation, and crews would be forced to pay for "benefits (vacation and sick leave)"[10] afforded to observers that crew themselves do not receive, all while receiving a smaller paycheck. This is inequitable.

Regardless, the industry funded monitoring amendment saddles Seafreeze vessels in particular with more economic harm than any other "herring" vessels due to the nature of our operations. This is unacceptable. Therefore, the only alternatives that we can support would be Alternative 1, No Action, or Alternatives 2.4-2.6, which would keep our vessels at SBRM coverage.

3. **Mackerel Alternatives**.

All of the comments above pertaining to the herring alternatives also apply to the mackerel alternatives. However, mackerel itself deserves special comment. The current state of the mackerel fishery is less of a directed fishery than in years past. Requiring an industry funded monitoring requirement for mackerel will discourage any directed fishing, including looking for mackerel on any part of a trip fishing for other species. The cost for monitors would without a doubt outweigh the benefits of any coverage in this fishery at this time. Many vessels at this time catch mackerel as an incidental species in the herring fishery, and herring fishery coverage would therefore cover these trips. However, Seafreeze vessels occasionally target mackerel on trips of squid or butterfish. See for example, the composition of these trips:

2/17/14-2/27/14; 11 Days
Butterfish- 72.55%
Mackerel - 27.32%
Loligo - .13%

3/4/14-3/12/14; 9 Days

---

[10] See http://s3.amazonaws.com/nefmc.org/150701-Discussion-Document-Appendix.pdf, page 11.

5

Butterfish- 8.72%
Mackerel - 23.03%
Loligo - 67.97%
Illex - .25%

The trips are of extended duration, which would require considerable cost to the vessels, and the monitoring cost would undoubtedly need to be covered from revenue other than mackerel. Due to the sporadic/diminished state of the mackerel fishery, a requirement to pay for monitoring would discourage trips like these, and would therefore essentially reduce the mackerel fishery to a bycatch fishery in the herring fishery only. This cannot be consistent with the requirement to achieve optimum yield.

Therefore, for the reasons above as well as those detailed for the herring alternatives, we can only support Mackerel Alternative 1, No Action.

4. **Outstanding Issues**.

There are still several outstanding issues associated with this amendment:

A. <u>ASM</u>: At its June 2015 meeting, the NEFMC voted 13/2/2 to "evaluate the ASM program for its effectiveness in support of stock assessments, its total costs to the groundfish fishery (e.g. returns to owner vs ASM costs), data precision and accuracy, and whether it is actually ensuring catch accountability."[11] This was due to concerns raised at both the Groundfish Committee and Council levels of the cost/benefit of the program, the quality of the data produced, the utility and effectiveness of the program. [12] While these motions pertained to the groundfish ASM program, this is all the industry has to compare any future ASM programs to. This evaluation has never been completed, but the Councils are seeking to expand the program to other fisheries. All evaluations should be completed prior to a future action concerning ASM.

B. <u>Unforeseen circumstances/Industry Profitability</u>: The IFM amendment does not take into account any changes in fishery profitability over time, and industry's future ability to afford IFM. Sub Option 4 allows the Councils to examine the results of increased herring/mackerel coverage two years after implementation, and allows adjustments via framework or amendment. However, it does not specifically state that industry's ability to pay should be a driving factor in industry funded monitoring programs. Although costs to industry as a result of the groundfish ASM program represented a large portion of total revenue of the fishery, causing significant numbers of vessels to become unprofitable or face bankruptcy,[13] and although the Council voted subsequently to request emergency action of NMFS to suspend the groundfish ASM program,[14] this request was rejected by the agency. There is no safeguard for industry in the IFM amendment document to ensure a similar situation would not occur with future industry funded monitoring programs. There is only assurance that the programs would not be activated if the agency did not have the finances for its administration costs. This is unacceptable. It is also something that would not occur should the Councils follow the Magnuson Stevens Act requirements for Information Collection Programs.

---

[11] See http://s3.amazonaws.com/nefmc.org/150615-18_final_motions2.pdf.

[12] See http://s3.amazonaws.com/nefmc.org/11_150604_GF_CTE_Draft_Summary-2.pdf.

[13] Ibid.

[14] See http://s3.amazonaws.com/nefmc.org/150615-18_final_motions2.pdf

_0000017704

C.  Equality of Trip Selection:  The IFM document contains no provisions to ensure equal allocation of observer or monitoring coverage among vessels. This would result in certain vessels being required to individually pay for monitoring costs for the whole fleet's coverage target. For example, below is a log detailing how one Seafreeze vessel received 50% observer coverage for the herring/mackerel fishing year, while the fleet as a whole had a much lower average of coverage:

**Observer Coverage for Herring/Mackerel Season, Nov. 2014-April 2015, F/V Relentless**

Trip 655 11/21/14-11/25/14; Observer (forced to come in in middle of trip for weather/mechanical problems, but did not offload; counts as one trip for dealer report; counts as two trips for NEFOP purposes)

Trip 656 11/28/14-12/8/14; Observer

Trip 657 12/12/14-12/18/14; No Observer

Trip 658 12/21/14-12/24/14; Observer

Trip 659 12/27/14- 1/3/15; No Observer

Trip 660 (660 A) 1/10/15-1/13/15; Observer (For trip 660, weather problems, had to come to dock, but did not offload; counts as one trip for dealer report; counts as multiple trips for NEFOP purposes)

Trip (660 B) 1/19/15-1/24/15; Observer

Trip (660 C) 1/28/15-2/8/15; No Observer

Trip 661 2/16/15-2/24/15; No Observer

Trip 662 3/6/15-3/17/15; No Observer

Trip 663 3/21/15-3/30/15; No Observer

Trip 664 4/4/15-4/15/15; Observer

Should this occur under an industry funded monitoring program, our vessel would have been significantly and unfairly burdened with costs that other vessels were not.

D.  Discrepancies in Coverage Calculation: The IFM document does not detail how coverage would be calculated. After observing discrepancies in various Council documents as to the level of observer coverage on catch cap trips in 2014 on small mesh bottom trawl vessels,[15] we discovered that coverage levels can be calculated in multiple ways. The amendment does not specify how IFM coverage would be calculated, and therefore we have not been given the opportunity to comment effectively, and the Council has not been given the opportunity to effectively discuss or weigh the options presented.

E.  Limited Public Input: Due to the fact that the initial focus of this amendment was herring and mackerel, the majority of public input has only been through those venues. No other Council Advisory Panels, which are bodies designed to give industry input to the Councils and Committees, were given opportunities to discuss the Omnibus portions of the amendment, and public hearings were not held south of New Jersey, although the Omnibus has the potential to apply to every FMP in the Greater Atlantic Region.

---

[15] According to the Herring PDT Meeting Summary Dec 10, 2015, revised Jan 15, 2016, in 2014 observers covered approximately 26 % of herring catch cap trips; see http://s3.amazonaws.com/nefmc.org/3.151210-Herring-PDT-mtg-summary-REVISED.pdf. However, similar analysis in the MAFMC Supplement to IFM Draft Environmental Assessment document, the same coverage was calculated to be approximately 17%; see https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57504cae746fb9ccc234ba75/14648803089 12/Tab09_IFM-Amendment.pdf, page 88. Upon further investigation, this was discovered to be due to differences in calculation parameters.

7

_0000017705

Thank you for the opportunity to comment.

Sincerely,
Meghan Lapp
Fisheries Liaison, Seafreeze Ltd.

_0000017706

TABLE 95. SUMMARY OF TOTAL TRIP COSTS FOR HERRING AND MACKEREL VESSELS IN 2014

| Cost Category | Description | Average Percent of 2014 Gross Revenue for Herring and Mackerel Vessels | Average Percent of 2014 Gross Revenue for Squid Vessels |
|---|---|---|---|
| Variable Costs | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| Crew Share | Total annual payments to crew | 28% | 26% |
| Repair, Maintenance, Upgrades, Haulout (RMUH) | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, safety equipment, upgrades and haulout. Because these costs vary considerably from year to year and are typically spread out over several years, only a portion of these costs were applied to 2014 revenue | 13% | 11% |
| Fixed Costs | Annual mooring, dockage, permits and licenses, insurance, quota and DAS lease, crew benefits, vessel monitoring, workshop and storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs Note: depreciation expense of the vessel is not included in fixed costs. | 19% | 21% |
| Return to Owner | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

The NEFMC is considering four types of industry-funded monitoring for the herring fishery, including NEFOP-level observers, at-sea monitors, EM, and portside sampling coverage. NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

_0000017707

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811,000 to $75,000 – a 91% reduction. However, Herring Alternative 2.5 only provides increased monitoring in the Groundfish Closed Areas.

Initial industry cost assumptions for Herring Alternative 2.4 estimated $325 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected for the duration of the trip, 100% vide review) and $5.12 per mt for portside sampling (administration and sampling cost) on close to 100% of trips.  Revised industry cost assumptions for Herring Alternative 2.4 estimated $187 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected around haulback, 50% video review) and $3.84 per mt for portside sampling (only sampling costs) on close to 50% of trips.  Using the revised cost assumptions rather than the initial cost assumption for Herring Alternative 2.4 reduces total industry monitoring costs by 51% ($457,595 to $222,958) in Year 2 for paired midwater trawl vessels and reduces costs by 54% ($134,165 to $61,067) in Year 2 for single midwater trawl vessels.

Many of the vessels that would be impacted by industry-funded monitoring costs in the herring fishery would also be impacted by industry-funded monitoring costs in the mackerel fishery.  For example, all the vessels impacted by Herring Alternative 2.1 would also be impacted by Mackerel Alternative 2.1.

A trip must be a declared herring trip in order to land 1 lb or more of herring.  The economic analysis focused on trips that landed 1 lb or more of herring because those are the trips that would be subject to industry-funded monitoring.  However, industry participants also requested consideration of the economic impacts associated with declared herring trips that did not land any herring.

In 2014, there were 121 sea days for 22 trips that had no herring landings.  If 100% NEFOP-level observer coverage was required on those trips, then $98,978 would have been spent monitoring those trips.  If 100% at-sea monitoring coverage was required on those trips, then $85,910 would have been spent monitoring those trips.  The breakdowns of these costs by gear type as well as other coverage levels and monitoring types are provided in Table 96.

TABLE 96. MONITORING COSTS ASSOCIATED WITH DECLARED HERRING TRIPS THAT DID NOT LAND HERRING IN 2014.

|  | Small Mesh Bottom Trawl | Single Midwater Trawl | Paired Midwater Trawl | Total |
|---|---|---|---|---|
| Permit Category | A | A | A |  |
| Total Number of Days | 111 | 6 | 4 | 121 |
| Total NEFOP Cost – 100% Coverage | $90,586 | $5,217 | $3,212 | $99,015 |
| Total ASM Cost – | $78,626 | $4,528 | $2,788 | $85,943 |

_0000017708

| 100% Coverage | | | | |
|---|---|---|---|---|
| Total ASM Cost – 75% Coverage | $58,970 | $3,396 | $2,091 | $64,457 |
| Total ASM Cost – 50% Coverage | $39,313 | $2,264 | $1,394 | $42,971 |
| Total ASM Cost – 25% Coverage | $19,657 | $1,132 | $697 | $21,486 |
| Total EM Cost, Year 2 – $325 per day | | $2,073 | $1,276 | $3,349 |
| Total EM Cost, Year 2 – $187 per day | | $1,193 | $734 | $1,927 |

The tables and box plots on the following pages provide summarized economic data for each of the herring coverage target alternatives. The economic impact on vessels associated with paying for monitoring coverage is described as a percentage of RTO for each herring coverage target alternative in the following figures. The tables provide the mean and median number of sea days per vessel that would result from each of the alternatives, as well as the mean and median RTO that would ultimately be reduced by the industry-funded monitoring costs. Additionally, fleet level effort, revenue, and monitoring cost information for each herring coverage target alternative are also provided. Additional economic analysis is available in Appendix 8.

### 4.2.5.1  Impacts of Herring Alternatives 1 and 2 on Fishery-Related Businesses

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP. Monitoring for herring vessels would be allocated according to SBRM. If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis. Under Herring Alternative 1, additional costs to vessels participating in the herring fishery associated with monitoring coverage, if there were any, would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-by-FMP basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 will not likely affect the setting of

_0000017709



**Seafreeze Ltd.**

December 24, 2018

**100 Davisville Pier**
**North Kingstown, R.I. 02852 U.S.A.**
**Tel: (401)295-2585**

**Comments on NOAA-NMFS-2018-0109**

1. **Omnibus Alternatives**

    **a.** As the Proposed Rule notes, the Omnibus amendment was a joint amendment initiated by both the New England And Mid Atlantic Fishery Management Councils. The entire development of the Omnibus portion of the amendment was joint between both Councils. We, as well as others in the industry, were led to believe that identical action on this portion of the amendment needed to be taken by both Councils in order to go forward. We were surprised that, without that possibility being made clear to the public, the Omnibus section was announced as part of this Proposed Rule.

    As a joint amendment, both Councils would be required to take the same course of action. The significant overlap of permits of species managed by both the New England and Mid Atlantic on the same vessels which operate in the Greater Atlantic Region make this issue of utmost importance. We are unaware of any other regions whose vessels experience this significant an overlap between Councils, managed species and associated permits. In the GARFO region, 3,673 vessels hold both MAFMC and NEFMC commercial permits, compared to 111 vessel who only hold a MAFMC commercial permit and 1, 585 vessels which hold only a NEFMC commercial permit..[1] By moving forward with New England Omnibus alternatives alone, we foresee that, although the Mid Atlantic Council chose not to move forward with the joint amendment, Mid Atlantic fisheries may be forced into industry funded monitoring by default, should vessels be engaged in multiple New England/Mid Atlantic fisheries on the same trip. This, in fact, is the very reason why an undue and disproportionate burden is placed on Seafreeze vessels alone as part of the Herring Alternatives. No analysis nor even discussion took place during development of the amendment regarding the potential crossovers should one Council choose to move forward with the Omnibus portion of the Amendment and one Council decline to move forward. Considering that one of the central points of discussion and action in the Mid Atlantic Council's April 2017 meeting was the question of Mid Atlantic managed fisheries being able to sustain the costs of industry funded monitoring, we believe that the Omnibus portion of the Proposed Rule should be disapproved.

    Amendment documents state that "there are no direct impacts on….fishery-related businesses and human communities associated with the preferred Omnibus Alternatives because they are administrative, specifying a process to develop and administer future industry-

---

[1] See https://s3.amazonaws.com/nefmc.org/10_NEFMC-FDDI-update-2018-12.pdf, slide 11.

_0000017710

funded monitoring " .[2] We disagree.  As clearly delineated, the future foreseeable impact of an IFM Omnibus amendment is future IFM programs, which is in fact the intent of the action. We understand that specific impacts cannot be quantified at this time; however, from a business perspective a "greasing of the skids" of IFM programs initiates uncertainty for the future and business plans moving forward. We also disagree with the EA assertions that standardized IFM requirements have any type of positive impacts on the fishing industry. While we understand that even in the absence of action, the Council has the ability to initiate IFM programs in the fisheries that it manages, the Omnibus Alternatives chosen indicate a clear path of intent. No IFM program has positive benefits on the fishing industry. In fact, the impacts of every Herring IFM Alternative in the amendment other than No Action are "Negative" for fishery-related businesses and communities.[3] This will be the same for any future IFM program.

**b.** We disagree with NMFS that there is any substantive difference between "cost-sharing agreements" with NMFS for monitoring and direct payment of such monitoring.[4] Both require the fishing industry to pay for data collection used for monitoring and management, which is inherently a government function, except where legislatively exempted by the Magnuson Stevens Act in the case of limited access privilege programs.[5] Only in this specific legislative exemption is the fishing industry responsible for "data collection", or "costs related to …management [and] data collection" which is the express purpose of the Omnibus Amendment. According to the amendment's purpose and need, it was developed "for the collection of information"[6] for management.  There is no difference between "data collection" per the Magnuson Act and "collection of information" per the Omnibus Amendment. For fishery management plans that do not specifically fall under the limited access privilege program exemption, The Magnuson Stevens Act specifically provides for "Information Collection" programs which can be initiated at the request of a Fishery Management Council, upon Secretarial approval, for "monitoring a fishery management plan" which may by regulation "implement an information collection or observer program requiring submission of such additional information for the fishery."[7] Congress would not have had to create these specific legislative exemptions and provisions if the agency were given blanket authority to extract costs for data collection, monitoring and management from the fishing industry across all fishery management plans.

Additionally, for those exemptions created by Congress, there is a specified cap on costs that can be required of the fishing industry, to ensure industry economic viability. According to Section 304(d)(2)(B), the fees which industry can be required to pay cannot exceed 3% of ex-vessel revenue. This is critically important, as even in full cost recovery, the requirements for data collection for monitoring and management cannot be allowed to become so burdensome

---

[2] Draft EA for IFM Amendment, p. vii; at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf.
[3] See page 308-309
[4] See https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf, p. 37-38.
[5] MSA Section 303A (9)(e). "program of fees paid by limited access privilege holders that will cover the costs of…data collection… See also Section 304(d)(2)(A) "the Secretary is authorized and shall collect a fee to recover the actual **costs related to the management, data collection**, and enforcement of any- (i) limited access privilege program"
[6] See Draft EA, p. 46.
[7] MSA Section 402(a).

on the fishing industry that it becomes financially infeasible to continue to participate in the fishery itself. In fact, the Draft EA itself states that "Vessels that...derive less revenue from herring...may be *more likely* to exit the fishery if the cost of monitoring is perceived as too expensive."[8] The fact that this is already identified and documented as a possibility resulting from the action is troubling, as is the fact that according to the alternatives in the action, there is no limit to the agency's discretion on requiring financial burdens on the fishing industry. Throughout the development of the Omnibus and Herring IFM Amendment, we have consistently argued that there is no provision in the document that would account for the event that industry would not be able to pay the costs. Clearly, if Congress places a limit on financial burdens that can be placed on industry under limited access privilege program provisions, the agency does not have blanket approval to require the fishing industry to pay for data collection and monitoring costs without limit. During the development of the Omnibus and Herring IFM Amendment, it was made very clear that if NMFS does not have the funding to cover its portion of the IFM costs, the IFM program would not be available for that time. However, there are no similar restrictions that would apply if the fishing industry were unable to pay its portion of an IFM program, or even to cap costs at a financially reasonable level. We do not believe that Congress would intend to eliminate participants from a fishery due to their inability to cover data collection and monitoring costs that elsewhere, for other fishery management plans, are explicitly capped.

This is especially concerning given the details of this amendment and its development. *Full* cost recovery that exists in North Pacific limited access privilege programs are in the estimated range of $360-$420 per sea day, according to the Draft EA,[9] as compared with the estimates in this action of *shared* industry costs of $818 per sea day for observers and $710 per sea day for at sea monitors.[10] And even of this estimated cost, NMFS states, "Monitoring program costs include a variety of administrative and sampling costs that vary substantially within and between years."[11] Not only are costs not capped to ensure economic viability of the fishing industry, but estimated costs may increase due to factors such as high monitor turnover and the experience rates of the monitors themselves.[12] This leaves the door open for monitoring costs to skyrocket, or to become so burdensome as to render vessels unprofitable, with no recourse for the fishing industry. This situation has already occurred with the New England groundfish fishery, as noted in our previous comments to the Council.[13]

This amendment also raises other questionable legal issues. Being required to enter into a contractual agreement with a monitoring provider is similar to being required to enter into a contractual agreement with a healthcare provider, which the Supreme Court has ruled is a form of taxation. However, only Congress has the authority to tax, which is why cost recovery for monitoring and data collection has been mandated by Congress in only specific circumstances. An agency does not have the authority to extend that tax indefinitely, further than what

---

[8] See EA at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf, p. 343, 345.
[9] Ibid, p. 44.
[10] Ibid, p. 243.
[11] Ibid, p. 39.
[12] Ibid.
[13] See Seafreeze Comments on Industry Funded Monitoring Omnibus Amendment Public Hearing Document September 2016, submitted November 4, 2016, p. 6. Also attached.

3

Congress has specified. Another question is how information and data collected through industry funds could be used in enforcement actions against that industry member, by essentially compelling him to be a witness against himself, violating the 5th Amendment of the U.S. Constitution. For example, during the exit interviews of the electronic monitoring pilot study (EM) developed as a part of this amendment to determine if EM could be an option for monitoring/data collection requirements, the participants commented on "the criminal case that was built around EM video data" collected during the course of the study.[14] While the pilot study was funded by the agency and no individual was required to pay for the monitoring in this case, the fact that data collected as part of the monitoring was used in a criminal action raises questions as to whether data paid for by fishing industry members as a requirement of industry funded monitoring could be thus used.

We therefore support Omnibus Alternative 1: No Action.

2. **Herring Alternatives**

**a.** Following on from the points above regarding economic impacts which have no boundaries, the herring portion of the amendment relies solely on cost analysis and potential reductions to vessel return to owner (RTO) which are expected to result from the various industry funding alternatives using harvest levels and vessel income/expenditures from 2014. In 2014, the herring quota was 104, 088 mt, and industry harvested 95,037 mt- 91.3% of the total quota.[15] However, in 2018, a herring stock assessment was completed that will result in reductions to the quota by approximately 70%. In 2019, the quota levels are expected to be between 21,266 and 30,668 mt, and in 2020 quota levels are expected to be between 12,672 and 16,131 mt.[16] This significant reduction in quota will result in major economic impacts to the herring fishery. No economic impacts analysis was conducted as part of the amendment to demonstrate impacts to the commercial herring fishery at harvest levels drastically below those of 2014. In fact, the projected reduction in herring revenue from 2017 to 2019 is 80-87%.[17] Again, we raised these types of issues during amendment development but were never given satisfactory answers. The fixed costs of vessel operation (acknowledged in the RTO analysis)[18] do not change with vessel income, so economic impacts to herring vessels under 2019-2021 quotas will be much different than projected by the amendment analysis. Overall reduction in herring income will also result in lower RTO.

**b.** The two Seafreeze freezer vessels are disproportionately impacted by the herring portion of the amendment. For further details see our attached letter to the Council dated November 4, 2016. During the development of the amendment the "public perception problem" that initiated the action, as well as development of alternatives, all focused on midwater trawl vessels. We repeatedly commented that our freezer vessels, which are small mesh bottom trawl, do not have the same daily capacity or fishing behavior as the midwater trawl fleet. The Council adopted a 50 mt exemption from IFM requirements for other small daily capacity small mesh

---

[14] See https://s3.amazonaws.com/nefmc.org/2_Herring-and-Mackerel-Fishery-Electronic-Monitoring-Project_Final-Report.pdf, p. 83.

[15] See https://www.greateratlantic.fisheries.noaa.gov/aps/monitoring/atlanticherring.html.

[16] See Herring Presentation at December 2018 New England Council Meeting at https://s3.amazonaws.com/nefmc.org/181205-Herring-Presentation-for-NEFMC-Meeting-post.pdf,

[17] Ibid.

[18] See EA at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf. , p. 249.

bottom trawl vessels, which is appropriate due to the undue economic burden that would result if those vessels were required to comply with herring IFM. However, our vessels are now unduly burdened for three reasons:

1. Midwater trawl vessels for which this amendment was designed, can harvest in excess of 500,000 lbs of herring a day, because they do not process at sea and simply pump herring into a refrigerated seawater tank upon harvest and return to port. Our vessels, because they are freezing at sea, are limited to approximately 125,000 lbs a day production, essentially the same as the vessels with the 50 mt exemption. Not only are we limited in daily production, but we incur much greater daily operating costs than midwater vessels due to larger crew size and fuel needed to hand pack and freeze our product. This is why the annual "RTO" related to "squid" (i.e., small mesh bottom trawl- which includes our vessels) vessels in the analysis is averaged at 7% as compared to the RTO of "herring and mackerel vessels" at 15%. As payment for industry funded monitoring is a daily cost, and our vessels have lower daily harvest capabilities and higher daily overheads than the midwater vessels for which this amendment was designed, we would incur disproportionate financial burdens as the result of any action. Seafreeze vessels are the only such A or B herring permit holders who will be thus affected. Because the 50 mt exemption is a per trip exemption, and not a daily harvest level exemption, it still does not help our vessels. It will only address the needs of small daily capacity vessels with short trips landing fresh product.

2. Seafreeze freezer vessels require much longer fishing trips than fresh herring vessels, i.e., midwater vessels or other small mesh bottom trawl vessels, due to our unique operations. Seafreeze fishing trips are typically 7-14 days long, as opposed to typical 1-3 day long trips for fresh herring vessels. Therefore, the cost of a daily monitoring fee would be much higher per trip for Seafreeze than any other herring fishery participants.

3. Out of all affected permit holders, Seafreeze vessels are the <u>only</u> vessels which participate in the other fisheries in addition to herring/mackerel fishery on the same trip. This is by design and this flexibility to fish multiple species on the same trip has been the key to our success as a company over the past 30 years. We are the only vessels which operate in this manner, due to our unique setup. As such, we declare into all fisheries in which we may potentially fish prior to leaving on a trip. We may or may not harvest each one of those species-including herring- on a given trip, depending on the unique characteristics of each given trip, but require the need to reserve the right to do so to ensure profitability.[19] As we have continually pointed out during the development of the IFM amendment, the cost of herring monitoring is not a function of herring harvest, it is a function of VMS trip/species declaration. As part of the amendment development, we requested an analysis on the monitoring costs associated with declared "herring" trips that did not land herring, to demonstrate these impacts to our freezer vessels. Although our freezer vessels were not the only small mesh bottom trawl vessels analyzed (but are the only small mesh bottom trawl vessels which fish in this "multispecies" manner), the average cost for "herring" monitoring on trips that did not land herring in 2014 for small mesh

---

[19] For a more detailed explanation, broken down by actual trips, actual species composition, and actual length of trip, please refer to pages 4-6 of our Comments on Industry Funded Monitoring Omnibus Amendment Public Hearing Document September 2016, submitted November 4, 2016, attached. This detailed information, although confidential business information, was provided publicly to the Council to prove our points made here. However, it went unrecognized.

_0000017714

bottom trawl vessels associated with the Council's preferred alternative of 50% ASM coverage is $39,313 per vessel.[20] This means that the actual costs to our vessels would have been higher than this average. By comparison, the same costs associated with single midwater and paired midwater trawls were $2,264 and $1,394, respectively.[21] Therefore, the disproportionate economic impacts to our vessels have been documented by the agency itself, as NMFS is the lead role in developing the amendment. Seafreeze vessels should not be forced to pay approximately $80,000 a year or more for herring monitoring on trips that do not land herring. Furthermore, our entire unique business plan on which our company and vessels were founded and has been in operation since 1986, should not be made unviable due to an action designed to address issues arising from other segments of the fishery.

The Herring Alternatives put forward by the IFM Amendment do not prevent or take into account these disproportionate economic impacts to Seafreeze vessels. As such, they violate National Standard 6 of the Magnuson Stevens Act, which states, "Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches."[22] Therefore we can only support Herring Alternative 1: No Action.

Thank you for the opportunity to comment.

Sincerely,

Meghan Lapp
Fisheries Liaison, Seafreeze Ltd.

---

[20] See EA at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf, p. 250.
[21] Ibid.
[22] MSA, Section 301(a)(6).

6

# Document Metadata:NOAA-NMFS-2018-0109-0015



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment * |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0016 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0015 |
| **Title:** | Comment from Stephen Weiner |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 12/24/2018 * |
| **Date Posted:** | 01/30/2019 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 01/30/2019 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-97ac-j17r |

| | |
|---|---|
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

# Submitter Info

**Comment:**

We are writing today to comment on the proposed rule regarding Industry-Funded Monitoring. CHOIR is an industry coalition made up of commercial, charter, and recreational fishing organizations, fishing and shore-side businesses, researchers and ecotourism companies that all rely on herring as a key forage stock. CHOIR was formed in 2002 as a result of the general and localized depletion of herring caused by midwater trawlers. To this day our diverse and large membership sees midwater trawling as the biggest threat to the health of our fisheries and marine resources. While CHOIR would prefer 100% monitoring of the herring and mackerel mid-water trawlers 50% is an important first step. Clearly the current monitoring levels are too low and ineffective. The mid-water trawl fleet has made a mockery of the current system. CHOIR also believes that electronic monitoring (EM) should be mandatory as it provides a more cost effective and accurate means by which to monitor this fleet. At Sea Monitors (ASM) are too costly and much less reliable. Clearly the long term success to monitor this fleet depends on EM. NOAA needs to put all its time and resources on just one method of monitoring this fleet. The goal is to document slippage and discard events. If no discarding/slippage occurs on a trip then the ensuing shoreside monitoring can be believed. If slippage does occur then the Agency knows the shoreside data is incomplete. At least the slippage/discarding is documented and hopefully the EM program can develop means by which to identify what has been slipped/discarded and how much. It is CHOIR's belief that the requirement of net sensors for the vessels and the incorporation of the net sensor data into the monitoring program will at help quantify the amount of catch slipped. CHOIR also believes that the use of an Exempted Fishing Permit (EFP) is a good way to proceed with the program. It gives NOAA the necessary leeway to be able to develop the new program and to do so more expeditiously. To the degree that this program can be developed without the interference of the NEFMC it will be all the better. CHOIR also believes that if purse seiners are to be included in the program then they too should be able to choose EM. While the previous pilot program focussed on mid-water trawlers the lessons learned should be easily adaptable to a purse seine operation. If anything a purse seine operation should be easier to adapt to EM. Purse seiners should be allowed the same opportunity as mid-water trawlers. There is no need to spend money on a NEW Pilot and there is nothing so unique to seining that would require another pilot. CHOIR believes that the single most important tool to he proper management of herring and mackerel is an effective monitoring program. Had such a program been implemented years ago the herring and mackerel resources would not be in the mess they are today. CHOIR supports the approval of this Amendment and the rapid development of EM in both the herring and mackerel fishery. *

**First Name:**

Stephen

**Middle Name:**

**Last Name:**    Weiner

**Mailing Address:**  PO Box 465

**Mailing Address 2:**

**City:**     Ogunquit

**Country:**    United States

**State or Province:** Maine

**ZIP/Postal Code:** 03907

**Email Address:**  weinersb@gmail.com

**Phone Number:**  978-764-3637

**Fax Number:**

**Organization Name:**

**Government Agency Type:**

**Government Agency:**

**Cover Page:**

REGULATORY IMPACT REVIEW CLEARANCE

And

REGULATORY FLEXIBILITY ACT CLEARANCE

I have reviewed the RIR for the Industry-Funded Monitoring Omnibus Amendment to the Fishery Management Plans of the New England Fishery Management Council and find that the economic analysis is **consistent** with existing guidance for E.O. 12866.

I have reviewed the Initial Regulatory Flexibility Analysis provided in the same document and find that the Initial Regulatory Flexibility Analysis is **consistent** with existing guidelines. The IRFA notes that cost data were collected only for vessels that participated in the herring fishery. This means that the economic impacts on profits at the affiliated entity level are uncertain because some of the vessels in the affiliated firms do not participate in the herring fishery. For this reason, the estimated reduction in operating profit for participating herring vessels ranging from 3.5% to 7-10% (see page 353) on Group 1 and Group 2 vessels, respectively, likely overestimates the impact on total profit at the affiliated entity level. However, given the uncertainty in profitability for affiliated vessels that do not participate in the herring fishery it is not possible to ascertain whether or not the action can be certified as not having a significant adverse impact on a substantial number of small entities.

Eric M. Thunberg, Chief, Social Sciences Branch

THUNBERG.ERIC.
M.DR.1365815298

Digitally signed by
THUNBERG.ERIC.M.DR.1365815298
Date: 2017.10.27 11:25:29
-04'00'

_____                          October 27, 2017

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 648**

[Docket No. 200115–0017]

RIN 0648–BG91

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** This action implements the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment. This amendment allows the New England Council flexibility to increase monitoring in certain fishery management plans to assess the amount and type of catch and reduce uncertainty around catch estimates. This amendment establishes a process to standardize future industry-funded monitoring programs in New England fishery management plans and establishes industry-funded monitoring in the Atlantic herring fishery. This action helps ensure consistency in industry-funded monitoring programs across fisheries and increases monitoring in the Atlantic herring fishery.

**DATES:** Effective March 9, 2020, except for §§ 648.11(m) and 648.14(r) which are effective April 1, 2020.

**ADDRESSES:** Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this rule may be submitted to the Greater Atlantic Regional Fisheries Office and by email to *OIRA_Submission@omb.eop.gov* or fax to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:** Carrie Nordeen, Fishery Policy Analyst, phone: (978) 282–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

The New England Fishery Management Council developed an amendment to allow industry-funded monitoring in its fishery management plans (FMPs), except those managed jointly with the Mid-Atlantic Fishery Management Council, and establish industry-funded monitoring in the Atlantic herring fishery. The amendment standardizes the development and administration of future industry-funded monitoring programs in New England Council FMPs and increases monitoring in the herring fishery to help provide increased accuracy in catch estimates.

The New England Industry-Funded Monitoring Omnibus Amendment provides a mechanism to allow the Council flexibility to increase monitoring in its FMPs to assess the amount and type of catch and reduce uncertainty around catch estimates. Industry-funded monitoring would be in addition to monitoring requirements associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA). This amendment remedies NMFS disapprovals of previous Council proposals for industry-funded monitoring that either required NMFS to spend money that was not yet appropriated or split monitoring costs between the fishing industry and NMFS in ways that were inconsistent with Federal law.

To remedy the disapproved measures, the amendment uses a monitoring coverage target, as opposed to a mandatory coverage level, to allow NMFS to approve new monitoring programs without committing to support coverage levels above appropriated funding or before funding is determined to be available. Using a coverage target instead of mandatory coverage level means the realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year. Industry-funded monitoring coverage targets are specified in individual FMPs and realized coverage for a fishery in a given year would be anywhere from no additional coverage above SBRM up to the specified coverage target. Additionally, the amendment defines cost responsibilities for industry-funded monitoring programs between the fishing industry and NMFS in a manner that is consistent with legal requirements. Monitoring cost responsibilities may be divided between the industry and the government, provided government cost responsibilities are paid by the government and the government's costs are differentiated from the industry's cost responsibilities. This amendment specifies that industry-funded monitoring costs are delineated between NMFS administrative costs and industry sampling costs.

The Industry-Funded Monitoring Amendment was adopted by the Council on April 20, 2017. The Council refined its recommendations for industry-funded monitoring in the herring fishery on April 19, 2018. We published a notice of availability (NOA) for the amendment in the **Federal Register** on September 19, 2018 (83 FR47326), with a comment period ending November 19, 2018. We published a proposed rule for the amendment in the **Federal Register** on November 7, 2018 (83 FR 55665), with a comment period ending December 24, 2018. After considering public comment, we approved the Industry-Funded Monitoring Amendment, on behalf of the Secretary of Commerce, on December 18, 2018. We informed the Council of the amendment's approval in a letter dated December 18, 2018. This final rule implements the Industry-Funded Monitoring Amendment as approved.

**Approved Omnibus Measures**

This amendment standardizes the development and administration of future industry-funded monitoring programs in New England Council FMPs, including the Atlantic Herring FMP, the Atlantic Salmon FMP, the Atlantic Sea Scallop FMP, the Deep-Sea Red Crab FMP, the Northeast Multispecies FMP, and the Northeast Skate FMP. In the future, if the Council develops an industry-funded monitoring programs, the Council would develop those programs consistent with the specifications and requirements for industry-funded programs established in this amendment. The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be affected by this amendment. While cost responsibilities and monitoring service provider requirements established in this amendment are consistent with the existing programs, the industry-funded monitoring programs in the Multispecies and Scallop FMPS would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding.

_0000017731

The Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Additionally, future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the omnibus measures.

This amendment provides for industry-funded monitoring coverage targets in Council FMPs, noting that annual funding available to cover NMFS cost responsibilities would likely vary and dictate realized coverage levels. The realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

The standards for future industry-funded monitoring programs in New England fisheries apply to several types of monitoring, including observing, at-sea monitoring, electronic monitoring, portside sampling, and dockside monitoring. This rule establishes the following principles to guide the Council's consideration when developing future industry-funded monitoring programs:

• A clear need or reason for the data collection;
• Objective design criteria;
• Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;
• Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;
• Prioritize the use of modern technology to the extent practicable; and
• Incentives for reliable self-reporting.

All of this amendment's omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs and do not directly affect fishing effort or amounts of fish harvested. However, the omnibus measures may have indirect effects on Council FMPs. Standardizing the process for developing and administering future industry-funded monitoring programs may help reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected through industry-funded monitoring programs. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources. The prioritization process is expected to help ensure that available Federal funding is used to support industry-funded monitoring programs consistent with Council monitoring priorities. While industry-funded monitoring programs are expected to have an economic impact on the fishing industry, standard cost responsibilities may help the industry better understand and plan for their industry-funded monitoring cost responsibilities. Standard cost responsibilities may also aid the industry in negotiating coverage costs with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Monitoring set-aside programs may also help minimize the economic burden on the fishing industry associated with paying for monitoring coverage.

### 1. Standard Process To Implement and Revise Industry-Funded Monitoring Programs

This amendment specifies that future industry-funded monitoring programs are implemented through an amendment to the relevant FMP. Because industry-funded monitoring programs have the potential to economically impact the fishing industry, the Council determined that implementing new industry-funded monitoring programs through an amendment would help ensure additional public notice and comment during the development of new programs. The details of any new industry-funded monitoring program implemented via amendment may include, but are not limited to:

• Level and type of coverage target;
• Rationale for level and type of coverage;
• Minimum level of coverage necessary to meet coverage goals;
• Consideration of waivers if coverage targets cannot be met;
• Process for vessel notification and selection;
• Cost collection and administration;
• Standards for monitoring service providers; and
• Any other measures necessary to implement the industry-funded monitoring program.

This amendment also specifies that future industry-funded monitoring programs, implemented through an amendment, may be revised through framework adjustments to the relevant FMP. Additional National Environmental Policy Act (NEPA) analysis would be required for any action implementing and/or modifying industry-funded monitoring programs, regardless if the vehicle is an amendment or framework adjustment.

### 2. Standard Cost Responsibilities

Cost responsibilities for industry-funded monitoring must be divided by cost category, rather than a dollar amount or percentage of total cost, between the fishing industry and NMFS. NMFS is obligated to pay any cost for which the benefit of the expenditure accrues to the government. This means that NMFS would be responsible for administrative costs to support industry-funded programs, but not the costs associated with sampling activities. Costs associated with sampling activities would be paid by the fishing industry. NMFS may help offset industry cost responsibilities if Federal funding is available, but NMFS cannot be obligated to pay sampling costs in industry-funded sampling programs. Cost responsibilities dictated by legal requirements cannot be modified through this amendment. Instead, this amendment codifies NMFS cost responsibilities for industry-funded monitoring in New England FMPs to ensure consistency and compliance with legal requirements.

NMFS is responsible for paying costs associated with setting standards for, monitoring the performance of, and administering industry-funded monitoring programs. These program elements would include:

• The labor and facilities costs associated with training and debriefing of monitors;
• NMFS-issued gear (e.g., electronic reporting aids used by human monitors to record trip information);
• Certification of monitoring providers and individual observers or monitors;
• Performance monitoring to maintain certificates;
• Developing and executing vessel selection;
• Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and
• Costs associated with liaison activities between service providers, NMFS, Coast Guard, Council, sector managers, and other partners.

NMFS costs to administer industry-funded monitoring for all monitoring types would be paid with Federal funds. The industry is responsible for funding all other monitoring program costs, including but not limited to:

• Costs to the service provider for deployments and sampling (e.g., travel and salary for observer deployments and debriefing);
• Equipment, as specified by NMFS, to the extent not provided by NMFS (e.g., electronic monitoring system);

**7416** **Federal Register** / Vol. 85, No. 26 / Friday, February 7, 2020 / Rules and Regulations

• Costs to the service provider for observer or monitor time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time;

• Costs to the service provider for installation and maintenance of electronic monitoring systems;

• Provider overhead and project management costs (*e.g.*, provider office space, administrative and management staff, recruitment costs, salary and per diem for trainees); and

• Other costs of the service provider to meet performance standards laid out by an FMP.

The cost responsibilities described above are consistent with the existing scallop and multispecies industry-funded monitoring programs, although cost responsibilities are not explicitly defined in those FMPs. This amendment codifies NMFS cost responsibilities for industry-funded monitoring for all New England FMPs, but it does not alter other current requirements for existing industry-funded monitoring programs.

*3. Standard Requirements for Monitoring Service Providers and Observers/Monitors*

The SBRM Omnibus Amendment (80 FR 37182; June 30, 2015) adopted general industry-funded observer service provider and observer requirements (at 50 CFR 648.11(h) and (i), respectively) should a Council develop and implement a requirement or option for an industry-funded observer program to support SBRM in any New England or Mid-Atlantic Council FMP. However, the SBRM Amendment did not address requirements for other types of industry-funded monitoring programs or coverage in addition to SBRM.

This amendment modifies and expands existing observer and service provider requirements and allows those requirements to apply to coverage supplemental to SBRM, ESA, and MMPA coverage. Specifically, this rule modifies and expands existing observer service provider requirements at § 648.11(h) to apply to service providers for observers, at-sea monitors, portside samplers, and dockside monitors. Similarly, this rule modifies and expands existing observer requirements at § 648.11(i) to apply to observers, at-sea monitors, portside samplers, and dockside monitors, described collectively as observers/monitors. These observer/monitor requirements serve as the default requirements for any future industry-funded monitoring programs in New England FMPs. The Council may add new requirements or revise existing requirements for FMP-specific industry-funded monitoring programs as part of the amendment developing those programs or the framework adjustment revising those programs.

*4. Prioritization Process*

This amendment establishes a Council-led process to prioritize industry-funded monitoring programs for available Federal funding across New England FMPs. This prioritization process allows the Council to align industry-funded monitoring programs with its monitoring priorities by recommending priorities for available NMFS funding to pay NMFS cost responsibilities associated with industry-funded monitoring. Revising the prioritization process would be done in a framework adjustment. The existing scallop and multispecies industry-funded monitoring programs will not be included in the prioritization process, unless the Council takes action in the future to include those programs in the prioritization process or develops new industry-funded monitoring programs within those FMPs consistent with this amendment.

Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements that may be used to cover NMFS costs associated with supporting industry-funded monitoring programs. Funding for SBRM, ESA, and MMPA observer coverage is not affected by this prioritization process. Any industry-funded monitoring programs will be prioritized separately from and, in addition to, any SBRM coverage or other statutory coverage requirements. The realized industry-funded monitoring coverage in a given year will be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring programs would operate that year. If available funding in a given year is sufficient to support all industry-funded monitoring programs, the prioritization process would fully operationalize the industry-funded monitoring coverage targets specified in each FMP. If there is some available funding, but not enough to support all industry-funded monitoring programs, the Council will determine how to prioritize industry-funded monitoring coverage targets for available funding across FMPs.

As part of the Council-led prioritization process, this amendment establishes an equal weighting approach to prioritize industry-funded monitoring programs for available funding. An example of an equal weighting approach would be funding all industry-funded monitoring programs at 70 percent, if only 70 percent of the Federal funding needed to administer all the programs was available. Additionally, this rule specifies that the Council will adjust the equal weighting approach on an as-needed basis. This means that the equal weighting approach will be adjusted whenever a new industry-funded monitoring program consistent with this amendment is approved or whenever an existing industry-funded monitoring program consistent with this amendment is adjusted or terminated. The Council will revise the weighting approach for the Council-led prioritization process in a framework adjustment or by considering a new weighting approach at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the weighting approach, consistent with the Administrative Procedure Act (APA).

The SBRM coverage year begins in April and extends through March. SBRM coverage levels in a given year are determined by the variability of discard rates from the previous year and the availability of SBRM funding. During the spring, NMFS determines SBRM coverage for the upcoming year. Once NMFS finalizes SBRM coverage levels for the upcoming year, NMFS will then evaluate what Federal funding is available to cover its costs for meeting the industry-funded monitoring coverage targets for the upcoming year. NMFS will provide the Council, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels, incorporating the prioritization process and weighting approach, and based on available funding, for each FMP-specific monitoring program; and (2) the rationale for the industry-funded monitoring coverage levels, including the reason for any deviation from the Council's recommendations. NMFS will inform the Council of the estimated industry-funded coverage levels during a Council meeting. At that time, the Council may recommend revisions and additional considerations by the Regional Administrator and Science and Research Director. If NMFS costs associated with industry-funded coverage targets are fully funded in a given year, NMFS will also determine, in consultation with the Council, the allocation, if any, of any remaining available funding to offset industry costs. The earlier in the year that

industry-funded monitoring coverage targets are set for the following year, the more time the affected fishing industry would have to plan for industry-funded monitoring the following year. FMP-specific industry-funded monitoring programs would determine if industry-funded coverage targets were administered consistent with the FMP's fishing year or the SBRM year.

### 5. Monitoring Set-Aside Programs

This amendment standardizes the process to develop future monitoring set-aside programs and allows monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP. A monitoring set-aside program would use a portion of the annual catch limit (ACL) from a fishery to help offset industry cost responsibilities associated with industry-funded monitoring coverage targets. There are many possible ways to structure a monitoring set-aside program, and the details of each program would be developed on an FMP-by-FMP basis. Monitoring set-aside programs are an option to help ease industry cost responsibilities associated with industry-funded monitoring, but they likely would only help offset a portion of the industry's cost responsibilities.

The details of monitoring set-aside programs may include, but are not limited to:

• The basis for the monitoring set-aside;

• The amount of the set-aside (e.g., percentage of ACL, days-at-sea (DAS));

• How the set-aside is allocated to vessels required to pay for monitoring (e.g., increased possession limit, differential DAS counting, additional trips against a percent of the ACL);

• The process for vessel notification;

• How funds are collected and administered to cover the industry's costs of monitoring coverage; and

• Any other measures necessary to develop and implement a monitoring set-aside.

### Approved Atlantic Herring Measures

This amendment establishes an industry-funded monitoring program in the Atlantic herring fishery that is expected to provide increased accuracy in catch estimates. Increased monitoring in the herring fishery will address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and (3) affordable monitoring for the herring fishery.

This amendment establishes a 50-percent industry-funded monitoring coverage target on vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permits fishing on a declared herring trip. The Council considered other coverage targets, including 100 percent, 75 percent, and 25 percent, but determined that the 50-percent coverage target best balanced the benefits and costs of additional monitoring. When tracking catch against catch caps in the herring fishery, analyses in the EA supporting this amendment suggest that a 50-percent coverage target would reduce the uncertainty around catch estimates, and likely result in a coefficient of variation (CV) less than 30 percent for the majority of catch caps. Additionally, the industry's cost responsibilities associated with a 50-percent coverage target are substantially less than those associated with higher coverage targets. Vessels participating in the herring fishery also participate in the Atlantic mackerel fishery. Currently, the mackerel fishery does not have an industry-funded monitoring program. If the Mid-Atlantic Council develops industry-funded monitoring in the mackerel fishery and the coverage targets do not match for the herring and mackerel fisheries, then the higher coverage target would apply on all trips declared into the fishery with the higher coverage target.

Herring coverage targets would be calculated for the SBRM year, April through March, by combining SBRM and industry-funding monitoring coverage. NMFS will determine how to calculate the coverage target, in consultation with Council staff. For example, if there is an estimated 10-percent SBRM coverage in a given year (based on allocated sea days and anticipated effort), then 40-percent industry-funded monitoring coverage will be needed to achieve the 50-percent coverage target. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel will not have SBRM coverage and industry-funded coverage on the same trip. Any vessel selected for SBRM coverage on a particular trip will not have the option of industry-funded monitoring on that trip. Per the prioritization process in the proposed omnibus measures, the realized coverage level in a given year will be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the herring fishery in a given year will fall somewhere between no additional coverage in addition to SBRM and the specified coverage target. Combined coverage targets are intended to help reduce the cost of industry-funded coverage, but the level of SBRM coverage in the herring fishery varies by gear type and has the potential to vary year to year. The variability of SBRM coverage has the potential to make it difficult for the herring industry to plan for industry-funded monitoring year to year.

In addition to the standard monitoring and service provider requirements in the omnibus measures, this amendment specifies that requirements for industry-funded observers and at-sea monitors in the herring fishery include a high volume fishery (HVF) certification. Currently, NMFS's Northeast Fisheries Observer Program (NEFOP) observers must possess a HVF certification in order to observe the herring fishery. NMFS developed the HVF certification to more effectively train observers in high volume catch sampling and documentation. NEFOP determined that data quality on herring trips was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices, and fast-paced operations proved more demanding for observers. Having additional training to identify these practices improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Additionally, this amendment requires the Council to examine the results of any increased coverage in the herring fishery two years after implementation of this amendment, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate. Measures implemented in this amendment would remain in place unless revised by the Council.

### 1. Industry-Funded At-Sea Monitoring Coverage on Vessels Issued Category A or B Herring Permits

This rule specifies that vessels issued Category A or B herring permits will carry an industry-funded at-sea monitor on declared herring trips that are selected for coverage by NMFS, unless NMFS issues the vessel a waiver for coverage on that trip. Vessels will be selected for coverage by NMFS to meet the 50-percent coverage target. Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits are required to notify NMFS for monitoring coverage. If an SBRM observer is not selected to

cover that trip, NMFS will notify the vessel representative whether an at-sea monitor must be procured through a monitoring service provider. Because the 50-percent coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel will not carry an SBRM observer on the same trip that carries an at-sea monitor. If NMFS informs the vessel representative that they need at-sea monitoring coverage, they will be required to obtain and pay for an at-sea monitor to carry on that trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on that trip. If NMFS informs the vessel representative that the vessel is not selected for at-sea monitoring coverage, NMFS will issue the vessel an at-sea monitoring coverage waiver for that trip.

This rule establishes three additional reasons for issuing vessels waivers for industry-funded monitoring requirements on a trip-by-trip basis. First, if an at-sea monitor is not available to cover a specific herring trip (either due to logistics or a lack of available Federal funding to cover NMFS cost responsibilities), NMFS will issue the vessel an at-sea monitoring coverage waiver for that trip. Second, if a vessel using midwater trawl gear intends to operate as a wing vessel on a trip, meaning that it would pair trawl with another midwater trawl vessel but would not pump or carry any fish onboard, then that vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the wing vessel trip, and NMFS would issue a waiver for industry-funded monitoring requirements for that trip. Wing vessels would be prohibited from carrying fish onboard during these trips. If a wing vessel did carry fish, the vessel would be out of compliance with industry-funded monitoring requirements on that trip. Third, if a vessel intended to land less than 50 mt of herring on a trip, then the vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels will notify NMFS in advance of the trip on which they intend to land less than 50 mt of herring, and NMFS will issue a waiver for industry-funded monitoring requirements for that trip. Vessels would be prohibited from landing 50 mt or more of herring on these trips. If the vessel landed 50 mt or more of herring, the vessel would be out of compliance with industry-funded monitoring requirements on that trip.

At-sea monitors will collect the following information on herring trips:

• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);
• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);
• Species, weight, and disposition of all retained and discarded catch on observed hauls;
• Species, weight, and disposition of all retained catch on unobserved hauls;
• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
• Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;
• Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
• Vessel trip costs (*i.e.,* operational costs for trips including food, fuel, oil, and ice).

The primary biological data that at-sea monitors will collect are length data on retained and discarded catch. However, to verify species identification, at-sea monitors may also collect whole specimens or photos. In the future, the Council may recommend that at-sea monitors collect additional biological information upon request. Revising what information an at-sea monitor collects could be done in a framework adjustment. Alternatively, the Council may recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors, consistent with the Administrative Procedure Act.

In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection.

Currently, vessels issued Category A or B herring permits are required to comply with all slippage restrictions, slippage reporting requirements, and slippage consequence measures when carrying an observer for SBRM coverage (§ 648.11(m)(4)). Because the purpose of slippage restrictions is to help ensure catch is made available for sampling, this rule ensures that existing slippage requirements also apply when vessels

are carrying an industry-funded at-sea monitor. Specifically, when vessels issued Category A or B herring permits are carrying either an SBRM observer or industry-funded at-sea monitor, vessels are required to bring catch aboard the vessel and make it available for sampling prior to discarding. If vessels slipped catch for any reason, they would be required to report that slippage event on the daily vessel monitoring catch report and complete a slipped catch affidavit. If vessels slip catch due to excess catch of spiny dogfish, mechanical failure, or safety, then vessels are required to move 15 nautical miles (27.78 km) following that slippage event and remain 15 nautical miles (27.78 km) away from that slippage event before making another haul and for the duration of that fishing trip. If vessels slip catch for any other reason, they are required to terminate that fishing trip and immediately return to port.

Industry-funded monitoring would have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery. The EA estimates the industry's cost responsibility associated with carrying an at-sea monitor at $710 per day. The EA uses returns-to-owner (RTO) to estimate the potential reduction in annual RTO associated with paying for monitoring coverage. RTO was calculated by subtracting annual operating costs from annual gross revenue and was used instead of net revenues to more accurately reflect fishing income. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of the proposed at-sea monitoring coverage may reduce the annual RTO for vessels with Category A or B herring permits up to approximately 20 percent. Waiving at-sea monitoring coverage requirements for wing vessel trips or trips that land less than 50 mt of herring would help reduce the cost of at-sea monitoring coverage on those trips, but those waivers are not an option for vessels that choose to land more than 50 mt of herring on a trip.

## 2. Industry-Funded Observer Coverage on Midwater Trawl Vessels Fishing in Groundfish Closed Areas

Midwater trawl vessels fishing in the Groundfish Closed Areas are required to carry an observer under the requirements at § 648.202(b). When Amendment 5 to the Herring FMP (79 FR 8786; February 13, 2014) established that requirement, the Groundfish Closed Areas included Closed Area I, Closed

Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Currently, the only mechanism for midwater trawl vessels to carry an observer is if an observer is assigned through the SBRM. As described previously, SBRM coverage for midwater trawl vessels has recently been variable (approximately 4 to 40 percent from 2012 through 2018). This rule maintains the requirement to carry an observer for midwater trawl vessels fishing in a Groundfish Closed Area, but allows midwater trawl vessels to purchase observer coverage in order to access Groundfish Closed Areas.

Prior to any trip declared into a Groundfish Closed Area, representatives for midwater trawl vessels are required to provide notice to NMFS for monitoring coverage. If neither an SBRM observer nor industry-funded monitoring is selected to cover that trip, NMFS will notify the vessel representative that an observer may be procured from a monitoring service provider. The vessel is prohibited from fishing in the Groundfish Closed Areas without carrying an observer. Observers will collect the following information on midwater trawl trips:

• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);
• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);
• Species, weight, and disposition of all retained and discarded catch on observed hauls;
• Species, weight, and disposition of all retained catch on unobserved hauls;
• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
• Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae);
• Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
• Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

The measure allowing midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas also has economic impacts on vessels participating in the herring fishery. The EA estimates the industry's cost responsibility associated with carrying an observer at $818 per day. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of observer coverage may reduce the annual RTO for midwater trawl vessels up to 5 percent. That 5 percent reduction in RTO would be in addition to any reduction in RTO due to other types of industry-funded monitoring coverage. Coverage waivers for Groundfish Closed Area trips are not an option to reduce the cost of observer coverage because coverage waivers do not apply on midwater trawl vessels fishing in the Groundfish Closed Areas.

If the Groundfish Closed Areas are modified, eliminated, or added in the future, existing observer coverage requirements for midwater trawl vessels apply to the modified areas, except for areas that are eliminated as Groundfish Closed Areas. Anticipating changes to the Groundfish Closed Areas in the Omnibus Essential Fish Habitat Amendment 2 (Habitat Amendment) (83 FR 15240; April 9, 2018), the Industry-Funded Monitoring Amendment Development Team/Fishery Management Action Team (PDT/FMAT) recommended the Council clarify its intent regarding the requirement that midwater trawl vessels fishing in Groundfish Closed Areas must carry an observer. In a March 17, 2017, memorandum, the PDT/FMAT noted that the Habitat Amendment proposed changes to Groundfish Closed Areas, such as eliminating areas, boundary changes, and seasonality. That same memorandum proposed the Council clarify that this amendment maintains the 100-percent observer coverage requirement on midwater trawl vessels fishing in Groundfish Closed Areas, as modified by the Habitat Amendment. The Council accepted the FM PDT/ FMAT's proposed clarification when it took final action on this amendment in April 2017.

In January 2018, NMFS partially approved the Habitat Amendment, including changes to Closed Area I, Nantucket Lightship Closed Area, and the Western Gulf of Maine Closure Area. Consistent with Council intent regarding observer coverage, the final rule for the Habitat Amendment maintained the 100-percent observer requirement for midwater trawl vessels fishing in Closed Area I North (February 1–April 15), Closed Area II, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Because the Habitat Amendment removed the Nantucket Lightship Closed Area and the southern portion of Closed Area 1 from the list of Groundfish Closed Areas, the 100-percent observer coverage requirement no longer applies to midwater trawl vessels fishing in the area previously known as the Nantucket Lightship Closed Area and the southern portion of what was formerly Closed Area 1. A recent Court Order (*Conservation Law Found.* v. *Ross, No. CV 18–1087 (JEB), 2019 WL 5549814 (D.D.C. Oct. 28, 2019)* enjoined NMFS from allowing gillnet fishing in the Nantucket Lightship Closed Area and Closed Area I. This decision does not apply to fishing gears other than gillnet gear, and the rule implementing this order (84 FR 68799; December 17, 2019) is specific to gillnet gear and does not prohibit midwater trawl vessels from fishing in these areas.

Recognizing that it recommended multiple industry-funded monitoring types, including at-sea monitoring coverage and observer coverage in Groundfish Closed Areas for the herring fishery, the Council also recommended prioritizing coverage aboard Category A and B vessels because those vessels harvest the majority of the herring. Consistent with that recommendation, if available Federal funding is insufficient to cover NMFS cost responsibilities associated with administering multiple monitoring programs for the herring fishery, this rule prioritizes industry-funded monitoring coverage on Category A and B vessels before observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.

**Atlantic Herring Exempted Fishing Permit**

On April 19, 2018, the Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to address monitoring goals for the herring fishery. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition data along with age and length information. After reviewing the midwater trawl electronic monitoring study, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.

The EFP would exempt midwater vessels from the requirement for industry-funded at-sea monitoring coverage and allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target. The recent midwater trawl electronic monitoring study provides a good foundation for an electronic monitoring program. However, using an EFP would provide NMFS with further information about how to most effectively and efficiently administer the electronic monitoring and portside sampling program, while allowing NMFS the flexibility to respond quickly to emerging issues, helping to make the monitoring program more robust. An EFP would also enable NMFS to evaluate other monitoring issues in the herring fishery that are of interest to the Council and herring industry, such as evaluating the utility of electronic monitoring and portside sampling when midwater trawl vessels fish in Groundfish Closed Areas or for other gear types (*e.g.*, purse seine or bottom trawl) used in the herring fishery.

The supporting documentation for the EFP was developed concurrently with rulemakings for this amendment and midwater trawl vessels issued EFPs are allowed to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. The Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

### Status of Industry-Funded Monitoring in 2020

Throughout the development of this amendment, we cautioned the Council that any additional coverage would be contingent upon us having sufficient funding to administer industry-funded monitoring. For 2020, we have sufficient Federal funding to pay NMFS cost responsibilities associated with fully implementing industry-funded monitoring in the herring fishery. We estimate industry-funded monitoring cost responsibilities for the herring fishery to total approximately $100,000 in 2020. Therefore, beginning April 1,

2020, vessels issued Category A or B herring permits will be required to pay for at-sea monitoring coverage on trips we select for industry-funded monitoring coverage. Alternatively, herring vessels will have the option of requesting an EFP to use electronic monitoring and portside sampling instead of at-sea monitoring coverage to satisfy industry-funded monitoring requirements in 2020. We cannot yet determine if we will have funding to administer industry-funded monitoring in the herring fishery in 2021. We will evaluate available Federal funding relative to the cost of administering industry-funded monitoring in the herring fishery during the upcoming year.

### Compliance With the National Environmental Policy Act

In light of recent catch reductions in the herring fishery, we evaluated whether the EA supporting the Industry-Funded Monitoring Amendment remained valid to support this amendment. In making a determination on the need for additional analysis under NEPA, we considered and were guided by the Council on Environmental Quality (CEQ) NEPA regulations and applicable case law. The CEQ's regulations state that ''[a]gencies shall prepare supplements to either draft or final environmental impact statements if: (i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts'' (40 Code of Federal Regulations (CFR) § 1502.09(c)). In addition, we considered the CEQ's significance criteria at 40 CFR 1508.27 to determine if any new circumstances or information are significant, which could require a new EA.

The EA describes the economic impacts of herring measures on fishery-related businesses and human communities as negative and explained they result from paying for monitoring coverage. The economic impact of industry-funded monitoring coverage on the herring fishery is difficult to estimate because it varies with sampling costs, fishing effort, SBRM coverage, price of herring, and participation in other fisheries. The EA estimates industry's cost for at-sea monitoring

coverage at $710 per day and observer coverage at $818 per day, but cautioned those estimates would largely depend on negotiated costs between vessels and monitoring service providers. Less than half of the 50 vessels issued Category A or B herring permits are active in the herring fishery.

The impact of management measures on fishing-related businesses and communities is typically based on an analysis of revenue. But in an effort to better understand income from fishing trips, a survey of herring and mackerel vessels collected more detailed cost information for 2014, including payments to crew, repairs, maintenance, upgrades, and permitting costs. This additional information was used to calculate the vessel RTO for 2014 by subtracting fixed and operational costs from gross revenue, thereby providing a general framework for understanding the interaction between revenue and monitoring requirement costs.

Analysis in the EA estimates that at-sea monitoring coverage associated with the 50-percent coverage target has the potential to reduce annual RTO for vessels with Category A or B herring permits up to 20 percent and up to an additional 5 percent for midwater trawl access to Groundfish Closed Areas. Electronic monitoring and portside sampling may be a more cost effective way for herring vessels to satisfy industry-funded monitoring requirements. At the conclusion of our electronic monitoring project aboard midwater trawl vessels, we estimated industry's cost for electronic monitoring and portside sampling at $515 per day. Analysis in the EA estimates a reduction in annual RTO of up to 10 percent for electronic monitoring and portside sampling coverage.

At the Council's request, we reduced the herring ACL for 2018 (49,900 mt) on August 22, 2018, and reduced the herring ACL for 2019 (15,065 mt) on February 8, 2019, from the ACL that was in place during 2014 (104,088 mt).

To assess how a reduction in herring ACL may affect revenue, we compared herring revenue generated by Category A and B herring vessels from 2014 to 2018 (see Table 1). Even though the 2018 ACL was reduced by 52 percent (54,188 mt) from the 2014 ACL, the impact on 2018 revenue was not proportional to the reduction in ACL and differed by gear type.

_0000017737

TABLE 1—CHANGE IN CATEGORY A AND B HERRING REVENUE FROM 2014 TO 2018

| Gear type | 2014 herring revenue | 2018 herring revenue | Change in herring revenue |
|---|---|---|---|
| Midwater Trawl | $13,439,000 | $7,886,000 | −$5,553,000 |
| Purse Seine | 11,000,000 | 13,088,000 | +2,088,000 |
| Bottom Trawl | 1,508,000 | 1,017,000 | −491,000 |

Source: NMFS.

The change in herring revenue between 2014 may have been affected by several factors, such as the availability of herring relative to the demand and vessel participation in other fisheries. The price of herring increased almost 70 percent between 2014 and 2018 from approximately $310 per mt to $525 per mt. While the price of herring is not likely to increase every year, we expect that a herring price increase would mitigate the negative economic impact of lowering the ACL. Total revenue from all fisheries for small-mesh bottom trawl vessels increased by approximately $25,000,000 between 2014 and 2018 suggesting vessels are expanding their participation in other fisheries. We expect that increases in total revenue from other fisheries would also mitigate the

negative economic impacts of reductions to the herring ACL and associated revenue.

At its September 2019 meeting, the Council recommended further reducing the herring ACL for 2020 and 2021 (11,821 mt). These catch levels are consistent with Council's new harvest policy for herring developed in Amendment 8 to the Herring FMP and recommendations from the Council's Scientific and Statistical Committee. If the 2020 herring stock assessment determines recruitment and biomass are higher than expected, the Council may request an increase to the 2021 ACL.

While the economic impact of industry-funded monitoring coverage on the herring fishery is affected by revenue, the level of fishing effort and SBRM coverage would also affect the economic impact of industry-funded

monitoring. Analyses in the EA estimate the coverage days to achieve the 50-percent coverage target in the herring fishery in 2014. In an effort to estimate the maximum number of coverage days, that particular analysis did not account for SBRM coverage or coverage waivers for trips landing less than 50 mt of herring. To assess how changes in the herring fishery may affect industry-funded monitoring coverage, we re-estimated the coverage days to achieve the 50-percent coverage target for 2020. Our updated analysis adjusts for recent vessel activity, low herring ACL, recent SBRM coverage, and coverage waivers for trips landing less than 50 mt of herring. The change in estimated average coverage days to achieve the 50-percent coverage target from 2014 to 2020 is shown in Table 2.

TABLE 2—ESTIMATED REDUCTION IN INDUSTRY-FUNDED MONITORING COVERAGE DAYS TO ACHIEVE A 50-PERCENT COVERAGE TARGET FROM 2014 TO 2020

| Gear type | 2014 | 2020 | Change in days |
|---|---|---|---|
| Midwater Trawl | Up to 728 days (14 vessels) | Up to 54 days (9–11 vessels) | −674 |
| Purse Seine | Up to 196 days (7 vessels) | Up to 67 days (5 vessels) | −129 |
| Bottom Trawl | Up to 108 days (9 vessels) | Up to 29 days (2 vessels) | −79 |

Source: NMFS.

The reduction in expected industry-funded monitoring coverage days and vessels participating in the herring fishery from 2014 to 2020 is largely driven by changes in fishing behavior, likely linked to the availability of herring (distribution and seasonality) and a low herring ACL in 2020. Because the RTO analysis was, in part, based on economic data collected with a special cost survey that could not be repeated in a timely way for this action, it is not possible to update that analysis for 2020. However, fewer sea days required to achieve the 50-percent coverage target will result in lower industry costs in 2020 than what the EA estimated for 2014. Fewer coverage days and fewer active vessels in 2020 (and likely 2021) is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

We also expect midwater trawl fishing effort in Groundfish Closed Areas to be lower in 2020 than was estimated for 2014. Without considering SBRM coverage, the EA estimates midwater trawl vessels may purchase observer coverage for up to approximately 250 coverage days to access Groundfish Closed Areas in 2014. After adjusting for recent vessel activity and a low herring ACL and assuming recent SBRM coverage, we estimate that midwater trawl vessels may purchase coverage for up to 30 coverage days to access Groundfish Closed Areas in 2020 (and likely 2021). Even though purchasing observer coverage to access Groundfish Closed Areas is optional, few coverage days and fewer active vessels in 2020 is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

As recommended by the Council, we intend to offer an EFP in 2020 and 2021 to allow vessels to use electronic monitoring and portside sampling in lieu of at-sea monitoring coverage to achieve the 50-percent coverage target. Depending on vessel interest and sampling logistics, that same EFP may also allow midwater trawl vessels to access Groundfish Closed Areas or evaluate electronic monitoring for other gear types (e.g., purse seine or bottom trawl) used in the herring fishery. Analyses in the EA and updated estimates at the conclusion of our electronic monitoring project aboard midwater trawl vessels, suggest that electronic monitoring and portside sampling is likely less expensive and more cost effective than either at-sea monitoring or observer coverage. Excluding the initial cost associated with purchasing and installing

electronic monitoring equipment, video review and storage are likely the most substantial ongoing industry costs associated with using electronic monitoring. A portion of our Federal funding to administer industry-funded monitoring in the herring fishery is designated to help offset industry's video review and storage costs. Federal funding helping offset industry's electronic monitoring sampling costs is expected to minimize the economic impact of industry-funded monitoring coverage on the herring fishery. Participating in the EFP is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

High herring prices and low coverage days to achieve the 50-percent coverage target are likely short-term influences on the economic impact of industry-funded monitoring coverage on the herring fishery associated with a low herring ACL. If herring recruitment and biomass return to average levels, the long-term economic impact of industry-funded monitoring coverage on the herring fishery is likely consistent with estimated impacts analyzed and described in the EA.

Additionally, the EA analyzes a range of coverage targets for at-sea monitoring and electronic monitoring and portside sampling aboard Category A and B vessels, including 100 percent, 75 percent, 50 percent, and 25 percent. The EA estimates the reduction in annual RTO associated with these coverage target alternatives ranged from 42 percent to less than 1 percent. Despite reductions in expected revenue for 2020 and 2021, we expect the reduction of annual RTO associated with implementing a 50-percent coverage target for at-sea monitoring aboard Category A and B vessels to be within this analyzed range.

After considering the action, new information, and new circumstances, we determined that the action and its impacts fall within the scope of the existing EA. It is not necessary to develop a new NEPA analysis because (1) the action is identical to the proposed action analyzed in the EA and (2) no new information or circumstances relevant to environmental concerns or impacts of the action are significantly different from when the EA's finding of no significant impact was signed on December 17, 2018. Thus, the FONSI for existing EA for the New England Industry-Funded Monitoring Omnibus Amendment remains valid to support implementing this amendment.

## Changes From the Proposed Rule

This rule includes minor changes from the proposed rule to clarify requirements. First, it revises the definition for *slippage in the Atlantic herring fishery* to make it consistent with the definition for *slips* and *slipping catch in the Atlantic herring fishery* and clarifies that slippage applies when a NMFS-certified observer or monitor is aboard the vessel.

Second, this rule aligns the herring coverage target with the SBRM year (April–March) instead of the fishing year (January–December) and adjusts the date by which the herring industry selects a monitoring type for the following year (October instead of July). This change ensures the coverage target will be more predictable for the entire year rather than changing with the SBRM year. NMFS will determine how to calculate the coverage target in consultation with Council staff.

Third, this rule removes "on a declared herring trip" from the criteria described at § 648.11(m)(2)(i) and revises the list of required information at § 648.11(m)(2)(i) to clarify when and how the owner, operator, or manager of a herring vessel must notify NMFS of a herring trip. The existing notification requirement describes that vessels issued certain herring permits or acting as herring carriers must notify NMFS of trips on which a vessel may harvest, possess, or land herring. Because pre-trip notifications are required at least 48 hours in advance of a trip and trip declarations are required just prior to a vessel leaving port on a trip, the existing criteria absent the reference to "on a declared herring trip" is a more logical descriptor of when a vessel is required to notify NMFS of a herring trip. The list of required information is revised to support NMFS selecting vessels for industry-funded monitoring coverage.

Fourth, this rule corrects references to § 648.11 to reflect provisions implemented in this rule.

## Comments and Responses

We received 20 comment letters on the NOA and proposed rule: 5 from participants in the herring fishery (Seafreeze, Lund's Fisheries, Providian, O'Hara Corporation); 3 from fishing industry organizations (CHOIR Coalition, New England Purse Seiner's Alliance (NEPSA), and Cape Cod Commercial Fishermen's Alliance (CCCFA); 3 from environmental advocacy groups (Conservation Law Foundation (CLF) and Cause of Action Institute (COA)); and 9 from members of the public.

*Comment 1:* COA and Seafreeze commented that the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) does not authorize an industry-funded monitoring program as envisioned by the Industry-Funded Monitoring Amendment. They cautioned that the amendment intends to standardize the development of industry-funded monitoring programs, yet it fails to identify any specific provision in the Magnuson-Stevens Act granting it such authority. COA also commented that the Council does not have explicit statutory authorization to require the industry to fund discretionary supplemental at-sea monitoring programs. COA and Seafreeze explained that the Magnuson-Stevens Act only explicitly authorizes industry-funded monitoring for foreign fishing, limited access privilege programs (LAPPs), and the North Pacific fisheries research plan. They cautioned that because the Magnuson-Steven Act caps industry fees related to LAPPs at 3 percent of ex-vessel revenue, the agency does not have the ability to require the fishing industry to pay data collection and monitoring costs without limit.

*Response:* We disagree. The Magnuson-Stevens Act expressly authorizes onboard human monitors to be carried on fishing vessels "for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. 1853(b)(8). The requirement to carry observers, along with many other requirements under the Magnuson-Stevens Act, includes compliance costs on industry participants. For example, NMFS regulations require fishing vessels to install vessel monitoring systems for monitoring vessel positions and fishing, report catch electronically, fish with certain gear types or mesh sizes, or ensure a vessel is safe before an observer may be carried on a vessel. Vessels pay costs to third-parties for services or goods in order to comply with these regulatory requirements that are authorized by the Magnuson-Stevens Act. There are also opportunity costs imposed by restrictions on vessel sizes, fish sizes, fishing areas, or fishing seasons. These industry costs are not "fees." A fee is a form of "funding" where the industry is assessed a payment by the agency, authorized by statute, to be deposited in the U.S. Treasury and disbursed for administrative costs otherwise borne by the agency. This amendment does not address administrative costs that are charged in LAPPs and are subject to the 3 percent cap.

The need for monitoring and the data it provides is discussed in the amendment. Section 1.1 of the amendment explains that the Council is

establishing the framework for industry-funded monitoring programs because of its interest in increasing monitoring and/or other types of data collection in some FMPs to assess the amount and type of catch, to more accurately monitor annual catch limits, and/or provide other information for management. The Council's goals for industry-funded monitoring in the herring fishery are described in Section 2.2 of the amendment and include: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species for which catch caps apply; and (3) affordable monitoring for the herring fishery. The Council's rationale for increased monitoring through industry-funded monitoring programs is consistent with the Magnuson-Stevens Act provision "for the purpose of collecting data appropriate for the conservation and management of the fishery."

*Comment 2:* COA and Seafreeze claim that the amendment is inconsistent with Federal appropriations laws and the U.S. Constitution. They commented that Congress decides how to finance any program it establishes, stating that a Federal agency cannot spend money on a program without authorization from Congress and cannot add to its appropriations from sources outside the government without permission from Congress. COA and Seafreeze caution that the type of industry-funded program set forth in the amendment imposes a "tax" on regulated parties. COA raised additional concerns that the industry funded program may violate the Anti-Deficiency Act and Miscellaneous Receipts Statute. Further, COA stated the amendment violates the Fourth Amendment to, and the Commerce Clause in, the U.S. Constitution. Last, Seafreeze expressed concern that the amendment violates the Fifth Amendment to the Constitution because data collected using industry funds could be used in enforcement actions.

*Response:* The Magnuson-Stevens Act expressly authorizes measures, including monitoring, "for the purpose of collecting data necessary for the conservation and management of the fishery." It also acknowledges such measures may result in costs to the fishing industry as evident by its requirement to, where practicable, minimize costs and adverse economic impacts on communities. The inherent cost of a requirement, like industry-funding monitoring, is not the same as a "tax." A hallmark of a tax is that the government receives some revenue. The government receives no revenue from industry-funded monitoring. Similar to arrangements between vessels and vessel monitoring system service providers, the payment for industry cost responsibilities associated with industry-funded monitoring would be made by the vessel to the monitoring service provider. Because the agency would not receive any payment from the vessel related to industry-funded monitoring, this amendment is consistent with the Anti-Deficiency Act and Miscellaneous Receipts Statue. Industry-funded monitoring in the herring fishery does not does not violate the Commerce Clause of the Constitution, which authorizes Congress to regulate commerce, because NMFS is regulating existing economic activity, which is permissible under the Commerce Clause. Industry-funded monitoring does not violate the Fourth Amendment protection against unreasonable searches and seizures because it is neither a search nor unreasonable if it was considered to be a search. At-sea monitors are not authorized officers conducting vessel searches for purposes of ensuring compliance with fisheries requirements. Further, the fishing industry is pervasively regulated, and monitoring is reasonable as authorized under the Magnuson-Stevens Act to receive critical fisheries data. Last, the amendment does not violate the Fifth Amendment to the Constitution because the monitoring requirement does not compel evidence that is testimonial in nature. An at-sea monitor simply records the results of the vessel's actions. An individual's participation in the fishery is voluntary, and an individual may choose to land less than the 50 mt of herring per trip threshold for requiring industry-funded monitoring. Further, monitoring is a regulatory reporting requirement, to which the Fifth Amendment privilege does not apply. Last, the information provided is not for purposes of discovering criminal violations. The herring fishery is a regulated industry under the Magnuson-Stevens Act, which provides for civil penalties for fisheries catch violations, not criminal sanctions. Any potentially incriminating evidence would be merely a byproduct of the requirement for industry-funded monitoring.

*Comment 3:* Seafreeze commented that because the amendment was initiated jointly by the New England and Mid-Atlantic Councils, it was led to believe that identical omnibus measures would need to be selected by both Councils. Seafreeze expressed concern that the potential of only one Council adopting the amendment was not considered during the development of the amendment and, therefore, recommended the omnibus measures be disapproved.

*Response:* When the New England Council took final action on the Industry-Funded Monitoring Amendment in April 2017, it considered whether to make its recommendations contingent upon a similar action by the Mid-Atlantic Council, but decided against it. Instead, the Council overwhelmingly approved the omnibus measures for its FMPs, with the exception of FMPs managed jointly with the Mid-Atlantic Council (*i.e.,* Monkfish and Spiny Dogfish FMPs) and the herring measures in the amendment and recommended the amendment be submitted to the agency for review and approval. The Mid-Atlantic Council considered industry-funded monitoring for its FMPs at its April 2017 and October 2018 meetings, but decided not to pursue it. Mid-Atlantic fishermen had an opportunity to participate and submit their concerns to the Mid-Atlantic Council during those meetings. Mid-Atlantic representatives on the New England Council also had an opportunity to present the Mid-Atlantic Council's concerns to the New England Council during the amendment's development. Further, while the omnibus measures, especially the prioritization process, were designed to be appropriate for both Councils, they were never intended to obligate a Council to establish provisions for industry-funded monitoring. Therefore, as explained in the proposed rule (83 FR 55665; November 7, 2018), the joint amendment initiated by both Councils to allow for industry-funded monitoring became the New England Industry-Funded Monitoring Amendment and, as such, omnibus measures only apply to New England Council FMPs. The omnibus measures do not impose any substantive burden on any Mid-Atlantic fishery. Rather, the amendment sets up the framework under which future potential monitoring programs for New England fisheries would be established. If the Mid-Atlantic Council reconsiders industry-funded monitoring it a future action, it may consider whether to adopt similar omnibus measures at that time.

*Comment 4:* COA commented that our publication of **Federal Register** notices for the Industry-Funded Monitoring Amendment caused confusion. It questioned why we published an NOA in September 2018 seeking public comment on the approval or disapproval of the amendment followed

by a proposed rule with implementing regulations in November 2018 prior to finalizing our decision on the amendment. COA suggested that by publishing the notices for the approval/ disapproval of the amendment and implementing regulations concurrently, that we had already made a decision on the amendment and would view public comments with prejudice. Additionally, the O'Hara Corporation was concerned that we approved the amendment in December 2018, prior to the closing of the public comment period on the proposed rule. O'Hara Corporation was disappointed in our process for notice and comment and wondered how public comments received after the amendment approval were considered.

*Response:* It is our practice to publish an NOA and proposed rule concurrently. The NOA for the Industry-Funded Monitoring Amendment was published on September 19, 2018, with a comment period ending November 19, 2018. The proposed rule for the amendment was published on November 7, 2018, with a comment period ending December 24, 2018. The comment periods for the NOA and proposed rule overlapped for 13 days. Both the NOA and proposed rule explained that any public comments we received on the amendment or the proposed rule during the NOA comment period would be considered in our decision to approve/disapprove the amendment.

We received seven comment letters during the NOA comment period. Those commenters expressed diverse views on the Industry-Funded Monitoring Amendment and recommended we approve, disapprove, and re-consider the amendment. We carefully reviewed and considered all of those comments prior to approving the amendment on December 18, 2018. NMFS must approve/disapprove an amendment within 30 days of the end of the comment period on the amendment. The decision date for the Industry-Funded Monitoring Amendment was December 19, 2018. Therefore, it would not have been possible to consider all public comments received through December 24, 2018, in the decision to approve/disapprove the Industry-Funded Monitoring Amendment.

The proposed rule explained that we would consider any public comment received after the NOA comment period but during the proposed rule comment period in our decision to implement proposed measures. We reviewed and considered all additional comments received during the proposed rule comment period prior to publishing this final rule. Commenters did not provide

any new or additional information during the public comment period on the proposed rule that would have prevented us from approving the Industry-Funded Monitoring Amendment.

*Comment 5:* Seafreeze disagreed with the conclusions in the EA regarding impacts of the omnibus measures on fishery-related business and human communities. Specifically, it questioned assertions that omnibus measures would have no direct impacts, that costs are too speculative to analyze, and that standardized industry-funded monitoring requirements would have a positive impact. Seafreeze also commented that the impact of any future industry-funded monitoring program on fishery-related business and communities would be negative.

*Response:* The EA explains that omnibus measures are tools for the Council to use when developing future industry-funded monitoring programs. The omnibus measures have no direct biological impacts because they do not directly affect the level of fishing, fishing operations, amount of fish harvested, or area fished. Additionally, the omnibus measures do not have any direct economic impacts on fishery-related business or human communities because they do not require the development of industry-funded monitoring programs nor do they directly impose any costs. Categorizing and characterizing industry cost responsibilities in this action could provide the industry with information to better understand and plan for their industry-funded monitoring cost responsibilities as well negotiate better contracts with industry-funded monitoring service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Improved catch information that results from the opportunity to align funding with the most critical industry-funded monitoring programs may lead to better management of biological resources, which may eventually lead to higher harvest levels.

In the future, if the Council developed an industry-funded monitoring program for a particular FMP, the EA acknowledges there would be direct negative economic impacts to fishing vessels provided vessels were required to pay for increased monitoring. Future industry-funded monitoring programs would be developed to achieve specific goals. Without knowing the goals or the details of the measures to achieve those goals, attempting to quantify in this amendment the impact or the specific benefits of a future industry-funded

monitoring program is too speculative. The economic impacts to fishing vessels and benefits resulting from a future industry-funded monitoring program would be evaluated in the amendment to establish that industry-funded monitoring program and cannot considered in this amendment.

*Comment 6:* COA commented that the introduction of industry-funded monitoring across the Greater Atlantic Region would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing. As an example, COA referenced a 2016 letter by the Long Island Commercial Fishing Association in which the Association states the $800 per day cost of monitoring would force more than half of its fleet out of business.

*Response:* Generalizing economic impacts associated with industry-funded monitoring programs is often inaccurate. Members of the Long Island Commercial Fishing Association participate in a variety of fisheries, including vessels using small-mesh bottom trawl gear in the herring fishery. The $800 cost per covered day is the estimated cost for observer coverage in the herring fishery. The Industry-Funded Monitoring Amendment does not require observer coverage on small-mesh bottom trawl vessels in the herring fishery, instead it establishes a 50-percent coverage for at-sea monitoring coverage on declared herring trips at an estimated cost of $710 per day of coverage. Additionally, the Industry-Funded Monitoring Amendment does not require industry-funded monitoring coverage on trips intending to land less than 50 mt of herring. For those trips, the vessel owner/operator would request a waiver for industry-funded monitoring coverage and would not be responsible for industry-funded monitoring costs on that trip. The amendment estimated that waiving coverage on trips that land less than 50 mt of herring would result in industry-funded monitoring coverage on only 19 percent of trips by small-mesh bottom trawl vessels. More recently, when we only considered small-mesh bottom trawl vessels with Category A or B permits that had been active in the herring fishery in the last two years, we found that industry-funded monitoring requirements would likely only apply to only two small-mesh bottom trawl vessels. For these reasons, we disagree that the implementation of industry-funded monitoring in the herring fishery would lead to the elimination of small-scale fishing in the Greater Atlantic Region.

_0000017741

*Comment 7:* Seafreeze expressed concern that vessels participating in New England and Mid-Atlantic fisheries on the same trip may be subject to industry-funded monitoring requirements, even though the Mid-Atlantic Council did not adopt the this amendment. COA commented the EA fails to address the possibility of overlapping requirements for industry-funded monitoring in multiple fisheries.

*Response:* Similar to other measures in FMPs (*e.g.,* possession limits, gear restrictions, or reporting requirements), vessels are subject to the most restrictive requirements when participating in multiple fisheries on a single trip. With the understanding that vessels participate in multiple fisheries, the EA explicitly considers revenue and operational costs associated with participation in the herring, Atlantic mackerel, and squid fisheries. Because herring and mackerel are often harvested together on the same trip, the amendment specifies that the higher coverage target applies on trips declared into both fisheries. If the Council considers industry-funded monitoring in other fisheries in the future, the impacts of those programs relative to existing industry-funded monitoring programs will be considered at that time.

*Comment 8:* Several commenters expressed opinions on the relative costs and benefits of industry-funded monitoring. CLF, CCCFA, and CHOIR generally support the industry-funded monitoring requirements for the herring fishery, but are concerned that anything less than 100-percent coverage, especially when combined with coverage waivers, may undermine the effectiveness of additional monitoring. In contrast, Lund's cautioned that the 50-percent coverage target for the herring fishery is higher than necessary and wastes scarce agency and industry resources by monitoring a fishery with a low bycatch rate. COA commented that the amendment is inconsistent with National Standards 7 and 8 because it fails to explain why increased monitoring is necessary, in light of the financial burden it will place on the fishing industry, or how the amendment would minimize adverse economic impacts and provide for the sustained participation of communities.

*Response:* This amendment establishes industry-funded monitoring in the herring fishery to help increase the accuracy of catch estimates, especially for species with incidental catch caps (*i.e.,* haddock and river herring/shad). Our decision to approve this amendment included weighing the benefits of the measures relative to the

costs, especially the industry's cost associated with additional monitoring. We concluded that the Council's measures minimize costs to the extent practicable and take into account the importance of fishery resources to fishing communities to provide for their sustained participation in the fishery and minimize the adverse economic impacts of these measures on those communities.

The 50-percent coverage target for vessels with Category A or B herring permits has the potential to reduce uncertainty around catch estimates in the herring fishery, thereby improving catch estimation for stock assessments and management. SBRM coverage on vessels participating in the herring fishery is variable. Recent coverage has ranged from 2 percent to 40 percent during 2012 to 2018. Analysis in the EA suggests a 50-percent coverage target would reduce the uncertainty around estimates of catch tracked against catch caps, likely resulting in a CV of less than 30 percent for the majority of catch caps. If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be more constrained by catch caps, thereby increasing accountability, or they may be less constrained by catch caps and better able to fully harvest herring sub-ACLs. Recent CVs associated with catch caps constraining the herring fishery have been as high as 86 percent. Improving our ability to track catch against catch limits is expected to support the herring fishery achieve optimum yield, minimize bycatch and incidental catch to the extent practicable, and support the sustained participation of fishing communities. Coverage waivers would only be issued under specific circumstances, when monitors are unavailable or trips have minimal to no catch, and are not expected to reduce the benefits of additional monitoring. This amendment does not require additional monitoring aboard herring vessels in Groundfish Closed Areas. Rather it maintains an existing requirement for 100-percent observer coverage on herring midwater trawl vessels fishing inside of Groundfish Closed Areas, but provides flexibility for vessels by allowing the purchase of observer coverage to access Groundfish Closed Areas.

While the economic impact of industry-funding monitoring on participants in the herring fishery may be substantial, we considered the nature and extent of these costs relative to the benefits of additional monitoring, such as reducing uncertainty around catch

estimates to improve management, and measures to mitigate costs.

Recognizing the potential economic impact of industry-funded monitoring on the herring industry, the Council recommended several measures to minimize the impact of paying for additional coverage. Setting the coverage target at 50 percent, instead of 75 or 100 percent, balances the benefit of additional monitoring with the costs associated with additional monitoring. Allowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry. Waiving industry-funded monitoring requirements on certain trips, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring. Trips that land less than 50 mt are common for small-mesh bottom trawl, single midwater trawl, and purse seine vessels. As such, the 50-mt exemption has the potential to result in a less than 5 percent reduction in annual RTO associated with at-sea monitoring coverage for those vessels. Electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage.

The amendment also includes measures to ensure the Council considers the cost of additional monitoring relative to its effectiveness and provides the flexibility to adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wants to recommend that we not prioritize Federal funding to administer industry-funded monitoring in herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. Additionally, if we find that coverage waivers undermine the benefits of

additional monitoring, the Council could restrict waivers when it reviews the industry-funded monitoring requirements two years after implementation.

*Comment 9:* Seafreeze and COA commented that industry-funding monitoring in the herring fishery disproportionately affects Seafreeze vessels and any other vessels that make multi-day trips processing catch at sea in violation of National Standard 6's requirement to take into account and allow for variations among fisheries, fishery resources, and catch. Seafreeze explained that despite a relatively low daily production capacity (57 mt), its vessels would not qualify for a coverage waiver, like other small-mesh bottom trawl vessels, because its vessels make longer than average trips processing and freezing catch from multiple fisheries. Seafreeze also commented that, according to the EA, the 50-percent coverage target would cost it $80,000 per year ($40,000 per vessel) on trips that do not land herring.

*Response:* We disagree. In an effort to minimize the economic impact of industry-funded monitoring, the Council explicitly considered measures to address Seafreeze's concern about disproportional impacts on its vessels, including considering alternatives for coverage waivers for trips when landings would be less than 20-percent herring or less than 50 mt of herring per day. Ultimately, the Council determined that the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring and chose the 50 mt per trip threshold. The EA estimates the effort and monitoring costs associated with declared herring trips that ultimately did not land herring. In 2014, there were 111 sea days for small-mesh bottom trawl vessels that had no herring landings. The cost of at-sea monitoring coverage on 50 percent of those trips was estimated at just under $40,000. That $40,000 is the total cost for monitoring all small-mesh bottom trawl vessels for the year. Therefore, it is highly unlikely that Seafreeze would be paying $80,000 per year for at-sea monitoring on trips that did not land herring. As described previously, the Council has the flexibility to recommend we not prioritize Federal funding for industry-funded monitoring in the herring fishery and/or adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous or do not allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

*Comment 10:* Several commenters (CLF, CCCFA, Lund's) support the option to allow midwater trawl vessels to purchase observers to access Groundfish Closed Areas. However, CLF and CCCFA object to midwater trawl vessels having any additional access to Groundfish Closed Areas, including access to areas maintained as Groundfish Closed Areas in the recent Omnibus Habitat Amendment.

*Response:* We acknowledge the commenters support for the measure allowing midwater trawl vessels to purchase an observer to access Groundfish Closed Areas. This amendment does not relax any restrictions for Groundfish Closed Areas implemented in the recent Omnibus Habitat Amendment.

*Comment 11:* Several commenters were concerned with recent catch limit reductions in the herring fishery and how that affects the economic impact of industry-funded monitoring. The specifics of their comments are as follows:

• COA, Providian, and Seafreeze noted that economic impacts for the herring fishery were analyzed based on revenue and operating costs from 2014 and do not reflect the recent reductions in ACLs;

• Providian acknowledges that lower ACLs means fewer fishing trips and recommends continued SBRM coverage in the herring fishery;

• Lund's recommends SBRM coverage, in conjunction with the existing state-administered portside sampling program, as the best investment to understand catch in herring fishery; and

• Lund's, Providian, and O'Hara request the amendment be delayed, at least until after 2021, in hopes that future increases in herring harvest and revenue would be able to support industry-funded monitoring.

*Response:* As discussed in the preamble, we acknowledge that herring effort, catch, and resulting revenue will likely be lower in 2020 and 2021 than in prior years, such that the cost of industry-funded monitoring relative to herring catch and revenue may be high in the short-term. However, the magnitude of that impact on individual vessels and businesses is likely variable and would be mitigated by several factors, which are discussed in the preamble section addressing our NEPA considerations.

*Comment 12:* Four members of the public supported this amendment and believe increased monitoring is necessary for sustainable FMPs. For two of those individuals, their support is conditional on the economic impact of the amendment, specifically that the amendment does not overburden an already struggling New England fishing industry.

*Response:* We appreciate the commenters' support for this amendment and note the amendment includes several measures to minimize the economic impact on the herring industry of paying for additional coverage.

*Comment 13:* Several commenters provided input on the EFP to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. The specifics of their comments are as follows:

• NEPSA, CLF, CCCFA, and CHOIR supported us using an EFP to initially administer electronic monitoring and portside sampling in the herring fishery and urged us to quickly transition to electronic monitoring in the herring fishery because electronic monitoring provides a more cost effective and accurate means to monitor the herring fishery than human monitors;

• CHOIR and NEPSA urged us to allow purse seine vessels to participate in the EFP and explained that lessons learned from the midwater trawl electronic monitoring study would apply to purse seine vessels as both gear types capture fish in nets and bring those nets alongside the vessels to pump fish aboard;

• NEPSA asserted that electronic monitoring is easier for vessel operators than at-sea monitoring coverage because it does not involve the logistics of carrying a human monitor and noted that allowing purse seine vessels to participate in the EFP would increase the number of participants and help decrease the per-vessel cost of using electronic monitoring;

• Lund's commented that it supports us using an EFP to further evaluate an electronic monitoring and portside sampling program, but at this time prefers human monitors to electronic monitoring;

• CLF and CHOIR advocated that net sensors be incorporated into the EFP to help quantify the amount of slipped catch and CHOIR hoped that electronic monitoring can be developed to identify the contents and estimate the amount of slipped catch; and

• CLF requested the EFP include documenting all discards, verifying compliance with slippage requirements and consequence measures, 100-percent video review, documenting interactions with protected species, and complementary coverage by SBRM observers.

*Response:* We acknowledge commenters' support for the EFP and will consider these recommendations as

the terms and conditions of the EFP are finalized.

*Comment 14:* One member of the public supported developing future industry-funded monitoring programs via amendment to allow for public input and standardizing industry-funded monitoring programs to help ensure fairness across fisheries.

*Response:* We acknowledge the commenter's support for omnibus measures in the amendment.

*Comment 15:* One individual commented that additional monitoring, especially industry-funded monitoring for herring, is unnecessary because herring are numerous and not at risk of extinction. The individual is not convinced the Council considered its own criteria for the development of an industry-funded monitoring program, such as a clear need for the data collection, cost of collection, less data intensive methods, prioritizing modern technology, and incentive for reliable self-reporting. Instead, the commenter recommended tracking catch by using fishing industry reporting to NMFS of the weight of fish sold.

*Response:* We disagree. The Council identified and supported the need for additional monitoring as reducing uncertainty around catch estimates in the herring fishery, thereby improving catch estimation for stock assessments and management, as noted in the response to Comment 8. The Council considered less data intensive methods, prioritizing modern technology, and incentives for self-reporting by allowing vessels to use either at-sea monitoring or electronic monitoring and portside sampling coverage to satisfy industry-funded monitoring requirements. In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection for at-sea monitors compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to

address monitoring goals for the herring fishery. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage.

We currently track catch in the herring fishery using the weight of fish purchased by dealers, but those data are not robust enough to track catch against catch caps and would not help reduce the uncertainty associated with catch tracked against catch caps.

*Comment 16:* Three members of the public provided comments on forest management, keeping marine mammals in captivity, and NEPA requirements for terrestrial businesses.

*Response:* Because those comments are outside the scope of this amendment, we are not providing responses to those comments in this final rule.

## Classification

The Administrator, Greater Atlantic Region, NMFS determined that this amendment is necessary for the conservation and management of New England Council FMPs and that it is consistent with the Magnuson-Stevens Act and other applicable law.

This final rule has been determined to be not significant for purposes of Executive Order (E.O.) 12866.

This final rule is not an E.O. 13771 regulatory action because this action is not significant under E.O. 12866.

NMFS prepared a final regulatory flexibility analysis (FRFA) in support of this action. The FRFA incorporates the initial RFA, a summary of the significant issues raised by the public comments in response to the initial RFA, NMFS responses to those comments, and a summary of the analyses completed in support of this action. A description of why this action was considered, the objectives of, and the legal basis for this rule is contained in in the preamble to the proposed and this final rule, and is not repeated here. All of the documents that constitute the FRFA and a copy of the EA/RIR/IRFA are available upon request (see **ADDRESSES**) or via the internet at: *http://www.nefmc.org.*

The omnibus measures are administrative, specifying a process to

develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the omnibus measures have no direct economic impacts, they will not be discussed in this section. The herring measures affect levels of monitoring, rather than harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities due to the costs associated with the industry-funded monitoring measures for the herring fishery.

*A Statement of the Significant Issues Raised by the Public in Response to the IRFA, a Statement of the Agency's Assessment of Such Issues, and a Statement of Any Changes Made in the Final Rule as a Result of Such Comments*

We received 18 comment letters on the NOA and proposed rule. Those comments, and our responses, are contained in the Comments and Responses section of this final rule and are not repeated here. Comments 1, 2, 5, 6, 8, 9, 11, and 12 discussed the economic impacts of the measures, but did not directly comment on the IRFA. All changes from the proposed rule, as well as the rationale for those changes, are described in the Changes from the Proposed Rule section of this final rule and are not repeated here.

*Description and Estimate of the Number of Small Entities To Which the Rule Would Apply*

Effective July 1, 2016, NMFS established a small business size standard of $11 million in annual gross receipts for all businesses primarily engaged in the commercial fishing industry for RFA compliance purposes only (80 FR 81194, December 29, 2015). The directly regulated entities are businesses that own at least one limited access Atlantic herring vessel. As of 2016, there are 66 businesses that own at least one limited access herring vessel. Four businesses are large entities (gross receipts greater than $11 million). The remaining 62 businesses are small entities. Gross receipts and gross receipts from herring fishing for the small entities are characterized in Table 3.

TABLE 3—GROSS REVENUES AND REVENUES FROM HERRING FOR THE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from all fishing by herring permitted small entities | Gross receipts from herring fishing by herring permitted small entities |
|---|---|---|
| Mean | $1,847,392 | $422,210 |
| Median | 1,076,172 | 0 |
| 25th Percentile | 656,965 | 0 |
| 75th Percentile | 2,684,753 | 95,218 |
| Permitted Small Entities | 62 | 62 |

Source: NMFS.

Many of the businesses that hold limited access herring permits are not actively fishing for herring. Of those businesses actively fishing for herring, there are 32 directly regulated entities with herring landings. Two businesses are large entities (gross receipts over $11 million). The remaining 30 businesses are small entities. Table 4 characterizes gross receipts and gross receipts from the herring fishery for the active small entities.

TABLE 4—GROSS REVENUES AND REVENUES FROM HERRING FOR THE ACTIVE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from all fishing by active herring permitted small entities | Gross receipts from active herring permitted fishing by small entities |
|---|---|---|
| Mean | $2,070,541 | $872,567 |
| Median | 1,030,411 | 95,558 |
| 25th Percentile | 554,628 | 6,570 |
| 75th Percentile | 2,955,883 | 1,696,758 |
| Active Small Entities | 30 | 30 |

Source: NMFS.

For the 30 small entities, herring represents an average of 36 percent of gross receipts. For 12 of the small entities, herring represents the single largest source of gross receipts. For eight of the small entities, longfin squid is the largest source of gross receipts and Atlantic sea scallops is the largest source of gross receipts for five of the small entities. The largest source of gross receipts for the remaining five small entities are mixed across different fisheries. Eight of the 30 small entities derived zero revenues from herring.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements*

This final rule contains collection-of-information requirements subject to review and approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA). The new requirements, which are described in detail in the preamble, have been submitted to OMB for approval as a revised collection under control number 0648–0674. The action does not duplicate, overlap, or conflict with any other Federal rules.

The Industry-Funded Monitoring Amendment would replace the current phone-based observer pre-trip notification system with a new web-based pre-trip notification system. There would be no additional reporting burden associated with this measure because the new notification system would increase convenience and will require approximately the same time burden (5 minutes).

This amendment would implement a 50-percent industry-funded monitoring coverage target on vessels issued Category A or B herring permits. The herring industry would be required to pay for industry cost responsibilities associated with at-sea monitoring. There are an estimated 42 vessels with Category A or B permits in the herring fishery. After considering SBRM coverage, we estimate that each vessel would incur monitoring costs for an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an at-sea monitor for Category A and B vessels would be $566,580, with an average cost per vessel of $13,490.

In addition to the 50-percent industry-funded monitoring coverage target, midwater trawl vessels would have the option to purchase observer coverage to allow them to fish in Groundfish Closed Areas. This option would be available to the estimated 12 vessels that fish with midwater trawl gear. Because this option would be available on all trips not otherwise selected for SBRM or industry-funded coverage, it is estimated that each vessel may use this option for up to 21 days per year, at an estimated maximum cost of $818 per sea day. Therefore, the annual cost associated with industry-funded observer coverage for midwater trawl vessels fishing in Groundfish Closed Areas is estimated to be $206,136, with an average annual cost per vessel of $17,178.

To access Groundfish Closed Areas, owners/operators of the 12 affected midwater trawl vessels would request an observer by calling one of the approved monitoring service providers. The average midwater trawl vessel is estimated to take 7 of these trips per year, and each call would take an estimated 5 minutes at a rate of $0.10 per minute. Thus, the total annual burden estimate to the industry for calls to obtain industry-funded observer coverage would be 7 hours and $42 (Per vessel: 1 hr and $3.50). For each of the 7 estimated trips that the vessel calls in to request an industry-funded observer to access Groundfish Closed Areas, the vessel has the option to cancel that trip. The call to cancel the trip would take an estimated 1 minute at a rate of $0.10 per minute. The total annual burden

estimated to the industry for cancelling these trips would be 1 hour and $8 (Per vessel: 1 hr and $1).

We expect that some monitoring service providers would apply for approval under the service provider requirements at § 648.11(h), specifically that four out of six providers may apply for approval, and would be subject to these requirements. These providers would submit reports and information required of service providers as part of their application for approval. Service providers must comply with the following requirements, submitted via email, phone, web-portal, fax, or postal service: Submit applications for approval as a monitoring service provider; formally request industry-funded at-sea monitor training by the NEFOP; submit industry-funded at-sea monitor deployment and availability reports; submit biological samples, safety refusal reports, and other reports; give notification of industry-funded at-sea monitor availability within 24 hours of the vessel owner's notification of a prospective trip; provide vessels with notification of industry-funded observer availability in advance of each trip; and maintain an updated contact list of all industry-funded at-sea monitors/ observers that includes the monitor's/ observer's identification number, name, mailing and email address, phone numbers, homeports or fisheries/trip types assigned, and whether or not the monitor/observer is ''in service'' (i.e., available to provide coverage services). Monitoring service providers would have to provide raw at-sea monitoring data to NMFS and make at-sea monitors available to NMFS for debriefing upon request. The regulations would also require monitoring service providers to submit any outreach materials, such as informational pamphlets, payment notification, and descriptions of monitor duties, as well as all contracts between the service provider and entities requiring monitoring services for review to NMFS. Monitoring service providers also have the option to respond to application denials, and submit a rebuttal in response to a pending removal from the list of approved monitoring service providers. NMFS expects that all of these reporting requirements combined are expected to take 1,192 hours of response time per year for a total annual cost of $12,483 for all affected monitoring service providers ($3,121 per provider). The following table provides the detailed time and cost information for each response item.

TABLE 5—BURDEN ESTIMATE FOR MEASURES

| Monitoring service provider requirements | Number of respondents | Total number of annual responses | Response time per response (minutes) | Total annual burden (hours) | Cost per response | Total annual cost |
|---|---|---|---|---|---|---|
| Monitor deployment report | 4 | 444 | 10 | 74 | $0.00 | $0 |
| Monitor availability report | 4 | 216 | 20 | 72 | 0.00 | 0 |
| Safety refusals | 4 | 40 | 30 | 20 | 0.00 | 0 |
| Raw monitor data | 4 | 444 | 5 | 37 | 23.75 | 10,545 |
| Monitor debriefing | 4 | 124 | 120 | 248 | 12.00 | 1,488 |
| Other reports | 4 | 68 | 30 | 34 | 0.00 | 0 |
| Biological samples | 4 | 516 | 60 | 516 | 0.50 | 258 |
| New application to be a service provider | 4 | 4 | 600 | 40 | 0.55 | 2 |
| Applicant response to denial | 1 | 1 | 600 | 10 | 0.55 | 1 |
| Request for monitor training | 4 | 12 | 30 | 6 | 1.80 | 22 |
| Rebuttal of pending removal from list of approved service providers | 1 | 1 | 480 | 8 | 0.55 | 1 |
| Request to service provider to procure a monitor | 90 | 360 | 10 | 60 | 0.00 | 0 |
| Notification of unavailability of monitors | 90 | 360 | 5 | 30 | 0.00 | 0 |
| Call to service provider to procure an observer for Groundfish Closed Areas by phone | 21 | 84 | 10 | 14 | 1.00 | 84 |
| Notification of unavailability of observers for Groundfish Closed Areas | 21 | 84 | 5 | 7 | 0.50 | 42 |
| Monitor contact list updates | 4 | 48 | 5 | 4 | 0.00 | 0 |
| Monitor availability updates | 4 | 48 | 5 | 4 | 0.00 | 0 |
| Service provider material submissions | 4 | 8 | 30 | 4 | 2.50 | 20 |
| Service provider contracts | 4 | 8 | 30 | 4 | 2.50 | 20 |
| Total | | | | 1,192 | | 12,483 |

Public comment is sought regarding the following: Whether this proposed collection of information is necessary for the proper performance of agency functions, including whether the information shall have practical utility; the accuracy of the burden estimate; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the collection of information, including through the use of automated collection techniques or other forms of information technology. Send comments on these or any other aspects of the collection of information to the Regional Administrator (see **ADDRESSES**) and email to *OIRA_Submission@ omb.eop.gov* or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

*Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule*

This action does not duplicate, overlap, or conflict with any other Federal rules.

*Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes*

Recognizing the potential economic impact of industry-funded monitoring

on the herring industry, this amendment contains several measures to minimize the impact of paying for additional coverage. Setting the coverage target at 50 percent, instead of 75 or 100 percent, balances the benefit of additional monitoring with the costs associated with additional monitoring. Allowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry. Waiving industry-funded monitoring requirements on certain trips, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring. Trips that land less than 50 mt are common for small-mesh bottom trawl, single midwater trawl vessel, and purse seine vessels. As such, the 50-mt exemption has the potential to result in a less than 5 percent reduction in annual RTO associated with at-sea monitoring coverage for those vessels. Electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wants to recommend that we not prioritize Federal funding to administer industry-funded monitoring in the herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. These measures ensure the Council considers the cost of additional monitoring relative to its effectiveness and provides the flexibility to adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous. Section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996 states that, for each rule or group of related rules for which an agency is required to prepare a FRFA, the agency shall publish one or more guides to assist small entities in complying with the rule, and shall designate such publications as "small entity compliance guides." The agency shall explain the actions a small entity is required to take to comply with a rule or group of rules. As part of this rulemaking process, a letter to permit holders that also serves as small entity compliance guide was prepared. Copies of this final rule are available from the Greater Atlantic Regional Fisheries Office (GARFO), and the compliance guide (*i.e.*, fishery bulletin) will be sent to all holders of permits for the herring fishery. The guide and this final rule will be posted on the GARFO website.

## List of Subjects in 50 CFR Part 648

Fisheries, Fishing, Recordkeeping and reporting requirements.

Dated: January 15, 2020.

**Samuel D. Rauch III,**
*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons set out in the preamble, 50 CFR part 648 is amended as follows:

## PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.2, revise the definitions for "Electronic monitoring," "Observer/sea sampler," "Slippage in the Atlantic herring fishery," and "Slip(s) or slipping catch in the Atlantic herring fishery" to read as follows:

### § 648.2  Definitions.

\*    \*    \*    \*    \*

*Electronic monitoring* means a network of equipment that uses a software operating system connected to one or more technology components, including, but not limited to, cameras and recording devices to collect data on catch and vessel operations. With respect to the NE multispecies fishery, electronic monitoring means any equipment that is used to monitor area fished and the amount and identity of species kept and discarded in lieu of at-sea monitors as part of an approved Sector at-sea monitoring program.

\*    \*    \*    \*    \*

*Observer or monitor* means any person certified by NMFS to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels as part of NMFS' Northeast Fisheries Observer Program. Observers or monitors include NMFS-certified fisheries observers, at-sea monitors, portside samplers, and dockside monitors.

\*    \*    \*    \*    \*

*Slippage in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-certified observer or monitor after the catch is on board. Slippage also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slippage includes releasing catch from a codend or seine prior to the completion of pumping the catch aboard and the release of catch from a codend or seine while the codend or seine is in the water. Fish that cannot be pumped and remain in the codend or seine at the end of pumping operations are not considered slippage. Discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor are also not considered slippage.

*Slip(s) or slipping catch in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-certified observer or monitor after the catch is on board. Slip(s) or slipping catch also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slip(s) or slipping catch includes releasing fish from a codend or seine prior to the completion of pumping the fish on board and the release of fish from a codend or seine while the codend or seine is in the water. Slippage or slipped catch refers to fish that are slipped. Slippage or slipped catch does not include operational discards, discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor, or fish that inadvertently fall out of or off fishing gear as gear is being brought on board the vessel.

\*    \*    \*    \*    \*

■ 3. In § 648.7, revise paragraph (b)(2)(i) to read as follows:

**§ 648.7   Record keeping and reporting requirements.**

\*   \*   \*   \*   \*

(b) \* \* \*

(2) \* \* \*

(i) *Atlantic herring owners or operators issued an All Areas open access permit.* The owner or operator of a vessel issued an All Areas open access permit to fish for herring must report catch (retained and discarded) of herring via an IVR system for each week herring was caught, unless exempted by the Regional Administrator. IVR reports are not required for weeks when no herring was caught. The report shall include at least the following information, and any other information required by the Regional Administrator: Vessel identification; week in which herring are caught; management areas fished; and pounds retained and pounds discarded of herring caught in each management area. The IVR reporting week begins on Sunday at 0001 hour (hr) (12:01 a.m.) local time and ends Saturday at 2400 hr (12 midnight). Weekly Atlantic herring catch reports must be submitted via the IVR system by midnight each Tuesday, eastern time, for the previous week. Reports are required even if herring caught during the week has not yet been landed. This report does not exempt the owner or operator from other applicable reporting requirements of this section.

\*   \*   \*   \*   \*

■ 4. Revise § 648.11 to read as follows:

**§ 648.11   Monitoring coverage.**

(a) *Coverage.* The Regional Administrator may request any vessel holding a permit for Atlantic sea scallops, NE multispecies, monkfish, skates, Atlantic mackerel, squid, butterfish, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, tilefish, Atlantic surfclam, ocean quahog, or Atlantic deep-sea red crab; or a moratorium permit for summer flounder; to carry a NMFS-certified fisheries observer. A vessel holding a permit for Atlantic sea scallops is subject to the additional requirements specified in paragraph (k) of this section. A vessel holding an All Areas or Areas ⅔ Limited Access Herring Permit is subject to the additional requirements specified in paragraph (m) of this section. Also, any vessel or vessel owner/operator that fishes for, catches or lands hagfish, or intends to fish for, catch, or land hagfish in or from the exclusive economic zone must carry a NMFS-certified fisheries observer when requested by the Regional Administrator in accordance with the requirements of this section.

(b) *Facilitating coverage.* If requested by the Regional Administrator or their designees, including NMFS-certified observers, monitors, and NMFS staff, to be sampled by an observer or monitor, it is the responsibility of the vessel owner or vessel operator to arrange for and facilitate observer or monitor placement. Owners or operators of vessels selected for observer or monitor coverage must notify the appropriate monitoring service provider before commencing any fishing trip that may result in the harvest of resources of the respective fishery. Notification procedures will be specified in selection letters to vessel owners or permit holder letters.

(c) *Safety waivers.* The Regional Administrator may waive the requirement to be sampled by an observer or monitor if the facilities on a vessel for housing the observer or monitor, or for carrying out observer or monitor functions, are so inadequate or unsafe that the health or safety of the observer or monitor, or the safe operation of the vessel, would be jeopardized.

(d) *Vessel requirements associated with coverage.* An owner or operator of a vessel on which a NMFS-certified observer or monitor is embarked must:

(1) Provide accommodations and food that are equivalent to those provided to the crew.

(2) Allow the observer or monitor access to and use of the vessel's communications equipment and personnel upon request for the transmission and receipt of messages related to the observer's or monitor's duties.

(3) Provide true vessel locations, by latitude and longitude or loran coordinates, as requested by the observer or monitor, and allow the observer or monitor access to and use of the vessel's navigation equipment and personnel upon request to determine the vessel's position.

(4) Notify the observer or monitor in a timely fashion of when fishing operations are to begin and end.

(5) Allow for the embarking and debarking of the observer or monitor, as specified by the Regional Administrator, ensuring that transfers of observers or monitors at sea are accomplished in a safe manner, via small boat or raft, during daylight hours as weather and sea conditions allow, and with the agreement of the observers or monitors involved.

(6) Allow the observer or monitor free and unobstructed access to the vessel's bridge, working decks, holding bins, weight scales, holds, and any other space used to hold, process, weigh, or store fish.

(7) Allow the observer or monitor to inspect and copy any the vessel's log, communications log, and records associated with the catch and distribution of fish for that trip.

(e) *Vessel requirements associated with protected species.* The owner or operator of a vessel issued a summer flounder moratorium permit, a scup moratorium permit, a black sea bass moratorium permit, a bluefish permit, a spiny dogfish permit, an Atlantic herring permit, an Atlantic deep-sea red crab permit, a skate permit, or a tilefish permit, if requested by the observer or monitor, also must:

(1) Notify the observer or monitor of any sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, tilefish, skates (including discards) or other specimens taken by the vessel.

(2) Provide the observer or monitor with sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, skates, tilefish, or other specimens taken by the vessel.

(f) *Coverage funded from outside sources.* NMFS may accept observer or monitor coverage funded by outside sources if:

(1) All coverage conducted by such observers or monitors is determined by NMFS to be in compliance with NMFS' observer or monitor guidelines and procedures.

(2) The owner or operator of the vessel complies with all other provisions of this part.

(3) The observer or monitor is approved by the Regional Administrator.

(g) *Industry-funded monitoring programs.* Fishery management plans (FMPs) managed by the New England Fishery Management Council (New England Council), including Atlantic Herring, Atlantic Salmon, Atlantic Sea Scallops, Deep-Sea Red Crab, Northeast Multispecies, and Northeast Skate Complex, may include industry-funded monitoring programs (IFM) to supplement existing monitoring required by the Standard Bycatch Reporting Methodology (SBRM), Endangered Species Act, and the Marine Mammal Protection Act. IFM programs may use observers, monitors, including at-sea monitors and portside samplers, and electronic monitoring to meet specified IFM coverage targets. The ability to meet IFM coverage targets may be constrained by the availability of

Federal funding to pay NMFS cost responsibilities associated with IFM.

(1) *Guiding principles for new IFM programs.* The Council's development of an IFM program must consider or include the following:

(i) A clear need or reason for the data collection;

(ii) Objective design criteria;

(iii) Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;

(iv) Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;

(v) Prioritize the use of modern technology to the extent practicable; and

(vi) Incentives for reliable self-reporting.

(2) *Process to implement and revise new IFM programs.* New IFM programs shall be developed via an amendment to a specific FMP. IFM programs implemented in an FMP may be revised via a framework adjustment. The details of an IFM program may include, but are not limited to:

(i) Level and type of coverage target;

(ii) Rationale for level and type of coverage;

(iii) Minimum level of coverage necessary to meet coverage goals;

(iv) Consideration of waivers if coverage targets cannot be met;

(v) Process for vessel notification and selection;

(vi) Cost collection and administration;

(vii) Standards for monitoring service providers; and

(viii) Any other measures necessary to implement the industry-funded monitoring program.

(3) *NMFS cost responsibilities.* IFM programs have two types of costs, NMFS and industry costs. Cost responsibilities are delineated by the type of cost. NMFS cost responsibilities include the following:

(i) The labor and facilities associated with training and debriefing of monitors;

(ii) NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);

(iii) Certification of monitoring service providers and individual observers or monitors; performance monitoring to maintain certificates;

(iv) Developing and executing vessel selection;

(v) Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and

(vi) Costs associated with liaison activities between service providers, and NMFS, Coast Guard, New England Council, sector managers, and other partners.

(vii) The industry is responsible for all other costs associated with IFM programs.

(4) *Prioritization process to cover NMFS IFM cost responsibilities.* (i) Available Federal funding refers to any funds in excess of those allocated to meet SBRM requirements or the existing IFM programs in the Atlantic Sea Scallop and Northeast Multispecies FMPs that may be used to cover NMFS cost responsibilities associated with IFM coverage targets. If there is no available Federal funding in a given year to cover NMFS IFM cost responsibilities, then there shall be no IFM coverage during that year. If there is some available Federal funding in a given year, but not enough to cover all of NMFS cost responsibilities associated with IFM coverage targets, then the New England Council will prioritize available Federal funding across IFM programs during that year. Existing IFM programs for Atlantic sea scallops and Northeast multispecies fisheries shall not be included in this prioritization process.

(ii) Programs with IFM coverage targets shall be prioritized using an equal weighting approach, such that any available Federal funding shall be divided equally among programs.

(iii) After NMFS determines the amount of available Federal funding for the next fishing year, NMFS shall provide the New England Council with the estimated IFM coverage levels for the next fishing year. The estimated IFM coverage levels would be based on the equal weighting approach and would include the rationale for any deviations from the equal weighting approach. The New England Council may recommend revisions and additional considerations to the Regional Administrator and Science and Research Director.

(A) If available Federal funding exceeds that needed to pay all of NMFS cost responsibilities for administering IFM programs, the New England Council may request NMFS to use available funding to help offset industry cost responsibilities through reimbursement.

(B) [Reserved]

(iv) Revisions to the prioritization process may be made via a framework adjustment to all New England FMPs.

(v) Revisions to the weighting approach for the New England Council-led prioritization process may be made via a framework adjustment to all New England FMPs or by the New England Council considering a new weighting approach at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the weighting approach. NMFS shall implement revisions to the weighting approach in a manner consistent with the Administrative Procedure Act.

(5) *IFM program monitoring service provider requirements.* IFM monitoring service provider requirements shall be consistent with requirements in paragraph (h) of this section and observer or monitor requirements shall be consistent with requirements in paragraph (i) of this section.

(6) *Monitoring set-aside.* The New England Council may develop a monitoring set-aside program for individual FMPs that would devote a portion of the annual catch limit for a fishery to help offset the industry cost responsibilities for monitoring coverage, including observers, at-sea monitors, portside samplers, and electronic monitoring.

(i) The details of a monitoring set-aside program may include, but are not limited to:

(A) The basis for the monitoring set-aside;

(B) The amount of the set-aside (*e.g.,* quota, days at sea);

(C) How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* an increased trip limit, differential days at sea counting, additional trips, an allocation of the quota);

(D) The process for vessel notification;

(E) How funds are collected and administered to cover the industry's costs of monitoring; and

(F) Any other measures necessary to develop and implement a monitoring set-aside.

(ii) The New England Council may develop new monitoring set-asides and revise those monitoring set-asides via a framework adjustment to the relevant FMP.

(h) *Monitoring service provider approval and responsibilities*—(1) *General.* An entity seeking to provide monitoring services, including services for IFM Programs described in paragraph (g) of this section, must apply for and obtain approval from NMFS following submission of a complete application. Monitoring services include providing NMFS-certified observers, monitors (at-sea monitors and portside samplers), and/or electronic monitoring. A list of approved monitoring service providers shall be distributed to vessel owners and shall be posted on the NMFS Fisheries Sampling Branch (FSB) website at: *https://www.nefsc.noaa.gov/femad/fsb/.*

(2) [Reserved]

_0000017749

(3) *Contents of application.* An application to become an approved monitoring service provider shall contain the following:

(i) Identification of the management, organizational structure, and ownership structure of the applicant's business, including identification by name and general function of all controlling management interests in the company, including but not limited to owners, board members, officers, authorized agents, and staff. If the applicant is a corporation, the articles of incorporation must be provided. If the applicant is a partnership, the partnership agreement must be provided.

(ii) The permanent mailing address, phone and fax numbers where the owner(s) can be contacted for official correspondence, and the current physical location, business mailing address, business telephone and fax numbers, and business email address for each office.

(iii) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, that they are free from a conflict of interest as described under paragraph (h)(6) of this section.

(iv) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, describing any criminal conviction(s), Federal contract(s) they have had and the performance rating they received on the contracts, and previous decertification action(s) while working as an observer or monitor or monitoring service provider.

(v) A description of any prior experience the applicant may have in placing individuals in remote field and/or marine work environments. This includes, but is not limited to, recruiting, hiring, deployment, and personnel administration.

(vi) A description of the applicant's ability to carry out the responsibilities and duties of a monitoring service provider as set out under paragraph (h)(5) of this section, and the arrangements to be used.

(vii) Evidence of holding adequate insurance to cover injury, liability, and accidental death for observers or monitors, whether contracted or employed by the service provider, during their period of employment (including during training). Workers' Compensation and Maritime Employer's Liability insurance must be provided to cover the observer or monitor, vessel owner, and observer provider. The minimum coverage required is $5 million. Monitoring service providers shall provide copies of the insurance policies to observers or monitors to display to the vessel owner, operator, or vessel manager, when requested.

(viii) Proof that its observers or monitors, whether contracted or employed by the service provider, are compensated with salaries that meet or exceed the U.S. Department of Labor (DOL) guidelines for observers. Observers shall be compensated as Fair Labor Standards Act (FLSA) non-exempt employees. Monitoring service providers shall provide any other benefits and personnel services in accordance with the terms of each observer's or monitor's contract or employment status.

(ix) The names of its fully equipped, NMFS/FSB certified, observers or monitors on staff or a list of its training candidates (with resumes) and a request for an appropriate NMFS/FSB Training class. All training classes have a minimum class size of eight individuals, which may be split among multiple vendors requesting training. Requests for training classes with fewer than eight individuals will be delayed until further requests make up the full training class size.

(x) An Emergency Action Plan (EAP) describing its response to an "at sea" emergency with an observer or monitor, including, but not limited to, personal injury, death, harassment, or intimidation. An EAP that details a monitoring service provider's responses to emergencies involving observers, monitors, or monitoring service provider personnel. The EAP shall include communications protocol and appropriate contact information in an emergency.

(4) *Application evaluation.* (i) NMFS shall review and evaluate each application submitted under paragraph (h)(3) of this section. Issuance of approval as a monitoring service provider shall be based on completeness of the application, and a determination by NMFS of the applicant's ability to perform the duties and responsibilities of a monitoring service provider, as demonstrated in the application information. A decision to approve or deny an application shall be made by NMFS within 15 business days of receipt of the application by NMFS.

(ii) If NMFS approves the application, the monitoring service provider's name will be added to the list of approved monitoring service providers found on the NMFS/FSB website specified in paragraph (h)(1) of this section, and in any outreach information to the industry. Approved monitoring service providers shall be notified in writing and provided with any information pertinent to its participation in the observer or monitor programs.

(iii) An application shall be denied if NMFS determines that the information provided in the application is not complete or the evaluation criteria are not met. NMFS shall notify the applicant in writing of any deficiencies in the application or information submitted in support of the application. An applicant who receives a denial of his or her application may present additional information to rectify the deficiencies specified in the written denial, provided such information is submitted to NMFS within 30 days of the applicant's receipt of the denial notification from NMFS. In the absence of additional information, and after 30 days from an applicant's receipt of a denial, a monitoring service provider is required to resubmit an application containing all of the information required under the application process specified in paragraph (h)(3) of this section to be re-considered for being added to the list of approved monitoring service providers.

(5) *Responsibilities of monitoring service providers*—(i) *Certified observers or monitors.* A monitoring service provider must provide observers or monitors certified by NMFS/FSB pursuant to paragraph (i) of this section for deployment in a fishery when contacted and contracted by the owner, operator, or vessel manager of a fishing vessel, unless the monitoring service provider refuses to deploy an observer or monitor on a requesting vessel for any of the reasons specified at paragraph (h)(5)(viii) of this section.

(ii) *Support for observers or monitors.* A monitoring service provider must provide to each of its observers or monitors:

(A) All necessary transportation, lodging costs and support for arrangements and logistics of travel for observers and monitors to and from the initial location of deployment, to all subsequent vessel assignments, to any debriefing locations, and for appearances in Court for monitoring-related trials as necessary;

(B) Lodging, per diem, and any other services necessary for observers or monitors assigned to a fishing vessel or to attend an appropriate NMFS/FSB training class;

(C) The required observer or monitor equipment, in accordance with equipment requirements listed on the NMFS/FSB website specified in paragraph (h)(1) of this section, prior to any deployment and/or prior to NMFS observer or monitor certification training; and

(D) Individually assigned communication equipment, in working order, such as a mobile phone, for all

necessary communication. A monitoring service provider may alternatively compensate observers or monitors for the use of the observer's or monitor's personal mobile phone, or other device, for communications made in support of, or necessary for, the observer's or monitor's duties.

(iii) *Observer and monitor deployment logistics.* Each approved monitoring service provider must assign an available certified observer or monitor to a vessel upon request. Each approved monitoring service provider must be accessible 24 hours per day, 7 days per week, to enable an owner, operator, or manager of a vessel to secure monitoring coverage when requested. The telephone or other notification system must be monitored a minimum of four times daily to ensure rapid response to industry requests. Monitoring service providers approved under this paragraph (h) are required to report observer or monitor deployments to NMFS for the purpose of determining whether the predetermined coverage levels are being achieved in the appropriate fishery.

(iv) *Observer deployment limitations.* (A) A candidate observer's first several deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/FSB prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified. For further information, see *https://www.nefsc.noaa.gov/fsb/ training/.*

(B) For the purpose of coverage to meet SBRM requirements, unless alternative arrangements are approved by NMFS, a monitoring service provider must not deploy any NMFS-certified observer on the same vessel for more than two consecutive multi-day trips, and not more than twice in any given month for multi-day deployments.

(C) For the purpose of coverage to meet IFM requirements, a monitoring service provider may deploy any NMFS-certified observer or monitor on the same vessel for more than two consecutive multi-day trips and more than twice in any given month for multi-day deployments.

(v) *Communications with observers and monitors.* A monitoring service provider must have an employee responsible for observer or monitor activities on call 24 hours a day to handle emergencies involving observers or monitors or problems concerning observer or monitor logistics, whenever observers or monitors are at sea, stationed portside, in transit, or in port awaiting vessel assignment.

(vi) *Observer and monitor training requirements.* A request for a NMFS/ FSB Observer or Monitor Training class must be submitted to NMFS/FSB 45 calendar days in advance of the requested training. The following information must be submitted to NMFS/FSB at least 15 business days prior to the beginning of the proposed training: A list of observer or monitor candidates; candidate resumes, cover letters and academic transcripts; and a statement signed by the candidate, under penalty of perjury, that discloses the candidate's criminal convictions, if any. A medical report certified by a physician for each candidate is required 7 business days prior to the first day of training. CPR/First Aid certificates and a final list of training candidates with candidate contact information (email, phone, number, mailing address and emergency contact information) are due 7 business days prior to the first day of training. NMFS may reject a candidate for training if the candidate does not meet the minimum qualification requirements as outlined by NMFS/FSB minimum eligibility standards for observers or monitors as described on the NMFS/FSB website.

(vii) *Reports and Requirements*—(A) *Deployment reports.* The monitoring service provider must report to NMFS/ FSB when, where, to whom, and to what vessel an observer or monitor has been deployed, as soon as practicable, and according to requirements outlined on the NMFS/FSB website. The deployment report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week. The monitoring service provider must ensure that the observer or monitor reports to NMFS the required electronic data, as described in the NMFS/FSB training. Electronic data submission protocols will be outlined in training and may include accessing government websites via personal computers/ devices or submitting data through government issued electronics. The monitoring service provider shall provide the raw (unedited) data collected by the observer or monitor to NMFS at the specified time per program. For further information, see *https://www.nefsc.noaa.gov/fsb/ scallop/.*

(B) *Safety refusals.* The monitoring service provider must report to NMFS any trip or landing that has been refused due to safety issues (*e.g.,* failure to hold a valid USCG Commercial Fishing Vessel Safety Examination Decal or to meet the safety requirements of the observer's or monitor's safety checklist) within 12 hours of the refusal.

(C) *Biological samples.* The monitoring service provider must ensure that biological samples, including whole marine mammals, sea turtles, sea birds, and fin clips or other DNA samples, are stored/handled properly and transported to NMFS within 5 days of landing. If transport to NMFS/FSB Observer Training Facility is not immediately available then whole animals requiring freezing shall be received by the nearest NMFS freezer facility within 24 hours of vessel landing.

(D) *Debriefing.* The monitoring service provider must ensure that the observer or monitor remains available to NMFS, either in-person or via phone, at NMFS' discretion, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any monitored trip. If requested by NMFS, an observer or monitor that is at sea during the 2-week period must contact NMFS upon his or her return. Monitoring service providers must pay for travel and land hours for any requested debriefings.

(E) *Availability report.* The monitoring service provider must report to NMFS any occurrence of inability to respond to an industry request for observer or monitor coverage due to the lack of available observers or monitors as soon as practicable if the provider is unable to respond to an industry request for monitoring coverage. Availability report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week.

(F) *Incident reports.* The monitoring service provider must report possible observer or monitor harassment, discrimination, concerns about vessel safety or marine casualty, or observer or monitor illness or injury; and any information, allegations, or reports regarding observer or monitor conflict of interest or breach of the standards of behavior, to NMFS/FSB within 12 hours of the event or within 12 hours of learning of the event.

(G) *Status report.* The monitoring service provider must provide NMFS/ FSB with an updated list of contact information for all observers or monitors that includes the identification number, name, mailing address, email address, phone numbers, homeports or fisheries/ trip types assigned, and must include whether or not the observer or monitor is "in service," indicating when the observer or monitor has requested leave and/or is not currently working for an industry-funded program. Any Federally contracted NMFS-certified observer not actively deployed on a vessel for 30 days will be placed on Leave of Absence (LOA) status (or as specified by NMFS/FSB according to

most recent Information Technology Security Guidelines at *https://www.nefsc.noaa.gov/fsb/memos/*. Those Federally contracted NMFS-certified observers on LOA for 90 days or more will need to conduct an exit interview with NMFS/FSB and return any NMFS/FSB issued gear and Common Access Card (CAC), unless alternative arrangements are approved by NMFS/FSB. NMFS/FSB requires 2-week advance notification when a Federally contracted NMFS-certified observer is leaving the program so that an exit interview may be arranged and gear returned.

(H) *Vessel contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and those entities requiring monitoring services.

(I) *Observer and monitor contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and specific observers or monitors.

(J) *Additional information.* The monitoring service provider must submit to NMFS/FSB, if requested, copies of any information developed and/or used by the monitoring service provider and distributed to vessels, observers, or monitors, such as informational pamphlets, payment notification, daily rate of monitoring services, description of observer or monitor duties, etc.

(viii) *Refusal to deploy an observer or monitor.* (A) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider does not have an available observer or monitor within the required time and must report all refusals to NMFS/FSB.

(B) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described at § 600.746.

(C) The monitoring service provider may refuse to deploy an observer or monitor on a fishing vessel that is otherwise eligible to carry an observer or monitor for any other reason, including failure to pay for previous monitoring deployments, provided the monitoring service provider has

received prior written confirmation from NMFS authorizing such refusal.

(6) *Limitations on conflict of interest.* A monitoring service provider:

(i) Must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, a fishing vessel, fish dealer, and/or fishery advocacy group (other than providing monitoring services);

(ii) Must assign observers or monitors without regard to any preference by representatives of vessels other than when an observer or monitor will be deployed for the trip that was selected for coverage; and

(iii) Must not solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing related activities that are regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of monitoring service providers.

(7) *Removal of monitoring service provider from the list of approved service providers.* A monitoring service provider that fails to meet the requirements, conditions, and responsibilities specified in paragraphs (h)(5) and (6) of this section shall be notified by NMFS, in writing, that it is subject to removal from the list of approved monitoring service providers. Such notification shall specify the reasons for the pending removal. A monitoring service provider that has received notification that it is subject to removal from the list of approved monitoring service providers may submit written information to rebut the reasons for removal from the list. Such rebuttal must be submitted within 30 days of notification received by the monitoring service provider that the monitoring service provider is subject to removal and must be accompanied by written evidence rebutting the basis for removal. NMFS shall review information rebutting the pending removal and shall notify the monitoring service provider within 15 days of receipt of the rebuttal whether or not the removal is warranted. If no response to a pending removal is received by NMFS, the monitoring service provider shall be automatically removed from the list of approved monitoring service providers. The decision to remove the monitoring service provider from the list, either after reviewing a rebuttal, or if no rebuttal is submitted, shall be the final decision of NMFS and the Department of Commerce. Removal from the list of approved monitoring service providers does not necessarily prevent such

monitoring service provider from obtaining an approval in the future if a new application is submitted that demonstrates that the reasons for removal are remedied. Certified observers and monitors under contract with observer monitoring service provider that has been removed from the list of approved service providers must complete their assigned duties for any fishing trips on which the observers or monitors are deployed at the time the monitoring service provider is removed from the list of approved monitoring service providers. A monitoring service provider removed from the list of approved monitoring service providers is responsible for providing NMFS with the information required in paragraph (h)(5)(vii) of this section following completion of the trip. NMFS may consider, but is not limited to, the following in determining if a monitoring service provider may remain on the list of approved monitoring service providers:

(i) Failure to meet the requirements, conditions, and responsibilities of monitoring service providers specified in paragraphs (h)(5) and (6) of this section;

(ii) Evidence of conflict of interest as defined under paragraph (h)(6) of this section;

(iii) Evidence of criminal convictions related to:

(A) Embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; or

(B) The commission of any other crimes of dishonesty, as defined by state law or Federal law, that would seriously and directly affect the fitness of an applicant in providing monitoring services under this section; and

(iv) Unsatisfactory performance ratings on any Federal contracts held by the applicant; and

(v) Evidence of any history of decertification as either an observer, monitor, or monitoring service provider.

(i) *Observer or monitor certification—* (1) *Requirements.* To be certified, employees or sub-contractors operating as observers or monitors for monitoring service providers approved under paragraph (h) of this section. In addition, observers must meet NMFS National Minimum Eligibility Standards for observers specified at the National Observer Program website: *https://www.nmfs.noaa.gov/op/pds/categories/scienceandtechnology.html.* For further information, see *https://www.st.nmfs.noaa.gov/observer-home/.*

(2) *Observer or monitor training.* In order to be deployed on any fishing vessel, a candidate observer or monitor

must have passed an appropriate NMFS/FSB Observer Training course and must adhere to all NMFS/FSB program standards and policies (refer to website for program standards, *https://www.nefsc.noaa.gov/fsb/training/*). If a candidate fails training, the candidate and monitoring service provider shall be notified immediately by NMFS/FSB. Observer training may include an observer training trip, as part of the observer's training, aboard a fishing vessel with a trainer. Refer to the NMFS/FSB website for the required number of program specific observer and monitor training certification trips for full certification following training, *https://www.nefsc.noaa.gov/fsb/training/*.

(3) *Observer requirements.* All observers must:

(i) Have a valid NMFS/FSB fisheries observer certification pursuant to paragraph (i)(1) of this section;

(ii) Be physically and mentally capable of carrying out the responsibilities of an observer on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iii) Have successfully completed all NMFS-required training and briefings for observers before deployment, pursuant to paragraph (i)(2) of this section;

(iv) Hold a current Red Cross (or equivalence) CPR/First Aid certification;

(v) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vi) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(4) *Monitor requirements.* All monitors must:

(i) Hold a high school diploma or legal equivalent;

(ii) Have a valid NMFS/FSB certification pursuant to paragraph (i)(1) of this section;

(iii) Be physically and mentally capable of carrying out the responsibilities of a monitor on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iv) Have successfully completed all NMFS-required training and briefings for monitors before deployment, pursuant to paragraph (i)(2) of this section;

(v) Hold a current Red Cross (or equivalence) CPR/First Aid certification if the monitor is to be employed as an at-sea monitor;

(vi) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vii) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(5) *Probation and decertification.* NMFS may review observer and monitor certifications and issue observer and monitor certification probation and/or decertification as described in NMFS policy found on the NMFS/FSB website specified in paragraph (h)(1) of this section.

(6) *Issuance of decertification.* Upon determination that decertification is warranted under paragraph (i)(5) of this section, NMFS shall issue a written decision to decertify the observer or monitor to the observer or monitor and approved monitoring service providers via certified mail at the observer's or monitor's most current address provided to NMFS. The decision shall identify whether a certification is revoked and shall identify the specific reasons for the action taken. Decertification is effective immediately as of the date of issuance, unless the decertification official notes a compelling reason for maintaining certification for a specified period and under specified conditions. Decertification is the final decision of NMFS and the Department of Commerce and may not be appealed.

(j) *Coverage.* In the event that a vessel is requested by the Regional Administrator to carry a NMFS-certified fisheries observer pursuant to paragraph (a) of this section and is also selected to carry an at-sea monitor as part of an approved sector at-sea monitoring program specified in § 648.87(b)(1)(v) for the same trip, only the NMFS-certified fisheries observer is required to go on that particular trip.

(k) *Atlantic sea scallop observer program*—(1) *General.* Unless otherwise specified, owners, operators, and/or managers of vessels issued a Federal scallop permit under § 648.4(a)(2), and specified in paragraph (a) of this section, must comply with this section and are jointly and severally responsible for their vessel's compliance with this section. To facilitate the deployment of at-sea observers, all sea scallop vessels issued limited access and LAGC IFQ permits are required to comply with the additional notification requirements specified in paragraph (k)(2) of this section. When NMFS notifies the vessel owner, operator, and/or manager of any requirement to carry an observer on a specified trip in either an Access Area or Open Area as specified in paragraph (k)(3) of this section, the vessel may not fish for, take, retain, possess, or land any scallops without carrying an observer. Vessels may only embark on a scallop trip in open areas or Access Areas without an observer if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver of the observer requirement for that trip pursuant to paragraphs (k)(3) and (k)(4)(ii) of this section.

(2) *Vessel notification procedures*—(i) *Limited access vessels.* Limited access vessel owners, operators, or managers shall notify NMFS/FSB by telephone not more than 10 days prior to the beginning of any scallop trip of the time, port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl, or general category vessel.

(ii) *LAGC IFQ vessels.* LAGC IFQ vessel owners, operators, or managers must notify the NMFS/FSB by telephone by 0001 hr of the Thursday preceding the week (Sunday through Saturday) that they intend to start any open area or access area scallop trip and must include the port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl vessel. If selected, up to two trips that start during the specified week (Sunday through Saturday) can be selected to be covered by an observer. NMFS/FSB must be notified by the owner, operator, or vessel manager of any trip plan changes at least 48 hr prior to vessel departure.

(3) *Selection of scallop trips for observer coverage.* Based on predetermined coverage levels for various permit categories and areas of the scallop fishery that are provided by NMFS in writing to all observer service providers approved pursuant to paragraph (h) of this section, NMFS shall notify the vessel owner, operator, or vessel manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified scallop trip, within 24 hr of the vessel owner's, operator's, or vessel manager's notification of the prospective scallop trip, as specified in paragraph (k)(2) of this section. Any request to carry an observer may be waived by NMFS. All waivers for observer coverage shall be issued to the vessel by VMS so as to have on-board verification of the waiver. A vessel may not fish in an area with an observer waiver confirmation number that does not match the scallop

trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(4) *Procurement of observer services by scallop vessels.* (i) An owner of a scallop vessel required to carry an observer under paragraph (k)(3) of this section must arrange for carrying an observer certified through the observer training class operated by the NMFS/FSB from an observer service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected to carry an observer must contact the observer service provider and must provide at least 48-hr notice in advance of the fishing trip for the provider to arrange for observer deployment for the specified trip. The observer service provider will notify the vessel owner, operator, or manager within 18 hr whether they have an available observer. A list of approved observer service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/femad/fsb/.* The observer service provider may take up to 48 hr to arrange for observer deployment for the specified scallop trip.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure a certified observer within 48 hr of the advance notification to the provider due to the unavailability of an observer may request a waiver from NMFS/FSB from the requirement for observer coverage for that trip, but only if the owner, operator, or vessel manager has contacted all of the available observer service providers to secure observer coverage and no observer is available. NMFS/FSB shall issue such a waiver within 24 hr, if the conditions of this paragraph (g)(4)(ii) are met. A vessel may not begin the trip without being issued a waiver.

(5) *Cost of coverage.* Owners of scallop vessels shall be responsible for paying the cost of the observer for all scallop trips on which an observer is carried onboard the vessel, regardless of whether the vessel lands or sells sea scallops on that trip, and regardless of the availability of set-aside for an increased possession limit or reduced DAS accrual rate. The owners of vessels that carry an observer may be compensated with a reduced DAS accrual rate for open area scallop trips or additional scallop catch per day in Sea Scallop Access Areas or additional catch per open area or access area trip for LAGC IFQ trips in order to help defray the cost of the observer, under the program specified in §§ 648.53 and 648.60.

(i) Observer service providers shall establish the daily rate for observer coverage on a scallop vessel on an Access Area trip or open area DAS or IFQ scallop trip consistent with paragraphs (k)(5)(i)(A) and (B), respectively, of this section.

(A) *Access Area trips.* (*1*) For purposes of determining the daily rate for an observed scallop trip on a limited access vessel in a Sea Scallop Access Area when that specific Access Area's observer set-aside specified in § 648.60(d)(1) has not been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, or any portion of a 24-hr period, regardless of the calendar day. For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time at sea equals 27 hr, which would equate to 2 full ''days.''

(*2*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for an observed scallop trip on a limited access vessel taken after NMFS has announced the industry-funded observer set-aside in that specific Access Area has been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(*3*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for observed scallop trips on an LAGC vessel, regardless of the status of the industry-funded observer set-aside, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(B) *Open area scallop trips.* For purposes of determining the daily rate for an observed scallop trip for DAS or LAGC IFQ open area trips, regardless of the status of the industry-funded

observer set-aside, a service provider shall charge dock to dock where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on the July 1st at 10 p.m. and lands on July 3rd at 1 a.m., the time at sea equals 27 hr, so the provider would charge 1 day and 3 hr.

(ii) NMFS shall determine any reduced DAS accrual rate and the amount of additional pounds of scallops per day fished in a Sea Scallop Access Area or on an open area LAGC IFQ trips for the applicable fishing year based on the economic conditions of the scallop fishery, as determined by best available information. Vessel owners and observer service providers shall be notified through the Small Entity Compliance Guide of any DAS accrual rate changes and any changes in additional pounds of scallops determined by the Regional Administrator to be necessary. NMFS shall notify vessel owners and observer providers of any adjustments.

(iii) Owners of scallop vessels shall pay observer service providers for observer services within 45 days of the end of a fishing trip on which an observer deployed.

(6) *Coverage and cost requirements.* When the available DAS or TAC set-aside for observer coverage is exhausted, vessels shall still be required to carry an observer as specified in this section, and shall be responsible for paying for the cost of the observer, but shall not be authorized to harvest additional pounds or fish at a reduced DAS accrual rate.

(l) *NE multispecies observer coverage*—(1) *Pre-trip notification.* Unless otherwise specified in this paragraph (l), or notified by the Regional Administrator, the owner, operator, or manager of a vessel (*i.e.,* vessel manager or sector manager) issued a limited access NE multispecies permit that is fishing under a NE multispecies DAS or on a sector trip, as defined in this part, must provide advanced notice to NMFS of the vessel name, permit number, and sector to which the vessel belongs, if applicable; contact name and telephone number for coordination of observer deployment; date, time, and port of departure; and the vessel's trip plan, including area to be fished, whether a monkfish DAS will be used, and gear type to be used at least 48 hr prior to departing port on any trip declared into the NE multispecies fishery pursuant to § 648.10 or § 648.85, as instructed by the Regional Administrator, for the purposes of selecting vessels for observer deployment. For trips lasting

48 hr or less in duration from the time the vessel leaves port to begin a fishing trip until the time the vessel returns to port upon the completion of the fishing trip, the vessel owner, operator, or manager may make a weekly notification rather than trip-by-trip calls. For weekly notifications, a vessel must notify NMFS by 0001 hr of the Friday preceding the week (Sunday through Saturday) that it intends to complete at least one NE multispecies DAS or sector trip during the following week and provide the date, time, port of departure, area to be fished, whether a monkfish DAS will be used, and gear type to be used for each trip during that week. Trip notification calls must be made no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS of any trip plan changes at least 24 hr prior to vessel departure from port. A vessel may not begin the trip without being issued an observer notification or a waiver by NMFS.

(2) *Vessel selection for observer coverage.* NMFS shall notify the vessel owner, operator, or manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified trip within 24 hr of the vessel owner's, operator's or manager's notification of the prospective trip, as specified in paragraph (l)(1) of this section. All trip notifications shall be issued a unique confirmation number. A vessel may not fish on a NE multispecies DAS or sector trip with an observer waiver confirmation number that does not match the trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are valid for 48 hr from the intended sail date. If a trip is interrupted and returns to port due to bad weather or other circumstance beyond the operator's control, and goes back out within 48 hr, the same confirmation number and observer status remains. If the layover time is greater than 48 hr, a new trip notification must be made by the operator, owner, or manager of the vessel.

(3) *NE multispecies monitoring program goals and objectives.* Monitoring programs established for the NE multispecies are to be designed and evaluated consistent with the following goals and objectives:

(i) Improve documentation of catch:

(A) Determine total catch and effort, for each sector and common pool, of target or regulated species; and

(B) Achieve coverage level sufficient to minimize effects of potential monitoring bias to the extent possible while maintaining as much flexibility as possible to enhance fleet viability.

(ii) Reduce the cost of monitoring:

(A) Streamline data management and eliminate redundancy;

(B) Explore options for cost-sharing and deferment of cost to industry; and

(C) Recognize opportunity costs of insufficient monitoring.

(iii) Incentivize reducing discards:

(A) Determine discard rate by smallest possible strata while maintaining cost-effectiveness; and

(B) Collect information by gear type to accurately calculate discard rates.

(iv) Provide additional data streams for stock assessments:

(A) Reduce management and/or biological uncertainty; and

(B) Perform biological sampling if it may be used to enhance accuracy of mortality or recruitment calculations.

(v) Enhance safety of monitoring program.

(vi) Perform periodic review of monitoring program for effectiveness.

(m) *Atlantic herring monitoring coverage*—(1) *Monitoring requirements.* (i) In addition to the requirement for any vessel holding an Atlantic herring permit to carry a NMFS-certified observer described in paragraph (a) of this section, vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to industry-funded monitoring (IFM) requirements on declared Atlantic herring trips, unless the vessel is carrying a NMFS-certified observer to fulfill Standard Bycatch Reporting Methodology requirements. An owner of a midwater trawl vessel, required to carry a NMFS-certified observer when fishing in Northeast Multispecies Closed Areas at § 648.202(b), may purchase an IFM high volume fisheries (HVF) observer to access Closed Areas on a trip-by-trip basis. General requirements for IFM programs in New England Council FMPs are specified in paragraph (g) of this section. Possible IFM monitoring for the Atlantic herring fishery includes NMFS-certified observers, at-sea monitors, and electronic monitoring and portside samplers, as defined in § 648.2.

(A) IFM HVF observers shall collect the following information:

(*1*) Fishing gear information (*e.g.*, size of nets, mesh sizes, and gear configurations);

(*2*) Tow-specific information (*e.g.*, depth, water temperature, wave height, and location and time when fishing begins and ends);

(*3*) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(*4*) Species, weight, and disposition of all retained catch on unobserved hauls;

(*5*) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(*6*) Whole specimens, photos, length information, and biological samples (*e.g.*, scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);

(*7*) Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(*8*) Vessel trip costs (*i.e.*, operational costs for trip including food, fuel, oil, and ice).

(B) IFM HVF at-sea monitors shall collect the following information:

(*1*) Fishing gear information (*e.g.*, size of nets, mesh sizes, and gear configurations);

(*2*) Tow-specific information (*e.g.*, depth, water temperature, wave height, and location and time when fishing begins and ends);

(*3*) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(*4*) Species, weight, and disposition of all retained catch on unobserved hauls;

(*5*) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(*6*) Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

(*7*) Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(*8*) Vessel trip costs (*i.e.*, operational costs for trip including food, fuel, oil, and ice).

(*9*) The New England Council may recommend that at-sea monitors collect additional biological information upon request. Revisions to the duties of an at-sea monitor, such that additional biological information would be collected, may be done via a framework adjustment. At-sea monitor duties may also be revised to collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the duties for at-sea monitors. NMFS shall implement revisions to at-sea monitor duties in accordance with the APA.

(C) IFM Portside samplers shall collect the following information:

(*1*) Species, weight, and disposition of all retained catch (fish, sharks, crustaceans, invertebrates, and debris) on sampled trips;

(*2*) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling; and

(3) Whole specimens, photos, length information, and biological samples (*i.e.*, scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes).

(ii) Vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to IFM at-sea monitoring coverage. If the New England Council determines that electronic monitoring, used in conjunction with portside sampling, is an adequate substitute for at-sea monitoring on vessels fishing with midwater trawl gear, and it is approved by the Regional Administrator as specified in (m)(1)(iii), then owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose either IFM at-sea monitoring coverage or IFM electronic monitoring and IFM portside sampling coverage, pursuant with requirements in paragraphs (h) and (i) of this section. Once owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose an IFM monitoring type, vessel owners must select one IFM monitoring type per fishing year and notify NMFS of their selected IFM monitoring type via selection form six months in advance (October 31) of the beginning of the SBRM year. NMFS will provide vessels owners with selection forms no later than September 1 in advance of the beginning of the SBRM year.

(A) In a future framework adjustment, the New England Council may consider if electronic monitoring and portside sampling coverage is an adequate substitute for at-sea monitoring coverage for Atlantic herring vessels that fish with purse seine and/or bottom trawl gear.

(B) IFM coverage targets for the Atlantic herring fishery are calculated by NMFS, in consultation with New England Council staff.

(C) If IFM coverage targets do not match for the Atlantic herring and Atlantic mackerel fisheries, then the higher IFM coverage target would apply on trips declared into both fisheries.

(D) Vessels intending to land less than 50 mt of Atlantic herring are exempt from IFM requirements, provided that the vessel requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(B) and (m)(3) of this section. Vessels issued a waiver must land less than 50 mt of Atlantic herring on that trip.

(E) A wing vessel (*i.e.*, midwater trawl vessel pair trawling with another midwater trawl vessel) is exempt from IFM requirements on a trip, provided the wing vessel does not possess or land any fish on that trip and requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(C) and (m)(3) of this section.

(F) Two years after implementation of IFM in the Atlantic herring fishery, the New England Council will examine the results of any increased coverage in the Atlantic herring fishery and consider if adjustments to the IFM coverage targets are warranted.

(iii) Electronic monitoring and portside sampling coverage may be used in place of at-sea monitoring coverage in the Atlantic herring fishery, if the electronic monitoring technology is deemed sufficient by the New England Council. The Regional Administrator, in consultation with the New England Council, may approve the use of electronic monitoring and portside sampling for the Atlantic herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the **Federal Register**. A vessel electing to use electronic monitoring and portside sampling in lieu of at-sea monitoring must develop a vessel monitoring plan to implement an electronic monitoring and portside sampling program that NMFS determines is sufficient for monitoring catch, discards and slippage events. The electronic monitoring and portside sampling program shall be reviewed and approved by NMFS as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

(iv) Owners, operators, or managers of vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit are responsible for their vessel's compliance with IFM requirements. When NMFS notifies a vessel owner, operator, or manager of the requirement to have monitoring coverage on a specific declared Atlantic herring trip, that vessel may not fish for, take, retain, possess, or land any Atlantic herring without the required monitoring coverage. Vessels may only embark on a declared Atlantic herring trip without the required monitoring coverage if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver for the required monitoring coverage for that trip, pursuant to paragraphs (m)(2)(iii)(B) and (C) and (m)(3) of this section.

(v) To provide the required IFM coverage aboard declared Atlantic herring trips, NMFS-certified observers and monitors must hold a high volume fisheries certification from NMFS/FSB. See details of high volume certification at *https://www.nefsc.noaa.gov/fsb/training/*.

(2) *Pre-trip notification.* (i) At least 48 hr prior to the beginning of any trip on which a vessel may harvest, possess, or land Atlantic herring, the owner, operator, or manager of a vessel issued a Limited Access Herring Permit, or a vessel issued an Areas 2/3 Open Access Herring Permit, or a vessel issued an All Areas Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), or a vessel acting as a herring carrier must notify NMFS/FSB of the trip.

(ii) The notification to NMFS/FSB must include the following information: Vessel name or permit number; email and telephone number for contact; the date, time, and port of departure; trip length; and gear type.

(iii) For vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit, the trip notification must also include the following requests, if appropriate:

(A) For IFM NMFS-certified observer coverage aboard vessels fishing with midwater trawl gear to access the Northeast Multispecies Closed Areas, consistent with requirements at § 648.202(b), at any point during the trip;

(B) For a waiver of IFM requirements on a trip that shall land less than 50 mt of Atlantic herring; and

(C) For a waiver of IFM requirements on trip by a wing vessel as described in paragraph (m)(ii)(E) of this section.

(iv) Trip notification must be provided no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS/FSB of any trip plan changes at least 12 hr prior to vessel departure from port.

(3) *Selection of trips for monitoring coverage.* NMFS shall notify the owner, operator, and/or manager of a vessel with an Atlantic herring permit whether a declared Atlantic herring trip requires coverage by a NMFS-funded observer or whether a trip requires IFM coverage. NMFS shall also notify the owner, operator, and/or manager of vessel if a waiver has been granted, either for the NMFS-funded observer or for IFM coverage, as specified in paragraph (m)(2) of this section. All waivers for monitoring coverage shall be issued to the vessel by VMS so that there is an on-board verification of the waiver. A waiver is invalid if the fishing behavior on that trip is inconsistent with the terms of the waiver.

(4) *Procurement of monitoring services by Atlantic herring vessels.* (i) An owner of an Atlantic herring vessel required to have monitoring under paragraph (m)(3) of this section must

arrange for monitoring by an individual certified through training classes operated by the NMFS/FSB and from a monitoring service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected for monitoring must contact a monitoring service provider prior to the beginning of the trip and the monitoring service provider will notify the vessel owner, operator, or manager whether monitoring is available. A list of approved monitoring service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/femad/fsb/*.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure monitoring due to the unavailability of monitoring may request a waiver from NMFS/FSB from the requirement for monitoring on that trip, but only if the owner, operator, or vessel manager has contacted all of the available monitoring service providers to secure monitoring and no monitoring is available. NMFS/FSB shall issue a waiver, if the conditions of this paragraph (m)(4)(ii) are met. A vessel without monitoring coverage may not begin a declared Atlantic herring trip without having been issued a waiver.

(iii) Vessel owners shall pay service providers for monitoring services within 45 days of the end of a fishing trip that was monitored.

(5) *Vessels working cooperatively.* When vessels issued limited access herring permits are working cooperatively in the Atlantic herring fishery, including pair trawling, purse seining, and transferring herring at-sea, each vessel must provide to observers or monitors, when requested, the estimated weight of each species brought on board and the estimated weight of each species released on each tow.

(6) *Sampling requirements for NMFS-certified observer and monitors.* In addition to the requirements at § 648.11(d)(1) through (7), an owner or operator of a vessel issued a limited access herring permit on which a NMFS-certified observer or monitor is embarked must provide observers or monitors:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers or monitors to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers or monitors; and collecting and carrying baskets of fish when requested by the observers or monitors.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(iv) Visual access to the net, the codend of the net, and the purse seine bunt and any of its contents after pumping has ended and before the pump is removed from the net. On trawl vessels, the codend including any remaining contents must be brought on board, unless bringing the codend on board is not possible. If bringing the codend on board is not possible, the vessel operator must ensure that the observer or monitor can see the codend and its contents as clearly as possible before releasing its contents.

(7) *Measures to address slippage.* (i) No vessel issued a limited access herring permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish which can be pumped from the net prior to release.

(ii) Vessels may make test tows without pumping catch on board if the net is re-set without releasing its contents provided that all catch from test tows is available to the observer to sample when the next tow is brought on board for sampling.

(iii) If a vessel issued any limited access herring permit slips catch, the vessel operator must report the slippage event on the Atlantic herring daily VMS catch report and indicate the reason for slipping catch. Additionally, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iv) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any of the reasons described in paragraph (m)(7)(i) of this section when an observer or monitor is aboard, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(v) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any reason on a trip selected by NMFS for portside sampling, pursuant to paragraph (m)(3) of this section, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(vi) If catch is slipped by a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit for any reason not described in paragraph (m)(7)(i) of this section when an observer or monitor is aboard, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

(n) *Atlantic mackerel, squid, and butterfish observer coverage*—(1) *Pre-trip notification.* (i) A vessel issued a limited access Atlantic mackerel permit, as specified at § 648.4(a)(5)(iii), must, for the purposes of observer deployment, have a representative provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, telephone number or email address for contact; and the date, time, port of departure, gear type, and approximate trip duration, at least 48 hr, but no more than 10 days, prior to beginning any fishing trip, unless it complies with the possession restrictions in paragraph (n)(1)(iii) of this section.

(ii) A vessel that has a representative provide notification to NMFS as described in paragraph (n)(1)(i) of this section may only embark on a mackerel trip without an observer if a vessel representative has been notified by NMFS that the vessel has received a waiver of the observer requirement for that trip. NMFS shall notify a vessel representative whether the vessel must carry an observer, or if a waiver has been granted, for the specific mackerel trip, within 24 hr of the vessel representative's notification of the prospective mackerel trip, as specified in paragraph (n)(1)(i) of this section. Any request to carry an observer may be waived by NMFS. A vessel that fishes

with an observer waiver confirmation number that does not match the mackerel trip plan that was called in to NMFS is prohibited from fishing for, possessing, harvesting, or landing mackerel except as specified in paragraph (n)(1)(iii) of this section. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(iii) A vessel issued a limited access mackerel permit, as specified in §648.4(a)(5)(iii), that does not have a representative provide the trip notification required in paragraph (n)(1)(i) of this section is prohibited from fishing for, possessing, harvesting, or landing more than 20,000 lb (9.07 mt) of mackerel per trip at any time, and may only land mackerel once on any calendar day, which is defined as the 24-hr period beginning at 0001 hours and ending at 2400 hours.

(iv) If a vessel issued a limited access Atlantic mackerel permit, as specified in §648.4(a)(5)(iii), intends to possess, harvest, or land more than 20,000 lb (9.07 mt) of mackerel per trip or per calendar day, and has a representative notify NMFS of an upcoming trip, is selected by NMFS to carry an observer, and then cancels that trip, the representative is required to provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, and telephone number or email address for contact, and the intended date, time, and port of departure for the cancelled trip prior to the planned departure time. In addition, if a trip selected for observer coverage is cancelled, then that vessel is required to carry an observer, provided an observer is available, on its next trip.

(2) *Sampling requirements for limited access Atlantic mackerel and longfin squid/butterfish moratorium permit holders.* In addition to the requirements in paragraphs (d)(1) through (7) of this section, an owner or operator of a vessel issued a limited access Atlantic mackerel or longfin squid/butterfish moratorium permit on which a NMFS-certified observer is embarked must provide observers:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers; and collecting and carrying baskets of fish when requested by the observers.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(3) *Measures to address slippage.* (i) No vessel issued a limited access Atlantic mackerel permit or a longfin squid/butterfish moratorium permit may slip catch, as defined at §648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for sampling and inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish that can be pumped from the net prior to release.

(ii) If a vessel issued any limited access Atlantic mackerel permit slips catch, the vessel operator must report the slippage event on the Atlantic mackerel and longfin squid daily VMS catch report and include the reason for slipping catch. Additionally, vessels issued a limited Atlantic mackerel permit or a longfin squid/butterfish moratorium permit, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iii) If a vessel issued a limited access Atlantic mackerel permit slips catch for any of the reasons described in paragraph (n)(3)(i) of this section, the vessel operator must move at least 15 nm (27.8 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.8 km) from the slippage event location for the remainder of the fishing trip.

(iv) If catch is slipped by a vessel issued a limited access Atlantic mackerel permit for any reason not described in paragraph (n)(3)(i) of this section, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

■ 5. In §648.14, revise paragraphs (e), (r)(1)(vi)(A), (r)(2)(v), and (r)(2)(viii) through (xii) and add paragraphs (r)(2)(xiii) and (xiv) to read as follows:

### §648.14  Prohibitions.

\*     \*     \*     \*     \*

(e) *Observer program.* It is unlawful for any person to do any of the following:

(1) Assault, resist, oppose, impede, harass, intimidate, or interfere with or bar by command, impediment, threat, or coercion any NMFS-certified observer or monitor conducting his or her duties; any authorized officer conducting any search, inspection, investigation, or seizure in connection with enforcement of this part; any official designee of the Regional Administrator conducting his or her duties, including those duties authorized in §648.7(g).

(2) Refuse monitoring coverage by a NMFS-certified observer or monitor if selected for monitoring coverage by the Regional Administrator or the Regional Administrator's designee.

(3) Fail to provide information, notification, accommodations, access, or reasonable assistance to either a NMFS-certified observer or monitor conducting his or her duties as specified in §648.11.

(4) Submit false or inaccurate data, statements, or reports.

\*     \*     \*     \*     \*

(r) \* \* \*

(1) \* \* \*

(vi) \* \* \*

(A) For the purposes of observer deployment, fail to notify NMFS at least 48 hr prior to departing on a declared herring trip with a vessel issued an All Areas Limited Access Herring Permit and/or an Area 2 and 3 Limited Access Herring Permit and fishing with midwater trawl or purse seine gear, or on a trip with a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit that is fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in §648.200(f)(1) and (3), pursuant to the requirements in §648.80(d) and (e).

\*     \*     \*     \*     \*

(2) \* \* \*

(v) Fish with midwater trawl gear in any Northeast Multispecies Closed Area, as defined in §648.81(a)(3) through (5) and (c)(3) and (4), without a NMFS-certified observer on board, if the vessel has been issued an Atlantic herring permit.

\*     \*     \*     \*     \*

(viii) Slip catch, as defined at §648.2, unless for one of the reasons specified at §648.11(m)(7)(i).

(ix) For vessels with All Areas or Areas 2/3 Limited Access Herring

Permits, fail to move 15 nm (27.78 km), as required by §§ 648.11(m)(7)(iv) and (v) and 648.202(b)(4)(iv).

(x) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to immediately return to port, as required by §§ 648.11(m)(7)(vi) and 648.202(b)(4)(iv).

(xi) Fail to complete, sign, and submit a Released Catch Affidavit as required by §§ 648.11(m)(7)(iii) and 648.202(b)(4)(ii).

(xii) Fail to report or fail to accurately report a slippage event on the Atlantic herring daily VMS catch report, as required by §§ 648.11(m)(7)(iii) and 648.202(b)(4)(iii).

(xiii) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to comply with industry-funded monitoring requirements at § 648.11(m).

(xiv) For a vessel with All Areas or Areas 2/3 Limited Access Herring Permit, fail to comply with its NMFS-approved vessel monitoring plan requirements, as described at § 648.11(m).

*    *    *    *    *

■ 6. In § 648.80, revise paragraphs (d)(5) and (e)(5) to read as follows:

### § 648.80 NE Multispecies regulated mesh areas and restrictions on gear and methods of fishing.

*    *    *    *    *

(d) *    *    *    *

(5) To fish for herring under this exemption, a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit on a declared herring trip, or a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit fishing with midwater trawl gear in

Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), must provide notice of the following information to NMFS at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment: Vessel name; contact name for coordination of observer deployment; telephone number for contact; the date, time, and port of departure; and

*    *    *    *    *

(e) *    *    *

(5) To fish for herring under this exemption, vessels that have an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit must provide notice to NMFS of the vessel name; contact name for coordination of observer deployment; telephone number for contact; and the date, time, and port of departure, at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment; and

*    *    *    *    *

■ 7. In § 648.86, revise paragraph (a)(3)(ii)(A)(*1*) to read as follows:

### § 648.86 NE Multispecies possession restrictions.

*    *    *    *    *

(a) *    *    *

(3) *    *    *

(ii) *    *    *

(A) *    *    *

(*1*) *Haddock incidental catch cap.* When the Regional Administrator has determined that the incidental catch allowance for a given haddock stock, as specified in § 648.90(a)(4)(iii)(D), has been caught, no vessel issued an Atlantic herring permit and fishing with midwater trawl gear in the applicable stock area, *i.e.*, the Herring GOM Haddock Accountability Measure (AM)

Area or Herring GB Haddock AM Area, as defined in paragraphs (a)(3)(ii)(A)(*2*) and (*3*) of this section, may fish for, possess, or land herring in excess of 2,000 lb (907.2 kg) per trip in or from that area, unless all herring possessed and landed by the vessel were caught outside the applicable AM Area and the vessel's gear is stowed and not available for immediate use as defined in § 648.2 while transiting the AM Area. Upon this determination, the haddock possession limit is reduced to 0 lb (0 kg) for a vessel issued a Federal Atlantic herring permit and fishing with midwater trawl gear or for a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, regardless of area fished or gear used, in the applicable AM area, unless the vessel also possesses a NE multispecies permit and is operating on a declared (consistent with § 648.10(g)) NE multispecies trip. In making this determination, the Regional Administrator shall use haddock catches observed by NMFS-certified observers or monitors by Herring vessel trips using midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), expanded to an estimate of total haddock catch for all such trips in a given haddock stock area.

*    *    *    *    *

### §§ 648.10, 648.14, 648.51, 648.59, 648.80, 648.86, and 648.202   [Amended]

■ 8. In the table below, for each section indicated in the left column, remove the text indicated in the middle column from wherever it appears in the section, and add the text indicated in the right column:

| Section | Remove | Add |
|---|---|---|
| 648.10(f)(4)(i) introductory text | NMFS-approved | NMFS-certified. |
| 648.14(i)(1)(ix)(B) | NMFS-approved | NMFS-certified. |
| 648.14(i)(1)(ix)(C) | 648.11(g) | 648.11(k). |
| 648.14(k)(2)(iii) | 648.11(k) | 648.11(l). |
| 648.14(k)(2)(iv) | 648.11(k) | 648.11(l). |
| 648.51(c)(4) | 648.11(g) | 648.11(k). |
| 648.51(e)(3)(iii) | 648.11(g) | 648.11(k). |
| 648.59(b)(2) | 648.11(g) | 648.11(k). |
| 648.80(d)(3) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.80(e)(2)(ii) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.86(a)(3)(ii)(A)(*1*) | NMFS-approved | NMFS-certified. |
| 648.202(b)(4)(iv) | 648.11(m)(4)(iv) and (v) | 648.11(m)(7)(iv) and (vi). |

[FR Doc. 2020–00881 Filed 2–6–20; 8:45 am]
**BILLING CODE 3510–22–P**



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

**DEC 1 8 2018**

Dr. John Quinn, Chairman
New England Fishery Management Council
50 Water Street
Newburyport, MA 01950

Dear John:

On behalf of the Secretary of Commerce, we approved the New England Industry-Funded
Monitoring Omnibus Amendment, including all the management measures recommended by the
Council in this amendment.

This amendment establishes a process to standardize future industry-funded monitoring
programs for Council fishery management plans (FMPs) and establishes industry-funded
monitoring in the Atlantic herring fishery.

### Omnibus Measures

The omnibus measures amend all Council FMPs to standardize the development and
administration of future industry-funded monitoring programs.

The omnibus measures establish:
- A process for FMP-specific industry-funded monitoring to be implemented via
  amendment and revised via framework adjustment;
- Standard cost responsibilities for us and the fishing industry;
- Standard administrative requirements for industry-funded observers/monitors and
  monitoring service providers;
- A process to prioritize monitoring coverage that may be provided by available Federal
  funding across FMPs for new industry-funded monitoring programs; and
- A process for FMP-specific monitoring set-aside programs to be implemented via a
  future framework adjustment action.

Standard cost responsibilities and administrative requirements would apply to the existing
industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop
FMPs, but the other omnibus measures would not apply to these existing programs. The Council
may incorporate these existing industry-funded monitoring programs into the process to
prioritize industry-funded monitoring programs for available Federal funding in a future action.
Future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either
expand the existing programs or develop new programs consistent with the omnibus measures.



*Atlantic Herring Measures*

The herring measures establish an industry-funded monitoring program in the herring fishery. Increased monitoring in the herring fishery is designed to address the following goals: 1) Accurate estimates of catch (retained and discarded); 2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and 3) affordable monitoring for the herring fishery. To achieve these goals, the measures require a 50-percent coverage target for at-sea monitoring coverage aboard vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permit. Approximately 40 vessels have Category A or B herring permits, but those vessels typically catch over 95 percent of the total herring harvest.

As recommended by the Council, the 50-percent coverage target includes a combination of Standardized Bycatch Reporting Methodology (SBRM) and industry-funded monitoring coverage. Industry participants would pay for any additional monitoring coverage above SBRM to meet the 50-percent coverage target. Coverage requirements may be waived on a trip-by-trip basis if monitoring coverage is unavailable. Trips that land less than 50 mt of herring and vessels carrying no fish on pair trawling trips would be exempt from the amendment's coverage requirements.

During 2016 and 2017, we conducted an electronic monitoring project aboard herring vessels using midwater trawl gear. The purpose of the project was to evaluate the feasibility of using electronic monitoring to verify catch retention and track discarded catch. In April 2018, the Council reviewed results from the project and approved electronic monitoring, in combination with portside sampling, as a monitoring option for midwater trawl vessels, instead of at-sea monitoring, to meet the 50-percent industry-funded monitoring coverage target. The Council did not recommend requiring electronic monitoring and portside sampling as part of this action; instead it recommended we use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. Additionally, the EFP would provide us with the flexibility to troubleshoot and react to problems, thus helping make the monitoring program more robust. Using the results of the EFP, the Council may consider establishing electronic monitoring and portside sampling requirements via a framework adjustment when it revisits industry-funded monitoring requirements two years after implementation.

The herring measures maintain the existing requirement that midwater trawl vessels fishing in the Groundfish Closed Areas must carry an observer, but would allow herring vessels to purchase observer coverage to access these closed areas. Herring midwater trawl vessels are currently only able to fish in the Groundfish Closed Areas if they are randomly selected to carry an observer to meet SBRM requirements.

As you are aware, industry-funded monitoring coverage in the herring fishery is contingent upon the availability of Federal funds to support our cost responsibilities. Without additional funding, we would be unable to administer industry-funded monitoring for the herring fishery in a given year. We were awarded funding to administer electronic monitoring for the herring fishery in 2020, but do not currently have funding to implement and administer the at-sea monitoring and portside sampling components. We continue working toward securing funding to administer

2

industry-funded monitoring in the herring fishery, but the earliest we could implement industry-funded monitoring in the herring fishery is 2020.

We appreciate the Council's and Council staff's efforts to develop this amendment and ongoing efforts to improve monitoring in New England fisheries. Please contact me if you have any questions.

Sincerely,

Michael Pentony
Regional Administrator

Cc: Thomas A. Nies, Executive Director, New England Fishery Management Council
    Michael Luisi, Chairman, Mid-Atlantic Fishery Management Council
    Dr. Christopher M. Moore, Executive Director, Mid-Atlantic Fishery Management Council
    Robert E. Beal, Executive Director, Atlantic States Marine Fisheries Commission

3

_0000017762



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

**DEC 1 8 2019**

MEMORANDUM FOR:    Chris Oliver
                   Assistant Administrator for Fisheries

FROM:              Michael Pentony
                   Regional Administrator

SUBJECT:           Approval of a Final Rule to Implement the New England
                   Industry-Funded Monitoring Omnibus Amendment (0648-
                   BG91)--DECISION MEMORANDUM

I request you approve and make determinations about the final rule to implement the New
England Industry-Funded Monitoring Omnibus Amendment.

## BACKGROUND

The New England Fishery Management Council adopted the Industry-Funded
Monitoring Amendment in April 2017 and refined its recommendations for industry-
funded monitoring in the Atlantic herring fishery in April 2018. We approved the
Industry-Funded Monitoring Amendment and notified the Council of our approval on
December 18, 2018. We published the proposed rule for the amendment on November 7,
2018, with a comment period ending December 24, 2018. We delayed publishing the
final rule until we determined that we had sufficient funding to administer industry-
funded monitoring in the herring fishery in 2020.

This amendment establishes a process to standardize future industry-funded monitoring
programs for Council fishery management plans (FMPs) and establishes industry-funded
monitoring in the herring fishery.

*Omnibus Measures*

The omnibus measures amend Council FMPs, except those managed jointly with the
Mid-Atlantic Fishery Management Council, to standardize the development and
administration of future industry-funded monitoring programs.

The omnibus measures establish:
- A process for FMP-specific industry-funded monitoring to be implemented via
  amendment and revised via framework adjustment;
- Standard cost responsibilities for us and the fishing industry;
- Standard administrative requirements for industry-funded observers/monitors and
  monitoring service providers;



- A process to prioritize monitoring coverage that may be provided by available Federal funding across FMPs for new industry-funded monitoring programs; and
- A process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

Standard cost responsibilities and administrative requirements would apply to the existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs, but the other omnibus measures would not apply to these existing programs. The Council may incorporate these existing industry-funded monitoring programs into the process to prioritize industry-funded monitoring programs for available Federal funding in a future action. Future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the omnibus measures.

Nothing in this amendment obligates or commits the agency to fund its share of an industry-funded program absent sufficient appropriations to do so. Rather, this action establishes the features and requirements of an industry-funded monitoring program that can be implemented on a case-by-case and year-by-year basis if/when sufficient appropriations are available.

*Atlantic Herring Measures*

The herring measures establish a 50-percent coverage target for at-sea monitoring coverage aboard vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permit. The 50-percent coverage target includes a combination of Standardized Bycatch Reporting Methodology (SBRM) and industry-funded monitoring coverage. Vessel owners would pay for any additional monitoring coverage above SBRM to achieve the 50-percent coverage target. Coverage requirements may be waived on a trip-by-trip basis if monitoring coverage is unavailable, vessels intend to land less than 50 mt of herring, or vessels carry no fish on pair trawling trips. The Council will review the effectiveness of industry-funded monitoring in the herring fishery two years after implementation.

In April 2018, the Council reviewed results from our electronic monitoring project aboard midwater trawl vessels and approved electronic monitoring, in combination with portside sampling, as a monitoring option for midwater trawl vessels. The Council did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, it recommended we use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program during the first two years of the industry-funded monitoring program in the herring fishery. Vessels participating in the EFP would use electronic monitoring and portside sampling, instead of at-sea monitoring, to achieve the 50-percent coverage target. The EFP would provide us with the flexibility to troubleshoot any problems, thus helping make the monitoring program more robust. We could also use the EFP to evaluate other uses for electronic monitoring that are of interest to the Council and herring industry, such as the utility of electronic monitoring and portside sampling when

2

midwater trawl vessels fish in Groundfish Closed Areas or for other gear types (e.g., purse seine or bottom trawl) in the herring fishery. Using the results of the EFP, the Council could consider establishing electronic monitoring and portside sampling requirements in regulation via a framework adjustment when it revisits industry-funded monitoring requirements two years after implementation.

Herring measures maintain the existing requirement that midwater trawl vessels fishing in the Groundfish Closed Areas must carry an observer but allow vessels to purchase observer coverage to access Groundfish Closed Areas. Midwater trawl vessels are currently only able to fish in the Groundfish Closed Areas if they are randomly selected to carry an observer to meet SBRM requirements.

Throughout the development of this amendment, we cautioned the Council that any additional coverage would be contingent upon us having sufficient funding to administer industry-funded monitoring. For 2020, based on currently available appropriations, we have sufficient Federal funding to pay for NOAA's National Marine Fisheries Service (NMFS) cost responsibilities associated with fully implementing industry-funded monitoring in the herring fishery. We estimate industry-funded monitoring cost responsibilities for the herring fishery to total approximately $100,000 in 2020. Because the herring annual catch limit (ACL) will be extremely low in 2020, we are seeking funding to help offset industry cost responsibilities in 2020 to help minimize negative economic impacts associated with paying for coverage. We cannot yet determine if we will have funding to administer industry-funded monitoring in the herring fishery in 2021. We will evaluate available Federal funding relative to the cost of administering industry-funded monitoring in the herring fishery during the upcoming year.

## CHANGES FROM THE PROPOSED RULE

The final rule includes minor changes from the proposed rule to clarify requirements. The final rule:
- Aligns industry-funded monitoring coverage for the herring fishery with the SBRM year (April – March) instead of the fishing year (January – December) and adjusts the date by which the herring industry selects a monitoring type for the following year;
- Revises the definition for slippage in the herring fishery to clarify that it occurs when a NMFS-certified observer or monitor is aboard the vessel;
- Clarifies when and how the owner, operator, or manager of a vessel must notify NMFS of a trip on which a vessel may harvest, possess, or land herring; and
- Corrects references to regulatory text to reflect provisions implemented in this rule.

## COMMENTS AND CONTROVERSIALITY

This action is controversial. Development of this action was contentious and took several years. Some participants in New England fisheries, including those in the herring fishery, have expressed concern during development of the Industry-Funded Monitoring

3

Amendment that they cannot afford industry-funded monitoring. Recent changes in the herring fishery have exacerbated industry's concerns about paying for industry-funded monitoring.

A new herring assessment in 2018 concluded that poor recruitment would likely result in a substantial decline in herring biomass. The assessment projected that biomass could increase, after reaching a low in 2019, if recruitment returns to average levels, but that herring catch would need to be reduced, starting in 2018, to prevent overfishing and lower the risk of the stock becoming overfished.

At its September 2019 meeting, the Council recommended an extremely low ACL for 2020 and 2021 (11,621 mt) – 77 percent of this year's ACL (15,065 mt) but only 11 percent of the ACL in 2017 (104,800 mt). This catch level is consistent with Council's new harvest policy for herring developed in Amendment 8 to the Herring FMP. If the 2020 herring stock assessment determines recruitment and biomass are higher than expected, the Council may request an increase to the 2021 ACL.

We received 11 comment letters on the proposed rule: 3 from participants in the herring fishery (Seafreeze, Providian, O'Hara Corporation); 3 from fishing industry organizations (CHOIR Coalition, New England Purse Seiner's Alliance (NEPSA), and Cape Cod Commercial Fishermen's Alliance (CCCFA); 1 from an environmental advocacy group (Cause of Action Institute (COA)); and 4 from members of the public. Comments on the proposed rule that were the same or similar to comments on the amendment's notice of availability (NOA) were addressed in our decision to approve the Industry-Funded Monitoring Amendment and are not repeated here. New comments related to the amendment are summarized below.

Seafreeze urged us to disapprove the amendment because it believes the industry-funded monitoring program in the amendment imposes a "tax" on regulated parties and potentially violates the Fifth Amendment to the U.S. Constitution. We disagree. Industry-funded monitoring in the herring fishery is not a tax. The essential feature of a tax is that it produces some revenue for the government. Industry-funded monitoring produces no revenue for the government. Industry payments are made to third-parties for monitoring services. Industry-funded monitoring does not violate the Fifth Amendment to the Constitution because the monitoring requirement does not compel evidence that is testimonial in nature. An at-sea monitor simply records the results of the vessel's actions. An individual's participation in the fishery is voluntary, and an individual may choose to land less than the 50 mt of herring per trip threshold for requiring industry-funded monitoring. Further, monitoring is a regulatory reporting requirement, to which the Fifth Amendment privilege does not apply. Any potentially incriminating evidence is merely a byproduct of the requirement for industry-funded monitoring. Last, the information provided is not for purposes of discovering criminal violations. The herring fishery is a regulated industry under the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), which provides for civil penalties for fisheries catch violations, not criminal sanctions. Any potentially incriminating evidence would be merely a byproduct of the requirement for industry-funded monitoring.

4

COA and O'Hara were concerned with the timing of the NOA and the proposed rule and that we approved the amendment prior to the close of the public comment period on the proposed rule. The NOA published in September 2018, the proposed rule published in November 2018, and their comment periods overlapped for 13 days. We received seven comment letters during the NOA comment period and carefully considered all comments, especially those urging us to disapprove or delay the amendment, prior to approving the amendment on December 18, 2018. We reviewed and considered all additional comments received during the proposed rule comment period prior to preparing this final rule. Commenters did not provide any new or additional information during the public comment period on the proposed rule that would have prevented us from approving the amendment.

Seafreeze commented that the amendment was jointly initiated by the New England and Mid-Atlantic Councils and it understood both Councils would need to adopt the same omnibus measures. When the New England Council took final action on the amendment, it considered whether to make its recommendations contingent upon a similar action by the Mid-Atlantic Council, but decided against it. Instead, the Council overwhelmingly approved the omnibus measures for its FMPs, with the exception of those managed jointly with the Mid-Atlantic Council (i.e., Monkfish and Spiny Dogfish FMPs) and the herring measures and recommended the amendment be submitted to the agency for review and approval. The Mid-Atlantic Council is not currently considering industry-funded monitoring for its FMPs. If it re-considers industry-funded monitoring, it would consider whether to adopt similar omnibus measures at that time.

COA and Seafreeze disagree with conclusions in the Environmental Assessment (EA) supporting this amendment that economic impacts associated with future industry-funded monitoring programs were too speculative to analyze. Instead they argue that those economic impacts should be determined to be negative. Additionally, COA cautions that introducing industry-funded monitoring across the Greater Atlantic Region would impose an economic burden on the fishing industry that could lead to the elimination of small-scale fishing. This amendment establishes the structure and process for implementing future industry-funded monitoring programs. Generalizing economic impacts associated with future industry-funded monitoring programs is often inaccurate. Future industry-funded monitoring programs would be developed to achieve specific goals. Without knowing the details of the measures to achieve those goals, attempting to quantify the impact of future programs in this amendment is too speculative. The EA acknowledges there would be negative economic impacts to fishing vessels resulting from future industry-funded monitoring programs, provided vessels were required to pay for increased monitoring. The EA also explains that those economic impacts would be evaluated in the amendment to establish the future industry-funded monitoring program.

Seafreeze was concerned that vessels participating in New England and Mid-Atlantic fisheries on the same trip may be subject to industry-funded monitoring requirements, even though the Mid-Atlantic Council did not adopt the this amendment. COA commented the EA failed to address the possibility of overlapping requirements for industry-funded monitoring in multiple fisheries. Similar to other measures, such as

5

_0000017773

possession limits and gear restrictions, vessels are subject to the most restrictive requirements when participating in multiple fisheries on a single trip. With the understanding that vessels participate in multiple fisheries, the EA explicitly considered revenue and operational costs associated with participation in the herring, Atlantic mackerel, and squid fisheries. Because herring and mackerel are often harvested together on the same trip, the amendment specifies that the higher coverage target applies on trips declared into both fisheries. If the Council considers industry-funded monitoring in other fisheries in the future, the impacts of those programs relative to existing industry-funded monitoring programs will be considered at that time.

Seafreeze and COA believe industry-funding monitoring in the herring fishery disproportionately affects Seafreeze vessels and any other vessels that make multi-day trips processing catch at sea in violation of National Standard 6. Despite a relatively low daily production capacity (57 mt), Seafreeze explained that its vessels would not qualify for a coverage waiver, like other small-mesh bottom trawl vessels, because its vessels make longer than average trips processing and freezing catch from multiple fisheries. We disagree. The Council complied with National Standard 6's requirement to take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches. The Council explicitly considered measures to address Seafreeze's concern about disproportional impacts on its vessels, including coverage waivers for trips when landings would be less than 20 percent herring or less than 50 mt of herring per day. But the Council ultimately determined that the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wanted to recommend that we not prioritize Federal funding to administer industry-funded monitoring in herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. These measures ensure the Council considers the cost of additional monitoring relative to its effectiveness and provides the flexibility to adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous or do not allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

One member of the public supported developing future industry-funded monitoring programs via amendment to allow for public input and standardizing industry-funded monitoring programs to help ensure fairness across fisheries. Three members of the public support this amendment and believe increased monitoring is necessary for sustainable FMPs. For two of those individuals, their support is conditional on the economic impact of the amendment, specifically that the amendment does not overburden an already struggling New England fishing industry.

Several commenters highlighted recent changes in the economics of the herring fishery. COA, Providian, and Seafreeze expressed concern that economic impacts of industry-

6

funded monitoring on the herring fishery were analyzed based on revenue and operating costs from 2014 and do not reflect the recent reductions in ACLs. Providian acknowledged that lower ACLs means fewer fishing trips and recommended continued SBRM coverage in the herring fishery.

The economic analysis is based on the best information available at the time the amendment was developed, and we considered the potential economic impacts from current and future management measures using that information. We recognize that industry's costs potentially may be proportionally higher in relation to lower available catch amounts and that the economic impact of industry-funding monitoring on the herring fishery is not negligible. Because herring effort, catch, and resulting revenue will be lower in 2020 and 2021 than in prior years, the cost of industry-funded monitoring relative to herring catch and revenue may be high in the short-term. However, the magnitude of that impact on individual vessels and businesses is likely variable and would be mitigated by several factors. Vessel costs for industry-funded monitoring are largely driven by the number of fishing days. We expect the number of herring fishing days in 2020 to equal less than half the number of days in past years. To the extent that reductions in fishing days reduces industry-funded monitoring costs, our estimates of industry's actual costs associated with paying for monitoring coverage may be proportionally lowered. Industry's costs may be reduced if vessels fish fewer days and the price of herring is higher in the than in past years. Additionally, a higher price for herring and revenue from other fisheries may help offset the cost of industry-funded monitoring in the short-term when herring catch limits are low. Last, if the number of fishing days covered by SBRM in the herring fishery during 2020 is similar to the level in past years, then we expect SBRM coverage to make up a larger percent of the 50-percent coverage target than it would have in past years. We are considering these impacts as we implement industry-funded monitoring in the herring fishery in 2020 and in future years.

## CERTIFICATION

I have determined that the final rule is consistent with the New England Industry-Funded Monitoring Omnibus Amendment, the national standards, other provisions of the Magnuson-Stevens Act, and other applicable laws. Determinations supporting this finding are attached.

## RECOMMENDATION

I recommend that approve the final rule, sign the attached clearance memorandum to the NOAA General Counsel, and sign the attached clearance memorandum to the Chief Counsel for Regulation, Department of Commerce.

1. I concur. _____    12/20/19 .
                                                    Date

2. I do not concur. _____ .
                                                    Date

7

**ATTACHMENT 1: DETERMINATIONS**

NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

An EA was prepared for this amendment. The approved omnibus measures are administrative and standardize the development of new industry-funded monitoring programs. The approved herring measures establish an industry-funded monitoring program for the herring fishery, including specifying coverage targets, information to be collected, and service provider requirements. The herring measures would generally have indirect low positive impacts on biological resources, if additional monitoring reduces uncertainty around catch in the herring fishery and leads to improved management, and negligible impacts on the physical environment. The herring measures would have direct negative impacts on fishery-related businesses and communities associated with paying for monitoring. Industry-funded monitoring on vessels with Category A or B herring permits has the potential to reduce annual returns-to-owner (RTO) by up to 20 percent for at-sea monitoring coverage and up to an additional 5 percent for observer coverage to access Groundfish Closed Areas. Based on the analysis contained in the EA and the information provided in the accompanying finding of no significant impact (FONSI), I determined that despite these potential economic impacts there is no need to prepare an environmental impact statement because there will be no significant impact on the human environment as a result of this amendment.

In light of recent catch reductions in the herring fishery, we evaluated whether the EA remained valid to support this amendment. After considering the action, new information, and new circumstances, we determined that the action and its impacts fall within the scope of the existing EA. It is not necessary to develop a new NEPA analysis because (1) the action is identical to the proposed action analyzed in the EA and (2) no new information or circumstances relevant to environmental concerns or impacts of the action are significantly different from when the EA's FONSI was signed on December 17, 2018. Thus, the FONSI for the existing EA for this amendment remains valid to support implementing this amendment. The details of our consideration are in Attachment 2.

COASTAL ZONE MANAGEMENT ACT (CZMA)

NMFS determined that this action is consistent to the maximum extent practicable with the enforceable policies of the approved coastal management programs of Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, and North Carolina. This determination was submitted on December 21, 2017, for review by the responsible state agencies under section 307 of the CZMA. The states of New Hampshire, Delaware, Virginia, and North Carolina concurred with the consistency determination. The remaining states did not respond; therefore, consistency is inferred.

_0000017776

## REGULATORY FLEXIBILITY ACT (RFA)

A final regulatory flexibility analysis (FRFA) was prepared as part of the regulatory impact review. The FRFA is contained in the final rule that accompanies this action. Each item in section 604(a)(1)-(5) of the RFA has been addressed in the classification section of the final rule.

## PAPERWORK REDUCTION ACT (PRA)

This action contains a collection-of-information requirement subject to review and approval by the Office of Management and Budget (OMB) under the PRA. This requirement has been submitted to OMB for approval under Control Number 0648-0674.

## ESSENTIAL FISH HABITAT (EFH)

The area affected by this action has been identified as EFH for species managed under the following FMPs: Northeast Multispecies; Monkfish; Atlantic Sea Scallop; Atlantic Mackerel, Squid, and Butterfish; Spiny Dogfish; Summer Flounder, Scup, and Black Sea Bass; Atlantic Bluefish; Surfclam and Ocean Quahog; Tilefish; and Atlantic Tunas, Swordfish, and Sharks. The action will not have an adverse impact on EFH; therefore, an EFH consultation is not required. The basis for this determination is described in a memorandum dated October 18, 2017.

## ENDANGERED SPECIES ACT (ESA)

The informal consultation on the herring fishery completed on February 9, 2010, and the batched fisheries Biological Opinion completed on December 16, 2013, concluded that the continued operation of several fisheries would not jeopardize the continued existence of an ESA-listed species and would not result in the destruction or adverse modification of designated critical habitat. On October 17, 2017, NMFS reinitiated consultation on the batched Biological Opinion due to updated information on the decline of North Atlantic right whale abundance. New information on all listed species will be incorporated into an updated batched Biological Opinion that will be used to evaluate the impact of these fisheries on listed species.

Section 7(d) of the ESA prohibits Federal agencies from making any irreversible or irretrievable commitment of resources with respect to the agency action that would have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives during the consultation period. Resource commitments may occur and non-jeopardizing activities may proceed as long as their implementation would not violate section 7(d) and would allow the action agency to retain sufficient discretion and flexibility to modify its action to allow formulation and implementation of an appropriate reasonable and prudent alternative.

This action does not represent any irreversible or irretrievable commitment of resources with respect to the FMP that would affect the development or implementation of

9

reasonable and prudent measures during the consultation period. NMFS has discretion to amend its Magnuson-Stevens Act and ESA regulations, and may do so at any time subject to the Administrative Procedure Act and other applicable laws. As a result, I have determined that fishing activities conducted pursuant to this action is consistent with Section 7(d) of the ESA and will not affect endangered and threatened species or critical habitat in any manner beyond what has been considered in prior consultations on this fishery.

An informal consultation under the ESA on the herring fishery was completed on February 9, 2010. As a result of the informal consultation, I have determined that fishing activities conducted under this rule are not likely to adversely affect endangered or threatened species or critical habitat as this action will not result in a substantial change in fishing activity. The basis for this determination is described in a memorandum dated December 17, 2018.

MARINE MAMMAL PROTECTION ACT

I have determined that fishing activities conducted under this action will have no adverse impact on marine mammals. This action would not result in any substantial change in fishing activity.

EXECUTIVE ORDER (E.O.) 12866

Pursuant to the procedures established to implement section 6 of E.O. 12866, OMB has determined that this action is not significant.

EXECUTIVE ORDER 13132

This action does not contain policies with federalism implications under E.O. 13132.

INFORMATION QUALITY ACT

Pursuant to section 515 of Public Law 106-554, this information product has undergone a pre-dissemination review by the Sustainable Fisheries Division, Greater Atlantic Regional Fisheries Office, completed on October 18, 2019. The signed Pre-dissemination Review and Documentation Form is on file in that Office, and a copy of the form is included with this package.

NATIONAL MARINE SANCTUARIES ACT (NMSA)

I have determined that this action will not destroy, cause the loss of, or injure any sanctuary resource subject to consultation with the Secretary under the NMSA.

_0000017778

**ATTACHMENT 2:  COMPLIANCE WITH THE NATIONAL ENVIRONMENTAL POLICY ACT**

In light of recent catch reductions in the herring fishery, we evaluated whether the Environmental Assessment (EA) supporting the New England Industry-Funded Monitoring Omnibus Amendment remained valid to support this amendment.

In making a determination on the need for additional analysis under NEPA, we considered and were guided by the Council on Environmental Quality (CEQ) NEPA regulations and applicable case law.  The CEQ's regulations state that "[a]gencies shall prepare supplements to either draft or final environmental impact statements if: (i) the agency makes *substantial* changes in the proposed action that are relevant to environmental concerns; or (ii) there are *significant* new circumstances or information relevant to environmental concerns *and* bearing on the proposed action or its impacts" (40 Code of Federal Regulations (CFR) § 1502.09(c)).  In addition, we considered the CEQ's significance criteria at 40 CFR § 1508.27 to determine if any new circumstances or information are significant, which could require a new EA.

**EXISTING ANALYSIS**

The EA describes the economic impacts of herring measures on fishery-related businesses and human communities as negative and explained they result from paying for monitoring coverage.  The economic impact of industry-funded monitoring coverage on the herring fishery is difficult to estimate because it varies with sampling costs, fishing effort, SBRM coverage, price of herring, and participation in other fisheries.  The EA estimates industry's cost for at-sea monitoring coverage at $710 per day and observer coverage at $818 per day, but cautioned those estimates would largely depend on negotiated costs between vessels and monitoring service providers.  Both at-sea monitors and observers collect species composition data, but at-sea monitors have a more limited collection of biological samples than observers to allow for possible cost savings.  Less than half of the 50 vessels issued Category A or B herring permits are active in the herring fishery.

The impact of management measures on fishing-related businesses and communities is typically based on an analysis of revenue.  But in an effort to better understand income from fishing trips, a survey of herring and mackerel vessels collected more detailed cost information for 2014, including payments to crew, repairs, maintenance, upgrades, and permitting costs.  This additional information was used to calculate the vessel returns-to-owners (RTO) for 2014 by subtracting fixed and operational costs from gross revenue, thereby providing a general framework for understanding the interaction between revenue and monitoring requirement costs.

Analysis in the EA estimates that at-sea monitoring coverage associated with the 50-percent coverage target has the potential to reduce annual RTO for vessels with Category A or B herring permits up to 20 percent and up to an additional 5 percent for midwater trawl access to Groundfish Closed Areas.

11

Electronic monitoring and portside sampling may be a more cost effective way for herring vessels to satisfy industry-funded monitoring requirements. At the conclusion of our electronic monitoring project aboard midwater trawl vessels, we estimated industry's cost for electronic monitoring and portside sampling at $515 per day. Analysis in the EA estimates a reduction in annual RTO of up to 10 percent for electronic monitoring and portside sampling coverage.

Using revenue information from 2014, the EA's Regulatory Flexibility Act analysis also estimated the impact of implementing industry-funded monitoring on regulated entities. The average annual vessel cost associated with the 50-percent coverage target was estimated to range from $6,397 to $25,751. When the monitoring cost associated with the 50-percent coverage target was added to the monitoring cost associated with accessing Groundfish Closed Areas, the average annual vessel cost was estimated to range from $20,229 to $27,223. Vessel-level profits also varied across vessels. The EA estimated the operating profit for regulated vessels ranging from $91,000 to $282,000 with industry-funded monitoring equaling 3.5 percent to 28 percent of those profits.

## NEW INFORMATION

At the Council's request, we reduced the herring ACL for 2018 (49,900 mt) on August 22, 2018, and reduced the herring ACL for 2019 (15,065 mt) on February 8, 2019, from the ACL that was in place during 2014 (104,088 mt).

To assess how a reduction in the herring ACL may affect revenue, we compared herring revenue generated by Category A and B herring vessels from 2014 to 2018 (see Table 1). Even though the 2018 ACL was reduced by 52 percent (54,188 mt) from the 2014 ACL, the impact on 2018 revenue was not proportional to the reduction in ACL and differed by gear type.

Table 1 -- Change in Category A and B Herring Revenue from 2014 to 2018

| Gear Type | 2014 Herring Revenue | 2018 Herring Revenue | Change in Herring Revenue |
|---|---|---|---|
| Midwater Trawl | $13,439,000 | $7,886,000 | - $5,553,000 |
| Purse Seine | $11,000,000 | $13,088,000 | + 2,088,000 |
| Bottom Trawl | $1,508,000 | $1,017,000 | - 491,000 |

*Source: NMFS*

The change in herring revenue between 2014 may have been affected by several factors, such as the availability of herring relative to the demand and vessel participation in other fisheries. The price of herring increased almost 70 percent between 2014 and 2018 from approximately $310 per mt to $525 per mt. While the price of herring is not likely to increase every year, we expect that a herring price increase would mitigate the negative economic impact of lowering the ACL. Total revenue from all fisheries for small-mesh bottom trawl vessels increased by approximately $25,000,000 between 2014 and 2018

12

_0000017780

suggesting vessels are expanding their participation in other fisheries. We expect that increases in total revenue from other fisheries would also mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

At its September 2019 meeting, the Council recommended further reducing the herring ACL for 2020 and 2021 (11,621 mt). These catch levels are consistent with Council's new harvest policy for herring developed in Amendment 8 and recommendations from the Council's Scientific and Statistical Committee. If the 2020 herring stock assessment determines recruitment and biomass are higher than expected, the Council may request an increase to the 2021 ACL.

While the economic impact of industry-funded monitoring coverage on the herring fishery is affected by revenue, the level of fishing effort and SBRM coverage would also affect the economic impact of industry-funded monitoring. Analyses in the EA estimate the coverage days to achieve the 50-percent industry-funded monitoring coverage target in the herring fishery in 2014. In an effort to estimate the maximum number of coverage days, that particular analysis did not account for SBRM coverage or coverage waivers for trips landing less than 50 mt of herring. To assess how changes in the herring fishery may affect industry-funded monitoring coverage, we re-estimated the coverage days to achieve the 50-percent coverage target for 2020. Our updated analysis adjusts for recent vessel activity, a low herring ACL, recent SBRM coverage, and coverage waivers for trips landing less than 50 mt of herring. The change in estimated average coverage days to achieve the 50-percent coverage target from 2014 to 2020 is shown in Table 2.

**Table 2 -- Estimated Reduction in Industry-Funded Monitoring Coverage Days to Achieve a 50-Percent Coverage Target from 2014 to 2020**

| Gear Type | 2014 | 2020 | Change in Days |
|---|---|---|---|
| Midwater Trawl | Up to 728 days (14 vessels) | Up to 54 days (9-11 vessels) | - 674 |
| Purse Seine | Up to 196 days (7 vessels) | Up to 67 days (5 vessels) | - 129 |
| Bottom Trawl | Up to 108 days (9 vessels) | Up to 29 days (2 vessels) | - 79 |

*Source: NMFS*

The reduction in expected industry-funded monitoring coverage days and vessels participating in the herring fishery from 2014 to 2020 is largely driven by changes in fishing behavior, likely linked to the availability of herring (distribution and seasonality) and a low herring ACL in 2020. Because the RTO analysis was, in part, based on economic data collected with a special cost survey that could not be repeated in a timely way for this action, it is not possible to update that analysis for 2020. However, fewer sea days required to achieve the 50-percent coverage target will result in lower industry costs in 2020 than what the EA estimated for 2014. Fewer coverage days and fewer active vessels in 2020 (and likely 2021) is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

13

_0000017781

We also expect midwater trawl fishing effort in Groundfish Closed Areas to be lower in 2020 than was estimated for 2014. Without considering SBRM coverage, the EA estimates midwater trawl vessels may purchase observer coverage for up to approximately 250 coverage days to access Groundfish Closed Areas in 2014. After adjusting for recent vessel activity and a low herring ACL and assuming recent SBRM coverage levels, we estimate that midwater trawl vessels may purchase coverage for up to 30 coverage days to access Groundfish Closed Areas in 2020 (and likely 2021). Even though purchasing observer coverage to access Groundfish Closed Areas is optional, few coverage days and fewer active vessels in 2020 is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

As recommended by the Council, we intend to offer an exempted fishing permit (EFP) in 2020 and 2021 to allow vessels to use electronic monitoring and portside sampling in lieu of at-sea monitoring coverage to achieve the 50-percent coverage target. Depending on vessel interest and sampling logistics, that same EFP may also evaluate the utility of electronic monitoring and portside sampling when midwater trawl vessels fish in Groundfish Closed Areas or for other gear types (e.g., purse seine or bottom trawl) used in the herring fishery. Analyses in the EA and updated estimates at the conclusion of our electronic monitoring project aboard midwater trawl vessels, suggest that electronic monitoring and portside sampling is likely less expensive and more cost effective than either at-sea monitoring or observer coverage. Excluding the initial cost associated with purchasing and installing electronic monitoring equipment, video review and storage are likely the most substantial ongoing industry costs associated with using electronic monitoring. A portion of our Federal funding to administer industry-funded monitoring in the herring fishery is designated to help offset industry's video review and storage costs. Federal funding helping offset industry's electronic monitoring sampling costs is expected to minimize the economic impact of industry-funded monitoring coverage on the herring fishery. Participating in the EFP is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

High herring prices and low coverage days to achieve the 50-percent coverage target are likely short-term influences on the economic impact of industry-funded monitoring coverage on the herring fishery associated with a low herring ACL. If herring recruitment and biomass return to average levels, the long-term economic impact of industry-funded monitoring coverage on the herring fishery is likely consistent with estimated impacts analyzed and described in the EA.

Additionally, the EA analyzed a range of coverage targets for at-sea monitoring and electronic monitoring and portside sampling aboard Category A and B vessels, including 100 percent, 75 percent, 50 percent, and 25 percent. The EA estimates the reduction in annual RTO associated with these coverage target alternatives ranges from 42 percent to less than 1 percent. Despite reductions in expected revenue for 2020 and 2021, we expect the reduction of annual RTO associated with implementing a 50-percent coverage target for at-sea monitoring aboard Category A and B vessels to be within this analyzed range.

14

_0000017782

**COMPLIANCE WITH THE NATIONAL ENVIRONMENTAL POLICY ACT**

CEQ regulations indicate that a supplemental NEPA analysis must be prepared if a new proposed action is substantially different from a previously completed but related action. However, not every change to a proposed action, including the presence of new information, necessitates the development of a new or supplemental NEPA analysis. In our consideration of whether the existing EA remains valid to support this amendment, we reviewed CEQ's criteria for *substantial* changes in the proposed action that are relevant to environmental concerns and *significant* new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

*1. Were substantial change(s) made to the proposed action that is/are relevant to environmental concerns? Is the proposed action a minor variation of the alternatives in the previous EA?*
No. The action is identical to the proposed action analyzed in the EA.

*2. Are there significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts?*
No. The new information on the herring ACL and associated revenue for 2020 (and likely 2021) is not relevant to the environmental concerns or impacts associated with implementing industry-funded monitoring in the herring fishery. The impacts of the herring measures on biological resources (herring resource, non-target species, and protected species) are expected to remain indirect because they affect levels of monitoring rather than harvest specifications. The impacts of herring measures on the physical environment are expected to remain negligible and the impacts of herring measures on fishery-related businesses and human communities are expected to remain negative and within the scope of impacts analyzed in the EA.

We considered how a low herring ACL in 2020 (and likely 2021) and associated revenue might affect the economic impact of implementing industry-funded monitoring coverage on the herring fishery, but economic and social impacts alone do not trigger significance (40 CFR § 1508.14). The low herring ACL will likely reduce the amount of herring revenue available to herring vessels to pay their sampling costs associated with industry-funded monitoring. But we expect recent increases in the price of herring, potential increases in total revenue from participation in other fisheries, the ability to choose less expensive types of monitoring, such as electronic monitoring and portside sampling, in combination with recent reductions in fishing effort and corresponding industry-funded monitoring coverage days to minimize the impact of reductions to the herring ACL and associated revenue.

*3. Should any new information or change to the action have been known and/or included at the time the previous EA was drafted?*
No. The EA was drafted from 2013 to 2017 and information on the affected environment was relatively stable during that time period. The EA was finalized and the FONSI signed in December 2018. We were aware that the 2018 herring stock assessment indicated that catch limits needed to be reduced to prevent overfishing and lower the risk

15

_0000017783

of the stock becoming overfished when we signed the FONSI, but were unaware of the actual ACLs for 2020 and 2021 until the Council recommended ACLs for 2020 and 2021 at its September 2019 meeting.

*4. Are data or other analyses required in order to characterize the impacts of the proposed action?*

No. The biological and economic impacts of the action fall within the scope of what was previously analyzed in the EA, therefore, no new analyses are required to support implementation of the New England Industry-Funded Monitoring Omnibus Amendment. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. This provision ensures the Council considers the cost of industry-funded monitoring relative to its effectiveness and provides the flexibility to adjust measures if they become too onerous for the herring fishery.

After considering the action, new information, and new circumstances, we determined that the action and its impacts fall within the scope of the existing EA. It is not necessary to develop a new NEPA analysis because (1) the action is identical to the proposed action analyzed in the EA and (2) no new information or circumstances relevant to environmental concerns or impacts of the action are significantly different from when the EA's FONSI was signed on December 17, 2018. Thus, the FONSI for the existing EA for the New England Industry-Funded Monitoring Omnibus Amendment remains valid to support implementing this amendment.

_0000017784



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

DEC 1 7 2018

MEMORANDUM FOR:      Chris Oliver
                     Assistant Administrator for Fisheries

FROM:                Michael Pentony
                     Regional Administrator

SUBJECT:             Approval of the New England Industry-Funded Monitoring
                     Omnibus Amendment, RIN 0648-BG91--DECISION
                     MEMORANDUM

I intend, with your concurrence, to approve the New England Industry-Funded Monitoring
Omnibus Amendment.

### BACKGROUND

This amendment would establish a process to standardize future industry-funded monitoring
programs for Council fishery management plans (FMPs) and establish industry-funded
monitoring in the herring fishery.

The amendment was initially adopted by the Council on April 20, 2017, and the Council later
refined its recommendations for industry-funded monitoring in the Atlantic herring fishery on
April 19, 2018. The notice of availability (NOA) for the amendment was published on
September 19, 2018, with a comment period ending November 19, 2018. The proposed rule for
the amendment was published on November 7, 2018, with a comment period ending December
24, 2018. The final rule implementing approved measures in the Industry-Funded Monitoring
Amendment will be provided in a separate package at a later date.

*Omnibus Measures*

The omnibus measures would amend all New England Council FMPs to standardize the
development and administration of future industry-funded monitoring programs.

The omnibus measures would establish:
- A process for FMP-specific industry-funded monitoring to be implemented via
  amendment and revised via framework adjustment;
- Standard cost responsibilities for us and the fishing industry;
- Standard administrative requirements for industry-funded observers/monitors and
  monitoring service providers;
- A process to prioritize monitoring coverage that may be provided by available Federal
  funding across FMPs for new industry-funded monitoring programs; and



- A process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

Standard cost responsibilities and administrative requirements would apply to the existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs, but the other omnibus measures would not apply to these existing programs. The Council may incorporate these existing industry-funded monitoring programs into the process to prioritize industry-funded monitoring programs for available Federal funding in a future action. Future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the omnibus measures.

Nothing in this amendment obligates or commits the agency to fund its share of an industry-funded program absent sufficient appropriations to do so. Rather, this action establishes the features and requirements of an industry-funded monitoring program that can be implemented on a case-by-case and year-by-year basis if/when sufficient appropriations are available.

### Atlantic Herring Measures

The herring measures would establish an industry-funded monitoring program in the herring fishery. Increased monitoring in the herring fishery is designed to address the following goals: 1) Accurate estimates of catch (retained and discarded); 2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and 3) affordable monitoring for the herring fishery. To achieve these goals, the measures require a 50-percent coverage target for at-sea monitoring coverage aboard vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permit. Approximately 40 vessels have Category A or B herring permits, and those vessels typically catch over 95 percent of the total herring harvest.

The 50-percent coverage target includes a combination of Standardized Bycatch Reporting Methodology (SBRM) and industry-funded monitoring coverage. Industry participants would pay for any additional monitoring coverage above SBRM levels to meet the 50-percent coverage target. Coverage requirements may be waived on a trip-by-trip basis if monitoring coverage is unavailable. Trips that land less than 50 mt of herring and vessels carrying no fish on pair trawling trips would be exempt from coverage requirements. The Council recommended the combined method for achieving the coverage target as well as coverage waivers and exemptions to help reduce monitoring costs for the fishing industry.

During 2016 and 2017, we conducted an electronic monitoring project aboard herring vessels using midwater trawl gear. The purpose of the project was to evaluate the feasibility of using electronic monitoring to verify catch retention and track discarded catch. In April 2018, the Council reviewed results from the project and approved electronic monitoring, in combination with portside sampling, as a monitoring option for midwater trawl vessels, instead of at-sea monitoring, to meet the 50-percent industry-funded monitoring coverage target. The Council did not recommend requiring electronic monitoring and portside sampling as part of this action; instead it recommended we use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. Additionally, the EFP would provide us with the flexibility to troubleshoot and react to problems, thus helping

2

make the monitoring program more robust. Using the results of the EFP, the Council may consider establishing electronic monitoring and portside sampling requirements via a framework adjustment when it revisits industry-funded monitoring requirements two years after implementation.

The herring measures would maintain the existing requirement that midwater trawl vessels fishing in the Groundfish Closed Areas must carry an observer, but would allow herring vessels to purchase observer coverage to access these closed areas. Herring midwater trawl vessels are currently only able to fish in the Groundfish Closed Areas if they are randomly selected to carry an observer to meet SBRM requirements.

## COMMENTS AND CONTROVERSIALITY

This action is controversial. Development of this action has been contentious and has taken several years. Some participants in New England fisheries, including those in the herring fishery, have expressed concern that they cannot afford industry-funded monitoring or that the Magnuson-Stevens Act does not authorize industry-funded monitoring. Environmental advocates (e.g., Pew Environment, Earth Justice, Herring Alliance) and individuals in the groundfish, tuna, and recreational fisheries are adamant that the herring fishery, in particular the midwater trawl fleet, needs additional monitoring beyond the coverage required by the SBRM because of the potential for large catch and discarding events. This amendment remedies our previous disapprovals of New England Council monitoring actions because it establishes a process to implement industry-funded monitoring that is consistent with Federal law, but any additional monitoring is contingent upon the availability of Federal funds to support our cost responsibilities.

Recent changes in the herring fishery have highlighted industry's concerns about paying for industry-funded monitoring. A new herring assessment in 2018 concluded that although herring was not overfished and overfishing did not occur in 2017, poor recruitment would likely result in a substantial decline in herring biomass. The assessment projected that biomass could increase, after reaching a low in 2019, if recruitment returns to average levels, but that herring catch would need to be reduced, starting in 2018, to prevent overfishing and lower the risk of the stock becoming overfished.

We recently proposed reducing the 2019 herring annual catch limit (ACL) from 49,900 mt to 24,488 mt (51-percent reduction), while the Council recommended a more conservative ACL of 15,065 mt (70-percent reduction) for 2019. These proposed ACLs for 2019 are projected to reduce revenue from herring catch by as much as 87 percent and reduce revenue from all catch for herring vessels by as much as 22 percent from 2017. The Council will begin developing herring specifications for 2020 and 2021 early next year. The Council's Scientific and Statistical Committee recommended herring catch stay below 16,131 mt for 2020 and 2021 to prevent overfishing and lower the risk of the stock becoming overfished, unless the assessment update scheduled for 2020 indicates higher than expected estimates of recruitment and biomass.

3

_0000017787

We received seven comment letters on the NOA. Four letters were from the general public, one letter was from Lund's Fisheries, one letter was from the Conservation Law Foundation (CLF), and one letter was from Cause of Action Institute (COA Institute).

Of the four comment letters from the general public, two letters were off topic, commenting on forest management and keeping marine mammals in captivity. One letter did not support industry-funded monitoring in the herring fishery. Instead, it advised that it would be more cost effective for the fishing industry to report all herring sold. One letter supported approval of this amendment to prevent overfishing.

Lund's Fisheries is a seafood harvesting and processing company. Its letter supports additional monitoring in the herring fishery, but asserts that industry-funded monitoring has the potential to add a financial burden on the current herring fishery. Lund's claims the 50-percent coverage target is higher than necessary because bycatch rates in the herring fishery are low. Instead, Lund's recommends SBRM coverage, in conjunction with the existing state-administered portside sampling program, as the best investment to understand catch in herring fishery. Lund's also requests that this amendment be disapproved or put on hold until after 2021 in hopes that future increases in herring harvest and subsequent increases in herring revenue would be able to support industry-funded monitoring.

The CLF letter expresses general support for industry-funded monitoring in the herring fishery, but cautions that certain aspects of the monitoring program may prevent the benefits of additional monitoring from being fully realized. CLF advocates that only 100-percent coverage on midwater trawl vessels would guarantee catch was retained for sampling, help track catch against catch limits, and prevent overfishing. It warns that overuse of coverage waivers may undermine the effectiveness of additional monitoring and urges us to ensure adequate funding so that we can administer industry-funded monitoring. Lastly, CLF supports using an EFP to further develop an electronic monitoring and portside sampling program for midwater trawl vessels and urges a quick transition from human at-sea monitoring to an electronic monitoring and portside sampling program.

The COA Institute letter urges us to disapprove the amendment. It claims the amendment is inconsistent with the Magnuson-Stevens Act and other Federal law, such as the Antideficiency Act and the Miscellaneous Receipts Statute. The COA Institute advises that the Magnuson-Stevens Act does not expressly authorize industry-funded monitoring, as described in this amendment, and that the Council must have explicit statutory authorization to require industry-funded monitoring. The COA Institute also advocates that the economic impact of industry-funded monitoring, particularly on the herring fishery, would violate National Standards 7 and 8.

We disagree, in part, with these comments.

The COA Institute previously challenged the statutory authority for industry-funded at-sea monitoring in conjunction with Amendment 16 to the Northeast Multispecies FMP (A16), arguing that the Magnuson-Stevens Act does not expressly authorize requiring industry to pay its monitoring costs and that it violates the Antideficiency Act and Miscellaneous Receipts Statute. The U.S. District Court Judge in that case reviewed COA Institute's arguments and the

4

Magnuson-Stevens Act provisions relating to industry funding of monitors. The Court concluded, "NMFS and the Council permissibly found A16's industry-funding provision 'necessary and appropriate for the conservation and management of the fishery' and there is no dispute that the provision is a 'measure, requirement, or condition' as contemplated by 16 U.S.C. § 1853(b)(14). Accordingly, the Court finds that the Magnuson-Stevens Act does authorize industry funding of monitors." (Goethel v. Pritzker, 2016 WL 4076831, at *4 (D.N.H. 2016) *aff'd. on other grounds* Goethel v. U.S. Department of Commerce (1ˢᵗ Cir. 2016).

The COA Institute and Lund's assert that the cost of industry-funded monitoring in the herring fishery outweighs the benefits of additional monitoring. When considering a recommendation for approving this amendment, we weighed the benefits of the measures relative to the costs, especially the industry's cost associated with additional monitoring.

The 50-percent industry-funded monitoring coverage target for vessels with Category A or B herring permits has the potential to reduce uncertainty around catch estimates in the herring fishery, thereby improving catch estimation for stock assessments and management. SBRM coverage on vessels participating in the herring fishery is variable. Recent coverage has ranged from 2 percent to 40 percent during 2012 to 2017. Analysis in the environmental assessment (EA) supporting this action suggests a 50-percent coverage target would likely result in a coefficient of variation (CV) of less than 30 percent on catch tracked against fishery catch caps. If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be more constrained by catch caps, thereby increasing accountability, or they may be less constrained by catch caps and better able to fully harvest herring sub-ACLs. Recent CVs associated with catch caps constraining the herring fishery have been as high as 86 percent. Improving our ability to track catch against catch limits is expected to support the herring fishery achieve optimum yield (OY) and minimize bycatch and incidental catch to the extent practicable. Coverage waivers would only be issued under specific circumstances, when monitors are unavailable or trips have minimal to no catch, and are not expected to reduce the benefits of additional monitoring.

We estimated the economic impact of paying for monitoring coverage by analyzing returns-to-owner (RTO). RTO was calculated by subtracting fixed and variable operating costs from gross revenue and was used rather than net revenues to more accurately reflect income from fishing trips. Analysis in the EA estimated that at-sea monitoring coverage has the potential to reduce annual RTO for vessels with Category A or B herring permits up to 20 percent. Up to an additional 5 percent reduction in RTO is associated with midwater trawl vessels purchasing observers to access to Groundfish Closed Areas. While the economic impact of industry-funding monitoring on the herring fishery may be substantial, we considered the nature and extent of these costs relative to the benefits of additional monitoring and cost mitigation measures recommended by the Council.

Herring catch, and resulting herring revenue, will likely be much lower in 2019 through 2021 than in prior years. The cost of additional monitoring relative to herring catch and revenue may be high in the short-term, but the magnitude of that impact on individual vessels and businesses is likely variable and would be mitigated by several factors. Vessel costs for industry-funded monitoring are largely driven by the number of fishing days. To the extent that reductions in

_0000017789

fishing days reduces industry-funded monitoring costs, our estimates of industry's actual costs associated with paying for monitoring coverage may be proportionally lowered. Economic impacts associated with paying for additional coverage may also be reduced if vessels fish fewer days and the price of herring is higher in the than in past years. Additionally, revenue from other fisheries may help offset the cost of industry-funded monitoring in the short-term when herring catch limits are low.

Recognizing the potential economic impact of industry-funded monitoring on the herring industry, the Council recommended several measures to minimize the impact of paying for additional coverage. Allowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry. Exempting certain trips from industry-funded monitoring requirements, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring. Trips that land less than 50 mt are common for small-mesh bottom trawl, single midwater trawl vessel, and purse seine vessels. As such, the 50-mt exemption has the potential to result in a less than 5 percent reduction in annual RTO associated with at-sea monitoring coverage for those fleets. Additionally, electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage. Analysis in the EA estimated that electronic monitoring and portside sampling has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage. Lastly, herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. The Council will have an opportunity to consider the cost of additional monitoring relative to its effectiveness and may adjust industry-funded monitoring requirements for the herring fishery if they become too onerous.

We expect that delaying the implementation of industry-funded monitoring will also help ease the economic impact on the herring industry. Industry-funded monitoring is contingent upon the availability of Federal funds to support our cost responsibilities. Without additional funding in a given year, there would be no industry-funded monitoring required for the herring fishery during that year. We were awarded funding to administer electronic monitoring for the herring fishery in 2020, but do not have funding to implement and administer the at-sea monitoring and portside sampling components. We continue to seek funding to support our industry-funded monitoring cost responsibilities, but the earliest we could implement industry-funded monitoring for the herring fishery is 2020.

We have worked closely with the Council over the last several years to develop this amendment and provide a mechanism to allow for additional monitoring in New England fisheries, particularly the herring fishery. While the economic impact of industry-funding monitoring on the herring fishery is not negligible, we considered the nature and extent of these costs relative to the benefits of additional monitoring and cost mitigation measures recommended by the Council, and found potential benefits to be commensurate with potential costs. Improving catch estimates in the herring fishery is expected to benefit future stock assessments and overall management with the potential of helping the fishery achieve OY and reduce bycatch and incidental catch to the extent practicable. For these reasons, we recommend approval of this amendment. Please see additional details of our consideration in the attachment.

6

_0000017790

**CERTIFICATION**

I certify the New England Industry-Funded Monitoring Omnibus Amendment to be consistent with the national standards and other provisions of the Magnuson-Stevens Act and other applicable laws. Determinations supporting this finding are attached.

**RECOMMENDATION**

I recommend that you concur in the approval of the New England Industry-Funded Monitoring Omnibus Amendment. I also recommend that you sign the attached information memorandum to the NOAA General Counsel.

1. I concur. _Donna S Wieting (for)_ _12/18/18_ .
Date

2. I do not concur. _____ .
Date

Attachments

7

_0000017791

**DETERMINATIONS**

NATIONAL ENVIRONMENTAL POLICY ACT

An environmental assessment was prepared for this action. The approved omnibus measures are administrative and would standardize the development of new industry-funded monitoring programs. The approved herring measures would establish an industry-funded monitoring program for the herring fishery, including specifying coverage targets, information to be collected, and service provider requirements. The herring measures would generally have indirect low positive impacts on biological resources, if additional monitoring reduces uncertainty around catch in the herring fishery and leads to improved management, and negligible impacts on the physical environment. The herring measures would have direct negative impacts on fishery-related businesses and communities associated with paying for monitoring. Industry-funded monitoring on vessels with Category A or B herring permits has the potential to reduce annual returns-to-owner (RTO) up to 20 percent for at-sea monitoring coverage and up to an additional 5 percent for observer coverage to access Groundfish Closed Areas. These economic impacts may be minimized by the provision to waive coverage on trips that land less than 50 mt of herring and allowing SBRM coverage to contribute towards the 50-percent industry-funded monitoring coverage target. While these economic impacts are not expected to be significant, I determined that despite the potential economic impacts, there is no need to prepare an environmental impact statement. Therefore, I have found that there will be no significant impact on the human environment as a result of this action, based on the analysis contained in the environmental assessment and the information provided in the accompanying finding of no significant impact (FONSI).

COASTAL ZONE MANAGEMENT ACT (CZMA)

NMFS determined that this action is consistent to the maximum extent practicable with the enforceable policies of the approved coastal management programs of Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, and North Carolina. This determination was submitted on December 21, 2017, for review by the responsible state agencies under section 307 of the CZMA. The states of New Hampshire, Delaware, Virginia, and North Carolina concurred with the consistency determination. The remaining states did not respond; therefore, consistency is inferred.

REGULATORY FLEXIBILITY ACT (RFA)

An Initial Regulatory Flexibility Analysis (IRFA) was prepared, as required by section 603 of the RFA, as part of the regulatory impact review. A final RFA will be completed with submission of the final rule, as part of the regulatory impact review, which describes the impact this amendment would have on small entities.

PAPERWORK REDUCTION ACT (PRA)

This action contains a collection-of-information requirement subject to review and approval by the Office of Management and Budget (OMB) under the PRA. This requirement has been submitted to OMB for approval under Control Number 0648-0674.

_0000017792

## ESSENTIAL FISH HABITAT (EFH)

The area affected by this action has been identified as EFH for species managed under the following FMPs: Northeast Multispecies; Monkfish; Atlantic Sea Scallop; Atlantic Mackerel, Squid, and Butterfish; Spiny Dogfish; Summer Flounder, Scup, and Black Sea Bass; Atlantic Bluefish; Surfclam and Ocean Quahog; Tilefish; and Atlantic Tunas, Swordfish, and Sharks. The proposed action will not have an adverse impact on EFH; therefore, an EFH consultation is not required. The basis for this determination is described in a memorandum dated October 18, 2017.

## ENDANGERED SPECIES ACT (ESA)

The batched fisheries Biological Opinion completed on December 16, 2013, concluded that the continued operation of several fisheries would not jeopardize the continued existence of an ESA-listed species and would not result in the destruction or adverse modification of designated critical habitat. On October 17, 2017, NMFS reinitiated consultation on the batched Biological Opinion due to updated information on the decline of North Atlantic right whale abundance. New information on all listed species will be incorporated into an updated batched Biological Opinion that will be used to evaluate the impact of these fisheries on listed species.

Section 7(d) of the ESA prohibits Federal agencies from making any irreversible or irretrievable commitment of resources with respect to the agency action that would have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives during the consultation period. Resource commitments may occur and non-jeopardizing activities may proceed as long as their implementation would not violate section 7(d) and would allow the action agency to retain sufficient discretion and flexibility to modify its action to allow formulation and implementation of an appropriate reasonable and prudent alternative.

This action does not represent any irreversible or irretrievable commitment of resources with respect to the FMP that would affect the development or implementation of reasonable and prudent measures during the consultation period. NMFS has discretion to amend its Magnuson-Stevens Act and ESA regulations, and may do so at any time subject to the Administrative Procedure Act and other applicable laws. As a result, I have determined that fishing activities conducted pursuant to this action is consistent with Section 7(d) of the ESA and will not affect endangered and threatened species or critical habitat in any manner beyond what has been considered in prior consultations on this fishery.

## MARINE MAMMAL PROTECTION ACT

I have determined that fishing activities conducted under this action will have no adverse impact on marine mammals. This action would not result in any substantial change in fishing activity.

## EXECUTIVE ORDER (E.O.) 12866

Pursuant to the procedures established to implement section 6 of E.O. 12866, OMB has determined that this action is not significant.

_0000017793

EXECUTIVE ORDER 13132

This action does not contain policies with federalism implications under E.O. 13132.

INFORMATION QUALITY ACT

Pursuant to section 515 of Public Law 106-554, this information product has undergone a pre-dissemination review by the Sustainable Fisheries Division, Greater Atlantic Regional Fisheries Office, completed on July 26, 2018. The signed Pre-dissemination Review and Documentation Form is on file in that Office, and a copy of the form is included with this package.

NATIONAL MARINE SANCTUARIES ACT (NMSA)

I have determined that this action will not destroy, cause the loss of, or injure any sanctuary resource subject to consultation with the Secretary under the NMSA.

10

_0000017794

**Attachment:  Impacts of Approved Measures in the New England Industry-Funded Monitoring Omnibus Amendment**

The impacts of the approved measures are summarized below.  The potential benefits of additional monitoring are commensurate with the potential costs associated with industry-funded monitoring.

*Omnibus Measures*

In general, there are no direct impacts on biological resources (target, non-target, and protected species), the physical environment, or fishery-related businesses and human communities associated with the omnibus measures.

Omnibus measures would become tools for the Council to use when developing future industry-funded monitoring programs.  Because these procedural measures would not directly affect the level of fishing, fishing operations, amount of fish harvested, or area fished, they do not have direct impacts on biological resources or the physical environment.  Omnibus measures would not have any direct economic impacts on fishery-related business or human communities because they are procedural administrative measures that do not require the development of industry-funded programs nor do they directly impose any costs.

In the future, if the Council developed an industry-funded monitoring program for a particular FMP, there would likely be direct negative economic impacts to fishing vessels resulting from the standardized cost responsibilities, provided there was available Federal funding to support that industry-funded monitoring program and vessels were required to pay for increased monitoring.  However, any direct negative economic impacts to fishing vessels resulting from a future industry-funded monitoring program would be evaluated in the amendment to establish that industry-funded monitoring program and were not considered in the approval of measures in this amendment.

Omnibus measures would likely have an indirect low positive impact on biological resources.  Standard monitoring service provider requirements have the potential to help improve data collections for industry-funded monitoring programs.  A process to prioritize available Federal funding across New England FMPs allows industry-funded monitoring programs to align with Council monitoring priorities.

There would also likely be indirect low positive economic impacts associated with the omnibus measures.  These indirect impacts would result from standardized cost responsibilities, standardized service provider requirements, and a process to prioritize available Federal funding.  Standardized cost responsibilities and service provider requirements may allow the fishing industry to negotiate contracts with service providers and increase the efficiency of administering industry-funded monitoring programs, potentially reducing future sampling costs for the industry.

11

_0000017795

*Atlantic Herring Measures*

The impacts of herring measures on biological resources (herring resource, non-target species, and protected species) are indirect because they affect levels of monitoring rather than harvest specifications. The impacts of herring measures on the physical environment are expected to be negligible and the impacts of herring measures on fishery-related businesses and human communities are expected to be negative.

Indirect low positive impacts to biological resources are possible if the increased monitoring associated with herring measures can reduce uncertainty of catch tracked against catch limits and generate more information for stock assessments and to improve management. Additionally, herring measures may lead to direct positive impacts on biological resources if herring fishing effort is limited, by increased information on catch tracked against catch limits, leading to increased reproductive potential of the herring resource and non-target species and reduced interactions between the herring fishery and protected species.

According to the EA, less than 50 vessels issued Category A or B herring permits harvest the majority of herring. The 50-percent coverage target, as well as the ability to increase monitoring in Groundfish Closed Areas, is expected to have low positive impacts on the herring resource and non-target species if the uncertainty around catch track against catch caps (haddock and river herring and shad) is reduced.

Economic impacts of herring measures on fishery-related businesses and human communities are negative and result from paying for monitoring coverage. When considering economic impacts, we estimated industry's cost for at-sea monitoring coverage at $710 per day and observer coverage at $818 per day, but these estimates are variable and will largely depend on negotiated costs between vessels and monitoring service providers.

Early in the development of this amendment, we estimated economic impacts to herring vessels by analyzing RTO. Analysis in the EA estimated that at-sea monitoring coverage has the potential to reduce annual RTO for vessels with Category A and B herring permits up to 20 percent and up to an additional 5 percent for access to Groundfish Closed Areas.

The 50-percent coverage target recommended by the Council for vessels with Category A or B herring permits provides for the benefits of collecting additional information on biological resources while minimizing industry cost responsibilities, especially when compared to non-preferred coverage targets of 100 percent and 75 percent. Additionally, this amendment would not require additional monitoring aboard herring vessels in Groundfish Closed Areas. Rather it maintains an existing requirement for 100 percent observer coverage on herring midwater trawl vessels fishing inside of Groundfish Closed Areas, but allows vessels to purchase observer coverage to access Groundfish Closed Areas.

Electronic monitoring and portside sampling may be a more cost effective way for herring vessels to satisfy industry-funded monitoring requirements. At the conclusion of our electronic monitoring project aboard midwater trawl vessels, we estimated industry's cost for electronic

12

monitoring and portside sampling at $515 per day. Analysis in the EA estimated a reduction in annual RTO of up to 10 percent for electronic monitoring and portside sampling coverage.

We further refined our estimates of industry's costs by accounting for SBRM coverage that would contribute towards the 50-percent monitoring coverage target. Category A and B vessels would pay for at-sea monitoring coverage an average of 19 days per year for an average annual cost per vessel of $13,490. Similarly, we estimated that midwater trawl vessels may opt to pay for observer coverage to access Groundfish Closed Area up to 21 days per year for an average annual cost per vessel of $17,178. These estimates are affected by fishing effort but independent of revenue.

The provision to use existing SBRM coverage to help meet the 50-percent monitoring coverage target is expected to help minimize industry's costs. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. The Council recommended this combined coverage target to help reduce the cost of industry-funded coverage and to minimize unnecessary duplication. Exempting trips that land less 50 mt of herring from industry-funded monitoring coverage also has the potential greatly reduce industry-funded monitoring costs. Based on past performance, 81 percent of trips by small-mesh bottom trawl vessels land less than 50 mt of herring, followed by 60 percent of single midwater trawl trips, 33 percent of purse seine trips, and 13 percent of paired midwater trawl trips. Additionally, wing vessels pair trawling with another vessel would be exempt from industry-funded monitoring coverage provided the wing vessel does not carry any fish.

Indirect positive or negative economic impacts on herring vessels associated with herring measures may result from increased monitoring helping to reduce uncertainty around retained and discarded catch estimates. If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be less likely to be constrained by catch caps and more likely to be able to fully harvest herring sub-ACLs. However, if increased monitoring results in higher than expected catch of haddock, and river herring and shad, vessels may be more constrained by catch caps.

Lastly, amendment provisions address variations and contingencies associated with industry-funded monitoring in the herring fishery. Herring measures would require the Council to revisit the industry-funded monitoring requirements two years after implementation and evaluate whether changes to requirements are necessary. At this time, the Council could evaluate the costs and benefits of industry-funded monitoring and, if necessary and appropriate, consider changes via a framework action. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wanted to recommend that we not prioritize Federal funding to administer industry-funded monitoring in herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. Lastly, the Council recommended that midwater trawl vessels may use electronic monitoring and portside sampling to meet industry-funded monitoring requirements. Electronic monitoring and

13

_0000017797

portside sampling may be a more cost effective way to meet industry-funded monitoring requirements than at-sea monitoring coverage.

14



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

APR 1 9 2019

Thomas Nies, Executive Director
New England Fishery Management Council
50 Water Street
Newburyport, MA 01950

Dear Tom:

The partial government shutdown this year required us to re-evaluate our workload priorities and resulted in our decision to delay completion of the final rule for the New England Industry-Funded Monitoring (IFM) Omnibus Amendment. We plan to publish the final rule for the IFM Amendment later this summer. We are continuing our implementation activities for the IFM Amendment, including development of the exempted fishing permit that will accompany implementation of the IFM Amendment, and are still targeting 2020 for implementation.

When we returned to work following the shutdown, we were faced with several competing priorities for the Atlantic Herring Fishery Management Plan (FMP), including the final rule for the IFM Amendment, the final rule for the 2019 in-season adjustment, review and implementation of Amendment 8 to the FMP, development of the 2019-2021 herring specifications, and implementation of the IFM Amendment. We prioritized our work on Amendment 8 and the 2019-2021 herring specifications because of the inter-related nature of these actions and the need to have new specifications in place for 2020.

As we noted throughout development of the IFM Amendment, administering IFM coverage requires available Federal funding. We are still determining whether or not we will have sufficient appropriations to administer IFM coverage in herring fishery next year and the level of appropriations will determine the IFM coverage level. When we publish the final rule, we intend to announce the level of IFM coverage in the herring fishery for 2020. Delaying the IFM Amendment final rule until August allows us more time to evaluate available funding and determine the level of IFM coverage. If appropriations are not sufficient for us to administer IFM coverage in 2020, there will be no additional monitoring in the herring fishery above Standardized Bycatch Reporting Methodology coverage.

In December 2018, we notified the Council that the earliest we could implement IFM in the herring fishery is 2020. We will target making the IFM Amendment effective starting April 1, 2020. This will align the start of the IFM requirements for the herring fishery with the 2020 standardized bycatch reporting methodology year. It also provides additional time to evaluate levels of funding and implementation for 2020. We have not yet determined whether herring IFM coverage and the SBRM year should remain aligned, but we will update the Council within the next few months when we have made that decision.

If you have questions or concerns, please contact Pete Christopher at 978-281-9288.

Sincerely,

Michael Pentony
Regional Administrator

Cc: Jon Hare, Ph.D., Director, Northeast Fisheries Science Center