## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GARY BURKE**, *et al.*,[1]<br><br>Plaintiffs,<br><br>v.<br><br>**WYNN COGGINS**, *as acting Secretary, U.S. Department of Commerce, et al.*,[2]<br><br>Defendants,<br><br>**OCEANA, INC.**,<br><br>Intervenor-Defendant. | Case No. 1:20-cv-00667 (TNM) |

## <u>MEMORANDUM OPINION</u>

Some California fishermen sued the Secretary of Commerce and the National Marine Fisheries Service (collectively, the "Government") challenging a rule that will close their swordfish fishery if they accidentally kill or injure too many marine mammals or turtles. Remarkably, the Government agrees with the fishermen that the rule is invalid and should be vacated. Even before the rule's promulgation, the Service maintained that the rule conflicts with the governing statute because it imposes significant short-term economic effects with only minor conservation benefits. The Service made this position clear in the final rule and only promulgated it to comply with another court's order. Oceana, Inc., however, intervened here to

---

[1]  Plaintiff Chris Williams voluntarily dismissed his claims without prejudice. *See* Min. Order (Jan. 20, 2021).

[2]  The Court automatically substitutes Wynn Coggins for named defendant Wilbur L. Ross, Jr., former Secretary of the Department of Commerce. *See* Fed. R. Civ. P. 25(d).

preserve the rule.  It raises procedural and substantive challenges to the Service's determination that the rule violates the law.  The parties cross-move for summary judgment.

The Court casts its line in favor of the fishermen.  The Service's determination that the rule conflicts with the governing statute finds support in the administrative record.  For the following reasons, the Court will grant Plaintiffs' summary judgment motion and deny Defendants' and Oceana's motions for summary judgment.

## I.

### A.

The Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act") seeks to "conserve and manage the fishery resources found off the coasts of the United States" and to "promote domestic commercial and recreational fishing under sound conservation and management principles."  16 U.S.C. § 1801(b)(1), (3).  It contemplates the creation and implementation of "fishery management plans."  *Id.* §§ 1801(b)(4), 1853.  The Secretary delegated to the Service authority to manage these plans.

All fishery management plans and "any regulation promulgated to implement any such plan" must comply with the Magnuson Act's ten "National Standards."  *Id.* § 1851(a).  As relevant here, National Standard 2 provides that "[c]onservation and management measures shall be based upon the best scientific information available."  *Id.* § 1851(a)(2).  National Standard 7 requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication."  *Id.* § 1851(a)(7).  And National Standard 8 states that "[c]onservation and management measures shall, consistent with the conservation requirements of this chapter . . . , take into account the importance of fishery resources to fishing communities . . . ."  *Id.* § 1851(a)(8).

"Regional Fishery Management Councils" prepare fishery management plans and propose regulations to implement them.  *Id.* §§ 1852, 1853.  There are eight regional councils.  *See id.* § 1852(a)(1).  The Pacific Council has authority over fisheries in California, Oregon, Washington, and Idaho.  *Id.* § 1852(a)(1)(F).  Each regional council "reflect[s] the expertise and interest" of the represented states.  *Id.* § 1852(a)(2).

These regional councils submit proposed regulations for fishery management plans to the Service for review.  *See id.* § 1854.  The Service then determines whether the regulation complies with the fishery management plan, the Magnuson Act, and "other applicable law."  *Id.* § 1854(b)(1).  If the Service approves the regulations, it publishes them in the Federal Register for public comment.  *Id.* § 1854(b)(1)(A).  The Service must "promulgate final regulations within 30 days after the end of the comment period."  *Id.* § 1854(b)(3).  If the Service disapproves the proposed regulations, it must notify the regional council and "provide recommendations on revisions that would make the proposed regulations consistent."  *Id.* § 1854(b)(1)(B).

## B.

Plaintiffs are three California commercial fishermen who participate in the West Coast drift gill net swordfish fishery (the "Fishermen").[3]  *See* Decl. of Jeff Hepp ¶ 2, ECF No. 20-3;

---

[3] The Government and Oceana do not challenge the Fishermen's standing.  In any event, the Court is satisfied that they have standing here.  *See Penkowski v. Bowser*, --- F. Supp.3d ---, 2020 WL 4923620, at *3 (D.D.C. Aug. 21, 2020) ("[E]ven if [defendant] had not challenged Plaintiffs' standing, the Court would need to consider it sua sponte.").  The Fishermen identify the economic hardship they would suffer from closure of their fishery and the investments they made in alternative fisheries to insure against a potential shutdown of the swordfish fishery.  *See* Decl. of Jeff Hepp, ECF No. 20-3; Decl. of Fred Hepp, ECF No. 20-4; Decl. of Gary Burke, ECF No. 20-5.  Their "current economic injury from identified risk of future harm [is] sufficient to support standing."  *San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 136 (D.C. Cir. 2019); *see also Bonacci v. TSA*, 909 F.3d 1155, 1160 (D.C. Cir. 2018) (finding standing where plaintiff was "object of the action at issue" (cleaned up)).

Decl. of Fred Hepp ¶ 2, ECF No. 20-4; Decl. of Gary Burke ¶ 2, ECF No. 20-5.  A drift gill net is "a wall of nylon netting that hangs in the water column and is kept at the proper depths through weights and buoys."  Compl. ¶ 46, ECF No. 1.  The net's mesh "is large enough to allow a fish to insert its head but not its body, thus catching the fish by its gills."  *Id.*  These drift gill nets also produce "bycatch"—species inadvertently captured and then discarded.  *See* 16 U.S.C. § 1802(2) (defining "bycatch" as the "fish which are harvested in a fishery, but which are not sold or kept for personal use").

In 2015, the Pacific Council recommended a rule that would immediately close the drift gill net swordfish fishery in California and Oregon if the mortality or injury for some marine mammals and turtles meets or exceeds the "hard caps" (or limit) over a rolling two-year period ("Hard Caps Rule").[4]  *See* AR24731; AR30509–10.  The closure continues until May 1 of the fishing season following two seasons of no hard cap exceedance.  AR24731.  The purpose of the Hard Caps Rule was to "conserve non-target species and further reduce bycatch . . . in the [drift gill net] fishery below levels currently permitted by applicable law while maintaining or enhancing an economically viable U.S. West Coast-based swordfish fishery."  AR20175.

The Service first found the Hard Caps Rule consistent with the Magnuson Act and published it for public comment.  AR30463–66.  The comments, however, prompted the Service to "conduct[] further analysis of the economic effects," which revealed "significant adverse short-term economic effects that were not identified at the proposed rule stage."  AR24731.  The "[a]dditional analysis indicated that taking action as proposed would threaten the economic viability of the [drift gill net] fishery while providing minor environmental benefits."  AR20291.

---

[4]  The species include:  "fin, humpback, and sperm whales, leatherback, loggerhead, olive ridley, and green sea turtles, short-fin pilot whales, and bottlenose dolphins."  AR24731.

The Service thus found the Hard Caps Rule inconsistent with National Standard 7 of the Magnuson Act. *See* AR24733 ("[The Service] conducted additional economic analysis and found the regulations to be inconsistent with [] National Standard 7."). So it withdrew the rule. AR30467.

Oceana successfully challenged the withdrawal in the U.S. District Court for the Central District of California. *See* AR30416–23. The Central District ruled that the Service must either promulgate the Hard Caps Rule as is or consult with the Pacific Council on any revisions because the Service had approved the proposed rule. AR 30422. In other words, the court held that the Service could not withdraw the Hard Caps Rule after its preliminary approval. The court remanded to the Service for further action. AR30423.

Over a year later, Oceana moved to enforce the court's decision because the Service had still not promulgated the Hard Caps Rule. AR30303–09. The court granted the motion and ordered the Service to promulgate any final rule within thirty days. AR30309. The Service lacked time to consult with the Pacific Council to revise the Hard Caps Rule before this deadline, so the Service published the Hard Caps Rule as proposed. AR20154. In the final rule, the Service noted that promulgation was "necessary to comply with a court order," and that the Hard Caps Rule is "inconsistent with [Magnuson Act] National Standard 7." AR24733; *see also* AR20155 (January 29, 2020 Decision Memorandum concluding that the Hard Caps Rule "is not consistent with [Magnuson Act] National Standard 7," and that it "does not minimize costs and avoid unnecessary duplication").

The Fishermen then sued the Secretary and the Service under the Administrative Procedure Act ("APA") here. They claim that the Hard Caps Rule conflicts with National Standards 2, 7, and 8 of the Magnuson Act. Compl. ¶¶ 63–74. They also raise two constitutional

challenges. The Fishermen first contend that appointment of the regional councils' members violates the Appointments Clause.[5] *Id.* ¶¶ 75–87. Second, they argue that the removal process for nearly all regional council members violates the Take Care Clause.[6] *Id.* ¶¶ 88–95. The Fishermen seek declaratory relief and an injunction "setting aside the Hard Caps Rule" and "forbidding [the Government] from enforcing it." *Id.* at 23.

Oceana moved to intervene to defend the Hard Caps Rule. *See* Oceana, Inc.'s Unopposed Mot. Intervene, ECF No. 16. The Court granted this motion. *See* Order, ECF No. 17.

The parties cross-move for summary judgment. The Government concedes that the Fishermen are entitled to summary judgment on their APA claim because the Hard Caps Rule conflicts with National Standard 7. *See* Defs.' Cross-Mot. Summ. J. ("Defs.' Mot.") at 20–21, ECF No. 26.[7] The Government also agrees that vacatur of the Hard Caps Rule is appropriate. *Id.* It asks the Court not to reach the Fishermen's constitutional claims or, alternatively, to interpret the Magnuson Act to avoid any constitutional issue. *Id.* at 26–33.

Oceana seeks to preserve the Hard Caps Rule under National Standard 7. *See* Oceana, Inc.'s Cross-Mot. Summ. J. ("Oceana Mot."), ECF No. 28. It characterizes the Service's position as an impermissible "post-hoc determination." *Id.* at 24. Oceana also argues that the

---

[5] The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const. art. II, § 2.

[6] The Take Care Clause states that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

[7] All citations are to the page numbers generated by this Court's CM/ECF system.

administrative record does not support the finding that the Hard Caps Rule violates National Standard 7. *Id.* at 25–26.

The cross-motions are ripe for disposition.[8]

## II.

Regulations under the Magnuson Act—such as the Hard Caps Rule—are subject to judicial review under the APA. 16 U.S.C. § 1855(f)(1). When reviewing agency action, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

Courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

The scope of a court's review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It need only determine whether the agency "examin[ed] the relevant data and articulat[ed] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (cleaned up). It is "not enough for the agency decision to be incorrect; so long as it has some rational basis, the court is bound to uphold the decision."

---

[8]  The Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331, and the Magnuson Act, 16 U.S.C. § 1855(f)(1) (authorizing judicial review of APA challenges to Magnuson Act regulations). The Court declines the requests for an oral hearing because one is unnecessary to resolve the motions. *See* LCvR 7(f).

*New Life Evangelistic Ctr. v. Sebelius*, 753 F. Supp. 2d 103, 113 (D.D.C. 2010). But if the "agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (cleaned up).

"Judicial review of agency action under the [Magnuson Act] is especially deferential." *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007). "Fisheries regulation requires highly technical and scientific determinations that are within the agency's expertise, but are beyond the ken of most judges." *Id.* at 80.[9]

## III.

The Fishermen seek summary judgment on statutory and constitutional grounds. *See* Pls.' Mem. P. & A. in Supp. Mot. Summ. J. ("Pls.' Mem.") at 13–30, ECF No. 20-1. The Court considers the statutory question first. *See United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988) ("[O]ur established practice is to resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue.").

---

[9] The Court notes "that there is some ambiguity regarding the proper standard of review" under the Magnuson Act. *See Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 64 n.16 (D.D.C. 2014). Some courts have applied the two-step process in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), not the arbitrary and capricious standard. *Id.* (citing cases). The parties here do not invoke *Chevron* so the Court "sees no reason to move beyond the prevailing *State Farm* standard." *Id.* In any event, *Chevron* would lead to the same result because the "inquiry under *Chevron* step two overlaps with [the] inquiry under the arbitrary and capricious standard." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 355 (D.C. Cir. 2007); *see also Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000) (recognizing that "we have not been sticky as to whether an argument in the area of overlap is characterized as a *Chevron* step two claim or as an arbitrary and capricious challenge"). "Whether a statute is unreasonably interpreted is close analytically to the issue whether an agency's actions under a statute are unreasonable." *Gen. Instrument Corp.*, 213 F.3d at 732.

**A.**

The Fishermen move for summary judgment under the APA because the Hard Caps Rule

conflicts with National Standards 2, 7, and 8 of the Magnuson Act.  Pls.' Mem. at 13–19.  The

Court need only address their challenge under National Standard 7.

Recall that National Standard 7 provides that "[c]onservation and management measures

shall, where practicable, minimize costs and avoid unnecessary duplication."  16 U.S.C. §

1851(a)(7).  It ensures that measures do "not impose unnecessary burdens on the economy, on

individuals, on private or public organizations, or on Federal, state, or local governments."  50

C.F.R. § 600.340(b).  Any analysis for fishery management plans "should demonstrate that the

benefits of fishery regulation are real and substantial relative to the added research,

administrative, and enforcement costs, as well as costs to the industry of compliance."  *Id.* §

600.340(c).

This is an unusual case.  The Government concedes that its Hard Caps Rule conflicts with

National Standard 7.  *See* Defs.' Mot. at 20–21.  The Service reached this conclusion well before

promulgating the Rule.  *See, e.g.*, AR20315–16 (June 9, 2017 Service letter to Pacific Council

stating that implementing the Hard Caps Rule "is not warranted at this time").  The Service

reversed its preliminary approval of the Hard Caps Rule after recognizing that it had not

considered the short-term economic effects.  *See* AR20274 ("Further, the short-term

effects . . . [were] not considered in the [initial] analysis.").  The new economic analysis revealed

that "the majority of the [drift gill net] fleet relies on the fishery for over 50 percent of their

annual revenue" and such participants "would experience significant adverse short-term

economic effects in the case of a [drift gill net] fishery closure."  AR20289.  Even if fishery

members were able to switch to other fisheries or types of fishing, they would still likely face substantial costs. AR21040.

More, the Service expected any benefits from the Hard Caps Rule "to be minor." AR21041. It recognized that the Hard Caps Rule "offers little additional benefit to protected species beyond what has been achieved through implementing regulations based on recommendations developed through" the Endangered Species Act ("ESA") and the Marine Mammal Protection Act ("MMPA"). AR20316; *see also* AR20313 (noting that drift gill net "interactions with protected species are also currently managed under a MMPA Take Reduction Team and ESA Section 7 processes"). Weighing these minor beneficial effects against the significant negative short-term economic effects, the Service concluded that the Hard Caps Rule "does not minimize costs and avoid unnecessary duplication, inconsistent with [] National Standard 7." AR20155; *see also* AR20291 ("Additional analysis indicated that taking action as proposed would threaten the economic viability of the [drift gill net] fishery while providing minor environmental benefits.").

Indeed, the Service tried to withdraw the Hard Caps Rule. *See* AR20154 ("Citing inconsistency with the purpose and need for the action and [] National Standard 7 . . . [the Service] withdrew the proposed rule[.]"); AR30467. It promulgated the Hard Caps Rule only to comply with the California district court's order, as explained in the final rule:

> Because the [Pacific] Council's next meeting is not until March 20, [the Service] does not have an opportunity to consult with the [Pacific] Council on revisions to the [Hard Caps Rule] before the Court's deadline. Therefore, [the Service] is publishing the hard caps regulations as they were originally proposed, without changes to the regulatory text, in accord with the order.

AR24731.

10

The Service's determination that the Hard Caps Rule conflicts with National Standard 7—reflected in the final rule and the Government's concession that the Fishermen are entitled to summary judgment—should end the Court's inquiry here. "There is little reason for [the Court] to enter a binding ruling on an administrative decision when the responsible agency has already determined that the decision under review is fundamentally flawed." *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1008 (D.C. Cir. 1997). But Oceana asks the Court to preserve the Hard Caps Rule. It raises procedural and substantive challenges to the Service's determination that the Hard Caps Rule violates National Standard 7. Oceana's blind casting is unavailing.

The Court need only determine whether the Service's conclusion is "rational and supported by the record." *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1562 (D.C. Cir. 1991). It "will not second guess an agency decision or question whether the decision made was the best one." *Id.* at 1565. Guided by these principles, the Court turns to Oceana's challenges.

Procedurally, Oceana characterizes the Service's U-turn as an impermissible "post-hoc determination." *See* Oceana Mot. at 24–25. Oceana claims that the "operative agency action" is the Service's initial determination that the Hard Caps Rule complies with the Magnuson Act, including National Standard 7. *Id.* at 24. Oceana cites the Central District's decision to argue that the Service cannot change this position without following the Magnuson Act's procedure for amending a rule. *Id.* at 25; *see also* Oceana Inc.'s Reply in Supp. Cross-Mot. Summ. J. ("Oceana Reply") at 12–13, ECF No. 33. The Court disagrees.

Even if the Court were bound to follow the Central District's decision—which it is not—the issue here is different. The Central District addressed how the Service can revise *proposed* regulations before it promulgates them. *See* AR30422 ("The Court finds that, under the [Magnuson Act], Congress requires [the Service] to adhere to the precise process set out in

§ 1854(b) when reviewing *proposed* regulations." (emphasis added)).  The court did not reach

whether the *substance* of the promulgated Hard Caps Rule complied with the Magnuson Act.

*See* AR30422 n.2 (declining to reach Service's argument that it could withdraw the Hard Caps

Rule).

      This Court confronts *that* question here.  The Service satisfied the Central District's order

to promulgate the Hard Caps Rule within thirty days.  The question now is whether the Hard

Caps Rule meets National Standard 7.  Under this inquiry, the Service's updated position

reflected in the final rule—not the Service's initial determination—is the operative agency

action.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) ("The

federal courts ordinarily are empowered to review only an agency's *final* action[.]"); *Dep't of*

*Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a foundational

principle of administrative law that judicial review of agency action is limited to the grounds that

the agency invoked when it took the action." (cleaned up)).

      The Service's change in position was not unexplained or inconsistent, contrary to

Oceana's arguments.  Oceana Reply at 12.  It was the result of the Magnuson Act's notice-and-

comment requirement.  *See* 16 U.S.C. § 1854(b).  As required, the Service solicited public

comment to the Hard Caps Rule, which prompted "further analysis of short-term economic

impacts to entities expected to be affected by the proposed rule."  AR20313.  This analysis

revealed that "a majority of [drift gill net] participants rely on the fishery for over half of their

annual landings and revenue," which the Service had not considered.  AR20316.  The Service

then changed its position, AR21042, which appears in the final Hard Caps Rule, AR24733

("Following public comment on the proposed rule, [the Service] conducted additional economic

analysis and found the regulations to be inconsistent with [Magnuson Act] National Standard 7[.]").

The Service thus did exactly what the Magnuson Act contemplates.  If the notice-and-comment process is to be more than an exercise in futility, federal agencies should be willing to reconsider their positions after receiving comments from the public.  *Cf. Nat'l Ass'n of Home Builders*, 551 U.S. at 659 ("[T]he fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.").

Oceana also raises substantive challenges to the Service's determination.  It argues that economic effects cannot outweigh conservation benefits under the Magnuson Act.  *See* Oceana Mot. at 22–23.  And that "this Court has upheld much more stringent fishery-closure regulations under National Standard 7 challenges."  *Id.* at 22 (citing *Nat'l Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119 (D.D.C. 2002)).

To be sure, "the Service must give priority to conservation measures."  *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000).  It does not follow, however, that *all* conservation measures must be pursued and that any such measure must override *all* economic consequences.  *See id.* (allowing for consideration of "adverse economic consequences" where "two different plans achieve similar conservation measures").  That interpretation would require the Service "to implement virtually any measure . . . so long as it is feasible."  *Conservation Law Found. v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004).  But "by using the term 'practicable,' Congress intended rather to allow for the application of agency expertise and discrimination in determining how best to manage fishery resources."  *Id.*; *see also Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 91–92 (D.D.C. 2019) ("Congress's inclusion of the term 'practicable' is thus

critical; it is the means by which it delegated to the agency the discretion to weigh the relevant factors embodied in the [Magnuson Act's] competing objectives." (cleaned up)).[10]

More, efforts to eliminate any bycatch may be counterproductive to the conservation goals they seek. Here, for example, there were concerns that the Hard Caps Rule would "diminish the effectiveness" of take reduction plans—which are "established under the MMPA to reduce the serious injury and mortality of marine mammal stocks," AR20953; AR20153—and "potentially undermine the integrity of the MMPA process," AR2536–37. And that implementation of the Hard Caps Rule was "likely to produce over-reactive management, resulting in volatile decision making, and instability in the fishery, which can incentivize 'bad behavior.'" AR21484. It is the Service's task to make these "difficult policy judgments and choos[e] appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors." *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990).

---

[10] *National Coalition for Marine Conservation* does not counsel otherwise. There, the Service *defended* the challenged provisions under National Standard 7, finding that the "positive biological impacts" outweighed the "significant negative economic impacts." *Nat'l Coal. for Marine Conservation*, 231 F. Supp. 2d at 132 (cleaned up). The opposite is true here. The Service determined that the Hard Caps Rule "would have minor beneficial effects to target and non-target species and protected species at the cost of significant adverse economic effects to the fishery participants if and when closures would occur." AR21042. And the court in *National Coalition for Marine Conservation* reasoned that the plaintiff specified no "record evidence showing that [the Service] ignored a less costly, practicable approach or that [the Service's] regulations cause unnecessary duplication." 231 F. Supp. 2d at 133 (cleaned up). Here, the evidence suggests that the Service believed that a no hard caps rule would be the least costly, practicable approach. *See* AR20940 ("Because implementing any of the action alternatives is expected to result in significant costs to a substantial number of small entities . . . , [the Service] decided not to take further action (*i.e.*, has selected the No Action Alternative)."). And the Service noted that the Hard Caps Rule "offers little additional benefit to protected species beyond what has been achieved by implementing regulations" under the ESA and MMPA. AR20316.

Oceana also maintains that the record evidence does not support the Service's revised position. Oceana Mot. at 25. It first claims that the Service had considered the short-term economic effects when it originally determined that the Hard Caps Rule complied with National Standard 7. *Id.* at 25–26. True, there were discussions of "economic losses" and "slim profit margins" surrounding the Hard Caps Rule before the Service changed course. *See, e.g.*, AR20005 ("The proposed action is expected to cause economic losses for the small businesses participating in the DGN fishery due to potential closure periods."). But these general references did not put the Service on notice of the "significant short-term economic effects" revealed after further analysis. AR24732. Oceana offers no compelling record evidence to rebut the Service's finding that its initial determination relied on a flawed analysis, which "did not account for the fixed costs of [drift gill net] participation." AR20244.[11] Or that the new economic analysis revealed that "the majority of the [drift gill net] fleet relies on the fishery for over 50 percent of their annual revenue" and their "ability to offset losses of a [drift gill net] fishery closure is minimal." AR20289.

Next, Oceana contends that the Service's analysis ignored offsetting costs "presented" to the Service, such as California state legislation and deep-set buoy fishing gear. Oceana Mot. at 26; *see also* Oceana Reply at 16–17. Not so.

---

[11] Oceana alternatively suggests that the new evidence of short-term economic effects should not disturb the Service's initial approval of the Hard Caps Rule because these effects apply equally to the other alternatives the Service considered and rejected before approving the Hard Caps Rule. Oceana Mot. at 26. So the new "evidence would not disturb the conclusion that the promulgated rule represented 'the least costly alternative' that was feasible." *Id.* But this argument rests on the mistaken premise that the Service *had* to promulgate *some* hard caps rule. The Service could have pursued *no* hard caps. *See* 50 C.F.R. § 600.340(c) ("Rather, an evaluation of effects and costs, especially of differences among workable alternatives, *including the status quo*, is adequate." (emphasis added)).

The Service anticipated "at least some increased participation in other fisheries if a [drift gill net] closure went into effect." AR20288. But it also recognized that "[t]o offset lost opportunity during a closure period, [drift gill net] fishermen would need to possess or obtain permits for another fishery to participate in that fishery." *Id.* And that "[f]ishermen may incur significant costs when purchasing an additional permit, especially if that permit allows participation in a limited entry fishery." *Id.*

Oceana suggests that the Service should have, but failed to, consider potential reimbursement to the fishermen through a "transition program" that California established through legislation. Oceana Mot. at 26. Oceana explains that this program offers fishermen financial incentives to surrender their drift gill net permits. Oceana Reply at 8 n.2; *see also id.* at 16. But Oceana identifies no substantive discussion of this program in the administrative record. It instead cites only a passing reference to "recently enacted legislation," which does not undermine the Service's analysis. AR20507. Nor can the Court rely on discussion of the California program in Oceana's briefing as evidence to rebut the Service's determination. *See Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981) ("It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made.").

Deep-set buoy gear is a type of exempted fishing permit that can be issued "to allow fishing activities that would otherwise be prohibited under a fishery management plan." Nat'l Oceanic & Atmospheric Admin., *Highly Migratory Species—Exempted Fishing Permits*, https://www.fisheries.noaa.gov/west-coast/sustainable-fisheries/highly-migratory-species-exempted-fishing-permits. The administrative record discusses this option. *See* AR25189 (referring to 2015-16 data from California Department of Fish and Wildlife on four deep-set

buoy gear exempted fishing permit vessels). But it also suggests that deep-set buoy and other alternative gear were "still in the research phase." AR22439. It remained unclear to the Service "what fleetwide bycatch levels would be under non-research conditions, or what an optimal fleet size would be" for this gear. *Id.*; *see also* AR20136 ("The significance of any adverse effects under the [exempted fishing permit] is unknown at this time, and would be dependent on any conditions placed on the [exempted fishing permit].").

On the whole, then, it is sufficient that the Service considered that the fishermen could obtain alternative permits and the costs that they would incur in doing so. *See* AR21040 ("Fishermen may incur significant costs when purchasing a permit for a new fishery, especially if that permit allows participation in a limited entry fishery. Further, the cost of purchasing fishing gear for a new fishery may also be significant."). Preliminary (and developing) data on deep-set buoy gear and other alternative gear does not override the "especially deferential" standard afforded to the Service's analysis. *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 79.

In sum, Oceana provides no procedural or substantive basis to overturn the Service's determination that the Hard Caps Rule conflicts with National Standard 7, as reflected in the final rule. The Court will grant Plaintiffs' summary judgment motion on their statutory APA claim and deny Oceana's summary judgment motion.[12]

---

[12] The Government only seeks summary judgment on the Fishermen's statutory claims under National Standards 2 and 8 and the constitutional claims. *See* Defs.' Mot. at 1. But the Court need not reach the remaining statutory claims because the Hard Caps Rule conflicts with National Standard 7. *See* 16 U.S.C. § 1851(a) (requiring fishery management plans and "any regulation promulgated to implement any such plan" to comply with National Standards). As explained below, the Court also will not resolve the constitutional claims now. So the Government's summary judgment motion will be denied as moot.

## B.

The Court next must decide the remedy. The Fishermen ask the Court to vacate the Hard Caps Rule. *See* Compl. at 23; Pls.' Mem. at 8, 31. The Government agrees. *See* Defs.' Mot. at 11, 20–21; *see also* Pls.' Reply in Supp. Mot. Summ. J. & Opp'n Cross-Mots. Summ. J. ("Pls.' Reply") at 7 n.1, ECF No. 30. They are correct.

A court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). So "the practice of the court is ordinarily to vacate" an unlawful rule. *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997). "[A]lthough vacatur is the normal remedy, [courts] sometimes decline to vacate an agency's action." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). If a rule is "potentially lawful but insufficiently or inappropriately explained," a court may remand to the agency "for further explanation (including discussion of relevant factors and precedents) while withholding judgment on the lawfulness of the agency's proposed action." *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999). "The decision whether to vacate depends on" two factors: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)"; and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (cleaned up).

Vacatur is appropriate here because the Service acknowledged that the Hard Caps Rule conflicts with National Standard 7 and is "already committed to agency revision." *Am. Iron & Steel Inst.*, 115 F.3d at 1008; *see also Sierra Club v. EPA*, 705 F.3d 458, 463–64 (D.C. Cir. 2013) (vacating and remanding rule where EPA conceded the challenged provisions were flawed and requested vacatur). And the Government did not defend the merits of the Hard Caps Rule

under National Standard 7 at summary judgment. *See Time Warner Ent. Co., L.P. v. FCC*, 144 F.3d 75, 82 (D.C. Cir. 1998) ("Because the [agency] chose not to argue the merits in the alternative, we have no choice but to vacate the challenged portions of the order[.]"); *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 388 (D.C. Cir. 2020) (same).

Both *Allied-Signal* factors support vacatur. "The seriousness of a deficiency . . . is determined at least in part by whether there is a significant possibility that the agency may find an adequate explanation for its actions on remand." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (cleaned up). Oceana argues that "it is reasonably likely that the Service would reach a positive determination on remand based on a more thorough evaluation of the economic impacts of the Hard Caps Rule." Oceana Reply at 21 (cleaned up). But such speculation swims against the current of the Government's own vacatur request, suggesting the Service will not reach a different conclusion on remand. Defs.' Mot. at 20–21. Indeed, the Service has contemplated "separate rulemaking" to fix the Hard Caps Rule. AR24731; *see also* AR20509 (February 15, 2019 Service letter to Pacific Council recommending revising the Hard Caps Rule). Oceana's disagreement with this position does not warrant deviating from the "normal remedy" of vacatur.

Vacatur also will not cause unnecessarily disruptive consequences. "Under our precedents, a quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). That concern is not present here. A return to the status quo causes little or no disruption. The Service determined that the Hard Caps Rule is "expected to have minor beneficial effects to target, non-target, and protected species," AR20153, and that it "offers little additional benefit to protected species beyond what has been achieved by

implementing regulations based on recommendations developed through" the ESA and MMPA. AR21042; *see also id.* ("[The Service] has successfully managed the [drift gill net] fishery's interactions with protected species through the ESA Section 7 and MMPA TRT processes to non-jeopardy levels for ESA-listed species and below PBR for all marine mammal stocks."). Existing regulations thus will preserve most (if not all) conservation benefits intended from the Hard Caps Rule. *Accord Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 271 (D.D.C. 2014) (finding vacatur appropriate even where "[t]here is no denying that vacatur here would cause some disruption").

Oceana disagrees. It suggests that vacatur allows the Service to circumvent the Central District's decision. Oceana Reply at 21. But remember that decision addresses the procedures the Service must follow between a rule's proposal and promulgation under the Magnuson Act. It does not forever bind what the Service can do with the Hard Caps Rule *after* promulgating it.

The Court will therefore vacate the Hard Caps Rule.

\*     \*     \*

Given the Fishermen's success on their statutory APA claim, the Court need not address their constitutional challenges to the Hard Caps Rule. *Accord Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 83 (D.D.C. 2020) ("Because the court agrees with Plaintiffs that the FDA's rulemaking was not the product of reasoned decisionmaking and therefore violates the APA, the court does not reach Plaintiffs' First Amendment and Appointments Clause arguments."). "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 443 (1988).

Because the Court will vacate the Hard Caps Rule, the Fishermen will have obtained complete relief through their APA claim.  *See* Compl. at 23.  The Court need not wade into deep constitutional waters unnecessarily.  *See Lyng*, 485 U.S. at 446 ("If no additional relief would have been warranted, a constitutional decision would have been unnecessary and therefore inappropriate.").[13]

The Fishermen urge the Court to consider their constitutional claims now because they "invoke[] principles of the separation of powers worthy of this Court's review."  Pl.'s Reply at 17.  But this is a teaser lure.  Most (if not all) constitutional claims purport to raise some "worthy" issue.  The "strong duty to avoid constitutional issues that need not be resolved" rests on judicial restraint, not the significance of the question.  *Cnty. Court v. Allen*, 442 U.S. 140, 154 (1979).  Such restraint is appropriate when, as here, a plaintiff receives full relief elsewhere through other avenues.

To be sure, the Fishermen raise serious (and potentially legitimate) concerns about the Magnuson Act's regional councils and the appointment and removal of their members.  *See* Compl. ¶¶ 75–95; Pls.' Mem. at 19–30.  But any decision on these constitutional questions now "would be premature."  *Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 284 (1969); *see also Sierra Club*, 705 F.3d at 464 (declining to determine EPA's authority to issue rule where question was "not prudentially ripe for determination").  These issues must await another time.

---

[13] The Government alternatively asks the Court to interpret the Magnuson Act to avoid any constitutional issue.  *See* Defs.' Mot. at 29–33.  Oceana also invites the Court to either apply the "de facto officer" doctrine or sever any unconstitutional portion of the Magnuson Act to preserve the Hard Caps Rule.  Oceana Mot. at 22–26.  Because the Court declines to reach the Fishermen's constitutional claims, these alternative arguments are moot.

**IV.**

For these reasons, Plaintiffs' motion for summary judgment will be granted, and Defendants' and Defendant-Intervenor's motions for summary judgment will be denied. A separate Order will issue.

2021.02.18
11:28:16 -05'00'

Dated: February 18, 2021                    TREVOR N. McFADDEN, U.S.D.J.